FILED

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

4:43 pm, 3/27/23

**Margaret Botkins**

**Clerk of Court**

JANE DOE I, JANE DOE II, JANE DOE )
III, JANE DOE IV, JANE DOE V, JANE )
DOE VI, AND JANE DOE VII, on behalf )
of themselves and derivatively on behalf of )
KAPPA KAPPA GAMMA FRATERNITY, )
                                     )
     Plaintiffs, )
                                     )
     v. )
                                     )
KAPPA KAPPA GAMMA FRATERNITY, )
an Ohio non-profit corporation, as a )
Nominal Defendant and as a Direct )
Defendant; MARY PAT ROONEY, )
President of the Fraternity Council of )
KAPPA KAPPA GAMMA FRATERNITY, )
in her official capacity, KAPPA KAPPA )
GAMMA BUILDING CO., a Wyoming )
non-profit corporation, and TERRY )
SMITH )
                                   )
     Defendants. )

**DEMAND FOR JURY TRIAL**

**VERIFIED MEMBER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES**

CASE NO. 23-CV-51-J

## VERIFIED COMPLAINT

## INTRODUCTION

1.   The anonymous Plaintiffs are young women and members of Kappa Kappa Gamma

Fraternity, a national women-only social organization with a chapter at the University of Wyoming

(also called "the Sorority" ).[1] Four months ago—after national Sorority officials disregarded the

---

[1] Founded in 1870, Kappa Kappa Gamma Fraternity pre-dates, by 30 years, use of the word "sorority" to refer to "[a] women's society in a college or university." *Sorority*, Oxford English Dictionary Online (Mar. 2023). Kappa Kappa Gamma's corporate documents refer to the entity as a fraternity. Modern usage distinguishes between "fraternities" for men and "sororities" for women, so this Complaint refers to Kappa Kappa Gamma as "the Sorority" and similar organizations as "sororities." This is consistent with Kappa Kappa Gamma's own publications. *See* "Why Kappa: Membership Expectations" *available at* kappakappagamma.org/why-kappa/membership-expectations (visited Feb. 2, 2023) ("Joining a sorority can provide you with support, connection, friendship, and growth that starts now and lasts a lifetime.")

secret voting process required by Sorority rules and after extensive behind-the-scenes direction from national Sorority officials and alumnae advisers—the Sorority inducted a man, Terry Smith, as a member.[2]

2.      Kappa Kappa Gamma limits membership to women only. Under the Sorority's Bylaws, every new member must be "a woman." Attachment 1 at 2 (art. III, sec. 1.A). A woman is an adult human female. An adult human *male* is not a woman, no matter how he chooses to describe himself. From conception, every single cell in a man's body differs from the analogous cell in a woman: brain cells, muscle cells, bone cells. These cells mature and develop in different ways— before, during, and after puberty—for reasons that are still not fully understood. As but one example, medical researchers know testosterone affects the male brain through the mid-20s, but they still do not understand how the hormone affects cognition.

3.      Kappa Kappa Gamma was founded in 1870 as a single-sex organization for women, and it has consistently described itself as such. Defendants have not altered this membership requirement in *any* of the Sorority's corporate governance documents—its Articles of Incorporation, Bylaws, Standing Rules or Policies—in a manner that would permit a man to join Kappa Kappa Gamma. Instead, Defendant Mary Pat Rooney and other members of the Corporation's Fraternity Council (the Sorority's name for its Board of Directors) have unilaterally concluded a man can become a Kappa member if he claims to have the subjective belief he is a woman. This conclusion disregards biology, Kappa's 150-year history, and Kappa's purpose, mission, and bylaws.

---

[2] Plaintiffs refer to this Defendant by a pseudonym, Terry Smith, for the same reasons Plaintiffs have sought leave from this Court to proceed anonymously. Plaintiffs do not seek damages or other relief from Mr. Smith. Plaintiffs allege that Mr. Smith's sorority membership is void, however, and this likely makes him a required party. Fed. R. Civ. P. 19(a)(1)(B). Mr. Smith is a Defendant for this reason only.

4.      Kappa Kappa Gamma is an Ohio non-profit corporation, so Defendant Mary Pat Rooney and the other members of the Sorority's Fraternity Council (its Board of Directors) have fiduciary duties to the Sorority under Ohio law. At all times relevant to this matter, Defendant Rooney has owed Kappa Kappa Gamma and its members the fiduciary obligations of good faith, loyalty, candor, care, and compliance. She has a fiduciary duty to operate Kappa Kappa Gamma in an honest, fair, and just manner that is faithful to the nonprofit corporation's purpose and mission.

5.      Defendant Rooney and the members of Kappa Kappa Gamma's Fraternity Council have violated their fiduciary duties. At their direction, the Sorority issued a "Guide for Supporting our LGBTQIA+ Members" in 2018. Attachment 2 (the "Guide"). The Guide was sent to the Sorority's District Directors and Alumnae Advisers—women who supervise the Sorority's college chapters—and posted on the Sorority's website as "a resource that educates and supports our membership on the subject of the LGBTQIA+ community and its intersection with Kappa." The Guide states, without citation to any of the Sorority's Bylaws or other governing documents, that Kappa Kappa Gamma is a "single gender organization" that admits both "women" and "individuals who identify as women" (*i.e.*, men). *Id.* at 1.

6.      The commonly understood meaning of the phrase "single-gender organization" is the same as "single-sex organization": men or women, but not both. *See* Gender, Oxford English Dictionary Online (Mar. 2023) ("Males or females viewed as a group; = sex"). Under the Guide, however, "gender" is no longer a synonym for "sex." Instead, as the Sorority's attorney explained to Plaintiffs, the Fraternity Council views gender as a "broader construct encompassing identity." Attachment 3 at 1. This concept of gender connects to "[h]ow an individual defines themselves in terms of characteristics traditionally identified in this culture as male or female," which is a

person's "gender identity." Attachment 2 at 1, 9. As a result, the Sorority's attorney claims that men can also become Kappa members if they "identify as women." *Id.* at 1.

7.      Kappa cannot be a "single-gender organization" wherein members have a "single" gender identity unless the Sorority uses gender identity to make membership decisions.[3] But the Guide itself states that the Sorority does not discriminate based on gender identity. *Id.* at 1 ("Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on … gender identity…."). *Id.* What the Guide actually purports to do is change the Sorority's membership criteria. Under the Guide, all women—including, for example, nonbinary women who do not have a female gender identity—can become members. And, under the Guide, some men can also join.

8.      The Guide is an unlawful abandonment of the Sorority's requirement of single-sex membership. Kappa Kappa Gamma's founding principles and governance documents limit membership to women. An adult human male does not become a woman just because he tells others that he has a female 'gender identity' and behaves in what he believes to be a stereotypically female manner. In the same way, an adult human female does not cease to be a woman just because she refuses to dress or behave in a feminine manner. Defendant Rooney and the Fraternity Council members cannot, consistent with their fiduciary duties, twist the Sorority's longstanding membership requirement to conflate being female (being a woman) with femininity (acting like one believes a woman 'should').

---

[3] The Guide describes the concept of "gender" as "more accurately viewed as a spectrum rather than a polarized, dichotomous concept." Attachment 2 at 11. If each person's gender lies somewhere along a spectrum, then one can never sort individuals into a "single gender." It is impossible for Kappa Kappa Gamma to be a "single-gender organization" under the Guide's own definition of gender.

9.      The Guide purports to create an opportunity for men to join Kappa Kappa Gamma in violation of the Sorority's longstanding restriction. By creating the Guide, and intentionally admitting a man as a Sorority member, Defendant Rooney and the other Fraternity Council members have violated their duty of loyalty, their duty of care, and their duty of obedience/compliance to the Sorority and its purpose and mission.

10.     Since 1870—when a woman's presence in a college classroom, by itself, defied societal norms—Kappa Kappa Gamma has united women in defiance of stereotypes about how women "should" be. The Sorority provides a separate place where young women can speak for themselves; a place where young women do not have to constantly fight the social pressure of how men think women should behave. Now, Mr. Smith—a man who claims to be a woman because he thinks he knows how women should behave—has been brought into Plaintiffs' sorority house. The Fraternity Council has betrayed the central purpose and mission of Kappa Kappa Gamma, by conflating the experience of *being a woman* with the experience of men *engaging in behavior generally associated with women*.

11.     Plaintiffs' Complaint is a derivative suit to obtain a judgment that Kappa Kappa Gamma remains as required by its Articles of Incorporation: a non-profit corporation "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4 (emphasis added). Plaintiffs ask this Court to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules by fiat, and ask this Court to enjoin the unlawful implementation of the Guide. Plaintiffs ask this Court to hold that the admission of Terry Smith, and any other man, as a member of Kappa Kappa

Gamma is void *ab initio*. Plaintiffs further ask this Court to declare that Defendant Rooney and the other members of the Fraternity Council have violated their fiduciary duties to the Sorority. Plaintiffs further ask for damages, reflecting the injuries the Sorority has and will continue to suffer in its membership, including the closure of the Sorority's chapter at the University of Wyoming, loss of donations, decrease in *alumnae* support and participation, and permanent damage to the Sorority's reputation and mission.

12.     Plaintiffs also seek direct relief from the Defendants. Ohio law recognizes that faithless directors of a corporation can directly injure others through a breach of fiduciary duty in addition to the derivative injuries suffered by the corporation itself. In pursuit of an ideological agenda, Defendants have violated numerous other Bylaws, Standing Rules, and Policies of the Sorority, and caused the Sorority to act in a manner that has specifically harmed Plaintiffs and undermined contractual obligations to the Plaintiffs. The Fraternity's officers, directors, and employees directly, and through alumnae advisers acting at Fraternity Council direction, pressured student members to endorse Mr. Smith's initiation to the Sorority. When Mr. Smith's membership vote violated the Sorority's secret-ballot procedures, Defendants and their agents knowingly disregarded the clear violations of the corporate rules. When Plaintiffs raised concerns about Mr. Smith's inappropriate and threatening behavior in the sorority house, Defendants and their agents refused to protect Plaintiffs and prevented others from doing so. Instead of protecting Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma altogether. Defendants have pushed Plaintiffs to resign even though—having already joined Kappa Kappa Gamma—Plaintiffs are permanently barred from joining a different sorority. Finally, Defendants have retaliated against Plaintiffs and other sorority members who object to the Board's

unauthorized Guide. Plaintiffs ask for all remedies available in response to Defendants'
wrongdoing, including monetary damages, punitive damages, injunctive relief, declaratory relief,
and attorney fees.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court, pursuant to 28 United States Code Section 1332, as the
parties are citizens of different States, all necessary Parties are present before this Court, and the
sum of the matter in controversy, including damages and the value of the declaratory and injunctive
relief sought by Plaintiffs, exceeds seventy-five thousand dollars ($75,000.00). Plaintiffs were
members of Defendant Kappa Kappa Gamma Fraternity at the time of the transactions complained
of. This action is not a collusive one to confer jurisdiction the Court would otherwise lack.

14.     Venue is proper in this District, pursuant to 28 United States Code Section 1391, as two
Defendants in this matter are citizens of the State of Wyoming and reside in the District of
Wyoming, and the substantial part of the events giving rise to these claims occurred in Wyoming.

## PARTIES

15.     Jane Doe I is a citizen of Nebraska. She is a student at the University of Wyoming and a
current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the
events giving rise to this case.

16.     Jane Doe II is a citizen of a State that is not Illinois, Ohio, Utah, Washington, or Wyoming.
She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma
Fraternity. She was a Kappa member at the time of the events giving rise to this case.

17.     Jane Doe III is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

18.     Jane Doe IV is a citizen of Oklahoma. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

19.     Jane Doe V is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

20.     Jane Doe VI is a citizen of a state that is not Illinois, Ohio, Utah, Washington, or Wyoming. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

21.     Jane Doe VII is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

22.     Defendant, and nominal Defendant, Kappa Kappa Gamma Fraternity is a nonprofit corporation organized under the laws of Ohio with its headquarters located in Dublin, Ohio.

23.     Defendant Mary Pat Rooney is a citizen of Illinois and the President of the Fraternity Council of Kappa Kappa Gamma Fraternity.

24.     Defendant Kappa Kappa Gamma Building Co., is a Wyoming nonprofit corporation with its principal office at 1604 E. Sorority Row, Laramie, Wyoming (also called the "Kappa Housing Corp."). Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege

that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation. Fed. R. Civ. P. 19(a)(1)(B).

**25.**   Upon information and belief, Defendant Terry Smith is a citizen of Wyoming. Mr. Smith currently resides in a dormitory in Laramie, Wyoming. In the alternative, Mr. Smith is a Utah citizen as Mr. Smith's father and mother reside in Utah. As a third alternative, Mr. Smith is a citizen of Washington State, as he presents a Washington State driver license with a Washington State address when asked for official identification.

# STATEMENT OF FACTS

I.    Kappa Kappa Gamma was established more than 150 years ago to unite women through membership. ...................................................................12

   A.   Kappa Kappa Gamma has always been an organization limited to women...12

   B.  Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment. ...................................................15

II.   The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women. ...............................................20

   A.  The Sorority's Corporate Charter specifically references women. ..................20

   B.  The Sorority's Bylaws, Standing Rules and Policies also limit membership to women.  ...................................................................................22

      1.    Kappa Kappa Gamma's Bylaws prohibit Mr. Smith's membership. .......23

      2.    Mr. Smith's selection process violated Kappa Kappa Gamma's Standing Rules.  . ...............................................................................28

      3.    The Policies of Kappa Kappa Gamma prohibit Mr. Smith's membership in the Sorority. ..............................................................30

III. National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Mr. Smith's wrongful membership. ..................................................................................32

IV. Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies. ..........................................................................35

V.   Defendants' evasion of Kappa Kappa Gamma's membership restrictions represents an ongoing violation of fiduciary duties to the Corporation, and any additional demands to the Sorority's Directors would be futile. ..........................39

A.   The Defendants have refused Plaintiffs' demands to prevent violation of the Sorority's restrictions on membership. ................................................39

B.   Any further demand to the Fraternity Council, seeking enforcement of Kappa Kappa Gamma's membership restrictions, would be futile. ............................41

VI.  Kappa Kappa Gamma's effort to force the membership of Mr. Terry Smith, and the experience of Plaintiffs since his admission, demonstrate the disruptive effect of a man on the sorority experience.............................................46

A.   Mr. Smith's behavior has destroyed the single-sex haven that Kappa members describe as the heart of the sorority experience....................................48

B.   Mr. Smith's interactions with the Sorority members prior to voting on his Membership...........................................................................50

C.   The Voting Process. ...............................................................53

D.   The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies......56

E.   Mr. Smith's conduct after Defendants granted him access to the sorority house...................................................................................58

F.   Damages. ............................................................................62

I. **Kappa Kappa Gamma was established more than 150 years ago to unite women through membership.**

A. **Kappa Kappa Gamma has always been an organization limited to women.**

26.    In 1870, six women at Monmouth College in western Illinois founded the Kappa Kappa Gamma Fraternity. The Sorority's founders believed that Greek-letter societies helped male students, and college women should have the same opportunities. Women were a distinct minority in colleges in the late 19th century. At the time of Kappa Kappa Gamma's founding, only 11,000 women between the ages of 18 and 21 were enrolled in college in the entire United States. Men outnumbered women by nearly five to one on college campuses. Many institutions did not permit women to enroll at all. As one of Kappa's Presidents, Kay Smith Larson, described that era, "Women were often ignored in the classroom and ridiculed outside of it."

27.    Louise Bennett Boyd, one of the six founding members of Kappa Kappa Gamma, explained that the young women "concluded we would have something new; the world seemed to be moving too slowly for us and moreover the young men had Greek letter fraternities. We determined that nothing short of a Greek letter fraternity (we did not even speak of it as a sorority in those days) would satisfy us." Today, Kappa is one of the nation's oldest and largest sororities, with approximately 210,000 living alumnae, 140 collegiate chapters, and 230 alumnae associations.

28.    The first Bylaws of Kappa Kappa Gamma Fraternity make clear that only women can be members. The 1871 Bylaws state "Any lady may become a candidate for membership who shall be of good moral character, and of above average talent; and who, at the time of proposal, either is or has been in attendance at some college or seminary." These early sorority members were concerned with academics, scholarship and understanding what their responsibilities should be as

"new women" enjoying the privileges of fraternal life. Kappa Kappa Gamma Fraternity, *History: Kappa Kappa Gamma Through the Years* 126 (2000).

**29.**     In 1871, the Sorority's initiation ceremony was simple. New members were read the organization's constitution and took an oath of loyalty. *Id.* at 27. "The [Kappa] *Constitution* at that time was secret and contained the first purpose of the Fraternity which, with little change, remains the same today." *Id.* The first Kappa members affirmed "union in the bonds of friendship…for the development of the nobler qualities of the mind and finer feelings of the heart, helping one another attain excellence and for the advancement of its members socially and in literary attainments." *Id.* When the Sorority filed its Articles of Incorporation with Ohio Secretary of State in 1930, the first purpose was only slightly changed:

> To perpetuate Kappa Kappa Gamma Fraternity for the development of the nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence among its members.

Attachment 4 at 6. The Sorority's first purpose now explicitly links the original pledge of 150 years ago to the Sorority's single-sex identity, but the commitment remains constant:

> To unite **women**, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence.

*Id.* at 4 (emphasis added).

**30.**     The words *woman* and *women*, as used in Kappa Kappa Gamma's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Sorority's 150 years, have always referred to adult female human beings.

**31.**     Kappa Kappa Gamma's communications, throughout its history, use vocabulary that reinforces that the Sorority uses the word "woman" with its traditional, immutable biological

meaning. Members are part of a "sisterhood." "Editor's Letter," *The Key: 150 Anniversary*, Vol. 137, No. 1 at 1 (2020) ("Your commitment to Kappa—in word and in deed—helps to drive the future of our sisterhood."). The Sorority refers to members who have finished college as *alumnae*, the plural form of the Latin term *alumna*. *Alumna* and *alumnae* are gendered Latin words that refer exclusively to females. "Alumna," *Oxford English Dictionary* (Dec. 2022) ("A female former pupil or student of a particular school, university, etc.; a female graduate of a particular seat of learning."). *Alumnus* is the word for a male graduate. *Alumni* refers to a group of graduates that is all-male or one that includes both men and women.

32.     When Kappa Kappa Gamma published an official history of the sorority's first sixty years (through 1930), two of the six sorority founders were still living. Louise Bennett Boyd and Jeannette Boyd introduced the book with an open letter to "Our dear Kappa girls." Burton-Roth & Whiting-Westermann, *History of Kappa Kappa Gamma Fraternity, 1870-1930* at v (1932). The Sorority's 1889 songbook is replete with references to young maids, girls, women, and sisters. Susan Goldsmith & Jessie Cougill, *Songs of the Kappa Kappa Gamma Fraternity* (1889).

33.     Articles in the Sorority's official magazine, *The Key*, reflect the traditional, biological meaning of the word "woman." Perhaps the most salient article was published in 2002. The Sorority conducted focus groups and personal interviews to identify the traits that exemplify the Kappa experience. According to more than 500 collegiate members, alumnae, parents of Kappa members, Kappa volunteers, and university administrators, the "Benefits of Kappa Kappa Gamma" are:

> Kappa Kappa Gamma **is a single-sex haven in a mainly coed campus environment**.

Kappa Kappa Gamma is a family away from home, diminishing campus size and impersonality.

Kappa Kappa Gamma provides sisterhood support via alumnae associations in hundreds of cities.

Kappa Kappa Gamma sustains members in bad times, celebrates good times, and share all times.

Kappa Kappa Gamma offers a diversity of background and interest among its members.

"In the Company of Leaders," *The Key (A Kappa Kappa Gamma Publication)*, Vol 119, No. 2 at 9 (Summer 2002) (emphasis added).

34.     Mr. Smith is not a woman as that word has been adopted and understood by Kappa Kappa Gamma for the past 150 years. Mr. Smith is not an adult female human being. Mr. Smith would not have been eligible for membership in Kappa Kappa Gamma in 1870, nor would he have been eligible during any subsequent time since Kappa's founding. Mr. Smith is not eligible for Kappa membership today.

### B.     Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment.

35.     A woman is an adult human female. A man is an adult human male. For a biologist, these words distinguish between human beings who donate genetic material (men) or receive genetic material (women) during the reproductive process. The distinctions between men and women, however, extend far beyond reproductive biology. Genetic material within every cell in the human body guides that cell's creation and operation. This genetic coding is different for men and women from conception to death. No one questions that the endocrine systems of men and women, which are essential to the development of sexual maturity, differ and affect the human body's development. But muscles, bones, and brains of men and women also differ at a cellular level.

Scientists lack a complete understanding of sex-based differences, but there is scientific consensus that men's bodies and women's bodies are different.

36.     In many circumstances, whether an individual is a man or a woman "bears no relation to ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). A person's sex is determined at the moment of conception. Like race and national origin, sex is an immutable characteristic. Therefore, *governmental* distinctions between men and women are inherently suspect.

37.     Kappa Kappa Gamma and other Greek fraternities and sororities are private social organizations, however, and they *explicitly do* discriminate "on the basis of sex." 20 U.S.C. § 1681(a). Indeed, after passage of Title IX in 1972, the federal government took the position that fraternities and sororities could not continue as part of college life. Members of Congress, led by former Senator Birch Bayh, the Senate sponsor of Title IX, rejected this view. Senator Bayh stated that "[f]raternities and sororities have been a tradition in the country for over 200 years. Greek organizations, much like the single-sex college, must not be destroyed in a misdirected effort to apply Title IX." 120 Cong. Rec. 39992 (1974) (statement of Sen. Bayh). In 1974, Congress amended Title IX to exempt Kappa Kappa Gamma and similar Greek organizations altogether. 20 U.S.C. § 1681(a)(6). Title IX does not apply at all to the "membership practices" of a non-profit "social fraternity or social sorority… the active membership of which consists primarily of students in attendance at an institution of higher education." *Id. See also* Pub. L. No. 93-568 § 3 (1974).

38.     Kappa Kappa Gamma discriminates against men to provide a sex-segregated environment for college women. The Sorority's Bylaws acknowledge that the Sorority discriminates on the

basis of sex: "The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972." Attachment 1 at 9-10 (art. V., sec. 2.D). Single-gender, as the phrase is used in the Bylaws, means "single-sex" and not "gender identity" or a related concept. This is clear from the Bylaws' reference to Title IX, which prohibits discrimination "on the basis of sex."

39.      Social science research demonstrates that when young women are allowed to learn in an all-female environment, they are more likely to seek out 'nontraditional' academic subjects like math and science. Young women in single-sex environments are more likely to develop higher academic, and socially competent, self-images. Young women who attend single-sex schools are more positive about their own abilities and their control over their lives, are less inhibited by stereotyped gender role attitudes, and hold higher aspirations for their futures. These benefits are not limited to the classroom.  One study, for example, showed that strong female role models increased the willingness of college women to study more rigorous academic subjects (with more lucrative careers) such as economics.

40.      Until now, Kappa Kappa Gamma has been a strong defender of the benefits of an all-female environment for college women. Plaintiffs assert—as the Sorority itself did when it filed a Complaint in the U.S. District Court for the District of Massachusetts in 2018—that single-sex sororities are a traditional source of stability and community in college life for young women. The single-sex nature of a sorority is necessary to create this cohesive atmosphere. *See* Complaint, *Kappa Alpha Theta Fraternity, Inc., et al v. Harvard Univ.*, Dkt. No. 1:18-cv-12485 at ¶ 93 (D. Mass.) (filed Dec. 3, 2018) (Kappa Kappa Gamma Fraternity is the second plaintiff named in the Complaint.).

**41.**    Less than five years ago, Kappa Kappa Gamma made numerous allegations about "the proven benefits of single-sex environments" for college women:

> ¶ 93. It is no surprise that single-sex organizations have thrived at Harvard for so many years. Single-sex social organizations represent a traditional source of stability and community in college life. They meet many of the social and cultural needs of students. They provide a surrogate family for students away from home and offer students an opportunity to grow with peers who share common values, problems, and goals. Members of all-male and all-female organizations feel that the single-sex nature of the groups is important to the cohesive atmosphere that the organizations provide.

> ¶ 94. A 2014 Gallup survey of more than 30,000 college graduates across the United States found that students who were members of fraternities or sororities experienced notable long-term benefits linked to their fraternity and sorority membership. These students were more likely to be "thriving" in their well-being and engaged at work than college graduates who did not join a fraternity or sorority. The survey found that fraternity and sorority members were more likely than other students to find fulfillment in daily work and interactions, to have strong social relationships and access to the resources people need, to feel financially secure, to be physically healthy, and to take part in a true community.

> ¶ 95. Single-sex environments are associated with a myriad of developmental and other benefits, particularly for young women. Many educational researchers have found that single-sex education contributes to academic achievement at all levels for women. There "is a body of research carried out since the late 1960's which shows that graduates of women's colleges are more likely to become achievers than are the women graduates of coeducational institutions." As an example, in the 1970s, graduates of women's colleges were more than twice as likely than graduates of co-ed colleges to enter medical school or to obtain a natural science or other doctoral degree.

> ¶ 96. Studies have found that women in single-sex schools at both the secondary and college levels have higher levels of self-esteem and a greater sense of personal control. Exposure to single-sex environments can even positively influence a woman's interest in nontraditional or male-dominated careers—one study concluded that "the opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests." Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment.

*Id.* at 31-33.

42.     Sorority representatives made these and similar assertions to Plaintiffs when they were considering whether to join Kappa Kappa Gamma. Sorority representatives make these representatives to donors and alumnae. None of the research cited in the 2018 Complaint categorized "individuals who identify as women" (*i.e.* men) as "women" when defining a single-sex environment. *Id.* at 31-33. Kappa's 2018 Complaint relied on evidence from all-female, single-sex environments. In fact, Defendants have **no** peer-reviewed research that the benefits of a "single-sex" environment continue to exist when men "who identify as women" are admitted. Despite the lack of evidence to support this new theory, Defendants have continued to promote the benefits of the sorority environment to Plaintiffs and other prospective members.

43.     The claim that "trans women are women" is a political slogan. It is not a fact supported by social science or medical research. Kappa's view, less than five years ago, was that women and girls benefit from a single-sex environment. A single-sex environment excludes every man without regard to how the man claims to identify himself. Defendants should not be allowed to radically alter the very core of the Sorority's identity, and then claim to this Court, without evidence, that the benefits remain. Kappa Kappa Gamma could, theoretically, abandon its 150-year commitment to women, but any decision would need to approved at the Sorority's biennial convention. Defendants certainly cannot abandon the Sorority's mission and purpose by subterfuge, with an unsigned Guide from Defendant Rooney and the rest of the Fraternity Council that declares some men are now, in fact, women.

## II.   The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women.

### A.   The Sorority's Corporate Charter specifically references women.

44.     Kappa Kappa Gamma Fraternity is an Ohio non-profit corporation, and its Articles of Incorporation are available from the Ohio Secretary of State. In Ohio, a corporation's charter consists of its articles of incorporation and the Ohio laws in existence when the articles of incorporation were filed. With a for-profit corporation, the corporate charter is a contract between the corporation and its stockholders. For a non-profit corporation, the corporate charter is a contract between the corporation and its members.

45.     The Articles of Incorporation for Kappa Kappa Gamma, in conjunction with Ohio law when the Corporation was organized, form the Sorority's charter. As a nonprofit corporation, Kappa's corporate charter is a contract between the Sorority and its members, including Plaintiffs.

46.     A corporate charter contains the terms upon which the incorporators have agreed to associate. The charter therefore establishes the authority that members can exercise and sets the limits within which the body of corporators can lawfully act in a corporate capacity. Like other corporations, the Sorority and its Board of Directors (the Fraternity Council) must act consistently with Kappa's corporate charter. When a corporation's actions exceed the authority granted by its corporate charter, these actions are ultra vires and void. Such is the case here.

47.     Corporate board members who disregard or otherwise seek to circumvent a corporation's corporate charter violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance). Under Ohio's Nonprofit Corporation Law, claims involving a "lack of, or limitation upon, the authority of a corporation" can be asserted "[b]y or on behalf of the corporation against a director, an officer, or a member as such" and "[b]y a member as such or by or on behalf

of the members against the corporation, a director, an officer, or a member as such." Ohio Rev. Code Ann. § 1702.12(I) (2023).

48.     The Articles of Incorporation for Kappa Kappa Gamma restrict sorority membership to women. They prohibit any college chapter from defying this restriction. The Sorority's purposes are, *inter alia*, "**[t]o unite women, through membership**" and further provide that all members must be selected "**in accordance with Fraternity standards and procedures**" (emphasis added):

> To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;

> To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

> To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;

> To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

> To advocate for and seek to address issues of concern for members and women in general;

> To provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and

> To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

Attachment 4 at 4.

49.     Kappa Kappa Gamma's Articles of Incorporation cannot be amended by its Board of Directors (the Fraternity Council). Any amendment must occur "in accordance with the Fraternity *Bylaws*," *Id.*, which require a two-thirds majority vote at the Sorority's biennial convention.

Moreover, the "exact content" of any amendments must be provided at least three months prior to the convention:

> The Fraternity Articles of Incorporation and Bylaws may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

Attachment 1 at 20 (art. XXIV, sec. 1).

50.     Regardless of whether Kappa Kappa Gamma Fraternity *could* amend its corporate charter to provide that the Sorority's mission and purpose is to 'unite women *and men who identify as women* through membership,' Defendants have not adopted such an amendment. Under the corporate charter as it exists now, only women can be Kappa members. The Sorority has not amended its Articles of Incorporation to define "woman" to include men who claim to identify as women. The meaning of woman therefore remains constant to the meaning it has had since its use in 1870: an adult human female. Initiation of Terry Smith as a member of Kappa Kappa Gamma violates Kappa Kappa Gamma's corporate charter and the contractual promise the corporation has made to Kappa members. Defendant Rooney and the other members of the Fraternity Council violated their fiduciary duties to the corporation when they procured and approved the initiation of a man as a Kappa member.

### B.      The Sorority's Bylaws, Standing Rules and Policies also limit membership to women.

51.     In addition to its corporate charter, Kappa Kappa Gamma has bound itself through its Bylaws, Standing Rules, and Policies. These corporate governance documents restrict Kappa membership to women and do not permit Mr. Smith's membership.

### 1.   Kappa Kappa Gamma's Bylaws prohibit Mr. Smith's membership.

52.    Under Ohio law, the Bylaws of Kappa Kappa Gamma are the code of regulations for the

corporation. Attachment 1 at 19 (art. XIX). The Bylaws restrict membership to women only:

> A.    New Member. **A new member shall be a woman** who has accepted an invitation to join the Fraternity but has not been initiated. A new member shall:
>
> > 1.   Have signed a dated, written pledge to membership witnessed in writing by an active or alumna member of the Fraternity;
> >
> > 2.   Remain eligible as a new member for a term of one year before the pledge to membership expires so long as enrolled in the same college or university; and
> >
> > 3.   Have the right to attend meetings, speak in debate and present their views to a committee on a referred question but shall not vote on any question. A new member shall not be present at a meeting during ritual for initiated members.

Attachment 1 at 2 (art. III, sec. 1) (emphasis added).

53.    While local chapter members of Kappa Kappa Gamma recruit and vote on new members,

they must do so "in accordance with Fraternity standards and procedures." Attachment 4 at 4.

Because the *Bylaws* require that every new member be a woman, and Mr. Smith is not a woman,

his membership is void:

> Section 2. Qualifications. **A woman** may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.
>
> > A.   Collegiate New Member and Alumna Candidate. To qualify as either a collegiate new member or an alumna candidate, **a woman** shall:
> >
> > 1.   Have demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals;
> >
> > 2.   Not be pledged to membership or be a member of any similar college or university women's social sorority except honorary or professional organizations;

3. Not have been initiated into any other member group of the National Panhellenic Conference;

4. Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements; or

5. Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity Bylaws, Standing Rules and Policies.

B. Collegiate New Member. To qualify as a collegiate new member, **a woman** shall also:

1. Be enrolled at any college or university having a chapter of the Fraternity; and

2. Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B- minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

C. Alumna Candidate. To qualify as an alumna candidate, **a woman** shall also:

1. Have attended a four-year college or university; and

2. Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

Attachment 1 at 3 (art. III, sec.2 (emphasis added)).

**54.** The Sorority last amended its Bylaws in 2022, adopting a complete revision. Upon information and belief, these changes were not lawful. At the 2022 Biennial Convention, Defendant Rooney and the other members of the Fraternity Council conducted a voice vote and—even though there were loud votes against the changes—concluded that the bylaws amendments received a two-thirds vote without actually counting votes. Tellingly, the minutes of the convention

still have not been released. Even if the new bylaws were adopted in 2022, however, they do not alter the requirement that Kappa Kappa Gamma members must be women. *Id.*

55.     The evidence surrounding the 2022 Bylaws revisions supports the conclusion that membership criteria remain the same. In the Report of the Bylaws Committee, which accompanied the proposed Bylaws, there is no reference to "individuals who identify as women" or any discussion of a change to the Sorority's membership rules. The explanatory report for the Bylaws changes states that "[w]hile the documents now look different in structure, most of the content is unchanged." Attachment 5 at 1. The report identifies what it describes as "[s]ome of the major amendments and the rationale behind the change." *Id.* These changes do not include a change to membership rules. Admittedly, the Bylaws were changed to promote "inclusivity," but these changes were "to make sure the language of the documents is inclusive. The committee has tried to craft the documents in such a way that gendered pronouns are not used and references are inclusive of all of our membership." *Id.* at 2. The changes did not affect the actual criteria for membership.

56.     The 2022 Bylaws revisions did add a provision forbidding "Members, chapters and associations" of Kappa Kappa Gamma from engaging in discrimination, but this new antidiscrimination provision does not apply to the Sorority itself. *Id.* at 9-10. In fact, the provision explicitly recognizes that the Sorority *does* discriminate on the basis of sex:

> **D. Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

Attachment 1 at 9 (art. V, sec. 2.D). The reference to the "single-gender nature of Greek-letter social organizations" is not a change to the Sorority's membership rules. It cannot be. The "exemption" in Title IX of the Educational Amendments of 1972 does not refer to gender identity. Rather, "single-gender" in this provision of the Bylaws means the same thing as "single-sex," because the Title IX exemption permits sororities to discriminate "on the basis of sex." 20 U.S.C. § 1681(a)(6).

57.    Shortly before the Sorority's biennial convention in 2022, the national headquarters provided another document to members, entitled "Bylaws and Standing Rules Revisions 2022: FAQS [Frequently Asked Questions]." Attachment 6. This document was provided in April 2022, less than two months before the convention. This FAQs document was not subject to a vote or otherwise approved at the convention. The document makes several statements that are not connected, in any way, to the Bylaws revisions that were under consideration:

**DIVERSITY, EQUITY AND INCLUSION**

**Can nonbinary people join? Is this a chapter-by-chapter decision?**

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.

We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

**Have we vetted these changes with our legal counsel?**

Yes. We have conferred with legal counsel as well as NPC on DEI-related updates to our Fraternity documents. We are confident that these changes would hold up if contested in a court of law.

*Id.* at 18.

58.     The FAQs document does not alter the Sorority's membership requirements. First, to the extent that the Sorority sought to adopt a new definition of woman, contrary to the word's longstanding meaning, this change must be made in the text of the Bylaws. Such a change cannot be presumed. Second, Kappa members must receive "notice" of any amendment to the Bylaws "indicating its exact content" at least three months before the convention. Attachment 1 at 20. (art. XXIV, sec. 1). Even if the FAQs document could somehow supplement the Bylaws amendments, this document was not presented to members with the required three-month notice. These FAQs were provided less than 60 days before the Convention, so they cannot be considered part of the "exact content" required by the Bylaws. Third, under Ohio law, the bylaws of a corporation cannot conflict with its Articles of Incorporation. Kappa's articles of incorporation make clear that the Sorority is limited to women, so any bylaws amendments that say otherwise are unlawful. Finally, the language in the Bylaws FAQs does not actually support the claim that Mr. Smith is a woman. The language in the Bylaws FAQs does not say that a man who identifies as a woman is a "woman." Rather, the language expands the list of eligible members by adding another category: "women" and also "individuals who identify as women." If this second category were naturally subsumed within the meaning of "women," there would be no need for this statement at all.

59.     To the extent that Defendants intended to alter the membership requirements of Kappa Kappa Gamma through the 2022 Bylaw revisions, they have violated their fiduciary duties to the

Defendant non-profit corporation. Defendant Mary Pat Rooney and the other members of the Fraternity Council have a fiduciary duty to be faithful to the Sorority's purpose and mission. This fiduciary duty requires that the Fraternity Council members act forthrightly in their efforts to carry out the Sorority's mission and purpose. Defendants cannot, consistent with their fiduciary duty, even *attempt* to alter the Bylaws of a 150-year-old organization through language that appears on page 18 of an explanatory document presented to members just before a vote on a Bylaws amendment that has no corresponding language.

### 2.   Mr. Smith's selection process violated Kappa Kappa Gamma's Standing Rules.

**60.**   Kappa Kappa Gamma has also adopted "Standing Rules" and "Policies" to govern the conduct of the Sorority. The Standing Rules describe the processes that must be followed when selecting a new member of the Sorority. Under the Articles of Incorporation, these "procedures" must be followed by every chapter when selecting new members. Attachment 4 at 4. Standing Rules can be amended by a majority vote at the Sorority's biennial national convention, provided that the proposed amendments were submitted, in writing, at least three months prior to the Convention. Attachment 7 at 25.

**61.**   The Standing Rules of the Sorority do not include any language that supports expansion of Kappa membership to a man who claims to identify as a woman.

**62.**   The Standing Rules do, however, impose two requirements that were violated in the admission of Mr. Smith to Kappa Kappa Gamma. Under the Standing Rules, all chapter members must vote on whether to admit a new member, unless a chapter member is excused from voting, in writing, by the chapter's alumnae adviser. Attachment 7 at 1 (sec 1.1.A.1). For Mr. Smith's vote on membership, the chapter officers adopted the opposite policy, forbidding Plaintiffs Jane Doe

IV and Jane Doe V, and all other members who were not present at the chapter meeting on September 20, 2022, from voting on Mr. Smith's membership. None of these non-voters were excused, in writing, by the chapter's alumnae adviser. Further, none of the specifically identified members asked to be excluded from the vote. The chapter committed a second violation when voting on Mr. Smith. Any vote on a new member must be secret and must happen through use of the Sorority-approved electronic voting system, which is a mobile phone application (app) called "Omega Recruit":

> 1.1   Membership Selection.
>
> A.   Collegiate New Member Selection. Active members shall be responsible for selecting new members of their chapter. Any initiated member may provide information about qualified women. The electronic voting system selected by the Fraternity shall be used by the chapter.
>
> > 1.   Participation. All active members of the chapter shall participate in membership selection unless excused in writing by the designated chapter adviser.
> >
> > 2.   Confidentiality. All information concerning the membership selection process is confidential and shall be kept within the chapter.
> >
> > 3.   Bid List. The bid list shall be produced using the overall scoring calculation in the electronic voting system and shall not be manipulated.

Attachment 7 at 1. Mr. Smith's selection did not use Omega Recruit. Omega Recruit was used to select new Kappa members during continuous open bidding at the University of Wyoming in Spring 2022 and to select new Kappa members during the formal recruitment in Fall 2022 ("rush week"). In contrast, Mr. Smith's approval occurred through a Google Poll that was not anonymous.

**63.**   The Standing Rule requirement that every chapter use the "Omega Recruit" process was imposed by the Sorority through an amendment to the Standing Rules in 2022. The requirement that all chapter members must vote, unless excused by the chapter's alumnae adviser for

membership, has existed since at least 2016. Mr. Smith's vote did not occur using Omega Recruit and chapter members were prevented from voting on his membership. Mr. Smith's selection process was a violation of the Sorority's Standing Rules, and it is invalid.

64.     When Plaintiffs, and their attorneys, wrote to Sorority officials after the vote on Mr. Smith, but before his initiation ceremony, their concerns were ignored.

### 3.     The Policies of Kappa Kappa Gamma prohibit Mr. Smith's membership in the Sorority.

65.     The Sorority also has corporate governance documents called the "Policies of Kappa Kappa Gamma Fraternity" which are "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by the Kappa Kappa Gamma Articles of Incorporation and the Fraternity Bylaws and Standing Rules." Attachment 8 at 1.

66.     The Policies of Kappa Kappa Gamma also restrict Sorority membership to women. Policy III imposes requirements on the Sorority's college chapters that make clear the Sorority is a single-sex organization. Policy III prohibits Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Sorority or a chapter:

> **Section 2. Auxiliary Groups.** Participation in auxiliary groups of men's fraternities, including but not limited to little sisters, is prohibited and is in conflict with the National Panhellenic Conference Unanimous Agreements. The formation of male auxiliary groups, such as big brothers, is prohibited. **The activities of such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status.** Kappa chapters shall not bestow honorary status to individuals, such as Key Man or chapter sweetheart.

Attachment 8 at 3 (emphasis added). Policy VII explicitly prohibits men from participating in the Sorority's recruitment events:

> 3.I.     Men. **Men shall not participate in any Kappa recruitment events**, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements.

*Id.* at 13 (emphasis added). Mr. Smith is a man. His participation in Kappa recruitment was a violation of the Sorority's Policies.

67.    Kappa Kappa Gamma Policies also require that all members of a chapter vote on whether to accept a new member, unless excused in writing, and require that membership votes use the Sorority's designated electronic voting platform. *Id.* at 11 (§ 3) & 14 (§ 3.P).

68.    Kappa Policy III does include a reference to the concept of "gender identity," but this Policy does not permit Mr. Smith to join the Sorority. Under a section called "Personal Responsibility," Policy III requires that Kappa members respect Human Dignity. Like the Sorority's Bylaws, this provision requires Sorority to behave in a manner that respects others. The provision does not link gender identity to Kappa membership:

> **2. Human Dignity.** Kappa Kappa Gamma expects all members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals. Any member who makes discriminatory, inflammatory or inappropriate actions based on race, national origin, religion, disability, age, gender identity, sexual orientation or other class protected by local, state/provincial, or federal law shall be subject to dismissal or other disciplinary action.

Attachment 8 at 4. Respect for human dignity is consistent with the Sorority's historical, longstanding membership requirements. Policy III applies to members' conduct. Respect for the worth of all individuals, however, does not require membership for all individuals. Moreover, because the Policy is adopted by the Fraternity Council, not the membership, the Policy cannot deviate or undermine the Sorority's Articles of Incorporation, Bylaws or Standing Rules.

III.   **National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Mr. Smith's wrongful membership.**

69.   Kappa Kappa Gamma acts through 140 collegiate chapters. Kappa Kappa Gamma chapters are not distinct entities in any way. The Fraternity Council, the employees of the Sorority, the Sorority's District Directors, and the Sorority's network of alumnae advisers provide direction to the student members of the Sorority. Mr. Smith could not have been admitted as a Kappa member without the explicit approval and support of the Fraternity Council and those acting at the Council's direction. Under the Standing Rules, no person can be initiated as a Kappa member without approval from Sorority headquarters:

> 6.2   Ritual.

> *      *      *

> B.     Chapter Initiation of New Members.

> *      *      *

> 2.     At least two weeks before Initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

Attachment 7 at 10. Sorority officials regularly reject ineligible members, even when a chapter has voted to admit the member. Reasons for rejection can include a failure to meet the grade requirements for new Kappa members.

70.   Upon information and belief, Sorority representatives not only approved Mr. Smith's membership, but national Sorority officials also encouraged chapter officers to pursue Mr. Smith and guided chapter officers in the illegal selection process. Plaintiffs have not brought suit against

their collegiate chapter. The Gamma Omicron chapter of Kappa Kappa Gamma Fraternity, which operates on the University of Wyoming's campus, did not have authority to admit Mr. Smith. All decisions about compliance with the Sorority's corporate charter, Bylaws, Standing Rules, and Policies were made by adults acting on behalf of the national Sorority. While the Sorority's legal counsel stated that the Sorority does not participate in member selection, Attachment 3 at 1, this statement was not true as it relates to the admission of Mr. Smith.

71.     Indeed, national Sorority officials and representatives are responsible for all membership decisions at collegiate chapters. The Sorority controls the intake of new members, the decision to expel or suspend Sorority members, and the decision to discipline, suspend or revoke a chapter. Kappa Kappa Gamma has a hierarchy of national, regional and local officers answerable to and involved in the national Sorority. No person may become a new Kappa member unless the Sorority's alumnae specialists or staff, in advance, have given "permission to initiate."

72.     On the national level, the Fraternity Council has authority to approve, suspend or revoke a collegiate chapter. The Fraternity Council also has authority to suspend or dismiss any Sorority member. Below the Fraternity Council, the Sorority has Content Directors, who supervise all matters that relate to a specific aspect of the Sorority's operation (such as the Sorority's disciplinary process, called "Standards"). The Sorority has District Directors who supervise the activities of the local chapters and administer discipline to individual chapters for rules violations. Finally, the Sorority has paid staff at the national headquarters. All of these individuals operate under the supervision of an Executive Director who reports to the Fraternity Council.

73.     The Standing Rules of the Sorority permit national officials to place any individual member

on probation, even if the collegiate chapter members do not support this decision. The Fraternity

Council (the Sorority's board) can dismiss any member entirely. Attachment 7 at 13-20.

74.     Every chapter must adopt its own bylaws and standing rules, which "must be approved by

the Fraternity Bylaws Committee before becoming effective." *Id.* (art. iv, sec. 2.G.). All

subsequent amendments must also be approved by the Sorority's officials. *Id.*

75.     For every collegiate chapter, Kappa Kappa Gamma has a network of appointed alumnae

who supervise operation of the chapter and the actions of individual chapter officers. The

Sorority's Bylaws require this supervision:

> **J. Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist
> the chapter in fulfilling its purpose and in the management of the affairs of the
> chapter. The board shall be composed of a chairman, alumna advisers to Executive
> Board and vice presidents. Additional advisers may be added on a case-by-case
> basis with the approval of the Advisory Board Specialist, Leadership Development
> Specialist, and District Director, and in consultation with the Leadership
> Development and Advisory Board Directors.

Attachment 1 at 7 (art. IV, sec 2.J.). These appointed alumnae, in turn, report to other alumnae

with broad responsibility over every aspect of sorority life, such as chapter operations, housing,

membership recruitment and retention, and discipline of sorority members. Appointed alumnae

control all aspects of chapter operation. For example, a chapter cannot host a social function (*e.g.*,

a party) without submitting an event form to the national Sorority headquarters and also receiving

approval from the chapter's appointed alumnae adviser. Fraternity Council members refer to these

appointed alumnae as part of the Sorority's "workforce."

76.     The President of each collegiate chapter *must* discuss matters with the chapter's alumnae

adviser. In addition, each chapter's Vice President of Standards and Vice President of Academics

must work with an alumnae adviser. Alumnae advisers are selected by the Sorority, not by chapter members. Chapter members have no authority over the alumnae advisers, and these advisers *must be* present for all chapter meetings of significance:

> E.    Meetings. An adviser shall be present at chapter meetings for the election of officers, revision of the chapter Bylaws and Standing Rules, preparation and presentation of the budget, Executive Board meetings, officer training, Initiation, and including those of the Nominating Committee and consideration of disciplinary action by the chapter and Standards Committee. Advisers may attend meetings electronically via telephone or through other electronic communications as long as all the members can simultaneously hear one another and participate during the meeting.

Attachment 8 at 1 (Policy I, sec. 2.E.).

77.    All Kappa Kappa Gamma members commit that they will comply with federal and state law, and, where applicable, the regulations of a college or university. Members also pledge they "shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct." Attachment 1 at 9 (art. V, sec. 1). These commitments reinforce the existing fiduciary duties of Defendant Mary Pat Rooney and other members of the Fraternity Council to the Sorority's mission and purpose.

**IV.    Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies.**

78.    Kappa Kappa Gamma is one of only three sororities with a residential house at the University of Wyoming. Plaintiffs chose to join the Sorority, in part, because they wanted to live communally in a single-sex environment. Some Plaintiffs wanted to be able to rely on other young women, including juniors and seniors, for help and advice with college. Some Plaintiffs sought to live in Kappa's single-sex environment because of religious or moral beliefs that young, unmarried women should not live with young, unmarried men. Some Plaintiffs are sisters or daughters of

Kappa Kappa Gamma alumnae and wanted to experience the close bonds that develop when living in a sorority house. Plaintiffs also include a victim of sexual assault who wanted a safe place to interact with other college students without the presence of men.

79.     The Kappa Kappa Gamma house at the University of Wyoming has a capacity of 52 young women. Currently, only 44 Kappa members live there. The national Sorority requires every chapter to have a "live-in rule" to guarantee the sorority house "is filled to capacity at all times." Attachment 8 at 7 (Policy V, sec. 1.J). Upon information and belief, Defendant Kappa Housing Corporation needs at least 44 Kappa members to live in the sorority house each year. If fewer than 44 residents live in the sorority house, the Defendant Housing Corporation lacks sufficient revenue to operate and maintain the house.

80.     The Kappa Kappa Gamma sorority house at the University of Wyoming does not have facilities to support co-educational living. Most of the rooms are on the second floor of the house. There is a small common area on the second floor with a couch. The bedrooms on the second floor and the third floor are old, and many of the doors do not lock consistently. There are two communal bathrooms for the women on the second floor and one on the third floor. The doors to the communal bathrooms do not lock and do not require a code to enter. The primary bathroom on the second floor does not have a private area to disrobe before showering.

81.     The Kappa rules for the sorority house forbid all men from being on the second floor. Attachment 13 at 11 (House Standing Rule 2.4.A.2) ("Males will only be allowed upstairs or in the basement during events that are approved by the Facility Director in consultation with the House Director annually with times set before each event. Exceptions to this require approval from the House Director, President or Facility Director."). Other than specific days, such as the fall

move-in date, even fathers and boyfriends are prohibited from being on the second floor. Plaintiffs and other sorority members describe the second floor as a private, safe space where young women can interact without concern that they will be on display for men.

82.    Since his admission to the Sorority, Mr. Smith has received all privileges of Kappa Kappa Gamma membership, including access to living areas that are restricted to women only. Mr. Smith does not currently live in the sorority house because he has a housing contract that requires him to live in a dormitory at the University of Wyoming for the 2022-23 academic year.

83.    Even though Mr. Smith does not live in the sorority house, he has several times chosen to sit for hours on the couch in the second-floor common area. He does not study. He does not speak to the women who live there. Mr. Smith is not meeting another member of the sorority who lives in the house. Instead, Mr. Smith stares at women walking to the bathroom. One sorority member walked down the hall to take a shower, wearing only a towel. She felt an unsettling presence, turned, and saw Mr. Smith watching her silently.

84.    As a member of the Sorority, each Plaintiff "has an obligation, in accordance with the chapter's live-in rule, to live in the chapter facility." Attachment 8 at 7 (Policy V, sec. 1.J). "Failure to fulfill this obligation may result in a loss of membership." *Id.*  Under the live-in rule at the University of Wyoming, no member is permitted to live outside of the sorority house until there are 52 residents. Attachment 13 at 9 (sec. 2.3.A.1.).

85.    Plaintiffs Jane Doe I-V & VII have signed a House Contract with Defendant Housing Corporation. Attachment 10. Under the House Contract, Plaintiffs have paid $7,700 to live in the Defendant House Corporation's residential building. This year, Plaintiffs have not received the benefit of their housing contracts, which guaranteed a single-sex environment that is separate from

men and safe. Instead, Mr. Smith has regularly been present throughout the sorority house when there should be no men present.

86. When Plaintiffs, and in some cases the parents of Plaintiffs, reached out to national Sorority officials about Mr. Smith living in the sorority house next year, the Kappa officials dismissed their concerns. Sorority officials falsely stated that the sorority house was no different than a co-ed dorm at the University of Wyoming. When Plaintiffs and their parents pointed out that the sorority house does not have locked bathroom facilities, the Sorority officials were dismissive. The officials recommended that, if Plaintiffs were uncomfortable or concerned about their safety, they should quit Kappa Kappa Gamma entirely.

87. Plaintiffs have requested to live away from the sorority house next year to avoid being forced to live with Mr. Smith. These requests have all been refused, even though the sorority house will no longer be single-sex.

88. Defendant Housing Corporation is currently pressuring the Plaintiffs, and other sorority members, to sign a housing contract for the next academic year, 2023-24. The cost of living in the sorority house has increased by $1,300 to $9,000 per year. Housing contracts were due on February 17, 2023, but at present only ten of the more than 40 chapter members have returned a signed contract. This dramatic decline is because of the lack of privacy in the sorority house, and Mr. Smith's access to all areas within.

89. Defendants' wrongful admission of Mr. Smith to the Sorority has caused the sorority house to become financially unsustainable. As a direct result of Defendants' wrongful admission of Mr. Smith to the Sorority house, the Kappa house will close. Upon information and belief, once the Sorority house closes, the Kappa Kappa Gamma chapter at the University of Wyoming—which

has been in existence since 1927 with thousands of alumnae, including prominent leaders in Wyoming and beyond—will close. Plaintiffs will not only be forced to seek housing elsewhere, away from the single-sex environment that Kappa offered, but they will also lose—forever—the opportunity to participate in a sorority during their college years at the University of Wyoming.

**V.     Defendants' evasion of Kappa Kappa Gamma's membership restrictions represents an ongoing violation of fiduciary duties to the Corporation, and any additional demands to the Sorority's Directors would be futile.**

90.     Plaintiffs bring this action derivatively in the right and for the benefit of Kappa Kappa Gamma to redress the breaches of fiduciary duty and other violations of law by Defendant Mary Pat Rooney and other members of the Fraternity Council.

91.     Plaintiffs will adequately and fairly represent the interests of Kappa Kappa Gamma Fraternity and its members in enforcing and prosecuting this action. Plaintiffs are college students and Kappa members, who are currently experiencing the changes that occur when a man becomes a part of an all-female sorority house.

92.     The Federal Rules of Civil Procedure, and analogous requirements adopted by the State of Ohio, require that Plaintiffs' derivative action begin, first, with a request to the corporation. Plaintiffs must describe with particularity the efforts by Plaintiffs to resolve this violation without resort to litigation or, in the alternative, explain why any such request would be futile.

**A.     The Defendants have refused Plaintiffs' demands to prevent violation of the Sorority's restrictions on membership.**

93.     The Articles of Incorporation, Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma Fraternity restrict membership in the Sorority to women only. Defendants have not amended these corporate governance documents to permit membership for Mr. Smith, who is a man who claims to identify as a woman.

94.     Plaintiffs demanded that the Sorority act to prevent the initiation of Mr. Smith, who was ineligible to become a Kappa member. In September and early October 2022, Plaintiffs and, in some cases, their parents, reached out to national Sorority leaders to raise concerns about Mr. Smith. At that time, Mr. Smith's membership had not yet been finalized. In response, Kari Kitrell Poole, the Executive Director of the Sorority, told Plaintiffs that their request had been presented to the Fraternity Council and refused. Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

95.     In November 2022, Plaintiffs, through counsel, again wrote to the national Sorority, requesting that Kappa Kappa Gamma prevent the initiation of Mr. Smith until concerns about his membership were resolved. Attachment 11. Plaintiffs' letter pointed out that Mr. Smith's membership is both a violation of the Sorority's bylaws and also breaches the housing contract that Plaintiffs signed with the Defendant Kappa Housing Corporation.

96.     The Sorority, through counsel, rejected Plaintiffs' request. Attachment 3. The Sorority repeated its claim that it is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id.* This statement, which disregards the actual meaning of the word "woman" as used by the Sorority for 150-years, was presented to Plaintiffs as the official policy of the Sorority. Kappa's counsel stated that the Sorority leadership concluded that a woman need not be "biologically born as female." *Id.* at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs' request for relief within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

**B.      Any further demand to the Fraternity Council, seeking enforcement of Kappa Kappa Gamma's membership restrictions, would be futile.**

97.      Even had the Plaintiffs not demanded that the Sorority prevent Mr. Smith's wrongful initiation, any demand would have been a futile, wasteful, and useless act. Defendant Rooney, and the other members of the Fraternity Council, are unable to fairly consider any such demand because the directors face a substantial likelihood of liability for their role in the Sorority's improper conduct.

98.      The current Fraternity Council is unable to independently assess Plaintiffs' demands. Defendant Rooney and the other members of the Fraternity Council have been actively involved in the development and dissemination of the revised membership policy in flagrant disregard of the Sorority's corporate governance documents.

99.      Defendant Rooney, with the other members of the Fraternity Council, served as the Board of Directors for the Sorority during the wrongful behavior alleged herein, and each director knew of this wrongdoing but failed to act in the face of a known duty to act. For these reasons, Defendant Rooney faces a substantial likelihood of liability for her participation in these acts. The sustained failure of the Fraternity Council to ensure effective corporate governance and ensure compliance with the mission and purpose of the Sorority can only have been a result of a knowing breach or reckless disregard of fiduciary duties.

100.     The futility of any request by Plaintiffs is further demonstrated by the November 2022 letter to Plaintiffs' attorney from the attorney for the Sorority. The Sorority, through counsel, stated that "Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status." *Id.* at 2. With this statement, the Sorority's counsel indicates that the Sorority is not only not willing to take action

related to Mr. Smith, but the letter indicates that the Sorority has no intention to evaluate whether *any* member complies with the Sorority's requirement that a member be a woman. In stating that the Sorority has no interest in objective evidence about a member's sex, Kappa's counsel demonstrated that the Sorority will never take action to enforce the membership restrictions that guided the Sorority for its first 150 years.

**101.**    The letter from Kappa's attorney also lays out, for the first time, the subterfuge that Defendant Rooney and the Sorority's leadership have undertaken to undermine Kappa Kappa Gamma's longstanding membership criteria. The attorney refers to two "Position Statements" issued by the Sorority in September 2021. Position Statements are documents prepared by Sorority staff, and they are never presented to the Sorority's membership for approval or review. These position statements restate language that was originally included in the "Guide for Supporting our LGBTQIA+ Members." Attachment 2. Upon information and belief, the Position Statements were prepared by staff at Sorority headquarters at the direction of the Fraternity Council. In addition to position statements on "Academic Excellence" and "Hazing," the Position Statements include the following paragraphs:

> **MEMBERSHIP SELECTION**
> Kappa Kappa Gamma is a single-gender organization comprised of women *and individuals who identify as women* whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.
>
> Kappa Kappa Gamma continues to seek members who:
> - Will further the mission and purpose of the Fraternity.
> - Have achieved academic success.
> - Have demonstrated good character.
> - Will enrich the life of the group through shared congeniality.
> - Are responsible citizens and contributing members of their communities.
>
> Each chapter of Kappa Kappa Gamma has the final choice of its own members.

**SINGLE-GENDER ORGANIZATIONS**
Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.

The single-gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX.

Attachment 12 at 2 (emphasis added). Kappa "Position Statements" are not Bylaws, Standing Rules or Policies of the Sorority. These documents were issued *before* any changes to the Sorority's Bylaws in 2022, and they reflect further evidence that Defendant Rooney and the Sorority's Fraternity Council are knowingly working to undermine the Sorority's lawful membership criteria.

102.    In the letter to Plaintiffs, Kappa's counsel also refers to a policy issued by the National Panhellenic Conference in 2020. The National Panhellenic Conference is an umbrella organization of twenty-six sororities active on college campuses. The attorney's letter cites the NPC Policy as support for the Kappa Kappa Gamma's action, stating that the NPC policy means that "all women" may join a sorority, including men who claim to be women. The Kappa counsel's letter, however, selectively quotes the NPC policy. The letter incorrectly suggests that the NPC policy has an effect on the membership requirements of Kappa Kappa Gamma and the other sororities that belong to the NPC. This is false. The 2020 Policy Statement expressly states that it only applies to whether a man who identifies as a woman may participate in formal recruitment ("rush week") when all twenty-six sororities recruit new members. An individual Sorority's membership requirements are not affected by the NPC policy:

Panhellenic Recruitment Eligibility (2020) – POLICY

For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.

The Sorority cannot use the NPC policy to justify a change in Kappa Kappa Gamma's membership requirements. Moreover, the Sorority cannot claim that its policy reflects the NPC policy when it differs materially. The NPC policy requires that a man "consistently live[] and self-identif[y] as a woman." The Kappa Guide requires only that a man "identify" as a woman. Defendants have eliminated any requirement that a male applicant take any steps to demonstrate that he "consistently lives" as though he is a woman. The letter's misleading reference to the NPC Policy is further evidence that the Sorority's leadership intended to act contrary to the corporation's governance documents.

103.    The "Guide for Supporting our LGBTQIA+ Members" is not a Bylaw of Kappa Kappa Gamma. The Guide is not a Standing Rule of Kappa Kappa Gamma. The Guide is not one of the official Policies of Kappa Kappa Gamma. The Guide was not adopted by a vote of the Fraternity Council.

104.    The Guide was distributed to the Sorority's 'workforce' (the alumnae who direct chapter operations) in 2018 as a "resource," but the document was not provided to all Sorority members. The Guide states that its purpose is to help fulfill the Sorority's expectation that members "promote integrity, respect, and regard for others, and appreciation of the worth of all individuals." The Guide does not read like an official corporate policy. Members can learn about "How to Be an Ally," "Using Inclusive Language," and "How to Support Someone Who Is Coming Out." Attachment 2 at 1-2. Much of the Guide is unobjectionable as a matter of setting expectations

about how Kappa members will interact with others. Upon information and belief, much of the Guide repeats, without attribution, material created by an organization called CampusPride.org. *Compare* Attachment 2 with "Greek Ally Kit" *available at* bit.ly/401gHhv (visited March 3, 2023).

105.    Although the Guide was disseminated by the Sorority as a resource, Defendant Rooney and the members of the Fraternity Council have treated the Guide as change to the Sorority's membership rules. Upon information and belief, Defendant Rooney and other members of the Fraternity Council regularly communicate through "GroupMe" to avoid oversight and potential discovery of their discussion of the changes to Kappa's membership requirements. Defendant Rooney's active work to conceal the Fraternity Council's decision-making, when considered in combination with the Sorority's *ultra vires* decision to permit men to become members of the Sorority, demonstrate that the Fraternity Council actions have not been made in good faith and are contrary to the best interests of the Sorority.

106.    As alleged herein and based on the duties imposed pursuant to the Fraternity's corporate governance, Ohio law, and obligations set forth in the Sorority's Code of Conduct, Defendant Rooney and the other members of the Fraternity Council were aware that Mr. Smith is ineligible to become a member of the Sorority. Given the duties placed on the directors of the Sorority, to the extent Defendant Rooney or any other member of the Fraternity Council did not have actual knowledge of these repeated violations, such lack of knowledge could only be the product of recklessness or willful disregard of their duties that constitutes bad faith. Any further demand upon the Sorority's leadership would be futile.

**VI.**    **Kappa Kappa Gamma's effort to force the membership of Mr. Terry Smith, and the experience of Plaintiffs since his admission, demonstrate the disruptive effect of a man on the sorority experience.**

**107.**    In pursuit of their improper goal of transforming Kappa Kappa Gamma through the initiation of Terry Smith, Defendants have violated other Bylaws, Standing Rules, and Policies of the Sorority. Officers and employees of the national organization, and alumnae advisers acting at their direction, actively pressured members of the Chapter to support Mr. Smith's admission to the sorority, ignoring Bylaws and Standing Rules that would have foreclosed his initiation. Mr. Smith was selected and initiated as a Kappa member without following the Standing Rules and Policies that ensure a secret ballot.

**108.**    Since Mr. Smith's unlawful admission to Kappa Kappa Gamma, Defendants have disregarded concerns about Mr. Smith's inappropriate, and sometimes threatening, behavior. Instead, Defendants have retaliated against Plaintiffs and other sorority members who have raised concerns about the transformation of Kappa Kappa Gamma from a women's sorority into a co-ed organization.

**109.**    Plaintiffs Jane Does I-III and V-VII all participated in fall sorority recruitment, colloquially known as "rush week," during their first year at the University of Wyoming. Ms. Doe IV joined Kappa Kappa Gamma at another college and transferred to the University of Wyoming. During Kappa recruitment, Kappa Kappa Gamma members repeatedly described the Sorority as a sisterhood, a term universally understood to refer to women only. Jane Doe I was told that, even after she graduates from college, "You are always going to have a sisterhood right there." No person told Plaintiffs that Kappa Kappa Gamma's definition of a "woman" includes men. No

person told Plaintiffs that men who claim to identify as women could be accepted to membership and live in the Kappa sorority house with access to all private areas.

110.    During the recruitment process, Plaintiffs learned that if they joined Kappa Kappa Gamma, they would be forever barred from switching to a different sorority. Plaintiffs could have joined other sororities at the University of Wyoming. Plaintiffs would not have joined Kappa Kappa Gamma if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

111.    Plaintiffs' Complaint is supported by information from five other Kappa members who are Wyoming citizens These young women are not Plaintiffs solely because their participation could destroy this Court's jurisdiction should the Court conclude that Mr. Smith is a citizen of Wyoming and also a required party.

112.    Witnesses VIII-XI are current members of Kappa Kappa Gamma and have been members of the Sorority at all relevant times at issue before this Court. These non-party witnesses all participated in the fall sorority recruitment during their first year at the University of Wyoming. During recruitment, the members of Kappa Kappa Gamma repeatedly described the Sorority as a sisterhood for women only. No person told Witnesses VIII-XI that Kappa Kappa Gamma's definition of a "woman" included men who claim to identify as women. No person told Witnesses VIII-XI that, if accepted to membership, they would be required to live in the sorority house and that men who claim to identify as women would also reside in the house and have access to all private areas. During the recruitment process, Witnesses VIII-XI were told that if they joined Kappa Kappa Gamma, they could never join a different sorority. These women could have pledged other sororities at the University of Wyoming. They would not have joined Kappa Kappa Gamma

if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

113.    Witness XII is also a citizen of Wyoming, but she is not a Kappa member. Witness XII participated in formal recruitment ("rush week") in Fall 2022, and she has been invited to become a Kappa member. Witness XII has not yet been initiated as a Kappa member. Witness XII does not wish to join a sorority that admits men, even if the sorority restricts admission to men who claim to identify as women. Of the twelve women who were invited to become Kappa members in Fall 2022, Witness XII and four others have declined to join because they do not want to live in a sorority house with a man. After interacting with Mr. Smith, one Kappa pledge suffered a panic attack and required medical care. Several of Witness XII's fellow pledges stated that they do not feel comfortable living in a sorority house with Mr. Smith, as the house does not have sex-segregated facilities. Witness XII would not have participated in Kappa Kappa Gamma's formal recruitment if she had known Mr. Smith would later be admitted during the Sorority's continuous open bidding process.

> A.    **Mr. Smith's behavior has destroyed the single-sex haven that Kappa members describe as the heart of the sorority experience.**

114.    Plaintiffs' concerns about the admission of a man into the Sorority have been validated by Mr. Smith's own behavior and statements.

115.    Mr. Smith is 6'2" tall, and he weighs 260 pounds. No other member of Kappa Kappa Gamma has comparable size or strength. Mr. Smith is a sophomore at the University of Wyoming, but he is older than his peers. Prior to attending the University of Wyoming, Mr. Smith attended Eastern Washington University. Mr. Smith graduated from high school in 2020 and turned 21 years old in October 2022.

116.   Mr. Smith states that he is transgender and that he self-identifies as a woman. His behavior, however, does not reflect a man living as a woman, let alone a man attempting to "consistently live" as a woman (as noted in the NPC Policy in paragraph 102 above). Mr. Smith was involved in an automobile crash in January 2023. Mr. Smith presented a Washington State driver license to the responding officer. The license states that Mr. Smith is a male with residence in Bellevue, Washington. The license was issued in 2020. Beginning in 2019, a year before Mr. Smith applied for his license, Washington State permitted applicants to select their gender as they wanted it to appear on the license. When Mr. Smith applied for a Washington license, he could have reported he was male, female, or "X." Mr. Smith told the State of Washington that he is male. Mr. Smith could have sought to change the sex indicated on his license in 2021, when he changed his legal name, but Mr. Smith did not do so. Mr. Smith's current driver license states he is male, and when he presented this official document in January 2023, Mr. Smith asserted that he was male.

117.   Mr. Smith wears women's clothing only occasionally. He regularly travels about campus wearing baggy pants as would any other male student. Other than occasionally wearing women's clothing, Mr. Smith makes little effort to resemble a woman. He has not undergone treatments to create a more feminine appearance, such as female hormones, feminization surgery, or laser hair removal. Plaintiffs often see Mr. Smith with the facial hair one would expect on a man who either did not shave that morning or whose facial hair has regrown by the evening.

118.   Witness XI's experience when interacting with Mr. Smith is that he is very interested in politics and the law. Whenever Mr. Smith encounters disagreement, he claims the other person disagrees with him because he is transgender. Mr. Smith then states that this disagreement is an

act of discrimination. Witness XI has observed Mr. Smith use his transgender identity to threaten

others with discipline, especially those he believes do not support his Kappa membership.

119.    Mr. Smith's behavior is made more threatening because Mr. Smith is sexually interested

in women. Mr. Smith has a profile on Tinder—an online dating application—through which he

seeks to meet women. Plaintiffs have regularly discovered Mr. Smith using his Kappa membership

to enter private areas of the sorority house and watch other members. Witnesses IX and X work in

the evenings, so they often do not return to the sorority house until the evening (6 p.m. for Witness

IX and 9 p.m. for Witness X). On at least five occasions each, Witnesses IX and X have entered

the main door of the sorority house and observed Mr. Smith sitting alone in a chair in the living

room. Mr. Smith's chair is located where he can see women walk through the foyer, but the women

can only see him out of the corner of their eyes. Mr. Smith does not speak to sorority members as

they enter. Instead, Mr. Smith stares, following the women with his eyes. Witnesses IX and X have

seen no evidence that Mr. Smith is studying in the living room. Indeed, it would be difficult to

study where Mr. Smith sits as there are no easily accessible writing surfaces or places to keep study

materials. Mr. Smith has, while watching members enter the sorority house, had an erection visible

through his leggings. Other times, he has had a pillow in his lap.

**B.      Mr. Smith's interactions with the Sorority members prior to voting on his
         Membership.**

120.    Mr. Smith first participated in the Panhellenic sorority recruitment at the University of

Wyoming in Spring 2022. Mr. Smith did not apply to join Kappa Kappa Gamma at that time.

Instead, Mr. Smith sought to join the Delta Delta Delta sorority. During the event to meet members

of the sorority, Mr. Smith talked about his desire to be near cadavers and to touch dead bodies.

Delta Delta Delta did not invite Mr. Smith to join the sorority. Plaintiff Jane Doe IV learned of

this conversation, but she was out of town during the chapter meeting to vote on Mr. Smith, and she was not able to present her concerns due to the illegal voting process approved by Defendants and their agents.

121.    In August 2022, Mr. Smith participated in the formal recruitment process for sororities at the University of Wyoming. The formal recruitment process permits prospective applicants to meet members of each of the four sororities at the University of Wyoming. On the first day of the week, young women attend presentations about sorority life. During the next two days, each sorority sets aside several hours for potential applicants to meet current sorority members. Prospective members visit a sorority house, where they meet with groups of current members in roughly five minute intervals. After the meetings, the potential applicant and the sorority members rate the experience using Omega Recruit. Each day, the ratings are tabulated and the individual and the sorority determine whether to continue to discuss membership. During formal recruitment, the Membership Chair for the Kappa chapter at the University of Wyoming told other sorority members that Kappa rules did not permit them to refuse to admit Mr. Smith because he was a biological male. The Membership Chair did, however, tell all members that they would have to unanimously agree before Mr. Smith could live in the sorority house.

122.    During the week of formal recruitment, Mr. Smith avoided answering questions about his hobbies, passions, or involvement in other organizations. Witness XI remembers speaking with Mr. Smith during the formal recruitment process. Mr. Smith repeatedly asked whether he could live in the sorority house. While formal recruitment is intended to determine whether applicants have character traits that align with Kappa Kappa Gamma, Plaintiffs and other chapter members

felt Mr. Smith lacked passion for the sorority experience. Plaintiffs voiced this concern to the chapter's Membership Chair.

123.    Mr. Smith did not complete the full recruitment week for Kappa Kappa Gamma, choosing to try to join a different sorority.

124.    After formal recruitment ended, Plaintiffs and other members of the Sorority believed Mr. Smith's membership application was moot. What the chapter's Membership Chair did not tell these Sorority members, however, was that she was actively recruiting Mr. Smith and pushing him to pursue Kappa membership through a process called "continuous open bidding." Continuous open bidding allows women to become members of a sorority outside of formal recruitment. The Sorority requires all chapters to use continuous open bidding if the sorority house has additional capacity. Attachment F at 12 (Policy VIII, sec. 3.F).

125.    The national Sorority's alumnae advisers also directed chapter officers to recruit Mr. Smith. From 2016 until Spring 2022, the Kappa chapter at the University of Wyoming was under continuing review by national Sorority leaders. These alumnae supervisors did not believe the chapter was providing the expected benefits to members. Having just concluded this multi-year evaluation period, alumnae advisers told the chapter President and other officers that they could raise the prominence of the Wyoming chapter and garner the favor of national Sorority leaders if they recruited and admitted Mr. Smith as Kappa Kappa Gamma's first transgender member.

126.    During Continuous Open Bidding, applicants visit the sorority house for dinner or meet Kappa members for coffee. The Membership Chair schedules these events. The Membership Chair used the chapter group chat to announce dinners and coffee dates to meet *other* prospective new members in fall 2022. This was not done for Mr. Smith. Most Plaintiffs did not know Mr. Smith

was being considered for membership through the continuous open bidding process. Prior to the vote on Mr. Smith's membership, the only mention of his membership application occurred at a chapter meeting. At the meeting, the Membership Chair simply announced that Mr. Smith had asked to apply though continuous open bidding. The only written notice about a proposed dinner to meet Mr. Smith was a brief reference to a dinner in the paper minutes from the chapter meeting.

127.    The Membership Chair stated that the chapter was required to permit Mr. Smith to apply, but she downplayed any possibility that he would become a Kappa member. She said it was "nearly 100%" that he would not be offered membership. The Membership Chair also continued to state that, if Mr. Smith were to join Kappa Kappa Gamma, he could not live in the sorority house unless every other member agreed.

128.    National Sorority representatives usually have little involvement in member selection until after chapter members have voted. After that point, every prospective member must be reviewed and approved by the national Sorority; the chapter must receive "permission to initiate" each candidate. In Mr. Smith's case, however, national Sorority representatives, including the alumnae advisers, were extensively involved from the start of the continuous open bidding process. Upon information and belief, alumnae advisers coached chapter officers about the importance of Mr. Smith's admission.

C.    **The Voting Process.**

129.    Chapter leadership, with direction from alumnae advisers, implemented an illegal voting process to ensure that Mr. Smith was admitted to Kappa Kappa Gamma. Under the Standing Rules and Policies of the Sorority, chapters must use the electronic voting system selected by the national Sorority, called "Omega Recruit," when voting on new members. Attachment 7 at 1 (Standing

Rules 1.1A); Attachment 8 at 14 (Policy VIII, sec. 3.P.). This electronic voting system guarantees anonymity, and Omega Recruit was used in Spring 2022 for applicants in the continuous open bidding process. Further, under the Sorority's Standing Rules, all active chapter members "shall participate in membership selection unless excused in writing by the designated chapter adviser." Attachment 7 at 1 (Standing Rules 1.1.A.1).

130.    Voting for Mr. Smith did not follow the required procedures. All Chapter members are expected to attend the weekly Chapter meeting on Monday evening. Members can be excused if they attend a Sunday evening Chapter Council meeting where officers discuss the upcoming meeting. Plaintiff Jane Doe V and Witness IX attended the Chapter Council meeting prior to the vote on Mr. Smith's membership. At the Chapter Council meeting, officers intentionally concealed the fact that Mr. Smith's candidacy would be presented for a vote, that the chapter officers intended vote using a Google Poll, and that only those present at the chapter meeting could vote on Mr. Smith. Ms. Doe V and Witness IX would have attended the chapter meeting if they had known a vote on Mr. Smith would occur. They would have voted against Mr. Smith's admission.

131.    At the Chapter meeting on September 19, 2022, members were told that they would vote that day on Mr. Smith. Sorority rules prohibit discussion during the voting process, but this restriction was not followed for Mr. Smith. Several members of the chapter, including the President, the Membership Chair, and the Vice President for Academic Excellence, spoke prior to the vote. Each made almost identical statements that, upon information and belief, were coordinated with national Sorority officials. Each speaker stated that members could only vote against Mr. Smith if they could articulate specific concerns about his personality. If members had not met Mr. Smith, then a "no" vote was evidence that the member was a bigot. Kappa members

understand that bigotry is a basis for suspension or expulsion from the Sorority. The Membership Chair, however, had concealed the only opportunity to meet Mr. Smith. Upon information and belief, the Membership Chair, in conjunction with national Sorority officials, did so because it would permit her to threaten members if they did not vote for Mr. Smith.

132.    The members who discussed Mr. Smith at the chapter meeting repeatedly referenced "transphobia" and "homophobia." One officer stated, "[r]egardless of what your political views are, our Kappa values are acceptance and kindness so if that is something that you disagree with, that's not in line with Kappa values." When other members asked to respond, the chapter President stated, "No, no discussion." Even after this statement, the chapter President continued to recognize other members to speak about why Kappa Kappa Gamma had to admit Mr. Smith. Statements included: "You should basically be voting yes for everyone unless they truly go against Kappa's values." "It's 2022. If you vote no, it better be for, like, literal issues with that new member or else it's homophobic." "If you have something to say about this that isn't kind or respectful, keep it to yourself." "If your only concerns are about [Mr. Smith] living in the house, you are thinking too far down the road."

133.    At the end of the chapter meeting, the chapter officers described the voting process. Rather than using Omega Recruit, chapter members would vote using a link to a Google Poll. Further, even though the link to the Google Poll would be emailed to all chapter members, the officers stated that only members who had attended the chapter meeting could vote. This restriction violated the Sorority's Standing Rules.

134.    Thirty minutes after the link to the Google Poll was sent to members, the chapter officers sent out a link to a second Google Poll. This second Google Poll required voters to sign-in with

their email address. When a Google Poll is conducted in this manner, it is not a secret ballot. The Google dashboard shows when each email address logs in, and it also records how the vote total changed. In addition, during the second vote, chapter officers moved throughout the sorority house, locating some (but not all) members and instructing them to vote on their phones while the officers watched. When enough votes for Mr. Smith's membership had been secured, the voting stopped.

135.    Witness VIII voted against Mr. Smith in the first Google Poll. When she was told that she would have to vote again with her email address, Witness VIII knew that this vote would not be secret. Witness VIII believed that she would be disciplined for voting against Mr. Smith, so she changed her vote. Witness VIII voted for Mr. Smith's membership only because she feared retribution. Witness X voted against Mr. Smith's membership, and she has spoken with several other Kappa members who admitted that they also changed their votes in fear of reprisal.

136.    Mr. Smith was admitted by a margin of either one or two votes. Had the chapter conducted a lawful voting process, according to the Sorority's required procedures, Mr. Smith would not have been offered membership in Kappa Kappa Gamma.

**D.    The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies.**

137.    The day after the vote on Mr. Smith, Plaintiffs Jane Does I, III, and V as well as Witness IX approached the chapter President about the repeated assurances that Mr. Smith would not live in the sorority house unless every member agreed. The chapter President responded that she had no idea where this assurance came from, that it was false, and that she had never heard anyone make such a statement. The chapter President was standing next to the Membership Chair when the Membership Chair made this statement about housing in August 2022.

138.    Plaintiffs expressed concern that the chapter would lose other initiated and uninitiated members who do not want to live with a man. The chapter officers are seniors who will never live with Mr. Smith. They replied "we don't care about numbers." When Plaintiffs objected to Mr. Smith's membership as a violation of Kappa rules, Defendants and their agents instructed Plaintiffs to resign from Kappa Kappa Gamma if they disagreed with Mr. Smith's membership. At the time Defendants urged these Kappa members to resign, Defendants and their agents knew that Plaintiffs cannot join another Sorority.

139.    In addition to the voting process for Mr. Smith, his membership application has been evaluated using a different standard. In fall 2022, Mr. Smith had a 1.9 cumulative grade point average. This GPA is disqualifying for Kappa applicants, who must have at least a 2.7 GPA. Attachment 14 at 1 (House Bylaws, art. III, sec. 1.A.1.). Nevertheless, Mr. Smith was approved by the national Sorority. Upon information and belief, the national Sorority did not even consider whether a grade exception was necessary before admitting Mr. Smith. Mr. Smith is also not on grade probation, despite the fact that his low GPA requires probation as a condition of membership.

140.    When Plaintiffs and their parents raised concerns about Mr. Smith's presence in intimate areas of the sorority house, Sorority officials told them "just don't use the same bathroom that [Terry] uses", and "since [Terry] identifies as a woman you have no reason to feel uncomfortable." Sorority employees stated Mr. Smith's presence would be no different than a co-ed dormitory living situation. This is factually incorrect, as the co-ed dormitories at the University of Wyoming have locks and other protections for women. Sorority officials said that if Plaintiffs objected to Mr. Smith's membership, they do not subscribe to Kappa's values of inclusion and diversity.

141.    Plaintiffs reached out to Kari Kitrell Poole, the Executive Director of the Sorority, with concerns about the voting process and Mr. Smith's membership. Ms. Poole responded that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

142.    After Jane Doe I raised further concerns, she was brought before a disciplinary hearing. Chapter officers read prepared statements that they had discussed with Sorority officials and provided material so Ms. Doe I could "educate" herself. One chapter officer spent the entire hearing texting with Sorority officials on her phone. The material given to Ms. Doe I included the "Guide for Supporting our LGTBQIA+ Members." Ms. Doe I was threatened with further discipline if she did not agree that Mr. Smith is a woman or questioned whether his vote complied with the Sorority's rules. When Ms. Doe I asked questions, she was told "that's what we are supposed to do now." Witness IX has also been threatened with discipline if she does not agree that Mr. Smith is a woman.

   E.    **Mr. Smith's conduct after Defendants granted him access to the sorority house.**

143.    Since the vote, Mr. Smith has received all privileges of Kappa Kappa Gamma membership, including access to living areas that are restricted to women only. Mr. Smith participates in the weekly meetings and the secret rituals of sorority chapter; he eats at the sorority house; he participates in other all-female activities that are closed to non-members. The second floor of the sorority house is off-limits to men at all times, and it has a small common room called the "PJ," so called because members can socialize there in pajamas. Since his admission, Mr. Smith has

visited the P.J. several times, sitting alone for hours each time. At other times, members have entered the first-floor study room, turned on the lights, and found Mr. Smith asleep on the couch.

144.   Mr. Smith's conduct at the slumber party prior to the Kappa initiation ceremony for new members was inappropriate and threatening. The pledge group had agreed that Ms. Doe VI would be responsible for taking pictures of the new pledges, but Mr. Smith took the camera away and began taking pictures of the young women at awkward moments when they were not prepared. During the evening, Mr. Smith repeatedly questioned the women about what vaginas look like, breast cup size, whether some women were considering breast reductions, and birth control. Mr. Smith talked about his virginity and at what age it would be appropriate for someone to have sex. Mr. Smith also talked about kissing a girl.

145.   Mr. Smith stated that he would not be staying the night at the slumber party, but he remained after all other women had departed, saying he would not leave "until after you fall asleep." Mr. Smith was supposed to leave by 10 p.m.. At about 11:15 p.m., when the lights had been turned off and other pledges were trying to sleep, Mr. Smith started loudly singing "God Rest Ye Merry Gentlemen" by himself in the corner of the room by the light of his laptop screen. Mr. Smith did not leave until midnight.

146.   The next morning, Mr. Smith returned and stood silently in the corner of the room near the door while other pledges changed from sleeping garments into other clothing. Plaintiff Jane Doe VI did not know that Mr. Smith had returned. Ms. Doe VI had not slept wearing a bra. She faced away from the others and removed her shirt. After she had put on a new shirt, Ms. Doe VI turned around and discovered Mr. Smith staring at her. After the morning activities, other Kappa members informed Ms. Doe VI that while watching her, Mr. Smith had become sexually aroused. He stood

by the door with his hands over his genitals. Since that event, Mr. Smith has repeatedly asked Ms. Doe VI about her romantic attachments.

147.    In December 2022, Witness XI attended a yoga class sponsored by the Panhellenic union for sorority members at the University of Wyoming. Mr. Smith attended this yoga class, but he did not participate. He sat in the back of the room for an hour and watched the assembled young women flex their bodies. The door to the yoga studio was near where Mr. Smith sat, so he could have left without drawing attention or disrupting the class. Mr. Smith did not leave until the end of the one-hour class. Mr. Smith did not speak to anyone at the yoga event. After the class, participants were invited to stay for refreshments. Other participants commented on how uncomfortable they felt as Mr. Smith watched them.

148.    Witness IX has observed Mr. Smith constantly writing notes about sorority members and their statements and behavior. Mr. Smith states that he is a journalist, and he has published articles and columns in *The Branding Iron*, the campus newspaper at the University of Wyoming. Witness IX believes that Mr. Smith is recording these private comments in order to publish them at a later date.

149.    Mr. Smith uses his phone to take pictures of women in the sorority house without their knowledge or consent. In one incident, Mr. Smith walked up to a sorority member in the dining room, raised his phone to her face, took a picture, and then walked away without explanation or apology. Witness XI has observed Mr. Smith taking other pictures with his phone while eating at the house. She has seen Mr. Smith rest his phone on the table in a manner that it appears as though he is scrolling through an app when he is, in fact, covertly using the camera to photograph women.

150.    In December 2022, Witness XI submitted a letter of resignation to the chapter officers, because her interactions with Mr. Smith made her feel unsafe. She did not want to live in the sorority house with him. Shortly after submitting the letter of resignation, Witness XI determined that she valued her "women-only" sisterhood experience. Witness XI's parents offered to pay for off-campus housing, so Witness XI now pays the full cost of living in the sorority house and also pays to live in an off-campus apartment.

151.    Witness XI withdrew her letter of resignation after her parents offered to pay for her housing. The Kappa chapter officers and their alumnae advisor, however, stated that Witness XI could not do so. The alumnae advisor stated that Witness XI was required to withdraw her letter by early January 2023, when all students were gone for semester break. Witness XI objected to this interpretation of the Sorority's rules, and the Sorority's national officer for standards eventually agreed that the alumnae adviser was wrong. Witness XI was entitled to have a vote on her request to resign. The chapter members overwhelmingly voted to let Witness XI remain as a member in good standing.

152.    Before the vote by chapter members, Witness XI learned that Mr. Smith had sent a blacklist of chapter members to officials at the national Sorority headquarters. Mr. Smith's list contains the names of women he believes are transphobic and should be expelled from Kappa Kappa Gamma. Witness XI learned that her name is on Mr. Smith's list. Upon information and belief, Witness XI believes that the alumnae adviser intentionally put forward an incorrect interpretation of the Sorority rules in retaliation for her view that Mr. Smith is not a woman and not eligible to be a member of Kappa Kappa Gamma. Further, Witness XI believes that Sorority officials have made, and will continue to make, efforts to eject her and the other Kappas on Mr. Smith's list from the

Sorority. This attempt to force Witness XI out of the Sorority was in retaliation for her disagreement with Mr. Smith's membership. Mr. Smith has demonstrated and acted on his intention to pressure the Sorority, at the local and national level, to expel any member who is committed to preserving the women-only character of the Sorority.

**F.    Damages.**

153.    As a requirement of membership, Sorority members must "promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the *Bylaws, Standing Rules, and Policies* [of the Sorority] as well as my chapter Bylaws and Standing Rules." Attachment 9. (Commitment Form). Collegiate members pay dues at initiation and additional dues every year to the Sorority. Plaintiffs cannot resign from Kappa Kappa Gamma to join a different sorority. Kappa Kappa Gamma is one of the 26 sororities that comprise the National Panhellenic Conference (NPC). These sororities have all agreed a woman who joins one NPC sorority is permanently ineligible for membership in any other NPC sorority.

154.    Each Plaintiff joined Kappa Kappa Gamma with the promise they would be able to live and socialize in an all-female environment. Defendants have repeatedly lauded the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will *never* have the benefits of a college sorority experience. Some of the damages to each Plaintiff are easily calculable, including the dues and housing payments that were made for the purpose of living in an all-female environment. Some will be more difficult to calculate, but they are no less real. For 150 years, Kappa Kappa Gamma has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa Kappa Gamma has stated that these benefits result from the single-sex experience. Plaintiffs agree that these benefits exist. The

loss of these lifetime benefits is similarly calculable, and Defendants are responsible for this damage to Plaintiffs.

155.    The Sorority itself has also been damaged by Defendant Rooney and the other members of the Fraternity Council. Their violations of fiduciary duty have caused the sorority chapter at the University of Wyoming to lose significant membership in less than six months. With only ten signed housing contracts for the next academic year, the sorority house at the University of Wyoming will close and then the college chapter itself will fold. The loss of a sorority chapter has a significant effect beyond just the loss of dues from the college students there. These young women will become leaders, and—just as prior generations have—they will donate to the Sorority and its continued operation. The loss of a sorority chapter cuts off all future alumnae from that school.

156.    Plaintiffs want Kappa Kappa Gamma to remain loyal to the promises the Sorority has made throughout its history. Plaintiffs ask for a declaratory judgment that Kappa Kappa Gamma remains as it claims in its articles of incorporation: an organization "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4. Plaintiffs seek to prevent the transformation of their intimate living arrangements and their social organization—without any change in the sorority's legal documents—into a co-ed organization that admits men and women.

157.    Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs, ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each

member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty, and their contractual obligations to the Plaintiffs, by purporting to admit Mr. Smith into the Sorority.

## COUNT I

### Derivative Cause of Action

**158.**     Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**159.**     Under Ohio law, members of a nonprofit corporation can bring two types of claims. A derivative action is brought in the name of the corporation. As a general proposition, claims for breach of fiduciary duties by the corporation's directors or officers are brought as derivative suits. This is because the damage that results from the fraudulent or negligent management of the corporation is primarily damage to the corporation and to the corporate assets, and because it affects the members only indirectly and all of them alike. On the other hand, if the complaining member is injured in a way that is separate and distinct from the injury to the corporation, then the complaining member has a direct action. A distinct injury includes an injury to the member's contractual rights.

**160.**     Ohio's nonprofit-corporation law provides members of nonprofit corporations with a derivative cause of action on behalf of the corporation. When members bring a derivative cause of action against a nonprofit corporation, they are enforcing a corporate right just as shareholders may do in for-profit corporations. Because such a suit brought by a member is identical to a

shareholder-derivative suit, the procedural requirements for bringing a shareholder-derivative suit must be fulfilled by members of a nonprofit corporation who bring such a derivative suit.

161.    Rule 23.1 establishes the requirements for maintaining a shareholders' derivative action. Specifically, complaining shareholders must (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort or did not make it, and (3) show that they "fairly and adequately" represent the interests of other shareholders "similarly situated."

162.    The Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma, since the corporation's creation, have limited membership to women only. Women, as understood throughout the Sorority's existence, are adult female human beings. Mr. Smith is not a woman. He is a man.

163.    By not only allowing, but also by endorsing and actively working to secure the membership of Mr. Smith, the directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance to the nonprofit corporation they lead.

164.    Plaintiffs have repeatedly reached out to Kappa Kappa Gamma's leadership to contest its refusal to enforce the Sorority's membership requirements. Defendants have not only refused to prevent Mr. Smith's membership, they maintain that no such membership requirement exists at all. To the extent any further demand is required, such a demand would have been futile.

165.    As a result of Defendant's behavior, Kappa Kappa Gamma has lost its identity as an organization for women. At the University of Wyoming chapter, almost half of the women who were offered membership in the Sorority in Fall 2022 have declined to become members. During Spring 2023 recruitment, only two women pledged to join the Sorority at the University of Wyoming. Upon information and belief, the insistence on admitting men to the Sorority has also

resulted in a significant decline in alumnae giving, membership, and participation. These changes have also harmed the ability of Kappa Kappa Gamma chapters across the nation to recruit new members.

166.    The chapter at the University of Wyoming no longer has enough members to be financially viable, and the behavior of Defendant Rooney and the other Fraternity Council members will result in the chapter's closure unless the Court intervenes. Plaintiffs seek monetary, declaratory, and injunctive relief, as well as such fees and costs as are available.

## COUNT II

### Breach of Contract

167.    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

168.    To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages.

169.    Defendant Kappa Kappa Gamma Building Co. and Plaintiffs have entered into contracts to provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. These Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house. Indeed, men cannot enter the living areas of the Sorority except upon special circumstances that have been approved in advance.

170.    Mr. Smith's access to and presence in the sorority house violates the housing contract that Plaintiffs signed.

171.    Plaintiffs have suffered damages as a result of this breach.

## COUNT III

### Tortious Interference with a Contract

**172.**    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**173.**    A claim of tortious interference with a contract requires (1) existence of the contract; (2) Defendant's knowledge of the contract; (3) intentional and improper interference *inducing or causing a breach*; and (4) resulting damages.

**174.**    Defendant Kappa Kappa Gamma knew that Plaintiffs have a contract for housing with Kappa Kappa Gamma Building Co. Defendants knew, because they required this language  in the contract, that the contract parties to comply with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. Through their initiation of Mr. Smith, Defendants have prevented Plaintiffs from having the benefit of the Housing Contract that they signed. Plaintiffs have suffered damages as a result of this breach.

## COUNT IV

### Direct Cause of Action

**175.**    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**176.**    When wrongful acts are not only against the corporation but are also violations of a duty arising from contract or otherwise owed directly by the wrongdoer to the shareholder, the shareholder can bring suit for personal damages or other relief.

**177.**    The Plaintiffs were deceived, believing that they were joining a woman-only organization, and they are now ineligible to join a different Sorority. Plaintiffs are now deprived of the all-female

environment that other Kappa members have enjoyed throughout the Sorority's 150 year history. Plaintiffs are now required, as a condition of membership, to reside in the same house as a 6'2", 260 pound man who stares at them, asks about their intimate past, makes notes about their statements and takes photographs of them without their consent, and intimidates them by threatening to publicly label them bigots if they raise concerns.

178.     Plaintiffs' loss of privacy, frustration of contractual expectations, and emotional distress are not injuries that Plaintiffs share in common with all Sorority members. They are, however, the direct result of Defendants' actions to force the admission of Mr. Smith as a sorority member.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

1.       A declaratory judgment that, under the organization's corporate governance documents, including its Bylaws, Standing Rules and Policies, men who identify as women, such as Mr. Smith, are not eligible for membership in Kappa Kappa Gamma Fraternity and his purported admission is therefore void *ab initio*.

2.       A declaratory judgment that the Defendants have violated their obligations to the organization by purporting to admit Mr. Smith to the Sorority.

3.       A declaratory judgment that the Defendants have violated the housing contract and Plaintiffs are entitled to the money damages they have suffered as a result thereof.

4.       Preliminary and permanent injunctive relief invalidating Mr. Smith's membership and prohibiting any man from being a member of the Sorority.

5.       Monetary damages to compensate for Defendants' wrongful acts.

6.      Plaintiffs' reasonable costs and attorneys' fees pursuant to applicable contractual

language, statute or authority, and further relief this Court may grant in its discretion.

7.      Any other relief that the Court deems just and appropriate.


Respectfully submitted,


Cassie Craven                              John Knepper
Wyoming Bar No. 7-5664                     Wyoming Bar No. 7-4608
Longhorn Law Limited Liability Company     Law Office of John G. Knepper, LLC
109 E. 17th St., Suite 11                  P.O. Box 1512
Cheyenne, Wyoming 82001                    Cheyenne, Wyoming 82003
307-823-3062                               307-632-2842
cassie@longhornlawllc.com                  John@KnepperLLC.com


Dated this 27th day of March, 2023.

**VERIFICATION**

I, _Jane Doe 1_, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _3/22/23_                    Signed: _Jane Doe 1_

I, _Jane Doe 2_, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _3/22/2023_                    Signed: _Jaune doe_

I, _Jane Doe 3_, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _3/22/23_                    Signed: _Jane Doe 3_

I, _Jane Doe 4_, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _3/22/2023_                    Signed: _Jane doe_

I, _Jane Doe 5_ , hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/22/23                    Signed: _Jane Doe 5_

I, _Jane Doe 6_ , hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/22/2023                    Signed: _Jane Doe 6_

I, _Jane Doe 7_ , hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/22/2023                    Signed:

_Jane Doe_

# ATTACHMENT 1

# Bylaws of
# Kappa Kappa Gamma Fraternity



Adopted by the 2004 General Convention.
Revised 2006, 2008, 2010, 2012, 2014, 2016, 2018, and **2022** General Conventions.

Kappa Kappa Gamma
is an organization of women, which
seeks for every member throughout her life
bonds of friendship, mutual support,
opportunities for self-growth, respect
for intellectual development,
and an understanding of and an allegiance
to positive ethical principles.

Mission Statement
(Written by the 1984–86 Fraternity Council)

FRATERNITY BYLAWS REVISION

Preamble ........................................................................................................................ 1
Article I. Name ............................................................................................................... 1
Article II. Purpose .......................................................................................................... 1
Article III. Members ....................................................................................................... 2
Article IV. Fraternity Organization ................................................................................ 6
Article V. Member, Chapter, and Association Responsibilities ..................................... 9
Article VI. Officers ....................................................................................................... 11
Article VII. Nominations and Elections ....................................................................... 12
Article VIII. Meetings ................................................................................................... 13
Article IX. Fraternity Council ....................................................................................... 14
Article X. Committees .................................................................................................. 15
Article XI. Content Areas ............................................................................................. 16
Article XII. Administrative Operations ........................................................................ 17
Article XIII. Finance ..................................................................................................... 17
Article XIV. Proprietary Materials ............................................................................... 17
Article XV. National Panhellenic Conference .............................................................. 18
Article XVI. Indemnification ........................................................................................ 18
Article XVII. Dissolution ............................................................................................... 18
Article XVIII. Electronic Meetings and Communications ............................................. 19
Article XIX. Nonprofit Corporation .............................................................................. 19
Article XX. Kappa Kappa Gamma Foundation .............................................................. 19
Article XXI. Fraternity Housing Corporation ................................................................ 19
Article XXII. Chapter House Corporation and Chapter House Association ................... 19
Article XXIII. Parliamentary Authority ......................................................................... 20
Article XXIV. Amendment of *Articles of Incorporation* and *Bylaws* ......................... 20
Provisos Relating to Transition .................................................................................... 21

22.09

FRATERNITY BYLAWS REVISION

## PREAMBLE

We, believing a closer union in the bonds of friendship to be for our mutual benefit, appreciating the advantages to be derived from a secret fraternity, and feeling that in union there is strength, hereby form ourselves into a social sorority for the development of nobler qualities of the mind and finer feelings of the heart, and for mutual helpfulness in the attainment of individual and social excellence.

## BYLAWS OF
## KAPPA KAPPA GAMMA FRATERNITY

### ARTICLE I
### NAME

The name of the corporation shall be Kappa Kappa Gamma Fraternity, hereinafter referred to as *the Fraternity.*

### ARTICLE II
### PURPOSE

The Fraternity is formed to function exclusively as an organization described in Section 501(c)(7) of the Internal Revenue Code of 1986 as amended (or corresponding provisions of any future United States internal revenue law) (the "Code"). The purposes for which the Fraternity is formed are:

to unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity at large may attain social, moral and intellectual excellence;

to establish chapters at various colleges and universities, provide for their proper organization, installation and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

to cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest and promote higher standards of social conduct;

to cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

to advocate for and seek to address issues of concern for members and women in general;

to provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and

to have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

22.09

FRATERNITY BYLAWS REVISION

Notwithstanding anything to the contrary contained in these articles, the corporation shall not carry on any activities not permitted to be carried on by a corporation exempt from federal income tax under Code Section 501(a) as an organization described in Code Section 501(c)(7).

## ARTICLE III
## MEMBERS

**Section 1. Classifications of Members.** The Fraternity shall have the following classifications of members:

A. **New Member.** A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated. A new member shall:
   1. Have signed a dated, written pledge to membership witnessed in writing by an active or alumna member of the Fraternity;
   2. Remain eligible as a new member for a term of one year before the pledge to membership expires so long as enrolled in the same college or university; and
   3. Have the right to attend meetings, speak in debate and present their views to a committee on a referred question but shall not vote on any question. A new member shall not be present at a meeting during ritual for initiated members.

B. **Active.** An active member shall be:
   1. An undergraduate enrolled at the college or university where initiated;
   2. A member enrolled beyond the fourth academic year who chooses to remain an active member;
   3. A graduate student who chooses to remain an active member;
   4. A graduate student initiated while pursuing graduate courses;
   5. An undergraduate member who enrolls in a college or university where a chapter of the Fraternity is located and affiliates with such a chapter; or
   6. An undergraduate member who returns to college or university after an absence of two or more years and who has completed at least one academic term and had their active membership restored by a three-fourths vote of the chapter.

C. **Associate.** An associate member shall be:
   1. An active member who transfers to a college or university:
      a. With an active chapter and who does not affiliate with the chapter; or
      b. Where no chapter is located;
   2. An active member who has been granted Associate Membership by the District Director after receiving Advisory Board's approval; or
   3. An active member who is unable to participate in chapter activities because they are:
      a. Studying abroad; or
      b. Completing a full-time co-op or internship.

D. **Alumna.** An alumna member shall be:
   1. An active member who has received a college degree or has left college without receiving a degree;
   2. An active member enrolled beyond the fourth academic year who chooses to become an alumna member;

FRATERNITY BYLAWS REVISION

    3. An active member still attending college when Fraternity Council has deemed it necessary to reorganize the chapter;
    4. A member of a petitioning group who has been initiated into the Fraternity as an alumna; or
    5. An individual who initiates through Alumna Initiation.

**Section 2. Qualifications.** A woman may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.

  **A. Collegiate New Member and Alumna Candidate.** To qualify as either a collegiate new member or an alumna candidate, a woman shall:
    1. Have demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals;
    2. Not be pledged to membership or be a member of any similar college or university women's social sorority except honorary or professional organizations;
    3. Not have been initiated into any other member group of the National Panhellenic Conference;
    4. Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements; or
    5. Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity *Bylaws*, *Standing Rules* and *Policies*.

  **B. Collegiate New Member.** To qualify as a collegiate new member, a woman shall also:
    1. Be enrolled at any college or university having a chapter of the Fraternity; and
    2. Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B-minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

  **C. Alumna Candidate.** To qualify as an alumna candidate, a woman shall also:
    1. Have attended a four-year college or university; and
    2. Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

**Section 3. Initiation.** A new member, upon fulfilling the requirements for Initiation, shall be initiated and become a member of the Fraternity. Each new initiate shall receive a certificate of membership.

  **A. Requirements for Initiation.**
    1. A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational institution may be initiated. In extraordinary cases, chapters may petition the Membership Director for an exception to these requirements.

22.09

FRATERNITY BYLAWS REVISION

    2. An alumna candidate who has completed a period of education and has met all financial obligations may be initiated.

    3. The new member or candidate shall make provision for securing a badge before Initiation.

**B. Special Circumstances.** A college alumna previously pledged to membership may petition Fraternity Council no sooner than five years after the expiration of the pledge to membership. Initiation under these special circumstances shall be granted upon a three-fourths vote of Fraternity Council. Such an alumna shall become a member of the original chapter to which they were pledged.

**Section 4. Affiliation.** A member who transfers to a college or university with a chapter may affiliate with the chapter at that college or university provided that a statement of the member's good standing has been received from the original chapter. A majority vote of the affiliated chapter shall be required. Upon leaving college, the member shall be considered a member of both the original chapter and the affiliated chapter.

**Section 5. Voluntary Resignation, Broken Pledge, Resignation and Dismissal.**

**A. Voluntary Resignation.**

    1. **New Member.** A new member wishing to resign from their pledge to membership shall submit the resignation in writing and shall state the reason(s) for the resignation. The chapter shall accept such resignation and notify the new member, the Standards Specialist and Kappa Kappa Gamma Headquarters.

    2. **Active, Associate and Alumna Member.** An active, associate or alumna member wishing to resign from membership shall submit the resignation in writing and shall state the reason(s) for the resignation.

**B. Broken Pledge, Requested Resignation and Dismissal.**

    1. **New Member.** A new member's pledge to membership may be broken with or without prior Probation by a three-fourths vote of the chapter.

    2. **Active Member.** An active member may be requested to resign or may be dismissed for violating the purposes and standards of the Fraternity or the regulations of the college or university. A three-fourths vote of the chapter shall be required.

    3. **Associate or Alumna Member.** An associate or alumna member may be dismissed for violating the purposes and standards of the Fraternity by a three-fourths vote of the chapter or Fraternity Council depending on the member's classification or affiliation.

**Section 6. Reinstatement or Renewal.**

**A. Active, Alumna and Associate Member.**

    1. **Reinstatement After Voluntary Resignation.** Reinstatement shall require a three-fourths vote of Fraternity Council for a former member who voluntarily resigned and is applying in writing for reinstatement no sooner than three years after resignation.

22.09

FRATERNITY BYLAWS REVISION

    2. **Reinstatement After Requested Resignation or Dismissal.** Reinstatement shall require a unanimous vote of Fraternity Council for a former member who was requested to resign or was dismissed and is applying in writing for reinstatement no sooner than five years after resignation or dismissal.

  **B.** **New Member Renewal.** The expired pledge period of a new member may be renewed by a three-fourths vote of the chapter.

**Section 7. Direct Fraternity Council Action.**

  **A.** **Fraternity Council Action.** By a three-fourths vote, Fraternity Council may take direct action against a new or active member in the breaking of a pledge to membership; by requesting a member's resignation; or by dismissing a new, active, associate or alumna member. The member shall be notified of the reason(s) for the proposed action and be provided an opportunity to respond.

  **B.** **Decision Final.** Fraternity Council's decision shall be final and binding upon the member and the Fraternity and shall not be subject to review by any other body.

**Section 8. Fees.**

  **A.** **New Member Fee.** Each new member, alumna initiate, active member and alumna of a petitioning group shall pay a member fee of $175 within one month after signing the pledge to membership and before Initiation.

  **B.** **Renewal Fee.** A renewal fee of $50 and new member fee of $175 shall be required for any woman repledged to membership. The Fraternity Membership Director may grant exceptions under unusual circumstances.

  **C.** **Annual Per Capita Fee.**

    1. Active member: $97
    2. Active member granted Associate Membership: $97
    3. Alumna member: $35
    4. Alumna member within eight years of their initiation date (excluding alumna initiates) or members who have reached their 65-year member milestone: $25
    5. The annual per capita fee shall be calculated each year, as of January 1, by the annual cost of living adjustment (COLA) and shall be calculated utilizing the Consumer Price Index for All Urban Consumers (CPI-U). The per capita fee shall be rounded to the nearest dollar. If the COLA decreases, the per capita fee shall remain the same as the previous year. If the COLA is more than 10%, the per capita fee increase shall be capped at 10%. Notification that the fee shall be effective at the beginning of the next fiscal year shall be sent to members, chapters, and alumnae associations by February 1. This increase shall take effect at the beginning of the fiscal year, July 1.

  **D.** **Reinstatement Fee.** The reinstatement fee for a former member shall be $300, payable upon reinstatement.

22.09

FRATERNITY BYLAWS REVISION

## ARTICLE IV
## FRATERNITY ORGANIZATION

**Section 1. Districts.** The Fraternity shall be organized into districts determined by Fraternity Council for the purposes of providing leadership, membership retention and extension, and development of Fraternity interests.

A.   **District Directors.** District Directors shall be elected, and their number shall correspond to the number of districts defined by Fraternity Council. Fraternity Council shall assign the director for each district. District Directors shall supervise the operation and management of chapters and alumnae associations within their assigned districts and may report on recommendations to Fraternity Council.

1.   **Qualifications.** Each District Director shall be an alumna who has served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) a former Regional Director or Province Director; 3) a District Director or Content Director; 4) a Content Specialist; 5) a member of a Fraternity standing or special committee; 6) a former Fraternity Council Assistant; 7) a Field Representative; 8) a member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) a member of the Fraternity Housing Corporation Board of Directors.

2.   **Term of Office and Term Limits.** District Directors shall take office at the close of the Biennial Convention. A District Director shall hold office for a term of two years or until their successor is elected and shall be eligible for re-election to the same office for two additional terms.

3.   **Temporary Absence.** In the event a District Director is temporarily unable to perform the duties of office, Fraternity Council shall assign such duties to another District Director or another member of the Fraternity.

4.   **Request for Resignation or Removal from Office.** Any District Director failing to perform the duties of office may be requested to resign from office or may be removed from office when, in the opinion of the President and a three-fourths vote of Fraternity Council, the welfare of the Fraternity demands it. The District Director shall be given the opportunity to provide a defense.

B.   **District Director Meetings.** The District Directors shall hold at least one meeting in the interim between Biennial Conventions.

**Section 2. Chapters.**

A.   **Purpose.** Chapters shall be established in connection with colleges and universities to carry out the purpose of the Fraternity.

B.   **Members.**

1.   **Member Classifications.** Chapter members shall be active, associate, and new members of the Fraternity.

2.   **Chapter Membership Selection.** Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures.

C.   **Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or

FRATERNITY BYLAWS REVISION

functional areas: internal affairs, external affairs, operations, membership, membership development, finance, and standards.[1]

D. **Required Officers.** Chapter officers shall be a President and a vice president for each department or functional area. A chapter may combine chapter officer positions and have other officers as needed in the administration of the chapter with the approval of the Leadership Development Specialist.[2]

E. **Officer Eligibility.** A chapter member meeting all membership responsibilities and having attained at least a B-minus average or its equivalent in the previous term shall be eligible for election to office and to remain in office if elected. The chapter may establish a higher grade point average for officer eligibility. In either case, an exception for failure to meet the higher of the two standards may be granted by the Academic Excellence Specialist or Standards Specialist, in consultation with the District Director.

F. **Meetings.** Chapters shall meet regularly during the academic year and shall hold a formal meeting using ritual for initiated members at least once a month.

G. **Governance.** Each chapter shall adopt bylaws and standing rules for its governance that shall be approved by the Fraternity Bylaws Committee before becoming effective. Bylaws, standing rules, and amendments adopted thereafter, shall be approved by the Fraternity Bylaws Committee before becoming effective.

H. **Convention Representation.** Each chapter shall elect one delegate and two alternates to attend a Convention. Only the delegate shall represent the chapter with the right to vote.

I. **College Panhellenic Association.** A chapter shall be a member of its host institution's College Panhellenic Association, an affiliate of the National Panhellenic Conference, and shall be represented by a delegate from the chapter. If the delegate is unable to provide representation, an alternate shall represent the chapter.

J. **Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the chapter. The board shall be composed of a chairman, alumna advisers to Executive Board and vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director, and in consultation with the Leadership Development and Advisory Board Directors.

K. **Establishing a New Chapter.**
   1. A new chapter may be established:
      a. By membership selection directed by Fraternity Council.
      b. Upon receipt of a petition from a qualified group of women. Members of the petitioning group, both current and previous, shall be eligible to become members of the Fraternity.
   2. Upon establishment, a new chapter shall join the Fraternity Housing Corporation.

---

[1] Effective with the chapter election cycle of 2022–23.
[2] ibid

FRATERNITY BYLAWS REVISION

L. **Removal of a Chapter.**
   1. **Initiating the Removal by Fraternity Council.** By a three-fourths vote, Fraternity Council may initiate the removal of a chapter.
   2. **Vote to Remove a Chapter.** The removal of a chapter shall require a 30-day notice and a three-fourths vote of each District Director, each Content Director, each standing committee chairman, and each Content Specialist in the district where the chapter is located.

M. **Surrender of Charter.** A chapter may petition to sever connection with the Fraternity by presenting a written request to Fraternity Council stating reasons in full and signed by three-fourths of the active members of the chapter and three-fourths of the chapter Advisory Board.
   1. **Fraternity Council Action.** By a three-fourths vote, Fraternity Council may accept the petition and agree to the surrender of the chapter charter or may condition surrender on additional actions before accepting the surrender of the charter.
   2. **Chapter Requirements.** If the request to surrender a charter is accepted, the charter shall be withdrawn when the chapter has fulfilled all financial obligations, transferred chapter assets according to the current Fraternity Financial Policies, returned all records and archives, and returned the charter.

N. **Return of Chapter Charter and Archives.** Whether a charter is surrendered by the chapter or removed by the Fraternity, the District Director shall take charge of the chapter charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

O. **Reestablishment of a Chapter.** Fraternity Council shall appoint a special committee to investigate the request for reestablishment of a former chapter. A three-fourths vote of Fraternity Council shall be required to reestablish a former chapter. All reestablished chapters shall join the Fraternity Housing Corporation.

P. **Reorganization of a Chapter.** The reorganization of a chapter shall occur when Fraternity Council deems it is in the best interest of the chapter and the Fraternity. Any current active member of the chapter may be designated an alumna and shall remain an alumna unless otherwise designated by Fraternity Council.

**Section 3. Alumnae Associations.**
   A. **Purpose.** Fraternity alumnae may organize as associations to further the work of the Fraternity and extend friendship to all members.
   B. **Officers.** The officers of an association shall be a President, Secretary, Treasurer, and such other officers as may be considered necessary.
   C. **Meetings.** An association shall hold at least four meetings during the year. At least two of these shall be open to the entire membership.
   D. **Association Governance.** Each association shall adopt bylaws for its governance.
   E. **Convention Representation.** Each association shall be entitled to be represented by one delegate at any Convention.
   F. **Alumnae Panhellenic Associations.** If a local Alumnae Panhellenic Association, which is affiliated with the National Panhellenic Conference, exists, an alumnae association of

FRATERNITY BYLAWS REVISION

the Fraternity shall become a member and may send representatives to the Alumnae Panhellenic meetings.

G. **Establishing New Associations.** A group of alumnae may form a petitioning group and petition Fraternity Council to establish an association. A three-fourths vote of Fraternity Council shall be necessary to establish an association. The date of Fraternity Council approval of the application shall be considered the date of establishment.

H. **Surrender of Charter.** An association voting to disband shall give three months' notice in writing of such intention to the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. At the end of this period, provided the request to disband has not been withdrawn, the charter shall be surrendered.

I. **Withdrawal of a Charter.** An association that has failed to fulfill its responsibilities or failed to meet the Fraternity financial standards or the standards of conduct shall have the charter of the association withdrawn upon the recommendations to Fraternity Council by the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. A three-fourths vote by Fraternity Council shall be required to approve the withdrawal of the charter.

J. **Return of Association Charter and Archives.** Whether a charter is surrendered by the association or withdrawn by the Fraternity, the Alumna Relations Specialist shall take charge of the association charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

K. **Reestablishment of an Alumnae Association.** An association that has surrendered its charter or had its charter withdrawn may be reestablished by a three-fourths vote of Fraternity Council.

## ARTICLE V
## MEMBER, CHAPTER, AND ASSOCIATION RESPONSIBILITIES

**Section 1. Overview.** Members and the chapters and associations to which they belong shall comply with all federal, state or provincial laws and college or regulations where applicable and shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct.

**Section 2. Legal Compliance.** Members, chapters, and associations of the Fraternity shall adhere to local, state, provincial, and federal laws with a specific emphasis on the following:

A. **Hazing.** Participating in or being involved in any way with hazing — defined as any activity or action taken with or without consent of the individual involved that produces mental, emotional, psychological, or physical discomfort, intimidation, humiliation, degradation, embarrassment, harassment, or ridicule — shall be prohibited.

B. **Alcohol.** The illegal use or misuse of alcoholic beverages shall be prohibited.

C. **Drugs.** The use, sale, purchase or possession of any drugs or other controlled substance in violation of local, state, provincial or federal law shall be prohibited.

D. **Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall

22.09

be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

**Section 3. College or University Regulations.** Collegiate chapters and their members shall adhere to all rules or regulations stipulated by the college or university even when the rules or regulations are more stringent than the standards of the Fraternity.

**Section 4. Academic Excellence.** Chapters and individual members shall meet, maintain, or exceed chapter-specific academic standards.

    **A.** **Chapter Standard.** Each chapter shall maintain a scholastic average equal to or higher than the university or college all-sorority average.

    **B.** **Active Member Standard.** Each chapter shall establish a minimum GPA requirement for active members. Each active member of a chapter shall meet or exceed the chapter-specific GPA requirement.

**Section 5. Finance.** Individual members, chapters, and associations shall remain current with all financial obligations as established by a chapter, an association, or the Fraternity.

**Section 6. Conduct.** Individual members, chapters, and associations shall act with high standards of ethical conduct that represent the values of the Fraternity.

**Section 7. Accountability.**

    **A.** **Overview.** The purpose of holding a member, chapter, or association accountable for inappropriate conduct shall be established to protect the integrity and prestige of the Fraternity.

    **B.** **Process.** The Fraternity shall develop and implement procedures for the enforcement of the responsibilities and expectations enumerated herein that shall afford fairness and respect to the member, chapter, or association.

    **C.** **Outcome.** The outcome of the process may be a Warning of Probation, Probation, Suspension, and in extreme cases, dismissal of a member from the Fraternity or removal of a chapter or association.

**Section 8. Good Standing.**

    **A.** **Member.** A member meeting all member standards and responsibilities, academic, financial and conduct, and not under any accountability outcome is a member in good standing and, therefore, eligible for any elected, appointed, or volunteer position within the Fraternity.

    **B.** **Chapter.** A chapter meeting the standards for responsibility, academic and conduct, its financial and reporting obligations and that is not on Probation or Suspension shall be a chapter in good standing, eligible for awards and representation at Convention, and shall have the right to a vote.

22.09

FRATERNITY BYLAWS REVISION

**C.   Association.** An association meeting its financial and reporting obligations and that maintains standards of conduct shall be an association in good standing, and eligible for awards and representation at Convention, and shall have the right to a vote.

**Section 9. Conflict of Interest.** Any member serving in an elected, appointed or volunteer position with the Fraternity, the Kappa Kappa Gamma Foundation, the Fraternity Housing Corporation, any chapter, any alumnae association, or similar entity affiliated or associated with these entities under any chapter, license franchise or similar arrangement shall maintain high standards of ethical conduct in performing their duties and shall avoid situations where their financial or personal interests or professional obligations interfere or appear to interfere with the interests of the Fraternity. They shall not use Fraternity property, information, or position for personal gain or violate Fraternity expectations of confidentiality.

**ARTICLE VI**
**OFFICERS**

**Section 1. Officers.** The officers of the Fraternity shall be a President, four Vice Presidents, and a Treasurer.

**Section 2. Qualifications.** Officers shall be alumna members who have formerly served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) Regional Director or Province Director; 3) District Director or Content Director; 4) Content Specialist; 5) chairman or member of a Fraternity standing or special committee; 6) Fraternity Council Assistant; 7) Field Representative; 8) member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) member of the Fraternity Housing Corporation Board of Directors.

**Section 3. Term of Office and Term Limits.** Officers shall take office at the close of the Biennial Convention and shall hold office for a term of two years or until their successors are elected. The President and Treasurer may be elected to the same office for no more than two terms. The Vice Presidents may be elected to the same office for no more than three terms.

**Section 4. Officer Transition Meeting.** Following an election and prior to Convention, outgoing Fraternity Council shall host at least one transition meeting with newly elected Fraternity Council members.

**Section 5. Vacancies and Temporary Absences.**
  **A.   Vacancies.**
      1.   **President.** At the first Fraternity Council meeting following the Biennial Convention, by a three-fourths vote, Fraternity Council shall designate one of the Vice Presidents to assume the presidency if a permanent vacancy occurs in the office and to preside at meetings if the President is absent.

22.09

FRATERNITY BYLAWS REVISION

    2. **Other Officers.** By a three-fourths vote, a vacancy in any office other than the President shall be filled for the unexpired term by Fraternity Council.

**B. Temporary Absences.** In the event an officer other than the President is temporarily unable to perform the duties of their office, Fraternity Council shall assign such duties to another member of Fraternity Council or to another member of the Fraternity who shall have the right to vote.

**Section 6. Request for Resignation or Removal From Office.** An officer may be requested to resign from office or shall be removed from office when the welfare of the Fraternity necessitates it. A three-fourths vote of Fraternity Council shall be required. The officer shall be given the opportunity to provide a defense.

### ARTICLE VII
### NOMINATIONS AND ELECTIONS

**Section 1. Nominations.** Nominees for each officer and District Director shall be determined by the Leadership Selection Committee.

**A. Committee Composition.** The Leadership Selection Committee shall be composed of a chairman, a vice chairman and an equal number of alumnae association and chapter representatives. One member, collegiate or alumna, shall be appointed from each district.

    1. **Chairman and Vice Chairman.** Fraternity Council shall appoint the Leadership Selection Committee Chairman and Vice Chairman following the Convention. These positions shall be nonvoting members of the committee except in the case where the chairman may vote to break a tie.

    2. **Members.** Fraternity Council shall appoint chapter and association representatives as members of the committee in February following Convention based on applications. The Leadership Education and Development Committee shall receive and review applications and make recommendations to Fraternity Council.

    3. **Equal Number of Collegiate and Alumna Representatives.** One representative, collegiate or alumna, shall be appointed from each district with an equal number of collegiate and alumna representatives.

    4. **Alternating Each Biennium.** In one biennium, one chapter representative shall be appointed from districts Alpha, Beta, Delta, Eta, Theta, Mu, and Pi and one alumna representative appointed from districts Gamma, Kappa, Lambda, Epsilon, Zeta, Xi, and Rho. In the next biennium, chapter representatives shall be appointed from the second group of districts and the alumna representative from the first group, subsequently alternating each biennium.

**B. Nominee Selection.** The Leadership Selection Committee shall nominate one candidate for each officer and District Director position based on recommendations received from members and applications received from candidates.

**C. Nominations Report.** The report of the Leadership Selection Committee shall be prepared and communicated to eligible voters no less than 12 weeks prior to the Convention.

FRATERNITY BYLAWS REVISION

**D.    Open Nominations.** Following the publication of the report, open nominations from eligible voters shall be accepted for at least 10 days, provided the consent of the nominee has been obtained and the member is qualified.

**Section 2. Elections.** Fraternity Council shall determine the dates and times for the election. The election shall be completed at least eight weeks prior to the Biennial Convention.

**A.    Eligible Voters.** Members eligible to vote in an election shall be those members who are eligible to vote according to Article VII, Section 2, E., and who have been credentialed as delegates for the purpose of voting in the election of officers.

**B.    Voting.** The election shall be conducted electronically utilizing an online voting and election software application. The candidate for each officer and District Director position receiving the most votes shall be elected provided such candidate receives a majority of the votes cast for that position.

**C.    Election Committee.** An Election Committee comprised of nonvoting members and appointed by Fraternity Council shall oversee and coordinate the election process in conjunction with the Executive Director. The report of the election results shall be sent electronically to the membership within five business days following the close of voting and shall be published on the Fraternity website.

**ARTICLE VIII**
**MEETINGS**

**Section 1. Membership Meetings.** Membership meetings shall be a Convention at which the rights and authority of members shall be vested in the voting members of the Convention.

**Section 2. Convention.**

**A.    Regular Meeting.** The regular meeting of the membership of the Fraternity shall be a Convention that shall be held biennially in even-numbered years. Fraternity Council shall determine the date, time, and place.

**B.    Special Meeting.** A special meeting of the membership may be called by a unanimous vote of Fraternity Council and shall be called upon the written request of a majority of the chapters and alumnae associations.

**C.    Notice of Meetings.** Notice of meetings, both regular and special, shall be sent to all voting members, chapters, and alumnae associations entitled to representation at such meetings.

    1.    **Regular Meeting.** The notice shall state the date, time, and place, and shall be given not less than three months prior to the meeting date.

    2.    **Special Meeting.** The notice shall state the date, time, and place, and shall be given not less than one month prior to the meeting date. Notice of a special meeting shall include the purpose of the meeting.

**D.    Postponement or Cancellation of a Meeting.** In cases of emergency, Fraternity Council, by a unanimous vote, may postpone or cancel a previously noticed Convention meeting. When a meeting is canceled, it shall become the duty of Fraternity Council to reschedule the canceled meeting as soon as conditions permit.

FRATERNITY BYLAWS REVISION

  **E.**  **Voting Members.** The voting members of the Convention shall be composed of the following Fraternity members who are registered delegates, entitled to one vote and voting in person:

    1.  Fraternity Council members
    2.  District Directors
    3.  Chairmen of standing committees
    4.  Content Directors
    5.  One delegate from each chapter
    6.  One delegate from each alumnae association

  **F.**  **Alumnae Associations Vote Value.** If the total number of registered alumnae association delegates present exceeds the total number of registered chapter delegates present, the value of the alumnae associations' total votes in any vote taken shall be reduced by the proportion of registered chapter delegates to registered alumnae association delegates.

  **G.**  **Vote and Voting.** A majority vote shall decide in all cases except where otherwise specifically provided. There shall be no absentee voting or voting by proxy.

  **H.**  **Quorum.** The quorum at any meeting of any Convention shall be a majority of the eligible voting members.

  **I.**  **Nonvoting Members.** The privilege of speaking may be granted to a nonvoting member of a Convention at the discretion of the President.

**Section 3. Enacted Business.** Any item of business brought before and acted upon by any Convention shall not be changed with the exception of emergency powers granted to Fraternity Council.

### ARTICLE IX
### FRATERNITY COUNCIL

**Section 1. Composition.** The members of Fraternity Council shall be the officers of the Fraternity: the President, the four Vice Presidents, and the Treasurer.

**Section 2. Duties.** Except as otherwise provided by law, the *Articles of Incorporation* or these bylaws, all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law. Fraternity Council shall:

  **A.**  Exercise the rights of the Fraternity as a shareholder, member, holder, or other ownership interest in any other entity;

  **B.**  Elect representatives to serve on the Board of Trustees as provided for in the Code of Regulations of the Kappa Kappa Gamma Foundation; and

  **C.**  Elect representatives to serve on the Board of Directors as provided for in the Code of Regulations of the Fraternity Housing Corporation.

**Section 3. Emergency Powers.** If Fraternity Council determines in the interval between Biennial Conventions that an emergency exists that ordinarily requires action by a vote of the

22.09

FRATERNITY BYLAWS REVISION

Convention, Fraternity Council may exercise the voting power vested in the Convention. Any such action shall be reported to the next Biennial Convention.

**Section 4. Meetings.**
A. **Called Meeting.** A Fraternity Council meeting may be called by the President and shall be called upon the request of a majority of its members. Reasonable notice of date, time and place of a meeting shall be sent to each Fraternity Council member.
B. **Quorum.** A majority of the members of Fraternity Council shall constitute a quorum.
C. **Business Without a Meeting.** Fraternity Council may conduct business without a meeting as long as the decisions are written, signed, and unanimous.
D. **Voting.** There shall be no absentee voting or voting by proxy.

**ARTICLE X**
**COMMITTEES**

**Section 1. Standing Committees.** The standing committees of the Fraternity, appointed by and under the supervision of Fraternity Council, shall be Bylaws, Convention, Finance, *The Key* Publication, Leadership Education and Development, and Panhellenic.

**Section 2. Special Committees.** Special committees may be established by the membership meeting in Convention or by Fraternity Council.

**Section 3. Composition of Committees.**
A. **General Composition.** Each committee shall be composed of a chairman and members appointed by Fraternity Council.
B. **Finance Committee Composition and Term.** The Finance Committee shall be composed of the committee chairman, the Fraternity Treasurer, the Fraternity Facilities Director, and at least three other persons, one of whom may be a nonmember qualified by experience in financial operations. Members shall serve for a term of three years or until their successors are appointed. One-third of the appointees shall be appointed each year. No member shall serve for more than two consecutive terms.

**Section 4. Appointment and Term of Office.** Except as otherwise specifically provided here, standing committee chairmen and members shall be appointed by Fraternity Council, shall take office immediately upon appointment following the Biennial Convention, and shall remain in office for a term of two years, except for Finance Committee members, who serve for three years or until their successors are appointed.

**Section 5. Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a standing committee chairman.

**Section 6. Removal.** Any standing committee chairman or committee member failing to perform the duties of office may be removed from office by Fraternity Council. A

FRATERNITY BYLAWS REVISION

standing committee chairman or committee member shall be notified of pending removal and given the opportunity to respond.

**Section 7. Member *Ex-Officio*.** The Fraternity President shall be a member *ex-officio* of all committees except the Leadership Selection Committee.

### ARTICLE XI
### CONTENT AREAS

**Section 1. Content Areas.** The content areas shall be academic excellence; Advisory Board; alumna relations; diversity, equity, and inclusion; facilities; leadership development; membership; Panhellenic; philanthropy; programming; public relations; risk prevention; ritual and history; and standards.

**Section 2. Content Directors.** Content Directors shall lead the work of the Fraternity in the appointed content area, collaborate with Kappa Kappa Gamma Headquarters staff, and guide the Content Specialists to provide support to alumnae and collegians.

    **A.** **Appointment and Term of Office.** A Content Director shall be appointed by Fraternity Council for each content area. Content Directors shall take office immediately upon appointment following the Biennial Convention and remain in office for a term of two years or until their successors are appointed.

    **B.** **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Director.

    **C.** **Removal From Office.** Any Content Director failing to perform the duties of office may be removed from office by Fraternity Council. A Content Director shall be notified of pending removal and given the opportunity to respond.

**Section 3. Content Specialist.** Each district shall have at least one Content Specialist in each content area who shall work with the District Director and the Content Director to foster growth of chapters and associations within the district.

    **A.** **Appointment and Term of Office.** Content Specialists shall be appointed by Fraternity Council to serve a two-year term with no term limits. Content Specialists shall begin their terms at the beginning of the fiscal year in non-Convention years and shall remain in office until their successors are appointed.

    **B.** **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Specialist.

    **C.** **Removal From Office.** Upon recommendation of the Content Director, a Content Specialist failing to perform the duties of office may be removed from office by Fraternity Council. A Content Specialist shall be notified of pending removal and given the opportunity to respond.

22.09

FRATERNITY BYLAWS REVISION

## ARTICLE XII
## ADMINISTRATIVE OPERATIONS

**Section 1. Kappa Kappa Gamma Headquarters.**

A. **Kappa Kappa Gamma Headquarters Office.** The Fraternity shall maintain a headquarters office as its principal place of business.

B. **Kappa Kappa Gamma Headquarters Staff.** A professional staff shall be employed to conduct the business of the Fraternity at the direction of Fraternity Council. This staff shall be under the direct supervision of an Executive Director.

**Section 2. Executive Director.** An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.

**Section 3. Financial Director.** A financial director, authorized by Fraternity Council, shall be in charge of the finances and accounts of the Fraternity. The financial director shall report to the Executive Director.

## ARTICLE XIII
## FINANCE

**Section 1. Investment of Fraternity Funds.** The investments and securities performance shall be reviewed by the Finance Committee for compliance with the Fraternity's investment policy statement.

**Section 2. Financial Drives and Campaigns.** No chapter, alumnae association, Advisory Board, House Board or individual member shall undertake any financial drive or campaign of more than local extent in the name of the Fraternity without first securing the recommendation of the Finance Committee and approval of Fraternity Council.

**Section 3. Audit and Tax Returns.** An audit of the Fraternity finances shall be conducted annually by a certified public accountant and appropriate tax returns filed annually.

**Section 4. Insurance.** The Fraternity shall maintain a master insurance program.

**Section 5. Liabilities.** Total current liabilities, including contingent liabilities and mortgage notes payable assumed by the Fraternity, shall not exceed 50% of the assets of the Fraternity.

## ARTICLE XIV
## PROPRIETARY MATERIALS

**Section 1. Trademarks.** Fraternity Council shall determine which Fraternity marks shall be registered with the United States Patent and Trademark Office. All Fraternity marks are owned by the Fraternity and shall not be used or reproduced except as authorized by Fraternity Council.

22.09

FRATERNITY BYLAWS REVISION

**Section 2. Copyrights.** All written material created in the name of the Fraternity is automatically copyrighted and shall not be used outside of the Fraternity unless approved by Fraternity Council.

**Section 3. Secret Materials.** Secret materials, such as the *Book of Ritual* and related materials, shall be kept secret and shall not be disclosed to nonmembers or used outside of the Fraternity. Reproduction of the secret materials shall be prohibited except as authorized by Fraternity Council.

## ARTICLE XV
## NATIONAL PANHELLENIC CONFERENCE

**Section 1. Membership.** The Fraternity shall maintain the Fraternity's membership in the National Panhellenic Conference (NPC).

**Section 2 Membership Requirements.** The Fraternity shall follow NPC Unanimous Agreements, policies, and procedures.

**Section 3. Representation.** The Fraternity shall be represented at the annual meeting of the NPC Council of Delegates by a Fraternity member appointed by Fraternity Council who shall be empowered to act and vote on behalf of the Fraternity.

## ARTICLE XVI
## INDEMNIFICATION

The Fraternity shall indemnify, to the maximum extent permitted by law, any person who is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that they are or were a member of Fraternity Council, an elected officer, a member serving in an appointed position, a volunteer, an authorized agent, or an employee of the Fraternity against all expenses, judgments, fines, and amounts paid in settlement incurred by them if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interest of the Fraternity and with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful. The Fraternity may pay expenses incurred by any person covered by this section in defending any action, suit or proceeding in advance of final disposition on such terms and conditions, as shall be determined by Fraternity Council. The indemnification provided by this section is not exclusive and the Fraternity may purchase and maintain insurance on behalf of any person covered by this section, whether or not the Fraternity would have the obligation or power to indemnify them under this section.

## ARTICLE XVII
## DISSOLUTION

If for any reason the Fraternity shall be dissolved, all assets not otherwise disposed of shall be transferred to the Kappa Kappa Gamma Foundation, an Ohio nonprofit corporation.

22.09

FRATERNITY BYLAWS REVISION

## ARTICLE XVIII
## ELECTRONIC MEETINGS AND COMMUNICATIONS

**Section 1. Meetings.** The biennial or a special convention, Fraternity Council, all committees and subcommittees and any other Fraternity sub-group is authorized to meet through any communications equipment that provides a transmission, including, but not limited to, telephone, telecopy, or any electronic means, from which it can be determined that the transmission was authorized by, and accurately reflects the intention of the members involved and, with respect to the meeting, allows all persons who may attend and participate in the meeting to contemporaneously communicate with each other.

**Section 2. Voting by Ballot.** An anonymous vote conducted through a designated internet meeting service or electronic means such as audience response devices or computer software shall be deemed to be a ballot vote, fulfilling any requirement that a vote be by ballot.

**Section 3. Communications.** Unless a member indicates otherwise, all communication required in these bylaws, including required notices, may be sent electronically.

## ARTICLE XIX
## NONPROFIT CORPORATION

The Fraternity is an Ohio nonprofit corporation. The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity. The Fraternity shall be governed in accordance with the laws of the state of Ohio, without giving effect to the choice of law or conflicts of laws principles thereof.

## ARTICLE XX
## KAPPA KAPPA GAMMA FOUNDATION

The Kappa Kappa Gamma Foundation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax under Internal Revenue Code Section 501(c)(3).

## ARTICLE XXI
## FRATERNITY HOUSING CORPORATION

The Fraternity Housing Corporation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax in accordance with Internal Revenue Code Section 501(c)(7).

## ARTICLE XXII
## CHAPTER HOUSE CORPORATION AND CHAPTER HOUSE ASSOCIATION

**Section 1. Chapter House Corporation.** A chapter house corporation shall own or lease and maintain all property, including land, buildings, furnishings and equipment for the use and benefit of a chapter. Members of a house corporation shall be members of the Fraternity, shall have paid a membership fee in the corporation, and shall agree to be bound by the regulations of the corporation and the Fraternity *Bylaws, Standing Rules*

FRATERNITY BYLAWS REVISION

and *Policies*. The Fraternity shall be a member of each chapter house corporation, and if necessary, representation shall be determined on a case-by-case basis.

**Section 2. Chapter House Association.** All rental property, furnishings and equipment shall be managed and maintained by a chapter house association provided the chapter was chartered before July 1, 1976, and the house association has not incorporated. Members of a house association shall be a member of the Fraternity, shall have paid a membership fee in the house association, and shall agree to be bound by the regulations of the house association and the Fraternity *Bylaws*, *Standing Rules* and *Policies*. The Fraternity shall be a member of each chapter house association, and if necessary, representation shall be determined on a case-by-case basis.

**ARTICLE XXIII**
**PARLIAMENTARY AUTHORITY**

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern the Fraternity in all cases to which they are applicable and in which they are not inconsistent with these bylaws and any special rules of order the Fraternity may adopt.

**ARTICLE XXIV**
**AMENDMENT OF *ARTICLES OF INCORPORATION* AND *BYLAWS***

**Section 1. Amendment.** The Fraternity *Articles of Incorporation* and *Bylaws* may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

**Section 2. Submitting Proposed Amendments.** An amendment may be proposed by Fraternity Council, a District Director, a standing or special committee, a Content Director, a Content Specialist, a chapter, or an alumnae association. Proposed amendments shall be submitted no later than six months prior to the date of the Convention and only amendments approved by Fraternity Council shall be submitted to the Convention for a vote.

# # #

ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

### PROVISOS RELATING TO TRANSITION

**I.   Effective with the Chapter Election Cycle of 2022–23.**

The following two provisions of Article IV. Fraternity Organization shall become effective with the chapter election cycle of 2022–23.

**Section 2. Chapters.**

    **C. Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or functional areas: internal affairs, external affairs, operations, membership, membership development, finance, and standards.

    **D. Required Officers.** Chapter officers shall be a President, and a vice president for each department or functional area. A chapter may combine chapter officers and have other offices as needed in the administration of the chapter with the approval of the Leadership Development Specialist.

**II.   Remain in Effect Until the Election Cycle of 2022–23.**

The following sections from Article XII of the 2018 Kappa Kappa Gamma *Bylaws* remain in effect until the chapter election cycle of 2022–23 when Article IV, Section 2. C and D shall become effective.

### ARTICLE XII
### CHAPTER ORGANIZATION AND MANAGEMENT

**Section 2. Officers.** The officers of a chapter shall be: President, Vice President-Standards, Vice President-Organization, Vice President-Academic Excellence, Recording Secretary, Corresponding Secretary, Treasurer, Registrar and Marshal. Chapters may combine chapter offices and duties.

**Section 3. Standing Committee Chairmen** The standing committee chairmen shall be: Education, Event, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations and Risk Management. Chapters may combine standing committee chairmen and duties.

**Section 4. Standing Committees.** The standing committees shall be: Academic Excellence, Catalog, Organization, Education, Event, Finance, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations, Risk Management, Ritual, and Standards. Chapters may combine standing committees and duties.

**Section 5. Qualification of Officers and Standing Committee Chairmen.**

    **A. Eligibility.** Only members meeting all financial obligations and standards of conduct and attaining at least a B-minus average or its equivalent for the previous term shall be eligible to be nominated for or hold office unless the **relevant Content Specialist** (Academic Excellence Specialist or **Standards Specialist**), in consultation with the District Director, grants an exception.

    **B. Maintaining Eligibility.** If an officer or standing committee chairman fails to maintain the qualifications to hold office, she shall become ineligible to remain in office unless the Academic Excellence Specialist or **Standards Specialist**, in consultation with the District Director, grants an exception.

**Section 6. Nomination, Election and Installation of Officers and Standing Committee Chairmen.**

  **A. Nominations.**

    1. The Nominating Committee shall consist of a chairman appointed by the Chapter Council and at least four additional members, including representation from each academic class, elected one month in advance of the chapter election. A member of the Advisory Board shall act as an adviser to the committee without vote.

    2. The committee, by majority vote, shall nominate one candidate for each office to be filled and one for each standing committee chairmanship. Written suggestions for candidates from members of the chapter shall be carefully reviewed. The committee shall secure the consent of the nominee prior to placing her name in nomination.

    3. The committee shall report the slate of nominees to the members at the chapter meeting one week prior to election.

    4. Nominations from the floor shall be called for following the report of the Nominating Committee and before the election.

  **B. Election.** Chapter election of officers and standing committee chairmen shall be held annually between Nov. 1 and March 31 unless the District Director grants an exception. Voting shall be by ballot and a majority vote of the members present at the meeting and voting shall elect.

  **C. Installation of Officers.** All chapter officers and standing committee chairmen shall be installed at a formal meeting following a satisfactory period of officer training.

**Section 7. Chapter Council.** The Chapter Council shall be the Executive Committee of the chapter.

  **A. Membership.** The Chapter Council shall consist of the following members: President as Chairman, Vice President-Standards, Vice President-Organization, Vice President-Academic Excellence, Recording Secretary, Corresponding Secretary, Treasurer, Registrar, Marshal, Education Chairman, Event Chairman, House Chairman, Membership Chairman, New Member Chairman, Panhellenic Delegate, Philanthropy Chairman, Public Relations Chairman, Risk Management Chairman and special committee chairmen as necessary.

  **B. Duties.** The duties of the Chapter Council members shall be:

    1. To be responsible for the proper functioning of the chapter.

    2. Other duties as assigned in the current *Leadership Guides*.

    3. To administer the chapter finance program according to the guidelines approved by and under the direction of Fraternity Council.

    4. To send representatives to the College Panhellenic organization in accordance with National Panhellenic Conference Unanimous Agreements and according to the structure of the respective College Panhellenic.

    5. To make reports as specified in *Leadership Guides* or as requested.

6. To ensure that the archives of the chapter are properly maintained including an alphabetical roll and chronological index of chapter initiates, proxy initiates and affiliates.

**Section 9. Removal of Officers and Standing Committee Chairmen.** The Chapter Council, with the approval of Advisory Board, may recommend to the chapter the removal of any officer or standing committee chairman failing to adequately perform the duties of her office, failing to maintain Fraternity standards, or falling below academic requirements. The officer or standing committee chairman shall be given the opportunity to defend herself.

A. **Vote.** A three-fourths vote of the chapter members present at the meeting and voting shall be required to remove an officer or standing committee chairman. If the officer or chairman is not removed by chapter vote, Advisory Board may remove her with approval of the District Director.

B. **Vacancies.**
   1. After a nomination made by the Chapter Council, a majority vote of the chapter members present at the meeting and voting shall fill a vacancy. Following Chapter Council nomination, nominations from the floor shall be in order.
   2. **In the event the chapter President is permanently unable to perform the duties of her office, Chapter Council shall assign such duties to a vice President until a new chapter President is elected.**
   3. In the event an officer or standing committee chairman is temporarily unable to perform the duties of her office, the Chapter Council shall assign such duties to another member of the chapter who shall have the right to vote.

**Section 10. Chapter Advisers and Advisory Boards.** Alumna advisers in good standing shall be selected annually as a board with the joint approval of the chapter and the Executive Board of the local alumnae association. Advisers to each of the chapter officers, standing committees, Chapter Council and the Panhellenic Delegate shall serve in an advisory capacity without vote. In the absence of a local alumnae association, the board may be selected with joint approval of the District Director, Advisory Board Specialist, and Alumna Relations Specialist.

**Section 11. Chapter Archives.** The archives of the chapter shall consist of the items listed in the Fraternity manuals. All archive properties pertaining to ritual, except when in use, shall be kept in a locked place suitable for security of these materials. All archived documents, records, resources and memorabilia that are not secret in nature shall be maintained in a secure manner.

### # # #

ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

**Administrative Operations**......................**17**
  Executive Director................................... 17
  Finance Director..................................... 17
  Kappa Kappa Gamma Headquarters
    Office.................................................. 17
  Kappa Kappa Gamma Headquarters Staff
    ........................................................ 17
**Amendment of *Articles of Incorporation***
  **and *Bylaws*** ...........................................**20**
  Amendment ........................................... 20
  Submitting Proposed Amendments...... 20
**Chapter House Corporation and Chapter**
  **House Association** ..............................**19**
  Chapter House Assiociation ................. 20
  Chapter House Corporation.................. 19
**Committees**..........................................**15**
  Appointment and Term of Office.......... 15
  Composition of Committees................. 15
    Finance Committee Composition and
      Term ............................................... 15
    General Composition ........................ 15
  Member *Exo-Officio* ............................. 16
  Qualifications ...................................... 15
  Removal ............................................... 15
  Special Committees .............................. 15
  Standing Committees........................... 15
**Content Areas** ....................................**16**
  Content Directors.................................. 16
    Appointment and Term of Office...... 16
    Qualifications ................................... 16
    Removal From Office ........................ 16
  Content Specialists................................ 16
    Appointment and Term of Office...... 16
    Qualifications ................................... 16
    Removal From Office ........................ 16
**Dissolution** ...........................................**18**
**Electronic Meetings and Communications**
  ............................................................**19**
  Communications ................................... 19
  Meetings .............................................. 19
  Voting By Ballot.................................... 19
**Finance** ................................................**17**

Audit and Tax Returns........................... 17
Financial Drives and Campaigns............ 17
Insurance.............................................. 17
Investment of Fraternity Funds ........... 17
Liabilities .............................................. 17
**Fraternity Council** ...................................**14**
  Composition .......................................... 14
  Duties ................................................... 14
  Emergency Powers................................. 14
  Meetings ............................................... 15
    Business Without a Meeting.............. 15
    Called Meeting ................................... 15
    Quorum ............................................. 15
    Voting................................................. 15
**Fraternity Housing Corporation**..............**19**
**Fraternity Organization**...........................**6**
  Alumnae Associations ........................... 8
    Alumnae Panhellenic Associations ..... 8
    Association Governance ..................... 8
    Convention Representation ................. 8
    Establishing New Associations............ 9
    Meetings ............................................ 8
    Officers .............................................. 8
    Purpose .............................................. 8
    Reestablishment of an Alumnae
      Association ........................................ 9
    Return of Association Charter and
      Archives............................................. 9
    Surrender of Charter........................... 9
    Withdrawl of a Charter ....................... 9
  Chapters................................................ 6
    Advisory Boards and Chapter Advisers 7
    Chapter Structure ............................... 6
    College Panhellenic Association.......... 7
    Convention Representation ................. 7
    Establishing a New Chapter ................ 7
    Governance......................................... 7
    Meetings ............................................ 7
    Members............................................. 6
      Chapter Membership Selection ...... 6
      Member Classification .................... 6
    Officer Eligibility................................. 7

22.09

ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

Purpose .................................. 6
Reestablishment of a Chapter ........... 8
Removal of a Chapter ...................... 8
Reorganization of a Chapter ............. 8
Required Officers .......................... 7
Return of Chapter Charter and
    Archives............................. 8
Surrender of Charter........................ 8
Districts ..................................... 6
District Director Meetings................... 6
District Directors ............................ 6
    Qualifications ......................... 6
    Request for Resignation or Removal
        from Office ........................ 6
    Temporary Absence ........................ 6
    Term of Office and Term Limits ...... 6
**Indemnification...................................18**
**Kappa Kappa Gamma Foundation............19**
**Meetings....................................13**
Convention.............................. 13
    Alumnae Association Vote Value...... 14
    Enacted Business............................ 14
    Nonvoting Members ........................ 14
    Notice of Meetings...................... 13
        Regular Meeting........................... 13
        Special Meeting............................ 13
    Postponement or Cancellation of a
        Meeting................................ 13
    Quorum............................. 14
    Regular Meeting................................ 13
    Special Meeting................................ 13
    Vote and Voting................................ 14
    Voting Members ................................ 14
Membership Meetings........................ 13
**Member, Chapter, and Association**
**Responsibilities................................. 9**
Academic Excellence
    Active Member Standard.................. 10
    Chapter Standard.............................. 10
Academic Excellence .............................. 10
Accountability ..................................... 10
    Outcome ........................................ 10
    Overview .......................................... 10

Process ............................... 10
College or University Regulations......... 10
Conduct .................................. 10
Conflict of Interest ................................ 11
Finance ...................................... 10
Good Standing...................................... 10
    Association .................................. 11
    Chapter.................................... 10
    Member .................................... 10
Legal Compliance ................................ 9
    Alcohol .................................... 9
    Discrimination .............................. 9
    Drugs ......................................... 9
    Hazing......................................... 9
Overview .................................. 9
**Members...................................... 2**
Affiliation .................................. 4
Classifications of Members.................... 2
    Active ...................................... 2
    Alumna ...................................... 2
    Associate .................................. 2
    New Members.............................. 2
Direct Fraternity Council Action............. 5
Fees ...................................... 5
    Annual Per Capita Fee........................ 5
    New Member Fee .............................. 5
    Reinstatement Fee.............................. 5
    Renewal Fee...................................... 5
Initiation
    Requirements for Initiation ............... 3
Initiation .................................. 3
Initiation
    Special Circumstances........................ 4
Qualifications ........................... 3
    Alumna Candidate.............................. 3
    Collegiate New Member and Alumna
        Candidate ......................... 3
Reinstatement or Renewal .................... 4
    Active Alumna and Associate Member4
    Reinstatement After Requested
        Resignation or Dismissal. ........... 5
    Reinstatement After Voluntary
        Resignation.................................. 4

Decision Final ................................... 5
New Member Renewal ...................... 5
Voluntary Resignation, Broken Pledge,
Resignation and Dismissal................... 4
Broken Pledge, Requested Resignation
and Dismissal
Active Member ............................... 4
Associate or Alumna Member ....... 4
New Member .................................. 4
Broken Pledge, Requested Resignation
and Dismissal ................................... 4
Voluntary Resignation........................ 4
Active, Associate and Alumna
Member ................................... 4
New Member .................................. 4
**Name ...................................................... 1**
**National Panhellenic Conference ............18**
Membership.......................................... 18
Membership Requirements .................. 18
Representation ..................................... 18
**Nominations and Elections .....................12**
Committee Composition....................... 12
Alternating Each Biennium .............. 12
Chairman and Vice Chairman .......... 12

Equal Number of Collegiate and
Alumna Representatives.............. 12
Members............................................ 12
Elections................................................. 13
Election Committee ......................... 13
Eligible Voters .................................. 13
Voting................................................ 13
Nominations Report............................. 12
Nominee Selection ............................... 12
Open Nominations................................ 13
**Nonprofit Corporation ........................... 19**
**Officers................................................... 11**
Officer Transition Meeting................... 11
Request for Resignation or Removal From
Office................................................ 12
Term of Office and Term Limits ........... 11
Vacancies and Temporary Absences .... 11
Other Officres ................................. 12
President ........................................... 11
**Parliamentary Authority ........................ 20**
**Proprietary Materials ........................... 17**
Copyrights ............................................ 18
Secret Materials................................... 18
Trademarks .......................................... 17
**Purpose .................................................. 1**

# ATTACHMENT 2

 **Kappa Kappa Gamma**

**GUIDE FOR SUPPORTING OUR LGBTQIA+ MEMBERS**

Kappa Kappa Gamma was founded more than 150 years ago on the principles of integrity, respect and regard for others.

Kappa Kappa Gamma recognizes the value of each individual and expects its members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals.

Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on race, national origin, religion, disability, age, gender identity or sexual orientation. Members are encouraged to promote and demonstrate an understanding of inclusion, both on the college campus and in the world community.

**Membership Selection**

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character.

**How to Be an Ally [i]**

As an individual:

- Treat every person with dignity and respect.
- Do not make or perpetuate assumptions about someone's Sexual orientation or Gender identity.
- Your friend may be exploring or questioning her [1] sexual orientation or gender identity. How she does so is up to her. If prompted by her, be supportive and make it known that you are there to listen without judgment.
- Listen and keep an open mind. Ask questions. Be honest about your feelings and be willing to learn.
- Ask LGBTQIA+ (Lesbian, Gay, bisexual, Transgender, questioning, Intersex, Asexual) individuals how you can support them.
- Educate yourself and those around you who may have misinformation about the LGBTQIA+ community.
- Understand your own culture, socialization, prejudices, and privileges.
  Respect the privacy of LGBTQIA+ individuals. Allow them to make their own decisions on how, when and with whom to reveal their sexual orientation or gender identity.
- Support LGBTQIA+ individuals as you would any other person. Refrain from treating LGBTQIA+ individuals differently.
- Always refer to people by the names and pronouns they prefer.
- Confront those who mock or harass others on the basis of sexual orientation or gender identity.
- <u>Know when and how to refer someone to outside, professional help.</u>

As a chapter [ii]:

- During Recruitment — and at all times — make it clear that the chapter values inclusion.
- <u>Use inclusive, nongender-specific language</u> (e.g., partner and date) that does not assume heterosexuality in others.

---

[1] We have selected to use the she/her/hers pronouns throughout this document for the purpose of simplicity. It is not meant to signify which pronouns are appropriate in a given situation.

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- Make it known that same-sex dates/guests are welcome at chapter events.
- Invite a panel of LGBTQIA+ students or faculty to make a presentation to the chapter.
- Encourage members to get involved in an ally program on your campus <u>or start one if one does not exist.</u>
- Include the Fraternity's position statement on nondiscrimination in the chapter Bylaws.
- Attend campus and community LGBTQIA+ events and activities as a group.

**Using Inclusive Language**

Being a welcoming community means intentionally working to find ways to name and value experiences and identities that are often minimized or devalued. It means uncovering our unconscious assumptions about what's "normal" and who is present in our community and striving to understand the ways that language often unconsciously makes assumptions about people and unintentionally reinforces societal norms. Here are a few things to be mindful about when seeking to use inclusive language:

- **Use language that reflects what people call themselves.** Respect a person's identity and self-label as well as that person's chosen name and pronouns. Practice offering your own pronouns when you meet new people.
- **Use person-centered language.** For example, do not use an identity as a stand-in for a person or a group: "transgender people" instead of "transgenders." Remember that any aspect of a person is just that, an aspect of a person.
- **Understand and respect the difference between sexual orientation and gender identity**. For example, do not say "LGBT" if you are only talking about sexual orientation or use "straight" as the opposite of "LGBT," Transgender people can be any sexual orientation, including straight.
- **Ask yourself whether it is appropriate to share a particular fact about a person pertaining to gender identity or sexual orientation.** In some circumstances, a person's or group's identity will be irrelevant to what you are communicating. In other circumstances, it will be an important part of the context.
- **Use words that encompass all genders, sexual orientations and family units.** For example, "people of all genders" instead of "women and men"; "children" instead of "boys and girls"; "parents" instead of "mom and dad"; and "partner" or "significant other" instead of "boyfriend and girlfriend."

<u>Learning about the most current terminology</u> encourages a more productive conversation about diversity and inclusion.

**How to Support Someone Who Is Coming out** [iii]

This list provides ideas to keep in mind when you learn that a Kappa member (or any other friend) self-discloses that she is exploring or questioning her sexual orientation or gender identity.

- Listen to what your friend has to say and keep an open mind.
- Understand the personal risk your friend took in telling you. Realize the trust that person has in you.
- Realize your friend has not changed.
- Respect the choice to tell you by letting that person know you will keep the conversation confidential.
- Do not shy away from your friend. Feel free to ask questions to better understand.
- Offer your support and willingness to help through the coming-out process.
- Become familiar with the national, local, and on-campus resources available.

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

**A Member Is Outed to the Chapter**

The choice to come out, when, and to whom is personal and private to the individual. No one should ever be outed – coming out is a process, and it can be difficult due to discrimination, homophobia and fear of not being accepted. If someone in the chapter is outed, the following are ways to provide support:

- Reach out to the member and let them know you are willing to listen and be a friend.
- Calm the member if they are upset and allow them to take the lead and speak about their feelings.
- Stand up for the member as you would for any other sister.
- Attempt to resolve any conflict among other sisters who may not understand by asking them to give the sister some time to process their feelings.
- Seek the expertise of campus officials or Kappa Kappa Gamma Headquarters if you are concerned about the chapter's response and need assistance processing the experience.
- Let the member know that you value them as a Kappa and as an individual.
- As appropriate, refer members to the Vice President-Standards.

**How to Support Someone Questioning Their Gender Identity** [iv]

Gender identity refers to how an individual views themselves in terms of characteristics traditionally identified in this culture as male or female. A person may self-identify as male, female, or as possessing gender non-binary characteristics. This list provides some ideas to keep in mind when you learn that a Kappa member (or any other friend) is questioning their gender identity.

- Respect the language the person uses to describe their identity.
- Be discrete in order to avoid outing. Assure the person that you will not betray their confidence.
- Do not make assumptions about the person's sexual orientation.
- If you aren't sure what pronouns to use, listen. Ask if it seems appropriate.
- Understand the difference between "coming out" in regard to sexual orientation and "coming out" in regard to gender identity. Do not out a transgender individual. It can feel disempowering for transgender persons to disclose their transgender status as they are living life as their true selves.
- Recognize there is not one acceptable way to transition. It is different for every person.
- Challenge anti-transgender comments and try to educate others who are misinformed.
- Be supportive of gender-neutral bathroom options.
- Recognize and admit when you do not know something.
- Know when to seek outside help.

**Frequently Asked Questions**

- Membership
  - **A potential new member identified herself as a member of the LGBTQIA+ community and asked if the chapter would be accepting.**
    - Yes. Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women. Kappa does not discriminate in membership selection except by requiring good scholarship and ethical character. Chapter members should become versed in this position statement in order to communicate this message to PNMs.
  - **My chapter is ready to extend a bid to a PNM who identifies as transgender, but a member/adviser present is not supportive.**

 **Kappa Kappa Gamma**    GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- Each Kappa chapter has the final choice of its own members. Because Kappa is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character, the chapter is well within its rights to offer that potential member a bid. Please bring any concerns regarding this matter to <u>Kappa Headquarters</u> or the Membership Specialist.
  - o **A sophomore member is in a romantic relationship with one of the new members. They have both requested to be paired as big sister and little sister. Is this allowed?**
    - Kappa does not oversee the intimate relationships of its members. However, it is important to reiterate the responsibilities listed in the Big Sister Commitment Form with the older member. The role of a big sister is meant to offer education and mentorship. It is important to consider if a romantic relationship will hinder that vital component of the New Member Experience.
  - o **It was brought to my attention that a PNM has specified pronouns they want to be used throughout Recruitment. How do I explain this to the chapter and ensure this PNM feels comfortable at our recruitment events?**
    - Reach out to the relevant office on your campus in order to obtain guidance from a knowledgeable professional. This could be the Greek life office, office of diversity and inclusion, etc. Consider bringing in a speaker if time will allow.
    - Ensure that recruitment rounds are designed so that all feel welcome and respected.
    - Collaborate with the office of fraternity and sorority life in order to institute nametags that include pronouns. If this is not possible, take time between rounds to notify chapter members if a PNM who uses pronouns other than she/her/hers.
- Housing
  - o **Can transgender members or members who identify as women live in the chapter facility?**
    - Yes. All Kappa members are eligible to live in a chapter facility. When available, living in the chapter facility can enhance the member's experience. Therefore, members and House Boards should work to make appropriate accommodations in order to support those members living in. Some recommendations for making all involved comfortable throughout the process include:
      - Have an open discussion with the member about living in the chapter house and address any fears she might have. Think creatively in order to find solutions to issues that may arise.
      - Create a resource that details the bathrooms available for that member to use.
      - Classify a gender-neutral restroom in the facility.
      - If the member is comfortable, have an open discussion with all members who live in the facility in order to determine comfort levels and address any questions that may arise.
      - Identify a room/rooming situation that all members involved are comfortable with. This could include the possibility of housing the member in a single room (for which House Board may not charge additional fees).

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- o **Our chapter has a transgender member who does not feel comfortable living in the chapter house. How do we deal with the residency requirement in this instance?**
    - ▪ Similarly to other circumstances that warrant a waiver, House Board should waive the live-in requirement for this member. Reach out to the Director of Housing and Facilities Director for further assistance regarding this matter.
- o **How should House Board handle relationships between members, specifically when one or more of the members in the relationship lives in the chapter house?**
    - ▪ The Fraternity does not oversee the intimate relationships of its members. However, all members should operate under the basic tenets of communal living (e.g., showing respect for one another and seeking permission from roommates when having guests in private quarters). If a member violates those communal living standards, she should be referred to the Standards Committee. The Standards Committee should work with the members involved to create a fair solution. Treat the member the same as a member who violated the rule with a heterosexual partner.
- • Standards
    - o **I am an initiated member of Kappa who has recently transitioned from female to male. Am I going to lose my membership?**
        - ▪ Kappa members who identify as transgender during any stage of their membership will not lose their membership rights.
    - o **A member of the chapter came out as gay a few months ago. Since then, she has stopped attending most chapter meetings and activities. What should I do?**
        - ▪ The Standards Committee should call the member in for a meeting and initiate the conversation as they would handle any other attendance issue. However, the committee should be prepared for the member to divulge that she has felt isolated or uncomfortable during her coming-out process. The committee should ask the member about some of the issues and what would make her feel more comfortable. Jointly, the committee and the member will develop a strategy for positive engagement and identify allies to support her during this time.
        - ▪ Be prepared with information about campus and local resources.
        - ▪ If the member remains uncomfortable at chapter gatherings, the viability of Associate Membership or Special Status should be discussed in order to stave off the possibility of a member feeling that she needs to resign. If the member is experiencing mental health issues as a result of her gender identity or sexual orientation, the Alternative Standards Contract should be discussed as a possibility.
    - o **A member of the chapter recently came out as gay. It has been reported that a few members of the chapter have been making inappropriate jokes about the member's sexuality. How should the chapter handle this?**
        - ▪ Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on gender identity or sexual orientation. Members are encouraged to promote and demonstrate an understanding of inclusion on the college campus and in the world community. Thus, like any other rule violation, members who allegedly violate Kappa's nondiscrimination policy should be referred to the Standards Committee. If there is a violation, Probation with appropriate terms may be considered, including:

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- Interview a professional from the campus' diversity and inclusion office and write a report.
- Create a presentation regarding bullying and its negative effects.
- Research the Fraternity's history and values and discuss the role of nondiscrimination in those values.

o **A live-in member of the chapter is currently dating another member of the chapter, which has led to some complaints from the live-in member's roommates. The couple has also requested to room together for the next school year. How should this be handled?**

- The Fraternity does not oversee the intimate relationships of its members. However, all members should operate under the basic tenets of communal living (e.g., showing respect for one another and seeking permission from roommates when having guests in private quarters). If a member or members violate those communal living standards, they should be referred to the Standards Committee. The committee will work with the members involved to create a fair solution. Furthermore, the committee will treat those members the same as they would any other member who violates a rule.
- The House Chairman should deal with the housing request and the roommate-selection process as written. If the opportunity for the members who are dating each other does materialize, hold a discussion regarding the communal living standards and what might happen if the relationship were to not work out.

- Ritual
  o **Is Kappa's ritual and history inclusive? I don't want LGBTQIA+ members to feel left out during ritual ceremonies.**
    - After a thorough review, Fraternity Council has stated its belief that Kappa's ritual and history does use inclusive language that should not work to isolate any of our members. Please bring any concerns regarding ritual and history to the Ritual and History Director.
  o **Where should transgender members change clothes prior to Initiation?**
    - While the answer to this question will depend on the circumstances of individual chapters, the comfort of all members should be considered when it comes to a sensitive situation like this. View it as an opportunity to potentially change how your chapter handles pre-initiation activities so that the needs of all members are met and no member needs to be unnecessarily singled out. Ritual is meant to bring the sisterhood together and should not isolate individuals.

- Education
  o **Should my chapter be hosting or endorsing LGBTQIA+-related programming?**
    - At a minimum, all Kappa members should be knowledgeable about Kappa's policies and position statements regarding membership selection, nondiscrimination and human dignity. Chapters are encouraged to conduct basic training on inclusivity with the assistance of campus professionals. Beyond that, Kappa encourages its chapters to select programming that meets the chapter's unique needs. Reach out to the office of fraternity and sorority life for assistance in bringing in campus professionals to discuss the topic of inclusivity.

**What Would You Do? Case Studies [v]**

 **Kappa Kappa Gamma**          GUIDE FOR SUPPORTING
                                      OUR LGBTQIA+ MEMBERS

1.  You are managing a recruitment table in the student center when a student asks if it would be a problem for a transgender student to join Kappa.

    **Possible Discussion Questions**
    o   Prior to Recruitment, what sort of preparation and training should be done with the chapter to prepare for questions like this?
    o   What Kappa resources (human and written) would you use?
    o   What type of response would be inclusive and welcoming?
    o   What are Kappa's policies regarding this?

2.  A member of your chapter brought her girlfriend as her date to the spring formal. On the bus ride home, you overheard another member's date refer to the couple as "dykes." The date who made the comment is the president of one of the most popular fraternities on campus, and you are worried about the social repercussions for your chapter if his comment were to be reported.

    **Possible Discussion Questions**
    o   There are many different ways you could choose to handle this situation. Let's explore three possible actions. You could 1) choose to ignore this statement, 2) address this with the member who brought him as a date, or 3) directly confront the individual who made this derogatory statement. What are the possible repercussions of each of these actions? Which would you choose and why?
    o   By doing nothing, you are being a bystander. What does that mean and why is it a problem?

3.  You are in a membership selection session during Recruitment. The chapter is discussing a potential new member prior to voting and several members have made comments that the potential new member doesn't fit "the chapter's image." The understood message is that the potential new member is bisexual.

    **Possible Discussion Questions**
    o   How do these comments and lines of thinking go against what Kappa values?
    o   What are the possible consequences if this is not confronted or addressed?
    o   What could be done prior to Recruitment to educate chapter members so these types of comments are avoided?

4.  You are on the Standards Committee. Your chapter's Greek Week delegate visits a standards meeting to ask if she should try to change the chapter's pairing with a fraternity that has many members who identify as gay. The delegate is worried that the pairing will not go over very well with the chapter and expresses concern that the fraternity will also feel uncomfortable.

    **Possible Discussion Questions**
    o   How would you respond to the Greek Week delegate?
    o   In this situation, the Greek Week delegate is making a lot of assumptions, including the reaction of the chapter and that the fraternity will feel uncomfortable. Why is this a problem? How could this be addressed with the Greek Week delegate?
    o   What type of consequences could occur if your chapter backed out of the Greek Week pairing?



**GUIDE FOR SUPPORTING**
**OUR LGBTQIA+ MEMBERS**

o   What resources are available from Kappa or on your campus to turn to for guidance?

5.   A member of your chapter is an active member of a campus LGBTQIA+ student organization. Recently, rumors have begun circulating on campus that your chapter is the "lesbian" chapter. Some members and advisers feel that this is going to negatively impact Recruitment in the fall. As a result, the Membership Chairman recently told the lesbian member not to take part in Recruitment and to be less visible in LGBTQIA+ activities.

**Possible Discussion Questions**
o   What mistakes did the Membership Chairman make?
o   How might the chapter member who was asked not to take part in Recruitment and be less visible feel about her membership with Kappa Kappa Gamma right now? What can be done to build trust with this member again?
o   What can you do to change the culture and mindset within your chapter?

6.   A member of your chapter tells you that her little sister disclosed that she is questioning her gender identity. The little is wondering if she should come out to the chapter, and, if so, whether to do so before or after Initiation. The chapter seems closed-minded since it recently registered very low attendance at a required program regarding LGBTQIA+ and the Greek-letter community.

**Possible Discussion Questions**
o   How can the chapter support the new member who is questioning her gender identity?
o   What are the consequences if the new member shares this information before or after Initiation? Should it matter?
o   Since many chapter members missed the required program regarding LGBTQIA+ and the Greek-letter community, what can be done to ensure the chapter receives this education?

7.   House Board recently proposed a house rule that states, "Any member who permits her same-sex partner to stay overnight in her private quarters shall be subject to discipline and possible eviction."

**Possible Discussion Questions**
o   What problems do you see with this house rule?
o   What are Kappa's policies regarding this?
o   Based on Kappa's policies, what are the potential next steps?

**Terms, Definitions and Labels** [vi]
The words we use and how we use them can be powerful. Knowing and understanding the words we use advances communication and helps prevent misunderstandings. The following terms are not absolutely defined. Rather, they provide a starting point for conversations.
•   **Ally:** An "ally" is a term used to describe someone who is supportive of LGBTQIA+ people. It encompasses non-LGBTQIA+ allies as well as those within the LGBTQIA+ community who support each other (e.g., a lesbian who is an ally to the bisexual community).
•   **Asexual:** A person who is not sexually attracted to either men or women and does not have a desire to engage in sexual activity with a partner. Asexuality is a sexual orientation and differs

 **Kappa Kappa Gamma**

from celibacy, which is a choice to abstain from sex. Some asexual people have a desire to form intimate but nonsexual romantic relationships and will date and seek long-term partnerships.

- **Assigned sex:** The sex that was recorded on a person's birth certificate.
- **Bi-curious:** A term used to describe a person who identifies as heterosexual or homosexual, but experiences some thoughts or visions about engaging in intimate relationships with a gender other than the one to which he or she is primarily attracted.
- **Biological sex:** The dichotomous distinction between female and male based on physiological characteristics, especially chromosomes and external genitalia.
- **Cisgender:** Not transgender. This term describes a person who has a gender identity or gender role that society considers consistent with the sex assigned at birth.
- **Closeted/in the closet:** The confining state of being secretive about one's true gender identity and/or sexual orientation. A person may feel compelled to be closeted for their safety or in order to keep a job, housing situation or family/friends. Many LGBTQIA+ individuals are "out" in some situations and "closeted" in others.
- **Coming out (of the closet)/being out:** Refers to the process through which a person acknowledges, accepts, and learns to appreciate their lesbian, gay, bisexual, transgender or other identity. Sharing this information with others is not a single event. Instead, it is a lifelong process.
- **FTM/F2M:** Abbreviation for female-to-male. A term that refers to male-identified people who were categorized as female at birth. (See also MTF and Transgender.)
- **Gay:** Used to describe a man who is romantically, sexually, and/or affectionally attracted to men. However, not all men who engage in sexual relations with other men identify themselves as "gay." The term is sometimes used to refer to the LGBTQIA+ community as a whole. Although, many women prefer to be identified as "lesbian" instead of "gay."
- **Gender:** A term used to describe the social status of people as men, women, boys, girls, or variously transgender, including characteristics of masculinity and femininity that are learned or chosen.
- **Gender dysphoria:** An intense, continuous discomfort resulting from an individual's belief in the inappropriateness of their assigned sex at birth and resulting gender role expectations.
- **Gender identity:** How an individual views themselves in terms of characteristics traditionally identified in this culture as male or female. A person may self-identify as purely male, purely female, or as possessing characteristics of both.
- **Gender-neutral/gender-free pronouns:** Pronouns that do not associate a gender with the person or creature being discussed. The English language has no truly gender-neutral, third-person pronoun available. Some examples are "hir" for "him/her" and "ze" for "he/she."
- **Gender normative/gender conforming:** A person who conforms to gender-based societal expectations.
- **Gender queer:** A term that is growing in usage that represents a blurring of the lines surrounding society's rigid views of both gender identity and sexual orientation. Gender-queer people embrace a fluidity of gender expression that is not limiting. They may not identify as male or female, but as both, neither, or as a blend. Similarly, gender queer is a more inclusive term with respect to sexual orientation.
- **Gender roles:** The socially constructed and culturally specific behavior and appearance expectations imposed on women (femininity) and men (masculinity).

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- **Homosexual:** A sexual orientation in which a person feels physically and emotionally attracted to people of the same sex. This clinical term originated in the 1800s and is not used within the gay and lesbian community.
- **Hormone therapy/hormonal sex reassignment:** The administration of hormones to affect the development of secondary sex characteristics is a process, possibly lifelong, of using hormones to change one's internal body chemistry.
- **Intersex:** A person born with sex chromosomes, external genitalia, or an internal reproductive system that is not considered medically standard for either male or female. The gender identity and sexual orientation of these people varies as it does with non-intersex people.
- **Lesbian:** Preferred term for a woman who is romantically, sexually, and/or affectionally attracted to women.
- **LGBTQIA+:** Initialism of lesbian, gay, bisexual, transgender, queer/questioning, intersex, and asexual/agender/aromantic. LGBTQIA+ is a term encompassing people with non-mainstream sexual orientation or gender identity.
- **MTF/M2F:** Abbreviation for male-to-female. A term that refers to female-identified people who were categorized as male at birth.
- **Outing:** Publicly revealing the sexual orientation, gender identity, or intersex status of an individual who has chosen to keep that information private. Some activists, political groups, and media believe outing is justified and/or newsworthy when the person involved works against the interests of LGBTQIA+ people. Others oppose it entirely as an invasion of privacy.
- **Pangender/omnigender/polygender:** A person whose gender identity is comprised of all or many genders.
- **Pansexual/omnisexual/polysexual:** A person who is sexually attracted to all or many genders or gender expressions.
- **Passing:** Being taken for a member of the dominant group — white, straight, and cisgender (nontransgender). For example, LGBTQIA+ people who have the ability to pass can choose to conceal the stigma associated with being a member of a sexual minority.
- **Queer:** Historically, it is a pejorative term for "gay." The word "queer" has been reclaimed by some members of the community as a political act intended to undermine the violence that is embedded with the original use of the term. Queer is also sometimes used as an umbrella term for LGBTQIA+. It is still considered to be a slur by some people and in some contexts. This and other reclaimed terms can be offensive to the in-group when used by the out-group. Such terms should be used with caution.
- **Questioning:** A process whereby an individual is reassessing their sexual orientation and/or gender identity. A person who is questioning may be unsure of their sexual identity or still exploring their feelings.
- **Sex:** The biological (i.e., anatomical, hormonal or genetic) traits used to categorize someone as either male or female.
- **Sexism:** The societal/cultural, institutional, and individual beliefs and practices that privilege men, subordinate women, and denigrate women-identified values.
- **Sexuality:** Who you like and what you do.
- **Sexual identity:** Sexual identity is identifying, claiming, and owning a part of the self that is associated with one's gender identity, sexual orientation, or sexuality. Sexual identity may mean identifying as a member of the LGBTQIA+ community.
- **Sexual orientation:** A person's emotional, physical, and sexual attraction and the expression of that attraction with other individuals. The term "sexual orientation" is preferred over "sexual

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

preference." The latter term implies a choice and sexual attraction is not generally considered a choice.

- **Sex reassignment surgery:** Sex reassignment surgery is a permanent surgical body modification that seeks to attain congruence between one's body and one's gender identity. Use this term instead of "sex change." Sometimes known as gender reassignment surgery. Many in the transgender community prefer gender confirmation surgery.
- **Straight:** A term originating in the gay community to describe heterosexuals.
- **Transgender/trans:** A term for people who challenge society's view of gender as fixed, unmoving, dichotomous, and inextricably linked to one's biological sex. Gender is more accurately viewed as a spectrum rather than a polarized, dichotomous construct. This is a broad term that encompasses cross-dressers, intersexed people, gender-benders, transsexuals and those who defy what society tells them is appropriate for their gender. The sexual orientation of transgender persons varies just as it varies across society. An individual is transgender, not "transgendered."
- **Transsexual:** Individuals whose assigned sex at birth does not match their gender identity. Through sex reassignment surgery and hormone treatments, those individuals may seek to change their physical bodies to match their gender identities. Transsexual individuals' sexual orientation can be heterosexual, homosexual, bisexual, or anywhere on the continuum.
- **WomXn:** An alternative spelling of the word "woman" that is meant to denote the intersectionality in womanhood and emphasize the idea that women are independent.

———

**Additional Resources**

**The Lambda 10 Project** National Clearinghouse for Gay, Lesbian, Bisexual, Transgender Fraternity & Sorority Issues. https://www.campuspride.org/lambda10/

**Campus Pride** Building future leaders and safer, more LGBTQIA+-friendly colleges and universities. https://www.campuspride.org/

**CDC LGBT Youth Resources** www.cdc.gov/lgbthealth/youth-resources.htm

**The Trevor Project** A national 24-hour, toll-free confidential suicide hotline for LGBTQIA+ youth. www.thetrevorproject.org/ 866-488-7386

**It Gets Better Project** www.itgetsbetter.org/

**LGBT National Help Center** http://www.glbthotline.org/ Toll-free number: 1-888-843-4564; Email: help@LGBTQIA+hotline.org

**The National Suicide Prevention Lifeline** 1-800-273-TALK (8255)

---

i https://www.campuspride.org/resources/sample-greek-ally-commitment/
ii https://www.campuspride.org/lambda10/greekally/greek-ally-resources/

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

iii Shane L. Windmeyer and Pamela W. Freeman, Lambda 10 Project,
https://www.campuspride.org/resources/what-to-do-when-you-learn-a-brothersister-is-gay/
iv https://www.glaad.org/transgender/allies
v Campus Pride, 2014, https://www.campuspride.org/wp-content/uploads/Greek-Ally-Case-Studies.pdf
vi Safe Zones Manual http://thesafezoneproject.com/

# ATTACHMENT 3



**VORYS**

Vorys, Sater, Seymour and Pease LLP
Legal Counsel

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Natalie M. McLaughlin
Direct Dial   (614) 464-5452
Direct Fax    (614) 719-5252
Email nmmclaughlin@vorys.com

November 15, 2022

**VIA US MAIL AND E-MAIL [JOHN@KNEPPERLLC.COM;
CCRAVEN.LAW@GMAIL.COM]**

John G. Knepper
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY  82001

Cassie Craven
Longhorn Law, LLC
109 E. 17th St. Suite 223
Cheyenne, WY 82001

Re:     **Response to Litigation Threat**

Dear Mr. Knepper and Ms. Craven:

I am legal counsel for Kappa Kappa Gamma Fraternity, Inc. ("Kappa"). Please direct any future communications to my attention.

As an initial matter, I want to ensure you understand the lack of involvement of Kappa in collegiate chapter member selection. Active members of each collegiate chapter are responsible for voting on new members of their chapter. Chapters have the right to select members of their choice in accordance with fraternity standards and procedures. Kappa does not overrule decisions of a collegiate chapter because collegiate chapter members or alumnae disagree with a chapter's decisions on who to initiate. Kappa will only involve itself if a collegiate chapter has acted contrary to Kappa's bylaws, guidelines, or other policies or procedures.

Kappa's bylaws and other governing documents state that Kappa is a single-gender organization. Gender is not equivalent to biological sex, birth anatomy, or chromosomes. Rather, it is a broader construct encompassing identity. A person's gender identity is their subjective, deep-core sense of self as being a particular gender. As a single-gender organization, Kappa welcomes all women, including individuals who may have been born as males but who identify as women.



**VORYS**
Legal Counsel

John G. Knepper and Cassie Craven
November 15, 2022
Page 2

Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status.

Nothing in Kappa's bylaws or in any other Kappa governing document limits membership only to individuals who were biologically born as female. Indeed, Kappa's Position Statements on Membership Selection and Single-Gender Organizations state that as a single-gender organization, Kappa includes individuals who identify as women. Though each chapter of Kappa chooses its own members, all chapters are expected to adhere to the Position Statements and not discriminate in membership selection except by requiring good scholarship and ethical character. Kappa's Guide for Supporting Our LGBTQIA+ Members again iterates that for membership selection, as a single-gender organization, individuals who identify as women may be initiated. That Guide also prohibits discrimination in membership selection except by requiring good scholarship and ethical character.

The National Panhellenic Counsel, of which Kappa is a member, issued a policy in 2020 that states: "For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman." All 26 national/international women's sororities that are members of the NPC are open to all women, including individuals who were biologically born male, but who identify as women. This makes sense, as the NPC and women's sororities recognizes that as single-gender organizations for women, this includes all women, not just those who were biologically born female.

For all of these reasons, the assertion in your letter that Kappa has breached a contract in violation of its bylaws and standing rules by allowing Gamma Omicron to bring a "non-woman into the organization" is without basis. Kappa is unaware of any "non-woman" new member of the Gamma Omicron chapter.

Kappa is also unaware of the Gamma Omicron chapter violating any Kappa bylaws, rules, guidelines, or other policies and procedures. Again, chapters have the right to select members of their choice. If there are specific provisions in any Kappa governing documents that you contend were not followed by Kappa, please identify what those specific provisions are, what governing documents they are contained within, and what actions of Kappa you contend are in violation of those specific provisions.[1]

We regret that the initiation of a collegiate member at the Gamma Omicron chapter has caused some chapter members to question whether to continue with Kappa. We also regret that there are alumnae, including those who were never part of the Gamma Omicron chapter, that seek to fund divisive litigation because of a collegiate chapter's decision to initiate a 20-year-old college

---

[1] Any statement made by chapter officers that Kappa includes individuals who identify as women and that the chapter does not discriminate against someone because that individual was biologically born as a male, but identifies as a woman, would be appropriate and consistent with fraternity standards and procedures.



**VORYS**

Legal Counsel

John G. Knepper and Cassie Craven
November 15, 2022
Page 3

student that some alumnae believe should be excluded from participating in a women's organization. With a diverse array of hundreds of thousands of members, Kappa realistically recognizes that there will often be some contingent of individuals who have values that do not align with Kappa and who thereby disagree with Kappa's decisions. This, however, does not justify derogatory statements and cruelty. The unkindness, vitriol, lack of regard for others, and disrespect that has been exhibited by some individuals over the past month is contrary to all that Kappa stands for.

You are correct that Kappa is important to the individuals who have loved and served it for generations and that those in positions of leadership have a duty to protect the organization against those that would seek to adversely impact it. Kappa also has a duty to care for all members, even when other members may seek to exclude them. Kappa's responsibility is to act in the best interest of the organization as a whole and for the future of the organization. Kappa believes that its positions on inclusivity and non-discrimination fulfill these responsibilities.

In summary, the decision of whom to initiate into the Gamma Omicron chapter is not made by Kappa. Kappa, however, does not limit membership to individuals who are biologically born as female, and therefore, the chapter has not violated any policies or procedures in initiating an individual who identifies as a woman. If there are any specific obligations to your clients that you contend Kappa has violated, please identify those. To the extent frivolous litigation is pursued, Kappa will vigorously defend itself.

Very truly yours,

Natalie M. McLaughlin

NMM/kay

43645791

# ATTACHMENT 4

DOC ID ----> 200421000424



| DATE:<br>07/28/2004 | DOCUMENT ID<br>200421000424 | DESCRIPTION<br>DOMESTIC/AMENDED RESTATED<br>ARTICLES (AMA) | FILING<br>50.00 | EXPED<br>.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |
|---|---|---|---|---|---|---|---|

**Receipt**

This is not a bill. Please do not remit payment.

VORYS, SATER, SEYMOUR & PEASE
52 E. GAY STREET
COLUMBUS, OH 43215

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, J. Kenneth Blackwell

**142747**

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**KAPPA KAPPA GAMMA FRATERNITY**

and, that said business records show the filing and recording of:

Document(s)                                                     Document No(s):

**DOMESTIC/AMENDED RESTATED ARTICLES**                          **200421000424**



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 26th day of July, A.D.
2004.

*J. Kenneth Blackwell*

Ohio Secretary of State

DOC ID ----> 200421000424



Prescribed by **J. Kenneth Blackwell**

Ohio Secretary of State
Central Ohio: (614) 466-3910
Toll Free: 1-877-SOS-FILE (1-877-767-3453)

www.state.oh.us/sos
e-mail: busserv@sos.state.oh.us

| Expedite this Form: (Select One) | |
|---|---|
| ○ Yes | PO Box 1390<br>Columbus, OH 43216<br>*** Requires an additional fee of $100 *** |
| ● No | PO Box 1028<br>Columbus, OH 43216 |

## Certificate of Amendment by
## Shareholders or Members
### (Domestic)
### Filing Fee $50.00

**(CHECK ONLY ONE (1) BOX)**

| (1) Domestic for Profit | | (2) Domestic Non-Profit | |
|---|---|---|---|
| ☐ Amended<br>(122-AMAP) | ☐ Amendment<br>(125-AMDS) | ☑ Amended<br>(126-AMAN) | ☐ Amendment<br>(126-AMD) |

---

**Complete the general information in this section for the box checked above.**

| | |
|---|---|
| Name of Corporation | Kappa Kappa Gamma Fraternity |
| Charter Number | 142747 |
| Name of Officer | Lila A. Isbell |
| Title | Executive Director and Corporate Secretary |

☑ Please check if additional provisions attached.

The above named Ohio corporation, does hereby certify that:

☑ A meeting of the        ☐ shareholders      ☐ directors ( *non-profit amended articles only*)

☑ members was duly called and held on        June 28, 2004
                                                  (Date)

at which meeting a quorum was present in person or by proxy, based upon the quorum present, an affirmative
vote was cast which entitled them to exercise        100        % as the voting power of the corporation.

☐ In a writing signed by all of the   ☐ shareholders   ☐ directors (*non-profit amended articles only*)
☐ members who would be entitled to the notice of a meeting or such other proportion not less than a majority as the
    articles of regulations or bylaws permit.

---

**Clause applies if amended box is checked.**

Resolved, that the following amended articles of incorporations be and the same are hereby adopted to supercede
and take the place of the existing articles of incorporation and all amendments thereto.

DOC ID ----> 200421000424

All of the following information must be completed if an amended box is checked.
If an amendment box is checked, complete the areas that apply.

**FIRST:**     The name of the corporation is:     Kappa Kappa Gamma Fraternity

**SECOND:** The place in the State of Ohio where its principal office is located is in the City of:

Columbus                                              Franklin
(city, village or township)                                (county)

**THIRD:**     The purposes of the corporation are as follows:

Attached and incorporated herein by reference as Exhibit A.

**FOURTH:** The number of shares which the corporation is authorized to have outstanding is:     Not Applicable
                **(Does not apply to box (2))**

**REQUIRED**
Must be authenticated
**(signed)** by an authorized
representative
**(See Instructions)**

*Lila A. Isbell*
Authorized Representative

Lila A. Isbell
(Print Name)

July 22, 2004
Date

Authorized Representative

(Print Name)

DOC ID ----> 200421000424

**Exhibit A**

**PURPOSE CLAUSE AT THIRD**

Kappa Kappa Gamma Fraternity (the "Fraternity or Corporation") is formed to function exclusively as an organization described in Section 501(c)(7) of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any future United States internal revenue law) (the "Code"). The purposes for which the Corporation is formed are:

A.   To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;

B.   To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

C.   To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;

D.   To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

E.   To advocate for and seek to address issues of concern for members and women in general;

F.   To promote the establishment and growth of alumnae associations and encourage participation of alumnae in the Fraternity programs; and

G.   To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

Notwithstanding anything to the contrary contained in these Articles, the Corporation shall not carry on any activities not permitted to be carried on by a corporation exempt from federal income tax under Code Section 501(a) as an organization described in Code Section 501(c)(7).

DOC ID ----> 200421000424

**ATTACHMENT TO**
**CERTIFICATE OF AMENDMENT BY**
**SHAREHOLDERS OR MEMBERS**
**OF KAPPA KAPPA GAMMA FRATERNITY**

**FOURTH**:    No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its directors, officers, members or other private persons or organizations, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article THIRD hereof. The Corporation shall have the power to do any and all lawful acts and things and to engage in any and all lawful activities which may be necessary, useful, suitable, desirable or proper for the furtherance, accomplishment or attainment of any or all of the purposes for which the Corporation is organized, and to aid or assist other organizations whose activities are such as to further, accomplish, foster or attain any such purposes.

**FIFTH**:    Upon the dissolution of the Corporation, the Board of Directors shall, after paying or making provision for the payment of all liabilities of the Corporation, dispose of the assets of the Corporation exclusively for the purposes of the Corporation in such manner as the Board of Directors shall determine and in accordance with the Fraternity *Bylaws*.

**SIXTH**:    These Articles may be amended from time to time, in whole or in part, in accordance with the Fraternity *Bylaws*.

DOC ID ----> A527_0076

A527 - 75

Page..... 188.... Line.. 25

Number... 142747

Form D

## Articles of Incorporation

—OF—

KAPPA KAPPA GAMMA FRATERNITY

Filed in the office of the Secretary of State,

at Columbus, Ohio, on the......31......day of

......July......19......and recorded

in Volume......387...... Page......

of the Records of Incorporation.

Secretary of State.

### REMARKS

Articles of incorporation must be subscribed by at
least three persons, a majority of whom must be citi-
zens of the United States. They may be acknowledged
before any officer who is authorized to take "ac-
knowledgments of deeds.

The fee is $10.00.

Mail To: R. H. Grossinger atty
33 No. High St.
Columbus, Ohio

---

THE STATE OF OHIO, COUNTY OF.................. ss.

Personally appeared before me, the undersigned, a Notary Public, in and for said county, this

.......day of.......July.......19.....20., the above named...................................................

...................................................who acknowledged the foregoing articles of incorporation to be his free act and deed, for the

uses................................................................therein mentioned.

WITNESS my hand and official seal on the day and year last aforesaid.

(SEAL)

............................................ Notary Public.

§8623-97. A corporation not for profit may be formed hereunder for any purpose or purposes not involving pecuniary
gain or profit, for which natural persons may lawfully associate themselves, provided that where the General Code makes
special provision for the filing of articles of incorporation of designated classes of corporations not for profit, such corpora-
tion shall be formed under such provisions and not hereunder.

§8623-98. Any number of persons, not less than three, a majority of whom are citizens of the United States, may
become a corporation not for profit by subscribing, acknowledging and filing in the office of the secretary of state articles
of incorporation, hereinafter called "Articles," setting forth:

1. The name of the corporation.
2. The place in this state where the principal office of the corporation is to be located.
3. The purpose or purposes for which it is formed.
4. The names and postal addresses of the trustees, not less than three, who are to serve until the first annual
meeting or other meeting called to elect trustees.
5. If desired, the names of any persons who, together with the subscribers to the articles, are to be members of
the corporation upon organization.
6. If desired, any qualifications for membership in such corporations.
7. Any lawful provision which may be desired for the purpose of defining, limiting or regulating the election
of the powers of the corporation, and of the trustees and of any class of members, or the division of members into
classes, or creating a definite plan not in violation of the provisions of the members into classes for the purpose
of the distribution of such property. Any provision authorized to be made in the distribution of such property. Any provision authorized to be
No case may be used which shall be likely to mislead the public.

A527   76   142 747

CORPORATION NOT FOR PROFIT.                                                                    REGULAR

# Articles of Incorporation

—OF—

------------KAPPA KAPPA GAMMA, FRATERNITY------------

The undersigned, a majority of whom are citizens of the United States, desiring to form a corporation, not for profit, under the General Corporation Act of Ohio, do hereby certify:

FIRST.   The name of said corporation shall be..Kappa Kappa Gamma Fraternity..........

SECOND.   The place in this State where the principal office of the corporation is to be located

Columbus                                           Franklin ...County.
...(City, Village or Township)...

THIRD.   The purpose or purposes for which said corporation is formed are:

(a) To perpetuate Kappa Kappa Gamma Fraternity for the development of the Nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence.

(b) To promote the establishment of local fraternities(chapters) at various colleges and universities in the several states of the United States and Canada and to provide for their proper organization, installation and maintenance, including the giving of such financial or other assistance in connection with or incidental to the owning, acquiring, selling, exchanging, mortgaging, leasing and improving all property by such fraternity(chapter) as may be necessary or desirable from time to time in the interests of the corporation.

(c) To act as trustee for the purpose of receiving and accepting by way of gift or otherwise moneys to be used, loaned, invested, donated, administered and disposed of for educational, social endowment and philanthropic purposes, and as such trustee to loan, invest, re-invest, donate and dispose of such funds and to create, establish, maintain and administer funds for educational, social, endowment and philanthropic purposes and do all things necessary and incidental to the establishment, maintenance and administration of such funds.

(d) To have and protect a distinctive and exclusive badge.

The foregoing are not limitations or restrictions of the general authority conferred upon the corporation by Section 8623-99 of the General Code of Ohio but are in addition thereto.

FOURTH.   The following persons shall serve said corporation as trustees until the first annual meeting or other meeting called to elect trustees.                    GIVE STREET ADDRESS.

Florence T. Myers                410 Ohio State Sav. Bldg.
Clara O. Pierce                  Columbus Ohio
Eleanor V. V. Bennet             2525 Webster St, Berkeley, Cal.
Alice Tyrrell                    605 8th Ave S.E Minneapolis Minn
Marie B. Macnaughlin            St Mario Ohio 747 N.S.A

IN WITNESS WHEREOF, We have hereunto subscribed our names, this........26th................day of

.................July......................., 19..30.            Florence T. Myers
                                                              Clara O. Pierce
                                                              Eleanor V. Bennett
                                                              Alice T. Bierley
                                                              Marie B. Macnaughlin

ALL ARTICLES OF INCORPORATION FILED ON OR AFTER JULY 23, 1929, MUST BE
ACCOMPANIED BY FOLLOWING DESIGNATION OF AGENT.

# Original Appointment of Agent

Ohio Corporation,
Section 8623-129, General Code.

A527     77

KNOW ALL MEN BY THESE PRESENTS, That___MISS CLARA O. PIERCE___
_____Name of Agent

of__410 Ohio State Savings Bldg.,__, in__Columbus__,
Street or Avenue

__Franklin_____County, Ohio, a natural person and resident of said county,

being the county in which the principal office of__KAPPA KAPPA GAMMA FRATERNITY__
Name of Corporation

is located, is hereby appointed as the person on whom process, tax notices and demands against

said___KAPPA KAPPA GAMMA FRATERNITY_____may be served.
Name of Corporation

KAPPA KAPPA GAMMA FRATERNITY
Name of Corporation

*Florence N. Myers*

*Alice T Barney*

*Eleanor V. V. Dennet*
Incorporators

(To be executed by all or a majority of the Incorporators at the time
of organization.)

_____COLUMBUS_____, Ohio,

_____JULY 26_____, A. D. 19_30_.

KAPPA KAPPA GAMMA FRATERNITY
Name of Corporation

Columbus, Ohio

Gentlemen: I hereby accept the appointment as the representative of your company upon

whom process, tax notices, or demands may be served.

*Clara O. Pierce*

State of Ohio,
County of__Franklin_____, ss.:

Personally appeared before me, the undersigned, a Notary Public in and for said County,

this_____26th____day of____July_____, A. D. 19_30_, the above named

*Clara O. Pierce*_____who acknowledged the signing of the foregoing

to be her free act and deed for the uses and purposes therein mentioned.

WITNESS my hand and official seal on the day and year last aforesaid.

*R H Greppinger*
Notary Public in and for

*Franklin*_____County, Ohio.

P. H. T-

# ATTACHMENT 5

Kappa Kappa Gamma    REPORT OF THE BYLAWS COMMITTEE

In spring 2021, the Bylaws Committee and a parliamentarian were tasked with reviewing the Fraternity's governing documents with an eye toward making sure subjects were in the correct documents. The committee found that the subjects that should be in the Fraternity *Bylaws* were in the Fraternity *Standing Rules*, some things in the Fraternity *Bylaws* should be in the Fraternity *Standing Rules,* and some things should be moved to the Fraternity Policies. The Bylaws Committee looked at each subject area within the documents to make sure they were interacting correctly and not contradicting other parts of the documents.

The whole committee met weekly to review provisions together. Parts of the committee were assigned specific topics or sections to research and to make recommendations to be brought back to the full committee for review. The parliamentarian kept up with revisions, updates, and keeping the committee focused. The committee met for over 100 hours spanning seven months. This was not a quick process, and the committee took time to reflect on each change and amendment to make sure the full meaning was understood. The committee also reached out to subject-area specialists as necessary for clarification and insight into how operations were happening in reality versus the aspirational goals set forth in the documents.

Because of the number of random amendments and the need to move provisions from one article to another and moving provisions between documents, the committee's final decision was the writing of a new set of bylaws and a new set of standing rules — each document called a revision.

While the documents now look different in structure, most of the content is unchanged. As in years past, the Bylaws Committee solicited amendments to the Fraternity *Bylaws* and *Standing Rules* per our documents and amendments that were accepted, along with accepted amendments from the 2018–20 Biennium, were incorporated into these new documents. If adopted, these documents will take effect at the end of Convention 2022. Some of the major amendments and the rationale behind the change are explained below.

- Term Limit of District Directors. The term limit for District Directors has been increased to three terms of two years each from two terms. The District Director role requires unique skill sets of team building, overall Fraternity operations knowledge and mentoring. There are volunteers who are particularly talented and are able to build rapport and trust with our chapters and alumnae associations to move them forward in a positive way. Their skills can be used in a variety of different districts. It is limiting the work of the Fraternity to have these volunteers only eligible to serve four years total in their lifetime, especially for those volunteers who serve when they are younger.
- Fees. The alumna per capita fee will increase $10 from the current $25 to $35 and the active per capita fee will increase $5 from $92 to $97. Both of these fee changes will take effect at the end of Convention. In addition, there will be an automatic cost of living adjustment of fees annually that is in line with the Consumer Price Index for All Urban Consumers. This shall be rounded to the nearest dollar. These fee increases are critical to maintaining and growing Kappa's offerings as well as sustaining Kappa's long-term future.

Kappa Kappa Gamma   REPORT OF THE BYLAWS COMMITTEE

- Fraternity Nominating Process. At the 2016 Convention, a resolution was put forth to study the Fraternity nominating process. The Leadership Development and Education (LEAD) Committee has reviewed the Fraternity nominating process and has proposed a new nominating structure and a new committee name from Nominating Committee to Leadership Selection Committee to reflect the purpose of the committee. The goal of the amendments surrounding this process change is to allow for the leaders of the Fraternity to be chosen in a transparent process by a committee given the time and education necessary for this important task. Under the proposed changes, elections for Fraternity officers and District Directors will take place before Convention but those officers and District Directors will not take office until after the close of Convention. Conducting the election virtually may have an added benefit of a higher voter participation rate since those voting members unable to attend Convention will be able to cast a vote in the election. The change in the election timing gives a chance for training and transitions between officers.
- Chapter Officer Structure. The Fraternity has piloted a new officer structure in two districts for the past four years. Kappa Kappa Gamma is proposing a scalable chapter officer structure that would be flexible and customizable to a chapter's size, priorities and needs. This model provides a more robust membership experience, increased strategic planning and decision-making, and enhances the leadership and professional opportunities at the chapter level. The proposed chapter leadership structure consists of a President and six vice presidents who would oversee specific areas of the chapter. These executives would serve as a visionary leadership board. Each of the six vice presidents would oversee and manage one of six departments. With these requirements in place, chapters can customize the leadership roles based on their needs. Chapters may choose to fill the content areas in each department with a director, all of whom would report to a vice president.
- Convention Body Vote on Ritual Changes. As proposed in 2020 but not voted on, a provision has been added in the documents that requires a Convention body vote on any proposed changes to ritual. Historically, Fraternity documents have stated that the Convention body would vote on changes to the ritual. When the 2016 structure changes were approved, this was not included. The intent is to return to the vote for emphasis but also the need for our beautiful ritual to be used and practiced in the same manner and the same words by all.
- Inclusivity. Since diversity, equity and inclusion have been a focus and the subject of a previous resolution at Convention, a concerted effort has been made to make sure the language of the documents is inclusive. The committee has tried to craft the documents in such a way that gendered pronouns are not used and references are inclusive of all of our membership. The committee looked at the term chairman and decided that, like President, it identifies a position of leadership without regard to the gender of the holder of the office.

The chairman of the committee would like to thank the committee members for their time and dedication to this project. The Bylaws Committee consists of Carmen Mincy, *Vermont;* Ann

## Kappa Kappa Gamma   REPORT OF THE BYLAWS COMMITTEE

Truesdell, *Ohio Wesleyan;* and Tracy Nadzieja, *Arizona State*. We were also guided by the Fraternity parliamentarian, Patricia McDougle, whom we would have been lost without.

**Committee Recommendations**
The committee recommends the adoption of the following resolutions:

*Resolved*, That amendment #1 to the Fraternity *Articles of Incorporation* submitted by the committee be adopted.

*Resolved,* That, as a substitute for the present bylaws, the bylaws submitted by the committee be adopted, with the provisos attached thereto.

*Resolved,* That, as a substitute for the present standing rules, the standing rules submitted by the committee be adopted.


Meredith Perlman, *Emory*, Bylaws Committee Chairman

March 16, 2022

 Kappa Kappa Gamma

Kappa Kappa Gamma Fraternity
Notice of Amendment to the
Kappa Kappa Gamma Fraternity *Bylaws*

Pursuant to Article XXIX of the Kappa Kappa Gamma *Bylaws* requiring a notice of three months for amendments to the Fraternity *Bylaws*, notice is hereby given that a revision — substitution of an entirely new set of bylaws for the current bylaws — will be presented for consideration by the voting members of the Biennial Convention meeting June 23–26, 2022.

Kari Kittrell Poole, Executive Director
March 16, 2022

i

22.03

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

## PREAMBLE

We, believing a closer union in the bonds of friendship to be for our mutual benefit, appreciating the advantages to be derived from a secret fraternity, and feeling that in union there is strength, hereby form ourselves into a social sorority for the development of nobler qualities of the mind and finer feelings of the heart, and for mutual helpfulness in the attainment of individual and social excellence.

*an association* [handwritten]

## BYLAWS OF
## KAPPA KAPPA GAMMA FRATERNITY

## ARTICLE I
## NAME

The name of the corporation shall be Kappa Kappa Gamma Fraternity, hereinafter referred to as *the Fraternity*.

## ARTICLE II
## PURPOSE

The Fraternity is formed to function exclusively as an organization described in Section 501(c)(7) of the Internal Revenue Code of 1986 as amended (or corresponding provisions of any future United States internal revenue law) (the "Code"). The purposes for which the Fraternity is formed are:

*why this addition?* [handwritten]

to unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity at large may attain social, moral and intellectual excellence;

to establish chapters at various colleges and universities, provide for their proper organization, installation and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

to cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest and promote higher standards of social conduct;

to cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

to advocate for and seek to address issues of concern for members and women in general;

*Bad news* [handwritten]

to provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and

to have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

22.03

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

*or Fraternity*

*Why?*

Notwithstanding anything to the contrary contained in these articles, the corporation shall not carry on any activities not permitted to be carried on by a corporation exempt from federal income tax under Code Section 501(a) as an organization described in Code Section 501(c)(7).

## ARTICLE III
## MEMBERS

**Section 1. Classifications of Members.** The Fraternity shall have the following classifications of members:

A. **New Member.** A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated. A new member shall:
   1. Have signed a dated, written pledge to membership witnessed in writing by an active or alumna member of the Fraternity.
   2. Remain eligible as a new member for a term of one year before the pledge to membership expires so long as enrolled in the same college or university.
   3. Have the right to attend meetings, speak in debate and present their views to a committee on a referred question but shall not vote on any question. A new member shall not be present at a meeting during ritual for initiated members.

B. **Active.** An active member shall be:
   1. An undergraduate enrolled at the college or university where initiated.
   2. A member enrolled beyond the fourth academic year who chooses to remain an active member.
   3. A graduate student who chooses to remain an active member.
   4. A graduate student initiated while pursuing graduate courses.
   5. An undergraduate member who enrolls in a college or university where a chapter of the Fraternity is located and affiliates with such a chapter.
   6. An undergraduate member who returns to college or university after an absence of two or more years and who has completed at least one academic term and had their active membership restored by a three-fourths vote of the members at a chapter meeting.

C. **Associate.** An associate member shall be:
   1. An active member who transfers to a college or university;
      a. With an active chapter and who does not affiliate with the chapter.
      b. Where no chapter is located.
   2. An active member who has been granted Associate Membership by the District Director after receiving Advisory Board's approval.
   3. An active member who is unable to participate in chapter activities because they are:
      a. Studying abroad.
      b. Completing a full-time co-op or internship.

D. **Alumna.** An alumna member shall be:
   1. An active member who has received a college degree or has left college without receiving a degree.

22.03

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

2. An active member enrolled beyond the fourth academic year who chooses to become an alumna member.
3. An active member still attending college when Fraternity Council has deemed it necessary to reorganize the chapter.
4. A member of a petitioning group who has been initiated into the Fraternity as an alumna.
5. An individual who initiates through Alumna Initiation.

**Section 2. Qualifications.** A woman may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.

A. **Collegiate New Member and Alumna Candidate.** To qualify as either a collegiate new member or an alumna candidate, a woman shall:
1. Have demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals.
2. Not be pledged to membership or be a member of any similar college or university women's social sorority except honorary or professional organizations.
3. Not have been initiated into any other member group of the National Panhellenic Conference. or  N I C
4. Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements.
5. Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity *Bylaws*, *Standing Rules* and *Policies*.

B. **Collegiate New Member.** To qualify as a collegiate new member, a woman shall also:
1. Be enrolled at any college or university having a chapter of the Fraternity; and
2. Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B-minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

C. **Alumna Candidate.** To qualify as an alumna candidate, a woman shall also:
1. Have attended a four-year college or university.
2. Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

**Section 3. Initiation.** A new member, upon fulfilling the requirements for Initiation, shall be initiated and become a member of the Fraternity. Each new initiate shall receive a certificate of membership.

A. **Requirements for Initiation.**
1. A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational

*(handwritten margin notes:)* No previous group with Panhellenic Council



FRATERNITY BYLAWS REVISION

institution may be initiated. In extraordinary cases, chapters may petition the Membership Director for an exception to these requirements.

2. An alumna candidate who has completed a period of education and has met all financial obligations may be initiated.

3. The new member or candidate shall make provision for securing a badge before Initiation.

B. **Special Circumstances.** A college alumna previously pledged to membership may petition Fraternity Council no sooner than five years after the expiration of the pledge to membership. Initiation under these special circumstances shall be granted upon a three-fourths vote of Fraternity Council. Such an alumna shall become a member of the original chapter to which they were pledged.

**Section 4. Affiliation.** A member who transfers to a college or university with a chapter may affiliate with the chapter at that college or university provided that a statement of the member's good standing has been received from the original chapter. A majority vote of the affiliated chapter shall be required. Upon leaving college, the member shall be considered a member of both the original chapter and the affiliated chapter.

**Section 5. Voluntary Resignation, Broken Pledge, Resignation and Dismissal.**

A. **Voluntary Resignation.**

1. **New Member.** A new member wishing to resign from their pledge to membership shall submit the resignation in writing and shall state the reason(s) for the resignation. The chapter shall accept such resignation and notify the new member, the Standards Specialist and Kappa Kappa Gamma Headquarters.

2. **Active, Associate and Alumna Member.** An active, associate or alumna member wishing to resign from membership shall submit the resignation in writing and shall state the reason(s) for the resignation. *where to who?*   *not finished finished*

B. **Broken Pledge, Requested Resignation and Dismissal.**

1. **New Member.** A new member's pledge to membership may be broken with or without prior Probation by a three-fourths vote of the chapter members present and eligible to vote at a chapter meeting at which quorum is present.

2. **Active Member.** An active member may be requested to resign or may be dismissed for violating the purposes and standards of the Fraternity or the regulations of the college or university. A three-fourths vote of the chapter members present and eligible to vote at a chapter meeting at which quorum is present shall be required.

3. **Associate or Alumna Member.** An associate or alumna member may be dismissed for violating the purposes and standards of the Fraternity by a three-fourths vote of chapter members present and eligible to vote at a chapter meeting at which quorum is present or Fraternity Council depending on the

 **Kappa Kappa Gamma**    FRATERNITY BYLAWS REVISION

**Section 6. Reinstatement or Renewal.**
  A.  **Active, Alumna and Associate Member.**
      1.  **Reinstatement After Voluntary Resignation.** Reinstatement shall require a three-fourths vote of Fraternity Council for a former member who voluntarily resigned and is applying in writing for reinstatement no sooner than three years after resignation.
      2.  **Reinstatement After Requested Resignation or Dismissal.** Reinstatement shall require a unanimous vote of Fraternity Council for a former member who was requested to resign or was dismissed and is applying in writing for reinstatement no sooner than five years after resignation or dismissal.
  B.  **New Member Renewal.** The expired pledge period of a new member may be renewed by a three-fourths vote of chapter members present and eligible to vote at a chapter meeting at which quorum is present.

**Section 7. Direct Fraternity Council Action.**
  A.  **Fraternity Council Action.** By a three-fourths vote, Fraternity Council may take direct action against a new or active member in the breaking of a pledge to membership; by requesting a member's resignation; or by dismissing a new, active, associate or alumna member. The member shall be notified of the reason(s) for the proposed action and be provided an opportunity to respond.
  B.  **Decision Final.** Fraternity Council's decision shall be final and binding upon the member and the Fraternity and shall not be subject to review by any other body.

**Section 8. Fees.**
  A.  **New Member Fee.** Each new member, alumna initiate, active member and alumna of a petitioning group shall pay a member fee of $175 within one month after signing the pledge to membership and before Initiation.
  B.  **Renewal Fee.** A renewal fee of $50 and new member fee of $175 shall be required for any woman repledged to membership. The Fraternity Membership Director may grant exceptions under unusual circumstances.



  C.  **Annual Per Capita Fee.**
      1.  Active member: $97
      2.  Active member granted Associate Membership: $97
      3.  Alumna member: $35
      4.  Alumna member within five years of leaving school or who have reached their 65-year member milestone: $25
      5.  The annual per capita fee shall be calculated each year, as of January 1, by the annual cost of living adjustment (COLA) and shall be calculated utilizing the Consumer Price Index for All Urban Consumers (CPI-U). The per capita fee shall be rounded to the nearest dollar. If the COLA decreases, the per capita fee shall remain the same as the previous year. Notification that the fee shall be effective at the beginning of the next fiscal year shall be sent to members, chapters, and alumnae associations by February 1. This increase shall take effect at the beginning of the fiscal year, July 1.



22.03

 **Kappa Kappa Gamma**                    FRATERNITY BYLAWS REVISION

D.   **Reinstatement Fee.** The reinstatement fee for a former member shall be $300, payable upon reinstatement.

## ARTICLE IV
## FRATERNITY ORGANIZATION

**Section 1. Districts.** The Fraternity shall be organized into districts determined by Fraternity Council for the purposes of providing leadership, membership retention and extension, and development of Fraternity interests.

A.   **District Directors.** District Directors shall be elected, and their number shall correspond to the number of districts defined by Fraternity Council. Fraternity Council shall assign the director for each district. District Directors shall supervise the operation and management of chapters and alumnae associations within their assigned districts and may report on recommendations to Fraternity Council.

1.   **Qualifications.** Each District Director shall be an alumna who has served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) a former Regional Director or Province Director; 3) a District Director or Content Director; 4) a Content Specialist; 5) a member of a Fraternity standing or special committee; 6) a former Fraternity Council Assistant; 7) a Field Representative; 8) a member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) a member of the Fraternity Housing Corporation Board of Directors.

2.   **Term of Office and Term Limits.** District Directors shall take office at the close of the Biennial Convention. A District Director shall hold office for a term of two years or until their successor is elected and shall be eligible for re-election to the same office for two additional terms.

3.   **Temporary Absence.** In the event a District Director is temporarily unable to perform the duties of office, Fraternity Council shall assign such duties to another District Director or another member of the Fraternity.

4.   **Request for Resignation or Removal from Office.** Any District Director failing to perform the duties of office may be requested to resign from office or may be removed from office when, in the opinion of the President and a three-fourths vote of Fraternity Council, the welfare of the Fraternity demands it. The District Director shall be given the opportunity to provide a defense.

B.   **District Director Meetings.** The District Directors shall hold at least one meeting in the interim between Biennial Conventions.

**Section 2. Chapters.**

A.   **Purpose.** Chapters shall be established in connection with colleges and universities to carry out the purpose of the Fraternity.

B.   **Members.**

1.   **Member Classifications.** Chapter members shall be active, associate, and new members of the Fraternity.

2.   **Chapter Membership Selection.** Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures.

 **Kappa Kappa Gamma**                    FRATERNITY BYLAWS REVISION

C. **Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or functional areas: internal affairs, external affairs, operations, membership, membership development, and finance.[1]

*new*

D. **Required Officers.** Chapters officers shall be a President, a vice president for each department or functional area, and a Standards Director. A chapter may combine chapter officer positions and have other officers as needed in the administration of the chapter with the approval of the Leadership Development Specialist.[2]

*who?*

E. **Officer Eligibility.** A chapter member meeting all membership responsibilities and having attained at least a B-minus average or its equivalent in the previous term shall be eligible for election to office and to remain in office if elected. In either case, an exception for failure to meet the standard may be granted by the Academic Excellence Specialist or Standards Specialist, in consultation with the District Director.

F. **Meetings.** Chapters shall meet regularly during the academic year and shall hold a formal meeting using ritual for initiated members at least once a month.

G. **Governance.** Each chapter shall adopt bylaws and standing rules for its governance that shall be approved by the Fraternity Bylaws Committee before becoming effective. Bylaws, standing rules, and amendments adopted thereafter, shall be approved by the Fraternity Bylaws Committee before becoming effective.

H. **Convention Representation.** Each chapter shall elect one delegate and two alternates to attend a Convention. Only the delegate shall represent the chapter with the right to vote.

I. **College Panhellenic Association.** A chapter shall be a member of its host institution's College Panhellenic Association, an affiliate of the National Panhellenic Conference, and shall be represented by a delegate from the chapter. If the delegate is unable to provide representation, an alternate shall represent the chapter.

J. **Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the chapter. The board shall be composed of alumna advisers to the chapter officers, directors, Executive Board, and the Panhellenic Delegate.

K. **Establishing a New Chapter.**
   1. A new chapter may be established:
      a. By membership selection directed by Fraternity Council.
      b. Upon receipt of a petition from a qualified group of women. Members of the petitioning group, both current and previous, shall be eligible to become members of the Fraternity.
   2. Upon establishment, a new chapter shall join the Fraternity Housing Corporation.

---

[1] Effective with the chapter election cycle of 2022–23.
[2] ibid

22.03

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

L. Removal of a Chapter.
1. **Initiating the Removal by Fraternity Council.** By a three-fourths vote, Fraternity Council may initiate the removal of a chapter.
2. **Vote to Remove a Chapter.** The removal of a chapter shall require a 30-day notice and a three-fourths vote of each District Director, each Content Director, each standing committee chairman, and each Content Specialist in the district where the chapter is located.

M. **Surrender of Charter.** A chapter may petition to sever connection with the Fraternity by presenting a written request to Fraternity Council stating reasons in full and signed by three-fourths of the active members of the chapter and three-fourths of the chapter Advisory Board.
1. **Fraternity Council Action.** By a majority vote, Fraternity Council may accept the petition and agree to the surrender of the chapter charter or may condition surrender on additional actions before accepting the surrender of the charter.
2. **Chapter Requirements.** If the request to surrender a charter is accepted, the charter shall be withdrawn when the chapter has fulfilled all financial obligations, transferred chapter assets according to the current Fraternity Financial Policies, returned all records and archives, and returned the charter.

N. **Return of Chapter Charter and Archives.** Whether a charter is surrendered by the chapter or removed by the Fraternity, the District Director shall take charge of the chapter charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

O. **Reestablishment of a Chapter.** Fraternity Council shall appoint a special committee to investigate the request for reestablishment of a former chapter. A three-fourths vote of Fraternity Council shall be required to reestablish a former chapter. All reestablished chapters shall join the Fraternity Housing Corporation.

P. **Reorganization of a Chapter.** The reorganization of a chapter shall occur when Fraternity Council deems it is in the best interest of the chapter and the Fraternity. Any current active member of the chapter may be designated an alumna and shall remain an alumna unless otherwise designated by Fraternity Council.

**Section 3. Alumnae Associations.**
A. **Purpose.** Fraternity alumnae may organize as associations to further the work of the Fraternity and extend friendship to all members.
B. **Officers.** The officers of an association shall be a President, Secretary, Treasurer, and such other officers as may be considered necessary.
C. **Meetings.** An association shall hold at least four meetings during the year. At least two of these shall be open to the entire membership.
D. **Association Governance.** Each association shall adopt bylaws for its governance.
E. **Convention Representation.** Each association shall be entitled to be represented by one delegate at any Convention.
F. **Alumnae Panhellenic Associations.** If a local Alumnae Panhellenic Association, which is affiliated with the National Panhellenic Conference, exists, an alumnae association of

22.03

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

the Fraternity shall become a member and may send representatives to the Alumnae Panhellenic meetings.

G. **Establishing New Associations.** A group of alumnae may form a petitioning group and petition Fraternity Council to establish an association. A three-fourths vote of Fraternity Council shall be necessary to establish an association. The date of Fraternity Council approval of the application shall be considered the date of establishment.

H. **Surrender of Charter.** An association voting to disband shall give three months' notice in writing of such intention to the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. At the end of this period, provided the request to disband has not been withdrawn, the charter shall be surrendered.

I. **Withdrawal of a Charter.** An association that has failed to fulfill its responsibilities or failed to meet the Fraternity financial standards or the standards of conduct shall have the charter of the association withdrawn upon the recommendations to Fraternity Council by the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. A three-fourths vote by Fraternity Council shall be required to approve the withdrawal of the charter.

J. **Return of Association Charter and Archives.** Whether a charter is surrendered by the association or withdrawn by the Fraternity, the Alumna Relations Specialist shall take charge of the association charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

K. **Reestablishment of an Alumnae Association.** An association that has surrendered its charter or had its charter withdrawn may be reestablished by a three-fourths vote of Fraternity Council.

## ARTICLE V
## MEMBER, CHAPTER, AND ASSOCIATION RESPONSIBILITIES

**Section 1. Overview.** Members and the chapters and associations to which they belong shall comply with all federal, state or provincial laws and college or regulations where applicable and shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct.

**Section 2. Legal Compliance.** Members, chapters, and associations of the Fraternity shall adhere to local, state, provincial, and federal laws with a specific emphasis on the following:

A. **Hazing.** Participating in or being involved in any way with hazing — defined as any activity or action taken with or without consent of the individual involved that produces mental, emotional, psychological, or physical discomfort, humiliation, degradation, embarrassment, harassment, or ridicule — shall be prohibited.

B. **Alcohol.** The illegal use or misuse of alcoholic beverages shall be prohibited.

C. **Drugs.** The use, sale, purchase or possession of any drugs or other controlled substance in violation of local, state, provincial or federal law shall be prohibited.

D. **Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall


**Kappa Kappa Gamma**                    FRATERNITY BYLAWS REVISION

*new*

be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

**Section 3. College or University Regulations.** Collegiate chapters and their members shall adhere to all rules or regulations stipulated by the college or university even when the rules or regulations are more stringent than the standards of the Fraternity.

**Section 4. Academic Excellence.** Chapters and individual members shall meet, maintain, or exceed chapter-specific academic standards.

*membership?*

A. **Chapter Standard.** Each chapter shall maintain a scholastic average equal to or higher than the university or college all-sorority average.

B. **Active Member Standard.** Each chapter shall establish a minimum GPA requirement for active members. Each active member of a chapter shall meet or exceed the chapter-specific GPA requirement.

**Section 5. Finance.** Individual members, chapters, and associations shall remain current with all financial obligations as established by a chapter, an association, or the Fraternity.

**Section 6. Conduct.** Individual members, chapters, and associations shall act with high standards of ethical conduct that represent the values of the Fraternity.

**Section 7. Accountability.**

A. **Overview.** The purpose of holding a member, chapter, or association accountable for inappropriate conduct shall be established to protect the integrity and prestige of the Fraternity.

B. **Process.** The Fraternity shall develop and implement procedures for the enforcement of the responsibilities and expectations enumerated herein that shall afford fairness and respect to the member, chapter, or association.

C. **Outcome.** The outcome of the process may be a Warning of Probation, Probation, Suspension, and in extreme cases, dismissal of a member from the Fraternity or removal of a chapter or association.

**Section 8. Good Standing.**

A. **Member.** A member meeting all member standards and responsibilities, academic, financial and conduct, and not under any accountability outcome is a member in good standing and, therefore, eligible for any elected, appointed, or volunteer position within the Fraternity.

B. **Chapter.** A chapter meeting the standards for responsibility, academic and conduct, its financial and reporting obligations and that is not on Probation or Suspension shall be a chapter in good standing, eligible for awards and representation at Convention, and shall have the right to a vote.

 Kappa Kappa Gamma                    FRATERNITY BYLAWS REVISION

C.  **Association.** An association meeting its financial and reporting obligations and which maintains standards of conduct shall be an association in good standing, and eligible for awards and representation at Convention, and shall have the right to a vote.

**Section 9. Conflict of Interest.** Any member serving in an elected, appointed or volunteer position with the Fraternity, the Kappa Kappa Gamma Foundation, the Fraternity Housing Corporation, any chapter, any alumnae association, or similar entity affiliated or associated with these entities under any chapter, license franchise or similar arrangement shall maintain high standards of ethical conduct in performing their duties and shall avoid situations where their financial or personal interests or professional obligations interfere or appear to interfere with the interests of the Fraternity. They shall not use Fraternity property, information, or position for personal gain or violate Fraternity expectations of confidentiality.

### ARTICLE VI
### OFFICERS

**Section 1. Officers.** The officers of the Fraternity shall be a President, four Vice Presidents, and a Treasurer.

**Section 2. Qualifications.** Officers shall be alumna members who have formerly served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) Regional Director or Province Director; 3) District Director or Content Director; 4) Content Specialist; 5) chairman or member of a Fraternity standing or special committee; 6) Fraternity Council Assistant; 7) Field Representative; 8) member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) member of a Fraternity Housing Corporation Board of Directors.

**Section 3. Term of Office and Term Limits.** Officers take office at the close of the Biennial Convention and shall hold office for a term of two years or until their successors are elected. The President and Treasurer may be elected to the same office for no more than two terms. The Vice Presidents may be elected to the same office for no more than three terms.

**Section 4. Officer Transition Meeting.** Following an election and prior to Convention, the outgoing Fraternity Council shall host at least one transition meeting with newly elected Fraternity Council members.

**Section 5. Vacancies and Temporary Absences.**

A.  **Vacancies.**

  1.  **President.** At the first Fraternity Council meeting following the Biennial Convention, by a three-fourths vote, Fraternity Council shall designate one of the Vice Presidents to assume the presidency if a permanent vacancy occurs in the office and to preside at meetings if the President is absent.

 Kappa Kappa Gamma          FRATERNITY BYLAWS REVISION

2. **Other Officers.** By a three-fourths vote, a vacancy in any office other than the President shall be filled for the unexpired term by Fraternity Council.

B. **Temporary Absences.** In the event an officer other than the President is temporarily unable to perform the duties of their office, Fraternity Council shall assign such duties to another member of Fraternity Council or to another member of the Fraternity who shall have the right to vote.

**Section 6. Request for Resignation or Removal From Office.** An officer may be requested to resign from office or shall be removed from office when the welfare of the Fraternity necessitates it. A three-fourths vote of Fraternity Council shall be required. The officer shall be given the opportunity to provide a defense.

### ARTICLE VII
### NOMINATIONS AND ELECTIONS

**Section 1. Nominations.** Nominees for each officer and District Director shall be determined by the Leadership Selection Committee.

A. **Committee Composition.** The Leadership Selection Committee shall be composed of a chairman, a vice chairman and ~~an equal number of alumnae association and chapter~~ representatives. One member, ~~collegiate or alumna, shall be appointed from each district.~~ *[handwritten: elected]*

   1. **Chairman and Vice Chairman.** Fraternity Council shall appoint the Leadership Selection Committee Chairman and Vice Chairman following the Convention. These positions shall be nonvoting members of the committee except in the case where the chairman may vote to break a tie.

   2. **Members.** Fraternity Council shall appoint chapter and association representatives as members of the committee in February following Convention based on applications. The Leadership Education and Development Committee shall receive and review applications and make recommendations to Fraternity Council.

   3. **Equal Number of Collegiate and Alumna Representatives.** One representative, collegiate or alumna, shall be appointed from each district with an equal number of collegiate and alumna representatives.

   4. **Alternating Each Biennium.** In one biennium, one chapter representative shall be appointed from districts Alpha, Beta, Delta, Eta, Theta, Mu, and Pi and one alumna representative appointed from districts Gamma, Kappa, Lambda, Epsilon, Zeta, Xi, and Rho. In the next biennium, chapter representatives shall be appointed from the second group of districts and the alumna representative from the first group, subsequently alternating each biennium.

B. **Nominee Selection.** The Leadership Selection Committee shall nominate one candidate for each officer and District Director position based on recommendations received from members and applications received from candidates.

C. **Nominations Report.** The report of the Leadership Selection Committee shall be prepared and communicated to eligible voters no less than 10 weeks prior to the Convention.

 **Kappa Kappa Gamma**　　　FRATERNITY BYLAWS REVISION

D. **Open Nominations.** Following the publication of the report, open nominations from eligible voters shall be in order for at least five days provided consent of the nominee has been obtained and the member is qualified.

**Section 2. Elections.** Fraternity Council shall determine the dates and times for the election. The election shall be completed at least eight weeks prior to the Biennial Convention.

A. **Eligible Voters.** Members eligible to vote in an election shall be the voting members of a Convention.

B. **Voting.** The election shall be conducted electronically utilizing an online voting and election software application. The candidate for each officer and District Director position receiving the most votes shall be elected provided such candidate receives a majority of the votes cast for that position.

C. **Election Committee.** An Election Committee comprised of nonvoting members and appointed by the President shall oversee and coordinate the election process in conjunction with the Executive Director. The report of the election results shall be sent electronically to the membership within five business days following the close of voting and shall be published on the Fraternity website.

## ARTICLE VIII
### MEETINGS

**Section 1. Membership Meetings.** Membership meetings shall be a Convention at which the rights and authority of members shall be vested in the voting members of the Convention.

**Section 2. Convention.**

A. **Regular Meeting.** The regular meeting of the membership of the Fraternity shall be a Convention, which shall be held biennially in even-numbered years. Fraternity Council shall determine the date, time, and place.

B. **Special Meeting.** A special meeting of the membership may be called by a unanimous vote of Fraternity Council and shall be called upon the written request of a majority of the chapters and alumnae associations.

C. **Notice of Meetings.** Notice of meetings, both regular and special, shall be sent to all voting members, chapters, and alumnae associations entitled to representation at such meetings.

  1. **Regular Meeting.** Notice shall state the date, time, place, and shall be given not less than three months prior to the meeting date.

  2. **Special Meeting.** Notice shall state the date, time, place, and shall be given not less than one month prior to the meeting date. Notice of a special meeting shall include the purpose of the meeting.

D. **Postponement or Cancellation of a Meeting.** In cases of emergency, Fraternity Council, by a unanimous vote, may postpone or cancel a previously noticed Convention meeting. When a meeting is canceled, it shall become the duty of Fraternity Council to reschedule the canceled meeting as soon as conditions permit.

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

E. **Voting Members.** The voting members of the Convention shall be composed of the following Fraternity members who are registered delegates, entitled to one vote and voting in person:
   1. Fraternity Council members
   2. District Directors
   3. Chairmen of standing committees
   4. Content Directors
   5. One delegate from each chapter
   6. One delegate from each alumnae association

*no leadership rep vote*

F. **Alumnae Associations Vote Value.** If the total number of registered alumnae association delegates present exceeds the total number of registered chapter delegates present, the value of the alumnae associations' total votes in any vote taken shall be reduced by the proportion of registered chapter delegates to registered alumnae association delegates.

G. **Vote and Voting.** A majority vote shall decide in all cases except where otherwise specifically provided. There shall be no absentee voting or voting by proxy.

H. **Quorum.** The quorum at any meeting of any Convention shall be a majority of the eligible voting members.

I. **Nonvoting Members.** The privilege of speaking may be granted to a nonvoting member of a Convention at the discretion of the President.

**Section 3. Enacted Business.** Any item of business brought before and acted upon by any Convention shall not be changed with the exception of emergency powers granted to Fraternity Council.

## ARTICLE IX
## FRATERNITY COUNCIL

**Section 1. Composition.** The members of Fraternity Council shall be the officers of the Fraternity: the President, the four Vice Presidents, and the Treasurer. *6*

**Section 2. Duties.** Except as otherwise provided by law, the *Articles of Incorporation* or these bylaws, all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law. Fraternity Council shall:

A. Exercise the rights of the Fraternity as a shareholder, member, holder, or other ownership interest in any other entity;

B. Elect representatives to serve on the Board of Trustees as provided for in the Code of Regulations of the Kappa Kappa Gamma Foundation; and

C. Elect representatives to serve on the Board of Directors as provided for in the Code of Regulations of the Kappa Kappa Gamma Fraternity Housing Corporation.

**Section 3. Emergency Powers.** If Fraternity Council determines in the interval between Biennial Conventions that an emergency exists that ordinarily requires action by a vote of the

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

Convention, Fraternity Council may exercise the voting power vested in the Convention. Any such action shall be reported to the next Biennial Convention.

**Section 4. Meetings.**
   A. **Called Meeting.** A Fraternity Council meeting may be called by the President and shall be called upon the request of a majority of its members. Reasonable notice of date, time and place of a meeting shall be sent to each Fraternity Council member.
   B. **Quorum.** A majority of the members of Fraternity Council shall constitute a quorum.
   C. **Business Without a Meeting.** Fraternity Council may conduct business without a meeting as long as the decisions are written, signed, and unanimous.
   D. **Voting.** There shall be no absentee voting or voting by proxy.

ARTICLE X
COMMITTEES

**Section 1. Standing Committees.** The standing committees of the Fraternity, appointed by and under the supervision of Fraternity Council, shall be Bylaws, Convention, Finance, *The Key* Publication, Leadership Education and Development, and Panhellenic.

**Section 2. Special Committees.** Special committees may be established by the membership meeting in Convention or by Fraternity Council.

**Section 3. Composition of Committees.**
   A. **General Composition.** Each committee shall be composed of a chairman and members appointed by Fraternity Council.
   B. **Finance Committee Composition and Term.** The Finance Committee shall be composed of the committee chairman, the Fraternity Treasurer, the Fraternity Facilities Director, and at least three other persons, one of whom may be a nonmember qualified by experience in financial operations. Members shall serve for a term of three years or until their successors are appointed. One-third of the appointees shall be appointed each year. No member shall serve for more than two consecutive terms.

**Section 4. Appointment and Term of Office.** Except as otherwise specifically provided here, standing committee chairmen and members shall be appointed by Fraternity Council, shall take office immediately upon appointment following the Biennial Convention, and shall remain in office for a term of two years, except for Finance Committee members, who serve for three years or until their successors are appointed.

**Section 5. Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a standing committee chairman.

**Section 6. Removal.** Any standing committee chairman or committee member failing to perform the duties of office may be removed from office by Fraternity Council. A



# Kappa Kappa Gamma

FRATERNITY BYLAWS REVISION

standing committee chairman or committee member shall be notified of pending removal and given the opportunity to respond.

**Section 7. Member *Ex-officio*.** The Fraternity President shall be a member *ex-officio* of all committees except the Leadership Selection Committee.

## ARTICLE XI
## CONTENT AREAS

**Section 1. Content Areas.** The content areas shall be academic excellence; Advisory Board; alumna relations; diversity, equity, and inclusion; facilities; leadership development; membership; Panhellenic; philanthropy; programming, public relations, risk prevention; ritual and history; and standards.

**Section 2. Content Directors.** Content Directors shall lead the work of the Fraternity in the appointed content area, collaborate with Kappa Kappa Gamma Headquarters staff, and guide the Content Specialists to provide support to alumnae and collegians.

A. **Appointment and Term of Office.** A Content Director shall be appointed by Fraternity Council for each content area. Content Directors shall take office immediately upon appointment following the Biennial Convention and remain in office for a term of two years or until their successors are appointed.

B. **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Director.

C. **Removal From Office.** Any Content Director failing to perform the duties of office may be removed from office by Fraternity Council. A Content Director shall be notified of pending removal and given the opportunity to respond.

*[handwritten margin note: could they not be elected by ws/m]*

**Section 3. Content Specialist.** Each district shall have at least one Content Specialist in each content area who shall work with the District Director and the Content Director to foster growth of chapters and associations within the district.

A. **Appointment and Term of Office.** Content Specialists shall be appointed by Fraternity Council to serve a two-year term with no term limits. Content Specialists shall begin their terms at the beginning of the fiscal year in non-Convention years and shall remain in office until their successors are appointed.

B. **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Specialist.

C. **Removal From Office.** Upon recommendation of the Content Director, a Content Specialist failing to perform the duties of office may be removed from office by Fraternity Council. A Content Specialist shall be notified of pending removal and given the opportunity to respond.

22.03

## Kappa Kappa Gamma     FRATERNITY BYLAWS REVISION

### ARTICLE XII
### ADMINISTRATIVE OPERATIONS

**Section 1. Kappa Kappa Gamma Headquarters.**

A.  **Headquarters Office.** The Fraternity shall maintain a headquarters office as its principal place of business.

B.  **Headquarters Staff.** A professional staff shall be employed to conduct the business of the Fraternity at the direction of Fraternity Council. This staff shall be under the direct supervision of an Executive Director.

**Section 2. Executive Director.** An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.

**Section 3. Financial Director.** A financial director, authorized by Fraternity Council, shall be in charge of the finances and accounts of the Fraternity. The financial director shall report to the Executive Director.

### ARTICLE XIII
### FINANCE

**Section 1. Investment of Fraternity Funds.** The investments and securities performance shall be reviewed by the Finance Committee for compliance with the Fraternity's investment policy statement.

**Section 2. Financial Drives and Campaigns.** No chapter, alumnae association, Advisory Board, House Board or individual member shall undertake any financial drive or campaign of more than local extent in the name of the Fraternity without first securing the recommendation of the Finance Committee and approval of Fraternity Council.

**Section 3. Audit and Tax Returns.** An audit of the Fraternity finances shall be conducted annually by a certified public accountant and appropriate tax returns filed annually.

**Section 4. Insurance.** The Fraternity shall maintain a master insurance program.

**Section 5. Liabilities.** Total current liabilities, including contingent liabilities and mortgage notes payable assumed by the Fraternity, shall not exceed 50% of the assets of the Fraternity.

### ARTICLE XIV
### PROPRIETARY MATERIALS

**Section 1. Trademarks.** Fraternity Council shall determine which Fraternity marks shall be registered with the United States Patent and Trademark Office. All Fraternity marks are owned by the Fraternity and shall not be used or reproduced except as authorized by Fraternity Council.

22.03

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

**Section 2. Copyrights.** All written material created in the name of the Fraternity is automatically copyrighted and shall not be used outside of the Fraternity unless approved by Fraternity Council.

**Section 3. Secret Materials.** Secret materials, such as the *Book of Ritual* and related materials, shall be kept secret and shall not be disclosed to nonmembers or used outside of the Fraternity. Reproduction of the secret materials shall be prohibited except as authorized by Fraternity Council.

## ARTICLE XV
## NATIONAL PANHELLENIC CONFERENCE

**Section 1. Membership.** The Fraternity shall maintain the Fraternity's membership in the National Panhellenic Conference (NPC).

**Section 2 Membership Requirements.** The Fraternity shall follow NPC Unanimous Agreements, policies, and procedures.

**Section 3. Representation.** The Fraternity shall be represented at the annual meeting of the NPC Council of Delegates by a Fraternity member appointed by Fraternity Council who shall be empowered to act and vote on behalf of the Fraternity.

## ARTICLE XVI
## INDEMNIFICATION

The Fraternity shall indemnify, to the maximum extent permitted by law, any person who is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that they are or were a member of Fraternity Council, an elected officer, a member serving in an appointed position, a volunteer, an authorized agent, or an employee of the Fraternity against all expenses, judgments, fines, and amounts paid in settlement incurred by them if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interest of the Fraternity and with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful. The Fraternity may pay expenses incurred by any person covered by this section in defending any action, suit or proceeding in advance of final disposition on such terms and conditions, as shall be determined by Fraternity Council. The indemnification provided by this section is not exclusive and the Fraternity may purchase and maintain insurance on behalf of any person covered by this section, whether or not the Fraternity would have the obligation or power to indemnify them under this section.

## ARTICLE XVII
## DISSOLUTION

If for any reason the Fraternity shall be dissolved, all assets not otherwise disposed of shall be transferred to the Kappa Kappa Gamma Foundation, an Ohio nonprofit corporation.

 **Kappa Kappa Gamma**                    FRATERNITY BYLAWS REVISION

### ARTICLE XVIII
### ELECTRONIC MEETINGS AND COMMUNICATIONS

**Section 1. Meetings.** The membership, Fraternity Council, all committees and subcommittees, and any Fraternity subgroup may attend and participate in any meeting through any communications equipment that provides a transmission, including, but not limited to, by telephone, telecopy, or any electronic means, from which it can be determined that the transmission was authorized by, and accurately reflects the intention of, the participant involved and allows all persons participating in the meeting to contemporaneously communicate with each other.

**Section 2. Voting by Ballot.** An anonymous vote conducted through a designated internet meeting service or electronic means such as audience response devices or computer software shall be deemed to be a ballot vote, fulfilling any requirement that a vote be by ballot.

**Section 3. Communications.** Unless a member indicates otherwise, all communication required in these bylaws, including required notices, may be sent electronically.

### ARTICLE XIX
### NONPROFIT CORPORATION

The Fraternity is an Ohio nonprofit corporation. The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity. The Fraternity shall be governed in accordance with the laws of the state of Ohio, without giving effect to the choice of law or conflicts of laws principles thereof.

### ARTICLE XX
### KAPPA KAPPA GAMMA FOUNDATION

The Kappa Kappa Gamma Foundation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax under Internal Revenue Code Section 501(c)(3).

### ARTICLE XXI
### KAPPA KAPPA GAMMA FRATERNITY HOUSING CORPORATION

The Kappa Kappa Gamma Fraternity Housing Corporation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax in accordance with Internal Revenue Code Section 501(c)(7).

### ARTICLE XXII
### CHAPTER HOUSE CORPORATION AND CHAPTER HOUSE ASSOCIATION

**Section 1. Chapter House Corporation.** A chapter house corporation shall own or lease and maintain all property, including land, buildings, furnishings and equipment for the use and benefit of a chapter. Members of a house corporation shall be members of the Fraternity, shall have paid a membership fee in the corporation, and shall agree to be bound by the regulations of the corporation and the Fraternity *Bylaws, Standing Rules*

 **Kappa Kappa Gamma**     FRATERNITY BYLAWS REVISION

and *Policies.* The Fraternity shall be a member of each chapter house corporation, and if necessary, representation shall be determined on a case-by-case basis.

**Section 2. Chapter House Association.** All rental property, furnishings and equipment shall be managed and maintained by a chapter house association provided the chapter was chartered before July 1, 1976, and the house association has not incorporated. Members of a house association shall be a member of the Fraternity, shall have paid a membership fee in the house association, and shall agree to be bound by the regulations of the house association and the Fraternity *Bylaws, Standing Rules* and *Policies.* The Fraternity shall be a member of each chapter house association, and if necessary, representation shall be determined on a case-by-case basis.

## ARTICLE XXIII
## PARLIAMENTARY AUTHORITY

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern the Fraternity in all cases to which they are applicable and in which they are not inconsistent with these bylaws and any special rules of order the Fraternity may adopt.

## ARTICLE XXIV
## AMENDMENT OF ARTICLES OF INCORPORATION AND BYLAWS

**Section 1. Amendment.** The Fraternity *Articles of Incorporation* and *Bylaws* may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

**Section 2. Submitting Proposed Amendments.** An amendment may be proposed by Fraternity Council, a District Director, a standing or special committee, a Content Director, a Content Specialist, a chapter, or an alumnae association. Proposed amendments shall be submitted no later than six months prior to the date of the Convention and only amendments approved by Fraternity Council shall be submitted to the Convention for a vote.

# # #

22.03

 Kappa Kappa Gamma

ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

## PROVISOS RELATING TO TRANSITION

**I.   Effective with the Chapter Election Cycle of 2022–23.**
The following two provisions of Article IV. Fraternity Organization shall become effective with the chapter election cycle of 2022–23.

**Section 2. Chapters.**

   C. **Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or functional areas: internal affairs, external affairs, operations, membership, membership development, and finance.

   D. **Required Officers.** Chapters officers shall be a President, a vice president for each department or functional area, and a Standards Director. A chapter may combine chapter officers and have other offices as needed in the administration of the chapter with the approval of the Leadership Development Specialist.

**II.  Remain in Effect Until the Election Cycle of 2022–23.**
The following sections from Article XII of the 2018 Kappa Kappa Gamma *Bylaws* remain in effect until the chapter election cycle of 2022–23 when Article IV, Section 2. C and D shall become effective.

### ARTICLE XII
### CHAPTER ORGANIZATION AND MANAGEMENT

**Section 2. Officers.** The officers of a chapter shall be: President, Vice President-Standards, Vice President-Organization, Vice President-Academic Excellence, Recording Secretary, Corresponding Secretary, Treasurer, Registrar and Marshal. Chapters may combine chapter offices and duties.

**Section 3. Standing Committee Chairmen** The standing committee chairmen shall be: Education, Event, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations and Risk Management. Chapters may combine standing committee chairmen and duties.

**Section 4. Standing Committees.** The standing committees shall be: Academic Excellence, Catalog, Organization, Education, Event, Finance, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations, Risk Management, Ritual, and Standards. Chapters may combine standing committees and duties.

**Section 5. Qualification of Officers and Standing Committee Chairmen.**

   A. **Eligibility.** Only members meeting all financial obligations and standards of conduct and attaining at least a B-minus average or its equivalent for the previous term shall be eligible to be nominated for or hold office unless the **relevant Content Specialist** (Academic Excellence Specialist or **Standards Specialist**), in consultation with the District Director, grants an exception.

   B. **Maintaining Eligibility.** If an officer or standing committee chairman fails to maintain the qualifications to hold office, she shall become ineligible to remain in office unless the Academic Excellence Specialist or **Standards Specialist**, in consultation with the District Director, grants an exception.

22.03