## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, HANNAH HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **DEMAND FOR JURY TRIAL** |
| | ) | **FIRST AMENDED VERIFIED** |
| v. | ) ) | **MEMBER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES** |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 2:23-cv-00051-ABJ |
| Defendants. | ) | |

## FIRST AMENDED VERIFIED COMPLAINT

## INTRODUCTION

1.     Plaintiffs are young women and members of Kappa Kappa Gamma Fraternity, a national women-only social organization with a chapter at the University of Wyoming (also called "the Sorority" ).[1] Four months ago—after national Sorority officials disregarded the secret voting

---

[1] Founded in 1870, Kappa Kappa Gamma Fraternity pre-dates, by 30 years, use of the word "sorority" to refer to "[a] women's society in a college or university." *Sorority*, Oxford English Dictionary Online (Mar. 2023). Kappa Kappa Gamma's corporate documents refer to the entity as a fraternity. Modern usage distinguishes between "fraternities" for men and "sororities" for women, so this Complaint refers to Kappa Kappa Gamma as "the Sorority" and similar organizations as "sororities." This is consistent with Kappa Kappa Gamma's own publications.

process required by Sorority rules and after extensive behind-the-scenes direction from national Sorority officials and alumnae advisers—the Sorority inducted a man, Artemis Langford, as a member.[2]

**2.**     Kappa Kappa Gamma limits membership to women only. Under the Sorority's Bylaws, every new member must be "a woman." Attachment 1 at 2 (art. III, sec. 1.A). A woman is an adult human female. An adult human *male* is not a woman, no matter how he chooses to describe himself. From conception, every single cell in a man's body differs from the analogous cell in a woman: brain cells, muscle cells, bone cells. These cells mature and develop in different ways—before, during, and after puberty—for reasons that are still not fully understood. As but one example, medical researchers know testosterone affects the male brain through the mid-20s, but they still do not understand how the hormone affects cognition.

**3.**     Kappa Kappa Gamma was founded in 1870 as a single-sex organization for women, and it has consistently described itself as such. Defendants have not altered this membership requirement in *any* of the Sorority's corporate governance documents—its Articles of Incorporation, Bylaws, Standing Rules or Policies—in a manner that would permit a man to join Kappa Kappa Gamma. Instead, Defendant Mary Pat Rooney and other members of the Corporation's Fraternity Council (the Sorority's name for its Board of Directors) have unilaterally concluded a man can become a

---

*See*, *e.g.*, "Why Kappa: Membership Expectations" *available at* kappakappagamma.org/why-kappa/ membership-expectations (visited Feb. 2, 2023) ("Joining a sorority can provide you with support, connection, friendship, and growth that starts now and lasts a lifetime.")

[2] Plaintiffs do not seek damages or other relief from Langford. Plaintiffs allege that Langford's sorority membership is void, however, and this likely makes him a required party. Fed. R. Civ. P. 19(a)(1)(B). Langford is a Defendant for this reason only.

Kappa member if he claims to have the subjective belief he is a woman. This conclusion disregards biology, Kappa's 150-year history, and Kappa's purpose, mission, and bylaws.

4.      Kappa Kappa Gamma is an Ohio non-profit corporation, so Defendant Mary Pat Rooney and the other members of the Sorority's Fraternity Council (its Board of Directors) have fiduciary duties to the Sorority under Ohio law. At all times relevant to this matter, Defendant Rooney has owed Kappa Kappa Gamma and its members the fiduciary obligations of good faith, loyalty, candor, care, and compliance. She has a fiduciary duty to operate Kappa Kappa Gamma in an honest, fair, and just manner that is faithful to the nonprofit corporation's purpose and mission.

5.      Defendant Rooney and the members of Kappa Kappa Gamma's Fraternity Council have violated their fiduciary duties. At their direction, the Sorority issued a "Guide for Supporting our LGBTQIA+ Members" in 2018. Attachment 2 (the "Guide"). The Guide was sent to the Sorority's District Directors and Alumnae Advisers—women who supervise the Sorority's college chapters—and posted on the Sorority's website as "a resource that educates and supports our membership on the subject of the LGBTQIA+ community and its intersection with Kappa." The Guide states, without citation to any of the Sorority's Bylaws or other governing documents, that Kappa Kappa Gamma is a "single gender organization" that admits both "women" and "individuals who identify as women" (*i.e.*, men). *Id.* at 1.

6.      The commonly understood meaning of the phrase "single-gender organization" is the same as "single-sex organization": men or women, but not both. *See* Gender, Oxford English Dictionary Online (Mar. 2023) ("Males or females viewed as a group; = sex"). Under the Guide, however, "gender" is no longer a synonym for "sex." Instead, as the Sorority's attorney explained to Plaintiffs, the Fraternity Council views gender as a "broader construct encompassing identity."

Attachment 3 at 1. This concept of gender connects to "[h]ow an individual defines themselves in terms of characteristics traditionally identified in this culture as male or female," which is a person's "gender identity." Attachment 2 at 1, 9. As a result, the Sorority's attorney claims that men can also become Kappa members if they "identify as women." *Id.* at 1.

7.      Kappa cannot be a "single-gender organization" wherein members have a "single" gender identity unless the Sorority uses gender identity to make membership decisions.[3] But the Guide itself states that the Sorority does not discriminate based on gender identity. *Id.* at 1 ("Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on … gender identity…."). *Id.* What the Guide actually purports to do is change the Sorority's membership criteria. Under the Guide, all women—including, for example, nonbinary women who do not have a female gender identity—can become members. And, under the Guide, some men can also join.

8.      The Guide is an unlawful abandonment of the Sorority's requirement of single-sex membership. Kappa Kappa Gamma's founding principles and governance documents limit membership to women. An adult human male does not become a woman just because he tells others that he has a female 'gender identity' and behaves in what he believes to be a stereotypically female manner. In the same way, an adult human female does not cease to be a woman just because she refuses to dress or behave in a feminine manner. Defendant Rooney and the Fraternity Council members cannot, consistent with their fiduciary duties, twist the Sorority's longstanding

---

[3] The Guide describes the concept of "gender" as "more accurately viewed as a spectrum rather than a polarized, dichotomous concept." Attachment 2 at 11. If each person's gender lies somewhere along a spectrum, then one can never sort individuals into a "single gender." It is impossible for Kappa Kappa Gamma to be a "single-gender organization" under the Guide's own definition of gender.

membership requirement to conflate being female (being a woman) with femininity (acting like one believes a woman 'should').

9.      The Guide purports to create an opportunity for men to join Kappa Kappa Gamma in violation of the Sorority's longstanding restriction. By creating the Guide, and intentionally admitting a man as a Sorority member, Defendant Rooney and the other Fraternity Council members have violated their duty of loyalty, their duty of care, and their duty of obedience/compliance to the Sorority and its purpose and mission.

10.     Since 1870—when a woman's presence in a college classroom, by itself, defied societal norms—Kappa Kappa Gamma has united women in defiance of stereotypes about how women "should" be. The Sorority provides a separate place where young women can speak for themselves; a place where young women do not have to constantly fight the social pressure of how men think women should behave. Now, Langford—a man who claims to be a woman because he thinks he knows how women should behave—has been brought into Plaintiffs' sorority house. The Fraternity Council has betrayed the central purpose and mission of Kappa Kappa Gamma, by conflating the experience of *being a woman* with the experience of men *engaging in behavior generally associated with women*.

11.     Plaintiffs' Complaint is a derivative suit to obtain a judgment that Kappa Kappa Gamma remains as required by its Articles of Incorporation: a non-profit corporation "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4 (emphasis added). Plaintiffs ask this Court to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules

by fiat, and ask this Court to enjoin the unlawful implementation of the Guide. Plaintiffs ask this Court to hold that the admission of Artemis Langford, and any other man, as a member of Kappa Kappa Gamma is void *ab initio*. Plaintiffs further ask this Court to declare that Defendant Rooney and the other members of the Fraternity Council have violated their fiduciary duties to the Sorority. Plaintiffs further ask for damages, reflecting the injuries the Sorority has and will continue to suffer in its membership, including the closure of the Sorority's chapter at the University of Wyoming, loss of donations, decrease in *alumnae* support and participation, and permanent damage to the Sorority's reputation and mission.

12.     Plaintiffs also seek direct relief from the Defendants. Ohio law recognizes that faithless directors of a corporation can directly injure others through a breach of fiduciary duty in addition to the derivative injuries suffered by the corporation itself. In pursuit of an ideological agenda, Defendants have violated numerous other Bylaws, Standing Rules, and Policies of the Sorority, and caused the Sorority to act in a manner that has specifically harmed Plaintiffs and undermined contractual obligations to the Plaintiffs. The Fraternity's officers, directors, and employees directly, and through alumnae advisers acting at Fraternity Council direction, pressured student members to endorse Langford's initiation to the Sorority. When Langford's membership vote violated the Sorority's secret-ballot procedures, Defendants and their agents knowingly disregarded the clear violations of the corporate rules. When Plaintiffs raised concerns about Langford's inappropriate and threatening behavior in the sorority house, Defendants and their agents refused to protect Plaintiffs and prevented others from doing so. Instead of protecting Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma altogether. Defendants have pushed Plaintiffs to resign even though—having already joined Kappa

Kappa Gamma—Plaintiffs are permanently barred from joining a different sorority. Finally, Defendants have retaliated against Plaintiffs and other sorority members who object to the Board's unauthorized Guide. Plaintiffs ask for all remedies available in response to Defendants' wrongdoing, including monetary damages, punitive damages, injunctive relief, declaratory relief, and attorney fees.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, as the parties are citizens of different States, all necessary Parties are before this Court, and the sum of the matter in controversy, including damages and the value of the declaratory and injunctive relief sought by Plaintiffs, exceeds seventy-five thousand dollars ($75,000.00). Plaintiffs were members of Defendant Kappa Kappa Gamma Fraternity at the time of the actions at issue. This action is not a collusive one to confer jurisdiction the Court would otherwise lack.

14.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, as two Defendants in this matter are citizens of the State of Wyoming and reside in the District of Wyoming, and the substantial part of the events giving rise to Plaintiffs' claims and injuries occurred in Wyoming.

## PARTIES

15.     Jaylyn Westenbroek is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

16.     Hannah Holtmeier is a citizen of Nebraska. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

17.     Allison Coghan is a citizen of Kansas. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

18.     Grace Choate is a citizen of Oklahoma. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

19.     Madeline Ramar is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

20.     Megan Kosar is a citizen of Virginia. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

21.     Defendant, and nominal Defendant, Kappa Kappa Gamma Fraternity is a nonprofit corporation organized under the laws of Ohio with its headquarters located in Dublin, Ohio.

22.     Defendant Mary Pat Rooney is a citizen of Illinois and the President of the Fraternity Council of Kappa Kappa Gamma Fraternity.

23.     Defendant Kappa Kappa Gamma Building Co., is a Wyoming nonprofit corporation with its principal office at 1604 E. Sorority Row, Laramie, Wyoming (also called the "Kappa Housing Corp."). Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation. Fed. R. Civ. P. 19(a)(1)(B).

**24.**     Upon information and belief, Defendant Artemis Langford is a citizen of Wyoming. Langford currently resides in a dormitory in Laramie, Wyoming. In the alternative, Langford is a Utah citizen as Langford's father and mother reside in Utah. As a third alternative, Langford is a citizen of Washington State, as he presents a Washington State driver license with a Washington State address when asked for official identification.

## STATEMENT OF FACTS

I.   Kappa Kappa Gamma was established more than 150 years ago to unite women through membership.................................................................12

   A.   Kappa Kappa Gamma has always been an organization limited to women. . 12

   B.   Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment. .................................................15

II.   The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women................................................20

   A.   The Sorority's Corporate Charter specifically references women..................20

   B.   The Sorority's Bylaws, Standing Rules and Policies also limit membership to women. ....................................................................................22

      1.   Kappa Kappa Gamma's Bylaws prohibit Langford's membership. .......23

      2.   Langford's selection process violated Kappa Kappa Gamma's Standing Rules. ....................................................................................28

      3.   The Policies of Kappa Kappa Gamma prohibit Langford's membership in the Sorority. ....................................................................30

III.   National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Langford's wrongful membership. ....................................................................................32

IV.   Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies. ....................................................................................35

**V.  Defendants' evasion of Kappa Kappa Gamma's membership restrictions represents an ongoing violation of fiduciary duties to the Corporation, and any additional demands to the Sorority's Directors would be futile.**..........................39

**A.  The Defendants have refused Plaintiffs' demands to prevent violation of the Sorority's restrictions on membership.**..................................40

**B.  Any further demand to the Fraternity Council, seeking enforcement of Kappa Kappa Gamma's membership restrictions, would be futile.**............................41

**VI.  Kappa Kappa Gamma's effort to force the membership of Artemis Langford, and the experience of Plaintiffs since his admission, demonstrate the disruptive effect of a man on the sorority experience.**............................46

**A.  Langford's behavior has destroyed the single-sex haven that Kappa members describe as the heart of the sorority experience.**..................................49

**B.  Langford's interactions with the Sorority members prior to voting on his Membership.**..................................51

**C.  The Voting Process.**..................................54

**D.  The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies.**....57

**E.  Langford's conduct after Defendants granted him access to the sorority house.**..................................59

**F.  Damages**..................................63

I. **Kappa Kappa Gamma was established more than 150 years ago to unite women through membership.**

A. **Kappa Kappa Gamma has always been an organization limited to women.**

25.     In 1870, six women at Monmouth College in western Illinois founded the Kappa Kappa Gamma Fraternity. The Sorority's founders believed that Greek-letter societies helped male students, and college women should have the same opportunities. Women were a distinct minority in colleges in the late 19th century. At the time of Kappa Kappa Gamma's founding, only 11,000 women between the ages of 18 and 21 were enrolled in college in the entire United States. Men outnumbered women by nearly five to one on college campuses, and many colleges did not permit women to enroll at all. As one of Kappa's Presidents, Kay Smith Larson, described that era, "Women were often ignored in the classroom and ridiculed outside of it."

26.     Louise Bennett Boyd, one of the six founding members of Kappa Kappa Gamma, explained that the young women "concluded we would have something new; the world seemed to be moving too slowly for us and moreover the young men had Greek letter fraternities. We determined that nothing short of a Greek letter fraternity (we did not even speak of it as a sorority in those days) would satisfy us." Today, Kappa is one of the nation's oldest and largest sororities, with approximately 210,000 living alumnae, 140 collegiate chapters, and 230 alumnae associations.

27.     The first Bylaws of Kappa Kappa Gamma Fraternity make clear that only women can be members. The 1871 Bylaws state "Any lady may become a candidate for membership who shall be of good moral character, and of above average talent; and who, at the time of proposal, either is or has been in attendance at some college or seminary." Early sorority members were concerned with academics, scholarship and understanding what their responsibilities should be as "new

women" enjoying the privileges of fraternal life. Kappa Kappa Gamma Fraternity, *History: Kappa Kappa Gamma Through the Years* 126 (2000).

28.      In 1871, the Sorority's initiation ceremony was simple. New members were read the organization's constitution and took an oath of loyalty. *Id.* at 27. "The [Kappa] *Constitution* at that time was secret and contained the first purpose of the Fraternity which, with little change, remains the same today." *Id.* The first Kappa members affirmed their "union in the bonds of friendship…for the development of the nobler qualities of the mind and finer feelings of the heart, helping one another attain excellence and for the advancement of its members socially and in literary attainments." *Id.* When the Sorority filed its Articles of Incorporation with the Ohio Secretary of State in 1930, this first purpose was only slightly changed:

> To perpetuate Kappa Kappa Gamma Fraternity for the development of the nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence among its members.

Attachment 4 at 6. The Sorority's first purpose now explicitly links the original pledge of 150 years ago to the Sorority's single-sex identity:

> To unite **women**, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence.

*Id.* at 4 (emphasis added).

29.      The words *woman* and *women*, as used in Kappa Kappa Gamma's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Sorority's 150 years, have always referred to adult female human beings. These words, as used by Kappa Kappa Gamma prior to Defendants' unlawful actions, have never referred to biological males who claim to be women.

30.     Kappa Kappa Gamma's communications, throughout its history, use vocabulary that reinforces that the Sorority uses the word "woman" with its traditional, immutable biological meaning. Members are part of a "sisterhood." "Editor's Letter," *The Key: 150 Anniversary*, Vol. 137, No. 1 at 1 (2020) ("Your commitment to Kappa—in word and in deed—helps to drive the future of our sisterhood."). The Sorority refers to members who have finished college as *alumnae*, the plural form of the Latin term *alumna*. *Alumna* and *alumnae* are gendered Latin words that refer exclusively to females. "Alumna," *Oxford English Dictionary* (Dec. 2022) ("A female former pupil or student of a particular school, university, etc.; a female graduate of a particular seat of learning."). *Alumnus* is the word for a male graduate. *Alumni* refers to a group of graduates that is all-male or one that includes both men and women.

31.     When Kappa Kappa Gamma published an official history of the sorority's first sixty years (through 1930), two of the six sorority founders were still living. Louise Bennett Boyd and Jeannette Boyd introduced the book with an open letter to "Our dear Kappa girls." Burton-Roth & Whiting-Westermann, *History of Kappa Kappa Gamma Fraternity, 1870–1930* at v (1932). The Sorority's 1889 songbook is replete with references to young maids, girls, women, and sisters. Susan Goldsmith & Jessie Cougill, *Songs of the Kappa Kappa Gamma Fraternity* (1889).

32.     Articles in the Sorority's official magazine, *The Key*, reflect the traditional, biological meaning of the word "woman." Perhaps the most salient article was published in 2002. The Sorority conducted focus groups and personal interviews to identify the traits that exemplify the Kappa experience. According to more than 500 collegiate members, alumnae, parents of Kappa members, Kappa volunteers, and university administrators, the "Benefits of Kappa Kappa Gamma" include "Friendship/Sisterhood":

Kappa Kappa Gamma **is a single-sex haven in a mainly coed campus environment**.

Kappa Kappa Gamma is a family away from home, diminishing campus size and impersonality.

Kappa Kappa Gamma provides sisterhood support via alumnae associations in hundreds of cities.

Kappa Kappa Gamma sustains members in bad times, celebrates good times, and shares all times.

Kappa Kappa Gamma offers a diversity of background and interest among its members.

"In the Company of Leaders," *The Key (A Kappa Kappa Gamma Publication)*, Vol 119, No. 2 at 9 (Summer 2002) (emphasis added).

33.     Artemis Langford is not a woman as that word has been adopted and understood by Kappa Kappa Gamma for the past 150 years. Artemis Langford is not an adult female human being. Artemis Langford would not have been eligible for membership in Kappa Kappa Gamma in 1870, nor would he have been eligible during any subsequent time since Kappa's founding. Artemis Langford is not eligible for Kappa membership today.

   **B.     Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment.**

34.     A woman is an adult human female. A man is an adult human male. For a biologist, these words distinguish between human beings who donate genetic material (men) or receive genetic material (women) during the reproductive process. The distinctions between men and women, however, extend far beyond reproductive biology. Genetic material within every cell in the human body guides that cell's creation and operation. This genetic coding is different for men and women from conception to death. No one questions that the endocrine systems of men and women, which

are essential to the development of sexual maturity, differ and affect the human body's development. But muscles, bones, and brains of men and women also differ at a cellular level. Scientists lack a complete understanding of sex-based differences, but there is scientific consensus that men's bodies and women's bodies are different.

35.      In many circumstances, whether an individual is a man or a woman "bears no relation to ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). A person's sex is determined at the moment of conception. Like race and national origin, sex is an immutable characteristic. Therefore, *governmental* distinctions between men and women are inherently suspect.

36.      Kappa Kappa Gamma and other Greek fraternities and sororities are private social organizations, however, and they *explicitly do* discriminate "on the basis of sex." 20 U.S.C. § 1681(a). Indeed, after passage of Title IX in 1972, the federal government took the position that fraternities and sororities could not continue as part of college life. Members of Congress, led by former Senator Birch Bayh, the Senate sponsor of Title IX, rejected this view. Senator Bayh stated that "[f]raternities and sororities have been a tradition in the country for over 200 years. Greek organizations, much like the single-sex college, must not be destroyed in a misdirected effort to apply Title IX." 120 Cong. Rec. 39992 (1974) (statement of Sen. Bayh). Therefore, in 1974, Congress amended Title IX to exempt Kappa Kappa Gamma and similar Greek organizations altogether. 20 U.S.C. § 1681(a)(6). Title IX does not apply at all to the "membership practices" of a non-profit "social fraternity or social sorority… the active membership of which consists primarily of students in attendance at an institution of higher education." *Id. See also* Pub. L. No. 93-568 § 3 (1974).

37.     Kappa Kappa Gamma discriminates against men to provide a sex-segregated environment for college women. The Sorority's Bylaws acknowledge that the Sorority discriminates on the basis of sex: "The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972." Attachment 1 at 9–10 (art. V., sec. 2.D). Single-gender, as the phrase is used in the Bylaws, means "single-sex" and not "gender identity" or a related concept. This is clear from the Bylaws' reference to Title IX, which prohibits discrimination "on the basis of sex."

38.     Social science research demonstrates that when young women are allowed to learn in an all-female environment, they are more likely to seek out 'nontraditional' academic subjects like math and science. Young women in single-sex environments are more likely to develop higher academic, and socially competent, self-images. Young women who attend single-sex schools are more positive about their own abilities and their control over their lives, are less inhibited by stereotyped gender role attitudes, and hold higher aspirations for their futures. These benefits are not limited to the classroom.  One study, for example, showed that strong female role models increased the willingness of college women to study more rigorous academic subjects (with more lucrative careers) such as economics.

39.     Until now, Kappa Kappa Gamma has been a strong defender of the benefits of an all-female environment for college women. Plaintiffs assert—as the Sorority itself did when it filed a Complaint in the U.S. District Court for the District of Massachusetts in 2018—that single-sex sororities are a traditional source of stability and community in college life for young women. The single-sex nature of a sorority is necessary to create this cohesive atmosphere. *See* Complaint, *Kappa Alpha Theta Fraternity, Inc., et al v. Harvard Univ.*, Dkt. No. 1:18-cv-12485 at ¶ 93 (D.

Mass.) (filed Dec. 3, 2018) (Kappa Kappa Gamma Fraternity is the second plaintiff named in the Complaint.).

**40.**    Less than five years ago, Kappa Kappa Gamma made numerous allegations about "the proven benefits of single-sex environments" for college women:

¶ 93. It is no surprise that single-sex organizations have thrived at Harvard for so many years. Single-sex social organizations represent a traditional source of stability and community in college life. They meet many of the social and cultural needs of students. They provide a surrogate family for students away from home and offer students an opportunity to grow with peers who share common values, problems, and goals. Members of all-male and all-female organizations feel that the single-sex nature of the groups is important to the cohesive atmosphere that the organizations provide.

¶ 94. A 2014 Gallup survey of more than 30,000 college graduates across the United States found that students who were members of fraternities or sororities experienced notable long-term benefits linked to their fraternity and sorority membership. These students were more likely to be "thriving" in their well-being and engaged at work than college graduates who did not join a fraternity or sorority. The survey found that fraternity and sorority members were more likely than other students to find fulfillment in daily work and interactions, to have strong social relationships and access to the resources people need, to feel financially secure, to be physically healthy, and to take part in a true community.

¶ 95. Single-sex environments are associated with a myriad of developmental and other benefits, particularly for young women. Many educational researchers have found that single-sex education contributes to academic achievement at all levels for women. There "is a body of research carried out since the late 1960's which shows that graduates of women's colleges are more likely to become achievers than are the women graduates of coeducational institutions." As an example, in the 1970s, graduates of women's colleges were more than twice as likely than graduates of co-ed colleges to enter medical school or to obtain a natural science or other doctoral degree.

¶ 96. Studies have found that women in single-sex schools at both the secondary and college levels have higher levels of self-esteem and a greater sense of personal control. Exposure to single-sex environments can even positively influence a woman's interest in nontraditional or male-dominated careers—one study concluded that "the opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests."

Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment.

*Id.* at 31–33.

**41.** Sorority representatives made these and similar assertions to Plaintiffs when they were considering whether to join Kappa Kappa Gamma. Sorority representatives make these representations to donors and alumnae. None of the research cited in the 2018 Complaint categorized "individuals who identify as women" (*i.e.* men) as "women" when defining a single-sex environment. *Id.* at 31–33. Kappa's 2018 Complaint relied on evidence from all-female, single-sex environments. In fact, Defendants have **no** peer-reviewed research that the benefits of a "single-sex" environment continue to exist when men "who identify as women" are admitted. Despite the lack of evidence to support this new theory, Defendants have continued to promote the benefits of the sorority environment to Plaintiffs and other prospective members.

**42.** The claim that "trans women are women" is a political slogan. It is not a fact supported by social science or medical research. Kappa's view, less than five years ago, was that women and girls benefit from a single-sex environment. A single-sex environment excludes every man without regard to how the man claims to identify himself. Defendants should not be allowed to radically alter the very core of the Sorority's identity, and then claim to this Court, without evidence, that the Sorority's benefits remain. Kappa Kappa Gamma could, theoretically, abandon its 150-year commitment to women, but any such decision would need to be approved at the Sorority's biennial convention. Defendants cannot abandon the Sorority's mission and purpose by subterfuge, with an unsigned Guide from Defendant Rooney and the rest of the Fraternity Council that declares some men should now be called women.

II.     **The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women.**

    A.     **The Sorority's Corporate Charter specifically references women.**

**43.**     Kappa Kappa Gamma Fraternity is an Ohio non-profit corporation, and its Articles of Incorporation are available from the Ohio Secretary of State. In Ohio, a corporation's charter consists of its articles of incorporation and the Ohio laws in existence when the articles of incorporation were filed. With a for-profit corporation, the corporate charter is a contract between the corporation and its stockholders. For a non-profit corporation, the corporate charter is a contract between the corporation and its members.

**44.**     The Articles of Incorporation for Kappa Kappa Gamma, in conjunction with Ohio law when the Corporation was organized, form the Sorority's charter. As a nonprofit corporation, Kappa's corporate charter is a contract between the Sorority and its members, including Plaintiffs.

**45.**     A corporate charter contains the terms upon which the incorporators have agreed to associate. The charter therefore establishes the authority that members can exercise and sets the limits within which the body of corporators can lawfully act in a corporate capacity. Like other corporations, the Sorority and its Board of Directors (the Fraternity Council) must act consistently with Kappa's corporate charter. When a corporation's actions exceed the authority granted by its corporate charter, these actions are *ultra vires* and void. Such is the case here.

**46.**     Corporate board members who disregard or otherwise seek to circumvent a corporation's corporate charter violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance). Under Ohio's Nonprofit Corporation Law, claims involving a "lack of, or limitation upon, the authority of a corporation" can be asserted "[b]y or on behalf of the corporation against a director, an officer, or a member as such" and "[b]y a member as such or by or on behalf

of the members against the corporation, a director, an officer, or a member as such." Ohio Rev. Code Ann. § 1702.12(I) (2023).

47.     The Articles of Incorporation for Kappa Kappa Gamma restrict sorority membership to women. They prohibit any college chapter from defying this restriction. The Sorority's purposes in its Articles of Incorporation are, *inter alia*, "**[t]o unite women, through membership**" and further provide that all members must be selected "**in accordance with Fraternity standards and procedures**" (emphasis added):

> To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;

> To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

> To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;

> To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

> To advocate for and seek to address issues of concern for members and women in general;

> To provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and

> To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

Attachment 4 at 4.

48.     Kappa Kappa Gamma's Articles of Incorporation cannot be amended by its Board of Directors (the Fraternity Council). Any amendment must occur "in accordance with the Fraternity

*Bylaws*," *id.*, which require a two-thirds majority vote at the Sorority's biennial convention. Moreover, under the Bylaws, the "exact content" of any amendments must be provided at least three months prior to the convention:

> The Fraternity Articles of Incorporation and Bylaws may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

Attachment 1 at 20 (art. XXIV, sec. 1).

49.    Regardless of whether Kappa Kappa Gamma Fraternity *could* amend its corporate charter to provide that the Sorority's mission and purpose is to 'unite women *and men who identify as women* through membership,' Defendants have not adopted such an amendment. Under the corporate charter as it exists now, only women can be Kappa members. The Sorority has not amended its Articles of Incorporation to define "woman" to include men who claim to identify as women. The meaning of woman therefore remains constant to the meaning it has had since its use in 1870: an adult human female. Initiation of Artemis Langford as a member of Kappa Kappa Gamma violates Kappa Kappa Gamma's corporate charter and the contractual promise the corporation has made to Kappa members. Defendant Rooney and the other members of the Fraternity Council violated their fiduciary duties to the corporation when they procured and approved the initiation of a man as a Kappa member.

**B.    The Sorority's Bylaws, Standing Rules and Policies also limit membership to women.**

50.    In addition to its corporate charter, Kappa Kappa Gamma has bound itself through its Bylaws, Standing Rules, and Policies. These corporate governance documents restrict Kappa membership to women and do not permit Langford's membership.

1.      **Kappa Kappa Gamma's Bylaws prohibit Langford's membership.**

51.     Under Ohio law, the Bylaws of Kappa Kappa Gamma are the code of regulations for the

corporation. Attachment 1 at 19 (art. XIX). The Bylaws restrict membership to women only:

> A.     New Member. **A new member shall be a woman** who has accepted an
> invitation to join the Fraternity but has not been initiated. A new member shall:
>
>> 1.   Have signed a dated, written pledge to membership witnessed in writing
>>      by an active or alumna member of the Fraternity;
>>
>> 2.   Remain eligible as a new member for a term of one year before the
>>      pledge to membership expires so long as enrolled in the same
>>      college or university; and
>>
>> 3.   Have the right to attend meetings, speak in debate and present their
>>      views to a committee on a referred question but shall not vote on
>>      any question. A new member shall not be present at a meeting during
>>      ritual for initiated members.

Attachment 1 at 2 (art. III, sec. 1) (emphasis added).

52.     While local chapter members of Kappa Kappa Gamma recruit and vote on new members,

they must do so "in accordance with Fraternity standards and procedures." Attachment 4 at 4.

Because the *Bylaws* require that every new member be a woman, and Langford is not a woman,

his membership is void:

> Section 2. Qualifications. **A woman** may be selected to become a member of the
> Fraternity as a collegiate or alumna initiate provided specific qualifications are met.
>
>> A.   Collegiate New Member and Alumna Candidate. To qualify as either a
>> collegiate new member or an alumna candidate, **a woman** shall:
>>
>> 1.   Have demonstrated integrity, respect, and regard for others and an
>>      appreciation for the worth of all individuals;
>>
>> 2.   Not be pledged to membership or be a member of any similar college or
>>      university women's social sorority except honorary or professional
>>      organizations;

3.    Not have been initiated into any other member group of the National Panhellenic Conference;

4.    Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements; or

5.    Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity Bylaws, Standing Rules and Policies.

B.    Collegiate New Member. To qualify as a collegiate new member, **a woman** shall also:

1.    Be enrolled at any college or university having a chapter of the Fraternity; and

2.    Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B- minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

C.    Alumna Candidate. To qualify as an alumna candidate, **a woman** shall also:

1.    Have attended a four-year college or university; and

2.    Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

Attachment 1 at 3 (art. III, sec.2 (emphasis added)).

**53.**    The Sorority last amended its Bylaws in 2022, adopting a complete revision. Upon information and belief, these changes were not lawful. At the 2022 Biennial Convention, Defendant Rooney and the other members of the Fraternity Council conducted a voice vote and— even though there were loud votes against the changes—concluded that the bylaws amendments received a two-thirds vote without actually counting votes. Tellingly, the minutes of the convention

still have not been released. Even if the new bylaws were adopted in 2022, however, they do not alter the requirement that Kappa Kappa Gamma members must be women. *Id.*

54.     The evidence surrounding the 2022 Bylaws revisions supports the conclusion that the Sorority's membership criteria remain the same. In the Report of the Bylaws Committee, which accompanied the proposed Bylaws, there is no reference to "individuals who identify as women" or any discussion of a change to the Sorority's membership rules. The explanatory report for the Bylaws changes states that "[w]hile the documents now look different in structure, most of the content is unchanged." Attachment 5 at 1. The report identifies what it describes as "[s]ome of the major amendments and the rationale behind the change." *Id.* These changes do not include a change to membership rules. Admittedly, the Bylaws were changed to promote "inclusivity," but these changes were "to make sure the language of the documents is inclusive. The committee has tried to craft the documents in such a way that gendered pronouns are not used and references are inclusive of all of our membership." *Id.* at 2. The changes did not affect the actual criteria for membership.

55.     The 2022 Bylaws revisions did add a provision forbidding "Members, chapters and associations" of Kappa Kappa Gamma from engaging in discrimination, but this new antidiscrimination provision does not apply to the Sorority itself. *Id.* at 9–10. In fact, the provision explicitly recognizes that the Sorority *does* discriminate on the basis of sex:

> **D. Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

Attachment 1 at 9 (art. V, sec. 2.D). The reference to the "single-gender nature of Greek-letter social organizations" is not a change to the Sorority's membership rules. It cannot be. The "exemption" in Title IX of the Educational Amendments of 1972 does not refer to gender identity. Rather, "single-gender" in this provision of the Bylaws means the same thing as "single-sex," because the Title IX exemption permits sororities to discriminate "on the basis of sex." 20 U.S.C. § 1681(a)(6).

**56.**    Shortly before the Sorority's biennial convention in 2022, the national headquarters staff provided another document to members, entitled "Bylaws and Standing Rules Revisions 2022: FAQS [Frequently Asked Questions]." Attachment 6. This document was provided in April 2022, less than two months before the convention. This FAQs document was not subject to a vote or otherwise approved at the convention. The document makes several statements that are not connected, in any way, to the Bylaws revisions that were under consideration:

**DIVERSITY, EQUITY AND INCLUSION**

**Can nonbinary people join? Is this a chapter-by-chapter decision?**

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.

We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

**Have we vetted these changes with our legal counsel?**

Yes. We have conferred with legal counsel as well as NPC on DEI-related updates to our Fraternity documents. We are confident that these changes would hold up if contested in a court of law.

*Id.* at 18.

57.     The FAQs document does not alter the Sorority's membership requirements. First, to the extent that the Sorority sought to adopt a new definition of woman, contrary to the word's longstanding meaning, this change must be made in the text of the Bylaws. Such a change cannot be presumed. Second, Kappa members must receive "notice" of any amendment to the Bylaws "indicating its exact content" at least three months before the convention. Attachment 1 at 20. (art. XXIV, sec. 1). Even if the FAQs document could somehow supplement the Bylaws amendments, this document was not presented to members with the required three-month notice. These FAQs were provided less than 60 days before the Convention, so they cannot be considered part of the "exact content" of the changes required by the Bylaws. Third, under Ohio law, the bylaws of a corporation cannot conflict with its Articles of Incorporation. Kappa's articles of incorporation make clear that the Sorority is limited to women; any bylaws amendments that say otherwise are unlawful. Finally, the language in the Bylaws FAQs does not actually support the claim that Langford is a woman. The language in the Bylaws FAQs does not say that a man who identifies as a woman is a "woman." Rather, the language expands the list of eligible members by adding another category: "women" and also "individuals who identify as women." If this second category were naturally subsumed within the meaning of "women," there would be no need for the FAQs statement at all.

58.     To the extent that Defendants intended to alter the membership requirements of Kappa Kappa Gamma through the 2022 Bylaw revisions, they have violated their fiduciary duties to the Defendant non-profit corporation. Defendant Mary Pat Rooney and the other members of the Fraternity Council have a fiduciary duty to be faithful to the Sorority's purpose and mission. This fiduciary duty requires that the Fraternity Council members act forthrightly in their efforts to carry out the Sorority's purpose and mission. Defendants cannot, consistent with their fiduciary duties, even *attempt* to alter the Bylaws of a 150-year-old organization through language that appears on page 18 of an explanatory document presented to members just before a vote on a Bylaws amendment that has no corresponding language.

## 2.     Langford's selection process violated Kappa Kappa Gamma's Standing Rules.

59.     Kappa Kappa Gamma has also adopted "Standing Rules" and "Policies" to govern the conduct of the Sorority. The Standing Rules describe the processes that must be followed when selecting a new member of the Sorority. Under the Articles of Incorporation, these "procedures" must be followed by every chapter when selecting new members. Attachment 4 at 4. Standing Rules can be amended by a majority vote at the Sorority's biennial national convention, provided that the proposed amendments were submitted, in writing, at least three months prior to the Convention. Attachment 7 at 25.

60.     The Standing Rules of the Sorority do not include any language that supports expansion of Kappa membership to a man who claims to identify as a woman.

61.     The Standing Rules do, however, impose two requirements that were violated in the admission of Langford to Kappa Kappa Gamma. Under the Standing Rules, all chapter members must vote on whether to admit a new member, unless a chapter member is excused from voting,

in writing, by the chapter's alumnae adviser. Attachment 7 at 1 (sec 1.1.A.1). For Langford's vote on membership, the chapter officers adopted the opposite policy, forbidding Plaintiffs Choate and Ramar, and all other members who were not present at the chapter meeting on September 20, 2022, from voting on Langford's membership. None of these non-voters were excused, in writing, by the chapter's alumnae adviser. Further, none of the Plaintiffs or other sorority members asked to be excluded from the vote. The chapter committed a second violation when voting on Langford. Any vote on a new member must be secret and must happen through use of the Sorority-approved electronic voting system, which is a mobile phone application (app) called "Omega Recruit":

    1.1   Membership Selection.

    A.    Collegiate New Member Selection. Active members shall be responsible for selecting new members of their chapter. Any initiated member may provide information about qualified women. The electronic voting system selected by the Fraternity shall be used by the chapter.

        1.    Participation. All active members of the chapter shall participate in membership selection unless excused in writing by the designated chapter adviser.

        2.    Confidentiality. All information concerning the membership selection process is confidential and shall be kept within the chapter.

        3.    Bid List. The bid list shall be produced using the overall scoring calculation in the electronic voting system and shall not be manipulated.

Attachment 7 at 1. Langford's selection did not use Omega Recruit. Omega Recruit was used to select new Kappa members during continuous open bidding at the University of Wyoming in Spring 2022 and to select new Kappa members during the formal recruitment in Fall 2022. In contrast, Langford's approval occurred through a Google Poll that was not anonymous.

**62.**    The Standing Rule requirement that every chapter use the "Omega Recruit" process was imposed by the Sorority through an amendment to the Standing Rules in 2022. The requirement

that all chapter members must vote, unless excused by the chapter's alumnae adviser for membership, has existed since at least 2016. Langford's vote did not occur using Omega Recruit and chapter members were prevented from voting on his membership. Langford's selection process was a violation of the Sorority's Standing Rules, and it is invalid.

63.     When Plaintiffs, and their attorneys, wrote to Sorority officials after the vote on Langford, but before his initiation ceremony, their concerns were ignored.

### 3.     The Policies of Kappa Kappa Gamma prohibit Langford's membership in the Sorority.

64.     The Sorority also has corporate governance documents called the "Policies of Kappa Kappa Gamma Fraternity" which are "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by the Kappa Kappa Gamma Articles of Incorporation and the Fraternity Bylaws and Standing Rules." Attachment 8 at 1.

65.     The Policies of Kappa Kappa Gamma also restrict Sorority membership to women. Policy III imposes requirements on the Sorority's college chapters that make clear the Sorority is a single-sex organization. Policy III prohibits Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Sorority or a chapter:

> **Section 2. Auxiliary Groups.** Participation in auxiliary groups of men's fraternities, including but not limited to little sisters, is prohibited and is in conflict with the National Panhellenic Conference Unanimous Agreements. The formation of male auxiliary groups, such as big brothers, is prohibited. **The activities of such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status.** Kappa chapters shall not bestow honorary status to individuals, such as Key Man or chapter sweetheart.

Attachment 8 at 3 (emphasis added). Policy VIII explicitly prohibits men from participating in the Sorority's recruitment events:

     3.I.     Men. **Men shall not participate in any Kappa recruitment events**, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements.

*Id.* at 13 (emphasis added). Langford is a man. His participation in Kappa recruitment was a violation of the Sorority's Policies.

66.     Kappa Kappa Gamma Policies also require that all members of a chapter vote on whether to accept a new member, unless excused in writing, and require that membership votes use the Sorority's designated electronic voting platform. *Id.* at 11 (§ 3) & 14 (§ 3.P).

67.     Kappa Policy III does include a reference to the concept of "gender identity," but this Policy does not permit Langford to join the Sorority. Under a section called "Personal Responsibility," Policy III requires that Kappa members respect Human Dignity. Like the Sorority's Bylaws, this provision requires Sorority to behave in a manner that respects others. The provision does not link gender identity to Kappa membership:

     **2. Human Dignity.** Kappa Kappa Gamma expects all members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals. Any member who makes discriminatory, inflammatory or inappropriate actions based on race, national origin, religion, disability, age, gender identity, sexual orientation or other class protected by local, state/provincial, or federal law shall be subject to dismissal or other disciplinary action.

Attachment 8 at 4. Respect for human dignity is consistent with the Sorority's historical, longstanding membership requirements. Policy III applies to members' conduct; it does not change Kappa membership requirements. Respect for the worth of all individuals does not require sorority membership for all individuals. Moreover, because the Policy is adopted by the Fraternity Council, not the membership, the Policy cannot deviate or undermine the Sorority's Articles of Incorporation, Bylaws or Standing Rules.

**III.    National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Langford's wrongful membership.**

**68.**    Kappa Kappa Gamma acts through 140 collegiate chapters. Kappa Kappa Gamma chapters are not distinct entities in any way. The Fraternity Council, the employees of the Sorority, the Sorority's District Directors, and the Sorority's network of alumnae advisers provide direction to the student members of the Sorority. Langford could not have been admitted as a Kappa member without the explicit approval and support of the Fraternity Council and those acting at the Council's direction. Under the Standing Rules, no person can be initiated as a Kappa member without prior approval from Sorority headquarters:

6.2   Ritual.

*        *        *

B.    Chapter Initiation of New Members.

*        *        *

2.    At least two weeks before Initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

Attachment 7 at 10. Sorority officials regularly reject ineligible members, even when a chapter has voted to admit the member. Reasons for rejection can include a failure to meet the grade requirements for new Kappa members.

**69.**    Upon information and belief, Sorority representatives not only approved Langford's membership, but national Sorority officials also encouraged chapter officers to pursue Langford

and guided chapter officers in the illegal selection process. Plaintiffs have not brought suit against their collegiate chapter. The Gamma Omicron chapter of Kappa Kappa Gamma Fraternity, which operates on the University of Wyoming's campus, did not have authority to admit Langford as a Kappa member. All decisions about compliance with the Sorority's corporate charter, Bylaws, Standing Rules, and Policies were made by adults acting on behalf of the national Sorority. While the Sorority's legal counsel stated that the Sorority does not participate in member selection, Attachment 3 at 1, this statement was not true as it relates to the admission of Langford.

70.     Indeed, national Sorority officials and representatives are responsible for all membership decisions at collegiate chapters. The Sorority controls the intake of new members, the decision to expel or suspend Sorority members, and the decision to discipline, suspend or revoke a chapter. Kappa Kappa Gamma has a hierarchy of national, regional and local officers answerable to and involved in the national Sorority. No person may become a new Kappa member unless the Sorority's alumnae specialists or staff, in advance, have given "permission to initiate."

71.     On the national level, the Fraternity Council has authority to approve, suspend or revoke a collegiate chapter. The Fraternity Council also has authority to suspend or dismiss any Sorority member. Below the Fraternity Council, the Sorority has Content Directors, who supervise all matters that relate to a specific aspect of the Sorority's operation (such as the Sorority's disciplinary process, called "Standards"). The Sorority has District Directors who supervise the activities of the local chapters and administer discipline to individual chapters for rules violations. Finally, the Sorority has paid staff at the national headquarters. All of these individuals operate under the supervision of an Executive Director who reports to the Fraternity Council.

72.     The Standing Rules of the Sorority permit national officials to place any individual member on probation, even if collegiate chapter members do not support this decision. The Fraternity Council (the Sorority's board) can dismiss any member entirely. Attachment 7 at 13–20.

73.     Every chapter must adopt its own bylaws and standing rules, which "must be approved by the Fraternity Bylaws Committee before becoming effective." *Id.* (art. iv, sec. 2.G.). All subsequent amendments must also be approved by the Sorority's officials. *Id.*

74.     For every collegiate chapter, Kappa Kappa Gamma has a network of appointed alumnae who supervise operation of the chapter and the actions of individual chapter officers. The Sorority's Bylaws require this supervision:

> **J. Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the chapter. The board shall be composed of a chairman, alumna advisers to Executive Board and vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director, and in consultation with the Leadership Development and Advisory Board Directors.

Attachment 1 at 7 (art. IV, sec 2.J.). These appointed alumnae, in turn, report to other alumnae with broad responsibility over every aspect of sorority life, such as chapter operations, housing, membership recruitment and retention, and discipline of sorority members. Appointed alumnae control all aspects of chapter operation. For example, a chapter cannot host a social function (*e.g.*, a party) without submitting an event form to the national Sorority headquarters and also receiving approval from the chapter's appointed alumnae adviser. Fraternity Council members refer to these appointed alumnae as part of the Sorority's "workforce."

75.     The President of each collegiate chapter *must* discuss matters with the chapter's alumnae adviser. In addition, each chapter's Vice President of Standards and Vice President of Academics

must work with an alumnae adviser. Alumnae advisers are selected by the Sorority, not by chapter members. Chapter members have no authority over the alumnae advisers, and these advisers *must be* present for all chapter meetings of significance:

> E.     Meetings. An adviser shall be present at chapter meetings for the election of officers, revision of the chapter Bylaws and Standing Rules, preparation and presentation of the budget, Executive Board meetings, officer training, Initiation, and including those of the Nominating Committee and consideration of disciplinary action by the chapter and Standards Committee. Advisers may attend meetings electronically via telephone or through other electronic communications as long as all the members can simultaneously hear one another and participate during the meeting.

Attachment 8 at 1–2 (Policy I, sec. 2.E.).

76.    All Kappa Kappa Gamma members commit that they will comply with federal and state law, and, where applicable, the regulations of a college or university. Members also pledge they "shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct." Attachment 1 at 9 (art. V, sec. 1). These commitments reinforce the existing fiduciary duties of Defendant Mary Pat Rooney and other members of the Fraternity Council to the Sorority's mission and purpose.

## IV.    Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies.

77.    Kappa Kappa Gamma is one of only three sororities with a residential house at the University of Wyoming. Plaintiffs chose to join the Sorority, in part, because they wanted to live communally in a single-sex environment. Some Plaintiffs wanted to be able to rely on other young women, including juniors and seniors, for help and advice with college. Some Plaintiffs sought to live in Kappa's single-sex environment because of religious or moral beliefs that young, unmarried women should not live with young, unmarried men. Some Plaintiffs are sisters or daughters of

Kappa Kappa Gamma alumnae and wanted to experience the close bonds that develop when living in a sorority house. Plaintiffs also include a victim of sexual assault who wanted a safe place to interact with other college students without the presence of men.

**78.** The Kappa Kappa Gamma house at the University of Wyoming has a capacity of 52 young women. Currently, the chapter has 44 members, and approximately 36 women signed housing contracts to live in the Kappa sorority house during the current 2022–23 academic year. The national Sorority requires every chapter to have a "live-in rule" to guarantee the sorority house "is filled to capacity at all times." Attachment 8 at 7 (Policy V, sec. 1.J). Upon information and belief, Defendant Kappa Housing Corporation needs approximately forty Kappa members to live in the sorority house each year. If fewer than forty residents live in the sorority house, the Defendant Kappa Housing Corp. lacks sufficient revenue to operate and maintain the house.

**79.** The Kappa Kappa Gamma sorority house at the University of Wyoming does not have facilities to support co-educational living. Most of the rooms are on the second floor of the house. There is a small common area on the second floor with a couch. The bedrooms on the second floor and the third floor are old, and many of the doors do not lock consistently. There are two communal bathrooms for the women on the second floor and one on the third floor. The doors to the communal bathrooms do not lock and do not require a code to enter. The primary bathroom on the second floor does not have a private area to disrobe before showering.

**80.** The Kappa rules for the sorority house forbid all men from being on the second floor. Attachment 13 at 11 (House Standing Rule 2.4.A.2) ("Males will only be allowed upstairs or in the basement during events that are approved by the Facility Director in consultation with the House Director annually with times set before each event. Exceptions to this require approval from

the House Director, President or Facility Director."). Other than specific days, such as the fall move-in date, even fathers and boyfriends are prohibited from being on the second floor. Plaintiffs and other sorority members describe the second floor as a private, safe space where young women can interact without concern that they will be on display for men.

81.     Since his admission to the Sorority, Langford has received all privileges of Kappa Kappa Gamma membership, including access to living areas that are restricted to women only. Langford does not currently live in the sorority house because he has a housing contract that requires him to live in a dormitory at the University of Wyoming for the 2022–23 academic year.

82.     Even though Langford does not live in the sorority house, he has several times chosen to sit for hours on the couch in the second-floor common area. He does not study. He does not speak to the women who live there. Langford is not meeting another member of the sorority who lives in the house. Instead, Langford stares at women walking past. One sorority member walked down the hall to take a shower, wearing only a towel. She felt an unsettling presence, turned, and saw Langford watching her silently.

83.     As a member of the Sorority, each Plaintiff "has an obligation, in accordance with the chapter's live-in rule, to live in the chapter facility." Attachment 8 at 7 (Policy V, sec. 1.J). "Failure to fulfill this obligation may result in a loss of membership." *Id.*  Under the live-in rule at the University of Wyoming, no member is permitted to live outside of the sorority house until there are 52 residents. Attachment 13 at 9 (sec. 2.3.A.1.).

84.     Plaintiffs Holtmeier, Coghan, Westenbroek, Choate, and Ramar signed a House Contract with Defendant Kappa Housing Corp. for the 2022–23 academic year. Attachment 10. Under the contract, Plaintiffs have paid $7,700 to live in the Defendant House Corporation's residential

building. This year, Plaintiffs have not received the benefit of their housing contracts, which guaranteed a single-sex environment that is separate from men and safe. Instead, Langford has regularly been present throughout the sorority house when there should be no men present.

85.     When the Plaintiffs, and in some cases the parents of the Plaintiffs, reached out to Sorority headquarters about Langford's admission, Kappa officials dismissed their concerns. Sorority officials falsely stated that the sorority house is no different than a co-ed dorm at the University of Wyoming. When Plaintiffs and their parents pointed out that the Kappa house does not have locked bathroom facilities, national officials were dismissive. Kappa officials recommended that, if Plaintiffs were uncomfortable or concerned about their safety, they should quit Kappa Kappa Gamma entirely.

86.     Defendants continue to pressure Plaintiffs, and other sorority members, to sign a housing contract for the next academic year, 2023–24. The cost of living in the sorority house has increased by $1,300 to $9,000 per year. Housing contracts were due on February 17, 2023. As of March 27, 2023, only ten women had signed housing contracts. At that time, Defendant Kappa Housing Corp. informed sorority members that Langford had been given permission to live outside the sorority house by national Sorority officials because of unspecified security concerns. The representative of the Kappa Housing Corp. stated that this should resolve concerns and permit members to sign housing contracts for the 2023–24 year. Authorization to live outside of the Kappa house is granted on a semester-by-semester basis, but the housing contract is for the entire academic year. Two sorority members, Jaylyn Westenbroek and Katelyn Fisher, asked that the housing contract be modified to permit the young women to terminate the contract if Langford moves in. Defendant

Kappa Housing Corp. refused this request. If a sorority member refuses to sign the housing contract, she is subject to discipline by the Sorority, including suspension or dismissal.

87.     At present, the house will have at most 28 residents next year. Only 25 women have returned a signed contract. This dramatic decline is because of the lack of privacy in the sorority house and Langford's access to all areas within.

88.     Defendants' wrongful admission of Langford to the Sorority has caused the sorority house to become financially unsustainable. As a direct result of Defendants' wrongful admission of Langford to the Sorority house, the Kappa house will close. Upon information and belief, once the Sorority house closes, the Kappa Kappa Gamma chapter at the University of Wyoming—which has been in existence since 1927 with thousands of alumnae, including prominent leaders in Wyoming and beyond—will close. Plaintiffs will not only be forced to seek housing elsewhere, away from the single-sex environment that Kappa offered, but they will also lose—forever—the opportunity to participate in a sorority during their college years at the University of Wyoming.

**V.    Defendants' evasion of Kappa Kappa Gamma's membership restrictions represents an ongoing violation of fiduciary duties to the Corporation, and any additional demands to the Sorority's Directors would be futile.**

89.     Plaintiffs bring this action derivatively in the right and for the benefit of Kappa Kappa Gamma to redress the breaches of fiduciary duty and other violations of law by Defendant Mary Pat Rooney and other members of the Fraternity Council.

90.     Plaintiffs will adequately and fairly represent the interests of Kappa Kappa Gamma Fraternity and its members in enforcing and prosecuting this action. Plaintiffs are college students and Kappa members, who are currently experiencing the changes that occur when a man becomes a part of an all-female sorority house.

**91.** The Federal Rules of Civil Procedure, and analogous requirements adopted by the State of Ohio, require that Plaintiffs' derivative action begin, first, with a request to the corporation. Plaintiffs must describe with particularity the efforts by Plaintiffs to resolve this violation without resort to litigation or, in the alternative, explain why any such request would be futile.

### A. The Defendants have refused Plaintiffs' demands to prevent violation of the Sorority's restrictions on membership.

**92.** The Articles of Incorporation, Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma Fraternity restrict membership in the Sorority to women only. Defendants have not amended these corporate governance documents to permit membership for Langford, who is a man who claims to identify as a woman.

**93.** Plaintiffs demanded that the Sorority act to prevent the initiation of Langford, who is ineligible to be a Kappa member. In September and early October 2022, Plaintiffs and, in some cases, their parents reached out to national Sorority leaders to raise concerns about Langford. At that time, Langford's membership had not yet been finalized. In response, Kari Kitrell Poole, the Executive Director of the Sorority, told Plaintiffs that their request had been presented to the Fraternity Council and refused. Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

**94.** In November 2022, Plaintiffs, through counsel, again wrote to the national Sorority, requesting that Kappa Kappa Gamma prevent the initiation of Langford until concerns about his membership were resolved. Attachment 11. Plaintiffs' letter pointed out that Langford's membership is both a violation of the Sorority's bylaws and also breaches the housing contract that Plaintiffs signed with the Defendant Kappa Housing Corporation.

95.     The Sorority, through counsel, rejected Plaintiffs' request. Attachment 3. The Sorority repeated its claim that Kappa Kappa Gamma is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id.* This statement, which disregards the actual meaning of the word "woman" as used by the Sorority for 150 years, was presented to Plaintiffs as the official policy of the Sorority. Kappa's counsel stated that the Sorority leadership has concluded that a woman need not be "biologically born as female." *Id.* at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs' request for relief within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

### B.     Any further demand to the Fraternity Council, seeking enforcement of Kappa Kappa Gamma's membership restrictions, would be futile.

96.     Even had the Plaintiffs not demanded that the Sorority prevent Langford's wrongful initiation, any demand would have been a futile, wasteful, and useless act. Defendant Rooney, and the other members of the Fraternity Council, are unable to fairly consider any such demand because the directors face a substantial likelihood of liability for their role in the Sorority's improper conduct.

97.     The current Fraternity Council is unable to independently assess Plaintiffs' demands. Defendant Rooney and the other members of the Fraternity Council have been actively involved in the development and dissemination of the revised membership policy in flagrant disregard of the Sorority's corporate governance documents.

98.     Defendant Rooney, with the other members of the Fraternity Council, served as the Board of Directors for the Sorority during the wrongful behavior alleged herein, and each director knew of this wrongdoing but failed to act in the face of a known duty to act. For these reasons, Defendant Rooney faces a substantial likelihood of liability for her participation in these acts. The sustained

failure of the Fraternity Council to ensure effective corporate governance and ensure compliance with the mission and purpose of the Sorority can only have been a result of a knowing breach or reckless disregard of fiduciary duties.

99.     The futility of any request by Plaintiffs is further demonstrated by the November 2022 letter to Plaintiffs' attorney from an attorney for the Sorority. The Sorority, through counsel, stated that "Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status." *Id.* at 2. With this statement, the Sorority's counsel indicates that the Sorority is not only unwilling to take action related to Langford, but the letter indicates that the Sorority has no intention to evaluate whether *any* member complies with the Sorority's requirement that a member be a woman. In stating that the Sorority has no interest in objective evidence about a member's sex, Kappa's counsel demonstrated that the current Sorority leadership will never take action to enforce the membership restrictions that guided the Sorority for its first 150 years.

100.    The letter from Kappa's attorney also lays out, for the first time, the subterfuge that Defendant Rooney and the Sorority's leadership have undertaken to undermine Kappa Kappa Gamma's longstanding membership criteria. The attorney refers to two "Position Statements" issued by the Sorority in September 2021. Position Statements are documents prepared by Sorority staff, and they are never presented to the Sorority's membership for approval or review. These position statements restate language that was originally included in the "Guide for Supporting our LGBTQIA+ Members." Attachment 2. Upon information and belief, the Position Statements were prepared by staff at Sorority headquarters at the direction of the Fraternity Council. In addition to

position statements on "Academic Excellence" and "Hazing," the Position Statements include the

following paragraphs:

> **MEMBERSHIP SELECTION**
> Kappa Kappa Gamma is a single-gender organization comprised of women *and individuals who identify as women* whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.
>
> Kappa Kappa Gamma continues to seek members who:
> - Will further the mission and purpose of the Fraternity.
> - Have achieved academic success.
> - Have demonstrated good character.
> - Will enrich the life of the group through shared congeniality.
> - Are responsible citizens and contributing members of their communities.
>
> Each chapter of Kappa Kappa Gamma has the final choice of its own members.
>
> **SINGLE-GENDER ORGANIZATIONS**
> Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.
>
> The single-gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX.

Attachment 12 at 2 (emphasis added). Kappa "Position Statements" are not Bylaws, Standing

Rules or Policies of the Sorority. These documents were issued *before* any changes to the

Sorority's Bylaws in 2022, and they reflect further evidence that Defendant Rooney and the

Sorority's Fraternity Council are knowingly working to undermine the Sorority's lawful

membership criteria.

**101.** In the letter to Plaintiffs, Kappa's counsel also refers to a policy issued by the National

Panhellenic Conference in 2020. The National Panhellenic Conference is an umbrella organization

of twenty-six sororities active on college campuses. The attorney's letter cites the NPC Policy as

support for the Kappa Kappa Gamma's action, stating that the NPC policy means that "all women" may join a sorority, including men who claim to be women. The Kappa counsel's letter, however, selectively quotes the NPC policy. The letter incorrectly suggests that the NPC policy has an effect on the membership requirements of Kappa Kappa Gamma and the other sororities that belong to the NPC. This is false. The 2020 Policy Statement expressly states that it only applies to whether a man who identifies as a woman may participate in formal recruitment ("rush week"), a time when all twenty-six sororities recruit new members. Individual sorority membership requirements are unaffected by the NPC policy:

> Panhellenic Recruitment Eligibility (2020) – POLICY
>
> For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.

The Sorority cannot use the NPC policy to justify a change in Kappa Kappa Gamma's membership requirements. Moreover, the Sorority cannot claim that its policy reflects the NPC policy when it differs materially. The NPC policy requires that a man "consistently live[] and self-identif[y] as a woman." The Kappa Guide requires only that a man "identify" as a woman. Defendants have eliminated any requirement that a male applicant take any steps to demonstrate that he "consistently lives" as though he is a woman. The letter's misleading reference to the NPC policy is further evidence that the Sorority's leadership intended to act contrary to the corporation's governance documents.

**102.** The "Guide for Supporting our LGBTQIA+ Members" is not a Bylaw of Kappa Kappa Gamma. The Guide is not a Standing Rule of Kappa Kappa Gamma. The Guide is not one of the

official Policies of Kappa Kappa Gamma. The Guide was not adopted by a vote of the Fraternity Council.

103.    The Guide was distributed to the Sorority's 'workforce' (alumnae who direct chapter operations) in 2018 as a "resource," but the document was not provided to all Sorority members. The Guide states that its purpose is to help fulfill the Sorority's expectation that members "promote integrity, respect, and regard for others, and appreciation of the worth of all individuals." The Guide does not read like an official corporate policy. Members can learn about "How to Be an Ally," "Using Inclusive Language," and "How to Support Someone Who Is Coming Out." Attachment 2 at 1–2. Much of the Guide is unobjectionable as a matter of setting expectations about how Kappa members will interact with others. Upon information and belief, much of the Guide repeats, without attribution, material created by an organization called CampusPride.org. *Compare* Attachment 2 with "Greek Ally Kit" *available at* bit.ly/401gHhv (visited March 3, 2023).

104.    Although the Guide was disseminated by the Sorority as a resource, Defendant Rooney and the members of the Fraternity Council have treated the Guide as a change to the Sorority's membership rules. Upon information and belief, Defendant Rooney and other members of the Fraternity Council regularly communicate through "GroupMe" to avoid oversight and potential discovery of their discussion of the changes to Kappa's membership requirements. Defendant Rooney's active work to conceal the Fraternity Council's decision-making, when considered in combination with the Sorority's *ultra vires* decision to permit men to become members of the Sorority, demonstrates that the Fraternity Council actions have not been made in good faith and are contrary to the best interests of the Sorority.

105.    As alleged herein and based on the duties imposed pursuant to the Fraternity's corporate governance, Ohio law, and obligations set forth in the Sorority's Code of Conduct, Defendant Rooney and the other members of the Fraternity Council were aware that Langford is ineligible to become a member of the Sorority. Given the duties placed on the directors of the Sorority, to the extent Defendant Rooney or any other member of the Fraternity Council did not have actual knowledge of these repeated violations, such lack of knowledge could only be the product of recklessness or willful disregard of their duties that constitutes bad faith. Any further demand upon the Sorority's leadership would be futile.

**VI.**     **Kappa Kappa Gamma's effort to force the membership of Artemis Langford, and the experience of Plaintiffs since his admission, demonstrate the disruptive effect of a man on the sorority experience.**

106.    In pursuit of their improper goal of transforming Kappa Kappa Gamma through the initiation of Artemis Langford, Defendants have violated other Bylaws, Standing Rules, and Policies of the Sorority. Officers and employees of the national organization, and alumnae advisers acting at their direction, actively pressured members of the Chapter to support Langford's admission to the sorority, ignoring Bylaws and Standing Rules that would have foreclosed his initiation. Langford was selected and initiated as a Kappa member without following the Standing Rules and Policies that ensure a secret ballot.

107.    Since Langford's unlawful admission to Kappa Kappa Gamma, Defendants have disregarded concerns about Langford's inappropriate, and sometimes threatening, behavior. Instead, Defendants have retaliated against Plaintiffs and other sorority members who have raised concerns about the transformation of Kappa Kappa Gamma from a women's sorority into a co-ed organization.

108.    Plaintiffs Westenbroek, Holtmeier, Coghan, Ramar, and Kosar all participated in fall sorority recruitment, colloquially known as "rush week," during their first year at the University of Wyoming. Plaintiff Choate joined Kappa Kappa Gamma at another college and transferred to the University of Wyoming at the beginning of her sophomore year. During Kappa recruitment, Kappa Kappa Gamma members repeatedly described the Sorority as a sisterhood, a term universally understood to refer to women only. Ms. Holtmeier was told that, even after she graduates from college, "You are always going to have a sisterhood right there." No person told Plaintiffs that Kappa Kappa Gamma's definition of a "woman" includes men. No person told Plaintiffs that men who claim to identify as women could be accepted to membership and live in the Kappa sorority house with access to all private areas.

109.    During the recruitment process, Plaintiffs learned that if they joined Kappa Kappa Gamma, they would be forever barred from switching to a different sorority. Plaintiffs could have joined other sororities at the University of Wyoming. Plaintiffs would not have joined Kappa Kappa Gamma if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

110.    Plaintiffs' Complaint is supported by other Kappa members who are Wyoming citizens. These young women are not Plaintiffs solely because their participation could destroy this Court's jurisdiction should the Court conclude that Langford is a citizen of Wyoming and also a required party.

111.    Haley Rutsch, Elizabeth Renkert, and Madison Terrell are current members of Kappa Kappa Gamma. These non-party witnesses all participated in fall sorority recruitment during their first year at the University of Wyoming. During recruitment, the members of Kappa Kappa

Gamma repeatedly described the Sorority as a sisterhood for women only. No person told Rutsch, Renkert or Terrell that Kappa Kappa Gamma's definition of "woman" includes men who claim to identify as women. No person told these witnesses that, if they became members of Kappa Kappa Gamma, they would be required to live in the sorority house and that men who claim to identify as women would also be able reside in the house and have access to all private areas. During the recruitment process, Rutsch, Renkert, and Terrell were told that if they joined Kappa Kappa Gamma, they could never join a different sorority. These women could have pledged other sororities at the University of Wyoming. They would not have joined Kappa Kappa Gamma if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

112.    Both Ms. Terrell and Katelyn Fisher participated in formal recruitment for Kappa Kappa Gamma in fall 2022, and they were offered the opportunity to join the Sorority at that time. Before initiation, the Sorority requires pledges to attend meetings to learn about the Sorority's history and values. Ms. Terrell, Ms. Fisher, and the other fall 2022 Kappa pledges did not know that Langford would also be joining the Sorority until he attended an educational meeting for new pledges. One pledge originally believed that Langford was at the meeting to write an article about the Sorority for the campus newspaper. Ms. Terrell wrote to national Sorority officials about her surprise, noting that she and other new members had not even received a "heads up" about Langford's potential membership. Sorority leadership has not responded to Ms. Terrell's concerns.

113.    Of the twelve women who were invited to become Kappa members in Fall 2022, four women dropped out before initiation because they did not want to live in a sorority house with a man. One pledge suffered a panic attack and required medical care as a result of her interactions

with Langford. This pledge informed Ms. Choate that, while at a new member meeting, Langford

said, "I can't wait to live in the house and sleep with all the girls." Ms. Fisher's fellow pledges told

her that they did not join Kappa Kappa Gamma because they did not feel comfortable living in a

sorority house with Langford.

**A.      Langford's behavior has destroyed the single-sex haven that Kappa members describe as the heart of the sorority experience.**

**114.**    Plaintiffs' concerns about the admission of a man into the Sorority have been validated by

Langford's own behavior and statements.

**115.**    Langford is 6'2" tall, and he weighs 260 pounds. No other member of Kappa Kappa

Gamma has comparable size or strength. Langford is a sophomore at the University of Wyoming,

but he is older than his peers. Prior to attending the University of Wyoming, Langford attended

Eastern Washington University. Langford graduated from high school in 2020 and turned 21 years

old in October 2022.

**116.**    Langford states that he is transgender and that he self-identifies as a woman. His behavior,

however, does not reflect a man living as a woman let alone a man attempting to "consistently

live" as a woman (as noted in the NPC policy in paragraph 101 above). Langford was involved in

an automobile crash in January 2023. At that time, Langford presented a Washington State driver

license to the responding officer. The Washington license states that Langford is a male with

residence in Bellevue, Washington. The license was issued in November 2020. Beginning in 2019,

one year before Langford applied for his license, Washington State permitted applicants to select

the gender that would appear on the license. When Langford applied for a Washington license, he

could have reported he was male, female, or "X." Langford told the State of Washington that he

is male. Langford could have sought to change the sex indicated on his license in 2021, when he

changed his legal name to Artemis Langford, but Langford did not do so. Langford's current driver license states he is male, and when he presented this official document to law enforcement officials in January 2023, Langford was making an assertion that he is male.

117.    Langford wears women's clothing only occasionally. He regularly travels about campus wearing baggy pants as would any other male student. Other than occasionally wearing women's clothing, Langford makes little effort to resemble a woman. He has not undergone treatments to create a more feminine appearance, such as female hormones, feminization surgery, or laser hair removal. Plaintiffs often observe Langford with the facial hair one would expect on a man who either did not shave that morning or whose facial hair has regrown by the evening.

118.    One Kappa member, Lillian Feist, has observed that Langford is very interested in politics and the law. When Langford encounters disagreement, he claims the other person disagrees with him because he is transgender. Langford then states that the disagreement is an act of discrimination. Ms. Feist has observed Langford use his transgender identity to threaten others with discipline, especially those he believes do not support his Kappa membership.

119.    Langford's behavior is made more threatening because Langford is sexually interested in women. Langford has a profile on Tinder—an online dating application—through which he seeks to meet women. Plaintiffs have regularly discovered Langford using his Kappa membership to enter private areas of the sorority house and watch other members. Ms. Rutsch and other members of the sorority work in the evenings, and these women may not return home until the evening hours (9 p.m. for Ms. Rutsch). On at least five occasions, Ms. Rutsch has entered the sorority house and observed Langford sitting alone in a chair in the living room. Langford's chair is located where he can see women walk through the foyer, but the women can only see him out of the corner of their

eyes. Langford does not speak to sorority members as they enter. Instead, Langford stares, following the women with his eyes. Ms. Rutsch and other members of the Sorority have seen no evidence that Langford is studying in the living room. Indeed, it would be difficult to study where Langford sits as there are no easily accessible writing surfaces or places to keep study materials. Langford has, while watching members enter the sorority house, had an erection visible through his leggings. Other times, he has had a pillow in his lap.

**B.      Langford's interactions with the Sorority members prior to voting on his Membership.**

**120.**    Langford first participated in the Panhellenic sorority recruitment at the University of Wyoming in Spring 2022. Langford did not apply to join Kappa Kappa Gamma at that time. Instead, Langford sought to join the Delta Delta Delta sorority. During the event to meet members of that sorority, Langford talked about his desire to be near cadavers and to touch dead bodies. Delta Delta Delta did not invite Langford to join the sorority. Plaintiff Choate learned of this conversation, but she was out of town during the chapter meeting to vote on Langford, and she was not able to present her concerns due to the illegal voting process approved by Defendants and their agents.

**121.**    In August 2022, Langford participated in the formal recruitment process for sororities at the University of Wyoming. The formal recruitment process permits prospective applicants to meet members of each of the four sororities at the University of Wyoming. On the first day of the week, young women attend presentations about sorority life. During the next two days, each sorority sets aside several hours for potential applicants to meet current sorority members. Prospective members visit a sorority house, where they meet with groups of current members in roughly five-minute intervals. After the meetings, the potential applicant and the sorority members rate the experience

using Omega Recruit. Each day, the ratings are tabulated and the individual and the sorority determine whether to continue to discuss membership. During formal recruitment, the Membership Chair for the Kappa chapter at the University of Wyoming told other sorority members that Kappa rules did not permit them to refuse to admit Langford because he was a biological male. The Membership Chair also stated that all members would have to unanimously agree before Langford could live in the sorority house.

122.    During the week of formal recruitment, Langford avoided answering questions about his hobbies, passions, or involvement in other organizations. Plaintiffs Westenbroek, Holtmeier, Choate, and Ramar remember speaking with Langford during the formal recruitment process. Ms. Choate and Ms. Westenbroek remember Langford specifically asking whether he could live in the sorority house. While formal recruitment is intended to determine whether applicants have character traits that align with Kappa Kappa Gamma, Plaintiffs and other chapter members felt Langford lacked passion for the sorority experience. Plaintiffs voiced this concern to the chapter's Membership Chair.

123.    Langford did not complete the full recruitment week for Kappa Kappa Gamma, choosing to try to join a different sorority.

124.    After formal recruitment ended, Plaintiffs and other members of the Sorority believed Langford's membership application was moot. What the chapter's Membership Chair did not tell these Sorority members, however, was that Langford had reached out to pursue Kappa membership through a process called "continuous open bidding." Continuous open bidding allows women to become members of a sorority outside of formal recruitment. The Sorority requires all chapters to

use continuous open bidding if the sorority house has additional capacity. Attachment F at 13 (Policy VIII, sec. 3.F).

125.    The national Sorority's alumnae advisers also directed chapter officers to recruit Langford. From 2016 until Spring 2022, the Kappa chapter at the University of Wyoming was under continuing review by national Sorority leaders. These alumnae supervisors did not believe the chapter was providing the expected benefits to members. Having just concluded this multi-year evaluation period, alumnae advisers told the chapter President and other officers that they could raise the prominence of the Wyoming chapter and garner the favor of national Sorority leaders if they recruited and admitted Langford as Kappa Kappa Gamma's first transgender member.

126.    During Continuous Open Bidding, applicants visit the sorority house for dinner or meet Kappa members for coffee. The Membership Chair schedules these events and uses the chapter group chat to announce dinners and coffee dates to meet *other* prospective new members in fall 2022. This was not done for Langford. Most Plaintiffs did not know Langford was being considered for membership through the continuous open bidding process. Prior to the vote on Langford's membership, the only mention of his membership application occurred at a chapter meeting. At the meeting, the Membership Chair announced that Langford had asked to apply though continuous open bidding. The only written notice to chapter members about a proposed dinner to meet Langford was a brief reference in the paper minutes from that chapter meeting.

127.    When Ms. Holtmeier and Ms. Ramar asked about Langford's application, the Membership Chair stated that the chapter was required to permit Langford to apply, but she downplayed any possibility that he would become a Kappa member. The Membership Chair said so many Kappa members had come to her that it was "a 99.9% chance" that he would not be offered membership.

Just one week before the surprise vote on Langford, the Membership Chair continued to state that, if Langford were to join Kappa Kappa Gamma, he could not live in the sorority house unless every other member agreed.

128.   National Sorority representatives usually have little involvement in member selection until after chapter members have voted. After that point, every prospective member must be reviewed and approved by the national Sorority; the chapter must receive "permission to initiate" each candidate. In Langford's case, however, national Sorority representatives, including the alumnae advisers, were extensively involved from the start of the continuous open bidding process. Upon information and belief, alumnae advisers coached chapter officers about the importance of Langford's admission.

### C.    The Voting Process.

129.   The chapter leaders who were in office in September 2022, with direction from alumnae advisers, implemented an illegal voting process to ensure that Langford was admitted to Kappa Kappa Gamma. (The chapter elects new officers each year in November, and the new officers take over at the end of the fall semester.) Under the Standing Rules and Policies of the Sorority, chapters must use the electronic voting system selected by the national Sorority, called "Omega Recruit," when voting on new members. Attachment 7 at 1 (Standing Rules 1.1A); Attachment 8 at 14 (Policy VIII, sec. 3.P.). This electronic voting system guarantees anonymity, and Omega Recruit was used in Spring 2022 for applicants in the continuous open bidding process. Further, under the Sorority's Standing Rules, all active chapter members "shall participate in membership selection unless excused in writing by the designated chapter adviser." Attachment 7 at 1 (Standing Rules 1.1.A.1).

130.    Voting for Langford did not follow the required procedures. All Chapter members are expected to attend the weekly Chapter meeting on Monday evening. Members can be excused if they attend a Sunday evening Chapter Council meeting where officers discuss the upcoming meeting. Ms. Ramar and another sorority member attended the Chapter Council meeting prior to the vote on Langford's membership. At the Chapter Council meeting, officers intentionally concealed the fact that Langford's candidacy would be presented for a vote, that the chapter officers intended vote using a Google Poll, and that only those present at the chapter meeting could vote on Langford. Ms. Ramar and the other member would have attended the chapter meeting if they had known a vote on Langford would occur. They would have voted against Langford's admission.

131.    At the Chapter meeting on September 19, 2022, members were told that they would vote that day on Langford. Sorority rules prohibit discussion during the voting process, but this restriction was not followed for Langford. Several members of the chapter, including the President, the Membership Chair, and the Vice President for Academic Excellence, spoke prior to the vote. Each made almost identical statements that, upon information and belief, were coordinated with national Sorority officials. Each speaker stated that members could only vote against Langford if they could articulate specific concerns about his personality. If members had not met Langford, then a "no" vote was evidence that the member was a bigot. Kappa members understand that bigotry is a basis for suspension or expulsion from the Sorority. The Membership Chair, however, had obscured the only opportunity to meet Langford. Upon information and belief, the Membership Chair, in conjunction with national Sorority officials, did so because it would permit her to threaten members if they did not vote for Langford.

**132.**     The members who discussed Langford at the chapter meeting repeatedly referenced "transphobia" and "homophobia." One officer stated, "[r]egardless of what your political views are, our Kappa values are acceptance and kindness so if that is something that you disagree with, that's not in line with Kappa values." When other members asked to respond, the chapter President, stated, "No, no discussion." Then, the chapter President continued to recognize other members to speak about why Kappa Kappa Gamma had to admit Langford. Statements included: "You should basically be voting yes for everyone unless they truly go against Kappa's values." "It's 2022. If you vote no, it better be for, like, literal issues with that new member or else it's homophobic." "If you have something to say about this that isn't kind or respectful, keep it to yourself." "If your only concerns are about [Langford] living in the house, you are thinking too far down the road."

**133.**     At the end of the chapter meeting, the chapter officers described the voting process. Rather than using Omega Recruit, chapter members would vote using a link to a Google Poll. Further, even though the link to the Google Poll would be emailed to all chapter members, the officers stated that only members who had attended the chapter meeting could vote. This restriction violated the Sorority's Standing Rules.

**134.**     Thirty minutes after the link to the Google Poll was sent to members, the chapter officers sent out a link to a second Google Poll. This second Google Poll required voters to sign-in with their email address. When a Google Poll is conducted in this manner, it is not a secret ballot. The Google dashboard shows when each email address logs in, and it also records how the vote total changed. In addition, during the second vote, chapter officers moved throughout the sorority house, locating some (but not all) members and instructing them to vote on their phones while the officers watched. When enough votes for Langford's membership had been secured, the voting stopped.

135.    At least three members of the Sorority voted against Langford in the first Google Poll and changed their vote in the second poll. When these women were told that they would have to vote again with an email address, they understood that the second vote would not be secret. The members changed their votes. At least one sorority member voted for Langford's membership only because she feared retribution. Ms. Rutsch voted against Langford's membership, and she has spoken with several other Kappa members who admitted that they also changed their votes in fear of reprisal.

136.    Langford was admitted by a margin of either one or two votes. Had the chapter conducted a lawful voting process, according to the Sorority's required procedures, Langford would not have been offered membership in Kappa Kappa Gamma.

**D.     The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies.**

137.    The day after the vote on Langford, Plaintiffs Westenbroek and Ramar and another sorority member approached the chapter President and the Vice President for Standards about prior assurances that Langford would not live in the sorority house unless every member agreed. The chapter President responded that she had no idea where this assurance came from, that it was false, and that she had never heard anyone make such a statement. In August 2022, however, the chapter President was standing next to the Membership Chair on the stairs of the Sorority house when the Membership Chair made this statement about housing for Langford.

138.    Plaintiffs expressed concern that the chapter would lose other initiated and uninitiated members who do not want to live with a man. The chapter officers are seniors who will never live with Langford. They replied "we don't care about numbers." When Plaintiffs objected to Langford's membership as a violation of Kappa rules, Defendants and their agents instructed

Plaintiffs to resign from Kappa Kappa Gamma if they disagreed with Langford's membership. At the time Defendants urged these Kappa members to resign, Defendants and their agents knew that Plaintiffs cannot join another Sorority.

139.    In addition to the voting process for Langford, his membership application has been evaluated using a different standard. In fall 2022, Langford had a 1.9 cumulative grade point average. This GPA is disqualifying for Kappa applicants, who must have at least a 2.7 GPA. Attachment 14 at 1 (House Bylaws, art. III, sec. 1.A.1.). Nevertheless, Langford was approved by the national Sorority. Upon information and belief, the national Sorority did not even consider whether a grade exception was necessary before admitting Langford. Langford is also not on grade probation, despite the fact that his low GPA requires probation as a condition of membership.

140.    When Plaintiffs and their parents raised concerns about Langford's presence in intimate areas of the sorority house, Sorority officials told them "just don't use the same bathroom that [Artemis] uses" and "since [Artemis] identifies as a woman you have no reason to feel uncomfortable." Sorority employees stated Langford's presence would be no different than a co-ed dormitory living situation. This is factually incorrect, as the co-ed dormitories at the University of Wyoming have locks and other protections for women. Sorority officials said that if Plaintiffs objected to Langford's membership, they do not subscribe to Kappa's values of inclusion and diversity.

141.    Plaintiffs reached out to Kari Kitrell Poole, the Executive Director of the Sorority, with concerns about the voting process and Langford's membership. Ms. Poole responded that "your concerns were reviewed by several national officers of the organization" and "we [these national

officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

142.     After Plaintiff Holtmeier raised further concerns, she was brought before a disciplinary hearing. Chapter officers read prepared statements that they had discussed with Sorority officials and provided material so Ms. Holtmeier could "educate" herself. The Sorority's alumnae adviser for standards was present, and she spent the entire hearing texting with national Sorority officials on her phone. The material given to Ms. Holtmeier included the "Guide for Supporting our LGTBQIA+ Members." Ms. Holtmeier was threatened with further discipline if she did not agree that Langford is a woman or questioned whether his vote complied with the Sorority's rules. When Ms. Holtmeier asked questions, she was told "that's what we are supposed to do now." At least one other sorority member has also been threatened with discipline if she does not agree that Langford is a woman.

### E.      Langford's conduct after Defendants granted him access to the sorority house.

143.     Since the vote, Langford has received all privileges of Kappa Kappa Gamma membership, including access to living areas that are restricted to women only. Langford participates in the weekly meetings and the secret rituals of sorority chapter; he eats at the sorority house; he participates in other all-female activities that are closed to non-members. The second floor of the sorority house is off-limits to men at all times, and it has a small common room called the "PJ," so called because members can socialize there in pajamas. Since his admission, Langford has visited the P.J. several times, sometimes sitting alone for hours. At other times, members have entered the first-floor study room, turned on the lights, and found Langford asleep on the couch.

144.    Langford's conduct at the slumber party prior to the Kappa initiation ceremony for new members was inappropriate and threatening. Ms. Kosar offered to be responsible for taking pictures of the other pledges with a disposable camera. At some point in the evening, after Ms. Kosar had put down the camera briefly, Langford took the camera and began taking pictures of the young women at awkward moments when they were not prepared. During the evening, Langford repeatedly questioned the women about what vaginas look like, breast cup size, whether some women were considering breast reductions, and birth control. Langford talked about his virginity and at what age it would be appropriate for someone to have sex. Langford also talked about kissing a girl.

145.    Langford stated that he would not be staying the night at the slumber party, but he remained after all other women had departed, saying he would not leave "until after you fall asleep." Langford was supposed to leave by 10 p.m.. At about 11:15 p.m., when the lights had been turned off and other pledges were trying to sleep, Langford started loudly singing "God Rest Ye Merry Gentlemen" by himself in the corner of the room by the light of his laptop screen. Langford did not leave until midnight.

146.    The next morning, Langford returned and stood silently in the corner of the room near the door while other pledges changed from sleeping garments into other clothing. Ms. Kosar did not know that Langford had returned. Ms. Kosar had not slept wearing a bra. She faced away from the others and removed her shirt. After she had put on a new shirt, Ms. Kosar turned around and discovered Langford staring at her. After the morning activities, another Kappa member informed Ms. Kosar that while watching her, Langford had become sexually aroused. He stood by the door

with his hands over his genitals. Since that event, Langford has repeatedly asked Ms. Kosar about her romantic attachments.

147.     In December 2022, Ms. Renkert attended a yoga class sponsored by the Panhellenic union for members of all of the sororities at the University of Wyoming. Langford attended this yoga class, but he did not participate. He sat in the back of the room for an hour and watched the assembled young women flex their bodies. The door to the yoga studio was near where Langford sat, so he could have left without drawing attention or disrupting the class. Langford did not leave until the end of the one-hour class. Langford did not speak to anyone at the yoga event. After the class, participants were invited to stay for refreshments. Other participants commented on how uncomfortable they felt as Langford watched them.

148.     At times, sorority members have observed Langford writing detailed notes about members and their statements and behavior. Langford states that he is a journalist, and he has published articles and columns in *The Branding Iron*, the campus newspaper at the University of Wyoming. Langford told Ms. Feist that he is always writing things down in his notebook so that he can use them later in an article. Sorority members believe that Langford is recording these private comments in order to publish them at a later date.

149.     Langford uses his phone to take pictures of women in the sorority house without their knowledge or consent. In one incident, Langford walked up to a sorority member in the dining room, raised his phone to her face, took a picture, and then walked away without explanation or apology. Ms. Renkert has observed Langford taking other pictures with his phone while eating at the house. She has seen Langford rest his phone on the table in a manner that it appears as though he is scrolling through an app when he is, in fact, covertly using the camera to photograph women.

150.    In December 2022, Ms. Renkert submitted a letter of resignation to the chapter officers, because her interactions with Langford made her feel unsafe. She did not want to live in the sorority house with him. Shortly after submitting the letter of resignation, Ms. Renkert determined that she valued her "women-only" sisterhood experience. Ms. Renkert's parents offered to pay for off-campus housing, so Ms. Renkert now pays the full cost of living in the sorority house and also pays to live in an off-campus apartment.

151.    Ms. Renkert withdrew her letter of resignation after her parents offered to pay for her housing. The Kappa chapter officers and their alumnae advisor, however, stated that Ms. Renkert could not do so. The alumnae advisor stated that Ms. Renkert was required to withdraw her letter by early January 2023, when all students were gone for semester break. Ms. Renkert objected to this interpretation of the Sorority's rules, and the Sorority's national officer for standards eventually agreed that the alumnae adviser was wrong. Ms. Renkert was entitled to have a vote on her request to resign. The chapter members overwhelmingly voted to let Ms. Renkert remain as a member in good standing.

152.    Before the vote by chapter members, Ms. Renkert learned that Langford had sent a blacklist of chapter members to officials at the national Sorority headquarters. Langford's list contains the names of women he believes are transphobic and should be expelled from Kappa Kappa Gamma. Ms. Renkert learned that her name is on Langford's list. Upon information and belief, Ms. Renkert believes that the alumnae adviser intentionally put forward an incorrect interpretation of the Sorority rules in retaliation for her view that Langford is not a woman and not eligible to be a member of Kappa Kappa Gamma. Further, Ms. Renkert believes that Sorority officials have made, and will continue to make, efforts to eject her and the other Kappas on Langford's list from the

Sorority. This attempt to force Ms. Renkert out of the Sorority was in retaliation for her disagreement with Langford's membership. Langford has demonstrated and acted on his intention to pressure the Sorority, at the local and national level, to expel any member who is committed to preserving the women-only character of the Sorority.

**F.    Damages.**

153.    As a requirement of membership, Sorority members must "promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the *Bylaws, Standing Rules, and Policies* [of the Sorority] as well as my chapter Bylaws and Standing Rules." Attachment 9. (Commitment Form). Collegiate members pay dues at initiation and additional dues every year to the Sorority. Plaintiffs cannot resign from Kappa Kappa Gamma to join a different sorority. Kappa Kappa Gamma is one of the 26 sororities that comprise the National Panhellenic Conference (NPC). These sororities have all agreed a woman who joins one NPC sorority is permanently ineligible for membership in any other NPC sorority.

154.    Each Plaintiff joined Kappa Kappa Gamma with the promise they would be able to live and socialize in an all-female environment. Defendants have repeatedly lauded the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will *never* have the benefits of a college sorority experience. Some of the damages to each Plaintiff are easily calculable, including the dues and housing payments that were made for the purpose of living in an all-female environment. Some will be more difficult to calculate, but they are no less real. For 150 years, Kappa Kappa Gamma has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa Kappa Gamma has stated that these benefits result from the single-sex experience. Plaintiffs agree that these benefits exist. The

loss of these lifetime benefits is similarly calculable, and Defendants are responsible for this damage to Plaintiffs.

155.    The Sorority itself has also been damaged by Defendant Rooney and the other members of the Fraternity Council. Their violations of fiduciary duty have caused the sorority chapter at the University of Wyoming to lose significant membership in less than six months. With only ten signed housing contracts for the next academic year, the sorority house at the University of Wyoming will close and then the college chapter itself will fold. The loss of a sorority chapter has a significant effect beyond just the loss of dues from the college students there. These young women will become leaders, and—just as prior generations have—they will donate to the Sorority and its continued operation. The loss of a sorority chapter cuts off all future alumnae from that school.

156.    Plaintiffs want Kappa Kappa Gamma to remain loyal to the promises the Sorority has made throughout its history. Plaintiffs ask for a declaratory judgment that Kappa Kappa Gamma remains as it claims in its articles of incorporation: an organization "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4. Plaintiffs seek to prevent the transformation of their intimate living arrangements and their social organization—without any change in the sorority's legal documents—into a co-ed organization that admits men and women.

157.    So long as Langford has the same *legal* access as any other sorority member, young women will not seek Kappa membership at the University of Wyoming. Plaintiffs cannot rely on assurances that Langford will minimize his presence or otherwise alter his behavior. On April 6, 2023, shortly after information about this Complaint became public, Langford requested a

"standing excuse" that he not be required to attend Kappa events "until further guidance is given." On April 9, 2023, Langford extended this request to chapter meetings and other gatherings, asking that he be excused unless his presence is "absolutely essential." This time away lasted little more than a week.  On April 17, 2023, Langford resumed his active presence at the sorority house.

158.    Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty, and their contractual obligations to the Plaintiffs, by purporting to admit Langford into the Sorority.

## COUNT I

### Derivative Cause of Action

159.    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

160.    Under Ohio law, members of a nonprofit corporation can bring two types of claims. A derivative action is brought in the name of the corporation. Such a suit is the exception to the usual rule that a corporation's board of directors manages or supervises the management of the corporation, and it allows a member to circumvent a board's refusal to bring a suit on a claim. On the other hand, if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation, then the complaining shareholder has a direct action. An injury that

would be distinct from that suffered by other members could be shareholders could be a wrong involving one of the member's contractual rights as a member. As a general proposition, claims for breach of fiduciary duties on the part of corporate directors or officers are to be brought in derivative suits. This is because the damage that results from the fraudulent or negligent management of the corporation is primarily damage to the corporation and to the corporate assets, and because it affects the members only indirectly and all of them alike.

161.    Ohio's nonprofit-corporation law provides members of nonprofit corporations with a derivative cause of action on behalf of the corporation. When members bring a derivative cause of action against a nonprofit corporation, they are enforcing a corporate right just as shareholders may do in for-profit corporations. Because such a suit brought by a member is identical to a shareholder-derivative suit, the procedural requirements of Fed.R.Civ.P. 23.1 for bringing a shareholder-derivative suit must be fulfilled by members of a nonprofit corporation who bring such a derivative suit.

162.    Rule 23.1 establishes the requirements for maintaining a shareholders' derivative action. Specifically, complaining shareholders must (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort or did not make it, and (3) show that they "fairly and adequately" represent the interests of other shareholders "similarly situated."

163.    By not only allowing, but also by endorsing and actively working to secure the membership of Langford, the directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance.

164.     The Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma, since the corporation's creation, have limited membership to women only. Women, as understood throughout the Sorority's existence, are adult female human beings. Langford is not a woman. He is a man.

165.     Plaintiffs have repeatedly reached out to the corporation's leadership to contest its refusal to enforce the Sorority's membership requirements. Defendants have not only refused to prevent Langford's membership, they maintain that no such membership requirement exists at all. To the extent any further demand is required, such a demand would have been futile.

166.     As a result of Defendant's behavior, Kappa Kappa Gamma has lost its identity as an organization for women. At the University of Wyoming chapter, almost half of the women who were offered membership in the Sorority in Fall 2022 have declined to become members. During Spring 2023 recruitment, only two women pledged to join the Sorority at the University of Wyoming. Upon information and belief, the insistence on admitting men to the Sorority has also resulted in a significant decline in alumnae giving, membership, and participation. These changes have also harmed the ability of Kappa Kappa Gamma chapters across the nation to recruit new members.

167.     The chapter at the University of Wyoming no longer has enough members to be financially viable, and the behavior of Defendant Rooney and the other Fraternity Council members will result in the chapter's closure unless the Court intervenes. Plaintiffs seek monetary, declaratory, and injunctive relief, as well as such fees and costs as are available.

## COUNT II

### Breach of Contract

**168.**    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**169.**    To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages.

**170.**    Defendant Kappa Kappa Gamma Building Corp., and Plaintiffs have entered into a contract to provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. These Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house. Indeed, men cannot enter the living areas of the Sorority except upon special circumstances that have been approved in advance.

**171.**    Langford's access to and presence in the sorority house violates the housing contract that Plaintiffs signed.

**172.**    Plaintiffs have suffered damages as a result of this breach.

## COUNT III

### Tortious Interference with a Contract

**173.**    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**174.**    A claim of tortious interference with a contract requires (1) existence of the contract; (2) Defendant's knowledge of the contract; (3) intentional and improper interference *inducing or causing a breach*; and (4) resulting damages.

175.    Defendant Kappa Kappa Gamma knew that Plaintiffs have a contract for housing with Kappa Kappa Gamma Building Corp. Defendants knew, because they required this language, that the contract requires the parties to comply with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. Through their initiation of Langford, Defendants have prevented Plaintiffs from having the benefit of the Housing Contract that they signed.

## COUNT IV

### Direct Cause of Action

176.    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

177.    When wrongful acts are not only against the corporation but are also violations of a duty arising from contract or otherwise owed directly by the wrongdoer to the shareholder, the shareholder can bring suit for personal damages or other relief.

178.    The Plaintiffs were deceived, believing that they were joining a woman-only organization, which has made them ineligible to join a different Sorority. Plaintiffs have now been deprived of the all-female environment that other Kappa members have enjoyed throughout the Sorority's 150 year history. Plaintiffs are now required, as a condition of membership, to reside in the same house as a 6'2", 260 pound man who stares at them, asks about their intimate past, makes notes about their statements and takes photographs of them without their consent, and intimidates them by threatening to publicly label them bigots if they raise concerns.

179.    Plaintiffs' loss of privacy, frustration of contractual expectations, and emotional distress are not injuries that Plaintiffs share in common with all Sorority members. They are, however, the direct result of Defendants' actions to force the admission of Langford as a sorority member.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

**1.**     A declaratory judgment that, under the organization's corporate governance documents, including its Bylaws, Standing Rules and Policies, Langford is not eligible for membership in Kappa Kappa Gamma Fraternity and his purported admission is therefore void *ab initio.*

**2.**     A declaratory judgment that the Defendants have violated their obligations to the organization by purporting to admit Langford to the Sorority.

**3.**     A declaratory judgment that the Defendants have violated the housing contract and Plaintiffs are entitled to the money damages they have suffered as a result thereof.

**4.**     Preliminary and permanent injunctive relief preventing Defendants from seeking or encouraging Langford or any man from becoming members of the Sorority.

**5.**     Monetary damages to compensate for Defendants' wrongful acts.

**6.**     Plaintiffs' reasonable costs and attorneys' fees pursuant to applicable contractual language, statute or authority, and further relief this Court may grant in its discretion.

**7.**     Any other relief that the Court deems just and appropriate.

 Respectfully submitted,

/s/ Cassie Craven
Cassie Craven
Wyoming Bar No. 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St., Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

/s/ John Knepper
John Knepper
Wyoming Bar No. 7-4608
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

Dated this 20th day of April, 2023.

## VERIFICATION

I, _Hannah Holfmeier_ hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-18-23                           Signed: _Hannah Hutt_

I, _Allison Coghan_, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-18-23                           Signed: _allie Coghan_

I, _Jaylyn Westenbroek_ hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/18/23                           Signed: _Jaylyn Westenbroek_

I, _Grace Choate_, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-18-2023                         Signed: _[signature]_

I, Madeline Ramar, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/18/23                                    Signed: Madeline Ramar

I, Megan E Kosar, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/28/23                                    Signed: _____