Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:    sklosterman@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:    nmmclaughlin@vorys.com
         bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 23-CV-00051-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

I.      INTRODUCTION ..................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................... 3

III.    LEGAL ARGUMENT ............................................................................... 4

        A.      Standards of Review ..................................................................... 5

        B.      The Court Lacks Subject-Matter Jurisdiction Over the Breach of Contract Claim Against the Building Co. ........................................... 7

        C.      The Court Lacks Personal Jurisdiction over Defendant Rooney ............................ 8

        D.      Plaintiffs' Derivative Claim Fails as a Matter of Law ............................ 9

                i.      Plaintiffs Fail to Meet the Requirements of Rule 23.1 ............................ 10

                ii.     Plaintiffs Fail to Establish that Rooney Violated Kappa's Bylaws or that Kappa has Unreasonably Interpreted its Bylaws .............................. 12

                iii.    Kappa has a Constitutional Right to Determine Who to Include and Who to Exclude from Its Membership ........................................ 16

        E.      Plaintiffs' Breach of Contract Claim Fails as a Matter of Law ............................ 17

        F.      Plaintiffs' Tortious Interference with Contract Claim Fails as a Matter of Law .. 20

        G.      Plaintiffs' Direct Claim Fails as a Matter of Law .................................. 20

IV.     CONCLUSION........................................................................................ 22

CERTIFICATE OF SERVICE ...................................................................................... 25

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Allen v. Bank of Am. Corp.*, No. 10-4205 (MJD/JSM), 2011 U.S. Dist. LEXIS 96836 (D. Minn. July 22, 2011) ................................................................................................ 23

*Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005) ................................................ 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 6

*Auletta v. Ortino (In re Ferro Corp. Derivative Litig.)*, 511 F.3d 611 (6th Cir. 2008) ............... 12

*B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820 (S.D. W. Va. Jan. 5, 2023) .......................................................................................... 1

*Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio App. LEXIS 154 (Jan. 18, 2007) ...................... 21

*Barrash v. Am. Ass'n of Neurological Surgs., Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605 (S.D. Tex. Aug. 13, 2013) ........................................................... 15

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ...................................................... 14

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) .......................................................... 16

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .................................................... 8

*Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768 (W.D. Tex. 1999) ........................... 15

*Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio App. 2003) .......................................... 11, 12, 21

*Cent. Wyo. Med. Lab. v. Med. Testing Lab., Inc.*, 43 P.3d 121 (Wyo. 2002) ............................. 18

*Christian v. Loyakk, Inc.*, No. 22-CV-215-F, 2023 U.S. Dist. LEXIS 6952 (D. Wyo. Jan. 12, 2023) ................................................................................................. 6, 8, 9

*Colo. Off-Highway Vehicle Coalition v. U.S. Forest Serv.*, 357 F.3d 1130 (10th Cir. 2004) ...... 18

*Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063 (10th Cir. 2008) ............................ 8

*Dutcher v. Matheson*, 733 F.3d 980 (10th Cir. 2013) ...................................................... 7

*Flandro v. Salt Lake County Jail*, 53 F. App'x 499 (10th Cir. 2002) ..................................... 6

*Grand Council v. Owens*, 620 N.E.2d 234 (Ohio App. 1993) .............................................. 11

*Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ......................................... 2

*Haynes v. Peters*, 403 F. Supp. 3d 1072 (D.N.M. 2019) .................................................... 7

*Heaton v. Rohl*, 954 N.E.2d 165 (Ohio App. 2011) ........................................................................ 21

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ........................................ 16

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557 (1995) ...... 16

*In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 U.S. Dist. LEXIS 11608 (N.D.
    Ohio Mar. 21, 2006) ................................................................................................................ 11

*In re Lubrizol S'holders Litig.*, 79 N.E.3d 579 (Ohio App. 2017) ......................................... 10, 12

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................................................ 8

*Kadel v. Folwell*, No. 1:19CV272, 2022 U.S. Dist. LEXIS 103780 (M.D.N.C. June 10,
    2022) ......................................................................................................................................... 1

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) .............................................................. 11

*Kirscher v. Wagner*, No. 19-CV-0037-ABJ, 2020 U.S. Dist. LEXIS 257235 (D. Wyo. Mar.
    16, 2020) .................................................................................................................................... 6

*McKinney v. Granite Park Fabrication*, No. 19-CV-00266-ABJ, 2020 U.S. Dist. LEXIS
    257239 (D. Wyo. Mar. 12, 2020) .............................................................................................. 6

*Morgan v. Ramby*, No. 2012-Ohio-763, 2012 Ohio App. LEXIS 662 (Feb. 27, 2012) .............. 21

*Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013) ............................................................... 9

*Peterson v. Meritain Health, Inc.*, 508 P.3d 696 (Wyo. 2022) .................................................... 17

*Pikk v. Pedersen*, 826 F.3d 1222 (10th Cir. 2016) ................................................................. 10, 11

*Putka v. First Catholic Slovak Union*, 600 N.E.2d 797 (Ohio App. 1991) ................................. 14

*Rishell v. Jane Phillips Episcopal Mem. Med. Ctr.*, 94 F.3d 1407 (10th Cir. 1996) .................... 7

*Rudolph v. Cunningham*, No. 2:13-CV-00181-ABJ, 2015 U.S. Dist. LEXIS 44250 (D.
    Wyo. Mar. 31, 2015) .................................................................................................................. 6

*Schlinger v. McGhee*, 268 P.3d 264 (Wyo. 2012) ....................................................................... 17

*Shaw v. AAA Eng'g & Drafting Inc.*, 138 F. App'x 62 (10th Cir. 2005) ....................................... 7

*Sheaffer v. State ex Rel. Univ. of Wyo.*, 202 P.3d 1030 (Wyo. 2009) ......................................... 20

*Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221 (10th Cir. 2001) ............................................ 6

*Sunshine Custom Paints & Body, Inc. v. S. Douglas Hwy. Water & Sewer Dist.*, 173 P.3d
    398 (Wyo. 2007) ...................................................................................................................... 20

*Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) ......................................... 14

*Virgin Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 U.S. Dist. LEXIS 246099 (D. Wyo. Dec. 30, 2019) ................................................................................................. 9

*Warwick v. Accessible Space, Inc.*, 448 P.3d 206 (Wyo. 2019) .................................................. 19

*Woodmen of World Life Ins. Soc. v. Manganaro*, 342 F.3d 1213 (10th Cir. 2003)....................... 7

## Statutes

28 U.S.C. § 1332 ............................................................................................................................. 7

Wyo. Stat. § 5-1-107 ....................................................................................................................... 8

## Other Authorities

The Cambridge Dictionary .................................................................................................... 15, 16

## Rules

Fed. R. Civ. P. 12(b)(1) .................................................................................................................. 5

Fed. R. Civ. P. 12(b)(2) ............................................................................................................. 5, 6

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 5, 6

Fed. R. Civ. P. 19 ........................................................................................................................... 7

Fed. R. Civ. P. 23.1 ...................................................................................................................... 10

Fed. R. Civ. P. 23.1(b)(3) ............................................................................................................ 10

Fed. R. Civ. Proc. 19(a)(1)(B) ....................................................................................................... 7

## I.  INTRODUCTION

Plaintiffs are current and recently graduated members of the Gamma Omicron chapter of the Kappa Kappa Gamma Fraternity ("Kappa").  In September 2022, the Gamma Omicron chapter voted to admit Artemis Langford ("Langford"), a transgender woman.  Rather than accept the results of their chapter's decision to admit Langford, Plaintiffs bring sorority recruitment to this Court and ask that it declare her membership void ab initio.  Plaintiffs believe that Langford and anyone else who is not biologically born female should be ineligible for membership in Kappa. Plaintiffs, however, fail to state any cognizable claim upon which relief can be granted against Kappa, the Kappa Kappa Gamma Building Co. (the "Building Co."), or Mary Pat Rooney ("Rooney") and fail to establish subject-matter jurisdiction over the sole claim against the Building Co. or personal jurisdiction over Rooney.

Plaintiffs are asking this Court to decide who can and who cannot join a private fraternal organization.  They implore this Court not only to void Langford's membership, but also to prohibit any transgender woman from joining Kappa.  Plaintiffs request the Court to insert itself into this controversial political debate and declare that a private organization can only interpret the term "woman" using Plaintiffs' exclusionary definition of biologically born females.[1]

Plaintiffs assert "[t]he claim that 'trans women are women' is a political slogan.  It is not a fact supported by social science or medical research."  (Am. Compl., ¶ 42.)  Other federal courts disagree: "[t]ransgender men are men; transgender women are women."  *Kadel v. Folwell*, No. 1:19CV272, 2022 U.S. Dist. LEXIS 103780, at *66 (M.D.N.C. June 10, 2022); *see also Grimm v.*

---

[1] A federal judge in West Virginia in assessing a transgender rights case recently stated:  "I will not get into the business of defining what it means to be a 'girl' or a 'woman.' The courts have no business creating such definitions."  *B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820, at *14 (S.D. W. Va. Jan. 5, 2023).

*Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 620 (4th Cir. 2020) (discussing the "importance of gender affirmation," stressing "that hypothetical fears [about transgender students] such as the 'predator myth' were merely that – hypothetical," and finding that the federal judiciary should "affirm the burgeoning values . . . rather than preserve the prejudices of the past").

If the answer to the question of whether a transgender woman should be treated as a woman were as clear as Plaintiffs suggest, it would not occupy so much space in scholarly articles, political debate, or media commentary.  There are undoubtedly difficult legal issues that some courts will have to consider as they assess legislation and policies affecting the rights of transgender people.  But the Court need not wade into that controversy here; it can simply dismiss Plaintiffs' claims for being legally defective without entering the political fray.

Although Plaintiffs' purported legal claims are often confusing and inconsistently pled, the central issue in this case is simple:  do the Plaintiffs have a ***legal right*** to be in a sorority that excludes transgender women?  They do not.

Kappa's policy since 2015 has been to allow chapters to accept transgender women.  That policy mirrors those of the 25 other national and international sororities that are a part of the National Panhellenic Conference ("NPC").  Kappa has shared the policy with its collegiate chapters.  If Plaintiffs' disagreements with Kappa's inclusionary position actually represented the majority view of other Kappa members, as opposed to that of a vocal minority, they could presumably effect a change in the position.  Plaintiffs can also resign their membership in the organization if a position of inclusion is too offensive to their personal values.[2]  What they cannot do is have this Court define their sorority's membership for them.

---

[2] Defendants note, however, that if Plaintiffs wanted to join a women's organization that would guarantee exclusion of transgender women, ***none*** of the NPC sororities have that kind of exclusionary policy.  (Attach. 3 to Am. Compl.)

Plaintiffs' personal view on transgender inclusion aside, whether a sorority can define its membership to allow someone who is transgender to join is not a matter for federal courts—or any court—to decide.  Therefore, for all the reasons set forth in this Motion, Defendants respectfully request that this Court dismiss Plaintiffs' claims in their entirety, with prejudice.

## II.    FACTUAL BACKGROUND

The Amended Complaint is rife with false, inflammatory allegations that do not relate to the claims Plaintiffs assert.  Putting aside Plaintiffs' statements of opinion and irrelevant allegations, and accepting as true the allegations that actually relate to each cause of action, the Amended Complaint fails to set forth a cognizable legal claim.

The Gamma Omicron chapter at the University of Wyoming voted to accept Langford as a member in September 2022.  (Am. Compl., ¶ 61.)  No Kappa bylaw defines who qualifies as a "woman." (Attach. 1 to Am. Compl.)  Kappa has allowed transgender women to qualify for membership since 2015, before Plaintiffs sought membership.  (Attach. 12 to Am. Compl.) However, "[a]ctive members shall be responsible for selecting new members of their chapter." (Am. Compl., ¶ 61, Attach. 7 at 1.1). And "[e]ach chapter of Kappa Kappa Gamma has the final choice of its own members."  (Am. Compl., ¶ 100, Attach. 12 to Am. Compl. at 2)  The Building Co. also has no role in member selection and, in fact, only serves the purpose of providing and maintaining the Gamma Omicron house at the University of Wyoming.  It is an independent non-profit Wyoming corporation and does not interact with Kappa on any non-housing issues.

Plaintiffs are upset that Langford was accepted for membership into their chapter because she is transgender, so they hired legal counsel.  Plaintiffs' counsel contacted Kappa regarding Langford's admission on November 4, 2022 and explained why Plaintiffs objected to Kappa's admitting transgender women generally and Langford specifically.  (Attach. 11 to Am. Compl.)

That letter, which is the *only* communication from Plaintiffs' counsel before this lawsuit, complains that "a small number of chapter members . . . violate[d] the sorority's corporate by-laws and standing rules through the induction of a non-woman into this fraternal organization." (*Id.*)

That letter does not:  (1) assert that any director or member of Fraternity Council actively worked to secure the membership of Langford; (2) allege that Kappa's inclusive position statement issued in 2015 or its Guide for Supporting our LGBTQIA+ Members issued in 2018 violates any bylaw; (3) cite to any provision in the bylaws that is violated by Langford's admission; (4) allege any wrongdoing by Rooney; (5) allege that Langford had engaged in conduct that makes chapter members uncomfortable or violates Kappa's standards of conduct; or (6) allege any wrongdoing by the Building Co. or that there are any violations of members' housing contracts.  (*Id.*)

Kappa responded through counsel on November 15, 2022.  (Attach. 3 to Am. Compl.)  That correspondence clarified that Kappa was not involved in the selection of Langford and does not overrule membership decisions of collegiate chapters when members or alumnae disagree with them, but noted that Kappa includes transgender women and explained the reasons for that policy. (*Id.*)  Kappa also explained it was unaware of any bylaw violations, but stated: "[i]f there are specific provisions in any Kappa governing documents that you contend were not followed by Kappa, *please identify what those specific provisions are, what governing documents they are contained within, and what actions of Kappa you contend are in violation of those specific provisions*." (*Id.* (emphasis added).)  Plaintiffs' counsel *never* responded.

## III.   LEGAL ARGUMENT

The end goal of Plaintiffs' lawsuit is clear.  They do not like that their sorority chapter inducted a transgender member or that Kappa did not overturn the chapter's decision, so they ask

the Court to declare Langford's membership void ab initio and, in so doing, tell a private fraternal organization whom it can and cannot accept as a member at any of its more than 145 chapters.

The majority of the Amended Complaint amounts to little more than a winding discussion of why Plaintiffs believe that transgender women should not be treated as women and should therefore be excluded from women's organizations.  Plaintiffs then attempt to package those opinions as legal claims by alleging that Kappa is required by its bylaws to share this exclusionary viewpoint and that Plaintiffs have some contractual right to live in a sorority house that is free from the presence of transgender women.  They do this through a member-derivative claim, a breach-of-contract claim, a tortious-interference-with-contract claim, and a member-direct claim.

Those efforts fail for a number of reasons.  As an initial matter, Plaintiffs fail to establish subject-matter jurisdiction over the sole claim brought against the Building Co. and fail to establish personal jurisdiction over Rooney.  Turning to the actual claims, Plaintiffs neither meet the procedural requirements for a derivative claim nor plead one in substance.  They similarly do not demonstrate any contractual provision that was allegedly interfered with or breached.  Finally, they fail to allege any other cause of action to support a claim for a direct action.

### A.  Standards of Review

Rule 12(b) of the Federal Rules of Civil Procedure provides that certain defenses must be presented by motion.  Relevant here, Defendants can move to dismiss a claim at the responsive-pleading stage for "lack of subject-matter jurisdiction" for the breach of contract claim against the Building Co., "lack of personal jurisdiction" for all claims against Rooney, and "failure to state a claim upon which relief can be granted" for all claims that survive jurisdictional dismissal.  *See* Fed. R. Civ. P. 12(b)(1), (2), and (6).

A motion to dismiss for lack of subject-matter jurisdiction can facially attack the sufficiency of the complaint's allegations as to subject-matter jurisdiction or challenge the facts the plaintiffs are using to establish subject-matter jurisdiction.   *Christian v. Loyakk, Inc.*, No. 22-CV-215-F, 2023 U.S. Dist. LEXIS 6952, at *13 (D. Wyo. Jan. 12, 2023).   The Court accepts the allegations in the Complaint as true and assesses whether there is a basis for subject-matter jurisdiction.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).

In motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2), plaintiffs bear the burden of establishing personal jurisdiction.  *Kirscher v. Wagner*, No. 19-CV-0037-ABJ, 2020 U.S. Dist. LEXIS 257235, at *4 (D. Wyo. Mar. 16, 2020).   They can meet that burden by "demonstrating facts that if true would support jurisdiction over the defendant."   *Rudolph v. Cunningham*, No. 2:13-CV-00181-ABJ, 2015 U.S. Dist. LEXIS 44250, at *9 (D. Wyo. Mar. 31, 2015) (citation omitted).

For a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "should assume [the] veracity" of ***factual*** allegations and "then determine whether they plausibly give rise to an entitlement to relief."  *McKinney v. Granite Park Fabrication*, No. 19-CV-00266-ABJ, 2020 U.S. Dist. LEXIS 257239, at *5 (D. Wyo. Mar. 12, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  In making this assessment, the Court is not bound to accept any legal conclusion or opinion alleged in the complaint as true.  *Flandro v. Salt Lake County Jail*, 53 F. App'x 499, 500 (10th Cir. 2002) ("[w]e will accept the complainant's allegations of fact as true, but we will not accept assertions or opinions or conclusions where no facts are alleged to support them").

**B.** **The Court Lacks Subject-Matter Jurisdiction Over the Breach of Contract Claim Against the Building Co.**

Federal courts must have a statutory basis for exercising jurisdiction. *Dutcher v. Matheson*, 733 F.3d 980, 984 (10th Cir. 2013). Here, Plaintiffs invoke diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs bear the burden of establishing the jurisdictional minimum of $75,000. *Woodmen of World Life Ins. Soc. v. Manganaro*, 342 F.3d 1213, 1216 (10th Cir. 2003). When there are multiple defendants, however, the rules on aggregation are applicable:

> The statutory amount-in-controversy . . . must be satisfied as between a single plaintiff and a single defendant for a federal district court to have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold . . . If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims. . . . Similarly, multiple plaintiffs may aggregate the amounts of their claims against a single defendant if the claims are not "separate and distinct."

*Haynes v. Peters*, 403 F. Supp. 3d 1072, 1082 (D.N.M. 2019) (internal citations omitted).

Here, on the face of the Amended Complaint, Plaintiffs do not meet the $75,000 requirement to establish diversity jurisdiction over the breach-of-contract claim, which is the sole claim brought against the Building Co. They explicitly state that they are not seeking ***any*** damages from the Building Co. at all. (Am. Comp. ¶ 23.)[3] Nor could Plaintiffs meet the threshold through

---

[3] Plaintiffs appear to believe that the Building Co. is nonetheless properly joined because it is a "necessary party" under Rule 19(a)(1)(B). Courts evaluate these claims by considering: (1) whether complete relief is available between the other parties; (2) whether the purportedly necessary party has an interest that will be impaired; and (3) whether another party would be subject to inconsistent obligations. *Rishell v. Jane Phillips Episcopal Mem. Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996). None of these factors suggest the Building Co. is a necessary party. *See also Shaw v. AAA Eng'g & Drafting Inc.*, 138 F. App'x 62, 66 (10th Cir. 2005) (Rule 19 "does not provide a joinder mechanism for plaintiffs").

a second amendment to the Complaint, as the Building Co.'s only involvement in this case is because it is a party to House Contracts with some of the Plaintiffs.[4]   They do not seek to void these contracts, and even if they did, the full value of each contract including an entire year of board, rent, and maintenance is only $7,700 per Plaintiff.   Any contract rights Plaintiffs have are separate and distinct based on their own individual contracts, and even if a breach of contract claim for the full value of each individual contract were aggregated would not amount to $75,000.   As such, the Court should dismiss the sole claim against the Building Co. with prejudice.

## C.   The Court Lacks Personal Jurisdiction over Defendant Rooney

Plaintiffs' claims against Rooney can only proceed if the Court has personal jurisdiction over her, which it does not.   Personal jurisdiction is governed both by the law of the forum state and constitutional standards of due process.   *Christian*, 2023 U.S. Dist. LEXIS 6952, at *29–*30 (citation omitted).   Wyoming, the forum state, extends personal jurisdiction to the constitutional limit in the Due Process Clause.   *See* Wyo. Stat. § 5-1-107.   Thus, to establish personal jurisdiction over Rooney, Plaintiffs would need to establish that she has "minimum contacts" with the State of Wyoming such that her having to defend a lawsuit in the state "would not offend traditional notions of fair play and substantial justice."   *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

To establish minimum contacts, Plaintiffs need to show that Rooney "purposefully directed" her activities at the forum state and that Plaintiffs suffered injuries arising from those same activities.   *Id.* at 1071 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "[J]urisdiction over the representatives of a corporation may not be predicated on jurisdiction over

---

[4] There are no allegations that the Building Co. was responsible for any of the complained-of conduct or any of Kappa's policy or membership decisions.

the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum state." *Virgin Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 U.S. Dist. LEXIS 246099, at *8–*9 (D. Wyo. Dec. 30, 2019) (citation omitted). Furthermore, contacts of a company's officers or other agents "with a forum in their corporate capacity do not count for personal jurisdiction over the individual." *Christian*, 2023 U.S. Dist. LEXIS 6952, at *35 (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1277 (10th Cir. 2013)).

Here, the inquiry is easy. Rooney is a citizen of Illinois, not Wyoming. (Am. Compl., ¶ 22.) Plaintiffs do not allege that Rooney directed any activity at the State of Wyoming, let alone activity related to Plaintiffs' alleged injuries. They also do not allege that Rooney was present in Wyoming for any of the relevant events, or that she was involved in those events from afar. (Am. Compl.) Her involvement in administering Kappa policies as a Kappa officer, which Plaintiffs falsely paint as nefarious, also does not create personal jurisdiction in Wyoming. Those allegations concern actions affecting Kappa generally, not ones purposefully directed at Wyoming. Without allegation of a single contact between Rooney and the forum state, the Court lacks personal jurisdiction over Rooney and should dismiss all claims against her on that basis.

### D. **Plaintiffs' Derivative Claim Fails as a Matter of Law**

Plaintiffs' first claim is a derivative cause of action under Ohio law. (Am. Comp. ¶¶ 160–167.) In the derivative claim, they seek to bring an action on behalf of all members of Kappa to enforce the purported rights of the organization.

As Defendants can best surmise, Plaintiffs plead this claim as one for a breach of fiduciary duty. (Am. Compl., ¶ 160 ("claims for breach of fiduciary duties on the part of corporate directors or officers are to be brought in derivative suits"); ¶ 163 ("the directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance")). Such a claim would typically be

Case 2:23-cv-00051-ABJ   Document 20   Filed 06/20/23   Page 15 of 30

brought against individual directors or officers of a corporation.  *In re Lubrizol S'holders Litig.*, 79 N.E.3d 579, 585 (Ohio App. 2017).  Plaintiffs appear to assert this claim against Rooney, the only individual named in the Amended Complaint who owes a fiduciary duty to Kappa.[5]

Plaintiffs' derivative claim is legally deficient for at least four reasons.  First, the Court lacks personal jurisdiction over Rooney.  (*See supra* 9–10.)  Second, Plaintiffs fail to meet the requirements of Federal Rule of Civil Procedure 23.1 for bringing a derivative claim.  Third, Plaintiffs fail to identify any Kappa bylaw that Rooney violated.  Fourth, Kappa has the right to determine whom to include in its membership and impeding that decision would violate Kappa's right of association protected by the First Amendment.

### i.   ***Plaintiffs Fail to Meet the Requirements of Rule 23.1***

Rule 23.1 of the Federal Rules of Civil Procedure imposes special requirements that plaintiffs must meet when asserting a derivative claim.  It requires plaintiffs to submit a verified complaint that states with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary from the shareholders or members," and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).  The requirement to demand that the corporation take the actions desired may be excused if a plaintiff demonstrates that any further demand would have been futile.  *Pikk v. Pedersen*, 826 F.3d 1222, 1227 (10th Cir. 2016).

Plaintiffs claim the futility exception applies to them due to their extraordinarily limited efforts to resolve the matter without bringing a derivative claim.  (Am. Compl., ¶ 165.)  To

---

[5] Though Plaintiffs reference "the directors of the Sorority" and "the other Fraternity Council members" (Am. Compl., ¶¶ 163, 167), no director is a party to the Amended Complaint, nor is any Fraternity Council member besides Rooney.  There is no reason for suing only Rooney—who was not on the Council when it adopted the relevant policies—and not any other former or current Fraternity Council members—other than a personal vendetta of the alumnae funding this litigation.

determine if the futility exception applies to a case, courts "adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit." *Pikk*, 826 F.3d at 1228 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991)).  Kappa is incorporated in Ohio (Am Compl., ¶ 21), and it is clear that Plaintiffs' efforts fall woefully short under Ohio law.

Ohio's futility standard is demanding.  *In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 U.S. Dist. LEXIS 11608, at *13 (N.D. Ohio Mar. 21, 2006) ("establishing demand futility in Ohio is not an easy task").  "Futility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed." *Carlson v. Rabkin*, 789 N.E.2d 1122, 1128 (Ohio App. 2003).  Ohio courts recognize that the requirement that plaintiffs first make a demand before proceeding with a derivative claim "is clearly not a technical procedural requirement" and instead "serves the very important purpose of ensuring that before a shareholder derivative suit is brought, the company's board of directors has considered all possible intracorporate remedies." *Grand Council v. Owens*, 620 N.E.2d 234, 238 (Ohio App. 1993).

Plaintiffs allege they "have repeatedly reached out to the corporation's leadership to contest its refusal to enforce the sorority's membership requirements." (Am. Compl., ¶ 165.)  Plaintiffs do not allege that any of them had any personal communication raising the accusations in the Amended Complaint with the Fraternity Council.  The only communication arguably directed to any member of Fraternity Council that Plaintiffs provided to the Court was the letter from their attorney on November 4, 2022.  (Attach. 11 to Am. Compl.)  As discussed above, that letter failed to assert the claims raised in the Amended Complaint.  (*See supra* 4–5.)  Notably, it makes no mention of Plaintiffs' allegation that Kappa's directors "actively work[ed] to secure the

membership of Langford." (Am. Compl., ¶ 163.) If Plaintiffs had any reason to believe this accusation, they were required to bring it to Fraternity Council before filing this lawsuit.[6]

Counsel for Kappa responded to Plaintiffs' counsel's letter, explicitly asking them to identify any provision in any Kappa governing documents that was not followed. (Attach. 3 to Am. Compl.) Plaintiffs' counsel never responded before filing the initial Complaint in this case.

Plaintiffs' failure to raise their alleged concerns to the Fraternity Council and identify any allegedly violated bylaws or policies is fatal to their futility argument. Ohio law requires Plaintiffs to show that the minds of Kappa's Fraternity Council were "closed to argument" to excuse them from the requirement of making a demand that Kappa pursue litigation against Rooney. *Carlson*, 789 N.E.2d at 1128. Plaintiffs cannot satisfy the futility exception when the last communication they received from Kappa's legal counsel ***invited*** them to identify any bylaws or policies Kappa violated by allowing transgender women in general and Langford specifically to join the sorority.

### ii. *Plaintiffs Fail to Establish that Rooney Violated Kappa's Bylaws or that Kappa has Unreasonably Interpreted its Bylaws*

Second, even if Plaintiffs had satisfied Ohio's stringent futility standard to excuse them from satisfying the requirements of Federal Rule of Civil Procedure 23.1, the derivative claim is not one on which the Court can grant relief. To pursue a derivative claim, plaintiffs must allege "particular facts" against an individual defendant explaining what role that individual defendant had in the conduct to pursue a claim against that individual. *Auletta v. Ortino (In re Ferro Corp. Derivative Litig.)*, 511 F.3d 611, 621 (6th Cir. 2008) (Ohio derivative claim). It is not sufficient to make generalized allegations that "provide no specific facts indicating a nexus between any

---

[6] Alleging that a director is a wrongdoer does not inherently establish futility. *Lubrizol*, 79 N.E.3d at 587. Notably, no member of Fraternity Council was informed about Langford until ***after*** Langford had accepted the Gamma Omicron's invitation to join.

individual committee member and any inappropriate action or failure to act." *Id.* Plaintiffs fail to allege any particular facts to establish that Rooney engaged in conduct to breach her fiduciary duty.

Furthermore, Plaintiffs fail to identify any bylaw that forbids Kappa from admitting a transgender woman. Throughout the Amended Complaint, Plaintiffs allege that the admission of Langford or any other transgender woman violates Kappa's bylaws, standing rules, and policies. They reference these documents repeatedly in the Amended Complaint and append them for the Court's consideration as if they resolve the question of whether Fraternity Council was required to override the chapter's membership decision. The trouble with this position is that ***none*** of the documents actually say what Plaintiffs allege.

Plaintiffs would have the Court take the following logical journey: (1) Kappa's bylaws and other documents say that it is an organization for women; (2) the term "women" necessarily only includes people biologically born female; and, therefore, (3) only people biologically born female can join Kappa. This argument fails at the second step. Nowhere in these documents can Plaintiffs find their restrictive definition of the term "woman." Kappa defines its membership in its position statement adopted in 2015 as individuals who identify as women. (*See supra* 3.) Plaintiffs cannot identify any bylaw, standing rule, or policy that prohibits Kappa from taking this position, and the term is unquestionably open to multiple interpretations.

For example, Plaintiffs' own proposed definition of "woman" is an "adult human female." (Am. Compl., ¶¶ 2, 49). If one interprets adult to be someone who is 18 years old, this is inconsistent with how Kappa has ever defined "women" because there are many women who have joined collegiate chapters of Kappa at 17 years old. Surely, Plaintiffs are not contending that

-13-

Kappa violates its bylaws every time it admits a freshman who is young for her grade, but their own logic leads directly to that conclusion.

To see how the definition of a word may reasonably evolve over time, the Court need look no further than the Supreme Court's 2020 decision in *Bostock v. Clayton County*. *See* 140 S. Ct. 1731 (2020).  There, the Supreme Court held "Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee.  We do not hesitate to recognize today a necessary consequence of that legislative choice:  An employer who fires an individual merely for being gay or transgender defies the law." *Id.* at 1754 (Gorsuch, J.); *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028–29 (10th Cir. 2021).  Congress passed Title VII in the same 150-year period where Plaintiffs contend Langford is "not a woman as that word has been adopted and understood . . . for the past 150 years."  (Am. Compl., ¶ 33.)  If the Supreme Court can reasonably interpret "discrimination because of sex" to prohibit discrimination based upon someone's transgender status or sexual orientation, surely Kappa, as a private organization, can reasonably interpret its own bylaws to be similarly inclusive.

This Court's task, should it reach this question at all, is far easier than the one the Supreme Court faced in *Bostock*; it does not need to reach a definitive interpretation of what the word "woman" means.  It need not delve into this politically charged issue and determine that Kappa's inclusive definition or Plaintiffs' exclusive definition is the ***only*** way to define "woman."  Rather, Ohio law provides that "[g]enerally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein members have mutually agreed upon a charter or rules, the decision of the association itself is supreme." *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797, 802 (Ohio App. 1991).  That is what happened here when a voluntary, non-profit organization decided in 2015 to define "women" to include transgender women.

Plaintiffs' position that courts should step in to assess every challenged interpretation of an organization's bylaws has no logical stopping point.  Consider some of the bylaws in this case. Kappa member qualifications include that the candidate has "demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals."  (Attach. 1 to Am. Compl.) If a chapter admitted a candidate and some members thought that she lacked a regard for others, could those members then claim a violation of the bylaws and challenge her admission in court? If the bylaws of a private golf club only allowed members of "excellent playing ability to join," would courts find themselves litigating the newest member's handicap?  Will the Supreme Court one day judge whether someone is smart enough to join MENSA under its charter?  Of course not.

Judicial non-intervention in the decisions of a private organization is important because, "if the courts were to interfere [every time] some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility."  *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 779 (W.D. Tex. 1999) (internal quotation omitted).  As such, private organizations have the right to interpret their own governing documents:

> The right of a voluntary club or association to interpret its own
> organic agreements . . . is not inferior to its right to make and adopt
> them, and an individual, by becoming a member, subjects himself,
> within legal limits, to the association's power to administer as well
> as its power to make its rules . . . the requirements for judicial review
> are more than a mere breach of [an association's] own policies.

*Barrash v. Am. Ass'n of Neurological Surgs., Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605, at *16 (S.D. Tex. Aug. 13, 2013) (internal citations omitted).  The Court should defer to the decision of Kappa to inclusively define "women."[7]

---

[7] The Cambridge Dictionary and well known women's colleges have also adopted inclusive definitions of "women."  https://www.campuspride.org/tpc/womens-colleges/ (identifying many

     *iii.*      **<u>Kappa has a Constitutional Right to Determine Who to Include and Who to Exclude from Its Membership</u>**

As articulated by the United States Supreme Court, unless there is unlawful discrimination, the government (which includes a court) cannot determine whom a private organization must include or exclude in its membership. "Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 658 (2000) (internal citations omitted). Kappa unquestionably engages in expressive activity. As explained by the Tenth Circuit:

> [An organization's] speech or conduct may reflect the view of only a bare majority of the members, or even just the view of the members' delegate—such as the editor of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents an 'official position.' *See Dale*, 530 U.S. at 655 ("[T]he First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.' The Boy Scouts takes an official position . . . and that is sufficient for First Amendment purposes.")

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013).

The Supreme Court recognized, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). Plaintiffs here have asked this Court to do precisely that and interfere with Kappa's decision to adopt an inclusionary definition of the term "women" that includes individuals

---

well-known women's colleges that admit transgender women); (Woman, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/woman (defining "woman" as "an adult female human being" and as "an adult who lives and identifies as female though they may have been said to have a different sex at birth") (both last visited June 19, 2023).

who "identify as women" and to order instead that "women" can only be defined as individuals who are "adult human females."

In summary, Plaintiffs' derivative claim should be dismissed with prejudice for lack of personal jurisdiction; failure to follow procedural requirements; failure to identify a violated or unreasonably interpreted bylaw; and for seeking relief that would violate Kappa's right of association protected by the First Amendment.

### E. **Plaintiffs' Breach of Contract Claim Fails as a Matter of Law**

Plaintiffs' second claim is for breach of the contracts that some Plaintiffs allege they entered into with the Building Co. [8]  (Am. Compl., ¶¶ 168–75.)  Plaintiffs entered into their House Contracts in Wyoming and they contain a Wyoming choice-of-law provision.  (Attach. 10 to Am. Compl.)   Under Wyoming law, a breach-of-contract claim requires a "lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages."  *Schlinger v. McGhee*, 268 P.3d 264, 268 (Wyo. 2012) (citation omitted).  "A claim for breach of contract is asserted against the party to the contract." *Peterson v. Meritain Health, Inc.*, 508 P.3d 696, 707 n.7 (Wyo. 2022).

Like the first claim, it is difficult to decipher what Plaintiffs are attempting to assert. Plaintiffs allege the contracts were with the Building Co. but they plead that "Plaintiffs ***do not seek damages*** directly from [the Building Co.], but Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with the Defendant.  As such, Plaintiffs believe the [Building Co.] is a required party to this litigation."   (Am. Comp. ¶ 23 (emphasis added)).

---

[8] To the extent Plaintiffs purport to allege a breach of contract claim against Kappa or Rooney, the Court should dismiss it because Plaintiffs do not allege that either is a party to the House Contracts.

Plaintiffs' breach of contract claim can be dismissed for lack of subject matter jurisdiction. (*See supra* 7–8.)  Moreover, as Plaintiffs specifically plead that they do not seek damages from the Building Co. and as damages are a requirement for a breach of contract claim, the Court can easily dispose of this claim on that basis as well.  Additionally, Plaintiffs do not have Article III standing to assert a breach of contract claim against the Building Co. given:  (1) Article III standing requires an actual "case or controversy"; and (2) "[a] case or controversy no longer exists when it is impossible for the court to grant any effectual relief whatsoever to a  prevailing party."  *Colo. Off-Highway Vehicle Coalition v. U.S. Forest Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004).

Furthermore, Plaintiffs cannot fix this claim by amending the pleadings.  In assessing a claim for breach of contract, the job of courts is to "secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract."  *Cent. Wyo. Med. Lab. v. Med. Testing Lab., Inc.*, 43 P.3d 121, 127 (Wyo. 2002).  Tellingly, Plaintiffs do not cite to any specific provisions of the House Contract that were breached.  Instead, Plaintiffs allege that the "Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house," that "men cannot enter the living areas of the Sorority except upon special circumstances that have been approved in advance," and that "Langford's access to and presence in the sorority house violates the housing contract that Plaintiffs signed."  (Am. Compl., ¶¶ 170–71.)

Reviewing the House Contract and House Rules, it is apparent that there is no provision that supports the interpretation Plaintiffs offer and, therefore, no plausible breach.  (Attach. 10 to Am. Compl.)  Specifically, nothing in those documents prevents Langford's access to and presence in the sorority house, including entering the living areas of the house.  *Id*.  Indeed, although Langford is not living in the house and will not be living in the house, as Plaintiffs acknowledge in their Amended Complaint (Am. Compl., ¶¶ 82, 86), nothing in the House Contract or House

Rules prohibits her from living in the house. Though the Gamma Omicron chapter may choose to restrict the visitation to the house, nothing in the House Contract or the House Rules obligates the Building Co. to ban transgender women or men from living in or accessing the house.

Furthermore, contrary to Plaintiffs' contention, the House Contract does not obligate the Building Co. to provide housing in accordance with the bylaws, standing rules, and policies of Kappa. The only mention in the House Contract of those documents does not relate to any obligation of the Building Co:

> Other Services. The chapter shall provide the student such services as are customarily furnished by the chapter to residents of the chapter house, subject to this contract, the Kappa Kappa Gamma Fraternity Bylaws, Standing Rules and Policies ("Fraternity standards"); and rules and regulations of the chapter, including, without limitation, the House Rules ("House Rules") attached hereto as Exhibit B, subject to any changes as may be made by the chapter, House Board, or the Fraternity at any time.

(Attach.10, ¶ 5 to Am. Compl.)

Finally, even if there were some obligation in the House Contract for the Building Co. to comply with Kappa's bylaws, standing rules, and policies, Plaintiffs have not identified any provision in those governing documents that is violated by Langford, who is a member of the Gamma Omicron chapter, having access to and a presence in the house.[9] This claim just circles back to the same argument dispelled above that Langford should have had her membership voided because she is a transgender woman. As previously discussed, Kappa has defined women to include individuals who "identify as women" and nothing in Kappa's governing documents bars

---

[9] Plaintiffs do not allege that the Building Co. is responsible for any of Langford's alleged conduct or that the House Contracts are breached by Langford's alleged conduct. Indeed, property owners and landlords have no duty to protect their tenants from another person and are not liable for the actions of another unless there is evidence of prior criminal or violent acts by another or notice of an imminent threat of danger. *See Warwick v. Accessible Space, Inc.*, 448 P.3d 206, 212–213 (Wyo. 2019).

that interpretation.  (*See supra* 13–16.)  Therefore, the Court should dismiss Plaintiffs' breach of contract claim against the Building Co. with prejudice.

### F.   Plaintiffs' Tortious Interference with Contract Claim Fails as a Matter of Law

Plaintiffs assert a tortious interference claim against Kappa only (Am. Comp., ¶ 175).[10] The elements for a claim for tortious interference are (1) the existence of a valid contractual relationship; (2) knowledge of the contractual relationship; (3) intentional and improper interference inducing or causing a breach of the contract relationship; and (4) resultant damage to the party from that breach.  *Sheaffer v. State ex Rel. Univ. of Wyo.*, 202 P.3d 1030, 1044 (Wyo. 2009).  Accordingly, without an underlying breach of contract, a tortious interference claim fails.

Again, this claim is entirely premised on Kappa not voiding Langford's membership, which they claim prevents Plaintiffs "from having the benefit of the Housing Contract that they signed."  (*See* Am. Compl., ¶ 175).  It fails because there was no underlying breach of the House Contract.  (*See supra* 18–19.)  Without a breach of the House Contract, there can be no tortious interference with that contract.  Plaintiffs also fail to allege anything that could constitute intentional and improper interference and fail to allege any resultant damages.  Therefore, the Court should dismiss Plaintiffs' tortious interference claim against Kappa with prejudice.

### G.   Plaintiffs' Direct Claim Fails as a Matter of Law

Finally, Plaintiffs attempt to assert a direct cause of action, which is their most perplexing claim.  (Am. Compl., ¶¶ 176-179).  Once again, they do not identify whom they bring this claim

---

[10] Plaintiffs confusingly reference "Defendants" twice in this claim.  They have not indicated, however, that this is a claim intended against Rooney or the Building Co.  To the extent Plaintiffs seek to assert this claim against Rooney, it fails for lack of personal jurisdiction and because Plaintiffs have not alleged Rooney knew of the contracts or did anything to induce a breach.  And the Building Co. cannot tortuously interfere with its own contract.  *See Sunshine Custom Paints & Body, Inc. v. S. Douglas Hwy. Water & Sewer Dist.*, 173 P.3d 398, 404 (Wyo. 2007) (tortious interference requires a contract "between the plaintiff and a ***third party***") (emphasis added).

against, but as they allege the harm is the "direct result of Defendants' actions to force the admission of Langford as a sorority member," Defendants will consider this an attempt to allege a direct action against Kappa and Rooney.

A plaintiff can bring a direct cause of action only when "(1) the injury arises out of a special duty, e.g., via contract, between the wrongdoer and the shareholder; or (2) the shareholder suffered damages separate and distinct from that suffered by other shareholders." *Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio App. 2011). In other words, the complaining shareholder must be "injured in a way that is separate and distinct from an injury to the corporation." *Morgan v. Ramby*, No. 2012-Ohio-763, 2012 Ohio App. LEXIS 662, at *11 (Feb. 27, 2012) (citations omitted). Plaintiffs do not allege an injury arising out of a special duty, so they must allege separate and distinct damages from those suffered by other members.

Of course, there must be some injury to the corporation from which the shareholder suffered distinct damages in order for a direct cause of action to proceed. *Carlson*, 789 N.E.2d 1122, 1126-27; *see also Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio App. LEXIS 154, at *7– *8 (Jan. 18, 2007) (analyzing plaintiff's breach of contract, fraud, and misrepresentation causes of action as direct actions). To the extent this claim is based upon Rooney's alleged breach of fiduciary duty, it fails for the reasons described above.[11] (*See supra* 10–17.)

Plaintiffs complain about being "deceived" into "believing that they were joining a woman-only organization," being "deprived of the all-female environment," and having to reside in a sorority house that Langford has access to because Langford has made them uncomfortable in

---

[11] Typically, claims for breach of fiduciary duty are alleged as derivative claims because the purported damage is to the corporation, not individual members. *Heaton*, 954 N.E.2d at 175 (internal citations omitted).

various ways, including "threatening to publicly label them bigots."[12]   (Am. Comp. ¶ 178.)
Plaintiffs, however, do not indicate what legal cause of action they are attempting to advance.

As Defendants can best surmise, Plaintiffs may be attempting to claim that they believed a transgender women could not join Kappa and that they have some right to have Langford excluded by Kappa and banned from the sorority house because she is transgender.  As discussed above, Plaintiffs have no legal claim against Rooney (or Kappa) for a transgender woman joining Kappa. (*See supra* 10–17).  Plaintiffs also have no legal claim against Kappa (or Rooney) because Langford is able to be present in the sorority house as a member of the chapter.  (*See supra* 17–20).  In summary, there is no articulated or plausible legal claim upon which Plaintiffs base the contention that they suffered individual legal harm distinct from that which they allege on behalf of all Kappa members.  Therefore, the Court should dismiss Plaintiffs' direct claim with prejudice.

## IV.   CONCLUSION

Plaintiffs are upset that Kappa has adopted an inclusive position allowing for the admission of transgender women.  They are upset that their collegiate chapter decided to admit Langford as a transgender woman.  They are upset that Kappa did not step in to override their chapter's membership decision.  And they are upset that they now have a transgender woman in their chapter who has access to and a presence in their sorority house.  They and their supporters have taken to the media to complain of the unfairness of having a transgender woman in their chapter and how

---

[12] Despite representing to the Court that they feared participation in this litigation due to "significant press coverage" and "the social media maelstrom that surrounds these issues generally" (ECF No. 2), Plaintiffs and one of their attorneys have appeared on multiple national news programs to discuss this case and make incendiary statements about Langford, Kappa, and transgender women.  A "bigot" is defined as "a person who is obstinately or intolerantly devoted to his or her own opinions and prejudices."  (https://www.merriam-webster.com/dictionary/bigot) (last visited June 19, 2023).  Given Plaintiffs' public statements, their professed concern about being publicly labeled with this term by Langford rings hollow.  Other members of Kappa, students at their university, and the public can now determine whether a public label of "bigot" is warranted.

-22-

it has deprived them of their right to be part of a sorority where everyone is biologically born female.  One alumnae supporter has given media interviews declaring that Kappa's inclusion of someone who is transgender is the "biggest setback for women since suffrage."  Plaintiffs and their supporters are indignant about Langford's admission and believe they have been wronged.  But "the law is a tool of limited capacity.  Not every wrong, even the worst, is cognizable as a legal claim."  *Allen v. Bank of Am. Corp.*, No. 10-4205 (MJD/JSM), 2011 U.S. Dist. LEXIS 96836, at *29 (D. Minn. July 22, 2011) (citing *Alperin v. Vatican Bank*, 410 F.3d 532, 562 (9th Cir. 2005)).  Our courts exist to address legal wrongs; they are not a place where people can go to reshape society to fit their exact sensibilities and preferences.

But perhaps the greatest wrongs in this case are not the ones Plaintiffs and their supporters imagine they have suffered, but the ones that they have inflicted through their conduct since filing the Complaint.  Regardless of personal views on the rights of transgender people, the cruelty that Plaintiffs and their supporters have shown towards Langford and anyone in Kappa who supports Langford is disturbing.[13]  This conduct has unsurprisingly resulted in hate mail and threats to Langford, Rooney, and others at Kappa, not to mention the inevitable mental toll inherent in being the target of such public and untrue vitriol.  As just one example, following Plaintiffs' national media interviews with their attorney, an anonymous man left a threatening message against Kappa in response to those media interviews stating: "you cock sucking woke pieces of fucking human

---

[13] Plaintiffs appeared with their attorney, Cassie Craven, on national media interviews in which Langford is referred to as a "pervert," it is suggested she could be "getting off" on living with other members, and, in discussing her appearance, is analogized to be a pig wearing lipstick.  *See* The Megyn Kelly Show, *Left's Trans Ideology Religion, and Men in Women's Spaces, with Sen. Josh Hawley & KKG Sisters Suing*, YOUTUBE, beginning at 49:52 (May 15, 2023), https://www.youtube.com/watch?v=51wAdkZEUC8.  It is hard to imagine behavior that is more cruel, more un-sisterly, or more contrary to Kappa values.  Plaintiffs' statement to the Court that Langford "deserves kindness" (Mot. for Reconsideration, ECF 6) was a flagrant misrepresentation of Plaintiffs' plans for conducting this litigation.

garbage" and threatening "I'm going to do everything to destroy your fucking organization." This is what Plaintiffs have brought to their beloved organization and sisters since filing this litigation.[14]

This Court should dismiss all claims with prejudice for the myriad of reasons discussed in detail above. Dismissal may be unlikely to change Plaintiffs' and their supporters' feelings about having a transgender woman in their sorority or lead them to behave more kindly towards sorority sisters with different views. It may not cause them to reevaluate the morality of attacking the character and appearance of a college student in a publicity drive for divisive litigation or begin to acknowledge the humanity of transgender people in their words and actions.

What dismissal will do is establish that Plaintiffs' legal claims are baseless and show their supporters and others who may seek to use the courts for their own political purposes that funding frivolous litigation is not the way to resolve disputes or effect change. It may also be the first step in allowing Kappa and the Gamma Omicron chapter to begin rebuilding from the significant harm that Plaintiffs and their supporters have unleashed on this organization and chapter that they profess to love.

Dated: June 20, 2023

Respectfully submitted,

/s/ *Natalie M. McLaughlin*
Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:      (614) 464-5452
Email:        nmmclaughlin@vorys.com
           bwdressel@vorys.com

Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:      (307) 265-0700
E-Mail:       sklosterman@wpdn.net

*Attorneys for Defendants Kappa Kappa Gamma Fraternity, Mary Pat Rooney, and the Kappa Kappa Gamma Building Co.*

---

[14] Kappa made a report to law enforcement after receiving this threatening message.

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 20[h] day of June, 2023.

Cassie Craven (#7-5664)
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
E-Mail: ccraven.law@gmail.com

☒ CM/ECF Electronic Transmission
☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ Email

John G. Knepper (#7-4608)
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
E-Mail: john@knepperllc.com

☒ CM/ECF Electronic Transmission
☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ Email

/s/ *Brian W. Dressel*
Brian W. Dressel

45411231