Nos. 14-556, 14-562, 14-571, 14-574

IN THE

# Supreme Court of the United States

————

JAMES OBERGEFELL, ET AL.,

*Petitioners*,

v.

RICHARD HODGES, DIRECTOR,
OHIO DEPARTMENT OF HEALTH, ET AL.,

*Respondents.*

————

**On Writ of Certiorari to the
United States Court of Appeals
for the Sixth Circuit**

————

**BRIEF OF THE ORGANIZATION OF
AMERICAN HISTORIANS AS *AMICUS CURIAE*
IN SUPPORT OF PETITIONERS**

————

CATHERINE E. STETSON
 *Counsel of Record*
ERICA KNIEVEL SONGER
MARY HELEN WIMBERLY
MADELINE H. GITOMER
KATHERINE J. DUNCAN*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Amicus Curiae*

* Not admitted in D.C.; super-
 vised by members of firm.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..........................................ii

STATEMENT OF INTEREST ...................................1

INTRODUCTION AND SUMMARY OF
    ARGUMENT ..........................................................2

ARGUMENT ...............................................................5

I.  GAY AND LESBIAN PEOPLE HAVE
    BEEN SUBJECT TO WIDESPREAD AND
    SIGNIFICANT DISCRIMINATION IN
    THE UNITED STATES.......................................5

    A. The Historical Roots of Discrimination
       Against Gay People ..........................................5

    B. Modern American History: 1890-1940............5

    C. World War II and Its Aftermath....................10

    D. The Gay Rights Movement and Its Op-
       ponents in the 1960s, 1970s, and 1980s ........15

    E. The Persistence of Anti-Gay Discrimi-
       nation from the 1990s to the Present ...........19

    F. How This History of Discrimination Has
       Shaped the Debate Over the Right of
       Gay Couples to Marry ...................................28

II. HISTORY PLAYS A CRITICAL ROLE IN
    THE COURT'S EQUAL-PROTECTION
    ANALYSIS ............................................................34

CONCLUSION .........................................................37

(i)

ii

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Baehr* v. *Lewin*,
852 P.2d 44 (Haw. 1993) ..................................... 28

*Baehr* v. *Miike*,
Civ. No. 20371, 1999 Haw. LEXIS 391
(Haw. Dec. 9, 1999) ............................................. 29

*Boseman* v. *Jarrell*,
704 S.E.2d 494 (N.C. 2010) ................................. 28

*Bottoms* v. *Bottoms*,
457 S.E.2d 102 (Va. 1995) ................................... 26

*Bowen* v. *Gilliard*,
483 U.S. 587 (1987) ................................................ 2

*City of Cleburne* v. *Cleburne Living Ctr.*,
473 U.S. 432 (1985) ............................................. 35

*Department of Agric.* v. *Moreno*,
413 U.S. 528 (1973) ............................................. 35

*Ex parte H.H.*,
830 So. 2d 21 (Ala. 2002) .................................... 27

*Finstuen* v. *Crutcher*,
496 F.3d 1139 (10th Cir. 2007) ........................... 27

*Florida Dep't of Children & Families* v.
*Adoption of X.X.G.*,
45 So. 3d 79 (Fla. Ct. App. 2010) ........................ 18

*Frontiero* v. *Richardson*,
411 U.S. 677 (1973) ............................................. 36

*Hernandez* v. *Texas*,
347 U.S. 475 (1954) ............................................. 34

iii

## TABLE OF AUTHORITIES—Continued

Page(s)

*In re Marriage Cases*,
   183 P.3d 384 (Cal. 2008) ..................................... 32

*Lawrence* v. *Texas*,
   539 U.S. 558 (2003) ......................................... 2, 36

*Loving* v. *Virginia*,
   388 U.S. 1 (1967) ................................................. 35

*Nevada Dep't of Human Res.* v. *Hibbs*,
   538 U.S. 721 (2003) ............................................. 36

*One, Inc.* v. *Oleson*,
   355 U.S. 371 (1958) ............................................. 15

*Oyama* v. *California*,
   332 U.S. 633 (1948) ............................................. 35

*Palmore* v. *Sidoti*,
   466 U.S. 429 (1984) ............................................. 26

*Perry* v. *Schwarzenegger*,
   704 F. Supp. 2d 921 (N.D. Cal. 2010), *aff'd*
   *sub nom. Perry* v. *Brown*, 671 F.3d 1052
   (9th Cir. 2012), *vacated and remanded*
   *sub nom. Hollingsworth* v. *Perry*, 570
   U.S. __, 133 S. Ct. 2652 (2013) ..................... 33, 34

*Romer* v. *Evans*,
   517 U.S. 620 (1996) ........................................ 20, 35

*Strauss* v. *Horton*,
   207 P.3d 48 (Cal. 2009) ........................................ 34

*United States* v. *Virginia*,
   518 U.S. 515 (1996) ............................................. 36

*United States* v. *Windsor*,
   570 U.S. __, 133 S. Ct. 2675 (2013) .............. 29, 30

iv

## TABLE OF AUTHORITIES—Continued

Page(s)

STATE CONSTITUTIONS:

CAL. CONST. ART. I, § 7.5............................................33

HAWAII CONST. art. I, § 23........................................29

STATUTES:

1 U.S.C. § 7 ...............................................................30

Pub. L. No. 103-160, 107 Stat. 1547 (1993).............21

Pub. L. No. 104-199, 110 Stat. 2419 (1996).............29

FLA. STAT. ANN. § 63.042 (West 2001) .....................17

OKLA. STAT. ANN. tit. 10, § 7502-1.4 ........................27

MISS. CODE ANN. § 93-17-3(2) ...................................27

LEGISLATIVE HISTORY:

H. R. Rep. No. 104-664 (1996)............................29, 30

Ohio Defense of Marriage Act: Consideration
    of H.B. No. 272 Before the H. of Repre-
    sentatives, 2003 Leg., 125th Sess. (Ohio
    2003) (statements of Rep. Bill Seitz and
    Rep. Ron Young) .................................................32

S. REP. NO. 81-241 (1950) ...................................11, 12

EXECUTIVE ORDERS:

Exec. Order No. 10,450,
    3 C.F.R. 936 (1949-1953) ...................................12

Exec. Order No. 13,087,
    63 Fed. Reg. 30,097 (May 28, 1998) ...................21

v

TABLE OF AUTHORITIES—Continued

Page(s)

OTHER AUTHORITIES:

*About NARTH*, NARTH ............................................ 25

AMERICAN BAR ASS'N, AN ANALYSIS OF THE
  LAW REGARDING SAME-SEX MARRIAGE,
  CIVIL UNIONS, AND DOMESTIC PARTNER-
  SHIPS (2005) ........................................................ 30

American Psychiatric Ass'n, *Position State-
  ment on Homosexuality and Civil Rights*
  (Dec. 15, 1973), *reprinted in* 131 AM. J.
  PSYCHIATRY 497 (1974) ........................................ 16

JOHN-MANUEL ANDRIOTE, VICTORY DE-
  FERRED: HOW AIDS CHANGED GAY LIFE IN
  AMERICA (1999) .................................................... 19

ALLAN BERUBE, COMING OUT UNDER FIRE:
  THE HISTORY OF GAY MEN AND WOMEN IN
  WORLD WAR TWO (1990) ................................. 10, 11

GREGORY D. BLACK, THE CATHOLIC CRUSADE
  AGAINST THE MOVIES, 1940-1975 (1997) ................ 9

KARLYN H. BOWMAN & ADAM FOSTER, AMERI-
  CAN ENTER. INST., ATTITUDES ABOUT HO-
  MOSEXUALITY AND GAY MARRIAGE (2008) ...... 22, 25

NAN ALAMILLA BOYD, WIDE-OPEN TOWN: A
  HISTORY OF QUEER SAN FRANCISCO TO
  1965 (2003) ......................................................... 10

PAUL BOYER, URBAN MASSES AND MORAL OR-
  DER IN AMERICA, 1820-1920 (1978) ....................... 7

STACY BRAUKMAN, COMMUNISTS AND PER-
  VERTS UNDER THE PALMS: THE JOHNS
  COMMITTEE IN FLORIDA, 1956-1965 (2012) .......... 13

TABLE OF AUTHORITIES—Continued

Page(s)

James Brooke, *Gay Man Dies From Attack, Fanning Outrage and Debate*, N.Y. TIMES, Oct. 13, 1998.............................................23

Robbie Brown, *Antipathy Toward Obama Seen as Helping Arkansas Limit Adoption*, N.Y. TIMES, Nov. 8, 2008.............................28

CALIFORNIA SEC'Y OF STATE, OFFICIAL VOTER INFORMATION GUIDE: CALIFORNIA GENERAL ELECTION ON NOV. 4, 2008, PROP 8 (2008)............................................................33, 34

MARGOT CANADAY, THE STRAIGHT STATE: SEXUALITY AND CITIZENSHIP IN TWENTIETH-CENTURY AMERICA (2009) .............................11

Rebecca Cathcart, *Boy's Killing, Labeled a Hate Crime, Stuns a Town*, N.Y. TIMES, Feb. 23, 2008 .......................................................23

*Cause for Concern (Adoption)*, FOCUS ON THE FAMILY (2009).......................................................27

George Chauncey, *A Gay World, Vibrant and Forgotten*, N.Y. TIMES, June 26, 1994...................8

George Chauncey, *From Sexual Inversion to Homosexuality: Medicine and the Changing Conceptualization of Female Deviance*, 58-59 SALMAGUNDI 114 (1982-1983) ............6

GEORGE CHAUNCEY, GAY NEW YORK: GENDER, URBAN CULTURE, AND THE MAKING OF THE GAY MALE WORLD, 1890-1940 (1994)........... *passim*

vii

**TABLE OF AUTHORITIES—Continued**

Page(s)

George Chauncey, *The Postwar Sex Crime Panic*, *in* TRUE STORIES FROM THE AMERICAN PAST (William Graebner ed., 1993) ........ 14, 15

GEORGE CHAUNCEY, WHY MARRIAGE? THE HISTORY SHAPING TODAY'S DEBATE OVER GAY EQUALITY (2004) ................................... *passim*

John Cheves, *KY State Senate OKs Putting Gay Marriage Ban to a Vote for Nov. 2, but House Balks*, HERALD-LEADER, Mar. 12, 2004 ................................................................ 31

DUDLEY CLENDINEN & ADAM NAGOURNEY, OUT FOR GOOD: THE STRUGGLE TO BUILD A GAY RIGHTS MOVEMENT IN AMERICA (1999) ................ 17

Colorado for Family Values, EQUAL RIGHTS NOT SPECIAL RIGHTS! (1992) ................................ 33

Kenneth J. Cooper, *Placement of Foster Children with Gay Couple Is Revoked*, BOSTON GLOBE, May 9, 1985 ................................ 18

John D'Emilio, *The Homosexual Menace: The Politics of Sexuality in Cold War America*, *in* PASSION AND POWER: SEXUALITY IN HISTORY (Kathy Peiss *et al.*, eds. 1989) .................... 13

JOHN D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES: THE MAKING OF A HOMOSEXUAL MINORITY, 1940-1970 (1981) ....... 12, 14, 15

JOHN D'EMILIO & ESTELLE B. FREEDMAN, INTIMATE MATTERS: A HISTORY OF SEXUALITY IN AMERICA (2d ed. 1997)............................. 7, 21

viii

**TABLE OF AUTHORITIES—Continued**

Page(s)

DEPARTMENT OF DEF., REPORT OF THE COM-
PREHENSIVE REVIEW OF THE ISSUES ASSO-
CIATED WITH A REPEAL OF "DON'T ASK,
DON'T TELL" (2010) ............................................ 22

Patti Doten, *They Want a Chance to Care;
Gay Couple Still Hurts from Decision
That Took Away Their Foster Children*,
BOSTON GLOBE, Sept. 27, 1990 ............................ 18

Laura E. Durso & Gary J. Gates, *Serving Our
Youth: Findings from a National Survey of
Service Providers Working with Lesbian,
Gay, Bisexual and Transgender Youth Who
Are Homeless or At Risk of Becoming
Homeless*, THE WILLIAMS INST. (2012) ................ 23

Robert Dreyfuss, *The Holy War on Gays*,
ROLLING STONE, Mar. 18, 1999 ............................ 29

STEVEN EPSTEIN, IMPURE SCIENCE: AIDS, AC-
TIVISM, AND THE POLITICS OF KNOWLEDGE
(1996) ..................................................................... 19

William Eskridge, Jr., *Law and the Con-
struction of the Closet: American Regula-
tion of Same-Sex Intimacy, 1880-1946*, 82
IOWA L. REV. 1007 (1997) ...................................... 5

Patrick M. Fahey, *Advocacy Group Boycott-
ing of Network Television Advertisers
and its Effects on Programming Content*,
140 U. PA. L. REV. 647 (1991) .............................. 31

Estelle Freedman, *"Uncontrolled Desires":
The Response to the Sexual Psychopath,
1920-1960*, 74 J. AM. HIST. 83 (1987) ........... 14, 15

ix

## TABLE OF AUTHORITIES—Continued

Page(s)

Andrea Friedman, PRURIENT INTERESTS: GENDER, DEMOCRACY, AND OBSCENITY IN NEW YORK CITY, 1909-1945 (2000) ....................... 9

JOHN GALLAGHER & CHRIS BULL, PERFECT ENEMIES: THE RELIGIOUS RIGHT, THE GAY MOVEMENT, AND THE POLITICS OF THE 1990s (1996) .................................................. 20, 21

Richard Godbeer, *"The Cry of Sodom": Discourse, Intercourse, and Desire in Colonial New England*, 52 WILLIAM & MARY Q. 259 (1995) ............................................................. 5

KAREN L. GRAVES, AND THEY WERE WONDERFUL TEACHERS:  FLORIDA'S PURGE OF GAY AND LESBIAN TEACHERS  (2009) ........................... 13

LARRY GROSS, UP FROM INVISIBILITY: LESBIANS, GAY MEN, AND THE MEDIA IN AMERICA (2001) .............................................................. 16, 22

Michael Gurovitsch, *Proposal may increase limits on gay union*, THE MICHIGAN DAILY, Oct. 9, 2003 ............................................................ 32

Jean Hardisty, *Constructing Homophobia: Colorado's Right-Wing Attack on Homosexuals*, PUB. EYE, Mar. 1993 ....................... 29, 31

THE HISTORY PROJECT, IMPROPER BOSTONIANS: LESBIAN AND GAY HISTORY FROM THE PURITANS TO PLAYLAND (1998) ........................... 8, 9

P.J. Huffstutter, *Police Raid at Gay Club in Texas Stirs Ugly Memories*, L.A. TIMES, July 6, 2009 ......................................................... 25

TABLE OF AUTHORITIES—Continued

Page(s)

HUMAN RIGHTS CAMPAIGN, MAPS OF STATE
    LAWS & POLICIES (Jan. 14, 2015)........................ 21

Ron Jenkins, *Henry Signs Measure On Gay
    Adoptions*, ASSOCIATED PRESS STATE &
    LOCAL WIRE, May 4, 2004 .................................. 27

DAVID K. JOHNSON, THE LAVENDER SCARE:
    THE COLD WAR PERSECUTION OF GAYS AND
    LESBIANS IN THE FEDERAL GOVERNMENT
    (2004) .................................................................... 12

Philip W. Johnston, *Policy Statement on
    Foster Care* (May 24, 1985), *reprinted in*
    BOSTON GLOBE, May 25, 1985 ............................ 18

JONATHAN NED KATZ, GAY AMERICAN HISTO-
    RY: LESBIANS AND GAY MEN IN THE U.S.A.
    (1976) ...................................................................... 8

JONATHAN NED KATZ, THE INVENTION OF
    HETEROSEXUALITY (1995) ....................................... 6

JOSEPH G. KOSCIW ET AL., GAY, LESBIAN &
    STRAIGHT EDUCATION NETWORK, THE 2013
    NATIONAL SCHOOL CLIMATE SURVEY: THE
    EXPERIENCES OF LESBIAN, GAY, BISEXUAL
    AND TRANSGENDER YOUTH IN OUR NA-
    TION'S SCHOOLS (2014) ........................................ 24

Ralph H. Major, Jr., *New Moral Menace to
    Our Youth*, CORONET, Sept. 1950 ........................ 14

WAYNE VAN DER MEIDE, NATIONAL GAY &
    LESBIAN TASKFORCE, LEGISLATING EQUAL-
    ITY: A REVIEW OF LAWS AFFECTING GAY,
    LESBIAN, BISEXUAL, AND TRANSGENDERED
    PEOPLE IN THE UNITED STATES (2000) ................. 16

xi

## TABLE OF AUTHORITIES—Continued

Page(s)

*Membership Standards Resolution*, BOY
    SCOUTS OF AMERICA..............................................24

LEISA D. MEYER, CREATING GI JANE: SEXUAL-
    ITY AND POWER IN THE WOMEN'S ARMY
    CORPS DURING WORLD WAR II (1996) .................11

Sue O'Connell, *The Money Behind the 2004
    Marriage Amendments*, NAT'L INST. ON
    MONEY IN STATE POL., Jan. 27, 2006....................31

THE PEW FORUM ON RELIGION & PUBLIC LIFE,
    U.S. RELIGIOUS LANDSCAPE SURVEY (2008).........17

Bill Rankin, *Employees to Fight Charges in
    Gay Bar Raid*, ATLANTA J.-CONST., Nov. 4,
    2009 ........................................................................25

DANIEL WINUNWE RIVERS, RADICAL RELA-
    TIONS: LESBIAN MOTHERS, GAY FATHERS,
    AND THEIR CHILDREN IN THE UNITED
    STATES SINCE WORLD WAR II (2013) ....................18

*Rudolph Reveals Motives*, CNN (Apr. 19, 2005)......23

Stephen T. Russell & Kara Joyner, *Adoles-
    cent Sexual Orientation and Suicide Risk*,
    91 AM. J. PUB. HEALTH 1276 (2001)....................23

VITO RUSSO, THE CELLULOID CLOSET: HOMO-
    SEXUALITY IN THE MOVIES (1991) ...........................9

Brad Sears et al., *Documenting Discrimina-
    tion on the Basis of Sexual Orientation
    and Gender Identity in State Employ-
    ment*, THE WILLIAMS INST., Sept. 2009 ...............19

xii

## TABLE OF AUTHORITIES—Continued

Page(s)

Julie Shapiro, *Custody and Conduct: How the Law Fails Lesbian and Gay Parents and Their Children*, 71 IND. L.J. 623 (1996) ........ 18, 25

KENNETH M. STAMPP, THE PECULIAR INSTITUTION: SLAVERY IN THE ANTE-BELLUM SOUTH (1956) ......................................................... 2

*State lawmaker dismisses criticism over saying 'queers,'* AP ALERT- POLITICAL, June 15, 2006 ................................................................ 32

Karla J. Starr, *Adoption by Homosexuals: A Look at Differing State Court Opinions*, 40 ARIZ. L. REV. 1497 (1998) ................................ 19

*Statewide Votes on Same-Sex Marriage, 1998-Present*, NATIONAL CONFERENCE OF STATE LEGISLATURES ........................................... 30

MARC STEIN, CITY OF SISTERLY AND BROTHERLY LOVES: LESBIAN AND GAY PHILADELPHIA, 1945-1972 (2000) ........................................ 15

*The Three Myths About Homosexuality*, NARTH ................................................................ 25

*Uniform Crime Reports, Hate Crime Statistics*, FBI ...................................................................... 23

IN THE
# Supreme Court of the United States
―――――――
Nos. 14-556, 14-562, 14-571, 14-574
―――――――
JAMES OBERGEFELL, ET AL.,
*Petitioners*,

v.

RICHARD HODGES, DIRECTOR,
OHIO DEPARTMENT OF HEALTH, ET AL.,
*Respondents*.
―――――――

## On Writ of Certiorari to the United States Court of Appeals for the Sixth Circuit
―――――――

## BRIEF OF THE ORGANIZATION OF AMERICAN HISTORIANS AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS
―――――――

### STATEMENT OF INTEREST[1]

The Organization of American Historians (OAH) respectfully submits this brief as *amicus curiae* in support of Petitioners.

Founded in 1907, the OAH is the largest scholarly organization devoted to promoting the study and teaching of American history. Its distinguished *Journal of American History*, annual meetings, and public service activities aim to promote excellence in the scholarship, teaching, and presentation of Amer-

―――――――

[1] No party or counsel for a party authored or paid for this brief in whole or in part, or made a monetary contribution to fund the brief's preparation or submission. All parties have filed blanket *amicus* consent letters.

2

ican history.  The OAH is an international, nonprofit membership organization, whose 7,800 historian members include university and college professors in the United States and abroad, as well as individuals employed in a variety of scholarly and institutional settings, such as libraries, museums, and historical societies.

The late Kenneth M. Stampp, historian and past president of OAH, wrote:  "With the historian it is an article of faith that knowledge of the past is a key to understanding the present."  THE PECULIAR INSTITUTION:  SLAVERY IN THE ANTE-BELLUM SOUTH vii (1956).  The OAH adheres to this principle, and has an interest—not as an advocate of a particular legal standard, but as a steward of history—in ensuring that the Court is presented with an accurate description of the history of discrimination against gay men and lesbians in America.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

In answering the question presented in this case, the Court will consider, among other things, whether "[a]s a historical matter" a particular class of persons "ha[s] been subjected to discrimination."  *Bowen* v. *Gilliard*, 483 U.S. 587, 602 (1987) (citation omitted). The OAH offers this Brief to inform the Court that gay and lesbian people have been subject to widespread and significant discrimination and hostility in the United States.

Sexual intimacy between people of the same sex has been condemned by "powerful voices" for centuries.  *Lawrence* v. *Texas*, 539 U.S. 558, 571 (2003). In twentieth century America, discrimination against gay people reached remarkable proportions.

3

In the first half of the century, for example, the State of New York prohibited theaters from staging plays with lesbian or gay characters, many states prohibited bars and restaurants from serving gay people, and the federal government banned gay people from employment. Until the 1960s, all states outlawed sexual intimacy between men. Many municipalities launched police campaigns to suppress gay meeting places and sought to purge gay civil servants from employment. These policies worked to create and reinforce the belief that gay men and lesbians comprised an inferior class of people to be shunned by other Americans.

Official discrimination was accompanied by private condemnation of homosexuality and discrimination against gay people, with a similarly enduring negative effect. Hollywood studios enforced a censorship code that for decades prohibited the discussion of gay issues or the appearance of gay or lesbian characters in film; press campaigns fostered frightening stereotypes of homosexuals as child molesters; and leading medical associations declared that homosexuality was a pathological condition or disease. These stereotypes had profound consequences, and they continue to inspire public fears and hostility.

Gay men and lesbians saw their situation begin to improve in the 1970s. But their limited gains precipitated a powerful opposition movement that initiated scores of referendum campaigns to repeal or prohibit newly-won protections against discrimination. No other group in American history has been confronted with as many referenda designed to take away its rights. In the 1980s, the early press coverage of AIDS reinforced the view that homosexuals were diseased and threatened other Americans. Mothers

4

who identified as lesbian often lost custody of their
children.

Despite social and legal progress in the past thirty
years, gay men and lesbians continue to live with the
legacy of anti-gay laws and hostility.  In most states,
gay men and lesbians still lack protection from dis-
crimination in schools, employment, housing, and
public accommodations.  State laws discriminating
against gay men and lesbians remain on the books.
Two states formally prohibit adoptions by same-sex
couples, and adoption agencies in many other states
continue to favor heterosexual couples over same-sex
couples.  Well over a thousand gay men, lesbians, bi-
sexuals, and transgendered people are the victims of
hate crimes every year.

When marriage emerged as the new flashpoint in
debates over gay civil rights, the debate was shaped
by this legacy, which initially prompted many Amer-
icans to respond to the idea of same-sex marriage
with the same hostility with which they previously
greeted the idea of openly gay teachers or television
characters or laws prohibiting discrimination against
gay people.  Opponents of marriage equality, many of
whom previously led campaigns against other gay
rights measures, have deployed enduring anti-gay
stereotypes to great effect.  The approval of laws and
constitutional amendments limiting marriage to one
man and one woman in a total of forty-one states
demonstrates the continuing influence of anti-gay
hostility and the persistence of ideas about the ine-
quality of gay people and their relationships.

5

## ARGUMENT

### I.  GAY AND LESBIAN PEOPLE HAVE BEEN SUBJECT TO WIDESPREAD AND SIGNIFI-CANT DISCRIMINATION IN THE UNITED STATES.

#### A.  The Historical Roots of Discrimination Against Gay People

The first laws against sex between men in the American colonies were rooted in early settlers' understanding of ancient Judeo-Christian prohibitions against sodomy and "unnatural acts."  Some Puritan New England colonies quoted scripture in their laws, while the southern and middle colonies generally drew on the secular laws against "buggery" enacted by the English Reformation Parliament of 1533.  William Eskridge, Jr., *Law and the Construction of the Closet: American Regulation of Same-Sex Intimacy, 1880-1946*, 82 IOWA L. REV. 1007, 1012-13 (1997).

"Sodomy" did not mean precisely the same thing as today's "homosexual conduct," and colonial laws penalized many other forms of non-procreative sexual behavior.  But Puritan clergy vigorously condemned the "unnatural uncleanness * * * when men with men commit filthiness, and women with women," in part because they worried that all people were subject to such temptations.  Richard Godbeer, *"The Cry of Sodom": Discourse, Intercourse, and Desire in Colonial New England*, 52 WILLIAM & MARY Q. 259, 264-265 (1995).

#### B.  Modern American History:  1890-1940

Most historians now agree that the concept of the homosexual and the heterosexual as distinct categories of people emerged only in the late nineteenth

6

century.  JONATHAN NED KATZ, THE INVENTION OF
HETEROSEXUALITY 10 (1995).  The growth of Ameri-
can cities in the same period permitted homosexuals
to develop an extensive collective life to which some
Americans responded with fascination and sympa-
thy, and many others with dread.  Prosecutions for
sodomy and related offenses increased dramatically
in the late nineteenth century, and the policing of
gay life escalated in the first decades of the twentieth
century.  *See* GEORGE CHAUNCEY, GAY NEW YORK:
GENDER, URBAN CULTURE, AND THE MAKING OF THE
GAY MALE WORLD, 1890-1940, at 132-141, 147, 256,
271-273 (1994).

*Hostile Medical and Religious Views Encouraged
the Escalation of Anti-Gay Policing.*  Hostility toward
homosexuals was at times motivated by uneasiness
about the dramatic changes underway in gender
roles at the turn of the last century.  In this era—
indeed until 1973—homosexuality was classified as a
disease, defect, or disorder.  Many physicians initial-
ly argued that the homosexual (or "sexual invert")
was characterized as much by his or her violation of
conventional gender roles as by sexual interests.
Numerous doctors identified suffragists, women en-
tering the professions, and other women challenging
the limits placed on their sex as victims of a medical
disorder.  Thus, doctors explained that "the female
possessed of masculine ideas of independence" was a
"degenerate" and that "a decided taste and tolerance
for cigars, * * * [the] dislike and sometimes incapaci-
ty for needlework * * * and some capacity for athlet-
ics" were all signs of female "sexual inversion."  Simi-
larly, a doctor thought it significant that a male
"pervert" "never smoked and never married; and was
entirely averse to outdoor games."  *George Chauncey*,

7

*From Sexual Inversion to Homosexuality: Medicine and the Changing Conceptualization of Female Deviance*, 58-59 SALMAGUNDI 114, 119-121, 124, 139-141 (1982-1983) (brackets, citations, and quotation marks omitted).

Doctors for decades continued to identify homosexuality per se as a "disease," "mental defect," "disorder," or "degeneration."  Such medical pronouncements provided "a powerful source of legitimation to anti-homosexual sentiment, much as medical science had previously legitimized widely held (and subsequently discarded) beliefs about male superiority and white racial superiority."  GEORGE CHAUNCEY, WHY MARRIAGE? THE HISTORY SHAPING TODAY'S DEBATE OVER GAY EQUALITY 17 (2004).

Religiously inspired hostility to homosexuality also inspired an escalation in anti-gay policing.  In the late nineteenth century, native-born Protestants organized "anti-vice" societies to suppress what they regarded as the sexual immorality and social disorder of the nation's burgeoning Catholic and Jewish immigrant neighborhoods—including the growing visibility of homosexuality.  In New York City in the 1910s and 1920s, for instance, the Society for the Suppression of Vice (also known as the Comstock Society) worked closely with the police to arrest several hundred men for homosexual conduct.  In Massachusetts, the Watch and Ward Society, established as the New England Society for the Suppression of Vice, conducted surveillance on virtually all the popular gay bars and gathering places of the time.  *See* PAUL BOYER, URBAN MASSES AND MORAL ORDER IN AMERICA, 1820-1920, at 207 (1978); CHAUNCEY, GAY NEW YORK 137-141, 146-147, 249-250; JOHN D'EMILIO & ESTELLE B. FREEDMAN, INTIMATE MATTERS: A HISTO-

8

RY OF SEXUALITY IN AMERICA 150-153 (2d ed. 1997);
THE HISTORY PROJECT, IMPROPER BOSTONIANS: LES-
BIAN AND GAY HISTORY FROM THE PURITANS TO PLAY-
LAND 121-122 (1998).

*Police Harassment.*  Responding to pressure from
Protestant moral reform organizations, police forces
began using misdemeanor charges—disorderly con-
duct, vagrancy, lewdness, loitering, and the like—to
harass homosexuals and keep them from meeting in
public.  CHAUNCEY, WHY MARRIAGE? 10.  In 1923, the
New York State Legislature specified that a man's
"frequent[ing] or loiter[ing] about any public place
soliciting men for the purpose of committing a crime
against nature or other lewdness" was a form of dis-
orderly conduct.  Many more men were arrested and
prosecuted under this charge than for sodomy; in the
next forty years, there were more than 50,000 ar-
rests on this charge in New York City alone.
CHAUNCEY, GAY NEW YORK 172; George Chauncey, *A
Gay World, Vibrant and Forgotten*, N.Y. TIMES, June
26, 1994, at E17.

The earliest gay activists also fell victim to police
harassment.  In 1924, for example, Chicago police
raided the home of the founder of the nation's earli-
est known gay political group and seized the group's
files.  JONATHAN NED KATZ, GAY AMERICAN HISTORY:
LESBIANS AND GAY MEN IN THE U.S.A. 385, 388-391
(1976).

*Censorship.*  The growing visibility of lesbian and
gay life in the early twentieth century precipitated
censorship campaigns designed to curtail gay peo-
ple's freedom of speech and the freedom of all Ameri-
cans to discuss gay issues.  In 1927, police arrested
the cast of "The Captive," an acclaimed Broadway
drama exploring one woman's unrequited love for

9

another.  New York State then passed a "padlock law" forbidding theaters from staging plays with gay or lesbian characters.  ANDREA FRIEDMAN, PRURIENT INTERESTS: GENDER, DEMOCRACY, AND OBSCENITY IN NEW YORK CITY, 1909-1945, at 108-116 (2000).  Boston's mayor banned "The Children's Hour," a play dealing with lesbianism, because it "showed moral perversion, the unnatural appetite of two women for each other."  THE HISTORY PROJECT, IMPROPER BOSTONIANS 121-122.

Censorship also spread to the movies.  A movement led by religious leaders threatened Hollywood studios with boycotts and restrictive federal legislation if they did not begin censoring their films.  This prompted the studios to establish a production code that, beginning in 1934, prohibited the inclusion of gay or lesbian characters or even the "inference" of "sex perversion" in Hollywood films.  This code remained in effect for some thirty years, effectively prohibiting discussion of homosexuality in one of the nation's most powerful media for more than a generation.  CHAUNCEY, GAY NEW YORK 353 & n.57.  *See generally* GREGORY D. BLACK, THE CATHOLIC CRUSADE AGAINST THE MOVIES, 1940-1975 (1997); VITO RUSSO, THE CELLULOID CLOSET: HOMOSEXUALITY IN THE MOVIES (1991).

*Constraints on Freedom of Association.*  New regulations began to curtail gay people's freedom of association at the same time they were pushed off stage and screen.  The New York State Liquor Authority, for instance, issued regulations shortly after Prohibition's repeal in 1933 prohibiting bars, restaurants, cabarets, and other establishments with liquor licenses from serving or employing homosexuals or allowing them to congregate on their premises.  When

10

courts rejected the Authority's argument that the mere presence of homosexuals made an establishment "disorderly," the Authority began using evidence of unconventional gender behavior or homosexual solicitation to establish a bar's "disorderly" character, closing hundreds of bars on this basis in the next thirty years. CHAUNCEY, GAY NEW YORK 335-349. Similar regulations and laws were enacted elsewhere. In the 1950s, for example, California's Alcoholic Beverage Control Board ruled that acts of touching, women wearing mannish attire, and men with limp wrists, high-pitched voices, and/or tight clothing were evidence of a bar's "dubious character" and grounds for closing it. NAN ALAMILLA BOYD, WIDE-OPEN TOWN: A HISTORY OF QUEER SAN FRANCISCO TO 1965, at 136-137 (2003).

## C. World War II and Its Aftermath

Discrimination against gay men and lesbians by federal and state governments dramatically increased during the Second World War and postwar years.

*Discrimination in the Military.* The U.S. military had long criminalized homosexual sodomy. During World War II, the Armed Forces decided for the first time to exclude gay people as a class from military service. Officials put in place new screening mechanisms designed to identify homosexuals during the induction process. Military authorities also collaborated with local police to monitor gay bars near bases; servicemen caught in these establishments risked discharge. ALLAN BERUBE, COMING OUT UNDER FIRE: THE HISTORY OF GAY MEN AND WOMEN IN WORLD WAR TWO 3 (1990); BOYD, WIDE-OPEN TOWN 113-117. In the Women's Army Corps, formal and

11

informal investigations led to the discharge of suspected lesbians during and after the war.  LEISA D. MEYER, CREATING GI JANE: SEXUALITY AND POWER IN THE WOMEN'S ARMY CORPS DURING WORLD WAR II 169-178 (1996).

Despite these barriers to service, many gay men and lesbians served heroically in the military during the War.  *See* BERUBE, COMING OUT UNDER FIRE 2, 8-18, 121-126, 143-148, 260-262.  But the Veterans Administration denied G.I. Bill benefits to soldiers undesirably discharged for being homosexual.  These gay veterans thus were denied the educational, housing, and readjustment allowances provided to millions of their peers.  *See* MARGOT CANADAY, THE STRAIGHT STATE:  SEXUALITY AND CITIZENSHIP IN TWENTIETH-CENTURY AMERICA 140-141, 146-147 (2009).

*Discrimination in the Federal Government.*  The persecution of gay men and lesbians dramatically increased at every level of government after the War. In 1950, following Senator Joseph McCarthy's denunciation of the employment of gay people in the State Department, a Senate subcommittee conducted a special investigation into "the employment of homosexuals and other sex perverts in government."  S. REP. NO. 81-241, at 1 (1950).  The subcommittee recommended excluding gay men and lesbians from all federal employment.  To support this recommendation, the subcommittee stated that "those who engage in overt acts of perversion lack the emotional stability of normal persons" and that homosexuals "constitute security risks."  *Id.* at 3, 4.  The subcommittee also portrayed homosexuals as predators: "These perverts will frequently attempt to entice

12

normal individuals to engage in perverted practices."
*Id.*

The Senate investigation and report were only one part of a massive anti-homosexual campaign launched by the federal government after the war. Between January 1, 1947, and August 1, 1950, "approximately 1,700 applicants for Federal positions were denied employment because they had a record of homosexuality or other sex perversion," and during the same period over 400 federal employees resigned or were dismissed for the same reasons. *Id.* at 9, 20. In 1953, President Eisenhower issued an executive order banning gay men and lesbians from civilian and military employment and requiring federal contractors to ferret out and discharge their homosexual employees or risk losing their contracts. Exec. Order No. 10,450, 3 C.F.R. 936 (1949-1953); JOHN D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES: THE MAKING OF A HOMOSEXUAL MINORITY, 1940-1970, at 44, 46-47 (1981). At the height of the McCarthy era, the State Department discharged more homosexuals than communists. DAVID K. JOHNSON, THE LAVENDER SCARE: THE COLD WAR PERSECUTION OF GAYS AND LESBIANS IN THE FEDERAL GOVERNMENT 76 (2004).

Two years after the Senate subcommittee recommended that homosexuals be purged from government employment, Congress further signaled its conviction that gay men and lesbians had no place in American society by denying them entry into the country. In 1952, Congress prohibited homosexuals (whom it called "psychopaths") from entering the United States, much as it previously had prohibited immigration from Asia and curtailed the immigra-

13

tion of Jews and Catholics from eastern and southern Europe.  CHAUNCEY, WHY MARRIAGE? 21.

*State and Local Discrimination.*  Many state and local governments also sought to ferret out and fire their gay employees; countless state employees, teachers, hospital workers, and others lost their jobs as a result.  *Id.* at 7.  Between 1957 and 1963 the Florida Legislative Investigation Committee interrogated hundreds of suspected gay men and lesbians throughout the state, leading to the dismissal of dozens of faculty and staff at the University of Florida and the University of South Florida.  Pressure from the Committee also led to the ouster of over one hundred public school teachers in the state.  KAREN L. GRAVES, AND THEY WERE WONDERFUL TEACHERS: FLORIDA'S PURGE OF GAY AND LESBIAN TEACHERS 6, 10-12, 58-67 (2009); *see also* STACY BRAUKMAN, COMMUNISTS AND PERVERTS UNDER THE PALMS: THE JOHNS COMMITTEE IN FLORIDA, 1956-1965, at 130 (2012).

The policing of gay life sharply escalated across the country in the 1950s and 1960s.  Police departments from Seattle and Dallas to New Orleans and Baltimore stepped up raids on bars and private parties attended by gay men and lesbians, and police made thousands of arrests for "disorderly conduct."  By 1950, Philadelphia had a six-man "morals squad" arresting some 200 gay men each month.  In the District of Columbia alone, there were more than a thousand arrests every year.  Police raids on gay bars were so common that some bars posted signs announcing "We Do Not Serve Homosexuals."  John D'Emilio, *The Homosexual Menace: The Politics of Sexuality in Cold War America*, *in* PASSION AND POWER: SEXUALITY IN HISTORY 226, 231 (Kathy Peiss

14

*et al.*, eds. 1989); D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES 182-84, 208; CHAUNCEY, WHY MARRIAGE? 7-8, 10-11.

*Demonization and Censorship.*  The harassment of gay people was justified by a series of police and press campaigns in the 1940s and 1950s that fomented demonic stereotypes of homosexuals as child molesters intent on recruiting the young into their way of life.  *See* Estelle Freedman, *"Uncontrolled Desires": The Response to the Sexual Psychopath, 1920-1960*, 74 J. AM. HIST. 83, 92 (1987); *see also* George Chauncey, *The Postwar Sex Crime Panic*, *in* TRUE STORIES FROM THE AMERICAN PAST 172 (William Graebner ed., 1993).  A Special Assistant Attorney General of California claimed in 1949, for example, that:

> [t]he sex pervert, in his more innocuous form, is too frequently regarded as merely a queer individual who never hurts anyone but himself.  All too often we lose sight of the fact that the homosexual is an inveterate seducer of the young of both sexes, and is ever seeking for younger victims.  [Chauncey, *The Postwar Sex Crime Panic* 170-171.]

In 1950, *Coronet*, a popular national magazine, claimed that "Some male sex deviants do not stop with infecting their often-innocent partners: they descend through perversions to other forms of depravity, such as drug addiction, burglary, sadism, and even murder."  Ralph H. Major, Jr., *New Moral Menace to Our Youth*, CORONET, Sept. 1950, at 101-108.  Vicious stereotypes of homosexuals as child molesters fostered by such campaigns continue even today to stoke public fears about gay teachers and parents.  CHAUNCEY, WHY MARRIAGE? 150-151.

15

Between the late 1930s and late 1950s, public hysteria prompted more than half the states to enact laws empowering the police or courts to force people convicted of certain sexual offenses—or, in some states, merely suspected of being "sexual deviants"—to undergo psychiatric examinations. In some cases, those examinations could result in indeterminate civil confinements for individuals deemed in need of a "cure" for their homosexual "pathology." *See* Freedman, *"Uncontrolled Desires,"* 74 J. AM. HIST. at 95-98; MARC STEIN, CITY OF SISTERLY AND BROTHERLY LOVES: LESBIAN AND GAY PHILADELPHIA, 1945-1972, at 124-127 (2000); Chauncey, *The Postwar Sex Crime Panic* 166-167.

Censorship, government-sanctioned discrimination, and the fear of both made it difficult for gay people to organize and speak on their own behalf. In 1954, Los Angeles postal officials banned an issue of the first gay political magazine, *One*, from the mail. D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES 115. Although the ban was overturned by this Court in 1958, *One, Inc.* v. *Oleson*, 355 U.S. 371 (1958), police in some cities warned newsstands not to carry the magazine. A few weeks after the Mattachine Society—the most significant gay-rights organization in the 1950s—held a national convention in Denver and staged its first press conference, police raided the homes of three of its organizers; one lost his job and was jailed. D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES 119-121.

### D. The Gay Rights Movement and Its Opponents in the 1960s, 1970s, and 1980s

Gay people received more support in some parts of the country in the 1960s and 1970s, but the pace of

16

change varied enormously. In 1966, New York's
Mayor Lindsay put an end to the widespread police
entrapment of gay New Yorkers. *Id.* at 206-207.
New York and California state court rulings finally
curtailed the policing of gay bars in the 1960s, alt-
hough in other parts of the country the police contin-
ued to raid gay bars well into the 1970s. CHAUNCEY,
WHY MARRIAGE? 36. Forty municipalities passed
laws protecting gay people from certain forms of dis-
crimination in the 1970s, and another forty did so in
the 1980s. *Id.* at 45; WAYNE VAN DER MEIDE, NA-
TIONAL GAY & LESBIAN TASKFORCE, LEGISLATING
EQUALITY: A REVIEW OF LAWS AFFECTING GAY, LESBI-
AN, BISEXUAL, AND TRANSGENDERED PEOPLE IN THE
UNITED STATES (2000). The Hollywood studios be-
came free to make films with gay characters in the
early 1960s—but few did so. *See* CHAUNCEY, WHY
MARRIAGE? 52-53; LARRY GROSS, UP FROM INVISIBIL-
ITY: LESBIANS, GAY MEN, AND THE MEDIA IN AMERICA
60-61 (2001). The American Psychiatric Association
voted to remove homosexuality from its list of mental
disorders in 1973—although dissident psychoana-
lysts continued to contest that opinion. American
Psychiatric Ass'n, *Position Statement on Homosexu-
ality and Civil Rights* (Dec. 15, 1973), *reprinted in*
131 AM. J. PSYCHIATRY 497, 497 (1974). In the 1970s,
seven mainline Protestant denominations affirmed
that homosexuals should enjoy equal protection un-
der criminal and civil law. But those denominations
accounted for only about ten percent of the American
population; at the same time, leaders of Catholic and
evangelical Protestant faith traditions, who had five
times as many adherents, stepped up their opposi-
tion to gay civil rights. CHAUNCEY, WHY MARRIAGE?

17

37, 40; *see* THE PEW FORUM ON RELIGION & PUBLIC LIFE, U.S. RELIGIOUS LANDSCAPE SURVEY (2008).

As the gay movement grew stronger in the late 1960s and 1970s, so, too, did its opponents. Beginning in the late 1970s, the initial success of the gay movement in securing local gay-rights legislation provoked a sharp reaction. The anti-gay-rights campaign of this era was effectively launched in 1977, when the prominent Baptist singer Anita Bryant led a campaign to "Save Our Children" by repealing newly enacted civil-rights protections for gay men and lesbians in Dade County, Florida. The "Save Our Children" campaign warned about the influence openly gay teachers might have on young students and relied heavily on the stereotype of the homosexual as child molester: One of its full-page advertisements warned that the "OTHER SIDE OF THE HOMOSEXUAL COIN IS A HAIR-RAISING PATTERN OF RECRUITMENT AND OUTRIGHT SEDUCTIONS AND MOLESTATION." DUDLEY CLENDINEN & ADAM NAGOURNEY, OUT FOR GOOD: THE STRUGGLE TO BUILD A GAY RIGHTS MOVEMENT IN AMERICA 291-299, 303-304 (1999). Bryant's campaign succeeded, and her victory prompted other groups to start similar campaigns. In the next three years, local laws extending civil rights protections to gay men and lesbians were repealed in more than a half-dozen bitterly fought referenda. Gay rights supporters won only two referenda. CHAUNCEY, WHY MARRIAGE? 39.

The "Save Our Children" campaign had other far-reaching effects. The day after the Dade County vote, Florida's governor signed into law a ban on adoption by gay men and lesbians—the first such statewide prohibition. FLA. STAT. ANN. § 63.042

18

(West 2001).   Similarly, in 1985 the Massachusetts
Department of Social Services removed two boys
from their foster care placement with a gay male
couple and implemented a policy of preferred place-
ment in "traditional family settings."   Philip W.
Johnston, *Policy Statement on Foster Care* (May 24,
1985), *reprinted in* BOSTON GLOBE, May 25, 1985, at
24; Kenneth J. Cooper, *Placement of Foster Children
with Gay Couple Is Revoked*, BOSTON GLOBE, May 9,
1985, at 1.   Massachusetts' discriminatory policy was
amended in 1990 as part of an effort to settle pend-
ing litigation.   *See* Patti Doten, *They Want a Chance
to Care; Gay Couple Still Hurts from Decision That
Took Away Their Foster Children*, BOSTON GLOBE,
Sept. 27, 1990.   The Florida ban remained in effect
until 2010.   *See Florida Dep't of Children & Families*
v. *Adoption of X.X.G.*, 45 So. 3d 79, 81 (Fla. Ct. App.
2010).

Across the country, the unfounded fear that homo-
sexuals posed a threat to children *itself* threatened
children being raised by gay men and lesbians.   In a
growing number of child-custody battles, courts took
custody away from mothers and fathers whose es-
tranged husbands and wives used their former
spouses' gay identities against them.   *See* Julie
Shapiro, *Custody and Conduct: How the Law Fails
Lesbian and Gay Parents and Their Children*, 71
IND. L.J. 623, 660-664 (1996); *see also* DANIEL WIN-
UNWE RIVERS, RADICAL RELATIONS:  LESBIAN MOTH-
ERS, GAY FATHERS, AND THEIR CHILDREN IN THE
UNITED STATES SINCE WORLD WAR II 53-79 (2013).
Some courts confronting such disputes articulated a
"per se" rule denying all custody and visitation
claims made by gay and lesbian parents, holding as a
matter of law that homosexuality was inherently in-

19

consistent with parenthood.  Karla J. Starr, *Adoption by Homosexuals: A Look at Differing State Court Opinions*, 40 ARIZ. L. REV. 1497, 1501-03 (1998).

## E. The Persistence of Anti-Gay Discrimination from the 1990s to the Present

*Inequality Under State Law.*  The spread of AIDS and the debate over gay rights led to increasing national polarization over homosexuality in the 1980s and 1990s.  The media's initial sensationalist coverage of AIDS frequently depicted homosexuals as bearers of a deadly disease threatening others.  *See, e.g.*, JOHN-MANUEL ANDRIOTE, VICTORY DEFERRED: HOW AIDS CHANGED GAY LIFE IN AMERICA 65-71 (1999); STEVEN EPSTEIN, IMPURE SCIENCE: AIDS, ACTIVISM, AND THE POLITICS OF KNOWLEDGE 52 (1996). Cities and states that had passed gay-rights laws found those laws under attack from an increasingly well-organized and well-funded opposition.  Between 1974 and 2009, anti-gay activists introduced and campaigned for more than 100 anti-gay rights referenda across the country.  Brad Sears et al., *Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment*, THE WILLIAMS INST., Sept. 2009, at 15-1.

Following Anita Bryant's lead, anti-gay-rights activists frequently fomented public fear of gay people by deploying vicious stereotypes of homosexuals as perverts threatening the nation's children and moral character.   Two videos repeatedly screened in churches and on cable television in the early 1990s, "The Gay Agenda" and "Gay Rights, Special Rights," juxtaposed discussions of pedophilia with images of gay teachers and gay parents marching with their children in Gay Pride parades.  This message was

20

reinforced by mass mailings and door-to-door distri-
bution of anti-gay pamphlets, all of which fostered a
climate of hostility and fear.  CHAUNCEY, WHY MAR-
RIAGE? 47; JOHN GALLAGHER & CHRIS BULL, PERFECT
ENEMIES: THE RELIGIOUS RIGHT, THE GAY MOVEMENT,
AND THE POLITICS OF THE 1990S, at 26, 46, 52, 115,
171, 266 (1996).

In 1992, Colorado voters passed Amendment Two,
which amended the state constitution to prohibit any
municipality or government unit from enacting anti-
gay-discrimination ordinances or policies.  Amend-
ment Two repealed ordinances already enacted by
Denver, Boulder, and Aspen, and it removed from
the Colorado political arena any future effort to se-
cure anti-discrimination legislation for gay people.
This Court struck down the amendment for violating
the Equal Protection Clause, explaining that the
amendment unconstitutionally "classifie[d] homo-
sexuals not to further a proper legislative end but to
make them unequal to everyone else"—a "denial of
equal protection of the laws in the most literal
sense."  *Romer* v. *Evans*, 517 U.S. 620, 633, 635-636
(1996).  As the Court put it, "laws of the kind now
before us raise the inevitable inference that the dis-
advantage imposed is born of animosity toward the
class of persons affected."  *Id.* at 634.

A number of states now have extended basic anti-
discrimination protections to gay men and lesbians.
But more than half the states lack any statutory pro-
tection against such discrimination in employment,
housing, or public accommodations, and nineteen
have no statutory or administrative protection
against such discrimination in state government em-

ployment. HUMAN RIGHTS CAMPAIGN, MAPS OF STATE
LAWS & POLICIES (Jan. 14, 2015).[2]

*Discrimination in the Federal Government and the
Military.* Although the outright ban on hiring gay
federal employees ended in 1975, federal agencies
remained free for over two decades after that to dis-
criminate against gay people in employment.
D'EMILIO & FREEDMAN, INTIMATE MATTERS 324. It
was not until 1998 that President Clinton issued an
executive order forbidding such discrimination. *See*
Exec. Order No. 13,087, 63 Fed. Reg. 30,097 (May 28,
1998).

Discrimination against gay people remained solidly
entrenched in the military until very recently. In
1992, then-candidate Bill Clinton called for an end to
the military's policy banning gay men and lesbians
from serving in the military. The proposal sparked a
national firestorm, led by the same groups that had
organized ballot initiatives to repeal local gay rights
measures, with calls to Congress and the White
House running ten-to-one against the plan. Presi-
dent Clinton and Congress implemented a compro-
mise called "Don't Ask, Don't Tell," which required
the military to discharge gay men or lesbians if they
acknowledged their sexual orientation under any cir-
cumstance—even during private counseling. Pub. L.
No. 103-160, 107 Stat. 1547 (1993); GALLAGHER &
BULL, PERFECT ENEMIES: THE RELIGIOUS RIGHT, THE
GAY MOVEMENT, AND THE POLITICS OF THE 1990S, at
132-33, 149, 153, 53-54, 157. More than 13,000 ser-
vice members were discharged during the "Don't
Ask, Don't Tell" era. The law's repeal in 2011 did not
restore their careers, nor those of the 19,000 other

---

[2]   http://www.hrc.org/state_maps.

22

active-duty service members discharged since 1980 on the basis of their sexual orientation.  *See* DE-PARTMENT OF DEF., REPORT OF THE COMPREHENSIVE REVIEW OF THE ISSUES ASSOCIATED WITH A REPEAL OF "DON'T ASK, DON'T TELL" 23 (2010).[3]

Federal law continues to leave gay men and lesbians exposed to anti-gay discrimination in schools, employment, housing, and public accommodations. The Employment Non-Discrimination Act, which would extend employment protections to sexual orientation, has been introduced in Congress repeatedly since 1994.  It has never been passed.

*Public Awareness and Targeted Violence.*  Starting in the 1990s, the visibility of gay people on television and in movies significantly increased.  GROSS, UP FROM INVISIBILITY 156-183.  The urgency of the AIDS crisis and the relative openness of the 1990s also prompted many more Americans to "come out" to their families, friends, and colleagues.  In 1985, only a quarter of Americans reported that an acquaintance had told them they were gay; more than half believed they did not know anyone gay.  Fifteen years later, three-quarters reported that they knew someone openly gay—a shift that led many heterosexuals to become more supportive of gay people. But a significant majority of Americans still expressed moral disapproval of homosexuality. KARLYN H. BOWMAN & ADAM FOSTER, AMERICAN EN-TER. INST., ATTITUDES ABOUT HOMOSEXUALITY & GAY MARRIAGE 2, 4, 17-18 (2008).[4]

---

[3]   http://www.defense.gov/home/features/2010/0610_dadt/ DADTReport__20101130(secure-hires).pdf.

[4]   http://www.aei.org/wp-content/uploads/2011/10/20080603-Homosexuality.pdf.

Some expressed that view violently. The FBI documented more than a thousand hate crimes based on perceived sexual orientation every year from 1996 to 2013, the most recent year for which this data is available. *See Uniform Crime Reports, Hate Crime Statistics*, FBI.[5] In 1997, a lesbian nightclub in Atlanta was bombed by a man who called homosexuality "aberrant sexual behavior." *Rudolph Reveals Motives*, CNN (Apr. 19, 2005).[6] The following year, Matthew Shepard, a gay Wyoming college student, was tied to a fence, beaten with a pistol, and abandoned. He died a few days later from his injuries. James Brooke, *Gay Man Dies From Attack, Fanning Outrage and Debate*, N.Y. TIMES, Oct. 13, 1998. Ten years later, Larry King, an openly gay 15-year-old student in Oxnard, California, was shot and killed at school by a fellow student. Rebecca Cathcart, *Boy's Killing, Labeled a Hate Crime, Stuns a Town*, N.Y. TIMES, Feb. 23, 2008.

The most vulnerable victims of discrimination are youth. A 2001 national study found that gay and lesbian youths were more than twice as likely to attempt suicide and more likely to suffer from depression and alcohol abuse than their heterosexual peers. Stephen T. Russell & Kara Joyner, *Adolescent Sexual Orientation and Suicide Risk*, 91 AM. J. PUB. HEALTH 1276, 1278 (2001). A 2012 survey of homeless youth providers discovered that almost 40 percent of the homeless youth they serve identify as lesbian, gay, bisexual, or transgender. Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from*

---

[5]    http://www.fbi.gov/about-us/cjis/ucr/ucr#cius_hatecrime (last visited Feb. 26, 2015).

[6]    http://articles.cnn.com/2005-04-13/justice/eric.rudolph_1_ emily-lyons-pipe-bomb-attack-eric-robert-rudolph?_s=PM:LAW.

24

*a National Survey of Service Providers Working with Lesbian, Gay, Bisexual and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless*, THE WILLIAMS INST. (2012).[7]  And according to a national 2013 study, 55.5 percent of LGBT students felt unsafe at school because of their sexual orientation.  A stunning 74.1 percent of LGBT students reported verbal harassment, 36.2 percent reported physical harassment, and 16.5 percent were physically assaulted because of their sexual orientation.  JOSEPH G. KOSCIW ET AL., GAY, LESBIAN & STRAIGHT EDUCATION NETWORK, THE 2013 NATIONAL SCHOOL CLIMATE SURVEY: THE EXPERIENCES OF LESBIAN, GAY, BISEXUAL AND TRANSGENDER YOUTH IN OUR NATION'S SCHOOLS xvi-xvii (2014).[8]

*Continued Condemnation of Homosexuality.*  Gay people also continue to face discrimination and opprobrium from highly regarded private organizations.  The Boy Scouts of America, a federally chartered group, continues to take the position that employees and volunteers may not be "individuals who are open or avowed homosexuals."  *Membership Standards Resolution*, BOY SCOUTS OF AMERICA.[9]  Although the American Psychiatric Association removed homosexuality from its list of mental disorders in 1973, dissident psychiatrists and psychologists established the National Association for Research & Therapy of Homosexuality (NARTH) in

---

[7]  http://williamsinstitute.law.ucla.edu/wp-content/uploads/Durso-Gates-LGBT-Homeless-Youth-Survey-July-2012.pdf.

[8]  http://www.glsen.org/sites/default/files/2013%20National%20School%20Climate%20Survey%20Full%20Report_0.pdf.

[9]  http://www.scouting.org/membershipStandards/resolution/resolution.aspx (last visited Feb. 26, 2015).

25

1992.  *About NARTH*, NARTH.[10]  Disagreeing with prevailing professional opinion, NARTH continues to disseminate materials claiming a scientific basis for believing that homosexuality is a psychological disorder and a "potentially deadly lifestyle," and that homosexuals can be "healed."  *The Three Myths About Homosexuality*, NARTH.[11]

Police harassment of gay men and lesbians at their meeting places is not as common as it once was—but it still occurs.  In 2009, for example, there were highly publicized police raids of gay bars in Atlanta, Georgia, and Fort Worth, Texas, where one patron was critically injured.  *See* Bill Rankin, *Employees to Fight Charges in Gay Bar Raid*, ATLANTA J.-CONST., Nov. 4, 2009; P.J. Huffstutter, *Police Raid at Gay Club in Texas Stirs Ugly Memories*, L.A. TIMES, July 6, 2009.

*Discrimination in Parenting and Family Life.*  Increasing numbers of gay men and lesbians revealed their homosexuality to their families, friends, neighbors, and co-workers in the 1990s.  *See* BOWMAN & FOSTER, ATTITUDES ABOUT HOMOSEXUALITY 16-17.  But parents who came out to their family members took a serious risk, since many states did not provide equal parenting rights to gay people.  This was particularly dangerous in custody cases, where courts had to evaluate the "fitness" of each parent when making decisions on custody or visitation rights.  *See* Shapiro, *Custody and Conduct*, 71 IND. L.J. at 628, 659.  A 1996 national study of custody cases revealed that many were decided against the gay parent due

---

[10]   http://narth.com (last visited Feb. 26, 2015).

[11]   http://www.narth.org/menus/myths.html (last visited Feb. 26, 2015).

26

to the presiding judge's prejudice against homosexuality. Courts were especially disapproving of gay parents who were honest with their children about their sexual orientation. *Id.* at 660-664.

In a widely publicized case, for example, a Virginia trial court granted a grandmother's petition to take a lesbian's two-year-old son away from her because, as the trial court judge explained, the mother's "conduct is illegal * * * in the Commonwealth of Virginia." *Bottoms* v. *Bottoms*, 457 S.E.2d 102, 109 (Va. 1995) (Keenan, J., dissenting) (quoting trial court). The trial judge declared "that it is the opinion of this Court that [the mother's] conduct is immoral" and "renders her an unfit parent." *Id.* Virginia's Supreme Court upheld the trial court's decision, concluding that the mother's lesbianism would subject her child to social condemnation and disturb the child's relationships with peers. *Id.* at 107-109 (majority opinion). This reasoning harkens back to prior courts' removals of children from the homes of divorced white mothers who married or lived with black men—before this Court ruled the practice unconstitutional. *See Palmore* v. *Sidoti*, 466 U.S. 429, 433 (1984).

Other courts have offered religious justifications for discriminatory custody rulings. In 2002, when the Supreme Court of Alabama reversed the Alabama Court of Civil Appeals' decision to grant a lesbian mother custody of her children, the Chief Justice of the Supreme Court of Alabama said this in his concurring opinion:

> Homosexuality is strongly condemned in the common law because it violates both natural and revealed law. * * * The law of the Old Testament enforced this distinction between the

27

genders by stating that "[i]f a man lies with a male as he lies with a woman, both of them have committed an abomination." *Leviticus* 20:13 (King James). * * * The common law designates homosexuality as an inherent evil, and if a person openly engages in such a practice, that fact alone would render him or her an unfit parent. [*Ex parte H.H.*, 830 So. 2d 21, 33, 35 (Ala. 2002).]

Prominent "traditional family values" group Focus on the Family continues to staunchly oppose adoption by same-sex couples as "threaten[ing] the adoption arena and children's best interests," asserting that such adoptions "deny God's design for the family." *Cause for Concern (Adoption)*, FOCUS ON THE FAMILY (2009).[12]

State and popular efforts that began in the 1970s to ban gay men and lesbians from adopting or serving as foster parents continued in the 1990s and 2000s. In 2000, Mississippi's legislature passed, and the governor signed, a ban on adoption by same-sex couples. *See* MISS. CODE ANN. § 93-17-3(2). In 2004, Oklahoma passed the "Adoption Invalidation Law," which stated that Oklahoma "shall not recognize an adoption by more than one individual of the same sex from any other state or foreign jurisdiction." Okla. Stat. Ann. tit. 10, § 7502-1.4, *invalidated in part by Finstuen* v. *Crutcher*, 496 F.3d 1139 (10th Cir. 2007); *see also* Ron Jenkins, *Henry Signs Measure On Gay Adoptions*, ASSOCIATED PRESS STATE & LOCAL WIRE, May 4, 2004. As recently as 2008, Arkansas enacted by popular referendum a ban on foster care and

---

[12]   http://www.focusonthefamily.com/socialissues/social-issues/adoption/cause-for-concern.aspx.

28

adoption by gay people.   Robbie Brown, *Antipathy Toward Obama Seen as Helping Arkansas Limit Adoption*, N.Y. TIMES, Nov. 8, 2008 at A26.

Some states still refuse to allow a biological parent's same-sex partner to adopt the children they raise together.   For example, in 2010, the North Carolina Supreme Court invalidated a second parent adoption by a woman's same-sex partner, holding that a non-biological same-sex partner could not be recognized as a legal parent.   *See Boseman* v. *Jarrell*, 704 S.E.2d 494, 505 (N.C. 2010).

## F. How This History of Discrimination Has Shaped the Debate Over the Right of Gay Couples to Marry

In the twenty years since the right of lesbian and gay couples to marry became a contentious national issue, the debate over marriage has been deeply shaped by the history of discrimination and demonization described in this brief.   Some of the same groups that previously fought gay teachers in schools, gay characters on television shows, domestic partnership policies and anti-discrimination laws have provided leadership to the campaigns to prevent gay couples from marrying.   Their messaging strategy has mobilized some of the same fears and anti-gay hostility that helped defeat prior gay rights measures.

The same-sex marriage issue first reached the national stage in 1993, when Hawaii's Supreme Court ruled that the state's ban on marriages between same-sex couples presumptively violated the state's equal rights amendment and remanded the case. *Baehr* v. *Lewin*, 852 P.2d 44, 67-68 (Haw. 1993).   By 1996, when a second trial began in the lower court,

29

the prospect of gay couples winning the right to mar-
ry had galvanized considerable opposition.
CHAUNCEY, WHY MARRIAGE? 125-126.   Ultimately,
Hawaii amended its constitution to give the legisla-
ture the authority to limit marriage to different-sex
couples, *see* HAWAII CONST. art. I, § 23, which it did.
The Hawaii Supreme Court then dismissed the case
as moot.   *Baehr* v. *Miike*, Civ. No. 20371, 1999 Haw.
LEXIS 391, at *1, 6, 8 (Haw. Dec. 9, 1999) (taking
notice of constitutional amendment).

Under pressure from the same organizations pro-
claiming support for "traditional family values" that
had earlier campaigned against other gay rights
measures, and in the throes of an election year, Con-
gress passed and the President signed the Defense of
Marriage Act (DOMA); the Senate passed DOMA on
the day the Hawaii trial began.   Pub. L. No. 104-199,
110 Stat. 2419 (1996); CHAUNCEY, WHY MARRIAGE?
125-126; Robert Dreyfuss, *The Holy War on Gays*,
ROLLING STONE, Mar. 18, 1999; Jean Hardisty, *Con-
structing Homophobia: Colorado's Right-Wing Attack
on Homosexuals*, PUB. EYE, Mar. 1993.   The House
Report declared that "it is both appropriate and nec-
essary for Congress to do what it can to defend the
institution of traditional heterosexual marriage. * * *
H. R. 3396 is appropriately titled the 'Defense of
Marriage Act.'"   H. R. Rep. No. 104-664, at 12 (1996),
*quoted in United States* v. *Windsor*, 570 U.S. __, 133
S. Ct. 2675, 2694 (2013).   The Report continued:
"The effort to redefine 'marriage' to extend to homo-
sexual couples is a truly radical proposal that would
fundamentally alter the institution of marriage."   *Id.*
The House concluded that DOMA expressed "both
moral disapproval of homosexuality, and a moral
conviction that heterosexuality better comports with

30

traditional (especially Judeo-Christian) morality." *Id.* at 16.

DOMA provided a federal definition of marriage as the union of one man and one woman, and declared that no state needed to give "full faith and credit" to "same-sex marriages" licensed in another state. DOMA also denied tax, social security, pension, immigration, and other federal benefits to such married couples. 1 U.S.C. § 7, *invalidated in part by United States* v. *Windsor*, 570 U.S. __, 133 S. Ct. 2675.

Fourteen states passed state-level "defense-of-marriage acts" prohibiting recognition of same-sex marriages the same year Congress passed DOMA, and another nine passed similar statutes the following year. AMERICAN BAR ASS'N, AN ANALYSIS OF THE LAW REGARDING SAME-SEX MARRIAGE, CIVIL UNIONS, AND DOMESTIC PARTNERSHIPS 33-36 (2005).[13] In 2004, when Massachusetts became the first state to permit gay couples to marry, thirteen states passed constitutional amendments banning such marriages, including Kentucky, Michigan, and Ohio. (Twelve of those states already had enacted statutory same-sex marriage prohibitions.) *Statewide Votes on Same-Sex Marriage, 1998-Present*, NATIONAL CONFERENCE OF STATE LEGISLATURES;[14] AMERICAN BAR ASS'N, AN ANALYSIS OF THE LAW 33-36. Groups such as the American Family Association, which previously had threatened boycotts of companies advertising on television shows that "promote[d] homosexuality as a normal and viable and acceptable alternative life-

---

[13]   http://www.americanbar.org/content/dam/aba/migrated/family/reports/WhitePaper.authcheckdam.pdf.

[14]   http://www.ncsl.org/legislatures-elections/elections/same-sex-marriage-on-the-ballot.aspx#3 (last visited Feb. 26, 2015).

31

style," and Focus on the Family, which previously
had supported voter referendum initiatives such as
Colorado's Amendment 2 (1992) that excluded gay
people from the protection of anti-gay discrimination
laws, played a major role in the amendment cam-
paigns that excluded gay couples from marriage.  *See*
Patrick M. Fahey, *Advocacy Group Boycotting of
Network Television Advertisers and its Effects on
Programming Content*, 140 U. PA. L. REV. 647, 675-
678 (1991); Hardisty, *Constructing Homophobia*,
PUB. EYE; Sue O'Connell, *The Money Behind the
2004 Marriage Amendments*, NAT'L INST. ON MONEY
IN STATE POL., Jan. 27, 2006.[15]

Some of the arguments made by key advocates of
the state constitutional amendments in Kentucky,
Michigan, and Ohio in 2004, and Tennessee in 2006,
reflect the enduring influence of anti-gay discrimina-
tion and hostility, which made the relationships of
gay people appear unequal—and even a threat—to
those of heterosexuals.  Each of these states reaf-
firmed its statutory ban on same-sex marriage—and
its discriminatory treatment of gay men and lesbi-
ans—with a constitutional amendment to prohibit
same-sex marriage.  The sponsor of the Kentucky
proposal to place the constitutional amendment on
the ballot claimed that the legislature had "no other
choice but to protect our communities from the dese-
cration of these traditional values," echoing the belief
that communities need to be "protected" from lesbi-
ans and gay men, whose morality was self-evidently
both inferior and threatening.  *See* John Cheves, *KY
State Senate OKs Putting Gay Marriage Ban to a
Vote for Nov. 2, but House Balks*, HERALD-LEADER,

---

[15]   http://www.followthemoney.org/research/institute-
reports/the-money-behind-the-2004-marriage-amendments/.

32

Mar. 12, 2004.[16]   In Michigan, a state senator as-
signed a lower status to same-sex couples wishing to
marry when he declared that same-sex marriage
"cheapens the whole definition of marriage."  Michael
Gurovitsch, *Proposal may increase limits on gay un-
ion*, THE MICHIGAN DAILY, Oct. 9, 2003.[17]   On the
floor of the Ohio House of Representatives, legisla-
tors referred to the prospect of gay couples getting
married as a "real threat" and an "unproven social
experiment."  *Ohio Defense of Marriage Act: Consid-
eration of H.B. No. 272 Before the H. of Representa-
tives*, 2003 Leg., 125th Sess. at 30:50, 59:55 (Ohio
2003) (statements of Rep. Bill Seitz and Rep. Ron
Young).[18] And, at a rally in support of Tennessee's
same-sex marriage ban, a state lawmaker stated
that "it will be a sad day when queers and lesbians
are allowed to get married * * * and kiss in front of
the courthouse."  *State lawmaker dismisses criticism
over saying 'queers,'* AP ALERT-POLITICAL, June 15,
2006.

The campaign to take the right to marry away from
gay couples in California illustrates the ways in
which such campaigns drew on a long history of anti-
gay demonization.  In May 2008, the California Su-
preme Court held that same-sex couples had the
right to marry under the state constitution's equal
protection clause.  *In re Marriage Cases*, 183 P.3d
384, 433-434, 451-453 (Cal. 2008).  Six months later,
California voters approved Proposition 8, adding to
the California Constitution the provision "Only mar-

---

[16]   http://www.freerepublic.com/focus/f-news/1096117/posts.

[17]   http://www.michigandaily.com/content/proposal-may-incr
ease-limits-gay-union.

[18]   http://www.ohiochannel.org/MediaLibrary/Media.aspx?file
Id=112162 (last visited Mar. 4, 2015).

33

riage between a man and a woman is valid or recognized in California." CAL. CONST. ART. I, § 7.5, *invalidated by Perry* v. *Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010), *aff'd sub nom. Perry* v. *Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated and remanded sub nom. Hollingsworth* v. *Perry*, 570 U.S. __, 133 S. Ct. 2652 (2013).

Proponents of Proposition 8 drew heavily on the historic demonization of gay people as threats to children to win support for the measure.  Key talking points in the Proposition 8 voter pamphlet echoed Anita Bryant's 1977 campaign to "Save Our Children" from homosexual influence and the 1992 campaign in support of Colorado's Amendment 2, which warned of the risk of "[h]omosexual indoctrination in the schools" in the absence of the Amendment (Colorado for Family Values, EQUAL RIGHTS NOT SPECIAL RIGHTS! (1992): "[Proposition 8] *protects our children* from being taught in public schools that 'same-sex marriage' is the same as traditional marriage." CALIFORNIA SEC'Y OF STATE, OFFICIAL VOTER INFORMATION GUIDE: CALIFORNIA GENERAL ELECTION ON NOV. 4, 2008, PROP 8, at 56 (2008).[19]  Some public statements supporting Proposition 8's passage overtly asserted the immorality or perversion of gay people.  *See, e.g.*, J.A. Exh. 97, *Hollingsworth* v. *Perry*, No. 12-144 (U.S.) (hereinafter "*Perry* J.A.") (transcript of campaign event asserting that if same-sex couples can marry, "any combination would have to be allowed," including marriages to children and horses); *Perry* J.A. Exh. 177 (print materials claiming that "[h]omosexuality is linked to pedophilia" and that "[h]omosexuals are 12 times more likely to mo-

---

[19]   http://vig.cdn.sos.ca.gov/2008/general/argu-rebut/pdf/prop8-a-and-r.pdf.

34

lest children"); *Perry* J.A. Exh. 81 (claiming that same-sex relationships "harm the body of society"); *Perry* J.A. Exh. 103 (message from official proponent that the "gay agenda" is "Satan[ic]" and wishes to "legalize prostitution" and "legalize having sex with children"). The last line of the pro-Proposition 8 pamphlet summed it up: "Voting YES *protects our children*." CALIFORNIA SEC'Y OF STATE, OFFICIAL VOTER INFORMATION GUIDE 56 (emphasis added).

The tactics worked. In November 2008, voters passed Proposition 8 by a slim margin. *See Strauss* v. *Horton*, 207 P.3d 48, 68 (Cal. 2009).

The approval of "defense-of-marriage" laws and constitutional amendments excluding gay couples from marriage in forty-one states reflects the enduring influence of anti-gay hostility and the persistence of ideas about the inequality of gay people and their relationships. Marriage has special significance for many people on both sides of the debate, but in many respects the controversy over the right of gay couples to marry is best understood as the most recent, and explosive, manifestation of a debate over the rights of lesbians and gay men that American society has been engaged in for more than half a century.

## II. HISTORY PLAYS A CRITICAL ROLE IN THE COURT'S EQUAL-PROTECTION ANALYSIS.

This Court gives great weight to the presence of historical discrimination against an identifiable group in evaluating the constitutionality of a challenged law—regardless of the level of scrutiny ultimately applied.[20]  *See Hernandez* v. *Texas*, 347 U.S.

---

[20]  History also helps determine whether a particular statute or constitutional amendment is based on animus toward the affected class. This Court has, in the past, taken a particularly

35

475, 477-480 (1954) (relying in part on historical seg-regation to determine that Mexican-Americans con-stituted a distinct class denied equal protection); *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985); *id.* at 454 (Stevens, J., concurring); *id.* at 461-464, 473 (Marshall, J., concurring in the judgment in part and dissenting in part). *See also, e.g.*, *Oyama* v. *California*, 332 U.S. 633, 650-663 (1948) (Murphy, J., concurring) (detailing the history of discrimination against Japanese-Americans in an equal-protection analysis).

In *Loving* v. *Virginia*, 388 U.S. 1, 10 (1967), for in-stance, the Court observed that anti-miscegenation laws "arose as an incident to slavery" *Id.* at 6 (cita-tions omitted). The Court ultimately held that "re-stricting the freedom to marry solely because of ra-cial classifications violates the central meaning of the Equal Protection Clause." *Id.* at 10; *see also, e.g.*, *Oyama* v. *California*, 332 U.S. 633, 650-663 (1948) (Murphy, J., concurring) (detailing the hundred-year history of racial discrimination against Japanese-Americans in an equal-protection analysis).

The Court has applied a heightened level of scruti-ny to laws that single out a group that has experi-enced a history of discrimination, even when the lev-el of discrimination historically faced by that group

---

hard look at such laws and amendments. *See, e.g.*, *Romer*, 517 U.S. at 632 ("[T]he amendment seems inexplicable by anything but animus toward the class it affects."); *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (holding uncon-stitutional an ordinance that "appears to us to rest on an irra-tional prejudice against the mentally retarded"); *Department of Agric.* v. *Moreno*, 413 U.S. 528, 534 (1973) (holding unconstitu-tional a statutory provision "intended to prevent so called 'hip-pies' and 'hippie communes' from participating in the food stamp program" (citation omitted)).

36

has diminished.  So, for instance, the Court continues to evaluate government action differentiating between men and women through the lens of the "Nation['s] long and unfortunate history of sex discrimination."  *United States* v. *Virginia*, 518 U.S. 515, 531-532 (1996) (citation omitted), and it continues to apply an intermediate scrutiny standard to gender-based classifications  *See Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721, 729-730 (2003).  It has done so in light of the discrimination historically faced by women, even though the Court has observed that "the position of women in America has improved markedly in recent decades."  *Frontiero* v. *Richardson*, 411 U.S. 677, 685 (1973) (plurality opinion).

This Court's previous gay-rights decisions emphasize the historical record undergirding its analysis.  The majority opinion in *Lawrence* devotes nearly a third of its pages to the history of anti-sodomy laws.  *See Lawrence*, 539 U.S. at 567-573.  The Court acknowledged that the *Bowers* majority had erred in "rel[ying] upon" "historical premises [that] are not without doubt and, at the very least, are overstated."  *Id.* at 571.  After correcting this historical record, the Court concluded that *Bowers* was wrongly decided.  *Id.*  As a professional organization devoted to the study of American history and culture, the OAH is not before the Court to advocate in favor of a particular legal doctrine or standard.  But it wishes to advise the Court that the historical record is clear.  Gay men and lesbians in America have been subjected to generations of widespread discrimination and demonization, commencing as soon as they emerged as a group into American public consciousness and continuing today.

37

## CONCLUSION

Today the civil rights enjoyed by gay and lesbian Americans still vary substantially from region to region and still are subject to the vicissitudes of public opinion. And like other minority groups before them, gay men and lesbians often must rely on judicial decisions to secure equal rights over public opposition. In 1948, when the California Supreme Court became the first in the nation to overturn a state law banning interracial marriage, it ruled in the face of majority public opposition to such marriages. This Court in 1967 overturned the remaining state bans on interracial marriage in *Loving*, and it took more than thirty years after that decision to reach the point where more Americans approved than disapproved of interracial marriage. History has vindicated the judges with the courage and foresight to declare certain emerging truths to be self-evident, even in the face of majoritarian hostility.

Respectfully submitted,

CATHERINE E. STETSON
  *Counsel of Record*
ERICA KNIEVEL SONGER
MARY HELEN WIMBERLY
MADELINE H. GITOMER
KATHERINE J. DUNCAN*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Amicus Curiae*

MARCH 2015          * Not admitted in D.C.; supervised by members of firm.