# Misgendering

### Chan Tov McNamarah*

*Pronouns are en vogue. Not long ago, introductions were limited to exchanges of names. Today, however, they are increasingly enhanced with a recitation of the speaker's appropriate gendered forms of address: he/him/his, she/her/hers, they/them/theirs, or neopronouns like zie/zir/zirs, xe/xem/xirs, or sie/hir/hirs. This development—like every other dimension of progress for LGBTQ+ people—has been met with fierce resistance. In particular, four prominent objections have surfaced: (1) that calls for pronoun respect are a fraught demand for "special rights" from a vocal queer minority; (2) that, semantically, gendered pronouns, honorifics, and titles cannot constitute offensive speech; (3) that these gendered labels are "just words," and any consequences of their misuse are trivial and legally incognizable; and (4) that sanctions against misgendering violate the First Amendment by both unconstitutionally compelling and restricting speech.*

DOI: https://doi.org/10.15779/Z38CV4BS4M
Copyright © 2021 Chan Tov McNamarah.
\*    Cornell Law School, J.D. 2019. They/them pronouns. For comments, critiques, and lots of healthy cynicism, my deepest thanks to Sherry F. Colb, Michael C. Dorf, Taylor M. N. Davis, Michaela Fikejzová, Jared D. Ham, Valerie P. Hans, Tyler P. Hepner, Cyril A. Heron, Rashelle James, Sheri Lynn Johnson, Sonia K. Katyal, Yasiman E. Montgomery, Jeffrey J. Rachlinski, Indira Rahman, Aziz Rana, Laura S. Underkuffler, Monty Zimmerman, and the participants in the 2020 Cornell Law School faculty summer workshop series. For important conversations on misgendering within the legal system, my thanks to Emily Gorcenski and Jillian T. Weiss. For particularly generous feedback and for sharing his expertise, special thanks to Ezra Ishmael Young. Finally, for masterful editorial work and superb suggestions, my thanks to the staff of the *California Law Review*. This Article builds upon and rounds out ideas introduced in prior and forthcoming work. *See* Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. REV. DISCOURSE 40 (2020); Chan Tov McNamarah, *Some Notes on Courts and Courtesy*, 107 VA. L. REV. ONLINE (forthcoming 2021).

*This Article explains why these arguments fail without exception. It counters the first two arguments by placing misgendering in its historical context. By recovering the history of subtle verbal practices meant to express social inferiority, exclusion, and caste, this Article demonstrates that misgendering is simply the latest link in a concatenation of disparaging modes of reference and address. From addressing Black persons by only their first names, to the intentional omission of women's professional titles, and to the deliberate butchering of the ethnically-marked names of minorities, these verbal slights have long been used to symbolize the subordination of societally disfavored groups.*

*Next, this Article takes on the third argument by articulating the injuries of misgendering to the legal academy, the judiciary, and, ultimately, the law. Until now, legal scholarship has largely overlooked misgendering as a pernicious socio-linguistic practice. To fill this gap, this Article identifies and examines the injuries of misgendering by looking to the stories of those who experience it. Drawing on a range of sources, it presents a layered account of the harms caused by the misattribution of gender. Finally, this Article rejects the fourth objection for failing as a matter of First Amendment doctrine. Anti-misgendering regulations do not unconstitutionally restrict free speech because they narrowly target harassing workplace conduct and because the government has a compelling interest in protecting gender minorities from discrimination. At the same time, anti-misgendering regulations do not unconstitutionally compel speech because they neither force a speaker to express an ideological message, nor do they alter or interfere with a speaker's primary message.*

*All told, this Article makes at least four contributions. First, contextually, it places misgendering in its historical milieu—along a continuum of verbal practices designed and deployed to harm the socially subordinated. Second, descriptively, it offers a sustained meditation on misgendering's injuries to gender minorities' autonomy, dignity, privacy, and self-identity by consulting original interviews, collected accounts, medical literature, and social science research. Even while making the latter two contributions, this Article makes a third, corrective one, as well: It takes up the necessary work of challenging and dispelling mistaken narratives on the wrongfulness and harmfulness of gender misattributions and replaces them with ones that center the lived realities of gender-diverse persons. Fourth, prescriptively, this Article concretely illustrates how the law must adapt to, respond to, and recognize the discriminatory harms of misgendering.*

Prologue............................................................................2230
Introduction ...................................................................2231
I. Milieu ..........................................................................2236
    A.   Dishonorifics: Expressions of Social Inferiority................2237
    B.   Black Persons' Experiences with Dishonorifics................2239
    C.   Women's Experiences with Dishonorifics........................2243
    D.   Other Racial and Ethnic Minorities' Experiences with
        Dishonorifics..............................................................2248
    E.   Sexual Minorities' Experiences with Dishonorifics ..........2249
    F.   Gender Minorities' Experiences with Dishonorifics .........2252
        1.  Mistitling, Mispronouning, and Other Mislabeling .....2252
        2.  Ungendering and Unpronouning ...............................2253
        3.  Deadnaming................................................................2254
    G.   Discrediting Arguments About Special Rights, Slurs, and
        Slurring ........................................................................2255
        1.  Why the Special Rights Objection Fails ......................2255
        2.  Why the Semantic Determinism Objection Fails.........2257
II. Meaning ......................................................................2259
    A.   An Introductory Typology of Intent .................................2261
        1.  Negligent Misgendering ............................................2261
        2.  Accidental Misgendering............................................2262
        3.  Intentional Misgendering............................................2263
        4.  Self-Misgendering .....................................................2264
    B.   Why the Trivialization Objection Fails.............................2265
        1.  Disrespect and Disregard ............................................2265
        2.  Embarrassment and Humiliation ...............................2267
        3.  Social Subordination..................................................2269
        4.  Deprivation of Privacy and Safety..............................2271
        5.  Dehumanization.........................................................2273
        6.  Gender Policing.........................................................2276
        7.  Epistemic Injustice....................................................2278
        8.  Diminution of Autonomy ..........................................2283
        9.  Gender Sadism..........................................................2285
        10. Measurable Psychological and Physiological
            Injuries....................................................................2288
III. Misgendering and the Law .........................................2293
    A.   Speech Law: Why the Unconstitutional Speech Regulation
        Objection Fails............................................................2294
        1.  Free Speech...............................................................2295
        2.  Compelled Speech ....................................................2297
    B.   Religious Freedom Law ..................................................2304
        1.  Religious Discrimination ............................................2304
        2.  Religious Accommodations........................................2306
        3.  Religious Refusals .....................................................2307

C.  Family Law.................................................................2308
D.  Elder Law..................................................................2309
E.  Wills and Testamentary Law ...............................2310
F.  Misgendering in Specific Contexts: The Law of the
    Workplace, Schools, Hospitals, and Prisons....................2311
    1.  Employment Discrimination Law................................2311
    2.  Education Law ............................................2314
    3.  Healthcare Law ...........................................2315
    4.  Prisoner Law .............................................2316
G.  The Legal Profession ..........................................2317
    1.  Rules of Attorney Professional Responsibility ...........2318
    2.  Rules of Judicial Conduct...............................2319
    3.  Legal Services...........................................2321
Conclusion ..............................................................2321

PROLOGUE

Imagine the following scenarios:

- A middle-aged Black man is walking home after work. He senses he is being followed. Turning around, he sees two young White police officers trailing him in a patrol car. He quickens his pace. The car does as well. Pulling alongside the man, one officer calls out: "Where are you going, boy?"[1]

- A physician enters her examination room and meets a male patient for the first time. She begins to introduce herself as "Dr. Brown," but the patient cuts her off and interjects, "Hi Lisa, so nice to meet you." Throughout their fifteen-minute-long checkup, the patient continues to address Dr. Brown by her first name, along with other informalities like "sweetheart" and "darling."[2]

- An accountant's coworkers refuse to properly pronounce his name, "Mamdouh." When he corrects them, they respond by either mockingly emphasizing its Middle Eastern pronunciation or continuing to intentionally botch it. Others are even less generous, referring to him with racist generics, like "Mohammed," "Osama," or "Bin Laden." Frustrated, he reports his coworkers' harassment to his supervisor who, instead of reprimanding them, suggests he adopt a nickname that is "easier to pronounce."[3]

---

1.  *See* King v. City of Eastpointe, 86 F. App'x 790, 802 (6th Cir. 2003).
2.  *See* Sagun v. Brigham & Women's Hosp., No. 07-12338, 2008 U.S. Dist. LEXIS 138433, at *10 (D. Mass. May 1, 2008).
3.  *See* Baig v. Indiana, No. 15-cv-382, 2017 U.S. Dist. LEXIS 46089, at *7 (S.D. Ind. Mar. 29, 2017).

- A student stays back after the first day of class to speak with her professor. As her classmates leave, the student explains she is transgender and requests that the professor refer to her using female titles and pronouns. The professor refuses to oblige. For the remainder of the semester, the professor uses only male pronouns and titles whenever he addresses her.[4]

At their core, the injuries in each vignette are kin. In all four, the forms of reference and address—honorifics, professional titles, names, and pronouns—were used in a manner that was equivalently belittling, dehumanizing, and humiliating. But, despite the similarities made obvious through this juxtaposition, contemporary conversations about the use of pronouns and gendered language remain largely ahistorical and acontextual. Detached from earlier examples of the use of terms of reference and address as tools to subjugate and degrade, the ways in which subtler forms of verbal discrimination are reincarnated, repurposed, and ultimately reinforced are kept concealed.

Today, the vast majority of Americans can easily see the indignity imposed by referring to a Black man as "boy." And yet, they remain oblivious to the harm of referring to a transgender girl or a nonbinary person as the same. Reintroducing historical context, therefore, is promising. Framed with such perspective, opposition to misgendering can be understood, not as demands for new "special rights" or "radical grammatical modifications," but as a link in an ongoing fight against verbal violence inflicted upon minority social groups. That is the guiding insight of this Article.

## INTRODUCTION

The rights of gender minorities[5] have sharply come into focus. In rapid succession, the spread of bathroom bills,[6] the rolling back of trans-protective Title VII and IX positions,[7] the Trump Administration's ban on transgender

---

4.  *Cf.* Meriwether v. Trs. of Shawnee State Univ., No. 18-cv-753, 2019 U.S. Dist. LEXIS 151494 at *11–12 (S.D. Ohio Sept. 5, 2019).

5.  Like any group label, this one is contested. My interchangeable use of the terms *gender minorities*, *gender expansive*, and *gender diverse* are meant as catch-alls for persons who are not cisgender. This includes persons who identify as transgender, nonbinary, genderqueer, gender fluid, genderless, agender, and other non-cisgender identities. While other scholars have used the term trans or trans* to refer to this group of people, I feel that those labels are inadequate, particularly in reference to nonbinary people. Recent scholarship has found many nonbinary people do not view themselves as falling under the transgender or trans umbrella. *See* Helana Darwin, *Challenging the Cisgender/Transgender Binary: Nonbinary People and the Transgender Label*, 34 GENDER & SOC'Y 357, 369–73 (2020).

6.  *E.g.*, Catherine Jean Archibald, *Transgender Bathroom Rights*, 24 DUKE J. GENDER L. & POL'Y 1, 3–6 (2016) (collecting cases); Terry S. Kogan, *Public Restrooms and the Distorting of Transgender Identity*, 95 N.C. L. REV. 1205, 1222–34 (2017).

7.  *See* Chan Tov McNamarah, Note, *On the Basis of Sex(ual Orientation or Gender Identity): Bringing Queer Equity to School with Title IX*, 104 CORNELL L. REV. 745, 769–71 (2019).

military service,[8] and most recently, the *Bostock v. Clayton County* holding,[9] have bombarded the societal consciousness. In their wake, now so more than ever, Americans have begun to acknowledge and address the second-class citizenship imposed upon persons who are transgender, genderqueer, gender nonbinary, agender, and otherwise gender diverse.

Legal scholarship has also begun to take notice of the inequalities faced by gender minorities. Commentators have documented prejudice against transgender venire members,[10] the routine use of trans-panic defenses,[11] the pervasive discrimination faced by transgender parents,[12] and that the law has only just begun to acknowledge the lived realities of nonbinary persons.[13]

For all this, however, perhaps the most common manifestation of discrimination against gender minorities has been all but ignored. Misgendering, the assignment of a gender with which a party does not identify, through the misuse of gendered pronouns, titles, names, and honorifics, has been given scant consideration in legal literature.

This oversight is puzzling. For one thing, gendered terms of reference and address are quite commonplace in everyday life. In casual conversation, it is not unusual to use names and pronouns interchangeably.[14] For instance, we might say, "I like Sam's new shirt," or "I like *his/her/their* new shirt." Neither is it particularly uncommon to introduce another person using gendered titles. For instance, we might present someone as *Mrs.-, Ms.-, Mr.-,* or *Mx.*[15] *Smith*.

The scarcity of writing is also curious since misgendering has played a sizable role in the culture war surrounding the social equality of gender minorities.[16] On the one hand, the increased awareness of gender-diverse

---

8.    *See* Commentary, *In Tweets, President Purports to Ban Transgender Servicemembers*, 131 HARV. L. REV. 934, 934–38 (2018).

9.    140 S. Ct. 1731 (2020) (holding that Title VII protects gay and transgender employees from workplace discrimination).

10.    *See generally* Julia C. Maddera, Note, Batson *in Transition: Prohibiting Peremptory Challenges on the Basis of Gender Identity or Expression*, 116 COLUM. L. REV. 195 (2016) (proposing that courts apply "the trans-inclusive conception of sex discrimination" to peremptory challenges).

11.    Cynthia Lee & Peter Kwan, *The Trans Panic Defense: Masculinity, Heteronormativity, and the Murder of Transgender Women*, 66 HASTINGS L.J. 77, 105–08 (2014).

12.    Sonia K. Katyal & Ilona M. Turner, *Transparenthood*, 117 MICH. L. REV. 1593 (2019); Shannon Price Minter, *Transgender Family Law*, 56 FAM. CT. REV. 410 (2018).

13.    *E.g.*, Jessica A. Clarke, *They, Them, and Theirs*, 132 HARV. L. REV. 894 (2019); Donald L. Revell & Jessica Vapnek, *Gender-Silent Legislative Drafting in a Non-Binary World*, 48 CAP. U. L. REV. 103 (2020); Derek Waller, Note, *Recognizing Transgender, Intersex, and Nonbinary People in Healthcare Antidiscrimination Law*, 103 MINN. L. REV. 467 (2018).

14.    *See* Dean Spade, *We Still Need Pronoun Go-Rounds*, DEAN SPADE (Dec. 1, 2018), https://www.deanspade.net/2018/12/01/we-still-need-pronoun-go-rounds/ [https://perma.cc/8YGD-CPWD] (responding to criticisms of the practice of asking individuals to identify their pronouns).

15.    Pronounced "mix."

16.    Chan Tov McNamarah, *Preliminary Report and Recommendation Rejects Professor's Faith-Based Excuses for Misgendering Transgender Student*, LGBT L. NOTES, Oct. 2019, at 17, 17 ("Pronouns, honorifics, and titles have become the latest flashpoint in efforts to discriminate against transgender Americans.").

identities has launched a movement for the use of gender-appropriate language[17] that has spread across campuses and workplaces and entered the national conversation. On the other hand, many critics have decried gender-appropriate language as "political correctness run amok"[18] among many other less courteous critiques.[19] Adding more fuel is the ever-growing list of persons facing employment consequences for misgendering others.[20] Yet, despite the brewing conflict over gendered language, these developments have gone largely unnoticed in print.

The gap is not inconsequential. Theoretically, the lack of an understanding of what misgendering is, or even a cogent definition of the term in legal scholarship, has allowed misunderstandings and flagrant inaccuracies to remain unchecked. What little commentary exists has been predominantly antagonistic, suggesting that being required to acknowledge or respect others' gender (or lack thereof) is coercive, unnecessary,[21] or perhaps even unconstitutional.[22] Others

---

17.   I use the term "gender appropriate" rather than "preferred pronouns" to acknowledge that gendered language is not simply a matter of taste.

18.   Andy Sher, *Tennessee Lawmakers Blast Gender-Neutral Pronouns at UT*, CHATTANOOGA TIMES FREE PRESS (Sept. 2, 2015), https://www.timesfreepress.com/news/local/story/2015/sep/02/lawmakers-blast-gender-neutral-pronouns-ut/323022/ [https://perma.cc/46JT-KNXE]; *see* Bud Stevenson, *Mr. Nice Guy: Pressure on to Avoid Misgendering*, DAILY REPUBLIC (July 26, 2019), https://www.dailyrepublic.com/all-dr-news/opinion/local-opinion-columnists/mr-nice-guy-pressure-on-to-avoid-misgendering/ [https://perma.cc/N549-T4VX] (characterizing pronoun awareness as a tool of "the P.C. police").

19.   *See* Joanna Williams, *Declaring Your Pronouns Is Pure Narcissism*, TIMES (Aug. 11, 2020), https://www.thetimes.co.uk/article/declaring-your-pronouns-is-pure-narcissism-7rffv2mrz [https://perma.cc/6BBH-6YRM]; Eugene Volokh, Opinion, *Claims by Transgender Schoolteacher (Who Wants to Be Called 'They') Yield $60,000 Settlement, Agreement to Create Disciplinary Rules Regulating 'Pronoun Usage,'* WASH. POST (May 25, 2016), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/05/25/claims-by-transgender-schoolteacher-who-wants-to-be-called-they-yield-60000-settlement-agreement-to-create-disciplinary-rules-regulating-pronoun-usage/ [https://perma.cc/KC6A-CZ7W] (framing neopronouns as "radical grammatical modifications").

20.   *See Teacher Fired for Refusing to Use Transgender Student's Pronouns*, NBC NEWS (Dec. 10, 2018), https://www.nbcnews.com/feature/nbc-out/teacher-fired-refusing-use-transgender-student-s-pronouns-n946006 [https://perma.cc/2U2D-598F]; Ashton Blatz, *Doctor Sues U.K. Govt. for Forcing Him to Use 'Transgender' Pronouns*, ADVOCATE (July 10, 2019), https://www.advocate.com/world/2019/7/10/doctor-sues-uk-gov-forcing-him-use-transgender-pronouns [https://perma.cc/S9L6-GVZ5].

21.   Ryan T. Anderson, *A Brave New World of Transgender Policy*, 41 HARV. J.L. & PUB. POL'Y 309, 314–15 (2018); Eugene Volokh, Opinion, *You Can Be Fined for Not Calling People 'Ze' or 'Hir,' If That's the Pronoun They Demand That You Use*, WASH. POST (May 17, 2016), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/05/17/you-can-be-fined-for-not-calling-people-ze-or-hir-if-thats-the-pronoun-they-demand-that-you-use/ [https://perma.cc/D6UN-9LFV].

22.   Volokh, *supra* note 19; Hans Bader, *Politically Correct Transgender Pronoun Mandates Violate First Amendment*, CNS NEWS (June 13, 2016), https://cnsnews.com/commentary/hans-bader/politically-correct-transgender-pronoun-mandates-violate-first-amendment [https://perma.cc/BZ5Q-8HGW]; Richard Thompson, *Transgender Individuals and Free Speech in New York City*, THE FEDERALIST SOC'Y: FEDSOC BLOG (May 16, 2016), https://fedsoc.org/commentary/fedsoc-blog/transgender-individuals-and-free-speech-in-new-york-city [https://perma.cc/6QH9-XDQ2].

raise even more apocalyptic warnings, alleging that efforts to curtail abusive misgendering will result in the criminalization of even accidental slips.[23]

There are also practical stakes. The lack of a conceptual baseline has proven costly for discrimination claims premised on misgendering. Because such litigation remains relatively new and unguided,[24] courts have struggled to comprehend the wrongfulness of gender misattributions. Consequently, gender minorities' legal claims have suffered. Judges in such cases either fail to recognize the extent of the injuries, or worse, declare them insignificant.[25] At other times, judges themselves are the perpetrators. In recent cases, courts have not only intentionally misgendered the parties before them, they have also referred to gender-diverse litigants as "it," "whichever," or "he/she."[26] Clearly, without the basic definition or framework to interpret misgendering, similar unfortunate mistakes—not to say deliberate disparagements—will only continue.

This Article enters the conversation to offer the necessary clarity. My primary goal is to attend to the threshold matter of what misgendering is, does, and means. I do this by shining new light on the practice through three interrelated projects: (1) introducing historical context; (2) looking to the firsthand accounts of gender minorities; and (3) examining the interplay of law and misgendering. I undertake these projects in three corresponding steps.

First, I seek to dismantle the increasingly dominant framing of the movement for gender-appropriate language as a demand for new "special rights" by situating misgendering in historical context. In that respect, Part I of this Article will show that misgendering is a modern reincarnation of a distinctive form of verbal violence I call *dishonorifics*.[27] Summarily, the label refers to the

---

23. Elliot Kaufman, *California Threatens Jail Time for Dissenters from the New Transgender Dogma*, NAT'L REV. (Aug. 25, 2017), https://www.nationalreview.com/2017/08/california-law-threatens-jail-time-dissenters-transgender-dogma/ [https://perma.cc/UH89-QCR4]; David M. Boertje, *New California Law Allows Jail Time for Using Wrong Gender Pronoun*, SAN DIEGO CRIM. LAWS. BLOG (Feb. 2, 2018), https://www.sandiegocriminallawyersblog.com/new-california-law-allows-jail-time-using-wrong-gender-pronoun/ [https://perma.cc/W5LL-WEFW].

24. Meg Elison, *Judge Rules Against Trans Barista in Starbucks Suit*, BAY AREA REP. (June 12, 2019), https://www.ebar.com/news/legal/277566 [https://perma.cc/6MQ2-VKTX] (quoting Attorney Arnold Peter's saying that no legal framework exists to analyze misgendering).

25. *See, e.g.*, Judgment at 2, 6, Wade v. Starbucks Corp., No. 18CECG02779 (Cal. Super. Ct. July 19, 2019) (finding ongoing misgendering did not result in a hostile work environment); Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000) (dismissing misgendering as mere "rudeness and name-calling"); Decision and Order at 11, Constantine v. Rensselaer Cnty. Jail, No. 17-cv-00661 (N.D.N.Y. Oct. 17, 2017) (finding "ongoing verbal abuse and harassment" insufficient to support a cognizable Fourteenth Amendment claim).

26. Gibson v. Collier, 920 F.3d 212, 217 n.2 (5th Cir. 2019); *In re* Name Change of M.E.B., 126 N.E.3d 932, 935 (Ind. Ct. App. 2019); *In re* Name & Gender Change of R.E., 142 N.E.3d 1045, 1050 (Ind. Ct. App. 2020).

27. By no means am I the first to recognize that terms of address and reference may be weaponized to subordinate. Omi Morgenstern Leissner's pathbreaking work on naming practices identified many of the harms I discuss here. *See* Omi, *Naming the Unheard Of*, 15 NAT'L BLACK L.J.

practice of manipulating terms of reference and address in order to otherize, degrade, and subjugate.

As the vignettes that opened this Article demonstrate, these expressions can be used to communicate respect and equality, or the lack thereof. From addressing Black people by only their first names, to refusing to acknowledge women's professional titles, or intentionally mispronouncing ethnically marked names,[28] terms of reference and address have historically been deployed as symbols of exclusion, dehumanization, and caste. This Part will establish that misgendering is simply a reincarnation. Thus, criticisms painting gender misattributions as novel demands for special rights are ultimately incorrect for failing to notice the longer line of verbally imposed social inequality. Additionally, this Part confronts criticisms that suggest benign words cannot be used to denigrate. Instead, it will show that words that are not inherently derogatory can be repurposed to demean.

Second, I respond to characterizations of misgendering as "trivial." Because harms tend to mean less to those who do not bear them, Part II looks to the experiences of gender minorities to explicate the injuries of gender misclassifications. Their rich accounts of misgendering force us to rethink the argument that misgendering is harmless. By appealing to testimony from original interviews of gender-diverse individuals, medical and social science literature, and case law, this Part presents evidence of what gender minorities have long attested: Misgendering has measurable psychological and physiological ill-effects. In prioritizing the voices of gender-diverse persons, the narratives collected in this Part fully expose the extent of misgendering's harms to gender minorities' dignity, privacy, safety, and autonomy.

Third, I examine misgendering's potential place in the law to push back against arguments that legal interventions against misgendering violate the First Amendment and that misgendering is, or should be, legally incomprehensible. With the caveat that Part III adopts a speculative register, its goal is to take the

---

109 (1997) [hereinafter *Naming the Unheard Of*]; Omi, *The Name of the Maiden*, 12 WIS. WOMEN'S L.J. 253 (1997) [hereinafter *Name of the Maiden*]; Omi, *The Problem That Has No Name*, 4 CARDOZO WOMEN'S L.J. 321 (1998) [hereinafter *No Name*]. I offer the label *dishonorifics* for ease of use and clarity, not as a novelty.

28.   For salient examples of how dishonorifics continue to be used today, consider the repeated deliberate mispronunciation of United States vice president-elect Kamala Harris' name during the 2020 election season, including by some of her long-time Senate colleagues. *E.g.*, Andrew Solender, *Trump Repeatedly Claims Kamala Harris Can't Pronounce Her Own Name Correctly*, FORBES (Oct. 30, 2020), https://www.forbes.com/sites/andrewsolender/2020/10/30/trump-repeatedly-claims-kamala-harris-cant-pronounce-her-own-name-correctly/?sh=30f9f2293c72 [https://perma.cc/ZP3V-74EX]; Margaret Sullivan, *Tucker Carlson's Mangling of Kamala Harris's Name Was All About Disrespect*, WASH. POST (Aug. 12, 2020), https://www.washingtonpost.com/lifestyle/media/tucker-carlsons-mangling-of-kamala-harriss-name-was-all-about-disrespect/2020/08/12/ea573d06-dca7-11ea-809e-b8be57ba616e_story.html [https://perma.cc/F4CR-S6S9]; Anushay Hossain, Opinion, *Let's Not Pretend David Perdue Wasn't Being Racist About Kamala Harris*, CNN (Oct. 18, 2020), https://www.cnn.com/2020/10/18/opinions/perdue-racist-kamala-harris-name-hossain/index.html [https://perma.cc/FE7T-N3C3].

law in new directions. The Part begins by specifically addressing whether laws aimed at preventing misgendering are constitutional under the First Amendment. It finds they likely are.

Widening its scope, the remainder of Part III considers how the law must respond to the harms of misgendering across a swath of legal subjects: From First Amendment religious freedom jurisprudence, to employment discrimination law, and to family law. The injuries identified in Part II have far-reaching implications for the law and legal practice. Thus, this Article concludes by sketching how the law should respond to the harms identified by the phenomenological account of misgendering described in Part II.

## I.
### MILIEU

This Part uses historical context to respond to two criticisms directed at the movement for gender-appropriate language. The first criticism frames the call for gender-appropriate language as a call for "special rights."[29] Critics argue that gendered language has traditionally been tied to "biological sex" and that only a closed class of pronouns have existed. A corollary argument is that, historically, gender-neutral language was only rarely used, and neopronouns[30] (i.e., pronouns like zie/zir/zirs, etc.) did not exist. For language to adapt to accommodate gender minorities and increasing societal awareness of gender diversity, then, suggests some "special right" for transgender, genderqueer, nonbinary, and other gender-diverse citizens.[31]

This depiction is not new. The critique is recycled during every flashpoint on the journey towards equal citizenship for minority groups[32] and deployed

---

29.    *E.g.*, Bader, *supra* note 22 ("[G]iving someone the right to be called an imaginary or ungrammatical pronoun is not about eradicating discrimination, but rather enforcing it, since it involves giving that [person] special rights."); Philip Carl Salzman, *Transgender Privilege: Why Must We All Be Forced to Bow to It?*, FRONTIER CTR. FOR PUB. POL'Y (May 15, 2019), https://fcpp.org/2019/05/15/transgender-privilege-why-must-we-all-be-forced-to-bow-to-it/ [https://perma.cc/J6LC-4JSH] (describing pronoun respect as a "special privilege"); Kaeley Triller, *Transgender Demands Are an Attack on Real Human Rights*, FEDERALIST (Dec. 9, 2019), https://thefederalist.com/2019/12/09/transgender-demands-are-an-attack-on-real-human-rights/ [https://perma.cc/TGQ7-ECM6] (describing policing pronouns as a "luxury of the privileged"); Cheryl K. Chumley, *California Crazy: Calling a 'He-She'* [sic] *a 'He' Can Now Get You Jailed*, WASH. TIMES (Oct. 9, 2017), https://www.washingtontimes.com/news/2017/oct/9/lgbt-law-calling-he-she-will-get-you-jailed/ [https://perma.cc/QR7X-HGJD] (claiming laws preventing misgendering create "special rights").

30.    I borrow the term from Dennis Baron. *See* DENNIS BARON, WHAT'S YOUR PRONOUN?: BEYOND HE AND SHE (2020). *See also Neopronouns*, MYPRONOUNS.ORG (n.d.), https://www.mypronouns.org/neopronouns [https://perma.cc/8T8U-LYQG].

31.    HERITAGE FOUND., HOW TO SPEAK UP ABOUT GENDER IDENTITY: QUESTIONS & ANSWERS DRIVING THE DEBATE 2 (2019) ("The transgender movement has rapidly advanced laws and policies that give special rights and protections to some people while infringing on the rights of others.").

32.    *See* Nan D. Hunter, *Varieties of Constitutional Experience: Democracy and the Marriage Equality Campaign*, 64 UCLA L. REV. 1662, 1707 (2017) (tracing the development of the "special

against queer equality in particular.[33] Since the idea underpinning this account ties gender-appropriate language to "special rights," I will call this the *special rights objection*.

The second line of criticism is more original to the context of misgendering. It argues that misgendering is less condemnable than known derogatory slurs.[34] The rationale is that slurs are more offensive, in part, because they "exist in the vernacular for a specific reason: to be derogatory."[35] At bottom, the argument is one of semantic stability: that it is the original meaning of words that dictates their offensiveness. By that logic, words whose initial meanings are not offensive —say, for example, pronouns, honorifics, and titles—cannot be offensive as applied. For ease of reference, I will call this argument the *semantic determinism objection*.

This Part will show that neither objection is persuasive. With respect to how societally marginalized groups are addressed, the history presented here demonstrates that calls for language changes are not unique to gender minorities. Just as importantly, in the past, language has proven to be remarkably dynamic, able to quickly accommodate cultural shifts and updated understandings of minority groups. Nothing, therefore, is particularly "special" about existing calls for gender-appropriate language.

Next, context demonstrates that the critique premised on semantics is flawed for ignoring how people actually use language in social life. By looking to the lessons of history, this Part will show that many other benign words can be and have been weaponized in manners equivalently, if not more derogatory, than the use of slurs themselves. Expressed succinctly, *slurs*—terms which "exist in the vernacular" to derogate social groups—are separate from *slurring*, the speech act of using language to convey group disrespect.

### A. Dishonorifics: Expressions of Social Inferiority

Lacking the elaborate honor terms or respect vocabularies of more complex systems of language,[36] the English language relies on the use of terms of

---

rights" frame); Peter J. Rubin, *Equal Rights, Special Rights, and the Nature of Antidiscrimination Law*, 97 MICH. L. REV. 564 (1998); Jonathan Goldberg-Hiller & Neal Milner, *Rights as Excess: Understanding the Politics of Special Rights*, 28 LAW & SOC. INQUIRY 1075, 1078 (2003).

33.    Samuel A. Marcosson, *The "Special Rights" Canard in the Debate Over Lesbian and Gay Civil Rights*, 9 NOTRE DAME J.L. ETHICS & PUB. POL'Y 137 (1995); Karen Engle, *What's So Special About Special Rights?*, 75 DENV. U. L. REV. 1265 (1998); JEAN HARDISTY, MOBILIZING RESENTMENT: CONSERVATIVE RESURGENCE FROM THE JOHN BIRCH SOCIETY TO THE PROMISE KEEPERS 112–14 (1999).

34.    Josh Blackman, Opinion, *Here Come the Pronoun Police*, POST & COURIER (July 5, 2016), https://www.postandcourier.com/opinion/here-come-the-pronoun-police/article_9006a463-791d-50a2-9117-a6e0036d86fb.html [https://perma.cc/X4U3-ZRHS].

35.    *Id.*

36.    Within more complex systems of language, honorifics and honor language refer to words, phrases, or grammatical styles that convey deference, respect, or elevation. *See, e.g.*, M. Shibatani,

reference and address—language used to classify, designate, or identify in the contexts of spoken and written communication[37]—to convey respect or formality.[38] For example, referring to someone by the titles Doctor, Captain, Judge, or Senator, or addressing them as Your Honor, Sir, or Madam, can express compliment, deference, or elevation.

Conversely, expressions used to communicate disrespect, disfavor, or inferiority are ordinarily considered to occur through stand-alone epithets. But the primary purpose of epithets is to demean, not to address or refer. So, while these expressions may contrast honorifics and titles functionally,[39] they fail to be diametric opposites of honorifics and titles from a conceptual view.[40]

Hence the question: What expressions do? A true dishonorific,[41] and the ones I am interested in here, must involve the communication of disrespect and subordinate status through the manipulation of terms of classification, reference, and address.[42] In other words, they must include the practice of using terms of reference and address to convey the social inferiority of the referenced person or addressee.

Sociolinguistics provides the answer. Honorifics are bidirectional:[43] Where used, titles and formal names express favored social status or positions; where withheld, their absence expresses the opposite.[44] Beyond that, several factors

---

*Honorifics, in* CONCISE ENCYCLOPEDIA OF SEMANTICS 381, 381 (Keith Allan ed. 2009) (describing honorifics as "special linguistic forms that are used to signify deference toward the nominal referent or the addressee."); Joy Hendry, *Honorific as Dialect: The Expression and Manipulation of Boundaries in Japanese*, 11 MULTILINGUA 341, 341 (1992) ("Honorifics in Japanese, as in other languages where they appear, have usually been related to the way they express hierarchical differences between the participants and referents of exchanges in which they are used.").

37. Terms of reference are those used to communicate about a third party. Terms of address are words used to communicate directly with another. See Eleanor Dickey, *Forms of Address and Terms of Reference*, 33 J. LINGUISTICS 255, 257 (1997) (stating one might refer to "Mrs. Smith" but "address Mrs. Smith as Jane").

38. Adam Jaworski & Dariusz Galasinski, *Vocative Address Forms and Ideological Legitimization in Political Debates*, 2 DISCOURSE STUD. 35, 35–36 (2000).

39. Which is to say, whereas honorifics and titles function to display respect, epithets function to display disrespect.

40. By this, I mean the purpose of epithets is dissimilar to that of titles or honorifics; their main function is to demean, not refer or identify other persons.

41. Here, I appropriate this term from sociolinguistics, where it is used to refer to words, phrases, or grammatical styles that serve to encode disrespect, disfavor, or lower social class or situation. *See* A.E. BACKHOUSE, THE JAPANESE LANGUAGE: AN INTRODUCTION 100 (1993) (defining dishonorifics as "items which encode disrespect").

42. *See* JOYCE O. HERTZLER, A SOCIOLOGY OF LANGUAGE 291 (1965).

43. *No Name, supra* note 27, at 374–75.

44. *See* Camila Domonoske, *When 'Miss' Meant So Much More: How One Woman Fought Alabama—And Won*, NPR (Nov. 30, 2017), https://www.npr.org/sections/codeswitch/2017/11/30/567177501/when-miss-meant-so-much-more-how-one-woman-fought-alabama-and-won [https://perma.cc/NG2E-W6UU] ("Language is significant because language calls attention to whether or not we value the humanity of the people that we are interacting with."); Asif Agha, *Stereotypes and Registers in Honorific Language*, 2 LANGUAGE SOC'Y 151, 153 (1998) ("Honorific speech . . . [also] serves many other interactional agendas such as control

might further signal the social positioning of speakers. As the second illustration opening this Article suggested, the patient's dismissal of Dr. Brown's title and his use of belittling informalities, the nonconsensual dismissal of titles can also express a lack of respect. Similarly, nonreciprocity in the use of these terms indicates deference from one direction or party, but the lack of it in the other.[45] Finally, and perhaps most importantly, history matters.[46] For instance, a child may address their teacher as "Ms. Daly," while the teacher addresses the child as "Alex," without any implicature of either party's social status. Yet, contrast that example with this Article's first illustration—that of the officers addressing a Black man as a "boy." There, using boy as an address form infantilized and disrespected our hypothetical protagonist.[47] Further, the language also called to bear the history of White dismissal of Black names and titles. Taken together, then, honorifics and their converse, dishonorifics, act as markers that signal social status.[48]

With the understanding that honorifics are bidirectional and historically defined, the following sections document the social use of dishonorifics to communicate social inferiority across a range of identity categories. As we will see, in an almost unbroken chain from history to present, forms of reference and address have always operated to subjugate societally disfavored minority groups.

### B.  Black Persons' Experiences with Dishonorifics

Historically, anti-Black caste regimes like Chattel Slavery and Jim Crow Segregation were harmful in both symbol and substance.[49] Said differently, these systems were detrimental not only due to the physical brutality of racial violence and the material inequality of segregated facilities for Black people, but equally, in the ever-present emblems of White supremacy. The latter existed as physical representations, such as Confederate iconography and spectacle terror lynching, as well as an infinite number of more minor social practices. To name a few, Black persons were expected to raise or remove their hats for Whites,[50] leave

and domination, irony, innuendo, and masked aggression, as well as other types of socially meaningful behaviors that . . . ideologies or honor or respect do not describe.").

45.  PENELOPE ECKERT & SALLY MCCONNELL-GINET, LANGUAGE AND GENDER 161–63 (2003).

46.  *See* SALLY MCCONNELL-GINET, GENDER, SEXUALITY, AND MEANING 217 (2011).

47.  ECKERT & MCCONNELL-GINET, *supra* note 45, at 162.

48.  Penelope Eckert & Sally McConnell-Ginet, *Think Practically and Look Locally: Language and Gender as Community-Based Practice*, 21 ANN. REV. ANTHROPOLOGY 461, 464 (1992).

49.  *See* Kimberlé Williams Crenshaw, *Race, Reform, and Retrenchment: Transformation and Legitimation in Antidiscrimination Law*, 101 HARV. L. REV. 1331, 1377 (1988) (describing Jim Crow racism as being both "symbolic subordination" and "material subordination"); *see also* JAMES W. LOEWEN, LIES ACROSS AMERICA: WHAT AMERICAN HISTORIC SITES GET WRONG 206 (2000) (describing Jim Crow as "an etiquette system" expressing "that [B]lacks were inferior to [W]hites").

50.  *See* STETSON KENNEDY, JIM CROW GUIDE TO THE U.S.A.: THE LAWS, CUSTOMS AND ETIQUETTE GOVERNING THE CONDUCT OF NONWHITES AND OTHER MINORITIES AS SECOND-CLASS CITIZENS 220–21 (2011)

sidewalks,[51] and never look Whites in the eye,[52] among numerous other humiliating rituals.[53]

All the while, language played a role in Black people's social degradation. To take the most obvious examples, language was present in signs that designated facilities "Whites Only" or announced, "No Dogs, No Negroes." But, it was equally present in the manipulation of deference and respect granted to Black people through spoken and written forms of address.

Historically, when referring to or addressing Black persons, withholding or misusing titles and honorifics served as a potent expression of White disrespect. During Chattel Slavery, titles were among the privileges that enslaved[54] Black persons were deprived.[55] Then, when the Civil War's outcome threatened to throw White supremacy into question, the urgency of preserving the Black community's designation as inferior increased.[56] Accordingly, for White persons, withholding titles and honorifics were crucial expressions; they testified that Black people were "excluded from not only the [W]hite man's society but also from the ordinary symbols of respect."[57]

It bears underscoring the exigency, bordering sheer fanaticism, with which White persons communicated Black persons' social denigration by withholding titles. When titles were unavoidable, say, for Black persons who were in professional positions, White persons used other inapplicable honorifics such as professor, doctor, or reverend—and, on occasion, even employed the French titles "messieurs and mademoiselles"[58]—all in an effort to avoid granting Black persons the respect associated with "Mr.", "Mrs.", or "Miss."[59] White children

---

51.   LOEWEN, *supra* note 49, at 206.

52.   RUTH THOMPSON-MILLER, JOE R. FEAGIN & LESLIE H. PICCA, JIM CROW'S LEGACY: THE LASTING IMPACT OF SEGREGATION 70 (2015).

53.   *See* THAD SITTON & JAMES H. CONRAD, FREEDOM COLONIES: INDEPENDENT BLACK TEXANS IN THE TIME OF JIM CROW 145 (2005). *See generally* KENNEDY, *supra* note 50.

54.   Throughout this Article, I have deliberately employed the language of the enslaved and the enslaver rather than slave or slave owner or slave master to acknowledge the humanity of persons treated as property. *See* P. Gabrielle Foreman et al., Community-Sourced Document, Writing About Slavery/Teaching           About           Slavery:           This           Might           Help, https://docs.google.com/document/d/1A4TEdDgYslX-hlKezLodMlM71My3KTN0zxRv0IQTOQs [https://perma.cc/56UB-48GY] ("Using enslaved (as an adjective) rather than 'slave' (as a noun) disaggregates the condition of being enslaved with the status of 'being' a slave."); Lindsey Norward, *Power           of           Words*,           MoCADA           (July           15,           2020), http://web.archive.org/web/20210311181444/https://mocada.org/2020/07/15/explorations-the-language-of-enslavement/

55.   CATHLEENE HELLIER, EIGHTEENTH-CENTURY ENGLISH AS A SECOND LANGUAGE 80–81 (2011).

56.   *See* J. William Harris, *Etiquette, Lynching, and Racial Boundaries in Southern History: A Mississippi Example*, 100 AM. HIST. REV. 387, 390 (1995).

57.   GUNNAR MYRDAL, AN AMERICAN DILEMMA: THE NEGRO PROBLEM AND MODERN DEMOCRACY 65 (1996); Harris, *supra* note 56, at 391 (finding forms of address and reference "embodied the symbolism of racial subordination").

58.   JENNIFER RITTENHOUSE, GROWING UP JIM CROW: HOW BLACK AND WHITE SOUTHERN CHILDREN LEARNED RACE 45 (2006).

59.   CHARLES S. JOHNSON, PATTERNS OF NEGRO SEGREGATION 139–41 (1944).

who dared to, or unknowingly, referred to Black persons with courtesy titles were sharply reprimanded.[60] White persons were so averse to even the appearance of respect for Black persons that if letters addressed to Black residents included titles, postal workers were wont to redact them.[61]

The everyday assaults on Black dignity even extended to the legal system.[62] In *Hamilton v. Alabama*, when Mary Hamilton was arrested for refusing to answer a White prosecutor who would not use her title, the National Association for the Advance of Color People's petition for certiorari captured the impact of these types of dishonorifics: "Petitioner's reaction to being called 'Mary' in a court-room where, if [W]hite, she would have been called 'Miss Hamilton,' was not thin-skinned sensitivity"; rather it was "one of the most distinct indicia of the racial caste system."[63]

Read together, these illustrations show that the impact of dishonorifics on the Black psyche cannot be rightly described as trivial. These were viscerally offensive devaluations.[64] Indeed, as sociologist Charles S. Johnson observed, Black citizens found these verbal offenses to be among the most dehumanizing: "[T]he promptness with which instances of failure to use titles of respect are mentioned, whenever the question of racial discrimination is raised, suggests that this offense to personal self-esteem might be considered more acute than the fact of segregation itself."[65]

Naming practices have also been used to inflict verbal violence on Black people. Practices of *renaming*—by which I mean the process through which the enslaved were systematically stripped of their identities through the replacement of their names, and *un-naming*—by which I mean the practice of devaluing Black persons by episodically replacing their names with a generic or diminutive, are potent examples.

Consider, first, the renaming of enslaved persons. Upon shipment and purchase, the renaming of enslaved persons served as an acculturation mechanism.[66] Then, should an enslaved person be sold or gifted they could again

---

60.    MATTIAS SMÅNGS, DOING VIOLENCE, MAKING RACE: LYNCHING AND WHITE RACIAL GROUP FORMATION IN THE U.S. SOUTH, 1882–1930, at 121 (2017); KRISTINA DUROCHER, RAISING RACISTS: THE SOCIALIZATION OF WHITE CHILDREN IN THE JIM CROW SOUTH 20–21 (2011).

61.    STEPHAN THERNSTROM & ABIGAIL THERNSTROM, AMERICA IN BLACK AND WHITE: ONE NATION, INDIVISIBLE 41 (1997); *see also* KENNEDY, *supra* note 50, at 214.

62.    JOHNSON, *supra* note 59, at 139 (noting a White judge stopping testimony to ask why "the Negroes did not call the [W]hite men 'mister'"); JACK GREENBERG, CRUSADERS IN THE COURTS: LEGAL BATTLES OF THE CIVIL RIGHTS MOVEMENT 39 (2004).

63.    Petition for a Writ of Certiorari at 9, Hamilton v. Alabama, 376 U.S. 650 (1964).

64.    BELL HOOKS, AIN'T I A WOMAN 59 (1982) (concluding the denial of titles was aimed at undermining "self-confidence and self-respect"); S. E. Rzeszutek, *"All Those Rosy Dreams We Cherish": James Jackson and Esthere Cooper's Marriage on the Front Lines of the Double Victory Campaign, in* RED ACTIVISTS AND BLACK FREEDOM: JAMES AND ESTER JACKSON AND THE LONG CIVIL RIGHTS REVOLUTION 41, 49 (David Levering Lewis, Michael H. Nash & Daniel J. Leab eds., 2010) (describing the experience as discombobulating).

65.    JOHNSON, *supra* note 59, at 279.

66.    PETER KOLCHIN, AMERICAN SLAVERY: 1619–1877, at 45 (1993).

face having their names replaced. Advertisements for runaways featured previous names, referring to "Tom, alias Tom Scipio"[67] or "Sarah alias Nope alias Moll," indicating White enslavers' imposition of new names upon each sale.[68]

Renaming served many functions. Most obviously, it expressed the enslaver's authority and the enslaved's lack of it. The power to name was reserved to White persons, and Black persons were denied the simple dignity of being able to name themselves.[69] At the same time, because names are intimately connected to identity, renaming was also meant as an act of violence, in that it sought to destroy the identity of the enslaved.[70] Finally, given the significance normally associated with naming, we might read the frivolity of the names selected by enslavers as further testimony of the enslaved's devalued status.[71] In total, the dishonorific of renaming was transformative; it was central to the process by which Africans were stripped of their humanity and recast as property.[72]

Un-naming, similarly, was rooted in enslavement. Given the mass-scale of human property consumed in the process, recognizing enslaved persons' individuality was impossible. Therefore, perhaps to demonstrate the enslaved's fungibility, rather than use names, enslavers often addressed enslaved persons with a range of generics: "boy" or "girl" and "uncle" or "auntie" for the elderly.[73] Following emancipation, un-naming practices continued. Variants like "George" and "Jack" for men were common.[74] For women, "Auntie," a holdover from

67.  RICHARD A. BAILEY, RACE AND REDEMPTION IN PURITAN NEW ENGLAND 95 (2011).
68.  ROBERT K. FITTS, INVENTING NEW ENGLAND'S SLAVE PARADISE: MASTER/SLAVE RELATIONS IN EIGHTEENTH-CENTURY NARRAGANSETT, RHODE ISLAND 181 (1998).
69.  *See* DWIGHT N. HOPKINS, DOWN, UP, AND OVER: SLAVE RELIGION AND BLACK THEOLOGY 82 (2000); *Naming the Unheard Of, supra* note 27, at 121.
70.  SIMON GIKANDI, SLAVERY AND THE CULTURE OF TASTE 218 (2011) (observing the violence of renaming, since in many cultures "the name was the core of a subject's basic relationship to a community and history").
71.  It was not unheard of for enslavers to choose random names or name groups of enslaved persons by chronological dictionary entries. *Naming the Unheard Of, supra* note 27, at 123 (describing naming at the enslavers' humorous whims, yet "at the expense of the [enslaved's] dignity"); Susan Benson, *Injurious Names: Naming, Disavowal, and Recuperation in Contexts of Slavery and Emancipation, in* THE ANTHROPOLOGY OF NAMES AND NAMING 178, 191 (Gabriele vom Bruck & Barbara Bodenhorn eds., 2006).
72.  Trevor Burnard, *Slave Naming Patterns: Onomastics and the Taxonomy of Race in Eighteenth-Century Jamaica*, 31 J. INTERDISC. HIST. 325, 326 (2001).
73.  *See* E. Franklin Frazier, *The Negro Slave Family*, 15 J. NEGRO HIST. 198, 229 (1930) (writing it was "common for [the enslaved] to answer to any name as it suits the humor of the master").
74.  Renaming Black men 'George' is linked to the rise of the George Pullman sleep car. *See* CECIL FOSTER, THEY CALL ME GEORGE: THE UNTOLD STORY OF BLACK TRAIN PORTERS AND THE BIRTH OF MODERN CANADA (2019); *see also* BETRAM WILBUR DOYLE, THE ETIQUETTE OF RACE RELATIONS IN THE SOUTH: A STUDY IN SOCIAL CONTROL 143 (1937).

enslavement, continued to be popular.[75] Mirroring these spoken modes of disrespect, written language in newspapers regularly used diminutive generics such as "Negro"—oftentimes de-capitalized while capitalizing "White"—rather than identifying Black persons by name.[76]

Un-naming practices sought to devalue Black people and maintain the symbolic superiority of White persons. By addressing Black persons with generics, White persons effectively said that Black referents were so inferior that they did not warrant differentiation.[77] Plainly, the practices were meant to demonstrate "the individual spoken to w[as] not worthy of the distinction of a name of [their] own."[78] Further, the distinct un-naming of Black adults with the dishonorific addresses "boy" or "girl," was specifically expressive. Those dishonorifics communicated that Black persons were symbolically locked out of adulthood. Thus, in this way as well, the infantilizing language signaled Black adults' subordinate status *vis-à-vis* White persons.[79]

### C. Women's Experiences with Dishonorifics

Historically, as in many ways still today, society classified and treated women as inferior to men. Notions of women's "natural or necessary or divinely ordained" position,[80] in addition to the accepted view of men's roles as providers,[81] worked in tandem to shore up men's dominance and undercut women's ability to participate in civic life.

Linguistic inequality also formed part of women's social subjugation. Among its more obvious forms, rampant androcentrism and the use of the

---

75.   Henry H. Mitchell, *Extended Family*, *in* DEP'T OF EDUC., FAMILIES: BLACK AND CATHOLIC, CATHOLIC AND BLACK: READINGS, RESOURCES, AND FAMILY ACTIVITIES, 21, 21 (Thea Bowman ed., 1985). Generally, these un-namings were viewed as pejorative. LISA JONES, *Never Auntie*, *in* BULLETPROOF DIVA: TALES OF RACE, SEX, AND HAIR 21, 21 (1994) (describing "Auntie" as a "perverted love letter from Jim Crow America"); Pat Alake Rosezelle, *"Sister," in* FEMINISM AND COMMUNITY 139, 139 (Penny A. Weiss & Marilyn Friedman eds., 1995) (writing for Black women the term is "the epitome of a vile insult").

76.   RONALD L. F. DAVIS, RACIAL ETIQUETTE: THE RACIAL CUSTOMS AND RULES OF RACIAL BEHAVIOR IN JIM CROW AMERICA (n.d.), https://files.nc.gov/dncr-moh/jim%20crow%20etiquette.pdf [https://perma.cc/6QRQ-68YF] ("In reporting incidents involving [B]lacks, the press usually adopted the gender-neutral term 'Negro,' thus designating [B]lacks as lifeless and unknown persons.").

77.   THERNSTROM & THERNSTROM, *supra* note 61, at 40.

78.   Margaret L. Hartley, *Black Boundaries in Big Texas*, 37 SW. REV. 68, 71 (1952).

79.   *See* Ned E. Felder, *A Long Way Since Houston: The Treatment of Blacks in the Military Justice System*, ARMY LAW., Oct. 1987, at 8, 10 ("The term 'boy' reflects the real and figurative emasculation," and a "denial of . . . manhood."); TRUDIER HARRIS, EXORCISING BLACKNESS: HISTORICAL AND LITERARY LYNCHING AND BURNING RITUALS 23–24 (1984).

80.   Barbara A. Brown, Thomas I. Emerson, Gail Falk & Ann E. Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women*, 80 YALE L.J. 871, 872 (1971).

81.   *See* Pauli Murray & Mary O. Eastwood, *Jane Crow and the Law: Sex Discrimination and Title VII*, 34 GEO. WASH. L. REV. 232, 238–40 (1965); Reva B. Siegel, *She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family*, 115 HARV. L. REV. 947, 977–87 (2002) (detailing the role of stereotypes in gendered restrictions).

generic masculine signaled men as the baseline and women as the derivative.[82] The existence of numerous sexually derogatory words for women—and their noticeable absence for men—also signaled women's all-pervading sexual objectification.[83] So, too, forms of address and reference used for women formed part of this linguistic chauvinism.[84]

The ways in which women's titles were regulated readily shows how dishonorifics have functioned as expressions of women's subordinated status in society. Towards the end of the Twentieth century, feminists began emphasizing the linguistic inequalities inherent in women's titles.[85] The predominant honorifics "Miss" and "Mrs.," they contended, perpetuated women's subordination in at least two ways. First, and most prominently, these titles explicitly denoted women's marital status.[86] "Mr.," by contrast, granted men a level of anonymity. Second, men's titles were unchanging, while women's fluctuated—again, depending on their relationships with men.

In response, women promoted the title "Ms."[87] The title was to be "adopted as a standard form of address by women who want to be recognized as individuals, rather than being identified by their relationship."[88] Not surprisingly, the introduction was met with resistance and, in response, counter-protest.[89] When the *New York Times* refused to adopt the title for more than a decade, women demonstrated outside the newspaper's headquarters, carrying placards reading "Miss, If She Chooses; Mrs., If She Chooses; Ms., If She Chooses," and "Ms. Now!"[90]

The legal sphere matched societal hesitancy towards adopting the title "Ms." In the 1973 case, *Allyn v. Allison*, two women challenged the California Elections Code section that required women's registration "be preceded in all cases by the designation Miss or Mrs.," alleging the condition was an

---

82.   *See* ANNA LIVIA, PRONOUN ENVY: LITERARY USES OF LINGUISTIC GENDER 3–7 (2001); CASEY MILLER & KATE SWIFT, WORDS AND WOMEN 31 (2000). So, too, did the addition of diminutive suffixes "ette," "ess," and "trix," to standard male baselines. *See* FRANCINE FRANK & FRANK ANSHEN, LANGUAGE AND THE SEXES 66 (1983).

83.   FRANK & ANSHEN, *supra* note 82, at 74–75; Muriel R. Schulz, *The Semantic Derogation of Women (1975), in* THE ROUTLEDGE LANGUAGE AND CULTURAL THEORY READER 82 (Lucy Burke, Tony Crowley & Alan Girvin eds., 2000).

84.   Anne Pauwels, *Linguistic Sexism and Feminist Linguistic Activism, in* THE HANDBOOK OF LANGUAGE AND GENDER 550 (Janet Holmes & Miriam Meyerhoff eds., 2003).

85.   Janet M. Fuller, *The Uses and Meanings of the Female Title* Ms., 80 AM. SPEECH 180, 180 (2005) (describing the background of the title "Ms.").

86.   *No Name*, *supra* note 27, at 348.

87.   MARGARET GIBBON, FEMINIST PERSPECTIVES ON LANGUAGE 62 (1999) ("[The] new title was intended to replace *Miss* and *Mrs.* so all women could be referred to without drawing attention to marital status, as men are with *Mr.*").

88.   BRUCE J. SCHULMAN, THE SEVENTIES: THE GREAT SHIFT IN AMERICAN CULTURE, SOCIETY, AND POLITICS 162 (2001).

89.   GIBBON, *supra* note 87, at 62.

90.   David W. Dunlap, *Looking Back: 1986: 'Ms.' Joins the Times's Vocabulary*, N.Y. TIMES (Apr. 6, 2017), https://www.nytimes.com/2017/04/06/insider/1986-ms-joins-the-timess-vocabulary.html [https://perma.cc/SN7Q-ZXEH].

unconstitutional denial of women's equal protection, on the argument that there was no comparable requirement for men.[91] The California Court of Appeal rejected the notion, finding the requirement reasonable in order to prevent voter fraud.[92] Moreover, the court concluded any harm was *de minimis*. Writing for the majority, Justice Compton surmised "[a]ssuming that compliance with [the law] . . . results in the disclosure of marital stated us, such compliance is not onerous or burdensome. A woman is not disadvantaged in any way by such disclosure."[93]

Despite *Allyn*'s holding, the injuries of these dishonorific practices were not trivial.[94] For one, as said before, women's titles defined them in relation to others, and specifically, men.[95] This not only told a woman her individual identity and accomplishments were less important than her intimate choices,[96] but was also especially insulting, in that no similar standard was applied to men. The nature of these titles also disparately diminished women's right to privacy. Because marital status was inherently bound up in women's titles, a woman who wanted to conceal her marital status was prevented from doing so.[97] Finally, for women who wished to use the title "Ms." to affirmatively communicate a specific identity,[98] the law at issue in *Allyn* also infringed on women's ability to express that message.[99]

Since *Allyn*, legal restrictions on women's titles have mostly waned. Still, socially, the disparate use of titles as expressions of bias against women has not. Referring to women without professional titles or by their first names, while using titles for men, remains a common linguistic slight on the former. Across a swath of contexts, and particularly in the judicial system,[100] studies find that

---

91.    Allyn v. Allison, 110 Cal. Rptr. 77, 78 (Cal. Ct. App. 1973).

92.    *Id.* at 79–80.

93.    *Id.* at 80.

94.    *See generally* Kenneth L. Karst, *"A Discrimination So Trivial": A Note on Law and the Symbolism of Women's Dependency*, 35 OHIO ST. L.J. 546, 548 (1974) (explaining why dishonorific practices were considered trivial).

95.    Dunlap, *supra* note 90.

96.    Enid Nemy, *Ms Isn't Sweeping the Nation the Foes of Miss/Mrs. Find*, N.Y. TIMES, Oct. 22, 1971, at 35, https://www.nytimes.com/1971/10/22/archives/ms-isnt-sweeping-the-nation-the-foes-of-missmrs-find.html?searchResultPosition=1 [https://perma.cc/CE66-N366].

97.    *Naming the Unheard Of*, *supra* note 27, at 121; Judith D. Fischer, *Framing Gender: Federal Appellate Judges' Choices About Gender-Neutral Language*, 43 U.S.F. L. REV. 473, 479 (2009) ("The implicit suggestion is that a woman's marital status is everyone's business, while a man's is not.").

98.    *See* ALETTE OLIN HILL, MOTHER TONGUE, FATHER TIME: A DECADE OF LINGUISTIC REVOLT 82 (1986) (writing "Ms." signals a woman "is self-respecting").

99.    *See* Margaret Eve Spencer, Comment, *A Woman's Right to Her Name*, 21 UCLA L. REV. 665, 684 (1973) ("Ms. . . . [expressly] rejects certain aspects of the traditional female role or stereotype.").

100.   *E.g.*, Kimberly A. Lonsway, Leslie V. Freeman, Lilia M. Cortina, Vicki J. Magley & Louise F. Fitzgerald, *Understanding the Judicial Role in Addressing Gender Bias: A View from the Eighth Circuit Federal Court System*, 27 LAW & SOC. INQUIRY 205, 220–21 (2002); Melisa D. Evangelos, *Bias in Washington Courts: A Call for Reform*, 16 U. PUGET SOUND L. REV. 741, 744–46 (1993); Andrea Stepnick & James D. Orcutt, *Conflicting Testimony: Judges' and Attorneys' Perceptions of Gender Bias in Legal Settings*, 34 SEX ROLES 567, 568–72 (1996).

women are significantly less likely to be addressed by professional title than are men.[101]

Like titles, naming practices have long served as symbols of women's social control. Most obviously, patronymic naming restricted women's right to choose their names.[102] Here, again, a woman's relationship to men was determinative: when born, women received their father's last name, which later might change upon marriage and, subsequently, could change again upon re-marriage or the initial marriage's dissolution.[103]

Law solidified this nominal sex inequality. Though common law traditionally observed a right to choose one's own name or change it, women were routinely denied the right.[104] Laws required married women to assume, and in some instances keep, their husbands' names.[105] Alongside this, in areas such as voting, paying taxes, applying for passports, or seeking a driver's license, women who asserted their right to use a pre-marital name faced several disadvantages.[106]

Even where laws did not directly cause women's nominal domination, the law's coercive force was used to buttress it. In 1988, District Court Judge Hubert Teitelbaum threatened attorney Barbara Wolvovitz with imprisonment for refusing to be addressed by her husband's last name in court.[107] The judge demanded: "From here on, in this courtroom you will use Mrs. Lobel. That's

---

101. *E.g.*, Hilary A. Takiff, Diana T. Sanchez & Tracie L. Stewart, *What's in a Name? The Status Implications of Students' Terms of Address for Male and Female Professors*, 25 PSYCH. WOMEN Q. 134 (2001) (finding female professors less likely to be addressed by titles); ERIKA FALK, WOMEN FOR PRESIDENT: MEDIA BIAS IN NINE CAMPAIGNS 62 (2010) (finding three female presidential candidates' titles dropped more often than equivalent men's); Julia A. Files, Anita P. Mayer, Marcia G. Ko, Patricia Friedrich, Marjorie Jenkins, Michael J. Bryan, Suneela Vegunta, Christopher M. Wittich, Melissa A. Lyle, Ryan Melikian, Trevor Duston, Yu-Hui H. Chang & Sharonne N. Hayes, *Speaker Introductions at Internal Medicine Grand Rounds: Forms of Address Reveal Gender Bias*, 26 J. WOMEN'S HEALTH 413, 415 (2017) (finding female professionals less likely to be referred to by professional title).

102. *No Name*, *supra* note 27, at 364.

103. *Name of the Maiden*, *supra* note 27, at 253.

104. Deborah J. Anthony, *A Spouse by Any Other Name*, 17 WM. & MARY J. WOMEN & L. 187, 197 (2010); Roslyn Goodman Daum, *The Right of Married Women to Assert Their Own Surnames*, 8 U. MICH. J.L. REFORM 63, 76 (1974).

105. Brown et al., *supra* note 80, at 940; *see also* Linda J. Mead, Comment, *Married Woman's Right to Her Maiden Name: The Possibilities for Change*, 23 BUFF. L. REV. 243, 245–46 (1973) (providing New York and Iowa statutes expressly excluding married women from the right); Kif Augustine-Adams, *The Beginning of Wisdom Is to Call Things by Their Right Names*, 7 S. CAL. REV. L. & WOMEN'S STUD. 1, 18 (1997) (collecting statutes limiting divorced women's ability to pre-marital names where children were involved); Joyce Penfield, *Surnaming: The Struggle for Personal Identity*, *in* WOMEN AND LANGUAGE IN TRANSITION 117, 120 (Joyce Penfield ed., 1987).

106. Anthony, *supra* note 104, at 199–200.

107. Esther Suarez, Note, *A Woman's Freedom to Choose Her Surname: Is It Really a Matter of Choice?*, 18 WOMEN'S RTS. L. REP. 233, 236 (1997).

your name."[108] When Wolvovitz objected, Teitelbaum allegedly replied, "What if I call you sweetie?"[109]

Judge Teitelbaum's last remark reveals yet another sexist dishonorific: addressing women with names of endearment (e.g., sweetie, baby, darling, etc.), or generics like "the girl" or "my girl," particularly in professional settings.[110] Principally, these forms of address verbally impose unwanted familiarity.[111] As one commentator remarked, "Terms of endearments are words used by close friends, families, and lovers, or so one would think, but they are also used on women by perfect strangers."[112]

Taking all this together, we can readily see that sexist naming practices were not harmless. Primarily, they unevenly extinguish women's names and identities in favor of men's.[113] By elevating the man's name at the expense of the woman's, the laws labeled women subordinate to their husbands and reified women's diminished status in society.[114] The automatic imposition of husband's names, or requirement of spousal approval for name changes,[115] also infringed on women's rights to freedom of speech,[116] interest in maintaining a consistent identity,[117] and personal liberty.[118] In the same vein, the practice of addressing women with terms of endearment was a symbolic devaluation. When used by a man, these dishonorifics served as a "unilateral declaration . . . that he need not trouble about the formalities expected between non-intimates."[119]

---

108.   *Federal Judge Apologizes in Fight Over Use of 'Ms.,'* N.Y. TIMES, July 15, 1988, at A10, https://www.nytimes.com/1988/07/15/us/federal-judge-apologizes-in-fight-over-use-of-ms.html?searchResultPosition=1 [https://perma.cc/H9GN-8AS3]; *U.S. Judge Won't Allow Lawyer 'to Use That Ms.,'* N.Y. TIMES, July 14, 1988, at A23, https://www.nytimes.com/1988/07/14/us/us-judge-won-t-allow-lawyer-to-use-that-ms.html?searchResultPosition=1 [https://perma.cc/6VGT-KK7M].

109.   *Federal Judge Apologizes in Fight Over Use of 'Ms.,' supra* note 108; *U.S. Judge Won't Allow Lawyer 'to Use That Ms.,' supra* note 108.

110.   Ann Bartow, *Some Dumb Girl Syndrome: Challenging and Subverting Destructive Stereotypes of Female Attorneys*, 11 WM. & MARY J. WOMEN & L. 221, 259 (2005).

111.   Fischer, *supra* note 97, at 479.

112.   HILL, *supra* note 98, at 86.

113.   Robin Lakoff, *Language and Woman's Place*, 2 LANGUAGE SOC'Y 45, 72–73 (1973) ("[Patronymic naming] suggests . . . that a woman is her husband's possession, having no other identity than that of his wife."); *Name of the Maiden*, *supra* note 27, at 258; William C. Matthews, Jr., Comment, *Married Women and the Name Game*, 11 U. RICH. L. REV. 121, 124 (1976).

114.   *See* Michael C. Dorf, *Same-Sex Marriage, Second-Class Citizenship, and Law's Social Meanings*, 97 VA. L. REV. 1267, 1307–08 (2011); Daum, *supra* note 104, at 66.

115.   Beth D. Cohen, *A Name of One's Own: The Spousal Permission Requirement and the Persistence of Patriarchy*, 46 SUFFOLK U. L. REV. 1, 2–3, 9 (2013) (collecting laws).

116.   *See* Spencer, *supra* note 99, at 683–85.

117.   *See* Marija Matich Hughes, *And Then There Were Two*, 23 HASTINGS L.J. 233, 245 (1971); Julia C. Lamber, *A Married Women's Surname: Is Custom Law?* 1973 WASH. U. L.Q. 779, 807; Lois B. Gordon, Note, *Statutory Development: Pre-Marriage Name Change, Resumption and Reregistration Statutes*, 74 COLUM. L. REV. 1508, 1513 (1974).

118.   Anthony, *supra* note 104, at 200.

119.   DEBORAH CAMERON, FEMINISM AND LINGUISTIC THEORY 106 (1992).

### D.  Other Racial and Ethnic Minorities' Experiences with Dishonorifics

Many of the dishonorifics discussed have also been used against other racial and ethnic minorities—to wit, the withholding of titles.[120] Others have been more uniquely deployed. The intentional mispronunciation of names, for example, has served as a vehicle for othering and excluding persons with ethnically-marked Eastern European, Hispanic, Asian, and Middle-Eastern names.[121] "Deliberate mispronunciation of foreign names," sociolinguist John Lipski points out, often "stems from a general desire to degrade, belittle, or ridicule members of minority ethnic groups."[122] Indeed, a look to employment discrimination case law provides a snapshot of how frequently nominal mispronunciation has been used to verbally harass minority employees.[123]

Anglicizing ethnic names or replacing them with ones the speaker finds easier to pronounce are other forms of dishonorifics that trivialize the non-dominant background and social meanings of names and the named.[124] Take *El-Hakem v. BJY Inc.*, a Ninth Circuit employment discrimination case involving a White employer's insistence on calling an Arabic employee, Mamdouh El-Hakem, by the Westernized "Manny."[125] Or, cases where employers anglicized

---

120.  *See* Sheri Lynn Johnson, *The Color of Truth: Race and the Assessment of Credibility*, 1 MICH. J. RACE & L. 261, 307 n.300 (1996) (collecting examples).

121.  Mary Bucholtz, *On Being Called Out of One's Name: Indexical Bleaching as a Technique of Deracialization*, *in* RACIOLINGUISTICS: HOW LANGUAGE SHAPES OUR IDEAS ABOUT RACE 273, 276 (Samy Alim, John R. Rickford & Arnetha F. Ball eds., 2016) ("[E]thnoracially marked names may be subject to extreme linguistic violence in the form of phonological mutilation or wholesale erasure."); *see also* Keya Roy, Zuheera Ali & Medha Kumar, *The Racist Practice of Mispronouncing Names*, KUOW (Mar. 21, 2019), https://www.kuow.org/stories/a-rose-by-any-other-name-would-not-be-me [https://perma.cc/3JES-S2T9] (discussing how name mispronunciation affects self-worth and identity and also causes embarrassment and anxiety).

122.  John M. Lipski, *Prejudice and Pronunciation*, 51 AM. SPEECH 109, 113 (1976); *see also* IRVING LEWIS ALLEN, *Sly Slurs: Mispronunciation and Decapitalization of Group Names*, *in* UNKIND WORDS: ETHNIC LABELING FROM *REDSKIN* TO *WASP* 67, 68 (1990) (reporting the slurs of intentional mispronunciation and de-capitalization).

123.  *See*, *e.g.*, Tlemcani v. Ga. Dep't. Cmty. Health, 2018 U.S. Dist. LEXIS 123556 at *39 (N.D. Ga. June 15, 2018) (reasoning a supervisor's continued mispronouncing, even after being corrected, was done "purposefully . . . perhaps for purposes of insulting"); Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 367 (S.D.N.Y. 2002) (discussing a supervisor's mocking and mispronunciation of a Latinx employee's name in "an ethnically disparaging manner"); Saellam v. Northfolk S. Corp., 2008 U.S. Dist. LEXIS 203207 at *8 (W.D. Pa. Dec. 19, 2008) (discussing a supervisor's intentional mispronunciation of a name "by emphasizing a Middle Eastern pronunciation"); Mayorga v. Ayers, 281 F. Supp. 3d 182, 189 (D.D.C. 2017) (mispronouncing a Hispanic employee's name Javier, as "Caviar" as a form of targeted harassment); Abe v. N.Y. Univ., 2017 N.Y. Misc. LEXIS 4680 at *10 (N.Y. Sup. Ct. Nov. 29, 2017) (alleging supervisor "mispronounced an Asian last name on purpose"); Mendez v. Toys 'R' Us, Inc., 2007 Cal. App. Unpub. LEXIS 1575 at *19–20 (Cal. Ct. App. Feb. 27, 2007) (pronouncing Hispanic name with an "exaggerated accent" and a smirk).

124.  Bucholtz, *supra* note 121, at 277 ("[H]yperanglicized pronunciation of words seen as otherthan-English is a fundamental strategy of [W]hite racial dominance through language . . . ."); Jane H. Hill, *Hasta La Vista, Baby: Anglo Spanish in the American Southwest*, 13 CRITIQUE ANTHROPOLOGY 145 (1993) (detailing anglicization as pejorative).

125.  El-Hakem v. BJY Inc., 415 F.3d 1068, 1071 (9th Cir. 2005).

the names of Hispanic workers, like changing "Jorge" to "George" or "Georgie,"[126] or "Luis" to the "more comfortable" name "Louis."[127]

Dishonorifics may additionally take the form of replacing the ethnically-marked name with the name of another person of the same or similar ethnic background. Of course, this can be accidental—though still harmful and offensive—such as the confusion of two persons of the same racial or ethnic group.[128] But, surprisingly often, it is intentional. Case law is replete with examples of Asian employees being addressed as "Samurai Jack," "Bruce Lee," or "Jackie Chan,"[129] and Muslim, Middle Eastern, and Sikh persons being harassed with names such as "Al-Qaeda," "Osama," and "bin Laden."[130] Here, though these words are not ethnic slurs—at least as the term is used in common parlance—their use is nevertheless wounding. In essence, they are racist generics. Insofar as these dishonorifics are designed and deployed to send the message that the target is a de-individualized, inter-changeable member of their racial and ethnic group, they are harmful for that reason as well.

## E.  Sexual Minorities' Experiences with Dishonorifics

Dishonorifics have served as a tool to demean lesbian women and gay men. For a start, the misapplication of gendered titles is an easy verbal barb to emphasize the apparent gender non-conformity of sexual minorities. For instance, to disparagingly refer to a gay man by the title Ms. or Mrs. is to emphasize his femininity and failure to conform with gender stereotypes.[131] The

---

126.   Youth Action Homes v. State Div. of Hum. Rts. *ex rel.* Palombo, 659 N.Y.S.2d 447, 451 (N.Y. App. Div. 1997).

127.   Fuentes v. Perskie, 32 F.3d 759, 767 (3d Cir. 1994).

128.   *See* Rachel Hatzipanagos, *It 'Makes You Feel Invisible,'* WASH. POST (May 2, 2019), https://www.washingtonpost.com/nation/2019/05/02/co-workers-keep-mixing-up-people-color-office-its-more-than-mistake/ [https://perma.cc/J98N-22LB] ("The implication is that, while [W]hite people are seen as individuals, other groups are often viewed as a monolith, with their race or ethnicity becoming the defining characteristic of who they are."); Michelle Ye He Lee, *She's Asian and Female. But She's Not Me*, WASH. POST (May 2, 2019), https://www.washingtonpost.com/nation/2019/05/02/shes-asian-female-shes-not-me/ [https://perma.cc/2PR7-8BU2] ("Whether the person acted without malice, the effect is the same: . . . It tells me that my place . . . is dispensable, interchangeable and indistinguishable."); Iris Kuo, *Why Do My Co-Workers Keep Confusing Me with Other People? Because I'm Asian*, WASH. POST (Feb. 12, 2016), https://www.washingtonpost.com/posteverything/wp/2016/02/12/why-do-my-co-workers-keep-confusing-me-with-other-people-im-asian/ [https://perma.cc/ZZ4Q-JT6X] ("It's a degrading and thoughtless error that boils away my identity and simplifies me as one thing: 'that Asian.'").

129.   Ryerson v. Berryhill, 2018 U.S. Dist. LEXIS 147216 at *5 (N.D. Tex. Aug. 2, 2018); Lee v. City of Camden, 2006 N.J. Super. Unpub. LEXIS 1434 at *5–7 (N.J. Super. Ct. App. Div. Dec. 22, 2006); Le v. Hoover Motors Holding Co., 2011 U.S. Dist. LEXIS 47969 at *3 (D.S.C. May 3, 2011).

130.   *See* Sahar F. Aziz, *Sticks and Stones, the Words that Hurt: Entrenched Stereotypes Eight Years After 9/11*, 13 N.Y. CITY L. REV. 33, 37–38, 60 (2009) (collecting cases).

131.   *Cf.* STEPHANIE CHO, CAROLYN LAUB, SEAN SAIFA M. WALL, CHRIS DALEY & COURTNEY JOSLIN, BEYOND THE BINARY: A TOOL KIT FOR GENDER IDENTITY ACTIVISM IN SCHOOLS 2 (2019) (describing the practice of effeminizing a boy's name when he is not acting the way a boy "is supposed to act"); *see also* Nichols v. Azteca Rest. Enters., 256 F.3d 864, 874–75 (9th Cir. 2001) (reviewing harassment of a "feminine" male employee by being referenced to as "she" and "her").

same is true for queer women. Courts have found that referring to queer women by masculine titles is a common form of targeted lesbophobic workplace harassment.[132]

Withholding professional or earned titles is another dishonorific used to belittle sexual minorities. In *United States v. Choi*, an assistant U.S. attorney (AUSA), Angela George, repeatedly omitted military titles when referring to gay men who were wrongfully dismissed from the armed forces under Don't Ask, Don't Tell (DADT).[133] *Choi* arose out of the November 2010 arrests of thirteen former servicemen for "failure to obey a lawful order" while protesting against DADT.[134] As the protesters were being taken into custody, the arresting officer publicly removed the rank insignia from their uniforms, a sign of disrespect in itself.[135] Then, at trial, George did verbally what the arresting officer did physically. George repeatedly refused to address testifying witnesses by their earned ranks, instead referring to the witnesses by "Mr."[136] The third instance prompted the following exchange:

*Ms. George*:       So, on March 17th, I believe Mr. Pietrangelo testified that you –

*Mr. Feldman:*      Captain Pietrangelo, please.

*The Court:*   Please, call everybody by their name.

. . .

*Ms. George:*       But it was shortly before March 18, 2010, that you and Mr. Pietrangelo –

*Mr. Feldman:*      Captain Pietrangelo, please.

*The Court:*   All right. They've been established. Ms. George, do you— please explain something to me: Do you have an objection to referring to these gentlemen as the rank they achieved in the United States army?

---

132.   *See, e.g.*, Doe v. Casino, 381 F. Supp. 3d 425, 427 (E.D. Pa. 2019) (referring to a lesbian woman as "sir"); Complaint at 5–6, Ford v. Applewood Ctrs., Inc., No.20-cv-00082 (N.D. Ohio Jan. 14, 2020) (same).

133.   U.S. v. Choi, 818 F. Supp. 2d 79 (D.D.C. 2011). Don't Ask, Don't Tell, was the 1994 U.S. policy excluding persons that "demonstrate a propensity or intent to engage in homosexual acts" from military service, on the reasoning that allowing gay persons to serve "would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654 (2006) (repealed 2010).

134.   Kerry Eleveld, *Dan Choi Protests in Front of WH*, ADVOCATE (Mar. 18, 2010), https://www.advocate.com/news/daily-news/2010/03/18/dan-choi-protests-front-wh [https://perma.cc/U5CE-GUY8].

135.   Choi also testified that, in the military, being stripped of one's rank is "the biggest insult, because it makes [the stripped person] your inferior." John Riley, *Choi Takes the Stand, Delivering Tense Testimony and Impassioned Speeches*, METRO WKLY. (Aug. 30, 2011), https://www.metroweekly.com/2011/08/choi-takes-the-stand-deliverin/ [https://perma.cc/2UY8-9G96]; *see also* R.A. Duff, *Punishment, Dignity and Degradation*, 25 OXFORD J. LEGAL STUD. 141, 149 (2005) (explaining rank removal as a degradation ceremony).

136.   Transcript of Bench Trial, P.M. Session – Day 2 at 16, 24, 69–70, U.S. v. Choi, 818 F. Supp. 2d 79 (D.D.C. 2011) (No. 10-739M-11).

> *Ms. George:* They're not in the military, Your Honor. Yes, I do.
>
> *The Court:* I appreciate that. But I would like to think after I retire, people still will call me Judge. So, the title that one captures at one point in his life usually follows him. I call retired judges Judge all the time and so do you. What's the difference?
>
> *Ms. George:* Is the Court ordering me to refer to him as –
>
> *The Court:* I would appreciate it if you would.[137]

Despite the court's instruction, AUSA George continued to mistitle the gay and lesbian veterans both at trial and in other exchanges.[138] While the reasoning for AUSA George's refusal is ultimately unknown, her targeted prosecution of DADT protestors, in addition to how other government actors easily used the discharged veterans' ranks, strongly suggests the dishonorifics were rooted in homophobic animus.[139]

Last, like titles, naming practices are used to verbally slight sexual minorities.[140] In *Walker v. City of Holyoke*, several coworkers repeatedly referred to Tammy Walker, a Black lesbian police sergeant, by the Black male name "Tyrone."[141] As Walker phrased in her complaint, by addressing Walker by the male name, her coworkers intended to offend her "as a [B]lack, lesbian female."[142] Indeed, the name was insulting because it harkened to the invidious stereotype that lesbian women aspire to be men, specifically expressing that as Walker herself was Black, she desired to be a Black man.

---

137.   *Id.* at 69–70.

138.   Overall, it is clear that AUSA George's mistitling of the LGBT veterans was deliberate. *First*, she took pains to both ask for and use the titles of everyone who served as government witnesses. *See* Transcript of Bench Trial, A.M. Session – Day 1 at 8–9, 26–30, 44–45, U.S. v. Choi, 818 F. Supp. 2d 79 (D.D.C. 2011) (No. 10-739M-11) (requesting and employing the title for testifying Park Officer, Park Ranger, and Lieutenant, respectively). *Second*, AUSA George went as far as to "correct" herself when she referred to the veterans by their earned ranks. *See* Transcript of Bench Trial, P.M. Session – Day 1 at 77, U.S. v. Choi, 818 F. Supp. 2d 79 (D.D.C. 2011) (No. 10-739M-11) (beginning to say "Lieutenant," but replacing it with "Defendant Choi"). *Third*, in subsequent email exchanges with Lieutenant Choi, AUSA George continued to dismiss his rank. *See* Defendant's Omnibus In-Trial Motion to Dismiss at 10, app. H at 43–45, U.S. v. Choi, No 10-739M-11 (D.D.C. Sept. 14, 2012) ("AUSA George adamantly refuses to acknowledge the earned rank of Lt. Choi and other gay discharged veterans in her official conversations.").

139.   Defendant's Omnibus In-Trial Motion to Dismiss, *supra* note 138, at 11 (describing George's behavior as "official homophobia").

140.   *See, e.g.*, Dawson v. Bumble & Bumble, 246 F. Supp. 2d 301, 328 (S.D.N.Y. 2003) (detailing a lesbian employee being called "Donald" to disparagingly convey she "wanted to be a boy"); Doe v. WM Operating, LLC, 2017 U.S. Dist. LEXIS 123979 at *3 (E.D. Pa. Aug. 7, 2017) (detailing a supervisor addressing a gay employee, Frank, as "Frances" in "a high-pitched, dramatic fashion"); Contreras v. UAL Corp., 2014 U.S. Dist. LEXIS 125649 at *1–2 (N.D. Cal. Sept. 3, 2014) (detailing harassment of a gay employee, Julio, by referring to him as "Julia").

141.   Walker v. City of Holyoke, 523 F. Supp. 2d 86, 92, 108 (D. Mass. 2007).

142.   Plaintiff Tammy Walker's Responses to Defendant City of Holyoke's Motion for Summary Judgment, Exhibit 7 at 3, Walker v. City of Holyoke, 523 F. Supp. 2d 86 (D. Mass. 2007) (No. 05-30074-MAP), ECF No. 56-9.

### *F. Gender Minorities' Experiences with Dishonorifics*

Generally, the dishonorifics weaponized against gender minorities are a form of *misgendering*. As I use the term here, misgendering refers to both the imposition of terms, honorifics, names, or pronouns at odds with a referent's gender, as well as the failure to use terms, honorifics, names, and pronouns in line with a referent's gender.[143]

Typically, misgendering consists of affirmative verbal assignments of a gender with which a party does not identify, through misapplied terms, honorifics, and pronouns.[144] For instance, to misgender a trans person may involve assigning a gender at odds with their own, while to misgender an agender or nonbinary person might involve the assignment of any gender at all. Additionally, misgendering can consist of deliberate omissions of gendered terms, honorifics, classifications, and pronouns. For instance, consistently referring to gender minorities by name instead of pronouns, while freely using pronouns for cisgender persons, qualifies as misgendering. Finally, though misgendering sometimes involves gendered titles and pronouns, it can also involve persons' names.[145]

As we will see, the three forms of misgendering detailed below—the affirmative, the omissive, and the name-related—mirror the same dishonorifics weaponized against other minority groups.

### *1. Mistitling, Mispronouning, and Other Mislabeling*

To "mistitle" a gender minority is to refer to them with a gender-specific title or honorific at odds with their gender. Most obviously, this includes titles like "Mr." "Ms." "Mrs." or "Ma'am" "Sir." However, gendered titles as I describe them here extend further. It would be mistitling to use the term "Gentlewoman" or "Congresswoman" to refer to a transgender elected official who identifies as a man. The use of any such gendered title to refer to a person who identifies as neither male nor female would, too, be mistitling.

Next, the use of pronouns at odds with the target's gender is "mispronouning."[146] To refer to a trans man as "she" or "her" is to mispronoun

---

143.    *See* Sonny Nordmarken, *Microaggressions*, 1 TRANSGENDER STUD. Q. 129, 130 (2014) (describing misgendering as addressing "trans people with incorrect gender pronouns, call[ing] them by former names . . . and deny[ing] or fail[ing] to acknowledge their pronouns, name, or identity").

144.    *See* Y. Gavriel Ansara & Peter Hegarty, *Methodologies of Misgendering: Recommendations for Reducing Cisgenderism*, 24 FEMINISM & PSYCH. 259, 260 (2014) ("Misgendering describes the use of gendered language that does not match how people identify themselves, such as when people who identify as women are described as men."); Clarke, *supra* note 13, at 914 (defining misgendering as "the refusal to refer to a person by the correct pronouns or other gender designations").

145.    *See* Nordmarken, *supra* note 143, at 130.

146.    Matthew Bruce Ingram, *YouTube Commentaries on Trans Time-lapse Videos: Transforming Misgendering Stances into Pedagogical Moments*, 9 SOMATECHNICS 32, 40 (2019) (defining the term to mean "inappropriately assigning pronouns that do not match the self-designated

him, and to refer to someone who is agender or nonbinary with gender-specific pronouns such as "he" or "she"—when the person uses gender neutral pronouns—is to mispronoun them. Particularly offensive, mispronouning includes referring to any gender-diverse person with the pronoun "it," a pronoun usually reserved for inanimate objects.[147]

Finally, the term "mislabeling" may be used as a catch-all to refer to the use of gendered designations or categorizing language that does not fall into one of the previous buckets. For example, to address a trans man as a "girl" or "chick," or to address an agender or nonbinary person in that way or as a "bro" or "dude," is a misattribution of gender. Similarly, to refer to someone's significant other as their "husband" or "wife" or "boyfriend" or "girlfriend," where the partner does not identify with the gendered label, would constitute mislabeling.

Mistitling, mispronouning, and mislabeling are offensive for many of the same reasons emphasized in earlier examples. The imposition of gendered terms with which gender minorities do not identify is insulting in the very same way that the renaming of Black persons or ethnic minorities is: the speaker rejects the referent's identity and imposes the speaker's own. As critically, we might also view the rejection of gender-appropriate language as analogous to the discriminatory control of women's titles; both are autonomy-encroaching expressions.

### 2. *Ungendering and Unpronouning*

To "ungender" a gender minority involves the asymmetrical use of gendered titles, terms, or pronouns for cisgender people but not for gender-diverse ones.[148] It may also involve the deliberate use of gender-neutral language where the referent explicitly identifies with a gender. To see this, consider how, after Danica Roem became Virginia's first transgender elected official, House Majority Leader M. Kirkland introduced the idea of changing officials' titles

---

gender descriptors specified" by the referenced party); *see also* Y. Gavriel Ansara, *Beyond Cisgenderism: Counselling People with Non-Assigned Gender Identities*, *in* COUNSELLING IDEOLOGIES: QUEER CHALLENGES TO HETERONORMATIVITY 167, 173 (Lyndsey Moon ed., 2010) (defining mispronouning as the "usage of a pronoun that inaccurately depict[s the referenced person's] articulated gender identity").

147.   *See* Talia Mae Bettcher, *Transphobia*, 1 TRANSGENDER STUD. Q. 249, 250 (2014).

148.   *See* Ansara & Hegarty, *supra* note 144, at 261 ("Degendering is a form of misgendering that incorrectly describes people who have clear gendered self-descriptions using 'neuter' or non-gendered language, in contexts in which gendered language is used to describe other people."). The term has roots in Julia Serena's pathbreaking work and coinage of the term "ungender," which she defines as "an attempt to undo a trans person's gender by privileging incongruities and discrepancies in their gendered appearance that would normally be overlooked or dismissed if they were presumed to be cis[.] The only purpose that ungendering serves is to privilege cis[] genders, while delegitimizing the genders of trans[] and other gender-variant people." JULIA SERANO, WHIPPING GIRL: A TRANSSEXUAL WOMAN ON SEXISM AND THE SCAPEGOATING OF FEMININITY 172 (2007).

from "Gentleman" and "Gentlewoman" to the gender-neutral "Delegate," an apparent attempt to avoid acknowledging Roem's womanhood.[149]

"Unpronouning" refers to the deliberate omission of pronoun usage for gender minorities while using them for cisfolk.[150] Say, using she/her or he/him pronouns when discussing a cis person, but referring to a trans or nonbinary person by name alone.[151] Likewise, unpronouning may involve the use of gender-neutral pronouns for gender minorities who use binary pronouns (i.e., she/her or he/him) as a means of avoiding the gender-appropriate language.[152] Say, referring to a trans woman or trans man by they/them pronouns.

Whereas other forms of misgendering, like mistitling, are offensive for affirmatively communicating a rejection of the referent's gender, ungendering and unpronouning are offensive for failing to acknowledge the referent's gender. To better understand this point, recall the earlier discussion of the dishonorific omissions of Black persons' and other ethnic minorities' honorifics and of women's professional titles. Speakers' conscious avoidance of gendered terms or pronouns for gender minorities is derogatory under the same logic. In this vein of dishonorifics, acknowledgment and respect are discriminatorily withheld from one minority group and offered to others.

### 3. *Deadnaming*

As we have seen from earlier examples, names and the power to name are incredibly important. This is especially true for gender minorities. Often, the process of choosing a name more closely in line with one's gender identity is the first step in transitioning or acknowledging a gender-expansive identity.[153] "Deadnaming," the term for the use of a person's name assigned at birth or previous name, is another example of a dishonorific used to harm gender

---

149.  Antonio Olivio, *After Roem's Election, Va. GOP Leader Wants to Do Away with 'Gentlewoman' Title*, WASH. POST (Nov. 21, 2017), https://www.washingtonpost.com/local/virginia-politics/after-roems-election-va-gop-leader-wants-to-do-away-with-gentlewoman-title/2017/11/21/62290076-cee1-11e7-9d3a-bcbe2af58c3a_story.html [https://perma.cc/4R9Z-7X9Y].

150.  Robin Dembroff & Daniel Wodak, *He/She/They/Ze*, 5 ERGO 371, 386–87 (2018); *see* Ansara & Hegarty, *supra* note 144, at 261.

151.  Clare Flourish, *Robin Dembroff and the Philosophy of Nonbinary*, CLARE FLOURISH (Apr. 19, 2020), https://clareflourish.wordpress.com/2020/04/19/robin-dembroff-philosophy-nonbinary/ [https://perma.cc/RDH8-5NXC] ("You unpronoun a person by referring to them by circumlocution, perhaps by name or title, because you do not want to use their chosen pronouns.").

152.  JULIA SERANO, EXCLUDED: MAKING FEMINIST AND QUEER MOVEMENTS MORE INCLUSIVE 307 (2013) ("Ze and hir are gender-neutral pronouns favored by many genderqueer people as substitutes for she/he and her/him, respectively. I have nothing against ze and hir *per se*, but I do object to people using them nonconsensually to describe me (I prefer she/her). Indeed, people only seem to use ze/hir when discussing trans people, but never cis people— a tendency that I find to be cissexist.").

153.  Adryan Corcione, *13 Stories of Folks Who Had a Legal Name Change*, TEENVOGUE (Mar. 13, 2018), https://www.teenvogue.com/story/trans-non-binary-name-change-stories [https://perma.cc/63HZ-VTT4] (collecting stories on the importance of name changing for transgender and nonbinary people).

minorities.[154] And, because most names are inherently gendered, deadnaming also qualifies as a form of misgendering.[155]

Why is deadnaming insulting? Persons normally have no issue with referring to cisgender persons with names that differ from their legal names. Think, for example, of Jamie Foxx, Lady Gaga, or Whoopi Goldberg, or Senators Mitt Romney or Ted Cruz.[156] When the willingness to refer to others by the names they have chosen for themselves does not extend to gender minorities, it must be understood as an offensive practice meant to deny these minorities' legitimacy.[157] Notice the similarity between deadnaming and previous dishonorifics, such as the unnaming and renaming of Black persons and the anglicization and replacement of ethnically-marked names. In all these examples, the speakers' power to unilaterally name and rename dismisses the referents' identities and acts as an expression of social domination.

### G. Discrediting Arguments About Special Rights, Slurs, and Slurring

The lessons of history shed necessary light on the current debate over gender-appropriate language. With the context introduced above, we can now return to a more informed vantage point to scrutinize the two criticisms outlined at the beginning of this Part: the (1) special rights objection; and (2) the semantic determinism objection.

#### 1. Why the Special Rights Objection Fails

Once again, the special rights critique proposes that, since gendered language has traditionally corresponded to the referent's gender assigned at birth, to use language in a way that accommodates and acknowledges the identities of

---

154. *See* Lucas Waldron & Ken Schwencke, *Deadnamed*, ProPublica (Aug. 10, 2018) https://www.propublica.org/article/deadnamed-transgender-black-women-murders-jacksonville-police-investigation [https://perma.cc/Y44G-SWJF] (defining the term as "calling a trans person by the name they no longer use"); KC Clements, *What is Deadnaming?*, Healthline (Oct. 19, 2017), https://www.healthline.com/health/transgender/deadnaming [https://perma.cc/8MMT-LXH2] ("Deadnaming occurs when someone, intentionally or not, refers to a person who's transgender by the name they used before they transitioned."). Not all gender minorities use the term. *See* Leo Caldwell, *3 Reasons I Won't Use the Term 'Dead Name,'* HuffPost (Apr. 1, 2017), https://www.huffpost.com/entry/3-reasons-i-wont-use-the-_b_9575082 [https://perma.cc/L359-CYAH].

155. Other commentators have compared deadnaming to misgendering, suggesting that they are slightly different phenomena. *See* Morgan Lev Edward Holleb, The A–Z of Gender and Sexuality: From Ace to Ze 89–90 (2019) (arguing deadnaming is comparable to misgendering). However, because most names are gendered, their misapplication functions in the same ways as other gendered pronouns, titles, or labels. For that reason, I treat deadnaming as a form of misgendering.

156. GLAAD Media Reference Guide 18 (10th ed. 2016); Parker Molloy, *Stuck on How to Refer to Trans People in the Past? The Answer Is Actually Really Simple.*, MediaMatters (Apr. 17, 2019), https://www.mediamatters.org/fox-friends/stuck-how-refer-trans-people-past-answer-actually-really-simple [https://perma.cc/LY5G-A6GS].

157. Antonio Tomas De La Garza, *A Eulogy for Roxsana Hernández: Tracing the Relationship Between Border Rhetoric and Queer Debility*, 6 QED 94, 98 (2019) ("Deadnaming is a micro-aggression that denies the legitimacy of a person's transition.").

gender minorities is to advocate for a special right or some other form of special treatment. Yet, the history of dishonorifics reveals at least three flaws in this criticism.

To begin, no "special" rights are actually involved in promoting the use of gender-appropriate language. Wanting to be addressed respectfully or appropriately isn't unique to gender-diverse persons. Rather, it is a larger matter of human dignity and a principle that is generally respected.[158] Somewhat ironically, it is the omission of and deviation from the standard use of honorifics, names, and titles that persons prefer which are out of the ordinary. If anything, then, dishonorifics—including misgendering—are a *special* deprivation of respect imposed upon the societally disfavored.

Second, calls for gender-appropriate language are not particularly different from the advocacy engaged by other minority groups. As we have seen, demands for changes in the ways members of marginalized groups have been referred to and addressed have played a role in many movements for civil rights and social equality. Gender minorities requesting language that acknowledges them as they know themselves to be, rather than as who society tells them they are, is therefore simply a modern retelling of earlier advocacy.

The reaction isn't new either. Not long ago, male commentators branded women pursuing non-sexist language as "Ms-guided," "linguistic luna[tics]," throwing "libspeak tantrum[s]," and "'women's lib redhots' with 'the nutty pronouns.'"[159] And, lest we forget, White resistance to racial labels adopted by Black people as unnecessary "political correctness," and White dismissal of calls for the capitalization of racial group designations, are not in the distant past.[160]

To put a finer point on it: past is prologue. Thus framed, a trans man's assertion that he is a man and should be addressed as such should be read in parallel with a Black man's Civil Rights Era mantra that, like his White

---

158.   *See* Geoff Nunberg, *The Social Life of Slurs*, *in* NEW WORK ON SPEECH ACTS 237, 238 (Daniel Fogal, Daniel W. Harris & Matt Moss eds., 2018) (describing the "implied . . . doctrine of linguistic self-determination . . . that every group should have the right to determine what it should— and, more important, should not—be called").

159.   Wendy Martyna, *Beyond the "He/Man" Approach: The Case for Nonsexist Language*, 5 SIGNS 482, 482, 484 (1980); *see also* ANN WEATHERALL, GENDER, LANGUAGE AND DISCOURSE 22 (2002) (capturing the headlines "Feminist title a Ms-take" and "Death by Ms adventure").

160.   *Political Correctness Enters World of Deaf*, BALTIMORE SUN (Jan. 3, 1994), https://www.baltimoresun.com/news/bs-xpm-1994-01-03-1994003110-story.html [https://perma.cc/GV2V-P3KA] (suggesting that "African-American" was "political correctness"); John Leo, *Militants Object to 'Negro' Usage*, N.Y. TIMES, Feb. 26, 1968, at 31, https://www.nytimes.com/1968/02/26/archives/militants-object-to-negro-usage-black-or-afroamerican-replacing.html [https://perma.cc/H2E2-THWQ]; Geneva Smitherman, *"What Is Africa to Me?": Language, Ideology, and* African American, 66 AM. SPEECH 115, 116 (1991) (collecting trivializations); Tom W. Smith, *Changing Racial Labels: From "Colored" to "Negro" to "Black" to "African American,"* 56 PUB. OPINION Q. 496, 509 (1992) (documenting White resistance).

counterparts, he too was a man and should be treated that way.[161] Both are calls for recognition of the speakers' innate dignity and equality. Likewise, a trans woman's request to be addressed as a woman is not very different from a cisgender woman's advocating for the title "Ms."—both women are calling to be addressed based on their autonomy and understanding of self, rather than external factors, i.e., her gender assigned at birth for the former, and her marital status for the latter. Lastly, just as the anglicization and replacement of ethnically marked names with ones that are easier to pronounce harmfully prioritize the speaker's ease at the expense of the referent's identity, so too does the replacement of gender-expansive persons' neo- and gender neutral-pronouns with binary or traditional ones that the speaker finds easier to remember and understand.

The third and most obvious reply is that the argument that calls for language to change and adapt to accommodate new understandings of gender are special fails because it misses how language changes. Calls for recognition of innate dignity and equality transform language, revealing its dynamism. History demonstrates the starkness with which dishonorifics strike the modern ear. Because Black people, women, and other marginalized groups have pointed out the harms of the dishonorifics wielded against them, it is no longer widely acceptable to use many of the dishonorifics explored here. Thus, again, critics' characterization of gender-appropriate language as "special" is misapplied.

### 2. *Why the Semantic Determinism Objection Fails*

Reexamined in context, the idea that language's original definition ultimately dictates its offensiveness also suffers from several flaws. This argument would find that language that exists in the collective vocabulary as derogatory is somehow qualitatively distinct from, and more offensive than, its "neutral" (semantically, that is) contemporaries.

That logic cannot be right. As an initial point, this reasoning completely ignores the number of ways slurs can be used in non-offensive, benign, or reclaimed ways.[162] It was only a few years ago that the Supreme Court considered Simon Tam's purported reclamation of anti-Asian slurs in striking down the disparagement clause of the Lanham Act in *Matal v. Tam*.[163] As Tam

---

161.   Here, I am referring to the iconic civil rights slogan, "I *Am* a Man!" *See, e.g.*, Steve Estes, *"I AM A MAN!": Race, Masculinity, and the 1968 Memphis Sanitation Strike*, 41 LAB. HIST. 153, 153 (2000).

162.   *See* Adam D. Galinsky, Cynthia S. Wang, Jennifer A. Whitson, Eric M. Anicich, Kurt Hugenberg & Galen V. Bodenhausen, *The Reappropriation of Stigmatizing Labels: The Reciprocal Relationship Between Power and Self-Labeling*, 24 PSYCH. SCI. 2020, 2022–28 (2013) (documenting evidence of slur reappropriation); Ernie Lepore & Matthew Stone, *Pejorative Tone*, *in* BAD WORDS: PHILOSOPHICAL PERSPECTIVES ON SLURS 144–45 (David Sosa ed., 2018) (describing the process of reclamation); 1 RACE AND ETHNICITY IN AMERICA: FROM PRE-CONTACT TO THE PRESENT 228 (Russel M. Lawson & Benjamin A. Lawson eds., 2019) (providing examples).

163.   Matal v. Tam, 137 S. Ct. 1744, 1751 (2017).

rightly argued in his petition for certiorari, minority groups have long re-appropriated what were originally "insults" and transformed them into "badges of pride."[164]

More importantly, though, the critique ignores the opposite of the prior example: benign words can be used offensively.[165] Above all else, by tracing the history of dishonorifics, this Part has shown that terms that exist in the vernacular for reasons other than derogation can be used and misused to demean.

For example, compare the term "boy" as applied to an adult Black man with an anti-Black epithet of your choosing. If, as the semantic determinism objection would have us believe, original meaning controls, then, juxtaposed against an actual anti-Black racial epithet, the epithet should, categorically, be considered more pejorative.

As the history of dishonorifics has shown, this is not necessarily the case. Often, it is the context, rather than the meaning, that is determinative. To see this, return to our above example, this time comparing a scenario where a White supervisor only refers to Black male workers as "boys" but uses names and titles for White workers with a scenario where a Black rapper uses the n-word in song lyrics. Undoubtedly, the former should be considered the more offensive of the two. Clearly, the context and history of the term "boy" are such that there are times when using the language would be equally if not more offensive than using the slur.[166]

Considered altogether, the semantic determinism objection misses the most critical point.[167] The social and historical contexts of language transform and inform its meaning and therefore its offensiveness. This context is precisely the difference between *slurs*—terms which, to use the objection's language, "exist in the vernacular"[168] to derogate social groups—and *slurring*—a species of speech act which involves the derogation of social groups.[169]

---

164.   Brief for Respondent at 1–2, Lee v. Tam, 137 S. Ct. 30 (2016) (No. 15-1293).

165.   *See, e.g.*, MARK RICHARD, WHEN TRUTH GIVES OUT 12 (2008) (defining a slur as any word that "is a conventional means to express strong negative attitudes towards members of a group"); Robin Jeshion, *Expressivism and the Offensiveness of Slurs*, 27 PHIL. LANGUAGE 231, 243 (2013) (defining slurs as words that "function to express the speaker's contempt for his target in virtue of the target's group-membership").

166.   Historical use has shown that, if the term "boy" is "not a proxy for the" n-word, "it is at the very least a close cousin." Amici Curiae Brief in Support of Plaintiff-Appellant's Petition for Rehearing En Banc of Civil Rights Leaders Hon. U.W. Clemon et al. at 5, Ash v. Tyson Foods, Inc., 664 F.3d 883 (11th Cir. 2011) (No. 08-16135).

167.   More broadly, the argument ignores other features of slurring speech made clear in extensive philosophical literature on semantics. Said briefly here, it ignores that affected individuals—not the meaning of words—determine whether a word is a slur. Luvell Anderson & Ernie Lepore, *Slurring Words*, 47 NOÛS 25, 39 (2013) ("What's clear is that no matter what its history, no matter what it means or communicates, no matter who introduces it, regardless of its past associations, *once relevant individuals declare a word a slur, it becomes one.*").

168.   Blackman, *supra* note 34.

169.   *See generally* Christopher Davis & Elin McCready, *The Instability of Slurs*, 97 GRAZER PHILOSOPHISCHE STUDIEN 63 (2020) (discussing framework for understanding slurs and slurring).

Applied to misgendering, the critique's reasoning cannot hold. As with the other dishonorifics we have examined, while gendered pronouns, honorifics, names, and labels are not by themselves derogatory, they are when applied as such. For the reasons outlined above, misgendering calls to bear a social and historical context that portrays gender minorities as inferior to their cisgender counterparts. In so doing, the otherwise inoffensive language acts as a slur against gender minorities.

\* \* \*

On balance, neither the special rights nor the semantic determinism objections can withstand scrutiny. Viewed alongside previous examples of dishonorific language levied against Black people, women, and ethnic and sexual minorities, the laxity of both accounts becomes readily apparent. Nothing, after all, is sufficiently "special" about the movement for gender-appropriate language such that the special rights objection can succeed. Nor does the original meaning of a pronoun or other gendered language render it inoffensive or non-derogatory as applied. The countless examples of dishonorifics, across a swath of identities, has shown that is far from the case.

## II.

### MEANING

When faced with the notion that misgendering is harmful, skeptics have put forward a number of replies. More than anything else, commentators usually sidestep the charge, choosing to ignore the harms altogether. Another common rejoinder is to question the seriousness of gender misclassifications. The use of gendered language, some argue, is a "simple social courtesy"[170] or an acknowledgment of "biological or physiological" facts.[171] On those views, to misgender another person is at worst an insignificant "oversight," or even a truth-telling—neither of which can be considered disrespectful or harmful.[172]

---

170. Michael Booker, *Why I Don't Use Female Pronouns for My Transgender Brother*, FEDERALIST (Sept. 11, 2017), https://thefederalist.com/2017/09/11/dont-use-female-pronouns-transgender-brother/ [https://perma.cc/FCA8-LKMQ]; Madeleine Kearns, *Teen Girls vs. 'Trans' Athletes*, NAT'L REV. (May 14, 2020), https://www.nationalreview.com/2020/05/teen-girls-vs-trans-athletes/ [https://perma.cc/ALH2-EMJT].

171. Brief Amicus Curiae of Dr. Paul R. McHugh et al. in Support of Plaintiff-Appellant at 23–25, Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021) (No. 18-cv-00753) (claiming sex is "a matter of demonstratable biological fact," and to "say or imply otherwise" is to lie).

172. *The Pronominal Is Political*, LANGUAGE: A FEMINIST GUIDE (May 16, 2016), https://debuk.wordpress.com/2016/05/16/the-pronominal-is-political/ [https://perma.cc/W22L-BSSX]; Kearns, *supra* note 170 (writing misgendering is "far from being a 'slur' (the correct noun is 'fact')"); Bre Payton, *Trans Activist: Using Pronouns that Align with Biology Is Just Like Saying the N-Word*, FEDERALIST (Oct. 28, 2016), https://thefederalist.com/2016/10/28/trans-activist-using-pronouns-align-biology-just-like-saying-n-word/ [https://perma.cc/Z59M-ZHQS] (mocking another writer's analogy comparing mispronouning with racist slurs); Daniel Moody, *Why You Shouldn't Use Transgender Pronouns*, FEDERALIST (Oct. 18, 2016), https://thefederalist.com/2016/10/18/shouldnt-use-transgender-pronouns/ [https://perma.cc/F8Q3-9SZJ] (arguing that pronouns undermine language and communication).

Others take the offensive; affirmatively claiming gender-diverse persons overexaggerate the injuries of gender misattributions, if there are any at all.[173] Because these accounts claim the consequences of misgendering are insignificant, collectively, I will call this brand of push-back the *trivialization objection*.

The objection is unsurprising. Generally, harms tend to mean quite little to those who do not experience them.[174] With respect to dishonorifics in particular, trivialization has always been the standard retort. Recall how the *Allyn v. Allison* court concluded California's sexist title-restrictive laws were "a discrimination so trivial."[175] Or how, despite extensive Black testimony to the contrary, Alabama's reply brief in *Hamilton v. Alabama* argued it would be an "imposition upon [the] Court to request that it concern itself with an attempt to inforce [*sic*] social amenities and rules of etiquette."[176]

This Part responds to the trivialization of misgendering by centering the voices of those who have the highest stakes in the conversation. Drawing on gender minorities' firsthand accounts, the questions answered by this Part are these: What is the social meaning of misgendering? That is, what is expressed or symbolized when a person misattributes the gender of another? What does the intentional deployment of gendered pronouns, honorifics, and labels say to and about gender-diverse folk? And, more directly, as seen from the perspectives of gender minorities, what is truly and fundamentally troubling about having one's gender misattributed?

These questions are answered in two steps. At the outset, to properly situate the conversation, this Part gives a brief typology of misgendering that distinguishes between when it is negligent, accidental, intentional, or self-imposed. Then, the Part looks to social science, psychology, interviews, and collected narratives of gender minorities' experiences with misgendering to demonstrate that misgendering is qualitatively harmful language that infringes on the social equality, autonomy, dignity, and privacy of transgender, genderqueer, and gender nonbinary persons.

---

173.   Scott Shackford, *Transgender Pronoun Policing Leads to Government-Mandated Speech*, REASON (May 25, 2016), https://reason.com/2016/05/25/transgender-pronoun-policing-leads-to-go/ [https://perma.cc/A26N-CT34]; Nat'l Ass'n of Scholars' Amicus Curiae Brief Supporting Plaintiff-Appellant at 20, 27, Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021) (No. 18-cv-00753) (questioning the validity of the harm).

174.   Studies comparing cisgender and gender minorities' experiences with misgendering find qualitative differences; cisgender people find it trivial, while gender minorities find it stigmatizing. *See* Jade Fung, Pronouns Good or Bad: Attitudes and Relationships with Gendered Pronouns in Gender-Diverse Undergraduates 15, 40 (May 2020) (B.A. thesis, Reed University) (on file with author).

175.   Allyn v. Allison, 110 Cal. Rptr. 77, 78 (Cal. Ct. App. 1973).

176.   Brief for Respondent in Opposition to Petition for Writ of Certiorari at 5, Hamilton v. Alabama, 376 U.S. 650 (1964) (No. 793).

### A. An Introductory Typology of Intent

Before turning to the typology, a brief clarification is in order. My purpose in differentiating between types of misgendering is not to suggest that some are not offensive. Rather, the principal point is that intent often informs the nature of action. Therefore, the takeaway is that though any misgendering of another person might be considered offensive, intentionally using the wrong language, and accidentally or negligently doing so, are both morally and experientially distinct.

#### 1. Negligent Misgendering

Most unintended misgendering can be thought of as negligent.[177] In other words, the label applies to misattributions of gender that occur due to a failure to take the proper care. To see this, imagine that you are introduced to someone for the first time who, in your view, appears male. You may assign a gender to the person by referring to them as "Sir" or "Mr." only to realize they are not a man. In this situation, the failure of care was the decision to make an assumption based on appearances,[178] rather than to inquire about the person's appropriate form of address.[179] The more prudent approach would be to ask the individual their pronouns and designations.

Understandably, this idea might strike most readers as novel. The reason for this is that, until fairly recently, American society has conflated gender, appearance, and anatomy.[180] This confusion, Sonny Nordmarken points out, "reflects epistemic assumptions about how gender *can be known*—holding that social actors are able to determine others' gender identities (and appropriate gender pronouns) based on their own sensory perceptions of others' bodies."[181] Yet, if mistaken, assumptions based on another's appearance can have

---

177. Lauren Simpson & Jean-Marc Dewaele, *Self-Misgendering Among Multilingual Transgender Speakers*, INT'L J. SOCIO. LANGUAGE, Feb. 2019, at 103, 105 (describing this as "uninformed" or "mistaken" misgendering); Kirby A. Conrod, Pronouns and Misgendering 26–27 (2018) (unpublished presentation) (on file with author) (providing empirical evidence most misgendering is not malicious).

    In the sense I use it, my definition of negligence draws from philosophical literature. *E.g.*, Joseph Raz, *Responsibility and the Negligence Standard*, 30 OXFORD J. LEGAL STUD. 1, 9 (2010) ("Negligent conduct . . . is careless conduct for which one is responsible, and where care was due."); Kenneth W. Simons, *Negligence*, 16 SOC. PHIL. & POL'Y FOUND. 52, 54 (1999) (defining negligence as "the failure to take a reasonable precaution against risks of harm").

178. We can think of many other appearance-based assumptions that would be found equally offensive if proven wrong: assuming someone is older than they are based on their facial features or hair loss, assuming that someone is younger than they are based on their height, or assuming someone is pregnant when they are not based on their weight.

179. To be clear, in assuming the person's gender, you made a choice between the risk of offending them or inflicting any of the harms discussed *infra*, and the precaution of asking their gender.

180. Nordmarken, *supra* note 143, at 131.

181. Sonny Nordmarken, *Queering Gendering: Trans Epistemologies and the Disruption and Production of Gender Accomplishment Practices*, 45 FEMINIST STUD. 36, 44 (2019).

devastating consequences, even for cisgender persons.[182] The better path forward, therefore, is to ask everyone their appropriate forms of address rather than to assume.

### 2.  *Accidental Misgendering*

Truly inadvertent or unconscious gender misclassifications qualify as accidental misgendering.[183] The label refers to a limited category where, by force of habit, a speaker uses the wrong pronoun, label, title, or name.[184] Accidental misgendering differs from negligent misgendering in that the latter is preventable; the negligent misgender-er has time to reflect, and that means that they can and should ask persons how they would like to be addressed. By contrast, because accidental misgendering is automatic, and therefore largely uncontrollable, there is no failure of care on the part of the person who accidentally misgenders another.

Take an example of a long-term friend or colleague who comes out as a gender minority. For obvious reasons, the process of transitioning or publicly acknowledging one's gender requires adjustment from persons who knew them before the transition or acknowledgment.[185] For longstanding friends or family members to unthinkingly slip by addressing a gender minority by their deadname or previous pronouns, particularly early in the transition or shortly after the acknowledgment, would be inadvertent.[186] The point here is not that accidental misgendering is not harmful. Instead, it is that truly accidental misattributions are less morally culpable, given the automaticity of the actor's behavior.[187]

---

182.    In perhaps the most striking example, in 2018, as the result of a nurse's assumption of a cisgender woman's gender, she was mistakenly sent to a men's prison. Natalie O'Neill, *Grandma Mistaken as Transgender, Sent to All-Male Jail*, N.Y. POST (Dec. 3, 2018), https://nypost.com/2018/12/03/grandma-mistaken-as-transgender-sent-to-all-male-jail/ [https://perma.cc/C3SE-749V].

183.    Simpson & Dewaele, *supra* note 177, at 106.

184.    Here, philosophical accounts of non-deliberativeness resulting in diminished moral responsibility prove helpful. *See* Christos Douskos, *Habit, Omission, and Responsibility*, 40 TOPOI 695, 695 (2021) ("The *automaticity* of habit . . . seems to bypass one's deliberative faculties"); Christoph Lumer, *Automatic Actions: Agency, Intentionality, and Responsibility*, 30 PHIL. PSYCH. 616, 620 (2017) (questioning moral responsibility for automatic actions).

185.    *See* LAURA ERICKSON-SCHROTH & LAURA A. JACOBS, "YOU'RE IN THE WRONG BATHROOM!" AND 20 OTHER MYTHS AND MISCONCEPTIONS ABOUT TRANSGENDER AND GENDER-NONCONFORMING PEOPLE 38–39 (2017) (detailing the process of adjustment to new names and designations for persons who know gender minorities); Abigail, *Uncharted Path: Parenting my Agender Teen*, *in* NONBINARY: MEMOIRS OF GENDER AND IDENTITY 120 (Micah Rajunov & Scott Duane eds., 2019) (detailing one parent's difficulty in adjusting to gender-neutral language); SALLY MCCONNELL-GINET, WORDS MATTER: MEANING AND POWER 201 (2020).

186.    BAKER A. ROGERS, TRANS MEN IN THE SOUTH: BECOMING MEN 27 (2020) (discussing accidental deadnaming).

187.    *See* GILBERT RYLE, THE CONCEPT OF MIND 10, 94–95 (1949); Steve Matthews, *The Significance of Habit*, 14 J. MORAL PHIL. 394, 412–13 (2017) (linking decreased responsibility to the lack of intentionality).

### 3. *Intentional Misgendering*

Intentional misgendering involves the conscious refusal to use the correct gendered language or designations. By "intentional," I mean actions that are not automatic or unthinkingly done; the label applies to scenarios where a speaker knows and is fully aware of the referent's gender-appropriate language and deliberately chooses not to use it or chooses to use language at odds with it.

Intentional misgendering is perhaps most obvious with respect to trans persons who "pass." Imagine a case where *A* does not realize that *B* is transgender because *B* passes.[188] All the while, *A* uses the correct language when talking to and about *B*. (In this case, say, with she/her/hers pronouns and Mrs./Ms./Miss titles). Imagine, further, that *A* learns that *B* was assigned male at birth. Thereafter, *A* refers to *B* exclusively with he/him/his pronouns and the title "Mr." In this scenario, given that *A* previously used *B*'s correct pronouns and titles to no apparent detriment and only made a conscious choice to misgender *B* after discovering she was transgender, *A's* misgendering is obviously deliberate.

Persons offer many reasons for why they intentionally misgender gender minorities.[189] Speakers may claim to be trying to express that they do not acknowledge the target's gender.[190] On this view, some feminists deliberately misgender transgender women in order to reject trans women's membership in the category of "women."[191] Alternatively, speakers may claim to be trying to express a larger political point about the binary nature of gender or deny the possibility of transition or gender-expansive identities: for instance, in rejecting musician Sam Smith's use of they/them/theirs pronouns, conservative journalist Douglas Murray rationalized his misgendering of Smith with the argument that he did not "think there is any such thing as non-binary."[192] Or, speakers may even just be trying to be cruel.[193] Regardless of the specific motive, because the

---

188. To be clear, this does not mean that *B* is a man *passing* as a woman; *B* is, in fact, a woman. Rather, "passing" here means passing as cisgender. *See* Daniel Silvermint, *Passing as Privileged*, 5 ERGO 1, 8 (2018).

189. Sebastian Cordoba, Exploring Non-binary Genders: Language and Identity 166 (Jan. 2020) (Ph.D. thesis, De Montfort University) (on file with author) (suggesting misgendering nonbinary persons may be done to hurt, because the speaker believes gender-neutral pronouns are grammatically incorrect or because the speaker considers them too difficult to use).

190. Amelia Gapin, *No, Misgendering Me Is Not Okay or Justifiable. Yes, This Is a Big Deal*, ENTIRELY AMELIA (Jan. 2, 2014), http://www.entirelyamelia.com/2014/01/02/misgendering-okay-justifiable-yes-big-deal/ [https://perma.cc/Q5W9-9W8Y].

191. *See, e.g.*, JANICE G. RAYMOND, THE TRANSSEXUAL EMPIRE: THE MAKING OF THE SHE-MALE (1994); SHEILA JEFFREYS, GENDER HURTS: A FEMINIST ANALYSIS OF THE POLITICS OF TRANSGENDERISM (2014).

192. *See* BBC Radio 4 Today (@BBCr4today), TWITTER (Sept. 17, 2019, 6:05 AM), https://twitter.com/BBCr4today/status/1173900825304977408 [https://perma.cc/7HLH-M97N].

193. Issac Michael Blythe, Passing Notion: The Experience of Four Trans Identified Students and the Violence of Assimilation 21 (May 2016) (Honors thesis, Texas State University) (on file with author) ("I know people who even now will call me my deadname because they can't physically assault me . . . and get away with it so readily."); Sam Hope, *Yes, Deliberate Misgendering Is Transphobia*,

speech was deliberate, we can conclude that it is more morally culpable than accidental or negligent misgendering.[194]

### 4. *Self-Misgendering*

Distinct from the other forms of misgendering, gender minorities, and particularly those whose genders are recently acknowledged or still in the process of formation, may misgender themselves.[195] There are several explanations for why this happens. As with accidental misgendering, self-misgendering might be the result of habit. Interestingly as well, gender minorities speaking a second language have been found to unintentionally misgender themselves in that language.[196]

A more typical reason is that self-misgendering is a product of necessity or safety.[197] Given that the majority of persons a gender minority must interact with on a daily basis subscribe to a binary conception of gender, or are openly transphobic, self-censoring one's gender pronouns and other language can be a tool to avoid backlash or attack. Research has indeed found that gender minorities often decline to ask their employers to use their correct pronouns in an effort to avoid more severe discrimination.[198] Along similar lines, in the context of litigation, gender minorities frequently report self-misgendering in an effort to appeal to decision-makers who would otherwise not understand or would be resistant to the gender minority's identity.[199]

FEMINIST CHALLENGING TRANSPHOBIA (Dec. 15, 2014), https://feministchallengingtransphobia.wordpress.com/2014/12/15/yes-deliberate-misgendering-is-transphobia/ [https://perma.cc/E2KN-YNPN].

194. This principle, of course, has long been present in criminal law. Jeremy Horder, *Criminal Culpability: The Possibility of a General Theory*, 12 LAW & PHIL. 193, 212–14 (1993) (explaining why intentional harms are more morally culpable than accidental harms).

195. Laura Nelson, *Pronoun Trouble*, MEDIUM (Sept. 11, 2019), https://lnelson10051954.medium.com/pronoun-trouble-8c1737828acb [https://perma.cc/9V7U-XRVG] (discussing examples of self-misgendering during her "still-in-process transition"); uppercaseCHASE1, *Misgendering Yourself*, YOUTUBE (Mar. 17, 2015), https://www.youtube.com/watch?v=ZWmfh2XfWaE [https://perma.cc/3HXG-ETDH] (providing an example); Jammidodger, *FTM Trans Guy: Misgendering Myself*, YOUTUBE (Apr. 19, 2017), https://www.youtube.com/watch?v=xlIzeW3IVq8&t=1s [https://perma.cc/J74F-MJYR] (same).

196. *See generally* Simpson & Dewaele, *supra* note 177 (qualitatively surveying self-misgendering and finding strong correlation between self-misgendering and (lack of) fluency in the language spoken).

197. Lauren Freeman, *Micro Interactions, Macro Harms: Some Thoughts on Improving Health Care for Transgender and Gender Nonbinary Folks*, 11 INT'L J. FEMINIST APPROACHES TO BIOETHICS 157–62 (2018).

198. SANDY E. JAMES, JODY L. HERMAN, SUSAN RANKIN, MARA KEISLING, LISA MOTTET & MA'AYAN ANAFI, THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY 154 (2016).

199. *See* Elizabeth M. Glazer, *Sexual Reorientation*, 100 GEO. L.J. 997, 1052 n.351 (2012) (discussing one example); Chinyere Ezie, *Deconstructing the Body: Transgender and Intersex Identities and Sex Discrimination—The Need for Strict Scrutiny*, 20 COLUM. J. GENDER & L. 141, 167–68 (2011) (collecting cases).

### B.  Why the Trivialization Objection Fails

Some critics have claimed that the consequences of misgendering are insignificant. They analogize the consequences to the minor offense some cisgender people feel when their gender is misattributed: say a short-haired woman is mistaken for a man, a man with a higher-pitched voice is misaddressed on the telephone, or parents' reaction when their baby's gender is misidentified by a stranger.[200]

But there's more to it than that. Though cisgender people might be uncomfortable or even irritated by being misgendered, the experience is qualitatively different for gender minorities.[201] In the sections that follow, I mine the gender minorities' narratives to develop a layered account that captures exactly how and why misgendering is harmful. Beyond the trivialities and potential discomfort experienced by cisgender people, misgendering, especially when done intentionally, inflicts a range of injuries on gender minorities' self-identity, dignity, autonomy, privacy, and mental and physical health.[202]

### 1.  Disrespect and Disregard

Foremost, misgendering is disrespectful.[203] Of course, accounts of what disrespect is and is not vary.[204] So, for the purposes of this argument, a disrespectful action is one that (1) ignores, fails to account for, or dismisses an

---

200.    Tellingly, social science studies have found even cisgender persons become uncomfortable when they are misgendered. *See* Jessica MacNamara, Sarah Glann & Paul Durlak, *Experiencing Misgendered Pronouns: A Classroom Activity to Encourage Empathy*, 45 TEACHING SOCIO. 269, 273 (2017).

201.    Sam Dylan Finch, *Doctors Using a Transgender Patient's Correct Pronouns Is a Life-or-Death Matter*, TEENVOGUE (Sept. 27, 2019), https://www.teenvogue.com/story/doctors-using-a-transgender-patients-correct-pronouns-is-a-life-or-death-matter [https://perma.cc/8PJP-MYBY] ("I get that for a cisgender person . . . pronouns are simply words, no different from mixing up 'pan' and 'pot' while shopping at IKEA."); Sam Dylan Finch, *What You're Actually Saying When You Ignore Someone's Gender Pronouns*, LETSQUEERTHINGSUP! (Sept. 15, 2014), https://letsqueerthingsup.com/2014/09/15/what-youre-actually-saying-when-you-ignore-someones-preferred-gender-pronouns/ [https://perma.cc/8MY2-4VSZ].

202.    Naturally, the descriptions here are exemplars, not rules. There are, of course, gender minorities who do not view misgendering as harmful. *E.g.*, Katy Koonce, *The Name Remains the Same*, *in* NONBINARY: MEMOIRS OF GENDER AND IDENTITY, *supra* note 185, at 130, 137 (providing one example); Helena Darwin, *Doing Gender Beyond the Binary: A Virtual Ethnography*, 40 SYMBOLIC INTERACTION 1, 14 (2017) (concluding nonbinary persons' "reactions to verbal misgendering vary: some accept it").

203.    KATE LIGHT, GENDER IDENTITY: THE SEARCH FOR SELF 50 (2017) ("Misgendering a person by using an incorrect pronoun is an act of disrespect."); Lauren Freeman & Heather Stewart, *The Problem of Recognition, Erasure, and Epistemic Injustice in Medicine: Harms to Transgender and Gender Non-Binary Patients— Why We Should Be Worried*, *in* RECOGNITION THEORY AND EPISTEMIC INJUSTICE (Paul Giladi & Nicola McMillan eds., forthcoming 2021) (manuscript at 22) ("Regardless of intention . . . deadnaming, mispronouning, and misgendering are all acts of profound disrespect").

204.    *Compare* Benjamin Eidelson, *Respect, Individualism, and Colorblindness*, 129 YALE L.J. 1600, 1617 (2020) (claiming disrespect "is just respect's absence"), *with* NICHOLAS WOLTERSTORFF, JUSTICE: RIGHTS AND WRONGS 297 (2008) ("Disrespect is active. Mere absence of showing respect is not, as such, showing disrespect . . . .").

affected individual's feelings; or (2) fails to reflect on its harms. Both definitions are applicable to misgendering.

To begin, persons who misgender gender minorities disrespect them by acting in a way that is contrary to the way they've made known they wish to be treated.[205] To understand why, think of the converse. Showing respect involves deference to others.[206] When someone we respect tells us they find our actions or words harmful, we typically stop doing or saying the relevant action or speech, to the extent we are capable. At the very least, we make efforts not to do or say the harmful actions or remarks around that person.[207] To do otherwise would be disrespectful.

For a concrete example, recall Judge Teitelbaum's insistence on addressing Barbara Wolvovitz by her husband's last name and the title Mrs. The judge's continued use of that form of address, despite Ms. Wolvovitz's objections, was disrespectful because it involved treating her as if her feelings, opinions, and personhood were unimportant. In that instance, the judge's continued misaddressing notwithstanding Wolvovitz's uneasiness was a communiqué expressing: "Your wishes or offense don't matter to me," "I don't care about how you feel," or, "I see I make you uncomfortable, but my desire to continue is more important than that." Whatever the message, it was one of disparaging dismissal: a disrespectful prioritizing of the speaker's own desire over the addressee's.[208]

Viewed in this way, misgendering can be considered disrespectful because it involves referring to someone in a manner that they have made known they find offensive or harmful. Just as before, it is the elevation of the speakers' desire to use offensive language and the concomitant dismissal of the targets' feelings that is disrespectful.

---

205.    *See* WOLTERSTORFF, *supra* note 204, at 297; Sarah Buss, *Appearing Respectful: The Moral Significance of Manners*, 109 ETHICS 795, 796–97 (1999).

206.    DAVID P. GAUTHIER, PRACTICAL REASONING: THE STRUCTURE AND FOUNDATIONS OF PRUDENTIAL AND MORAL ARGUMENTS AND THEIR EXEMPLIFICATION IN DISCOURSE 119 (1963); JOHN RAWLS, A THEORY OF JUSTICE 297 (rev. ed. 1971); Colin Bird, *Status, Identity, and Respect*, 32 POL. THEORY 207, 213 (2004).

207.    *C.f.* RICHARD B. MILLER, TERROR, RELIGION, AND LIBERAL THOUGHT 87 (2010) (surmising respecting others involves considering their feelings while formulating our conduct); Stanley I. Benn, *Privacy, Freedom, and Respect for Persons*, *in* PHILOSOPHICAL DIMENSIONS OF PRIVACY 223, 231 (Ferdinand David Shoeman ed., 1984) (contending respect involves accounting the impact of our decisions).

208.    *See* Stephen L. Darwall, *Two Kinds of Respect*, 88 ETHICS 36, 37 (1977); EMRYS WESTACOTT, THE VIRTUES OF OUR VICES: A MODEST DEFENSE OF GOSSIP, RUDENESS, AND OTHER BAD HABITS 219 (2012); *see also* Andrew Altman, *Liberalism and Campus Hate Speech: A Philosophical Examination*, 103 ETHICS 302, 310 (1993) (stating that it is wrong to treat another "in a way that takes their interests to be intrinsically less important, and their lives inherently less valuable").

Second, deliberate misgendering fails to account for the harms of the language.[209] Language, like actions, can be disrespectful when we ought to know that another person will find them dismissive. To grasp this account, consider the following scenario: imagine you are invited to a friend's house for a home-cooked dinner. Imagine, further, that your friend has spent all day laboriously preparing this meal. We can agree that for you to fail to show up simply because you weren't in the mood and worse, without an excuse or apology, would be disrespectful. Doing so would fail to recognize the harm of your actions, and it would devalue the time and effort that your friend put into preparing the meal.[210]

Along the same lines, to intentionally use language that gender minorities experience as harmful, without reflection on the harm it causes, is disrespectful. To be clear, gender minorities spend time, effort, and financial resources on coming to terms with their gender. It is no small feat to take the step of going against the societal status quo and identifying outside of the cis majority.[211] The costs may include the effort required to have name or gender marker changes, major life alterations, and transition-related care, not to mention the potential loss of personal relationships and the incurred burdens of discrimination. From that perspective, it is disrespectful to wantonly dismiss the efforts gender minorities make by choosing to use language at odds with their gender.[212]

### 2. *Embarrassment and Humiliation*

Misgendering can cause embarrassment and humiliation. Though related, the two concepts are distinct. As a threshold matter, embarrassment typically occurs in less consequential settings, and it is frequently unintentional and temporary.[213] Embarrassment may arise where one commits an awkward act or

---

209. This view of respect derives from accounts portraying respect as the viewing of situations from another's perspective. *See, e.g.*, RAWLS, *supra* note 206, at 297; Bernard Williams, *The Idea of Equality*, *in* MORAL CONCEPTS 153, 159 (Joel Feinberg ed., 1970); Darwall, *supra* note 208, at 38.

210. *See* Leslie Green, *Two Worries About Respect for Persons*, 120 ETHICS 212, 220 (2010); Carl Cranor, *Toward a Theory of Respect for Persons*, 12 AM. PHIL. Q. 309, 315 (1975).

211. VANESSA SHERIDAN, TRANSGENDER IN THE WORKPLACE: THE COMPLETE GUIDE TO THE NEW AUTHENTICITY FOR EMPLOYERS AND GENDER-DIVERSE PROFESSIONALS 126 (2019) ("Many gender-diverse individuals have been working for years toward the goal of being addressed by their appropriate names and correct personal pronouns, and that should be acknowledged and respected."); Brittney McNamara, *Why Incorrectly Identifying Transgender People Who Have Died Is a Lack of Respect*, TEEN VOGUE (June 28, 2017), https://www.teenvogue.com/story/why-incorrectly-identifying-transgender-people-who-have-died-is-a-lack-of-respect [https://perma.cc/ZF7L-DJLA] (writing misgendering is disrespectful for ignoring "the struggle trans people have to go through to be accepted").

212. *See* Laura A. Jacobs, *"Laura Is a Transgender. Didn't the Surgeons Do an Amazing Job?,"* *in* BODIES AND BARRIERS: QUEER ACTIVISTS ON HEALTH 133, 134 (Adrian Shanker ed., 2020) ("[Transfolk] have thought at length about how to define our identities, and our language choices are deeply personal, intended to reflect our nuanced understandings of ourselves.").

213. MARTHA C. NUSSBAUM, HIDING FROM HUMANITY: DISGUST, SHAME, AND THE LAW 204–06 (2004).

social faux pas.[214] On this definition, misgendering may be considered embarrassing where it occurs accidentally in that it (1) is a violation of the social rule of mutual respect and not offending others; and (2) misgendering places the onus on the gender minority to (often awkwardly) correct the speaker. [215]

Social situations may also be considered embarrassing when they involve the sudden onset of social scrutiny.[216] Consider instances when we are praised or receive an unexpected compliment; we might feel exposed because the focus is placed on us.[217] In this sense as well, misgendering may be considered embarrassing. Frequently, the misuse of the incorrect pronoun, honorific, or label, or an elaborate apology for doing so thereafter, turns unwarranted focus on the target, along with unwelcome scrutiny or evaluations of their gender or gender expression.[218]

Humiliation, by contrast, is more likely deliberate. Further, unlike embarrassment, humiliation involves elements of power and powerlessness: It is the victim's inability to stop or control the humiliator's actions—the victim's powerlessness—that makes an action humiliating. Thus, in Phil Leash's view, humiliation is a "demonstrative exercise of power" that involves "a personal sense of injustice matched by the lack of any remedy for the injustice suffered."[219] Humiliation is also qualitatively different from embarrassment in that it involves a loss of social status or the rejection of a self-presentation or social identity.[220] In this way, as a rejection of gender minorities' claim to their gender, particularly when repeated and defiant, misgendering can serve to humiliate its target.[221]

---

214.    Gün R. Semin & A.S.R. Manstead, *The Social Implications of Embarrassment Displays and Restitution Behavior*, 12 EUR. J. SOC. PSYCH. 367, 368 (1982); Luke Purshouse, *Embarrassment: A Philosophical Analysis*, 76 PHIL. 515, 526–27 (2001).

215.    Interview with Indira Rahman (Aug. 29, 2019); JEANNIE GAINSBURG, THE SAVVY ALLY: A GUIDE FOR BECOMING A SKILLED LGBTQ+ ADVOCATE 62 (2020) ("Occasional and accidental misgendering is embarrassing . . . .")

216.    THE OXFORD COMPANION TO EMOTION AND THE AFFECTIVE SCIENCES 138 (David Sander & Klaus R. Scherer eds., 2009); *see* Purshouse, *supra* note 214, at 530–32.

217.    NUSSBAUM, *supra* note 213, at 205.

218.    *See* Kay Martinez, *Pronouns 101: Why They Matter and What to Do (and Not Do) if You Misgender Someone*, MEDIUM (Oct. 7, 2019), https://medium.com/awaken-blog/pronouns-101-why-they-matter-and-what-to-do-and-not-do-if-you-misgender-someone-cfd747c762d1 [https://perma.cc/K8SX-QVWN] ("Whenever I am misgendered, I feel a range of emotions but largely embarrassed so I hope to correct what has happened as quickly as possible.").

219.    Phil Leask, *Losing Trust in the World: Humiliation and Its Consequences*, 19 PSYCHODYNAMIC PRAC. 129, 131 (2013).

220.    Walter J. Torres & Raymond M. Bergner, *Humiliation: Its Nature and Consequences*, 38 J. AM. ACAD. PSYCH. L. 195, 199 (2010); Marte Otten & Kai J. Jonas, *Humiliation as an Intense Emotional Experience: Evidence from the Electro-Encephalogram*, 9 SOC. NEUROSCIENCE 1, 23 (2014); *see also* Catherine L. Fisk, *Humiliation at Work*, 8 WM. & MARY J. WOMEN & L. 73, 77 (2001) (describing humiliation as "'having [one's] value in the eyes of other's' undermined").

221.    *See* Ezra Ishmael Young, *What the Supreme Court Could Have Heard in* R.G. & G.R. Harris Funeral Homes v. EEOC *and Aimee Stephens*, 11 CALIF. L. REV. ONLINE 9, 20 (2020) (deeming misgendering trans women "humiliating because it rejects a transgender woman's deepest personal truth").

This is especially true when intentional misgendering occurs publicly.[222] In fact, this is often the perpetrator's desired effect.[223] Take the events of conservative provocateur Milo Yiannapoulous's 2016 speech at the University of Wisconsin, Milwaukee.[224] Projecting a transgender UW student's name and photograph on screen, Yiannapoulous began the following targeted, degrading, tirade:

> I'll tell you one UW-Milwaukee student that does not need to man up. Have any of you come into contact with this person? This quote unquote nonbinary trans woman forced his [*sic*] way into the women's locker rooms this year. . . . He [*sic*] got into the women's room the way liberals always operate, using the government and the courts to weasel their way where they don't belong. In this case he [*sic*] made a Title IX complaint. . . . I've known some passing trannies [*sic*], which is to say transgender people who pass as the gender they would like to be considered.
>
> [pointing towards the projection of the student]
>
> The way you know he's [*sic*] failing is I'd almost still bang him [*sic*].
>
> [crowd laughs]
>
> It's [*sic*] really just a man in a dress, isn't it [*sic*].[225]

The intention to humiliate is obvious. The effort required to organize the projection, in addition to the consistent misgendering, the use of "it," transphobic epithets, and sexually crude comments, all point towards a conscious desire to intentionally harass.

### 3.  Social Subordination

Misgendering expresses that gender minorities are less valuable than their cisgender counterparts. When actions communicate the lessened importance of one person or a group *vis-a-vis* another, we should think of the actions as communicating the target's symbolic subordination.[226] One of the most common

---

222.     *See* Raffaele Rodogno, *Shame, Guilt, and Punishment*, 28 LAW & PHIL. 429, 433–34 (2009) (finding humiliation to increase with publicity).

223.     *See* Grace Lavery, *Grad School as Conversion Therapy*, BLARB (Oct. 29, 2018), https://blog.lareviewofbooks.org/essays/grad-school-conversion-therapy/ [https://perma.cc/ZTJ9-58JS] ("For the same reason that any bully weaponizes referential speech by making up names, repeating cruel epithets, etc. Misgendering and deadnaming are modes of abuse, designed to humiliate and hurt trans people.").

224.     *See* Clair Landsbaum, *Alt-Right Troll Milo Yiannopoulos Uses Campus Visit to Openly Mock a Transgender Student*, CUT (Dec. 15, 2016), https://www.thecut.com/2016/12/milo-yiannopoulos-harassed-a-trans-student-at-uw-milwaukee.html [https://perma.cc/6RJV-ASRW].

225.     MILO, *MILO at UW-Milwaukee: "Master Baiters: The Liberals Keeping America's Race War Alive*," YOUTUBE, at 49:48 (Dec. 13, 2016), https://www.youtube.com/watch?v=-t1ufzttyUM [https://perma.cc/FEJ7-TJNV].

226.     The concept of symbolic subordination is Kimberlé Crenshaw's, and she uses it to mean the "formal denial of social and political equality to all Blacks." Crenshaw, *supra* note 49, at 1377. I extend

ways individuals or groups are symbolically subordinated is through the denial of the symbols of social equality.[227]

To my mind, terms of reference and address—pronouns, honorifics, titles, names, and the like—are *ordinary signs* of social equality.[228] By "ordinary" I mean that they are widely used, commonplace, and generally thought of as inconsequential.[229] We might think of withholding these terms as expressing the target's lessened worth: doing so says, in effect, that the person the speaker is referring to or addressing does not deserve the due regard that is typically given to all other citizens. The connotation is that the target is in a lower pole of the social hierarchy and is the speaker's social inferior.[230]

Here, social context is key.[231] Largely, it is the prism of context that illuminates whether any deprivation of social equality is symbolically subordinating. In the case of members of groups that are or have been widely discriminated against, the absence of these ordinary signs of social equality takes on an even greater significance. To see this, consider that addressing professionals with titles like "Doctor," "Judge," "Sergeant," and "Officer" is ordinary. Yet, to specifically fail or refuse to use these terms with a Black person would be considered symbolically subordinating because the history of discrimination against Black people provides context for this action. Remember that, for centuries, withholding the ordinary signs of social equality—through a failure to use titles or by addressing Black persons by only their first names— was an integral part of the social practices that symbolized Black persons' purported inferiority. Thus, it is the deviation from ordinary treatment, against a

---

Crenshaw's definition here to cover all denials, formal and informal, of social equality to members of historically disfavored groups. Actions of this sort, those that communicate the target's inferiority, are morally wrong by virtue of that communication alone. *See* Stephen P. Garvey, *Two Kinds of Criminal Wrongs*, 5 PUNISHMENT & SOC'Y 279, 280–81 (2003).

227.    For a cogent definition of social equality, see Samuel R. Bagenstos, *Employment Law and Social Equality*, 112 MICH. L. REV. 225, 232–33 (2013) ("At its most fundamental level, social equality is the idea that each of us deserves to be treated as an equal member of our community . . . . we each are entitled to equal 'deference or regard' in our everyday relations with others in the community.'"); *see also* Carina Fourie, *What Is Social Equality? An Analysis of Status Equality as a Strongly Egalitarian Ideal*, 18 RES PUBLICA 107, 112 (2012).

228.    MICHAEL WALZER, SPHERES OF JUSTICE: A DEFENSE OF PLURALISM AND EQUALITY 252 (1983); Jason M. Solomon, *Civil Recourse as Social Equality*, 39 FLA. ST. U. L. REV. 243, 254 (2011).

229.    *See Ordinary*, OXFORD LEXICO (2021), https://www.lexico.com/en/definition/ordinary [perma.cc/37WL-WVZ8] (defining ordinary as "with no special or distinctive features; normal" and "what is commonplace or standard").

230.    *See* Yousef T. Jabareen, *Law, Minority, and Transformation: A Critique and Rethinking of Civil Rights Doctrines*, 46 SANTA CLARA L. REV. 513, 526 (2006) ("[Symbolic] subordination reinforces a group hierarchical ideology that minority members are inferior to the majority and are therefore excluded from the vision of society as a 'community of equals.'").

231.    *See* Deborah Hellman, *Equal Protection in the Key of Respect*, 123 YALE L.J. 3036, 3047–50 (2014) (stating context and culture determines the social meaning of actions).

backdrop of historical and ongoing social discrimination, that makes the conduct both meaningful and condemnable.[232]

How does that reasoning apply to pronouns, gendered titles, and the names of gender minorities? To fail to use these ordinary signs of social equality would be belittling on its own. Against the backdrop of widespread societal transphobia, to refuse to use a gender minority's preferred name or to deadname them is a deviation from the ordinary that takes on a new significance because of the social context of transphobic discrimination.[233] Normally, using persons' preferred names—whatever they want to be called—is accepted. Certainly, we would have no issue with referring to a person by their preferred moniker "Bob," when in actuality their legal name is Robert. Likewise, at their request, we would happily refer to a colleague by their pre-marital name, even though they've officially adopted their partner's surname after marriage. Like using preferred names, we ordinarily accept using pronouns that are in line with the gender of the people we refer to. It just so happens that most people we discuss or address are cisgender. To fail to do so when the referent is a gender minority, therefore, is to deviate from the ordinary in a way that must be understood as a deprivation of that person's right to social equality.

The deprivation of social equality has further consequences. Because gender misattributions signify that the target is of less social standing than the speaker, and perhaps, has less social standing than cisgender persons as a collective, it makes the target vulnerable to all the corollary mistreatment associated with being branded as inferior.[234] From a wider view, then, we must understand misgendering to act as a license—or even invitation—to mistreat, and discriminate against gender minorities.[235]

### 4. *Deprivation of Privacy and Safety*

Misgendering deprives gender minorities of privacy and threatens their safety. Among other things, the right to privacy includes the right to control intimate information.[236] Expressed differently, aspects of our personal lives are

---

232. For a synthesis of differentiation from the ordinary as a form of equality-denying discrimination, see Elise C. Boddie, *Ordinariness as Equality*, 93 IND. L.J. 57, 57 (2018).

233. This is why one might accidentally misgender a short-haired woman, or a baby, without much ado. In either instance, the message of the wrongful attribution of gender does not indicate, nor shore up, the woman's or baby's social inferiority.

234. Molloy, *supra* note 156 ("The misgendering of transgender people . . . can send a dangerous message to the public, reinforcing the very prejudice at the heart of the discrimination and violence transgender people face.").

235. *Cf.* Karsten Müller & Carlo Schwarz, From Hashtag to Hate Crime: Twitter and Anti-Minority Sentiment 28 (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3149103 [https://perma.cc/U2SE-AMD2] (providing evidence linking Donald Trump's subordinating speech against Muslims with a rise in anti-Muslim hate crimes).

236. JULIE C. INNESS, PRIVACY, INTIMACY, AND ISOLATION 140 (1992); Susan Hazeldean, *Privacy as Pretext*, 104 CORNELL L. REV. 1719, 1757–58 (2019).

private, precisely because we choose not to share them, or alternatively, to share them with only a select few.[237] Gender undoubtedly falls within the realm of intimate information.[238] As with pregnancy, sexual orientation, and the disclosure of HIV status, "there are few areas which more closely intimate facts of a personal nature" than one's own sense of gender.[239] It follows that, with information of this sort, individuals should have the right to decide when, how, whether, and with whom they share it.[240]

Misgendering, especially in public settings, undercuts the control of intimate information. Where misgendering *outs* the target—that is, non-consensually or forcibly reveals current gender or gender assigned at birth[241]—it deprives gender minorities of the right to choose when/if to reveal this information.[242] Accordingly, for gender minorities living "stealth," misgendering harms their privacy by exposing their intimate information.[243]

Whether inadvertent or deliberate, outing through misgendering harms the privacy of gender minorities. Consider these illustrations. In *Meriwether v. Trustees of Shawnee State University*, a Shawnee State student chose to limit knowledge of her transgender status by only divulging it to close friends and, when necessary, university administrators.[244] Her professor's incessant misgendering in class by "refus[ing] to use female honorifics and pronouns" when referring to her "'out[ed]' her to her classmates."[245] Author and journalist Meredith Talusan tells of a time when, after showing her ID containing her gender assigned at birth, a bartender maliciously asked her date: "So you want to buy him a beer?"[246] And, Os Keyes has documented how, in a fairly casual scenario, a store clerk revealed their deadname and gender assigned at birth to a

237.    *See* Danielle Keats Citron, *Sexual Privacy*, 128 YALE L.J. 1870, 1879 (2019); Jean L. Cohen, *The Necessity of Privacy*, 68 SOC. RSCH. 318, 319 (2001).

238.    *See* Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1999) (holding constitutional protection of "[t]he excruciatingly private and intimate nature of transsexualism [sic], for persons who wish to preserve privacy"); Grimes v. Cnty. of Cook, 455 F. Supp. 3d 630, 638 (N.D. Ill. 2020) (pointing out gender identity might also qualify as "private medical information").

239.    *See* Gonzalez v. Nevares, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); Doe v. Boyertown Area Sch. Dist., 897 F. 3d 518, 522 (3d Cir. 2018) ("Gender identity is the subjective, deep-core sense of self as being a particular gender."); *see also* Citron, *supra* note 237, at 1880.

240.    *See* Katheleen Guzman, *About Outing: Public Discourse, Private Lives*, 73 WASH. U. L.Q. 1531, 1549 (1995).

241.    *See* Citron, *supra* note 237, at 1884.

242.    *See* Elise Holtzman, Note, *I Am Cait, but It's None of Your Business: The Problem of Invasive Transgender Policies and a Fourth Amendment Solution*, 68 FLA. L. REV. 1943, 1962 (2016).

243.    *See* Gapin, *supra* note 190 ("When you misgendering me, you're outing me as trans [to other people.] You are taking away my right to control that information to the best of my ability. Maybe I don't want these people to know. Maybe this isn't how I want them to find out.").

244.    Meriwether v. Trs. Shawnee State Univ., 2019 U.S. Dist. LEXIS 98625 at *4 (S.D. Ohio Jan. 30, 2019).

245.    *Id.*

246.    Meredith Talusan, *Why Trans Women Care About Caitlyn Jenner's Pronouns*, BUZZFEED (June 2, 2015), https://www.buzzfeed.com/1demerith/why-caitlyn-jenners-pronouns-matter-to-trans-women [https://perma.cc/LPW4-TMJ8].

colleague who only knew them post-transition.[247] In all these instances, the misgendering violated the individuals' privacy and the non-consensual revelations interfered with their relationships, depriving each party of the ability to choose when, and if, to reveal their transgender status or name given at birth.

Closely related to misgendering's deprivation of gender minorities' privacy is its threat to their safety and security. When gender minorities are misgendered, there is the possibility that they will be exposed to actual physical violence. As discussed above, incorrect pronouns or honorifics can nonconsensually reveal someone's gender minority status to third parties. If these third parties are transphobic, this exposure can lead to a violent reaction.[248]

### 5. *Dehumanization*

Misgendering is dehumanizing. It deprives gender minorities of their "full humanness," exposes them to "the cruelty and suffering that accompany" such status,[249] and objectifies them—a specific form of dehumanization involving the portrayal of others as inanimate or lacking human qualities like autonomy and subjectivity.[250]

To start, misgendering is dehumanizing in that it not only denies gender minorities' rights, *qua* persons, to assert their identity[251] but also otherizes them. By denying them markers of social equality, misgendering marks gender minorities as being outside the community of respected moral equals.[252]

Occasionally, it goes further. Misgendering is also dehumanizing where it involves metaphorically likening gender minorities to the nonhuman.[253]

---

247.    Os Keyes, *(Mis)gendering*, *in* UNCERTAIN ARCHIVES: CRITICAL KEYWORDS FOR THE AGE OF BIG DATA 339 (Nanna Bonde Thylstrup, Daniela Agostinho, Annie Ring, Catherine D'Ignazio & Kristin Veel eds., 2021).

248.    Eve, *Say My Name*, ORIGINAL WOMAN (Apr. 24, 2017), https://web.archive.org/web/20180925034028/http://originalwoman.org/deadnaming-misgendering-trans-effects/ ("[M]isgendering and deadnaming . . . can actually put [gender minorities] as risk for physical violence. If a trans person's gender is being properly perceived by passers-by—if they're 'passing' or blending in—the act of someone deadnaming or misgendering them could cause other people to react negatively or violently. And on top of that, the threat of violence alone adds to the negative mental health effects of being misgendered.").

249.    Nick Haslam, *Dehumanization: An Integrative Review*, 10 PERSONALITY & SOC. PSYCH. REV. 252, 252 (2006).

250.    *Id.* at 253.

251.    Mari Mikkola, *Dehumanization*, *in* NEW WAVES IN ETHICS 128, 141–42 (Thom Brooks ed., 2011); *see* Herbert C. Kelman, *Violence Without Moral Restraint: Reflections on the Dehumanization of Victims and Victimizers*, 29 J. SOC. ISSUES 25, 48–49 (1973) (describing full humanity as having identity, agency, and community, and dehumanization as the deprivation thereof).

252.    Sophie Oliver, *Dehumanization: Perceiving the Body as (In)Human*, *in* HUMILIATION, DEGRADATION, DEHUMANIZATION: HUMAN DIGNITY VIOLATED 85, 86–88 (Paulus Kaufmann, Hannes Kuch, Christian Neuhäuser & Elaine Webster eds., 2011); Nick Haslam & Steve Loughnan, *Dehumanization and Infrahumanization*, 65 ANN. REV. PSYCH. 399, 401 (2014).

253.    *See* David Livingstone Smith, *Paradoxes of Dehumanization*, 42 SOC. THEORY & PRAC. 416, 418–19 (2016); DAVID LIVINGSTONE SMITH, LESS THAN HUMAN: WHY WE DEMEAN, ENSLAVE, AND EXTERMINATE OTHERS 28 (2011).

Specifically, the pronoun "it" is not used to describe other human beings; instead, it may be applied to the inanimate.[254] To apply the pronoun to another person is to portray them as less-than humans.

In being dehumanizing, misgendering is a precursor to and justification for injustices towards gender minorities; dehumanization, as we know, is often the lubricant for social oppression. On August 7, 1995, Tyra Hunter, a Black transgender woman, was involved in a car accident.[255] By the time Emergency Medical Service (EMS) workers arrived, bystanders had removed Hunter and another passenger from the car and laid them on the ground. As the attending EMS technician cut Hunter's pants and saw her genitals, he recoiled, exclaiming slurs in front of bystanders." He immediately stopped treating Hunter, leaving her bleeding unattended for up to five minutes.[256] For several minutes thereafter, Emergency Medical Technicians (EMTs) stood by and "laughed and joked" about Hunter's being trans, while bystanders begged them to render aid.[257] When Hunter was finally taken to the hospital an hour later, she died from blood loss.

By referring to Hunter as "it," the EMT rendered her nonhuman, such that his duty to provide care—both as a condition of his employment and his moral duty as a fellow person—was extinguished. Said another way, by describing Hunter as nonhuman, the EMT made plain that, at least to him, she was less valuable, and the urgency of caring for her diminished or extinguished completely. More pointedly: one has no duty to care for the life of the inanimate, simply because the inanimate does not have a life.[258]

From another angle, misgendering involves objectification, a distinct form of dehumanization that involves the denial of persons' humanities by treating them as instrumentalities or things.[259] This may take many different forms, but two are particularly applicable to the phenomenon of misgendering.

---

254.    JAMES C. JARRAD, THE CASE OF THE MISSING PRONOUN 27 (2012) (writing the pronoun "it" is "relegated to ideas . . . places, and things").

255.    Scott Bowles, *A Death Robbed of Dignity Mobilizes a Community*, WASH. POST (Dec. 10, 1995),            https://www.washingtonpost.com/archive/local/1995/12/10/a-death-robbed-of-dignity-mobilizes-a-community/2ca40566-9d67-47a2-80f2-e5756b2753a6/ [https://perma.cc/M7YB-MGPG].

256.    *Id.*; Sarah D. Fox, *Damages Awarded After Transsexual Woman's Death: Payout to Mother of Victim of Bigoted Emergency Workers' Negligence*, POLARE MAG., Jan. 1999, https://web.archive.org/web/20140324052938/http://www.gendercentre.org.au/resources/polare-archive/archived-articles/damages-awarded-after-transsexual-womans-death.htm.

257.    Bowles, *supra* note 255.

258.    *See* Richard Juang, *Transgendering the Politics of Recognition*, *in* THE TRANSGENDER STUDIES READER 706, 712 (Susan Stryker & Stephen Whittle eds., 2006) ("Regarded as an 'it,' Hunter is rendered socially dead, such that, lying injured on the ground, she is left to die, treated by the technicians at the scene as if she were *already* dead.") (emphasis added); Kendall Thomas, *Afterword: Are Transgender Rights* In*human Rights?*, *in* TRANSGENDER RIGHTS 310, 316 (Paisley Currah, Richard M. Juang & Shannon Price Minter eds., 2006) (describing "the condominia of racist, misogynistic, homophobic, and transphobic discourses that were at work in the deadly dehumanizing reduction of Tyra Hunter to an 'it'— to the status and condition of abject, inhuman being").

259.    *See* Lina Papadaki, *What Is Objectification?*, 7 J. MORAL PHIL. 16, 32 (2010) (defining objectification as "seeing and/or treating a person as an object . . . in such a way that denies this person's humanity").

For one, objectification may result from a denial of subjectivity. This occurs when we treat another person's subjective experiences or feelings as irrelevant.[260] When a woman is objectified through obscene catcalls or street harassment, for example, her harasser denies her subjectivity. Which is to say, her objectifier does not recognize the woman's feelings or her experience. From another view, the harasser may know the comments are unwelcome, but chooses to disempower the victim by making them anyway. The crude comments often involve an unwelcomed imposition; the harasser could have thought whatever he did, but he made the conscious choice to impose his feelings upon the victim by expressing his thoughts. [261]

Like the harasser who catcalls notwithstanding the target's fear and disgust, persons who intentionally misgender ignore gender minorities' subjectivity. As we have seen, gendered misclassifications are experienced as traumatic. To ignore this is to deny the referent or addressee's subjectivity. As one trans woman expressed, "When someone calls you 'sir' in spite of your gender presentation, it is a hostile act. . . . It is as though they are saying, 'Yes, I see that you 'think' you're a woman . . . but it is *more important* to me to express my distaste for transgender people and my indignation at having to serve or look at you.'"[262]

For two, objectification may take place through a reduction to body,[263] which is defined as "the treat[ment] [of a person] as identified with [their] body, or body parts."[264] When a woman is treated as if she is a sex object—that is, when she is evaluated by her appearance or body, rather than as a fully autonomous person and moral equal—she has been objectified. Put more plainly, persons are more than their bodies and their individual body parts. The objectifying wrong, therefore, is the act of treating another as if their body parts are representative of their personhood.[265]

---

260.    Martha C. Nussbaum, *Objectification*, 24 PHIL. & PUB. AFFS. 249, 257 (1995); *see also* Lina Papadaki, *Sexual Objectification*, *in* THE PHILOSOPHY OF SEX: CONTEMPORARY READINGS 381, 394 (Raja Halwani, Alan Soble, Sarah Hoffman & Jacob M. Held eds., 7th ed. 2017).

261.    *See* SANDRA LEE BARTKY, *On Psychological Oppression*, *in* FEMININITY AND DOMINATION: STUDIES IN THE PHENOMENOLOGY OF OPPRESSION 22, 27 (Linda J. Nicholson ed., 1990) ("[Harassers] could, after all, have enjoyed me in silence. . . . But I must be *made* to know that I am a 'nice piece of ass': I must be made to see myself as they see me."); CATHARINE A. MACKINNON, TOWARD A FEMINIST THEORY OF THE STATE 122, 140 (1989).

262.    Brief of Amicus Curiae Transgender Legal Defense and Education Fund in Support of Respondents at 18, Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n, 138 S. Ct. 1719 (2018) (No. 16-111) (emphasis added).

263.    RAE LANGTON, *Autonomy-Denial in Objectification*, *in* SEXUAL SOLIPSISM: PHILOSOPHICAL ESSAYS ON PORNOGRAPHY AND OBJECTIFICATION 223, 228–29 (2009); BARTKY, *supra* note 261, at 26.

264.    LANGTON, *supra* note 263, at 228.

265.    Barbara L. Frederickson & Toni-Ann Roberts, *Objectification Theory: Toward Understanding Women's Lived Experiences and Mental Health Risks*, 21 PSYCH. WOMEN Q. 173, 175 (1997).

Misgendering qualifies as an objectifying reduction to body.[266] It objectifies its victims by ignoring their full humanity (their personality, expression, inner life, sense of being, and choices), in view of their genitals: As one person remarked, "If someone misgenders me I feel like I've been forced to be naked and that people are making comments about my genitalia."[267] To address a trans man—a person who is, presents as, lives as, and navigates the world as, a man—with female pronouns, simply because of his reproductive organs is to objectify him. By the same token, to refer to a nonbinary person with male pronouns because of their sex organs is to reduce them to their body in an objectifying way. In either instance, the act of misgendering removes the human characteristics of the victim (i.e., his/their gender, constructed life, choices, identity, and personhood), and focuses solely on his/their body.

### 6. Gender Policing

Intentional misgendering is a technology of *gender policing*. That is to say, it is meant to reinforce a binary, discrete, stable notion of gender, and to punish and censor those who challenge it. Social hierarchies are not self-built, self-sustaining, self-enforcing, nor self-defending. To the contrary, they rely on persons with vested interests to protect them from precarity, and their stability demands constant vigilance. The socially powerful understand this and employ various interventions to neutralize threats to the castes necessary for these hierarchies to continue. Dishonorifics are among such hierarchy-protective interventions. Essentially, they are verbal barbs designed to reinforce social castes by reminding the societally disfavored of their place.

So understood, historically, the White man who called an educated Black man "boy,"[268] and the man who refused to address a woman by her preferred

---

266.    *See* Alexis Shotwell & Trevor Sangrey, *Resisting Definition: Gendering Through Interaction and Relational Selfhood*, 24 HYPATIA 56, 60 (2009) ("[F]or anti-trans thinkers, in synecdochic fashion, genitals stand in for the gender of a whole person . . . .").

267.    M. Paz Galupo, Lex Pulice-Farrow & Louis Lindley, *"Every Time I Get Gendered Male, I Feel a Pain in My Chest": Understanding the Social Context for Gender Dysphoria*, 5 STIGMA & HEALTH 199, 202 (2019).

268.    Recall the urgency with which Whites used dishonorifics against "uppity" Black persons, as captured in the following 1966 exchange relayed by a Black psychologist, Dr. Alvin Poussaint: "[A]s I was leaving my office in Jackson, Miss., . . . a [W]hite policeman yelled, 'Hey, boy! Come here!' Somewhat bothered, I retorted: 'I'm no boy!' He then rushed at me, inflamed, and stood towering over me, snorting, 'What d'ja say, boy?' Quickly he frisked me and demanded, 'What's your name, boy?' Frightened, I replied, 'Dr. Poussaint. I'm a physician.' He angrily chuckled and hissed, 'What's your first name, boy?' When I hesitated he assumed a threatening stance and clenched his fists. As my heart palpitated, I muttered in profound humiliation, 'Alvin.'" Alvin F. Poussaint, *A Negro Psychiatrist Explains the Negro Psyche*, N.Y. TIMES MAG., Aug. 20, 1967, at 52, https://www.nytimes.com/1967/08/20/archives/a-negro-psychiatrist-explains-the-negro-psyche-the-negro-psyche.html [https://perma.cc/J9SS-D79A].

        In that exchange, the White officer's use of the dishonorific "boy" was meant to remind Dr. Poussaint of his inferior status; to show him, a man who, by all metrics fit the criteria of adult

title or insisted on referring to her by her husband's last name, had similar aims. In the former, the speaker was deliberately humiliating a person whose existence threatened the principles of Black inferiority necessary to sustain Jim Crow White supremacy. In similar fashion, the latter speaker sought to neutralize a threat to patriarchy.

I want to suggest misgendering operates similarly. Today, many cisgender persons are heavily invested in the conception of binary, biologically-determined and stable gender categories and gender roles.[269] For many, gender, gender conformity, and gender immutability are valuable. Recognizing new understandings of gender, particularly those disaggregated from genitalia, and acknowledging gender-transgressive persons, threaten the value some cisgender people find in these concepts.[270]

Not surprisingly, the threat is unwelcomed. It is, as Murray S. Davis poses: "[A]nything that undermines confidence in the scheme of classification on which people base their lives sickens them as though the very ground on which they stood precipitously dropped away."[271] Naturally, the reaction to this psychic disequilibrium is negative, if not violent. Those confronted, those "for whom gender forms a cornerstone of their view of the world," viciously "defend[] the status quo of the existing gender system."[272] Thus, the gender destabilizing individual must be disciplined, either by being made to fit into standard categories through re-articulation and rationalization, or made invisible through obfuscation.[273]

All this to say that misgendering is, often explicitly, a declaration that gender is biologically determinable rather than socially constructed, and binary

---

masculinity—that is, both physically and by accomplishment–that he was still a "boy" in the eyes of White society. In this way, the dishonorific had the ability to police and regulate, what the officer no doubt considered an "uppity" Black man, whose existence threatened the principles of purported Black inferiority necessary to sustain Jim Crow White supremacy.

269.   *See* Davina Cooper & Flora Renz, *If the State Decertified Gender, What Might Happen to Its Meaning and Value?*, 43 J.L. & SOC'Y 483 (2016); Sonia K. Katyal, *The* Numerus Clausus *of Sex*, 84 U. CHI. L. REV. 389, 403 (2017); Clarke, *supra* note 13, at 945–90.

270.   *See* Karen L. Blair, *What Precisely Do Transgender People Threaten?*, PSYCH. TODAY (Sept. 24, 2018), https://www.psychologytoday.com/us/blog/inclusive-insight/201809/what-precisely-do-transgender-people-threaten [https://perma.cc/4W9Q-HSKR]; Hazeldean, *supra* note 236, at 1771; Marie-Amélie George, *Framing Trans Rights*, 114 NW. U. L. REV. 555, 599–600 (2019); Leslie Pearlman, *Transsexualism as Metaphor: The Collision of Sex and Gender*, 43 BUFF. L. REV. 835, 836 (1995).

271.   MURRAY S. DAVIS, SMUT: EROTIC REALITY/OBSCENE IDEOLOGY 93 (1983).

272.   Kate Bornstein, *Gender Terror, Gender Rage*, *in* THE TRANSGENDER STUDIES READER, *supra* note 258, at 236, 237.

273.   *See* JOHN M. SLOOP, DISCIPLINING GENDER: RHETORICS OF SEX IDENTITY IN CONTEMPORARY U.S. (2004) (describing how gender nonconformity is "disciplined back into binary norms"); JACK HALBERSTAM, FEMALE MASCULINITY 150 (1998) (misgendering as a method for "rationaliz[ing non-conforming bodies] out of existence").

rather than expansive.[274] Intentional misgendering, therefore, must be seen as the explicit refusal to recognize these order-destabilizing ways of being, and it must be seen as an effort by cisgender persons to protect that in which they have an interest.[275] It must be understood as a defense of that in which some cisgender persons find value, at the expense of limiting the freedom and liberty of gender minorities. For these reasons, trivializing intentional misgendering as "just words" is also harmful, in that it ignores the practice is a deliberate effort to break the spirits and silence those who have escaped from the societal conventions.

### 7. *Epistemic Injustice*

Misgendering produces two interconnected harms related to distortions in knowledge creation. Combined, these contribute to *epistemic injustice*. Miranda Fricker's work sorts epistemic injustice into two categories: *testimonial injustice* and *hermeneutical injustice*.[276] This Subsection documents how misgendering contributes to both.

Fricker finds testimonial injustice "occurs when prejudice causes a hearer to give a deflated level of credibility to a speaker's word."[277] Put another way, it is the harm present when a speaker's words are granted less credibility, simply on account of her identity.[278] As Fricker puts it, negative stereotypes about the speaker's socially disfavored group status impair her competence and believability in the eyes of the listener, and she is consequently placed in a credibility deficit.[279] This deficit, in turn, leads to a discounting of her testimony. In so doing, the speaker is harmed in her "capacity as a knower."[280]

Pause, for a moment, to consider the role of invidious group stereotypes in the process of reducing the speaker's credibility. As Fricker points out, "Many of the stereotypes of historically powerless groups . . . involve an association with some attribute inversely related to competence or sincerity or both: over-emotionality, illogicality, inferior intelligence, evolutionary inferiority, incontinence, lack of 'breeding', lack of moral fibre, being on the make, etc."[281] Thus understood, testimonial injustice might most obviously occur in situations

---

274.    Jessica King, *The Violence of Heteronormative Language Towards the Queer Community*, 7 AISTHESIS 17, 21 (2016) ("[Misgendering] reifies the idea that gender is fixed, immutable and decided at birth, a biological fact rather than a social construction.").

275.    *See* Sean Arayasirikul & Erin C. Wilson, *Spilling the T on Trans-Misogyny and Microaggressions: An Intersectional Oppression and Social Process Among Trans Women*, 66 J. HOMOSEXUALITY 1415, 1429 (2019) ("Misgendering as a microaggression and other forms of transphobic discrimination are ways society polices the boundaries of gender.").

276.    MIRANDA FRICKER, EPISTEMIC INJUSTICE: POWER AND THE ETHICS OF KNOWING (2007).

277.    *Id.* at 1.

278.    *Id.*

279.    *Id.* at 17–29.

280.    *Id.* at 17.

281.    *Id.* at 32.

involving identities societally associated with less credibility; examples include women,[282] racial minorities,[283] and persons who are both.[284]

To reinforce the concept, it will help to briefly assess an example of testimonial injustice in the context of sexual violence. In the typical *he-said-she-said* situation, necessarily, there must be a weighing of accounts.[285] Very often, the imputed diminished credibility of women manifests in the problematic standard questioning—"What was she wearing?" "What was she doing?" "Did she somehow cause it?" "Did she adequately resist?"—and the absence of similar interrogation of the man. This privileging of men's accounts over women's, despite the fact that the overwhelming majority of sexual violence is unreported and false accusations are few,[286] relies on stereotypical assumptions of women's veracity. It is testimonial injustice that explains the credibility deficit and widespread-yet-unwarranted skepticism of women's allegations of sexual violence.

The second form of epistemic injustice Fricker identifies, *hermeneutical injustice*, refers to "the injustice of having some significant area of one's social experience obscured from collective understanding owing to persistent and wide-ranging hermeneutical marginalization." [287] That occurs when an idea or event is rendered unintelligible by the wider society because the person who experiences it does not contribute to the collective socio-epistemic structures that create shared social meaning. [288] In other words, hermeneutical resources are the tools we use for understanding the world, such as the language, propositions, and concepts through which we interpret.[289] When identity discrimination is the reason society lacks the necessary tools for us to understand phenomena around us, that is a hermeneutical injustice. [290]

---

282.   *See* Deborah Tuerkheimer, *Beyond #MeToo*, 94 N.Y.U. L. REV. 1146, 1181 (2019) [hereinafter *Beyond #MeToo*]; Deborah Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount*, 166 U. PA. L. REV. 1, 1–2 (2017) [hereinafter *Incredible Women*].

283.   *See* Chan Tov McNamarah, *White Caller Crime: Racialized Police Communication and Existing While Black*, 24 MICH. J. RACE & L. 335, 371–74 (2019); Rebecca Tsosie, *Indigenous Peoples and Epistemic Injustice: Science, Ethics, and Human Rights*, 87 WASH. L. REV. 1133, 1152–64 (2012).

284.   *See* Kristie Dotson, *A Cautionary Tale: On Epistemic Oppression*, 33 FRONTIERS 24, 26–28 (2012) [hereinafter *Epistemic Oppression*]; Kristie Dotson, *Tracking Epistemic Violence, Tracking Practices of Silencing*, 26 HYPATIA 236, 237–42 (2011).

285.   *Incredible Women*, *supra* note 282, at 3.

286.   *See* NAT'L SEXUAL VIOLENCE RES. CTR., FALSE REPORTING: OVERVIEW 1, 3–4 (2012) (finding 63 percent of sexual assaults are never reported, while only 2 to 10 percent of reports are false).

287.   FRICKER, *supra* note 276, at 154; Miranda Fricker, *Powerlessness and Social Interpretation*, 3 EPISTEME 96, 99 (2006).

288.   *See Beyond #MeToo*, *supra* note 282, at 1181 ("Experiences not shared by the powerful find no meaningful outlet in collective notions of reality.").

289.   *Epistemic Oppression*, *supra* note 284, at 29.

290.   As final illustrations, think of a person experiencing inappropriate sexual misconduct at her job before the coinage of the term "sexual harassment" or a racial minority constantly being repeatedly pulled out of line and subjected to increased scrutiny at airports prior to the coinage of the term "racial profiling." In either case, attempts to understand and articulate the experience would prove difficult,

Again, an illustration will prove helpful. We might take the example of Fourth Amendment cases involving Black people. All too commonly, when evaluating police officers' conduct, White judges interpret officers' actions through their owned lived experience—rather than the Black defendants'.[291] In doing so, the victims' very real, very racialized, experience is ignored or even rendered unimaginable. There are at least two non-nefarious reasons for this. Because the experience of racially targeted police behavior is: (1) not shared by everyone in society, and so White judges cannot relate to it; and (2) has not yet been added to the collective hermeneutical resource, and therefore White judges cannot understand it. Simply, there is a hermeneutical chasm between White judges' and Black defendants' lived experience. Viewed thus, it is hermeneutical injustice that accounts for the late Justice Scalia's derisive biblical admonition that only "the wicked flee when no man pursueth,"[292]—in discussing Hodari D.'s choice to run from the police—ignoring completely rational reasons why Black persons would avoid the police.[293]

Misgendering involves and contributes to both forms of epistemic injustice. In the first place, it implicates testimonial injustice. As scholars have already previously described, societal narratives paint transgender persons as inauthentic and deceptive.[294] Many of these narratives carry over for other gender-expansive individuals. For instance, in litigation involving access to public facilities, persons advocating anti-gender minority positions have repeatedly made the argument that nonbinary and gender-fluid identities are deceptive claims made to wrongfully gain access to bathrooms (often, allegedly, for improper purposes).[295]

---

since the hermeneutical point of reference has not yet been established. FRICKER, *supra* note 276, at 149–52 (demonstrating hermeneutical injustice with the example of sexual harassment).

291.    *See* Roseanna Sommers & Vanessa K. Bohns, *The Voluntariness of Voluntary Consent: Consent Searches and the Psychology of Compliance*, 128 YALE L.J. 1962, 1975 (2019).

292.    California v. Hodari D., 499 U.S. 621, 623 (1991) (quoting Proverbs 28:1).

293*.    See* Tracey Maclin, *"Blacks and Blue Encounters"—Some Preliminary Thoughts About Fourth Amendment Seizures: Should Race Matter?*, 26 VAL. U. L. REV. 243, 276 (1991) (demonstrating that Justice Scalia's remark "never considers that Hodari, a [B]lack youth, may have had alternative reasons for wanting to avoid the cops").

294.    Talia Mae Bettcher, *Evil Deceivers and Make-Believers: On Transphobic Violence and the Politics of Illusion*, 22 HYPATIA 43, 43 (2007) (documenting the stereotype of trans people as "deceivers" and detailing its relationship to promoting transphobia and transphobic violence); Rachel McKinnon, *Stereotype Threat and Attributional Ambiguity for Trans Women*, 29 HYPATIA 857, 858–59 (2014).

295*.    E.g.*, Adams *ex rel* Kasper v. Sch. Bd. of St. Johns Cnty., 318 F. Supp. 3d 1293, 1303–04 (M.D. Fla. 2018) (discussing concerns of students "pretending to be gender-fluid" or "claim[ing] to be gender-fluid to gain access to the bathroom of the opposite sex"); Brief Amicus Curiae of Public Advocate of the United States et al. at 11, Kenosha Unified Sch. Dist. v. Whitaker, 138 S. Ct. 1260 (2018) (No. 17-301) (asking, rhetorically, "what is to stop a student from claiming she is 'gender fluid,' so as to allow her to use whatever restroom is located closest to a given classroom?"); Brief Amicus Curiae of Public Advocate of the United States et al. at 21–23, Gloucester Cnty. Sch. Bd. v. G.G. *ex rel* Grimm, 137 S. Ct. 1239 (2017) (No. 16-273) (arguing recognizing gender-expansive identities such as Native two-spirit, gender queer, or non-binary identities would "be a field day for pranksters").

In practice, frequently, misattributions of gender involve the deliberate exploitation of false notions of gender minorities' diminished credibility. At its core, to intentionally misgender is to accuse another person of lying (about their gender). In short, it is a claim that the misgender-er has some form of epistemic authority over the referent's body and consciousness that exceeds that of the misgendered.[296] Thus, the dismissal of persons' appropriate forms of address implicitly relies on the stereotypes of gender minorities as deceptive and feeds narratives of gender minorities' diminished authenticity.

To better see the way misgendering produces testimonial injustice, take the example of a 2017 civil suit, filed in the aftermath of the Unite the Right rally. There, Christopher Cantwell, a rally participant sued Emily Gorcenski for malicious prosecution when she served as a witness against him for charges related to his conduct at the rally. Throughout the malicious prosecution suit, Cantwell's attorney misgendered Gorcenski with male pronouns and honorifics and deadnamed her. In response to Gorcenski's motion to recaption the case to reflect her current name, Cantwell's attorney, filed a motion including the following:

> Despite his [*sic*] best efforts to the contrary, Gorcenski is not in fact a female human being, having been born with and retaining the XY chromosome . . . . Gorcenski's presenting himself [*sic*] as female is untruthful, mendacious, and deceptive. He [*sic*] is free to suffer the consequences of his [*sic*] decision, but has no right to force others to condone his [*sic*] lie. He [*sic*] further has no right to ask a court of law to condone his [*sic*] lie, nor to ask that court to force others to condone it. The United States District Court exists to determine the truth, not to condone falsehoods nor encourage or force others to do so. A United States District Court Judge is not a "transmagistrate;" the magistrate judge is not a "transjudge" any more than counsel for Plaintiff is "transthin," "transyoung, or trans-not-balding." Convicted criminals are not "translawful." Cars with rolled back odometers are not "transmileage;" and perjury is not "transtruth,['] except to used car salesmen and perjurors [*sic*]. This motion should not be transdenied, but rather granted.[297]

Here, the attorney's vastly inappropriate responsive motion makes the testimonial injustice obvious. The motion misgenders Gorcenski and, at the same time, offers the justification that to address Gorcenski appropriately is to "lie" or "condone falsehoods." Gorceski's first-person authority, that is, her rightful claim of being an expert on herself, is wrongfully ignored.[298] This is Woodward

296.   *See* MJ Eckhouse, *He Identifies as a Journalist: Language's Importance in Discussing Trans People*, FUSION, Spring 2017, at 13, 14 (stating misgendering tells gender minorities "I know your body better than you do").

297.   Motion for Enlargement of Time at 2–3, Cantwell v. Gorcenski, No. 17-cv-00089 (W.D. Va. Feb. 27, 2018).

298.   *See* Talia Mae Bettcher, *Trans Identities and First-Person Authority*, *in* "YOU'VE CHANGED": SEX REASSIGNMENT AND PERSONAL IDENTITY 98, 101–03 (Laurie J. Shrage ed., 2009).

stating, quite explicitly, that his account of Gorcenski's gender and name are more credible than her own. How could this be? Indisputably, it is Gorcenski, more so than Woodward—or anyone else for that matter—who has the most knowledge of her gender.[299] Thus, Woodward's misgendering constitutes testimonial injustice since Gorceski's account of herself was inappropriately undervalued because of her gender.[300]

Misgendering also involves hermeneutical injustice, because it is both the result of, and furthers, gender minorities' restricted contribution to the collective structures that create shared social meaning.[301] On a most basic level, misgendering is the result of gender minorities' exclusion from the resources with which we interpret our lives. Hermeneutical marginalization is precisely why some cisgender people cannot understand or appreciate gender minorities' descriptions of their gender.[302] Being silenced is why, rather than viewing a trans woman as a woman, some cisfolk see her "experience through a framework that positions her as 'a man living as a woman,'" which "is to simply fail to adequately represent her experience at all."[303]

But also, misgendering furthers gender minorities' hermeneutical disadvantage. To willfully mislabel someone is to deny them the opportunity to express and develop their own terms.[304] This view of hermeneutical injustice seems particularly applicable to the resistance to neopronouns. Imagine Alejandra, who is nonbinary, uses ze/zir/zirs pronouns. For another person, Johnathan, to dismiss these pronouns as "made up," and to insist on addressing Alejandra by she/her/hers pronouns, is for Johnathan to contribute Alejandra's continued hermeneutical marginalization. Johnathan has refused to recognize the validity of the conceptual tools Alexandra uses to make sense of zir reality.[305] And, by refusing to engage with or use neopronouns, Johnathan is (willfully) stymying the process of the acceptance, use, and proliferation of neopronouns,

---

299.   *See* Mathew J. Cull, *Epistemic Injustice and Trans Lives*, *in* TRANS BODIES, TRANS SELVES (2d ed. forthcoming 2021) ("Trans people are the authorities on our own gender—we're the experts! Experts, moreover, should (in their area of expertise) be granted a high level of credibility; people should generally believe what they say. Yet trans people are often not afforded the high level of credibility we deserve when we assert our identities—our self-identifications are disbelieved, and we are misgendered.").

300.   Interview with Emily Gorcenski (September 9, 2020).

301.   *See* Stephanie Julia Kapusta, *Misgendering and Its Moral Contestability*, 31 HYPATIA 502, 504 (2016) ("By being persistently classified as a 'man' according to particular conceptions and descriptions, a transgender woman is denied participation in shaping those descriptions herself").

302.   *See* Quinn McGlade-Ferentzy, Heterosexist Suspicion of a Queer Outsider 93 (Jan. 2020) (M.A. thesis, University of Guelph) (on file with author).

303.   Talia Mae Bettcher, *Trans 101*, *in* THE PHILOSOPHY OF SEX: CONTEMPORARY READINGS 124 (Nicholas Power, Raja Halwani & Alan Soble eds., 6th ed. 2013).

304.   Kapusta, *supra* note 301, at 504–05.

305.   *See* Freeman & Stewart, *supra* note 203, at 22–24 (linking this point to misgendering's epistemical harms).

and in so doing, limits nonbinary persons' ability to contribute to our collective hermeneutical resource.[306]

The consequences of exclusion from shared social meaning also extend beyond persons who are deliberately misgendered. Imagine another person, Xena, is prevented from knowing and understanding zir true gender and the associated pronouns because Johnathan and people like him prevented the adoption of Alejandra's neopronouns. Thus, Xena is also disadvantaged; Xena never received access to the understanding and shared vocabulary and meaning necessary to articulate zir experiences.[307]

In sum, misgendering is harmful for producing epistemic injustice along two axes. It causes testimonial injustice because it feeds off and contributes to narratives about gender minorities' diminished credibility and because it wrongfully discredits gender minorities' accounts of their gender. At the same time, it causes hermeneutical injustice by furthering the exclusion of gender minorities from the structures that create shared social meaning.

### 8. *Diminution of Autonomy*

Misgendering infringes and curtails the autonomy of gender minorities. To speak of autonomy is to state both that a person has the capacity to make their own decisions and that they live under conditions that allow their life to remain their own as well.[308] In the simplest terms, the autonomous person is the "author of [their] own life."[309]

One dimension of this self-determination is one's gender and gender expression.[310] We must come to understand that living openly in a manner consistent with one's gender (including through the use of pronouns and gendered language) is an assertion of autonomy. These are radical decisions of self-authorship and self-definition: these are actions by gender minorities intentionally chosen to shape and define their lives, as opposed to accepting the

---

306.    *See* Guro Parr Klyve, *Whose Knowledge? Epistemic Injustice and Challenges in Attending to Children's Voices*, 19 VOICES 1, 8 (2019); Amy Garlesky, On the Objectionable Nature of Binaristic Gender Pronouns 23 (2019) (unpublished manuscript) (on file with author).

307.    *See* Cull, *supra* note 299.

308.    Benjamin Eidelson, *Treating People as Individuals*, *in* PHILOSOPHICAL FOUNDATIONS OF DISCRIMINATION LAW 203, 212–13 (Deborah Hellman & Sophia Moreau eds., 2013).

309.    JOSEPH RAZ, THE MORALITY OF FREEDOM 369 (1986).

310*.    See* Lal Zimman, *Trans Self-Identification and the Language of Neoliberal Selfhood: Agency, Power, and the Limits of Monologic Discourse*, INT'L J. SOCIO. LANGUAGE, Feb. 2019, at 147, 147 (2016) (describing the principle as "gender self-determination"); Brian T. Ruocco, Comment, *Our Antitotalitarian Constitution and the Right to Identity*, 165 U. PENN. L. REV. 193, 197 (2016) (describing this as the "right to identity"); Kate Reineck, Note, *Running from the Gender Police: Reconceptualizing Gender to Ensure Protection for Non-Binary People*, 24 MICH. J. GENDER & L. 265, 266 (2017) (describing it as the right to "gender self-identification").

definitions imposed upon them by others.[311] In short, they are expressions of gender autonomy.[312]

Seen in this light, misgendering can be understood to infringe gender autonomy in both direct and indirect ways. Directly, both negligent and intentional misgendering ignore the autonomous choices gender minorities have made regarding how to live their lives.[313] Negligent misgendering normally relies on stereotypes that link appearance and gender; because someone appears male, the speaker assumes they use male pronouns. But this judgment fails to properly weigh the evidence of the person's self-authoring choices.[314] In that split-second decision, the speaker fails to pay attention to the person that the subject has made themself.

Intentional misgendering similarly impairs autonomy. Deliberate misattributions of gender, as we have seen, are a concentrated effort to impose an incorrect definition.[315] They aim, primarily, at "frustrat[ing] an individual's success in externalizing their self-identity, making it more difficult for them to come to occupy the social position associated with that identity."[316] Intentional misgendering therefore rejects, and is intended to reject, the gender minority's agency in deciding how they live their lives.[317] On this reasoning too, we must understand that misgendering restricts autonomy.

Indirectly, misgendering is an oppressive external condition that may stymie individual autonomy. To appreciate this, note again that autonomy requires more than the capacity to make one's own decisions. It also requires the necessary external conditions to make these self-defining choices. Severely

---

311. *See* Robin Dembroff & Catharine Saint-Croix, *'Yep, I'm Gay': Understanding Agential Identity*, 6 ERGO 571, 587 (2019).

312. In prescient work, Jillian T. Weiss has introduced the concept of gender autonomy, which she defines as "the right of self-determination of one's gender, free from state control, and the right to self-identify as that gender, free from state contradiction." Jillian T. Weiss, *Gender Autonomy, Transgender Identity and Substantive Due Process: Finding a Rational Basis for* Lawrence v. Texas, 5 J. RACE, GENDER, & ETHNICITY 2, 6–7 (2010); *see also* Jillian Todd Weiss, *The Gender Caste System: Identity, Privacy, and Heteronormativity*, 10 LAW & SEXUALITY 123, 153–54 (2001) (proposing the concept).

313. *See* MIA FISCHER, TERRORIZING GENDER: TRANSGENDER VISIBILITY AND THE SURVEILLANCE PRACTICES OF THE U.S. SECURITY STATE 94 (2019) (linking misgendering to a denial of the right to self-determination).

314. *See* Eidelson, *supra* note 308, at 1607 (arguing recognizing autonomy "requires paying attention to relevant evidence of her self-defining choices").

315. *See* Joli St. Patrick, *What You're Really Saying When You Misgender*, THE BODY IS NOT AN APOLOGY (May 26, 2017), https://thebodyisnotanapology.com/magazine/what-youre-really-saying-when-you-misgender/ [https://perma.cc/4UTH-U3JJ] ("[When I am misgendered,] I am suddenly reminded, as if the world would ever let me forget, of just how little my personal autonomy is worth, of just how easily and ubiquitously my right to self-determine and self-identify will be undermined as I move through life.").

316. Dembroff & Saint-Croix, *supra* note 311, at 585.

317. Davis & McCready, *supra* note 169, at 13 ("When misgendering is deliberate, the speaker *intends* to indicate his rejection of the misgendered individual's gender identity; this is a denial of an important aspect of that person's self-conception, and indeed a rejection of their self-determination."); Garlesky, *supra* note 306, at 3–4, 16–17.

oppressive or constraining social conditions, therefore, operate to limit the capacity for autonomy.[318]

Exposure to a constant barrage of external messages deeming one inferior erodes internal trust and self-worth and, consequently, decreases the likelihood of autonomous expression.[319] Self-trust and self-respect are integral conditions for expressions of autonomy; one cannot make or implement self-authoring decisions without trusting oneself.[320]

Understood thusly, we can see how the consistent misclassifications of gender minorities function to diminish their self-respect and autonomy.[321] Talia Mae Bettcher reminds us, "To be regarded as 'really a man' at every turn can undermine a trans women's sense of worth as an agent attempting to set forth her conception of what it is to live her life on her own terms, as a woman."[322] By eroding gender minorities' self-respect and self-worth, therefore, misgendering can also indirectly abridge autonomy.

### 9.  *Gender Sadism*

Intentional misgendering often involves misgender-ers deriving pleasure, satiation, or feelings of superiority. There is a word for such fulfillment gained from the pain of others; that word is "sadism." As it relates here, gender sadism is the enjoyment, pleasure, satisfaction, or feeling of superiority derived from denying the social equality of gender minorities through deliberately misgendering them.

To better see how sadism is bound up in deliberate misgendering, it will be helpful to consider sadism's relationship to dishonorifics more broadly. Return to the earlier explication of the inequality that Jim Crow laws imposed on Black people. In addition to material inequality, Jim Crow used social practices, including dishonorifics, to create racial inequality. Tellingly, no one would suggest that White persons' use of dishonorifics conferred any tangible benefit. Put more roughly, White persons gained nothing tangible from pettily refusing to address Black people with honorifics or titles or depersonalizing Black persons by addressing them by generics like "boy" or "girl."

Still, there must have been something to gain. Otherwise, we might assume these practices would not have existed. When these social and symbolic forms

---

318.   *E.g.*, Paul Benson, *Autonomy and Oppressive Socialization*, 17 Soc. Theory & Prac. 385, 385 (1991) (demonstrating how oppressive socialization can infringe autonomy); *see also* Paul Benson, *Free Agency and Self-Worth*, 91 J. Phil. 650, 650 (1994) (claiming "free agents must have a certain sense of their own worthiness to act").

319.   Trudy Govier, *Self-Trust, Autonomy, and Self*-Esteem, 8 Hypatia 99, 111–12 (1993).

320.   *Id.*; Thomas Nys, *Autonomy, Trust, and Respect*, 41 J. Med. & Phil. 10, 12 (2016).

321.   Stephanie Kapusta has stated, for instance, that "[b]ecause a person's gender identity can be part of her life struggle, and one of the most central values of who she is, misgendering—especially when persistent--can lead to an erosion of a transgender person's plans to lead the life she wishes to lead, indeed, to an erosion of pursuing any of her own plans for life." Kapusta, *supra* note 301, at 505.

322.   Bettcher, *supra* note 303, at 124.

of violence are included alongside overt racial violence and terror, the benefit, I think, must be psychic.[323] Which is to say, there must have been some psychological gratification gained from verbally inflicting pain upon, being cruel to, disrespecting, antagonizing, frustrating, or otherwise inconveniencing Black people—no matter how trivial or spectacular the pain, suffering, cruelty, disrespect, antagonism, or frustration.[324]

The point holds when we reflect on women's experiences. By taking a fresh look at examples of men deliberately misaddressing women, we can easily see elements of sadism. A male employee who steadfastly refuses to address his female colleague with her professional title gains nothing tangible. His job performance and role remain the same, and he is no better at his job for having disrespected his colleague. The conclusion is that this misogynistic disrespect is, I think, sadistic.[325] The same is true of the person who intentionally mispronounces the ethnically-marked name of another or the person who uses male pronouns or names when referring to a lesbian woman.

Against this, there is ample reason to believe that, today, there are persons who find sadistic satiation in being verbally cruel towards gender minorities.[326] To be sure, the conclusion that intentional misgendering involves sadism may strike some as an overreach. Assuredly, however, it is not. Think of the media's misgendering of Chelsea Manning, when she initially announced she was trans

---

323.    For support for the theory that social practices meant to signify Black people's purported inferiority is tied to White social sadism, see JOHN DOLLARD, CASTE AND CLASS IN A SOUTHERN TOWN 181 (Doubleday Anchor Books 1988) (1937) ("[S]lurs gave a] sadistic satisfaction to the user. In establishing the other person as inferior the user comments at the same time on his own superior position."); *see also* Anthony Paul Farley, *Sadomasochism and the Colorline: Reflections on the Million Man March, in* BLACK MEN ON RACE, GENDER, AND SEXUALITY: A CRITICAL READER 68, 71 (Devon W. Carbado ed., 1999). This is at least, I think, part of the "public and psychological wage" of Whiteness as described by W.E.B. Du Bois. *See* W.E.B. DU BOIS, BLACK RECONSTRUCTION IN AMERICA 700 (1935).

324.    *Cf.* THE DERRICK BELL READER 337 (Richard Delgado & Jean Stefancic eds., 2005) ( "Some [W]hite behavior towards [B]lacks seems to have little rhyme or reason, serving neither to advance [W]hite economic self-interest nor to solidify some [W]hite privilege, but rather to evince simple meanness."); THEODORE ROSENGARTEN, ALL GOD'S DANGERS: THE LIFE OF NATE SHAW 36 (1974) (describing, during Jim Crow, White attitudes as "[a]ny way they could deprive a Negro was a celebration to em").

325.    *Cf.* Tiffany D. Russell & Alan R. King, *Anxious, Hostile, and Sadistic: Maternal Attachment and Everyday Sadism Predict Hostile Masculine Beliefs and Male Sexual Violence*, 99 PERSONALITY & INDIVIDUAL DIFFERENCES 340 (2016) (linking everyday sexism to toxic hypermasculine views). *See generally* KATE MANNE, DOWN GIRL: THE LOGIC OF MISOGYNY (2018) (exploring misogyny as a technique of controlling women and reinforcing male dominance).

326.    As jarring as the thought may be, recent social science finds sadistic personality features are alarmingly common. *E.g.*, Erin E. Buckels, Daniel H. Jones & Delroy L. Paulhus, *Behavioral Confirmation of Everyday Sadism*, 24 PSYCH. SCI. 2201 (2013) (documenting "everyday sadism"); Jan Hoffman, *'Everyday Sadists' Among Us*, N.Y. TIMES (Sept. 16, 2013), https://well.blogs.nytimes.com/2013/09/16/everyday-sadists-among-us/ [https://perma.cc/9MDY-N2A6].

in 2013.[327] In one broadcast, Fox News went as far as to play Aerosmith's song "Dude (Looks Like a Lady)," while juxtaposing photographs of Manning, pre-transition in military uniform and post-transition.[328] Clearly, the entire segment was meant to be a cinematic production with Manning as the punchline. In other media outlets, commentators joked Manning would get "'good practice' being a female in prison."[329] Again, the punchline being Manning's harm. Obviously, none of this was necessary. So why do it? Why go to such lengths to debase and be deliberately cruel?

   To further see this point, consider a 2019 viral video of Tiffany Moore reacting angrily about being misgendered.[330] In the video, Moore can be seen yelling and cursing at a store employee. In a follow up interview, Moore relayed she lost her composure after the cashier repeatedly called her "Sir" "five or six times."[331] Public reactions to the video cut to the heart of the perverse enjoyment I have described: Social media users shared the clip with comments and captions such as "What happens when you 'misgender' someone . . ." "Macho Ma'am Tranny Savage," "He-Ma'am," "That was quite a testosterone fueled rage!" among others.[332] The ordeal went on to launch a stream of internet memes similarly mocking Moore.[333]

---

327.   For extensive analysis of the misgendering of Manning, see Jamie C. Capuzza, *What's in a Name? Transgender Identity, Metareporting and the Misgendering of Chelsea Manning*, *in* TRANSGENDER COMMUNICATION STUDIES: HISTORIES, TRENDS, AND TRAJECTORIES 93, 93–111 (Leland G. Spencer & Jamie C. Capuzza eds., 2015); Dana L. Cloud, *Private Manning and the Chamber of Secrets*, 1 QED 80, 80 (2014).

328.   FISCHER, *supra* note 313, at 44.

329.   Jase Peeples, *CNN Commentator: Chelsea Manning Will Get 'Good Practice' Being Female in Prison*, ADVOCATE (Aug. 27, 2013), https://www.advocate.com/politics/transgender/2013/08/27/cnn-commentator-chelsea-manning-will-get-good-practice-being-female [https://perma.cc/S4YQ-SM83].

330.   Kai Porter, *Trans Woman in Viral Video Claims Mistreatment at Albuquerque Store*, KOB4 (Jan. 16, 2019), http://web.archive.org/web/20201108003515/https://www.kob.com/albuquerque-news/as-video-goes-viral-transgender-woman-claims-mistreatment-at-albuquerque-store/5208766/?cat=500.

331.   *Id.*

332.   Alex Bollinger, *Trans Woman Mocked for Angry Outburst in Store After Being Misgendered Speaks Out*, LGBTQNATION (Jan. 17, 2019), https://www.lgbtqnation.com/2019/01/trans-woman-mocked-angry-outburst-store-misgendered-speaks/ [https://perma.cc/L7RT-G58E]; Alex Bollinger, *Conservatives Viciously Mock a Trans Woman Who Was Misgendered on Video*, LGBTQNATION (Dec. 31, 2018), https://www.lgbtqnation.com/2018/12/conservatives-viciously-mock-trans-woman-misgendered-video/ [https://perma.cc/S3WN-TVSC]; Maggie Parker, *Trans Woman Explains Why She Cursed at GameStop Cashier in Viral Video: 'It Was Blatant and Malicious Hate*,' YAHOO (Jan. 15, 2019), https://www.yahoo.com/now/trans-woman-explains-cursed-gamestop-cashier-viral-video-blatant-malicious-hate-162919129.html?guccounter=1 [https://perma.cc/AFR9-YQDL].

333.   *It's Ma'am*, KNOW YOUR MEME, https://knowyourmeme.com/memes/its-maam [https://perma.cc/MH8P-N7VS]; *Macho Ma'am Memes*, PINTEREST, https://www.pinterest.com/lvlakota777/macho-maam-memes/ [https://perma.cc/5JPF-35MB].

These examples, along with the host of other jokes, comedic material, and memes making light of misgendering,[334] indicate a market for enjoyment derived from witnessing gender minorities' obvious distress: a libidinal economy of persons producing, trading in, profiting from, and consuming some psychic value found in the terror, discomfort, and pain gender minorities feel when they are misgendered.

Involvement in gender sadism is not unharmful. In addition to the direct burdens gender-diverse persons must bear as the targets of misgendering, there are real affective, psychological, moral, and spiritual costs borne by those engaged in gender sadism. Indeed, studies find participation in sadistic acts ultimately causes perpetrators emotional pain and increased negative affect.[335] This is not surprising. Involvement in any form of oppression injures both the oppressed and the oppressing.[336] Just as participation in anti-Black racial sadism harms Whites, participation in misogyny harms men, and homophobia harms heterosexuals, so too does the involvement in gender sadism injure cisgender persons.[337] For this reason, as well—the affective, psychological, moral, and spiritual injuries borne by persons who derive enjoyment, pleasure, satisfaction, or feeling of superiority through verbally humiliating gender-diverse persons—misgendering is harmful.

### 10.  Measurable Psychological and Physiological Injuries

Given the other harms listed above, unsurprisingly, misgendering imposes a host of psychological and physiological injuries. Studies find that the use of the incorrect pronoun, name, or gendered title are experienced as microaggressions—"subtle forms of discrimination that communicate hostile or

---

334.    *See, e.g.*, Amrou Al-Kadhi, *Why I'm Not Surprised That Straight White Man Louis CK Is Mocking Young Non-Binary People Like Me*, INDEPENDENT (Dec. 31, 2018), https://www.independent.co.uk/voices/louis-ck-non-binary-gender-pronouns-parkland-shooting-a8705776.html [https://perma.cc/9BC9-S67B].

335.    *See* David S. Chester, C. Nathan DeWall & Brian Enjaian, *Sadism and Aggressive Behavior: Inflicting Pain to Feel Pleasure*, 45 PERSONALITY & SOC. PSYCH. BULL. 1252, 1264 (2019) (finding greater negative affect after sadistic acts).

336.    *See* PAULO FREIRE, PEDAGOGY OF THE OPPRESSED 56 (Myra Bergman Ramos trans., 2005) ("As oppressors dehumanize others and violate their rights, they themselves also become dehumanized."); NELSON MANDELA, A LONG WALK TO FREEDOM 544 (1994) ("The oppressed and the oppressor alike are robbed of their humanity.")

337.    *See, e.g.*, DERALD WING SUE, MICROAGGRESSIONS IN EVERYDAY LIFE: RACE, GENDER, AND SEXUAL ORIENTATION 128–32 (2010) (documenting the cognitive, affective, behavioral, spiritual and moral harms of racist, sexist, and heterosexist oppression to perpetrators); DIANE J. GOODMAN, PROMOTING DIVERSITY AND SOCIAL JUSTICE: EDUCATING PEOPLE FROM PRIVILEGED GROUPS 103–24 (2011) (detailing the psychological, social, moral, intellectual, and material costs of oppression on persons from dominant groups).

derogatory messages particularly to and about members of marginalized groups."[338]

This causes both instantaneous and accumulating harm. In the moment, misgendering induces anxiety. When they are misgendered, gender minorities report mentally calculating whether the misattribution was done intentionally or accidentally. They must further question whether to correct the speaker or not, whether the speaker's misattribution has placed them in danger, and what the speaker's misspeaking says about their gender presentation.[339] Then, even when the episode is over, gender minorities replay and reanalyze misgendering language, causing further harm.

The additive effects of these episodes are worse. Considered cumulatively, microaggressions have severe effects on targets' mental and physical health. In the long term, gender minorities experience misgendering as extremely stigmatizing and psychologically and emotionally distressing.[340] Gender misclassifications are also associated with lower self-esteem and increased negative views of self.[341] The clear psychologically detrimental impact of gender misattributions is underscored by studies finding that, among gender minorities, increased exposure to misgendering is associated with significantly increased

338.   Arayasirikul & Wilson, *supra* note 275, at 1417; *see also* Peggy C. Davis, *Law as Microaggression*, 98 YALE L.J. 1559, 1560 (1989) (describing microaggressions as "incessant, often gratuitous and subtle offenses").

339.   *See* St. Patrick, *supra* note 315 (describing misgendering as a "split-second mixture of anxiety and helplessness and fury and shame and dread and resignation"); Riley Black, *No, I Don't Have Patience for Your Misgendering*, MEDIUM (Apr. 3, 2020), https://aninjusticemag.com/no-i-dont-have-patience-for-your-misgendering-ec72d795baf5 [https://perma.cc/8WU8-DPZB] (saying she does a "quick calculation" when misgendered); Gapin, *supra* note 190 (stating misgendering triggers gender evaluation).

340.   *E.g.*, Kevin L. Nadal, Kristin C. Davidoff, Lindsey S. Davis & Yinglee Wong, *Emotional, Behavioral, and Cognitive Reactions to Microaggressions: Transgender Perspectives*, 1 PSYCH. SEXUAL ORIENTATION & GENDER DIVERSITY 72, 76–78 (2014) (finding misgendering causes distress and exhaustion among transfolk); Kevin L. Nadal, Avy Skolnik & Yinglee Wong, *Interpersonal and Systemic Microaggressions Toward Transgender People: Implications for Counseling*, 6 J. LGBT ISSUES COUNS. 55, 76 (finding that incorrect gender terminology "may take a toll on the[] physical and psychological well-beings" of transfolk); Brian A. Rood, Sari L. Reisner, Francisco I. Surace, Jae A. Puckett, Meredith R. Maroney & David W. Pantalone, *Expecting Rejection: Understanding the Minority Stress Experiences of Transgender and Gender-Nonconforming Individuals*, 1 TRANSGENDER HEALTH 151, 160–61 (2016) (finding feelings of exhaustion, depression, and anxiety among gender minorities who have their identities rejected); Lex Pulice-Farrow, Tabria D. Brown & M. Paz Galupo, *Transgender Microaggressions in the Context of Romantic Relationships*, 4 PSYCH. SEXUAL ORIENTATION & GENDER DIVERSITY 362, 367–68 (2017) (linking misgendering and psychological discomfort and anxiety)*; see also* Fung, *supra* note 174, at 15, 40 (finding misgendering stigmatizing among trans and nonbinary persons); Hampton v. Baldwin, 2018 U.S. Dist. LEXIS 190682 at *7 (S.D. Ill. Nov. 7, 2018) (citing medical testimony that "misgendering . . . can be degrading, humiliating, invalidating, and mentally devastating").

341.   Kevin A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 STIGMA & HEALTH 53, 58 (2018); Kevin A. McLemore, *Experiences with Misgendering: Identity Misclassification of Transgender Spectrum Individuals*, 14 SELF & IDENTITY 51, 53 (2015).

feelings of hopelessness, apathy, depressive symptomology, and suicidal ideation.[342]

Misgendering is further psychologically harmful because it invalidates gender minorities' identities and triggers emotional harms related to the undermining of their self-perception. Individuals need their private experiences to be validated or otherwise "met with understanding, legitimacy, and acceptance . . . "[343] On the contrary, invalidation—the process of having internal experiences trivialized or disregarded—is often traumatic and isolating.[344] Across a swath of contexts, psychologists find the invalidation may lead to and amplify emotional distress,[345] depression,[346] and PTSD,[347] as well as confusion and questioning of one's internal feelings and sense of self.[348] Consistent

---

342.   *See, e.g.*, Nicholas J. Parr & Bethany Grace Howe, *Heterogeneity of Transgender Identity Nonaffirmation Microaggressions and Their Association with Depression Symptoms and Suicidality Among Transgender Persons*, 6 PSYCH. SEXUAL ORIENTATION & GENDER DIVERSITY 461 (2019).

343.   Chad E. Shenk & Alan E. Fruzzetti, *The Impact of Validating and Invalidating Responses on Emotional Reactivity*, 30 J. SOC. & CLINICAL PSYCH. 163, 165 (2011); MARSHA M. LINEHAN, COGNITIVE-BEHAVIORAL TREATMENT OF BORDERLINE PERSONALITY DISORDER 222–23 (1993) (defining validation as communicating that another's "response[s] make sense and are understandable," taking another's responses "seriously" and not "discount[ing] or trivializ[ing] them"); Kelly Koerner & Marsha M. Linehan, *Validation Principles and Strategies*, *in* COGNITIVE BEHAVIOR THERAPY: APPLYING EMPIRICALLY SUPPORTED TECHNIQUES TO YOUR PRACTICE 456 (William O'Donohue, Jane E. Fisher & Steven C. Hayes eds., 2003) ("To validate means to confirm, authenticate, corroborate, substantiate, ratify, or verify.").

344.   *See* Ronald C. Naso, *Rethinking Trauma: A Critical View of Invalidation*, 25 PSYCHOANALYTIC PSYCH. 67, 71 (2008) (describing invalidation as "traumatogenic").

345.   *E.g.*, Elizabeth D. Krause, Tamar Mendelson & Thomas R. Lynch, *Childhood Emotional Invalidation and Adult Psychological Distress: The Mediating Role of Emotional Inhibition*, 27 CHILD ABUSE & NEGLECT 199, 209–10 (2003) (finding emotional invalidation leads to emotional suppression and psychological distress in adulthood); John W. Burns, Kristina M. Post, David A. Smith, Laura S. Porter, Asokumar Buvanendran, Anne Marie Fras & Francis J. Keefe, *Spouse and Patient Beliefs and Perceptions About Chronic Pain: Effects on Couple Interactions and Patient Pain Behavior*, 20 J. PAIN 1176 (2019) (finding invalidation increased emotional distress).

346.   *See, e.g.*, Laura E. M. Leong, Annmarie Cano & Ayna B. Johansen, *Sequential and Base Rate Analysis of Emotional Validation and Invalidation in Chronic Pain Couples: Patient Gender Matters*, 12 J. PAIN 1140 (2011); Marie B. H. Yap, Nicholas B. Allen & Cecile D. Ladouceur, *Maternal Socialization of Positive Affect: The Impact of Invalidation on Adolescent Emotional Regulation and Depressive Symptomatology*, 79 CHILD DEV. 1415 (2008) (finding that adolescents who faced invalidation saw increased symptoms of depression).

347.   *E.g.*, Phan Y. Hong & David A. Lishner, *General Invalidation and Trauma-Specific Invalidation as Predictors of Personality and Subclinical Psychopathology*, 89 PERSONALITY & INDIVIDUAL DIFFERENCES 211, 215 (2016) (finding invalidation predicted anxiety, depression, and PTSD).

348.   *E.g.*, Melinda Nicola, Helen Correia, Graeme Ditchburn & Peter Drummond, *Invalidation of Chronic Pain: A Thematic Analysis of Pain Narratives*, 43 DISABILITY & REHAB. 861, 861 (2021); Danielle M. Weber & Nathaniel R. Herr, *The Messenger Matters: Invalidating Remarks from Men Provoke a More Negative Emotional Reaction than Do Remarks from Women*, 122 PSYCH. REPS. 180, 193–94 (2019).

invalidation, therefore, is widely considered a form of emotional and psychological abuse.[349]

With respect to identity, invalidation can be particularly harmful. Identity development is a two-part process. First, one internally self-defines, and second, others externally either affirm or deny the self-definitions.[350] These denials may occur through explicit rejection or denial ("You say you are X but you *are not X*"), assumption and ascription ("You *are* X"), or through imposition ("Even though you claim to be X, you are *actually* Y").[351] In turn, where external responses create distance between self- and societal understandings, or challenge internal senses of self, individuals experience those responses as hostile and disconcerting.[352]

To fully see these harms, consider the case of multiracial individuals whose racial identities may not be readily perceived by others. Frequently, these persons face identity invalidation when others either reject their self-selected identities or impose a racial identity.[353] A chronic stressor, when multiracial individuals have their racial identity invalidated, they face increased psychological distress and suicidal ideation,[354] increased feelings of isolation and confusion,[355]

---

349. *See, e.g.*, Amy W. Wagner & Marsha M. Linehan, *Applications of Dialectical Behavior Therapy to Posttraumatic Stress Disorder and Related Problems*, *in* COGNITIVE-BEHAVIORAL THERAPIES FOR TRAUMA 117, 119 (Victoria M. Follette & Josef I. Ruzek eds., 2007); Leslie A. Sackett & Daniel G. Saunders, *The Impact of Different Forms of Psychological Abuse on Battered Women*, 14 VIOLENCE & VICTIMS 1 (1999); MARIE-FRANCE HIRIGOYEN, STALKING THE SOUL: EMOTIONAL ABUSE AND THE EROSION OF IDENTITY 63–64 (1998).

350. *See* Nikki Khanna, *"If You're Half Black, You're Just Black": Reflected Appraisals and the Persistence of the One-Drop Rule*, 51 SOCIO. Q. 96, 101 (2010) ("[S]elf-concepts are formed as reflections of the responses and evaluations of others in the environment."); Sarah S.M. Townsend, Hazel R. Markus & Hilary B. Bergsieker, *My Choice, Your Categories: The Denial of Multiracial Identities*, 65 J. SOC. ISSUES 185, 201 (2009) ("[A]ll individuals must negotiate their identities within their social environments. An identity, then, is not just a personal or private project; it is a group project. It includes how individuals identify themselves, but also how others in their social worlds identify them."). *See also* Richard B. Felson, *Social Sources of Information in the Development of Self*, 22 SOCIO. Q. 69, 79 (1981) ("[S]elf perception does not occur in a social vacuum . . . .").

351. Marisa G. Franco & Karen M. O'Brien, *Racial Identity Invalidation with Multiracial Individuals: An Instrument Development Study*, 24 CULTURAL DIVERSITY & ETHNIC MINORITY PSYCH. 112, 112 (2018).

352. *Id.* at 113.

353. Samuel D. Museus, Susan A. Lambe Sariñana, April L. Yee & Thomas E. Robinson, *A Qualitative Analysis of Multiracial Students' Experiences with Prejudice and Discrimination in College*, 57 J. COLLEGE STUDENT DEV. 680 (2016).

354. *E.g.*, Kerry Ann Rockquemore & Tracey A. Laszloffy, *Multiple Realities: A Relational Narrative Approach in Therapy with Black-White Mixed-Race Clients*, 52 FAM. RELS. 119, 119 (2003); *cf.* Whitney N. Laster Pirtle & Tony N. Brown, *Inconsistency Within Expressed and Observed Racial Identifications: Implications for Mental Health Status*, 59 SOCIO. PERSP. 582, 596–97 (2016) (finding racial identity misclassification increased depressive symptoms and suicidal ideation); Mary E. Campbell & Lisa Troyer, *The Implications of Racial Misclassification by Observers*, 72 AM. SOCIO. REV. 750, 758–61 (2007) (same).

355. *See, e.g.*, Marisa G. Franco, Rahel Katz & Karen M. O'Brien, *Forbidden Identities: A Qualitative Examination of Racial Identity Invalidation for Black/White Biracial Individuals*, 50 INT'L

decreased senses of self-esteem and self-perception,[356] and a sense of threatened identity.[357] In view of these findings, it is not difficult to see how misgendering inflicts the psychological harms related to identity invalidation.[358]

Finally, for gender minorities who experience gender-related dysphoria, a condition of clinically significant distress or discomfort resulting from an incongruence between gender assigned at birth and current gender, misgendering is especially traumatic.[359] Social transition, a process that typically involves the changing of ones pronouns, names, and way of dress, has been found to alleviate feelings of anxiety, depression, and suicidality, associated with dysphoria.[360] For persons experiencing gender dysphoria, rejection of their identity through misgendering further exacerbates feelings of distress, disquietude, and suicidal

---

J. INTERCULTURAL REL. 96, 106 (2016) (finding racial identity invalidation caused feelings of confusion and isolation); Franco & O'Brien, *supra* note 351, at 114 (finding racial invalidation engenders feelings of "racial homelessness and loneliness").

356.   *See* Margaret Shih & Diana T. Sanchez, *Perspectives and Research on the Positive and Negative Implications of Having Multiple Racial Identities*, 131 PSYC. BULL. 569, 572 (2005) (collecting sources finding that racial identity invalidation led to feelings of "moodiness, hypersensitivity, irritability, low self-confidence, self-hate, insecurity, and defensiveness").

357.   *See* Marisa G. Franco & Stephen A. Franco, *Impact of Identity Invalidation for Black Multicultural People: The Importance of Race of Perpetrator*, 42 J. BLACK PSYCH. 530 (2016).

358.   *Cf.* A. Finn Enke, *Stick Figures and Little Bits: Toward a Nonbinary Pedagogy*, *in* TRANS STUDIES: THE CHALLENGE TO HETERO/HOMO NORMATIVITIES 215, 221 (Yolanda Martínez-San Miguel & Sarah Tobias eds., 2016) ("[W]e cannot pronounce our gender identities by ourselves; it is always others who have the power to speak or refuse to speak our correct pronouns."); Jane M. Ussher, Alexandra Hawkey, Janette Perz, Pranee Liamputtong, Jessica Sekar, Brahmaputra Marjadi, Virginia Schmied, Tinashe Dune & Eloise Brook, *Crossing Boundaries and Fetishization: Experiences of Sexual Violence for Trans Women of Color*, J. INTERPERSONAL VIOLENCE ONLINEFIRST 1, 11 (2020) (linking misgendering to identity invalidation for trans women); Cordoba, *supra* note 189 at 166 (linking misgendering and invalidation for nonbinary folk); *see also* King, *supra* note 274, at 21 ("Misgendering transgender people by calling a transgender person anything but their preferred gender pronouns is violent in [that it] . . . invalidates their identity."); Riley J. Dennis, *Here's Why Misgendering Trans People Is an Act of Violence*, EVERYDAY FEMINISM (Jan. 20, 2017), https://everydayfeminism.com/2017/01/misgendering-trans-people-is-violence/ [https://perma.cc/UD4V-UML4] (describing misgendering as "a way of invalidating [trans person's] identity. It makes them feel disrespected, isolated, uncomfortable, and hated, simply because of their gender"); Luke A. Boso, *Anti-LGBT Speech and Group Subordination*, 63 ARIZ. L. REV. 341, 393 (2021) ("Our first names and pronouns are fundamental to who we are. Misgendering either intentionally or effectively erases a core aspect of identity and undermines the very existence of transgender people as a group.").

359.   Peggy T. Cohen-Kettenis & Thomas D. Steensma, *Gender Dysphoria*, *in* AM. PSYCH. ASS'N, APA HANDBOOK OF CLINICAL PSYCHOLOGY: PSYCHOPATHOLOGY AND HEALTH, 395 (J.C. Norcross, G.R. VandenBos, D.K. Freedheim & N. Pole eds., 2016); *see also* Prescott v. Rady Child.'s Hosp., 265 F. Supp. 3d 1090, 1096 (S.D. Cal. 2017) ("For a transgender person with gender dysphoria, being referred to by the wrong gender pronoun is often incredibly distressing."); Monroe v. Baldwin, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019) ("[M]isgendering someone with gender dysphoria is 'traumatic.'"); Avgi Saketopoulou, *Mourning the Body as Bedrock: Developmental Considerations in Treating Transsexual Patients Analytically*, 62 J. AM. PSYCHOANALYTIC ASS'N 773, 779–82 (2014) (detailing "massive gender trauma" resulting from misgendering).

360.   *See* Gonzalez v. Nevares, 305 F. Supp. 3d 327, 331 (D.P.R. 2018) (finding social transition is a "crucial component[] of treatment for gender dysphoria").

ideation associated with the condition.[361] Thus, for some gender minorities at least, using gender-appropriate language is a medical necessity.

* * *

The lived experiences of gender minorities render the trivialization objection moot. While pronouns, titles, and other gendered terms may not mean much to speakers, from the perspectives of gender minority referents, these words are extremely impactful and potentially devastating. Misgendering is disrespectful, humiliates gender minorities, deprives them of privacy, safety, and autonomy, contributes to epistemic injustices, and is a tool of gender policing, social subordination, and identity invalidation. Cumulatively, these harms also trigger a host of psychological and physiological ill effects. In total, the evidence disproves claims that gender misattributions are inconsequential.

## III.
### MISGENDERING AND THE LAW

This final Part reorients towards the contemporary moment. Primarily, it grapples with how lessons learned from history and firsthand accounts of gender misattributions should interplay with the law. The implications of these lessons for the law are, I believe, profound.

Most obviously, these lessons raise questions about the interaction of misgendering and free speech law. Many critics argue legal interventions against misgendering violate the First Amendment. However, the arguments laid out below should give such criticism pause.

There's more. The understanding gained from the experiences of gender minorities touches and informs divergent areas outside of First Amendment speech law, from religious freedom and criminal law, to even the law of incarceration and professional responsibility, among others.[362] Some examples: Should the law accommodate persons who believe their religious convictions prevent them from using gender minorities' appropriate gendered language? Could the professional responsibility rules sanction members of the bench and bar who willfully disrespect gender-diverse parties through misgendering in their filings and opinions? Consider a custody decision involving a gender-diverse

---

361.    Arayasirikul & Wilson, *supra* note 275, at 14–17; Brianna Huang, *The Power of Pronouns: How Misgendering Can Affect Student Health*, ARAGON OUTLOOK (Oct. 4, 2018), https://aragonoutlook.com/2018/10/the-power-of-pronouns-how-misgendering-can-affect-student-health/ [https://perma.cc/8YC3-HWYB]; *see* Cassie Brighter, *I Wasn't 'Annoyed' at Your Misgendering Me*, MEDIUM (Feb. 10, 2018), https://byrslf.co/i-wasnt-annoyed-at-your-misgendering-me-b13cd9480b2c [https://perma.cc/67DG-3X54].

362.    The examples documented below are not all-encompassing. I have left several other possibilities unaddressed. Examples include: *Criminal Law*—Should misgendering be relevant evidence of a hate crime or bias-motivated violence? *Criminal Procedure*—How should the law treat attorney misgendering in court? Or, what of a juror who misgenders during *voir dire* or during jury deliberations? *Tort Law*—Should misgendering be considered sufficiently harmful to support a claim of negligent infliction of emotional distress?

child. In balancing the child's best interest, how must the law weigh one parent who misgenders the child and another who respects the child's identity? Finally, suppose a testamentary instrument misgenders a beneficiary—how should a probate court interpret the document? Is the bequeathed property delivered, or does it lapse?

In what follows, I consider these and other potential questions and, very provisionally, suggest some answers. The discussion proceeds from the abstract to the specific. From a high level, Sections A–E address misgendering and various aspects of doctrinal law. Narrower in scope, Section F takes on misgendering in some specific contexts and places, examining the laws related to the workplace, schools, hospitals, and prisons. Finally, Section G ends this Part by describing interventions against misgendering within the legal profession.

### A.  Speech Law: Why the Unconstitutional Speech Regulation Objection Fails

Misgendering raises several thorny First Amendment issues. Specific efforts[363] to regulate misgendering in the workplace—what others have dubbed "pronoun laws"—raise questions of both the unconstitutional suppression and compulsion of speech.[364] Roughly, the laws fall into two categories: (1) regulations using misgendering as evidence of a hostile environment, thereby tracking Title VII's interpretation; and (2) regulations effectively requiring the use of gender-appropriate language by punishing the continued refusal to use it.

Regulations in Colorado, Washington State, and Washington, D.C. fall into the first category.[365] For example, the D.C. municipal regulation prohibits "harassment and actions that create a hostile environment based on gender identity or expression," which include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun."[366]

By contrast, only the law of New York City belongs to the second group. The New York City Human Rights Law (NYCHRL) "requires employers . . . use the name, pronoun and title . . . with which a person self-identifies, regardless of

---

363.    By this I mean laws referring to employee names and pronouns specifically. Arguably, other antidiscrimination laws covering sexual orientation and gender might also cover targeted misgendering as harassment in the workplace. *See* Jared Ham, Note, *Wrongful Termi(gay)tion: A Comparative Analysis of Employment Non-Discrimination Laws and LGBTQ+ Workplace Protections in South Africa and the United States*, 104 CORNELL L. REV. 233, 258 (2018).

364.    Thus far, pronoun laws have been exclusively limited to misgendering in professional settings and the employment context. As a consequence, this Section's analysis does not address how speech law might apply to regulations against misgendering that occurs outside of these situations. Admittedly, outside of those contexts, it is possible that a stranger's deliberately misgendering a gender-diverse individual would be as constitutionally protected as any other public insult that does not amount to fighting words.

365.    *See* COLO. CODE REGS. § 708-1(81.6)(A)(4) (2020); D.C. Mun. Regs. tit. 4, § 808.2 (2006); WASH. ADMIN. CODE § 162-32-040 (2015).

366.    D.C. Mun. Regs. tit. 4, § 808.2 (2006).

the individual's sex assigned at birth, anatomy, gender, medical history, appearance or sex indicated on the individual's identification."[367]

While the aims of the laws converge, and the critiques of pronoun law—what I will collectively call the *unconstitutional speech regulation objection*—share a similar pattern, the implicated constitutional issues are distinct. The objection is really two sub-arguments. The first class of pronoun laws in Colorado, Washington State, and D.C. prompt the question of whether it is constitutionally permissible to sanction individuals for misgendering others. This raises a free speech argument: that this class of laws is content-based speech restrictions—laws which target speech based on the ideas or viewpoints expressed—and are therefore subject to strict scrutiny.

The second class of pronoun laws, New York City's law, prompts the question of whether it is permissible to require persons to use gender-appropriate language. This raises a compelled speech argument: that New York City's law forces persons to express viewpoints that they do not hold or would not otherwise voice.

### 1. *Free Speech*

Put briefly, the First Amendment prohibits the government from restricting speech or expressive conduct based on disapproval of the ideas expressed. Laws that regulate speech based on its content, therefore, are presumptively unconstitutional and subject to strict scrutiny. Additionally, where speech is targeted, not only for content, but instead for specific views, invalidation is almost inescapable.

In considering whether the first group of pronoun laws are unconstitutional, the preliminary question should be whether the laws target speech. Some critics take the answer as given, but it is not. In *R.A.V. v. City of St. Paul*, the U.S. Supreme Court recognized a "valid basis for according differential treatment to . . . a content-defined subclass of proscribable speech" that "happens to be associated with particular 'secondary effects' of the speech."[368] This subclass includes "laws directed not against speech but against conduct."[369] As the prototypical example of such laws, the Court pointed to Title VII's prohibition on "sexually derogatory 'fighting words'" as part of a larger prohibition on sex discrimination. [370]

On those facts, there is a plausible argument that because the first group of pronoun laws targets discriminatory and hostile actions in employment, they primarily target workplace harassment. So, while the language of the first class of pronoun laws does specifically refer to types of speech, it is reasonable to

---

367.   N.Y.C., N.Y. ADMIN. CODE § 8-102, at 4–5 (2018) (interpreting N.Y.C., N.Y., ADMIN. CODE § 8-102 as prohibiting misgendering).

368.   R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992).

369.   *Id.*

370.   *Id.*

view them as not aimed at the speech or the speech's content, so much as identifying a leading exemplar of harassing conduct against gender minorities.

If we accept, however, that pronoun laws target speech and are outright content-based restrictions, then strict scrutiny applies. But even that does not mean their unconstitutionality is inevitable.[371] Resembling the language of Title VII's "hostile environment" jurisprudence, the first set of pronoun laws trigger the same First Amendment issues raised in the application of Title VII to hostile work environments. And many of the same responses as to why Title VII does not unconstitutionally restrict speech apply.

To begin with, the state's interest in protecting gender minorities is undeniable. As the Supreme Court found in *R.A.V. v. St. Paul*, "ensur[ing] the basic human rights of members of groups that have historically been subjected to discrimination, including the right of such group members to live in peace," is undoubtedly compelling.[372] Underscoring that point, in *Roberts v. United States Jaycees*, the Court likewise reasoned, "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups" was a compelling government interest, given "the importance, both to the individual and to society."[373] Seen in such light, the government's interest in protecting gender minorities is clearly compelling.

Further, pronoun laws are quite narrowly tailored. Which is to say, they "target[] and eliminate[] no more than the exact source of the 'evil' [they] seek[] to remedy."[374] The regulations only target one-to-one harassing speech.[375] By their text, none of the pronoun laws limit employees' ability to advocate or express their views on gender or gender identity either at work or outside of it. Importantly, under the laws, accidental misgendering is not punishable, and employees are free to espouse any transphobic views unless they (1) are targeted at specific coworkers; and (2) are sufficiently pervasive to create an objectively hostile environment.

Next, the context of the speech is significant.[376] The workplace differs vastly from the traditional public forum.[377] The unavoidability of being exposed to the harmful speech—gender-diverse employees are a captive audience, as they have no alternative to work—makes the regulations even more necessary.

---

371.    Luke Boso offers an even more novel solution, suggesting courts adopt an anti-subordination approach to First Amendment. In Boso's view, under that approach, "claimants should lose free speech claims to misgender others." *See* Boso, *supra* note 358, at 393.

372.    505 U.S. at 395.

373.    Roberts v. U.S. Jaycees, 468 U.S. 609, 626 (1984).

374.    Frisby v. Schultz, 487 U.S. 474, 485 (1988).

375.    *See* Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark*, 1994 SUP. CT. REV. 1, 42 (arguing "[n]arrowly targeted, face-to-face expression" receives less constitutional protection).

376.    *Frisby*, 487 U.S. at 479 (highlighting "place" as a factor in determining what limits may apply to protected speech).

377.    *See* Lisa B. Bingham, *Employee Free Speech in the Workplace: Using the First Amendment as Public Policy for Wrongful Discharge Actions*, 55 OHIO ST. L.J. 341, 377–78 (1994).

Lastly, like racist slurs or sexist speech in the workplace, targeted misgendering is low-value "directed harassing speech," which fails to deserve full constitutional protection.[378] As other commentators have rightly found, the First Amendment values that typically justify finding content-based regulations unconstitutional are not implicated in this narrow context.[379] Weighing the factors, it is completely possible, if not likely, that the first set of pronouns laws can withstand strict scrutiny.[380]

### 2. Compelled Speech

New York City's law raises compelled speech counterarguments. In recent times, it has become *de rigueur* to claim that any antidiscrimination law aimed at protecting the dignity of minorities somehow unconstitutionally compels speech.[381] Predictably, these arguments have also been raised in relation to pronoun laws, with First Amendment absolutists denouncing these regulations as unconstitutional speech compulsions. Condemning New York City's law as "designed to target a broad swathe of conduct and speech," and lofty "codified anti-microaggression prohibitions," one commentator swiftly concluded the law could not survive strict scrutiny—without examining the harms the regulations are designed to prohibit.[382]

I would not be so fast.[383] As a general matter, compelled speech doctrine is a morass; the result of the analysis, therefore, is significantly cloudier than some

---

378.  *See* Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1863–67 (1992).

379.  *Id.*

380.  If we think otherwise, workplace harassment protections at-large unravel. An employee having the right to harass a trans coworker through misgendering (as an expression of his offensive belief that being trans is an impossibility), and an employee having the right to harass his female married coworkers by insisting on addressing them by her husband's last name and the title Mrs. (as an expression of his offensive belief that women are their husband's property) are not so qualitatively distinct that we can allow one and refuse the other. On that score, finding this first form of pronoun laws unconstitutional for suppressing speech, means finding workplace harassment law also unconstitutionally limits the "free speech" rights of the hypothetical misogynistic employee as well. I must thank Professor Mike Dorf for making this point.

381.  *See* Terri R. Day, *Revisiting* Masterpiece Cakeshop—*Free Speech and the First Amendment: Can Political Correctness Be Compelled?*, 48 HOFSTRA L. REV. 47, 69–71 (2019) (concluding the NYCHRL is unconstitutionally overbroad).

382.  *See id.*

383.  Nor would many others. *See* Tyler Sherman, Note, *All Employers Must Wash Their Speech Before Returning to Work: The First Amendment & Compelled Use of Employees' Preferred Gender Pronouns*, 26 WM. & MARY BILL RTS. J. 219, 248 (2017) (concluding, after extensive review, the laws survive First Amendment compelled analysis); Erin E. Clawson, Comment, *I Now Pronoun-ce You: A Proposal for Transgender People*, 124 PENN. ST. L. REV. 247, 265–66 (2019) (concluding that the laws are analogous to other constitutional anti-workplace harassment regulations); *see also* Clarke, *supra* note 13, at 963 (emphasizing most harassment law compels speech); Josh Blackman, *Compelled Speech and Pronouns*, JOSHBLACKMAN (Dec. 28, 2015), https://joshblackman.com/blog/2015/12/28/compelled-speech-and-pronouns/ [https://perma.cc/Q9HA-FY9D] (presenting an overview of the constitutional issues, and concluding it is possible "that a state's interest in eradicating discrimination against transgender individuals is so strong, that it can defeat strict scrutiny").

commentators would have us believe.[384] In fact, on careful review, several factors cut against a finding of unconstitutionally compelled speech, particularly because gendered language does not carry the kind of semantic meaning that is constitutionally protected.

For one, it's unclear what exactly is being compelled. Regulations mandating gender-appropriate language are not examples of the government selecting a message and forcing persons to speak. This is not a case of the government saying, for instance, all persons who identify as *X* should be addressed as *Y*. Rather, the choice of gendered language lies in the hands of the gender-diverse employee. On those facts, these laws are not the prototypical speech compulsion where the speaker is given a "government-drafted script"[385] or is forced to serve as a "'billboard' for the State's ideological message.[386] It cannot rightly be said that the government has selected a favored message.[387]

More aptly, these laws might be characterized as "accommodations" of others' messages.[388] Yet, even then, what speech—if any—will actually be compelled is far from clear. Compelled-speech objections mistakenly rely on at least two assumptions: (1) that speakers will ever be in a situation where a gender-diverse person makes their gender-appropriate language known and (2) that the gender-diverse person will select language the speaker finds offensive (i.e., will use neopronouns).

Neither is necessarily true. A gender minority with no preference for pronouns, who does not make their preference known, or who prefers language in line with their gender assigned at birth, will not trigger the speaker to speak any particular message. So, if the linchpin of compelled speech is being required to express viewpoints one finds abhorrent, it's not certain that pronoun laws actually require that.[389]

---

384.   Note, *Two Models of the Right Not to Speak*, 133 HARV. L. REV. 2359, 2359–60 (2020) (documenting the complexity of compelled speech doctrine).

385.   NIFLA v. Becerra, 138 S. Ct. 2361 (2018); *see also* Nat Stern, *The Subordinate Status of Negative Speech Rights*, 59 BUFF. L. REV. 847, 857 (2011).

386.   Wooley v. Maynard, 430 U.S. 705, 715 (1977).

387.   *Cf.* PruneYard Shopping Ctr. v. Robbins, 447 U.S. 74, 87 (1980) (stating that where there is "no specific message is dictated by the state . . . [t]here consequently is no danger of governmental discrimination for or against a particular message").

388.   *E.g.*, Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557, 572–73 (1995) (finding the compelled association mandate required parade organizers to "alter the expressive content of their parade").

389.   *See* Leslie Gielow Jacobs, *Pledges, Parades, and Mandatory Payments*, 52 RUTGERS L. REV. 123, 182 (1999) ("[W]hether an expression requirement is 'ideological' and therefore provokes a 'crisis of conscience' is crucial to the constitutional analysis."); Eugene Volokh, *The Law of Compelled Speech*, 97 TEX. L. REV. 355, 368 (2018); Tobias Barrington Wolff, *Compelled Affirmation, Free Speech, and the U.S. Military's Don't Ask, Don't Tell Policy*, 63 BROOK. L. REV. 1141, 1199 (1997). *But see Two Models of the Right Not to Speak*, *supra* note 384, at 2373 ("[T]he problem . . . does not depend on the speaker's opposition to the compelled ideology.").

For two, there is no guarantee that the use of another person's pronouns will be misattributed as the speaker's message.[390] At first glance, it may seem like the use of gendered language will readily be attributed to the speaker; in everyday conversation, one does not usually say things they do not believe in.[391] But civility, particularly in the workplace, is rarely interpreted as the employee's free choice.[392] For instance, few believe that every time a store employee asks how we are or if we need assistance, they are actually interested; rather, they are more understandably compelled to ask as a condition of their employment. And, as the Court has pointed out, where the listener expects the speech to be coerced or unwilling, questions of misattribution are irrelevant.[393] Equally critical, the conclusion that gendered language will be misattributed to the speakers overlooks the speakers' ability to distance themselves from the speech in question.[394] Nothing on the face of any regulation prohibits speakers from disavowing using gender-appropriate language or making their views on gender minorities known at any time.[395]

For three, the Court has found speech compulsions unconstitutional where laws or policies require the affirmation of an "ideological message."[396] Admittedly, what constitutes an "ideological message" for compelled speech purposes is unsettled.[397] Even so, it is highly unlikely gendered language qualifies.[398]

What "ideological message" do pronouns, titles, and honorifics express? Critics of gender-appropriate language have claimed that using referent's appropriate language conveys support for "the transgender ideology"[399] or

---

390.    *See* Laurent Sacharoff, *Listener Interests in Compelled Speech Cases*, 44 CAL. W. L. REV. 329, 367–73 (2008); Steven H. Shiffrin, *What Is Wrong with Compelled Speech?*, 29 J.L. & POL. 499, 505 (2014).

391.    *See* Seana L. Shiffrin, *What Is Really Wrong with Compelled Association?*, 99 NW. U. L. REV. 839, 863 (2005).

392.    Larry Alexander, *Compelled Speech*, 23 CONST. COMMENT. 147, 153 (2006).

393.    *See* Rumsfeld v. F. for Acad. & Inst'l Rts., Inc., 547 U.S. 47, 65 (2006).

394.    Stern, *supra* note 385, at 909.

395.    Relatedly, the Supreme Court has found speech compulsions where the speech occurred in a limited forum or the regulation operated as taxes on speech. *See* Volokh, *supra* note 389, at 360. Pronoun laws do not raise any of those issues. The nature of the expression, actual speech, renders issues of limited forums or additional costs irrelevant. Distinct from, limited broadcast stations or space in newsprint, the speaker's ability to produce more speech is potentially limitless and comes at no additional cost. Vikram David Amar & Alan Brownstein, *Toward a More Explicit, Independent, Consistent and Nuanced Compelled Speech Doctrine*, 2020 U. ILL. L. REV. 1, 15.

396.    Wooley v. Maynard, 430 U.S. 705, 705–06 (1997) (holding the government cannot "require an individual to participate in the dissemination of an ideological message").

397.    Nadia N. Sawicki, *Informed Consent as Compelled Professional Speech: Fictions, Facts, and Open Questions*, 50 WASH. U. J.L. & POL'Y 11, 41 (2016).

398.    *See* Respondent's Brief, Taking Offense v. State, 66 Cal. App. 5th 696 (Cal. Ct. App. 2021) (No. C088485), 2020 CA App. Ct. Briefs LEXIS 214, at *15 ("Pronouns are words that stand in for nouns to limit repetition . . . they are not 'ideological messages.'").

399.    Recent Case, *United States v. Varner*, 134 HARV. L. REV. 2275, 2281 (2021) (writing opponents to gender-appropriate pronouns "view them as concessions to 'transgender ideology'").

statements in support of liberal politics.[400] Melding the two points slightly, one commentator has written, "[c]ompelled use of politically correct pronouns requires a speaker to convey the message of accepting non-binary gender classification."[401]

These characterizations are unconvincing. The contentions would suggest that every time the speaker uses pronouns or gendered titles, they send "ideological messages" about gender, sex, and the immutability of either. That argument is as clearly illogical as it is untrue.[402] On that logic, every word said expresses some element or support, affirmance, or approval. But it does not follow, obviously, that addressing a judge with "Your Honor" conveys any ideological messages about the judge's honorability.

Rather, if pronouns, honorifics, or gendered terms say anything, it is a message of respect.[403] But that does not qualify as the endorsement of an ideological viewpoint.[404] Clearly, we do not view referring to a Black person with honorifics or referring to a woman by her professional title as conveying or endorsing ideological messages about Black people or women. Instead, we see the terms as limited, neutral, and ordinary facets of respectful interaction. Thus, it is difficult to see exactly what ideological message the speaker is forced to "affirm" or "endorse" by using gender-appropriate pronouns, honorifics, or terms.

---

400. *See* Recent Case, *supra* note 399, at 2281 (using evidence of Democratic Presidential candidates' display of their gender-appropriate pronouns on their Twitter profiles to support the notion that since "support for preferred pronouns [sic] correlates with partisan affiliation, using them could be understood as a political statement").

401. *See* Day, *supra* note 381, at 70.

402. *Cf.* Meriwether v. Trs. Shawnee State Univ., 2019 U.S. Dist. LEXIS 151494 at *53–54 (S.D. Ohio Sept. 5, 2019) (concluding the policy of using gender-appropriate language did not compel the plaintiff to express any beliefs on gender).

403. *See* Motion to Dismiss at 10, Meriwether v. Trs. Shawnee State Univ., 2019 U.S. Dist. LEXIS 151494 (S.D. Ohio Sept. 5, 2019) (No. 18-cv-00753), 2020 U.S. Dist. LEXIS 24674 ("The simple, ministerial act of using a 'title' and/or 'pronoun' is not part of . . . discourse but instead a simple act of respect.").

404. There are many interactions that call for respectful speech, without endorsement, affirmation, or support. I will offer two examples. First, a deeply homophobic employee may address openly gay customers with honorifics and treat them courteously. The employee's speech and conduct are not affirmations of homosexuality; they are merely professionalism.

Second, when dealing with the police, a Black person may address law enforcement by the title, "Officer" or "Sergeant." Again, that cannot be taken as an endorsement of policing; it is merely a means of surviving the interaction with the police.

For four, the Court has found speech compulsions unconstitutional where they "alter[],"[405] "drown[] out,"[406] "interfere[] with,"[407] "impair[],"[408] or otherwise "distort[]" the speaker's message.[409] But gendered language is not semantically disruptive.[410] By this, I mean that it is not typically used to express or constitute a primary part of what a speaker is trying to say; gendered language is only ancillary or supplementary.[411] Consequently, its effect on speakers' principal message is negligible at best. Illustrations will help:

Example 1:

"Did you see Jerri's new guitar?"

"Did you see *her/his/their/zir* new guitar?"

Example 2:

"I'm looking for Ms. Avery. Do you know where she is?"

"I'm looking for *Mx.* Avery. Do you know where *he/she/they/ze*

---

405.   Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2371 (2018) (holding California's mandate that pregnancy centers provide specific disclosures "alter[ed] the content" of speech); Riley v. Nat'l Fed. of the Blind of N.C., Inc., 487 U.S. 781, 795 (1988) (finding that, because a fundraising disclosure requirement "[m]andat[es] speech that a speaker would not otherwise make," it "necessarily alter[ed] the content of the speech"); Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557, 572–73 (1995) (finding the compelled association mandate required parade organizers to "alter the expressive content of their parade").

406.   *Becerra*, 138 S. Ct. at 2378 (emphasizing the pregnancy center disclosure policy "drown[ed] out the facility's own message").

407.   Rumsfeld v. F. for Acad. & Inst'l Rts., Inc., 547 U.S. 47, 63–64 (2006) (justifying *Hurley*, *Pacific Gas*, and *Miami Herald* on the reasoning that those "compelled-speech violation[s] . . . resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate," and justifying *Tornillo* on the fact that it "inter[ed] with a speaker's desired message").

408.   Boy Scouts of Am. v. Dale, 530 U.S. 640, 654–55 (2000) (finding compelled association was unconstitutional where it could "impair[]" or "significantly affect[]" the "Boy Scouts' ability to disseminate its message").

409.   *See* Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 140 S. Ct. 2082, 2090–91, 2094–95 (2020) (suggesting the wrong of compelled speech is "government-compelled distortion"). *But see* Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 469 (2008) (Scalia, J., dissenting) (arguing the Court did not require a showing of distorted message when finding compelled association unconstitutional in *Dale* or *Hurley*).

410.   I acknowledge persons will disagree, particularly with respect to neopronouns. Differing opinions are, I think, the results of different views of neopronouns. On one view, neopronouns (e.g., ze/zir/zirs) inherently express or indicate nonbinary identity (call this the "loaded" view of what, collectively, we might call "neohonorifics"). Consequently, they cannot be said to be semantically empty.

       On the other hand, I view neopronouns and neotitles (e.g., Mx.) as gender neutral—expressing nothing of the referent's gender (we might call this the "empty" view of neohonorifics). *See, e.g.*, *Neopronouns*, *supra* note 30 ("Although neopronouns tend to be gender neutral or might be specifically meant to indicate a transgender or nonbinary person, a person who goes by neopronouns could actually be a man, a woman, both, neither, or something else entirely."). On the latter view, even cisgender persons can use neopronouns and neotitles (akin to heterosexual use of the label "partner" or "life partner" for their spouse or significant other). I think these are both viable understandings, though in practice, they may lead to conflicting outcomes.

411.   Here, I assume—and sociolinguistic research supports—that most persons use pronouns as stand-ins for proper nouns; their function is to indicate or refer, not to independently communicate any message.

are?"

Example 3:

> "I believe that gender is sex-linked, immutable, and biologically
> determined. Therefore, despite whatever Lee says, I do not view *her*
> as a woman."

> "I believe that gender is sex-linked, immutable, and biologically
> determined. Therefore, despite whatever Lee says, I do not view
> *him* as a woman."

In any of these examples, the gendered language does not form part of the focal
message and, importantly, changing it does not affect what the speaker seeks to
convey. Plainly, in example 1, the core message is about whether the listener has
seen Jerri's guitar; in example 2, the core message is whether the listener knows
the location of a third party with the last name Avery; and in example 3, the core
message is that the speaker views gender as "sex-linked, immutable, and
biologically determined," and as a result does not consider Lee a woman.
Nowhere have the speakers' fundamental messages been altered, drowned out,
interfered with, impaired, or otherwise distorted.[412]

The examples all make the same point. Functionally, the gendered language
is simply the replacement of a noun, name, or other marker word; it only works
to identify or refer. "Proper names and pronouns," sociolinguist Sally
McConnell-Ginet rightly emphasizes, "do not standardly have content in the
same way as ordinary common nouns do. . . . [R]ather than characterizing, they
indicate a person or group."[413] This reasoning is equally applicable to titles. As
shown above, from the standpoint of speakers' fundamental messages, they don't
actually say much. Proponents of the unconstitutional speech compulsion line of
argument have failed to acknowledge these points, much less address them.

Given this, it is difficult to reasonably argue that pronoun laws actually alter
or distort the content of the speaker's message. Simply, if it is the primary
message that matters, the arguments that pronoun laws interfere with the
speakers' right to "choose the content of [their] own message" fail.[414] Again, this
factor suggests the conclusion that pronoun laws unconstitutionally compel
speech is far from inescapable.

---

412.    Precisely because pronouns are not semantically disruptive, in the past, some persons have
even argued against transgender rights, while using gender-appropriate language. For instance, in an
amicus brief for the employers in *R.G. & G.R. Harris Funeral Homes*, one person argued that Ms.
Stephens "is not a woman," even while using gender-appropriate language throughout the brief. *See*
Brief of Ryan T. Anderson as Amicus Curiae in Support of Employers at 17–18, R.G. & G.R. Harris
Funeral Homes, Inc. v. Equal Emp. Opportunity Comm'n, 139 S. Ct. 1599 (2019) (Nos. 17-1623 & 18-
107).

413.    Sally McConnell-Ginet, *"What's in a Name?" Social Labeling and Gender Practices*, *in*
THE HANDBOOK OF LANGUAGE AND GENDER 69, 73 (Janet Holmes & Miriam Meyerhoff eds., 2003);
*see also* Leonhard Lipka, *Grammatical Categories, Lexical Items and Word-Formation*, 7 FOUNDS.
LANGUAGE 211, 221 n.33 (1971) (classifying pronouns "as dummies, whose semantic value can only
be assessed from the larger unit of the text, or situational and social context").

414.    Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston, 515 U.S. 557, 573 (1995).

For five, consider the consequences of crediting this argument. Accepting the argument that pronoun laws are unconstitutional speech compulsions undercuts antidiscrimination law more broadly. To understand the far-reaching repercussions, take a scenario of a homophobic and racist employee, *A*, who views Latinx people and gay people as less valuable than White heterosexual males. While at work, *A* routinely insults a gay coworker, *C*, by calling him "she," "her," and "girlfriend" and using the title "Miss," on the belief that, because of his sexual orientation, *C* is not "a real man"; *A* routinely insults a Latinx coworker, by addressing him by "boy," and by his first name only (while addressing White coworkers with titles), on the belief that, because of his race, *B* is subhuman.

Is a law unconstitutional if it prohibits *A*'s conduct, requiring him to address his coworkers properly or face sanction? If we accept the argument that pronoun laws unconstitutionally compel speech, the answer must be "yes." In this hypothetical, *A* could easily argue that his potential punishment forces him to express opinions he does not believe in. Namely, (1) that gay men are equal to and should be treated the same as their heterosexual counterparts; and (2) that Latinx people are equal to and should be treated the same as White persons. In either instance, *A* is called to behave in ways that his own views—that gay men aren't "real men" and that Latinx people are unequal to White ones—cut against.

Normally, we would rightly brush this objection aside. Whatever *A*'s genuine beliefs, *B* and *C* are still being subjected to a hostile work environment and harassment. And these are just examples related to dishonorifics. Following the logic of the speech compulsion argument, requiring a misogynist employee to treat or at least speak to female colleagues and customers with the same respect he gives to men would likewise be an unconstitutional speech compulsion. Discrimination law is not so oblivious and ineffective that any assertion of compelled speech causes it to turn a blind eye to *B* and *C*'s—or any harassed person's—unacceptable mistreatment. New York's pronoun laws, as they have so far been written and implemented, go no further than employment discrimination law generally or remedying the harassment captured by the above hypotheticals. For this reason, too, lest we unravel well-established antidiscrimination protections, the compelled speech argument against gender-appropriate language use must fail.

* * *

To summarize, the reasoning of the unconstitutional speech regulation objection leaves much to be desired. The argument that pronoun laws unconstitutionally restrict speech succumbs to the fact that pronoun laws can be viewed as targeting harassing conduct rather than speech and that they can very likely survive strict scrutiny. Among several other deficiencies, the contention that pronouns unconstitutionally compel speech fails for ignoring that gendered language does not comprise part of the constitutionally protected portion of

speakers' core messages. In short, like the rest, the unconstitutional speech regulation objection is ultimately untenable.

Having set this final objection aside, the remaining sections now turn to the task of how misgendering should interact with the law more broadly.

## B.   Religious Freedom Law

As with other progress for LGBTQ+ persons, misgendering raises thorny issues of how the law should treat religious adherents. Such persons may consider it religious doctrine that gender is immutable.[415] Or, their religious beliefs may be such that gender misclassifications are not offensive, but rather objective truths that their religious beliefs compel them to acknowledge.[416] Others may, without much by way of explanation, vaguely declare their religious beliefs prohibit them from using gender-appropriate language.[417] For example, in *Hankes v. Universal Protection Security Systems*, one woman repeatedly harassed a transgender coworker, and when confronted, she responded that she was "a good Christian woman" who believed there is "no such thing as misgendering."[418]

In view of such scenarios, this Section considers how the doctrines of religious discrimination, accommodation, and religiously-based service refusals should interact with gender misclassifications.

### 1.   Religious Discrimination

Is it religious discrimination to terminate an employee whose religious beliefs permit or even oblige them to address or refer to gender minorities with inappropriate language? Litigation involving persons' refusal to use gender-appropriate language on religious grounds has already begun to take shape.[419] Since 2016, there have been several high-profile instances of religious

---

415.   *See, e.g.*, Plaintiff's Verified Complaint at 13, Meriwether v. Trs. of Shawnee State Univ., 2019 U.S. Dist. LEXIS 151494 (S.D. Ohio Sept. 5, 2019) (No. 18-cv-00753).

416.   *See* Brief for Amicus Curiae Great Lakes Justice Center in Support of Petitioner at 6, R.G. & G.R. Harris Funeral Homes, Inc. v. Equal Emp. Opportunity Comm'n, 139 S. Ct. 1599 (2019) (No. 18-107) (claiming sex is "an objective reality" and an "immutable, innate, and biological truth"); Brief of Ryan T. Anderson as Amicus Curiae, *supra* note 412, at 18 (supporting Harris Homes' treating Ms. Stephens "in accordance with objective biological realities"); *see also* Complaint at 9, Kluge v. Brownsburg Cmty. Sch. Corp., 432 F. Supp. 3d 823 (S.D. Ind. 2020) (No. 19-cv-2462) (claiming employee could not "affirm as true ideas and concepts that he deems untrue and sinful, as this would violate Biblical injunctions against dishonesty, lying, and effeminacy").

417.   In one example, an employee intentionally misgendered a transmasculine/nonbinary coworker "for religious reasons," before finally using gender-appropriate pronouns on the rationale that, "God told [her that by misgendering her colleague] she wasn't being loving." Complaint at 13–14, Lyles v. Nike, Inc., No. 19-cv-53760 (Or. Cir. Ct. Dec. 16, 2019).

418.   Complaint at 5, Hankes v. Universal Prot. Sec. Sys. GP, No. 34-2019-00247797-CV (Cal. Super. Ct. Jan. 4, 2019).

419.   *See* Katie Reilly, *'This Isn't Just About a Pronoun.' Teachers and Trans Students Are Clashing Over Whose Rights Come First*, TIME (Nov. 15, 2019), https://time.com/5721482/transgender-students-pronouns-teacher-lawsuits/ [https://perma.cc/7DBT-L34K] (collecting examples).

observants facing employment actions for refusing to use gender-appropriate language on alleged religious grounds.[420] In one October 2019 complaint, a high school French teacher, Peter Vlaming, alleged being fired for refusing to use a student's gender-appropriate pronouns violated his First Amendment free exercise rights.[421] He claimed that "using male pronouns to refer to a female was against his religious beliefs" that "sex is biologically fixed in each person and cannot be changed regardless of a person's feelings or desires."[422] For Vlaming to use gender-appropriate language would be to "intentionally l[ie]," in violation of his "conscience and religious practice."[423]

    Though these claims frame misgendering as subscription to unassailable "sincerely held religious beliefs," that alone does not provide constitutional cover. Neutral, generally applicable laws are constitutional unless "the object of [the] law is to infringe upon or restrict practices because of their religious motivation" or if the "purpose of [the] the law is the suppression of religion or religious conduct."[424] Under this rule, burdens to persons of faith notwithstanding, neutral policies requiring all persons to use gender-appropriate language should withstand constitutional challenge. Indeed, on that reasoning, the lower court in *Meriwether v. Trustees of Shawnee State University* rejected a professor's claim that the university's non-discrimination policy barring misgendering "trampl[ed]" on his religious convictions.[425]

    More generally, it is fairly obvious that even genuinely held religious views do not excuse discrimination and harassment. For instance, a religious observer, say a teacher, may quite sincerely hold the religiously-derived belief that Black people are inferior to White persons and are divinely ordained to be eternally enslaved: beliefs which, though noxious to modern ears, were once widely accepted.[426] For the religious teacher to express their religiously-derived belief, by openly and repeatedly referring to Black students as "inferior to their White

---

    420.  *See id.*; Iliana Magra, *He Opposed Using Transgender Clients' Pronouns. It Became a Legal Battle.*, N.Y. TIMES (Oct. 3, 2019), https://www.nytimes.com/2019/10/03/world/europe/christian-transgender-uk.html [https://perma.cc/YT9W-3FJH].

    421.  Complaint at 2, Vlaming v. W. Point Sch. Bd., No. CL19-454 (Va. Cir. Ct. Sept. 30, 2019).

    422.  *Id.* at 10.

    423.  *Id.* at 11; *see also* Verified Complaint at 13, Meriwether v. Trs. Shawnee State Univ., 2019 U.S. Dist. LEXIS 151494 (S.D. Ohio Sept. 5, 2019) (No. 18-cv-00753) (claiming gender-appropriate language contradicted beliefs that "God created human beings as either male or female").

    424.  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993).

    425.  2019 U.S. Dist. LEXIS 151494 at *70.

    426.  Recall that religiously derived arguments were used to support much of the mistreatment and enslavement of Black persons, as well as to later defend legal segregation and racial oppression. *See* David L. Chappell, *Religious Ideas of the Segregationists*, 32 J. AM. STUD. 237 (1998); Paul Harvey, *Religion, White Supremacist, in* 24 THE NEW ENCYCLOPEDIA OF SOUTHERN CULTURE 142, 143–46 (Thomas C. Hold & Laurie B. Green eds., 2013); *see also* Bernadette Atuahene, *Things Fall Apart: The Illegitimacy of Property Rights in Context of Past Property Theft*, 51 ARIZ. L. REV. 829, 846 (2009) (collecting the religious doctrine concerning the "children of Ham" myth that "it was God's will for [B]lacks to be enslaved, dehumanized, and reduced to property"); William N. Eskridge, *Noah's Curse: How Religion Often Conflates Status, Belief, and Conduct to Resist Antidiscrimination Norms*, 45 GA. L. REV. 657, 665–77 (2011).

classmates," we can agree, would be wholly improper, not to say condemnable and impermissible.[427]

### 2. Religious Accommodations

A companion question is whether employers must make accommodations for religious observers whose beliefs are fundamentally opposed to the possibility of gender transition or gender-expansive identity. In a January 2019 case, *Brennan v. Deluxe Corporation*, a Christian employee brought a failure to accommodate claim when, as a part of his employment, he was required to complete an ethics compliance course that "was structured to accept only those responses acceptable to Deluxe [, his employer]."[428] If the employee selected the incorrect answer, the course refused to move forward or allow the employee to skip the question.[429] One question involved a hypothetical transgender employee, "Alex."[430] In Brennan's view, the answers the ethics course viewed as correct contradicted his faith, and he refused to "answer a question in a way that would make [him] compromise [his] faith in God."[431] Then, in an email to human resources, Brennan declared: "If God has created someone as a man, I will use the pronoun 'him' to refer to that person, or if God created someone as a woman, I will use the pronoun 'her' to refer to that person."[432] Subsequently, the company reduced Brennan's salary by 1% for failing to complete the compliance course. Four months later, Brennan was terminated.

Brennan alleged the company's actions constituted a failure to accommodate religious beliefs and failure to make reasonable attempts to accommodate.[433] On review for motion to dismiss, the court upheld the failure to accommodate claim.[434]

The ultimate outcome of *Brennan* is yet unknown, but even the memorandum opinion's conclusion that the failure to accommodate claim should proceed seems misguided. *Brennan* stands squarely against established principles in religious accommodations law. Equal Employment Opportunity Commission (EEOC) directives explicitly state not providing exceptions to employer-mandated training programs that "simply discusses and reinforces" expectations of professional behavior and policies against harassment or

---

427. *Cf.* Newman v. Piggie Park Enters., 390 U.S. 400, 402 n.5 (1968) (rejecting a restaurant owner's claim that the Civil Rights Act's prohibition of racial discrimination violated his religious beliefs that racial mixing "contravene[d] the will of God") (citing *Piggie Park Enters.*, 377 F.2d 433, 437–38 (4th Cir. 1967)).

428. Brennan v. Deluxe Corp. 361 F. Supp. 3d 494, 499 (D. Md. 2019); *see also* Cyril Heron, *Federal Court Allows Born-Again Christian Employee to Challenge Employer's Failure to Accommodate his Anti-transgender Religious Beliefs Under Title VII*, LGBT L. NOTES, Feb. 2019, at 9.

429. *Brennan*, 361 F. Supp. at 499.

430. *Id.* at 504.

431. *Id.*

432. *Id.*

433. *Id.* at 498.

434. *Id.* at 499.

discrimination is permissible.[435] Because employers must ensure all workers understand appropriate workplace conduct, the EEOC states religious exemptions to such programs can be considered an undue hardship for employers.[436]

More directly, what are the appropriate accommodations for employees with such religious beliefs? Some have suggested allowing employees to address others by last name in lieu of pronouns or first names.[437] In theory, perhaps that is a satisfactory solution. Assuming that the employee refers to all persons by last name, that accommodation seems reasonable. After all, gender-diverse persons will not be singled out for unequal treatment.

Symbolically though, this leveling-down move is probably so transparent as to offend the dignity of gender minorities. It is akin to pool closures by White persons following desegregation in order not to share them with Black people or the termination of male sports teams under Title IX, rather than expending resources for women's teams.[438] A person who avoids all pronouns and titles expresses an unmistakably stigmatizing message to their gender minority colleagues: *I would rather go to extreme lengths than respect you.* Future cases will certainly have to consider whether that accommodation is truly appropriate.

### 3. *Religious Refusals*

Following marriage equality, persons of faith—wedding vendors in particular—have increasingly claimed that providing service to sexual minorities is at odds with their religious beliefs. Participation, the argument goes, makes observers complicit in the alleged sinful conduct. There is no reason to doubt that as the movement for gender-appropriate language gains traction, religious exemption arguments will spread to that context as well. If past examples portend, one could imagine similar religious refusal arguments, such as a minister refusing to address a trans woman by her correct pronouns or with the term "bride," or persons who create wedding invitations refusing to make them with nonbinary or neopronouns. In fact, a July 2020 complaint with allegations

---

435.    EEOC COMPLIANCE MANUAL § 12 RELIGIOUS DISCRIMINATION (2021).

436.    Peterson v. Hewlett-Packard Co., 358 F.3d 599 (9th Cir. 2004).

437.    *See* Kluge v. Brownsburg Cmty. Sch. Corp., 432 F. Supp. 3d 823 (S.D. Ind. 2020) (alleging religious beliefs prevented him from referring to gender-diverse students with the correct pronouns or preferred first-names); *see also* Jeffrey S. Solochek, *Pasco Teacher Rejects Transgender Students' Pronouns, Told Last Names Are Okay*, TAMPA BAY TIMES (Feb. 25, 2020), https://www.tampabay.com/news/gradebook/2020/02/25/pasco-teacher-rejects-students-preferred-pronouns-told-last-names-are-okay/ [https://perma.cc/47AG-5CR3].

438.    Admittedly, despite the obvious indignities, the Supreme Court has allowed leveling down approaches. *See* Palmer v. Thompson, 403 U.S. 217 (1971); *see also* Deborah L. Brake, *When Equality Leaves Everyone Worse Off: The Problem of Leveling Down in Equality Law*, 46 WM. & MARY L. REV. 513 (2004).

along those lines has already been filed in the Northern District of Ohio.[439] Given *Masterpiece Cakeshop's* reticence on the issue, the ultimate outcomes of this and similar cases are unknowable.[440]

### C.   Family Law

Using children's gender-appropriate pronouns and names positively impacts their well-being.[441] Conversely, children who are misgendered and deadnamed face significantly higher risks of life-threatening behaviors and suicidal attempts.[442] For these reasons, courts cannot ignore the ill effects of misgendering in determinations related to child welfare. Put simply, gender misattributions must be considered a factor in the evaluation of the most central concern in issues involving youth: the "best interests" of the children involved.[443]

For a start, the possibility of misgendering must be considered in foster care and adoption decisions. Gender-diverse children placed for adoption report routinely facing resistance to their gender-appropriate pronouns and names. Fortunately, several states have recently introduced or adopted regulations specifically prohibiting the misgendering of children in foster care.[444] Other states should consider this as well.

Custody determinations present other issues. There are very real possibilities that one parent might support and affirm a gender-diverse child and the other will not. The possibility that a resistant parent may traumatize a gender-diverse child is also very real. In a widely-reported account, one father repeatedly misgendered his child, publicly humiliated her, forcibly shaved her hair, and forced her to wear male clothing, all in resistance to his transgender daughter's

---

439.    Complaint at 2, Covenant Weddings LLC v. Cuyahoga Cnty., No. 20-cv-01622 (N.D. Ohio July 22, 2020) (alleging antidiscrimination laws force the officiant to "write vows calling biological men women," and "write homilies using incorrect or gender-neutral pronouns (like Per, Xe, and Ze)").

440.    The *Masterpiece* decision never directly addressed the interaction between religious freedom and same-sex marriages. It was decided, instead, on a procedural point. *See* Michael Dorf, *Masterpiece Cakeshop Ruling Should (But Probably Won't) Doom the Travel Ban*, DORF ON LAW (June 4, 2018), http://www.dorfonlaw.org/2018/06/masterpiece-cakeshop-ruling-should-but.html [https://perma.cc/G6XH-KKWW].

441.    Stephen T. Russell, Amanda M. Pollitt, Gu Li & Arnold H. Grossman, *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. ADOLESCENT HEALTH 503 (2018) (finding less depression, suicidal ideation among affirmed trans youth); Kristina R. Olson, Lily Durwood, Madeleine DeMeules & Katie A. McLaughlin, *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 PEDIATRICS 2015 (2016) (finding socially transitioned trans youth showed rates of depression equivalent to cis peers).

442.    Arnold H. Grossman & Anthony R. D'Augelli, *Transgender Youth and Life-Threatening Behaviors*, 37 SUICIDE & LIFE-THREATENING BEHAV. 527, 534–35 (2007).

443.    Boswell v. Boswell, 721 A.2d 662, 678 (Md. 1998) ("In family law disputes involving children, the best interests of the child standard is always the starting—and ending—point . . .").

444.    Assemb. 175, 2019 Leg., Reg. Sess. (Cal. 2019); S. 1605, 80th Legis. Assemb., 2020 Spec. Sess. (Or. 2020). *But see* S. 224, 2020 Leg., Reg. Sess. (La. 2020) (failing); S. Res. 403, 101st Gen. Assemb., Reg. Sess. (Ill. 2019).

gender.[445] In that and similar scenarios, considering the hosts of ill effects of misgendering, where one parent of a gender-diverse child is intent on resisting the child's gender identity—through misgendering, opposition to social transition, or by enrolling the child in gender identity change efforts—courts should weigh this factor against a custody ruling in their favor.

Finally, American courts must begin to address the misgendering of gender minority youth as interpersonal violence, as foreign courts have already done. In 2019, the Supreme Court of British Columbia concluded that a father's incessant misgendering and deadnaming, in addition to attempts to have his son abandon transitioning, constituted impermissible psychological and emotional abuse under § 38 of the Canadian Family Law Act.[446] American courts should take cue.

### D.  Elder Law

The rate of identity abuse experienced by gender-diverse seniors is stark. Surveys find that anywhere between 64.8 and 80 percent of transgender elders have experienced psychological abuse, verbal abuse, or harassment.[447] Indeed, one of gender-diverse elders' more critical concerns is the fear that "that they will be misgendered in the event that they become reliant on others for care, especially if those care[takers] have not been accepting of their gender identity or are uninformed about such matters."[448]

Advocates have several interventions to prevent and address the targeted misgendering and misnaming of gender-diverse elders. In particular, California's SB 219, the "Lesbian, Gay, Bisexual, and Transgender Long-Term Care Facility Bill of Rights," enacted in 2017, makes it unlawful for long-term care facilities or facility staff to "[w]illfully and repeatedly fail to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns."[449] Similar legislation has been introduced in Maryland, New York, New Jersey, and Washington D.C.[450] Despite conservative criticism that these regulations would result in healthcare workers being arrested for simple

445.    *See* First Amended Petition to Modify Parent-Child Relationship, *In re* JA.D.Y. & JU.D.Y., No. DF-15-09887-S (D. Dallas Cnty. July 2, 2018).

446.    A.B. v. C.D., [2019] BCSC 604 (Can.).

447.    Elizabeth M. Bloemen, Tony Rosen, Veronica M. LoFaso, Allison Lasky, Skotti Church, Porsha Hall, Tom Weber & Sunday Clark, *Lesbian, Gay, Bisexual, and Transgender Older Adults' Experiences with Elder Abuse and Neglect*, 67 J. AM. GERIATRICS SOC'Y 2338, 2338 (2019); HANDBOOK OF LGBT ELDERS: AN INTERDISCIPLINARY APPROACH TO PRINCIPLES, PRACTICES, AND POLICIES 326, 345 (Debra A. Harley & Pamela B. Teaster eds., 2016).

448.    Sarah Steadman, *It's Still Me: Safeguarding Vulnerable Transgender Elders*, 30 YALE J.L. & FEMINISM 371, 373 (2018).

449.    Lesbian, Gay, Bisexual, and Transgender Long-Term Care Facility Residents' Bill of Rights, CAL. HEALTH & SAFETY CODE ch. 2.45 §§ 1439.50–1439.54 (2017).

450.    S. 3484, 218th Leg., Reg. Sess. (N.J. 2019); Care for LGBTQ Seniors and Seniors with HIV Amendment Act of 2020, 67 D.C. Reg. 13244 (Nov. 2, 2020); LGBTQ Seniors Bill of Rights, H. 1010, 2020 Gen. Assemb., Reg. Sess. (Md. 2020); Lesbian, Gay, Bisexual, and Transgender Long-Term Care Facility Residents' Bill of Rights, S. 2912, 2019 Leg., Reg. Sess. (N.Y. 2019).

accidental misgendering, where challenged thus far, they have withstood constitutional scrutiny.[451]

### E.   *Wills and Testamentary Law*

All too frequently, gender minorities are misgendered after death. Either by oversight or through the actions of disapproving family members, gender minorities are presented at burial in manners at odds with their gender or have death certificates categorizing them based on gender assigned at birth.[452] This is unfortunate since it erodes the deceased's identity and deprives them of a basic right: respect after death.[453]

The law has begun to address posthumous gender misattributions, but further progress is needed.[454] Currently, the few states with Respect After Death (RAD) laws fail to account for the lived realities of gender minorities, either through document requirements limiting the provisions to individuals who have undertaken medical or legal transition, affirmative planning, or completely omitting nonbinary identities.[455] To better avoid postmortem misgendering, new laws should prioritize the personal preference of the decedent, as well as firsthand evidence of the decedent's gender.[456]

Testamentary law, too, must adjust to acknowledge the harms of misgendering. To see why, suppose a parent executes a will, which leaves certain property to "my son, Ricardo," and other specific property to "my daughter, Gail." Now suppose that both children have obtained legal name and gender marker changes and are the openly nonbinary individual, Rhys, and the trans man, Gavin, respectively.[457] Due to the parent's misgendering in the instrument, have the children's rights to the bequeathed property been extinguished?

451.   *See* Tentative Ruling, Taking Offense v. State, No. 34-2017-80002749 (Super. Ct. Cal. Oct. 12, 2018).

452.   Delaney Naumann, Comment, *A Woman in Life, but a Man After Death: Protecting the Postmortem Identities of Transgender Individuals*, 10 EST. PLAN. & CMTY. PROP. L.J. 181, 182–83 (2017).

453.   *See* Karol Kovalovich Weaver, *Paying Your Respects: Transgender Women and Detransitioning After Death*, 44 DEATH STUD. 58, 58–61 (2020); Hector Torres, Greg Storms & Vanessa Sheridan eds., *End of Life: Honor and Celebration of TGNC Individuals*, *in* TRANSGENDER AND GENDER NONCONFORMING HEALTH AND AGING 191, 196–200 (Cecilia Hardacker, Kelly Ducheny & Magda Houlberg eds., 2019).

454.   Kara Nowakowski, Note, *Dying While Trans: A Critical Analysis of Respect After Death Laws*, 26 CARDOZO J. EQUAL RTS. & SOC. JUST. 79, 79 (2019).

455.   *Id.* at 94–95.

456.   *Id.* at 97–99.

457.   This vignette is based on one found in Ashleigh C. Rousseau, Note, *Transgender Beneficiaries: In Becoming Who You Are, Do You Lose the Benefits Attached to Who You Were?*, 47 HOFSTRA L. REV. 813, 813 (2018).

The answer is surprisingly unclear.[458] On one hand, probate law compels judges to give effect to all words in a testamentary instrument.[459] If that is so, then arguably, the original devisees no longer exist, and the lapse provisions apply. On the other hand, courts may consider extrinsic evidence to remedy the ambiguity.[460] Even then, that approach could cut both ways: external evidence could find that the misgendering of our hypothetical descendants could just as much indicate an intent to leave property to both children, regardless of gender, as it could indicate hostility to their transitions and an intention to disinherit them.

How should the law account for misgendering in testamentary instruments? Other commentators have suggested two solutions. Altering the Uniform Probate Code to provide a presumption that a decedent intended a gender-diverse beneficiary to receive property regardless of transition or interpreting trans beneficiaries as "after-born children."[461] Of course, this situation is also completely avoidable through careful drafting, the use of gender-neutral language, and the clever use of clauses.[462]

### F.   Misgendering in Specific Contexts: The Law of the Workplace, Schools, Hospitals, and Prisons

The discussion now moves away from broad constitutional and doctrinal questions and into discrete place-based or context-specific areas of law. The following subsections examine the potential for the law to address misgendering that occurs in the workplace, at school, during healthcare visits, and in prisons.

#### 1.   Employment Discrimination Law

Workplace harassment via misgendering is frighteningly common.[463] By one survey account, over 30 percent of trans women and over 60 percent of trans

---

458.   *Id.* at 835; Carla Spivack, *The Dilemma of the Transgender Heir*, 33 QUINNIPIAC PROB. L.J. 147, 154 (2020).

459.   Rousseau, *supra* note 457, at 835.

460.   Spivack, *supra* note 458, at 154.

461.   Rousseau, *supra* note 457 at 847; Spivack, *supra* note 458, at 175.

462.   Spivack, *supra* note 458, at 147.

463.   For an encyclopedic collection of workplace discrimination suits premised at least in part on misgendering, see: Complaint at 5, 7, Perez v. Burlington Coat Factory of Cal., LLC, No. 09-485332 (Cal. Super. Ct. Feb. 24, 2009); Complaint at 7–8, 11–12, 14–15, Versace v. Starwood Hotels & Resorts Worldwide, Inc., No. 14-cv-1003 (M.D. Fla. June 25, 2014); Complaint at 3–4, Garland v. Fairfield Malvern Lakes LLC, No. 15-cv-1721 (E.D. Va. Dec. 30, 2015); Complaint at 5, 9, 11, Higgs v. Cava Grp., Inc., No.16-cv-2365 (D.D.C. Dec. 5, 2016); Complaint at 2, 11–12, Williams v. Metro-North R.R., No. 17-cv-03847 (S.D.N.Y. May 22, 2017); Complaint at 9, Doe v. Fedcap Rehab. Servs., 2018 U.S. Dist. LEXIS 71174 (S.D.N.Y. Apr. 27, 2018) (No. 17-cv-08220); Complaint at 4-6, Doe v. Gardens for Memory Care at Easton, No. 18-cv-4027 (E.D. Pa. Sept. 18, 2018); Complaint at 7–8, Knapp v. N.Y. Off. Mental Health, No.18-cv-11536 (S.D.N.Y. Dec. 11, 2018); Complaint, at 4–5, Hankes v. Universal Prot. Sec. Sys. GP, Inc., No. 34-2019-00247797-CV (Cal. Super. Ct. Jan. 4, 2019); Complaint at 6, Allen v. Aramark Campus, LLC, No. 19-cv-3926 (N.D. Ill. June 11, 2019); Complaint at 5–6, Cunningham

men reported facing misgendering at work.[464] Importantly, these workplace behaviors far surpass simple accidental slip-ups. One trans man reported his coworker "told [him that he] had no right to request male pronouns . . . and told [him that he] didn't look like a man and never would."[465]

Misgendering at work serves "to alienate a transgender employee, reinforcing the notion that she is different than other members of her gender."[466] By targeting and isolating gender minority employees, gender misattributions create an unhealthy work environment and negatively impact employee morale and productivity.[467] It also places an additional mental burden on gender minorities,[468] who must decide whether to correct employers', coworkers' and customers' misuse of their pronouns, or avoid doing so out of fear of employment repercussions.[469]

Given these statistics, employment discrimination law must also account for misgendering. Per *Bostock v. Clayton County*, Title VII applies to gender minorities.[470] Accordingly, federal employment discrimination law would find sufficiently pervasive workplace misgendering actionable sexual harassment.

v. Burlington Coat Factory Warehouse Corp., 2018 U.S. Dist. LEXIS 169658 (D.N.J. Sept. 30, 2019) (No. 18-11266); Complaint at 12, 23, 26, Washbun v. Kingsborough Cmty. Coll., No. 20-cv-395 (E.D.N.Y. Jan. 24, 2020); Complaint at 6, Smith v. Swissport SA, LLC, No. 20-cv-808 (E.D.N.Y. Feb. 14, 2020); Complaint at 7–11, Wynter v. Victoria's Secret, Inc., No. 20-cv-02429 (N.Y. Feb. 10, 2020); Complaint at 3–4, Robinson v. Wash. Cnty., No. 20-cv-00992 (D. Or. June 19, 2020); Complaint at 10, Soule v. New Eng. Treatment Access, LLC, No.20-cv-11436 (D. Mass. July 29, 2020); Complaint at 5, Roe v. Tabu Lounge & Sports Bar, No. 20-cv-03688 (E.D. Pa. July 29, 2020); Complaint 12–15, Lerario v. Cornell Univ., No. 20-cv-06295 (S.D.N.Y. Aug. 10, 2020).

464. Gina R. Rosich, *Sexual Citizenship Theory and Employment Discrimination Among Transgender-Identified People*, 10 SOCIETIES 1, 9 (2020).

465. Stephanie M. AuBuchon, Exploring Microaggressions Among Trans Populations: Effects on Feelings of Social Exclusion 23 (Jan. 2019) (M.S. thesis, Illinois State University) (on file with author).

466. Brief for Amici Curiae Lambda Legal et al. at 20, Chavez v. Credit Nation Auto Sales, LLC, 641 F. App'x 883 (11th Cir. 2016) (No. 14-14596-E).

467. Mary Retta, *Work Sucks, Especially When People Get Your Pronouns Wrong*, VICE (June 21, 2019), https://www.vice.com/en/article/kzmy39/pronouns-at-work-trans-nonbinary [https://perma.cc/R95Y-5SPX].

468. M. Paz Galupo & Courtney A. Resnick, *Experiences of LGBT Microaggressions in the Workplace: Implications and Policy*, *in* SEXUAL ORIENTATION AND TRANSGENDER ISSUES IN ORGANIZATIONS: GLOBAL PERSPECTIVES ON LGBT WORKFORCE DIVERSITY 271, 278 (Thomas Köllen ed., 2016) (detailing one gender-diverse employee's experience with misgendering as: "happen[ing] so often and so casually, that I often feel bad about constantly correcting people—as a result, I usually say nothing"); Julia Carpenter, *What It's Like to Be Labeled the Wrong Gender at Work*, CNN (Oct. 9, 2018), https://www.cnn.com/2018/10/09/success/lgbtq-misgendering-workplace/index.html [https://perma.cc/2ZSS-4MMM]; Michelle Dietert & Dianne Dentice, *Gender Identity Issues and Workplace Discrimination: The Transgender Experience*, 14 J. WORKPLACE RTS. 121, 134–37 (2009) (collecting accounts).

469. ALISON ASH FOGARTY & LILY ZHENG, GENDER AMBIGUITY IN THE WORKPLACE: TRANSGENDER AND GENDER-DIVERSE DISCRIMINATION 127–29 (2018) (explaining directly responding to misgendering can make gender minorities greater targets for discrimination in transphobic workplaces).

470. 140 S. Ct. 1731, 1737 (2020) (holding that Title VII protects gay and transgender employees from workplace discrimination).

Thus far, courts confronted with the issue have generally been willing to hold that gender misattributions are evidence of sex discrimination.[471]

There are complications, however. In evaluating employment discrimination claims premised on gender misattributions, several courts have dismissed gender minorities' claims after demanding very specific illustrations of the gender misattributions they face at work.[472] This fundamentally misunderstands a critical feature of misgendering. Though equally as corrosive as other forms of verbal workplace harassment, unlike a racial, religious, or misogynistic slur, the use of gendered language is common in everyday conversation. This regularity means that, though the likelihood of its misuse is high, the prospect that the affected employee will keep log of every instance of misgendering is low. And yet, some courts expect that.

Other problems with courts' ability to find that gender misattributions are evidence of harassment are deeper rooted. Under current law, a plaintiff's allegation must be sufficiently "severe or pervasive[, so as] to alter the conditions of the victim's employment and create an abusive working environment" in order to constitute improper harassment for the purposes of supporting an employment discrimination claim.[473] Consequently, "accidental or isolated remarks" or intermittent verbal conduct are not sufficient.[474] This overlooks a core point captured by this Article's earlier exploration of firsthand accounts and medical literature: even a single misattribution of gender can be detrimental. And the standard requires the harassing action to be evaluated from a neutral, objective, and third-party perspective.[475] This is problematic since, as we have seen, most cisgender persons fail to grasp the harmful effects of misgendering, particularly when it is accidental or negligent.

One possible solution is the adoption of a standard that examines gender misattributions from the perspective of the victim,[476] a "reasonable gender

471.  *E.g.*, Parker v. Stawser Constr., Inc., 307 F. Supp. 3d 744 (S.D. Ohio 2018); Doe v. Arizona, 2019 U.S. Dist. LEXIS 112396 (D. Ariz. 2019); Tronetti v. TLC Healthnet Lakeshore Hosp., 2003 U.S. Dist. LEXIS 23757 (W.D.N.Y. Sept. 26, 2003); Doe v. Triangle Doughnuts, LLC, 472 F. Supp. 3d 115, 129, 136 (E.D. Pa. 2020) (misgendering as part of sexual harassment and wrongful termination); Holub v. Saber Healthcare Grp., LLC, 2018 U.S. Dist. LEXIS 35458 at *7 (N.D. Ohio March 2, 2018); Smith v. Global Contact Holding Co., 2020 N.Y. Misc. LEXIS 2969 (N.Y. June 26, 2020).

472.  *E.g.*, Milo v. CyberCore Techs., LLC, 2020 U.S. Dist. LEXIS 5355 (D. Md. Jan. 13, 2020); Barreth v. Reyes 1, Inc., 2020 U.S. Dist. LEXIS 134806 (M.D. Ga. July 29, 2020).

473.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993).

474.  Clarke, *supra* note 13, at 958; David M. Litman, Note, *What Is the Stray Remarks Doctrine? An Explanation and a Defense*, 65 CASE W. RES. L. REV. 823 (2015).

475.  *Harris*, 510 U.S. at 22.

476.  This particularly insightful path forward is Kendra Albert's. In past work, they have shown that harassment laws' hostile environment gatekeeping ignores systemic cissexism and queerphobia in most workplaces. Consequently, "if a nonbinary person is misgendered at work, even isolately or accidentally, it is almost undoubtedly part of a pattern of prohibited gender-identity or sex-based harassment." Kendra Albert, *Their Law*, HLR BLOG (June 26, 2019), https://blog.harvardlawreview.org/their-law/ [https://perma.cc/8GBJ-SZBW].

minority" standard.[477] And, by harnessing social framework evidence and expert testimony, courts will be able to evaluate misgendering in its appropriate social context. Properly contextualized, jurists and jurors will more readily recognize that misgendering—even on a single occasion—inflicts a range of psychic and physiological injuries and should be considered to render a workplace hostile for Title VII purposes.[478]

### 2.  Education Law

Gender-diverse students frequently face misgendering at school.[479] For instance, one 2018 complaint alleged that a transgender middle school student, C.T., faced "constant ridicule, taunting, and bullying," including "pervasive misnaming and misgendering."[480] Despite administrators' assurances that C.T.'s sex and name assigned at birth would be kept confidential, C.T.'s English teacher outed him on the first day of school by calling his female birth name while taking roll. Then, despite complaints to the school administration, staff and students continued to misgender and deadname C.T. This ultimately caused him "embarrassment, grief, and emotional distress."[481]

Like its employment counterpart Title VII, Title IX should be read to provide redress to C.T. and other gender-diverse youth who face misgendering in school. The Trump Administration withdrew Obama-era guidance on the applicability of Title IX to transgender students on February 22, 2017. Yet by its own admission, the Trump Department of Education has conceded that misgendering and deadnaming can constitute "harassment . . . based on sex stereotyping."[482] Additionally, since Title VII case law guides the interpretation of Title IX, *Bostock* underscores the conclusion that Title IX covers gender identity discrimination.[483] State- and district-specific civil antidiscrimination

---

477.  *Cf.* Anna I. Burke, *"It Wasn't That Bad": The Necessity of Social Framework Evidence in Use of the Reasonable Woman Standard*, 105 IOWA L. REV. 771, 790–98 (2020) (arguing for a reasonable woman standard paired with sociological and psychological evidence).

478.  Alternatively, context could also demonstrate that a single occasion could reflect a lack of intent (i.e., if the misgendering stopped, it might have originally been accidental or negligent).

479.  *E.g.*, Complaint at 7–8, 12, Brar v. Heritage Oak Priv. Educ., No. 30-2017-00935671 (Super. Ct. Cal. Aug. 2, 2017); Complaint at 5, L.O.K. v. Greater Albany Pub. Sch. Dist. 8J, No. 20-cv-00529 (D. Or. Mar. 31, 2020); V.A. Earnshaw, D.D. Menino, L.M. Sava, J. Perrotti, T.N. Barnes, D.L. Humphrey & S.L. Reisner, *LGBT Bullying: A Qualitative Investigation of Students and School Health Professional Perspectives*, 17 J. LGBT YOUTH 280, 280 (2020).

480.  Complaint at 10, 12, E.T. v. Redondo Beach Unified Sch. Dist., No. 18-cv-09749 (C.D. Cal. Nov. 19, 2018).

481.  *Id.* at 9.

482.  *See* Letter from Candice Jackson, Acting Assistant Sec'y for C. R., Off. for C.R., to Reg'l Dirs. (June 6, 2017), http://files.eqcf.org/wp-content/uploads/2017/06/2017.06.06_OCR-Instructions-to-the-Field-Re-Transgender-Students.pdf [https://perma.cc/KCW9-CKB6].

483.  *See* McNamarah, *supra* note 7, at 761 (detailing how Title VII guides Title IX's interpretation); Memorandum from U.S. Dep't of Just. C.R. Div., on Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972, at 1–3 (Mar. 26, 2021), https://www.justice.gov/crt/page/file/1383026/download [https://perma.cc/Y36T-AXQV] (explaining *Bostock*'s applicability in the Title IX context).

laws covering gender identity may also be interpreted to prohibit targeted harassment of gender-diverse students via misgendering.

More difficult questions involve the line between student disagreement on the topic of gender and misgendering. In a 2019 incident, a 6th grader initially faced reprimand for referring to a transgender female classmate as "a boy, and not a girl."[484] After intervention from attorneys from Liberty Counsel, an advocacy organization designated an anti-LGBTQ hate group by the Southern Poverty Law Center,[485] the school ultimately conceded that the student's statement did not warrant punishment, since it was a "respectful disagreement on the subject of transgender claims."[486] Obviously, students do not "shed their constitutional rights to freedom of speech and expression at the schoolhouse gate."[487] But where First Amendment protected student speech ends, and harassment and bullying begin, is a difficult line to draw. In the future, school administrators and courts will likely have to grapple with that delineation with respect to misgendering.

### 3. Healthcare Law

Gender minorities universally report facing misgendering in healthcare.[488] Whether current health care nondiscrimination law can address gender misattributions as sex discrimination, however, is far from clear. By its text, Section 1557 of the Affordable Care Act incorporates by reference the nondiscrimination clauses of Title VI, Title IX, Age Discrimination Act, and Rehabilitation Act. Further, in May 2016, the Obama Administration's Department of Health and Human Services (HHS) interpreted the nondiscrimination clause to cover a provider's "persistent and intentional" misgendering.[489]

The Trump Administration rejected that interpretation. In guidance released in June 2020, the Trump Administration's HHS explicitly stated misgendering does not constitute discrimination on the basis of sex for ACA purposes. The guidance specified that covered entities are not impermissibly

---

484.   Letter from Liberty Couns., to Superintendent, Ohio (July 2, 2019) (on file with author).

485.   *See Liberty Counsel*, S. POVERTY L. CTR. (n.d.), https://www.splcenter.org/fighting-hate/extremist-files/group/liberty-counsel [https://perma.cc/2KCH-V83S].

486.   Letter from Ennis Britton Co. LPA, to Richard L. Mast, Liberty Couns. (July 15, 2019) (on file with author).

487.   Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969).

488.   Ezra R. Morris, Louis Lindley & M. Paz Galupo, *"Better Issues to Focus On": Transgender Microaggressions as Ethical Violations in Therapy*, 48 COUNSELING PSYCH. 1, 10–12 (2020); Abbie E. Goldberg, Katherine A. Kuvalanka, Stephanie L. Budge, Madeline B. Benz & JuliAnna Z. Smith, *Health Care Experiences of Transgender Binary and Nonbinary University Students*, 47 COUNSELING PSYCH. 59, (2019); Aleta Baldwin, Brian Dodge, Vanessa R. Schick, Brenda Light, Phillip W. Shnarrs, Debby Herbenick & J. Dennis Fortenberry, *Transgender and Genderqueer Individuals' Experiences with Health Care Providers: What's Working, What's Not, and Where Do We Go From Here?*, 29 J. HEALTHCARE FOR POOR & UNDERSERVED 1300, 1307 (2018).

489.   81 Fed. Reg. 31,376, 31,406 (May 18, 2016).

stereotyping based on sex "if it uses pronouns such as 'him'" for "biological males," and "her" for "biological females."[490] Further, though Title VII usually informs Title IX interpretation, the HHS announced it "does not believe that Title IX requires . . . covered entities to use a pronoun other than the one consistent with an individual's sex and does not believe it otherwise appropriate to dictate pronoun use or force covered entities to recognize a conception of sex or gender identity with which they disagree for medical, scientific, religious, and/or philosophical reasons."[491] Thus, whether and how *Bostock*, not to mention Obama-era Title IX interpretation finding misgendering could constitute sex discrimination, will interact with the ACA, and therefore, whether misgendering can constitute healthcare discrimination, is yet unknown.

In any event, health privacy law may provide a vehicle to address the misgendering gender minorities face in health care. It is possible that facility misgendering, at least in public spaces, might be treated as a Health Insurance Portability and Accountability Act (HIPAA) violation. Arguably, gender identity information, particularly where linked to a medical condition like gender dysphoria, qualifies as "protected health information" for HIPAA purposes.[492] A health care practitioner misgendering a patient, or misgendering and then switching to gender-appropriate language, could qualify as an improper revelation under HIPAA. If the comments are made in a waiting room within earshot of others, they could be interpreted as an indication of the patient's health status and demographic information.

### 4. Prisoner Law

Misgendering raises issues for gender minorities who are incarcerated, including whether incarcerated persons have the right to be addressed with gender-appropriate language by prison officials and staff. By some accounts, the answer is complicated by regulations that limit or restrict inmates' ability to legally change their names or to go by aliases in prison. In *Konitzer v. Frank*, for example, the Wisconsin Resource Center argued against using gender-appropriate language for trans incarcerated people, claiming their policies "prohibited [them] from using false names and titles; they are not allowed to call themselves doctor if they are not a doctor, nor are they allowed to call themselves by nicknames, by their rank in a gang, or by religious titles."[493]

---

490.   85 Fed. Reg. 37,160, 37,185 (June 19, 2020).

491.   *Id.*

492.   The reasons are twofold. First, HIPAA protects demographic information, which includes gender and sex. Second, patient gender is relevant, and in some cases necessary, information for the provision of healthcare. *See also* NAT'L CTR. FOR TRANSGENDER EQUALITY, HEALTH CARE RIGHTS AND TRANSGENDER PEOPLE 2 (2012) (stating HIPAA covers information regarding "transgender status, [including] diagnosis, medical history, birth-assigned sex, or anatomy").

493.   Konitzer v. Frank, 711 F. Supp. 2d 874, 911 (E.D. Wis. 2010).

Courts normally defer to penal policies,[494] but at least with respect to gender-appropriate language, deference seems misplaced. Preventing incarcerated persons from being addressed appropriately fails to advance penological interests in security or rehabilitation. First, there is little reason to believe that officials will somehow suddenly be unable to track and monitor an inmate because they now refer to him/her/them/zir with a new name and title.[495] Second, nothing about misgendering can be characterized as rehabilitative.

Because misgendering is a form of verbal and psychological harassment, it may constitute sex discrimination violative of incarcerated persons' Equal Protection rights if it is sufficiently pervasive.[496] Verbal harassment of incarcerated persons is generally not thought to be unconstitutional,[497] but where incarcerated persons experience severe gender dysphoria, persistent misgendering may implicate the Eighth Amendment's bar against cruel and unusual punishment as psychological abuse.[498] At the same time, misgendering might be addressable under the Prison Rape Elimination Act (PREA), which defines sexual harassment as "repeated verbal comments or gestures of a sexual nature to an inmate . . . including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures."[499] Thus, courts' usual deference to prison administrators is not warranted when administrators refuse to use gender-appropriate forms of address.

## G.  The Legal Profession

More and more, lawyers and judges opposed to equality for gender minorities have intentionally woven abusive terms of reference and address into spoken arguments, written court filings, and opinions. Outside the courtroom, there are similar issues related to how lawyers address and treat gender-diverse clients, prospective clients, and colleagues.

---

494.  Emma Kaufman, *Segregation by Citizenship*, 132 HARV. L. REV. 1379, 1383 (2019) (referring to this deference as penal power doctrine).

495.  *See Konitzer*, 711 F. Supp. 2d. at 912 (finding referring to an inmate by her correct pronouns "does not appear to impinge on any . . . security issues").

496.  *E.g.*, Tay v. Dennison, 2020 U.S. Dist. LEXIS 76921 at *6 (S.D. Ill. May 1, 2020) (upholding an Equal Protection claim based on an incarcerated woman's allegations that "correctional and medical staff constantly misgender [her], referring to her as a 'mister' and using male pronouns even though they are aware that she is a transgender woman"); Crowder v. Fox, 2018 U.S. Dist. LEXIS 198097 (E.D. Cal. Nov. 19, 2018) (granting leave to amend sex discrimination claim, where premised on misgendering and other verbal abuse); Hampton v. Baldwin, 2018 U.S. Dist. LEXIS 190682 (S.D. Ill. Nov. 7, 2018) (upholding sexual harassment claim based on misgendering).

497.  *See* Brown v. Deparlos, 492 F. App'x 211, 215 (3d Cir. 2012) ("Verbal harassment of a prisoner, without more, does not violate the Eighth Amendment.").

498.  *See* Monroe v. Baldwin, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019) (crediting misgendering as "traumatic" for injunction sought on Eighth Amendment basis).

499.  Prison Rape Elimination Act of 2003, Pub. L. No. 108-79, 117 Stat. 972 (2003); 28 C.F.R. § 115.11 (2012).

This final Section considers legal interventions against misgendering in the legal profession. In particular, it contemplates the applicability of the Professional Conduct Rules and the Rules of Judicial Conduct to written misgendering by attorneys and judges. It then ends with recommendations on how legal service providers can adapt to minimize misgendering.

### 1.  Rules of Attorney Professional Responsibility

With increasing frequency, lawyers advocating anti-trans positions have been wont to use the misattribution of gender as a means to discredit, intimidate, and harass gender minorities. Often, it is quite explicit. In the 2007 trial of a Black trans woman, a prosecutor asked the jury, "How can you trust this person? He tells you *he* is a woman; *he* is clearly a man."[500] Even more recently, in 2019, defense attorneys tried to convince a jury that an attack on a transgender woman should be viewed as "mutual combat" between two men, rather than an attack on a woman.[501]

These tactics carry over for lawyers' written submissions. Recall Elmer Woodward's disrespectful misgendering and unnecessary diatribe discussed earlier,[502] or how in 2017, amici submitting briefs in *Grimm v. Gloucester School Board* revised the case caption to misgender the plaintiff, Gavin Grimm.[503]

Advocates have no tenable justification for misgendering gender minorities. It is done simply to disrespect, insult, and antagonize.[504] And yet, alarmingly, this blatant dimension of bias in the legal system has largely remained hidden from judicial and critical scrutiny.

In view of judicial inaction, I have argued that, at least in legal filings, misgendering may be addressed under the Rules of Professional Conduct 3.4, 4.4, and 8.4.[505] Rule 3.4, which prohibits an attorney from "allud[ing] to any matter that the lawyer does not reasonably believe is relevant,"[506] might be used in instances where advocates seek to inject extraneous prejudice to a trial via misgendering. Next, Rule 4.4, a bar against a lawyer's use of "means that have no substantial purpose other than to embarrass, delay, or burden," is applicable

---

500.   JOEY L. MOGUL, ANDREA J. RITCHIE & KAY WHITLOCK, QUEER (IN)JUSTICE: THE CRIMINALIZATION OF LGBT PEOPLE IN THE UNITED STATES 76 (2011).

501.   Trudy Ring, *Attacker of Trans Woman Muhlaysia Booker Gets Off with Reduced Charge*, ADVOCATE (Oct. 23, 2019), https://www.advocate.com/crime/2019/10/23/attacker-trans-woman-muhlaysia-booker-gets-reduced-charge [https://perma.cc/6B47-BKT3].

502.   *See supra* text accompanying notes 298–301.

503.   *See* Mark Joseph Stern, *SCOTUS Reprimands Anti-LGBTQ Groups for Misgendering Trans Student Gavin Grimm*, SLATE (Feb. 24, 2017), https://slate.com/human-interest/2017/02/supreme-court-reprimands-groups-for-misgendering-gavin-grimm.html [https://perma.cc/5V4U-955S].

504.   *See* Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. REV. DISCOURSE 40, 48–55 (2020) (entertaining the five most common justifications offered for misgendering in filings and demonstrating their invalidity).

505.   *See generally id.*

506.   MODEL RULES OF PRO. CONDUCT r. 3.4(e) (AM. BAR ASS'N 2018).

to misgendering since misgendering is undoubtedly experienced as embarrassing and burdensome.[507]

Last, Rule 8.4 defines professional misconduct as "conduct that is prejudicial to the administration of justice," or "conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of . . . gender identity . . . ."[508] Misgendering falls into both categories. It is directly prejudicial to the administration of justice, as it injects extraneous prejudice into trials. It is also indirectly prejudicial because those who witness such hostilities lose confidence in the impartiality of the legal profession. Simultaneously, misgendering is clearly conduct that a lawyer should know is discriminatory. Thus, again, Rule 8.4 would appear to cover such conduct.

### 2. *Rules of Judicial Conduct*

In their own writing, courts typically defer to individuals' chosen titles, pronouns, and names. Still, with increasing frequency, members of the judiciary are perpetuators of verbal violence against gender minorities. Two recent Fifth Circuit opinions—*Gibson v. Collier* and *United States v. Varner*—written by judges whose anti-LGBT positions preceded their appointments, so demonstrate.[509]

---

507. *Id.* at r. 4.4.

508. *Id.* at r. 8.4(d), (g).

509. United States v. Varner, 948 F. 3d 250 (5th Cir. 2020); Gibson v. Collier, 920 F. 3d 212 (5th Cir. 2019). For a full explanation of the justifications for judicial misgendering offered by *Gibson*, *Varner*, and the more recent *United States v. Thomason*—misgendering a non-binary litigant—as well as a demonstration of why the justifications are unsound, see Chan Tov McNamarah, *Some Notes on* Courts and Courtesy, 107 VA. L. REV. ONLINE (forthcoming 2021).. Recapped briefly here, together, the cases offer eight reasons for misgendering trans and nonbinary litigants.

*Gibson*: (1) relied on deference to litigant's classification in prisons, omitting the fact that none of the rationales for doing so were applicable; (2) cited *Frontiero v. Richardson* for the proposition that sex is immutable, missing that for the majority of modern history, pronoun use has been unhinged from persons' genital characteristics, in addition to disregarding the dangers of relying on outdated case law for support on a scientific claim; and (3) completely mischaracterized *Farmer v. Brennan* as "using male pronouns for transgender prisoner born male," though *Farmer* never actually does that.

*Varner*: (4) warned that gender-appropriate language would give the impression of wrongful partiality towards the trans parties, ignoring that misgendering trans parties signals bias against them; (5) overstated a slippery slope that referring to a trans woman with she/her/hers pronouns would eventually lead to courts to using "obscure" neo pronouns that would eventually "hinder communication between the parties and the court."; and (6) stated "no authority" advises courts to avoid misgendering trans parties, overlooking that the judicial professional responsibility rules require judges to be courteous and require courtesy from those before them.

*Thomason*: (7) claimed its misgendering was consistent "with the proceedings in the district court," failing to recognize that Thomason's sex was not a factual determination below, that appellate courts regularly correct lower court misgendering, and insofar as the concern was that readers needed to consistently identify Thomason over the course of multiple opinions, a clarifying footnote would suffice; and (8) overestimated potential misunderstanding resulting from using they/them pronouns, while missing the fact that the gender-neutral "they" is quite widely used and understood, and that careful drafting provides countless ways to minimize uncertainty—as countless opinions using them/them pronouns readily attest.

*CALIFORNIA LAW REVIEW*    [Vol. 109:2227

Often enough, judicial misgendering is overtly disrespectful and gratuitously contemptuous. Take *In re Name & Gender Change of R.E.*, an appeal from an Indiana trial court's refusal to grant a name and gender marker change.[510] Beyond refusing to use the correct pronouns during hearings, the trial court judge also referred to the plaintiff as "it" and "whichever."[511] On another occasion, the judge rejected the plaintiff's evidence of his "beard and a deep voice" in support of a gender marker change, with the response that: "I've got an aunt that has a significant amount of facial hair too, that doesn't make her a male."[512] The Indiana Supreme Court rightfully found the trial court's behavior inappropriate.[513]

Perhaps more so than misgendering from members of the bar, verbal indignities from judges are extremely problematic. For a start, disrespectful behavior reflects poorly on the judiciary and undercuts the appearance of impartiality and, in turn, the court's moral authority.[514] Additionally, recall that misgendering, particularly from institutional actors, serves important signaling functions.[515] Hence, judicial misgendering serves as an invitation for others to do the same. The plaintiff who was derisively misgendered in the *Varner* opinion experienced "an increase in verbal and emotional abuse from prison officials and from fellow prisoners who . . . used the majority's opinion as justification for their mockery."[516]

Against this backdrop, there is ample reason to address judicial misgendering through the Code of Judicial Conduct. Canon 2 of the Model Code of Judicial Conduct stipulates that judges "shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity," and further, should "require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control."[517] Additionally, Canon 2.3(A) of the Code of Judicial Conduct requires judges "perform the duties of judicial office . . . without bias or prejudice."[518] Clearly, refusing to address any party before the court with language in line with their gender should violate the Canon.[519]

---

510.   *In re* Name & Gender Change of R.E., 142 N.E.3d 1045 (Ind. Ct. App. 2020).

511.   *Id.* at 1050.

512.   *Id.* at 1049.

513.   *Id.* at 1054.

514.   *See* McNamarah, *supra* note 509.

515.   *See supra* Part II.B.3; *see also* Complaint for Declaratory and Injunctive Relief at 5, Langan v. Abbott, No. 20-cv-275 at 5 (W.D. Tex. Mar. 16, 2020) ("Institutional refusal to recognize a person's gender . . . signals . . . that disrespect, and even violence against that person on the basis of their gender will be tolerated, or is even expected.").

516.   Petition for Rehearing En Banc at 11, United States v. Varner, 948 F.3d 250 (5th Cir. 2020) (No. 19-40016).

517.   MODEL CODE OF JUD. CONDUCT Canon 2 r. 2.8(B) (AM. BAR ASS'N 2020).

518.   CODE OF CONDUCT FOR U.S. JUDGES Canon 3(A)(3) (2019).

519.   *See* Brief of 83 Legal Ethics Professors, United States v. Varner, 948 F.3d 250 (5th Cir. 2020) (No. 19-40016).

### 3. *Legal Services*

Legal services organizations must also adapt. At a collective level, this includes simple steps such as revising intake forms to be more inclusive.[520] Organizations might focus on the request for preferred or legal names, pronouns, and honorifics and consider making these questions open-ended. Beyond that, organizations could endorse the addition of gender pronouns and preferred forms of address in email signatures and add them to firm and organization webpages, directories, publications, and name tags. Lastly, legal services organizations could create employee educational programs on the importance of gender-appropriate language and implement policies that discourage misgendering at work.

At an individual level, lawyers can make efforts to advance gender-appropriate language as well. The simplest are being conscious of language use and avoiding negligent misgendering during conversations or email correspondence. During introductions, individuals might include their pronouns and ask if other persons are comfortable sharing theirs. Another possibility is respectfully intervening when judicial actors, colleagues, or opposing attorneys misgender or ask invasive questions of gender-expansive clients. Flagging clients' pronouns in filings,[521] and ensuring not to misgender or deadname in case captions may be other steps.[522]

## CONCLUSION

As gender diversity has become the subject of considerable interest and scrutiny, resistance to the movement for gender-appropriate language has increased. However, as this Article demonstrated, the prominent objections to gender-appropriate language are patently ahistorical, acontextual, and categorically incorrect on the facts and the law. Expressed more directly, the special rights, semantic determinism, trivialization, and speech regulation objections all fail.

There is a larger point running through this Article that is worth a final underscore: To understand modern-day social discrimination, it is important to look to history. When we do, oftentimes, we will see contemporary forms of discrimination are not new; they are reincarnations. Of course, how caste systems are preserved over time, as applied to specific social identities, is well-known. We can easily see how status regimes subordinating women have evolved, while avoiding erosion; and, most can follow the line of anti-Black racism and White supremacy beginning in enslavement, and tracking Black Codes, Jim Crow, to

---

520. Milo Primeaux, *What's in a Name? For Transgender People,* Everything, N.Y. ST. BAR. ASS'N J., June/July 2019, at 40, 41.

521. *See, e.g.*, Class Action Complaint at 6–7, Sow v. City of N.Y., No. 21-cv-00533 (S.D.N.Y. Jan. 21, 2021) (listing plaintiff's names, titles, and pronouns).

522. Lois Vitti, *Appropriate Case Captions in Cases Involving Transgender Litigants*, LAWS. J., Apr. 2020, at 6, 6.

*CALIFORNIA LAW REVIEW* [Vol. 109:2227

the War on Drugs and broken windows policing, to the present rise of "E-carceration" and supervised release.

Less examined is how oppression repeats *across* and *between* socially disfavored identities. To be certain, more spectacular examples, like the parallels between Japanese internment and the Trump Muslim Ban, or the similarities of the rise of religious refusals in *Obergefell*'s shadow, and the religious defenses of segregation in the Civil Rights Act's wake, are more readily discernable. But, just as importantly, forms of everyday social discrimination—such as the dishonorifics drawn out here—also replicate. That cannot be allowed to go overlooked.

History, particularly that of prejudice against other identity groups, then, must always inform conversations on modern-day discrimination. Through it, we can uncover and understand hitherto hidden patterns between forms of oppression. The current debate on gender-appropriate language for gender minorities provides a ready arena where historical perspective lays bare misconceptions on the offensiveness of misgendering and, crucially, upends misguided narratives painting this form of verbal violence as nouveau. The critical point, therefore, is to look backward. By doing so, we will see that the dishonorifics faced by gender-diverse persons today are but the ghosts of ones which came before.