# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

JAYLYN WESTENBROEK, et al., on ) <br>
behalf of themselves and derivatively on ) <br>
behalf of KAPPA KAPPA GAMMA ) <br>
FRATERNITY, ) <br>
         ) <br>
      Plaintiffs, )     CASE NO. 2:23-cv-00051-ABJ <br>
         ) <br>
       v. ) <br>
         ) <br>
KAPPA KAPPA GAMMA FRATERNITY, ) <br>
et al., ) <br>
         ) <br>
      Defendants. )

## PLAINTIFFS' RESPONSE IN OPPOSITION TO KAPPA KAPPA GAMMA'S MOTION TO DISMISS

At least the Kappa Kappa Gamma Defendants (the national Sorority, its President Mary Pat Rooney, and the Kappa Housing Corporation) and the Plaintiffs agree on one fact: Plaintiffs are members of the Kappa Kappa Gamma Fraternity, a nonprofit corporation organized under the laws of Ohio. Doc. 20 at 1. Beyond this, however, Kappa's current motion makes clear the parties agree on little else.

Kappa's motion distorts both the allegations in the Complaint and the relief that Plaintiffs seek. Fundamentally, Plaintiffs do not claim an inchoate "legal right to be in a Sorority that excludes transgender women." Doc. 20 at 2. Kappa Kappa Gamma is a nonprofit corporation that has, for more than 150 years, limited membership to women only. As Kappa's motion to dismiss makes clear, Rooney and the rest of the Fraternity Council have decided that Kappa must "evolve." Doc. 20 at 19. But corporations do not evolve. They change when the corporation's Articles of Incorporation or bylaws are amended. Plaintiffs claim the rather unremarkable right, as members

Page 1

of a nonprofit corporation, to insist that the corporation follow its bylaws and — when the Board of Directors refuses — to seek the aid of the courts. Plaintiffs do not dispute that Kappa Kappa Gamma *can* change its membership criteria. They dispute whether it has lawfully done so.

Kappa has moved to dismiss the Complaint for four reasons. They argue the Court lacks jurisdiction over Mary Pat Rooney, the President of Kappa Kappa Gamma; they argue that the Court lacks jurisdiction over the Plaintiffs' claim for breach of contract; they argue that the Plaintiffs have not adequately presented their demand to Kappa's Fraternity Council; and they argue the evolution of the word "woman" allows the Sorority leaders to admit men who claim to be women as members without any change to the bylaws. Plaintiffs will rearrange the order of the arguments slightly in this response, but none justify dismissal at this stage of litigation.

Rooney is the Chief Executive Officer of Kappa Kappa Gamma and the Complaint alleges that she has been directly involved in the decision to disregard the Sorority's bylaws and rules and to admit a man, Langford, as a member of Kappa Kappa Gamma. Tenth Circuit precedent holds that this Court has specific in personam jurisdiction over a derivative suit against corporate officials in the state where the injury to the corporation occurs. *See Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013). That location is Wyoming. Second, Kappa argues that the Complaint should be dismissed against the Sorority itself because the plaintiffs have failed to detail, with specificity, how they first sought a remedy from Rooney and the Fraternity Council of Kappa Kappa Gamma before filing suit. Kappa's argument misstates the allegations in the Complaint, in particular the recitation of the efforts of not just the Plaintiffs' attorneys but also the Plaintiffs and their parents to convince Kappa to address the bylaws violations identified in the Complaint. Doc 6. at ¶ 93-95; ¶140-142. Kappa also argues that this Court has no authority to determine Kappa

membership. This also misstates the Plaintiffs' argument. Plaintiffs are not arguing that Kappa could *never* change its membership requirements. Of course it can. The problem here is that Kappa has not. Kappa has availed itself of the corporate form, and it has adopted bylaws. These bylaws and other official policies restrict how the corporation may operate. If the corporation wishes to change, it must amend these bylaws.  What the current leadership of the corporation cannot do is ignore these bylaws and pretend that they are above the law.

Finally, Kappa moves to dismiss the Plaintiffs lawsuit against the Kappa Building Corporation, arguing that the Plaintiffs have not met the jurisdictional threshold. In doing so, they both ignore and artificially limit the damages that Plaintiffs are claiming. Plaintiffs are not claiming only the cost of their rental payments for each year, they are also claiming additional special damages. (*see* Doc 6. at ¶¶ 154-156 & ¶158). Wyoming allows special damages for contract breach, especially when there are special circumstances and a special relationship, as here. Kappa's artificial attempt to lower the damages claimed is not sufficient to defeat jurisdiction.[1]

Kappa's motion to dismiss is unsurprising in some ways, as it provides the consistent response that Plaintiffs have received since they first raised their concerns in September 2022: sit down and shut up. Or quit. This attitude reflects the arrogance of the underlying attempt at the unlawful transformation of a 150-year-old institution.

Of particular note, this Court should be sensitive to the numerous unsupported factual allegations that are introduced in Kappa's response. Kappa states that it has had a policy to admit men since 2015. The difficulty is that there is no evidence of this fact. Indeed, to the extent that

---

[1] Kappa also makes several derivative arguments to dismiss the Complaint, but each rest on the underlying assumption that the Sorority has the authority to disregard the membership restrictions in its bylaws.

this policy existed, it appears to have been concealed. Plaintiffs have not yet claimed fraud in their Complaint, but this new detail suggests that this is only a matter of time. To the extent that Kappa leaders have had a policy to admit men who claim to be women, but the organization has held itself out as all-female, the national Sorority has been engaged in fraud. The brief includes other claims of fact that simply cannot be credited at this stage of litigation.

## Standard of Review

At this early stage of litigation, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023).

Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that the defendant acted unlawfully but the complaint does not need to establish that the defendant probably acted unlawfully. *Mckinney v. Granite Peak Fabrication, LLC*, No. 19-CV-00266-ABJ, 2020 WL 10356870, at *2 (D. Wyo. Mar. 13, 2020) (citing *Iqbal*). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

"Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton*, 63 F.4th at 1276 (punctuation omitted). There is a "low bar for surviving a motion to dismiss," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.*

## I.    The Court has in personam jurisdiction over Rooney.

A federal district court's authority to assert personal jurisdiction in a diversity suit is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)). "[I]n addition to satisfying this state law requirement, the exercise of personal jurisdiction must not offend the due process clause of the Fourteenth Amendment." *United States v. Botefuhr*, 309 F.3d 1263, 1271 (10th Cir. 2002) (quotation omitted). Wyoming's long-arm statute confers the maximum jurisdiction permissible consistent with the Due Process Clause. *Markby v. St. Anthony Hosp. Sys.*, 647 P.2d 1068, 1070 (Wyo. 1982). Thus, this Court's analysis here is limited to a single due process analysis. *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010).

"Consistent with due process, a court may exercise specific personal jurisdiction over a non-resident defendant only when that defendant has the requisite 'minimum contacts' with the forum state, such that having to defend the lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[T]he Supreme Court has instructed that the 'minimum contacts' standard requires, first, that the out-of-state defendant

must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' [a] defendant's forum-related activities.'" *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

**A.      Rooney has sufficient minimum contacts with Wyoming to support specific in personam jurisdiction in this Court.**

The "purposefully directed" analysis "can appear in different guises," "[i]n all events, the shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Dudnikov*, 514 F.3d at 1071. Next, "[t]he import of the 'arising out of' analysis is whether the plaintiff can establish that the claimed injury resulted from the defendant's forum-related activities." *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (quotation omitted). Finally, "[i]f the defendant's actions create sufficient minimum contacts, the court must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." *Eighteen Seventy*, 32 F.4th at 966 (alterations and quotations omitted).

The "minimum contacts" standard requires, first, that Rooney must have "purposefully directed" her activities at residents of the forum state, and second, that the Plaintiffs' must "arise out of" Rooney's forum-related activities. Rooney argues that there is no basis to hold her subject to Wyoming jurisdiction when she has never been to Wyoming, but Tenth Circuit precedent makes clear that a corporate officer like Rooney can be sued in a derivative action by the corporation in the state when the injury occurred.  *Newsome v. Gallacher*, 722 F.3d 1257, 1264–81 (10th Cir.

2013). Even if the corporation is located elsewhere, courts do not "ignore where the injury was actually felt." *Id.*  ar 1268. "Thus, in a lawsuit claiming breach of fiduciary duty, we believe it is appropriate to consider harm to those to whom a fiduciary duty was owed … when answering the question of who was injured and where." *Id.*

Here, the Kappa members with the greatest injury, the strongest interest in vindicating the corporation's interests, and—indeed—standing to object are tied to the Wyoming forum. The answer to "Who was injured, and where?" is that Kappa and its members were injured by the admission of Artemis Langford as a member of Kappa at the University of Wyoming.

As noted, purposeful direction in this suit has three requirements: (1) intentional action, (2) express aiming at the forum state, and (3) knowledge that the brunt of the injury would be felt in the forum state. *Dudnikov,* 514 F.3d at 1072. The intentional action element requires little discussion. The record contains no suggestion that Rooney acted unintentionally when she took the steps that let to Langford's admission. Rooney is the "chief executive officer," Doc 6-1 at 112, of a non-profit corporation that operates in the State of Wyoming. As the verified complaint alleges, decisions at the chapter level are not made by students at the University of Wyoming. Doc. 6 at ¶ 74. Rather, every single decision is made by the "workforce" that Rooney commands. Doc. 6 at ¶¶ 75-76. These include the decision to admit Langford to Kappa Kappa Gamma.[2]

---

[2] Kappa's Motion infers malicious intent in the decision not to name other corporate officers of Kappa Kappa Gamma. The opposite is true. Just as Plaintiffs did not name the local chapter officers who worked at Kappa's behest to admit Langford, the Plaintiffs named only one member of the Fraternity Council to reduce the collateral consequences of the lawsuit on third parties. The law does not require more, but if there is a concern, Plaintiffs can sue more Directors. The Plaintiffs are open to whatever direction is provided.

Kappa attempts to introduce new facts in its motion to dismiss, claiming that Rooney had no awareness of the events at issue here. First, this new fact is directly contrary to Plaintiffs' allegation that Rooney knew what was happening in Wyoming. These allegations are more than mere conjecture, especially when the executive director of Kappa (Rooney's subordinate) referred to Rooney's direct involvement, telling Plaintiffs they should stop complaining about Langford's admission because "your concerns were reviewed…we believe proceeding with initiation is the appropriate next step" so "Thank you for respecting this decision" Doc. 6 at ¶93. The use of "we" in the passive voice is evidence that the decision was made by Poole's superior (Rooney). *See also* Doc. 6-1 at 21. The President supervises staff. Finally, the careful wordsmithing in Kappa's memorandum indicates the extent of Rooney's involvement. Kappa states that Rooney was unaware until an invitation to join was extended to Langford. But this was not the last moment before Langford was inducted into membership. As the Complaint alleges, Plaintiffs repeatedly noted the various bylaws and other violations up until the date of Langford's actual induction in mid-November. Doc. 6 at ¶¶ 93-95; ¶¶ 140-142. Kappa appears to be seeking to mislead this Court with its factual assertion.

The express aiming element requires Wyoming to have been the "focal point" of the tort or contract action. *Dudnikov,* 514 F.3d at 1074. Langford is a member of the Kappa Kappa Gamma sorority chapter located at the University of Wyoming. The women who will be most affected by Langford's admission all attend college in Laramie, Wyoming. The sorority house where Langford said he "cannot wait to sleep with all the girls," Doc. 6 at ¶ 113, is in Wyoming. The final requirement is knowledge that the brunt of the injury would be felt in the forum state. This is also alleged. Doc. 6 at ¶ 166.

When a plaintiff satisfies its minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless "offend traditional notions of fair play and substantial justice." *Dudnikov,* 514 F.3d at 1080 (internal quotation marks omitted). "Such cases are rare." *Rusakiewicz v. Lowe,* 556 F.3d 1095, 1102 (10th Cir.2009). The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477. Kappa does not address the usual factors, but instead suggests that a corporate officer is not subject to jurisdiction because of the actions of the corporation in a forum. The Tenth Circuit's decision in *Newsome* makes clear that this is not a requirement of due process analysis.

Under the 'fiduciary shield doctrine,' a nonresident corporate agent generally is not individually subject to a court's jurisdiction based on acts undertaken on behalf of the corporation. *Newsome*, 722 F.3d at 1275. The fiduciary shield doctrine, however, only exists as a matter of state law. *Id.* As noted earlier, Wyoming has abandoned any limits on personal jurisdiction beyond what the Constitution provides.[3]

## II.     The Plaintiffs' derivative claim has been pled with specificity.

Kappa claims that the Complaint has not specifically alleged sufficient information to allow Rooney and the other corporate leaders to act and avoid a breach of fiduciary duty. This, however, misses the extent to which the Plaintiffs, their parents, and their attorneys asked for months for actions by Kappa. The demands did not begin in November 2022 with a letter from

---

[3] Kappa cites a recent decision of another federal court in Wyoming which quotes the fiduciary shield doctrine. That case relies, ultimately, on a 1973 Wyoming Supreme Court case that applied the fiduciary shield doctrine. *Cozzens v. Piper Aircraft Corp.*, 514 P.2d 1375, 1378–80 (Wyo. 1973). At that time, Wyoming had a more limited long arm statute. As this Court has previously held, Wyoming no longer limits in personam jurisdiction beyond what the U.S. Constitution requires.

counsel. Doc. 6-1 at 178-180 (Attachment 11); (*see also* Doc. 6 at ¶ 93-95; ¶140-142 for other actions taken prior to formal demand.)

In September and early October 2022, Plaintiffs and, in some cases, their parents reached out to national Sorority leaders to raise concerns about Langford. At that time, Langford's membership had not yet been finalized. Doc. 6 at ¶ 93. The Executive Director of the Sorority, told Plaintiffs that their request had been presented to the Fraternity Council—which is led by Rooney—and refused. *Id.* Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

In November 2022, Plaintiffs, through counsel, again wrote to the national Sorority, requesting that Kappa Kappa Gamma prevent the initiation of Langford until concerns about his membership were resolved. Doc. 6-1 at 178-180 (Attachment 11). Plaintiffs' letter pointed out that Langford's membership is both a violation of the Sorority's bylaws and also breaches the housing contract that Plaintiffs signed with the Defendant Kappa Housing Corporation. The Sorority, through counsel, rejected Plaintiffs' request. Doc 6-1 at 45-47 (Attachment 3). The Sorority repeated its claim that Kappa Kappa Gamma is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id.* This statement, which disregards the actual meaning of the word "woman" as used by the Sorority for 150 years, was presented to Plaintiffs as the official policy of the Sorority. Kappa's counsel stated that the Sorority leadership has concluded that a woman need not be "biologically born as female." *Id.* at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs'

effort to obtain the desired action from the directors or comparable authority or other shareholders and/or members within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

### III.    There is no First Amendment or other bar that prevents this Court from holding that the Sorority's bylaws must be respected by its officers.

Kappa suggests that the right of free association prevents this Court from interfering with its membership decisions. This misstates both the law and the Plaintiffs' argument. The Plaintiffs are not arguing that Kappa could *never* admit a man (transgender or otherwise) into its membership. Plaintiffs' allegation is that Kappa must faithfully follow its bylaws, which do not permit such membership, until these bylaws are changed.

In Ohio, a corporation's charter consists of its articles of incorporation and the Ohio laws in existence when the articles of incorporation were filed. *Opdyke v. Sec. Sav. & Loan Co.*, 157 Ohio St. 121, 131-32, 105 N.E.2d 9, 16 (1952). For a for-profit corporation, the corporate charter is a contract between the corporation and its stockholders. *Opdyke*, 105 N.E.2d at 16; (1952).] For a non-profit corporation, the corporate charter is a contract between the corporation and its members. *See* 18 Am. Jur. 2d Corporations § 33 ("The fundamental rules and principles of law of for-profit corporations are equally applicable to nonprofit corporations unless otherwise specifically provided otherwise in the enabling statutes.").

The corporate charter contains the terms upon which the corporators have agreed to associate; it sets forth both the authority that members can exercise as well as the limits within which the body of corporators can lawfully act in a corporate capacity. *Wegener v. Wegener*, 126 N.E. 892, 893–94 (Ohio 1920). Like other corporations, the Sorority and the Fraternity Council/Board must act consistently with its corporate charter, as this forms the basis for the entity's authority. When a corporation's actions exceed the authority granted by its corporate

charter, the actions are ultra vires and void. *Id.* at 894. Board members who disregard or otherwise seek to circumvent the corporation's corporate charter violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance).

Kappa Kappa Gamma has bound itself through its Bylaws, Standing Rules, and Policies. *Brown v. Carter*, 15 Haw. 333, 344 (1903) ("The corporators may bind themselves by contract in the articles or outside the articles as well as in what they may prefer to call by-laws, as to their methods of dealing with officers."). Under Ohio law, the Bylaws of Kappa Kappa Gamma are the code of regulations for the corporation. *Kappa Kappa Gamma* Bylaws, art. xix (2022). The Kappa Kappa Gamma Bylaws explicitly restrict membership in the Sorority to women only. Doc. 6-1 at 183 (Attachment 12); Attachment B at 2 (art. III, sec. 1).

Kappa's response is that the meaning of the word "woman" has "reasonably evolve[d]" to include men to claim to identify as women. Doc. 20 at 19. But Kappa's citation, to the Supreme Court's decision in *Bostock*, is not a decision that adopts the concept of 'the evolution of words' that the Kappa Defendants advocate.  Doc. 20 at 14 (citing *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020)). *Bostock*'s holding is that discrimination against transgender member is discrimination based on the person's sex. "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). *Id.* The Court acknowledged that meaning of words can change. "[W]e must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context."

*Id.* The Court, however, drew the opposite conclusion from that advocated here by Kappa: The law's ordinary meaning at the time of enactment usually governs. *Id.* at 1738. [4]

The words *woman* and *women*, as used in Kappa Kappa Gamma's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Sorority's 150 years, have always referred to female human beings. These words, as used by Kappa Kappa Gamma prior to Defendants' unlawful actions, have never referred to biological males who claim to be women. The Complaint goes to great lengths to draw upon the history of Kappa and its origins to provide the Court context on its early distinctions between men and women competing in the classroom and the reasons for its formation.

Moreover, it must be noted that Kappa's new definition of "woman" is inconsistent and illogical. As the Sorority's attorney explained to Plaintiffs, the Fraternity Council views gender as a "broader construct encompassing identity." Doc 6-1 at 45 (Attachment 3). This concept of gender connects to "[h]ow an individual defines themselves in terms of characteristics traditionally identified in this culture as male or female," which is a person's "gender identity." *Id*. at 34, 40 (Attachment 2). As a result, the Sorority's attorney claims that men can also become Kappa members if they "identify as women." *Id.* at 32.

Kappa cannot be a "single-gender organization" wherein members have a "single" gender identity unless the Sorority uses gender identity to make membership decisions. But the Sorority

---

[4] Kappa's response is to draw upon a definition that was adopted by one dictionary in late 2022 after Langford's membership. This is precisely the sort of revisionist interpretation that is not permissible, either in the corporate boardroom or the courtroom.

states that it does not discriminate based on gender identity. *Id.* at 1 ("Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on … gender identity…."). *Id.*

## IV.   The breach of contract and tortious interference claims do not fail.

To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages. Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts. There is the contract between Kappa and its members under Ohio corporate law. And there is the contract with the Kappa Kappa Gamma Housing Corporation. The Defendant Kappa Kappa Gamma Building Corp., and the Plaintiffs entered into a contract to provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. These Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house. Men cannot even enter the living areas of the Sorority except upon special circumstances that have been approved in advance. Through Defendant Kappa's actions, they have created a breach of contract as to both the sorority experience and paid housing experience that these young women were promised. Langford's access to and unfettered presences in the sorority house violates the housing contract that Plaintiffs signed and the Plaintiffs suffer extensive damage as a result, including PTSD, anxiety, and emotional damages in an exact amount to be proven at the time of trial but far in excess to the jurisdictional requirement required in this matter. Additionally, many recruits and members have fled the house or sorority for this reason. One member even moved a state away. These damages and harms at a time of a college woman's experience are impactful, unfair and unjust.

Kappa argues that the Plaintiffs lack sufficient damages to bring their claims to federal court. This is incorrect. Plaintiffs assert—as the Sorority itself did when it filed a Complaint in the U.S. District Court for the District of Massachusetts in 2018—that single-sex sororities are a source of stability and community in college life for young women. The single-sex nature of a sorority is necessary to create this cohesive atmosphere. "[T]he opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests." Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment." Doc. 6 at 31-33 (quoting Kappa itself).

Jurisdiction based on diversity of citizenship exists when a dispute between citizens of different states involves an amount in controversy exceeding $75,000. 28 U.S.C. § 1332(a).  In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation. *E. g., McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 181 (1936). The Tenth Circuit has followed what has commonly been referred to as the "either viewpoint rule" which considers either the value to the plaintiff or the cost to defendant of injunctive and declaratory relief as the measure of the amount in controversy for purposes of meeting the jurisdictional minimum. *Justice v. Atchison, Topeka and Santa Fe Ry. Co.,* 927 F.2d 503, 505 (10th Cir.1991). However, in multiple plaintiff cases, the "either viewpoint rule" does not override the well-established principle that each plaintiff or member of the class must individually satisfy the amount in controversy requirement. *Snyder v. Harris,* 394 U.S. 332, 335 (1969); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006). At bar, the damages of any particular Plaintiff exceed $75,000, the requisite amount in controversy and

the jurisdictional threshold is met for this Court to properly exercise subject matter jurisdiction over this case.

Plaintiffs' Complaint is a derivative suit to obtain a judgment that Kappa Kappa Gamma remains as required by its Articles of Incorporation: a non-profit corporation "intended to unite women, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Doc.6-1 at 62 (emphasis added). Plaintiffs ask this Court to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules by fiat, and ask this Court to enjoin the unlawful implementation of the Guide. Plaintiffs ask this Court to hold that the admission of Artemis Langford, and any other man, as a member of Kappa Kappa Gamma is void ab initio. Plaintiffs further ask this Court to declare that Defendant Rooney and the other members of the Fraternity Council have violated their fiduciary duties to the Sorority. Plaintiffs further ask for damages, reflecting the injuries the Sorority has and will continue to suffer in its membership, including the closure of the Sorority's chapter at the University of Wyoming, loss of donations, decrease in alumnae support and participation, and permanent damage to the Sorority's reputation and mission. Doc. 6 at ¶ 11.

Plaintiffs also seek direct relief from the Defendants. Ohio law recognizes that faithless directors of a corporation can directly injure others through a breach of fiduciary duty in addition to the derivative injuries suffered by the corporation itself. In pursuit of an ideological agenda, Defendants have violated numerous other Bylaws, Standing Rules, and Policies of the Sorority, and caused the Sorority to act in a manner that has specifically harmed Plaintiffs and undermined contractual obligations to the Plaintiffs. The Fraternity's officers, directors, and employees

directly, and through alumnae advisers acting at Fraternity Council direction, pressured student members to endorse Langford's initiation to the Sorority. When Langford's membership vote violated the Sorority's secret-ballot procedures, Defendants and their agents knowingly disregarded the clear violations of the corporate rules. When Plaintiffs raised concerns about Langford's inappropriate and threatening behavior in the sorority house, Defendants and their agents refused to protect Plaintiffs and prevented others from doing so. Instead of protecting Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma altogether. Defendants have pushed Plaintiffs to resign even though—having already joined Kappa Kappa Gamma—Plaintiffs are permanently barred from joining a different sorority. Finally, Defendants have retaliated against Plaintiffs and other sorority members who object to the Board's unauthorized Guide. Plaintiffs ask for all remedies available in response to Defendants' wrongdoing, including monetary damages, punitive damages, injunctive relief, declaratory relief, and attorney fees. Doc. 6 at ¶ 12.

Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, as the parties are citizens of different States, all necessary parties are before this Court, and the sum of the matter in controversy, including damages and the value of the declaratory and injunctive relief sought by Plaintiffs, exceed seventy-five thousand dollars ($75,000.00). Doc. 6 at ¶ 13. Defendant Kappa Kappa Gamma Building Co., a Wyoming nonprofit corporation formed a contract with the Plaintiffs. While Plaintiffs do not seek damages directly from Kappa Housing Corp., Plaintiffs do allege that Kappa Kappa Gamma Fraternity has tortiously interfered with their contractual relationship with this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation. Fed. R. Civ. P. 19(a)(1)(B). Doc. 6 at ¶ 23. As a requirement of

membership, Sorority members must "promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the Bylaws, Standing Rules, and Policies [of the Sorority] as well as my chapter Bylaws and Standing Rules." Attachment 9 (Commitment Form). Collegiate members pay dues at initiation and additional dues every year to the Sorority. Plaintiffs cannot resign from Kappa Kappa Gamma to join a different sorority. Kappa Kappa Gamma is one of the 26 sororities that comprise the National Panhellenic Conference (NPC). These sororities have all agreed a woman who joins one NPC sorority is permanently ineligible for membership in any other NPC sorority. Doc. 6 at ¶ 153. Each Plaintiff joined Kappa Kappa Gamma with the promise they would be able to live and socialize in an all-female environment. Defendants have repeatedly lauded the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will never have the benefits of a college sorority experience. Some of the damages to each Plaintiff are easily calculable, including the dues and housing payments that were made for the purpose of living in an all-female environment. Some will be more difficult to calculate, but they are no less real. For 150 years, Kappa Kappa Gamma has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa Kappa Gamma has stated that these benefits result from the single-sex experience. Plaintiffs agree that these benefits exist. The loss of these lifetime benefits is similarly calculable, and Defendants are responsible for this damage to Plaintiffs. Doc. 6 at ¶ 154.

The Sorority itself has also been damaged by Defendant Rooney and the other members of the Fraternity Council. Their violations of fiduciary duty have caused the sorority chapter at the University of Wyoming to lose significant membership in less than six months. With very few signed housing contracts for the next academic year, the sorority house at the University of

Wyoming will close and then the college chapter itself will fold. The loss of a sorority chapter has a significant effect beyond just the loss of dues from the college students there. These young women will become leaders, and—just as prior generations have—they will donate to the Sorority and its continued operation. The loss of a sorority chapter cuts off all future alumnae from that school. Doc. 6 at ¶ 155. Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty, and their contractual obligations to the Plaintiffs, by purporting to admit Langford into the Sorority. Doc. 6 at ¶ 158.

Specifically, damages will be attested to further during discovery and at the time of trial in this matter. For purposes of this briefing, this Court should recognize that room, board and dues alone include $9,100 per year, per Plaintiff. One would not pay sorority fees, far in excess of campus housing, unless there was significant benefit to their membership in the female living experience and bond. The value of sorority membership includes leadership training, mentoring and access to valuable female networks of 260,000 alumnae for career opportunities and internships, both during the collegiate experience and after. Experts will testify during this action that this experience alone could be worth $100,000 to each individual Plaintiff. Although Defendants say these young women could simply resign their lifetime membership, they have no

ability to transfer to another NPC group. This too, is of significant monetary detriment far in excess of the jurisdictional threshold required in this matter.

## Conclusion

For the foregoing reasons, the Plaintiffs respectfully requests that this Court DENY Defendants' Motion to Dismiss and allow the Plaintiffs to be fully heard in this matter.

Respectfully submitted,

/s/ Cassie Craven_____          /s/ John Knepper_____
Cassie Craven, 7-5664               John Knepper
Longhorn Law Limited Liability Company   Law Office of John G. Knepper, LLC
109 E. 17th St. Suite 11            P.O. Box 1512
Cheyenne, Wyoming 82001             Cheyenne, Wyoming 82003
307-823-3062                        307-632-2842
cassie@longhornlawllc.com           John@KnepperLLC.com

Dated this 5th day of July, 2023.

## CERTIFICATE OF SERVICE

I hereby certify that on 5th day of July, a copy of the foregoing pleading, was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Cassie Craven
Cassie Craven, 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St. Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

/s/ John Knepper
John Knepper
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com