Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:(307) 265-0700
Facsimile: (307) 266-2306
E-Mail:    sklosterman@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:(614) 464-5452
Email:    nmmclaughlin@vorys.com
          bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) ) ) | |
|    Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 23-CV-00051-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | ) ) ) ) ) ) ) ) ) ) ) | |
|    Defendants. | ) | |

## REPLY IN SUPPORT OF DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION TO DISMISS

## I.     INTRODUCTION

Unable to offer any response to many of Defendants Kappa Kappa Gamma Fraternity ("Kappa"), Mary Pat Rooney ("Rooney"), and the Kappa Kappa Gamma Building Co.'s (the "Building Co.") arguments, Plaintiffs respond to Defendants' Motion to Dismiss by constructing straw men and advancing new theories of recovery found nowhere in their Amended Complaint. The entire endeavor amounts to little more than another plea for this Court to build them the social circle they want so that they can avoid the fact that their fellow sorority sisters voted to admit a transgender woman. But Plaintiffs still have not offered this Court a cognizable basis for taking a role in a college sorority's membership selection.

At multiple points, Plaintiffs' Response disregards the content of their own Amended Complaint as it draws on allegations Plaintiffs did not make. At another point, it spends pages attempting to dispel a jurisdiction argument that Defendants did not advance in their Motion to Dismiss. And, in the end, Plaintiffs give away the game when they do not even attempt to identify an actual bylaw that supports their preferred definition of the term "woman" or respond to Defendants' arguments on deferring to a private organization's interpretation of its own governing documents and fail to coherently explain how they suffered a breach of contract under the actual terms of the contract at issue in the Amended Complaint. As explained below, the arguments Plaintiffs advance fail, and the ones with which they do not even try to engage are fatal to their claims.

## II.    DISCUSSION

Each of Plaintiffs' four claims depends on either a finding that Langford's admission to the Gamma Omicron chapter of Kappa violated a Kappa bylaw or that there was a breach of Plaintiffs'

housing contract.[1]  It is therefore notable that Plaintiffs, now the better part of a year into contesting Langford's admission into Kappa, **still** cannot point to a bylaw that says she cannot join Kappa and do not identify any provision of their housing contract that was breached.  As evidenced by their Response, Plaintiffs cannot contest any of the following:

- No Kappa bylaw explicitly adopts Plaintiffs' exclusionary definition of the term "woman" or defines the term at all;

- Ohio law generally defers to an organization's interpretation of its own bylaws;

- Plaintiffs' position that a federal court should be involved in sorority recruitment has no logical stopping point and could drown the judiciary in disputes over the inner workings of private organizations; or

- No provision of the housing contract some Plaintiffs signed was breached by Langford's admission into Kappa.[2]

If the Court looks only at these undisputed arguments, it has sufficient grounds to grant the Motion to Dismiss in its entirety.  Plaintiffs' failure to present cogent argument or citation of pertinent legal authority to refute Defendants' arguments may be deemed a confession of the motion to dismiss.  *See*, U.S.D.C.L.R. 7.1(b)(2)(A); *Breen v. Black*, No. 15-CV-168-NDF, 2016 U.S. Dist. LEXIS 178820, at *3 (D. Wyo. Mar. 7, 2016) (citing *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006)) ("[t[he Court maintains the discretion to deem a motion confessed by the non-responding party").  The reason for this rule is, in part, because the Court

---

[1] In their Response, Plaintiffs contend that "there are actually two different contracts."  As discussed below, Plaintiffs have only asserted **one** breach-of-contract claim, and it is for breach of their housing contracts.

[2] Defendants argued that Plaintiffs could not identify a portion of their housing contract that was actually breached.  Plaintiffs responded by quoting their own Amended Complaint, but did not actually identify a portion of the contract (which they appended to the Amended Complaint) that supports their position.

should not be called upon to do the work of a party.  Plaintiffs should be held responsible for not responding to Defendants' arguments and the legal authority offered in support of such arguments.

Moreover, the arguments Plaintiffs offer in lieu of rebutting the Defendants' arguments fail on their own, only reinforcing the conclusion that their grievances belong nowhere near a federal courthouse.  Defendants address these issues below.

### A.  The Court Lacks Personal Jurisdiction over Rooney

In the Motion to Dismiss, Rooney explained how this Court lacked personal jurisdiction over her because Plaintiffs have not alleged that she had the requisite minimum contacts with Wyoming.  In response, Plaintiffs assert that a fiduciary can have minimum contacts with a state where they do not live.  (ECF No. 24 at 6 (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1264–81 (10th Cir. 2013).)  *Newsome*'s holding, however, is unremarkable.  It does not hold that a fiduciary is inherently subject to the personal jurisdiction of any state where a plaintiff claims to have been wronged by a corporation, only that a fiduciary **can** be subject to such personal jurisdiction **when they have minimum contacts with the forum state**.  *Newsome*, 722 F.3d at 1264.  Rooney never contended otherwise.

As set forth in its moving papers, the minimum-contacts test required Plaintiffs to assert allegations establishing that Rooney purposefully directed conduct at Wyoming.  *See Dudnikov v. Chalk and Vermilion Fine Arts*, 514 F.3d 1063, 1070–71 (10th Cir. 2008)).  Plaintiffs' Complaint does not do so.  Despite their contention that this issue "requires little discussion," Plaintiffs cannot point to any allegations that actually state **Rooney** directed **any** conduct at Wyoming.  Instead, they discuss allegations they made about other people and contend that they are implicitly about Rooney.  Under Plaintiffs' theory, Rooney, serving in a volunteer position on Kappa's Fraternity Council (not as the "Chief Executive Officer," as Plaintiffs state in their Response), would become

subject to the personal jurisdiction of any state were a member of a "workforce" she allegedly "commands" directs conduct.  Indeed, Plaintiffs' contention that Rooney, a non-employee who is a volunteer for Kappa, was directly involved in the Gamma Omicron chapter's decision to admit Langford is based on an email from Kari Kittrell Poole, an employee and Executive Director for Kappa, that does not reference Rooney.  (ECF No. 24 at 8.)

Traversing the morass of false and irrelevant allegations in the Amended Complaint is no easy task, but any reader who is able to complete it will emerge on the other side without having read a single allegation that Rooney directed any conduct at Wyoming.  Thus, Plaintiffs fail to establish personal jurisdiction over her.

**B.  The Court Lacks Subject-Matter Jurisdiction over the Building Co.**

The Building Co. moved to dismiss the claim(s) against it for lack of subject-matter jurisdiction, noting that Plaintiffs concede on the face of the Amended Complaint that they are not seeking any damages from the Building Co. (ECF No. 20 at 12–13.)  Kappa, on the other hand, did not move to dismiss the claims against it for lack of subject-matter jurisdiction.  Yet, in response, Plaintiffs inexplicably spend roughly five pages articulating their various theories of damages to which they are entitled from Kappa.[3]  (ECF No. 24 at 15–19.)  Amidst this section,

---

[3] Although not relevant to this pleading, Plaintiffs' claims for damages are facially outrageous and not reflective of any reality.  To the extent damages have been caused to Kappa and the Gamma Omicron chapter, they are more likely caused by the false defamatory statements Plaintiffs and their attorneys' have made, including in national media interviews.  Given the campaign that Plaintiffs and their supporters appear engaged in to ensure "the sorority house at the University of Wyoming will close and then the college chapter itself will fold," no so-called "expert" will be able to opine that Kappa caused this harm through its inclusive policy.  Indeed, as every other national sorority has a similar inclusive policy, this contention does not make any sense. Moreover, room and board for living in the Kappa house at the University of Wyoming is actually thousands of dollars **less** per year than on-campus room and board (https://www.uwyo.edu/sfa/cost-of-attendance/index.html), so Plaintiffs are not paying more for the "female living environment," regardless of how they define that term.

which at many points resembles a copy-pasted collage of allegations from the Amended Complaint, Plaintiffs reiterate that they are not seeking damages from the Building Co. and state that the Building Co. has nonetheless been named because "Plaintiffs believe [the Building Co.] is a required party."  (*Id.* at 17.)  Plaintiffs do not explain **why** they believe this or offer any authority suggesting their belief is grounded in the law, even though the Building Co. explained in the Motion to Dismiss why it is not a required party and how Plaintiffs cannot establish jurisdiction through Rule 19.  (ECF No. 20 at 7.)  Put simply, Plaintiffs never assert that they seek damages from the Building Co. in an amount that would give this Court subject-matter jurisdiction.

### C.  **Plaintiffs Have Not Met Rule 23.1's Requirements**

#### i.  ***Plaintiffs Misinterpret the Nature of Rule 23.1's Safeguards***

Plaintiffs did not meet Rule 23.1's requirement that they plead facts showing that they exhausted attempts to obtain the desired result from Kappa before filing this lawsuit.  Responding to Defendants' arguments on this point, Plaintiffs do not even address the governing law on futility, let alone show that they actually established it.

Plaintiffs note that they and their parents contacted Kappa with their concerns about transgender women in addition to their attorneys' communication with Kappa.  But futility does not turn on the number of communications; it requires Plaintiffs' to show that "the directors' minds [were] closed to argument."  *Carlson v. Rabkin*, 789 N.E.2d 1122, 1128 (Ohio App. 2003). Plaintiffs completely ignore the undisputed fact that the last communication they received from Kappa **invited** them to identify bylaws applicable to the situation.  They also ignore that their communications with Kappa prior to the lawsuit did not raise the allegation that Fraternity Council members had been involved in Langford's admission, which is a key factual allegation supporting a claim that those directors breached their fiduciary duties.  (*See* ECF No. 20 at 16–17.)

Absent a legal argument from Plaintiffs that they established futility, the Court should find Plaintiffs did not meet the requirements of Rule 23.1.

### ii.  ***Plaintiffs Again Fail to Identify a Bylaw Langford's Admission Breaches***

Defendants' Motion to Dismiss, like the November communication from its counsel, confronted Plaintiffs with a simple question: what Kappa bylaw compels Kappa to deny admission to transgender women?  Yet again, Plaintiffs fail to respond with an answer.

This entire case is premised on the idea that the term "women" only has one definition.  As Defendants have explained, it does not.  Courts, dictionaries, and society have not adopted a unified definition of the term, let alone the one Plaintiffs would prefer.  Kappa and the other sororities that have uniformly adopted the same view are not out of step with any kind of universal definition in including transgender women in their conception of who is a woman.  And Ohio law is clear that courts should not hold a magnifying glass to every interpretation a private organization makes of its own bylaws.  (ECF No. 20 at 17–20.)  Plaintiffs, of course, do not discuss the judicial non-intervention doctrine at all.

Instead they repeat ad nauseam some version of the idea that "the word[] . . . women . . . ha[s] always referred to female human beings."  (*See, e.g.* ECF No. 24 at 13.)  Setting aside the continued disrespectful and hurtful language Plaintiffs use in expressing this view, this case, as Plaintiffs themselves have defined it, is about Kappa's bylaws, and Plaintiffs do not identify any **bylaw** that establishes this definition.  Thus, Kappa is free to interpret its bylaws reasonably without having any member who disagrees with the interpretation challenge it in court.

Absent a bylaw that actually restricts Kappa's ability to accept transgender women as members, this case is nothing more than an attempt to have a court tell a private organization how to conduct its business and, specifically, define the people with whom the organization can

associate.  As discussed in the Motion to Dismiss, a court that takes that role in the governance of a private organization would violate the First Amendment.

### D.  <u>Plaintiffs Do Not Allege a Breach of Contract or Tortious Interference</u>

Turning to Plaintiffs' contract claims, Plaintiffs respond to Defendants argument that they have not identified a breached contractual provision by admitting "that there may be some ambiguities in the Complaint."  (ECF No. 24 at 14.)  They say this is so "only because there are actually two different contracts."  (*Id.*)  There is, however, only one at issue in their Amended Complaint: the housing contract.  Plaintiffs did not bring a breach-of-contract claim related to any membership contract.[4]  (*See* ECF No. 6.)  Plaintiffs' arguments about their membership contract are therefore irrelevant to their legal claims.  And, on the housing contract, Plaintiffs do not address Defendants' argument that there is no provision in the contract (the full text of which is before the Court) that Plaintiffs allege was breached.  Instead, they copy-paste the same nonsensical language on the contract from their Amended Complaint.  Plaintiffs have failed to advance any relevant legal argument and the Court should dismiss the breach-of-contract and tortious-interference claims.

### E.  <u>Plaintiffs Do Not Address Defendants' Arguments on Their Direct Claim</u>

Through their Motion to Dismiss, Defendants explained why Plaintiffs' direct claim fails.  Plaintiffs do not respond.  They instead repeat the same allegations without reference to any applicable authority.  Once again, Plaintiffs have implicitly conceded that there is no legal authority opposing Defendants' arguments.  Dismissal of the direct claim is appropriate.

---

[4] Had they done so, the claim would fail for the same reasons its derivative claims fail.  Therefore, an amendment to add a new breach-of-contract claim based on a membership contract would be futile.

**F.  Plaintiffs' Response Confirms that They Brought This Case as an Unserious Publicity Stunt, Not to Vindicate Legitimate Claims**

In filing her own Motion to Dismiss, Langford persuasively articulated how the Amended Complaint was little more than a "rambling . . . press release which [Plaintiffs] have used to gain national media attention and to fundraise." (ECF No. 23 at 2.)  Plaintiffs' Response to this Motion to Dismiss (and to Langford's) confirms that they filed this case not to advance cognizable claims, only to generate publicity and cloak their view of the world in the authority of this Court.

Plaintiffs' Response contains almost no legal argument or citation to cases.  The overwhelming majority of citations it does include state black-letter law and standards but do not address Defendants' arguments.  They assert a derivative claim without discussing specific bylaws (or the lack thereof) and contract claims without addressing the text of the relevant agreement. They ask the Court to provide "direction" as to whom would be proper to sue in a derivative action. (*See* ECF No. 24 at 7.)  They respond to the Motion to Dismiss by referencing contracts and contacts about which they make no allegations.  They make outlandish claims of six-figure damages resulting from someone they do not like joining their sorority.  Their most developed argument is in response to a jurisdictional claim that no one has advanced.  They do not appear aware of what constitutes a "necessary party" to litigation and have accordingly sued two Defendants against whom they do not seek damages.  They even make, for the first time in a Response, baseless allegations of "fraud."

None of these "arguments" are reflective of a genuine desire to litigate substantive claims, though Defendants suspect that the strategy may fare better on the cable news circuit than in this Court. Plaintiffs may continue to make disrespectful and untruthful statements to a public audience receptive to them, but they have no right to use this Court as a platform for trumpeting that message.  As Defendants have argued, it is not the role of courts to step in every time a person

feels slighted or wronged; it is to resolve legal disputes.  And Plaintiffs are plainly and profoundly unserious about litigating a legal dispute.

## III.    <u>CONCLUSION</u>

Though Plaintiffs and their supporters' voices may seem loud, there are many strong women of Kappa who do not support their conduct and statements, and instead, stand behind the organization and the chapter.  For example, in response to attempts to solicit funds for this litigation, some Kappa members have responded to Plaintiffs' supporters as follows:

- This is the HIGHLY INAPPROPRIATE POLITICIZING some alums are doing against a pledge, a college student, and our national organization rather than working through our organization, about a pledge that everyone on this chain KNOWS was only accepted into this Kappa chapter because the current Kappa's CHOSE her!  The insistence use of "biological male" vs transgender women highlights and underscores the bias and bigotry on display here - which has nothing to do with Kappa and what we stand for. Both disappointing and offensive to hear so many "educated" women behaving so ugly and hateful.  As a 4th generation Kappa, I assure you my ancestors are rolling in their graves at the suggestion Kappa be used to keep people out.  Doesn't belong here ladies!

- There are many members of Kappa who do not look like the founders of our organization, white women who had the privilege of attending college in 1870 when women could not vote, could not own property except in very narrow circumstances, could not have their own bank account or real estate holdings without the "supervision" of a man, and so on...there are many active and alumni members of Kappa who do not look like our founders. Had the internet been around in the 1960s, I'm sure we would have seen similar petitions to "save Kappa" from the wheel of societal progress. There may, indeed, have been such an effort at the time in the form of a letter-writing campaign filled with bigotry designed as concern for the health of the organization.

  There already are LGBT members of Kappa and, like our non-white members, they add to the beautifully diverse tapestry that makes Kappa strong. It is up to the ACTIVE members of Kappa Kappa Gamma to select their members from the pool of interested PNMs and as alumni, we must trust in them to help us build the future. If a chapter has elected to invite a trans woman for membership, then

they must believe that she embodies all the qualities we look for in our new members--except for what might be in her pants, which you seem to care a great deal about.  I would argue that you and the other signers of this petition are doing far more to harm the future of Kappa than active members who believe in principles of diversity and inclusion.

I will not debate the humanity and inherent dignity of transgender persons with you or anyone else on this thread.  I encourage you to look inward and explore why your response to another person's gender expression is repugnant to you or how it impacts your life in any meaningful way beyond personal discomfort that is rooted in your own biases.

These brave women give Kappa faith in the ability of this organization to overcome and thrive in spite of the hurtful course of conduct chosen by some members.  Plaintiffs have no legal claims, and their response to Defendants' Motion to Dismiss makes that clear.  The time has come for the Court to bring this charade to an end.  Defendants respectfully request that the Court dismiss Plaintiffs' claims in their entirety, with prejudice.

Dated: July 12, 2023

/s/ *Brian W. Dressel*
Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:(614) 464-5452
Email:    nmmclaughlin@vorys.com
            bwdressel@vorys.com

Respectfully submitted,

Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:(307) 265-0700
E-Mail:    sklosterman@wpdn.net

*Attorneys for Defendants Kappa Kappa Gamma Fraternity, Mary Pat Rooney, and the Kappa Kappa Gamma Building Co.*

**CERTIFICATE OF SERVICE**

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 12th day of July, 2023.

| | |
|---|---|
| Cassie Craven (#7-5664) | ☒ CM/ECF Electronic Transmission |
| Longhorn Law LLC | ☐ U.S. Mail (Postage Prepaid) |
| 109 East 17th Street, Suite 223 | ☐ Fax |
| Cheyenne, WY 82001 | ☐ Overnight Delivery |
| Telephone: (307) 823-3062 | ☐ Hand Delivery |
| E-Mail: ccraven.law@gmail.com | ☒ Email |

| | |
|---|---|
| John G. Knepper (#7-4608) | ☒ CM/ECF Electronic Transmission |
| Law Office of John G. Knepper, LLC | ☐ U.S. Mail (Postage Prepaid) |
| P.O. Box 1512 | ☐ Fax |
| Cheyenne, WY 82003 | ☐ Overnight Delivery |
| Telephone: (307) 632-2842 | ☐ Hand Delivery |
| E-Mail: john@knepperllc.com | ☒ Email |

/s/ *Brian W. Dressel*
Brian W. Dressel