# EXHIBIT 1

**FILED**

3:17 pm, 8/25/23

**Margaret Botkins**
**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

JAYLYN WESTENBROEK, HANNAH
HOLTMEIER, ALLISON COGHAN,
GRACE CHOATE, MADELINE
RAMAR, and MEGAN KOSAR, on
behalf of themselves and derivatively on
behalf of KAPPA KAPPA GAMMA
FRATERNITY,

        Plaintiffs,

        v.

KAPPA KAPPA GAMMA
FRATERNITY, an Ohio non-profit
corporation, as a Nominal Defendant and
as a Direct Defendant, MARY PAT
ROONEY, President of the Fraternity
Council of KAPPA KAPPA GAMMA
FRATERNITY, in her official capacity,
KAPPA KAPPA GAMMA BUILDING
CO., a Wyoming non-profit corporation,
and ARTEMIS LANGFORD,

        Defendants.

Case No.  23-CV-51-ABJ

---

**ORDER GRANTING DEFENDANTS' *MOTION TO DISMISS* (ECF NO. 19),
DISMISSING, WITHOUT PREJUDICE, PLANTIFFS' *FIRST AMENDED
VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES* (ECF NO. 6), AND DISMISSING AS MOOT
DEFENDANT ARTEMIS LANGFORD'S *MOTION TO DISMISS* (ECF NO. 22)**

---

THIS MATTER comes before the Court following Defendants', Kappa Kappa

Gamma Fraternity, an Ohio non-profit corporation ("KKG", "Kappa Kappa Gamma", or

"Kappa"), Mary Pat Rooney, President of the Fraternity Council of Kappa Kappa Gamma

Fraternity ("Rooney"), and Kappa Kappa Gamma Building Co., a Wyoming non-profit corporation ("KKG Building Co.") (collectively, "Defendants"), *Motion to Dismiss*, filed on June 20, 2023. ECF No. 19. Pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6), Defendants move to dismiss Plaintiffs', Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, and Megan Kosar (collectively, "Plaintiffs"), *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* ("*Complaint*") (ECF No. 6), due to lacking subject matter jurisdiction over KKG Building Co., lacking personal jurisdiction over Rooney, and Plaintiffs' failure to state a claim upon which relief can be granted. ECF Nos. 19, at 2; 20.

Having reviewed the filings, the applicable law, and being otherwise fully advised, the Court **GRANTS** Defendants' *Motion to Dismiss* (ECF No. 19) and **DISMISSES, WITHOUT PREJUDICE,** Plaintiffs' *Complaint* (ECF No. 6).

Separately, the Court **DISMISSES AS MOOT** Defendant's, Artemis Langford ("Langford"), *Motion to Dismiss with Prejudice* ("Langford's *Motion to Dismiss*") (ECF No. 22), filed on June 20, 2023.

## BACKGROUND

Embittered by their chapter's admission of Artemis Langford, a transgender woman, six KKG sisters at the University of Wyoming sue their national sorority and its president. Plaintiffs, framing the case as one of first impression, ask the Court to, *inter alia*, void their sorority sister's admission, find that KKG's President violated her fiduciary obligations by betraying KKG's bylaws, and prevent other transgender women from joining KKG

2

nationwide. A "woman", say Plaintiffs, is not a transgender woman. Unadorned, this case condenses to this: who decides whether Langford is a Kappa Kappa Gamma sister? Though given the opportunity to vote this past fall, not the six Plaintiffs. Not KKG's Fraternity Council. Not even this federal Court. The University of Wyoming chapter voted to admit – and, more broadly, a sorority of hundreds of thousands approved – Langford. With its inquiry beginning and ending there, the Court will not define "woman" today. The delegate of a private, voluntary organization interpreted "woman", otherwise undefined in the non-profit's bylaws, expansively; this Judge may not invade Kappa Kappa Gamma's freedom of expressive association and inject the circumscribed definition Plaintiffs urge. Holding that Plaintiffs fail to plausibly allege their derivative, breach of contract, tortious interference, and direct claims, the Court dismisses, without prejudice, Plaintiffs' causes of action. This Court outlines the case's posture,[1] its standard of review, and its disposition in the pages that follow.

Founded in 1870, Kappa Kappa Gamma is a non-profit organization based in Dublin, Ohio. ECF Nos. 6, ¶¶ 21, 25, 28; 6-1, at 49, 55–56.[2] Today, KKG spans 140 college

---

[1] Recounting the pertinent facts, *infra*, the Court wades through a well-researched, yet meandering, complaint; for example, despite a seventy-two-page complaint excluding attachments, Plaintiffs devote four-and-a-half pages to their actual claims. Only the facts relevant to the four claims Plaintiffs bring against Defendants are outlined today. Those facts are accepted as true for the purpose of resolving the motion at bar. ECF No. 6; *see also* ECF Nos. 20, 24, 26. The Court also looks to documents attached as exhibits to Plaintiffs' *Complaint*. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.") (internal citations omitted).
[2] KKG filed its *Articles of Incorporation* with the Ohio Secretary of State in 1930. ECF No. 6-1, at 56.

3

campuses and boasts 210,000 living alumnae. ECF No. 6, ¶ 26. Of note are policies from

KKG's national headquarters and the University of Wyoming's KKG chapter; bear with

me as I summarize both. Broadly, KKG's "purposes", *inter alia*, are:

> A. *To unite women*, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large[3] may attain social, moral, and intellectual excellence;
> B. To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, *with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures*[.]

ECF No. 6-1, at 52 (emphasis added). KKG has *Bylaws* ("bylaws"), *Standing Rules*,[4] and

*Fraternity Policies*. ECF Nos. 6, ¶ 53; 6-1, at 2–30, 109–38, 140–61. While the KKG

bylaws state that "[a] new member shall be a woman", no bylaw defines "woman". ECF

No. 6-1, at 6.[5]

In 2018, KKG published a *Guide for Supporting our LGBTQIA+ Members* ("2018

*Guide*").[6] ECF Nos. 6, ¶ 5; 6-1, at 32–43. The 2018 *Guide* states:

> Kappa Kappa Gamma is a single-gender organization *comprised of women and individuals who identify as women* whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character.

---

[3] KKG considers itself a "fraternity" in its governing documents. *E.g.*, ECF No. 6-1, at 5. However, emulating Plaintiffs and our national discourse, the Court refers to KKG as a "sorority".

[4] The *Standing Rules* state that "[a]ctive members shall be responsible for selecting new members of their chapter." ECF No. 6-1, at 111.

[5] When a new member, following acceptance of a local chapter's invitation, accepts admission to KKG and annually thereafter, she pledges to "uphold the [KKG] *Bylaws, Standing Rules and Policies* as well as [her] chapter Bylaws and Standing Rules." ECF No. 6-1, at 163.

[6] The parties dispute when KKG began to allow transgender women to qualify for membership. While Defendants allege that Kappa has allowed transgender women admission since 2015, Plaintiffs respond that "there is no evidence of this fact." *See* ECF Nos. 20, at 3; 24, at 3. The parties agree that KKG published its *Guide* in 2018. *See* ECF Nos. 6, ¶ 5; 20, at 4.

. . .

> Each Kappa chapter has the final choice of its own members. . . . [T]he
> chapter is well within its right to offer [a] potential member [who is
> transgender] a bid.

ECF No. 6-1, at 32, 35 (emphasis added). While KKG's bylaws do not reflect the "and

individuals who identify as women" addition, accompanying documents, including KKG's

*Position Statements*[7] in 2021 and *FAQs*[8] in 2022, both published ahead of KKG's 2022

biennial convention, do. *Id.* at 105 (same language *supra*), 183 (same); *cf. id.* at 2–30, 58–

86.[9] An Illinois resident and volunteer, Rooney heads KKG's eight-member Fraternity

Council, consisting of directors and by extension staff tasked with supervising chapters

nationwide. ECF Nos. 6, ¶¶ 22, 71; 26, at 3.[10] Plaintiffs equate KKG's Fraternity Council

to a corporation's board of directors. *E.g.*, ECF No. 6, ¶ 4.

---

[7] The *Position Statements* also note that "[e]ach chapter of Kappa Kappa Gamma has the final choice of its own members." ECF No. 6-1, at 183.

[8] The *FAQs* state:

> We also look to NPC [National Panhellenic Conference ("NPC")] policy as an NPC
> member organization. The NPC Recruitment Eligibility (2020) policy states: 'For the
> purpose of participation in Panhellenic recruitment, woman is defined as an individual who
> consistently lives and self-identifies as a woman. Each women's-only NPC member
> organization determines its own membership selection policies and procedures.'
> . . .
> **Why are we including gender-neutral pronouns in the revised documents?**
> This change is coming from a Convention resolution that formed Kappa's Diversity, Equity
> and Inclusion Committee. Kappa Kappa Gamma was founded 150 years ago on the
> principles of integrity, respect and regard for others. *Kappa has reflected on the path
> forward, and we are beginning with actions that speak to our belief that all members are
> valued. This is one of those action steps. We want to be as inclusive of all members as we
> can be.*

ECF No. 6-1, at 105 (emphasis in original and added).

[9] *See also* ECF No. 6-1, at 59 ("Inclusivity. Since diversity, equity and inclusion have been a focus and the subject of a previous resolution at [the] Convention, a concerted effort has been made to make sure the language of the documents is inclusive.").

[10] *See also* Kappa Kappa Gamma Fraternity Council, available at:
https://www.kappakappagamma.org/why-kappa/our-leadership-team/fraternity-council/
(accessed Aug. 25, 2023).

Founded in 1927, the KKG, or Gamma Omicron, chapter at the University of Wyoming ("the UW chapter") has forty-four members and an on-campus house today. ECF Nos. 6, ¶ 78; 6-1, at 200. Plaintiffs[11] are six – some current and some graduated – chapter members and undergraduates at the University. ECF Nos. 6, ¶¶ 1, 15–20; 20, at 1. Because KKG headquarters has a "live-in rule", all UW chapter members must reside within the on-campus house in Laramie, Wyoming, signing a contract with KKG Building Co.[12] to do so. ECF No. 6-1, at 148, 165–76. Like KKG's governing documents, neither the UW chapter's *Bylaws*,[13] nor its *Standing Rules*, define "woman". *Id.* at 185–98, 200–09.

During fall 2022 recruitment, the UW chapter voted to admit Langford, a transgender[14] woman. ECF No. 6, ¶ 116. Per KKG protocol, Langford was subsequently approved by KKG headquarters prior to her initiation to the chapter. *Id.*, ¶¶ 68, 139, 141;

---

[11] In accordance with Tenth Circuit guidance, the Court twice denied Plaintiffs' request to proceed anonymously in this matter. ECF Nos. 3, 5. On April 20, 2023, complying with the Court's instruction, Plaintiffs filed an amended complaint featuring their true names. ECF No. 6.
[12] Though not seeking damages from KKG Building Co., Plaintiffs allege that KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B) required party to this action because five Plaintiffs signed housing contracts with KKG Building Co. for the 2022–23 academic year. ECF No. 6, ¶¶ 23, 84.
[13] The UW chapter *Bylaws* state that membership "shall be in accordance with the provisions of the Fraternity [*i.e.*, KKG] *Bylaws*." ECF No. 6-1, at 200.
[14] "Transgender" is a broad, umbrella term that is often used for individuals whose brain sex, gender identity, or gender expression either does not or is perceived not to match the physical sex they were assigned at birth. *See* Stevie V. Tran & Elizabeth M. Glazer, *Transgenderless*, 35 HARV. J.L. & GENDER 399, 399 n.1 (2012).

ECF No. 6-1, at 120. Following Langford's admission, Plaintiffs accuse Langford[15] of salacious impropriety at the chapter house and elsewhere.[16]

Plaintiffs' four claims include: (1) a derivative[17] cause of action, pursuant to Ohio Rev. Code Ann. § 1702.12(I)(1)(c),[18] against Rooney (ECF No. 6, ¶¶ 159–67) ("Count I"); (2) breach of contract against KKG and KKG Building Co. (*id.*, ¶¶ 168–72) ("Count II"); (3) tortious interference with a contract against KKG (*id.*, ¶¶ 173–75) ("Count III"); and (4) a direct[19] cause of action against KKG and Rooney (*id.*, ¶¶ 176–79) ("Count IV"). Plaintiffs request three declaratory judgments from this Court, ordering: (1) that Langford is ineligible for KKG membership and voiding, *ab initio*, her admission; (2) Defendants' violation of their obligations to KKG by admitting Langford; and (3) Defendants' violation of Plaintiffs' housing contracts. *Id.* at 70. Plaintiffs also seek preliminary and permanent

---

[15] Like KKG Building Co., Plaintiffs do not seek damages or relief from Langford, but label her a Fed. R. Civ. P. 19(a)(1)(B) required party. ECF No. 6, ¶ 1 n.2.

[16] Given Plaintiffs' dual dearth of claims against Langford and their inability to connect their allegations concerning Langford's behavior to their four causes of action against the remaining Defendants, the Court sees no reason to recount Plaintiffs' peripheral allegations against Langford.

[17] A derivative cause of action against an Ohioan non-profit corporation "seeks to vindicate the duty owed by the board of the corporation to the corporation as a whole and not a duty that is owed to a particular member or shareholder." *Wood v. Cashelmara Condo. Unit Owners Ass'n, Inc.*, No. 110696, 2022 WL 1422807, at *4–5 (8th Dist. May 5, 2022).

[18] Ohio law provides members of non-profit corporations with a derivative cause of action on behalf of the corporation; § 1702.12, *inter alia*, states:

> (I)(1) No lack of, or limitation upon, the authority of a corporation shall be asserted in any action except as follows:
>
> . . .
>
> (c) By a member as such or by or on behalf of the members against the corporation, a director, an officer, or a member as such.

Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also* ECF No. 6, ¶ 46.

[19] "A shareholder brings a derivative action on behalf of the corporation for injuries sustained by or wrongs done to the corporation, and a shareholder brings a direct action where the shareholder is injured in a way that is separate and distinct from the injury to the corporation." *HER, Inc. v. Parenteau*, 147 Ohio App. 3d 285, 291 (10th Dist. 2002).

injunctive relief preventing Defendants from "seeking or encouraging" transgender women to join KKG, damages, and attorneys' fees and costs. *Id.*[20]

## STANDARD OF REVIEW

Defendants challenge Plaintiffs' *Complaint* on three bases – and three Federal Rules of Civil Procedure. I begin with a dose of procedural background; federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, federal courts are presumed to lack jurisdiction "unless and until a plaintiff pleads sufficient facts to establish it." *See Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) (internal citation omitted). If jurisdiction is challenged, the party asserting jurisdiction must demonstrate its existence by a preponderance of the evidence. *See id.* First, when considering a Fed. R. Civ. P. 12(b)(1) challenge to subject matter jurisdiction and the movant challenges the allegations set forth in the complaint, the Court must accept those allegations as true. *See Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Second, Plaintiffs bear the burden of establishing personal jurisdiction. *See Far W. Cap., Inc. v. Towne*, 46 F.3d 1071, 1075 (10th Cir. 1995). If, however, the Court resolves the pending motion on the basis of their *Complaint*, Plaintiffs need only make a prima-facie showing of personal jurisdiction. *See OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). Plaintiffs can make such a showing by alleging, "via

---

[20] Defendants, excluding Langford, filed their *Motion to Dismiss*, coupled with a *Memorandum in Support*, on June 20, 2023. ECF Nos. 19, 20. Plaintiffs responded in their *Response in Opposition* on July 5, 2023, to which Defendants replied on July 12, 2023. ECF Nos. 24, 26.

affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *See AST Sports Sci., Inc. v. CLF Distrib., Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). Like a Fed. R. Civ. P. 12(b)(1) challenge, the Court accepts as true all well-pleaded facts in the *Complaint* and resolves all factual disputes in Plaintiffs' favor. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Third, when considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, district courts follow a two-pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* *Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions", and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere

possibility that Defendants acted unlawfully, but the complaint does not need to establish that Defendants probably acted unlawfully. *See id.*

## ANALYSIS

The Court dismisses KKG Building Co. and Plaintiffs' four claims without prejudice. First, Plaintiffs fail to plead this Court's subject matter jurisdiction over KKG Building Co. Second, Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. Third, while Plaintiffs demonstrate futility under Ohio law, their derivative claim against Rooney fails to escape KKG's First-Amendment-protected freedom of expressive association to include transgender members. Fourth, Plaintiffs fail to allege any breach of contract. Fifth, Plaintiffs fail to allege any tortious interference of contract. Sixth, Plaintiffs fail to allege a direct claim against Rooney under Ohio law. Below, the Court proceeds from the courthouse door to the courtroom, addressing challenges to jurisdiction and on the merits, *seriatim.*

A. *The Court's Subject Matter Jurisdiction over Plaintiffs' Breach of Contract Claim against,* inter alia, *KKG Building Co.* (*i.e., Count II*).

Plaintiffs fail to allege this Court's subject matter jurisdiction over KKG Building Co. Defendants move to dismiss Count II, alleging breach of contract against, *inter alia*, KKG Building Co., for lack of subject matter jurisdiction. *See* ECF Nos. 20, at 7–8; 26, at 4–5. Plaintiffs appear to concede, parroting language from their *Complaint* that they do not seek damages from KKG Building Co. but consider it a required party.[21]

---

[21] *Compare* ECF No. 6, ¶ 23 ("Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege that [KKG] has interfered with their contractual relationship with

Preliminarily, the Court admits its confusion disentangling Plaintiffs' Count II, which Plaintiffs seem to recognize.[22] Count II in Plaintiffs' *Complaint* appears to sue KKG Building Co.; yet, in their response, Plaintiffs clarify that they sue KKG for *two* breach of contract claims. This section addresses KKG Building Co.'s status vis-à-vis Count II.

To proceed under this Court's diversity jurisdiction, 28 U.S.C. § 1332, as Plaintiffs do, "all [] plaintiff[s] need[] to do is allege an amount in excess of $75,000 and [they] will get [their] way, unless [] defendant[s] [are] able to prove 'to a legal certainty' that the plaintiff's claim cannot recover the alleged amount." *McPhail v. Deere & Co.*, 529 F.3d 947, 953 (10th Cir. 2008) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)) (internal citation omitted); ECF No. 6, ¶ 13. In *Young*, U.S. District Judge James O. Browning opined:

> The statutory amount-in-controversy requirement, which presently stands at $75,000.00, must be satisfied *as between a single plaintiff and a single defendant* for a federal district court to have original jurisdiction over the dispute; a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement, nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold. If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims. Similarly, multiple

---

this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation.") (citing Fed. R. Civ. P. 19(a)(1)(B)), *with* ECF No. 24, at 17–18 (near-*verbatim* language).

[22] ECF No. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts. There is the contract between Kappa and its members under Ohio corporate law. And there is the contract with the Kappa Kappa Gamma Housing Corporation . . . *Through Defendant Kappa's actions, they have created a breach of contract* as to both the sorority experience and paid housing experience that these young women were promised.") (emphasis added);

> plaintiffs may aggregate the amounts of their claims against a single
> defendant if the claims are not separate and distinct.

*Young v. Hartford Cas. Ins. Co.*, 503 F. Supp. 3d 1125, 1172–73 (D.N.M. 2020) (internal

quotations and citations omitted) (emphasis added). Here, Plaintiffs' *Complaint* and

response cement that they, explicitly, do not levy claims against or seek damages from

KKG Building Co. Plaintiffs also do not seek injunctive or declaratory relief from KKG

Building Co. *See* ECF No. 6, at 70 ("Plaintiffs pray for . . . [a] declaratory judgment that

the Defendants have violated the housing contract[.]") (presumably referring to KKG

and/or Rooney); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir.

2006) ("The Tenth Circuit has followed what has commonly been referred to as the

'either viewpoint rule' which considers either the value to the plaintiff or the cost to

defendant of injunctive and declaratory relief as the measure of the amount in

controversy for purposes of meeting the jurisdictional minimum.") (internal quotation

omitted). Plaintiffs also do not allege that KKG Building Co. is jointly liable with its co-

defendants. Nor is this a case where unquantifiable variables prevent the Court from

declaring to a legal certainty that no jury would award Plaintiff more than $75,000;

Plaintiffs, in their words, do not seek damages from KKG Building Co. and, when

prompted by Defendants to their amount-in-controversy flaw, fail to respond.

Accordingly, because Plaintiffs do not seek damages against KKG Building Co. and fail

to plead an amount in controversy as to that Defendant, the Court dismisses KKG

Building Co. from Count II for lacking subject matter jurisdiction.

But wait, say Plaintiffs, KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B) required party. "When applying Rule 19, a district court must first determine whether the absent party is necessary to the lawsuit[.]" *See Davis v. United States*, 192 F.3d 951, 957 (10th Cir. 1999) (citing Fed. R. Civ. P. 19(a)). Necessity weighs three factors, including: "(1) whether complete relief would be available to the parties already in the suit, (2) whether the absent party has an interest related to the suit which as a practical matter would be impaired, and (3) whether a party already in the suit would be subjected to a substantial risk of multiple or inconsistent obligations." *Rishell v. Jane Phillips Episcopal Mem. Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996) (footnote omitted).[23] "If a necessary person cannot be joined, the court proceeds to the second step, determining 'whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, because the absent person . . . is indispensable' to the litigation at hand." *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1289 (10th Cir. 2003) (quoting Fed. R. Civ. P. 19(b)) (internal brackets omitted).

---

[23] Identical in effect to *Rishell*'s three-factor test, Fed. R. Civ. P. 19(a) states:
> (1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

13

Plaintiffs bear the burden of demonstrating KKG Building Co.'s necessity, yet, beyond bare allusion to Fed. R. Civ. P. 19(a)(1)(B), make no effort to do so. *See Davis*, 192 F.3d at 951; ECF Nos. 6, ¶ 23; 24, at 17. Nor is it apparent to the Court whether joinder, in Plaintiffs' view, is warranted under Fed. R. Civ. P. 19(a)(1)(B)(i) or (ii). *See* Fed. R. Civ. P. 19(a)(1)(B); *see also* ECF No. 25, at 2, 4–8 (arguing for Langford's joinder under Fed. R. Civ. P. 19(a)). Considering, *sua sponte*, KKG Building Co.'s necessity under *Rishell*'s factors, none weigh in favor of KKG Building Co.'s joinder.

First, Plaintiffs fail to establish that complete relief cannot be granted among KKG and Rooney.[24] Though difficult to decipher,[25] Plaintiffs clarify that, under Count II, KKG's "actions" breached "two" contracts, including Plaintiffs' membership contracts with KKG in Ohio and their housing contracts with KKG Building Co. in Wyoming. ECF No. 24, at 14. As to Count III, Plaintiffs seemingly allege that KKG tortiously interfered with Plaintiffs' housing contracts – and, like Count II, not any improper action by KKG Building Co. ECF No. 6, ¶¶ 23 ("Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with [KKG Building Co.]."), 175. Because

---

[24] *See Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1183 (D.N.M. 2010) ("'Complete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought.'") (quoting *Champagne v. City of Kan. City, Kan.*, 157 F.R.D. 66, 67 (D. Kan. 1994)).

[25] *See also* ECF Nos. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts."), 20, at 17 n.8 ("To the extent Plaintiffs purport to allege a breach of contract claim against Kappa or Rooney, the Court should dismiss it because Plaintiffs do not allege that either is a party to the [KKG Building Co.] [c]ontracts.").

both contractual claims attack KKG's actions, not KKG Building Co.,[26] complete relief can be granted among KKG and/or Rooney.

Second, KKG Building Co. does not have an interest in this suit at risk of impairment. The Court's review of the housing contracts, in fact, belies Plaintiffs' contention that KKG Building Co. contracted with Plaintiffs to "provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma." ECF Nos. 6, ¶ 170; 24, at 14. The only applicable section of the housing contracts states:

> **5. Other Services.** *The chapter* [*i.e.*, the UW chapter] *shall provide the student such services* as are customarily furnished by the chapter to residents of the chapter house, subject to this contract, the Kappa Kappa Gamma Fraternity *Bylaws*, *Standing Rules and Policies*; and rules and regulations of the chapter, including, without limitation, the House Rules attached hereto as Exhibit, subject to any changes may be made by the chapter, House Board or the Fraternity at any time.

ECF No. 6-1, at 166–67 (identifiers omitted) (emphasis added). Notified of the lacking contractual language supporting their claim, Plaintiffs, once again, fail to respond. *See* ECF Nos. 20, at 19; 24. Thus, a key allegation to keep KKG Building Co. in this lawsuit – that KKG Building Co. is contractually obligated to provide housing per headquarters policy – withers under the Court's glancing scrutiny; if anything, the UW chapter must abide by such policies, not KKG Building Co. ECF No. 6, ¶ 170. Furthermore, it is KKG's policies that underpin the sorority's alleged breach and tortious interference; under Plaintiffs' view,

---

[26] ECF No. 6, ¶ 171 ("Langford's access to and presence in the sorority house violates the housing contract that Plaintiffs signed."), ¶ 175 ("Through their [*i.e.*, KKG and/or Rooney's] initiation of Langford, Defendants have prevented Plaintiffs from having the benefit of the Housing Contract that they signed."), at 70 (requesting "[a] declaratory judgment that the Defendants [*i.e.*, KKG and/or Rooney] have violated the housing contract").

this case turns on KKG's governing documents, not an independent non-profit confined to housing issues, of which any interests held are adequately represented by KKG and/or Rooney. *See id.*, ¶¶ 170, 175; *EquiMed, Inc. v. Genstler*, 170 F.R.D. 175, 179 (D. Kan. 1996) (finding that joinder of an absent party was not necessary if its interests were adequately represented by present parties) (citing *Rishell*, 94 F.3d at 1411–12); *Portable Solar, LLC v. Lion Energy, LLC*, No. 22-CV-00026-DAK, 2022 WL 3153869, at *2 (D. Utah Aug. 8, 2022) (noting that in tortious interference cases, courts should determine necessity "by evaluating whether the absent party's rights or obligations under an existing contract have necessarily become implicated"). However ineloquent, Plaintiffs' housing contracts with KKG Building Co., while possibly relevant to damages down the road, are *not* the subject of this litigation. *See Wolf Mountain Resorts, LC v. Talisker Corp.*, No. 07–CV–00548DAK, 2008 WL 65409, at *3 (D. Utah Jan. 4, 2008) ("It is well-established that a party to a contract *which is the subject of the litigation* is considered a necessary party.") (internal citation omitted) (emphasis added).

Third, there is no evidence to support an assertion that KKG or Rooney would be subject to a substantial risk of multiple or inconsistent obligations if KKG Building Co. was removed from this lawsuit. "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Sonnett v. Lankford*, No. 15–CV–0024–SWS, 2016 WL 9105175, at *2 (D. Wyo. Mar. 16, 2016) (internal quotation omitted). In short, nothing before the Court indicates that KKG or Rooney's abilities to protect their interests would be hindered by dismissing KKG Building Co.

16

Therefore, the Court finds that KKG Building Co. is not a Fed. R. Civ. P. 19(a)(1)(B) necessary party.[27] The action proceeds, as does the Court, without KKG Building Co.

B. *The Court's Personal Jurisdiction over Rooney.*

Shouldering their burden, Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The parties dispute Rooney's contacts with Wyoming. On one hand, Plaintiffs say that this Court has specific jurisdiction over a derivative suit against Rooney, a corporate official, in Wyoming, where alleged injury, past and future, occurred. *See* ECF No. 24, at 2 (citing *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013)). Defendants counter that Plaintiffs levy no allegation that Rooney directed any conduct at Wyoming. *See* ECF No. 26, at 3–4.

Plaintiffs assert one sect of personal jurisdiction – to wit, specific – which allows this Court to haul a nonresident defendant to Wyoming federal court. *See OMI Holdings, Inc.*, 149 F.3d at 1090–91.[28] Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*

---

[27] Because KKG Building Co. is not a necessary party, the Court need not proceed with an indispensability analysis under the Tenth Circuit's second step. *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1098 (10th Cir. 2003).

[28] This Court holds "'considerable leeway in deciding a pretrial motion to dismiss for lack of personal jurisdiction.'" *Tungsten Parts Wyo., Inc. v. Glob. Tungsten and Powders Corp.*, No. 21-CV-99-ABJ, 2022 WL 19263451, at *3 (D. Wyo. Jul. 13, 2022) (quoting *Cheyenne Publ'g, LLC v. Starostka*, 94 P.3d 463, 469 (Wyo. 2004) (internal citation omitted)). The Court also makes that determination "'on the basis of pleadings and other materials called to its attention.'" *Id.* (quoting *Staroska*, 94 P.3d at 469).

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation, citation, and brackets omitted). "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state[29] and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Towne*, 46 F.3d at 1074.

Notably, "[s]pecific jurisdiction is proper if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'" *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Challenged today, purposeful direction[30] "calls for an inquiry into whether [Plaintiffs] have shown that [Rooney's] acts were (1) intentional, (2) 'expressly aimed' at Wyoming, and (3) done with 'knowledge that the brunt of the injury would be felt' in Wyoming." *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 959 (10th Cir. 2022) (quoting *Dudnikov*, 514 F.3d at 1072).[31]

---

[29] Wyoming's long-arm statute, Wyo. Stat. § 5-1-107(a), confers jurisdiction "on any basis not inconsistent with the Wyoming or United States constitution."

[30] Purposeful direction, or purposeful availment, requires that the defendant "deliberately . . . engaged in significant activities within the forum State or deliberately directed [her] activities at the forum State, so that [she] has manifestly availed [her]self of the privilege of conducting business there." *XMission, L.C.*, 955 F.3d at 840 (internal quotation, citation, and brackets omitted).

[31] Additionally, if the Court determines that the minimum contacts standard is satisfied, exercising personal jurisdiction over Rooney "must always be consonant with traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Plaintiffs plead Rooney's[32] purposeful direction. Plaintiffs allege that Rooney, despite "aware[ness]" of Langford's ineligibility, "violated [her] fiduciary duties to [KKG] when [she] procured and approved the initiation of" Langford. ECF No. 6, ¶¶ 49, 105. Thus, the first element, intentional action, is satisfied; the record contains no suggestion that Rooney acted unintentionally when, accepted as true, she approved Langford's initiation following the UW chapter's invitation. While the parties disagree when Rooney, or others on the Fraternity Council, knew about Langford's invitation to join the UW chapter, Rooney's approval of Langford's induction, as alleged, occurred thereafter. *See* ECF Nos. 20, at 12 n.6; 24, at 8.

The second element, express aiming at Wyoming, is more difficult for Plaintiffs, but is nonetheless cleared. Yes, Plaintiffs' *Complaint* lacks reference to Rooney's dealings with the UW chapter as President or her personal sign-off on Langford's admission thirteen hundred miles away. The email from Executive Director[33] Kari Kittrell Poole – informing Plaintiffs that their "concerns were reviewed by several national officers of the organization" and "we believe proceeding with [Langford's]

---

[32] Plaintiffs' suing of only KKG's President, Rooney, and not other Fraternity Council members, is also debated. *See* ECF Nos. 20, at 10 n.5; 24, at 7 n.2 ("The law does not require more, but if there is a concern, Plaintiffs can sue more directors. [] Plaintiffs are open to whatever direction is provided."). § 1702.12(I)(1)(c) does not appear to require naming all directors or officers as defendants. *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c) (". . . against . . . *a* director, *an* officer[.]") (emphasis added); *see also In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 618–19 (6th Cir. 2008) ("[A] [pre-suit] demand may also be excused [from Ohio Civ. R. 23.1] 'when all directors are named as wrongdoers and defendants in a suit[.]'") (quoting *Carlson v. Rabkin*, 152 Ohio App. 3d 672, 681 (1st Dist. 2003)). Due to its inability, however, to locate any state authority on this question, the Court reserves judgment.
[33] ECF No. 6-1, at 21 ("An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.").

initiation is the appropriate next step" – goes both ways; while that email could refer to

any of the other six members of the Fraternity Council, excluding Rooney, it is obviously

feasible that the Fraternity Council's corporate secretary was referring to the president[34]

of that body when she used "we". ECF No. 6, ¶¶ 93, 141. Forgoing separation of their

purposeful direction analysis by element, Defendants lean upon, without naming, the

fiduciary shield doctrine. *See* ECF No. 20, at 8–9 (quoting *Christian v. Loyakk, Inc.*, No.

19-CV-220-F, 2023 WL 170868, at *14 (D. Wyo. Jan. 12, 2023)) (also quoting *Virgin*

*Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 WL 13222758, at *3 (D. Wyo. Dec.

30, 2019), that dealt with foreign service of process and is inapposite). Under that

doctrine,[35] even if a particular employee has "substantial contacts" with the forum state,

"those contacts will not count against the employee in the personal jurisdiction analysis

so long as the employee acted solely on the corporation's behalf." *Newsome*, 722 F.3d at

1275. Given that Rooney undoubtedly has not had "substantial contacts" with Wyoming,

Defendants appear to be arguing that contacts by Rooney's "workforce" (*e.g.*, KKG-

employed alumnae advisers at the UW chapter or Executive Director Poole)[36] in

Wyoming do not convey this Court's personal jurisdiction over Rooney. ECF No. 6, ¶ 74;

---

[34] "The members of Fraternity Council shall be the *officers* of the Fraternity: the President, the Four Vice Presidents, and the Treasurer." ECF No. 6-1, at 18 (emphasis added).

[35] Though the Wyoming Supreme Court has not expressly adopted the fiduciary shield doctrine, the Tenth Circuit invoked the doctrine under an application of Wyoming law. *See Newsome*, 722 F.3d at 1277.

[36] While this Judge is near-numb to hyperbole, Plaintiffs' statement that "every single [chapter] decision is made by the 'workforce' that Rooney commands" is plainly inaccurate. *See* ECF No. 24, at 7. Per the UW chapter's *Bylaws*, KKG advisers may not vote during recruitment of new members. *See* ECF No. 6-1, at 208 ("Advisers shall serve in an advisory capacity without a vote."). The KKG bylaws outline the same. *See id.* at 27 ("Advisers to each of the chapter officers . . . shall serve in an advisory capacity without vote.").

Case 2:23-cv-00051-ABJ   Document 32-2   Filed 09/25/23   Page 22 of 42

Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 21 of 41

*see, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("Due process requires that a defendant be haled into court in a forum State based on h[er] own affiliation with the State, not based on the . . . 'attenuated' contacts [s]he makes by interacting with other persons affiliated with the State.") (quoting *Burger King Corp.*, 471 U.S. at 475).

Fair enough. Nevertheless, accepting Plaintiffs' allegation that Rooney approved Langford as true, as I must, the "'focal point'" of Rooney's actions occurred in Wyoming. *See Dudnikov*, 514 F.3d at 1076–77 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). Langford's admission, however minor among thousands across 140 chapters each fall and spring, occurred at a KKG chapter house in Wyoming; Rooney's alleged sign-off was an "intentional action[] that [was] expressly aimed at" Wyoming. *See id.* (finding express aiming where the defendants intended "to halt a Colorado-based sale by a Colorado resident" and the presiding-state's location was obvious from an eBay auction page) (emphasis altered). Moreover, a corporate officer[37] may be sued in a derivative action where the injury occurred. *See, e.g.*, *Newsome*,[38] 722 F.3d at 1268–69 (finding personal jurisdiction where corporate directors expressly aimed their wrongdoing at

---

[37] Defendants do not offer, nor can this Court unearth, controlling authority indicating that Rooney's volunteer status on the Fraternity Council dictates a contrary outcome than would a compensated officer. *See* ECF Nos. 20, at 8–9; 26, at 3–4; *see also Bronner v. Duggan*, 249 F. Supp. 3d 27, 40 (D.D.C. 2017) (finding that, despite the volunteer service of a governing body's officers, the directors could still anticipate being hauled into a Washington, D.C. court to account for their activities).

[38] Defendants' interpretation of *Newsome*, that a fiduciary can be subject to personal jurisdiction *if* that fiduciary has contacts with the forum state, lacks support. *See* ECF No. 26, at 3 (citing 722 F.3d at 1264, which merely outlined personal jurisdiction's general contours). Defendants also fail to engage with *Newsome*'s analysis of the purposeful direction elements. *See* 722 F.3d at 1268–74; ECF No. 20, at 9. Their reply offers no additional authority that compels the Court otherwise. *See* ECF No. 26, at 3–4.

Oklahoma when they saddled a subsidiary company, knowing it "operated exclusively" in Oklahoma, with overwhelming debt).

The final element of purposeful direction "concentrates on the consequences of the defendant's action–where was the alleged harm actually felt by the plaintiff." *Dudnikov*, 514 F.3d at 1075. I look, once again, to *Newsome*, where the Tenth Circuit found that a Delaware corporation and its creditors, to whom the defendants owed fiduciary duties, were injured primarily in Oklahoma because "the individual defendants knew that the brunt of any injury to [the corporation] would be felt in Oklahoma." *See* 722 F.3d at 1269 (citing *Dudnikov*, 514 F.3d at 1077). KKG operates via its Gamma Omicron chapter in Wyoming; when Rooney approved Langford's admission, injury, if any, would occur on campus in Laramie, Wyoming. ECF No. 6, ¶¶ 166–67. Therefore, Rooney "purposefully directed" her activities at Wyoming.[39] *See Dudnikov*, 514 F.3d at 1078 (internal quotation marks omitted).

Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The Court proceeds to the merits.

C. *Count I: Plaintiffs' Derivative Claim.*

Defendants critique Count I in two ways, including Plaintiffs': (1) failure to demonstrate futility under Ohio law; and (2) seeking of relief contravening a voluntary

---

[39] Because Defendants do not challenge personal jurisdiction on any basis but purposeful direction (*i.e.*, specific jurisdiction's initial element), the Court declines from engaging in unbriefed analyses concerning Plaintiffs' alleged injuries "aris[ing] out of or relat[ing] to those activities [above]" or "'offend[ed] traditional notions of fair play and substantial justice.'" *See XMission, L.C.*, 955 F.3d at 840 (internal quotation omitted); *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co.*, 326 U.S. at 316); ECF Nos. 20, at 8–9; 26, at 3–4.

organization's freedom of association. While Plaintiffs demonstrate futility under Ohio law, their derivative claim against Rooney[40] fails to escape KKG's First-Amendment-protected freedom of expressive association to include transgender members.

### 1. Ohio Civ. R. 23.1 Futility.

I begin with Defendants' argument of lacking Ohio Civ. R. 23.1 specificity. Due to KKG's incorporation in Ohio, Ohio law governs Plaintiffs' derivative claim.[41] "When members bring a derivative action against a nonprofit corporation, they are enforcing a corporate right just as shareholders in for-profit corporations." *Russell v. United Missionary Baptist Church*, 92 Ohio App. 3d 736, 739 (12th Dist. 1994); Ohio Rev. Code Ann. § 1702.12(I)(1)(c). Governing derivative actions, Ohio Civ. R. 23.1 states:

> **Derivative Actions by Shareholders.** . . . The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors and, if necessary, from the shareholders and the reasons for his failure to obtain the action or for not making the effort.

---

[40] *See* ECF No. 6, ¶¶ 163 ("[T]he directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance."), 166 ("As a result of Defendant's behavior . . ."), 167 ("[T]he behavior of Defendant Rooney and other Fraternity Council members will result in the chapter's closure[.]").

[41] Both parties appear to stipulate that, due to its incorporation in Ohio as a private, non-profit corporation, KKG is governed by Ohio law. *See* ECF Nos. 20, at 9; 24, at 11–12; 6-1, at 23 ("The Fraternity shall be governed in accordance with the laws of the state of Ohio[.]"); *see, e.g.*, *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1228 (10th Cir. 2016) (noting that "federal common law should adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit"); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 n.10 (3d Cir. 2005) (applying the law of the state of incorporation to breach of fiduciary duty claims); *Baker-Bey v. Delta Sigma Theta Sorority, Inc.*, No. 12–1364, 2013 WL 1742449, at *4 (E.D. Pa. Apr. 23, 2013) (same).

Ohio Civ. R. 23.1; *see also* Fed. R. Civ. P. 23.1(b)(3)(A).[42] "'[N]o shareholder has an

independent right to bring suit *unless* the board [of directors] refuses to do so *and* that

refusal i[s] wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the

part of the directors.'" *In re Cardinal Health, Inc. Derivative Litig.*, 518 F. Supp. 3d

1046, 1064 (S.D. Ohio 2021) (quoting *Drage v. Procter & Gamble*, 119 Ohio App. 3d

19, 24 (1st Dist. 1997)) (emphasis in original). Failure to make this pre-suit demand is

excused, however, when a plaintiff can demonstrate that the demand would have been

futile. *Id.* (citing *Drage*, 119 Ohio App. 3d at 25).

> Ohio courts have found a demand presumptively futile '*where the directors
> are antagonistic, adversely interested, or involved in the transactions
> attacked*.' Likewise, for example, a demand may also be excused 'when all
> directors are named as wrongdoers and defendants in a suit, when there is
> self-dealing by the directors such that the directors gain directly from the
> challenged transactions, or when there is domination of nondefendant
> directors by the defendant directors.'

*In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618–19 (quoting *Bonacci*, 1992 WL

181682, at *4 and *Carlson*, 152 Ohio App. 3d at 681) (emphasis added). Defendants

argue that Plaintiffs' failure to elevate their concerns to the Fraternity Council and

identify violated KKG bylaws belies futility. *See* ECF No. 20, at 11–12. Plaintiffs

counter, sans state authority, that they and other relatives[43] pestered KKG for months

---

[42] "[Ohio] Civ. R. 23.1 and Fed. R. Civ. P. 23.1 are essentially the same." *Bonacci v. Ohio Highway Exp., Inc.*, No. 60825, 1992 WL 181682, at *4 (8th Dist. Jul. 30, 1992) (spacing altered).
[43] *See also* ECF No. 27-1, at 1 (*i.e.*, the mother of Plaintiff Holtmeier's email to a KKG officer). Though the email's date is unlisted, the Court presumes, based on the reference to Langford's accepting a bid "today", that the email was sent in October or early November 2022.

prior to Langford's induction and were ultimately rejected by Executive Director Poole's email in mid-November 2022. *See* ECF Nos. 24, at 10; 6, ¶ 165; 6-1, at 45–47.

Plaintiffs plead specific facts to demonstrate that the Fraternity Council, akin to Kappa's board of directors,[44] is "antagonistic, adversely interested, or involved in the transactions attacked." *See In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618; *see also Leff v. CIP Corp.*, 540 F. Supp. 857, 868–69 (S.D. Ohio 1982) (when evident from a complaint that the directors of a corporation would oppose a derivative suit, formal demand on the directors is considered futile and unnecessary). Though demand futility in Ohio is no "easy task,"[45] further efforts by Plaintiffs to convince the Fraternity Council to alter their stance on admitting "individuals who identify as women" would be futile. For months ahead of Langford's induction, Plaintiffs, their families, and counsel petitioned Executive Director Poole, Rooney, KKG district and content directors, and KKG alumni representatives to overrule the UW chapter's decision. ECF Nos. 6-1, at 178–79; 24, at 9–11; 27-1, at 1. Addressing KKG leadership, including Rooney, Plaintiffs' counsel communicated the crux of their future claims, including "a breach of contract and a

---

[44] *See* Ohio Rev. Code Ann. §§ 1702.01(K) ("'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated."), 1702.30(B) ("A director shall perform the duties of a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. A director serving on a committee of directors is acting as a director."); ECF No. 6-1, at 18 ("Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law.").

[45] *In re Ferro Corp. Derivative Litig*, No. 04CV1626, 2006 WL 2038659, at *5 (N.D. Ohio Mar. 21, 2006).

violation of Kappa Kappa Gamma's by-laws and standing rules", recounted their failed efforts thus far (*e.g.*, being "told that their values don't align with those of Kappa so they should reconsider being in Kappa"), and requested that the Fraternity Council "legally alter the sorority's membership requirements and conduct a valid vote in accord with existing rules or halt the illegal course of conduct being pursued[.]" ECF No. 6-1, at 179–80 (internal quotation marks and errant comma omitted). Rooney, Executive Director Poole, and other Fraternity Council members are the same officers who purportedly approved Langford; under Plaintiffs' theory, Rooney and other directors violated KKG's bylaws[46] – of course the Fraternity Council would oppose Plaintiffs' federal lawsuit. Finding futility under Ohio Civ. R. 23.1, the Court forges on.

### 2.  Kappa Kappa Gamma's Freedom of Expressive Association.

After much leadup, the Court turns to the gravamen of Plaintiffs' lawsuit. Their derivative claim condenses to this: from 1870 to 2018, KKG defined "woman" to exclude transgender women; any new definition may not be enacted, *ultra vires*, without a KKG bylaw amendment.[47] Expectedly, Defendants counter: private organizations may interpret their own governing documents and define "woman" as including transgender women.[48]

Defendants are correct. Defining "woman" is Kappa Kappa Gamma's bedrock right as a private, voluntary organization – and one this Court may not invade. Below, I apply Ohio and U.S. Supreme Court jurisprudence to the facts at bar.

---

[46] ECF No. 6, ¶¶ 163–65.
[47] *See* ECF Nos. 24, at 11–14; 6, ¶ 104.
[48] *See* ECF No. 20, at 12–15.

First, Ohio law is highly deferential to associational interpretation. "As a general

rule, Ohio courts are unwilling to interfere with the management and internal affairs of a

voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010

WL 107015, at *5 (N.D. Ohio Jan. 6, 2010). More specifically:

> [T]hose who become members of non-profit corporations are presumed to
> have joined them with knowledge of their nature and the law applicable to
> them, and to have consented to be bound by the principles and rules of
> government, *or the policy which they have adopted, or may adopt* . . . [T]he
> member has, by voluntarily becoming a member of the order, chosen his
> forum for the redress of his grievances, and *unless there has been some*
> *palpable violation of the constitution or laws of the corporation whereby he*
> *has been deprived of valuable rights, the civil courts will not interfere.*

*Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *3 (11th Dist. Dec. 4,

1978) (internal citations omitted) (emphasis added) (rejecting a member's plea to

overturn the termination of his club membership where the club met due process

requirements, including facilitating the member's presence and opportunity to be heard at

a hearing); *see Stibora v. Greater Cleveland Bowling Ass'n*, 63 Ohio App. 3d 107, 113

(8th Dist. 1989) ("'A voluntary association may, without direction or interference by the

courts, for its government, adopt a constitution, by-laws, rules and regulations which will

control as to all questions of discipline, *or internal policy and management*, and its *right*

*to interpret and administer the same is as sacred as the right to make them*.'") (quoting

*State ex rel. Givens v. Superior Court of Marion Cnty.*, 233 Ind. 235, 238 (1954))

(emphasis added); *Putka v. First Catholic Slovak Union*, 75 Ohio App. 3d 741, 748 (8th

Dist. 1991), *cert. denied*, 503 U.S. 986 (1992) ("Generally speaking, in matters of policy,

discipline or internal economy of a voluntary association, wherein the members have

27

mutually agreed upon a charter or rules, the decision of the association itself is supreme.") (internal citation omitted).

I turn to guidance from the United States Supreme Court. In *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (Rehnquist, C.J.), the Court held that the application of New Jersey's nondiscrimination law, requiring the Boy Scouts to appoint James Dale, an openly gay man as a scoutmaster, ran "afoul of the Scouts' freedom of expressive association."[49] *Id.* at 656. The Court found that a state compelling the Scouts to include Dale would "interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs." *Id.* at 653–54. "[T]he First Amendment simply *does not require that every member of a group agree on every issue* in order for the group's policy to be 'expressive association.' The Boy Scouts takes an official position . . . and that is sufficient for First Amendment purposes."[50] *Id.* at 655 (emphasis added). Chief Justice Rehnquist concluded:

> 'While the law is free to promote all sorts of conduct in place of harmful behavior, *it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one*, however enlightened either purpose may strike the government.'

---

[49] Freedom of expressive association is the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Dale*, 530 U.S. at 647.

[50] *See also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013) (en banc) (Hartz, J., concurring) ("[An organization's] speech or conduct may reflect the view of only a bare majority of the members, *or even just the view of the members' delegate*–such as the editor of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents an 'official position.'") (quoting *Dale*, 530 U.S. at 655) (emphasis added).

*Id.* at 661 (quoting *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515

U.S. 557, 579 (1995)) (emphasis added). *Dale*'s takeaway for the Court: the government

may not defy the internal decision-making of a private organization, including the criteria

governing that entity's membership.[51]

Voluntary organizations beget benefits and drawbacks. KKG provides community

on campus and a professional network for life.[52] Forty-four women in Laramie seemingly

prioritized those benefits when they rushed. Membership, on the other hand, relinquishes

a dose of personal autonomy. That organization may say or publish something anathema

to one or a faction of members. Take the 2018 *Guide*, speech that Plaintiffs undoubtedly

---

[51] Advanced by Defendants, *Bostock*, by contrast, is inapposite today. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) (Gorsuch, J.). There, the Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex" because "to discriminate on th[is] ground[] requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1741–42. Justice Gorsuch concluded that Title VII "prohibit[s] [employers] from firing employees on the basis of . . . transgender status." *Id.* at 1753. Both sides misapply *Bostock*. Defendants say that if the Supreme Court interpreted "discrimination because of sex" as protecting transgender individuals, so too may Kappa interpret its bylaws "to be similarly inclusive." *See* ECF No. 20, at 14. Plaintiffs respond that the law's ordinary meaning at enactment (*i.e.*, KKG's definition of "woman" in 1870) "usually governs." *See* ECF No. 24, at 12–13. Neither argument assists the Court today. Had the UW chapter or KKG denied Langford admission because she was transgender, *Bostock*, though addressing employer discrimination, would certainly amplify. On the other hand, *Bostock* concerned the Court's statutory interpretation of Title VII and not a private organization's internal bylaws. *See, e.g.*, 140 S. Ct. at 1738 ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending the statutes outside the legislative process reserved for the people's representatives.").

[52] In fact, each year of their KKG membership, Plaintiffs signed the following: "I recognize that membership in Kappa Kappa Gamma offers me many benefits and the opportunity for friendship, mutual support, personal growth and intellectual development. I understand that the privilege of membership comes with great responsibility." ECF No. 6-1, at 163; *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023) (Gorsuch, J.) ("In *Dale*, the Boy Scouts offered what some might consider a unique experience.") (citing 530 U.S. at 649–50).

disagree with. Just as the Boy Scouts were "an expressive association" entitled to First

Amendment protection, so too is Kappa Kappa Gamma.[53] *See Dale*, 530 U.S. at 647–56,

650 ("It seems indisputable that an association that seeks to transmit such a system of

values engages in expressive activity."). The law, or this Court, may not interfere with –

whether promoting or discouraging – that speech. *Dale* controls today, interestingly with

the shoe on the other foot.[54] Whether excluding gay scoutmasters in *Dale* or including

transgender women in Kappa, this Judge may not invade Kappa's sacrosanct,

associational right to engage in protected speech. KKG's "official position" of admitting

transgender women, even if decreed by a mere "delegate", is speech which this Court

may not impinge. *See Dale*, 530 U.S. at 655; *Sebelius*, 723 F.3d at 1149 (Hartz, J.,

---

[53] *See Iota XI Chapter of the Sigma CHI Fraternity v. Paterson*, 538 F. Supp. 2d 915, 923 (E.D. Va. 2008), *aff'd on other grounds*, 566 F.3d 138 (4th Cir. 2009) (extrapolating *Dale* to find that "a college fraternity is no different from the Boy Scouts"); *see also Schultz v. Wilson*, 304 F. Appx. 116, 120 (3d Cir. 2008) (unpublished) ("A social group is not protected unless it engages in expressive activity such as taking a stance on an issue of public, political, social, or cultural importance.") (internal citation omitted). The 2018 *Guide* was obviously such a stance by KKG. Because this matter presents no governmental action, which, in part, distinguishes *Dale*, the Court sees no reason to conduct *Dale*'s three-step analysis regarding a group's expressive association claim. *See* 530 U.S. at 650–56.

[54] Plaintiffs do not engage with *Dale*. Had they, Plaintiffs would likely contend that the Fraternity Council's unilateral decision to admit transgender women violated the members' First Amendment rights because it "force[d] the organization to send a message . . . that [it] accepts" transgender women for KKG membership, belying their views. *See Dale*, 530 U.S. at 650; *see also Green v. Miss United States of Am., LLC*, 52 F.4th 773, 802 (9th Cir. 2022) (rejecting a transgender applicant's plea to "use the power of the state to force Miss United States of America to express a message contrary to what it desires to express"). *Dale*'s posture, however, lends little to Plaintiffs; there, the Court considered the constitutionality of a state's nondiscrimination law compelling expression, rather than a member's challenge to an expressive decision of their voluntary organization. *See also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984) (Brennan, J.) ("There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together.").

concurring). Notably, there are also two associational layers before the Court. Not only

did KKG headquarters publish their willingness to accept transgender women in 2018,

the UW chapter voted to associate with Langford in 2022. *See Dale*, 530 U.S. at 658

("Impediments to the exercise of one's right to choose one's associates can violate the

right of association protected by the First Amendment.") (internal quotation and brackets

omitted). Cognizant of Langford's gender identity, the UW chapter determined that she

met *their* criteria for membership, including, *inter alia*, "integrity, respect, and regard for

others"; KKG confirmed the same thereafter. ECF No. 6-1, at 6–7. Their decisions lie

beyond the purview of this Court.

Plaintiffs respond that Kappa's freedom of expressive association does not insulate

the organization from amendment of its own bylaws. I disagree, especially where

Plaintiffs cannot point the Court to the bylaw that defines "woman" the way they wish.

Of course, an organization binds itself via its bylaws.[55] Those bylaws state that a new

Kappa "shall be a woman".[56] ECF No. 6-1, at 6. The parties diverge from there. Whereas

Plaintiffs circumscribe "woman", their delegate augmented the same. *See* ECF No. 24, at

11. In the Court's view, that is a lawful interpretation – explicitly authorized per the

sorority's *Standing Rules* – of an otherwise-silent bylaw. *See* ECF No. 6-1, at 119 ("The

---

[55] ECF No. 6-1, at 23 ("The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity.").

[56] The Court sees no reason to disturb the governance process by which the Fraternity Council published its *Position Statements* in 2021 and *FAQs* in 2022 ahead of KKG's biennial convention in 2022. Any issue that Plaintiffs raise with respect to KKG's putatively improper counting of the two-thirds vote necessary for bylaw amendment belong before the sorority, not this Court. *See also* ECF No. 6-1, at 24 (mandating a two-thirds convention vote to amend a KKG bylaw, sans any requirement regarding the Fraternity Council's method (*e.g.*, voice or written) of counting votes).

administrative duties of Fraternity Council shall include . . . [i]nterpreting the Fraternity
*Bylaws* and *Standing Rules*[.]"). Plaintiffs' plea that the Court interpret "woman" as it
was in 1870 clashes with this and other Courts' deference to organizational autonomy, or
the notion that organizations deserve considerable latitude to interpret their own bylaws.
For instance, the *Powell* court in Ohio spotlighted an exception to courts' general
unwillingness to interfere with a voluntary association when "there has been some
palpable violation of the constitution or laws of the corporation whereby [the member]
has been deprived of valuable rights." 1978 WL 216074, at *4. Plaintiffs make no such
showing. Instead, they ask this Court to overrule one interpretation and inject another.
The Court refuses to do so.

Though an akin bylaw-interpretation, derivative challenge is non-existent, the
Court's approach today, from a policy perspective, is practical. This Court cannot step in
every time a member, or even multiple members, cries foul when a bylaw is disparately
interpreted; if it did, KKG and its Fraternity Council would spend their days responding
to derivative suits from their thousands of current members and 210,000 alumnae. *See
also Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 13–cv–1054, 2013 WL
4401429, at *6 (S.D. Tex. Aug. 13, 2013) (noting that such interference would subject a
non-profit, private organization to "frustration at every turn" and cause it "to founder in
the waters of impotence and debility"). Our federal and state courts would similarly be
overrun with disgruntled members challenging large organizations. Consider, also, that
KKG supervises 140 chapters nationwide; reception of contested speech in today's
climate will obviously vary. Finally, Plaintiffs' alternative recourse lies within their

chapter and organization, not this Court. An appeal to other chapters is one such route; disassociation, while drastic, is another.

In summary, the delegate of a private, voluntary organization, in pursuit of "inclusiv[ity]", broadened its interpretation of "woman". ECF No. 6-1, at 105. The Court will not interfere with its result, nor invade the organization's freedom of expressive association. Accordingly, this Court dismisses Count I.[57]

D. *Count II: Plaintiffs' Breach of Contract Claim.*

Plaintiffs fail to demonstrate any breach of contract. Plaintiffs allege KKG's breach of two contracts, including Plaintiffs': (1) membership contracts with KKG under Ohio law; and (2) housing contracts with KKG Building Co. under Wyoming law.[58] *See* ECF Nos. 24, at 14; 6-1, at 163, 165–76. Defendants respond that Plaintiffs do not allege any plausible breach of their housing contracts. *See* ECF Nos. 20, at 18; 26, at 7.

Defendants are correct on both contracts. I begin with Plaintiffs' membership contracts with KKG. Under Ohio law, "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (internal quotation omitted); *Tel. Mgmt. Corp. v. Goodyear Tire & Rubber Co.*, 32 F. Supp. 2d 960, 969 (N.D. Ohio 1998) ("A breach of contract is a failure without legal excuse to

---

[57] ECF No. 6, ¶¶ 159–67.

[58] Finding that KKG Building Co. was not a Fed. R. Civ. P. 19(a)(1)(B) required party within Section A. *supra*, the Court dismissed KKG Building Co. from this lawsuit.

perform any promise that forms a whole or a part of a contract.") (internal citation

omitted). Entirely unalleged in their *Complaint*, Plaintiffs supplement that KKG's

admission of Langford in the UW chapter house "created a breach of contract as to . . .

the sorority experience[.]" *See* ECF No. 24, at 14. While Plaintiffs and KKG formed a

membership contract and Plaintiffs appear to have performed, any demonstration of

element (3) is absent; Plaintiffs fail to point the Court to any contractual breach by KKG.

*See* ECF No. 6-1, at 163. The Court admits its confusion as to what contractual language

KKG, in Plaintiffs' view, breached. *See id.*; *Allied Erecting and Dismantling Co., Inc. v.

Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 728 (N.D. Ohio 2009) ("[W]here a

contract is clear and unambiguous, the court need not ... go beyond the plain language of

the agreement to determine the rights and obligations of the parties.") (internal quotation

omitted). If anything, the membership contract primarily outlines Plaintiffs' obligations.

*See id.* Plaintiffs make no effort to contend otherwise.[59] Giving effect to the membership

contract before the Court, KKG undertook no contractual obligation to reject transgender

women. Accordingly, Plaintiffs fail to allege a breach of their membership contracts.

Reverting to Wyoming law, I turn to Plaintiffs' housing contracts.[60] Here, a breach

of contract claim consists of: (1) "'a lawfully enforceable contract;'" (2) "'an unjustified

---

[59] If Plaintiffs argue that KKG breached their membership contracts by redefining "woman" sans a bylaw amendment, they, similarly, fail to direct the Court to the contractual provision within their membership contracts that KKG allegedly violates. Even when liberally construing Plaintiffs' *Complaint* to incorporate an unpled breach of contract claim, the Court cannot do counsels' job for them.

[60] *See* ECF No. 6-1, at 173 ("This contract is made with reference to and shall be construed in accordance with the laws of Wyoming in which state it shall be performed by the parties.").

34

failure to timely perform all or any part of what is promised [*i.e.,* the breach];'" and (3)

'"entitlement of the injured party to damages."' *Peterson v. Meritain Health, Inc.*, 508

P.3d 696, 705 (Wyo. 2022) (quoting *Halling v. Yovanovich*, 391 P.3d 611, 616–17 (Wyo.

2017)) (internal brackets omitted). Plaintiffs allege that KKG breached their housing

contracts by allowing transgender women to live in the chapter house in violation of

KKG's governing documents. *See* ECF Nos. 6, ¶¶ 170–72; 24, at 14. Once again, though,

Plaintiffs fail to cite the Court to any explicit breach within the housing contracts; the

Court's analysis, thus, fails at element (2). ECF No. 6-1, at 165–76. As developed in

Section A. *supra*, the Court's review of the housing contract contradicts Plaintiffs. Within

those contracts, any obligations to comply with KKG's "*Bylaws, Standing Rules and

Policies* ('Fraternity standards')" were either undertaken by the UW chapter or Plaintiffs

themselves. *See, e.g., id.* at 166–67, 168 ("The student . . . shall, at all times, comply with

all . . . the Fraternity Standards. The student acknowledges that it is their responsibility to

seek out, read and understand . . . the Fraternity standards and they agree to follow the

same.").[61] Plaintiffs fail to show how KKG's receptive stance towards transgender

women "forms the whole or part of" their housing contracts. *See Reynolds v. Tice*, 595

P.2d 1318, 1323 (Wyo. 1979). Nowhere in the housing contracts do the parties contract

an obligation to "provide housing in accordance with" KKG's governing documents;

---

[61] Separately, KKG's bylaws state that *members* of KKG Building Co., described as "members
of the Fraternity", "shall agree to be bound by . . . the Fraternity *Bylaws, Standing Rules* and
*Policies*." *See* ECF No. 6-1, at 23–24.

Plaintiffs may not impose such an obligation on Defendants absent from those contracts. ECF No. 6, ¶ 170.

Accordingly, the Court dismisses Count II.[62]

E. *Count III: Plaintiffs' Tortious Interference Claim.*

Plaintiffs also fail to allege any tortious interference of contract. Plaintiffs claim that KKG[63] tortiously interfered with their housing contracts by inducting a transgender woman in violation of KKG's governing documents. ECF No. 6, ¶¶ 173–75. Defendants regurgitate that, without a breach of a housing contract, there can be no tortious interference with that contract. *See* ECF No. 20, at 20.

I concur with Defendants. To show tortious interference with a contract, Plaintiffs must allege: "(1) the existence of the contract; (2) the defendant's knowledge; (3) intentional and improper interference *inducing or causing a breach*; and (4) resulting damages." *First Wyo. Bank v. Mudge*, 748 P.2d 713, 715 (Wyo. 1998) (emphasis added) (citing Restatement (Second) of Torts, § 766 (Am. Law. Inst. 1979)). Inseverable from the Court's analyses above, Plaintiffs make no effort to demonstrate that KKG induced or caused a breach or termination of their housing contracts. *See USI Ins. Servs. LLC v. Craig*, No. 18-CV-79-F, 2019 WL 5295533, at *9–10 (D. Wyo. Apr. 9, 2019) (rejecting a

---

[62] ECF No. 6, ¶¶ 168–72.

[63] The Court admits its confusion by Plaintiffs' usage, twice, of "Defendants" within Count III. ECF No. 6, ¶ 175. However, because Plaintiffs use "Defendant Kappa Kappa Gamma" earlier in that paragraph and fail to clarify, even when prompted, the error in their response, the Court construes Count III as against solely KKG. *Id.*; *see* ECF Nos. 20, at 20 n.10; 24, at 17 ("Plaintiffs do allege that Kappa Kappa Gamma Fraternity has tortiously interfered with their contractual relationship with [KKG Building Co.]").

tortious interference claim where a plaintiff failed to show a breach of contract "[s]ince

the third element of this tort requires an underlying breach of a contract"); ECF No. 24, at

14–20. Plaintiffs fail to even attempt their burden. *See* ECF No. 24; *Gore v. Sherard*, 50

P.3d 705, 710 (Wyo. 2002) (internal citation omitted). Given Plaintiffs' failure to allege a

breach or termination by KKG, the Court need go no further.

Accordingly, the Court dismisses Count III.[64]

F.  *Count IV: Plaintiffs' Direct Claim.*

Plaintiffs fail to allege a direct claim against Rooney. Count IV appears to allege

that Plaintiffs suffered direct injuries due to KKG and Rooney's admission of Langford.

ECF No. 6, ¶¶ 176–79. Defendants argue that Plaintiffs' contention that they suffered

"individual legal harm distinct" from their derivative claim on behalf of all Kappa

members is wanting. *See* ECF No. 20, at 20–22. Plaintiffs copy and paste allegations

within their *Complaint* in response. *Compare* ECF No. 24, at 16–17, *with* ECF No. 6, ¶

12.

Plaintiffs have not shown a special duty, nor a separate and distinct injury, to

sustain their direct claim. Unlike a derivative action filed on behalf of a corporation, a

shareholder may bring a direct action "against a director or officer[65] of the corporation

'(1) where there is a special duty, such as contractual duty, between the wrongdoer and

the shareholder, *and* (2) the shareholder suffered an injury separate and distinct from that

---

[64] ECF No. 6, ¶¶ 173–75.
[65] Though Plaintiffs appear to sue KKG and Rooney under Count IV, direct actions under Ohio
law are only sanctioned against a corporation's director or officer. *Cf.* ECF No. 6, ¶ 179.
Therefore, the Court solely considers Plaintiffs' direct claim against Rooney.

suffered by other shareholders.'" *Morgan v. Ramby*, Nos. CA2010–10–095, CA2010–10–101, 2012 WL 626209, at \*4 (12th Dist. Feb. 27, 2012) (quoting *Herman's, Inc. v. Sach–Dolmar Div.*, 87 Ohio App. 3d 74, 77 (9th Dist. 1993)) (emphasis in original); *see also Heaton v. Rohl*, 193 Ohio App. 3d 770, 782 (11th Dist. 2011) (noting that a shareholder may bring a direct action where they demonstrate a special duty *or* a separate and distinct injury) (internal citation omitted).

First, Plaintiffs do not allege a special duty. Injury flowing "from a breach of corporate fiduciary duty" – as Plaintiffs briefly allude to – "amounts to nothing more than loss of the [non-profit corporation's] value, which is an injury shared in common with all other stockholders," or here, KKG members nationwide, and should be brought as a derivative action. *See* ECF No. 24, at 16; *Barr v. Lauer*, No. 87514, 2007 WL 117502, at \*2 (8th Dist. Jan. 18, 2007); *Carlson*, 152 Ohio App. 3d at 679 ("As a general proposition, claims for breach of fiduciary duties on the part of corporate directors or officers are to be brought in derivative suits."); *see also Weston v. Weston Paper & Mfg. Co.*, 74 Ohio St. 3d 377, 379 (Ohio 1996) (rejecting plaintiffs' argument that breach-of-fiduciary-duties claims against corporate directors should be allowed as a direct action in the absence of injury separate and distinct from the corporation). Moreover, for reasons articulated in Section C. above, Plaintiffs have not shown that Rooney breached any fiduciary duty to Plaintiffs by interpreting "woman" expansively.

Second, they also do not demonstrate a separate and distinct injury. Plaintiffs allege that their "loss of privacy, frustration of contractual expectations, and emotional distress" from Langford's induction are unique injuries. ECF No. 6, ¶ 179. However,

38

Plaintiffs sue Rooney, not their sorority sister; thus, only their frustrated contractual expectations merit consideration. Under Plaintiffs' theory, Rooney's actions contravene their pre-rush intent to join an organization that excludes transgender women. Yet, injury, if any, from Rooney's purported orchestration of Langford's admission inured to all KKG members alike, whether in Laramie or beyond, not merely Plaintiffs. In other words, Plaintiffs' putative injury – association with a transgender woman – technically affected all KKG members. Therefore, Plaintiffs' claims at bar, forgoing their determined unviability, belong as a derivative suit rather than a direct action. *See Grand Council of Ohio v. Owens*, 86 Ohio App. 3d 215, 220 (10th Dist. 1993) (determining that plaintiffs brought a derivative claim by "look[ing] to the nature of the alleged wrong rather than the designation used by plaintiffs"). Therefore, Plaintiffs fail to plead a special duty, nor a separate and distinct injury, to sustain their direct claim.

Accordingly, the Court dismisses Count IV.[66]

G. *Dismissal without Prejudice and Langford's* Motion to Dismiss *(ECF No. 22).*

Finally, Defendants argue that the Court should dismiss Plaintiffs' claims with prejudice. *See, e.g.*, ECF Nos. 20, at 22; 26, at 10. "'[A] dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'" *Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022) (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (internal citation omitted)) (emphasis in original) (brackets omitted). Defendants make no effort to

---

[66] ECF No. 6, ¶¶ 176–79.

argue futility and do not otherwise explain why dismissal with prejudice is appropriate; accordingly, the Court will dismiss Plaintiffs' claims without prejudice.[67]

Furthermore, due to the Court's dismissal today of Plaintiffs' four claims, the Court also dismisses Langford's *Motion to Dismiss* (ECF No. 22) as moot.[68]

## CONCLUSION

For the foregoing reasons, Plaintiffs' four claims fail. Pursuant to Fed. R. Civ. P. 12(b)(1), Defendant KKG Building Co. is dismissed. Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' four claims against Defendants KKG and Rooney are dismissed without prejudice.

Therefore, IT IS **HEREBY ORDERED** that Defendants', Kappa Kappa Gamma, Rooney, and KKG Building Co., *Motion to Dismiss* (ECF No. 19) is **GRANTED**.

---

[67] If Plaintiffs wish to amend their complaint, the Court advises Plaintiffs that they devote more than 6% of their complaint to their legal claims against Defendants. It also counsels Plaintiffs to provide more factual detail, where feasible, as well as highlight the Defendant(s) it sues under each count and relevant state statutes and authority. Finally, if provided another opportunity to clarify unclear language within an amended complaint, Plaintiffs should not copy and paste their complaint in lieu of elaboration or legal research that assists the Court in disentangling their claims. *See, e.g.*, ECF No. 24, at 14, 16–19.

[68] Langford moves to dismiss herself because, *inter alia*, she is not a Fed. R. Civ. P. 19(a)(1)(B) required party. *See* ECF Nos. 23, at 4; 27, at 2, 4. Plaintiffs respond: "if Langford stipulates that [s]he is not a required party, Plaintiffs would support h[er] dismissal." ECF No. 25, at 13 n.4. Langford did not reply. ECF No. 27. Without addressing the substance of Langford's motion, the Court notes the irrelevancy of Langford's alleged behavior. The crux of Plaintiffs' lawsuit is their derivative claim against Rooney and contractual claims against KKG. Unbefitting in federal court, Langford's unsubstantiated behavior at the UW chapter house has no bearing on Plaintiffs' legal claims. The Court, however, acknowledges that Plaintiffs' requested relief seeks to void Langford's KKG membership.

Case 2:23-cv-00051-ABJ   Document 32-2   Filed 09/25/23   Page 42 of 42

Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 41 of 41

Furthermore, IT IS **HEREBY ORDERED** that Plaintiffs' *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* (ECF No. 6) against Defendants is **DISMISSED WITHOUT PREJUDICE**.

Finally, IT IS **HEREBY ORDERED** that Defendant Langford's *Motion to Dismiss with Prejudice* (ECF No. 22) is **DISMISSED AS MOOT**.

IT IS **SO ORDERED**.

Dated this 25ᵗʰ day of August, 2023.

Alan B. Johnson
United States District Judge