# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Patsy Levang, *et al.*,

      Plaintiffs,

    v.

Kappa Kappa Gamma Fraternity, *et al*.

      Defendant.

Case No. 2:24-cv-316

Judge Michael H. Watson

Magistrate Judge Kimberly Jolson

## OPINION AND ORDER

This case is about whether Kappa Kappa Gamma ("Kappa") may allow transgender women to join its sisterhood.  All parties agree that their dispute boils down to this issue.  *See* Def. Mot. to Dismiss 2–3, ECF No. 23; Pl. Mot. to Certify 3, ECF No. 35.  This same issue is the subject of another case in another federal district court.  *See Westenbroek v. Fraternity*, No. 23-cv-51, 2023 WL 5533307, at *1 (D. Wyo. Aug. 25, 2023).  In short, this case duplicates *Westenbroek*.

Because they are duplicative, these two cases should not proceed simultaneously, for a plethora of prudential reasons.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("As between federal district courts, . . . the general principle is to avoid duplicative litigation.");  *West Gulf Maritime Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 728–29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid

rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." (internal citations omitted")); *Hooker v. Burson*, 960 F. Supp. 1283, 1291–92 (M.D. Tenn. 1996) ("One of the principles underlying the doctrine of comity is the desire to avoid conflicting decisions whenever possible.").

When a federal court is presented with duplicative suits, it may exercise its discretion to transfer, stay, or dismiss one of the duplicates. *NanoLogix, Inc. v. Novak*, No. 4:13-cv-1000, 2013 WL 6443376, at *2–3 (N.D. Ohio Dec. 9, 2013). In weighing its options, courts often proceed "under the rule of thumb that the entire action should be decided by the court in which an action was first filed," *Smith v. Sec. & Exch. Comm'n*, 129 F.3d 356, 361 (6th Cir. 1997) (en banc) (internal citations omitted), which courts call the first-to-file rule.

For the reasons stated below, the Court applies the first-to-file rule here and **TRANSFERS** this case in full to the United States District Court for the District of Wyoming.

## I.    BACKGROUND

### A.    The Parties

Kappa is a collegiate, social sorority.[1]  Incorporated as a non-profit organization, Kappa has hundreds of chapters and alumni associations in the

---

[1] Kappa is technically a women's 'fraternity' (it was founded before the term 'sorority' was coined).  *See* Compl. ¶ 20, ECF No. 1.  Even so, observing modern usage conventions, the Court will sometimes refer to Kappa as a 'sorority.'

U.S. and Canada.  Hundreds-of-thousands of women are members.  Defendants
Mary Pat Rooney, Maria Brown, Nancy Campbell, Barb Goettleman, Liz Wong,
Kyle Donnelly, and Beth Black are presently members.  Compl. ¶ 16, ECF No. 1.
They each have a seat on the "Fraternity Council," *see id.*, which functions like a
corporate Board of Directors.  *See id.* Ex. 1, ECF No. 1 PAGEID # 67–68, 70–71.
Plaintiffs Susan Jennings, Margo Knorr, Karen Pope, and Ann Witt are presently
alumnae members of the sorority.  *Id.* ¶ 5.  Plaintiffs Patsy Levang and Cheryl
Tuck-Smith are former members.  *Id.* ¶ 1.

## B.    Kappa's Governing Documents

Kappa is governed by its Articles of Incorporation, Bylaws, Standing Rules,
and Policies.  Article II of Kappa's Bylaws sets out the "purposes for which the
Fraternity is formed," including "to unite women, through membership, in a close
bond of friendship;" "to cooperate with other organizations in . . . building higher
standards of womanhood;" and "to advocate for and seek to address issues of
concern for members and women in general[.]"  *See id.* Ex. 1, ECF No. 1 at
PAGEID # 57.  Consistent with these purposes, Article III of Kappa's Bylaws
restrict membership to "women."  *See id.* at PAGEID # 58–59.  Neither Article III,
nor any other Bylaw, defines "woman" or "women," however.  The duty of
interpreting the Bylaws falls on the Council, under Standing Rule 5.1(B)(4).  *See*
ECF No. 9, PAGEID # 241.

The Council has taken the position that Kappa Chapters may select trans-
women as members since 2015.  That year, the Council issued a set of "Position

Statements." Compl. Ex. 6, ECF No. 1.  In a Position Statement on "Membership Selection," the Council advised that:

> Kappa Kappa Gamma is a single-*gender* organization comprised of women *and individuals who identify as women* whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character.  All chapters are expected to adhere to these documents . . . .

> Each chapter of Kappa Kappa Gamma has the final choice of its own members.

*Id.* at PAGEID # 89 (emphasis added).

Three years later, the Council reaffirmed its commitment to welcoming trans-women as members in a "Guide for Supporting Our LGBTQIA+ Members." Compl. Ex. 7, ECF No. 1.  The Council published the following in a "Frequently Asked Questions" Section of the Guide:

> [Q:] A potential new member identified herself as a member of the LGBTQIA+ community and asked if the chapter would be accepting.

> [A:] Yes. Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women. Kappa does not discriminate in membership selection except by requiring good scholarship and ethical character. Chapter members should become versed in this position statement in order to communicate this message to [potential new members].

> [Q:] My chapter is ready to extend a bid to a [potential new member] who identifies as transgender, but a member/adviser present is not supportive.

> [A:] Each Kappa chapter has the final choice of its own members. Because Kappa is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character, the chapter is well within its rights to offer that potential member a bid.

> [Q:] Can transgender members or members who identify as women live in the chapter facility?
>
> [A:] Yes. All Kappa members are eligible to live in a chapter facility. When available, living in the chapter facility can enhance the member's experience. Therefore, members and House Boards should work to make appropriate accommodations in order to support those members living in.

*Id.* at PAGEID # 100.  Neither party identifies how many people assigned a sex other than female at birth have been admitted to Kappa.  Plaintiffs mention two. Compl. ¶¶ 65, 77, ECF No. 1.

First, Plaintiffs allege that, in 2021, the Council admitted a "male" (a transwoman) as an alumna member by a three-fourths vote.  Compl. ¶ 65.  Within a year of admission, the Council then assigned the new alumna member to volunteer positions on the Bylaws Committee and as an Alumnae Advisor for a university chapter.  *Id.* ¶¶ 68–69.  The alumna member was then elected to a District Director position by a vote of the members at Kappa's 2022 Convention. *Id.* ¶ 73.

Second, in 2022, the Kappa chapter at the University of Wyoming (the Gamma Omicron chapter) voted to initiate a "male" student (a transgender woman).  *Id.* ¶ 77.  Plaintiffs allege that Kappa national "officials encouraged chapter officers to recruit the Student and guided chapter officers in the selection process."  *Id.* ¶ 78.  Plaintiffs question the student's "academic excellence" and the Gamma Omicron chapter's voting procedure.  *Id.* ¶¶ 79–81.  Aside from Plaintiffs, several active members of the Gamma Omicron chapter raised

concerns about the student's admission, both within the Gamma Omicron chapter and with Kappa nationals.  *Id.* ¶ 83.  Despite these concerns, the Gamma Omicron chapter in concert with Kappa nationals initiated the trans student as a full-fledged Kappa member.  *Id.* ¶ 82.

**C.    Wyoming Litigation**

Following the trans-student's admission, six active members of the Gamma Omicron chapter ("*Westenbroek* plaintiffs") sued in Wyoming federal court.  *Westenbroek v. Fraternity*, No. 23-cv-51, 2023 WL 5533307 (D. Wyo. Aug. 25, 2023).  Their suit named three defendants: Kappa Kappa Gamma Fraternity (also a Defendant here), Fraternity Council president Mary Pat Rooney (also a Defendant here), and Kappa Kappa Gamma Building Co. (a local non-profit that manages the Chapter's housing, not a defendant here).  *Id.*  The *Westenbroek* plaintiffs brought four claims:

> (1) a derivative cause of action under Ohio law;
>
> (2) a breach of contract claim, based on alleged (i) membership contracts with Kappa under Ohio law , and (ii) housing contracts with Kappa Building Co. under Wyoming law;
>
> (3) tortious interference with housing contracts against Kappa; and
>
> (4) a direct cause of action against Kappa and Rooney.

*Id.* at *4.  The district court dismissed all four claims.  *Id.* at *18.

The court dismissed the *Westenbroek* plaintiffs' derivative claim for three reasons.  First, it concluded that Ohio law demands deference to Kappa's "associational interpretation" that the term 'woman,' as used in its Bylaws,

includes trans-women.  *Id.* at *12–13.  Second, it concluded that the First

Amendment right to expressive association shields from court intervention the

internally established membership criteria of a private, voluntary organization.

*See id.* at *13–14 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)

(Rehnquist, C.J.)).  And third, it concluded that permitting the *Westenbroek*

plaintiffs' derivative claims to go forward would be imprudent from a policy

perspective: if allowed, derivative suits based on disparately interpreted bylaws

would overrun voluntary associations (like Kappa) as well as federal and state

courts.  *See id.* at *15.

　　The court dismissed the *Westenbroek* plaintiffs' contract claims based on

their failure to adequately allege breach of either contract.  *See id.*  The court

found no breach of the *Westenbroek* plaintiffs' membership contracts because

"KKG undertook no contractual obligation to reject transgender women," *id.*, nor

did the *Westenbroek* plaintiffs direct the court to a contractual provision that

Kappa may have violated by interpreting "woman" sans a bylaw amendment, *id.*

at *15, n. 60.  The court found the *Westenbroek* plaintiffs failed to allege breach

of their housing contracts based on analogous omissions.  *See id.* at 16.  The

court therefore dismissed the breach of contract claims.  *See id.*  Because

breach is also an element of tortious interference, the Court disposed of that

claim in the same stroke.  *See id.*

　　The court dismissed the *Westenbroek* plaintiffs' direct claim against

Rooney because they failed to plead either a "special duty" or a "separate and

distinct" injury. *See id.* at 17. Rooney owed the same duty to the *Westenbroek* plaintiffs that she owed to all Kappa sisters, not some "special duty," the court reasoned. *See id.* And the *Westenbroek* plaintiffs' "putative injury – association with a transgender woman – technically affected all KKG members," and was thus not "separate and distinct[.]" *Id.*

When the court dismissed these four claims, it did so without prejudice. *Id.* at 18. Although the defendants there requested dismissal with prejudice, they made no effort to argue that amending the complaint would be futile. *See id.* The court thus invited the *Westenbroek* plaintiffs to amend their complaint and explained how they might improve it. *See id.* at *18, n.67.

Rather than amend the complaint, the plaintiffs appealed. *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-8065, 2024 WL 2954705 (10th Cir. June 12, 2024).

The Tenth Circuit dismissed the appeal for lack of appellate jurisdiction based on the absence of a final order by the district court. *Id.* at *1, 3–4. The Tenth Circuit concluded that the district court's dismissal was not final because it was without prejudice. *Id.* at 3–4. The appellate court instructed the *Westenbroek* plaintiffs to either stand on their existing complaint and seek a dismissal with prejudice (so that they may perfect an appeal) or amend their complaint and proceed in the district court. *Id.* at 4. To date, the *Westenbroek* plaintiffs have not done either; the case remains pending in the District of Wyoming.

**D.    Kappa's Expulsion of Plaintiffs Levang and Tuck-Smith**

After they learned of *Westenbroek*, while they were still members, Patsy Levang and Cheryl Tuck-Smith openly opposed Kappa's trans-inclusive policy and espoused support for the *Westenbroek* plaintiffs.  For example, on May 2 and 3, 2023, Tuck-Smith expressed these views in emails to Alumnae Association Presidents of Kappa.  Compl. Ex. 9, ECF No. 1.  Levang similarly communicated with members on this subject.  She also published an op-ed in the National Review titled "Women Only Spaces Must Resist The Transgender Assault."  Compl. Ex. 10, ECF No. 1.

Kappa's Council contended that these actions violated Kappa policy. Kappa sent a letter to Levang and Tuck-Smith, warning them that they were being considered for dismissal.  Compl. Exs. 13, 14, ECF No. 1.  As to Levang, the Council alleged violations of: "the Use of Membership Lists and Contact Information Policy, Internet Policy, Local Regional or National Media Policy, Social Media Guidelines, Speaking for the Fraternity Policy, and the Human Dignity Policy."  Compl. Ex. 17, ECF No. 1.  In the same letter notifying her of these charges, Kappa's Standards Director recited the conduct Levang was alleged to have engaged in and how it violated Kappa policies.  For example, the letter states:

> Kappa has a Local, Regional or National Media Policy. That Policy requires individuals secure the approval of Kappa Kappa Gamma Headquarters before participating in any local, regional, or national media. We have become aware of multiple instances, examples of which are identified below, in which you have spoken to media about

the ongoing litigation in a manner that is injurious to the organization and perpetuates harmful stereotypes and false information without seeking approval from Kappa Kappa Gamma Headquarters.

*Id.*

As for Tuck-Smith, the Council alleged violations of: "Use of Membership Lists and Contact Information Policy and Human Dignity Policy." Compl. Ex. 18, ECF No. 1. Like Levang's letter, the letter sent to Ms. Tuck-Smith accuses her of specific facts that, per the Standards Director, constitute those policy violations. For example, the letter states:

> Kappa has a Use of Membership Lists and Contact Information Policy. That Policy provides that membership lists and member contact information available through the Kappa website, including names, emails, phone numbers, and mailing addresses, may only be used by Kappa alumna members in conducting the Fraternity business and shall not be used in non-Fraternity business or furnished to or used by anyone outside of the Fraternity. We have received complaints from Kappa alumna members that have been solicited by you and others that you have organized to donate money for the crowd funding site. Your use of member contact information to solicit donations to fund litigation against Kappa is a clear violation of Kappa's policy.

*Id.*

After some back-and-forth, Exs. 15–20, ECF No. 1, and a Council vote, Kappa terminated Levang's and Tuck-Smith's membership.

## E.   Ohio Litigation

While the motion to dismiss was pending in *Westenbroek*, several current Kappa members plus Levang and Tuck-Smith (none of whom are *Westenbroek* plaintiffs) filed this suit against Defendants in the Southern District of Ohio. They bring ten Counts. Counts I–III are derivative claims, brought on behalf of Kappa

against Kappa and its Council (just as the *Westenbroek* plaintiffs brought their derivative claims on behalf of Kappa against Kappa and its Council). Counts VI–X are individual claims on behalf of Levang and Tuck-Smith based on their dismissal. Counts IV (civil conspiracy) and V (free speech) are brought on behalf of all Plaintiffs. Defendants have moved to dismiss all ten Counts, arguing, among other things, that *Westenbroek* precludes this litigation. Mot., ECF No. 23.

## II.    DISCUSSION

### A.    Established Doctrines—like the First-to-File Rule—Enable Federal Courts to Prevent Duplicative Litigation.

Federal plaintiffs must generally bring all claims arising out of a common set of facts in a single suit in a single district court. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 34 (2012) (Alito, J., dissenting); *cf. Stone v. Dep't of Aviation*, 453 F.3d 1271, 1278 (10th Cir. 2006) ("A plaintiff's obligation to bring all related claims together in the same action arises under the common-law[.]"); Restatement (Second) of Judgments § 24. This requirement rests on "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952). When plaintiffs file duplicative actions in two different federal district courts, the courts may enforce the all-claims-in-one-case requirement, according to any one of several doctrines. *See Colorado*

*River*, 424 U.S. at 817 ("As between federal district courts, . . . the general principle is to avoid duplicative litigation." (internal citations omitted)).

Defendants invoke some of these anti-duplicative-litigation doctrines, relying on the Wyoming district court's dismissal in *Westenbroek*.  *See* Mot. to Dismiss 7–10, ECF No. 23 (res judicata); Def. Supp. Br., ECF No. 38 (res judicata, collateral estoppel, law of the case).  But none of the doctrines that Defendants invoke fit this case well; they all require a prior "final" judgment or ruling, *see generally* C. Wright et al., Federal Practice and Procedure §§ 4406, 4420, 4478 (3d ed. 2024), and the Wyoming district court's dismissal is not "final" because it is without prejudice, s*ee Westenbroek*, 2024 WL 2954705, at *3–4; *see also Rawlinson v. Wallerich*, 2006 WY 52, ¶ 10, 132 P.3d 204, 207 (Wyo. 2006) ("A dismissal without prejudice has no preclusive effect on subsequent litigation").

Defendants do not, however, exhaust the universe of anti-duplicative-litigation doctrines.  Another such doctrine—often called the "first-to-file" rule—is a better candidate for this case.  *See Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001) ("The first-to-file rule is a well-established doctrine[.]"); *Smith v. McIver*, 22 U.S. 532, 535 (1824) ("In all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it.").  Although Kappa has not invoked the first-to-file rule expressly, the Court may raise it sua sponte.  *Mack Indus. of Kalamazoo, LLC v.*

*J3 Eng'g Grp.*, LLC, No. 1:18-cv-1806, 2018 WL 5994968, at *4 (N.D. Ohio Nov. 15, 2018) (collecting cases).

Under the first-to-file rule, "when actions involving nearly identical parties and issues have been filed in two different district courts, the court in which the first suit was filed should generally proceed to judgment." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) (internal citations and quotation marks omitted). And, as a corollary, the court in which the later suit was filed should generally transfer, stay, or dismiss. *See Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 623 (9th Cir.1991)).

The first-to-file rule is prudential: it "encourages comity among federal courts of equal rank"; "conserves judicial resources"; and "protects the parties and the courts from the possibility of conflicting results." *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 789 (6th Cir. 2016) (internal citations and quotations omitted).

To determine whether the first-to-file rule applies, courts evaluate three threshold factors: (1) the chronology of events, (2) the similarity of the issues or claims at stake, and (3) the similarity of the parties involved. *Id.* If these three factors are met, courts then consider whether equitable factors merit excepting the particular case from the first-to-file rule. *Certified Restoration*, 511 F.3d at 551–52 (citing *Zide Sport Shop*, 16 F. App'x at 437). The Court now conducts that analysis.

**B.    The First-to-File Rule Applies Here.**

   **1.    All three threshold factors are met.**

      **a.    *Westenbroek* was filed first, satisfying the chronology factor.**

The first-to-file rule applies only if another case was filed first chronologically, as the name suggests.  "For purposes of first-to-file chronology, the date that an original complaint is filed controls."  *Zide Sport Shop*, 16 F. App'x at 437.

Chronology analysis is simple here.  The original complaint was filed in this Court on January 25, 2024.  But the original complaint in the Wyoming district court was filed about ten months earlier, on March 27, 2023.  The chronology factor is thus met.

      **b.    The issues raised here and in *Westenbroek* are similar enough to justify application of the first-to-file rule.**

For the first-to-file rule to apply, the issues in the second case must be sufficiently similar to the first.  This factor does not require perfect identity.  Rather, the issues "need only . . . substantially overlap" such that "'a determination in one action leaves little or nothing to be determined in the other.'"  *Baatz*, 814 F.3d at 791 (quoting *Smith v. SEC*, 129 F.3d at 361 (citation omitted)).  This factor is met when both cases share the same core issues.  *See Youngevity Int'l, Inc. v. Renew Life Formulas, Inc.*, 42 F. Supp. 3d 1377 (S.D. Cal. 2014) ("Although the claims in the two actions are brought under a variety of labels . . . , the key issues remain the same."); *NCR Corp. v. First Fin. Comput.*

*Servs., Inc.*, 492 F. Supp. 2d 864, 867 (S.D. Ohio 2007) (copyright and antitrust cases were similar enough to justify transfer under the first-to-file rule because they shared a "critical issue").

At bottom, all claims in both this case and *Westenbroek* revolve around one core issue: whether Kappa may admit transgender women consistent with its bylaws, Ohio law, and the First Amendment. Although the plaintiffs in both actions attack this core issue from various angles with a multiplicity of claims, their claims are similar enough to require resolution in a single case.

The Court analyzes each substantive[2] count below.

*Counts I–III here are identical to the Westenbroek Derivative Claim.* All three claims directly raise the core issue identified above. Counts I–III differ from the *Westenbroek* Derivative Claim only in how they are divided and labelled. Such a nominal difference does not remove Counts I, II, and III from the first-to-file rule's crosshairs. *See Emps. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-4813, 2020 WL 7487839, at *3 (S.D. Ohio Dec. 21, 2020).

*Count V here raises speech and associational issues that the Westenbroek Derivative Claim raises in equal measure.* Count V alleges that Kappa violated the Free Speech provision of the Ohio Constitution (Article I,

---

[2] Two counts here are not "substantive," in that they do not raise any issues of their own. Count IX (Injunctive Relief) merely requests injunctive relief for the breach alleged in Counts VI–VIII. Count IV (Civil Conspiracy) does not allege independently unlawful action on Kappa's part; it alleges that Defendants conspired in committing the unlawful acts that constitute the other counts. These Counts thus rise and fall with the others.

Section 11) by expelling or threatening to expel members who disagreed with Kappa's trans-inclusive membership policy.  Compl. ¶¶ 192–204.  Although the *Westenbroek* plaintiffs did not allege any actual expulsions, they did allege threats to expel.  Reply Ex. 2 at ¶¶ 12, 131, 142, 152 178, ECF No. 27.  And although the *Westenbroek* plaintiffs have not raised Article I, Section 11 of the Ohio Constitution, they have addressed arguments based on the First Amendment to the U.S. Constitution—which doubles as "the proper basis for interpretation of Section 11, Article I of the Ohio Constitution" because "the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment."  *Eastwood Mall, Inc. v. Slanco*, 68 Ohio St. 3d 221, 223 (1994).  The *Westenbroek* Derivative Claim raises free speech issues no less than Count V here.  *See Westenbroek*, 2023 WL 5533307, at *13–14 (analyzing the Derivative Claim under the First Amendment).

_Counts VI–VIII here involve the same core issue as the Westenbroek_ _Derivative Claim and arise from the same contract as the Westenbroek Contract_ _Claim_.  According to Counts VI–VIII, Kappa breached a contract with Plaintiffs Levang and Tuck-Smith (Count VI), broke a promise on which Levang and Tuck-Smith detrimentally relied (Count VII), or violated public policy (Count VIII) by terminating their membership.  Kappa responds that it extends membership contingent upon observance of its policies, which prohibit Levang's and Tuck-Smith's conduct.  To rebut this argument, Levang and Tuck-Smith assert that these were not Kappa's true reasons for expulsion; its true reasons were

retaliatory—that is, Kappa terminated Levang's and Tuck-Smith's membership because they reported a violation of Kappa policy, and, thereby, Kappa violated its own anti-retaliation policy.  Compl. ¶¶ 200–202 (referencing Fraternity Policy XIV).

Kappa's dismissal of Levang and Tuck-Smith and its alleged retaliatory motive weave together the merits of those claims with merits of the core issue (whether Kappa's bylaws permit admitting a transgender member) in three ways.

First, Levang's and Tuck-Smith's dismissal involves First Amendment issues of a piece with those implicated by the core issue.  As touched on above, the core issue implicates Kappa's First Amendment freedom of association.  That freedom protects exclusion as much as inclusion.  Indeed, after undertaking First Amendment analysis, the Wyoming district court held:

> "*Dale* controls today, interestingly with the shoe on the other foot.  Whether excluding gay scoutmasters in *Dale* or including transgender women in Kappa, [a] Judge may not invade Kappa's sacrosanct, associational right to engage in protected speech."

Though Kappa's exclusion of Levang and Tuck-Smith adds a second shoe for the original foot, this shoe and the *Westenbroek* shoe make a matching pair.  In other words, because Kappa's inclusion of transwomen and its exclusion of Levang and Tuck-Smith may both be protected by the same right, claims arising from either should proceed in the same case.

Second, the core issue is embedded in the retaliation allegation: whether Kappa violated the anti-retaliation policy hinges on whether Levang and Tuck-

Smith "reported a violation of Kappa policy," which in turn hinges on whether admitting trans-women is a "violation of Kappa policy"—the core issue.  What is more, Levang and Tuck-Smith seem to argue that blowing-the-whistle on Kappa's trans-inclusive policy insulated their membership status.  When Kappa informed Levang and Tuck-Smith that it was investigating possible violations of Kappa policy, each responded by referencing *Westenbroek*.  Compl. Ex. 16, 19, ECF No. 1.  They recited the argument behind the *Westenbroek* Derivative Claim, implying that Kappa's alleged bylaw violation justified their conduct.  *Id.* If this implication is accepted, the merits of Counts VI–VIII depend on the core issue.

Third, proof of retaliation would bolster Plaintiffs' position on the core issue. In brief, Plaintiffs' argument on the core issues is that Kappa violated its own governing documents by admitting transwomen.  Counts VI–VIII allege that Kappa violated its governing documents: the provisions prohibiting retaliation against whistleblowers.  Compl. ¶¶ 200–02 (referencing Fraternity Policy XIV).  If true (setting aside for now that establishing its truth may itself depend on the core issue), the proposition that Kappa violated its own anti-retaliation policy would tend to show a breach of fiduciary duty, a critical component of the derivative claims here and in *Westenbroek*.  That is presumably why both sets of Plaintiffs allege retaliation in their derivative claims.  *See* Compl. ¶¶ 115, 139, 155, ECF No. 1; Reply Ex. 2 at ¶¶ 12, 107, 152, ECF No. 27.  In short, Counts VI–VIII reinforce Plaintiffs' arguments on the core issue.

All in all, the core issue permeates Counts VI-VIII.

And, if that were not enough, Counts VI-VIII all arise from the same contract as the *Westenbroek* Breach of Contract Claim. "Judicial efficiency counsels against allowing multiplicity of litigation in different districts arising from the same contract." *Mercado-Salinas v. Bart Enterprises Int'l, Ltd.*, 669 F. Supp. 2d 176, 190 (D.P.R. 2009). Because the *Westenbroek* Breach Claim and Counts VI-VIII arise from the same essential Kappa membership contract, they are similar enough to trigger the first-to-file rule.

*Count X touches on the core issue too.* In Count X, Levang and Tuck-Smith allege that Kappa defamed them by publishing news of their dismissal. They do not clarify the exact statement (or statements) Kappa published, but the Court surmises from briefing that the statement (or statements) communicate: (i) the fact of Levang's and Tuck-Smith's dismissal, and (ii) the reasons they were dismissed. The defamation claim will fail on the merits if Kappa's allegedly defamatory statement is true. *See, e.g., Hersch v. E. W. Scripps Co.*, 445 N.E.2d 670, 678 (Ohio Ct. App. 1981). Levang and Tuck-Smith premise many of their other claims on their dismissal, so they must concede that (i) is true. They allege, however, that (ii) is false; they did not violate the cited Kappa rules as Kappa well knows. In essence, then, Levang and Tuck-Smith argue that (ii) is false because Kappa's real reason for dismissing them was retaliatory. As established above, the retaliation allegations are entangled with the core issue.

Zooming out, and viewing all Counts collectively, the Court concludes the issues raised here are similar enough to those in *Westenbroek* that application of the first-to-file rule is justified. Resolving the core issue—whether Kappa may admit trans-women consistent with its bylaws, Ohio law, and the First Amendment—will leave little else to be determined. Having reached this conclusion (that the litigation here and in *Westenbroek* raise substantially similar issues), the Court now turns to whether the parties to the two actions are sufficiently similar.

> ### c.   The parties here and in *Westenbroek* are similar enough to justify application of the first-to-file rule.

For the first-to-file rule to apply, the parties in the two actions need not be perfectly identical but must "'substantially overlap." *Baatz*, 814 F.3d at 790. Courts find that substantial overlap "if some [of] the parties in one matter are also in the other matter, regardless of whether there are additional, unmatched parties in one or both matters." *Youngevity*, 42 F. Supp. 3d at 1382 (quoting *Pac. Coast Breaker, Inc. v. Conn. Elec., Inc.*, 2011 WL 2073796, at *3 (E.D. Cal. May 24, 2011)); *see also Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950–51 (5th Cir.1997). Strict insistence on identity of the parties would, after all, allow a litigant to defeat the first-to-file doctrine by simply adding a party to the next lawsuit. *See Herer v. Ah Ha Pub., LLC*, 927 F. Supp. 2d 1080, 1089 (D. Or. 2013).

The derivative plaintiffs here (Jennings, Knorr, Pope, and Witt) are similar enough to the derivative plaintiffs in *Westenbroek*. In the closely related shareholder derivative context, courts have held that different shareholders asserting derivative claims against the same corporation were similar enough parties to trigger the first-to-file rule. *See, e.g.*, *Emps. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-CV-04813, 2020 WL 7487839 (S.D. Ohio Dec. 21, 2020); *Kelley v. HCR ManorCare, Inc.*, No. SACV171259JVSJCGX, 2017 WL 10441310 (C.D. Cal. Nov. 28, 2017). This Court holds the same here; plaintiffs, in both cases, are proceeding with "Kappa" as the plaintiff (and defendant), no matter which member lends her name to each derivative suit.

That still leaves Levang and Tuck-Smith, who have no true analogs in *Westenbroek*. They were formerly Kappa members, however. And, regardless, the first-to-file rule does not require perfect identity of parties. Plus, Levang and Tuck-Smith raise issues much like those raised by their former sisters, as discussed above. The Court therefore concludes that the parties are sufficiently similar.

Turning to the Defendants, Kappa is the primary defendant both here and in *Westenbroek*. Both suits also name members of Kappa's Council as defendants. Though many of the Council-member Defendants here are not named in *Westenbroek*, the Court finds that, because of their shared involvement in the Council, these defendants are similar enough to justify applying the first-to-file rule.

Finding all three threshold factors met, the Court holds that the first-to-file rule presumptively applies, subject to equitable factors which the Court now considers.

### 2.    No equitable factor triggers an exception; to the contrary, equity supports application of the first-to-file rule here.

This Court has the "discretion to dispense with the first-to-file rule where equity so demands." *AK Steel Corp.*, 2010 WL 11538475, at *2 (S.D. Ohio May 17, 2010). "Factors that weigh against enforcement of the first-to-file rule include extraordinary circumstances, inequitable conduct, bad faith, anticipatory suits, and forum shopping." *Certified Restoration*, 511 F.3d at 551–52 (quoting *Zide Sport Shop*, 16 F. App'x at 437). No factor weighs against the first-to-file rule here.

If anything, to not apply the first-to-file rule here would be to condone forum-shopping. The Court does not accuse Plaintiffs of forum-shopping or bad faith, to be clear. But allowing Plaintiffs to proceed simultaneously on the same core claims in two fora, as Plaintiffs here seek to do, encourages forum-shopping. The current situation in *Westenbroek* illustrates how. Six months have passed since the Tenth Circuit instructed the *Westenbroek* plaintiffs to either amend their complaint or move for a dismissal without prejudice. They have not done so. Why not? A plaintiff in the *Westenbroek* plaintiffs' shoes might respond to that question with one of their own: why would we proceed in a forum that dismissed our claim already when instead we can wait and see

whether the Southern District of Ohio will be more receptive?  Again, the Court

insinuates nothing; the point is that dispensing with the first-to-file rule in cases

like this one would, objectively, incentivize forum-shopping.

The Court thus resolves to apply the first-to-file rule.  All that remains is

how.

## C.    Transfer (Not a Stay or Dismissal) is the Most Appropriate Disposition for this Second Filed Case.

Owing to its inherent power over docket management, the court with the

second-filed case has discretion over that case's disposition.  *See Landis v. N.*

*Am. Co.*, 299 U.S. 248, 254 (1936).  The Court has three primary options:

transfer, stay, or dismissal.  *NanoLogix,* 2013 WL 6443376, at *2–3 (collecting

cases of each).

Dismissal is generally less favored than the other two options because it

risks accidentally prejudicing a party.  *See Baatz*, 814 F.3d at 793–905; *Asset*

*Allocation & Mgt. v. Western Employers Ins.*, 892 F.2d 566, 571 (7th Cir.1989)

("Granted, the statute of limitations problems may not be serious . . . . But why

take chances? It is simpler just to stay the second suit.").  Because Kappa raises

a statute of limitations argument here and because Plaintiffs Levang and Tuck-

Smith raise separate (but sufficiently similar) claims on behalf of themselves,

dismissing Plaintiffs' claims here presents some risk of prejudice.  The Court

therefore declines to dismiss.

As between transfer and stay, courts have offered relatively little guidance. Transfer appears to be the prevailing practice in this District.  *See, e.g.*, *BSI Indus., Inc. v. Q.B. Johnson Mfg., Inc.*, No. 08-cv-276, 2009 WL 349143, at *3 (S.D. Ohio Feb. 6, 2009) ("Second-filed courts generally choose to transfer an action when dealing with substantive matters."); *NCR Corp.*, 492 F. Supp. 2d at 868–869; *Dewhurst v. Century Aluminum Co.*, No. 2:09-cv-1033, 2009 WL 5205353, at *3 (S.D. Ohio Dec. 23, 2009).  Imagining it will save the parties here some time and money, the Court decides the best course is transfer in full to the District of Wyoming.

### III.    CONCLUSION

For all these reasons, the Court directs the Clerk to **TRANSFER** the case to the United States District Court for the District of Wyoming and **TERMINATE** the case on this Court's docket.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**