No. 23-8065

# In the United States Court of Appeals for the Tenth Circuit

JAYLYN WESTENBROEK, ET AL.,

*Plaintiffs-Appellants*,

v.

KAPPA KAPPA GAMMA FRATERNITY, AN OHIO NON-PROFIT CORPORATION AS NOMINAL DEFENDANT AND AS A DIRECT DEFENDANT, ET AL.,

*Defendants-Appellees*,

ARTEMIS LANGFORD,

*Defendant.*

On Appeal from the United States District Court for the District of Wyoming
No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson

## BRIEF OF APPELLANTS

GENE C. SCHAERR
CRISTINA MARTINEZ SQUIERS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

SYLVIA MAY MAILMAN
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
s.maymailman@gmail.com

JOHN KNEPPER
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
John@KnepperLLC.com

CASSIE CRAVEN
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
cassie@longhornlawllc.com

*Counsel for Plaintiffs-Appellants*

DECEMBER 4, 2023

**\*ORAL ARGUMENT IS REQUESTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF RELATED CASES .................................................................. viii

INTRODUCTION ................................................................................................. 1

JURISDICTION .................................................................................................... 3

ISSUES ................................................................................................................. 4

STATEMENT OF THE CASE ............................................................................... 5

   A.   Facts ........................................................................................................ 5

        1.   Kappa Was Founded as a Single-Sex Haven for Collegiate Women. ............................................................................................ 5

        2.   Defendants Have Subverted Kappa's Mission and Governing Documents by Changing the Definition of "Woman" Without Following the Required Processes. ......................................... 8

        3.   Defendants Have Further Subverted Kappa's Governing Documents by Admitting Langford through Coercion and Voting Irregularities. ...................................................... 10

        4.   Langford's Admission Harmed the Sorority Holistically and Plaintiffs Individually. ......................................................... 11

   B.   Procedural History ................................................................................. 13

SUMMARY OF ARGUMENT AND STANDARD OF REVIEW ......................... 17

ARGUMENT ........................................................................................................ 18

   I.   The District Court Erred in Dismissing Plaintiffs' Derivative Claim Against Defendants Kappa and Rooney. ................................................... 18

        A.   Plaintiffs Met the Procedural Requirements of Their Derivative Claim, and the Rule of Non-Interference Does Not Apply to That Claim. .................................................................. 18

        B.   Corporations Have No First Amendment Right to Disregard the Terms of Their Governing Documents. ................................... 23

C.   Plaintiffs Have Sufficiently Alleged Defendants' Fiduciary Breach Due to Their Failure to Follow Kappa's Governing Documents That Define "Woman" as a Biological Female. .........27

  1.   The Court applies the plain and ordinary meaning of common words. .......................................................................29

  2.   Kappa's governing documents (its contracts) have always defined "woman" as a biological female. ................30

  3.   Kappa has never changed the definition of "woman." ........34

  4.   "Woman" is not an ambiguous term open to an evolving interpretation. ..........................................................36

II.   The District Court Erred in Dismissing Plaintiffs' Direct Action Because Plaintiffs Were Separately and Distinctly Injured by Defendants' Admission of Langford into the Wyoming Chapter. ...........40

CONCLUSION ........................................................................................42

ORAL ARGUMENT STATEMENT .......................................................44

CERTIFICATE OF COMPLIANCE ........................................................45

CERTIFICATE OF DIGITAL SUBMISSION .......................................46

ATTACHMENT:

August 25, 2023 Order of Hon. Alan B. Johnson, U.S. District Judge, Granting Defs.' Mot. to Dismiss (ECF No. 19), Dismissing, Without Prejudice, Pls.' First Am. Verified Member Derivative Compl. for Breach of Fiduciary Duties (ECF No. 6), and Dismissing as Moot Def. Artemis Langford's Mot. to Dismiss (Mar. 3, 2023), ECF No. 31

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Alexander v. Buckeye Pipe Line Co.*,
   374 N.E.2d 146 (Ohio 1978)...................................................................... 30, 36, 39

*Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*,
   544 N.E.2d 920 (Ohio 1989)................................................................................ 29, 38

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................... 17

*Bonacci v. Ohio Highway Express, Inc.*,
   No. 60825, 1992 WL 181682 (Ohio Ct. App. July 30, 1992) ............................ 20

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) .......................................... 33, 39

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ................................................... 24

*Browning v. Fraternal Ord. of Eagles*,
   No. 1769, 1986 WL 9644 (Ohio Ct. App. Aug. 22, 1986) ................................ 25

*Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio Ct. App. 2003)................ 14, 20, 28, 42

*Carr v. Acacia Country Club Co.*,
   970 N.E.2d 1198 (Ohio Com. Pl. 2011) ............................................................. 28

*Cincinnati Camp Meeting Ass'n of Methodist Episcopal Church
   v. Danby*, 56 N.E.2d 694 (Ohio Ct. App. 1943) ............................................... 23

*Cincinnati Ins. Co. v. CPS Holdings, Inc.*,
   875 N.E.2d 31 (Ohio 2007)................................................................................. 30

*Crosby v. Beam*,
   548 N.E.2d 217 (Ohio 1989)......................................................................... 40, 41

*DiPasquale v. Costas*,
   926 N.E.2d 682 (Ohio Ct. App. 2010)................................................................ 28

*Eastom v. City of Tulsa*,
   783 F.3d 1181 (10th Cir. 2015) ............................................................................ 4

*Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention
  Facilities Auth.*, 678 N.E.2d 519 (Ohio 1997)................................................. 29, 30

*Frank v. Crawley Petroleum Corp.*,
  992 F.3d 987 (10th Cir. 2021) ............................................................................4

*Gee v. Pacheco*,
  627 F.3d 1178 (10th Cir. 2010) ........................................................................30

*Graham v. Drydock Coal Co.*,
  667 N.E.2d 949 (Ohio 1996)............................................................................38

*Heaton v. Rohl*,
  954 N.E.2d 165 (Ohio Ct. App. 2011)..............................................................40

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995)................................................................................... 24, 25

*In re Ferro Corp. Derivative Litig.*,
  511 F.3d 611 (6th Cir. 2008)............................................................................19

*Int'l Bhd. of Elec. Workers Local Union No. 8 v. Gromnicki*,
  745 N.E.2d 449 (Ohio Ct. App. 2000)................................................. 20, 25, 26

*Kelly v. Med. Life Ins. Co.*,
  509 N.E.2d 411 (Ohio 1987).............................................................................30

*Lutz v. Chesapeake Appalachia, L.L.C.*,
  71 N.E.3d 1010 (Ohio 2016)....................................................................... 36, 37

*Maas v. Maas*, 161 N.E.3d 863 (Ohio Ct. App. 2020) .........................................42

*Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*,
  246 N.E.2d 598 (Ohio Ct. App. 1969)................................................... 23, 26

*Moya v. Schollenbarger*,
  465 F.3d 444 (10th Cir. 2006) ........................................................................3, 4

*Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.*,
  388 U.S. 175 (1967)..........................................................................................26

*Ohio v. Ramirez*,
  151 N.E.3d 598 (Ohio 2020)............................................................................30

*Petty v. Manpower, Inc.*,
   591 F.2d 615 (10th Cir. 1979) ..............................................................4

*Powell v. Ashtabula Yacht Club*,
   No. 953, 1978 WL 216074 (Ohio Ct. App. 1978) ................................. 21, 22, 23

*Putka v. First Cath. Slovak Union*,
   600 N.E.2d 797 (Ohio Ct. App. 1991) ..................................................22

*Ray v. Hidden Harbour Ass'n, Inc.*,
   104 N.E.3d 261 (Ohio Ct. App. 2018) ............................................ 27, 28

*Redden v. Alpha Kappa Alpha Sorority, Inc.*,
   No. 1:09CV705, 2010 WL 107015 (N.D. Ohio Jan. 6, 2010) ..................... 21, 23

*Reyes v. Laborers' Int'l Union of N. Am.*,
   464 F.2d 595 (10th Cir. 1972) ..............................................................26

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ..............................................................................26

*Shifrin v. Forest City Enters., Inc.*,
   597 N.E.2d 499 (Ohio 1992) ................................................................36

*Smith v. United States*,
   561 F.3d 1090 (10th Cir. 2009) ...........................................................17

*Stibora v. Greater Cleveland Bowling Ass'n*,
   577 N.E.2d 1175 (Ohio Ct. App. 1989) ......................................... 22, 23

*Strah v. Lake Cnty. Humane Soc'y*,
   631 N.E.2d 165 (Ohio Ct. App. 1993) ........................................... 23, 29

*Sutton v. Utah State Sch. for Deaf & Blind*,
   173 F.3d 1226 (10th Cir. 1999) ...........................................................17

*Tri Cnty. Tel. Ass'n, Inc. v. Campbell*,
   No. 20-8053, 2021 WL 4447909 (10th Cir. June 16, 2021) ...................4

*Tucker v. Nat'l Ass'n of Postal Supervisors*,
   790 N.E.2d 370 (Cleveland Mun. Ct. 2003) .......................................23

*Ulliman v. Ohio High Sch. Athletic Ass'n,*
  919 N.E.2d 763 (Ohio Ct. App. 2009) ..................................... 20, 28, 31

*United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.,*
  716 N.E.2d 1201 (Ohio Ct. App. 1998) .............................................37

*Wisconsin Cent. Ltd. v. United States,*
  138 S. Ct. 2067 (2018) ......................................................................39

**Statutes**

20 U.S.C. § 1681 .............................................................................7, 33

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1332 ....................................................................................3

Ohio Rev. Code Ann. § 1702.11 ..........................................................28

Ohio Rev. Code Ann. § 1702.12 ....................................... 14, 20, 21, 28

Ohio Rev. Code Ann. § 1702.30 ................................................... 27, 28

**Rules**

Fed. R. App. P. 4 ....................................................................................3

Ohio Civ. R. 23.1 ....................................................................... 15, 18, 19

**Other Authorities**

Complaint, *Kappa Alpha Theta Fraternity, Inc., v. Harvard Univ.,*
  397 F. Supp. 3d 97 (D. Mass. 2019) (No. 1:18-cv-12485),
  2018 WL 6305759 ..............................................................................7

Kappa Kappa Gamma Convention 2004 and Bylaws/Standing Rules
  Revisions Video, Kappa Kappa Gamma (2004) ........................... 34, 36

Kappa Kappa Gamma Fraternity,
  By-Laws of Kappa Kappa Gamma (1870) ...........................................31

Kappa Kappa Gamma Fraternity,
  By-Laws of the Kappa Kappa Gamma Fraternity (1966)....................32

Kappa Kappa Gamma Fraternity,
   Constitution of Kappa Kappa Gamma (1882) ......................................31

Kappa Kappa Gamma Fraternity,
   Constitution of Kappa Kappa Gamma (1910) ......................................32

Kappa Kappa Gamma Fraternity,
   Constitution of Kappa Kappa Gamma (1926) ......................................32

Denise Tessier & Gay Chuba Barry,
   *History 2000: Kappa Kappa Gamma Through the Years* (2000)................. 30, 31

*Webster's International Dictionary of the English Language*
   *Comprising the issues of 1864, 1879, and 1884*
   (Springfield, Mass., G. & C. Merriam Co. 1898).................................31

Charles A. Wright & Arthur R. Miller,
   *Federal Practice & Procedure* (3d ed. 2023 update) .........................34

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28.2(C)(3), Appellants state that there are no prior or related appeals.

## INTRODUCTION

Well before women were granted the right to vote or permitted to attend most colleges, a small band of women in 1870 created a single-sex sorority, Kappa Kappa Gamma ("Kappa"), to provide women the benefits of Greek-letter societies then reserved for men. Those women were wildly successful, and today Kappa boasts 210,000 living alumnae. Kappa brings these many women together through its Bylaws and other governing documents, which set out Kappa's purpose, define membership, establish fees, and create organizational structure.

The question at the heart of this case is the definition of "woman," a term that Kappa has used since 1870 to prescribe membership, in Kappa's governing documents. Using any conceivable tool of contractual interpretation, the term refers to biological females. And yet, the district court avoided this inevitable conclusion by applying the wrong law and ignoring the factual assertions in the complaint.

First, the district court fabricated obstacles to avoid considering Plaintiffs' derivative claim, including Ohio courts' reluctance to interfere with an organization's internal affairs and the First Amendment's protection of expressive association. Neither of these doctrines applies here and neither prevents Plaintiffs' claims from proceeding as a matter of law. The non-interference rule applies when plaintiffs object to an organization's internal dispute-resolution process. It does not apply when, as here, plaintiffs claim a breach of fiduciary duty. Further, the First

Amendment prohibits the government from interfering with the expressive association rights of its citizens. It does not apply to a lawsuit devoid of state actors, and it does not prohibit private plaintiffs from suing to enforce the terms of a private organization's own bylaws. An Ohio corporation is bound to act in accordance with the rules of governance it voluntarily adopts. And Kappa's Bylaws plainly exclude biological men from membership.

Second, the district court erred in ruling that Plaintiffs had not sufficiently alleged direct claims stemming from the violation of the Bylaws and other governing documents. Rather than accept Plaintiffs' allegations as true in considering dismissal, as the court must, the district court treated these allegations as irrelevant. But they are not. Plaintiffs allege personal injuries stemming from the strange and sexualized behavior of the biological male (Langford) that Kappa admitted into the sorority house that were different from the injuries to the sorority as a whole. Specifically, Langford's unwanted staring, photographing, and videotaping of the Plaintiffs, as well as his asking questions about sex and displaying a visible erection while in the house, invaded Plaintiffs' privacy and caused emotional distress in a personalized and unique way. And thus Plaintiffs have pleaded a viable direct claim. This Court should therefore reverse the district court's dismissal of Plaintiffs' derivative and direct claims.

2

## JURISDICTION

Plaintiffs-Appellants appeal from an order dismissing all their claims without prejudice entered August 25, 2023, by the U.S. District Court for the District of Wyoming.  App. Vol. 2 at 108.  The district court had subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332.  In accordance with Federal Rule of Appellate Procedure 4(a), Plaintiffs filed a timely notice of appeal on September 25, 2023.  App. Vol. 2 at 108–09.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

Because the district court dismissed Plaintiffs' complaint without prejudice, Kappa has argued this Court lacks an underlying final decision.  But the dismissal of a complaint without prejudice does not mean the decision is "non-final under section 1291." *Moya v. Schollenbarger*, 465 F.3d 444, 448 (10th Cir. 2006).  For example, where "the district court's grounds for dismissal are such that the defect cannot be cured through an amendment to the complaint, that dismissal (even if it is ambiguous or nominally of the complaint) is for practical purposes of the entire action and therefore final." *Id.* at 450–51.

Under these settled principles, and as explained in Plaintiffs' Opposition to Defendants' Motion to Dismiss Appeal for Lack of Appellate Jurisdiction, Doc. 01011093987, the district court's decision in this case is final.  Plaintiffs cannot cure the defects the district court believed present in the First Amended Complaint

through an amendment because the district court's decision was based on "a matter going to the merits of appellant's complaint itself rather than a procedural problem which amendment of a complaint might rectify." *Petty v. Manpower, Inc.*, 591 F.2d 615, 617 (10th Cir. 1979) (per curiam); *accord Moya*, 465 F.3d at 448–49.[1]

## ISSUES

1. Whether the district court erred in holding that Ohio's non-interference rule and the First Amendment bar Plaintiffs' derivative claim, which asserts a violation of fiduciary duties for admitting a biological male in contravention of Kappa's Bylaws and governing documents.

---

[1] Further, Defendants' entire challenge to this Court's jurisdiction rests on *Eastom v. City of Tulsa*, 783 F.3d 1181 (10th Cir. 2015) ("*Eastom II*"), and its progeny. But in those cases, the Court dismissed for lack of jurisdiction given the line of cases holding that parties may not manufacture appellate jurisdiction by seeking voluntary dismissal of certain claims. *Id.* at 1184; *see also Tri Cnty. Tel. Ass'n, Inc. v. Campbell*, No. 20-8053, 2021 WL 4447909, at *7 (10th Cir. June 16, 2021) (unpublished) (citing cases). Here, by contrast, the district court granted Kappa's motion to "dismiss Plaintiffs' claims in their entirety." App. Vol. 2 at 11; *see* App. Vol. 2 at 106. And, unlike the plaintiffs in *Eastom*, Plaintiffs here do not attempt to jettison claims or defendants to facilitate federal review. Instead, "[t]here was nothing pending before the district court after it issued [the motion-to-dismiss] order." *Frank v. Crawley Petroleum Corp.*, 992 F.3d 987, 995 (10th Cir. 2021). In addition, permitting this appeal would not "lead to piecemeal appeals," nor would litigation be "interrupted and delayed." *Id.* In fact, delaying Plaintiffs' right to appeal "may be irreparable." *Id.* Plaintiffs and Kappa members across the nation are unable to benefit from the female-only space for which they contracted without this Court's immediate review of the district court's dismissal of Plaintiffs' claims.

4

2.  Whether the district court erred in holding that Plaintiffs' alleged injuries from the admission of a biological male—including loss of privacy and emotional distress caused by that student's inappropriate behavior—were not personal injuries that would support a direct action against the Defendants.

## STATEMENT OF THE CASE

A sound understanding of the issues in this case requires some familiarity with the underlying facts (as alleged in the complaint) and the procedural history.

**A.    Facts**

### 1.    Kappa Was Founded as a Single-Sex Haven for Collegiate Women.

Plaintiffs are current and recent members of the University of Wyoming's Gamma Omicron Chapter of Kappa Kappa Gamma Fraternity, an organization founded in 1870 to bring the benefits of exclusively male Greek-letter fraternities to women.  App. Vol. 1 at 20 (¶ 25).[2]  Kappa is a non-profit corporation incorporated in Ohio.  Kappa Certificate of Incorporation [App. Vol. 1 at 128–36].  Although Kappa is officially named a "fraternity" because its founding predated the common use of the term "sorority," it is now more commonly known as a sorority.

Kappa's governing documents include its Articles of Incorporation, Bylaws, and Standing Rules.  App. Vol. 1 at 10 (¶ 3).  The Articles of Incorporation form

---

[2] Appellants' Appendix is cited as "App. Vol. __ at __."

5

Kappa's charter.  *Id.* at 28 (¶ 43).  The Standing Rules describe the process Kappa must follow when selecting a new member, and the Articles of Incorporation state that these processes must be followed by every chapter.  *Id.* at 36 (¶ 59).  The Bylaws are the code of regulations for Kappa and govern membership criteria.  *Id.*

Kappa also has certain official Policies, though these are unilaterally issued and are not governing documents.  Rather, they are "statements of intent and rules formulated by Fraternity Council to consistently *carry out* its duties as defined by the … Articles of Incorporation and the Fraternity Bylaws and Standing Rules."  App. Vol. 1 at 38 (¶ 64) (emphasis added) (citing App. Vol. 1 at 222).  The Fraternity Council is Kappa's board of directors.  *Id.* at 42 (¶ 72); App. Vol. 1 at 98.

The Articles of Incorporation and Bylaws can only be amended "by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention."  App. Vol. 1 at 104.  The Standing Rules can only be amended through a similar process.  App. Vol. 1 at 36 (¶ 59).

Since its founding, Kappa has provided a self-described "single-sex haven" in the largely co-ed environment of college campuses.  *Id.* at 20, 22 (¶¶ 25, 32).  And all of Kappa's governing documents discussed above restrict membership to women. The Articles of Incorporation state that Kappa's purpose is "[t]o unite *women*,

through membership, in a close bond of friendship." App. Vol. 1 at 29 (¶ 47) (emphasis added) (quoting App. Vol. 1 at 132).

Kappa's Bylaws also provide that a "new member shall be a woman," *id.* at 31 (¶ 51)**,** and explicitly enshrine the sorority's legal right to have sex-based membership practices under Title IX. App. Vol. 1 at 25 (¶ 37) (quoting App. Vol. 1 at 150–51 (Art. V, Sec. 2.D.)); *see also* 20 U.S.C. § 1681(a) (forbidding discrimination "on the basis of sex" in educational programs but exempting the "membership practices" of sororities). This position is well supported by social science research that has established the importance of preserving single-sex environments for women. App. Vol. 1 at 25 (¶ 38). Indeed, women "in single-sex environments are more likely to develop higher academic, and socially competent, self-images." *Id.* As recently as 2018, Kappa supported and defended the benefits of single-sex environments for women in a lawsuit against Harvard University, in which Kappa defended its single-sex status and right to discriminate on the basis of sex under Title IX. *Id.* at 25–27 (¶¶ 39–40) (citing Complaint ¶ 93, *Kappa Alpha Theta Fraternity, Inc., v. Harvard Univ.*, 397 F. Supp. 3d 97 (D. Mass. 2019) (No. 1:18-cv-12485), 2018 WL 6305759).

Further, the Standing Rules "do not include any language that supports [the] expansion of Kappa membership" beyond women. App. Vol 1 at 36 (¶ 60). And the Policies cannot deviate from or undermine the Articles of Incorporation, Bylaws,

7

or Standing Rules. *Id.* at 39 (¶ 67). Thus, it is unsurprising that the Policies prohibit "Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Sorority or a chapter." *Id.* at 38–39 (¶ 65) (citing App. Vol. 1 at 224 (Policy III)). Policy III forbids this affiliation because "[t]he activities of such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status." *Id.* (emphasis omitted) (quoting App. Vol. 1 at 224 (Policy III, Sec. 2)). And Policy VIII explicitly forbids men from participating in any Kappa recruitment events. *Id.* at 39 (¶ 65) ("Men shall not participate in any Kappa recruitment events[.]" (quoting App. Vol. I at 234 (Policy VIII, 3.I.))). Kappa Policies also require chapter members to live in their respective chapter houses upon admission and restrict the access of men to the house to provide "a private, safe space where young women can interact without concern that they will be on display for men." *Id.* at 44–45 (¶¶ 80, 83).

## 2. Defendants Have Subverted Kappa's Mission and Governing Documents by Changing the Definition of "Woman" Without Following the Required Processes.

In contrast to the governing documents described above, Kappa staff can publish "position statements," which are never presented to the Sorority's membership for approval or review. App. Vol. 1 at 50–51 (¶ 100). In 2015, and at the direction of the Fraternity Council, Kappa posted a position statement that claims

Kappa "is a single-gender organization comprised of women *and individuals who identify as women*."[3]  *Id.* (quoting App. 263).

Then, in the Fall of 2022, Defendants Kappa and Mary Pat Rooney, the President of the Council of Kappa, and the Wyoming chapter leadership orchestrated and implemented a plan that resulted in the University of Wyoming chapter initiating as a member a biological male, Artemis Langford.  *Id.* at 40–43 (¶¶ 68–76).  It could not be otherwise: Kappa's Standing Rules explicitly provide that "no person can be initiated as a Kappa member without approval from Sorority headquarters."  *Id.* at 40 (¶ 68).

Kappa's counsel has referred to its position statement to justify Langford's admission into the sorority.  *Id.*  But Kappa can only change its membership criteria by amending its Bylaws.  And, as noted above, amendments can only be made if presented months before the Convention and approved by a majority (two-thirds) vote.  *See* App. Vol. 1 at 104 (Bylaws, Art. XXIV, Sec. 1).  Defendants did not amend Kappa's Bylaws to permit biological males and thus Langford's admission violated those Bylaws.  App. Vol. 1 at 50–51, 52–53 (¶¶ 100, 102).

---

[3] The district court took note of two documents, the 2018 Guide for Supporting our LGBTQIA+ Members, and the Bylaws and Standing Rules Revisions 2022: FAQs. App. Vol. 2 at 70–71 (citing App. Vol. 1 at 111–23; App. Vol. 1 at 167–87).  Neither of these documents appears in the Bylaws and each references the same 2015 statement, which this brief addresses.

### 3.    Defendants Have Further Subverted Kappa's Governing Documents by Admitting Langford through Coercion and Voting Irregularities.

Aside from facilitating and approving Langford's admission in contravention of Kappa's governing documents, Defendants went even further and violated several Standing Rules throughout the admission process.

The Standing Rules, as described above, prescribe rules and procedures for the election of new members by a local chapter. App. Vol. 1 at 37–38 (¶ 62). But these rules were not followed for Langford's admission. While the Standing Rules require that elections employ a secret ballot and use Kappa's approved electronic voting system, Wyoming chapter leadership forced the Wyoming sisters to vote through a non-anonymous Google poll. *Id.* at 62–64 (¶¶ 129–130, 134). And even though the Rules require that all members vote on admission of a new member unless excused by the chapter's alumnae adviser in writing, "the chapter officers adopted the opposite policy" for Langford's vote, "forbidding Plaintiffs Choate and Ramar, and all other members who were not present at the chapter meeting on September 20, 2022 from voting," even though none of them had been excused. *Id.* at 37 (¶ 61).

Further in violation of Kappa's rules, Wyoming chapter officials, after consultation with Kappa's leadership, told members that voting against Langford's admission was evidence of "bigotry" that "is a basis for suspension or expulsion from the Sorority." *Id.* at 63 (¶ 131). After an initial anonymous vote conducted via

10

Google Poll failed to result in admission, Chapter officers forced a second, non-anonymous vote in which multiple sisters changed their votes because of "fear of reprisal." *Id.* at 65 (¶ 135). Without these unlawful procedures preventing some members from voting and pressuring other members to change their votes, Langford would not have been admitted. *Id.* at 65 (¶ 136).

When Plaintiffs—current members and recent graduates of the Wyoming chapter—contacted Kappa leadership and alerted them to these irregularities and their objection to Kappa admitting a biological-male member, the leadership dismissed their concerns. *Id.* at 48–49 (¶¶ 94, 95). In a response letter, counsel for Kappa rejected requests to enforce the Bylaws and rescind Langford's admission. *Id.* Other attempts to have the Wyoming chapter enforce the single-sex provisions of Kappa's Bylaws were similarly met with hostility and retaliation. *Id.* at 48, 49–51, 65–67 (¶¶ 93–94, 97–100, 137–42).

### 4. Langford's Admission Harmed the Sorority Holistically and Plaintiffs Individually.

Admission to the Wyoming chapter gave Langford access to all Kappa meetings and, crucially, the areas of the chapter house that were reserved for women only. *Id.* at 45 (¶ 81). This was contrary to the housing contract that Plaintiffs had to sign as members of the chapter, which required Plaintiffs to pay approximately $8,000 to live in the chapter house, *id.* at 45–46 (¶ 84), and specified that housing would be provided "subject to … the [Kappa] Bylaws, Standing Rules and Policies."

11

*Id.* at 31, 44–46, 77 (¶¶ 51, 78, 80, 83–84, 175); App. Vol. 1 at 246.  Those rules exclude men from the house and limit membership to women.  App. Vol. 1 at 31, 44–46, 77 (¶¶ 51, 78, 80, 83–84, 175); App. Vol. 1 at 246; *see* App. Vol. 1 at 44 (¶ 80) (quoting App. Vol. 1 at 275 (House Standing Rule 2.4.A.2)) ("The Kappa rules for the sorority house forbid all men from being on the second floor.").

Admission of a biological male also eliminated the "single-sex haven" that Kappa had promised to provide to Plaintiffs, one of whom is a sexual assault survivor who sought "a safe place to interact with other college students without the presence of men." *Id.* at 43–44 (¶ 77).  That the chapter's house was not designed for co-educational living made matters worse.  "[M]any of the [bedroom] doors do not lock consistently," two of the bathrooms are communal and without a lock, and the non-communal bathroom lacks "a private area to disrobe before showering." *Id.* at 44 (¶ 79).

Although Langford did not live in the house, Langford frequently entered the restricted area of the house and engaged in inappropriate and odd behavior there.[4] To give just a few examples, Langford has "several times chosen to sit for hours on the couch in the second-floor common area," not talking or studying but simply "star[ing] at women walking past." *Id.* at 45 (¶ 82).  And "Langford has, while

---

[4] Further, the sorority has failed to assure Plaintiffs and other members that Langford would not live in the house at some point.  App. Vol. 1 at 65 (¶ 137).

watching members enter the sorority house, had an erection visible through his leggings." *Id.* at 58–59 (¶ 119). At other times, Langford sat with a pillow covering his lap. *Id.* At a slumber party, Langford "repeatedly questioned the women about what vaginas look like, [and] breast cup size," and stared as one Plaintiff changed her clothes. *Id.* at 68 (¶ 144). Langford also talked about his virginity and discussed at what age it would be appropriate for someone to have sex. *Id.* And he stated that he would not leave one of the sorority's sleepovers until after everyone fell asleep. *Id.* at 68 (¶ 145). Langford also took pictures of female members "without their knowledge or consent." *Id.* at 69 (¶¶ 148–49). And members "observed Langford writing detailed notes about [the students] and their statements and behavior." *Id.*

In response to Plaintiffs' concerns about privacy and safety, "Kappa officials recommended that … they should quit Kappa Kappa Gamma entirely." *Id.* at 46 (¶ 85). As Kappa officials well know, however, once Plaintiffs were accepted into Kappa, they were permanently barred from ever joining another sorority, *id.* at 14–15 (¶ 12), and thus could never again obtain the single-sex sorority experience for which they had contracted.

## B.    Procedural History

Following the events described above, Plaintiffs sued on their own behalf and derivatively on behalf of Kappa itself under Ohio law, App. Vol. 1 at 74 (¶ 161), which "provides members of nonprofit corporations with a derivative cause of action

13

on behalf of the corporation," *Carlson v. Rabkin*, 789 N.E.2d 1122, 1127 (Ohio Ct. App. 2003) (citing Ohio Rev. Code Ann. § 1702.12(I)(1)(c)).  In their First Amended Complaint, Plaintiffs alleged that Kappa's dissolution of the woman-only environment, orchestrated by Defendant Rooney, violated the sorority's Bylaws and other governing documents.  App. Vol. 1 at 73–75 (¶¶ 159–67).  Plaintiffs next asserted a breach of contract claim against Kappa Kappa Gamma Building Corp. ("Building Corp.") due to the presence of Langford in the restricted living areas of the house.  *Id.* at 76 (¶¶ 168–72).  Plaintiffs also brought claims against Rooney and Kappa for tortious interference with their housing contracts with the Building Corp. and asserted a direct claim against Rooney and Kappa seeking to recover for the personal, individual injuries Plaintiffs suffered because of Langford's unlawful admission and presence in the house.  *Id.* at 76–77 (¶¶ 173–79).

Defendants moved to dismiss Plaintiffs' "claims in their entirety," identifying the "central issue in this case" as whether "Plaintiffs have a legal right to be in a sorority that excludes" biological males.  App. Vol. 2 at 10, 11 (emphasis omitted). Defendants argued that Plaintiffs have no such right because Kappa's Bylaws do not create a "restrictive definition of the term 'woman.'"  *Id.* at 21.

The district court granted Defendants' motion on August 25, 2023.  App. Vol. 2 at 67–107.  The court first addressed jurisdiction.  It concluded that it lacked diversity jurisdiction to hear the breach of contract claim against KKG Building Co.

14

"because Plaintiffs do not seek damages against KKG Building Co. and fail to plead an amount in controversy as to that Defendant." App. Vol. 2 at 78.

The court held, however, that it was appropriate to exercise personal jurisdiction over Defendant Rooney because, "when Rooney approved Langford's admission, injury, if any, would occur on campus in Laramie, Wyoming," and therefore Rooney "purposefully directed her activities at Wyoming." App. Vol. 2 at 88 (internal quotation marks omitted).

Turning to the merits, the district court first concluded that Plaintiffs met the procedural requirements for a derivative claim under Ohio Civil Rule 23.1 because Plaintiffs and their families, before filing this lawsuit, petitioned Defendants to overrule Langford's admission and "communicated the crux of their future claims." App. Vol. 2 at 91. The court noted that Defendants rejected Plaintiffs' petition, and because they are the ones who approved Langford's admission, Defendants would oppose this lawsuit. *Id.* at 92. Thus, any attempt to make a pre-suit demand would have been futile. *Id.*

The court then held that Plaintiffs had failed to state a derivative claim against Kappa because Defendants had the right to interpret "woman" however they pleased. Specifically, the court understood the "gravamen" of Plaintiffs' lawsuit to be whether Kappa's Bylaws and other governing documents, in limiting membership to women, excluded biological males. App. Vol. 2 at 92. But the court refused to

15

hold that Plaintiffs had sufficiently alleged that Kappa's Bylaws "define[] 'woman'" to exclude biological men, instead concluding that (1) under Ohio law, it should not interfere with the actions taken by a voluntary association, and (2) Kappa has a First Amendment right to disregard its bylaw requirements. *See* App. Vol. 2 at 93 (citing Ohio precedent); *Id.* at 99 ("The Court will not … invade the organization's freedom of expressive association.").

The court also held that Plaintiffs could not bring a direct action against Defendants because they "have not shown a special duty, nor a separate and distinct injury, to sustain their direct claim." App. Vol. 2 at 103. The court reasoned that any injury from Langford's admission "inured to all KKG members alike, whether in Laramie or beyond," and stated that the egregious misbehavior of the biological male was "irrelevant" to the case. App. Vol. 2 at 105–06. The district court thus dismissed without prejudice all of Plaintiffs' claims, leaving no ongoing claims, counterclaims, motions, or other business before the court. App. Vol. 2 at 106.

Plaintiffs filed a timely notice of appeal on September 25, 2023 (App. Vol. 2 at 108–10). Defendants filed a motion to dismiss this appeal for lack of appellate jurisdiction, which Plaintiffs opposed on October 23, 2023. By Order of October 24, 2023, this Court deferred consideration of that motion to the merits panel.

### SUMMARY OF ARGUMENT AND STANDARD OF REVIEW

Reversal is required under this Court's settled standards. Specifically, this Court reviews de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6). *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Id.* And a complaint "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is because "'[t]he court's function on a Rule 12(b)(6) motion is'" only to determine whether the complaint "'is legally sufficient to state a claim for which relief may be granted.'" *Smith*, 561 F.3d at 1098 (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).

Under these standards, the district court was wrong to dismiss Plaintiffs' derivative and direct claims. First, the district court mistakenly applied a policy against judicial interference, which applies only to internal dispute-resolution processes, and the First Amendment, which applies only to state actors, to Plaintiffs' derivative claim. Without these irrelevant legal barriers, Plaintiffs' allegations of how Defendants violated their duties of care, loyalty, and compliance by acting outside of the Bylaws are sufficient to state a derivative claim.

Second, the district court disregarded key allegations in Plaintiffs' complaint to conclude that they had not adequately alleged a direct injury. The district court

17

had no basis for rejecting Plaintiffs' allegations of personal harm, including loss of privacy and emotional distress.

## ARGUMENT

**I.    The District Court Erred in Dismissing Plaintiffs' Derivative Claim Against Defendants Kappa and Rooney.**

Plaintiffs pled sufficient allegations for a derivative, breach-of-fiduciary duty claim because the First Amended Complaint explains in detail how Kappa disregarded its Bylaws and other governing documents to admit Langford, a biological male, into the sorority. The district court did so by ignoring longstanding principles of corporate law that require courts to enforce the articles and bylaws of a voluntary corporation. The district court compounded that error by misapplying the Supreme Court's First Amendment precedent to hold that Kappa is free to interpret the word "woman" however it pleases.

**A.    Plaintiffs Met the Procedural Requirements of Their Derivative Claim, and the Rule of Non-Interference Does Not Apply to That Claim.**

Although the district court correctly applied the law governing derivative claims to hold that Plaintiffs met the futility requirement under Ohio Civil Rule 23.1, it applied the incorrect law to hold that it should not interfere with the actions of a voluntary association in defining the term "woman." A derivative claim like the one Plaintiffs brought is not subject to the rule of non-interference.

First, the district court correctly concluded that Plaintiffs met the futility requirement of Ohio Civil Rule 23.1. That rule requires a shareholder to make a demand upon the board of directors prior to bringing a derivative suit unless such a demand would be futile.

Plaintiffs' complaint provides more than enough evidence that a formal demand would have been futile in this case. As the district court observed, Plaintiffs and their parents made multiple attempts to contact and convince Kappa's Council not to admit Langford. App. Vol. 2 at 90–92. Plaintiffs also sent a letter through counsel seeking the enforcement of Kappa's Bylaws to prevent the initiation of Langford in November 2022. App. Vol. 1 at 4 (¶ 94). Kappa rejected this request through a letter from its own counsel and delineated its commitment to a policy of admitting individuals who identify as women regardless of their sex. *Id.* at 49–51 (¶¶ 95, 100).

Additionally, as the district court found, "Rooney, Executive Director Poole, and other Fraternity Council members are the same officers who purportedly approved Langford; under Plaintiffs' theory, Rooney and other directors violated KKG's Bylaws – of course the Fraternity Council would oppose Plaintiffs' federal lawsuit." App. Vol. 2 at 92. Thus, Kappa's directors were "'antagonistic, adversely interested, or involved in the transactions attacked,'" such that demand would be futile. *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 618 (6th Cir. 2008)

(quoting *Bonacci v. Ohio Highway Express, Inc.*, No. 60825, 1992 WL 181682, at *4 (Ohio Ct. App. July 30, 1992) (unreported)).

However, when it came to the substance of Plaintiffs' derivative claim, the district court applied the wrong law. Ohio law is clear that organizations that choose to avail themselves of the corporate form must accept the responsibilities that accompany that form, including the duty to abide by the terms of their articles of incorporation, bylaws, and other governing documents. *Ulliman v. Ohio High Sch. Athletic Ass'n*, 919 N.E.2d 763, 771 (Ohio Ct. App. 2009) (citing *Int'l Bhd. of Elec. Workers Local Union No. 8 v. Gromnicki*, 745 N.E.2d 449, 452–53 (Ohio Ct. App. 2000) ("Constitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its members."). As a non-profit corporation incorporated in Ohio, Kappa has an obligation under Ohio law to comply with its Articles of Incorporation, Bylaws, and Standing Rules, all of which are contracts that limit membership to women. *See id.*; App. Vol. 1 at 137–66 (Bylaws, Arts. II, III.1.A).

In addition, Ohio law grants shareholders in a non-profit organization the right to bring a derivative action to challenge actions taken by a board of directors that violate an organization's bylaws and governing directives. Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also Carlson*, 789 N.E.2d at 1127. That is because corporate board members who disregard or otherwise seek to circumvent a corporation's

20

governing documents violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance). *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c).

Rather than apply these well-settled rules to assess whether Plaintiffs had sufficiently stated a derivative claim, the district court applied the doctrine that "'Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association'" unless "'there has been some palpable violation of the constitution or laws of the corporation whereby he has been deprived of valuable rights.'" App. Vol. 2 at 93 (quoting *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 WL 107015, at *5 (N.D. Ohio Jan. 6, 2010) (unreported); *Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *4 (Ohio Ct. App. 1978) (unreported) (emphasis omitted)).

But this rule does not apply to Plaintiffs' derivative claim. Indeed, none of the cases the district court cites apply this non-interference rule to a derivative claim or a claim concerning a breach of fiduciary duties. Rather, the court's cited cases all concerned a plaintiff's complaint about direct injuries resulting from a violation of due process or some other complaint personal to the plaintiff about an internal dispute-resolution process. *See Redden*, 2010 WL 107015, at *3–4 (plaintiff alleged sorority "did not comply with the requirements of due process which apply to proceedings for disciplining a member of a private association" and court applied

the non-interference rule only to this claim and not plaintiff's separate claim for breach of fiduciary duties); *Powell*, 1978 WL 216074, at *1 (plaintiff alleged association's termination of his membership for misbehavior violated due process); *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1178–79 (Ohio Ct. App. 1989) (suit arguing plaintiffs' suspension from membership because of their unauthorized withdrawal violated due process); *Putka v. First Cath. Slovak Union*, 600 N.E.2d 797, 801–02 (Ohio Ct. App. 1991) (plaintiff alleged organization violated his due process rights in expelling him from membership because he brought a complaint to a state agency before taking it to the organization).

Plaintiffs' derivative claim is not about due-process rights or a personal grievance concerning Kappa's internal-dispute resolution process. Rather, Plaintiffs allege, with particularity, the requirements for a derivative suit and why Plaintiffs meet those requirements. App. Vol. 1 at 74–75 (¶¶ 162–67). Specifically, Plaintiffs state that the Bylaws and rules of Kappa have always "limited membership to women only," and Defendants refused to enforce this requirement, which has resulted in the sorority losing "its identity as an organization for women" and experiencing "a significant decline in alumnae giving, membership, and participation." *Id.* at 75 (¶¶ 164–66). And thus, Defendants "have violated their duties of loyalty, care, and obedience/compliance." *Id.* at 74 (¶ 163).

Rather than analyze these allegations, the district court decided that it could not interfere with the private organization's interpretation and that the First Amendment permitted Kappa to define "woman" however it wanted.   But, as explained above, the non-interference rule does not apply to this derivative claim.[5] And, as explained next, the First Amendment does not shield Defendants from this claim.

### B.    Corporations Have No First Amendment Right to Disregard the Terms of Their Governing Documents.

Faced with Kappa's plain violation of its Bylaws and abandonment of required democratic procedures in admitting a biological male, the district court

---

[5] Further, even if the non-interference rule applied to a derivative claim—a proposition no case supports—Plaintiffs' claim would clearly fall under the rule's exception for a "'palpable violation of the … laws of the corporation whereby [the plaintiff] has been deprived of valuable rights.'"   *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 WL 107015, at *5 (N.D. Ohio Jan. 6, 2010) (unreported) (quoting *Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *4 (Ohio Ct. App. 1978) (unreported)); *see* App. Vol. 1 at 30, 32–38 (¶¶ 49, 53–63); *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1178–79 (Ohio Ct. App. 1989) (explaining that Ohio law requires courts to reject decisions of voluntary associations that "are arbitrary and undertaken as a willful exercise of power.").   Courts must not "hesitate to interfere where," as here, "proceedings have not been conducted in accordance with the organization's own rules of procedure," *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*, 246 N.E.2d 598, 602 (Ohio Ct. App. 1969), or when "'the managing officers are acting in excess of their corporate power.'"   *Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 171 (Ohio Ct. App. 1993) (quoting *Cincinnati Camp Meeting Ass'n of Methodist Episcopal Church v. Danby*, 56 N.E.2d 694, 696 (Ohio Ct. App. 1943)).   And "the courts may and should protect the democratic processes of those organizations and vindicate the rights of their members." *Tucker v. Nat'l Ass'n of Postal Supervisors*, 790 N.E.2d 370, 374 (Cleveland Mun. Ct. 2003).

refused to consider Plaintiffs' claims on the grounds that Kappa's decision to admit biological-male members was "speech which th[e] Court may not impinge," and "Kappa's freedom of expressive association … insulate[s] the organization" from the requirement that it abide by its Bylaws as written. App. Vol. 2 at 96–97. But the First Amendment's freedom of expressive association applies when a state actor is meddling with such association. There is no state actor here, and no authority supports the court's novel conclusion that the First Amendment protects a *private* organization from a *private* lawsuit when it contravenes its own *voluntarily chosen and private* obligations as provided in its corporate bylaws.

The district court based its flawed First Amendment analysis on the Supreme Court's decisions in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). App. Vol. 2 at 94–97. However, those cases are inapposite: Both involved situations in which *the State* attempted to force an organization to accept a member (or participant) the organization did not want to include. *Dale*, 530 U.S. at 656 (holding that the state's public accommodations law, which would have forced the Boy Scouts to accept a gay scoutmaster, infringed upon the group's freedom of association); *Hurley*, 515 U.S. at 575–76 (holding that the state's public

24

accommodations law that would have forced a private parade to allow pro-LGBT participants was unconstitutional).[6]

Here, in contrast, *Defendants*, the nationwide leaders of the sorority, are attempting to force Kappa to accept individuals that Kappa's own Bylaws exclude. The State has required nothing of the organization in this regard. Instead, Kappa has imposed limitations on itself.

Because there is no state action at issue, the First Amendment is not implicated. If it were otherwise, as the district court held, then courts would be barred from resolving any private contractual dispute that could be alleged to implicate a party's associational freedoms. That is not the law.

On the contrary, courts routinely resolve disputes over an organization's membership decisions and whether an organization's expulsion of a member was consistent with that organization's bylaws and rules. *See*, *e.g.*, *Gromnicki*, 745 N.E.2d at 452–53 (explaining that "[t]o determine when the union-member relationship terminated, we turn to the union's constitution"); *Browning v. Fraternal Ord. of Eagles*, No. 1769, 1986 WL 9644, at *1 (Ohio Ct. App. Aug. 22, 1986)

---

[6] *Hurley* is also inapposite because it was a case primarily about compelled speech, not freedom of association. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 559 (1995) ("The issue in this case is whether Massachusetts may require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey.").

(unreported) (Ohio courts review an expulsion of a member of a fraternal society for "compliance with the constitution and bylaws of the association"); *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*, 246 N.E.2d 598, 602 (Ohio Ct. App. 1969) (invalidating a member's expulsion from professional association).

In such circumstances, the court's role is simply to enforce the organization's contracts. *Gromnicki*, 745 N.E.2d at 452–53 ("according to the United States Supreme Court, '[t]he court's role is but to enforce the contract'") (quoting *Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 182 (1967)); *Reyes v. Laborers' Int'l Union of N. Am.,* 464 F.2d 595, 597 (10th Cir. 1972) (affirming a member's suspension because the court was not "apprised of any provision of the Union constitution which was violated by [the plaintiff's] suspension.").[7]   Simply put, judicial enforcement of corporate requirements does not infringe an organization's First Amendment rights of association.

---

[7] Even if Ohio's requirement that Kappa abide by its governing documents could somehow be deemed state interference, that law poses no concerns under the First Amendment.  The Supreme Court has recognized that "[t]he right to associate for expressive purposes is not … absolute.  Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).  State laws allowing shareholders and members to bring derivative suits against corporations when they deviate from their bylaws—a longstanding and unremarkable feature of corporate law—clearly meet that test.

26

### C.    Plaintiffs Have Sufficiently Alleged Defendants' Fiduciary Breach Due to Their Failure to Follow Kappa's Governing Documents That Define "Woman" as a Biological Female.

With the non-interference rule and First Amendment properly set aside, Plaintiffs' allegations state a viable derivative claim. As discussed above, the district court erred in concluding otherwise based on the theory that Kappa has "organizational autonomy … to interpret [its] own bylaws." App. Vol. 2 at 98. If the district court had properly assessed the contractual documents, it should have found that the Bylaws and other governing documents use "woman" as it is commonly understood—a biological female. And Kappa's off-the-cuff position statement in 2015 did not change that definition or give any of the Defendants the right to interpret the term as they wished.[8]

A plaintiff bringing a claim for breach of fiduciary duty "must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom." *Ray v. Hidden Harbour Ass'n, Inc.*, 104 N.E.3d 261, 269 (Ohio Ct. App. 2018) (citation omitted). Ohio law "imposes fiduciary duties on directors of nonprofit corporations." *Id.* (citing Ohio Rev. Code Ann. § 1702.30). In fact, Section 1702.30(B) explicitly states: "A director shall perform the duties of a director … in good faith, in a manner the director reasonably believes to be in or not

---

[8] If it were true that corporations could interpret their governing documents however they pleased, governing documents would become meaningless.

opposed to the best interests of the corporation, and with the care that an ordinary prudent person in a like position would use under similar circumstances." *Id.* (quoting Ohio Rev. Code Ann. § 1702.30(B)).

As noted above, part of a director's fiduciary duties involves following the terms of a nonprofit's governing documents, which are contracts. *Ulliman*, 919 N.E.2d at 771; *DiPasquale v. Costas*, 926 N.E.2d 682, 708 (Ohio Ct. App. 2010); *Carr v. Acacia Country Club Co.*, 970 N.E.2d 1198, 1206 (Ohio Com. Pl. 2011), *aff'd*, 970 N.E.2d 1075 (Ohio Ct. App. 2012). The governing documents may "reserve control" over the non-profit's governing body, *Carr,* 970 N.E.2d at 1206, including with respect to the "qualification[]" and "admission[]" of members, Ohio Rev. Code Ann. § 1702.11. And, when a board of directors violates an organization's bylaws and other governing documents, state law provides shareholders in a non-profit organization the right to bring a derivative action to challenge those actions. Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also Carlson*, 789 N.E.2d at 1127.

The First Amended Complaint explicitly alleges numerous breaches of Defendants' fiduciary duties based on violations of the Bylaws, Standing Rules, and Articles of Incorporation. First, Kappa's governing documents all require that membership be limited to women. *See supra* pp. 5–8. Yet Kappa leadership admitted Langford by claiming that Kappa altered the membership criterion to

include individuals who identify as women without amending the Bylaws and other governing documents. App. Vol. 1 at 27–30 (¶¶ 42, 46, 48–49); *see generally Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 172 (Ohio Ct. App. 1993) (affirming trial court's finding of arbitrariness when organization interpreted its bylaws inconsistently).

Second, Langford's admission violated additional provisions of Kappa's Standing Rules. App. Vol. 1 at 30–32, 38–39 (¶¶ 49, 52, 65). Specifically, the First Amended Complaint states that the Standing Rules were breached when (1) certain Plaintiffs and other members who were not present at the chapter meeting were prohibited from voting, and (2) voting took place in a non-anonymous and irregular way. *Id.* at 36–38 (¶¶ 59–63). Defendants approved Langford's membership despite these rule violations and coordinated with the Wyoming chapter leadership to pressure members to recruit then vote for Langford. *Id.* at 61–66 (¶¶ 125, 129, 131–36, 139). For the reasons stated below, these allegations cross the plausibility line.

### 1.    The Court applies the plain and ordinary meaning of common words.

Under Ohio law, "the cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Envirespose, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citing *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989)). The parties' intent is "presumed to reside in the language

they chose to employ in the agreement." *Id.* (quoting *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987)). The court applies the plain and "ordinary meaning" of common words, "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)); *see also Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007). The relevant plain meaning is the meaning "at the time" the contract was made. *Alexander*, 374 N.E.2d at 151; *cf. Ohio v. Ramirez*, 151 N.E.3d 598, 604 (Ohio 2020) ("In interpreting a statute, we look to its ordinary meaning at the time of its enactment.").

### 2. Kappa's governing documents (its contracts) have always defined "woman" as a biological female.

Kappa was founded in 1870 because six biological females questioned why "women should be satisfied with literary societies while men on campus enjoyed full-fledged fraternity chapters." Denise Tessier & Gay Chuba Barry, *History 2000: Kappa Kappa Gamma Through the Years* 14 (2000).[9] The founders' "aim was to

---

[9] In deciding a motion to dismiss, courts may take judicial notice of "documents referred to in the complaint" and "documents that the complaint incorporates by reference." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (quotation marks and citation omitted from first quotation; citation omitted from second quotation). The complaint incorporates and references the above document and thus the court may take notice of it. *See* App. Vol. 1 at 21–22 (¶ 27).

draw into the society the choicest spirits among the girls, not only for literary work, but also for social development." *Id.* Initiation gave new members self-assurance that "Kappa girls [held] an equality with any women in the world, even royalty." *Id.* at 23; *see* App. Vol. 1 at 20–21 (¶¶ 25–27).

Kappa's Bylaws are a contract that "constitute the code of regulations of the Fraternity." App. Vol. 1 at 103 (Bylaws, Art. XIX); *accord Ulliman*, 919 N.E.2d at 771. The earliest Bylaws stated that "[a]ny lady" may be a candidate for membership. App. Vol. 1 at 21–22 (¶ 27); *see also* Kappa Kappa Gamma Fraternity, By-Laws of Kappa Kappa Gamma, Art. III, Sec. 1 (1870), available at https://bit.ly/49L8LpN. By 1882, Kappa described membership as limited to "women." Kappa Kappa Gamma Fraternity, Constitution of Kappa Kappa Gamma, Art. VI, Sec. 2 (1882), available at https://bit.ly/3SSBMtK.

"Women" in the 1882 Constitution referred to biological females.[10] Indeed, Kappa does not argue otherwise. And since its founding, the organization has consistently used the term in its governing documents to prescribe qualifications for

---

[10] *See Woman, Webster's International Dictionary of the English Language Comprising the issues of 1864, 1879, and 1884,* at 1661 (Springfield, Mass., G. & C. Merriam Co. 1898) [https://archive.org/details/webstersinternat00port/page/1660 /mode/2up] (defining "woman" as a "female"); *Female, id.* at 551 [https://archive.org/details/webstersinternat00port/page/550/mode/2up] (defining "female" as a biological female—"[a]n individual of the sex…which has an ovary and produces ova.").

31

membership.  *See, e.g.*, Kappa Kappa Gamma Fraternity, Constitution of Kappa Kappa Gamma, Art. IV, Sec. 1 (1910), available at https://bit.ly/49PGxdC ("women ... shall be eligible to membership"); Kappa Kappa Gamma Fraternity, Constitution of Kappa Kappa Gamma, Art. IV, Sec. 1 (1926), available at https://bit.ly/47KiJG1 (same); Kappa Kappa Gamma Fraternity, By-Laws of the Kappa Kappa Gamma Fraternity, Art. IV, Sec. 1 (1966), available at https://bit.ly/3sO1rcs ("[a] woman … may be elected to membership").

The current Bylaws state: "A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated."  App. Vol. 1 at 86 (Bylaws, Art. III, Sec. 1.A).  "To qualify as … a collegiate new member … a woman shall" meet certain criteria including college enrollment, a B+ high school grade point average, and not belonging to "any similar college or university women's social sorority."  *Id*. at 87 (Bylaws, Art. III, Sec. 2.A–B).

While the Bylaws provide for waiver of certain obligations like the B+ grade point average (*Id.* at 87 (Bylaws, Art. III, Sec. 2.B.2)) or financial commitments (*Id.* (Bylaws, Art. III, Sec. 3.A.1)) in "extraordinary conditions" following a "petition" to Kappa's membership director from the "chapter," Kappa does not provide for an exception in any of its governing documents to the requirement that a new member must be a "woman" invited to membership or a "woman" who has not previously pledged to another sorority.  App. Vol. 1 at 87 (Bylaws, Art. III, Sec. 2).

The use of "women" and "woman" in the Bylaws incorporates references to other laws and policies that define and apply those words in biological terms. App. Vol. 1 at 21–22 (¶¶ 28–32). For example, under Article V, Section 2, "Legal Compliance," Kappa explains that its woman-only nature stems from sororities' "exemption under the Title IX of the Educational Amendments of 1972." App. Vol. 1 at 151. Title IX addresses *sex*-discrimination in biological, binary terms. *See, e.g.*, 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in … any education program or activity"); *id*. § 1681(a)(8) (permitting "father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one* sex, opportunities for reasonably comparable activities shall be provided for students of the *other* sex" (emphasis added)); *cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) (applying "sex" in Title VII of the Civil Rights Act, passed close in time to Title IX, as male or female as determined by reproductive biology). *See also* App. Vol. 1 at 24 (¶ 36).

And Kappa's Policies, which are intended to "carry out" the Bylaws, explain that Kappa women may not participate in "men's Fraternity events when or where the primary purpose is recruitment," and that "[m]en shall not participate in any Kappa recruitment events." App. Vol. 1 at 225, 234; App. Vol. 1 at 38–39 (¶ 65). These rules can only be understood through a biological lens.

### 3.    Kappa has never changed the definition of "woman."

Significantly, Kappa does not argue that the founders of Kappa or the drafters of Kappa's 1882 Constitution intended the word "woman" to refer to anything other than a biological female.  At no time has the organization amended its governing documents to define "woman" or "women" atypically or to open membership to people other than women.

In fact, the 2004 Convention voted to replace the Bylaws and Articles of Incorporation "in their entirety," to "*underscore* that we are a single gender organization."  Kappa Kappa Gamma Convention 2004 and Bylaws/Standing Rules Revisions Video, Kappa Kappa Gamma, at 7:13, 9:36 (2004) ("Kappa Convention Video") (emphasis added), https://bit.ly/3SSQiSj.[11]  Kappa's Fraternity Council President's use of "underscore" illustrates that the 2004 voting delegates were asked to continue, not eliminate, Kappa's longstanding membership criteria.  The 2004 revision clarified that Kappa would "unite *women*, through membership, in a close bond of friendship."  Restated Articles of Incorporation (2004) (emphasis added) (App. Vol. 1 at 132); App. Vol. 1 at 30 (¶ 49).  Kappa filed restated articles of

---

[11] In deciding a motion to dismiss, courts may consider "matters of public record." 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2023 update).

incorporation with the State of Ohio to reflect this clarified purpose, which have not since been refiled.  App. Vol. 1 at 129–32; App. Vol. 1 at 27 (¶ 47).[12]

Yet Kappa seems to believe that a "position statement adopted in 2015" means its membership criteria includes individuals who "identify as women."  App. Vol. 2 at 21.  The 2015 online statement, prepared at the direction of Defendants and others on Kappa's board, says Kappa "is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character."  App. Vol. 1 at 263; App. Vol. 1 at 50–51 (¶ 100).  But this statement did not change Kappa's membership requirements.  Only the Bylaws—not online statements free from any process, collaboration, explanation, or review

---

[12] In the summer of 2022, Kappa adopted a technical revision of the Bylaws, though "most of the content [was] unchanged."  App. Vol. 1 at 138 (Report of the Bylaws Committee (Mar. 16, 2022)); App. Vol. 1 at 32–33 (¶ 53).  The revision was "structur[al]," to reflect that the Bylaws Committee "found that the subjects that should be in the Fraternity Bylaws were in the Fraternity Standing Rules, some things in the Fraternity Bylaws should be in the Fraternity Standing Rules, and some things should be moved to the Fraternity Policies."  App. Vol. 1 at 138.  The "major amendments" included: term limits for regional leadership, a fee increase, and the reconsideration of "gendered pronouns" including whether "chairman" was appropriate.  (The Committee recommended keeping "chairman," given that it signified leadership and not maleness.).  App. Vol. 1 at 139.  The membership criteria remained the same: "A new member shall be a woman."  *See* App. Vol. 1 at 31–33 (¶¶ 52–54).  Thus, at no point in Kappa's history, including the 2004 or 2022 Conventions, were voting delegates made aware of a new or non-biological understanding of "woman" that differed from the term's constant presence as a biological limit to membership.

mechanism—govern membership.  *See* Kappa Convention Video, at 3:24 ("we always protect the rights of our members and allow the general convention assembly to make decisions on … membership qualifications"); *id.* at 2:23 ("The Bylaws include the rules considered *so important* that they *cannot* be changed without previous notice to the members and a vote of the members.") (emphasis in original by inflection).

### 4.    **"Woman" is not an ambiguous term open to an evolving interpretation.**

Despite the clear history of the definition of "woman" as a biological female in Kappa's documents, Kappa argued below that the word is "unquestionably open to multiple interpretations."  App. Vol. 2 at 21.  But courts will not find common words ambiguous unless "'manifest absurdity'" results or another meaning is "'clearly evidenced from the face or overall contents'" of the Bylaws.  *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992) (quoting *Alexander,* 374 N.E.2d 146 at 148).  Kappa cannot argue that applying its long-held biological meaning to "women" would be absurd.  Nor can Kappa argue that a non-biological interpretation is clearly evidenced from the Bylaws.

Even if this Court were to hold that the word "woman" is ambiguous today, which it is not, Plaintiffs still prevail.  The court may use extrinsic evidence to ascertain the parties' intended use of a word.  *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016).  "Extrinsic evidence can include '(1) the

36

circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement.'" *Id.* (quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998)).

As discussed above, Kappa crafted its Bylaws and other governing documents to provide an organization for women who were, at the time, excluded from fraternal organizations on the basis of sex, App. Vol. 1 at (¶ 12).  Today's Bylaws reflect this history and 152 subsequent years of sisterhood, during which voting delegates have never been asked to re-define woman or to expand membership to biological men.

Nothing about Kappa's more recent position statement demonstrates that the parties intended to revise the Bylaws and other documents governing membership criteria.  Kappa might think the 2015 statement (repeated in 2018 and 2020) either explains what earlier or later Bylaws mean, but that argument fails for several reasons.

First, an unattributed intention made without both parties' input (or awareness) cannot reliably determine a contract term's meaning, any more than a legislator or witness's statement in the legislative record determines the meaning of a statute.  For this reason, Ohio courts have held that "intentions not expressed in the

writing are deemed to have no existence and may not be shown by parol evidence."
*Aultman Hosp. Ass'n*, 544 N.E.2d at 923.

Second, Kappa holds the pen in revising the Bylaws and thus Kappa is not owed deference in asserting an interpretation outside the four corners of the document. Ohio courts have held that "a contract is to be construed against the party who drew it." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996).

Third, reading the 2015 statement itself, Kappa agrees with Plaintiffs that "women" is biologically distinct from "individuals who identify as women." That is, Kappa understands that describing itself as an organization comprised of "women" is insufficient to cover "individuals who identify as women" because we see the word "*and*." App. Vol. 1 at 51 (¶ 100) (quoting App. Vol. 1 at 263). For example, your neighbor might say he owns cats and dogs, using "and" to delineate two different things. He would not say he owns pets and dogs, because when the second category is synonymous with or a subcategory of the first, we see other connectors like "including," "such as," or "who are."

Ultimately, Kappa knows that its organizational history contradicts any claim that Kappa founders understood the word woman to refer to anything other than biological females. So, the organization argues instead that the meaning of the word "woman" has "evolve[d] over time." App. Vol. 2 at 22. (What, exactly, the word has evolved to mean, Kappa has not said. Nor have Defendants articulated when or

38

how the word evolved or whether any voting delegate knew or agreed to this evolution.).  But Kappa fundamentally misunderstands how contracts work.  Courts enforce the meaning of terms "at the time" a contract is made.  *Alexander*, 374 N.E.2d 146 at 151.

Incredibly, Kappa believes the Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), blessed the idea that words evolve and courts should apply that evolved meaning.  But *Bostock* and reams of Supreme Court precedent say the opposite.  The Court interprets words in a statute "consistent with their ordinary meaning *at the time* Congress enacted the statute."  *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (internal quotation marks, citation and alterations omitted) (emphasis added).  The Court in *Bostock* did not reimagine "sex" under the Civil Rights Act of Title VII of 1964 as synonymous with "transgender status" in 2020, enabling Kappa to reimagine "woman" from the 1870s as synonymous with "transgender woman" today.  App. Vol. 2 at 22.  Instead, the *Bostock* Court applied "sex" as a binary, biological term not interchangeable with a non-binary, identity-based term like "transgender status."  *Bostock*, 140 S. Ct. at 1739, 1741.  Consistent with this understanding, the Court used "woman" throughout its opinion to mean biological female.  It explained that employers discriminate against women—*i.e.,* discriminate on the basis of sex—when they employ men married to women but not women married to women.  *Bostock*'s

interpretive guidelines, accompanied by its use of the term "woman" to mean biological female, support Plaintiffs' interpretation, not Kappa's interpretation, of the Bylaws.

\*       \*       \*

In sum, there are no legal impediments to Plaintiffs' derivative, breach of fiduciary duty claim. The non-interference rule and First Amendment do not bar Plaintiffs' claims, and basic contract principles support it. Plaintiffs' allegations that Defendants flouted the definition of "woman" in the Bylaws and governing documents form a viable derivative claim.

## II.    The District Court Erred in Dismissing Plaintiffs' Direct Action Because Plaintiffs Were Separately and Distinctly Injured by Defendants' Admission of Langford into the Wyoming Chapter.

The district court also erred in dismissing Plaintiffs' direct claim against Kappa and Rooney on the ground that "Plaintiffs have not shown a special duty, nor a separate and distinct injury," to support that claim. App. Vol. 2 at 103. Under Ohio law, a shareholder may file a direct action "if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation." *Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989); *accord Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio Ct. App. 2011).

The First Amended Complaint satisfies this requirement, as it details several claims of injury that are personal to Plaintiffs and that have not, as the district court

suggested, "inured to all [Kappa] members alike, whether in Laramie or beyond."
App. Vol. 2 at 105. Kappa members beyond Laramie have not encountered
Langford's unwanted and uncomfortable behavior, including Langford's having a
visible erection while staring at the girls as they move about the sorority house. App.
Vol. 1 at 67–71 (¶¶ 143–52). Nor have Kappa members nationwide been subject to
Langford's "repeated[] question[ing]" about private anatomical details like "what
vaginas look like." *Id.* at 68 (¶ 144). They have not been placed in the physically
vulnerable position of unknowingly changing clothes in front of a biological male in
what was supposed to be a single-sex living space. *Id.* at 68–69 (¶ 146). Plaintiffs
were uniquely subjected to a loss of privacy, frustration of contractual expectations,
and emotional distress, such that they were "injured in a way that is separate and
distinct from an injury to the corporation." *Crosby*, 548 N.E.2d at 219.

The district court suggested these injuries should be disregarded because
"only [Plaintiffs'] frustrated contractual expectations merit consideration," and those
expectations were the same for "all KKG members." App. Vol. 2 at 105. That, too,
was error.[13] Ohio law is clear that "a wrong involving one of the shareholder's

---

[13] Indeed, the district court's dismissal of Plaintiffs' direct claim is in tension with
its holding that it had personal jurisdiction over Defendant Rooney, in part, because
"when Rooney approved Langford's admission, injury, if any, would occur on
campus in Laramie, Wyoming." App. Vol. 2 at 88. There was injury in Laramie,
and that injury is separate and distinct from the injury that occurred to the sorority
nationwide.

contractual rights as a shareholder" can result in "[a]n injury that is distinct from that suffered by other shareholders." *Carlson*, 789 N.E.2d at 1127. "The difference in the nature of the injury"—whether personal and direct or shared and derivative—"is reflected in the manner of recovery." *Maas v. Maas*, 161 N.E.3d 863, 880 (Ohio Ct. App. 2020). "In a shareholder's derivative suit, any recovery accrues to the corporation." *Id.* at 880–81. "In a direct action," on the other hand, "the complaining shareholder is directly compensated," which "prevent[s] the wrongdoers from being the principal beneficiaries of the damages." *Id.* at 881.

The contractual violations in this case resulted in personal injuries unique to Plaintiffs, who, unlike Kappa members of other chapters, found themselves required to share intimate spaces with a biologically male student. The district court was wrong to deem those harms "irrelevant" and dismiss Plaintiffs' direct claim. *See* App. Vol. 2 at 106 (n.67).

## CONCLUSION

The district court dismissed Plaintiffs' derivative claim by applying the wrong law, and it dismissed Plaintiffs' direct claim by ignoring the complaint's alleged facts. This Court should reverse the lower court's legal and factual errors and hold that Plaintiffs have pleaded sufficient direct and derivative claims.

Dated: December 4, 2023                Respectfully submitted,

                                       */s/ Sylvia May Mailman*
                                       SYLVIA MAY MAILMAN
                                       INDEPENDENT WOMEN'S LAW CENTER
                                       1802 Vernon Street NW, Suite 1027
                                       Washington, DC 20009
                                       Telephone: (202) 807-9986
                                       s.maymailman@gmail.com

                                       GENE C. SCHAERR
                                       CRISTINA MARTINEZ SQUIERS
                                       SCHAERR | JAFFE LLP
                                       1717 K Street NW, Suite 900
                                       Washington, DC 20006
                                       Telephone: (202) 787-1060
                                       gschaerr@schaerr-jaffe.com

                                       CASSIE CRAVEN
                                       LONGHORN LAW LLC
                                       109 East 17th Street, Suite 223
                                       Cheyenne, WY 82001
                                       Telephone: (307) 823-3062
                                       cassie@longhornlawllc.com

                                       JOHN G. KNEPPER
                                       LAW OFFICE OF JOHN G. KNEPPER, LLC
                                       P.O. Box 1512
                                       Cheyenne, WY 82003
                                       Telephone: (307) 632-2842
                                       John@KnepperLLC.com

                                       *Counsel for Plaintiffs-Appellants*

## ORAL ARGUMENT STATEMENT

Plaintiffs-Appellants respectfully request oral argument because this case raises important issues about the applicable law to Plaintiffs' derivative claims as well as the correct standards for assessing factual allegations regarding Plaintiffs' direct claims.

December 4, 2023                                 */s/ Sylvia May Mailman*
                                                  Sylvia May Mailman

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this document:

(i) complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(A) because, excluding those portions exempted by Fed. R. App. P. 32(f), it contains 10,312 words, as determined by the word counting feature of Microsoft Word; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 10th Circuit Rule 32(A) because it has been prepared in a proportionally spaced typeface using Microsoft 365, in Times New Roman 14-point font.

Dated: December 4, 2023

<div style="text-align: right">

*/s/ Sylvia May Mailman*
Sylvia May Mailman

</div>

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of that document;

(3)    the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee LifeSafe, version 1.11.279, most recently updated on October 18, 2023, and according to the program is free of viruses.

Dated: December 4, 2023

*/s/ Sylvia May Mailman*
Sylvia May Mailman

# ATTACHMENT

Order, August 25, 2023
U.S. District Court for the District of Wyoming
No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson

FILED



3:17 pm, 8/25/23

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING



JAYLYN WESTENBROEK, HANNAH
HOLTMEIER, ALLISON COGHAN,
GRACE CHOATE, MADELINE
RAMAR, and MEGAN KOSAR, on
behalf of themselves and derivatively on
behalf of KAPPA KAPPA GAMMA
FRATERNITY,

       Plaintiffs,

    v.

KAPPA KAPPA GAMMA
FRATERNITY, an Ohio non-profit
corporation, as a Nominal Defendant and
as a Direct Defendant, MARY PAT
ROONEY, President of the Fraternity
Council of KAPPA KAPPA GAMMA
FRATERNITY, in her official capacity,
KAPPA KAPPA GAMMA BUILDING
CO., a Wyoming non-profit corporation,
and ARTEMIS LANGFORD,

       Defendants.

Case No.  23-CV-51-ABJ

---

**ORDER GRANTING DEFENDANTS' *MOTION TO DISMISS* (ECF NO. 19),
DISMISSING, WITHOUT PREJUDICE, PLANTIFFS' *FIRST AMENDED
VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTIES* (ECF NO. 6), AND DISMISSING AS MOOT
DEFENDANT ARTEMIS LANGFORD'S *MOTION TO DISMISS* (ECF NO. 22)**

---

THIS MATTER comes before the Court following Defendants', Kappa Kappa

Gamma Fraternity, an Ohio non-profit corporation ("KKG", "Kappa Kappa Gamma", or

"Kappa"), Mary Pat Rooney, President of the Fraternity Council of Kappa Kappa Gamma

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 58 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 58
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 2 of 41

Fraternity ("Rooney"), and Kappa Kappa Gamma Building Co., a Wyoming non-profit corporation ("KKG Building Co.") (collectively, "Defendants"), *Motion to Dismiss*, filed on June 20, 2023. ECF No. 19. Pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6), Defendants move to dismiss Plaintiffs', Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, and Megan Kosar (collectively, "Plaintiffs"), *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* ("*Complaint*") (ECF No. 6), due to lacking subject matter jurisdiction over KKG Building Co., lacking personal jurisdiction over Rooney, and Plaintiffs' failure to state a claim upon which relief can be granted. ECF Nos. 19, at 2; 20.

Having reviewed the filings, the applicable law, and being otherwise fully advised, the Court **GRANTS** Defendants' *Motion to Dismiss* (ECF No. 19) and **DISMISSES, WITHOUT PREJUDICE,** Plaintiffs' *Complaint* (ECF No. 6).

Separately, the Court **DISMISSES AS MOOT** Defendant's, Artemis Langford ("Langford"), *Motion to Dismiss with Prejudice* ("Langford's *Motion to Dismiss*") (ECF No. 22), filed on June 20, 2023.

## BACKGROUND

Embittered by their chapter's admission of Artemis Langford, a transgender woman, six KKG sisters at the University of Wyoming sue their national sorority and its president. Plaintiffs, framing the case as one of first impression, ask the Court to, *inter alia*, void their sorority sister's admission, find that KKG's President violated her fiduciary obligations by betraying KKG's bylaws, and prevent other transgender women from joining KKG

2

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 59 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 59
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 3 of 41

nationwide. A "woman", say Plaintiffs, is not a transgender woman. Unadorned, this case condenses to this: who decides whether Langford is a Kappa Kappa Gamma sister? Though given the opportunity to vote this past fall, not the six Plaintiffs. Not KKG's Fraternity Council. Not even this federal Court. The University of Wyoming chapter voted to admit – and, more broadly, a sorority of hundreds of thousands approved – Langford. With its inquiry beginning and ending there, the Court will not define "woman" today. The delegate of a private, voluntary organization interpreted "woman", otherwise undefined in the non-profit's bylaws, expansively; this Judge may not invade Kappa Kappa Gamma's freedom of expressive association and inject the circumscribed definition Plaintiffs urge. Holding that Plaintiffs fail to plausibly allege their derivative, breach of contract, tortious interference, and direct claims, the Court dismisses, without prejudice, Plaintiffs' causes of action. This Court outlines the case's posture,[1] its standard of review, and its disposition in the pages that follow.

Founded in 1870, Kappa Kappa Gamma is a non-profit organization based in Dublin, Ohio. ECF Nos. 6, ¶¶ 21, 25, 28; 6-1, at 49, 55–56.[2] Today, KKG spans 140 college

---

[1] Recounting the pertinent facts, *infra*, the Court wades through a well-researched, yet meandering, complaint; for example, despite a seventy-two-page complaint excluding attachments, Plaintiffs devote four-and-a-half pages to their actual claims. Only the facts relevant to the four claims Plaintiffs bring against Defendants are outlined today. Those facts are accepted as true for the purpose of resolving the motion at bar. ECF No. 6; *see also* ECF Nos. 20, 24, 26. The Court also looks to documents attached as exhibits to Plaintiffs' *Complaint*. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.") (internal citations omitted).
[2] KKG filed its *Articles of Incorporation* with the Ohio Secretary of State in 1930. ECF No. 6-1, at 56.

3

campuses and boasts 210,000 living alumnae. ECF No. 6, ¶ 26. Of note are policies from

KKG's national headquarters and the University of Wyoming's KKG chapter; bear with

me as I summarize both. Broadly, KKG's "purposes", *inter alia*, are:

> A. *To unite women*, through membership, in a close bond of friendship,
> seeking to instill in them a spirit of mutual love and helpfulness, to the
> end that each member and the Fraternity-at-large[3] may attain social,
> moral, and intellectual excellence;
> B. To establish chapters at various colleges and universities, provide for the
> proper organization, installation, and operation, *with each chapter having
> the right and responsibility to select members of its choice in accordance
> with Fraternity standards and procedures*[.]

ECF No. 6-1, at 52 (emphasis added). KKG has *Bylaws* ("bylaws"), *Standing Rules*,[4] and

*Fraternity Policies*. ECF Nos. 6, ¶ 53; 6-1, at 2–30, 109–38, 140–61. While the KKG

bylaws state that "[a] new member shall be a woman", no bylaw defines "woman". ECF

No. 6-1, at 6.[5]

In 2018, KKG published a *Guide for Supporting our LGBTQIA+ Members* ("2018

*Guide*").[6] ECF Nos. 6, ¶ 5; 6-1, at 32–43. The 2018 *Guide* states:

> Kappa Kappa Gamma is a single-gender organization *comprised of women
> and individuals who identify as women* whose governing documents do not
> discriminate in membership selection except by requiring good scholarship
> and ethical character.

---

[3] KKG considers itself a "fraternity" in its governing documents. *E.g.*, ECF No. 6-1, at 5.
However, emulating Plaintiffs and our national discourse, the Court refers to KKG as a
"sorority".

[4] The *Standing Rules* state that "[a]ctive members shall be responsible for selecting new
members of their chapter." ECF No. 6-1, at 111.

[5] When a new member, following acceptance of a local chapter's invitation, accepts admission to
KKG and annually thereafter, she pledges to "uphold the [KKG] *Bylaws*, *Standing Rules and
Policies* as well as [her] chapter Bylaws and Standing Rules." ECF No. 6-1, at 163.

[6] The parties dispute when KKG began to allow transgender women to qualify for membership.
While Defendants allege that Kappa has allowed transgender women admission since 2015,
Plaintiffs respond that "there is no evidence of this fact." *See* ECF Nos. 20, at 3; 24, at 3. The
parties agree that KKG published its *Guide* in 2018. *See* ECF Nos. 6, ¶ 5; 20, at 4.

4

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 61 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 61
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 5 of 41

> . . .
> Each Kappa chapter has the final choice of its own members. . . . [T]he
> chapter is well within its right to offer [a] potential member [who is
> transgender] a bid.

ECF No. 6-1, at 32, 35 (emphasis added). While KKG's bylaws do not reflect the "and

individuals who identify as women" addition, accompanying documents, including KKG's

*Position Statements*[7] in 2021 and *FAQs*[8] in 2022, both published ahead of KKG's 2022

biennial convention, do. *Id.* at 105 (same language *supra*), 183 (same); *cf. id.* at 2–30, 58–

86.[9] An Illinois resident and volunteer, Rooney heads KKG's eight-member Fraternity

Council, consisting of directors and by extension staff tasked with supervising chapters

nationwide. ECF Nos. 6, ¶¶ 22, 71; 26, at 3.[10] Plaintiffs equate KKG's Fraternity Council

to a corporation's board of directors. *E.g.*, ECF No. 6, ¶ 4.

---

[7] The *Position Statements* also note that "[e]ach chapter of Kappa Kappa Gamma has the final
choice of its own members." ECF No. 6-1, at 183.

[8] The *FAQs* state:

> We also look to NPC [National Panhellenic Conference ("NPC")] policy as an NPC
> member organization. The NPC Recruitment Eligibility (2020) policy states: 'For the
> purpose of participation in Panhellenic recruitment, woman is defined as an individual who
> consistently lives and self-identifies as a woman. Each women's-only NPC member
> organization determines its own membership selection policies and procedures.'
>
> . . .
> **Why are we including gender-neutral pronouns in the revised documents?**
> This change is coming from a Convention resolution that formed Kappa's Diversity, Equity
> and Inclusion Committee. Kappa Kappa Gamma was founded 150 years ago on the
> principles of integrity, respect and regard for others. *Kappa has reflected on the path
> forward, and we are beginning with actions that speak to our belief that all members are
> valued. This is one of those action steps. We want to be as inclusive of all members as we
> can be.*

ECF No. 6-1, at 105 (emphasis in original and added).

[9] *See also* ECF No. 6-1, at 59 ("Inclusivity. Since diversity, equity and inclusion have been a
focus and the subject of a previous resolution at [the] Convention, a concerted effort has been
made to make sure the language of the documents is inclusive.").

[10] *See also* Kappa Kappa Gamma Fraternity Council, available at:
https://www.kappakappagamma.org/why-kappa/our-leadership-team/fraternity-council/
(accessed Aug. 25, 2023).

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 62 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 62
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 6 of 41

Founded in 1927, the KKG, or Gamma Omicron, chapter at the University of Wyoming ("the UW chapter") has forty-four members and an on-campus house today. ECF Nos. 6, ¶ 78; 6-1, at 200. Plaintiffs[11] are six – some current and some graduated – chapter members and undergraduates at the University. ECF Nos. 6, ¶¶ 1, 15–20; 20, at 1. Because KKG headquarters has a "live-in rule", all UW chapter members must reside within the on-campus house in Laramie, Wyoming, signing a contract with KKG Building Co.[12] to do so. ECF No. 6-1, at 148, 165–76. Like KKG's governing documents, neither the UW chapter's *Bylaws*,[13] nor its *Standing Rules*, define "woman". *Id.* at 185–98, 200–09.

During fall 2022 recruitment, the UW chapter voted to admit Langford, a transgender[14] woman. ECF No. 6, ¶ 116. Per KKG protocol, Langford was subsequently approved by KKG headquarters prior to her initiation to the chapter. *Id.*, ¶¶ 68, 139, 141;

---

[11] In accordance with Tenth Circuit guidance, the Court twice denied Plaintiffs' request to proceed anonymously in this matter. ECF Nos. 3, 5. On April 20, 2023, complying with the Court's instruction, Plaintiffs filed an amended complaint featuring their true names. ECF No. 6.
[12] Though not seeking damages from KKG Building Co., Plaintiffs allege that KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B) required party to this action because five Plaintiffs signed housing contracts with KKG Building Co. for the 2022–23 academic year. ECF No. 6, ¶¶ 23, 84.
[13] The UW chapter *Bylaws* state that membership "shall be in accordance with the provisions of the Fraternity [*i.e.*, KKG] *Bylaws*." ECF No. 6-1, at 200.
[14] "Transgender" is a broad, umbrella term that is often used for individuals whose brain sex, gender identity, or gender expression either does not or is perceived not to match the physical sex they were assigned at birth. *See* Stevie V. Tran & Elizabeth M. Glazer, *Transgenderless*, 35 HARV. J.L. & GENDER 399, 399 n.1 (2012).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 63 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 63
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 7 of 41

ECF No. 6-1, at 120. Following Langford's admission, Plaintiffs accuse Langford[15] of

salacious impropriety at the chapter house and elsewhere.[16]

Plaintiffs' four claims include: (1) a derivative[17] cause of action, pursuant to Ohio

Rev. Code Ann. § 1702.12(I)(1)(c),[18] against Rooney (ECF No. 6, ¶¶ 159–67) ("Count I");

(2) breach of contract against KKG and KKG Building Co. (*id.*, ¶¶ 168–72) ("Count II");

(3) tortious interference with a contract against KKG (*id.*, ¶¶ 173–75) ("Count III"); and

(4) a direct[19] cause of action against KKG and Rooney (*id.*, ¶¶ 176–79) ("Count IV").

Plaintiffs request three declaratory judgments from this Court, ordering: (1) that Langford

is ineligible for KKG membership and voiding, *ab initio*, her admission; (2) Defendants'

violation of their obligations to KKG by admitting Langford; and (3) Defendants' violation

of Plaintiffs' housing contracts. *Id.* at 70. Plaintiffs also seek preliminary and permanent

---

[15] Like KKG Building Co., Plaintiffs do not seek damages or relief from Langford, but label her a Fed. R. Civ. P. 19(a)(1)(B) required party. ECF No. 6, ¶ 1 n.2.

[16] Given Plaintiffs' dual dearth of claims against Langford and their inability to connect their allegations concerning Langford's behavior to their four causes of action against the remaining Defendants, the Court sees no reason to recount Plaintiffs' peripheral allegations against Langford.

[17] A derivative cause of action against an Ohioan non-profit corporation "seeks to vindicate the duty owed by the board of the corporation to the corporation as a whole and not a duty that is owed to a particular member or shareholder." *Wood v. Cashelmara Condo. Unit Owners Ass'n, Inc.*, No. 110696, 2022 WL 1422807, at *4–5 (8th Dist. May 5, 2022).

[18] Ohio law provides members of non-profit corporations with a derivative cause of action on behalf of the corporation; § 1702.12, *inter alia*, states:

(I)(1) No lack of, or limitation upon, the authority of a corporation shall be asserted in any action except as follows:

. . .

(c) By a member as such or by or on behalf of the members against the corporation, a director, an officer, or a member as such.

Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also* ECF No. 6, ¶ 46.

[19] "A shareholder brings a derivative action on behalf of the corporation for injuries sustained by or wrongs done to the corporation, and a shareholder brings a direct action where the shareholder is injured in a way that is separate and distinct from the injury to the corporation." *HER, Inc. v. Parenteau*, 147 Ohio App. 3d 285, 291 (10th Dist. 2002).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 64 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 64
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 8 of 41

injunctive relief preventing Defendants from "seeking or encouraging" transgender women to join KKG, damages, and attorneys' fees and costs. *Id.*[20]

## STANDARD OF REVIEW

Defendants challenge Plaintiffs' *Complaint* on three bases – and three Federal Rules of Civil Procedure. I begin with a dose of procedural background; federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, federal courts are presumed to lack jurisdiction "unless and until a plaintiff pleads sufficient facts to establish it." *See Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) (internal citation omitted). If jurisdiction is challenged, the party asserting jurisdiction must demonstrate its existence by a preponderance of the evidence. *See id.* First, when considering a Fed. R. Civ. P. 12(b)(1) challenge to subject matter jurisdiction and the movant challenges the allegations set forth in the complaint, the Court must accept those allegations as true. *See Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Second, Plaintiffs bear the burden of establishing personal jurisdiction. *See Far W. Cap., Inc. v. Towne*, 46 F.3d 1071, 1075 (10th Cir. 1995). If, however, the Court resolves the pending motion on the basis of their *Complaint*, Plaintiffs need only make a prima-facie showing of personal jurisdiction. *See OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). Plaintiffs can make such a showing by alleging, "via

---

[20] Defendants, excluding Langford, filed their *Motion to Dismiss*, coupled with a *Memorandum in Support*, on June 20, 2023. ECF Nos. 19, 20. Plaintiffs responded in their *Response in Opposition* on July 5, 2023, to which Defendants replied on July 12, 2023. ECF Nos. 24, 26.

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 65 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 65
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 9 of 41

affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *See AST Sports Sci., Inc. v. CLF Distrib., Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). Like a Fed. R. Civ. P. 12(b)(1) challenge, the Court accepts as true all well-pleaded facts in the *Complaint* and resolves all factual disputes in Plaintiffs' favor. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Third, when considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, district courts follow a two-pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions", and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere

9

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 66 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 66
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 10 of 41

possibility that Defendants acted unlawfully, but the complaint does not need to establish

that Defendants probably acted unlawfully. *See id.*

## ANALYSIS

The Court dismisses KKG Building Co. and Plaintiffs' four claims without

prejudice. First, Plaintiffs fail to plead this Court's subject matter jurisdiction over KKG

Building Co. Second, Plaintiffs demonstrate this Court's personal jurisdiction over

Rooney. Third, while Plaintiffs demonstrate futility under Ohio law, their derivative

claim against Rooney fails to escape KKG's First-Amendment-protected freedom of

expressive association to include transgender members. Fourth, Plaintiffs fail to allege

any breach of contract. Fifth, Plaintiffs fail to allege any tortious interference of contract.

Sixth, Plaintiffs fail to allege a direct claim against Rooney under Ohio law. Below, the

Court proceeds from the courthouse door to the courtroom, addressing challenges to

jurisdiction and on the merits, *seriatim*.

A. *The Court's Subject Matter Jurisdiction over Plaintiffs' Breach of Contract Claim against,* inter alia, *KKG Building Co. (*i.e., *Count II).*

Plaintiffs fail to allege this Court's subject matter jurisdiction over KKG Building

Co. Defendants move to dismiss Count II, alleging breach of contract against, *inter alia*,

KKG Building Co., for lack of subject matter jurisdiction. *See* ECF Nos. 20, at 7–8; 26, at

4–5. Plaintiffs appear to concede, parroting language from their *Complaint* that they do

not seek damages from KKG Building Co. but consider it a required party.[21]

---

[21] *Compare* ECF No. 6, ¶ 23 ("Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege that [KKG] has interfered with their contractual relationship with

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 67 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 67
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 11 of 41

Preliminarily, the Court admits its confusion disentangling Plaintiffs' Count II, which Plaintiffs seem to recognize.[22] Count II in Plaintiffs' *Complaint* appears to sue KKG Building Co.; yet, in their response, Plaintiffs clarify that they sue KKG for *two* breach of contract claims. This section addresses KKG Building Co.'s status vis-à-vis Count II.

To proceed under this Court's diversity jurisdiction, 28 U.S.C. § 1332, as Plaintiffs do, "all [] plaintiff[s] need[] to do is allege an amount in excess of $75,000 and [they] will get [their] way, unless [] defendant[s] [are] able to prove 'to a legal certainty' that the plaintiff's claim cannot recover the alleged amount." *McPhail v. Deere & Co.*, 529 F.3d 947, 953 (10th Cir. 2008) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)) (internal citation omitted); ECF No. 6, ¶ 13. In *Young*, U.S. District Judge James O. Browning opined:

> The statutory amount-in-controversy requirement, which presently stands at $75,000.00, must be satisfied *as between a single plaintiff and a single defendant* for a federal district court to have original jurisdiction over the dispute; a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement, nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold. If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims. Similarly, multiple

---

this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation.") (citing Fed. R. Civ. P. 19(a)(1)(B)), *with* ECF No. 24, at 17–18 (near-*verbatim* language).

[22] ECF No. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts. There is the contract between Kappa and its members under Ohio corporate law. And there is the contract with the Kappa Kappa Gamma Housing Corporation . . . *Through Defendant Kappa's actions, they have created a breach of contract* as to both the sorority experience and paid housing experience that these young women were promised.") (emphasis added);

11

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 68 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 68
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 12 of 41

> plaintiffs may aggregate the amounts of their claims against a single
> defendant if the claims are not separate and distinct.

*Young v. Hartford Cas. Ins. Co.*, 503 F. Supp. 3d 1125, 1172–73 (D.N.M. 2020) (internal

quotations and citations omitted) (emphasis added). Here, Plaintiffs' *Complaint* and

response cement that they, explicitly, do not levy claims against or seek damages from

KKG Building Co. Plaintiffs also do not seek injunctive or declaratory relief from KKG

Building Co. *See* ECF No. 6, at 70 ("Plaintiffs pray for . . . [a] declaratory judgment that

the Defendants have violated the housing contract[.]") (presumably referring to KKG

and/or Rooney); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir.

2006) ("The Tenth Circuit has followed what has commonly been referred to as the

'either viewpoint rule' which considers either the value to the plaintiff or the cost to

defendant of injunctive and declaratory relief as the measure of the amount in

controversy for purposes of meeting the jurisdictional minimum.") (internal quotation

omitted). Plaintiffs also do not allege that KKG Building Co. is jointly liable with its co-

defendants. Nor is this a case where unquantifiable variables prevent the Court from

declaring to a legal certainty that no jury would award Plaintiff more than $75,000;

Plaintiffs, in their words, do not seek damages from KKG Building Co. and, when

prompted by Defendants to their amount-in-controversy flaw, fail to respond.

Accordingly, because Plaintiffs do not seek damages against KKG Building Co. and fail

to plead an amount in controversy as to that Defendant, the Court dismisses KKG

Building Co. from Count II for lacking subject matter jurisdiction.

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 69 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 69
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 13 of 41

But wait, say Plaintiffs, KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B)

required party. "When applying Rule 19, a district court must first determine whether the

absent party is necessary to the lawsuit[.]" *See Davis v. United States*, 192 F.3d 951, 957

(10th Cir. 1999) (citing Fed. R. Civ. P. 19(a)). Necessity weighs three factors, including:

"(1) whether complete relief would be available to the parties already in the suit, (2)

whether the absent party has an interest related to the suit which as a practical matter

would be impaired, and (3) whether a party already in the suit would be subjected to a

substantial risk of multiple or inconsistent obligations." *Rishell v. Jane Phillips Episcopal*

*Mem. Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996) (footnote omitted).[23] "If a

necessary person cannot be joined, the court proceeds to the second step, determining

'whether in equity and good conscience the action should proceed among the parties

before it, or should be dismissed, because the absent person . . . is indispensable' to the

litigation at hand." *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1289 (10th Cir.

2003) (quoting Fed. R. Civ. P. 19(b)) (internal brackets omitted).

---

[23] Identical in effect to *Rishell*'s three-factor test, Fed. R. Civ. P. 19(a) states:
   (1) *Required Party.* A person who is subject to service of process and whose joinder will
   not deprive the court of subject-matter jurisdiction must be joined as a party if:
      (A) in that person's absence, the court cannot accord complete relief among
      existing parties; or
      (B) that person claims an interest relating to the subject of the action and is so
      situated that disposing of the action in the person's absence may:
         (i) as a practical matter impair or impede the person's ability to protect the
         interest; or
         (ii) leave an existing party subject to a substantial risk of incurring double,
         multiple, or otherwise inconsistent obligations because of the interest.
   Fed. R. Civ. P. 19(a)(1).

13

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 70 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 70
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 14 of 41

Plaintiffs bear the burden of demonstrating KKG Building Co.'s necessity, yet, beyond bare allusion to Fed. R. Civ. P. 19(a)(1)(B), make no effort to do so. *See Davis*, 192 F.3d at 951; ECF Nos. 6, ¶ 23; 24, at 17. Nor is it apparent to the Court whether joinder, in Plaintiffs' view, is warranted under Fed. R. Civ. P. 19(a)(1)(B)(i) or (ii). *See* Fed. R. Civ. P. 19(a)(1)(B); *see also* ECF No. 25, at 2, 4–8 (arguing for Langford's joinder under Fed. R. Civ. P. 19(a)). Considering, *sua sponte*, KKG Building Co.'s necessity under *Rishell*'s factors, none weigh in favor of KKG Building Co.'s joinder.

First, Plaintiffs fail to establish that complete relief cannot be granted among KKG and Rooney.[24] Though difficult to decipher,[25] Plaintiffs clarify that, under Count II, KKG's "actions" breached "two" contracts, including Plaintiffs' membership contracts with KKG in Ohio and their housing contracts with KKG Building Co. in Wyoming. ECF No. 24, at 14. As to Count III, Plaintiffs seemingly allege that KKG tortiously interfered with Plaintiffs' housing contracts – and, like Count II, not any improper action by KKG Building Co. ECF No. 6, ¶¶ 23 ("Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with [KKG Building Co.]."), 175. Because

---

[24] *See Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1183 (D.N.M. 2010) ("'Complete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought.'") (quoting *Champagne v. City of Kan. City, Kan.*, 157 F.R.D. 66, 67 (D. Kan. 1994)).

[25] *See also* ECF Nos. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts."), 20, at 17 n.8 ("To the extent Plaintiffs purport to allege a breach of contract claim against Kappa or Rooney, the Court should dismiss it because Plaintiffs do not allege that either is a party to the [KKG Building Co.] [c]ontracts.").

both contractual claims attack KKG's actions, not KKG Building Co.,[26] complete relief

can be granted among KKG and/or Rooney.

Second, KKG Building Co. does not have an interest in this suit at risk of

impairment. The Court's review of the housing contracts, in fact, belies Plaintiffs'

contention that KKG Building Co. contracted with Plaintiffs to "provide housing in

accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma." ECF

Nos. 6, ¶ 170; 24, at 14. The only applicable section of the housing contracts states:

> **5. Other Services.** *The chapter [i.e.,* the UW chapter] *shall provide the
> student such services* as are customarily furnished by the chapter to residents
> of the chapter house, subject to this contract, the Kappa Kappa Gamma
> Fraternity *Bylaws, Standing Rules and Policies*; and rules and regulations of
> the chapter, including, without limitation, the House Rules attached hereto
> as Exhibit, subject to any changes may be made by the chapter, House Board
> or the Fraternity at any time.

ECF No. 6-1, at 166–67 (identifiers omitted) (emphasis added). Notified of the lacking

contractual language supporting their claim, Plaintiffs, once again, fail to respond. *See* ECF

Nos. 20, at 19; 24. Thus, a key allegation to keep KKG Building Co. in this lawsuit – that

KKG Building Co. is contractually obligated to provide housing per headquarters policy –

withers under the Court's glancing scrutiny; if anything, the UW chapter must abide by

such policies, not KKG Building Co. ECF No. 6, ¶ 170. Furthermore, it is KKG's policies

that underpin the sorority's alleged breach and tortious interference; under Plaintiffs' view,

---

[26] ECF No. 6, ¶ 171 ("Langford's access to and presence in the sorority house violates the
housing contract that Plaintiffs signed."), ¶ 175 ("Through their [*i.e.,* KKG and/or Rooney's]
initiation of Langford, Defendants have prevented Plaintiffs from having the benefit of the
Housing Contract that they signed."), at 70 (requesting "[a] declaratory judgment that the
Defendants [*i.e.,* KKG and/or Rooney] have violated the housing contract").

this case turns on KKG's governing documents, not an independent non-profit confined to housing issues, of which any interests held are adequately represented by KKG and/or Rooney. *See id.*, ¶¶ 170, 175; *EquiMed, Inc. v. Genstler*, 170 F.R.D. 175, 179 (D. Kan. 1996) (finding that joinder of an absent party was not necessary if its interests were adequately represented by present parties) (citing *Rishell*, 94 F.3d at 1411–12); *Portable Solar, LLC v. Lion Energy, LLC*, No. 22-CV-00026-DAK, 2022 WL 3153869, at *2 (D. Utah Aug. 8, 2022) (noting that in tortious interference cases, courts should determine necessity "by evaluating whether the absent party's rights or obligations under an existing contract have necessarily become implicated"). However ineloquent, Plaintiffs' housing contracts with KKG Building Co., while possibly relevant to damages down the road, are *not* the subject of this litigation. *See Wolf Mountain Resorts, LC v. Talisker Corp.*, No. 07–CV–00548DAK, 2008 WL 65409, at *3 (D. Utah Jan. 4, 2008) ("It is well-established that a party to a contract *which is the subject of the litigation* is considered a necessary party.") (internal citation omitted) (emphasis added).

Third, there is no evidence to support an assertion that KKG or Rooney would be subject to a substantial risk of multiple or inconsistent obligations if KKG Building Co. was removed from this lawsuit. "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Sonnett v. Lankford*, No. 15–CV–0024–SWS, 2016 WL 9105175, at *2 (D. Wyo. Mar. 16, 2016) (internal quotation omitted). In short, nothing before the Court indicates that KKG or Rooney's abilities to protect their interests would be hindered by dismissing KKG Building Co.

16

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 73 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 73
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 17 of 41

Therefore, the Court finds that KKG Building Co. is not a Fed. R. Civ. P. 19(a)(1)(B) necessary party.[27] The action proceeds, as does the Court, without KKG Building Co.

B. *The Court's Personal Jurisdiction over Rooney.*

Shouldering their burden, Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The parties dispute Rooney's contacts with Wyoming. On one hand, Plaintiffs say that this Court has specific jurisdiction over a derivative suit against Rooney, a corporate official, in Wyoming, where alleged injury, past and future, occurred. *See* ECF No. 24, at 2 (citing *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013)). Defendants counter that Plaintiffs levy no allegation that Rooney directed any conduct at Wyoming. *See* ECF No. 26, at 3–4.

Plaintiffs assert one sect of personal jurisdiction – to wit, specific – which allows this Court to haul a nonresident defendant to Wyoming federal court. *See OMI Holdings, Inc.*, 149 F.3d at 1090–91.[28] Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*

---

[27] Because KKG Building Co. is not a necessary party, the Court need not proceed with an indispensability analysis under the Tenth Circuit's second step. *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1098 (10th Cir. 2003).

[28] This Court holds "'considerable leeway in deciding a pretrial motion to dismiss for lack of personal jurisdiction.'" *Tungsten Parts Wyo., Inc. v. Glob. Tungsten and Powders Corp.*, No. 21-CV-99-ABJ, 2022 WL 19263451, at *3 (D. Wyo. Jul. 13, 2022) (quoting *Cheyenne Publ'g, LLC v. Starostka*, 94 P.3d 463, 469 (Wyo. 2004) (internal citation omitted)). The Court also makes that determination "'on the basis of pleadings and other materials called to its attention.'" *Id.* (quoting *Staroskta*, 94 P.3d at 469).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 74 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 74
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 18 of 41

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation, citation, and brackets omitted). "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state[29] and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Towne*, 46 F.3d at 1074.

Notably, "[s]pecific jurisdiction is proper if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'" *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Challenged today, purposeful direction[30] "calls for an inquiry into whether [Plaintiffs] have shown that [Rooney's] acts were (1) intentional, (2) 'expressly aimed' at Wyoming, and (3) done with 'knowledge that the brunt of the injury would be felt' in Wyoming." *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 959 (10th Cir. 2022) (quoting *Dudnikov*, 514 F.3d at 1072).[31]

---

[29] Wyoming's long-arm statute, Wyo. Stat. § 5-1-107(a), confers jurisdiction "on any basis not inconsistent with the Wyoming or United States constitution."

[30] Purposeful direction, or purposeful availment, requires that the defendant "deliberately . . . engaged in significant activities within the forum State or deliberately directed [her] activities at the forum State, so that [she] has manifestly availed [her]self of the privilege of conducting business there." *XMission, L.C.*, 955 F.3d at 840 (internal quotation, citation, and brackets omitted).

[31] Additionally, if the Court determines that the minimum contacts standard is satisfied, exercising personal jurisdiction over Rooney "must always be consonant with traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

18

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 75 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 75
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 19 of 41

Plaintiffs plead Rooney's[32] purposeful direction. Plaintiffs allege that Rooney,

despite "aware[ness]" of Langford's ineligibility, "violated [her] fiduciary duties to

[KKG] when [she] procured and approved the initiation of" Langford. ECF No. 6, ¶¶ 49,

105. Thus, the first element, intentional action, is satisfied; the record contains no

suggestion that Rooney acted unintentionally when, accepted as true, she approved

Langford's initiation following the UW chapter's invitation. While the parties disagree

when Rooney, or others on the Fraternity Council, knew about Langford's invitation to

join the UW chapter, Rooney's approval of Langford's induction, as alleged, occurred

thereafter. *See* ECF Nos. 20, at 12 n.6; 24, at 8.

The second element, express aiming at Wyoming, is more difficult for Plaintiffs,

but is nonetheless cleared. Yes, Plaintiffs' *Complaint* lacks reference to Rooney's

dealings with the UW chapter as President or her personal sign-off on Langford's

admission thirteen hundred miles away. The email from Executive Director[33] Kari

Kittrell Poole – informing Plaintiffs that their "concerns were reviewed by several

national officers of the organization" and "we believe proceeding with [Langford's]

---

[32] Plaintiffs' suing of only KKG's President, Rooney, and not other Fraternity Council members, is also debated. *See* ECF Nos. 20, at 10 n.5; 24, at 7 n.2 ("The law does not require more, but if there is a concern, Plaintiffs can sue more directors. [] Plaintiffs are open to whatever direction is provided."). § 1702.12(I)(1)(c) does not appear to require naming all directors or officers as defendants. *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c) (". . . against . . . *a* director, *an* officer[.]") (emphasis added); *see also In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 618–19 (6th Cir. 2008) ("[A] [pre-suit] demand may also be excused [from Ohio Civ. R. 23.1] 'when all directors are named as wrongdoers and defendants in a suit[.]'") (quoting *Carlson v. Rabkin*, 152 Ohio App. 3d 672, 681 (1st Dist. 2003)). Due to its inability, however, to locate any state authority on this question, the Court reserves judgment.

[33] ECF No. 6-1, at 21 ("An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.").

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 76 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 76
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 20 of 41

initiation is the appropriate next step" – goes both ways; while that email could refer to

any of the other six members of the Fraternity Council, excluding Rooney, it is obviously

feasible that the Fraternity Council's corporate secretary was referring to the president[34]

of that body when she used "we". ECF No. 6, ¶¶ 93, 141. Forgoing separation of their

purposeful direction analysis by element, Defendants lean upon, without naming, the

fiduciary shield doctrine. *See* ECF No. 20, at 8–9 (quoting *Christian v. Loyakk, Inc.*, No.

19-CV-220-F, 2023 WL 170868, at *14 (D. Wyo. Jan. 12, 2023)) (also quoting *Virgin*

*Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 WL 13222758, at *3 (D. Wyo. Dec.

30, 2019), that dealt with foreign service of process and is inapposite). Under that

doctrine,[35] even if a particular employee has "substantial contacts" with the forum state,

"those contacts will not count against the employee in the personal jurisdiction analysis

so long as the employee acted solely on the corporation's behalf." *Newsome*, 722 F.3d at

1275. Given that Rooney undoubtedly has not had "substantial contacts" with Wyoming,

Defendants appear to be arguing that contacts by Rooney's "workforce" (*e.g.*, KKG-

employed alumnae advisers at the UW chapter or Executive Director Poole)[36] in

Wyoming do not convey this Court's personal jurisdiction over Rooney. ECF No. 6, ¶ 74;

---

[34] "The members of Fraternity Council shall be the *officers* of the Fraternity: the President, the Four Vice Presidents, and the Treasurer." ECF No. 6-1, at 18 (emphasis added).

[35] Though the Wyoming Supreme Court has not expressly adopted the fiduciary shield doctrine, the Tenth Circuit invoked the doctrine under an application of Wyoming law. *See Newsome*, 722 F.3d at 1277.

[36] While this Judge is near-numb to hyperbole, Plaintiffs' statement that "every single [chapter] decision is made by the 'workforce' that Rooney commands" is plainly inaccurate. *See* ECF No. 24, at 7. Per the UW chapter's *Bylaws*, KKG advisers may not vote during recruitment of new members. *See* ECF No. 6-1, at 208 ("Advisers shall serve in an advisory capacity without a vote."). The KKG bylaws outline the same. *See id.* at 27 ("Advisers to each of the chapter officers . . . shall serve in an advisory capacity without vote.").

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 77 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 77
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 21 of 41

*see, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("Due process requires that a defendant be haled into court in a forum State based on h[er] own affiliation with the State, not based on the . . . 'attenuated' contacts [s]he makes by interacting with other persons affiliated with the State.") (quoting *Burger King Corp.*, 471 U.S. at 475).

Fair enough. Nevertheless, accepting Plaintiffs' allegation that Rooney approved Langford as true, as I must, the "'focal point'" of Rooney's actions occurred in Wyoming. *See Dudnikov*, 514 F.3d at 1076–77 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). Langford's admission, however minor among thousands across 140 chapters each fall and spring, occurred at a KKG chapter house in Wyoming; Rooney's alleged sign-off was an "intentional action[] that [was] expressly aimed at" Wyoming. *See id.* (finding express aiming where the defendants intended "to halt a Colorado-based sale by a Colorado resident" and the presiding-state's location was obvious from an eBay auction page) (emphasis altered). Moreover, a corporate officer[37] may be sued in a derivative action where the injury occurred. *See, e.g.*, *Newsome*,[38] 722 F.3d at 1268–69 (finding personal jurisdiction where corporate directors expressly aimed their wrongdoing at

---

[37] Defendants do not offer, nor can this Court unearth, controlling authority indicating that Rooney's volunteer status on the Fraternity Council dictates a contrary outcome than would a compensated officer. *See* ECF Nos. 20, at 8–9; 26, at 3–4; *see also Bronner v. Duggan*, 249 F. Supp. 3d 27, 40 (D.D.C. 2017) (finding that, despite the volunteer service of a governing body's officers, the directors could still anticipate being hauled into a Washington, D.C. court to account for their activities).

[38] Defendants' interpretation of *Newsome*, that a fiduciary can be subject to personal jurisdiction *if* that fiduciary has contacts with the forum state, lacks support. *See* ECF No. 26, at 3 (citing 722 F.3d at 1264, which merely outlined personal jurisdiction's general contours). Defendants also fail to engage with *Newsome*'s analysis of the purposeful direction elements. *See* 722 F.3d at 1268–74; ECF No. 20, at 9. Their reply offers no additional authority that compels the Court otherwise. *See* ECF No. 26, at 3–4.

21

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 78 of 506
Appellate Case: 23-8065     Document: 010110962639     Date Filed: 12/04/2023     Page: 78
Case 2:23-cv-00051-ABJ     Document 31     Filed 08/25/23     Page 22 of 41

Oklahoma when they saddled a subsidiary company, knowing it "operated exclusively" in Oklahoma, with overwhelming debt).

The final element of purposeful direction "concentrates on the consequences of the defendant's action–where was the alleged harm actually felt by the plaintiff." *Dudnikov*, 514 F.3d at 1075. I look, once again, to *Newsome*, where the Tenth Circuit found that a Delaware corporation and its creditors, to whom the defendants owed fiduciary duties, were injured primarily in Oklahoma because "the individual defendants knew that the brunt of any injury to [the corporation] would be felt in Oklahoma." *See* 722 F.3d at 1269 (citing *Dudnikov*, 514 F.3d at 1077). KKG operates via its Gamma Omicron chapter in Wyoming; when Rooney approved Langford's admission, injury, if any, would occur on campus in Laramie, Wyoming. ECF No. 6, ¶¶ 166–67. Therefore, Rooney "purposefully directed" her activities at Wyoming.[39] *See Dudnikov*, 514 F.3d at 1078 (internal quotation marks omitted).

Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The Court proceeds to the merits.

C. *Count I: Plaintiffs' Derivative Claim*.

Defendants critique Count I in two ways, including Plaintiffs': (1) failure to demonstrate futility under Ohio law; and (2) seeking of relief contravening a voluntary

---

[39] Because Defendants do not challenge personal jurisdiction on any basis but purposeful direction (*i.e.*, specific jurisdiction's initial element), the Court declines from engaging in unbriefed analyses concerning Plaintiffs' alleged injuries "aris[ing] out of or relat[ing] to those activities [above]" or "'offend[ed] traditional notions of fair play and substantial justice.'" *See XMission, L.C.*, 955 F.3d at 840 (internal quotation omitted); *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co.*, 326 U.S. at 316); ECF Nos. 20, at 8–9; 26, at 3–4.

organization's freedom of association. While Plaintiffs demonstrate futility under Ohio

law, their derivative claim against Rooney[40] fails to escape KKG's First-Amendment-

protected freedom of expressive association to include transgender members.

### 1. Ohio Civ. R. 23.1 Futility.

I begin with Defendants' argument of lacking Ohio Civ. R. 23.1 specificity. Due

to KKG's incorporation in Ohio, Ohio law governs Plaintiffs' derivative claim.[41] "When

members bring a derivative action against a nonprofit corporation, they are enforcing a

corporate right just as shareholders in for-profit corporations." *Russell v. United*

*Missionary Baptist Church*, 92 Ohio App. 3d 736, 739 (12th Dist. 1994); Ohio Rev. Code

Ann. § 1702.12(I)(1)(c). Governing derivative actions, Ohio Civ. R. 23.1 states:

> **Derivative Actions by Shareholders.** . . . . The complaint shall also allege
> with particularity the efforts, if any, made by the plaintiff to obtain the
> action he desires from the directors and, if necessary, from the shareholders
> and the reasons for his failure to obtain the action or for not making the
> effort.

---

[40] *See* ECF No. 6, ¶¶ 163 ("[T]he directors of the Sorority have violated their duties of loyalty,
care, and obedience/compliance."), 166 ("As a result of Defendant's behavior . . ."), 167 ("[T]he
behavior of Defendant Rooney and other Fraternity Council members will result in the chapter's
closure[.]").
[41] Both parties appear to stipulate that, due to its incorporation in Ohio as a private, non-profit
corporation, KKG is governed by Ohio law. *See* ECF Nos. 20, at 9; 24, at 11–12; 6-1, at 23
("The Fraternity shall be governed in accordance with the laws of the state of Ohio[.]"); *see, e.g.*,
*In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1228 (10th Cir. 2016) (noting that
"federal common law should adopt the futility law of the state of incorporation of the company
on behalf of which the plaintiffs are bringing suit"); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d
168, 179 n.10 (3d Cir. 2005) (applying the law of the state of incorporation to breach of fiduciary
duty claims); *Baker-Bey v. Delta Sigma Theta Sorority, Inc.*, No. 12–1364, 2013 WL 1742449, at
*4 (E.D. Pa. Apr. 23, 2013) (same).

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 80 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 80
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 24 of 41

Ohio Civ. R. 23.1; *see also* Fed. R. Civ. P. 23.1(b)(3)(A).[42] "'[N]o shareholder has an

independent right to bring suit *unless* the board [of directors] refuses to do so *and* that

refusal i[s] wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the

part of the directors.'" *In re Cardinal Health, Inc. Derivative Litig.*, 518 F. Supp. 3d

1046, 1064 (S.D. Ohio 2021) (quoting *Drage v. Procter & Gamble*, 119 Ohio App. 3d

19, 24 (1st Dist. 1997)) (emphasis in original). Failure to make this pre-suit demand is

excused, however, when a plaintiff can demonstrate that the demand would have been

futile. *Id.* (citing *Drage*, 119 Ohio App. 3d at 25).

> Ohio courts have found a demand presumptively futile '*where the directors
> are antagonistic, adversely interested, or involved in the transactions
> attacked.*' Likewise, for example, a demand may also be excused 'when all
> directors are named as wrongdoers and defendants in a suit, when there is
> self-dealing by the directors such that the directors gain directly from the
> challenged transactions, or when there is domination of nondefendant
> directors by the defendant directors.'

*In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618–19 (quoting *Bonacci*, 1992 WL

181682, at *4 and *Carlson*, 152 Ohio App. 3d at 681) (emphasis added). Defendants

argue that Plaintiffs' failure to elevate their concerns to the Fraternity Council and

identify violated KKG bylaws belies futility. *See* ECF No. 20, at 11–12. Plaintiffs

counter, sans state authority, that they and other relatives[43] pestered KKG for months

---

[42] "[Ohio] Civ. R. 23.1 and Fed. R. Civ. P. 23.1 are essentially the same." *Bonacci v. Ohio
Highway Exp., Inc.*, No. 60825, 1992 WL 181682, at *4 (8th Dist. Jul. 30, 1992) (spacing
altered).
[43] *See also* ECF No. 27-1, at 1 (*i.e.*, the mother of Plaintiff Holtmeier's email to a KKG officer).
Though the email's date is unlisted, the Court presumes, based on the reference to Langford's
accepting a bid "today", that the email was sent in October or early November 2022.

24

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 81 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 81
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 25 of 41

prior to Langford's induction and were ultimately rejected by Executive Director Poole's email in mid-November 2022. *See* ECF Nos. 24, at 10; 6, ¶ 165; 6-1, at 45–47.

Plaintiffs plead specific facts to demonstrate that the Fraternity Council, akin to Kappa's board of directors,[44] is "antagonistic, adversely interested, or involved in the transactions attacked." *See In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618; *see also Leff v. CIP Corp.*, 540 F. Supp. 857, 868–69 (S.D. Ohio 1982) (when evident from a complaint that the directors of a corporation would oppose a derivative suit, formal demand on the directors is considered futile and unnecessary). Though demand futility in Ohio is no "easy task,"[45] further efforts by Plaintiffs to convince the Fraternity Council to alter their stance on admitting "individuals who identify as women" would be futile. For months ahead of Langford's induction, Plaintiffs, their families, and counsel petitioned Executive Director Poole, Rooney, KKG district and content directors, and KKG alumni representatives to overrule the UW chapter's decision. ECF Nos. 6-1, at 178–79; 24, at 9–11; 27-1, at 1. Addressing KKG leadership, including Rooney, Plaintiffs' counsel communicated the crux of their future claims, including "a breach of contract and a

---

[44] *See* Ohio Rev. Code Ann. §§ 1702.01(K) ("'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated."), 1702.30(B) ("A director shall perform the duties of a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. A director serving on a committee of directors is acting as a director."); ECF No. 6-1, at 18 ("Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law.").

[45] *In re Ferro Corp. Derivative Litig*, No. 04CV1626, 2006 WL 2038659, at *5 (N.D. Ohio Mar. 21, 2006).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 82 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 82
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 26 of 41

violation of Kappa Kappa Gamma's by-laws and standing rules", recounted their failed efforts thus far (*e.g.*, being "told that their values don't align with those of Kappa so they should reconsider being in Kappa"), and requested that the Fraternity Council "legally alter the sorority's membership requirements and conduct a valid vote in accord with existing rules or halt the illegal course of conduct being pursued[.]" ECF No. 6-1, at 179–80 (internal quotation marks and errant comma omitted). Rooney, Executive Director Poole, and other Fraternity Council members are the same officers who purportedly approved Langford; under Plaintiffs' theory, Rooney and other directors violated KKG's bylaws[46] – of course the Fraternity Council would oppose Plaintiffs' federal lawsuit. Finding futility under Ohio Civ. R. 23.1, the Court forges on.

### 2. Kappa Kappa Gamma's Freedom of Expressive Association.

After much leadup, the Court turns to the gravamen of Plaintiffs' lawsuit. Their derivative claim condenses to this: from 1870 to 2018, KKG defined "woman" to exclude transgender women; any new definition may not be enacted, *ultra vires*, without a KKG bylaw amendment.[47] Expectedly, Defendants counter: private organizations may interpret their own governing documents and define "woman" as including transgender women.[48]

Defendants are correct. Defining "woman" is Kappa Kappa Gamma's bedrock right as a private, voluntary organization – and one this Court may not invade. Below, I apply Ohio and U.S. Supreme Court jurisprudence to the facts at bar.

---

[46] ECF No. 6, ¶¶ 163–65.

[47] *See* ECF Nos. 24, at 11–14; 6, ¶ 104.

[48] *See* ECF No. 20, at 12–15.

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 83 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 83
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 27 of 41

First, Ohio law is highly deferential to associational interpretation. "As a general

rule, Ohio courts are unwilling to interfere with the management and internal affairs of a

voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010

WL 107015, at *5 (N.D. Ohio Jan. 6, 2010). More specifically:

> [T]hose who become members of non-profit corporations are presumed to
> have joined them with knowledge of their nature and the law applicable to
> them, and to have consented to be bound by the principles and rules of
> government, *or the policy which they have adopted, or may adopt* . . . [T]he
> member has, by voluntarily becoming a member of the order, chosen his
> forum for the redress of his grievances, and *unless there has been some*
> *palpable violation of the constitution or laws of the corporation whereby he*
> *has been deprived of valuable rights, the civil courts will not interfere.*

*Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *3 (11th Dist. Dec. 4,

1978) (internal citations omitted) (emphasis added) (rejecting a member's plea to

overturn the termination of his club membership where the club met due process

requirements, including facilitating the member's presence and opportunity to be heard at

a hearing); *see Stibora v. Greater Cleveland Bowling Ass'n*, 63 Ohio App. 3d 107, 113

(8th Dist. 1989) ("'A voluntary association may, without direction or interference by the

courts, for its government, adopt a constitution, by-laws, rules and regulations which will

control as to all questions of discipline, *or internal policy and management*, and its *right*

*to interpret and administer the same is as sacred as the right to make them.*'") (quoting

*State ex rel. Givens v. Superior Court of Marion Cnty.*, 233 Ind. 235, 238 (1954))

(emphasis added); *Putka v. First Catholic Slovak Union*, 75 Ohio App. 3d 741, 748 (8th

Dist. 1991), *cert. denied*, 503 U.S. 986 (1992) ("Generally speaking, in matters of policy,

discipline or internal economy of a voluntary association, wherein the members have

27

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 84 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 84
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 28 of 41

mutually agreed upon a charter or rules, the decision of the association itself is
supreme.") (internal citation omitted).

I turn to guidance from the United States Supreme Court. In *Boy Scouts of Am. v.
Dale*, 530 U.S. 640 (2000) (Rehnquist, C.J.), the Court held that the application of New
Jersey's nondiscrimination law, requiring the Boy Scouts to appoint James Dale, an
openly gay man as a scoutmaster, ran "afoul of the Scouts' freedom of expressive
association."[49] *Id.* at 656. The Court found that a state compelling the Scouts to include
Dale would "interfere with the Boy Scouts' choice not to propound a point of view
contrary to its beliefs." *Id.* at 653–54. "[T]he First Amendment simply *does not require
that every member of a group agree on every issue* in order for the group's policy to be
'expressive association.' The Boy Scouts takes an official position . . . and that is
sufficient for First Amendment purposes."[50] *Id.* at 655 (emphasis added). Chief Justice
Rehnquist concluded:

> 'While the law is free to promote all sorts of conduct in place of harmful
> behavior, *it is not free to interfere with speech for no better reason than
> promoting an approved message or discouraging a disfavored one*,
> however enlightened either purpose may strike the government.'

---

[49] Freedom of expressive association is the "right to associate with others in pursuit of a wide
variety of political, social, economic, educational, religious, and cultural ends." *Dale*, 530 U.S. at
647.

[50] *See also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013) (en banc)
(Hartz, J., concurring) ("[An organization's] speech or conduct may reflect the view of only a
bare majority of the members, *or even just the view of the members' delegate*–such as the editor
of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents
an 'official position.'") (quoting *Dale*, 530 U.S. at 655) (emphasis added).

28

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 85 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 85
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 29 of 41

*Id.* at 661 (quoting *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515

U.S. 557, 579 (1995)) (emphasis added). *Dale*'s takeaway for the Court: the government

may not defy the internal decision-making of a private organization, including the criteria

governing that entity's membership.[51]

Voluntary organizations beget benefits and drawbacks. KKG provides community

on campus and a professional network for life.[52] Forty-four women in Laramie seemingly

prioritized those benefits when they rushed. Membership, on the other hand, relinquishes

a dose of personal autonomy. That organization may say or publish something anathema

to one or a faction of members. Take the 2018 *Guide*, speech that Plaintiffs undoubtedly

---

[51] Advanced by Defendants, *Bostock*, by contrast, is inapposite today. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) (Gorsuch, J.). There, the Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex" because "to discriminate on th[is] ground[] requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1741–42. Justice Gorsuch concluded that Title VII "prohibit[s] [employers] from firing employees on the basis of . . . transgender status." *Id.* at 1753. Both sides misapply *Bostock*. Defendants say that if the Supreme Court interpreted "discrimination because of sex" as protecting transgender individuals, so too may Kappa interpret its bylaws "to be similarly inclusive." *See* ECF No. 20, at 14. Plaintiffs respond that the law's ordinary meaning at enactment (*i.e.*, KKG's definition of "woman" in 1870) "usually governs." *See* ECF No. 24, at 12–13. Neither argument assists the Court today. Had the UW chapter or KKG denied Langford admission because she was transgender, *Bostock*, though addressing employer discrimination, would certainly amplify. On the other hand, *Bostock* concerned the Court's statutory interpretation of Title VII and not a private organization's internal bylaws. *See, e.g.*, 140 S. Ct. at 1738 ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending the statutes outside the legislative process reserved for the people's representatives.").

[52] In fact, each year of their KKG membership, Plaintiffs signed the following: "I recognize that membership in Kappa Kappa Gamma offers me many benefits and the opportunity for friendship, mutual support, personal growth and intellectual development. I understand that the privilege of membership comes with great responsibility." ECF No. 6-1, at 163; *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023) (Gorsuch, J.) ("In *Dale*, the Boy Scouts offered what some might consider a unique experience.") (citing 530 U.S. at 649–50).

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 86 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 86
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 30 of 41

disagree with. Just as the Boy Scouts were "an expressive association" entitled to First

Amendment protection, so too is Kappa Kappa Gamma.[53] *See Dale*, 530 U.S. at 647–56,

650 ("It seems indisputable that an association that seeks to transmit such a system of

values engages in expressive activity."). The law, or this Court, may not interfere with –

whether promoting or discouraging – that speech. *Dale* controls today, interestingly with

the shoe on the other foot.[54] Whether excluding gay scoutmasters in *Dale* or including

transgender women in Kappa, this Judge may not invade Kappa's sacrosanct,

associational right to engage in protected speech. KKG's "official position" of admitting

transgender women, even if decreed by a mere "delegate", is speech which this Court

may not impinge. *See Dale*, 530 U.S. at 655; *Sebelius*, 723 F.3d at 1149 (Hartz, J.,

---

[53] *See Iota XI Chapter of the Sigma CHI Fraternity v. Paterson*, 538 F. Supp. 2d 915, 923 (E.D. Va. 2008), *aff'd on other grounds*, 566 F.3d 138 (4th Cir. 2009) (extrapolating *Dale* to find that "a college fraternity is no different from the Boy Scouts"); *see also Schultz v. Wilson*, 304 F. Appx. 116, 120 (3d Cir. 2008) (unpublished) ("A social group is not protected unless it engages in expressive activity such as taking a stance on an issue of public, political, social, or cultural importance.") (internal citation omitted). The 2018 *Guide* was obviously such a stance by KKG. Because this matter presents no governmental action, which, in part, distinguishes *Dale*, the Court sees no reason to conduct *Dale*'s three-step analysis regarding a group's expressive association claim. *See* 530 U.S. at 650–56.

[54] Plaintiffs do not engage with *Dale*. Had they, Plaintiffs would likely contend that the Fraternity Council's unilateral decision to admit transgender women violated the members' First Amendment rights because it "force[d] the organization to send a message . . . that [it] accepts" transgender women for KKG membership, belying their views. *See Dale*, 530 U.S. at 650; *see also Green v. Miss United States of Am., LLC*, 52 F.4th 773, 802 (9th Cir. 2022) (rejecting a transgender applicant's plea to "use the power of the state to force Miss United States of America to express a message contrary to what it desires to express"). *Dale*'s posture, however, lends little to Plaintiffs; there, the Court considered the constitutionality of a state's nondiscrimination law compelling expression, rather than a member's challenge to an expressive decision of their voluntary organization. *See also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984) (Brennan, J.) ("There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together.").

30

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 87 of 506
Appellate Case: 23-8065     Document: 010110962639     Date Filed: 12/04/2023     Page: 87
Case 2:23-cv-00051-ABJ     Document 31     Filed 08/25/23     Page 31 of 41

concurring). Notably, there are also two associational layers before the Court. Not only did KKG headquarters publish their willingness to accept transgender women in 2018, the UW chapter voted to associate with Langford in 2022. *See Dale*, 530 U.S. at 658 ("Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment.") (internal quotation and brackets omitted). Cognizant of Langford's gender identity, the UW chapter determined that she met *their* criteria for membership, including, *inter alia*, "integrity, respect, and regard for others"; KKG confirmed the same thereafter. ECF No. 6-1, at 6–7. Their decisions lie beyond the purview of this Court.

Plaintiffs respond that Kappa's freedom of expressive association does not insulate the organization from amendment of its own bylaws. I disagree, especially where Plaintiffs cannot point the Court to the bylaw that defines "woman" the way they wish. Of course, an organization binds itself via its bylaws.[55] Those bylaws state that a new Kappa "shall be a woman".[56] ECF No. 6-1, at 6. The parties diverge from there. Whereas Plaintiffs circumscribe "woman", their delegate augmented the same. *See* ECF No. 24, at 11. In the Court's view, that is a lawful interpretation – explicitly authorized per the sorority's *Standing Rules* – of an otherwise-silent bylaw. *See* ECF No. 6-1, at 119 ("The

---

[55] ECF No. 6-1, at 23 ("The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity.").

[56] The Court sees no reason to disturb the governance process by which the Fraternity Council published its *Position Statements* in 2021 and *FAQs* in 2022 ahead of KKG's biennial convention in 2022. Any issue that Plaintiffs raise with respect to KKG's putatively improper counting of the two-thirds vote necessary for bylaw amendment belong before the sorority, not this Court. *See also* ECF No. 6-1, at 24 (mandating a two-thirds convention vote to amend a KKG bylaw, sans any requirement regarding the Fraternity Council's method (*e.g.*, voice or written) of counting votes).

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 88 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 88
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 32 of 41

administrative duties of Fraternity Council shall include . . . [i]nterpreting the Fraternity *Bylaws* and *Standing Rules*[.]"). Plaintiffs' plea that the Court interpret "woman" as it was in 1870 clashes with this and other Courts' deference to organizational autonomy, or the notion that organizations deserve considerable latitude to interpret their own bylaws. For instance, the *Powell* court in Ohio spotlighted an exception to courts' general unwillingness to interfere with a voluntary association when "there has been some palpable violation of the constitution or laws of the corporation whereby [the member] has been deprived of valuable rights." 1978 WL 216074, at *4. Plaintiffs make no such showing. Instead, they ask this Court to overrule one interpretation and inject another. The Court refuses to do so.

Though an akin bylaw-interpretation, derivative challenge is non-existent, the Court's approach today, from a policy perspective, is practical. This Court cannot step in every time a member, or even multiple members, cries foul when a bylaw is disparately interpreted; if it did, KKG and its Fraternity Council would spend their days responding to derivative suits from their thousands of current members and 210,000 alumnae. *See also Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 13–cv–1054, 2013 WL 4401429, at *6 (S.D. Tex. Aug. 13, 2013) (noting that such interference would subject a non-profit, private organization to "frustration at every turn" and cause it "to founder in the waters of impotence and debility"). Our federal and state courts would similarly be overrun with disgruntled members challenging large organizations. Consider, also, that KKG supervises 140 chapters nationwide; reception of contested speech in today's climate will obviously vary. Finally, Plaintiffs' alternative recourse lies within their

32

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 89 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 89
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 33 of 41

chapter and organization, not this Court. An appeal to other chapters is one such route; disassociation, while drastic, is another.

In summary, the delegate of a private, voluntary organization, in pursuit of "inclusiv[ity]", broadened its interpretation of "woman". ECF No. 6-1, at 105. The Court will not interfere with its result, nor invade the organization's freedom of expressive association. Accordingly, this Court dismisses Count I.[57]

D. *Count II: Plaintiffs' Breach of Contract Claim.*

Plaintiffs fail to demonstrate any breach of contract. Plaintiffs allege KKG's breach of two contracts, including Plaintiffs': (1) membership contracts with KKG under Ohio law; and (2) housing contracts with KKG Building Co. under Wyoming law.[58] *See* ECF Nos. 24, at 14; 6-1, at 163, 165–76. Defendants respond that Plaintiffs do not allege any plausible breach of their housing contracts. *See* ECF Nos. 20, at 18; 26, at 7.

Defendants are correct on both contracts. I begin with Plaintiffs' membership contracts with KKG. Under Ohio law, "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (internal quotation omitted); *Tel. Mgmt. Corp. v. Goodyear Tire & Rubber Co.*, 32 F. Supp. 2d 960, 969 (N.D. Ohio 1998) ("A breach of contract is a failure without legal excuse to

---

[57] ECF No. 6, ¶¶ 159–67.
[58] Finding that KKG Building Co. was not a Fed. R. Civ. P. 19(a)(1)(B) required party within Section A. *supra*, the Court dismissed KKG Building Co. from this lawsuit.

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 90 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 90
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 34 of 41

perform any promise that forms a whole or a part of a contract.") (internal citation omitted). Entirely unalleged in their *Complaint*, Plaintiffs supplement that KKG's admission of Langford in the UW chapter house "created a breach of contract as to . . . the sorority experience[.]" *See* ECF No. 24, at 14. While Plaintiffs and KKG formed a membership contract and Plaintiffs appear to have performed, any demonstration of element (3) is absent; Plaintiffs fail to point the Court to any contractual breach by KKG. *See* ECF No. 6-1, at 163. The Court admits its confusion as to what contractual language KKG, in Plaintiffs' view, breached. *See id.*; *Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 728 (N.D. Ohio 2009) ("[W]here a contract is clear and unambiguous, the court need not ... go beyond the plain language of the agreement to determine the rights and obligations of the parties.") (internal quotation omitted). If anything, the membership contract primarily outlines Plaintiffs' obligations. *See id.* Plaintiffs make no effort to contend otherwise.[59] Giving effect to the membership contract before the Court, KKG undertook no contractual obligation to reject transgender women. Accordingly, Plaintiffs fail to allege a breach of their membership contracts.

Reverting to Wyoming law, I turn to Plaintiffs' housing contracts.[60] Here, a breach of contract claim consists of: (1) "'a lawfully enforceable contract;'" (2) "'an unjustified

---

[59] If Plaintiffs argue that KKG breached their membership contracts by redefining "woman" sans a bylaw amendment, they, similarly, fail to direct the Court to the contractual provision within their membership contracts that KKG allegedly violates. Even when liberally construing Plaintiffs' *Complaint* to incorporate an unpled breach of contract claim, the Court cannot do counsels' job for them.

[60] *See* ECF No. 6-1, at 173 ("This contract is made with reference to and shall be construed in accordance with the laws of Wyoming in which state it shall be performed by the parties.").

34

failure to timely perform all or any part of what is promised [*i.e.*, the breach];'" and (3)

'"entitlement of the injured party to damages."' *Peterson v. Meritain Health, Inc.*, 508

P.3d 696, 705 (Wyo. 2022) (quoting *Halling v. Yovanovich*, 391 P.3d 611, 616–17 (Wyo.

2017)) (internal brackets omitted). Plaintiffs allege that KKG breached their housing

contracts by allowing transgender women to live in the chapter house in violation of

KKG's governing documents. *See* ECF Nos. 6, ¶¶ 170–72; 24, at 14. Once again, though,

Plaintiffs fail to cite the Court to any explicit breach within the housing contracts; the

Court's analysis, thus, fails at element (2). ECF No. 6-1, at 165–76. As developed in

Section A. *supra*, the Court's review of the housing contract contradicts Plaintiffs. Within

those contracts, any obligations to comply with KKG's "*Bylaws, Standing Rules and

Policies* ('Fraternity standards')" were either undertaken by the UW chapter or Plaintiffs

themselves. *See, e.g., id.* at 166–67, 168 ("The student . . . shall, at all times, comply with

all . . . the Fraternity Standards. The student acknowledges that it is their responsibility to

seek out, read and understand . . . the Fraternity standards and they agree to follow the

same.").[61] Plaintiffs fail to show how KKG's receptive stance towards transgender

women "forms the whole or part of" their housing contracts. *See Reynolds v. Tice*, 595

P.2d 1318, 1323 (Wyo. 1979). Nowhere in the housing contracts do the parties contract

an obligation to "provide housing in accordance with" KKG's governing documents;

---

[61] Separately, KKG's bylaws state that *members* of KKG Building Co., described as "members
of the Fraternity", "shall agree to be bound by . . . the Fraternity *Bylaws, Standing Rules* and
*Policies*." *See* ECF No. 6-1, at 23–24.

Case 2:23-cv-00051-ABJ Document 47-4 Filed 02/28/25 Page 92 of 506
Appellate Case: 23-8065 Document: 010110962639 Date Filed: 12/04/2023 Page: 92
Case 2:23-cv-00051-ABJ Document 31 Filed 08/25/23 Page 36 of 41

Plaintiffs may not impose such an obligation on Defendants absent from those contracts.
ECF No. 6, ¶ 170.

Accordingly, the Court dismisses Count II.[62]

E. *Count III: Plaintiffs' Tortious Interference Claim.*

Plaintiffs also fail to allege any tortious interference of contract. Plaintiffs claim
that KKG[63] tortiously interfered with their housing contracts by inducting a transgender
woman in violation of KKG's governing documents. ECF No. 6, ¶¶ 173–75. Defendants
regurgitate that, without a breach of a housing contract, there can be no tortious
interference with that contract. *See* ECF No. 20, at 20.

I concur with Defendants. To show tortious interference with a contract, Plaintiffs
must allege: "(1) the existence of the contract; (2) the defendant's knowledge; (3)
intentional and improper interference *inducing or causing a breach*; and (4) resulting
damages." *First Wyo. Bank v. Mudge,* 748 P.2d 713, 715 (Wyo. 1998) (emphasis added)
(citing Restatement (Second) of Torts, § 766 (Am. Law. Inst. 1979)). Inseverable from
the Court's analyses above, Plaintiffs make no effort to demonstrate that KKG induced or
caused a breach or termination of their housing contracts. *See USI Ins. Servs. LLC v.
Craig,* No. 18-CV-79-F, 2019 WL 5295533, at *9–10 (D. Wyo. Apr. 9, 2019) (rejecting a

_____

[62] ECF No. 6, ¶¶ 168–72.

[63] The Court admits its confusion by Plaintiffs' usage, twice, of "Defendants" within Count III.
ECF No. 6, ¶ 175. However, because Plaintiffs use "Defendant Kappa Kappa Gamma" earlier in
that paragraph and fail to clarify, even when prompted, the error in their response, the Court
construes Count III as against solely KKG. *Id.; see* ECF Nos. 20, at 20 n.10; 24, at 17 ("Plaintiffs
do allege that Kappa Kappa Gamma Fraternity has tortiously interfered with their contractual
relationship with [KKG Building Co.]").

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 93 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 93
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 37 of 41

tortious interference claim where a plaintiff failed to show a breach of contract "[s]ince
the third element of this tort requires an underlying breach of a contract"); ECF No. 24, at
14–20. Plaintiffs fail to even attempt their burden. *See* ECF No. 24; *Gore v. Sherard*, 50
P.3d 705, 710 (Wyo. 2002) (internal citation omitted). Given Plaintiffs' failure to allege a
breach or termination by KKG, the Court need go no further.

Accordingly, the Court dismisses Count III.[64]

F. *Count IV: Plaintiffs' Direct Claim.*

Plaintiffs fail to allege a direct claim against Rooney. Count IV appears to allege
that Plaintiffs suffered direct injuries due to KKG and Rooney's admission of Langford.
ECF No. 6, ¶¶ 176–79. Defendants argue that Plaintiffs' contention that they suffered
"individual legal harm distinct" from their derivative claim on behalf of all Kappa
members is wanting. *See* ECF No. 20, at 20–22. Plaintiffs copy and paste allegations
within their *Complaint* in response. *Compare* ECF No. 24, at 16–17, *with* ECF No. 6, ¶
12.

Plaintiffs have not shown a special duty, nor a separate and distinct injury, to
sustain their direct claim. Unlike a derivative action filed on behalf of a corporation, a
shareholder may bring a direct action "against a director or officer[65] of the corporation
'(1) where there is a special duty, such as contractual duty, between the wrongdoer and
the shareholder, *and* (2) the shareholder suffered an injury separate and distinct from that

---

[64] ECF No. 6, ¶¶ 173–75.

[65] Though Plaintiffs appear to sue KKG and Rooney under Count IV, direct actions under Ohio
law are only sanctioned against a corporation's director or officer. *Cf.* ECF No. 6, ¶ 179.
Therefore, the Court solely considers Plaintiffs' direct claim against Rooney.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 94 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 94
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 38 of 41

suffered by other shareholders.'" *Morgan v. Ramby*, Nos. CA2010–10–095, CA2010–10–101, 2012 WL 626209, at *4 (12th Dist. Feb. 27, 2012) (quoting *Herman's, Inc. v. Sach–Dolmar Div.*, 87 Ohio App. 3d 74, 77 (9th Dist. 1993)) (emphasis in original); *see also Heaton v. Rohl*, 193 Ohio App. 3d 770, 782 (11th Dist. 2011) (noting that a shareholder may bring a direct action where they demonstrate a special duty *or* a separate and distinct injury) (internal citation omitted).

First, Plaintiffs do not allege a special duty. Injury flowing "from a breach of corporate fiduciary duty" – as Plaintiffs briefly allude to – "amounts to nothing more than loss of the [non-profit corporation's] value, which is an injury shared in common with all other stockholders," or here, KKG members nationwide, and should be brought as a derivative action. *See* ECF No. 24, at 16; *Barr v. Lauer*, No. 87514, 2007 WL 117502, at *2 (8th Dist. Jan. 18, 2007); *Carlson*, 152 Ohio App. 3d at 679 ("As a general proposition, claims for breach of fiduciary duties on the part of corporate directors or officers are to be brought in derivative suits."); *see also Weston v. Weston Paper & Mfg. Co.*, 74 Ohio St. 3d 377, 379 (Ohio 1996) (rejecting plaintiffs' argument that breach-of-fiduciary-duties claims against corporate directors should be allowed as a direct action in the absence of injury separate and distinct from the corporation). Moreover, for reasons articulated in Section C. above, Plaintiffs have not shown that Rooney breached any fiduciary duty to Plaintiffs by interpreting "woman" expansively.

Second, they also do not demonstrate a separate and distinct injury. Plaintiffs allege that their "loss of privacy, frustration of contractual expectations, and emotional distress" from Langford's induction are unique injuries. ECF No. 6, ¶ 179. However,

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 95 of 506
Appellate Case: 23-8065   Document: 010110962639   Date Filed: 12/04/2023   Page: 95
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 39 of 41

Plaintiffs sue Rooney, not their sorority sister; thus, only their frustrated contractual expectations merit consideration. Under Plaintiffs' theory, Rooney's actions contravene their pre-rush intent to join an organization that excludes transgender women. Yet, injury, if any, from Rooney's purported orchestration of Langford's admission inured to all KKG members alike, whether in Laramie or beyond, not merely Plaintiffs. In other words, Plaintiffs' putative injury – association with a transgender woman – technically affected all KKG members. Therefore, Plaintiffs' claims at bar, forgoing their determined unviability, belong as a derivative suit rather than a direct action. *See Grand Council of Ohio v. Owens*, 86 Ohio App. 3d 215, 220 (10th Dist. 1993) (determining that plaintiffs brought a derivative claim by "look[ing] to the nature of the alleged wrong rather than the designation used by plaintiffs"). Therefore, Plaintiffs fail to plead a special duty, nor a separate and distinct injury, to sustain their direct claim.

Accordingly, the Court dismisses Count IV.[66]

G. *Dismissal without Prejudice and Langford's* Motion to Dismiss *(ECF No. 22).*

Finally, Defendants argue that the Court should dismiss Plaintiffs' claims with prejudice. *See, e.g.*, ECF Nos. 20, at 22; 26, at 10. "'[A] dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'" *Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022) (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (internal citation omitted)) (emphasis in original) (brackets omitted). Defendants make no effort to

---

[66] ECF No. 6, ¶¶ 176–79.

39

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 96 of 506
Appellate Case: 23-8065    Document: 010110962639    Date Filed: 12/04/2023    Page: 96
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 40 of 41

argue futility and do not otherwise explain why dismissal with prejudice is appropriate; accordingly, the Court will dismiss Plaintiffs' claims without prejudice.[67]

Furthermore, due to the Court's dismissal today of Plaintiffs' four claims, the Court also dismisses Langford's *Motion to Dismiss* (ECF No. 22) as moot.[68]

## CONCLUSION

For the foregoing reasons, Plaintiffs' four claims fail. Pursuant to Fed. R. Civ. P. 12(b)(1), Defendant KKG Building Co. is dismissed. Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' four claims against Defendants KKG and Rooney are dismissed without prejudice.

Therefore, IT IS **HEREBY ORDERED** that Defendants', Kappa Kappa Gamma, Rooney, and KKG Building Co., *Motion to Dismiss* (ECF No. 19) is **GRANTED**.

---

[67] If Plaintiffs wish to amend their complaint, the Court advises Plaintiffs that they devote more than 6% of their complaint to their legal claims against Defendants. It also counsels Plaintiffs to provide more factual detail, where feasible, as well as highlight the Defendant(s) it sues under each count and relevant state statutes and authority. Finally, if provided another opportunity to clarify unclear language within an amended complaint, Plaintiffs should not copy and paste their complaint in lieu of elaboration or legal research that assists the Court in disentangling their claims. *See, e.g.*, ECF No. 24, at 14, 16–19.

[68] Langford moves to dismiss herself because, *inter alia*, she is not a Fed. R. Civ. P. 19(a)(1)(B) required party. *See* ECF Nos. 23, at 4; 27, at 2, 4. Plaintiffs respond: "if Langford stipulates that [s]he is not a required party, Plaintiffs would support h[er] dismissal." ECF No. 25, at 13 n.4. Langford did not reply. ECF No. 27. Without addressing the substance of Langford's motion, the Court notes the irrelevancy of Langford's alleged behavior. The crux of Plaintiffs' lawsuit is their derivative claim against Rooney and contractual claims against KKG. Unbefitting in federal court, Langford's unsubstantiated behavior at the UW chapter house has no bearing on Plaintiffs' legal claims. The Court, however, acknowledges that Plaintiffs' requested relief seeks to void Langford's KKG membership.

Furthermore, IT IS **HEREBY ORDERED** that Plaintiffs' *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* (ECF No. 6) against Defendants is **DISMISSED WITHOUT PREJUDICE**.

Finally, IT IS **HEREBY ORDERED** that Defendant Langford's *Motion to Dismiss with Prejudice* (ECF No. 22) is **DISMISSED AS MOOT**.

IT IS **SO ORDERED**.

Dated this 25th day of August, 2023.

Alan B. Johnson
United States District Judge

41

No. 23-8065

# In the United States Court of Appeals for the Tenth Circuit

JAYLYN WESTENBROEK, ET AL.,

*Plaintiffs-Appellants*,

v.

KAPPA KAPPA GAMMA FRATERNITY, AN OHIO NON-PROFIT CORPORATION AS NOMINAL DEFENDANT AND AS A DIRECT DEFENDANT, ET AL.,

*Defendants-Appellees*,

ARTEMIS LANGFORD,

*Defendant*.

On Appeal from the United States District Court for the District of Wyoming
No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson

## APPELLANTS' APPENDIX IN SUPPORT OF BRIEF
## VOLUME 1 OF 2

GENE C. SCHAERR
CRISTINA MARTINEZ SQUIERS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

SYLVIA MAY MAILMAN
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
s.maymailman@gmail.com

JOHN KNEPPER
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
John@KnepperLLC.com

CASSIE CRAVEN
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
cassie@longhornlawllc.com

*Counsel for Plaintiffs-Appellants*

DECEMBER 4, 2023

## INDEX OF DOCUMENTS

| ECF NO. | DATE | DOCUMENT | VOL. | APP. PAGES |
|---|---|---|---|---|
| | | **VOLUME I** | | |
| | | Docket Report, *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 2:23-cv-00051-ABJ (D. Wyo.) | 1 | 1–8 |
| 6 | 04/20/23 | First Am. Verified Member Derivative Compl. for Breach of Fiduciary Duties (04/20/23) | 1 | 9–80 |
| 6-1 | 04/20/23 | Attach. 1 to First Am. Compl.: Bylaws of Kappa Kappa Gamma Fraternity (Rev'd 09/22) | 1 | 81–110 |
| 6-1 | 04/20/23 | Attach. 2 to First Am. Compl.: Kappa Kappa Gamma Fraternity, Guide for Supporting Our LGBTQIA+ Members (2018) | 1 | 111–123 |
| 6-1 | 04/20/23 | Attach. 3 to First Am. Compl.: Ltr. Natalie M. McLaughlin, Legal Counsel to Kappa Kappa Gamma Fraternity, Inc. to Attorneys John G. Knepper & Cassie Craven Re: Response to Litigation Threat (11/15/22) | 1 | 124–127 |
| 6-1 | 04/20/23 | Attach. 4 to First Am. Compl.: Kappa Kappa Gamma Fraternity Articles of Incorporation, State of Ohio (07/26/30) & Restated Articles of Incorporation, State of Ohio (07/28/04) | 1 | 128–136 |
| 6-1 | 04/20/23 | Attach. 5 to First Am. Compl.: Kappa Kappa Gamma Fraternity Report of Bylaws Committee, Notice of Amendment to Bylaws & Bylaws Revision (03/22) | 1 | 137–166 |
| 6-1 | 04/20/23 | Attach. 6 to First Am. Compl.: Kappa Kappa Gamma Fraternity Bylaws and Standing Rules Revisions 2022: FAQs | 1 | 167–187 |

| ECF NO. | DATE | DOCUMENT | VOL. | APP. PAGES |
|---|---|---|---|---|
| 6-1 | 04/20/23 | Attach. 7 to First Am. Compl.: Standing Rules of Kappa Kappa Gamma Fraternity (rev'd 2022) | 1 | 188–218 |
| 6-1 | 04/20/23 | Attach. 8 to First Am. Compl.: Policies of Kappa Kappa Gamma Fraternity (adopted 02/23) | 1 | 219–241 |
| 6-1 | 04/20/23 | Attach. 9 to First Am. Compl.: Kappa Kappa Gamma Fraternity, Membership Commitment | 1 | 242–243 |
| 6-1 | 04/20/23 | Attach. 10 to First Am. Compl.: Gamma Omicron, Kappa Kappa Gamma Fraternity, Univ. of Wyo., Live-In House Contract (Fall 2022/Spring 2023) | 1 | 244–256 |
| 6-1 | 04/20/23 | Attach. 11 to First Am. Compl.: Ltr. from Attorneys John G. Knepper & Cassie Craven to Kappa Kappa Gamma Re: Kappa Kappa Gamma–Initiation of a Non-Woman, Artemis Langford (11/04/22) | 1 | 257–260 |
| 6-1 | 04/20/23 | Attach. 12 to First Am. Compl.: Kappa Kappa Gamma Fraternity Position Statements | 1 | 261–263 |
| 6-1 | 04/20/23 | Attach. 13 to First Am. Compl.: Kappa Kappa Gamma Fraternity, Gamma Omicron Chapter Standing Rules | 1 | 264–278 |
| 6-1 | 04/20/23 | Attach. 14 to First Am. Compl.: Kappa Kappa Gamma, Gamma Omicron Chapter Bylaws | 1 | 279–289 |
| **VOLUME II** | | | | |
| 19 | 06/20/23 | Defs. Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss Pls.' First Am. Verified Member Derivative Compl. | 2 | 1–3 |
| 20 | 06/20/23 | Mem. in Support of Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss Pls.' First Am. Verified Member Derivative Compl. | 2 | 4–33 |

| ECF NO. | DATE | DOCUMENT | VOL. | APP. PAGES |
|---|---|---|---|---|
| 24 | 07/05/23 | Pls.' Resp. in Opp'n to Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss | 2 | 34–54 |
| 26 | 07/12/23 | Reply In Support of Defs.' Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss | 2 | 55–66 |
| 31 | 08/25/23 | Order Granting Defs.' Mot. to Dismiss (ECF No. 19), Dismissing, Without Prejudice, Pls.' First Am. Verified Member Derivative Compl. for Breach of Fiduciary Duties (ECF No. 6), and Dismissing as Moot Def. Artemis Langford's Mot. to Dismiss (03/03/23) (Hon. Alan B. Johnson, U.S. District Judge) | 2 | 67–107 |
| 32 | 09/25/23 | Notice of Appeal | 2 | 108–110 |

Query    Reports ∎    Utilities ∎    Help    Log Out

APPEAL

# U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: 2:23-cv-00051-ABJ

Westenbroek et al v Kappa Kappa Gamma Fraternity et al
Assigned to: Honorable Alan B Johnson
Referred to: Honorable Kelly H Rankin
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 03/27/2023
Jury Demand: Both
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Jane Doe I**
*individually and*
*TERMINATED: 04/20/2023*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
LONGHORN LAW LLC
PO Box 1769
Cheyenne, WY 82003
307/823-3062
Email: ccraven.law@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
LAW OFFICE OF JOHN G KNEPPER LLC
Post Office Box 1512
Cheyenne, WY 82003
307-632-2842
Email: John@KnepperLLC.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe II**
*individually and*
*TERMINATED: 04/20/2023*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe III**
*individually and*
*TERMINATED: 04/20/2023*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**APP.001**

**Jane Doe IV**
*individually and*
*TERMINATED: 04/20/2023*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe V**
*individually and*
*TERMINATED: 04/20/2023*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe VI**
*individually and*
*TERMINATED: 04/20/2023*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe VII**
*individually and*
*TERMINATED: 04/20/2023*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jaylyn Westenbroek**
*individually and derivatively*
*on behalf of*
Kappa Kappa Gamma Fraternity

represented by **Casandra A Craven**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G Knepper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**APP.002**

**Hannah Holtmeier**                                    represented by    **Casandra A Craven**
*individually and derivatively*                                          (See above for address)
*on behalf of*                                                           *LEAD ATTORNEY*
Kappa Kappa Gamma Fraternity                                             *ATTORNEY TO BE NOTICED*

                                                                         **John G Knepper**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allison Coghan**                                      represented by    **Casandra A Craven**
*individually and derivatively*                                          (See above for address)
*on behalf of*                                                           *LEAD ATTORNEY*
Kappa Kappa Gamma Fraternity                                             *ATTORNEY TO BE NOTICED*

                                                                         **John G Knepper**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grace Choate**                                       represented by    **Casandra A Craven**
*individually and derivatively*                                          (See above for address)
*on behalf of*                                                           *LEAD ATTORNEY*
Kappa Kappa Gamma Fraternity                                             *ATTORNEY TO BE NOTICED*

                                                                         **John G Knepper**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Madeline Ramar**                                     represented by    **Casandra A Craven**
*individually and derivatively*                                          (See above for address)
*on behalf of*                                                           *LEAD ATTORNEY*
Kappa Kappa Gamma Fraternity                                             *ATTORNEY TO BE NOTICED*

                                                                         **John G Knepper**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Megan Kosar**                                        represented by    **Casandra A Craven**
*individually and derivatively*                                          (See above for address)
*on behalf of*                                                           *LEAD ATTORNEY*
Kappa Kappa Gamma Fraternity                                             *ATTORNEY TO BE NOTICED*

                                                                         **John G Knepper**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

V.

**APP.003**

**Defendant**

**Kappa Kappa Gamma Fraternity**
*an Ohio non-profit corporation, as a Nominal*
*and Direct Defendant*

represented by **Brian W. Dressel**
VORYS SATER SEYMOUR AND PEASE
LLP
52 E. Gay Street
Columbus, OH 43215
614-464-8326
Fax: 614-719-5241
Email: bwdressel@vorys.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott P Klosterman**
WILLIAMS PORTER DAY & NEVILLE
159 North Wolcott, Suite 400
P O Box 10700
Casper, WY 82602
307/265-0700
Fax: 307/266-2306
Email: sklosterman@wpdn net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Natalie Marie McLaughlin , I**
VORYS SATER SEYMOUR AND PEASE
LLP
52 East Gay Street
Columbus, OH 43215
614-464-5452
Fax: 614-719-5252
Email: nmmclaughlin@vorys.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kappa Kappa Gamma Fraternity Council**
**President**
*in her official capacity*
*also known as*
Mary Pat Rooney

represented by **Brian W. Dressel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott P Klosterman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Natalie Marie McLaughlin , I**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kappa Kappa Gamma Building Co**
*a Wyoming non-profit corporation*
*TERMINATED: 08/25/2023*

represented by **Brian W. Dressel**
(See above for address)
*LEAD ATTORNEY*

**APP.004**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott P Klosterman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Natalie Marie McLaughlin , I**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Terry Smith**
*TERMINATED: 04/20/2023*

**Defendant**

**Artemis Langford**                          represented by   **Rachel M Berkness**
                                                              FREEBURG LAW
                                                              235 E BROADWAY AVE #103
                                                              Jackson, WY 83001
                                                              307-223-8612
                                                              Email: rachel@tetonattorney.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/27/2023 | 1 | VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES WITH JURY DEMAND filed by Jane Doe IV, Jane Doe III, Jane Doe I, Jane Doe II, Jane Doe V, Jane Doe VI, Jane Doe VII. (Filing fee $402 Receipt #CHY 2-1291) (Attachments: # 1 Continuation of Document #1 (Complaint and Attachments), # 2 Civil Cover Sheet, # 3 Consent to Proceed Before US Magistrate Judge) (Court Staff, szf) (Entered: 03/28/2023) |
| 03/27/2023 | 2 | ~~Motion Referred to Magistrate Judge~~ MOTION to Proceed Anonymously filed by Plaintiffs Jane Doe I, Jane Doe II, Jane Doe III, Jane Doe IV, Jane Doe V, Jane Doe VI, Jane Doe VII. (Court Staff, szf) Modified docket text on 3/28/2023 (Court Staff, szf). Modified docket text on 3/29/2023 (Court Staff, szf). Modified on 3/29/2023 to unrefer motion (Court Staff, ssw). Modified on 3/29/2023 (Court Staff, sbh). (Entered: 03/28/2023) |
| 03/29/2023 |  | Motions No Longer Referred: 2 MOTION for Order Proceed Anonymously (Court Staff, ssw) (Entered: 03/29/2023) |
| 04/06/2023 | 3 | ORDER by the Honorable Alan B. Johnson denying 2 Motion to Proceed Anonymously. The Court grants Plaintiffs leave until April 20, 2023, to file an amended complaint that substitutes Plaintiffs' real names. (Court Staff, sbh) (Entered: 04/06/2023) |
| 04/07/2023 | 4 | Renewed MOTION to Proceed Anonymously filed by Plaintiffs Jane Doe IV, Jane Doe III, Jane Doe I, Jane Doe II, Jane Doe V, Jane Doe VI, Jane Doe VII (Craven, Casandra) (Additional attachment(s) added on 4/7/2023: # 2 Proposed Order) (Court Staff, sbh). Removed restriction and modified event and text on 4/7/2023 (Court Staff, sbh). (Additional attachment(s) added on 4/7/2023: # 1 Replaced Document - Renewed Motion) (Court Staff, stmo). (Unable to open original pleading. Pleading replaced on on 4/7/2023 and Modified text on 4/7/2023. (Court Staff, stmo). Attachments renamed on 4/7/2023. (Court Staff, szf) Modified text on 4/7/2023 (Court Staff, stmo). (Entered: 04/07/2023) |

| 04/14/2023 | 5 | ORDER by the Honorable Alan B. Johnson denying 4 Renewed Motion to Proceed Anonymously. In accordance with this Court's prior Order, the Court grants Plaintiffs leave until April 20, 2023, to file an amended complaint that substitutes Plaintiffs' real names. (Court Staff, sbh) (Entered: 04/14/2023) |
|---|---|---|
| 04/20/2023 | 6 | AMENDED COMPLAINT with Jury Demand *Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar and Megan Kosar on behalf of themselves and derivatively on behalf of Kappa Kappa Gamma Fraternity* against Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President, Terry Smith filed by Jane Doe IV, Jane Doe III, Jane Doe I, Jane Doe II, Jane Doe V, Jane Doe VI, Jane Doe VII. (Attachments: # 1 Exhibit Attachments) (Knepper, John) (Entered: 04/20/2023) |
| 04/21/2023 | 7 | Praecipes for Summons filed by Plaintiffs Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar, Jaylyn Westenbroek, 4 issued (Court Staff, sbh) (Entered: 04/21/2023) |
| 04/21/2023 | 8 | WAIVER OF SERVICE Returned Executed by Grace Choate, Jaylyn Westenbroek, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Artemis Langford 4/21/2023, answer due 6/20/2023 (Knepper, John) (Entered: 04/21/2023) |
| 04/25/2023 | 9 | WAIVER OF SERVICE Returned Executed by Jaylyn Westenbroek, Grace Choate, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Kappa Kappa Gamma Fraternity 4/21/2023, answer due 6/20/2023 (Knepper, John) Modified filers and text on 4/26/2023 (Court Staff, stmo). Corrected filers and text on 4/27/2023 (Court Staff, sbh). (Entered: 04/25/2023) |
| 04/25/2023 | 10 | WAIVER OF SERVICE Returned Executed by Jaylyn Westenbroek, Grace Choate, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Kappa Kappa Gamma Fraternity Council President 4/21/2023, answer due 6/20/2023 (Knepper, John) Modified filers and text on 4/26/2023 (Court Staff, stmo). Corrected filers and text on 4/27/2023 (Court Staff, sbh). (Entered: 04/25/2023) |
| 04/25/2023 | 11 | WAIVER OF SERVICE Returned Executed by Jaylyn Westenbroek, Grace Choate, Madeline Ramar, Allison Coghan, Megan Kosar, Hannah Holtmeier. Kappa Kappa Gamma Building Co 4/21/2023, answer due 6/20/2023 (Knepper, John) Modified filers and text on 4/26/2023 (Court Staff, stmo). Corrected filers and text on 4/27/2023 (Court Staff, sbh). (Entered: 04/25/2023) |
| 06/05/2023 | 12 | NOTICE of Attorney Appearance by Scott P Klosterman on behalf of Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President (Klosterman, Scott) (Entered: 06/05/2023) |
| 06/05/2023 | 13 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Natalie M. McLaughlin to appear pro hac vice; Check not tendered; filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Klosterman, Scott) (Entered: 06/05/2023) |
| 06/05/2023 | 14 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Brian W. Dressel to appear pro hac vice; Check not tendered; filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Klosterman, Scott) (Entered: 06/05/2023) |
| 06/05/2023 | 15 | ORDER by the Honorable Kelly H. Rankin granting 13 , 14 MOTIONS for Natalie M. McLaughlin and Brian W. Dressel to appear pro hac vice on behalf of Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity Council President, Kappa Kappa Gamma Fraternity (Order emailed to phv counsel on this date) (Court Staff, sbh) (Entered: 06/05/2023) |
| 06/07/2023 | 16 | Notice of Pro Hac Vice Attorney Appearance by Natalie Marie McLaughlin, I on behalf of Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President (McLaughlin, Natalie) (Entered: 06/07/2023) |
| 06/08/2023 | 17 | Notice of Pro Hac Vice Attorney Appearance by Natalie Marie McLaughlin, I on behalf of Kappa Kappa Gamma Building Co (McLaughlin, Natalie) (Entered: 06/08/2023) |

**APP.006**

| | | |
|---|---|---|
| 06/08/2023 | | FINANCIAL ENTRY: $100 PRO HAC VICE FEES PAID ON BEHALF OF NATALIE M. MCLAUGHLIN AND BRIAN W. DRESSEL ($200 RECEIVED RECEIPT NO. 2-1633) (Court Staff, stmo) (Entered: 06/08/2023) |
| 06/09/2023 | 18 | NOTICE of Pro Hac Vice Attorney Appearance by Brian W. Dressel on behalf of Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President (Dressel, Brian) Modified text on 6/9/2023 (Court Staff, stmo). (Entered: 06/09/2023) |
| 06/20/2023 | 19 | MOTION to Dismiss filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (McLaughlin, Natalie) (Entered: 06/20/2023) |
| 06/20/2023 | 20 | MEMORANDUM in Support of 19 Motion to Dismiss filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (McLaughlin, Natalie) (Entered: 06/20/2023) |
| 06/20/2023 | 21 | NOTICE of Attorney Appearance by Rachel M Berkness on behalf of Artemis Langford (Berkness, Rachel) (Entered: 06/20/2023) |
| 06/20/2023 | 22 | MOTION to Dismiss Party Artemis Langford filed by Defendant Artemis Langford. (Berkness, Rachel) (Entered: 06/20/2023) |
| 06/20/2023 | 23 | MEMORANDUM in Support of 22 Motion to Dismiss Party filed by Defendant Artemis Langford. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Supplement, # 4 Supplement) (Berkness, Rachel) (Attachment 1 and Attachment 2 flattened and replaced on 6/21/2023) (Court Staff, stmo). Modified text on 6/21/2023 (Court Staff, stmo). (Entered: 06/20/2023) |
| 07/05/2023 | 24 | First RESPONSE in Opposition re 19 MOTION to Dismiss filed by Plaintiffs Jaylyn Westenbroek, Madeline Ramar, Megan Kosar, Hannah Holtmeier, Allison Coghan and Grace Choate. (Knepper, John) Modified text and filers on 7/6/2023 (Court Staff, sjlg). (Entered: 07/05/2023) |
| 07/05/2023 | 25 | First RESPONSE in Opposition re 22 MOTION to Dismiss Party Artemis Langford filed by Plaintiffs Jaylyn Westenbroek, Madeline Ramar, Megan Kosar, Hannah Holtmeier, Allison Coghan and Grace Choate. (Knepper, John) Modified filers and text on 7/6/2023 (Court Staff, sjlg). (Entered: 07/05/2023) |
| 07/12/2023 | 26 | REPLY to 24 Response in Opposition to Motion filed by Defendants Kappa Kappa Gamma Building Co, Kappa Kappa Gamma Fraternity, Kappa Kappa Gamma Fraternity Council President. (Dressel, Brian) (Entered: 07/12/2023) |
| 07/12/2023 | 27 | REPLY to 25 Response in Opposition to Motion *to Dismiss with Prejudice* filed by Defendant Artemis Langford. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit) (Berkness, Rachel) (Entered: 07/12/2023) |
| 07/27/2023 | 28 | Notice requiring Defendants Kappa Kappa Gamma Fraternity to Submit a Disclosure Statement in accordance with Fed.R.Civ.P. 7.1(b). Disclosure Statement Due: July 31, 2023. (Court Staff, szf) (Entered: 07/27/2023) |
| 07/28/2023 | 29 | CORPORATE DISCLOSURE filed by Kappa Kappa Gamma Building Co. (McLaughlin, Natalie) (Entered: 07/28/2023) |
| 07/28/2023 | 30 | CORPORATE DISCLOSURE filed by Kappa Kappa Gamma Fraternity. (McLaughlin, Natalie) (Entered: 07/28/2023) |
| 08/25/2023 | 31 | ORDER by the Honorable Alan B. Johnson granting 19 Motion to Dismiss, dismissing without prejudice 6 Amended Complaint, dismissing as moot 22 Motion to Dismiss Party. Plaintiffs' claims fail. Pursuant to Fed. R. Civ. P. 12(b)(1), Defendant KKG Building Co is dismissed. Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' four claims against Defendants KKG and Rooney are dismissed without prejudice. (Court Staff, sbh) Modified text on 8/25/2023 (Court Staff, sbh). Modified to Opinion document type on 8/28/2023 (Court Staff, sbh). (Entered: 08/25/2023) |

| 09/25/2023 | 32 | NOTICE OF APPEAL as to 31 Order on Motion to Dismiss,,, Order on Motion to Dismiss Party,, filed by Plaintiffs Grace Choate, Allison Coghan, Hannah Holtmeier, Megan Kosar, Madeline Ramar, Jaylyn Westenbroek. (Attachments: # 1 Exhibit 1) (Craven, Casandra) (Entered: 09/25/2023) |

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| JAYLYN WESTENBROEK, HANNAH HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, <br><br> Plaintiffs, <br><br> v. <br><br> KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, <br><br> Defendants. | **DEMAND FOR JURY TRIAL** <br><br> **FIRST AMENDED VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES** <br><br> CASE NO. 2:23-cv-00051-ABJ |

## FIRST AMENDED VERIFIED COMPLAINT

### INTRODUCTION

1.      Plaintiffs are young women and members of Kappa Kappa Gamma Fraternity, a national

women-only social organization with a chapter at the University of Wyoming (also called "the

Sorority" ).[1] Four months ago—after national Sorority officials disregarded the secret voting

---

[1] Founded in 1870, Kappa Kappa Gamma Fraternity pre-dates, by 30 years, use of the word "sorority" to refer to "[a] women's society in a college or university." *Sorority*, Oxford English Dictionary Online (Mar. 2023). Kappa Kappa Gamma's corporate documents refer to the entity as a fraternity. Modern usage distinguishes between "fraternities" for men and "sororities" for women, so this Complaint refers to Kappa Kappa Gamma as "the Sorority" and similar organizations as "sororities." This is consistent with Kappa Kappa Gamma's own publications.

process required by Sorority rules and after extensive behind-the-scenes direction from national Sorority officials and alumnae advisers—the Sorority inducted a man, Artemis Langford, as a member.[2]

2.      Kappa Kappa Gamma limits membership to women only. Under the Sorority's Bylaws, every new member must be "a woman." Attachment 1 at 2 (art. III, sec. 1.A). A woman is an adult human female. An adult human *male* is not a woman, no matter how he chooses to describe himself. From conception, every single cell in a man's body differs from the analogous cell in a woman: brain cells, muscle cells, bone cells. These cells mature and develop in different ways—before, during, and after puberty—for reasons that are still not fully understood. As but one example, medical researchers know testosterone affects the male brain through the mid-20s, but they still do not understand how the hormone affects cognition.

3.      Kappa Kappa Gamma was founded in 1870 as a single-sex organization for women, and it has consistently described itself as such. Defendants have not altered this membership requirement in *any* of the Sorority's corporate governance documents—its Articles of Incorporation, Bylaws, Standing Rules or Policies—in a manner that would permit a man to join Kappa Kappa Gamma. Instead, Defendant Mary Pat Rooney and other members of the Corporation's Fraternity Council (the Sorority's name for its Board of Directors) have unilaterally concluded a man can become a

---

*See*, *e.g.*, "Why Kappa: Membership Expectations" *available at* kappakappagamma.org/why-kappa/ membership-expectations (visited Feb. 2, 2023) ("Joining a sorority can provide you with support, connection, friendship, and growth that starts now and lasts a lifetime.")

[2] Plaintiffs do not seek damages or other relief from Langford. Plaintiffs allege that Langford's sorority membership is void, however, and this likely makes him a required party. Fed. R. Civ. P. 19(a)(1)(B). Langford is a Defendant for this reason only.

Kappa member if he claims to have the subjective belief he is a woman. This conclusion disregards biology, Kappa's 150-year history, and Kappa's purpose, mission, and bylaws.

4.    Kappa Kappa Gamma is an Ohio non-profit corporation, so Defendant Mary Pat Rooney and the other members of the Sorority's Fraternity Council (its Board of Directors) have fiduciary duties to the Sorority under Ohio law. At all times relevant to this matter, Defendant Rooney has owed Kappa Kappa Gamma and its members the fiduciary obligations of good faith, loyalty, candor, care, and compliance. She has a fiduciary duty to operate Kappa Kappa Gamma in an honest, fair, and just manner that is faithful to the nonprofit corporation's purpose and mission.

5.    Defendant Rooney and the members of Kappa Kappa Gamma's Fraternity Council have violated their fiduciary duties. At their direction, the Sorority issued a "Guide for Supporting our LGBTQIA+ Members" in 2018. Attachment 2 (the "Guide"). The Guide was sent to the Sorority's District Directors and Alumnae Advisers—women who supervise the Sorority's college chapters—and posted on the Sorority's website as "a resource that educates and supports our membership on the subject of the LGBTQIA+ community and its intersection with Kappa." The Guide states, without citation to any of the Sorority's Bylaws or other governing documents, that Kappa Kappa Gamma is a "single gender organization" that admits both "women" and "individuals who identify as women" (*i.e.*, men). *Id.* at 1.

6.    The commonly understood meaning of the phrase "single-gender organization" is the same as "single-sex organization": men or women, but not both. *See* Gender, Oxford English Dictionary Online (Mar. 2023) ("Males or females viewed as a group; = sex"). Under the Guide, however, "gender" is no longer a synonym for "sex." Instead, as the Sorority's attorney explained to Plaintiffs, the Fraternity Council views gender as a "broader construct encompassing identity."

Attachment 3 at 1. This concept of gender connects to "[h]ow an individual defines themselves in terms of characteristics traditionally identified in this culture as male or female," which is a person's "gender identity." Attachment 2 at 1, 9. As a result, the Sorority's attorney claims that men can also become Kappa members if they "identify as women." *Id.* at 1.

7.      Kappa cannot be a "single-gender organization" wherein members have a "single" gender identity unless the Sorority uses gender identity to make membership decisions.[3] But the Guide itself states that the Sorority does not discriminate based on gender identity. *Id.* at 1 ("Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on … gender identity…."). *Id.* What the Guide actually purports to do is change the Sorority's membership criteria. Under the Guide, all women—including, for example, nonbinary women who do not have a female gender identity—can become members. And, under the Guide, some men can also join.

8.      The Guide is an unlawful abandonment of the Sorority's requirement of single-sex membership. Kappa Kappa Gamma's founding principles and governance documents limit membership to women. An adult human male does not become a woman just because he tells others that he has a female 'gender identity' and behaves in what he believes to be a stereotypically female manner. In the same way, an adult human female does not cease to be a woman just because she refuses to dress or behave in a feminine manner. Defendant Rooney and the Fraternity Council members cannot, consistent with their fiduciary duties, twist the Sorority's longstanding

---

[3] The Guide describes the concept of "gender" as "more accurately viewed as a spectrum rather than a polarized, dichotomous concept." Attachment 2 at 11. If each person's gender lies somewhere along a spectrum, then one can never sort individuals into a "single gender." It is impossible for Kappa Kappa Gamma to be a "single-gender organization" under the Guide's own definition of gender.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 114 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 17
Case 2:23-cv-00051-ABJ    Document 6    Filed 04/20/23    Page 5 of 72

membership requirement to conflate being female (being a woman) with femininity (acting like one believes a woman 'should').

9.      The Guide purports to create an opportunity for men to join Kappa Kappa Gamma in violation of the Sorority's longstanding restriction. By creating the Guide, and intentionally admitting a man as a Sorority member, Defendant Rooney and the other Fraternity Council members have violated their duty of loyalty, their duty of care, and their duty of obedience/compliance to the Sorority and its purpose and mission.

10.     Since 1870—when a woman's presence in a college classroom, by itself, defied societal norms—Kappa Kappa Gamma has united women in defiance of stereotypes about how women "should" be. The Sorority provides a separate place where young women can speak for themselves; a place where young women do not have to constantly fight the social pressure of how men think women should behave. Now, Langford—a man who claims to be a woman because he thinks he knows how women should behave—has been brought into Plaintiffs' sorority house. The Fraternity Council has betrayed the central purpose and mission of Kappa Kappa Gamma, by conflating the experience of *being a woman* with the experience of men *engaging in behavior generally associated with women*.

11.     Plaintiffs' Complaint is a derivative suit to obtain a judgment that Kappa Kappa Gamma remains as required by its Articles of Incorporation: a non-profit corporation "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4 (emphasis added). Plaintiffs ask this Court to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules

by fiat, and ask this Court to enjoin the unlawful implementation of the Guide. Plaintiffs ask this

Court to hold that the admission of Artemis Langford, and any other man, as a member of Kappa

Kappa Gamma is void *ab initio*. Plaintiffs further ask this Court to declare that Defendant Rooney

and the other members of the Fraternity Council have violated their fiduciary duties to the Sorority.

Plaintiffs further ask for damages, reflecting the injuries the Sorority has and will continue to suffer

in its membership, including the closure of the Sorority's chapter at the University of Wyoming,

loss of donations, decrease in *alumnae* support and participation, and permanent damage to the

Sorority's reputation and mission.

12.    Plaintiffs also seek direct relief from the Defendants. Ohio law recognizes that faithless

directors of a corporation can directly injure others through a breach of fiduciary duty in addition

to the derivative injuries suffered by the corporation itself. In pursuit of an ideological agenda,

Defendants have violated numerous other Bylaws, Standing Rules, and Policies of the Sorority,

and caused the Sorority to act in a manner that has specifically harmed Plaintiffs and undermined

contractual obligations to the Plaintiffs. The Fraternity's officers, directors, and employees

directly, and through alumnae advisers acting at Fraternity Council direction, pressured student

members to endorse Langford's initiation to the Sorority. When Langford's membership vote

violated the Sorority's secret-ballot procedures, Defendants and their agents knowingly

disregarded the clear violations of the corporate rules. When Plaintiffs raised concerns about

Langford's inappropriate and threatening behavior in the sorority house, Defendants and their

agents refused to protect Plaintiffs and prevented others from doing so. Instead of protecting

Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma

altogether. Defendants have pushed Plaintiffs to resign even though—having already joined Kappa

Kappa Gamma—Plaintiffs are permanently barred from joining a different sorority. Finally, Defendants have retaliated against Plaintiffs and other sorority members who object to the Board's unauthorized Guide. Plaintiffs ask for all remedies available in response to Defendants' wrongdoing, including monetary damages, punitive damages, injunctive relief, declaratory relief, and attorney fees.

## JURISDICTION AND VENUE

**13.**    Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, as the parties are citizens of different States, all necessary Parties are before this Court, and the sum of the matter in controversy, including damages and the value of the declaratory and injunctive relief sought by Plaintiffs, exceeds seventy-five thousand dollars ($75,000.00). Plaintiffs were members of Defendant Kappa Kappa Gamma Fraternity at the time of the actions at issue. This action is not a collusive one to confer jurisdiction the Court would otherwise lack.

**14.**    Venue is proper in this District, pursuant to 28 U.S.C. § 1391, as two Defendants in this matter are citizens of the State of Wyoming and reside in the District of Wyoming, and the substantial part of the events giving rise to Plaintiffs' claims and injuries occurred in Wyoming.

## PARTIES

**15.**    Jaylyn Westenbroek is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

**16.**    Hannah Holtmeier is a citizen of Nebraska. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

**APP.015**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 117 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 20
Case 2:23-cv-00051-ABJ    Document 6    Filed 04/20/23    Page 8 of 72

17.     Allison Coghan is a citizen of Kansas. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

18.     Grace Choate is a citizen of Oklahoma. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

19.     Madeline Ramar is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

20.     Megan Kosar is a citizen of Virginia. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

21.     Defendant, and nominal Defendant, Kappa Kappa Gamma Fraternity is a nonprofit corporation organized under the laws of Ohio with its headquarters located in Dublin, Ohio.

22.     Defendant Mary Pat Rooney is a citizen of Illinois and the President of the Fraternity Council of Kappa Kappa Gamma Fraternity.

23.     Defendant Kappa Kappa Gamma Building Co., is a Wyoming nonprofit corporation with its principal office at 1604 E. Sorority Row, Laramie, Wyoming (also called the "Kappa Housing Corp."). Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation. Fed. R. Civ. P. 19(a)(1)(B).

**24.**      Upon information and belief, Defendant Artemis Langford is a citizen of Wyoming. Langford currently resides in a dormitory in Laramie, Wyoming. In the alternative, Langford is a Utah citizen as Langford's father and mother reside in Utah. As a third alternative, Langford is a citizen of Washington State, as he presents a Washington State driver license with a Washington State address when asked for official identification.

## STATEMENT OF FACTS

I.  **Kappa Kappa Gamma was established more than 150 years ago to unite women through membership** ..............................................................................12

   A.  **Kappa Kappa Gamma has always been an organization limited to women** . . 12

   B.  **Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment.** ...............................................15

II.  **The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women** ............................................................20

   A.  **The Sorority's Corporate Charter specifically references women.** ...................20

   B.  **The Sorority's Bylaws, Standing Rules and Policies also limit membership to women.** .........................................................................................................22

     1.  **Kappa Kappa Gamma's Bylaws prohibit Langford's membership.** .......23

     2.  **Langford's selection process violated Kappa Kappa Gamma's Standing Rules.** .................................................................................................28

     3.  **The Policies of Kappa Kappa Gamma prohibit Langford's membership in the Sorority.** ...........................................................................................30

III.  **National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Langford's wrongful membership.** .........................................................................................................32

IV.  **Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies.** ........................................................................................................35

**V.    Defendants' evasion of Kappa Kappa Gamma's membership restrictions represents an ongoing violation of fiduciary duties to the Corporation, and any additional demands to the Sorority's Directors would be futile.** ........................ **39**

    **A.    The Defendants have refused Plaintiffs' demands to prevent violation of the Sorority's restrictions on membership.** ................................................. **40**

    **B.    Any further demand to the Fraternity Council, seeking enforcement of Kappa Kappa Gamma's membership restrictions, would be futile.** ............................. **41**

**VI.    Kappa Kappa Gamma's effort to force the membership of Artemis Langford, and the experience of Plaintiffs since his admission, demonstrate the disruptive effect of a man on the sorority experience.** ................................................. **46**

    **A.    Langford's behavior has destroyed the single-sex haven that Kappa members describe as the heart of the sorority experience.** ................................. **49**

    **B.    Langford's interactions with the Sorority members prior to voting on his Membership.** ................................................. **51**

    **C.    The Voting Process.** ................................................. **54**

    **D.    The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies.** .... **57**

    **E.    Langford's conduct after Defendants granted him access to the sorority house.** ................................................. **59**

    **F.    Damages** ................................................. **63**

**APP.019**

**I.    Kappa Kappa Gamma was established more than 150 years ago to unite women through membership.**

       **A.    Kappa Kappa Gamma has always been an organization limited to women.**

**25.**    In 1870, six women at Monmouth College in western Illinois founded the Kappa Kappa Gamma Fraternity. The Sorority's founders believed that Greek-letter societies helped male students, and college women should have the same opportunities. Women were a distinct minority in colleges in the late 19th century. At the time of Kappa Kappa Gamma's founding, only 11,000 women between the ages of 18 and 21 were enrolled in college in the entire United States. Men outnumbered women by nearly five to one on college campuses, and many colleges did not permit women to enroll at all. As one of Kappa's Presidents, Kay Smith Larson, described that era, "Women were often ignored in the classroom and ridiculed outside of it."

**26.**    Louise Bennett Boyd, one of the six founding members of Kappa Kappa Gamma, explained that the young women "concluded we would have something new; the world seemed to be moving too slowly for us and moreover the young men had Greek letter fraternities. We determined that nothing short of a Greek letter fraternity (we did not even speak of it as a sorority in those days) would satisfy us." Today, Kappa is one of the nation's oldest and largest sororities, with approximately 210,000 living alumnae, 140 collegiate chapters, and 230 alumnae associations.

**27.**    The first Bylaws of Kappa Kappa Gamma Fraternity make clear that only women can be members. The 1871 Bylaws state "Any lady may become a candidate for membership who shall be of good moral character, and of above average talent; and who, at the time of proposal, either is or has been in attendance at some college or seminary." Early sorority members were concerned with academics, scholarship and understanding what their responsibilities should be as "new

women" enjoying the privileges of fraternal life. Kappa Kappa Gamma Fraternity, *History: Kappa Kappa Gamma Through the Years* 126 (2000).

**28.** In 1871, the Sorority's initiation ceremony was simple. New members were read the organization's constitution and took an oath of loyalty. *Id.* at 27. "The [Kappa] *Constitution* at that time was secret and contained the first purpose of the Fraternity which, with little change, remains the same today." *Id.* The first Kappa members affirmed their "union in the bonds of friendship…for the development of the nobler qualities of the mind and finer feelings of the heart, helping one another attain excellence and for the advancement of its members socially and in literary attainments." *Id.* When the Sorority filed its Articles of Incorporation with the Ohio Secretary of State in 1930, this first purpose was only slightly changed:

> To perpetuate Kappa Kappa Gamma Fraternity for the development of the nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence among its members.

Attachment 4 at 6. The Sorority's first purpose now explicitly links the original pledge of 150 years ago to the Sorority's single-sex identity:

> To unite **women**, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence.

*Id.* at 4 (emphasis added).

**29.** The words *woman* and *women*, as used in Kappa Kappa Gamma's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Sorority's 150 years, have always referred to adult female human beings. These words, as used by Kappa Kappa Gamma prior to Defendants' unlawful actions, have never referred to biological males who claim to be women.

30.    Kappa Kappa Gamma's communications, throughout its history, use vocabulary that reinforces that the Sorority uses the word "woman" with its traditional, immutable biological meaning. Members are part of a "sisterhood." "Editor's Letter," *The Key: 150 Anniversary*, Vol. 137, No. 1 at 1 (2020) ("Your commitment to Kappa—in word and in deed—helps to drive the future of our sisterhood."). The Sorority refers to members who have finished college as *alumnae*, the plural form of the Latin term *alumna*. *Alumna* and *alumnae* are gendered Latin words that refer exclusively to females. "Alumna," *Oxford English Dictionary* (Dec. 2022) ("A female former pupil or student of a particular school, university, etc.; a female graduate of a particular seat of learning."). *Alumnus* is the word for a male graduate. *Alumni* refers to a group of graduates that is all-male or one that includes both men and women.

31.    When Kappa Kappa Gamma published an official history of the sorority's first sixty years (through 1930), two of the six sorority founders were still living. Louise Bennett Boyd and Jeannette Boyd introduced the book with an open letter to "Our dear Kappa girls." Burton-Roth & Whiting-Westermann, *History of Kappa Kappa Gamma Fraternity, 1870–1930* at v (1932). The Sorority's 1889 songbook is replete with references to young maids, girls, women, and sisters. Susan Goldsmith & Jessie Cougill, *Songs of the Kappa Kappa Gamma Fraternity* (1889).

32.    Articles in the Sorority's official magazine, *The Key*, reflect the traditional, biological meaning of the word "woman." Perhaps the most salient article was published in 2002. The Sorority conducted focus groups and personal interviews to identify the traits that exemplify the Kappa experience. According to more than 500 collegiate members, alumnae, parents of Kappa members, Kappa volunteers, and university administrators, the "Benefits of Kappa Kappa Gamma" include "Friendship/Sisterhood":

**APP.022**

Kappa Kappa Gamma **is a single-sex haven in a mainly coed campus environment**.

Kappa Kappa Gamma is a family away from home, diminishing campus size and impersonality.

Kappa Kappa Gamma provides sisterhood support via alumnae associations in hundreds of cities.

Kappa Kappa Gamma sustains members in bad times, celebrates good times, and shares all times.

Kappa Kappa Gamma offers a diversity of background and interest among its members.

"In the Company of Leaders," *The Key (A Kappa Kappa Gamma Publication)*, Vol 119, No. 2 at 9 (Summer 2002) (emphasis added).

**33.**     Artemis Langford is not a woman as that word has been adopted and understood by Kappa Kappa Gamma for the past 150 years. Artemis Langford is not an adult female human being. Artemis Langford would not have been eligible for membership in Kappa Kappa Gamma in 1870, nor would he have been eligible during any subsequent time since Kappa's founding. Artemis Langford is not eligible for Kappa membership today.

> **B.     Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment.**

**34.**     A woman is an adult human female. A man is an adult human male. For a biologist, these words distinguish between human beings who donate genetic material (men) or receive genetic material (women) during the reproductive process. The distinctions between men and women, however, extend far beyond reproductive biology. Genetic material within every cell in the human body guides that cell's creation and operation. This genetic coding is different for men and women from conception to death. No one questions that the endocrine systems of men and women, which

are essential to the development of sexual maturity, differ and affect the human body's development. But muscles, bones, and brains of men and women also differ at a cellular level. Scientists lack a complete understanding of sex-based differences, but there is scientific consensus that men's bodies and women's bodies are different.

35.    In many circumstances, whether an individual is a man or a woman "bears no relation to ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). A person's sex is determined at the moment of conception. Like race and national origin, sex is an immutable characteristic. Therefore, *governmental* distinctions between men and women are inherently suspect.

36.    Kappa Kappa Gamma and other Greek fraternities and sororities are private social organizations, however, and they *explicitly do* discriminate "on the basis of sex." 20 U.S.C. § 1681(a). Indeed, after passage of Title IX in 1972, the federal government took the position that fraternities and sororities could not continue as part of college life. Members of Congress, led by former Senator Birch Bayh, the Senate sponsor of Title IX, rejected this view. Senator Bayh stated that "[f]raternities and sororities have been a tradition in the country for over 200 years. Greek organizations, much like the single-sex college, must not be destroyed in a misdirected effort to apply Title IX." 120 Cong. Rec. 39992 (1974) (statement of Sen. Bayh). Therefore, in 1974, Congress amended Title IX to exempt Kappa Kappa Gamma and similar Greek organizations altogether. 20 U.S.C. § 1681(a)(6). Title IX does not apply at all to the "membership practices" of a non-profit "social fraternity or social sorority… the active membership of which consists primarily of students in attendance at an institution of higher education." *Id. See also* Pub. L. No. 93-568 § 3 (1974).

37.     Kappa Kappa Gamma discriminates against men to provide a sex-segregated environment for college women. The Sorority's Bylaws acknowledge that the Sorority discriminates on the basis of sex: "The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972." Attachment 1 at 9–10 (art. V., sec. 2.D). Single-gender, as the phrase is used in the Bylaws, means "single-sex" and not "gender identity" or a related concept. This is clear from the Bylaws' reference to Title IX, which prohibits discrimination "on the basis of sex."

38.     Social science research demonstrates that when young women are allowed to learn in an all-female environment, they are more likely to seek out 'nontraditional' academic subjects like math and science. Young women in single-sex environments are more likely to develop higher academic, and socially competent, self-images. Young women who attend single-sex schools are more positive about their own abilities and their control over their lives, are less inhibited by stereotyped gender role attitudes, and hold higher aspirations for their futures. These benefits are not limited to the classroom.  One study, for example, showed that strong female role models increased the willingness of college women to study more rigorous academic subjects (with more lucrative careers) such as economics.

39.     Until now, Kappa Kappa Gamma has been a strong defender of the benefits of an all-female environment for college women. Plaintiffs assert—as the Sorority itself did when it filed a Complaint in the U.S. District Court for the District of Massachusetts in 2018—that single-sex sororities are a traditional source of stability and community in college life for young women. The single-sex nature of a sorority is necessary to create this cohesive atmosphere. *See* Complaint, *Kappa Alpha Theta Fraternity, Inc., et al v. Harvard Univ.*, Dkt. No. 1:18-cv-12485 at ¶ 93 (D.

**APP.025**

Mass.) (filed Dec. 3, 2018) (Kappa Kappa Gamma Fraternity is the second plaintiff named in the

Complaint.).

**40.**    Less than five years ago, Kappa Kappa Gamma made numerous allegations about "the

proven benefits of single-sex environments" for college women:

> ¶ 93. It is no surprise that single-sex organizations have thrived at Harvard for so
> many years. Single-sex social organizations represent a traditional source of
> stability and community in college life. They meet many of the social and cultural
> needs of students. They provide a surrogate family for students away from home
> and offer students an opportunity to grow with peers who share common values,
> problems, and goals. Members of all-male and all-female organizations feel that the
> single-sex nature of the groups is important to the cohesive atmosphere that the
> organizations provide.

> ¶ 94. A 2014 Gallup survey of more than 30,000 college graduates across the United
> States found that students who were members of fraternities or sororities
> experienced notable long-term benefits linked to their fraternity and sorority
> membership. These students were more likely to be "thriving" in their well-being
> and engaged at work than college graduates who did not join a fraternity or sorority.
> The survey found that fraternity and sorority members were more likely than other
> students to find fulfillment in daily work and interactions, to have strong social
> relationships and access to the resources people need, to feel financially secure, to
> be physically healthy, and to take part in a true community.

> ¶ 95. Single-sex environments are associated with a myriad of developmental and
> other benefits, particularly for young women. Many educational researchers have
> found that single-sex education contributes to academic achievement at all levels
> for women. There "is a body of research carried out since the late 1960's which
> shows that graduates of women's colleges are more likely to become achievers than
> are the women graduates of coeducational institutions." As an example, in the
> 1970s, graduates of women's colleges were more than twice as likely than
> graduates of co-ed colleges to enter medical school or to obtain a natural science or
> other doctoral degree.

> ¶ 96. Studies have found that women in single-sex schools at both the secondary
> and college levels have higher levels of self-esteem and a greater sense of personal
> control. Exposure to single-sex environments can even positively influence a
> woman's interest in nontraditional or male-dominated careers—one study
> concluded that "the opportunity to interact in a single-sex environment is important
> at some stage of a young woman's life, if she is to develop nontraditional interests."

**APP.026**

> Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment.

*Id.* at 31–33.

41.     Sorority representatives made these and similar assertions to Plaintiffs when they were considering whether to join Kappa Kappa Gamma. Sorority representatives make these representations to donors and alumnae. None of the research cited in the 2018 Complaint categorized "individuals who identify as women" (*i.e.* men) as "women" when defining a single-sex environment. *Id.* at 31–33. Kappa's 2018 Complaint relied on evidence from all-female, single-sex environments. In fact, Defendants have **no** peer-reviewed research that the benefits of a "single-sex" environment continue to exist when men "who identify as women" are admitted. Despite the lack of evidence to support this new theory, Defendants have continued to promote the benefits of the sorority environment to Plaintiffs and other prospective members.

42.     The claim that "trans women are women" is a political slogan. It is not a fact supported by social science or medical research. Kappa's view, less than five years ago, was that women and girls benefit from a single-sex environment. A single-sex environment excludes every man without regard to how the man claims to identify himself. Defendants should not be allowed to radically alter the very core of the Sorority's identity, and then claim to this Court, without evidence, that the Sorority's benefits remain. Kappa Kappa Gamma could, theoretically, abandon its 150-year commitment to women, but any such decision would need to be approved at the Sorority's biennial convention. Defendants cannot abandon the Sorority's mission and purpose by subterfuge, with an unsigned Guide from Defendant Rooney and the rest of the Fraternity Council that declares some men should now be called women.

## II.  The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women.

### A.  The Sorority's Corporate Charter specifically references women.

**43.**    Kappa Kappa Gamma Fraternity is an Ohio non-profit corporation, and its Articles of Incorporation are available from the Ohio Secretary of State. In Ohio, a corporation's charter consists of its articles of incorporation and the Ohio laws in existence when the articles of incorporation were filed. With a for-profit corporation, the corporate charter is a contract between the corporation and its stockholders. For a non-profit corporation, the corporate charter is a contract between the corporation and its members.

**44.**    The Articles of Incorporation for Kappa Kappa Gamma, in conjunction with Ohio law when the Corporation was organized, form the Sorority's charter. As a nonprofit corporation, Kappa's corporate charter is a contract between the Sorority and its members, including Plaintiffs.

**45.**    A corporate charter contains the terms upon which the incorporators have agreed to associate. The charter therefore establishes the authority that members can exercise and sets the limits within which the body of corporators can lawfully act in a corporate capacity. Like other corporations, the Sorority and its Board of Directors (the Fraternity Council) must act consistently with Kappa's corporate charter. When a corporation's actions exceed the authority granted by its corporate charter, these actions are *ultra vires* and void. Such is the case here.

**46.**    Corporate board members who disregard or otherwise seek to circumvent a corporation's corporate charter violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance). Under Ohio's Nonprofit Corporation Law, claims involving a "lack of, or limitation upon, the authority of a corporation" can be asserted "[b]y or on behalf of the corporation against a director, an officer, or a member as such" and "[b]y a member as such or by or on behalf

**APP.028**

of the members against the corporation, a director, an officer, or a member as such." Ohio Rev. Code Ann. § 1702.12(I) (2023).

47.    The Articles of Incorporation for Kappa Kappa Gamma restrict sorority membership to women. They prohibit any college chapter from defying this restriction. The Sorority's purposes in its Articles of Incorporation are, *inter alia*, "**[t]o unite women, through membership**" and further provide that all members must be selected "**in accordance with Fraternity standards and procedures**" (emphasis added):

> To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;

> To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

> To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;

> To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

> To advocate for and seek to address issues of concern for members and women in general;

> To provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and

> To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

Attachment 4 at 4.

48.    Kappa Kappa Gamma's Articles of Incorporation cannot be amended by its Board of Directors (the Fraternity Council). Any amendment must occur "in accordance with the Fraternity

*Bylaws*," *id.*, which require a two-thirds majority vote at the Sorority's biennial convention. Moreover, under the Bylaws, the "exact content" of any amendments must be provided at least three months prior to the convention:

> The Fraternity Articles of Incorporation and Bylaws may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

Attachment 1 at 20 (art. XXIV, sec. 1).

49.     Regardless of whether Kappa Kappa Gamma Fraternity *could* amend its corporate charter to provide that the Sorority's mission and purpose is to 'unite women *and men who identify as women* through membership,' Defendants have not adopted such an amendment. Under the corporate charter as it exists now, only women can be Kappa members. The Sorority has not amended its Articles of Incorporation to define "woman" to include men who claim to identify as women. The meaning of woman therefore remains constant to the meaning it has had since its use in 1870: an adult human female. Initiation of Artemis Langford as a member of Kappa Kappa Gamma violates Kappa Kappa Gamma's corporate charter and the contractual promise the corporation has made to Kappa members. Defendant Rooney and the other members of the Fraternity Council violated their fiduciary duties to the corporation when they procured and approved the initiation of a man as a Kappa member.

### B.      The Sorority's Bylaws, Standing Rules and Policies also limit membership to women.

50.     In addition to its corporate charter, Kappa Kappa Gamma has bound itself through its Bylaws, Standing Rules, and Policies. These corporate governance documents restrict Kappa membership to women and do not permit Langford's membership.

       **1.    Kappa Kappa Gamma's Bylaws prohibit Langford's membership.**

**51.**    Under Ohio law, the Bylaws of Kappa Kappa Gamma are the code of regulations for the

corporation. Attachment 1 at 19 (art. XIX). The Bylaws restrict membership to women only:

> A.   New Member. **<u>A new member shall be a woman</u>** who has accepted an invitation to join the Fraternity but has not been initiated. A new member shall:
>
>> 1.   Have signed a dated, written pledge to membership witnessed in writing by an active or alumna member of the Fraternity;
>>
>> 2.   Remain eligible as a new member for a term of one year before the pledge to membership expires so long as enrolled in the same college or university; and
>>
>> 3.   Have the right to attend meetings, speak in debate and present their views to a committee on a referred question but shall not vote on any question. A new member shall not be present at a meeting during ritual for initiated members.

Attachment 1 at 2 (art. III, sec. 1) (emphasis added).

**52.**    While local chapter members of Kappa Kappa Gamma recruit and vote on new members,

they must do so "in accordance with Fraternity standards and procedures." Attachment 4 at 4.

Because the *Bylaws* require that every new member be a woman, and Langford is not a woman,

his membership is void:

> Section 2. Qualifications. **<u>A woman</u>** may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.
>
>> A.   Collegiate New Member and Alumna Candidate. To qualify as either a collegiate new member or an alumna candidate, **<u>a woman</u>** shall:
>>
>> 1.   Have demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals;
>>
>> 2.   Not be pledged to membership or be a member of any similar college or university women's social sorority except honorary or professional organizations;

**APP.031**

3.   Not have been initiated into any other member group of the National Panhellenic Conference;

4.   Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements; or

5.   Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity Bylaws, Standing Rules and Policies.

B.   Collegiate New Member. To qualify as a collegiate new member, **a woman** shall also:

1.   Be enrolled at any college or university having a chapter of the Fraternity; and

2.   Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B- minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

C.   Alumna Candidate. To qualify as an alumna candidate, **a woman** shall also:

1.   Have attended a four-year college or university; and

2.   Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

Attachment 1 at 3 (art. III, sec.2 (emphasis added)).

**53.**   The Sorority last amended its Bylaws in 2022, adopting a complete revision. Upon information and belief, these changes were not lawful. At the 2022 Biennial Convention, Defendant Rooney and the other members of the Fraternity Council conducted a voice vote and— even though there were loud votes against the changes—concluded that the bylaws amendments received a two-thirds vote without actually counting votes. Tellingly, the minutes of the convention

APP.032

still have not been released. Even if the new bylaws were adopted in 2022, however, they do not alter the requirement that Kappa Kappa Gamma members must be women. *Id.*

54.    The evidence surrounding the 2022 Bylaws revisions supports the conclusion that the Sorority's membership criteria remain the same. In the Report of the Bylaws Committee, which accompanied the proposed Bylaws, there is no reference to "individuals who identify as women" or any discussion of a change to the Sorority's membership rules. The explanatory report for the Bylaws changes states that "[w]hile the documents now look different in structure, most of the content is unchanged." Attachment 5 at 1. The report identifies what it describes as "[s]ome of the major amendments and the rationale behind the change." *Id.* These changes do not include a change to membership rules. Admittedly, the Bylaws were changed to promote "inclusivity," but these changes were "to make sure the language of the documents is inclusive. The committee has tried to craft the documents in such a way that gendered pronouns are not used and references are inclusive of all of our membership." *Id.* at 2. The changes did not affect the actual criteria for membership.

55.    The 2022 Bylaws revisions did add a provision forbidding "Members, chapters and associations" of Kappa Kappa Gamma from engaging in discrimination, but this new antidiscrimination provision does not apply to the Sorority itself. *Id.* at 9–10. In fact, the provision explicitly recognizes that the Sorority *does* discriminate on the basis of sex:

> **D. Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

**APP.033**

Attachment 1 at 9 (art. V, sec. 2.D). The reference to the "single-gender nature of Greek-letter social organizations" is not a change to the Sorority's membership rules. It cannot be. The "exemption" in Title IX of the Educational Amendments of 1972 does not refer to gender identity. Rather, "single-gender" in this provision of the Bylaws means the same thing as "single-sex," because the Title IX exemption permits sororities to discriminate "on the basis of sex." 20 U.S.C. § 1681(a)(6).

**56.**    Shortly before the Sorority's biennial convention in 2022, the national headquarters staff provided another document to members, entitled "Bylaws and Standing Rules Revisions 2022: FAQS [Frequently Asked Questions]." Attachment 6. This document was provided in April 2022, less than two months before the convention. This FAQs document was not subject to a vote or otherwise approved at the convention. The document makes several statements that are not connected, in any way, to the Bylaws revisions that were under consideration:

**DIVERSITY, EQUITY AND INCLUSION**

**Can nonbinary people join? Is this a chapter-by-chapter decision?**

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.

We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

APP.034

**Have we vetted these changes with our legal counsel?**

Yes. We have conferred with legal counsel as well as NPC on DEI-related updates to our Fraternity documents. We are confident that these changes would hold up if contested in a court of law.

*Id.* at 18.

**57.** The FAQs document does not alter the Sorority's membership requirements. First, to the extent that the Sorority sought to adopt a new definition of woman, contrary to the word's longstanding meaning, this change must be made in the text of the Bylaws. Such a change cannot be presumed. Second, Kappa members must receive "notice" of any amendment to the Bylaws "indicating its exact content" at least three months before the convention. Attachment 1 at 20. (art. XXIV, sec. 1). Even if the FAQs document could somehow supplement the Bylaws amendments, this document was not presented to members with the required three-month notice. These FAQs were provided less than 60 days before the Convention, so they cannot be considered part of the "exact content" of the changes required by the Bylaws. Third, under Ohio law, the bylaws of a corporation cannot conflict with its Articles of Incorporation. Kappa's articles of incorporation make clear that the Sorority is limited to women; any bylaws amendments that say otherwise are unlawful. Finally, the language in the Bylaws FAQs does not actually support the claim that Langford is a woman. The language in the Bylaws FAQs does not say that a man who identifies as a woman is a "woman." Rather, the language expands the list of eligible members by adding another category: "women" and also "individuals who identify as women." If this second category were naturally subsumed within the meaning of "women," there would be no need for the FAQs statement at all.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 137 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 40
Case 2:23-cv-00051-ABJ    Document 6    Filed 04/20/23    Page 28 of 72

58.     To the extent that Defendants intended to alter the membership requirements of Kappa Kappa Gamma through the 2022 Bylaw revisions, they have violated their fiduciary duties to the Defendant non-profit corporation. Defendant Mary Pat Rooney and the other members of the Fraternity Council have a fiduciary duty to be faithful to the Sorority's purpose and mission. This fiduciary duty requires that the Fraternity Council members act forthrightly in their efforts to carry out the Sorority's purpose and mission. Defendants cannot, consistent with their fiduciary duties, even *attempt* to alter the Bylaws of a 150-year-old organization through language that appears on page 18 of an explanatory document presented to members just before a vote on a Bylaws amendment that has no corresponding language.

### 2.     Langford's selection process violated Kappa Kappa Gamma's Standing Rules.

59.     Kappa Kappa Gamma has also adopted "Standing Rules" and "Policies" to govern the conduct of the Sorority. The Standing Rules describe the processes that must be followed when selecting a new member of the Sorority. Under the Articles of Incorporation, these "procedures" must be followed by every chapter when selecting new members. Attachment 4 at 4. Standing Rules can be amended by a majority vote at the Sorority's biennial national convention, provided that the proposed amendments were submitted, in writing, at least three months prior to the Convention. Attachment 7 at 25.

60.     The Standing Rules of the Sorority do not include any language that supports expansion of Kappa membership to a man who claims to identify as a woman.

61.     The Standing Rules do, however, impose two requirements that were violated in the admission of Langford to Kappa Kappa Gamma. Under the Standing Rules, all chapter members must vote on whether to admit a new member, unless a chapter member is excused from voting,

in writing, by the chapter's alumnae adviser. Attachment 7 at 1 (sec 1.1.A.1). For Langford's vote on membership, the chapter officers adopted the opposite policy, forbidding Plaintiffs Choate and Ramar, and all other members who were not present at the chapter meeting on September 20, 2022, from voting on Langford's membership. None of these non-voters were excused, in writing, by the chapter's alumnae adviser. Further, none of the Plaintiffs or other sorority members asked to be excluded from the vote. The chapter committed a second violation when voting on Langford. Any vote on a new member must be secret and must happen through use of the Sorority-approved electronic voting system, which is a mobile phone application (app) called "Omega Recruit":

    1.1  Membership Selection.

    A.    Collegiate New Member Selection. Active members shall be responsible for selecting new members of their chapter. Any initiated member may provide information about qualified women. The electronic voting system selected by the Fraternity shall be used by the chapter.

        1.    Participation. All active members of the chapter shall participate in membership selection unless excused in writing by the designated chapter adviser.

        2.    Confidentiality. All information concerning the membership selection process is confidential and shall be kept within the chapter.

        3.    Bid List. The bid list shall be produced using the overall scoring calculation in the electronic voting system and shall not be manipulated.

Attachment 7 at 1. Langford's selection did not use Omega Recruit. Omega Recruit was used to select new Kappa members during continuous open bidding at the University of Wyoming in Spring 2022 and to select new Kappa members during the formal recruitment in Fall 2022. In contrast, Langford's approval occurred through a Google Poll that was not anonymous.

**62.**    The Standing Rule requirement that every chapter use the "Omega Recruit" process was imposed by the Sorority through an amendment to the Standing Rules in 2022. The requirement

that all chapter members must vote, unless excused by the chapter's alumnae adviser for membership, has existed since at least 2016. Langford's vote did not occur using Omega Recruit and chapter members were prevented from voting on his membership. Langford's selection process was a violation of the Sorority's Standing Rules, and it is invalid.

63.    When Plaintiffs, and their attorneys, wrote to Sorority officials after the vote on Langford, but before his initiation ceremony, their concerns were ignored.

### 3.    The Policies of Kappa Kappa Gamma prohibit Langford's membership in the Sorority.

64.    The Sorority also has corporate governance documents called the "Policies of Kappa Kappa Gamma Fraternity" which are "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by the Kappa Kappa Gamma Articles of Incorporation and the Fraternity Bylaws and Standing Rules." Attachment 8 at 1.

65.    The Policies of Kappa Kappa Gamma also restrict Sorority membership to women. Policy III imposes requirements on the Sorority's college chapters that make clear the Sorority is a single-sex organization. Policy III prohibits Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Sorority or a chapter:

> **Section 2. Auxiliary Groups.** Participation in auxiliary groups of men's fraternities, including but not limited to little sisters, is prohibited and is in conflict with the National Panhellenic Conference Unanimous Agreements. The formation of male auxiliary groups, such as big brothers, is prohibited. **The activities of such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status.** Kappa chapters shall not bestow honorary status to individuals, such as Key Man or chapter sweetheart.

Attachment 8 at 3 (emphasis added). Policy VIII explicitly prohibits men from participating in the Sorority's recruitment events:

3.I.    Men. **Men shall not participate in any Kappa recruitment events**, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements.

*Id.* at 13 (emphasis added). Langford is a man. His participation in Kappa recruitment was a violation of the Sorority's Policies.

66.    Kappa Kappa Gamma Policies also require that all members of a chapter vote on whether to accept a new member, unless excused in writing, and require that membership votes use the Sorority's designated electronic voting platform. *Id.* at 11 (§ 3) & 14 (§ 3.P).

67.    Kappa Policy III does include a reference to the concept of "gender identity," but this Policy does not permit Langford to join the Sorority. Under a section called "Personal Responsibility," Policy III requires that Kappa members respect Human Dignity. Like the Sorority's Bylaws, this provision requires Sorority to behave in a manner that respects others. The provision does not link gender identity to Kappa membership:

**2. Human Dignity.** Kappa Kappa Gamma expects all members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals. Any member who makes discriminatory, inflammatory or inappropriate actions based on race, national origin, religion, disability, age, gender identity, sexual orientation or other class protected by local, state/provincial, or federal law shall be subject to dismissal or other disciplinary action.

Attachment 8 at 4. Respect for human dignity is consistent with the Sorority's historical, longstanding membership requirements. Policy III applies to members' conduct; it does not change Kappa membership requirements. Respect for the worth of all individuals does not require sorority membership for all individuals. Moreover, because the Policy is adopted by the Fraternity Council, not the membership, the Policy cannot deviate or undermine the Sorority's Articles of Incorporation, Bylaws or Standing Rules.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 141 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 44
Case 2:23-cv-00051-ABJ    Document 6    Filed 04/20/23    Page 32 of 72

**III.    National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Langford's wrongful membership.**

**68.**    Kappa Kappa Gamma acts through 140 collegiate chapters. Kappa Kappa Gamma chapters are not distinct entities in any way. The Fraternity Council, the employees of the Sorority, the Sorority's District Directors, and the Sorority's network of alumnae advisers provide direction to the student members of the Sorority. Langford could not have been admitted as a Kappa member without the explicit approval and support of the Fraternity Council and those acting at the Council's direction. Under the Standing Rules, no person can be initiated as a Kappa member without prior approval from Sorority headquarters:

> 6.2    Ritual.
>
> <div align="center">*      *      *</div>
>
> B.    Chapter Initiation of New Members.
>
> <div align="center">*      *      *</div>
>
> 2.    At least two weeks before Initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

Attachment 7 at 10. Sorority officials regularly reject ineligible members, even when a chapter has voted to admit the member. Reasons for rejection can include a failure to meet the grade requirements for new Kappa members.

**69.**    Upon information and belief, Sorority representatives not only approved Langford's membership, but national Sorority officials also encouraged chapter officers to pursue Langford

<div align="center">Page 32 of 70</div>

<div align="right">**APP.040**</div>

and guided chapter officers in the illegal selection process. Plaintiffs have not brought suit against their collegiate chapter. The Gamma Omicron chapter of Kappa Kappa Gamma Fraternity, which operates on the University of Wyoming's campus, did not have authority to admit Langford as a Kappa member. All decisions about compliance with the Sorority's corporate charter, Bylaws, Standing Rules, and Policies were made by adults acting on behalf of the national Sorority. While the Sorority's legal counsel stated that the Sorority does not participate in member selection, Attachment 3 at 1, this statement was not true as it relates to the admission of Langford.

70.    Indeed, national Sorority officials and representatives are responsible for all membership decisions at collegiate chapters. The Sorority controls the intake of new members, the decision to expel or suspend Sorority members, and the decision to discipline, suspend or revoke a chapter. Kappa Kappa Gamma has a hierarchy of national, regional and local officers answerable to and involved in the national Sorority. No person may become a new Kappa member unless the Sorority's alumnae specialists or staff, in advance, have given "permission to initiate."

71.    On the national level, the Fraternity Council has authority to approve, suspend or revoke a collegiate chapter. The Fraternity Council also has authority to suspend or dismiss any Sorority member. Below the Fraternity Council, the Sorority has Content Directors, who supervise all matters that relate to a specific aspect of the Sorority's operation (such as the Sorority's disciplinary process, called "Standards"). The Sorority has District Directors who supervise the activities of the local chapters and administer discipline to individual chapters for rules violations. Finally, the Sorority has paid staff at the national headquarters. All of these individuals operate under the supervision of an Executive Director who reports to the Fraternity Council.

**72.**    The Standing Rules of the Sorority permit national officials to place any individual member on probation, even if collegiate chapter members do not support this decision. The Fraternity Council (the Sorority's board) can dismiss any member entirely. Attachment 7 at 13–20.

**73.**    Every chapter must adopt its own bylaws and standing rules, which "must be approved by the Fraternity Bylaws Committee before becoming effective." *Id.* (art. iv, sec. 2.G.). All subsequent amendments must also be approved by the Sorority's officials. *Id.*

**74.**    For every collegiate chapter, Kappa Kappa Gamma has a network of appointed alumnae who supervise operation of the chapter and the actions of individual chapter officers. The Sorority's Bylaws require this supervision:

> **J. Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the chapter. The board shall be composed of a chairman, alumna advisers to Executive Board and vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director, and in consultation with the Leadership Development and Advisory Board Directors.

Attachment 1 at 7 (art. IV, sec 2.J.). These appointed alumnae, in turn, report to other alumnae with broad responsibility over every aspect of sorority life, such as chapter operations, housing, membership recruitment and retention, and discipline of sorority members. Appointed alumnae control all aspects of chapter operation. For example, a chapter cannot host a social function (*e.g.*, a party) without submitting an event form to the national Sorority headquarters and also receiving approval from the chapter's appointed alumnae adviser. Fraternity Council members refer to these appointed alumnae as part of the Sorority's "workforce."

**75.**    The President of each collegiate chapter *must* discuss matters with the chapter's alumnae adviser. In addition, each chapter's Vice President of Standards and Vice President of Academics

must work with an alumnae adviser. Alumnae advisers are selected by the Sorority, not by chapter members. Chapter members have no authority over the alumnae advisers, and these advisers *must be* present for all chapter meetings of significance:

> E.     Meetings. An adviser shall be present at chapter meetings for the election of officers, revision of the chapter Bylaws and Standing Rules, preparation and presentation of the budget, Executive Board meetings, officer training, Initiation, and including those of the Nominating Committee and consideration of disciplinary action by the chapter and Standards Committee. Advisers may attend meetings electronically via telephone or through other electronic communications as long as all the members can simultaneously hear one another and participate during the meeting.

Attachment 8 at 1–2 (Policy I, sec. 2.E.).

76.     All Kappa Kappa Gamma members commit that they will comply with federal and state law, and, where applicable, the regulations of a college or university. Members also pledge they "shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct." Attachment 1 at 9 (art. V, sec. 1). These commitments reinforce the existing fiduciary duties of Defendant Mary Pat Rooney and other members of the Fraternity Council to the Sorority's mission and purpose.

**IV.     Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies.**

77.     Kappa Kappa Gamma is one of only three sororities with a residential house at the University of Wyoming. Plaintiffs chose to join the Sorority, in part, because they wanted to live communally in a single-sex environment. Some Plaintiffs wanted to be able to rely on other young women, including juniors and seniors, for help and advice with college. Some Plaintiffs sought to live in Kappa's single-sex environment because of religious or moral beliefs that young, unmarried women should not live with young, unmarried men. Some Plaintiffs are sisters or daughters of

Kappa Kappa Gamma alumnae and wanted to experience the close bonds that develop when living in a sorority house. Plaintiffs also include a victim of sexual assault who wanted a safe place to interact with other college students without the presence of men.

**78.**    The Kappa Kappa Gamma house at the University of Wyoming has a capacity of 52 young women. Currently, the chapter has 44 members, and approximately 36 women signed housing contracts to live in the Kappa sorority house during the current 2022–23 academic year. The national Sorority requires every chapter to have a "live-in rule" to guarantee the sorority house "is filled to capacity at all times." Attachment 8 at 7 (Policy V, sec. 1.J). Upon information and belief, Defendant Kappa Housing Corporation needs approximately forty Kappa members to live in the sorority house each year. If fewer than forty residents live in the sorority house, the Defendant Kappa Housing Corp. lacks sufficient revenue to operate and maintain the house.

**79.**    The Kappa Kappa Gamma sorority house at the University of Wyoming does not have facilities to support co-educational living. Most of the rooms are on the second floor of the house. There is a small common area on the second floor with a couch. The bedrooms on the second floor and the third floor are old, and many of the doors do not lock consistently. There are two communal bathrooms for the women on the second floor and one on the third floor. The doors to the communal bathrooms do not lock and do not require a code to enter. The primary bathroom on the second floor does not have a private area to disrobe before showering.

**80.**    The Kappa rules for the sorority house forbid all men from being on the second floor. Attachment 13 at 11 (House Standing Rule 2.4.A.2) ("Males will only be allowed upstairs or in the basement during events that are approved by the Facility Director in consultation with the House Director annually with times set before each event. Exceptions to this require approval from

the House Director, President or Facility Director."). Other than specific days, such as the fall move-in date, even fathers and boyfriends are prohibited from being on the second floor. Plaintiffs and other sorority members describe the second floor as a private, safe space where young women can interact without concern that they will be on display for men.

**81.**    Since his admission to the Sorority, Langford has received all privileges of Kappa Kappa Gamma membership, including access to living areas that are restricted to women only. Langford does not currently live in the sorority house because he has a housing contract that requires him to live in a dormitory at the University of Wyoming for the 2022–23 academic year.

**82.**    Even though Langford does not live in the sorority house, he has several times chosen to sit for hours on the couch in the second-floor common area. He does not study. He does not speak to the women who live there. Langford is not meeting another member of the sorority who lives in the house. Instead, Langford stares at women walking past. One sorority member walked down the hall to take a shower, wearing only a towel. She felt an unsettling presence, turned, and saw Langford watching her silently.

**83.**    As a member of the Sorority, each Plaintiff "has an obligation, in accordance with the chapter's live-in rule, to live in the chapter facility." Attachment 8 at 7 (Policy V, sec. 1.J). "Failure to fulfill this obligation may result in a loss of membership." *Id.*   Under the live-in rule at the University of Wyoming, no member is permitted to live outside of the sorority house until there are 52 residents. Attachment 13 at 9 (sec. 2.3.A.1.).

**84.**    Plaintiffs Holtmeier, Coghan, Westenbroek, Choate, and Ramar signed a House Contract with Defendant Kappa Housing Corp. for the 2022–23 academic year. Attachment 10. Under the contract, Plaintiffs have paid $7,700 to live in the Defendant House Corporation's residential

building. This year, Plaintiffs have not received the benefit of their housing contracts, which guaranteed a single-sex environment that is separate from men and safe. Instead, Langford has regularly been present throughout the sorority house when there should be no men present.

85.    When the Plaintiffs, and in some cases the parents of the Plaintiffs, reached out to Sorority headquarters about Langford's admission, Kappa officials dismissed their concerns. Sorority officials falsely stated that the sorority house is no different than a co-ed dorm at the University of Wyoming. When Plaintiffs and their parents pointed out that the Kappa house does not have locked bathroom facilities, national officials were dismissive. Kappa officials recommended that, if Plaintiffs were uncomfortable or concerned about their safety, they should quit Kappa Kappa Gamma entirely.

86.    Defendants continue to pressure Plaintiffs, and other sorority members, to sign a housing contract for the next academic year, 2023–24. The cost of living in the sorority house has increased by $1,300 to $9,000 per year. Housing contracts were due on February 17, 2023. As of March 27, 2023, only ten women had signed housing contracts. At that time, Defendant Kappa Housing Corp. informed sorority members that Langford had been given permission to live outside the sorority house by national Sorority officials because of unspecified security concerns. The representative of the Kappa Housing Corp. stated that this should resolve concerns and permit members to sign housing contracts for the 2023–24 year. Authorization to live outside of the Kappa house is granted on a semester-by-semester basis, but the housing contract is for the entire academic year. Two sorority members, Jaylyn Westenbroek and Katelyn Fisher, asked that the housing contract be modified to permit the young women to terminate the contract if Langford moves in. Defendant

Kappa Housing Corp. refused this request. If a sorority member refuses to sign the housing contract, she is subject to discipline by the Sorority, including suspension or dismissal.

**87.**   At present, the house will have at most 28 residents next year. Only 25 women have returned a signed contract. This dramatic decline is because of the lack of privacy in the sorority house and Langford's access to all areas within.

**88.**   Defendants' wrongful admission of Langford to the Sorority has caused the sorority house to become financially unsustainable. As a direct result of Defendants' wrongful admission of Langford to the Sorority house, the Kappa house will close. Upon information and belief, once the Sorority house closes, the Kappa Kappa Gamma chapter at the University of Wyoming—which has been in existence since 1927 with thousands of alumnae, including prominent leaders in Wyoming and beyond—will close. Plaintiffs will not only be forced to seek housing elsewhere, away from the single-sex environment that Kappa offered, but they will also lose—forever—the opportunity to participate in a sorority during their college years at the University of Wyoming.

**V.   Defendants' evasion of Kappa Kappa Gamma's membership restrictions represents an ongoing violation of fiduciary duties to the Corporation, and any additional demands to the Sorority's Directors would be futile.**

**89.**   Plaintiffs bring this action derivatively in the right and for the benefit of Kappa Kappa Gamma to redress the breaches of fiduciary duty and other violations of law by Defendant Mary Pat Rooney and other members of the Fraternity Council.

**90.**   Plaintiffs will adequately and fairly represent the interests of Kappa Kappa Gamma Fraternity and its members in enforcing and prosecuting this action. Plaintiffs are college students and Kappa members, who are currently experiencing the changes that occur when a man becomes a part of an all-female sorority house.

91.    The Federal Rules of Civil Procedure, and analogous requirements adopted by the State of Ohio, require that Plaintiffs' derivative action begin, first, with a request to the corporation. Plaintiffs must describe with particularity the efforts by Plaintiffs to resolve this violation without resort to litigation or, in the alternative, explain why any such request would be futile.

### A.    The Defendants have refused Plaintiffs' demands to prevent violation of the Sorority's restrictions on membership.

92.    The Articles of Incorporation, Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma Fraternity restrict membership in the Sorority to women only. Defendants have not amended these corporate governance documents to permit membership for Langford, who is a man who claims to identify as a woman.

93.    Plaintiffs demanded that the Sorority act to prevent the initiation of Langford, who is ineligible to be a Kappa member. In September and early October 2022, Plaintiffs and, in some cases, their parents reached out to national Sorority leaders to raise concerns about Langford.  At that time, Langford's membership had not yet been finalized. In response, Kari Kitrell Poole, the Executive Director of the Sorority, told Plaintiffs that their request had been presented to the Fraternity Council and refused. Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

94.    In November 2022, Plaintiffs, through counsel, again wrote to the national Sorority, requesting that Kappa Kappa Gamma prevent the initiation of Langford until concerns about his membership were resolved. Attachment 11. Plaintiffs' letter pointed out that Langford's membership is both a violation of the Sorority's bylaws and also breaches the housing contract that Plaintiffs signed with the Defendant Kappa Housing Corporation.

95.     The Sorority, through counsel, rejected Plaintiffs' request. Attachment 3. The Sorority repeated its claim that Kappa Kappa Gamma is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id.* This statement, which disregards the actual meaning of the word "woman" as used by the Sorority for 150 years, was presented to Plaintiffs as the official policy of the Sorority. Kappa's counsel stated that the Sorority leadership has concluded that a woman need not be "biologically born as female." *Id.* at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs' request for relief within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

**B.     Any further demand to the Fraternity Council, seeking enforcement of Kappa Kappa Gamma's membership restrictions, would be futile.**

96.     Even had the Plaintiffs not demanded that the Sorority prevent Langford's wrongful initiation, any demand would have been a futile, wasteful, and useless act. Defendant Rooney, and the other members of the Fraternity Council, are unable to fairly consider any such demand because the directors face a substantial likelihood of liability for their role in the Sorority's improper conduct.

97.     The current Fraternity Council is unable to independently assess Plaintiffs' demands. Defendant Rooney and the other members of the Fraternity Council have been actively involved in the development and dissemination of the revised membership policy in flagrant disregard of the Sorority's corporate governance documents.

98.     Defendant Rooney, with the other members of the Fraternity Council, served as the Board of Directors for the Sorority during the wrongful behavior alleged herein, and each director knew of this wrongdoing but failed to act in the face of a known duty to act. For these reasons, Defendant Rooney faces a substantial likelihood of liability for her participation in these acts. The sustained

failure of the Fraternity Council to ensure effective corporate governance and ensure compliance with the mission and purpose of the Sorority can only have been a result of a knowing breach or reckless disregard of fiduciary duties.

99.     The futility of any request by Plaintiffs is further demonstrated by the November 2022 letter to Plaintiffs' attorney from an attorney for the Sorority. The Sorority, through counsel, stated that "Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status." *Id.* at 2. With this statement, the Sorority's counsel indicates that the Sorority is not only unwilling to take action related to Langford, but the letter indicates that the Sorority has no intention to evaluate whether *any* member complies with the Sorority's requirement that a member be a woman. In stating that the Sorority has no interest in objective evidence about a member's sex, Kappa's counsel demonstrated that the current Sorority leadership will never take action to enforce the membership restrictions that guided the Sorority for its first 150 years.

100.     The letter from Kappa's attorney also lays out, for the first time, the subterfuge that Defendant Rooney and the Sorority's leadership have undertaken to undermine Kappa Kappa Gamma's longstanding membership criteria. The attorney refers to two "Position Statements" issued by the Sorority in September 2021. Position Statements are documents prepared by Sorority staff, and they are never presented to the Sorority's membership for approval or review. These position statements restate language that was originally included in the "Guide for Supporting our LGBTQIA+ Members." Attachment 2. Upon information and belief, the Position Statements were prepared by staff at Sorority headquarters at the direction of the Fraternity Council. In addition to

position statements on "Academic Excellence" and "Hazing," the Position Statements include the

following paragraphs:

### MEMBERSHIP SELECTION
Kappa Kappa Gamma is a single-gender organization comprised of women *and individuals who identify as women* whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.

Kappa Kappa Gamma continues to seek members who:
- Will further the mission and purpose of the Fraternity.
- Have achieved academic success.
- Have demonstrated good character.
- Will enrich the life of the group through shared congeniality.
- Are responsible citizens and contributing members of their communities.

Each chapter of Kappa Kappa Gamma has the final choice of its own members.

### SINGLE-GENDER ORGANIZATIONS
Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.

The single-gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX.

Attachment 12 at 2 (emphasis added). Kappa "Position Statements" are not Bylaws, Standing

Rules or Policies of the Sorority. These documents were issued *before* any changes to the

Sorority's Bylaws in 2022, and they reflect further evidence that Defendant Rooney and the

Sorority's Fraternity Council are knowingly working to undermine the Sorority's lawful

membership criteria.

**101.**    In the letter to Plaintiffs, Kappa's counsel also refers to a policy issued by the National

Panhellenic Conference in 2020. The National Panhellenic Conference is an umbrella organization

of twenty-six sororities active on college campuses. The attorney's letter cites the NPC Policy as

**APP.051**

support for the Kappa Kappa Gamma's action, stating that the NPC policy means that "all women" may join a sorority, including men who claim to be women. The Kappa counsel's letter, however, selectively quotes the NPC policy. The letter incorrectly suggests that the NPC policy has an effect on the membership requirements of Kappa Kappa Gamma and the other sororities that belong to the NPC. This is false. The 2020 Policy Statement expressly states that it only applies to whether a man who identifies as a woman may participate in formal recruitment ("rush week"), a time when all twenty-six sororities recruit new members. Individual sorority membership requirements are unaffected by the NPC policy:

> Panhellenic Recruitment Eligibility (2020) – POLICY
>
> For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.

The Sorority cannot use the NPC policy to justify a change in Kappa Kappa Gamma's membership requirements. Moreover, the Sorority cannot claim that its policy reflects the NPC policy when it differs materially. The NPC policy requires that a man "consistently live[] and self-identif[y] as a woman." The Kappa Guide requires only that a man "identify" as a woman. Defendants have eliminated any requirement that a male applicant take any steps to demonstrate that he "consistently lives" as though he is a woman. The letter's misleading reference to the NPC policy is further evidence that the Sorority's leadership intended to act contrary to the corporation's governance documents.

**102.**    The "Guide for Supporting our LGBTQIA+ Members" is not a Bylaw of Kappa Kappa Gamma. The Guide is not a Standing Rule of Kappa Kappa Gamma. The Guide is not one of the

official Policies of Kappa Kappa Gamma. The Guide was not adopted by a vote of the Fraternity Council.

**103.**    The Guide was distributed to the Sorority's 'workforce' (alumnae who direct chapter operations) in 2018 as a "resource," but the document was not provided to all Sorority members. The Guide states that its purpose is to help fulfill the Sorority's expectation that members "promote integrity, respect, and regard for others, and appreciation of the worth of all individuals." The Guide does not read like an official corporate policy. Members can learn about "How to Be an Ally," "Using Inclusive Language," and "How to Support Someone Who Is Coming Out." Attachment 2 at 1–2. Much of the Guide is unobjectionable as a matter of setting expectations about how Kappa members will interact with others. Upon information and belief, much of the Guide repeats, without attribution, material created by an organization called CampusPride.org. *Compare* Attachment 2 with "Greek Ally Kit" *available at* bit.ly/401gHhv (visited March 3, 2023).

**104.**    Although the Guide was disseminated by the Sorority as a resource, Defendant Rooney and the members of the Fraternity Council have treated the Guide as a change to the Sorority's membership rules. Upon information and belief, Defendant Rooney and other members of the Fraternity Council regularly communicate through "GroupMe" to avoid oversight and potential discovery of their discussion of the changes to Kappa's membership requirements. Defendant Rooney's active work to conceal the Fraternity Council's decision-making, when considered in combination with the Sorority's *ultra vires* decision to permit men to become members of the Sorority, demonstrates that the Fraternity Council actions have not been made in good faith and are contrary to the best interests of the Sorority.

105.    As alleged herein and based on the duties imposed pursuant to the Fraternity's corporate governance, Ohio law, and obligations set forth in the Sorority's Code of Conduct, Defendant Rooney and the other members of the Fraternity Council were aware that Langford is ineligible to become a member of the Sorority. Given the duties placed on the directors of the Sorority, to the extent Defendant Rooney or any other member of the Fraternity Council did not have actual knowledge of these repeated violations, such lack of knowledge could only be the product of recklessness or willful disregard of their duties that constitutes bad faith. Any further demand upon the Sorority's leadership would be futile.

**VI.    Kappa Kappa Gamma's effort to force the membership of Artemis Langford, and the experience of Plaintiffs since his admission, demonstrate the disruptive effect of a man on the sorority experience.**

106.    In pursuit of their improper goal of transforming Kappa Kappa Gamma through the initiation of Artemis Langford, Defendants have violated other Bylaws, Standing Rules, and Policies of the Sorority. Officers and employees of the national organization, and alumnae advisers acting at their direction, actively pressured members of the Chapter to support Langford's admission to the sorority, ignoring Bylaws and Standing Rules that would have foreclosed his initiation. Langford was selected and initiated as a Kappa member without following the Standing Rules and Policies that ensure a secret ballot.

107.    Since Langford's unlawful admission to Kappa Kappa Gamma, Defendants have disregarded concerns about Langford's inappropriate, and sometimes threatening, behavior. Instead, Defendants have retaliated against Plaintiffs and other sorority members who have raised concerns about the transformation of Kappa Kappa Gamma from a women's sorority into a co-ed organization.

108.    Plaintiffs Westenbroek, Holtmeier, Coghan, Ramar, and Kosar all participated in fall sorority recruitment, colloquially known as "rush week," during their first year at the University of Wyoming. Plaintiff Choate joined Kappa Kappa Gamma at another college and transferred to the University of Wyoming at the beginning of her sophomore year. During Kappa recruitment, Kappa Kappa Gamma members repeatedly described the Sorority as a sisterhood, a term universally understood to refer to women only. Ms. Holtmeier was told that, even after she graduates from college, "You are always going to have a sisterhood right there." No person told Plaintiffs that Kappa Kappa Gamma's definition of a "woman" includes men. No person told Plaintiffs that men who claim to identify as women could be accepted to membership and live in the Kappa sorority house with access to all private areas.

109.    During the recruitment process, Plaintiffs learned that if they joined Kappa Kappa Gamma, they would be forever barred from switching to a different sorority. Plaintiffs could have joined other sororities at the University of Wyoming. Plaintiffs would not have joined Kappa Kappa Gamma if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

110.    Plaintiffs' Complaint is supported by other Kappa members who are Wyoming citizens. These young women are not Plaintiffs solely because their participation could destroy this Court's jurisdiction should the Court conclude that Langford is a citizen of Wyoming and also a required party.

111.    Haley Rutsch, Elizabeth Renkert, and Madison Terrell are current members of Kappa Kappa Gamma. These non-party witnesses all participated in fall sorority recruitment during their first year at the University of Wyoming. During recruitment, the members of Kappa Kappa

Gamma repeatedly described the Sorority as a sisterhood for women only. No person told Rutsch, Renkert or Terrell that Kappa Kappa Gamma's definition of "woman" includes men who claim to identify as women. No person told these witnesses that, if they became members of Kappa Kappa Gamma, they would be required to live in the sorority house and that men who claim to identify as women would also be able reside in the house and have access to all private areas. During the recruitment process, Rutsch, Renkert, and Terrell were told that if they joined Kappa Kappa Gamma, they could never join a different sorority. These women could have pledged other sororities at the University of Wyoming. They would not have joined Kappa Kappa Gamma if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

112.    Both Ms. Terrell and Katelyn Fisher participated in formal recruitment for Kappa Kappa Gamma in fall 2022, and they were offered the opportunity to join the Sorority at that time. Before initiation, the Sorority requires pledges to attend meetings to learn about the Sorority's history and values. Ms. Terrell, Ms. Fisher, and the other fall 2022 Kappa pledges did not know that Langford would also be joining the Sorority until he attended an educational meeting for new pledges. One pledge originally believed that Langford was at the meeting to write an article about the Sorority for the campus newspaper. Ms. Terrell wrote to national Sorority officials about her surprise, noting that she and other new members had not even received a "heads up" about Langford's potential membership. Sorority leadership has not responded to Ms. Terrell's concerns.

113.    Of the twelve women who were invited to become Kappa members in Fall 2022, four women dropped out before initiation because they did not want to live in a sorority house with a man. One pledge suffered a panic attack and required medical care as a result of her interactions

with Langford. This pledge informed Ms. Choate that, while at a new member meeting, Langford said, "I can't wait to live in the house and sleep with all the girls." Ms. Fisher's fellow pledges told her that they did not join Kappa Kappa Gamma because they did not feel comfortable living in a sorority house with Langford.

### A. Langford's behavior has destroyed the single-sex haven that Kappa members describe as the heart of the sorority experience.

**114.** Plaintiffs' concerns about the admission of a man into the Sorority have been validated by Langford's own behavior and statements.

**115.** Langford is 6'2" tall, and he weighs 260 pounds. No other member of Kappa Kappa Gamma has comparable size or strength. Langford is a sophomore at the University of Wyoming, but he is older than his peers. Prior to attending the University of Wyoming, Langford attended Eastern Washington University. Langford graduated from high school in 2020 and turned 21 years old in October 2022.

**116.** Langford states that he is transgender and that he self-identifies as a woman. His behavior, however, does not reflect a man living as a woman let alone a man attempting to "consistently live" as a woman (as noted in the NPC policy in paragraph 101 above). Langford was involved in an automobile crash in January 2023. At that time, Langford presented a Washington State driver license to the responding officer. The Washington license states that Langford is a male with residence in Bellevue, Washington. The license was issued in November 2020. Beginning in 2019, one year before Langford applied for his license, Washington State permitted applicants to select the gender that would appear on the license. When Langford applied for a Washington license, he could have reported he was male, female, or "X." Langford told the State of Washington that he is male. Langford could have sought to change the sex indicated on his license in 2021, when he

changed his legal name to Artemis Langford, but Langford did not do so. Langford's current driver

license states he is male, and when he presented this official document to law enforcement officials

in January 2023, Langford was making an assertion that he is male.

**117.**    Langford wears women's clothing only occasionally. He regularly travels about campus

wearing baggy pants as would any other male student. Other than occasionally wearing women's

clothing, Langford makes little effort to resemble a woman. He has not undergone treatments to

create a more feminine appearance, such as female hormones, feminization surgery, or laser hair

removal. Plaintiffs often observe Langford with the facial hair one would expect on a man who

either did not shave that morning or whose facial hair has regrown by the evening.

**118.**    One Kappa member, Lillian Feist, has observed that Langford is very interested in politics

and the law. When Langford encounters disagreement, he claims the other person disagrees with

him because he is transgender. Langford then states that the disagreement is an act of

discrimination. Ms. Feist has observed Langford use his transgender identity to threaten others

with discipline, especially those he believes do not support his Kappa membership.

**119.**    Langford's behavior is made more threatening because Langford is sexually interested in

women. Langford has a profile on Tinder—an online dating application—through which he seeks

to meet women. Plaintiffs have regularly discovered Langford using his Kappa membership to

enter private areas of the sorority house and watch other members. Ms. Rutsch and other members

of the sorority work in the evenings, and these women may not return home until the evening hours

(9 p.m. for Ms. Rutsch). On at least five occasions, Ms. Rutsch has entered the sorority house and

observed Langford sitting alone in a chair in the living room. Langford's chair is located where he

can see women walk through the foyer, but the women can only see him out of the corner of their

eyes. Langford does not speak to sorority members as they enter. Instead, Langford stares, following the women with his eyes. Ms. Rutsch and other members of the Sorority have seen no evidence that Langford is studying in the living room. Indeed, it would be difficult to study where Langford sits as there are no easily accessible writing surfaces or places to keep study materials. Langford has, while watching members enter the sorority house, had an erection visible through his leggings. Other times, he has had a pillow in his lap.

**B.    Langford's interactions with the Sorority members prior to voting on his Membership.**

**120.**    Langford first participated in the Panhellenic sorority recruitment at the University of Wyoming in Spring 2022. Langford did not apply to join Kappa Kappa Gamma at that time. Instead, Langford sought to join the Delta Delta Delta sorority. During the event to meet members of that sorority, Langford talked about his desire to be near cadavers and to touch dead bodies. Delta Delta Delta did not invite Langford to join the sorority. Plaintiff Choate learned of this conversation, but she was out of town during the chapter meeting to vote on Langford, and she was not able to present her concerns due to the illegal voting process approved by Defendants and their agents.

**121.**    In August 2022, Langford participated in the formal recruitment process for sororities at the University of Wyoming. The formal recruitment process permits prospective applicants to meet members of each of the four sororities at the University of Wyoming. On the first day of the week, young women attend presentations about sorority life. During the next two days, each sorority sets aside several hours for potential applicants to meet current sorority members. Prospective members visit a sorority house, where they meet with groups of current members in roughly five-minute intervals. After the meetings, the potential applicant and the sorority members rate the experience

using Omega Recruit. Each day, the ratings are tabulated and the individual and the sorority determine whether to continue to discuss membership. During formal recruitment, the Membership Chair for the Kappa chapter at the University of Wyoming told other sorority members that Kappa rules did not permit them to refuse to admit Langford because he was a biological male. The Membership Chair also stated that all members would have to unanimously agree before Langford could live in the sorority house.

**122.**    During the week of formal recruitment, Langford avoided answering questions about his hobbies, passions, or involvement in other organizations. Plaintiffs Westenbroek, Holtmeier, Choate, and Ramar remember speaking with Langford during the formal recruitment process. Ms. Choate and Ms. Westenbroek remember Langford specifically asking whether he could live in the sorority house. While formal recruitment is intended to determine whether applicants have character traits that align with Kappa Kappa Gamma, Plaintiffs and other chapter members felt Langford lacked passion for the sorority experience. Plaintiffs voiced this concern to the chapter's Membership Chair.

**123.**    Langford did not complete the full recruitment week for Kappa Kappa Gamma, choosing to try to join a different sorority.

**124.**    After formal recruitment ended, Plaintiffs and other members of the Sorority believed Langford's membership application was moot. What the chapter's Membership Chair did not tell these Sorority members, however, was that Langford had reached out to pursue Kappa membership through a process called "continuous open bidding." Continuous open bidding allows women to become members of a sorority outside of formal recruitment. The Sorority requires all chapters to

use continuous open bidding if the sorority house has additional capacity. Attachment F at 13 (Policy VIII, sec. 3.F).

125.    The national Sorority's alumnae advisers also directed chapter officers to recruit Langford. From 2016 until Spring 2022, the Kappa chapter at the University of Wyoming was under continuing review by national Sorority leaders. These alumnae supervisors did not believe the chapter was providing the expected benefits to members. Having just concluded this multi-year evaluation period, alumnae advisers told the chapter President and other officers that they could raise the prominence of the Wyoming chapter and garner the favor of national Sorority leaders if they recruited and admitted Langford as Kappa Kappa Gamma's first transgender member.

126.    During Continuous Open Bidding, applicants visit the sorority house for dinner or meet Kappa members for coffee. The Membership Chair schedules these events and uses the chapter group chat to announce dinners and coffee dates to meet *other* prospective new members in fall 2022. This was not done for Langford. Most Plaintiffs did not know Langford was being considered for membership through the continuous open bidding process. Prior to the vote on Langford's membership, the only mention of his membership application occurred at a chapter meeting. At the meeting, the Membership Chair announced that Langford had asked to apply though continuous open bidding. The only written notice to chapter members about a proposed dinner to meet Langford was a brief reference in the paper minutes from that chapter meeting.

127.    When Ms. Holtmeier and Ms. Ramar asked about Langford's application, the Membership Chair stated that the chapter was required to permit Langford to apply, but she downplayed any possibility that he would become a Kappa member. The Membership Chair said so many Kappa members had come to her that it was "a 99.9% chance" that he would not be offered membership.

Just one week before the surprise vote on Langford, the Membership Chair continued to state that, if Langford were to join Kappa Kappa Gamma, he could not live in the sorority house unless every other member agreed.

**128.**     National Sorority representatives usually have little involvement in member selection until after chapter members have voted. After that point, every prospective member must be reviewed and approved by the national Sorority; the chapter must receive "permission to initiate" each candidate. In Langford's case, however, national Sorority representatives, including the alumnae advisers, were extensively involved from the start of the continuous open bidding process. Upon information and belief, alumnae advisers coached chapter officers about the importance of Langford's admission.

### C.    The Voting Process.

**129.**     The chapter leaders who were in office in September 2022, with direction from alumnae advisers, implemented an illegal voting process to ensure that Langford was admitted to Kappa Kappa Gamma. (The chapter elects new officers each year in November, and the new officers take over at the end of the fall semester.) Under the Standing Rules and Policies of the Sorority, chapters must use the electronic voting system selected by the national Sorority, called "Omega Recruit," when voting on new members. Attachment 7 at 1 (Standing Rules 1.1A); Attachment 8 at 14 (Policy VIII, sec. 3.P.). This electronic voting system guarantees anonymity, and Omega Recruit was used in Spring 2022 for applicants in the continuous open bidding process. Further, under the Sorority's Standing Rules, all active chapter members "shall participate in membership selection unless excused in writing by the designated chapter adviser." Attachment 7 at 1 (Standing Rules 1.1.A.1).

130.    Voting for Langford did not follow the required procedures. All Chapter members are expected to attend the weekly Chapter meeting on Monday evening. Members can be excused if they attend a Sunday evening Chapter Council meeting where officers discuss the upcoming meeting. Ms. Ramar and another sorority member attended the Chapter Council meeting prior to the vote on Langford's membership. At the Chapter Council meeting, officers intentionally concealed the fact that Langford's candidacy would be presented for a vote, that the chapter officers intended vote using a Google Poll, and that only those present at the chapter meeting could vote on Langford. Ms. Ramar and the other member would have attended the chapter meeting if they had known a vote on Langford would occur. They would have voted against Langford's admission.

131.    At the Chapter meeting on September 19, 2022, members were told that they would vote that day on Langford. Sorority rules prohibit discussion during the voting process, but this restriction was not followed for Langford. Several members of the chapter, including the President, the Membership Chair, and the Vice President for Academic Excellence, spoke prior to the vote. Each made almost identical statements that, upon information and belief, were coordinated with national Sorority officials. Each speaker stated that members could only vote against Langford if they could articulate specific concerns about his personality. If members had not met Langford, then a "no" vote was evidence that the member was a bigot. Kappa members understand that bigotry is a basis for suspension or expulsion from the Sorority. The Membership Chair, however, had obscured the only opportunity to meet Langford. Upon information and belief, the Membership Chair, in conjunction with national Sorority officials, did so because it would permit her to threaten members if they did not vote for Langford.

132.    The members who discussed Langford at the chapter meeting repeatedly referenced "transphobia" and "homophobia." One officer stated, "[r]egardless of what your political views are, our Kappa values are acceptance and kindness so if that is something that you disagree with, that's not in line with Kappa values." When other members asked to respond, the chapter President, stated, "No, no discussion." Then, the chapter President continued to recognize other members to speak about why Kappa Kappa Gamma had to admit Langford. Statements included: "You should basically be voting yes for everyone unless they truly go against Kappa's values." "It's 2022. If you vote no, it better be for, like, literal issues with that new member or else it's homophobic." "If you have something to say about this that isn't kind or respectful, keep it to yourself." "If your only concerns are about [Langford] living in the house, you are thinking too far down the road."

133.    At the end of the chapter meeting, the chapter officers described the voting process. Rather than using Omega Recruit, chapter members would vote using a link to a Google Poll. Further, even though the link to the Google Poll would be emailed to all chapter members, the officers stated that only members who had attended the chapter meeting could vote. This restriction violated the Sorority's Standing Rules.

134.    Thirty minutes after the link to the Google Poll was sent to members, the chapter officers sent out a link to a second Google Poll. This second Google Poll required voters to sign-in with their email address. When a Google Poll is conducted in this manner, it is not a secret ballot. The Google dashboard shows when each email address logs in, and it also records how the vote total changed. In addition, during the second vote, chapter officers moved throughout the sorority house, locating some (but not all) members and instructing them to vote on their phones while the officers watched. When enough votes for Langford's membership had been secured, the voting stopped.

**APP.064**

**135.**    At least three members of the Sorority voted against Langford in the first Google Poll and changed their vote in the second poll. When these women were told that they would have to vote again with an email address, they understood that the second vote would not be secret. The members changed their votes. At least one sorority member voted for Langford's membership only because she feared retribution. Ms. Rutsch voted against Langford's membership, and she has spoken with several other Kappa members who admitted that they also changed their votes in fear of reprisal.

**136.**    Langford was admitted by a margin of either one or two votes. Had the chapter conducted a lawful voting process, according to the Sorority's required procedures, Langford would not have been offered membership in Kappa Kappa Gamma.

### D.    The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies.

**137.**    The day after the vote on Langford, Plaintiffs Westenbroek and Ramar and another sorority member approached the chapter President and the Vice President for Standards about prior assurances that Langford would not live in the sorority house unless every member agreed. The chapter President responded that she had no idea where this assurance came from, that it was false, and that she had never heard anyone make such a statement. In August 2022, however, the chapter President was standing next to the Membership Chair on the stairs of the Sorority house when the Membership Chair made this statement about housing for Langford.

**138.**    Plaintiffs expressed concern that the chapter would lose other initiated and uninitiated members who do not want to live with a man. The chapter officers are seniors who will never live with Langford. They replied "we don't care about numbers." When Plaintiffs objected to Langford's membership as a violation of Kappa rules, Defendants and their agents instructed

Plaintiffs to resign from Kappa Kappa Gamma if they disagreed with Langford's membership. At the time Defendants urged these Kappa members to resign, Defendants and their agents knew that Plaintiffs cannot join another Sorority.

**139.**    In addition to the voting process for Langford, his membership application has been evaluated using a different standard. In fall 2022, Langford had a 1.9 cumulative grade point average. This GPA is disqualifying for Kappa applicants, who must have at least a 2.7 GPA. Attachment 14 at 1 (House Bylaws, art. III, sec. 1.A.1.). Nevertheless, Langford was approved by the national Sorority. Upon information and belief, the national Sorority did not even consider whether a grade exception was necessary before admitting Langford. Langford is also not on grade probation, despite the fact that his low GPA requires probation as a condition of membership.

**140.**    When Plaintiffs and their parents raised concerns about Langford's presence in intimate areas of the sorority house, Sorority officials told them "just don't use the same bathroom that [Artemis] uses" and "since [Artemis] identifies as a woman you have no reason to feel uncomfortable." Sorority employees stated Langford's presence would be no different than a co-ed dormitory living situation. This is factually incorrect, as the co-ed dormitories at the University of Wyoming have locks and other protections for women. Sorority officials said that if Plaintiffs objected to Langford's membership, they do not subscribe to Kappa's values of inclusion and diversity.

**141.**    Plaintiffs reached out to Kari Kitrell Poole, the Executive Director of the Sorority, with concerns about the voting process and Langford's membership. Ms. Poole responded that "your concerns were reviewed by several national officers of the organization" and "we [these national

officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

**142.**     After Plaintiff Holtmeier raised further concerns, she was brought before a disciplinary hearing. Chapter officers read prepared statements that they had discussed with Sorority officials and provided material so Ms. Holtmeier could "educate" herself. The Sorority's alumnae adviser for standards was present, and she spent the entire hearing texting with national Sorority officials on her phone. The material given to Ms. Holtmeier included the "Guide for Supporting our LGTBQIA+ Members." Ms. Holtmeier was threatened with further discipline if she did not agree that Langford is a woman or questioned whether his vote complied with the Sorority's rules. When Ms. Holtmeier asked questions, she was told "that's what we are supposed to do now." At least one other sorority member has also been threatened with discipline if she does not agree that Langford is a woman.

###### E.     Langford's conduct after Defendants granted him access to the sorority house.

**143.**     Since the vote, Langford has received all privileges of Kappa Kappa Gamma membership, including access to living areas that are restricted to women only. Langford participates in the weekly meetings and the secret rituals of sorority chapter; he eats at the sorority house; he participates in other all-female activities that are closed to non-members. The second floor of the sorority house is off-limits to men at all times, and it has a small common room called the "PJ," so called because members can socialize there in pajamas. Since his admission, Langford has visited the P.J. several times, sometimes sitting alone for hours. At other times, members have entered the first-floor study room, turned on the lights, and found Langford asleep on the couch.

144.    Langford's conduct at the slumber party prior to the Kappa initiation ceremony for new members was inappropriate and threatening. Ms. Kosar offered to be responsible for taking pictures of the other pledges with a disposable camera. At some point in the evening, after Ms. Kosar had put down the camera briefly, Langford took the camera and began taking pictures of the young women at awkward moments when they were not prepared. During the evening, Langford repeatedly questioned the women about what vaginas look like, breast cup size, whether some women were considering breast reductions, and birth control. Langford talked about his virginity and at what age it would be appropriate for someone to have sex. Langford also talked about kissing a girl.

145.    Langford stated that he would not be staying the night at the slumber party, but he remained after all other women had departed, saying he would not leave "until after you fall asleep." Langford was supposed to leave by 10 p.m.. At about 11:15 p.m., when the lights had been turned off and other pledges were trying to sleep, Langford started loudly singing "God Rest Ye Merry Gentlemen" by himself in the corner of the room by the light of his laptop screen. Langford did not leave until midnight.

146.    The next morning, Langford returned and stood silently in the corner of the room near the door while other pledges changed from sleeping garments into other clothing. Ms. Kosar did not know that Langford had returned. Ms. Kosar had not slept wearing a bra. She faced away from the others and removed her shirt. After she had put on a new shirt, Ms. Kosar turned around and discovered Langford staring at her. After the morning activities, another Kappa member informed Ms. Kosar that while watching her, Langford had become sexually aroused. He stood by the door

**APP.068**

with his hands over his genitals. Since that event, Langford has repeatedly asked Ms. Kosar about her romantic attachments.

147.    In December 2022, Ms. Renkert attended a yoga class sponsored by the Panhellenic union for members of all of the sororities at the University of Wyoming. Langford attended this yoga class, but he did not participate. He sat in the back of the room for an hour and watched the assembled young women flex their bodies. The door to the yoga studio was near where Langford sat, so he could have left without drawing attention or disrupting the class. Langford did not leave until the end of the one-hour class. Langford did not speak to anyone at the yoga event. After the class, participants were invited to stay for refreshments. Other participants commented on how uncomfortable they felt as Langford watched them.

148.    At times, sorority members have observed Langford writing detailed notes about members and their statements and behavior. Langford states that he is a journalist, and he has published articles and columns in *The Branding Iron*, the campus newspaper at the University of Wyoming. Langford told Ms. Feist that he is always writing things down in his notebook so that he can use them later in an article. Sorority members believe that Langford is recording these private comments in order to publish them at a later date.

149.    Langford uses his phone to take pictures of women in the sorority house without their knowledge or consent. In one incident, Langford walked up to a sorority member in the dining room, raised his phone to her face, took a picture, and then walked away without explanation or apology. Ms. Renkert has observed Langford taking other pictures with his phone while eating at the house. She has seen Langford rest his phone on the table in a manner that it appears as though he is scrolling through an app when he is, in fact, covertly using the camera to photograph women.

150.    In December 2022, Ms. Renkert submitted a letter of resignation to the chapter officers, because her interactions with Langford made her feel unsafe. She did not want to live in the sorority house with him. Shortly after submitting the letter of resignation, Ms. Renkert determined that she valued her "women-only" sisterhood experience. Ms. Renkert's parents offered to pay for off-campus housing, so Ms. Renkert now pays the full cost of living in the sorority house and also pays to live in an off-campus apartment.

151.    Ms. Renkert withdrew her letter of resignation after her parents offered to pay for her housing. The Kappa chapter officers and their alumnae advisor, however, stated that Ms. Renkert could not do so. The alumnae advisor stated that Ms. Renkert was required to withdraw her letter by early January 2023, when all students were gone for semester break. Ms. Renkert objected to this interpretation of the Sorority's rules, and the Sorority's national officer for standards eventually agreed that the alumnae adviser was wrong. Ms. Renkert was entitled to have a vote on her request to resign. The chapter members overwhelmingly voted to let Ms. Renkert remain as a member in good standing.

152.    Before the vote by chapter members, Ms. Renkert learned that Langford had sent a blacklist of chapter members to officials at the national Sorority headquarters. Langford's list contains the names of women he believes are transphobic and should be expelled from Kappa Kappa Gamma. Ms. Renkert learned that her name is on Langford's list. Upon information and belief, Ms. Renkert believes that the alumnae adviser intentionally put forward an incorrect interpretation of the Sorority rules in retaliation for her view that Langford is not a woman and not eligible to be a member of Kappa Kappa Gamma. Further, Ms. Renkert believes that Sorority officials have made, and will continue to make, efforts to eject her and the other Kappas on Langford's list from the

**APP.070**

Sorority. This attempt to force Ms. Renkert out of the Sorority was in retaliation for her disagreement with Langford's membership. Langford has demonstrated and acted on his intention to pressure the Sorority, at the local and national level, to expel any member who is committed to preserving the women-only character of the Sorority.

### F. Damages.

153.    As a requirement of membership, Sorority members must "promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the *Bylaws, Standing Rules, and Policies* [of the Sorority] as well as my chapter Bylaws and Standing Rules." Attachment 9. (Commitment Form). Collegiate members pay dues at initiation and additional dues every year to the Sorority. Plaintiffs cannot resign from Kappa Kappa Gamma to join a different sorority. Kappa Kappa Gamma is one of the 26 sororities that comprise the National Panhellenic Conference (NPC). These sororities have all agreed a woman who joins one NPC sorority is permanently ineligible for membership in any other NPC sorority.

154.    Each Plaintiff joined Kappa Kappa Gamma with the promise they would be able to live and socialize in an all-female environment. Defendants have repeatedly lauded the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will *never* have the benefits of a college sorority experience. Some of the damages to each Plaintiff are easily calculable, including the dues and housing payments that were made for the purpose of living in an all-female environment. Some will be more difficult to calculate, but they are no less real. For 150 years, Kappa Kappa Gamma has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa Kappa Gamma has stated that these benefits result from the single-sex experience. Plaintiffs agree that these benefits exist. The

loss of these lifetime benefits is similarly calculable, and Defendants are responsible for this damage to Plaintiffs.

**155.**     The Sorority itself has also been damaged by Defendant Rooney and the other members of the Fraternity Council. Their violations of fiduciary duty have caused the sorority chapter at the University of Wyoming to lose significant membership in less than six months. With only ten signed housing contracts for the next academic year, the sorority house at the University of Wyoming will close and then the college chapter itself will fold. The loss of a sorority chapter has a significant effect beyond just the loss of dues from the college students there. These young women will become leaders, and—just as prior generations have—they will donate to the Sorority and its continued operation. The loss of a sorority chapter cuts off all future alumnae from that school.

**156.**     Plaintiffs want Kappa Kappa Gamma to remain loyal to the promises the Sorority has made throughout its history. Plaintiffs ask for a declaratory judgment that Kappa Kappa Gamma remains as it claims in its articles of incorporation: an organization "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4. Plaintiffs seek to prevent the transformation of their intimate living arrangements and their social organization—without any change in the sorority's legal documents—into a co-ed organization that admits men and women.

**157.**     So long as Langford has the same *legal* access as any other sorority member, young women will not seek Kappa membership at the University of Wyoming. Plaintiffs cannot rely on assurances that Langford will minimize his presence or otherwise alter his behavior. On April 6, 2023, shortly after information about this Complaint became public, Langford requested a

"standing excuse" that he not be required to attend Kappa events "until further guidance is given." On April 9, 2023, Langford extended this request to chapter meetings and other gatherings, asking that he be excused unless his presence is "absolutely essential." This time away lasted little more than a week. On April 17, 2023, Langford resumed his active presence at the sorority house.

**158.**    Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty, and their contractual obligations to the Plaintiffs, by purporting to admit Langford into the Sorority.

## <u>COUNT I</u>

### Derivative Cause of Action

**159.**    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**160.**    Under Ohio law, members of a nonprofit corporation can bring two types of claims. A derivative action is brought in the name of the corporation. Such a suit is the exception to the usual rule that a corporation's board of directors manages or supervises the management of the corporation, and it allows a member to circumvent a board's refusal to bring a suit on a claim. On the other hand, if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation, then the complaining shareholder has a direct action. An injury that

**APP.073**

would be distinct from that suffered by other members could be shareholders could be a wrong involving one of the member's contractual rights as a member. As a general proposition, claims for breach of fiduciary duties on the part of corporate directors or officers are to be brought in derivative suits. This is because the damage that results from the fraudulent or negligent management of the corporation is primarily damage to the corporation and to the corporate assets, and because it affects the members only indirectly and all of them alike.

161.    Ohio's nonprofit-corporation law provides members of nonprofit corporations with a derivative cause of action on behalf of the corporation. When members bring a derivative cause of action against a nonprofit corporation, they are enforcing a corporate right just as shareholders may do in for-profit corporations. Because such a suit brought by a member is identical to a shareholder-derivative suit, the procedural requirements of Fed.R.Civ.P. 23.1 for bringing a shareholder-derivative suit must be fulfilled by members of a nonprofit corporation who bring such a derivative suit.

162.    Rule 23.1 establishes the requirements for maintaining a shareholders' derivative action. Specifically, complaining shareholders must (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort or did not make it, and (3) show that they "fairly and adequately" represent the interests of other shareholders "similarly situated."

163.    By not only allowing, but also by endorsing and actively working to secure the membership of Langford, the directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance.

**APP.074**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 176 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 79
Case 2:23-cv-00051-ABJ    Document 6    Filed 04/20/23    Page 67 of 72

**164.**    The Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma, since the corporation's creation, have limited membership to women only. Women, as understood throughout the Sorority's existence, are adult female human beings. Langford is not a woman. He is a man.

**165.**    Plaintiffs have repeatedly reached out to the corporation's leadership to contest its refusal to enforce the Sorority's membership requirements. Defendants have not only refused to prevent Langford's membership, they maintain that no such membership requirement exists at all. To the extent any further demand is required, such a demand would have been futile.

**166.**    As a result of Defendant's behavior, Kappa Kappa Gamma has lost its identity as an organization for women. At the University of Wyoming chapter, almost half of the women who were offered membership in the Sorority in Fall 2022 have declined to become members. During Spring 2023 recruitment, only two women pledged to join the Sorority at the University of Wyoming. Upon information and belief, the insistence on admitting men to the Sorority has also resulted in a significant decline in alumnae giving, membership, and participation. These changes have also harmed the ability of Kappa Kappa Gamma chapters across the nation to recruit new members.

**167.**    The chapter at the University of Wyoming no longer has enough members to be financially viable, and the behavior of Defendant Rooney and the other Fraternity Council members will result in the chapter's closure unless the Court intervenes. Plaintiffs seek monetary, declaratory, and injunctive relief, as well as such fees and costs as are available.

<u>**COUNT II**</u>

**Breach of Contract**

**168.**    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set

forth fully herein.

**169.**    To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully

enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised

therein, and (3) entitlement of the injured party to damages.

**170.**    Defendant Kappa Kappa Gamma Building Corp., and Plaintiffs have entered into a contract

to provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa

Gamma. These Bylaws, Standing Rules, and Policies do not permit men to live in the sorority

house. Indeed, men cannot enter the living areas of the Sorority except upon special circumstances

that have been approved in advance.

**171.**    Langford's access to and presence in the sorority house violates the housing contract that

Plaintiffs signed.

**172.**    Plaintiffs have suffered damages as a result of this breach.

<u>**COUNT III**</u>

**Tortious Interference with a Contract**

**173.**    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set

forth fully herein.

**174.**    A claim of tortious interference with a contract requires (1) existence of the contract; (2)

Defendant's knowledge of the contract; (3) intentional and improper interference *inducing or

causing a breach*; and (4) resulting damages.

**APP.076**

175.    Defendant Kappa Kappa Gamma knew that Plaintiffs have a contract for housing with Kappa Kappa Gamma Building Corp. Defendants knew, because they required this language, that the contract requires the parties to comply with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. Through their initiation of Langford, Defendants have prevented Plaintiffs from having the benefit of the Housing Contract that they signed.

<u>**COUNT IV**</u>

**Direct Cause of Action**

176.    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

177.    When wrongful acts are not only against the corporation but are also violations of a duty arising from contract or otherwise owed directly by the wrongdoer to the shareholder, the shareholder can bring suit for personal damages or other relief.

178.    The Plaintiffs were deceived, believing that they were joining a woman-only organization, which has made them ineligible to join a different Sorority. Plaintiffs have now been deprived of the all-female environment that other Kappa members have enjoyed throughout the Sorority's 150 year history. Plaintiffs are now required, as a condition of membership, to reside in the same house as a 6'2", 260 pound man who stares at them, asks about their intimate past, makes notes about their statements and takes photographs of them without their consent, and intimidates them by threatening to publicly label them bigots if they raise concerns.

179.    Plaintiffs' loss of privacy, frustration of contractual expectations, and emotional distress are not injuries that Plaintiffs share in common with all Sorority members. They are, however, the direct result of Defendants' actions to force the admission of Langford as a sorority member.

**APP.077**

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

1.      A declaratory judgment that, under the organization's corporate governance documents, including its Bylaws, Standing Rules and Policies, Langford is not eligible for membership in Kappa Kappa Gamma Fraternity and his purported admission is therefore void *ab initio.*

2.      A declaratory judgment that the Defendants have violated their obligations to the organization by purporting to admit Langford to the Sorority.

3.      A declaratory judgment that the Defendants have violated the housing contract and Plaintiffs are entitled to the money damages they have suffered as a result thereof.

4.      Preliminary and permanent injunctive relief preventing Defendants from seeking or encouraging Langford or any man from becoming members of the Sorority.

5.      Monetary damages to compensate for Defendants' wrongful acts.

6.      Plaintiffs' reasonable costs and attorneys' fees pursuant to applicable contractual language, statute or authority, and further relief this Court may grant in its discretion.

7.      Any other relief that the Court deems just and appropriate.

 Respectfully submitted,

/s/ Cassie Craven                              /s/ John Knepper
Cassie Craven                                  John Knepper
Wyoming Bar No. 7-5664                         Wyoming Bar No. 7-4608
Longhorn Law Limited Liability Company         Law Office of John G. Knepper, LLC
109 E. 17th St., Suite 11                      P.O. Box 1512
Cheyenne, Wyoming 82001                        Cheyenne, Wyoming 82003
307-823-3062                                   307-632-2842
cassie@longhornlawllc.com                      John@KnepperLLC.com

Dated this 20th day of April, 2023.

## **VERIFICATION**

I, Hannah Holtmeier hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-18-23                    Signed: _Hannah Holt_

I, Allison Coghan, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-18-23                    Signed: _allie Coghan_

I, Jaylyn Westenbroek hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/18/23                    Signed: _Jaylyn Westenbroek_

I, Grace Choate, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-18-2023                    Signed: _[signature]_

**APP.079**

I, Madeline Ramar, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/18/23                                    Signed: Madeline Ramar

I, Megan E Kosar, hereby declare and verify that I am a member of Kappa Kappa Gamma Fraternity. I have authorized the filing of the attached Verified Complaint. I have reviewed the Complaint and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/28/23                                    Signed:

**APP.080**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 182 of 506

Appellate Case: 23-8065    Document: 010110962649    Date Filed: 12/04/2023    Page: 85
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 1 of 209

# ATTACHMENT 1

# Bylaws of
# Kappa Kappa Gamma Fraternity



Adopted by the 2004 General Convention.
Revised 2006, 2008, 2010, 2012, 2014, 2016, 2018, and **2022** General Conventions.

Kappa Kappa Gamma
is an organization of women, which
seeks for every member throughout her life
bonds of friendship, mutual support,
opportunities for self-growth, respect
for intellectual development,
and an understanding of and an allegiance
to positive ethical principles.

Mission Statement
(Written by the 1984–86 Fraternity Council)

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 185 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 88
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 4 of 209

 FRATERNITY BYLAWS REVISION

Preamble ................................................................................................................. 1
Article I. Name ....................................................................................................... 1
Article II. Purpose.................................................................................................. 1
Article III. Members .............................................................................................. 2
Article IV. Fraternity Organization ..................................................................... 6
Article V. Member, Chapter, and Association Responsibilities ..................... 9
Article VI. Officers .............................................................................................. 11
Article VII. Nominations and Elections ........................................................... 12
Article VIII. Meetings.......................................................................................... 13
Article IX. Fraternity Council ............................................................................ 14
Article X. Committees ........................................................................................ 15
Article XI. Content Areas................................................................................... 16
Article XII. Administrative Operations ............................................................ 17
Article XIII. Finance ........................................................................................... 17
Article XIV. Proprietary Materials .................................................................... 17
Article XV. National Panhellenic Conference................................................. 18
Article XVI. Indemnification .............................................................................. 18
Article XVII. Dissolution.................................................................................... 18
Article XVIII. Electronic Meetings and Communications ............................. 19
Article XIX. Nonprofit Corporation.................................................................. 19
Article XX. Kappa Kappa Gamma Foundation................................................ 19
Article XXI. Fraternity Housing Corporation .................................................. 19
Article XXII. Chapter House Corporation and Chapter House Association.................. 19
Article XXIII. Parliamentary Authority............................................................. 20
Article XXIV. Amendment of *Articles of Incorporation* and *Bylaws*................... 20
Provisos Relating to Transition ........................................................................ 21

**APP.084**

 FRATERNITY BYLAWS REVISION

### PREAMBLE

We, believing a closer union in the bonds of friendship to be for our mutual benefit, appreciating the advantages to be derived from a secret fraternity, and feeling that in union there is strength, hereby form ourselves into a social sorority for the development of nobler qualities of the mind and finer feelings of the heart, and for mutual helpfulness in the attainment of individual and social excellence.

### BYLAWS OF
### KAPPA KAPPA GAMMA FRATERNITY

### ARTICLE I
### NAME

The name of the corporation shall be Kappa Kappa Gamma Fraternity, hereinafter referred to as *the Fraternity*.

### ARTICLE II
### PURPOSE

The Fraternity is formed to function exclusively as an organization described in Section 501(c)(7) of the Internal Revenue Code of 1986 as amended (or corresponding provisions of any future United States internal revenue law) (the "Code"). The purposes for which the Fraternity is formed are:

to unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity at large may attain social, moral and intellectual excellence;

to establish chapters at various colleges and universities, provide for their proper organization, installation and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

to cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest and promote higher standards of social conduct;

to cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

to advocate for and seek to address issues of concern for members and women in general;

to provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and

to have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

**APP.085**

 **Kappa Kappa Gamma**                 FRATERNITY BYLAWS REVISION

Notwithstanding anything to the contrary contained in these articles, the corporation shall not carry on any activities not permitted to be carried on by a corporation exempt from federal income tax under Code Section 501(a) as an organization described in Code Section 501(c)(7).

**ARTICLE III**
**MEMBERS**

**Section 1. Classifications of Members.** The Fraternity shall have the following classifications of members:

**A.  New Member.** A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated. A new member shall:

1.  Have signed a dated, written pledge to membership witnessed in writing by an active or alumna member of the Fraternity;
2.  Remain eligible as a new member for a term of one year before the pledge to membership expires so long as enrolled in the same college or university; and
3.  Have the right to attend meetings, speak in debate and present their views to a committee on a referred question but shall not vote on any question. A new member shall not be present at a meeting during ritual for initiated members.

**B.  Active.** An active member shall be:

1.  An undergraduate enrolled at the college or university where initiated;
2.  A member enrolled beyond the fourth academic year who chooses to remain an active member;
3.  A graduate student who chooses to remain an active member;
4.  A graduate student initiated while pursuing graduate courses;
5.  An undergraduate member who enrolls in a college or university where a chapter of the Fraternity is located and affiliates with such a chapter; or
6.  An undergraduate member who returns to college or university after an absence of two or more years and who has completed at least one academic term and had their active membership restored by a three-fourths vote of the chapter.

**C.  Associate.** An associate member shall be:

1.  An active member who transfers to a college or university:
    a.  With an active chapter and who does not affiliate with the chapter; or
    b.  Where no chapter is located;
2.  An active member who has been granted Associate Membership by the District Director after receiving Advisory Board's approval; or
3.  An active member who is unable to participate in chapter activities because they are:
    a.  Studying abroad; or
    b.  Completing a full-time co-op or internship.

**D.  Alumna.** An alumna member shall be:

1.  An active member who has received a college degree or has left college without receiving a degree;
2.  An active member enrolled beyond the fourth academic year who chooses to become an alumna member;

**APP.086**

 FRATERNITY BYLAWS REVISION

3. An active member still attending college when Fraternity Council has deemed it necessary to reorganize the chapter;
4. A member of a petitioning group who has been initiated into the Fraternity as an alumna; or
5. An individual who initiates through Alumna Initiation.

**Section 2. Qualifications.** A woman may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.

**A.** **Collegiate New Member and Alumna Candidate.** To qualify as either a collegiate new member or an alumna candidate, a woman shall:
1. Have demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals;
2. Not be pledged to membership or be a member of any similar college or university women's social sorority except honorary or professional organizations;
3. Not have been initiated into any other member group of the National Panhellenic Conference;
4. Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements; or
5. Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity *Bylaws*, *Standing Rules* and *Policies*.

**B.** **Collegiate New Member.** To qualify as a collegiate new member, a woman shall also:
1. Be enrolled at any college or university having a chapter of the Fraternity; and
2. Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B-minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

**C.** **Alumna Candidate**. To qualify as an alumna candidate, a woman shall also:
1. Have attended a four-year college or university; and
2. Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

**Section 3. Initiation.** A new member, upon fulfilling the requirements for Initiation, shall be initiated and become a member of the Fraternity. Each new initiate shall receive a certificate of membership.

**A.** **Requirements for Initiation.**
1. A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational institution may be initiated. In extraordinary cases, chapters may petition the Membership Director for an exception to these requirements.

**APP.087**

 **FRATERNITY BYLAWS REVISION**

    2. An alumna candidate who has completed a period of education and has met all financial obligations may be initiated.

    3. The new member or candidate shall make provision for securing a badge before Initiation.

**B. Special Circumstances.** A college alumna previously pledged to membership may petition Fraternity Council no sooner than five years after the expiration of the pledge to membership. Initiation under these special circumstances shall be granted upon a three-fourths vote of Fraternity Council. Such an alumna shall become a member of the original chapter to which they were pledged.

**Section 4. Affiliation.** A member who transfers to a college or university with a chapter may affiliate with the chapter at that college or university provided that a statement of the member's good standing has been received from the original chapter. A majority vote of the affiliated chapter shall be required. Upon leaving college, the member shall be considered a member of both the original chapter and the affiliated chapter.

**Section 5. Voluntary Resignation, Broken Pledge, Resignation and Dismissal.**

**A. Voluntary Resignation.**

    1. **New Member.** A new member wishing to resign from their pledge to membership shall submit the resignation in writing and shall state the reason(s) for the resignation. The chapter shall accept such resignation and notify the new member, the Standards Specialist and Kappa Kappa Gamma Headquarters.

    2. **Active, Associate and Alumna Member.** An active, associate or alumna member wishing to resign from membership shall submit the resignation in writing and shall state the reason(s) for the resignation.

**B. Broken Pledge, Requested Resignation and Dismissal.**

    1. **New Member.** A new member's pledge to membership may be broken with or without prior Probation by a three-fourths vote of the chapter.

    2. **Active Member.** An active member may be requested to resign or may be dismissed for violating the purposes and standards of the Fraternity or the regulations of the college or university. A three-fourths vote of the chapter shall be required.

    3. **Associate or Alumna Member.** An associate or alumna member may be dismissed for violating the purposes and standards of the Fraternity by a three-fourths vote of the chapter or Fraternity Council depending on the member's classification or affiliation.

**Section 6. Reinstatement or Renewal.**

**A. Active, Alumna and Associate Member.**

    1. **Reinstatement After Voluntary Resignation.** Reinstatement shall require a three-fourths vote of Fraternity Council for a former member who voluntarily resigned and is applying in writing for reinstatement no sooner than three years after resignation.

 **Kappa Kappa Gamma**                FRATERNITY BYLAWS REVISION

  2.  **Reinstatement After Requested Resignation or Dismissal.** Reinstatement shall require a unanimous vote of Fraternity Council for a former member who was requested to resign or was dismissed and is applying in writing for reinstatement no sooner than five years after resignation or dismissal.

B.  **New Member Renewal.** The expired pledge period of a new member may be renewed by a three-fourths vote of the chapter.

**Section 7. Direct Fraternity Council Action.**

A.  **Fraternity Council Action.** By a three-fourths vote, Fraternity Council may take direct action against a new or active member in the breaking of a pledge to membership; by requesting a member's resignation; or by dismissing a new, active, associate or alumna member. The member shall be notified of the reason(s) for the proposed action and be provided an opportunity to respond.

B.  **Decision Final.** Fraternity Council's decision shall be final and binding upon the member and the Fraternity and shall not be subject to review by any other body.

**Section 8. Fees.**

A.  **New Member Fee.** Each new member, alumna initiate, active member and alumna of a petitioning group shall pay a member fee of $175 within one month after signing the pledge to membership and before Initiation.

B.  **Renewal Fee.** A renewal fee of $50 and new member fee of $175 shall be required for any woman repledged to membership. The Fraternity Membership Director may grant exceptions under unusual circumstances.

C.  **Annual Per Capita Fee.**
  1.  Active member: $97
  2.  Active member granted Associate Membership: $97
  3.  Alumna member: $35
  4.  Alumna member within eight years of their initiation date (excluding alumna initiates) or members who have reached their 65-year member milestone: $25
  5.  The annual per capita fee shall be calculated each year, as of January 1, by the annual cost of living adjustment (COLA) and shall be calculated utilizing the Consumer Price Index for All Urban Consumers (CPI-U). The per capita fee shall be rounded to the nearest dollar. If the COLA decreases, the per capita fee shall remain the same as the previous year. If the COLA is more than 10%, the per capita fee increase shall be capped at 10%. Notification that the fee shall be effective at the beginning of the next fiscal year shall be sent to members, chapters, and alumnae associations by February 1. This increase shall take effect at the beginning of the fiscal year, July 1.

D.  **Reinstatement Fee.** The reinstatement fee for a former member shall be $300, payable upon reinstatement.

 FRATERNITY BYLAWS REVISION

## ARTICLE IV
## FRATERNITY ORGANIZATION

**Section 1. Districts.** The Fraternity shall be organized into districts determined by Fraternity Council for the purposes of providing leadership, membership retention and extension, and development of Fraternity interests.

**A.   District Directors.** District Directors shall be elected, and their number shall correspond to the number of districts defined by Fraternity Council. Fraternity Council shall assign the director for each district. District Directors shall supervise the operation and management of chapters and alumnae associations within their assigned districts and may report on recommendations to Fraternity Council.

    1.   **Qualifications.** Each District Director shall be an alumna who has served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) a former Regional Director or Province Director; 3) a District Director or Content Director; 4) a Content Specialist; 5) a member of a Fraternity standing or special committee; 6) a former Fraternity Council Assistant; 7) a Field Representative; 8) a member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) a member of the Fraternity Housing Corporation Board of Directors.

    2.   **Term of Office and Term Limits.** District Directors shall take office at the close of the Biennial Convention. A District Director shall hold office for a term of two years or until their successor is elected and shall be eligible for re-election to the same office for two additional terms.

    3.   **Temporary Absence.** In the event a District Director is temporarily unable to perform the duties of office, Fraternity Council shall assign such duties to another District Director or another member of the Fraternity.

    4.   **Request for Resignation or Removal from Office.** Any District Director failing to perform the duties of office may be requested to resign from office or may be removed from office when, in the opinion of the President and a three-fourths vote of Fraternity Council, the welfare of the Fraternity demands it. The District Director shall be given the opportunity to provide a defense.

**B.   District Director Meetings.** The District Directors shall hold at least one meeting in the interim between Biennial Conventions.

**Section 2. Chapters.**

**A.   Purpose.** Chapters shall be established in connection with colleges and universities to carry out the purpose of the Fraternity.

**B.   Members.**

    1.   **Member Classifications**. Chapter members shall be active, associate, and new members of the Fraternity.

    2.   **Chapter Membership Selection.** Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures.

**C.   Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or

**APP.090**

 **FRATERNITY BYLAWS REVISION**

functional areas: internal affairs, external affairs, operations, membership, membership development, finance, and standards.[1]

**D.** **Required Officers.** Chapter officers shall be a President and a vice president for each department or functional area. A chapter may combine chapter officer positions and have other officers as needed in the administration of the chapter with the approval of the Leadership Development Specialist.[2]

**E.** **Officer Eligibility.** A chapter member meeting all membership responsibilities and having attained at least a B-minus average or its equivalent in the previous term shall be eligible for election to office and to remain in office if elected. The chapter may establish a higher grade point average for officer eligibility. In either case, an exception for failure to meet the higher of the two standards may be granted by the Academic Excellence Specialist or Standards Specialist, in consultation with the District Director.

**F.** **Meetings.** Chapters shall meet regularly during the academic year and shall hold a formal meeting using ritual for initiated members at least once a month.

**G.** **Governance.** Each chapter shall adopt bylaws and standing rules for its governance that shall be approved by the Fraternity Bylaws Committee before becoming effective. Bylaws, standing rules, and amendments adopted thereafter, shall be approved by the Fraternity Bylaws Committee before becoming effective.

**H.** **Convention Representation.** Each chapter shall elect one delegate and two alternates to attend a Convention. Only the delegate shall represent the chapter with the right to vote.

**I.** **College Panhellenic Association**. A chapter shall be a member of its host institution's College Panhellenic Association, an affiliate of the National Panhellenic Conference, and shall be represented by a delegate from the chapter. If the delegate is unable to provide representation, an alternate shall represent the chapter.

**J.** **Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the chapter. The board shall be composed of a chairman, alumna advisers to Executive Board and vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director, and in consultation with the Leadership Development and Advisory Board Directors.

**K.** **Establishing a New Chapter.**
  1. A new chapter may be established:
     a. By membership selection directed by Fraternity Council.
     b. Upon receipt of a petition from a qualified group of women. Members of the petitioning group, both current and previous, shall be eligible to become members of the Fraternity.
  2. Upon establishment, a new chapter shall join the Fraternity Housing Corporation.

---

[1] Effective with the chapter election cycle of 2022–23.
[2] ibid

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

L. **Removal of a Chapter.**
   1. **Initiating the Removal by Fraternity Council.** By a three-fourths vote, Fraternity Council may initiate the removal of a chapter.
   2. **Vote to Remove a Chapter.** The removal of a chapter shall require a 30-day notice and a three-fourths vote of each District Director, each Content Director, each standing committee chairman, and each Content Specialist in the district where the chapter is located.

M. **Surrender of Charter.** A chapter may petition to sever connection with the Fraternity by presenting a written request to Fraternity Council stating reasons in full and signed by three-fourths of the active members of the chapter and three-fourths of the chapter Advisory Board.
   1. **Fraternity Council Action.** By a three-fourths vote, Fraternity Council may accept the petition and agree to the surrender of the chapter charter or may condition surrender on additional actions before accepting the surrender of charter.
   2. **Chapter Requirements.** If the request to surrender a charter is accepted, the charter shall be withdrawn when the chapter has fulfilled all financial obligations, transferred chapter assets according to the current Fraternity Financial Policies, returned all records and archives, and returned the charter.

N. **Return of Chapter Charter and Archives.** Whether a charter is surrendered by the chapter or removed by the Fraternity, the District Director shall take charge of the chapter charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

O. **Reestablishment of a Chapter.** Fraternity Council shall appoint a special committee to investigate the request for reestablishment of a former chapter. A three-fourths vote of Fraternity Council shall be required to reestablish a former chapter. All reestablished chapters shall join the Fraternity Housing Corporation.

P. **Reorganization of a Chapter.** The reorganization of a chapter shall occur when Fraternity Council deems it is in the best interest of the chapter and the Fraternity. Any current active member of the chapter may be designated an alumna and shall remain an alumna unless otherwise designated by Fraternity Council.

**Section 3. Alumnae Associations.**
   A. **Purpose.** Fraternity alumnae may organize as associations to further the work of the Fraternity and extend friendship to all members.
   B. **Officers.** The officers of an association shall be a President, Secretary, Treasurer, and such other officers as may be considered necessary.
   C. **Meetings.** An association shall hold at least four meetings during the year. At least two of these shall be open to the entire membership.
   D. **Association Governance.** Each association shall adopt bylaws for its governance.
   E. **Convention Representation.** Each association shall be entitled to be represented by one delegate at any Convention.
   F. **Alumnae Panhellenic Associations.** If a local Alumnae Panhellenic Association, which is affiliated with the National Panhellenic Conference, exists, an alumnae association of

**APP.092**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 194 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 97
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 13 of 209

 FRATERNITY BYLAWS REVISION

the Fraternity shall become a member and may send representatives to the Alumnae Panhellenic meetings.

G. **Establishing New Associations.** A group of alumnae may form a petitioning group and petition Fraternity Council to establish an association. A three-fourths vote of Fraternity Council shall be necessary to establish an association. The date of Fraternity Council approval of the application shall be considered the date of establishment.

H. **Surrender of Charter.** An association voting to disband shall give three months' notice in writing of such intention to the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. At the end of this period, provided the request to disband has not been withdrawn, the charter shall be surrendered.

I. **Withdrawal of a Charter.** An association that has failed to fulfill its responsibilities or failed to meet the Fraternity financial standards or the standards of conduct shall have the charter of the association withdrawn upon the recommendations to Fraternity Council by the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. A three-fourths vote by Fraternity Council shall be required to approve the withdrawal of the charter.

J. **Return of Association Charter and Archives.** Whether a charter is surrendered by the association or withdrawn by the Fraternity, the Alumna Relations Specialist shall take charge of the association charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

K. **Reestablishment of an Alumnae Association.** An association that has surrendered its charter or had its charter withdrawn may be reestablished by a three-fourths vote of Fraternity Council.

**ARTICLE V**
**MEMBER, CHAPTER, AND ASSOCIATION RESPONSIBILITIES**

**Section 1. Overview.** Members and the chapters and associations to which they belong shall comply with all federal, state or provincial laws and college or regulations where applicable and shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct.

**Section 2. Legal Compliance.** Members, chapters, and associations of the Fraternity shall adhere to local, state, provincial, and federal laws with a specific emphasis on the following:

A. **Hazing.** Participating in or being involved in any way with hazing — defined as any activity or action taken with or without consent of the individual involved that produces mental, emotional, psychological, or physical discomfort, intimidation, humiliation, degradation, embarrassment, harassment, or ridicule — shall be prohibited.

B. **Alcohol.** The illegal use or misuse of alcoholic beverages shall be prohibited.

C. **Drugs.** The use, sale, purchase or possession of any drugs or other controlled substance in violation of local, state, provincial or federal law shall be prohibited.

D. **Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall

 **Kappa Kappa Gamma**    FRATERNITY BYLAWS REVISION

be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

**Section 3. College or University Regulations.** Collegiate chapters and their members shall adhere to all rules or regulations stipulated by the college or university even when the rules or regulations are more stringent than the standards of the Fraternity.

**Section 4. Academic Excellence.** Chapters and individual members shall meet, maintain, or exceed chapter-specific academic standards.
   A. **Chapter Standard.** Each chapter shall maintain a scholastic average equal to or higher than the university or college all-sorority average.
   B. **Active Member Standard.** Each chapter shall establish a minimum GPA requirement for active members. Each active member of a chapter shall meet or exceed the chapter-specific GPA requirement.

**Section 5. Finance.** Individual members, chapters, and associations shall remain current with all financial obligations as established by a chapter, an association, or the Fraternity.

**Section 6. Conduct.** Individual members, chapters, and associations shall act with high standards of ethical conduct that represent the values of the Fraternity.

**Section 7. Accountability.**
   A. **Overview.** The purpose of holding a member, chapter, or association accountable for inappropriate conduct shall be established to protect the integrity and prestige of the Fraternity.
   B. **Process.** The Fraternity shall develop and implement procedures for the enforcement of the responsibilities and expectations enumerated herein that shall afford fairness and respect to the member, chapter, or association.
   C. **Outcome.** The outcome of the process may be a Warning of Probation, Probation, Suspension, and in extreme cases, dismissal of a member from the Fraternity or removal of a chapter or association.

**Section 8. Good Standing.**
   A. **Member.** A member meeting all member standards and responsibilities, academic, financial and conduct, and not under any accountability outcome is a member in good standing and, therefore, eligible for any elected, appointed, or volunteer position within the Fraternity.
   B. **Chapter.** A chapter meeting the standards for responsibility, academic and conduct, its financial and reporting obligations and that is not on Probation or Suspension shall be a chapter in good standing, eligible for awards and representation at Convention, and shall have the right to a vote.

**APP.094**

 **FRATERNITY BYLAWS REVISION**

**C.    Association.** An association meeting its financial and reporting obligations and that maintains standards of conduct shall be an association in good standing, and eligible for awards and representation at Convention, and shall have the right to a vote.

**Section 9. Conflict of Interest.** Any member serving in an elected, appointed or volunteer position with the Fraternity, the Kappa Kappa Gamma Foundation, the Fraternity Housing Corporation, any chapter, any alumnae association, or similar entity affiliated or associated with these entities under any chapter, license franchise or similar arrangement shall maintain high standards of ethical conduct in performing their duties and shall avoid situations where their financial or personal interests or professional obligations interfere or appear to interfere with the interests of the Fraternity. They shall not use Fraternity property, information, or position for personal gain or violate Fraternity expectations of confidentiality.

**ARTICLE VI**
**OFFICERS**

**Section 1. Officers.** The officers of the Fraternity shall be a President, four Vice Presidents, and a Treasurer.

**Section 2. Qualifications.** Officers shall be alumna members who have formerly served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) Regional Director or Province Director; 3) District Director or Content Director; 4) Content Specialist; 5) chairman or member of a Fraternity standing or special committee; 6) Fraternity Council Assistant; 7) Field Representative; 8) member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) member of the Fraternity Housing Corporation Board of Directors.

**Section 3. Term of Office and Term Limits.** Officers shall take office at the close of the Biennial Convention and shall hold office for a term of two years or until their successors are elected. The President and Treasurer may be elected to the same office for no more than two terms. The Vice Presidents may be elected to the same office for no more than three terms.

**Section 4. Officer Transition Meeting.** Following an election and prior to Convention, outgoing Fraternity Council shall host at least one transition meeting with newly elected Fraternity Council members.

**Section 5. Vacancies and Temporary Absences.**
**A.    Vacancies.**
    1.    **President.** At the first Fraternity Council meeting following the Biennial Convention, by a three-fourths vote, Fraternity Council shall designate one of the Vice Presidents to assume the presidency if a permanent vacancy occurs in the office and to preside at meetings if the President is absent.

**APP.095**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 197 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 100
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 16 of 209

 FRATERNITY BYLAWS REVISION

    2.  **Other Officers.** By a three-fourths vote, a vacancy in any office other than the President shall be filled for the unexpired term by Fraternity Council.

**B.**  **Temporary Absences.** In the event an officer other than the President is temporarily unable to perform the duties of their office, Fraternity Council shall assign such duties to another member of Fraternity Council or to another member of the Fraternity who shall have the right to vote.

**Section 6. Request for Resignation or Removal From Office.** An officer may be requested to resign from office or shall be removed from office when the welfare of the Fraternity necessitates it. A three-fourths vote of Fraternity Council shall be required. The officer shall be given the opportunity to provide a defense.

<div align="center">

**ARTICLE VII**
**NOMINATIONS AND ELECTIONS**
</div>

**Section 1. Nominations.** Nominees for each officer and District Director shall be determined by the Leadership Selection Committee.

**A.**  **Committee Composition.** The Leadership Selection Committee shall be composed of a chairman, a vice chairman and an equal number of alumnae association and chapter representatives. One member, collegiate or alumna, shall be appointed from each district.

    1.  **Chairman and Vice Chairman.** Fraternity Council shall appoint the Leadership Selection Committee Chairman and Vice Chairman following the Convention. These positions shall be nonvoting members of the committee except in the case where the chairman may vote to break a tie.

    2.  **Members.** Fraternity Council shall appoint chapter and association representatives as members of the committee in February following Convention based on applications. The Leadership Education and Development Committee shall receive and review applications and make recommendations to Fraternity Council.

    3.  **Equal Number of Collegiate and Alumna Representatives.** One representative, collegiate or alumna, shall be appointed from each district with an equal number of collegiate and alumna representatives.

    4.  **Alternating Each Biennium.** In one biennium, one chapter representative shall be appointed from districts Alpha, Beta, Delta, Eta, Theta, Mu, and Pi and one alumna representative appointed from districts Gamma, Kappa, Lambda, Epsilon, Zeta, Xi, and Rho. In the next biennium, chapter representatives shall be appointed from the second group of districts and the alumna representative from the first group, subsequently alternating each biennium.

**B.**  **Nominee Selection.** The Leadership Selection Committee shall nominate one candidate for each officer and District Director position based on recommendations received from members and applications received from candidates.

**C.**  **Nominations Report.** The report of the Leadership Selection Committee shall be prepared and communicated to eligible voters no less than 12 weeks prior to the Convention.

**APP.096**

 FRATERNITY BYLAWS REVISION

**D.    Open Nominations.** Following the publication of the report, open nominations from eligible voters shall be accepted for at least 10 days, provided the consent of the nominee has been obtained and the member is qualified.

**Section 2. Elections.** Fraternity Council shall determine the dates and times for the election. The election shall be completed at least eight weeks prior to the Biennial Convention.

**A.    Eligible Voters.** Members eligible to vote in an election shall be those members who are eligible to vote according to Article VII, Section 2, E., and who have been credentialed as delegates for the purpose of voting in the election of officers.

**B.    Voting.** The election shall be conducted electronically utilizing an online voting and election software application. The candidate for each officer and District Director position receiving the most votes shall be elected provided such candidate receives a majority of the votes cast for that position.

**C.    Election Committee.** An Election Committee comprised of nonvoting members and appointed by Fraternity Council shall oversee and coordinate the election process in conjunction with the Executive Director. The report of the election results shall be sent electronically to the membership within five business days following the close of voting and shall be published on the Fraternity website.

### ARTICLE VIII
### MEETINGS

**Section 1. Membership Meetings.** Membership meetings shall be a Convention at which the rights and authority of members shall be vested in the voting members of the Convention.

**Section 2. Convention.**

**A.    Regular Meeting.** The regular meeting of the membership of the Fraternity shall be a Convention that shall be held biennially in even-numbered years. Fraternity Council shall determine the date, time, and place**.**

**B.    Special Meeting.** A special meeting of the membership may be called by a unanimous vote of Fraternity Council and shall be called upon the written request of a majority of the chapters and alumnae associations.

**C.    Notice of Meetings.** Notice of meetings, both regular and special, shall be sent to all voting members, chapters, and alumnae associations entitled to representation at such meetings.

    1.    **Regular Meeting.** The notice shall state the date, time, and place, and shall be given not less than three months prior to the meeting date.

    2.    **Special Meeting.** The notice shall state the date, time, and place, and shall be given not less than one month prior to the meeting date. Notice of a special meeting shall include the purpose of the meeting.

**D.    Postponement or Cancellation of a Meeting.** In cases of emergency, Fraternity Council, by a unanimous vote, may postpone or cancel a previously noticed Convention meeting. When a meeting is canceled, it shall become the duty of Fraternity Council to reschedule the canceled meeting as soon as conditions permit.

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 199 of 506
Appellate Case: 23-8065     Document: 010110962640     Date Filed: 12/04/2023     Page: 102
Case 2:23-cv-00051-ABJ     Document 6-1     Filed 04/20/23     Page 18 of 209

 FRATERNITY BYLAWS REVISION

E.  **Voting Members.** The voting members of the Convention shall be composed of the following Fraternity members who are registered delegates, entitled to one vote and voting in person:
1.  Fraternity Council members
2.  District Directors
3.  Chairmen of standing committees
4.  Content Directors
5.  One delegate from each chapter
6.  One delegate from each alumnae association
F.  **Alumnae Associations Vote Value.** If the total number of registered alumnae association delegates present exceeds the total number of registered chapter delegates present, the value of the alumnae associations' total votes in any vote taken shall be reduced by the proportion of registered chapter delegates to registered alumnae association delegates.
G.  **Vote and Voting.** A majority vote shall decide in all cases except where otherwise specifically provided. There shall be no absentee voting or voting by proxy.
H.  **Quorum.** The quorum at any meeting of any Convention shall be a majority of the eligible voting members.
I.  **Nonvoting Members**. The privilege of speaking may be granted to a nonvoting member of a Convention at the discretion of the President.

**Section 3. Enacted Business.** Any item of business brought before and acted upon by any Convention shall not be changed with the exception of emergency powers granted to Fraternity Council.

**ARTICLE IX**
**FRATERNITY COUNCIL**

**Section 1. Composition.** The members of Fraternity Council shall be the officers of the Fraternity: the President, the four Vice Presidents, and the Treasurer.

**Section 2. Duties.** Except as otherwise provided by law, the *Articles of Incorporation* or these bylaws, all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law. Fraternity Council shall:
A.  Exercise the rights of the Fraternity as a shareholder, member, holder, or other ownership interest in any other entity;
B.  Elect representatives to serve on the Board of Trustees as provided for in the Code of Regulations of the Kappa Kappa Gamma Foundation; and
C.  Elect representatives to serve on the Board of Directors as provided for in the Code of Regulations of the Fraternity Housing Corporation.

**Section 3. Emergency Powers.** If Fraternity Council determines in the interval between Biennial Conventions that an emergency exists that ordinarily requires action by a vote of the

 **FRATERNITY BYLAWS REVISION**

Convention, Fraternity Council may exercise the voting power vested in the Convention. Any such action shall be reported to the next Biennial Convention.

**Section 4. Meetings.**
- **A.** **Called Meeting.** A Fraternity Council meeting may be called by the President and shall be called upon the request of a majority of its members. Reasonable notice of date, time and place of a meeting shall be sent to each Fraternity Council member.
- **B.** **Quorum.** A majority of the members of Fraternity Council shall constitute a quorum.
- **C.** **Business Without a Meeting.** Fraternity Council may conduct business without a meeting as long as the decisions are written, signed, and unanimous.
- **D.** **Voting.** There shall be no absentee voting or voting by proxy.

**ARTICLE X**
**COMMITTEES**

**Section 1. Standing Committees.** The standing committees of the Fraternity, appointed by and under the supervision of Fraternity Council, shall be Bylaws, Convention, Finance, *The Key* Publication, Leadership Education and Development, and Panhellenic.

**Section 2. Special Committees.** Special committees may be established by the membership meeting in Convention or by Fraternity Council.

**Section 3. Composition of Committees.**
- **A.** **General Composition.** Each committee shall be composed of a chairman and members appointed by Fraternity Council.
- **B.** **Finance Committee Composition and Term.** The Finance Committee shall be composed of the committee chairman, the Fraternity Treasurer, the Fraternity Facilities Director, and at least three other persons, one of whom may be a nonmember qualified by experience in financial operations. Members shall serve for a term of three years or until their successors are appointed. One-third of the appointees shall be appointed each year. No member shall serve for more than two consecutive terms.

**Section 4. Appointment and Term of Office.** Except as otherwise specifically provided here, standing committee chairmen and members shall be appointed by Fraternity Council, shall take office immediately upon appointment following the Biennial Convention, and shall remain in office for a term of two years, except for Finance Committee members, who serve for three years or until their successors are appointed.

**Section 5. Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a standing committee chairman.

**Section 6. Removal.** Any standing committee chairman or committee member failing to perform the duties of office may be removed from office by Fraternity Council. A

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 201 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 104
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 20 of 209

 **Kappa Kappa Gamma**    FRATERNITY BYLAWS REVISION

standing committee chairman or committee member shall be notified of pending removal and given the opportunity to respond.

**Section 7. Member *Ex-Officio*.** The Fraternity President shall be a member *ex-officio* of all committees except the Leadership Selection Committee.

<div align="center">

**ARTICLE XI**
**CONTENT AREAS**
</div>

**Section 1. Content Areas.** The content areas shall be academic excellence; Advisory Board; alumna relations; diversity, equity, and inclusion; facilities; leadership development; membership; Panhellenic; philanthropy; programming; public relations; risk prevention; ritual and history; and standards.

**Section 2. Content Directors.** Content Directors shall lead the work of the Fraternity in the appointed content area, collaborate with Kappa Kappa Gamma Headquarters staff, and guide the Content Specialists to provide support to alumnae and collegians.

    **A.** **Appointment and Term of Office.** A Content Director shall be appointed by Fraternity Council for each content area. Content Directors shall take office immediately upon appointment following the Biennial Convention and remain in office for a term of two years or until their successors are appointed.

    **B.** **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Director.

    **C.** **Removal From Office.** Any Content Director failing to perform the duties of office may be removed from office by Fraternity Council. A Content Director shall be notified of pending removal and given the opportunity to respond.

**Section 3. Content Specialist.** Each district shall have at least one Content Specialist in each content area who shall work with the District Director and the Content Director to foster growth of chapters and associations within the district.

    **A.** **Appointment and Term of Office.** Content Specialists shall be appointed by Fraternity Council to serve a two-year term with no term limits. Content Specialists shall begin their terms at the beginning of the fiscal year in non-Convention years and shall remain in office until their successors are appointed.

    **B.** **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Specialist.

    **C.** **Removal From Office.** Upon recommendation of the Content Director, a Content Specialist failing to perform the duties of office may be removed from office by Fraternity Council. A Content Specialist shall be notified of pending removal and given the opportunity to respond.

**APP.100**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 202 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 105
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 21 of 209

 **Kappa Kappa Gamma**  FRATERNITY BYLAWS REVISION

### ARTICLE XII
### ADMINISTRATIVE OPERATIONS

**Section 1. Kappa Kappa Gamma Headquarters.**

    **A.**   **Kappa Kappa Gamma Headquarters Office.** The Fraternity shall maintain a headquarters office as its principal place of business.

    **B.**   **Kappa Kappa Gamma Headquarters Staff.** A professional staff shall be employed to conduct the business of the Fraternity at the direction of Fraternity Council. This staff shall be under the direct supervision of an Executive Director.

**Section 2. Executive Director.** An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.

**Section 3. Financial Director.** A financial director, authorized by Fraternity Council, shall be in charge of the finances and accounts of the Fraternity. The financial director shall report to the Executive Director.

### ARTICLE XIII
### FINANCE

**Section 1. Investment of Fraternity Funds.** The investments and securities performance shall be reviewed by the Finance Committee for compliance with the Fraternity's investment policy statement.

**Section 2. Financial Drives and Campaigns.** No chapter, alumnae association, Advisory Board, House Board or individual member shall undertake any financial drive or campaign of more than local extent in the name of the Fraternity without first securing the recommendation of the Finance Committee and approval of Fraternity Council.

**Section 3. Audit and Tax Returns.** An audit of the Fraternity finances shall be conducted annually by a certified public accountant and appropriate tax returns filed annually.

**Section 4. Insurance.** The Fraternity shall maintain a master insurance program.

**Section 5. Liabilities.** Total current liabilities, including contingent liabilities and mortgage notes payable assumed by the Fraternity, shall not exceed 50% of the assets of the Fraternity.

### ARTICLE XIV
### PROPRIETARY MATERIALS

**Section 1. Trademarks.** Fraternity Council shall determine which Fraternity marks shall be registered with the United States Patent and Trademark Office. All Fraternity marks are owned by the Fraternity and shall not be used or reproduced except as authorized by Fraternity Council.

22.09
**APP.101**

 **Kappa Kappa Gamma**    FRATERNITY BYLAWS REVISION

**Section 2. Copyrights.** All written material created in the name of the Fraternity is automatically copyrighted and shall not be used outside of the Fraternity unless approved by Fraternity Council.

**Section 3. Secret Materials.** Secret materials, such as the *Book of Ritual* and related materials, shall be kept secret and shall not be disclosed to nonmembers or used outside of the Fraternity. Reproduction of the secret materials shall be prohibited except as authorized by Fraternity Council.

<div align="center">

**ARTICLE XV**
**NATIONAL PANHELLENIC CONFERENCE**
</div>

**Section 1. Membership.** The Fraternity shall maintain the Fraternity's membership in the National Panhellenic Conference (NPC).

**Section 2 Membership Requirements.** The Fraternity shall follow NPC Unanimous Agreements, policies, and procedures.

**Section 3. Representation.** The Fraternity shall be represented at the annual meeting of the NPC Council of Delegates by a Fraternity member appointed by Fraternity Council who shall be empowered to act and vote on behalf of the Fraternity.

<div align="center">

**ARTICLE XVI**
**INDEMNIFICATION**
</div>

The Fraternity shall indemnify, to the maximum extent permitted by law, any person who is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that they are or were a member of Fraternity Council, an elected officer, a member serving in an appointed position, a volunteer, an authorized agent, or an employee of the Fraternity against all expenses, judgments, fines, and amounts paid in settlement incurred by them if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interest of the Fraternity and with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful. The Fraternity may pay expenses incurred by any person covered by this section in defending any action, suit or proceeding in advance of final disposition on such terms and conditions, as shall be determined by Fraternity Council. The indemnification provided by this section is not exclusive and the Fraternity may purchase and maintain insurance on behalf of any person covered by this section, whether or not the Fraternity would have the obligation or power to indemnify them under this section.

<div align="center">

**ARTICLE XVII**
**DISSOLUTION**
</div>

If for any reason the Fraternity shall be dissolved, all assets not otherwise disposed of shall be transferred to the Kappa Kappa Gamma Foundation, an Ohio nonprofit corporation.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 204 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 107
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 23 of 209

  **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

## ARTICLE XVIII
## ELECTRONIC MEETINGS AND COMMUNICATIONS

**Section 1. Meetings.** The biennial or a special convention, Fraternity Council, all committees and subcommittees and any other Fraternity sub-group is authorized to meet through any communications equipment that provides a transmission, including, but not limited to, telephone, telecopy, or any electronic means, from which it can be determined that the transmission was authorized by, and accurately reflects the intention of the members involved and, with respect to the meeting, allows all persons who may attend and participate in the meeting to contemporaneously communicate with each other.

**Section 2. Voting by Ballot.** An anonymous vote conducted through a designated internet meeting service or electronic means such as audience response devices or computer software shall be deemed to be a ballot vote, fulfilling any requirement that a vote be by ballot.

**Section 3. Communications.** Unless a member indicates otherwise, all communication required in these bylaws, including required notices, may be sent electronically.

## ARTICLE XIX
## NONPROFIT CORPORATION

The Fraternity is an Ohio nonprofit corporation. The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity. The Fraternity shall be governed in accordance with the laws of the state of Ohio, without giving effect to the choice of law or conflicts of laws principles thereof.

## ARTICLE XX
## KAPPA KAPPA GAMMA FOUNDATION

The Kappa Kappa Gamma Foundation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax under Internal Revenue Code Section 501(c)(3).

## ARTICLE XXI
## FRATERNITY HOUSING CORPORATION

The Fraternity Housing Corporation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax in accordance with Internal Revenue Code Section 501(c)(7).

## ARTICLE XXII
## CHAPTER HOUSE CORPORATION AND CHAPTER HOUSE ASSOCIATION

**Section 1. Chapter House Corporation.** A chapter house corporation shall own or lease and maintain all property, including land, buildings, furnishings and equipment for the use and benefit of a chapter. Members of a house corporation shall be members of the Fraternity, shall have paid a membership fee in the corporation, and shall agree to be bound by the regulations of the corporation and the Fraternity *Bylaws*, *Standing Rules*

 **FRATERNITY BYLAWS REVISION**

and *Policies*. The Fraternity shall be a member of each chapter house corporation, and if necessary, representation shall be determined on a case-by-case basis.

**Section 2. Chapter House Association.** All rental property, furnishings and equipment shall be managed and maintained by a chapter house association provided the chapter was chartered before July 1, 1976, and the house association has not incorporated. Members of a house association shall be a member of the Fraternity, shall have paid a membership fee in the house association, and shall agree to be bound by the regulations of the house association and the Fraternity *Bylaws*, *Standing Rules* and *Policies*. The Fraternity shall be a member of each chapter house association, and if necessary, representation shall be determined on a case-by-case basis.

<div align="center">

**ARTICLE XXIII**
**PARLIAMENTARY AUTHORITY**

</div>

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern the Fraternity in all cases to which they are applicable and in which they are not inconsistent with these bylaws and any special rules of order the Fraternity may adopt.

<div align="center">

**ARTICLE XXIV**
**AMENDMENT OF *ARTICLES OF INCORPORATION* AND *BYLAWS***

</div>

**Section 1. Amendment.** The Fraternity *Articles of Incorporation* and *Bylaws* may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

**Section 2. Submitting Proposed Amendments.** An amendment may be proposed by Fraternity Council, a District Director, a standing or special committee, a Content Director, a Content Specialist, a chapter, or an alumnae association. Proposed amendments shall be submitted no later than six months prior to the date of the Convention and only amendments approved by Fraternity Council shall be submitted to the Convention for a vote.

<div align="center">

# # #

</div>



ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

## PROVISOS RELATING TO TRANSITION

**I.  Effective with the Chapter Election Cycle of 2022–23.**
The following two provisions of Article IV. Fraternity Organization shall become effective with the chapter election cycle of 2022–23.

**Section 2. Chapters.**

    **C**.  **Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or functional areas: internal affairs, external affairs, operations, membership, membership development, finance, and standards.

    **D**.  **Required Officers.** Chapter officers shall be a President, and a vice president for each department or functional area. A chapter may combine chapter officers and have other offices as needed in the administration of the chapter with the approval of the Leadership Development Specialist.

**II.  Remain in Effect Until the Election Cycle of 2022–23.**
The following sections from Article XII of the 2018 Kappa Kappa Gamma *Bylaws* remain in effect until the chapter election cycle of 2022–23 when Article IV, Section 2. C and D shall become effective.

## ARTICLE XII
## CHAPTER ORGANIZATION AND MANAGEMENT

**Section 2. Officers.** The officers of a chapter shall be: President, Vice President-Standards, Vice President-Organization, Vice President-Academic Excellence, Recording Secretary, Corresponding Secretary, Treasurer, Registrar and Marshal. Chapters may combine chapter offices and duties.

**Section 3. Standing Committee Chairmen** The standing committee chairmen shall be: Education, Event, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations and Risk Management. Chapters may combine standing committee chairmen and duties.

**Section 4. Standing Committees.** The standing committees shall be: Academic Excellence, Catalog, Organization, Education, Event, Finance, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations, Risk Management, Ritual, and Standards. Chapters may combine standing committees and duties.

**Section 5. Qualification of Officers and Standing Committee Chairmen.**

    **A.  Eligibility.** Only members meeting all financial obligations and standards of conduct and attaining at least a B-minus average or its equivalent for the previous term shall be eligible to be nominated for or hold office unless the **relevant Content Specialist** (Academic Excellence Specialist or **Standards Specialist**), in consultation with the District Director, grants an exception.

    **B.  Maintaining Eligibility.** If an officer or standing committee chairman fails to maintain the qualifications to hold office, she shall become ineligible to remain in office unless the Academic Excellence Specialist or **Standards Specialist**, in consultation with the District Director, grants an exception.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 207 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 110
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 26 of 209



ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

**Section 6. Nomination, Election and Installation of Officers and Standing Committee Chairmen.**

**A. Nominations.**

1. The Nominating Committee shall consist of a chairman appointed by the Chapter Council and at least four additional members, including representation from each academic class, elected one month in advance of the chapter election. A member of the Advisory Board shall act as an adviser to the committee without vote.

2. The committee, by majority vote, shall nominate one candidate for each office to be filled and one for each standing committee chairmanship. Written suggestions for candidates from members of the chapter shall be carefully reviewed. The committee shall secure the consent of the nominee prior to placing her name in nomination.

3. The committee shall report the slate of nominees to the members at the chapter meeting one week prior to election.

4. Nominations from the floor shall be called for following the report of the Nominating Committee and before the election.

**B. Election.** Chapter election of officers and standing committee chairmen shall be held annually between Nov. 1 and March 31 unless the District Director grants an exception. Voting shall be by ballot and a majority vote of the members present at the meeting and voting shall elect.

**C. Installation of Officers.** All chapter officers and standing committee chairmen shall be installed at a formal meeting following a satisfactory period of officer training.

**Section 7. Chapter Council.** The Chapter Council shall be the Executive Committee of the chapter.

**A. Membership.** The Chapter Council shall consist of the following members: President as Chairman, Vice President-Standards, Vice President-Organization, Vice President-Academic Excellence, Recording Secretary, Corresponding Secretary, Treasurer, Registrar, Marshal, Education Chairman, Event Chairman, House Chairman, Membership Chairman, New Member Chairman, Panhellenic Delegate, Philanthropy Chairman, Public Relations Chairman, Risk Management Chairman and special committee chairmen as necessary.

**B. Duties.** The duties of the Chapter Council members shall be:

1. To be responsible for the proper functioning of the chapter.

2. Other duties as assigned in the current *Leadership Guides*.

3. To administer the chapter finance program according to the guidelines approved by and under the direction of Fraternity Council.

4. To send representatives to the College Panhellenic organization in accordance with National Panhellenic Conference Unanimous Agreements and according to the structure of the respective College Panhellenic.

5. To make reports as specified in *Leadership Guides* or as requested.

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 208 of 506
Appellate Case: 23-8065     Document: 010110962640     Date Filed: 12/04/2023     Page: 111
Case 2:23-cv-00051-ABJ     Document 6-1     Filed 04/20/23     Page 27 of 209

 **Kappa Kappa Gamma**

ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

6. To ensure that the archives of the chapter are properly maintained including an alphabetical roll and chronological index of chapter initiates, proxy initiates and affiliates.

**Section 9. Removal of Officers and Standing Committee Chairmen.** The Chapter Council, with the approval of Advisory Board, may recommend to the chapter the removal of any officer or standing committee chairman failing to adequately perform the duties of her office, failing to maintain Fraternity standards, or falling below academic requirements. The officer or standing committee chairman shall be given the opportunity to defend herself.

  A. **Vote.** A three-fourths vote of the chapter members present at the meeting and voting shall be required to remove an officer or standing committee chairman. If the officer or chairman is not removed by chapter vote, Advisory Board may remove her with approval of the District Director.

  B. **Vacancies.**
    1. After a nomination made by the Chapter Council, a majority vote of the chapter members present at the meeting and voting shall fill a vacancy. Following Chapter Council nomination, nominations from the floor shall be in order.
    2. **In the event the chapter President is permanently unable to perform the duties of her office, Chapter Council shall assign such duties to a vice President until a new chapter President is elected.**
    3. In the event an officer or standing committee chairman is temporarily unable to perform the duties of her office, the Chapter Council shall assign such duties to another member of the chapter who shall have the right to vote.

**Section 10. Chapter Advisers and Advisory Boards.** Alumna advisers in good standing shall be selected annually as a board with the joint approval of the chapter and the Executive Board of the local alumnae association. Advisers to each of the chapter officers, standing committees, Chapter Council and the Panhellenic Delegate shall serve in an advisory capacity without vote. In the absence of a local alumnae association, the board may be selected with joint approval of the District Director, Advisory Board Specialist, and Alumna Relations Specialist.

**Section 11. Chapter Archives.** The archives of the chapter shall consist of the items listed in the Fraternity manuals. All archive properties pertaining to ritual, except when in use, shall be kept in a locked place suitable for security of these materials. All archived documents, records, resources and memorabilia that are not secret in nature shall be maintained in a secure manner.

# # #

**APP.107**



ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

**Administrative Operations......................17**
  Executive Director.................................. 17
  Finance Director...................................... 17
  Kappa Kappa Gamma Headquarters
    Office.................................................. 17
  Kappa Kappa Gamma Headquarters Staff
    ........................................................... 17
**Amendment of *Articles of Incorporation***
  **and *Bylaws* ..........................................20**
  Amendment .......................................... 20
  Submitting Proposed Amendments...... 20
**Chapter House Corporation and Chapter**
  **House Association .............................19**
  Chapter House Assiociation ................. 20
  Chapter House Corporation................. 19
**Committees............................................15**
  Appointment and Term of Office.......... 15
  Composition of Committees................. 15
    Finance Committee Composition and
      Term.............................................. 15
    General Composition ........................ 15
  Member *Exo-Officio* ............................. 16
  Qualifications ........................................ 15
  Removal ................................................. 15
  Special Committees .............................. 15
  Standing Committees............................ 15
**Content Areas .......................................16**
  Content Directors................................... 16
    Appointment and Term of Office...... 16
    Qualifications .................................. 16
    Removal From Office ....................... 16
  Content Specialists................................ 16
    Appointment and Term of Office...... 16
    Qualifications .................................. 16
    Removal From Office ....................... 16
**Dissolution ............................................18**
**Electronic Meetings and Communications**
  **.............................................................19**
  Communications ................................... 19
  Meetings ............................................... 19
  Voting By Ballot..................................... 19
**Finance ..................................................17**

Audit and Tax Returns........................... 17
Financial Drives and Campaigns........... 17
Insurance............................................... 17
Investment of Fraternity Funds ........... 17
Liabilities .............................................. 17
**Fraternity Council ................................. 14**
  Composition .......................................... 14
  Duties .................................................... 14
  Emergency Powers................................ 14
  Meetings ............................................... 15
    Business Without a Meeting............. 15
    Called Meeting ................................ 15
    Quorum ........................................... 15
    Voting.............................................. 15
**Fraternity Housing Corporation.............. 19**
**Fraternity Organization............................ 6**
  Alumnae Associations............................ 8
    Alumnae Panhellenic Associations ..... 8
    Association Governance ..................... 8
    Convention Representation................. 8
    Establishing New Associations........... 9
    Meetings ............................................ 8
    Officers............................................... 8
    Purpose .............................................. 8
    Reestablishment of an Alumnae
      Association ....................................... 9
    Return of Association Charter and
      Archives............................................ 9
    Surrender of Charter.......................... 9
    Withdrawl of a Charter ...................... 9
  Chapters ................................................. 6
    Advisory Boards and Chapter Advisers 7
    Chapter Structure .............................. 6
    College Panhellenic Association.......... 7
    Convention Representation................. 7
    Establishing a New Chapter ............... 7
    Governance........................................ 7
    Meetings ............................................ 7
    Members ............................................ 6
      Chapter Membership Selection ...... 6
      Member Classification ................... 6
    Officer Eligibility ................................ 7

22.09

**APP.108**

# Kappa Kappa Gamma

ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

Purpose ................................................ 6
Reestablishment of a Chapter ............ 8
Removal of a Chapter ......................... 8
Reorganization of a Chapter .............. 8
Required Officers ................................ 7
Return of Chapter Charter and
    Archives ......................................... 8
Surrender of Charter .......................... 8
Districts ................................................ 6
District Director Meetings.................. 6
District Directors ............................... 6
    Qualifications ................................ 6
    Request for Resignation or Removal
        from Office ................................ 6
    Temporary Absence ....................... 6
    Term of Office and Term Limits ...... 6
Indemnification .................................... 18
Kappa Kappa Gamma Foundation .......... 19
Meetings ............................................... 13
    Convention ..................................... 13
    Alumnae Association Vote Value ...... 14
    Enacted Business ........................... 14
    Nonvoting Members ........................ 14
    Notice of Meetings........................... 13
        Regular Meeting........................... 13
        Special Meeting............................ 13
    Postponement or Cancellation of a
        Meeting ........................................ 13
    Quorum .......................................... 14
    Regular Meeting............................... 13
    Special Meeting............................... 13
    Vote and Voting ............................... 14
    Voting Members ............................... 14
    Membership Meetings........................ 13
Member, Chapter, and Association
    Responsibilities................................ 9
    Academic Excellence
    Active Member Standard.................. 10
    Chapter Standard ............................ 10
    Academic Excellence........................ 10
    Accountability ................................. 10
    Outcome .......................................... 10
    Overview .......................................... 10

Process ............................................. 10
College or University Regulations ......... 10
Conduct ............................................. 10
Conflict of Interest ............................... 11
Finance .............................................. 10
Good Standing...................................... 10
    Association ...................................... 11
    Chapter............................................ 10
    Member ........................................... 10
Legal Compliance ................................. 9
    Alcohol ............................................ 9
    Discrimination ................................. 9
    Drugs .............................................. 9
    Hazing ............................................. 9
Overview ............................................. 9
Members............................................... 2
    Affiliation ........................................ 4
    Classifications of Members ................ 2
    Active .............................................. 2
    Alumna ........................................... 2
    Associate ......................................... 2
    New Members.................................... 2
    Direct Fraternity Council Action.......... 5
    Fees ................................................ 5
    Annual Per Capita Fee....................... 5
    New Member Fee .............................. 5
    Reinstatement Fee............................. 5
    Renewal Fee .................................... 5
    Initiation
    Requirements for Initiation ............... 3
    Initiation.......................................... 3
    Initiation
    Special Circumstances...................... 4
    Qualifications ................................... 3
    Alumna Candidate............................. 3
    Collegiate New Member and Alumna
        Candidate ..................................... 3
    Reinstatement or Renewal ................. 4
    Active Alumna and Associate Member 4
    Reinstatement After Requested
        Resignation or Dismissal. ............. 5
    Reinstatement After Voluntary
        Resignation................................... 4

 Kappa Kappa Gamma

ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

Decision Final ....................................... 5
New Member Renewal ...................... 5
Voluntary Resignation, Broken Pledge,
　　Resignation and Dismissal................... 4
Broken Pledge, Requested Resignation
　　and Dismissal
　　Active Member ............................... 4
　　Associate or Alumna Member ....... 4
　　New Member .................................. 4
Broken Pledge, Requested Resignation
　　and Dismissal ................................... 4
Voluntary Resignation........................ 4
　　Active, Associate and Alumna
　　　Member ....................................... 4
　　New Member .................................. 4
**Name ..................................................... 1**
**National Panhellenic Conference ............18**
Membership.......................................... 18
Membership Requirements ................. 18
Representation ..................................... 18
**Nominations and Elections ...................12**
Committee Composition...................... 12
　　Alternating Each Biennium .............. 12
　　Chairman and Vice Chairman .......... 12

Equal Number of Collegiate and
　　Alumna Representatives............... 12
Members............................................. 12
Elections .................................................. 13
　　Election Committee ......................... 13
　　Eligible Voters ................................. 13
　　Voting................................................ 13
Nominations Report............................. 12
Nominee Selection................................ 12
Open Nominations................................ 13
**Nonprofit Corporation ........................... 19**
**Officers.................................................... 11**
Officer Transition Meeting................... 11
Request for Resignation or Removal From
　　Office................................................. 12
Term of Office and Term Limits ........... 11
Vacancies and Temporary Absences .... 11
　　Other Offices ................................... 12
　　President .......................................... 11
**Parliamentary Authority ........................ 20**
**Proprietary Materials ........................... 17**
Copyrights ............................................ 18
Secret Materials ................................... 18
Trademarks ........................................... 17
**Purpose .................................................. 1**

**APP.110**

# ATTACHMENT 2

 **Kappa Kappa Gamma**

### GUIDE FOR SUPPORTING OUR LGBTQIA+ MEMBERS

Kappa Kappa Gamma was founded more than 150 years ago on the principles of integrity, respect and regard for others.

Kappa Kappa Gamma recognizes the value of each individual and expects its members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals.

Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on race, national origin, religion, disability, age, gender identity or sexual orientation. Members are encouraged to promote and demonstrate an understanding of inclusion, both on the college campus and in the world community.

**Membership Selection**

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character.

**How to Be an Ally** [i]

As an individual:

- Treat every person with dignity and respect.
- Do not make or perpetuate assumptions about someone's Sexual orientation or Gender identity.
- Your friend may be exploring or questioning her [1] sexual orientation or gender identity. How she does so is up to her. If prompted by her, be supportive and make it known that you are there to listen without judgment.
- Listen and keep an open mind. Ask questions. Be honest about your feelings and be willing to learn.
- Ask LGBTQIA+ (Lesbian, Gay, bisexual, Transgender, questioning, Intersex, Asexual) individuals how you can support them.
- Educate yourself and those around you who may have misinformation about the LGBTQIA+ community.
- Understand your own culture, socialization, prejudices, and privileges.
  Respect the privacy of LGBTQIA+ individuals. Allow them to make their own decisions on how, when and with whom to reveal their sexual orientation or gender identity.
- Support LGBTQIA+ individuals as you would any other person. Refrain from treating LGBTQIA+ individuals differently.
- Always refer to people by the names and pronouns they prefer.
- Confront those who mock or harass others on the basis of sexual orientation or gender identity.
- Know when and how to refer someone to outside, professional help.

As a chapter [ii]:

- During Recruitment — and at all times — make it clear that the chapter values inclusion.
- Use inclusive, nongender-specific language (e.g., partner and date) that does not assume heterosexuality in others.

---

[1] We have selected to use the she/her/hers pronouns throughout this document for the purpose of simplicity. It is not meant to signify which pronouns are appropriate in a given situation.

**APP.112**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 214 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 117
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 33 of 209

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- Make it known that same-sex dates/guests are welcome at chapter events.
- Invite a panel of LGBTQIA+ students or faculty to make a presentation to the chapter.
- Encourage members to get involved in an ally program on your campus or start one if one does not exist.
- Include the Fraternity's position statement on nondiscrimination in the chapter Bylaws.
- Attend campus and community LGBTQIA+ events and activities as a group.

**Using Inclusive Language**

Being a welcoming community means intentionally working to find ways to name and value experiences and identities that are often minimized or devalued. It means uncovering our unconscious assumptions about what's "normal" and who is present in our community and striving to understand the ways that language often unconsciously makes assumptions about people and unintentionally reinforces societal norms. Here are a few things to be mindful about when seeking to use inclusive language:

- **Use language that reflects what people call themselves.** Respect a person's identity and self-label as well as that person's chosen name and pronouns. Practice offering your own pronouns when you meet new people.
- **Use person-centered language**. For example, do not use an identity as a stand-in for a person or a group: "transgender people" instead of "transgenders." Remember that any aspect of a person is just that, an aspect of a person.
- **Understand and respect the difference between sexual orientation and gender identity**. For example, do not say "LGBT" if you are only talking about sexual orientation or use "straight" as the opposite of "LGBT." Transgender people can be any sexual orientation, including straight.
- **Ask yourself whether it is appropriate to share a particular fact about a person pertaining to gender identity or sexual orientation.** In some circumstances, a person's or group's identity will be irrelevant to what you are communicating. In other circumstances, it will be an important part of the context.
- **Use words that encompass all genders, sexual orientations and family units**. For example, "people of all genders" instead of "women and men"; "children" instead of "boys and girls"; "parents" instead of "mom and dad"; and "partner" or "significant other" instead of "boyfriend and girlfriend."

Learning about the most current terminology encourages a more productive conversation about diversity and inclusion.

**How to Support Someone Who Is Coming out** [iii]

This list provides ideas to keep in mind when you learn that a Kappa member (or any other friend) self-discloses that she is exploring or questioning her sexual orientation or gender identity.

- Listen to what your friend has to say and keep an open mind.
- Understand the personal risk your friend took in telling you. Realize the trust that person has in you.
- Realize your friend has not changed.
- Respect the choice to tell you by letting that person know you will keep the conversation confidential.
- Do not shy away from your friend. Feel free to ask questions to better understand.
- Offer your support and willingness to help through the coming-out process.
- Become familiar with the national, local, and on-campus resources available.

**APP.113**

 Kappa Kappa Gamma

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

**A Member Is Outed to the Chapter**
The choice to come out, when, and to whom is personal and private to the individual. No one should ever be outed – coming out is a process, and it can be difficult due to discrimination, homophobia and fear of not being accepted. If someone in the chapter is outed, the following are ways to provide support:
- Reach out to the member and let them know you are willing to listen and be a friend.
- Calm the member if they are upset and allow them to take the lead and speak about their feelings.
- Stand up for the member as you would for any other sister.
- Attempt to resolve any conflict among other sisters who may not understand by asking them to give the sister some time to process their feelings.
- Seek the expertise of campus officials or Kappa Kappa Gamma Headquarters if you are concerned about the chapter's response and need assistance processing the experience.
- Let the member know that you value them as a Kappa and as an individual.
- As appropriate, refer members to the Vice President-Standards.

**How to Support Someone Questioning Their Gender Identity** [iv]
Gender identity refers to how an individual views themselves in terms of characteristics traditionally identified in this culture as male or female. A person may self-identify as male, female, or as possessing gender non-binary characteristics. This list provides some ideas to keep in mind when you learn that a Kappa member (or any other friend) is questioning their gender identity.
- Respect the language the person uses to describe their identity.
- Be discrete in order to avoid outing. Assure the person that you will not betray their confidence.
- Do not make assumptions about the person's sexual orientation.
- If you aren't sure what pronouns to use, listen. Ask if it seems appropriate.
- Understand the difference between "coming out" in regard to sexual orientation and "coming out" in regard to gender identity. Do not out a transgender individual. It can feel disempowering for transgender persons to disclose their transgender status as they are living life as their true selves.
- Recognize there is not one acceptable way to transition. It is different for every person.
- Challenge anti-transgender comments and try to educate others who are misinformed.
- Be supportive of gender-neutral bathroom options.
- Recognize and admit when you do not know something.
- Know when to seek outside help.

**Frequently Asked Questions**
- Membership
    - **A potential new member identified herself as a member of the LGBTQIA+ community and asked if the chapter would be accepting.**
        - Yes. Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women. Kappa does not discriminate in membership selection except by requiring good scholarship and ethical character. Chapter members should become versed in this position statement in order to communicate this message to PNMs.
    - **My chapter is ready to extend a bid to a PNM who identifies as transgender, but a member/adviser present is not supportive.**

**APP.114**

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- Each Kappa chapter has the final choice of its own members. Because Kappa is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character, the chapter is well within its rights to offer that potential member a bid. Please bring any concerns regarding this matter to Kappa Headquarters or the Membership Specialist.

- **A sophomore member is in a romantic relationship with one of the new members. They have both requested to be paired as big sister and little sister. Is this allowed?**
  - Kappa does not oversee the intimate relationships of its members. However, it is important to reiterate the responsibilities listed in the Big Sister Commitment Form with the older member. The role of a big sister is meant to offer education and mentorship. It is important to consider if a romantic relationship will hinder that vital component of the New Member Experience.

- **It was brought to my attention that a PNM has specified pronouns they want to be used throughout Recruitment. How do I explain this to the chapter and ensure this PNM feels comfortable at our recruitment events?**
  - Reach out to the relevant office on your campus in order to obtain guidance from a knowledgeable professional. This could be the Greek life office, office of diversity and inclusion, etc. Consider bringing in a speaker if time will allow.
  - Ensure that recruitment rounds are designed so that all feel welcome and respected.
  - Collaborate with the office of fraternity and sorority life in order to institute nametags that include pronouns. If this is not possible, take time between rounds to notify chapter members if a PNM who uses pronouns other than she/her/hers.

- Housing
  - **Can transgender members or members who identify as women live in the chapter facility?**
    - Yes. All Kappa members are eligible to live in a chapter facility. When available, living in the chapter facility can enhance the member's experience. Therefore, members and House Boards should work to make appropriate accommodations in order to support those members living in. Some recommendations for making all involved comfortable throughout the process include:
      - Have an open discussion with the member about living in the chapter house and address any fears she might have. Think creatively in order to find solutions to issues that may arise.
      - Create a resource that details the bathrooms available for that member to use.
      - Classify a gender-neutral restroom in the facility.
      - If the member is comfortable, have an open discussion with all members who live in the facility in order to determine comfort levels and address any questions that may arise.
      - Identify a room/rooming situation that all members involved are comfortable with. This could include the possibility of housing the member in a single room (for which House Board may not charge additional fees).

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- o **Our chapter has a transgender member who does not feel comfortable living in the chapter house. How do we deal with the residency requirement in this instance?**
  - ▪ Similarly to other circumstances that warrant a waiver, House Board should waive the live-in requirement for this member. Reach out to the Director of Housing and Facilities Director for further assistance regarding this matter.
- o **How should House Board handle relationships between members, specifically when one or more of the members in the relationship lives in the chapter house?**
  - ▪ The Fraternity does not oversee the intimate relationships of its members. However, all members should operate under the basic tenets of communal living (e.g., showing respect for one another and seeking permission from roommates when having guests in private quarters). If a member violates those communal living standards, she should be referred to the Standards Committee. The Standards Committee should work with the members involved to create a fair solution. Treat the member the same as a member who violated the rule with a heterosexual partner.
- Standards
  - o **I am an initiated member of Kappa who has recently transitioned from female to male. Am I going to lose my membership?**
    - ▪ Kappa members who identify as transgender during any stage of their membership will not lose their membership rights.
  - o **A member of the chapter came out as gay a few months ago. Since then, she has stopped attending most chapter meetings and activities. What should I do?**
    - ▪ The Standards Committee should call the member in for a meeting and initiate the conversation as they would handle any other attendance issue. However, the committee should be prepared for the member to divulge that she has felt isolated or uncomfortable during her coming-out process. The committee should ask the member about some of the issues and what would make her feel more comfortable. Jointly, the committee and the member will develop a strategy for positive engagement and identify allies to support her during this time.
    - ▪ Be prepared with information about campus and local resources.
    - ▪ If the member remains uncomfortable at chapter gatherings, the viability of Associate Membership or Special Status should be discussed in order to stave off the possibility of a member feeling that she needs to resign. If the member is experiencing mental health issues as a result of her gender identity or sexual orientation, the Alternative Standards Contract should be discussed as a possibility.
  - o **A member of the chapter recently came out as gay. It has been reported that a few members of the chapter have been making inappropriate jokes about the member's sexuality. How should the chapter handle this?**
    - ▪ Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on gender identity or sexual orientation. Members are encouraged to promote and demonstrate an understanding of inclusion on the college campus and in the world community. Thus, like any other rule violation, members who allegedly violate Kappa's nondiscrimination policy should be referred to the Standards Committee. If there is a violation, Probation with appropriate terms may be considered, including:

**APP.116**

 **Kappa Kappa Gamma**

**GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS**

- Interview a professional from the campus' diversity and inclusion office and write a report.
- Create a presentation regarding bullying and its negative effects.
- Research the Fraternity's history and values and discuss the role of nondiscrimination in those values.

  o **A live-in member of the chapter is currently dating another member of the chapter, which has led to some complaints from the live-in member's roommates. The couple has also requested to room together for the next school year. How should this be handled?**

    ▪ The Fraternity does not oversee the intimate relationships of its members. However, all members should operate under the basic tenets of communal living (e.g., showing respect for one another and seeking permission from roommates when having guests in private quarters). If a member or members violate those communal living standards, they should be referred to the Standards Committee. The committee will work with the members involved to create a fair solution. Furthermore, the committee will treat those members the same as they would any other member who violates a rule.

    ▪ The House Chairman should deal with the housing request and the roommate-selection process as written. If the opportunity for the members who are dating each other does materialize, hold a discussion regarding the communal living standards and what might happen if the relationship were to not work out.

- Ritual

  o **Is Kappa's ritual and history inclusive? I don't want LGBTQIA+ members to feel left out during ritual ceremonies.**

    ▪ After a thorough review, Fraternity Council has stated its belief that Kappa's ritual and history does use inclusive language that should not work to isolate any of our members. Please bring any concerns regarding ritual and history to the Ritual and History Director.

  o **Where should transgender members change clothes prior to Initiation?**

    ▪ While the answer to this question will depend on the circumstances of individual chapters, the comfort of all members should be considered when it comes to a sensitive situation like this. View it as an opportunity to potentially change how your chapter handles pre-initiation activities so that the needs of all members are met and no member needs to be unnecessarily singled out. Ritual is meant to bring the sisterhood together and should not isolate individuals.

- Education

  o **Should my chapter be hosting or endorsing LGBTQIA+-related programming?**

    ▪ At a minimum, all Kappa members should be knowledgeable about Kappa's policies and position statements regarding membership selection, nondiscrimination and human dignity. Chapters are encouraged to conduct basic training on inclusivity with the assistance of campus professionals. Beyond that, Kappa encourages its chapters to select programming that meets the chapter's unique needs. Reach out to the office of fraternity and sorority life for assistance in bringing in campus professionals to discuss the topic of inclusivity.

**What Would You Do? Case Studies** [v]

**APP.117**

 Kappa Kappa Gamma

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

1. You are managing a recruitment table in the student center when a student asks if it would be a problem for a transgender student to join Kappa.

   **Possible Discussion Questions**
   o Prior to Recruitment, what sort of preparation and training should be done with the chapter to prepare for questions like this?
   o What Kappa resources (human and written) would you use?
   o What type of response would be inclusive and welcoming?
   o What are Kappa's policies regarding this?

2. A member of your chapter brought her girlfriend as her date to the spring formal. On the bus ride home, you overheard another member's date refer to the couple as "dykes." The date who made the comment is the president of one of the most popular fraternities on campus, and you are worried about the social repercussions for your chapter if his comment were to be reported.

   **Possible Discussion Questions**
   o There are many different ways you could choose to handle this situation. Let's explore three possible actions. You could 1) choose to ignore this statement, 2) address this with the member who brought him as a date, or 3) directly confront the individual who made this derogatory statement. What are the possible repercussions of each of these actions? Which would you choose and why?
   o By doing nothing, you are being a bystander. What does that mean and why is it a problem?

3. You are in a membership selection session during Recruitment. The chapter is discussing a potential new member prior to voting and several members have made comments that the potential new member doesn't fit "the chapter's image." The understood message is that the potential new member is bisexual.

   **Possible Discussion Questions**
   o How do these comments and lines of thinking go against what Kappa values?
   o What are the possible consequences if this is not confronted or addressed?
   o What could be done prior to Recruitment to educate chapter members so these types of comments are avoided?

4. You are on the Standards Committee. Your chapter's Greek Week delegate visits a standards meeting to ask if she should try to change the chapter's pairing with a fraternity that has many members who identify as gay. The delegate is worried that the pairing will not go over very well with the chapter and expresses concern that the fraternity will also feel uncomfortable.

   **Possible Discussion Questions**
   o How would you respond to the Greek Week delegate?
   o In this situation, the Greek Week delegate is making a lot of assumptions, including the reaction of the chapter and that the fraternity will feel uncomfortable. Why is this a problem? How could this be addressed with the Greek Week delegate?
   o What type of consequences could occur if your chapter backed out of the Greek Week pairing?

**APP.118**

 Kappa Kappa Gamma

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

      o   What resources are available from Kappa or on your campus to turn to for guidance?

5.  A member of your chapter is an active member of a campus LGBTQIA+ student organization. Recently, rumors have begun circulating on campus that your chapter is the "lesbian" chapter. Some members and advisers feel that this is going to negatively impact Recruitment in the fall. As a result, the Membership Chairman recently told the lesbian member not to take part in Recruitment and to be less visible in LGBTQIA+ activities.

**Possible Discussion Questions**
    o   What mistakes did the Membership Chairman make?
    o   How might the chapter member who was asked not to take part in Recruitment and be less visible feel about her membership with Kappa Kappa Gamma right now? What can be done to build trust with this member again?
    o   What can you do to change the culture and mindset within your chapter?

6.  A member of your chapter tells you that her little sister disclosed that she is questioning her gender identity. The little is wondering if she should come out to the chapter, and, if so, whether to do so before or after Initiation. The chapter seems closed-minded since it recently registered very low attendance at a required program regarding LGBTQIA+ and the Greek-letter community.

**Possible Discussion Questions**
    o   How can the chapter support the new member who is questioning her gender identity?
    o   What are the consequences if the new member shares this information before or after Initiation? Should it matter?
    o   Since many chapter members missed the required program regarding LGBTQIA+ and the Greek-letter community, what can be done to ensure the chapter receives this education?

7.  House Board recently proposed a house rule that states, "Any member who permits her same-sex partner to stay overnight in her private quarters shall be subject to discipline and possible eviction."

**Possible Discussion Questions**
    o   What problems do you see with this house rule?
    o   What are Kappa's policies regarding this?
    o   Based on Kappa's policies, what are the potential next steps?

**Terms, Definitions and Labels** [vi]
The words we use and how we use them can be powerful. Knowing and understanding the words we use advances communication and helps prevent misunderstandings. The following terms are not absolutely defined. Rather, they provide a starting point for conversations.

- **Ally:** An "ally" is a term used to describe someone who is supportive of LGBTQIA+ people. It encompasses non-LGBTQIA+ allies as well as those within the LGBTQIA+ community who support each other (e.g., a lesbian who is an ally to the bisexual community).
- **Asexual:** A person who is not sexually attracted to either men or women and does not have a desire to engage in sexual activity with a partner. Asexuality is a sexual orientation and differs

**APP.119**

 Kappa Kappa Gamma

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

from celibacy, which is a choice to abstain from sex. Some asexual people have a desire to form intimate but nonsexual romantic relationships and will date and seek long-term partnerships.

- **Assigned sex:** The sex that was recorded on a person's birth certificate.
- **Bi-curious:** A term used to describe a person who identifies as heterosexual or homosexual, but experiences some thoughts or visions about engaging in intimate relationships with a gender other than the one to which he or she is primarily attracted.
- **Biological sex:** The dichotomous distinction between female and male based on physiological characteristics, especially chromosomes and external genitalia.
- **Cisgender:** Not transgender. This term describes a person who has a gender identity or gender role that society considers consistent with the sex assigned at birth.
- **Closeted/in the closet:** The confining state of being secretive about one's true gender identity and/or sexual orientation. A person may feel compelled to be closeted for their safety or in order to keep a job, housing situation or family/friends. Many LGBTQIA+ individuals are "out" in some situations and "closeted" in others.
- **Coming out (of the closet)/being out:** Refers to the process through which a person acknowledges, accepts, and learns to appreciate their lesbian, gay, bisexual, transgender or other identity. Sharing this information with others is not a single event. Instead, it is a lifelong process.
- **FTM/F2M:** Abbreviation for female-to-male. A term that refers to male-identified people who were categorized as female at birth. (See also MTF and Transgender.)
- **Gay:** Used to describe a man who is romantically, sexually, and/or affectionally attracted to men. However, not all men who engage in sexual relations with other men identify themselves as "gay." The term is sometimes used to refer to the LGBTQIA+ community as a whole. Although, many women prefer to be identified as "lesbian" instead of "gay."
- **Gender:** A term used to describe the social status of people as men, women, boys, girls, or variously transgender, including characteristics of masculinity and femininity that are learned or chosen.
- **Gender dysphoria:** An intense, continuous discomfort resulting from an individual's belief in the inappropriateness of their assigned sex at birth and resulting gender role expectations.
- **Gender identity:** How an individual views themselves in terms of characteristics traditionally identified in this culture as male or female. A person may self-identify as purely male, purely female, or as possessing characteristics of both.
- **Gender-neutral/gender-free pronouns:** Pronouns that do not associate a gender with the person or creature being discussed. The English language has no truly gender-neutral, third-person pronoun available. Some examples are "hir" for "him/her" and "ze" for "he/she."
- **Gender normative/gender conforming:** A person who conforms to gender-based societal expectations.
- **Gender queer:** A term that is growing in usage that represents a blurring of the lines surrounding society's rigid views of both gender identity and sexual orientation. Gender-queer people embrace a fluidity of gender expression that is not limiting. They may not identify as male or female, but as both, neither, or as a blend. Similarly, gender queer is a more inclusive term with respect to sexual orientation.
- **Gender roles:** The socially constructed and culturally specific behavior and appearance expectations imposed on women (femininity) and men (masculinity).

**APP.120**

 Kappa Kappa Gamma

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

- **Homosexual:** A sexual orientation in which a person feels physically and emotionally attracted to people of the same sex. This clinical term originated in the 1800s and is not used within the gay and lesbian community.
- **Hormone therapy/hormonal sex reassignment:** The administration of hormones to affect the development of secondary sex characteristics is a process, possibly lifelong, of using hormones to change one's internal body chemistry.
- **Intersex:** A person born with sex chromosomes, external genitalia, or an internal reproductive system that is not considered medically standard for either male or female. The gender identity and sexual orientation of these people varies as it does with non-intersex people.
- **Lesbian:** Preferred term for a woman who is romantically, sexually, and/or affectionally attracted to women.
- **LGBTQIA+:** Initialism of lesbian, gay, bisexual, transgender, queer/questioning, intersex, and asexual/agender/aromantic. LGBTQIA+ is a term encompassing people with non-mainstream sexual orientation or gender identity.
- **MTF/M2F:** Abbreviation for male-to-female. A term that refers to female-identified people who were categorized as male at birth.
- **Outing:** Publicly revealing the sexual orientation, gender identity, or intersex status of an individual who has chosen to keep that information private. Some activists, political groups, and media believe outing is justified and/or newsworthy when the person involved works against the interests of LGBTQIA+ people. Others oppose it entirely as an invasion of privacy.
- **Pangender/omnigender/polygender:** A person whose gender identity is comprised of all or many genders.
- **Pansexual/omnisexual/polysexual:** A person who is sexually attracted to all or many genders or gender expressions.
- **Passing:** Being taken for a member of the dominant group — white, straight, and cisgender (nontransgender). For example, LGBTQIA+ people who have the ability to pass can choose to conceal the stigma associated with being a member of a sexual minority.
- **Queer:** Historically, it is a pejorative term for "gay." The word "queer" has been reclaimed by some members of the community as a political act intended to undermine the violence that is embedded with the original use of the term. Queer is also sometimes used as an umbrella term for LGBTQIA+. It is still considered to be a slur by some people and in some contexts. This and other reclaimed terms can be offensive to the in-group when used by the out-group. Such terms should be used with caution.
- **Questioning:** A process whereby an individual is reassessing their sexual orientation and/or gender identity. A person who is questioning may be unsure of their sexual identity or still exploring their feelings.
- **Sex:** The biological (i.e., anatomical, hormonal or genetic) traits used to categorize someone as either male or female.
- **Sexism:** The societal/cultural, institutional, and individual beliefs and practices that privilege men, subordinate women, and denigrate women-identified values.
- **Sexuality:** Who you like and what you do.
- **Sexual identity:** Sexual identity is identifying, claiming, and owning a part of the self that is associated with one's gender identity, sexual orientation, or sexuality. Sexual identity may mean identifying as a member of the LGBTQIA+ community.
- **Sexual orientation:** A person's emotional, physical, and sexual attraction and the expression of that attraction with other individuals. The term "sexual orientation" is preferred over "sexual

**APP.121**

 **Kappa Kappa Gamma**

**GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS**

preference." The latter term implies a choice and sexual attraction is not generally considered a choice.

- **Sex reassignment surgery:** Sex reassignment surgery is a permanent surgical body modification that seeks to attain congruence between one's body and one's gender identity. Use this term instead of "sex change." Sometimes known as gender reassignment surgery. Many in the transgender community prefer gender confirmation surgery.
- **Straight:** A term originating in the gay community to describe heterosexuals.
- **Transgender/trans:** A term for people who challenge society's view of gender as fixed, unmoving, dichotomous, and inextricably linked to one's biological sex. Gender is more accurately viewed as a spectrum rather than a polarized, dichotomous construct. This is a broad term that encompasses cross-dressers, intersexed people, gender-benders, transsexuals and those who defy what society tells them is appropriate for their gender. The sexual orientation of transgender persons varies just as it varies across society. An individual is transgender, not "transgendered."
- **Transsexual:** Individuals whose assigned sex at birth does not match their gender identity. Through sex reassignment surgery and hormone treatments, those individuals may seek to change their physical bodies to match their gender identities. Transsexual individuals' sexual orientation can be heterosexual, homosexual, bisexual, or anywhere on the continuum.
- **WomXn:** An alternative spelling of the word "woman" that is meant to denote the intersectionality in womanhood and emphasize the idea that women are independent.

———

**Additional Resources**

**The Lambda 10 Project** National Clearinghouse for Gay, Lesbian, Bisexual, Transgender Fraternity & Sorority Issues. https://www.campuspride.org/lambda10/

**Campus Pride** Building future leaders and safer, more LGBTQIA+-friendly colleges and universities. https://www.campuspride.org/

**CDC LGBT Youth Resources** www.cdc.gov/lgbthealth/youth-resources.htm

**The Trevor Project** A national 24-hour, toll-free confidential suicide hotline for LGBTQIA+ youth. www.thetrevorproject.org/ 866-488-7386

**It Gets Better Project** www.itgetsbetter.org/

**LGBT National Help Center** http://www.glbthotline.org/ Toll-free number: 1-888-843-4564; Email: help@LGBTQIA+hotline.org

**The National Suicide Prevention Lifeline** 1-800-273-TALK (8255)

---

[i] https://www.campuspride.org/resources/sample-greek-ally-commitment/
[ii] https://www.campuspride.org/lambda10/greekally/greek-ally-resources/

 **Kappa Kappa Gamma**

GUIDE FOR SUPPORTING
OUR LGBTQIA+ MEMBERS

---

iii Shane L. Windmeyer and Pamela W. Freeman, Lambda 10 Project,
https://www.campuspride.org/resources/what-to-do-when-you-learn-a-brothersister-is-gay/
iv https://www.glaad.org/transgender/allies
v Campus Pride, 2014, https://www.campuspride.org/wp-content/uploads/Greek-Ally-Case-Studies.pdf
vi Safe Zones Manual http://thesafezoneproject.com/

**APP.123**

Case 2:23-cv-00051-ABJ    Document 8-1    Filed 04/20/23    Page 44 of 209

# ATTACHMENT 3



**Vorys, Sater, Seymour and Pease LLP**
**Legal Counsel**

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

**614.464.6400 | www.vorys.com**

Founded 1909

Natalie M. McLaughlin
Direct Dial   (614) 464-5452
Direct Fax   (614) 719-5252
Email nmmclaughlin@vorys.com

November 15, 2022

**VIA US MAIL AND E-MAIL [JOHN@KNEPPERLLC.COM;**
**CCRAVEN.LAW@GMAIL.COM]**

John G. Knepper
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY  82001

Cassie Craven
Longhorn Law, LLC
109 E. 17th St. Suite 223
Cheyenne, WY 82001

        Re:    Response to Litigation Threat

Dear Mr. Knepper and Ms. Craven:

        I am legal counsel for Kappa Kappa Gamma Fraternity, Inc. ("Kappa"). Please direct any future communications to my attention.

        As an initial matter, I want to ensure you understand the lack of involvement of Kappa in collegiate chapter member selection. Active members of each collegiate chapter are responsible for voting on new members of their chapter. Chapters have the right to select members of their choice in accordance with fraternity standards and procedures. Kappa does not overrule decisions of a collegiate chapter because collegiate chapter members or alumnae disagree with a chapter's decisions on who to initiate. Kappa will only involve itself if a collegiate chapter has acted contrary to Kappa's bylaws, guidelines, or other policies or procedures.

        Kappa's bylaws and other governing documents state that Kappa is a single-gender organization. Gender is not equivalent to biological sex, birth anatomy, or chromosomes. Rather, it is a broader construct encompassing identity. A person's gender identity is their subjective, deep-core sense of self as being a particular gender. As a single-gender organization, Kappa welcomes all women, including individuals who may have been born as males but who identify as women.

**Ohio   |   Washington, D.C.   |   Texas |   Pennsylvania   |   California**

**APP.125**



John G. Knepper and Cassie Craven
November 15, 2022
Page 2

Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status.

Nothing in Kappa's bylaws or in any other Kappa governing document limits membership only to individuals who were biologically born as female. Indeed, Kappa's Position Statements on Membership Selection and Single-Gender Organizations state that as a single-gender organization, Kappa includes individuals who identify as women. Though each chapter of Kappa chooses its own members, all chapters are expected to adhere to the Position Statements and not discriminate in membership selection except by requiring good scholarship and ethical character. Kappa's Guide for Supporting Our LGBTQIA+ Members again iterates that for membership selection, as a single-gender organization, individuals who identify as women may be initiated. That Guide also prohibits discrimination in membership selection except by requiring good scholarship and ethical character.

The National Panhellenic Counsel, of which Kappa is a member, issued a policy in 2020 that states: "For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman." All 26 national/international women's sororities that are members of the NPC are open to all women, including individuals who were biologically born male, but who identify as women. This makes sense, as the NPC and women's sororities recognizes that as single-gender organizations for women, this includes all women, not just those who were biologically born female.

For all of these reasons, the assertion in your letter that Kappa has breached a contract in violation of its bylaws and standing rules by allowing Gamma Omicron to bring a "non-woman into the organization" is without basis. Kappa is unaware of any "non-woman" new member of the Gamma Omicron chapter.

Kappa is also unaware of the Gamma Omicron chapter violating any Kappa bylaws, rules, guidelines, or other policies and procedures. Again, chapters have the right to select members of their choice. If there are specific provisions in any Kappa governing documents that you contend were not followed by Kappa, please identify what those specific provisions are, what governing documents they are contained within, and what actions of Kappa you contend are in violation of those specific provisions.[1]

We regret that the initiation of a collegiate member at the Gamma Omicron chapter has caused some chapter members to question whether to continue with Kappa. We also regret that there are alumnae, including those who were never part of the Gamma Omicron chapter, that seek to fund divisive litigation because of a collegiate chapter's decision to initiate a 20-year-old college

---

[1] Any statement made by chapter officers that Kappa includes individuals who identify as women and that the chapter does not discriminate against someone because that individual was biologically born as a male, but identifies as a woman, would be appropriate and consistent with fraternity standards and procedures.



John G. Knepper and Cassie Craven
November 15, 2022
Page 3

student that some alumnae believe should be excluded from participating in a women's organization. With a diverse array of hundreds of thousands of members, Kappa realistically recognizes that there will often be some contingent of individuals who have values that do not align with Kappa and who thereby disagree with Kappa's decisions. This, however, does not justify derogatory statements and cruelty. The unkindness, vitriol, lack of regard for others, and disrespect that has been exhibited by some individuals over the past month is contrary to all that Kappa stands for.

You are correct that Kappa is important to the individuals who have loved and served it for generations and that those in positions of leadership have a duty to protect the organization against those that would seek to adversely impact it. Kappa also has a duty to care for all members, even when other members may seek to exclude them. Kappa's responsibility is to act in the best interest of the organization as a whole and for the future of the organization. Kappa believes that its positions on inclusivity and non-discrimination fulfill these responsibilities.

In summary, the decision of whom to initiate into the Gamma Omicron chapter is not made by Kappa. Kappa, however, does not limit membership to individuals who are biologically born as female, and therefore, the chapter has not violated any policies or procedures in initiating an individual who identifies as a woman. If there are any specific obligations to your clients that you contend Kappa has violated, please identify those. To the extent frivolous litigation is pursued, Kappa will vigorously defend itself.

Very truly yours,

Natalie M. McLaughlin

NMM/kay

**APP.127**

ATTACHMENT 4

DOC ID ----> 200421000424



| DATE: | DOCUMENT ID | DESCRIPTION | FILING | EXPED | PENALTY | CERT | COPY |
|---|---|---|---|---|---|---|---|
| 07/28/2004 | 200421000424 | DOMESTIC/AMENDED RESTATED ARTICLES (AMA) | 50.00 | .00 | .00 | .00 | .00 |

### Receipt
This is not a bill. Please do not remit payment.

VORYS, SATER, SEYMOUR & PEASE
52 E. GAY STREET
COLUMBUS, OH 43215

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, J. Kenneth Blackwell

**142747**

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**KAPPA KAPPA GAMMA FRATERNITY**

and, that said business records show the filing and recording of:

Document(s)                                                    Document No(s):
**DOMESTIC/AMENDED RESTATED ARTICLES**                          **200421000424**



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 26th day of July, A.D.
2004.

_J. Kenneth Blackwell_

Ohio Secretary of State

**APP.129**

DOC ID ----> 200421000424



Prescribed by **J. Kenneth Blackwell**

Ohio Secretary of State

Central Ohio: (614) 466-3910
Toll Free: 1-877-SOS-FILE (1-877-767-3453)

www.state.oh.us/sos
e-mail: busserv@sos.state.oh.us

| Expedite this Form: (Select One) | |
|---|---|
| ○ Yes | PO Box 1390<br>Columbus, OH 43216<br>*** Requires an additional fee of $100 *** |
| ● No | PO Box 1028<br>Columbus, OH 43216 |

## Certificate of Amendment by Shareholders or Members
### *(Domestic)*
### Filing Fee $50.00

**(CHECK ONLY ONE (1) BOX)**

| (1) Domestic for Profit | | (2) Domestic Non-Profit | |
|---|---|---|---|
| ☐ Amended<br>(122-AMAP) | ☐ Amendment<br>(125-AMDS) | ☑ Amended<br>(126-AMAN) | ☐ Amendment<br>(128-AMD) |

---

**Complete the general information in this section for the box checked above.**

Name of Corporation  Kappa Kappa Gamma Fraternity

Charter Number  142747

Name of Officer  Lila A. Isbell

Title  Executive Director and Corporate Secretary

☑ Please check if additional provisions attached.

The above named Ohio corporation, does hereby certify that:

☑ A meeting of the       ☐ shareholders     ☐ directors ( *non-profit amended articles only*)

☑ members was duly called and held on    June 28, 2004
                                          (Date)

at which meeting a quorum was present in person or by proxy, based upon the quorum present, an affirmative vote was cast which entitled them to exercise ___100___ % as the voting power of the corporation.

☐ In a writing signed by all of the   ☐ shareholders   ☐ directors ( *non-profit amended articles only*)
☐ members who would be entitled to the notice of a meeting or such other proportion not less than a majority as the articles of regulations or bylaws permit.

---

**Clause applies if amended box is checked.**

Resolved, that the following amended articles of incorporations be and the same are hereby adopted to supercede and take the place of the existing articles of incorporation and all amendments thereto.

---

**APP.130**

DOC ID ----> 200421000424

All of the following information must be completed if an amended box is checked.
If an amendment box is checked, complete the areas that apply.

**FIRST:**    The name of the corporation is:    Kappa Kappa Gamma Fraternity

**SECOND:** The place in the State of Ohio where its principal office is located is in the City of:

Columbus                                    Franklin
_____            _____
(city, village or township)                                    (county)

**THIRD:**    The purposes of the corporation are as follows:

Attached and incorporated herein by reference as Exhibit A.

**FOURTH:** The number of shares which the corporation is authorized to have outstanding is:    Not Applicable
                    **(Does not apply to box (2))**

| REQUIRED | | |
|---|---|---|
| Must be authenticated (signed) by an authorized representative **(See Instructions)** | *Lila A. Isbell* | *July 22, 2004* |
| | Authorized Representative | Date |
| | Lila A. Isbell | |
| | (Print Name) | |
| | | |
| | Authorized Representative | Date |
| | (Print Name) | |

APP.131

## Exhibit A

## PURPOSE CLAUSE AT THIRD

Kappa Kappa Gamma Fraternity (the "Fraternity or Corporation") is formed to function exclusively as an organization described in Section 501(c)(7) of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any future United States internal revenue law) (the "Code"). The purposes for which the Corporation is formed are:

A.    To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;

B.    To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

C.    To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;

D.    To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

E.    To advocate for and seek to address issues of concern for members and women in general;

F.    To promote the establishment and growth of alumnae associations and encourage participation of alumnae in the Fraternity programs; and

G.    To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

Notwithstanding anything to the contrary contained in these Articles, the Corporation shall not carry on any activities not permitted to be carried on by a corporation exempt from federal income tax under Code Section 501(a) as an organization described in Code Section 501(c)(7).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 234 of 506

Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 137
DOC ID ----> 200421000424-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 53 of 209

### ATTACHMENT TO
### CERTIFICATE OF AMENDMENT BY
### SHAREHOLDERS OR MEMBERS
### OF KAPPA KAPPA GAMMA FRATERNITY

**FOURTH**:     No part of the net earnings of the Corporation shall inure to the benefit of,
or be distributable to, its directors, officers, members or other private persons or
organizations, except that the Corporation shall be authorized and empowered to pay
reasonable compensation for services rendered and to make payments and distributions in
furtherance of the purposes set forth in Article THIRD hereof. The Corporation shall
have the power to do any and all lawful acts and things and to engage in any and all
lawful activities which may be necessary, useful, suitable, desirable or proper for the
furtherance, accomplishment or attainment of any or all of the purposes for which the
Corporation is organized, and to aid or assist other organizations whose activities are
such as to further, accomplish, foster or attain any such purposes.

**FIFTH**:     Upon the dissolution of the Corporation, the Board of Directors shall, after
paying or making provision for the payment of all liabilities of the Corporation, dispose
of the assets of the Corporation exclusively for the purposes of the Corporation in such
manner as the Board of Directors shall determine and in accordance with the Fraternity
*Bylaws*.

**SIXTH**:     These Articles may be amended from time to time, in whole or in part, in
accordance with the Fraternity *Bylaws*.

DOC ID ----> A527_0076

A527 - 75

Page 188  Line 25

Number 142747

Form B

## Articles of Incorporation

—OF—

KAPPA KAPPA GAMMA FRATERNITY

Filed in the office of the Secretary of State,

at Columbus, Ohio, on the 31 day of

July 19.. and recorded

in ..... Page .....

of the Records of Incorporation.

Secretary of State.

### REMARKS

Articles of incorporation must be subscribed by at least three persons, a majority of whom must be citizens of the United States. They may be acknowledged before any officer who is authorized to take acknowledgments of deeds.

The fee is $10.00.

Mail To: R.H.Greffinger atty
33 No High St
Columbus, Ohio

DOC ID ----> A527_0076

A527    76    *142 747*

CORPORATION NOT FOR PROFIT.                                    REGULAR

# Articles of Incorporation

—OF—

-----------KAPPA KAPPA GAMMA, FRATERNITY-----------------------

The undersigned, a majority of whom are citizens of the United States, desiring to form a corporation, not for profit, under the General Corporation Act of Ohio, do hereby certify:

FIRST.   The name of said corporation shall be  Kappa Kappa Gamma Fraternity

-----------------------------------------------------------------

SECOND.   The place in this State where the principal office of the corporation is to be located

Columbus                                      Franklin      County.
(City, Village or Township)

THIRD.   The purpose or purposes for which said corporation is formed are:

(a) To perpetuate Kappa Kappa Gamma Fraternity for the development of the nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence.

(b) To promote the establishment of local fraternities(chapters) at various colleges and universities in the several states of the United States and Canada and to provide for their proper organization, installation and maintenance, including the giving of such financial or other assistance in connection with or incidental to the owning, acquiring, selling, exchanging, mortgaging, leasing and improving all property by such fraternity(chapter) as may be necessary or desirable from time to time in the interests of the corporation.

(c)  To act as trustee for the purpose of receiving and accepting by way of gift or otherwise moneys to be used, loaned, invested, donated, administered and disposed of for educational, social endowment and philanthropic purposes, and as such trustee to loan, invest, re-invest, donate and dispose of such funds and to create, establish, maintain and administer funds for educational, social, endowment and philanthropic purposes and do all things necessary and incidental to the establishment, maintenance and administration of such funds.

(d)  To have and protect a distinctive and exclusive badge.

The foregoing are not limitations or restrictions of the general authority conferred upon the corporation by Section 8623-99 of the General Code of Ohio but are in addition thereto.

FOURTH.   The following persons shall serve said corporation as trustees until the first annual meeting or other meeting called to elect trustees.        GIVE STREET ADDRESS.

| | |
|---|---|
| Florence T. Myers | 9710 Ohio State Sav. Bldg. |
| Clara O. Pierce | Columbus, Ohio |
| Eleanor V. V. Bennett | 2525 Webster St. Berkley, Cal. |
| Alice T. Barney | 609 E. Ave. S.E. Minneapolis, Minn. |
| Marie B. Macnaughtan | St. Louis Mo. 7295 N.B.A. |

IN WITNESS WHEREOF, We have hereunto subscribed our names, this........26th.................day of

................July...................., 19..30.

Florence T. Myers
Clara O. Pierce
Eleanor V. V. Bennett
Alice T. Barney
Marie B. Macnaughtan

ALL ARTICLES OF INCORPORATION FILED ON OR AFTER JULY 23, 1929, MUST BE
ACCOMPANIED BY FOLLOWING DESIGNATION OF AGENT.

# Original Appointment of Agent

Ohio Corporation.
Section 8623-129, General Code.          A527    77

KNOW ALL MEN BY THESE PRESENTS, That ___MISS CLARA O. PIERCE___
                                                    Name of Agent

of _410 Ohio State Savings Bldg.,_ in _Columbus_
        Street or Avenue

_Franklin_____County, Ohio, a natural person and resident of said county,

being the county in which the principal office of ___KAPPA KAPPA GAMMA FRATERNITY___
                                                              Name of Corporation

is located, is hereby appointed as the person on whom process, tax notices and demands against

said ___KAPPA KAPPA GAMMA FRATERNITY_____ may be served.
              Name of Corporation

                            KAPPA KAPPA GAMMA FRATERNITY
                                    Name of Corporation

                            _Florence T. Myers_

                            _Alice T. Barney_

                            _Eleanor V. V. Bennet_
                                        Incorporators

                            (To be executed by all or a majority of the incorporators at the time
                                    of organization.)

                            _COLUMBUS_____, Ohio,

                            _JULY 26_____, A. D. 19_30_

KAPPA KAPPA GAMMA FRATERNITY
        Name of Corporation

Columbus, Ohio

    Gentlemen:   I hereby accept the appointment as the representative of your company upon

whom process, tax notices, or demands may be served.

                            _Clara O. Pierce_

State of Ohio,

County of _Franklin_____, ss.:

    Personally appeared before me, the undersigned, a Notary Public in and for said County,

this __26th__ day of __July__, A. D. 19_30_, the above named

_Clara O. Pierce_____ who acknowledged the signing of the foregoing

to be her free act and deed for the uses and purposes therein mentioned.

    WITNESS my hand and official seal on the day and year last aforesaid.

                            _R. H. Grepsinger_
                            Notary Public in and for

                            _Franklin_____County, Ohio.
                            P. H. To...

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 238 of 506
Appellate Case: 23-8065   Document: 010110962649   Date Filed: 12/04/2023   Page: 141
Case 2:23-cv-00051-ABJ   Document 6-1   Filed 04/20/23   Page 57 of 209

# ATTACHMENT 5

## Kappa Kappa Gamma — REPORT OF THE BYLAWS COMMITTEE

In spring 2021, the Bylaws Committee and a parliamentarian were tasked with reviewing the Fraternity's governing documents with an eye toward making sure subjects were in the correct documents. The committee found that the subjects that should be in the Fraternity *Bylaws* were in the Fraternity *Standing Rules*, some things in the Fraternity *Bylaws* should be in the Fraternity *Standing Rules,* and some things should be moved to the Fraternity Policies. The Bylaws Committee looked at each subject area within the documents to make sure they were interacting correctly and not contradicting other parts of the documents.

The whole committee met weekly to review provisions together. Parts of the committee were assigned specific topics or sections to research and to make recommendations to be brought back to the full committee for review. The parliamentarian kept up with revisions, updates, and keeping the committee focused. The committee met for over 100 hours spanning seven months. This was not a quick process, and the committee took time to reflect on each change and amendment to make sure the full meaning was understood. The committee also reached out to subject-area specialists as necessary for clarification and insight into how operations were happening in reality versus the aspirational goals set forth in the documents.

Because of the number of random amendments and the need to move provisions from one article to another and moving provisions between documents, the committee's final decision was the writing of a new set of bylaws and a new set of standing rules — each document called a revision.

While the documents now look different in structure, most of the content is unchanged. As in years past, the Bylaws Committee solicited amendments to the Fraternity *Bylaws* and *Standing Rules* per our documents and amendments that were accepted, along with accepted amendments from the 2018–20 Biennium, were incorporated into these new documents. If adopted, these documents will take effect at the end of Convention 2022. Some of the major amendments and the rationale behind the change are explained below.

- Term Limit of District Directors. The term limit for District Directors has been increased to three terms of two years each from two terms. The District Director role requires unique skill sets of team building, overall Fraternity operations knowledge and mentoring. There are volunteers who are particularly talented and are able to build rapport and trust with our chapters and alumnae associations to move them forward in a positive way. Their skills can be used in a variety of different districts. It is limiting the work of the Fraternity to have these volunteers only eligible to serve four years total in their lifetime, especially for those volunteers who serve when they are younger.
- Fees. The alumna per capita fee will increase $10 from the current $25 to $35 and the active per capita fee will increase $5 from $92 to $97. Both of these fee changes will take effect at the end of Convention. In addition, there will be an automatic cost of living adjustment of fees annually that is in line with the Consumer Price Index for All Urban Consumers. This shall be rounded to the nearest dollar. These fee increases are critical to maintaining and growing Kappa's offerings as well as sustaining Kappa's long-term future.

**APP.138**

## 🪻 Kappa Kappa Gamma　　REPORT OF THE BYLAWS COMMITTEE

- **Fraternity Nominating Process.** At the 2016 Convention, a resolution was put forth to study the Fraternity nominating process. The Leadership Development and Education (LEAD) Committee has reviewed the Fraternity nominating process and has proposed a new nominating structure and a new committee name from Nominating Committee to Leadership Selection Committee to reflect the purpose of the committee. The goal of the amendments surrounding this process change is to allow for the leaders of the Fraternity to be chosen in a transparent process by a committee given the time and education necessary for this important task. Under the proposed changes, elections for Fraternity officers and District Directors will take place before Convention but those officers and District Directors will not take office until after the close of Convention. Conducting the election virtually may have an added benefit of a higher voter participation rate since those voting members unable to attend Convention will be able to cast a vote in the election. The change in the election timing gives a chance for training and transitions between officers.

- **Chapter Officer Structure.** The Fraternity has piloted a new officer structure in two districts for the past four years. Kappa Kappa Gamma is proposing a scalable chapter officer structure that would be flexible and customizable to a chapter's size, priorities and needs. This model provides a more robust membership experience, increased strategic planning and decision-making, and enhances the leadership and professional opportunities at the chapter level. The proposed chapter leadership structure consists of a President and six vice presidents who would oversee specific areas of the chapter. These executives would serve as a visionary leadership board. Each of the six vice presidents would oversee and manage one of six departments. With these requirements in place, chapters can customize the leadership roles based on their needs. Chapters may choose to fill the content areas in each department with a director, all of whom would report to a vice president.

- **Convention Body Vote on Ritual Changes.** As proposed in 2020 but not voted on, a provision has been added in the documents that requires a Convention body vote on any proposed changes to ritual. Historically, Fraternity documents have stated that the Convention body would vote on changes to the ritual. When the 2016 structure changes were approved, this was not included. The intent is to return to the vote for emphasis but also the need for our beautiful ritual to be used and practiced in the same manner and the same words by all.

- **Inclusivity.** Since diversity, equity and inclusion have been a focus and the subject of a previous resolution at Convention, a concerted effort has been made to make sure the language of the documents is inclusive. The committee has tried to craft the documents in such a way that gendered pronouns are not used and references are inclusive of all of our membership. The committee looked at the term chairman and decided that, like President, it identifies a position of leadership without regard to the gender of the holder of the office.

The chairman of the committee would like to thank the committee members for their time and dedication to this project. The Bylaws Committee consists of Carmen Mincy, *Vermont;* Ann

**APP.139**

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 241 of 506
Appellate Case: 23-8065     Document: 010110962640     Date Filed: 12/04/2023     Page: 144
Case 2:23-cv-00051-ABJ     Document 6-1     Filed 04/20/23     Page 60 of 209

# Kappa Kappa Gamma     REPORT OF THE BYLAWS COMMITTEE

Truesdell, *Ohio Wesleyan;* and Tracy Nadzieja, *Arizona State*. We were also guided by the Fraternity parliamentarian, Patricia McDougle, whom we would have been lost without.

**Committee Recommendations**

The committee recommends the adoption of the following resolutions:

*Resolved*, That amendment #1 to the Fraternity *Articles of Incorporation* submitted by the committee be adopted.

*Resolved,* That, as a substitute for the present bylaws, the bylaws submitted by the committee be adopted, with the provisos attached thereto.

*Resolved,* That, as a substitute for the present standing rules, the standing rules submitted by the committee be adopted.

Meredith Perlman, *Emory*, Bylaws Committee Chairman

March 16, 2022

**APP.140**



**Kappa Kappa Gamma Fraternity**
**Notice of Amendment to the**
**Kappa Kappa Gamma Fraternity *Bylaws***

Pursuant to Article XXIX of the Kappa Kappa Gamma *Bylaws* requiring a notice of three months for amendments to the Fraternity *Bylaws*, notice is hereby given that a revision — substitution of an entirely new set of bylaws for the current bylaws — will be presented for consideration by the voting members of the Biennial Convention meeting June 23–26, 2022.

Kari Kittrell Poole, Executive Director
March 16, 2022

**APP.141**

 FRATERNITY BYLAWS REVISION

**PREAMBLE**

We, believing a closer union in the bonds of friendship to be for our mutual benefit, appreciating the advantages to be derived from a secret fraternity, and feeling that in union there is strength, hereby form ourselves into a social sorority for the development of nobler qualities of the mind and finer feelings of the heart, and for mutual helpfulness in the attainment of individual and social excellence.

**BYLAWS OF**
**KAPPA KAPPA GAMMA FRATERNITY**

**ARTICLE I**
**NAME**

The name of the corporation shall be Kappa Kappa Gamma Fraternity, hereinafter referred to as *the Fraternity*.

**ARTICLE II**
**PURPOSE**

The Fraternity is formed to function exclusively as an organization described in Section 501(c)(7) of the Internal Revenue Code of 1986 as amended (or corresponding provisions of any future United States internal revenue law) (the "Code"). The purposes for which the Fraternity is formed are:

to unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity at large may attain social, moral and intellectual excellence;

to establish chapters at various colleges and universities, provide for their proper organization, installation and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

to cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest and promote higher standards of social conduct;

to cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

to advocate for and seek to address issues of concern for members and women in general;

to provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and

to have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

**APP.142**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 244 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 147
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 63 of 209

 **Kappa Kappa Gamma**                    FRATERNITY BYLAWS REVISION

Notwithstanding anything to the contrary contained in these articles, the corporation shall not carry on any activities not permitted to be carried on by a corporation exempt from federal income tax under Code Section 501(a) as an organization described in Code Section 501(c)(7).

**ARTICLE III**
**MEMBERS**

**Section 1. Classifications of Members.** The Fraternity shall have the following classifications of members:

**A.    New Member.** A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated. A new member shall:

1. Have signed a dated, written pledge to membership witnessed in writing by an active or alumna member of the Fraternity.
2. Remain eligible as a new member for a term of one year before the pledge to membership expires so long as enrolled in the same college or university.
3. Have the right to attend meetings, speak in debate and present their views to a committee on a referred question but shall not vote on any question. A new member shall not be present at a meeting during ritual for initiated members.

**B.    Active.** An active member shall be:

1. An undergraduate enrolled at the college or university where initiated.
2. A member enrolled beyond the fourth academic year who chooses to remain an active member.
3. A graduate student who chooses to remain an active member.
4. A graduate student initiated while pursuing graduate courses.
5. An undergraduate member who enrolls in a college or university where a chapter of the Fraternity is located and affiliates with such a chapter.
6. An undergraduate member who returns to college or university after an absence of two or more years and who has completed at least one academic term and had their active membership restored by a three-fourths vote of the members at a chapter meeting.

**C.    Associate.** An associate member shall be:

1. An active member who transfers to a college or university:
   a. With an active chapter and who does not affiliate with the chapter.
   b. Where no chapter is located.
2. An active member who has been granted Associate Membership by the District Director after receiving Advisory Board's approval.
3. An active member who is unable to participate in chapter activities because they are:
   a. Studying abroad.
   b. Completing a full-time co-op or internship.

**D.    Alumna.** An alumna member shall be:

1. An active member who has received a college degree or has left college without receiving a degree.

**APP.143**

**Kappa Kappa Gamma**                    FRATERNITY BYLAWS REVISION

2. An active member enrolled beyond the fourth academic year who chooses to become an alumna member.
3. An active member still attending college when Fraternity Council has deemed it necessary to reorganize the chapter.
4. A member of a petitioning group who has been initiated into the Fraternity as an alumna.
5. An individual who initiates through Alumna Initiation.

**Section 2. Qualifications.** A woman may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.

**A.** **Collegiate New Member and Alumna Candidate.** To qualify as either a collegiate new member or an alumna candidate, a woman shall:
1. Have demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals.
2. Not be pledged to membership or be a member of any similar college or university women's social sorority except honorary or professional organizations.
3. Not have been initiated into any other member group of the National Panhellenic Conference.
4. Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements.
5. Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity *Bylaws*, *Standing Rules* and *Policies*.

**B.** **Collegiate New Member.** To qualify as a collegiate new member, a woman shall also:
1. Be enrolled at any college or university having a chapter of the Fraternity; and
2. Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B-minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

**C.** **Alumna Candidate**. To qualify as an alumna candidate, a woman shall also:
1. Have attended a four-year college or university.
2. Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

**Section 3. Initiation.** A new member, upon fulfilling the requirements for Initiation, shall be initiated and become a member of the Fraternity. Each new initiate shall receive a certificate of membership.

**A.** **Requirements for Initiation.**
1. A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational

 **FRATERNITY BYLAWS REVISION**

> institution may be initiated. In extraordinary cases, chapters may petition the Membership Director for an exception to these requirements.
> 2. An alumna candidate who has completed a period of education and has met all financial obligations may be initiated.
> 3. The new member or candidate shall make provision for securing a badge before Initiation.

**B. Special Circumstances.** A college alumna previously pledged to membership may petition Fraternity Council no sooner than five years after the expiration of the pledge to membership. Initiation under these special circumstances shall be granted upon a three-fourths vote of Fraternity Council. Such an alumna shall become a member of the original chapter to which they were pledged.

**Section 4. Affiliation.** A member who transfers to a college or university with a chapter may affiliate with the chapter at that college or university provided that a statement of the member's good standing has been received from the original chapter. A majority vote of the affiliated chapter shall be required. Upon leaving college, the member shall be considered a member of both the original chapter and the affiliated chapter.

**Section 5. Voluntary Resignation, Broken Pledge, Resignation and Dismissal.**
   **A. Voluntary Resignation.**
   1. **New Member.** A new member wishing to resign from their pledge to membership shall submit the resignation in writing and shall state the reason(s) for the resignation. The chapter shall accept such resignation and notify the new member, the Standards Specialist and Kappa Kappa Gamma Headquarters.
   2. **Active, Associate and Alumna Member.** An active, associate or alumna member wishing to resign from membership shall submit the resignation in writing and shall state the reason(s) for the resignation.
   **B. Broken Pledge, Requested Resignation and Dismissal.**
   1. **New Member.** A new member's pledge to membership may be broken with or without prior Probation by a three-fourths vote of the chapter members present and eligible to vote at a chapter meeting at which quorum is present.
   2. **Active Member.** An active member may be requested to resign or may be dismissed for violating the purposes and standards of the Fraternity or the regulations of the college or university. A three-fourths vote of the chapter members present and eligible to vote at a chapter meeting at which quorum is present shall be required.
   3. **Associate or Alumna Member.** An associate or alumna member may be dismissed for violating the purposes and standards of the Fraternity by a three-fourths vote of chapter members present and eligible to vote at a chapter meeting at which quorum is present or Fraternity Council depending on the member's classification or affiliation.

**APP.145**

 **Kappa Kappa Gamma**     FRATERNITY BYLAWS REVISION

**Section 6. Reinstatement or Renewal.**

   **A.**   **Active, Alumna and Associate Member.**

      1.   **Reinstatement After Voluntary Resignation.** Reinstatement shall require a three-fourths vote of Fraternity Council for a former member who voluntarily resigned and is applying in writing for reinstatement no sooner than three years after resignation.

      2.   **Reinstatement After Requested Resignation or Dismissal.** Reinstatement shall require a unanimous vote of Fraternity Council for a former member who was requested to resign or was dismissed and is applying in writing for reinstatement no sooner than five years after resignation or dismissal.

   **B.**   **New Member Renewal.** The expired pledge period of a new member may be renewed by a three-fourths vote of chapter members present and eligible to vote at a chapter meeting at which quorum is present.


**Section 7. Direct Fraternity Council Action.**

   **A.**   **Fraternity Council Action.** By a three-fourths vote, Fraternity Council may take direct action against a new or active member in the breaking of a pledge to membership; by requesting a member's resignation; or by dismissing a new, active, associate or alumna member. The member shall be notified of the reason(s) for the proposed action and be provided an opportunity to respond.

   **B.**   **Decision Final.** Fraternity Council's decision shall be final and binding upon the member and the Fraternity and shall not be subject to review by any other body.


**Section 8. Fees.**

   **A.**   **New Member Fee.** Each new member, alumna initiate, active member and alumna of a petitioning group shall pay a member fee of $175 within one month after signing the pledge to membership and before Initiation.

   **B.**   **Renewal Fee.** A renewal fee of $50 and new member fee of $175 shall be required for any woman repledged to membership. The Fraternity Membership Director may grant exceptions under unusual circumstances.

   **C.**   **Annual Per Capita Fee.**

      1.   Active member: $97

      2.   Active member granted Associate Membership: $97

      3.   Alumna member: $35

      4.   Alumna member within five years of leaving school or who have reached their 65-year member milestone: $25

      5.   The annual per capita fee shall be calculated each year, as of January 1, by the annual cost of living adjustment (COLA) and shall be calculated utilizing the Consumer Price Index for All Urban Consumers (CPI-U). The per capita fee shall be rounded to the nearest dollar. If the COLA decreases, the per capita fee shall remain the same as the previous year. Notification that the fee shall be effective at the beginning of the next fiscal year shall be sent to members, chapters, and alumnae associations by February 1. This increase shall take effect at the beginning of the fiscal year, July 1.

**APP.146**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 248 of 506
Appellate Case: 23-8265    Document: 010110962640    Date Filed: 12/04/2023    Page: 151
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 67 of 209

 FRATERNITY BYLAWS REVISION

**D. Reinstatement Fee.** The reinstatement fee for a former member shall be $300, payable upon reinstatement.

## ARTICLE IV
## FRATERNITY ORGANIZATION

**Section 1. Districts.** The Fraternity shall be organized into districts determined by Fraternity Council for the purposes of providing leadership, membership retention and extension, and development of Fraternity interests.

**A. District Directors.** District Directors shall be elected, and their number shall correspond to the number of districts defined by Fraternity Council. Fraternity Council shall assign the director for each district. District Directors shall supervise the operation and management of chapters and alumnae associations within their assigned districts and may report on recommendations to Fraternity Council.

   1. **Qualifications.** Each District Director shall be an alumna who has served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) a former Regional Director or Province Director; 3) a District Director or Content Director; 4) a Content Specialist; 5) a member of a Fraternity standing or special committee; 6) a former Fraternity Council Assistant; 7) a Field Representative; 8) a member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) a member of the Fraternity Housing Corporation Board of Directors.

   2. **Term of Office and Term Limits.** District Directors shall take office at the close of the Biennial Convention. A District Director shall hold office for a term of two years or until their successor is elected and shall be eligible for re-election to the same office for two additional terms.

   3. **Temporary Absence.** In the event a District Director is temporarily unable to perform the duties of office, Fraternity Council shall assign such duties to another District Director or another member of the Fraternity.

   4. **Request for Resignation or Removal from Office.** Any District Director failing to perform the duties of office may be requested to resign from office or may be removed from office when, in the opinion of the President and a three-fourths vote of Fraternity Council, the welfare of the Fraternity demands it. The District Director shall be given the opportunity to provide a defense.

**B. District Director Meetings.** The District Directors shall hold at least one meeting in the interim between Biennial Conventions.

**Section 2. Chapters.**

**A. Purpose.** Chapters shall be established in connection with colleges and universities to carry out the purpose of the Fraternity.

**B. Members.**

   1. **Member Classifications.** Chapter members shall be active, associate, and new members of the Fraternity.

   2. **Chapter Membership Selection.** Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures.

 **FRATERNITY BYLAWS REVISION**

C. **Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or functional areas: internal affairs, external affairs, operations, membership, membership development, and finance.[1]

D. **Required Officers.** Chapters officers shall be a President, a vice president for each department or functional area, and a Standards Director. A chapter may combine chapter officer positions and have other officers as needed in the administration of the chapter with the approval of the Leadership Development Specialist.[2]

E. **Officer Eligibility.** A chapter member meeting all membership responsibilities and having attained at least a B-minus average or its equivalent in the previous term shall be eligible for election to office and to remain in office if elected. In either case, an exception for failure to meet the standard may be granted by the Academic Excellence Specialist or Standards Specialist, in consultation with the District Director.

F. **Meetings.** Chapters shall meet regularly during the academic year and shall hold a formal meeting using ritual for initiated members at least once a month.

G. **Governance.** Each chapter shall adopt bylaws and standing rules for its governance that shall be approved by the Fraternity Bylaws Committee before becoming effective. Bylaws, standing rules, and amendments adopted thereafter, shall be approved by the Fraternity Bylaws Committee before becoming effective.

H. **Convention Representation.** Each chapter shall elect one delegate and two alternates to attend a Convention. Only the delegate shall represent the chapter with the right to vote.

I. **College Panhellenic Association**. A chapter shall be a member of its host institution's College Panhellenic Association, an affiliate of the National Panhellenic Conference, and shall be represented by a delegate from the chapter. If the delegate is unable to provide representation, an alternate shall represent the chapter.

J. **Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the chapter. The board shall be composed of alumna advisers to the chapter officers, directors, Executive Board, and the Panhellenic Delegate.

K. **Establishing a New Chapter.**
1. A new chapter may be established:
   a. By membership selection directed by Fraternity Council.
   b. Upon receipt of a petition from a qualified group of women. Members of the petitioning group, both current and previous, shall be eligible to become members of the Fraternity.
2. Upon establishment, a new chapter shall join the Fraternity Housing Corporation.

---

[1] Effective with the chapter election cycle of 2022–23.
[2] ibid

**APP.148**

 **FRATERNITY BYLAWS REVISION**

L. **Removal of a Chapter.**
  1. **Initiating the Removal by Fraternity Council.** By a three-fourths vote, Fraternity Council may initiate the removal of a chapter.
  2. **Vote to Remove a Chapter.** The removal of a chapter shall require a 30-day notice and a three-fourths vote of each District Director, each Content Director, each standing committee chairman, and each Content Specialist in the district where the chapter is located.

M. **Surrender of Charter.** A chapter may petition to sever connection with the Fraternity by presenting a written request to Fraternity Council stating reasons in full and signed by three-fourths of the active members of the chapter and three-fourths of the chapter Advisory Board.
  1. **Fraternity Council Action.** By a majority vote, Fraternity Council may accept the petition and agree to the surrender of the chapter charter or may condition surrender on additional actions before accepting the surrender of the charter.
  2. **Chapter Requirements.** If the request to surrender a charter is accepted, the charter shall be withdrawn when the chapter has fulfilled all financial obligations, transferred chapter assets according to the current Fraternity Financial Policies, returned all records and archives, and returned the charter.

N. **Return of Chapter Charter and Archives.** Whether a charter is surrendered by the chapter or removed by the Fraternity, the District Director shall take charge of the chapter charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

O. **Reestablishment of a Chapter.** Fraternity Council shall appoint a special committee to investigate the request for reestablishment of a former chapter. A three-fourths vote of Fraternity Council shall be required to reestablish a former chapter. All reestablished chapters shall join the Fraternity Housing Corporation.

P. **Reorganization of a Chapter.** The reorganization of a chapter shall occur when Fraternity Council deems it is in the best interest of the chapter and the Fraternity. Any current active member of the chapter may be designated an alumna and shall remain an alumna unless otherwise designated by Fraternity Council.

**Section 3. Alumnae Associations.**
  A. **Purpose.** Fraternity alumnae may organize as associations to further the work of the Fraternity and extend friendship to all members.
  B. **Officers.** The officers of an association shall be a President, Secretary, Treasurer, and such other officers as may be considered necessary.
  C. **Meetings.** An association shall hold at least four meetings during the year. At least two of these shall be open to the entire membership.
  D. **Association Governance.** Each association shall adopt bylaws for its governance.
  E. **Convention Representation.** Each association shall be entitled to be represented by one delegate at any Convention.
  F. **Alumnae Panhellenic Associations.** If a local Alumnae Panhellenic Association, which is affiliated with the National Panhellenic Conference, exists, an alumnae association of

 FRATERNITY BYLAWS REVISION

the Fraternity shall become a member and may send representatives to the Alumnae Panhellenic meetings.

G. **Establishing New Associations.** A group of alumnae may form a petitioning group and petition Fraternity Council to establish an association. A three-fourths vote of Fraternity Council shall be necessary to establish an association. The date of Fraternity Council approval of the application shall be considered the date of establishment.

H. **Surrender of Charter.** An association voting to disband shall give three months' notice in writing of such intention to the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. At the end of this period, provided the request to disband has not been withdrawn, the charter shall be surrendered.

I. **Withdrawal of a Charter.** An association that has failed to fulfill its responsibilities or failed to meet the Fraternity financial standards or the standards of conduct shall have the charter of the association withdrawn upon the recommendations to Fraternity Council by the District Director, the Alumna Relations Director, and the Alumna Relations Specialist. A three-fourths vote by Fraternity Council shall be required to approve the withdrawal of the charter.

J. **Return of Association Charter and Archives.** Whether a charter is surrendered by the association or withdrawn by the Fraternity, the Alumna Relations Specialist shall take charge of the association charter and archives and transfer them to Kappa Kappa Gamma Headquarters. All remaining financial assets shall be transferred according to the current Fraternity Financial Policies.

K. **Reestablishment of an Alumnae Association.** An association that has surrendered its charter or had its charter withdrawn may be reestablished by a three-fourths vote of Fraternity Council.

<div align="center">

**ARTICLE V**
**MEMBER, CHAPTER, AND ASSOCIATION RESPONSIBILITIES**

</div>

**Section 1. Overview.** Members and the chapters and associations to which they belong shall comply with all federal, state or provincial laws and college or regulations where applicable and shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct.

**Section 2. Legal Compliance.** Members, chapters, and associations of the Fraternity shall adhere to local, state, provincial, and federal laws with a specific emphasis on the following:

A. **Hazing.** Participating in or being involved in any way with hazing — defined as any activity or action taken with or without consent of the individual involved that produces mental, emotional, psychological, or physical discomfort, intimidation, humiliation, degradation, embarrassment, harassment, or ridicule — shall be prohibited.

B. **Alcohol.** The illegal use or misuse of alcoholic beverages shall be prohibited.

C. **Drugs.** The use, sale, purchase or possession of any drugs or other controlled substance in violation of local, state, provincial or federal law shall be prohibited.

D. **Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall

**APP.150**

 **Kappa Kappa Gamma**    FRATERNITY BYLAWS REVISION

be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

**Section 3. College or University Regulations.** Collegiate chapters and their members shall adhere to all rules or regulations stipulated by the college or university even when the rules or regulations are more stringent than the standards of the Fraternity.

**Section 4. Academic Excellence.** Chapters and individual members shall meet, maintain, or exceed chapter-specific academic standards.
   A. **Chapter Standard.** Each chapter shall maintain a scholastic average equal to or higher than the university or college all-sorority average.
   B. **Active Member Standard.** Each chapter shall establish a minimum GPA requirement for active members. Each active member of a chapter shall meet or exceed the chapter-specific GPA requirement.

**Section 5. Finance.** Individual members, chapters, and associations shall remain current with all financial obligations as established by a chapter, an association, or the Fraternity.

**Section 6. Conduct.** Individual members, chapters, and associations shall act with high standards of ethical conduct that represent the values of the Fraternity.

**Section 7. Accountability.**
   A. **Overview.** The purpose of holding a member, chapter, or association accountable for inappropriate conduct shall be established to protect the integrity and prestige of the Fraternity.
   B. **Process.** The Fraternity shall develop and implement procedures for the enforcement of the responsibilities and expectations enumerated herein that shall afford fairness and respect to the member, chapter, or association.
   C. **Outcome.** The outcome of the process may be a Warning of Probation, Probation, Suspension, and in extreme cases, dismissal of a member from the Fraternity or removal of a chapter or association.

**Section 8. Good Standing.**
   A. **Member.** A member meeting all member standards and responsibilities, academic, financial and conduct, and not under any accountability outcome is a member in good standing and, therefore, eligible for any elected, appointed, or volunteer position within the Fraternity.
   B. **Chapter.** A chapter meeting the standards for responsibility, academic and conduct, its financial and reporting obligations and that is not on Probation or Suspension shall be a chapter in good standing, eligible for awards and representation at Convention, and shall have the right to a vote.

**APP.151**

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

**C.   Association.** An association meeting its financial and reporting obligations and which maintains standards of conduct shall be an association in good standing, and eligible for awards and representation at Convention, and shall have the right to a vote.

**Section 9. Conflict of Interest.** Any member serving in an elected, appointed or volunteer position with the Fraternity, the Kappa Kappa Gamma Foundation, the Fraternity Housing Corporation, any chapter, any alumnae association, or similar entity affiliated or associated with these entities under any chapter, license franchise or similar arrangement shall maintain high standards of ethical conduct in performing their duties and shall avoid situations where their financial or personal interests or professional obligations interfere or appear to interfere with the interests of the Fraternity. They shall not use Fraternity property, information, or position for personal gain or violate Fraternity expectations of confidentiality.

<div align="center">

**ARTICLE VI**
**OFFICERS**
</div>

**Section 1. Officers.** The officers of the Fraternity shall be a President, four Vice Presidents, and a Treasurer.

**Section 2. Qualifications.** Officers shall be alumna members who have formerly served the Fraternity within the past 10 years in any one of the following positions: 1) member of Fraternity Council; 2) Regional Director or Province Director; 3) District Director or Content Director; 4) Content Specialist; 5) chairman or member of a Fraternity standing or special committee; 6) Fraternity Council Assistant; 7) Field Representative; 8) member of the Kappa Kappa Gamma Foundation Board of Trustees; or 9) member of a Fraternity Housing Corporation Board of Directors.

**Section 3. Term of Office and Term Limits.** Officers take office at the close of the Biennial Convention and shall hold office for a term of two years or until their successors are elected. The President and Treasurer may be elected to the same office for no more than two terms. The Vice Presidents may be elected to the same office for no more than three terms.

**Section 4. Officer Transition Meeting.** Following an election and prior to Convention, the outgoing Fraternity Council shall host at least one transition meeting with newly elected Fraternity Council members.

**Section 5. Vacancies and Temporary Absences.**
    **A.   Vacancies.**
        1.  **President.** At the first Fraternity Council meeting following the Biennial Convention, by a three-fourths vote, Fraternity Council shall designate one of the Vice Presidents to assume the presidency if a permanent vacancy occurs in the office and to preside at meetings if the President is absent.

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 254 of 506
Appellate Case: 23-8065     Document: 010110962640     Date Filed: 12/04/2023     Page: 157
Case 2:23-cv-00051-ABJ     Document 6-1     Filed 04/20/23     Page 73 of 209

 **FRATERNITY BYLAWS REVISION**

2.  **Other Officers.** By a three-fourths vote, a vacancy in any office other than the President shall be filled for the unexpired term by Fraternity Council.

B.  **Temporary Absences.** In the event an officer other than the President is temporarily unable to perform the duties of their office, Fraternity Council shall assign such duties to another member of Fraternity Council or to another member of the Fraternity who shall have the right to vote.

**Section 6. Request for Resignation or Removal From Office.** An officer may be requested to resign from office or shall be removed from office when the welfare of the Fraternity necessitates it. A three-fourths vote of Fraternity Council shall be required. The officer shall be given the opportunity to provide a defense.

<div align="center">

**ARTICLE VII**
**NOMINATIONS AND ELECTIONS**

</div>

**Section 1. Nominations.** Nominees for each officer and District Director shall be determined by the Leadership Selection Committee.

A.  **Committee Composition.** The Leadership Selection Committee shall be composed of a chairman, a vice chairman and an equal number of alumnae association and chapter representatives. One member, collegiate or alumna, shall be appointed from each district.

   1.  **Chairman and Vice Chairman.** Fraternity Council shall appoint the Leadership Selection Committee Chairman and Vice Chairman following the Convention. These positions shall be nonvoting members of the committee except in the case where the chairman may vote to break a tie.

   2.  **Members.** Fraternity Council shall appoint chapter and association representatives as members of the committee in February following Convention based on applications. The Leadership Education and Development Committee shall receive and review applications and make recommendations to Fraternity Council.

   3.  **Equal Number of Collegiate and Alumna Representatives.** One representative, collegiate or alumna, shall be appointed from each district with an equal number of collegiate and alumna representatives.

   4.  **Alternating Each Biennium.** In one biennium, one chapter representative shall be appointed from districts Alpha, Beta, Delta, Eta, Theta, Mu, and Pi and one alumna representative appointed from districts Gamma, Kappa, Lambda, Epsilon, Zeta, Xi, and Rho. In the next biennium, chapter representatives shall be appointed from the second group of districts and the alumna representative from the first group, subsequently alternating each biennium.

B.  **Nominee Selection.** The Leadership Selection Committee shall nominate one candidate for each officer and District Director position based on recommendations received from members and applications received from candidates.

C.  **Nominations Report.** The report of the Leadership Selection Committee shall be prepared and communicated to eligible voters no less than 10 weeks prior to the Convention.

**APP.153**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 255 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 158
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 74 of 209

 **FRATERNITY BYLAWS REVISION**

**D.** **Open Nominations.** Following the publication of the report, open nominations from eligible voters shall be in order for at least five days provided consent of the nominee has been obtained and the member is qualified.

**Section 2. Elections.** Fraternity Council shall determine the dates and times for the election. The election shall be completed at least eight weeks prior to the Biennial Convention.

**A.** **Eligible Voters.** Members eligible to vote in an election shall be the voting members of a Convention.

**B.** **Voting.** The election shall be conducted electronically utilizing an online voting and election software application. The candidate for each officer and District Director position receiving the most votes shall be elected provided such candidate receives a majority of the votes cast for that position.

**C.** **Election Committee.** An Election Committee comprised of nonvoting members and appointed by the President shall oversee and coordinate the election process in conjunction with the Executive Director. The report of the election results shall be sent electronically to the membership within five business days following the close of voting and shall be published on the Fraternity website.

<div align="center">

**ARTICLE VIII**
**MEETINGS**

</div>

**Section 1. Membership Meetings.** Membership meetings shall be a Convention at which the rights and authority of members shall be vested in the voting members of the Convention.

**Section 2. Convention.**

**A.** **Regular Meeting.** The regular meeting of the membership of the Fraternity shall be a Convention, which shall be held biennially in even-numbered years. Fraternity Council shall determine the date, time, and place.

**B.** **Special Meeting.** A special meeting of the membership may be called by a unanimous vote of Fraternity Council and shall be called upon the written request of a majority of the chapters and alumnae associations.

**C.** **Notice of Meetings.** Notice of meetings, both regular and special, shall be sent to all voting members, chapters, and alumnae associations entitled to representation at such meetings.

    1. **Regular Meeting.** Notice shall state the date, time, place, and shall be given not less than three months prior to the meeting date.

    2. **Special Meeting.** Notice shall state the date, time, place, and shall be given not less than one month prior to the meeting date. Notice of a special meeting shall include the purpose of the meeting.

**D.** **Postponement or Cancellation of a Meeting.** In cases of emergency, Fraternity Council, by a unanimous vote, may postpone or cancel a previously noticed Convention meeting. When a meeting is canceled, it shall become the duty of Fraternity Council to reschedule the canceled meeting as soon as conditions permit.

**APP.154**

 **Kappa Kappa Gamma**          FRATERNITY BYLAWS REVISION

E. **Voting Members.** The voting members of the Convention shall be composed of the following Fraternity members who are registered delegates, entitled to one vote and voting in person:

1. Fraternity Council members
2. District Directors
3. Chairmen of standing committees
4. Content Directors
5. One delegate from each chapter
6. One delegate from each alumnae association

F. **Alumnae Associations Vote Value.** If the total number of registered alumnae association delegates present exceeds the total number of registered chapter delegates present, the value of the alumnae associations' total votes in any vote taken shall be reduced by the proportion of registered chapter delegates to registered alumnae association delegates.

G. **Vote and Voting.** A majority vote shall decide in all cases except where otherwise specifically provided. There shall be no absentee voting or voting by proxy.

H. **Quorum.** The quorum at any meeting of any Convention shall be a majority of the eligible voting members.

I. **Nonvoting Members**. The privilege of speaking may be granted to a nonvoting member of a Convention at the discretion of the President.

**Section 3. Enacted Business.** Any item of business brought before and acted upon by any Convention shall not be changed with the exception of emergency powers granted to Fraternity Council.

### ARTICLE IX
### FRATERNITY COUNCIL

**Section 1. Composition.** The members of Fraternity Council shall be the officers of the Fraternity: the President, the four Vice Presidents, and the Treasurer.

**Section 2. Duties.** Except as otherwise provided by law, the *Articles of Incorporation* or these bylaws, all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law. Fraternity Council shall:

A. Exercise the rights of the Fraternity as a shareholder, member, holder, or other ownership interest in any other entity;

B. Elect representatives to serve on the Board of Trustees as provided for in the Code of Regulations of the Kappa Kappa Gamma Foundation; and

C. Elect representatives to serve on the Board of Directors as provided for in the Code of Regulations of the Kappa Kappa Gamma Fraternity Housing Corporation.

**Section 3. Emergency Powers.** If Fraternity Council determines in the interval between Biennial Conventions that an emergency exists that ordinarily requires action by a vote of the

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 257 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 160
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 76 of 209

 **FRATERNITY BYLAWS REVISION**

Convention, Fraternity Council may exercise the voting power vested in the Convention. Any such action shall be reported to the next Biennial Convention.

**Section 4. Meetings.**
- **A.  Called Meeting.** A Fraternity Council meeting may be called by the President and shall be called upon the request of a majority of its members. Reasonable notice of date, time and place of a meeting shall be sent to each Fraternity Council member.
- **B.  Quorum.** A majority of the members of Fraternity Council shall constitute a quorum.
- **C.  Business Without a Meeting.** Fraternity Council may conduct business without a meeting as long as the decisions are written, signed, and unanimous.
- **D.  Voting.** There shall be no absentee voting or voting by proxy.

<div align="center">

**ARTICLE X**
**COMMITTEES**
</div>

**Section 1. Standing Committees.** The standing committees of the Fraternity, appointed by and under the supervision of Fraternity Council, shall be Bylaws, Convention, Finance, *The Key* Publication, Leadership Education and Development, and Panhellenic.

**Section 2. Special Committees.** Special committees may be established by the membership meeting in Convention or by Fraternity Council.

**Section 3. Composition of Committees.**
- **A.  General Composition.** Each committee shall be composed of a chairman and members appointed by Fraternity Council.
- **B.  Finance Committee Composition and Term.** The Finance Committee shall be composed of the committee chairman, the Fraternity Treasurer, the Fraternity Facilities Director, and at least three other persons, one of whom may be a nonmember qualified by experience in financial operations. Members shall serve for a term of three years or until their successors are appointed. One-third of the appointees shall be appointed each year. No member shall serve for more than two consecutive terms.

**Section 4. Appointment and Term of Office.** Except as otherwise specifically provided here, standing committee chairmen and members shall be appointed by Fraternity Council, shall take office immediately upon appointment following the Biennial Convention, and shall remain in office for a term of two years, except for Finance Committee members, who serve for three years or until their successors are appointed.

**Section 5. Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a standing committee chairman.

**Section 6. Removal.** Any standing committee chairman or committee member failing to perform the duties of office may be removed from office by Fraternity Council. A

**APP.156**

 **KAPPA KAPPA GAMMA**        FRATERNITY BYLAWS REVISION

standing committee chairman or committee member shall be notified of pending removal and given the opportunity to respond.

**Section 7. Member *Ex-officio*.** The Fraternity President shall be a member *ex-officio* of all committees except the Leadership Selection Committee.

## ARTICLE XI
## CONTENT AREAS

**Section 1. Content Areas.** The content areas shall be academic excellence; Advisory Board; alumna relations; diversity, equity, and inclusion; facilities; leadership development; membership; Panhellenic; philanthropy; programming, public relations, risk prevention; ritual and history; and standards.

**Section 2. Content Directors.** Content Directors shall lead the work of the Fraternity in the appointed content area, collaborate with Kappa Kappa Gamma Headquarters staff, and guide the Content Specialists to provide support to alumnae and collegians.

  A. **Appointment and Term of Office.** A Content Director shall be appointed by Fraternity Council for each content area. Content Directors shall take office immediately upon appointment following the Biennial Convention and remain in office for a term of two years or until their successors are appointed.

  B. **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Director.

  C. **Removal From Office.** Any Content Director failing to perform the duties of office may be removed from office by Fraternity Council. A Content Director shall be notified of pending removal and given the opportunity to respond.

**Section 3. Content Specialist.** Each district shall have at least one Content Specialist in each content area who shall work with the District Director and the Content Director to foster growth of chapters and associations within the district.

  A. **Appointment and Term of Office.** Content Specialists shall be appointed by Fraternity Council to serve a two-year term with no term limits. Content Specialists shall begin their terms at the beginning of the fiscal year in non-Convention years and shall remain in office until their successors are appointed.

  B. **Qualifications.** Alumnae who have previously given their consent and have been active in Fraternity work shall be eligible for appointment as a Content Specialist.

  C. **Removal From Office.** Upon recommendation of the Content Director, a Content Specialist failing to perform the duties of office may be removed from office by Fraternity Council. A Content Specialist shall be notified of pending removal and given the opportunity to respond.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 259 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 162
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 78 of 209

 FRATERNITY BYLAWS REVISION

## ARTICLE XII
## ADMINISTRATIVE OPERATIONS

**Section 1. Kappa Kappa Gamma Headquarters.**

**A.** **Headquarters Office.** The Fraternity shall maintain a headquarters office as its principal place of business.

**B.** **Headquarters Staff.** A professional staff shall be employed to conduct the business of the Fraternity at the direction of Fraternity Council. This staff shall be under the direct supervision of an Executive Director.

**Section 2. Executive Director.** An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.

**Section 3. Financial Director.** A financial director, authorized by Fraternity Council, shall be in charge of the finances and accounts of the Fraternity. The financial director shall report to the Executive Director.

## ARTICLE XIII
## FINANCE

**Section 1. Investment of Fraternity Funds.** The investments and securities performance shall be reviewed by the Finance Committee for compliance with the Fraternity's investment policy statement.

**Section 2. Financial Drives and Campaigns.** No chapter, alumnae association, Advisory Board, House Board or individual member shall undertake any financial drive or campaign of more than local extent in the name of the Fraternity without first securing the recommendation of the Finance Committee and approval of Fraternity Council.

**Section 3. Audit and Tax Returns.** An audit of the Fraternity finances shall be conducted annually by a certified public accountant and appropriate tax returns filed annually.

**Section 4. Insurance.** The Fraternity shall maintain a master insurance program.

**Section 5. Liabilities.** Total current liabilities, including contingent liabilities and mortgage notes payable assumed by the Fraternity, shall not exceed 50% of the assets of the Fraternity.

## ARTICLE XIV
## PROPRIETARY MATERIALS

**Section 1. Trademarks.** Fraternity Council shall determine which Fraternity marks shall be registered with the United States Patent and Trademark Office. All Fraternity marks are owned by the Fraternity and shall not be used or reproduced except as authorized by Fraternity Council.

**APP.158**

 **Kappa Kappa Gamma**    FRATERNITY BYLAWS REVISION

**Section 2. Copyrights.** All written material created in the name of the Fraternity is automatically copyrighted and shall not be used outside of the Fraternity unless approved by Fraternity Council.

**Section 3. Secret Materials.** Secret materials, such as the *Book of Ritual* and related materials, shall be kept secret and shall not be disclosed to nonmembers or used outside of the Fraternity. Reproduction of the secret materials shall be prohibited except as authorized by Fraternity Council.

<div align="center">

**ARTICLE XV**
**NATIONAL PANHELLENIC CONFERENCE**
</div>

**Section 1. Membership.** The Fraternity shall maintain the Fraternity's membership in the National Panhellenic Conference (NPC).

**Section 2 Membership Requirements.** The Fraternity shall follow NPC Unanimous Agreements, policies, and procedures.

**Section 3. Representation.** The Fraternity shall be represented at the annual meeting of the NPC Council of Delegates by a Fraternity member appointed by Fraternity Council who shall be empowered to act and vote on behalf of the Fraternity.

<div align="center">

**ARTICLE XVI**
**INDEMNIFICATION**
</div>

The Fraternity shall indemnify, to the maximum extent permitted by law, any person who is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that they are or were a member of Fraternity Council, an elected officer, a member serving in an appointed position, a volunteer, an authorized agent, or an employee of the Fraternity against all expenses, judgments, fines, and amounts paid in settlement incurred by them if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interest of the Fraternity and with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful. The Fraternity may pay expenses incurred by any person covered by this section in defending any action, suit or proceeding in advance of final disposition on such terms and conditions, as shall be determined by Fraternity Council. The indemnification provided by this section is not exclusive and the Fraternity may purchase and maintain insurance on behalf of any person covered by this section, whether or not the Fraternity would have the obligation or power to indemnify them under this section.

<div align="center">

**ARTICLE XVII**
**DISSOLUTION**
</div>

If for any reason the Fraternity shall be dissolved, all assets not otherwise disposed of shall be transferred to the Kappa Kappa Gamma Foundation, an Ohio nonprofit corporation.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 261 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 164
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 80 of 209

 FRATERNITY BYLAWS REVISION

## ARTICLE XVIII
## ELECTRONIC MEETINGS AND COMMUNICATIONS

**Section 1. Meetings.** The membership, Fraternity Council, all committees and subcommittees, and any Fraternity subgroup may attend and participate in any meeting through any communications equipment that provides a transmission, including, but not limited to, by telephone, telecopy, or any electronic means, from which it can be determined that the transmission was authorized by, and accurately reflects the intention of, the participant involved and allows all persons participating in the meeting to contemporaneously communicate with each other.

**Section 2. Voting by Ballot.** An anonymous vote conducted through a designated internet meeting service or electronic means such as audience response devices or computer software shall be deemed to be a ballot vote, fulfilling any requirement that a vote be by ballot.

**Section 3. Communications.** Unless a member indicates otherwise, all communication required in these bylaws, including required notices, may be sent electronically.

## ARTICLE XIX
## NONPROFIT CORPORATION

The Fraternity is an Ohio nonprofit corporation. The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity. The Fraternity shall be governed in accordance with the laws of the state of Ohio, without giving effect to the choice of law or conflicts of laws principles thereof.

## ARTICLE XX
## KAPPA KAPPA GAMMA FOUNDATION

The Kappa Kappa Gamma Foundation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax under Internal Revenue Code Section 501(c)(3).

## ARTICLE XXI
## KAPPA KAPPA GAMMA FRATERNITY HOUSING CORPORATION

The Kappa Kappa Gamma Fraternity Housing Corporation, as established, shall be maintained as a separate, nonprofit corporation exempt from federal income tax in accordance with Internal Revenue Code Section 501(c)(7).

## ARTICLE XXII
## CHAPTER HOUSE CORPORATION AND CHAPTER HOUSE ASSOCIATION

**Section 1. Chapter House Corporation.** A chapter house corporation shall own or lease and maintain all property, including land, buildings, furnishings and equipment for the use and benefit of a chapter. Members of a house corporation shall be members of the Fraternity, shall have paid a membership fee in the corporation, and shall agree to be bound by the regulations of the corporation and the Fraternity *Bylaws*, *Standing Rules*

 **Kappa Kappa Gamma**    FRATERNITY BYLAWS REVISION

and *Policies*. The Fraternity shall be a member of each chapter house corporation, and if necessary, representation shall be determined on a case-by-case basis.

**Section 2. Chapter House Association.** All rental property, furnishings and equipment shall be managed and maintained by a chapter house association provided the chapter was chartered before July 1, 1976, and the house association has not incorporated. Members of a house association shall be a member of the Fraternity, shall have paid a membership fee in the house association, and shall agree to be bound by the regulations of the house association and the Fraternity *Bylaws*, *Standing Rules* and *Policies*. The Fraternity shall be a member of each chapter house association, and if necessary, representation shall be determined on a case-by-case basis.

<div align="center">

**ARTICLE XXIII**
**PARLIAMENTARY AUTHORITY**
</div>

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern the Fraternity in all cases to which they are applicable and in which they are not inconsistent with these bylaws and any special rules of order the Fraternity may adopt.

<div align="center">

**ARTICLE XXIV**
**AMENDMENT OF ARTICLES OF INCORPORATION AND BYLAWS**
</div>

**Section 1. Amendment.** The Fraternity *Articles of Incorporation* and *Bylaws* may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

**Section 2. Submitting Proposed Amendments.** An amendment may be proposed by Fraternity Council, a District Director, a standing or special committee, a Content Director, a Content Specialist, a chapter, or an alumnae association. Proposed amendments shall be submitted no later than six months prior to the date of the Convention and only amendments approved by Fraternity Council shall be submitted to the Convention for a vote.

<div align="center"># # #</div>

**APP.161**



ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

## PROVISOS RELATING TO TRANSITION

**I.   Effective with the Chapter Election Cycle of 2022–23.**
The following two provisions of Article IV. Fraternity Organization shall become effective with the chapter election cycle of 2022–23.

**Section 2. Chapters.**

  **C**.  **Chapter Structure.** The structure of a chapter necessary to facilitate chapter operations shall be determined by Fraternity Council and shall include the following departments or functional areas: internal affairs, external affairs, operations, membership, membership development, and finance.

  **D.**  **Required Officers.** Chapters officers shall be a President, a vice president for each department or functional area, and a Standards Director. A chapter may combine chapter officers and have other offices as needed in the administration of the chapter with the approval of the Leadership Development Specialist.

**II.  Remain in Effect Until the Election Cycle of 2022–23.**
The following sections from Article XII of the 2018 Kappa Kappa Gamma *Bylaws* remain in effect until the chapter election cycle of 2022–23 when Article IV, Section 2. C and D shall become effective.

### ARTICLE XII
### CHAPTER ORGANIZATION AND MANAGEMENT

**Section 2. Officers.** The officers of a chapter shall be: President, Vice President-Standards, Vice President-Organization, Vice President-Academic Excellence, Recording Secretary, Corresponding Secretary, Treasurer, Registrar and Marshal. Chapters may combine chapter offices and duties.

**Section 3. Standing Committee Chairmen** The standing committee chairmen shall be: Education, Event, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations and Risk Management. Chapters may combine standing committee chairmen and duties.

**Section 4. Standing Committees.** The standing committees shall be: Academic Excellence, Catalog, Organization, Education, Event, Finance, House, Membership, New Member, Panhellenic, Philanthropy, Public Relations, Risk Management, Ritual, and Standards. Chapters may combine standing committees and duties.

**Section 5. Qualification of Officers and Standing Committee Chairmen.**

  **A.**  **Eligibility.** Only members meeting all financial obligations and standards of conduct and attaining at least a B-minus average or its equivalent for the previous term shall be eligible to be nominated for or hold office unless the **relevant Content Specialist** (Academic Excellence Specialist or **Standards Specialist**), in consultation with the District Director, grants an exception.

  **B.**  **Maintaining Eligibility.** If an officer or standing committee chairman fails to maintain the qualifications to hold office, she shall become ineligible to remain in office unless the Academic Excellence Specialist or **Standards Specialist**, in consultation with the District Director, grants an exception.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 264 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 167
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 83 of 209



ATTACHMENT A
FRATERNITY BYLAWS PROVISOS

**Section 6. Nomination, Election and Installation of Officers and Standing Committee Chairmen.**

    **A. Nominations.**

        1. The Nominating Committee shall consist of a chairman appointed by the Chapter Council and at least four additional members, including representation from each academic class, elected one month in advance of the chapter election. A member of the Advisory Board shall act as an adviser to the committee without vote.

        2. The committee, by majority vote, shall nominate one candidate for each office to be filled and one for each standing committee chairmanship. Written suggestions for candidates from members of the chapter shall be carefully reviewed. The committee shall secure the consent of the nominee prior to placing her name in nomination.

        3. The committee shall report the slate of nominees to the members at the chapter meeting one week prior to election.

        4. Nominations from the floor shall be called for following the report of the Nominating Committee and before the election.

    **B. Election.** Chapter election of officers and standing committee chairmen shall be held annually between Nov. 1 and March 31 unless the District Director grants an exception. Voting shall be by ballot and a majority vote of the members present at the meeting and voting shall elect.

    **C. Installation of Officers.** All chapter officers and standing committee chairmen shall be installed at a formal meeting following a satisfactory period of officer training.

**Section 7. Chapter Council.** The Chapter Council shall be the Executive Committee of the chapter.

    **A. Membership.** The Chapter Council shall consist of the following members: President as Chairman, Vice President-Standards, Vice President-Organization, Vice President-Academic Excellence, Recording Secretary, Corresponding Secretary, Treasurer, Registrar, Marshal, Education Chairman, Event Chairman, House Chairman, Membership Chairman, New Member Chairman, Panhellenic Delegate, Philanthropy Chairman, Public Relations Chairman, Risk Management Chairman and special committee chairmen as necessary.

    **B. Duties.** The duties of the Chapter Council members shall be:

        1. To be responsible for the proper functioning of the chapter.

        2. Other duties as assigned in the current *Leadership Guides*.

        3. To administer the chapter finance program according to the guidelines approved by and under the direction of Fraternity Council.

        4. To send representatives to the College Panhellenic organization in accordance with National Panhellenic Conference Unanimous Agreements and according to the structure of the respective College Panhellenic.

        5. To make reports as specified in *Leadership Guides* or as requested.

**APP.163**



<div align="right">ATTACHMENT A<br>FRATERNITY BYLAWS PROVISOS</div>

6. To ensure that the archives of the chapter are properly maintained including an alphabetical roll and chronological index of chapter initiates, proxy initiates and affiliates.

**Section 9. Removal of Officers and Standing Committee Chairmen.** The Chapter Council, with the approval of Advisory Board, may recommend to the chapter the removal of any officer or standing committee chairman failing to adequately perform the duties of her office, failing to maintain Fraternity standards, or falling below academic requirements. The officer or standing committee chairman shall be given the opportunity to defend herself.

   **A. Vote.** A three-fourths vote of the chapter present and eligible to vote at a chapter meeting at which quorum is present shall be required to remove an officer or standing committee chairman. If the officer or chairman is not removed by chapter vote, Advisory Board may remove her with approval of the District Director.

   **B. Vacancies.**
   1. After a nomination made by the Chapter Council, a majority vote of the chapter members present and eligible to vote at a chapter meeting at which quorum is present shall fill a vacancy. Following Chapter Council nomination, nominations from the floor shall be in order.
   2. **In the event the chapter President is permanently unable to perform the duties of her office, Chapter Council shall assign such duties to a vice President until a new chapter President is elected.**
   3. In the event an officer or standing committee chairman is temporarily unable to perform the duties of her office, the Chapter Council shall assign such duties to another member of the chapter who shall have the right to vote.

**Section 10. Chapter Advisers and Advisory Boards.** Alumna advisers in good standing shall be selected annually as a board with the joint approval of the chapter and the Executive Board of the local alumnae association. Advisers to each of the chapter officers, standing committees, Chapter Council and the Panhellenic Delegate shall serve in an advisory capacity without vote. In the absence of a local alumnae association, the board may be selected with joint approval of the District Director, Advisory Board Specialist, and Alumna Relations Specialist.

**Section 11. Chapter Archives.** The archives of the chapter shall consist of the items listed in the Fraternity manuals. All archive properties pertaining to ritual, except when in use, shall be kept in a locked place suitable for security of these materials. All archived documents, records, resources and memorabilia that are not secret in nature shall be maintained in a secure manner.

<div align="center">**# # #**</div>

<div align="right">**APP.164**</div>

## ❄ Kappa Kappa Gamma

**Kappa Kappa Gamma Fraternity**
**Notice of Amendment to the**
**Kappa Kappa Gamma Fraternity *Bylaws***

Pursuant to Article XXIX of the Kappa Kappa Gamma *Bylaws* requiring a notice of three months for amendments to the Fraternity *Bylaws*, notice is hereby given that a revision — substitution of an entirely new set of bylaws for the current bylaws — will be presented for consideration by the voting members of the Biennial Convention meeting June 23–26, 2022.

Kari Kittrell Poole, Executive Director
March 16, 2022

i

22.03

**APP.165**



# Kappa Kappa Gamma

| Kappa Kappa Gamma Fraternity *Articles of Incorporation* |
|---|

**Amendment 1.**

Amend Item F of the THIRD article by.
1. Striking out the words "promote the establishment and growth of" and inserting the words "provide opportunities for engagement throughout the lives of."

2. Striking out the word "associations" after "alumnae."

| Current Wording | Amendments to Current Wording | If Adopted, Will Read |
|---|---|---|
| The Corporation is formed for the following purposes:<br><br>. . .<br><br>F. To promote the establishment and growth of alumnae associations and encourage participation of alumnae in the Fraternity programs; and | The Corporation is formed for the following purposes:<br><br>. . .<br><br>F. To ~~promote the establishment and growth of~~ <u>provide opportunities for engagement throughout the lives of</u> alumnae ~~associations~~ and encourage participation of alumnae in the Fraternity programs; and | The Corporation is formed for the following purposes:<br><br>. . .<br><br>F. To provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and |

Rationale:
One of the priorities of the Fraternity's strategic plan is member engagement. Changing the language in this section emphasizes engagement opportunities for all members, not just those belonging to an alumnae association.

**APP.166**

# ATTACHMENT 6



BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

**CONTENTS**

Fraternity Documents Revision......................................................................... 2

Voting Process/Parliamentary Procedure ........................................................ 3

Fraternity Nominating Process/Term Limits.................................................... 4

Finances ............................................................................................................ 7

Chapter Officer Structure ................................................................................ 13

Diversity, Equity and Inclusion........................................................................ 18

Miscellaneous .................................................................................................. 19

**APP.168**

 **Kappa Kappa Gamma**

**BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS**

FRATERNITY DOCUMENTS REVISION

**Why did we revise the documents?**

We did not have a chance to make amendments in 2020 due to COVID-19. We had quite a few amendments at that time scattered throughout the documents. The last full revision of the documents was in 2004. We wanted to improve the documents and make them work better together so our organization can operate more efficiently and effectively moving forward.

**What was the process for revising the documents?**

The Bylaws Committee met for over 100 hours with our Parliamentarian and focused on improving the overall organization of the documents. We accepted amendments as per our *Bylaws* and major changes were highlighted in the Bylaws Committee Report.

We are looking to be transparent about the changes made. Based on the advisement of our Parliamentarian, things were moved throughout the Fraternity documents so they live in the appropriate place. That is why we are not able to provide redline versions of the documents. We wrote new documents. We did not edit the old ones. However, we are working on providing a resource to show where things have moved throughout the documents. We aren't trying to hide any changes to the documents, just make them work with our current organization.

**Could we get a current version of the Fraternity *Bylaws* so we can compare the changes?**

The current documents are available on the Kappa website. In addition, we are working on providing a resource to show where things have moved throughout the documents. The documents can be found by searching "Fraternity *Bylaws*" and "Fraternity *Standing Rules*" on the Kappa website.

**Who is communicating these changes to the general membership?**

Delegates should review the proposed revisions to the Fraternity *Bylaws* and *Standing Rules* prior to arriving at Convention. Additionally, they should seek input from the members they are representing. That is the role of the voting delegates, such as alumnae association Presidents and chapter Presidents. Voting delegates should share the proposed changes with their organization so they can make recommendations on how the delegate should vote to represent them.

These documents are available on the [Convention website](#) so any member can see them.

**Are the Fraternity policies amendable?**

Adopting amendments to the Fraternity *Bylaws* and *Standing Rules* are subject to vote by the delegates of the membership body. However, Fraternity *Policies* are not. Policy revisions are submitted to the Fraternity Council, who then reviews and votes on them during the biennium. Policies are meant to be more nimble by design as they come into play more at the procedural and process level.

 **Kappa Kappa Gamma**

**BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS**

**VOTING PROCESS/PARLIAMENTARY PROCEDURE**

**What will the voting process look like for the revised documents?**

A revision is a new set of *Bylaws*/*Standing Rules*. Each article, section, or paragraph within a revision document will be open to amendment. Any amendment brought forward is introduced, is debatable, and shall require a majority vote for adoption. When all amendments to a revision document have been considered, the main question on substituting the revision — as amended — for the current document (*Bylaws* or *Standing Rules*) is taken up, debated, and the vote taken. A two-thirds vote is required to adopt the *Bylaws* revision and a majority vote to adopt the *Standing Rules* revision. Since the revisions to both documents rely heavily on each other, if the *Bylaws* fail, the motion on the *Standing Rules* will not be considered.

**What does the amendment process look like?**

Amendments are limited to Convention delegates. Please see the Convention Standing Rules for more information.

All amendments of more than six words shall be submitted in writing on the official motion form and forwarded to the presiding officer by the Pages. The signature of the maker and seconder presenting the amendment and their Convention status must be included on the form. Official motion forms may be obtained from the Kappa Koncierge desk or the Pages.

Amendments must be submitted by 12:30 p.m. PT on Friday, June 24, using the form provided at the Kappa Koncierge desk. We are encouraging members to submit amendments to the Bylaws Chairman and the committee so they may help the member with the wording and placement of the amendment into the document so that it flows with the rest of the documents. You may email proposed amendments to meredith.perlman@kappa.org but you still need to submit the form at Convention.

**Why can amendments not be submitted as the discussion proceeds?**

The rules that were established for Convention state that amendments must be submitted in advance, no later than 12:30 p.m. PT on Friday, June 24. This deadline falls after the Bylaws Forum session that will be hosted onsite during Convention.

This year is different since we are doing a full revision of the documents. Because of the major changes, we are asking that they be submitted in advance so that the Bylaws Committee can be prepared to review any proposed amendments, and so that the Committee can work with the submitters to refine amendments and ensure they work within the revisions.

Finally, time is also an issue that led to this decision. We anticipate the business meeting in which the revisions are discussed to run longer than usual since we are voting on revised documents. Submitting amendments in advance will help to make the meeting run more efficiently and cut down on the time that members would be forced to sit through the behind-the-scenes work that takes place in order to present an amendment to the Convention body.

 Kappa Kappa Gamma

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

Voting members will be allowed to amend the previously submitted amendments during the business meeting but any new amendments will be ruled out of order.

**What happens if the revised documents do not pass?**
We would revert to the 2018 Fraternity documents and the next chance for any amendments to those documents would be 2024.

**During the discussion in the business meeting, can delegates still present motions to what is being discussed?**
The answer is yes and no. A motion to amend a revision document must be submitted by 12:30 p.m. PT on Friday, June 24, in order to be considered during the business meeting. While an amendment to a revision is being discussed, it may be amended; that is the "yes" part of the answer. However, additional amendments to a revision document cannot be presented; that is the "no" part of the answer.

**Please provide a timeline for revisions to the amendments and for new amendments. How and when are resolutions submitted/due?**
Please review the Convention Standing Rules for these details.

A motion to amend a revision document must be submitted by 12:30 p.m. PT on Friday, June 24, in order to be considered during the business meeting.

FRATERNITY NOMINATING PROCESS/TERM LIMITS
**What is the rationale for electing officers and District Directors prior to Convention?**
We reviewed what other volunteer-based groups are doing and found that this is a very common practice. Given the scale of our organization, there is a lot of information needed to successfully transition, which is critical to the success of our organization. This allows new officers to shadow the outgoing officers and be thinking about appointments for the upcoming biennium so that those appointments can happen earlier. Having appointments happening weeks after Convention has not served our chapters well when many go back to school in early August.

It's important to note that under the current structure, the new officers transition into their roles immediately and are asked to make important decisions with no time for transition or training. This change would allow our officers to better serve our membership. It's important to note that newly elected officers will not preside over the Convention a few weeks later, they would be installed at the end of the Convention and begin their terms after installation.

Since this vote would be conducted virtually, more of our association delegates would be able to vote and have a voice in our elections process if they are unable to fund Convention attendance for their delegate.

**APP.171**

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 273 of 506
Appellate Case: 23-8065     Document: 010110962640     Date Filed: 12/04/2023     Page: 176
Case 2:23-cv-00051-ABJ     Document 6-1     Filed 04/20/23     Page 92 of 209

  BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

**Who is eligible to vote since we are voting prior to Convention?**
There has not been a change to who is an eligible voter in the revision process, aside from the removal of voting rights for Field Representatives. Below is who is able to vote under the revised *Bylaws*:

Voting Members. The voting members of the Convention shall be composed of the following Fraternity members who are registered delegates: 1. Fraternity Council members 2. District Directors 3. Chairmen of standing committees 4. Content Directors 5. One delegate from each chapter. 6. One delegate from each alumnae association.

**Is the District Director term limit for serving in the same district or any District Director appointment/any district?**
It's the latter. District Directors are elected to the position, and Fraternity Council appoints them to a district, which may stay the same or be a different district.

**How will additional nominations be handled if slating takes place prior to Convention?**
Open nominations from eligible voters would still be permitted. Per the Fraternity Bylaws, Article VII. Section 1. D, there will be at least five days after the slate is announced for additional nominations to be submitted. If someone is eligible, qualified and willing to serve, they would then be added to the ballot.

**When will election results be announced?**
The results of the election will be announced prior to Convention to allow for officer transitions before Convention. New officers and District Directors are installed at the close of Convention. This also allows for a greater time of leadership transition.

**Why are we eliminating debate on nominees?**
We do not allow for debate on nominations currently. When there is a nomination from the floor, the nominator may say a few comments about the nominee at Convention Hall, but that would be the extent. There has not been any further debate on a nominee.

Since elections would take place at least eight weeks prior to General Convention, this would provide all alumnae associations the opportunity to have a vote and voice in the process since the vote would be electronic. They would not have to attend General Convention in order to vote in elections.

**Will the Nominating Committee process remain the same?**
The Fraternity Bylaws, Article VII and Fraternity Standing Rules, Rule 7. 1 detail the committee selection and process. There will be an application process to serve on the Leadership Selection Committee (LSC). The Leadership Education and Development (LEAD) Committee reviews applications and makes recommendation to Fraternity Council, who appoints members of the LSC. Just as we do currently, the active and alumna members of the committee switch for

 Kappa Kappa Gamma

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

districts in alternating biennia. LSC members will be selected based on their skills, representing a variety of chapters, alumnae and other experiences.

LSC members are known throughout their tenure and will receive significant training on the Fraternity, current needs and trends in higher education, and diversity, inclusion, and bias. The LSC will present the nominations at least 10 weeks prior to Convention. Following the publication of the report, open nominations from eligible voters shall be in order for at least five days provided the consent of the nominee has been obtained and the member is qualified.

**What is the difference between the LSC and the LEAD Committee?**
LSC focuses on nominating Fraternity officers and District Directors who are elected. The LEAD Committee helps in identifying, recruiting, cultivating, and training of all volunteers. LSC members will be selected based on their skills, representing a variety of chapters, alumnae and other experiences.

Unlike the current Nominating Committee, LSC members are known throughout their tenure and will receive significant training on the Fraternity, current needs and trends in higher education, and diversity, inclusion, and bias.

**Why is the Nominating Committee name changing to the Leadership Selection Committee? This seems like it has the effect of cutting Kappa members out of the election process.**
Given that the new version of the Nominating Committee will be doing their work for more than a year, we felt it important to identify a name that better signifies the breadth and depth of their work. General members have never been able to vote in the election for Fraternity Council and District Directors. Only chapter and alumnae association delegates may vote. The LSC will release their report (often referred to as the slate) similar to how it's always been done so there will be good awareness as well as communication directly to delegates. One of the many advantages to voting prior to Convention is that all alumnae associations will be able to vote, not just those that are able to attend Convention. "Nominations from the floor" will also still be in order.

**What happens if a vote does not end in a majority vote for a Fraternity Council and District Director position?**
The election provision in the revised *Bylaws* is: "The election shall be completed at least eight weeks prior to the Biennial Convention."

If there is no election in any one office, voting again for that office must take place.

Fraternity Council in setting the timeline for the election should allow for the possibility of reballoting in one or more positions. With online voting, this should not be a problem.

**APP.173**

 Kappa Kappa Gamma

**BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS**

**What does it mean for a member to be qualified to serve?**

Per the Fraternity *Bylaws*, a member is qualified to be considered for an elected position if they are an alumna member in good standing. A member is eligible for election to a District Director position or Fraternity Council if they have served Kappa within 10 years prior to election as a member of Fraternity Council, Regional or Province Director, District or Content Director, Content Specialist, chairman or member of a Fraternity standing or special committee, Fraternity Council Assistant, Field Representative, or member of the Foundation Board of Trustees.

If the revision is adopted, anyone who has served on the Fraternity Housing Corporation within the past 10 years will also be eligible to serve.

FINANCES

**What are the changes that are proposed related to fee increases?**

The Fraternity Bylaws, Article VIII. Section 3 discusses the proposed fees. The following have been proposed:

- $10 increase making per capita fees for alumna members $35.
- $10 discount for young alumnae (between zero and five years out) and senior alumnae (more than 65 years post-initiation) making per capita fees for these members $25.
- $5 increase to making per capita fees for collegiate members $97.
- An annual cost of living adjustment, beginning July 1, 2023.

**Why are we raising fees?**

The Fraternity Finance Committee recommended this change to Fraternity Council. The increase is necessary for Kappa to continue to provide the level of service members expect and deserve as well as invest in the future of the organization. This is especially critical in a period when collegiate member numbers are decreasing across Greek life, costs are rising, and strategic initiatives (e.g., enhanced alumna engagement programs) are set to launch. There must be a dues increase to navigate these circumstances while keeping pace with the needs of the organization.

**What value is being provided to alumnae with the dues increase?**

Per capita fees (alumna dues) are paid to the international organization to invest in the creation of engagement opportunities for members throughout their lifetime, the organizational infrastructure of Kappa Kappa Gamma, and to ensure future women can experience our sisterhood. It is important to note that with 243,000 living members, 238 associations and 142 chapters, Kappa Kappa Gamma must have sufficient operating dollars in order to ensure a holistic experience.

With the payment of per capita fees, members receive full membership benefits and alumnae associations receive:

- <u>Volunteer and professional staff support:</u> Covers the cost associated with training, recruiting volunteers, and employing staff, including the Alumnae Experience

**APP.174**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 276 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 179
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 95 of 209

 **Kappa Kappa Gamma**

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

Department, and covers any costs culminated by volunteers and staff when managing
the business of the Fraternity (e.g., travel).

- <u>Access to technology:</u> Covers the costs to essential technology platforms to run the
  business of the Fraternity, including but not limited to *KeyReports*, OmegaOne,
  kappa.org, the membership database, and the online learning platform.
- <u>Expertise:</u> Access to legal, financial and insurance partners as well as the National
  Panhellenic Conference, all of whom provide valuable industry expertise to associations
  and the organization as a whole.

With the fee increase, we will be able to focus on alumnae associations and look at what works
in the association model. With this information, the Fraternity will be able to provide more
focused support for associations. Fraternity Council has put a strategic focus on the alumna
experience. As a result, the Alumnae Experience Department was created just three years ago.
Since then, we have been looking at what our alumnae want as well as how to engage our
disengaged members and best support our volunteers.

In addition, we have hosted several successful programs recently, such as our four Fleurish
virtual events, Career Academy, and Wellness Wednesdays. These are just some examples of
what we have done.

**If we tie fees to a cost-of-living adjustment (COLA), where is the motivation to improve and
become more efficient?**
The Fraternity is certainly committed to making the most of its resources, including finding
efficiencies. The premise of making COLA adjustments is to maintain a standard of operations,
accounting for facilities, utilities, taxes, staff salary, supplies, etc. The effects of inflation mean
that the purchasing power of a dollar today may not remain consistent from one year to the
next. If no adjustments were made to respond to fluctuations in inflation, even the most
efficient organization would struggle to maintain the same standards of operations and recruit
and retain staff with the same amount of income, which can (and in some cases already has)
necessitate making budget cuts and reducing those services. By using the CPI to make COLA
adjustments, the Fraternity can stay in step with those changes. This is also a common practice
with organizations and companies of all sizes.

**If COLA increases, will the dues automatically increase each year?**
Yes. The fees will likely increase every year. For example, if the Consumer Price Index for All
Urban Consumers (CPI-U) is 1%, the $97 active fee would increase by $1 and the $35 alumna
fee would not increase. If inflation is zero, there would be no increase. We are hopeful that our
members will see that the COLA increases are more incremental than how they might end up if
they were subject to debate and change every two years at Convention.

**How is Kappa supporting alumnae associations?**
We are constantly listening and incorporating technologies to help our associations function
more efficiently, but this also does come with costs. In regard to **Dues Direct**, associations can

 Kappa Kappa Gamma

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

pull their membership roster at any time (it updates in real time) and it has a column to show any member living in their ZIP codes who has paid Dues Direct. They can then go and solicit those members to join their association and simply pay local dues. Additionally, it shows the last time the record was updated so they can solicit alumnae who have moved to their area. We continue to also work with OmegaOne to improve their association websites and templates.

In terms of trainings, we rolled out the new **Fraternity Leadership Institute** last year. This was open to EVERY volunteer in the workforce, including ALL association officers. We have continued training and learning opportunities through the **Fraternity Leadership Series,** which offers monthly programming. Again, these are available to every volunteer in Kappa's workforce. These programs provide opportunities for training, idea sharing, support, etc., on a more global level. Our alumna relations team also has offered town halls and training opportunities. We send out a quarterly newsletter to all association officers with trainings, information and updates. All of this takes time from volunteers/staff and money.

And yes, we want to ensure we are engaging all alumnae and continuing to support our alumna associations. The **alumna survey** we conducted gave us great feedback on why individual alumnae may not choose to participate in an association, so we are rolling out programming (Fleurish, Career Academy, Wellness Wednesdays, etc.) to try to reengage their membership and hopefully boost dues-paying members at both the Fraternity and the local level. Phase two is to audit our alumnae association model to ensure we are supporting and operating our associations in the best way. The hope is this dues increase will allow us the funds to tackle a project like that while also continuing the day-to-day support we offer the associations.

**Can we reproportion the fees among alumna and collegiate members? Why is the alumna dues increase different?**
Historically, we have relied heavily on dues from our collegians to cover all Fraternity expenses. In the last two years especially, we have seen how this model has presented incredible challenges:
- We've faced the effects of COVID-19 on higher education.
- We've seen opposition to sororities through movements like Abolish Greek Life.
- This is on top of a multiyear trend of decreasing college enrollment.

Another point we must bear in mind is that the Fraternity expanded rapidly over the past 50 years with 43% of all active chapters having been chartered since 1970. Once established, collegiate numbers tend to stay level due to the fact that this membership stage lasts for only a few years, whereas the number of living alumnae increases exponentially as more and more members leave school and remain alumnae for life. The demand for infrastructure and services to support the needs of our alumnae has long since outpaced the per capita fees that they have historically paid and our financial structure needs additional alumna support. So, we are focusing on reengaging more alumnae and, therefore, rebalancing the organization to fit the needs of all members.

**APP.176**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 278 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 181
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 97 of 209



**BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS**

**Why are we not allowing debate on fees among the Convention body?**
Removing the need to have a Convention body vote in order to change fees is critical for Kappa to continue to provide the level of service the members expect and deserve as well as invest in the future of the organization. This is especially critical in a period when collegiate member numbers are decreasing across Greek life, costs are rising and strategic initiatives, like enhanced alumna engagement programs, are set to launch. There must be a dues increase to navigate these circumstances while keeping pace with the needs of the organization.

With COLA being calculated on Jan. 1, everyone will be notified of the fees by Feb. 1. This will help both chapters and associations to budget more easily, which has been a source of frustration for associations in particular in the past. This means we are letting everyone know much earlier what will be owed, but that increased fee will not raise until July 1, in alignment with the start of the new fiscal year. It also helps the Fraternity budget more easily for programs for the following year since the anticipated income from the per capita fee is known by Feb. 1.

In addition, removing the need to do a Convention vote on fees at each Convention allows the fees to increase more incrementally annually rather than implementing larger increases every four to six years.

**Why are we tying fee increases to COLA?**
Tying fee increases to COLA allows for income to increase in proportion to expenses so Kappa can continue to provide a consistent level of services from year to year. In addition, this means that fee increases are determined at the beginning of each new calendar year so our chapters and associations may factor the cost of living adjustment into their future budgets. Tying the increase to COLA should also minimize the need for large fee increases periodically.

**Which other National Panhellenic Conference (NPC) groups use COLA and whom?**
Tri Delta and Gamma Phi Beta both use COLA. NPC has also instituted incremental fee increases without a membership vote. Many other groups are considering it. Additionally, when we considered the raise to alumna dues, we looked to other nonprofit groups and what they are doing. Associations have been asking for help with future budgeting. This allows them to know sooner what a budget increase would be.

**Can the per capita fee ever be increased above the COLA?**
Yes, but it would take an emergency action by Fraternity Council to do so. A Convention vote could also have this result.

**What is the impact of the COLA increase on association fees?**
Members will need to pay the per capita fee still to the association, and association dues may increase as a result.

**APP.177**

 **Kappa Kappa Gamma**

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

However, an increase in fees does mean more funds available that the Fraternity is able to devote to supporting alumnae and our associations.

We're hopeful that the association members will understand that the Fraternity costs have increased exponentially. Also, in the next biennium, we will be focusing on alumnae associations and will look at what is working and what is not. In that way, we will be able to provide better, focused support to our associations.

**Why can't the proposed fee increase be voted on by delegates at Convention and, if passed, be implemented in the next, not immediate fiscal year?**
We've set our 2022–23 operating budget based on the $10 increase for alumnae and $5 for collegiate members. To set a budget with these fee increases to take effect a year from now would be financially impossible given our current environment of rising costs of doing business. However, the COLA, which will take effect in fiscal year 2024, is for this very purpose: to manage ongoing per capita fees so that all members have complete fee transparency and can budget a known number.

**If we keep increasing fees, how do we keep young alumnae engaged?**
We do provide a discount for young alumnae. However, our focus for the next biennium is to concentrate on this area and supporting alumnae associations. We would like to use our increased funds to focus on alumnae, keeping them engaged, and reengaging our many alumnae who are not currently actively involved in Kappa.

**Why are we not paying for advisers to attend Convention?**
The role of the adviser at Convention has shifted. Chapter advisers are not voting delegates. Ultimately, Convention is for conducting the business of the Fraternity. In addition, we are no longer providing adviser-specific training there. That training has been shifted to a different conference (Kappa Leadership Conference) that advisers now attend along with their advisees.

**What is the total amount of revenue the Fraternity receives from alumna dues?**
About $400,000 each year.

**What is the projected amount of dues revenue from alumnae if the changes pass?**
Just shy of $500,000.

**How many alumnae pay dues each year?**
An average of 15,000 alumnae pay dues each year, which is only between 6%–7% of alumna members.

**Why is the Fraternity budget not submitted for vote to the Convention body?**
Prior to the 2018 Convention, the Fraternity *Bylaws* required a vote by the Convention body to approve the Fraternity budget. In 2018, effective for the 2019 fiscal year, the Convention body adopted an amendment that removed approval of the Fraternity budget as an item of business

**APP.178**

 Kappa Kappa Gamma

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

at Convention. When the budget was presented for a vote, it was based on a two-year forecast. Trying to determine revenue and expenses two years out made budgeting incredibly difficult. That was the main impetus for changing the Fraternity *Bylaws* to not having the Convention body vote on the budget. The Fraternity Treasurer does a budget presentation to the Convention body. The budget is recommended by the Finance Committee and approved by Fraternity Council now.

**Can you provide detailed financials to support the per capita increase? How will we know how the money is being spent?**
The Fraternity budget (this year's and last year's) will be presented at Convention along with other relevant Convention information. The financials are presented at Convention and will be posted to the site. It is our goal to invest in our alumnae and associations, keep members engaged, and fund the Fraternity's strategic plan. This dials into both infrastructure as well as meeting members where they are and being part of all members' lives regardless of their life stage. Through the alumna engagement team and other volunteers, we are working in earnest to ensure our membership experience is meaningful throughout our members' lives. The goal is to fund our organization moving forward into the next 152 years.

**Can you provide more transparency on how Fraternity funds are being spent?**
It is our goal to be transparent with how Fraternity funds are being spent. We want to continue to communicate and reach our members to share updates on what is happening with the Fraternity, including how dues are being utilized. We are looking into how we best reach our alumnae throughout their lives: *The Key*, social media, email, etc. All of this plays into the reengagement and continued engagement of our alumnae and we absolutely plan to include these types of messages as we move forward. In addition, the Fraternity budget (for the upcoming two fiscal years) and the financial reports from the prior two fiscal years will be presented at Convention.

**Why is the per capita fee increasing when membership numbers are declining?**
We want to make sure that Kappa is around for another 152 years and remains sustainable, so we need to invest in Kappa now more than ever. We do not want to cut programs or other corners. We feel this increase is needed to keep our budget operational. In particular, we need to invest in our alumnae in order to reengage them as we have been doing and as we will be moving forward.

**Could dues be frozen for members over the age of 65 years of age versus years of membership?**
Not every record has a birthdate for our members but every record does have an initiation date. We want to ensure we are providing the most accurate lists to our associations and members on who would fit into this category, so we need to use initiation date versus age simply due to the information we have.

   BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

We would have to consider the financial impact, but the goal with the 65-year and young alumna discounts was to recognize that these members are on a more fixed income.

**Does Kappa and the Kappa Foundation have annual report requirements as part of their nonprofit status? Where are those reports posted?**
Both groups have filing requirements. The Fraternity 501(c)(7) and the Foundation 501(c)(3) are both required to file a Form 990 with the IRS. Those 990s can be found on sites like irs.gov and candid.org.

Our annual reports are reflected in our 990s.

**What has been done to decrease Kappa Headquarters' expenses?**
The Finance Committee and Budget Committee have worked very hard the last several years to reduce expenses in every category and we have been successful in reducing some expenses. Additionally, we reduced travel for volunteers and staff, sublet a space at Kappa Headquarters, underwent overall cost reduction of projects and operating expenses, and held more virtual meetings. We have done numerous detailed reviews of every expense line within the budget.

CHAPTER OFFICER STRUCTURE
**Why are we changing the chapter officer structure?**
This change is a result of direct feedback from our collegians. In spring 2017, we surveyed chapter members, advisers, and Fraternity volunteers and heard their feedback on the need for improvements to the chapter leadership structure. Fraternity Council added this as a priority to the strategic plan and directed the Chapter Services Department and volunteers to craft and pilot the proposed structure. In addition, in 2018, a resolution from the Convention body was proposed to review the chapter officer structure. The resolution was not adopted at that time as the proposed structure was already in the planning stages. It is important to note that this resolution was proposed by Fraternity volunteers who recognized the need for change.

Our chapters' needs, operations, priorities, dynamics and sizes are unique to their chapter and campus. We heard from our chapter members that a more sustainable leadership model was a necessity. Based on this as well as the feedback from the survey in 2017, we created a flexible chapter leadership structure to meet the needs of our chapters and members, which we have been piloting since 2018 in select districts. This new structure aims to enhance and build stronger chapters, meeting the needs of chapters and our members while providing relevant and skill-building opportunities that translate to post-graduate life.

**Can you provide more information on resources and training that will be provided? How will Advisory Boards get help condensing their boards?**
Be sure to review the proposed structure officer resources on the Kappa website. These resources will give you more in-depth information on the proposed officer structure and the timeline of training.

 **Kappa Kappa Gamma**

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

Leading up to Convention, these resources are available 24/7 so that delegates may understand the proposed changes and the timeline for the rollout if passed at Convention. Based on feedback from these town halls, we will evaluate if further discussion opportunities are needed.

If approved by the Convention body, we will send out an email in early July inviting chapter Presidents, Advisory Board Chairmen, and Chapter Council Advisers to learn more about the structure at a virtual training at the end of July and in August. Additionally, the process for sharing this change with their chapter, how to choose an officer structure, and how to get it approved will be shared.

In August and September, the Nominating Committee Chairman and advisers will attend a virtual Nominating Committee training to learn more about the nomination process.

Chapters already piloting the structure are welcome to attend that virtual training and will continue to operate in the structure. A separate conversation will be held for Official Family members so they understand how their role is evolving as well.

Advisory Board Chairmen will also learn about condensing their boards during these meetings.

**How would the positions that the chapter should/would adopt be determined?**
Should the proposed chapter officer structure be adopted at Convention, chapter Presidents and Chapter Council Advisers will attend a training in July or August (based on when they start school and availability) to learn about how to choose their structure. The chapter will determine which director positions to fill by considering their priorities, needs, and size. Once they choose their structure, it will be reviewed and approved by the Leadership Development Specialist. They will also need to vote on adding it to their chapter documents.

In addition, we have suggested applications of the structure based on chapter size that chapters can use as a starting place to determine their structure.

**What will the role of Academic Excellence Specialists be once the Vice President-Academic Excellence role changes?**
The academic excellence officer role will not be under standards. Rather, if the chapter chooses to elect an Academic Excellence Director, they will be a member of the Internal Affairs Department and managed by the Vice President Internal Affairs.

The role of the Academic Excellence Specialist will not change. In this example, the Academic Excellence Specialist will continue to share their expertise of academic support and resources with the chapter Academic Excellence Director. The Vice President Internal Affairs will act in a manner similar to how the chapter President currently acts and will provide support and mentorship to the chapter Academic Excellence Director in an effort to oversee all operations specific to member support and expectations.

**APP.181**

 Kappa Kappa Gamma

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

**How will it work with smaller Executive Boards?**
We believe new initiatives will be handled even more effectively by a smaller Executive Board of seven officers. We saw that chapters piloting the proposed structure were able to pivot more quickly and effectively when the COVID-19 shutdown started in 2020 due to the smaller and streamlined nature of the board.

Additionally, Executive Board will receive focused training on how to strategically think and goal set on new initiatives. This structure is built to encourage executive leaders to think strategically, which allows them to focus on enhancing the membership experience rather than just executing day-to-day tasks.

**What is the role of Content Specialists in the new structure?**
The role of the Content Specialist will not change, and they will still work directly with the director, vice president, or chapter President they are assigned to work with.

Additionally, we are setting up the vice presidents as the first line of support for questions from their directors. Our hope is to allow Content Specialists to be utilized in more strategic ways and in situations that require their unique expertise and to enable chapter officers to search for questions from their resources first. Content Specialists will continue to support their content area and align with the chapter director roles.

**How do we prevent burnout in officers/leadership in the new structure?**
The intention of the proposed structure was to spread the workload and responsibilities while empowering more members to get involved. For example, the chapter President is currently tasked with managing a Chapter Council of 15 officers. In the proposed structure, the chapter President would manage six vice presidents who, in turn, manage their own departments of around one to five directors.

Similarly, the Vice President-Standards is now the chapter Standards Director. We have heard feedback and seen the current Vice President-Standards position has become overwhelming. This shift is to focus on their role as managing the member support and accountability process in coordination with the other Standards Committee members.

For smaller chapters, we know that fewer members likely means fewer members to be officers. We are actively working on streamlining leadership resources for vice presidents who will be taking on all or most of the department's workload. We currently have chapters that are combining positions, and we believe these resources will help to spell out and give structure to their role so they and their chapter members may enjoy a robust and supportive experience.

**How does the new chapter officer structure affect Advisory Boards?**
The chapter officer structure will result in more sustainability and more consistency for our Advisory Boards. Many of our Advisory Boards have struggled to fill all 17 advisory positions. Currently, 76 (53%) Advisory Boards have vacancies. That's over half of our chapter Advisory

**APP.182**



BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

Boards left unfilled. Additionally, only 10 chapters currently have advisers who are not serving in multiple adviser roles in that chapter or adviser roles in multiple chapters. The new Advisory Board structure will contain nine advisers.

With the new structure in place, advisers will have the opportunity to take on more of a mentorship role. They'll guide chapter officers as they navigate team dynamics and management and consult the chapter from a strategic, visionary perspective. Advisers will help guide chapter officers in their leadership roles through encouragement, use of leadership skills, and the teamwork it takes for the chapter to achieve its goals. Advisers play a critical role in our chapters' success and there will still be valuable opportunities to work with our chapters.

**Are there any plans to adjust training for Advisory Board members?**
Our Advisory Board team is hard at work on a revised adviser training. A project specialist was assigned to this task and more will be shared in the coming months.

**Will the proposed changes in the officer structure change the Nominating Committee process?**
Yes, there will be some changes made to the chapter officer nominating process, including the introduction of an application and interview process. Training and resources will be available in July if the proposed officer structure passes for chapters and advisers so they can utilize the new process for the upcoming officer election cycle.

We have seen this streamline the nominating process and produce the best candidates.

**What happens if the proposed new chapter leadership structure does not pass at Convention?**
If the proposed structure is not adopted at Convention, the new Fraternity Council, in partnership with the Chapter Services Department and district volunteers currently working with chapters piloting the proposed structure, will evaluate the concerns around why it did not pass. Based on these conversations, a new proposed structure could be a possibility.

We firmly believe in the need to shift to a new chapter officer structure. The needs and priorities are evolving for chapters, and we believe this proposed chapter officer structure will allow Kappa Kappa Gamma to remain relevant for our chapter members and provide enhanced skill-building opportunities that translate to post-graduate life.

**Should we have a labeled set of directors in order for nominations and elections to be more organized?**
Chapters will determine which director positions they will elect based on Kappa-prescribed chapter directors. Chapter structures will be approved by the Leadership Development Specialist in consultation with their District Director and their chosen structure will be included in their chapter Bylaws.

**APP.183**

 Kappa Kappa Gamma

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

**I don't understand why a chapter Executive Board would need to be thinking strategically?**
The Executive Board will focus on the vision for the member experience and goal setting. They will manage directors as well as contemplate bigger membership questions, such as retention and lack of interest. As they will not be focused on the day-to-day activities, Executive Board will be able to dive deep into those questions. They would then work with directors to address those concerns.

**Why are we not hearing the term committee? Are chapters not using a committee structure anymore and if so, why?**
Committees are just changing in name and how they are being assigned. For smaller chapters, we are suggesting assigning general members to a department to work on department tasks/projects. For larger chapters, we are recommending that they be assigned to content-focused teams to assist with content-specific projects.

**How many chapters have been in the pilot program?**
Twenty-five. Epsilon District — encompassing schools in Illinois, Wisconsin, and Minnesota — started piloting the structure in fall 2018. Xi District — encompassing schools in Louisiana, Arkansas, Mississippi, Alabama, and Florida — started piloting the structure in fall 2019. Additionally, chapters at Pfeiffer University, Long Island University Post, Seton Hall University, Princeton University, and the University of Pittsburgh have also joined the pilot.

**Will the current Content Specialists have more work than they currently have now?**
Content Specialists will continue to share their expertise with chapter leaders through training and ongoing support. With this new structure, the vice presidents will be the first line of support for their direct reports, helping to solve problems and find solutions together (something we're already seeing). Advisers will assist if they are still needing assistance with these questions. We believe this will allow our chapters to better utilize our Content Specialists and their expertise.

**How will the changes in officers/structure change any officer live-in requirements?**
The Fraternity *Policies* require a minimum of two of the Emergency Team officers to live in the chapter facility. In the proposed structure, this would be at least two of the following officers: President, Vice President Operations, Risk Prevention Director and Facility Director. The chapter Standing Rules may also require more officers to live in and would need to be updated should the proposed chapter structure be adopted at Convention.

**How does the new officer structure impact ritual considering that some of the positions are named specifically?**
For our ritual ceremonies, the Ritual Director or Vice President Internal will act as Marshal.

**Will the district team structure change to be similar to the new chapter leadership structure?**
The district team structure will stay the same but note that the Panhellenic, facility, and DEI content areas are being added as new Content Directors. Should the chapter officer structure

 **Kappa Kappa Gamma**

BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

be adopted at Convention, we will continue to evaluate how the district team structure operates in conjunction with the chapter officer structure.

**Do the chapter Bylaws and Standing Rules need to be updated if the chapter decides to adjust its officer structure.**
Yes. A chapter is free to evaluate its structure and adjust as needed. We believe it makes sense to give them this ability. Making it scalable so that it works for each chapter meets the goal of this initiative. Chapters can easily vote to change their documents with assistance from the Bylaws Committee.

### DIVERSITY, EQUITY AND INCLUSION

**Can nonbinary people join? Is this a chapter-by-chapter decision?**
Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.

We also look to NPC policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

**Have we vetted these changes with our legal counsel?**
Yes. We have conferred with legal counsel as well as NPC on DEI-related updates to our Fraternity documents. We are confident that these changes would hold up if contested in a court of law.

**What is happening with the use of "womanly and true" in ritual?**
This phrase can be found in the new member oath. We have worked hard to make our language more inclusive and changed that to "loyal and true." The Ritual Committee felt that what womanly and true meant, we could not quite define, but we feel "loyal and true" best represents our current member population and is easily understood.

**Why are we including gender-neutral pronouns in the revised documents?**
This change is coming from a Convention resolution that formed Kappa's Diversity, Equity and Inclusion Committee. Kappa Kappa Gamma was founded 150 years ago on the principles of integrity, respect and regard for others. Kappa has reflected on the path forward, and we are beginning with actions that speak to our belief that all members are valued. This is one of those action steps. We want to be as inclusive of all members as we can be. Please review Kappa's Diversity, Equity and Inclusion Initiatives for more information.

     BYLAWS AND STANDING
RULES REVISIONS 2022: FAQS

**You reference the NPC policy on nonbinary and transgender members as part of Recruitment. What is the policy for alumna initiates? What guidelines are used in these scenarios?**
You can find information on alumna initiation here: www.kappa.org/stay-connected/news/2020/alumna-initiation-process/.

MISCELLANEOUS

**What about legacies and recommendations? Where are those in the Fraternity *Bylaws* and what changes are being proposed?**
Recommendations/references have not been required for many years. Neither are in the Fraternity *Bylaws*, both current and proposed. You will find references in the Fraternity Standing Rules, Rule XII. Section 1 (adopted in 2018).

The proposed wording in the 2022 version of the Fraternity Standing Rules, Rule 1. 1. A. states: Active members shall be responsible for selecting new members of their chapter. Any initiated member may provide information about qualified women. We have not taken away the right of members to give information on potential new members, as members may still provide information about qualified women.

**Has the Fraternity seen a decline in membership or giving since the legacy policy change?**
The legacy policy is outside the scope of the Fraternity *Bylaws* and *Standing Rules*. Because we no longer define and record familial relationships between members, there is no way to directly draw a straight line between the policy change and the impact on membership numbers. There is a myriad of factors that have impacted sorority recruitment across NPC, including time commitments of today's college student, cost of membership, fluctuations in enrollment in colleges and universities, and the impact of national movements like Abolish Greek Life to name a few. Not all factors impact every institution where we have a chapter equally, but that is a broad view of the landscape. We are also not alone in this policy change. Since 2020, 19 of the 26 NPC member organizations have removed preferential treatment for legacies.

We are seeing a decline in overall recruitment pools in many parts of the country, which is impacting our membership numbers on some campuses. We do not know if association membership numbers have been impacted by the change to the legacy policy. We have no way to attribute the change in numbers to this legacy policy change.

We are not aware of any direct impact of the legacy policy change on overall Foundation giving.

**Just for clarification: Since the legacy definition is a "policy," then this matter is not open to discussion at Convention?**
Currently, the Fraternity *Policies* are not open to discussion for the general membership. They are voted upon by Fraternity Council. You can always send suggestions for the Fraternity *Policies* to Fraternity Council.

**How do other NPC groups handle legacies?**

                                    BYLAWS AND STANDING
                                                        RULES REVISIONS 2022: FAQS

Since 2020, 19 of the 26 NPC member organizations have removed preferential treatment for
legacies.

**How is a member chosen to be on the Bylaws Committee?**
The Bylaws Chairman is appointed by Fraternity Council. Members of the committee are
selected based on expressing interest in the Volunteer Interest Form as well as their unique
qualifications.

**Why does the change to the *Articles of Incorporation* eliminate associations?**
The intent behind this change was to be more inclusive of all alumnae whether they are in an
association or not. For example, Kappa currently has 213,966 mailable alumnae but only 8,175
have paid dues to an association this year. Thus, Kappa has a large number of alumnae who are
not involved in associations, so this change is reflective of that.

**What is the purpose of Convention?**
The main purpose of Convention is to conduct the business of the Fraternity. If elections are
completed prior to Biennial Convention in the future, priority can be given to other agenda
items that require delegates to be together in person to address.

**Going forward, will general alumnae be part of an international meeting or Convention?**
All alumnae are invited to and encouraged to attend Convention.

**If we're allowing for alumnae associations to vote electronically, then what is the purpose of
voting in person at Convention on the changes to the Fraternity *Bylaws*?**
We are proposing allowing electronic voting during officer elections. Because we still require
contemporaneous communication for both debate on these important changes as well as in
order to meet legal requirements, it makes the most sense to vote on changes to the *Bylaws* in
person. Voting on the *Bylaws* in person allows for the opportunity for discussion and debate
that would be difficult to achieve in a virtual forum.

**Why did we remove the vote of Leadership Consultants?**
Leadership Consultants are full-time, salaried employees. Because they are governed by
Kappa's HR guidelines, we were guided by legal counsel to put them in the same category as
other employees and remove voting rights.

**What happened to references to the Leadership Consultants in the documents?**
Leadership Consultants are the employees of the Fraternity. Their employment is governed by
their employment contracts, not the Fraternity *Bylaws*.

Case 2:23-cv-00051-ABJ   Document 61   Filed 04/20/23   Page 108 of 205

# ATTACHMENT 7

**APP.188**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 290 of 506
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 109 of 209
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 193

# Standing Rules
## of
# Kappa Kappa Gamma Fraternity



Adopted by the 2004 General Convention.
Revised 2006, 2008, 2012, 2014, 2016, 2018, and **2022** General Conventions.

The Kappa Kappa Gamma Fraternity *Standing Rul*es are not to be shared with the public. If
there is a request for a copy of the Fraternity *Standing Rules*, contact the National Panhellenic
Conference Delegate.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 291 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 194
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 110 of 209



## KAPPA KAPPA GAMMA FRATERNITY STANDING RULES REVISION

**1.0 Members, Chapters, and Associations** ............................................................. **1**
   1.1 Membership Selection ......................................................................... 1
   1.2 Submitting Grade Verifications............................................................ 1
   1.3 Chapter and Association Archives........................................................ 1
   1.4 Alcohol and Drugs .............................................................................. 1
**2.0 Duties of Fraternity Officers and District Directors**............................... **2**
   2.1 Duties of Fraternity Officers................................................................ 2
   2.2 Duties of a District Director. ............................................................... 3
**3.0 Duties of Committees and Other Appointed Positions** ........................ **3**
   3.1 Duties of a Standing Committee Chairman ......................................... 3
   3.2 Duties of Standing Committees ........................................................... 4
   3.3 Duties of a Content Director ............................................................... 5
   3.4 Duties of a Content Specialist ............................................................. 6
**4.0 Conventions**.............................................................................................. **6**
   4.1 Organization of the Convention.......................................................... 6
   4.2 Credentialed Delegates....................................................................... 6
   4.3 Convention Agenda............................................................................. 7
   4.4 Convention Committees ...................................................................... 8
   4.5 Convention Expenses. ......................................................................... 8
**5.0 Fraternity Council** .................................................................................... **9**
   5.1 Duties of Fraternity Council ................................................................ 9
**6.0 The Fraternity** ......................................................................................... **10**
   6.1 Finance .............................................................................................. 10
   6.2 Ritual ................................................................................................. 10
   6.3 Founders Day ..................................................................................... 11
   6.4 Publications........................................................................................ 11
   6.5 Insignia, Fraternity Jewelry, and Symbols.......................................... 11
**7.0 Procedures** .............................................................................................. **13**
   7.1 Leadership Selection Committee Appointment .................................. 13
   7.2 Member Probation. ............................................................................ 13
   7.3 Voluntary Resignation Procedure ...................................................... 18
   7.4 Requested Resignation and Dismissal ................................................ 18
   7.5 Establishing a New Chapter ............................................................... 20
   7.6 Chapter Standing ............................................................................... 21
**8.0 Amendments** .......................................................................................... **25**
   8.1 Amendment of Standing Rules ........................................................... 25

**APP.190**



KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

### 1.0 MEMBERS, CHAPTERS, AND ASSOCIATIONS

**1.1 Membership Selection.**

　**A.　Collegiate New Member Selection**. Active members shall be responsible for selecting new members of their chapter. Any initiated member may provide information about qualified women. The electronic voting system selected by the Fraternity shall be used by the chapter.

　　　1.　**Participation**. All active members of the chapter shall participate in membership selection unless excused in writing by the designated chapter adviser.

　　　2.　**Confidentiality**. All information concerning the membership selection process is confidential and shall be kept within the chapter.

　　　3.　**Bid List**. The bid list shall be produced using the overall scoring calculation in the electronic voting system and shall not be manipulated.

　**B.　Alumna Candidate Selection.** Alumnae who meet the membership requirements may petition Fraternity Council to be initiated as an alumna member of the Fraternity. A three-fourths vote of Fraternity Council shall be required to grant permission for Alumna Initiation. Such an alumna shall become a member of the collegiate initiating chapter or the special chapter designated by the Fraternity.

**1.2 Submitting Grade Verifications.** All active and new members shall submit verification of their grades each term to the officer in charge of academic excellence unless the college or university releases the grades directly to the chapter.

**1.3 Chapter and Association Archives.**

　**A.　Chapter Archives.** Each chapter shall maintain the chapter's charter, Fraternity proprietary materials, and records of the chapter's activities and history in its archives. All archive properties pertaining to ritual, except when in use, shall be kept in a locked place. All archived documents, records, resources, and memorabilia that are not secret in nature shall be maintained in a secure manner.

　**B.　Association Archives.** Each association shall maintain the association's charter, Fraternity proprietary materials, and the records of the association in its archives.

**1.4 Alcohol and Drugs.**

　**A.　Chapter and Association Events.** Alcoholic beverages, drugs or other controlled substances shall not be used or served in conjunction with any function related to Recruitment, Bid Day, Inspiration Period, chapter philanthropic events, membership selection, chapter meetings, or services of Fraternity ritual, including Formal Pledging, Initiation, and Founders Day.

　**B.　Chapter Facilities.** The use, sale or possession of alcohol or drugs or other controlled substances shall not be permitted in a chapter facility or within the area considered part of that property. Members, including alumnae, shall observe the house rules at all times when using the chapter house.

　**C.　Alumna Functions.** Alumnae shall abide by event and risk prevention requirements at all functions where active or new members are present.

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

### 2.0 DUTIES OF FRATERNITY OFFICERS
### AND DISTRICT DIRECTORS

**2.1 Duties of Fraternity Officers.**

**A. Duties of All Fraternity Officers.** All Fraternity officers shall:
1. Serve as members of Fraternity Council;
2. Support the policies and programs adopted by the membership and Fraternity Council;
3. Hold for safekeeping and reference the latest edition of the *Book of Ritual*, reference materials issued by the Fraternity, and the Kappa Kappa Gamma Fraternity *Bylaws*, *Standing Rules*, and *Policies*;
4. Contribute to the research, development, and execution of a strategic plan;
5. Provide vision and direction to the Fraternity volunteers and Kappa Kappa Gamma Headquarters staff;
6. Provide strategic vision for educational programming;
7. Maintain focus on international and campus trends as well as the needs and possibilities of active and alumna members;
8. Uphold the Fraternity's commitment to diversity, equity, and inclusion;
9. Participate in the identification, cultivation, and retention of volunteers; and
10. Perform the duties prescribed for each officer in the Fraternity *Standing Rules* and such other duties as may be directed by Fraternity Council and as may be prescribed in the parliamentary authority adopted by the Fraternity.

**B. Duties of the President.** The President shall:
1. Shall be the chief executive officer and official spokesman of the Fraternity;
2. Sign official documents authorized by Fraternity Council;
3. Act as a liaison between the Fraternity and colleges and universities;
4. Preside at the installation of new chapters and, if unable to attend, designate a member of Fraternity Council to preside instead;
5. Be a member *ex officio* of all committees except the Leadership Selection Committee;
6. Call meetings of Fraternity Council and request the attendance of such other members of the Fraternity, as necessary; and
7. Preside at all meetings of the membership and of Fraternity Council.

**C. Duties of a Vice President.** A Vice President shall:
1. Act as a liaison to District Directors, Content Directors, and committee chairmen for awareness of internal trends; and
2. Recommend to Fraternity Council a review of chapter compliance with Fraternity standards based on recommendations from respective District Directors, Content Directors and staff.

**D. Duties of the Treasurer** The Treasurer shall:
1. Review regularly scheduled reports of the financial operation of the Fraternity;
2. Be informed on all financial matters;
3. Annually review the Fraternity financial audit and tax returns;

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

4.  Plan for maintaining the efficient financial operation of the Fraternity at Kappa Kappa Gamma Headquarters in collaboration with the Executive Director and the financial director;

5.  Present reports with suggestions and recommendations regarding the financial condition of the Fraternity to the Finance Committee and Fraternity Council;

6.  Serve as a member of the Finance Committee and oversee the committee's work;

7.  Be responsible for the preparation of the annual budget in collaboration with the Executive Director and the financial director and present the budget to the Finance Committee and Fraternity Council by June of each year; and

8.  Present financial reports and the proposed budget for the next fiscal year to Convention.

**2.2 Duties of a District Director.**

**A.    Primary Duties.** A District Director shall:

1.  Supervise the organization and management of alumnae associations and chapters in collaboration with the Content Specialists and Kappa Kappa Gamma Headquarters staff;

2.  Direct the work of the Content Specialists in collaboration with the respective Content Director;

3.  Annually set goals for alumnae associations and chapters in collaboration with the Content Specialists, alumnae associations, and chapters;

4.  Evaluate chapters annually in collaboration with the district team;

5.  Serve as a liaison to the alumnae association Presidents and chapter Presidents in their district;

6.  Identify at-risk alumnae associations and chapters and develop a plan of support in collaboration with Content Specialists and Kappa Kappa Gamma Headquarters staff;

7.  Collaborate with Kappa Kappa Gamma Headquarters staff to determine alumnae association and chapter visits;

8.  Submit reports to Fraternity Council as requested;

9.  Uphold the Fraternity's commitment to diversity, equity, and inclusion; and

10. Participate in the identification, cultivation, and retention of volunteers.

**B.    Other Duties.** A District Director shall perform such other duties as may be prescribed in the Fraternity *Bylaws* or assigned by Fraternity Council.

### 3.0 DUTIES OF COMMITTEES
### AND OTHER APPOINTED POSITIONS

**3.1 Duties of a Standing Committee Chairman.**

**A.    Primary Duties.** A standing committee chairman shall**:**

1.  Plan a program for the committee with the approval of Fraternity Council;

2.  Communicate regularly with Fraternity Council and committee members;

3.  Serve as a voting member of Conventions;

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 295 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 198
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 114 of 209

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

    4. Attend other meetings as requested;

    5. Maintain files for the committee;

    6. Submit reports to Fraternity Council as requested;

    7. Submit a committee budget as requested;

    8. Monitor the committee budget;

    9. Uphold the Fraternity's commitment to diversity, equity, and inclusion; and

    10. Participate in the identification, cultivation, and retention of volunteers.

**B. Other Duties.** A standing committee chairman shall perform such other duties as may be prescribed in the Fraternity *Bylaws* or assigned by Fraternity Council.

### 3.2 Duties of Standing Committees.

**A. Bylaws.** The Bylaws Committee shall:

    1. Review the amendments to the Fraternity *Bylaws* and *Standing Rules* proposed by the membership, work with Fraternity Council on proposed amendments, and propose such other amendments as may be deemed advisable;

    2. Biennially review the Model Chapter Bylaws and Standing Rules;

    3. Biennially review chapter Bylaws and Standing Rules for compliance with the Fraternity *Bylaws*, *Standing Rules*, and *Policies*.; and

    4. Assist with the creation of new chapter and association Bylaws and Standing Rules to ensure they are compliant with the Fraternity *Bylaws*, *Standing Rules* and *Policies*.

**B. Convention.** The Convention Committee shall:

    1. Investigate potential Convention sites in collaboration with Kappa Kappa Gamma Headquarters staff; and

    2. Be responsible for all arrangements for any Convention in collaboration with Kappa Kappa Gamma Headquarters staff subject to the approval of Fraternity Council.

**C. Finance.** The Finance Committee shall:

    1. Make recommendations to Fraternity Council for the financial management of the property and funds of the Fraternity;

    2. Monitor and review investments and securities performance according to the Fraternity's investment policy statement;

    3. Review special financial projects, professional services, and financial institutions into which funds are deposited;

    4. Recommend to Fraternity Council a professional audit firm and annually review the Fraternity financial audit and tax returns and make recommendations on acceptance to Fraternity Council;

    5. Annually review the Fraternity's financial policies and procedures, investment policy, and travel policy;

    6. Form an Investment Subcommittee that consists of members appointed by the Finance Committee Chairman to oversee the investment strategy;

    7. Form a Budget Subcommittee that consists of members appointed by the Finance Committee Chairman to prepare an annual budget;

**APP.194**

 **KAPPA KAPPA GAMMA FRATERNITY**
**STANDING RULES REVISION**

8. Review and submit the annual budget to Fraternity Council for approval;
9. Review financial arrangements for chapter housing and make recommendations to Fraternity Council;
10. Recommend to Fraternity Council approval of financial drives or campaigns of more than local extent in the name of the Fraternity by a chapter, alumnae association, Advisory Board, House Board, or individual member; and
11. Bring all matters pertaining to the financial matters of the Fraternity to the attention of Fraternity Council.

**D.** ***The Key* Publication.** *The Key* Publication Committee shall supervise the publication of *The Key* in accordance with the direction, goals, and approved budget established by Fraternity Council.

**E.** **Leadership Education and Development.** The Leadership Education and Development Committee shall:
1. Educate the membership on leadership opportunities and volunteer involvement;
2. Work with Kappa Kappa Gamma Headquarters, the Kappa Kappa Gamma Foundation, and the Fraternity Housing Corporation to review, develop, and implement plans for volunteer identification, cultivation, placement, retention, recognition, and development;
3. Review applications and recommend candidates to Fraternity Council for the Leadership Selection Committee;
4. Create and implement skills development programs in collaboration with the Education and Training Department at Kappa Kappa Gamma Headquarters, including a required training for all elected or appointed volunteers on the subject of diversity, equity, and inclusion;
5. Implement a volunteer feedback program that utilizes the skills development programs for volunteers; and
6. Identify and recommend candidates for other available volunteer and leadership roles within the Fraternity, the Kappa Kappa Gamma Foundation, and the Fraternity Housing Corporation as requested.

**F.** **Panhellenic Affairs.** The Panhellenic Affairs Committee shall:
1. Represent the Fraternity as a member of the National Panhellenic Conference; and
2. Provide representation at regular and special meetings of Fraternity Council.


**3.3 Duties of a Content Director.**
**A.** **Primary Duties.** A Content Director shall:
1. Oversee the work of the Fraternity in their respective content area;
2. Lead the team of Content Specialists in their respective content area;
3. Direct the work of the Content Specialists in collaboration with the respective District Director;
4. Collaborate with Kappa Kappa Gamma Headquarters staff to develop curricula and programming for content-specific topics;

**APP.195**

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

5. Serve as a voting member of Conventions;
6. Attend other meetings as requested;
7. Submit reports to Fraternity Council as requested;
8. Uphold the Fraternity's commitment to diversity, equity, and inclusion; and
9. Participate in the identification, cultivation, and retention of volunteers.

**B. Other Duties.** A Content Director shall perform such other duties as may be prescribed in the Fraternity *Bylaws* or assigned by Fraternity Council.

**3.4 Duties of a Content Specialist.**
   **A. Primary Duties**. A Content Specialist shall
   1. Serve as a member of the content team and the district team in which they are assigned;
   2. Build relationships with chapters and associations within the district;
   3. Facilitate communication among the chapter, association, Content Director, District Director, and Kappa Kappa Gamma Headquarters staff;
   4. Collaborate with the district team on chapter evaluations;
   5. Assist alumnae associations with setting goals and programming;
   6. Collaborate with the content team on content matters and initiatives;
   7. Collaborate with the relevant Content Director and District Director to develop and provide training to alumnae associations and chapters;
   8. Attend meetings as requested;
   9. Uphold the Fraternity's commitment to diversity, equity, and inclusion;
   10. Participate in the identification, cultivation, and retention of volunteers; and
   11. Submit reports to Content Directors and District Directors as requested.

   **B. Other Duties**. A Content Specialist shall perform such other duties as may be prescribed in the Fraternity *Bylaws* or assigned by Fraternity Council.

## 4.0 CONVENTIONS

**4.1 Organization of the Convention.** The official organization of a Convention to conduct business shall be brought about by the adoption of the credentials report, the Convention Standing Rules, and the agenda.

**4.2 Credentialed Delegates.**
   **A. Approved Delegates.** Each chapter and association shall file credentials for its delegate and alternates who have been approved by the President and one other officer of the chapter or association.
   **B. Delegate Accreditation.** In order for a delegate to be accredited, the chapter or association represented shall have met all financial and reporting obligations.
   **C. Delegate Attendance.** Each delegate shall remain for the entire period of a Convention and shall be present at all business meetings. In the event it becomes impossible to do so, an accredited alternate may assume the role of delegate.

**APP.196**

 **Kappa Kappa Gamma**

KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

**4.3 Convention Agenda**. A Biennial Convention agenda shall include the order of business and the opening and closing ceremonies as required by Fraternity ritual and determined by Fraternity Council. The recommended agenda for a Convention is indicated below. Fraternity Council may alter the order of business as it may deem necessary.

Convention Procession
Call to Order by the Fraternity President
Song
Opening Ritual
Devotional or Inspirational Reading
Song
In Memoriam
Welcome to New Members, New Chapters, and New Alumnae Associations

Order of Business
    Official Organization of the Convention
        Adoption of the Credentials Report
        Adoption of Convention Standing Rules
        Adoption of the Agenda
    Appointment of Additional Committees and Special Announcements
        Appointment of Convention Committees
        Special Announcements by the Fraternity President
    Report on Approval of Prior Convention Minutes
    Reports of Officers, Boards, and Standing Committees
        Report of the Fraternity President
        Reports of Other Fraternity Officers
        Report of Fraternity Council Meetings of the Biennium
        Reports of Standing Committees
    Reports of Special Committees
        Report of the Leadership Selection Committee
        Report of the Election Committee
    Special Orders
    New Business
        Report of the Resolutions Committee
        Report of the Courtesy Resolutions Committee
    ————————————
    Installation of the District Directors and Fraternity Officers
    Closing Ritual
    Adjournment
    Convention Recession

**APP.197**



KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

**4.4 Convention Committees.**

**A.** **Appointment of Convention Committees.** The President, with the approval of Fraternity Council, shall appoint all required Convention committees with the exception of the Credentials Committee, which shall be appointed by the Executive Director.

**B.** **Credentials Committee.** The Credentials Committee shall validate the credentials of eligible voting members present and prepare a report to the Convention. Each report shall include the value of the alumnae association vote.

**C.** **Tellers Committee.** The Tellers Committee shall count the votes at Convention as required and report the results to the chair. The committee shall consist of a chairman and a minimum of two tellers who are nonvoting members.

**D.** **Resolutions Committee.** The Resolutions Committee shall review proposed resolutions and motions submitted to the committee by voting members and, at its discretion, shall present the resolutions and motions to the Convention with recommendations for appropriate action. The committee shall consist of the chairman, two District Directors, two Content Directors, eight chapter delegates, and six association delegates. The Bylaws Committee Chairman and the parliamentarian shall serve as advisers.

**E.** **Courtesy Resolutions Committee.** The Courtesy Resolutions Committee shall draft courtesy resolutions that express appreciation to those who arranged accommodations for physical needs or rendered services for the Convention and shall present them to the Convention for adoption. The committee shall consist of the chairman, two District Directors, two Content Directors, eight chapter delegates, and six association delegates.

**4.5 Convention Expenses.**

**A.** **Covered Expenses.** Expenses in connection with attendance at a Convention shall be paid by the Fraternity as follows for eligible individuals.

1. **Transportation Expenses.** Transportation expenses based on the lowest airfare or automobile mileage shall be paid by the Fraternity. In no case shall the automobile reimbursement exceed the cost of the lowest airfare. Automobile mileage expense shall be computed from home and, in some instances, from the chapter location.

2. **Housing Expenses.** Housing expenses shall include hotel accommodations or their equivalent.

3. **Other Expenses.** Other expenses shall be paid by the Fraternity as determined by Fraternity Council.

**B.** **Individuals Eligible for Covered Expenses.**

1. **Chapter and Association Delegates.** Transportation expenses shall be paid by the Fraternity for chapter and alumnae association delegates.

2. **Fraternity Representatives.** Transportation and housing expenses shall be paid by the Fraternity for Fraternity representatives designated by Fraternity Council. Fraternity officers, District Directors, Content Directors, and standing committee chairmen shall be considered Fraternity representatives.

3. **Kappa Kappa Gamma Headquarters Staff and Special Guests.** Transportation expenses and all other expenses for members of Kappa Kappa Gamma

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 300 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 203
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 119 of 209

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

Headquarters staff with assigned duties and special guests invited by Fraternity Council to attend the Convention shall be paid by the Fraternity.

4. **Extended Stay.** All expenses associated with an extended stay of Fraternity officers, directors, committee chairmen, members, staff, or guests asked by Fraternity Council to arrive prior to the start of or to stay after the conclusion of a Convention shall be paid by the Fraternity.

### 5.0 FRATERNITY COUNCIL

**5.1 Duties of Fraternity Council.**

A. **Financial Duties.** The financial duties of Fraternity Council shall include:
  1. Approving the annual budget;
  2. Adopting an investment policy statement;
  3. Reviewing annually the Fraternity tax returns; and
  4. Reviewing and accepting the annual audit report of the independent certified public accounting firm based on the recommendation from the Fraternity Finance Committee.

B. **Administrative Duties.** The administrative duties of Fraternity Council shall include:
  1. Developing and executing a strategic plan;
  2. Formulating Fraternity policies;
  3. Approving the engagement of the services of professional advisers;
  4. Interpreting the Fraternity *Bylaws* and *Standing Rules*;
  5. Appointing Fraternity members to all volunteer positions within the Fraternity, filling vacancies that occur, and removing members from appointed positions, if deemed necessary, by a three-fourths vote;
  6. Jurisdiction over all cases of loss of membership from the Fraternity and reinstatement;
  7. Jurisdiction over all cases of chapter standing;
  8. Employing the Executive Director and defining and supervising the duties of the position;
  9. Approving the selection of Alumnae Achievement Awards and Loyalty Award recipients;
  10. Approving the selection of Convention sites and the arrangements for a Convention;
  11. Reporting to the Biennial Convention all actions taken by Fraternity Council; and
  12. Giving a biennial report to the Biennial Convention that includes annual reports from District Directors, standing and special committees, Content Directors, and Kappa Kappa Gamma Headquarters.

C. **Other Duties**. Fraternity Council shall perform such other financial and administrative duties that may be dictated by the Convention or established in the Fraternity *Bylaws* and *Standing Rules* or as required in the management of the Fraternity.

**APP.199**

 **KAPPA KAPPA GAMMA FRATERNITY**
**STANDING RULES REVISION**

### 6.0 THE FRATERNITY

**6.1 Finance.**

  **A.** **Fiscal Year.** The fiscal year of the Fraternity, chapters, alumnae associations, house corporations, and house associations shall be from July 1 to June 30, inclusive.

  **B.** **Fraternity Operating Fund.**

    1. **Source of Funds.** The Fraternity operating fund shall receive income from new member fees, per capita fees, reinstatement fees, Convention registration fees, withdrawals from investments, gifts, bequests, memorials, and miscellaneous income.

    2. **Uses.** The Fraternity operating fund shall be used to maintain the Fraternity organization and its purpose, provide each member with a life subscription to *The Key*, and provide for Conventions. It may be used for loans as recommended by the Fraternity Finance Committee and may be lent, invested, donated, and administered for educational, social, endowment, philanthropic, and operational purposes.

  **C.** **Fees Payment.** Fees shall be payable to Kappa Kappa Gamma Fraternity and sent to Kappa Kappa Gamma Headquarters.

  **D.** **Bank Accounts.** All funds belonging to the Fraternity, the chapters, the alumnae associations, the house corporations, and the house associations shall be deposited in Federal Deposit Insurance Corporation or Canadian Deposit Insurance Corporation insured banking institutions or Security Investor Protection Corporations insured brokerage firms.

  **E.** **Budget Adjustments.** When necessary, budget adjustments shall be reviewed by the Finance Committee and approved by Fraternity Council.

  **F.** **Disbursements.** Disbursements shall be made in accordance with the annual budget of the Fraternity.

**6.2 Ritual.**

  **A.** **Ritual Changes.** Upon recommendation of Fraternity Council, changes in the ritual shall be submitted to the voting members of the Convention for approval.

  **B.** **Chapter Initiation of New Members.**

    1. Chapters may select the initiation ceremony in the *Book of Ritual* that meets the needs of the chapter. The initiation ritual in the *Book of Ritual* shall be used in its entirety by chapters and all pre- and post-initiation activities shall be dignified and constructive. Chapters may hold only one Initiation each term prior to the end of the academic year unless otherwise authorized by the Ritual and History Director. The active members of the chapter shall attend all services connected with Initiation unless excused in writing by a chapter adviser.

    2. At least two weeks before Initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

**APP.200**



KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

**6.3 Founders Day.** Every chapter and alumnae association shall observe Founders Day (October 13) in an appropriate manner.

**6.4 Publications.**
- **A.** ***The Key.*** *The Key* shall be the official magazine of the Fraternity.
- **B.** ***The Hoot.*** *The Hoot* shall be the official publication of a Convention.
- **C.** ***The Proceedings.*** *The Proceedings* shall be the biennial report of the activities of the Fraternity.

**6.5 Insignia, Fraternity Jewelry, and Symbols.**
- **A.** **Insignia.** The designs of the insignia belong to the Fraternity.
  1. **Badge of the Fraternity.** The badge of the Fraternity shall be a golden key, one inch in length with the Greek letters ΚΚΓ (Kappa Kappa Gamma) on the stem and ΑΩΟ (Alpha Omega Omicron) on the ward. A badge may either be plain or jeweled.
     - a. Only persons duly initiated shall wear the badge.
     - b. The badge shall be secured from firms authorized by Fraternity Council and only upon presentation of an official badge order issued by Kappa Kappa Gamma Headquarters or a member making provisions for the disposition of an official badge.
     - c. The badge shall be the emblem of membership. When membership is terminated or a member voluntarily resigns, the badge may be returned to Kappa Kappa Gamma Headquarters. The badge shall not be sold or transferred to a nonmember.
     - d. Members shall be urged to obtain genuine badges found in the possession of nonmembers and send the badges to Kappa Kappa Gamma Headquarters.
     - e. Each member shall make provisions for the disposition of their badge upon their death. The badge shall be returned to Kappa Kappa Gamma Headquarters, left to another member of the Fraternity, chapter or alumnae association, or buried with the member.
  2. **Coat-of-Arms.** The Fraternity Coat-of-Arms is described as follows:
     - a. The shield shall be azure, bearing in the honor point the golden key of the Fraternity and a golden owl in the middle base. These two charges are separated by a chevron of silver on which lie three fleurs-de-lis of azure.
     - b. The crest shall be a wreath of azure and silver resting on the helmeted head of Minerva, thereon a Sigma in Delta in azure hues.
     - c. The motto shall be the Greek letters ΚΚΓ (Kappa Kappa Gamma) in silver, resting on a ribbon of azure.
     - d. The mantling shall be silver and azure.
  3. **Fraternity Council Badge.** The official badge worn by Fraternity Council members shall be a flat, polished golden award key, one and one-quarter inch in length and three-eighths of an inch wide.

**APP.201**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 303 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 206
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 122 of 209

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

    a. The badge shall be the emblem of Fraternity Council membership.

    b. Only members who have served or are serving on Fraternity Council shall wear the badge.

    c. The badge worn by the Fraternity President shall be set with white diamonds, including one white diamond in the center of the handle and the Greek letters KKΓ (Kappa Kappa Gamma) incised in black enamel on the stem. A gold new member pin with three white diamonds shall be attached as a guard to the badge. The badge shall be worn by the President during their term of office and passed on to their successor.

    d. The badge worn by other Fraternity Council members shall be set with blue jewels, including one blue jewel in the center of the handle and the Greek letters KKΓ (Kappa Kappa Gamma) incised in black enamel on the stem. The Fraternity Council member shall retain the badge following their term of office on Fraternity Council.

    e. Each member of Fraternity Council shall have the emblem of their position attached to the stem of their badge.

4. **New Member Pin.** The new member pin of the Fraternity shall be a Delta of dark blue enameled on silver, one-half of an inch on each side, enclosing a Sigma of light blue enamel. Only a person pledged to membership in the Fraternity shall wear it.

5. **Recognition Pin.** The official recognition pin shall be a golden key, five-eighths of an inch in length, with the Greek letters KKΓ (Kappa Kappa Gamma) on the stem.

6. **Official Emblems.** Official emblems of office shall be purchased at the expense of the Fraternity for the members who hold the following positions: Fraternity Council member, National Panhellenic Conference Delegate, Editor of *The Key,* and the Executive Director. The emblem of the position shall be attached to the stem of the badge.

7. **Official Emblem for District Directors.** The District Directors shall have an emblem of their position attached as a guard to their District Director badges. The badges and guards shall be provided by the Fraternity for District Directors to wear during their term of office.

8. **Official Emblem for Content Directors.** Content Directors shall have an emblem of their position attached as a guard to their Content Director badges. The badges and guards shall be provided by the Fraternity for Content Directors to wear during their term of office.

B. **Fraternity Jewelry.** The Fraternity jewelry shall be limited to the badge of the Fraternity, Fraternity Council badge, new member pin, recognition pin, Coat-of-Arms, and articles decorated with the Coat-of-Arms. The Executive Director shall authorize the production and sale of Fraternity jewelry.

C. **Symbols of the Fraternity.**

    1. **Colors.** The colors shall be light blue and dark blue.

    2. **Flower.** The flower shall be the fleur-de-lis.

    3. **Jewel.** The jewel shall be the blue sapphire.

**APP.202**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 304 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 207
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 123 of 209

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

4. **Seal.** The seal shall be an arch of seven stones supported by two fluted columns with Corinthian caps. The keystone shall display the badge of Kappa Kappa Gamma and the base of each column, the Greek letters ΚΚΓ (Kappa Kappa Gamma) and each pedestal ΑΩΟ (Alpha Omega Omicron). Between upper thirds of the columns shall be a volant dove bearing a twig. Between the bases of the columns shall be an open scroll upon a laurel wreath. All shall be placed within a circular border bearing the phrase "Grand Seal of Kappa Kappa Gamma."

5. **Banner.** The banner shall be a vertical, dovetailed white satin banner measuring three feet at the widest point, tapering to two feet at the dovetail. The length shall be five feet. Three fleurs-de-lis of varying hues of blue shall be centered upon the field of white and overlaying them shall be the golden key of Kappa Kappa Gamma appliquéd in full detail. Fringe of gold or white shall outline the dovetail of the banner.

### 7.0 PROCEDURES

**7.1 Leadership Selection Committee Appointment.**

A. **Application Process.** Collegiate and alumna representatives shall be recommended by Leadership Education and Development Committee to Fraternity Council for appointment to the Leadership Selection Committee following an application process.

   1. **Call for Applications.** Following Convention, the committee shall send requests to all chapters, associations, and members seeking applicants interested in serving on the Leadership Selection Committee.

   2. **Submitting Applications.** Any member wishing to serve on the Leadership Selection Committee shall submit an application to the Leadership Education and Development Committee by the date specified in the call for applications.

B. **Committee Review Considerations.** In reviewing the applications, consideration should be given to diversity in the composition of the committee by geography, chapter and association size, campus size and type, leadership qualities, experiences, commitment, and ability to consider the best interests of the Fraternity.

C. **Recommendations to Fraternity Council.** Following the application and review process, the Leadership Education and Development Committee shall send its recommendations to Fraternity Council for appointment to the Leadership Selection Committee.

**7.2 Member Probation.**

A. **New Member Probation.** A new member may be placed on Probation for any of the following reasons: low scholarship, poor academic attitude, violations of the purposes or standards of the Fraternity, failure to meet the Fraternity requirements for initiation, failure to meet financial obligations, violations of the regulations of the college or university, or violations of state, federal, or provincial law.

   1. **Probation Process.** A new member, after being informed of the reasons for the proposed Probation and given the opportunity to appear before the Standards Committee, may be placed on Probation by one of the following methods:

      a. The Standards Committee may impose Probation by a three-fourths vote.

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

  b. A chapter, upon referral from the Standards Committee, may impose Probation by a three-fourths vote.

  c. A member of Fraternity Council, the respective District Director, or the Standards Director may impose Probation. The new member and the Vice President Standards shall be notified of this action.

2. **Term of Probation.** The probationary period of a new member shall be for a specified period not less than two weeks nor more than six weeks. At the end of the time specified, Probation shall be removed or extended or the pledge to membership shall be broken. Extension of Probation may be granted for a specified period of no more than six weeks.

3. **Notification.** The Vice President Standards shall immediately complete a report of the case with the action taken and send it to the Standards Specialist and the Standards Director. The Standards Specialist and Standards Director shall be kept advised of any further action or information pertinent to the case.

4. **Status of a New Member on Probation.** A new member on Probation shall be under the supervision of the Standards Committee. The pin of a new member on Probation may be surrendered to the chapter President if the chapter so desires. No new member shall be initiated into membership while on Probation.

5. **Removal or Extension of Probation.**

  a. If the Standards Committee imposed Probation, the committee shall vote upon removal or extension of Probation. A three-fourths vote of the committee shall be necessary to remove or extend Probation. If after a member has completed two weeks of the probationary period and the Standards Committee determines the member has completed all probationary terms, the committee may vote to remove Probation early by a three-fourths vote.

  b. If the chapter imposed Probation, the chapter shall vote upon removal or extension of Probation. A three-fourths vote of the chapter shall be necessary to remove or extend Probation. The chapter may vote upon removal at any time after two weeks.

  c. If a Fraternity Council member, District Director, or the Standards Director imposed Probation, that member may remove or extend Probation at the end of the specified time. If a Fraternity Council member, District Director, or the Standards Director who imposed Probation refuses to remove Probation, the chapter may appeal such action to Fraternity Council, after a majority vote. A majority vote of Fraternity Council shall be necessary to remove Probation.

  d. Action leading to the breaking of the pledge to membership may begin if the terms of Probation are violated before the end of the specified time. The Standards Director must grant approval.

6. **Broken Pledge to Membership.** With prior approval of the Standards Director in consultation with the Standards Specialist, a pledge to membership may be broken with or without prior Probation by a three-fourths vote of the chapter.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 306 of 506

Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 209
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 125 of 209

 **KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION**

    a.  The new member has violated the purposes or standards of the Fraternity or the regulations of the college or university, has been informed of the proposed reasons for breaking their pledge to membership, and has been given the opportunity to appear before the Standards Committee. The Standards Committee may recommend action be taken.

    b.  A new member whose pledge to membership has expired or has been broken shall not enjoy the privileges of a new member. If the new member whose pledge to membership has expired or been broken is living in the house, House Board shall be notified that the individual is no longer a new member.

    c.  The pin of a new member whose pledge to membership has been broken shall be surrendered to the chapter President.

    d.  If the chapter refuses to break the pledge to membership and the Standards Committee, upon review of the case, believes that such action is required for the welfare of the chapter, the Standards Committee shall report its findings with the result of the chapter vote to the Standards Specialist with notification to the Standards Director for such action as Fraternity Council deems advisable.

**B.**  **Active Member Probation.** An active member of a chapter may be placed on Probation for any of the following reasons: violation of member responsibilities, failure to adhere to the chapter documents, poor academic attitude, or failure to meet the requirements of an academic support plan.

    1.  **Investigation.** If a member fails to uphold member responsibilities and expectations or upon complaint by a chapter committee, chapter officer, House Director, member of the Fraternity, or official of the college or university, the Standards Committee shall conduct an investigation.

    2.  **Probation Imposed by the Standards Committee.**

        a.  If the Standards Committee believes an active member should be placed on Probation, after informing the member of the reasons for the proposed Probation and having been given an opportunity to appear before the committee, the committee may impose Probation by a three-fourths vote. The committee may submit a statement giving the reason(s) for this action to the chapter.

        b.  The length of such Probation shall be for a specified period not less than two weeks nor more than 10 weeks as determined by the Standards Committee or, with the approval of the Standards Director in consultation with the Standards Specialist, for a period of up to six months.

    3.  **Probation Imposed by the Chapter.**

        a.  If the Standards Committee considers it advisable, it shall recommend to the chapter that the active member be placed on Probation and notify the Standards Specialist.

**APP.205**

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

  b. The active member shall be informed of the reason(s) for the proposed Probation and shall be given the opportunity to respond in person or in writing at the meeting of the chapter. A three-fourths vote of the chapter shall be necessary to impose Probation.

  c. The length of Probation shall be for a specified period not less than two weeks or, with the approval of the Standards Director in consultation with the Standards Specialist, for a period over 10 weeks and up to six months.

4. **Probation Imposed by a Fraternity Council Member, a District Director, or the Standards Director.**

  a. If a member of Fraternity Council, a District Director, or the Standards Director believes that an active member should be placed on Probation, that member may require the chapter to vote on the question.

  b. If the chapter vote is negative, a Fraternity Council member, a District Director, or the Standards Director may impose Probation. The chapter shall be notified of this action.

  c. The length of Probation shall be for a specified period not less than two weeks or, with the approval of the Standards Director in consultation with the Standards Specialist, for a period over 10 weeks and up to six months.

5. **Notification.** Immediately after an active member has been placed on Probation, the Vice President Standards shall send a complete report of the case with the action taken to the Standards Specialist and the Standards Director. The Standards Specialist and Standards Director shall be kept advised of any further action or information pertinent to the case, including notification of the termination of Probation.

6. **Status of an Active Member on Probation.** An active member who has been placed on Probation shall be under the supervision of the Standards Committee. An active member on Probation shall be required to attend chapter meetings, Initiations, and such other functions the Standards Committee deems advisable. The member may not hold office or vote during the term of Probation unless granted an exception.

7. **Removal or Extension of Probation.**

  a. **Probation imposed by the Standards Committee:**

    i. If after a member has completed two weeks of their probationary period and the Standards Committee determines the member has completed all probationary terms, the committee may vote to remove Probation early. A three-fourths vote of the committee shall be necessary to remove Probation.

    ii. Provided the Standards Committee has not previously removed Probation, the Standards Committee may remove or extend Probation at the end of the probationary period. Probation may be extended for no less than two weeks but no more than six

**APP.206**



**KAPPA KAPPA GAMMA FRATERNITY**
**STANDING RULES REVISION**

weeks by a three-fourths vote. Probation may be removed by a three-fourths vote. If a three-fourths vote for removal is not obtained, the Standards Committee shall recommend to the chapter that a vote be taken on removal of Probation. A three-fourths vote of the chapter shall be necessary to remove Probation.

    iii.  If the probationary terms are violated before the end of the probationary period, the Standards Committee, with approval of the Standards Director in consultation with the Standards Specialist, may request the resignation of the member or recommend dismissal.

**b.**  **Probation imposed by the chapter:**

    i.  At the end of the probationary period, the chapter may remove or extend Probation. Probation may be extended once for no less than two weeks but no more than six months by a three-fourths vote. Probation may be removed by a three-fourths vote.

    ii.  At any time after two weeks and prior to the expiration of the probationary period, the chapter may review the progress and vote to remove Probation.

    iii.  If the probationary terms are violated before the end of the specified time, the Standards Committee, with the approval of the Standards Director in consultation with the Standards Specialist, may request the resignation of the active member or recommend dismissal.

**c.**  **Probation imposed by a Fraternity Council member, a District Director, or the Standards Director:**

    i.  At the end of the probationary period, the one who imposed Probation shall either remove or extend Probation.

    ii.  A request that Probation is removed may be made by a majority vote of the chapter. If the one who imposed Probation refuses to remove Probation upon request of the chapter, an appeal may be made to Fraternity Council. A majority vote of Fraternity Council shall be necessary to remove Probation.

    iii.  If the probationary terms are violated before the end of the specified time, with the approval of the Standards Director in consultation with the Standards Specialist, action leading to a requested resignation or dismissal may begin.

d.  If a member leaves school before Probation has expired, the Standards Specialist and the Standards Director shall be notified and shall review the case and present it to Fraternity Council for a vote on the question of the status of the member.

**APP.207**

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 309 of 506
Appellate Case: 23-8065     Document: 010110962640     Date Filed: 12/04/2023     Page: 212
Case 2:23-cv-00051-ABJ     Document 6-1     Filed 04/20/23     Page 128 of 209

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

8. **Refusal to Remove Probation.** If the removal of a Probation has been refused after six months, the Standards Specialist and Standards Director shall be immediately notified and action for dismissal may proceed.

**7.3 Voluntary Resignation Procedure.**
   A. **Active Member.**
   1. **Written Request to an Active Chapter.** A member of an active chapter wishing to resign from membership shall present the chapter with a written and dated letter stating the reason(s) for such action. The member shall be given 10 days to reconsider or withdraw their resignation. If the member has not withdrawn the letter of resignation at the expiration of 10 days, a vote shall be taken upon the question of resignation. The Vice President Standards shall send the written statement of resignation and the dated report of the chapter vote to Kappa Kappa Gamma Headquarters.
   2. **Written Request for a Nonfunctioning Chapter.** If a chapter is not currently functioning, the active member wishing to resign from membership shall present a written and dated letter to the Standards Director stating the reason(s) for the request. The member shall be given 10 days to reconsider their resignation. If the member has not withdrawn the letter within the allotted time, Fraternity Council shall accept the resignation.
   3. **Return of Fraternity Property.** The member may surrender their badge and certificate of membership and shall surrender all Fraternity proprietary materials to the chapter President. If the badge and certificate have been surrendered and the member has voluntarily resigned, the chapter President shall send the badge and certificate of membership to Kappa Kappa Gamma Headquarters.
   B. **Associate or Alumna Member.**
   1. **Written Request.** An associate or alumna member wishing to resign from membership in the Fraternity shall present a written, dated letter stating the reason(s) for such request to the Standards Director. The member shall be given 10 days for reconsideration and withdrawal of the request. If the member has not withdrawn their letter within the allotted time, Fraternity Council shall accept the resignation.
   2. **Action Taken.** Notice of the action taken shall be sent to the member and Kappa Kappa Gamma Headquarters.
   3. **Return of Fraternity Property.** The member may surrender their badge and certificate of membership and shall surrender all Fraternity proprietary materials to Kappa Kappa Gamma Headquarters.

**7.4 Requested Resignation and Dismissal.**
   A. **Active Member.** In the cases where a member violates their member responsibilities, the chapter, with the approval of the Standards Director, and when appropriate, the Content Director most closely related to the member violation, in consultation with the

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

Standards Specialist, may take immediate action to request a member submit their resignation or recommend that Fraternity Council dismiss the member.

1.  **Refusal of a Requested Resignation or Dismissal.** If a chapter refuses to accept a requested resignation or fails to recommend dismissal of a member and the Standards Committee, upon review of the case, believes such action is appropriate, the Standards Committee shall vote upon the question to report its findings and recommendations with the result of the chapter vote to the Standards Specialist and the Standards Director for presentation to Fraternity Council for such action as Fraternity Council deems advisable.

2.  **Fraternity Council Procedure for Dismissal if Refused by a Chapter.** Fraternity Council shall review and act upon all cases of dismissal from membership initiated by a chapter or a Standards Committee.

    a.  The Standards Specialist shall request a report on the case from the Standards Committee and notify the Standards Director.

    b.  The Standards Director shall notify the member in writing that the member has been suspended pending action by Fraternity Council and that the member may submit a written response to the Standards Director within a stated period. The Standards Director shall also notify the chapter, the District Director, the Standards Specialist, and the Executive Director that:

        i.  Action for dismissal is pending;

        ii.  The member has been suspended; or

        iii.  The member has received a written notice of the proposed dismissal.

    c.  Upon receiving the notice of Suspension, the member shall have no privileges of membership in the Fraternity.

    d.  At the expiration of the time allotted for the member's response, the Standards Director, after consultation with the Standards Specialist, shall send a summary of the case, including a copy of the member's response (if any), to each member of Fraternity Council. A three-fourths vote of Fraternity Council shall be necessary to dismiss the member.

    e.  The Executive Director shall send the member a notice of the action taken by Fraternity Council. The Executive Director also shall send notice to the District Director, the Standards Director, the Standards Specialist, and the chapter.

    f.  If a three-fourths vote of Fraternity Council is not obtained, Fraternity Council shall make such recommendations to the chapter as it considers appropriate.

    g.  Upon dismissal, the member may surrender their badge and certificate and shall surrender all proprietary materials to the chapter President. If the badge and certificate have been surrendered, the chapter President shall send the badge and certificate of membership to Kappa Kappa Gamma Headquarters.

**APP.209**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 311 of 506

Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 214
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 130 of 209

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

B.  **Associate or Alumna Member.** An associate or alumna member may be dismissed for violations of the member responsibilities.

  1.  **Written Complaint.** Any complaint concerning an associate or alumna member shall be made by a member in writing to the Standards Director.

  2.  **Investigation**. The Standards Director shall make such investigations as may be deemed necessary**.** If the Standards Director determines that the complaint sets forth grounds for dismissal, the complaint shall be presented to Fraternity Council.

  3.  **Notification.** If dismissal may be justified, the Standards Director shall notify the member of the reasons for the proposed dismissal and that the member may respond in writing within a stated period.

  4.  **Vote.** Fraternity Council shall vote on the dismissal of an alumna or an associate member who has transferred and not affiliated with a new chapter. In the case of an associate member who is still affiliated with a chapter, the chapter shall vote on dismissal and then send the recommendation to Fraternity Council. Prior to the date of the vote, the member or the chapter may present a written response to the Standards Director. A three-fourths vote of Fraternity Council (and the chapter in the case of an associate member affiliated with a chapter) shall be necessary to dismiss the member.

  5.  **Action Taken.** The Executive Director shall send the member a notice of the action taken by Fraternity Council.

      a.  **Associate Member.** The Executive Director shall send the member a notice of the action taken by Fraternity Council and shall also send a notice to the District Director, the Standards Director, the Standards Specialist, and the chapter.

      b.  **Alumna Member.** The Executive Director shall send the member a notice of the action taken by Fraternity Council and shall also send a notice to the District Director, the Standards Director, the Standards Specialist, and the President of the local alumnae association.

  6.  **Return of Fraternity Property.**  The member who is dismissed may surrender the Fraternity badge and certificate of membership and shall surrender all proprietary materials to Kappa Kappa Gamma Headquarters.

**7.5 Establishing a New Chapter.**

A.  **Fraternity Council Decision to Establish a New Chapter.**

  1.  **Directed by Fraternity Council.** Fraternity Council and the District Director of the district involved in the receipt of an extension report shall vote on the question of proceeding with the establishment of a new chapter.

  2.  **Establishment by Petition.** If the chapter will be established by petition, Fraternity Council shall request the group possessing the qualifications for membership to send a letter of petition signed by members of the group.

  3.  **Housing Requirement.** If chapter housing is required as part of the extension process, the Finance Committee shall also file a report prior to the vote.

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

    4. **Vote Required.** A three-fourths vote is required for Fraternity Council to proceed with plans to establish a new chapter.

**B.** **Initiation Into Membership in a New Chapter.**

    1. All those whose names appear on the petition and all those pledged to membership in a new chapter shall be initiated as charter members, provided they have fulfilled the requirements of the College Panhellenic Association and the Fraternity. A petitioner or a new member of a new chapter not initiated at the time of the installation of the chapter may be initiated at a later date as a charter member at the discretion of Fraternity Council.

    2. Other collegiate members of a petitioning group may be initiated, provided they possess the qualifications for membership and have fulfilled the requirements for initiation. They shall become the first initiates of the new chapter.

    3. At the discretion of Fraternity Council, alumna members or sponsors of the petitioning organization may be initiated, provided such alumnae or sponsors have completed at least one year in the college or university, completed a period of Fraternity education, and met their financial obligations.

    4. Alumnae who did not attend the installation or first initiation may be initiated within a period of time established by Fraternity Council for such initiations. Some other chapter, specified by Fraternity Council, may initiate alumna members of a group that becomes a chapter. Such alumnae, initiated by proxy, shall become members of the original chapter.

**7.6 Chapter Standing.**

**A.** **Chapter Accountability.** If Fraternity Council believes a chapter is not maintaining adequate standards in the areas of scholarship, conduct, or finance, or is failing to fulfill chapter responsibilities or reporting obligations, an investigation of the situation with appropriate follow-up shall be required.

    1. **Procedures.**

        a. Fraternity Council shall direct that an investigation be conducted.

        b. After reviewing the investigation report, a three-fourths vote of Fraternity Council shall be necessary to place a chapter on a Warning of Probation, Probation, or Suspension.

        c. Each of these actions is independent and need not be applied sequentially.

    2. **Warning of Probation.**

        a. If Fraternity Council places a chapter on a Warning of Probation, Fraternity Council shall approve the expected improvement, period, and terms of the Warning of Probation.

        b. The Fraternity President shall send the chapter a written notice of such warning.

        c. The chapter's progress shall be evaluated on an ongoing basis under the direction of the District Director in consultation with Kappa Kappa Gamma Headquarters staff.

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 313 of 506
Appellate Case: 23-8065   Document: 010110962640   Date Filed: 12/04/2023   Page: 216
Case 2:23-cv-00051-ABJ   Document 6-1   Filed 04/20/23   Page 132 of 209



KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

     d. At the end of the period, the District Director, in consultation with Kappa Kappa Gamma Headquarters staff, shall provide a report to Fraternity Council and Fraternity Council shall determine if the terms have been met.

     e. A three-fourths vote of Fraternity Council shall be required to remove or extend the Warning of Probation, place the chapter on another action, or begin proceedings for the removal of the chapter.

3. **Probation.**

     a. If Fraternity Council places a chapter on Probation, Fraternity Council shall approve the expected improvement, period, and probationary terms.

     b. The Fraternity President shall send the chapter a written notice of such Probation.

     c. The chapter's progress shall be evaluated on an ongoing basis under the direction of the District Director in consultation with Kappa Kappa Gamma Headquarters staff.

     d. At the end of the period, the District Director in consultation with Kappa Kappa Gamma Headquarters staff shall provide a report to Fraternity Council and Fraternity Council shall determine if the terms have been met.

     e. A three-fourths vote of Fraternity Council shall be required to remove or extend Probation, place the chapter on another action, or begin proceedings for the removal of the chapter.

4. **Suspension.**

     a. If Fraternity Council votes to suspend the chapter, Fraternity Council shall determine the period, terms, and status of members of the chapter.

     b. The Fraternity President shall send the chapter a written notice of such Suspension.

     c. While a chapter is suspended, campus conditions shall be monitored.

     d. At the end of the period by a three-fourths vote, Fraternity Council shall remove or extend the Suspension, place the chapter on another action, or begin proceedings for the removal of the chapter.

     e. Requirements During Chapter Suspension. The chapter shall fulfill the following requirements during Suspension.

        i. **Chapter Responsibilities.** The chapter shall pay all financial obligations, transfer chapter assets according to the current Fraternity financial policies, and send the chapter's charter, records, and archives to Kappa Kappa Gamma Headquarters.

        ii. **House Corporation or House Association Responsibilities.** The house corporation or house association shall make satisfactory arrangements to settle all financial obligations, including mortgages due to the Fraternity or guaranteed by the Fraternity.

**APP.212**

 **KAPPA KAPPA GAMMA FRATERNITY STANDING RULES REVISION**

They shall convey assets of the house corporation or house association according to the current Fraternity financial policies.

5. **Notification.**
   a. **Warning of Probation.** A notice shall be sent to each member of Fraternity Council, the District Director of the district where the chapter is located, each Content Director, the Content Specialists of the district where the chapter is located, standing committee chairmen, each Advisory Board member of the chapter, each House Board member of the chapter, and the leadership of the local alumnae association(s).
   b. **Probation and Suspension.** A notice shall be sent to each member of Fraternity Council, the District Director of the district where the chapter is located, each Content Director, the Content Specialists of the district where the chapter is located, standing committee chairmen, each Advisory Board member of the chapter, each House Board member of the chapter, each alumna member of the chapter, and the leadership of the local alumnae association(s).

B. **Removal of Chapter.** Fraternity Council shall initiate and supervise the removal of a chapter. A chapter may or may not have been on a Warning of Probation, Probation, or Suspension prior to the vote of Fraternity Council to proceed with removal.

1. **Reasons for Removal.** The process may be initiated for any of the following reasons.
   a. If a chapter fails to show sufficient evidence of the improvement required at the close of a Warning of Probation, Probation, or Suspension.
   b. If a chapter fails to comply with the requirements and procedures of the Fraternity *Bylaws*, *Standing Rules*, and *Policies.*
   c. If the general conditions of a chapter are below the standards of the Fraternity after efforts to improve have failed.
   d. If the best interests of the Fraternity will be served by the removal of a chapter.

2. **Unfavorable Conditions.** If circumstances exist within a chapter or in a college or university that make the continuance of a chapter undesirable, a Fraternity representative(s) shall contact the chapter and the administration of the college or university where the chapter is located to make an investigation of conditions that may warrant removal of the chapter. A report shall be made to Fraternity Council.

3. **Initiating the Removal of a Chapter by Fraternity Council.**
   a. Upon consideration of the report, Fraternity Council shall vote on the question of initiating the procedure for removal of the chapter. A three-fourths vote shall be required.
   b. A member of Fraternity Council or the District Director of the district where the chapter is located shall notify the chapter in person of Fraternity Council's decision to proceed with the removal of the chapter.

**APP.213**

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

If in-person notification is not possible due to extenuating circumstances, an alternate notification method may be used instead.

c.  The Executive Director shall send a notification of the action taken by Fraternity Council that details the reasons for the action and the date set for the vote on the removal of the chapter to each District Director, each Content Director, each Content Specialist in the district where the chapter is located, standing committee chairmen, each Advisory Board member of the chapter, each House Board member of the chapter, and each alumna member of the chapter.

4.  **Vote to Remove a Chapter.**

a.  Those entitled to vote on the removal of a chapter shall be each District Director, each Content Director, each Content Specialist in the district where the chapter is located, and each standing committee chairman. A three-fourths vote shall be required.

b.  Notice shall be sent to those members eligible to vote at least 30 days prior to the date for the close of voting. The notice shall include the reasons for the action and the date(s) for voting.

c.  Voting may be conducted by mail or by utilizing an internet-based electronic voting system.

i.  **Mail**. The official ballot and voting instructions shall be mailed at least 14 days prior to the date set for the return of the ballot.

ii.  **Electronic Voting System**. Instructions for voting shall be sent 14 days in advance of the final day for voting.

d.  The Executive Director shall be responsible for all acts that are necessary, desirable, or appropriate to conduct the vote and to report the results to Fraternity Council, consulting with the Fraternity's legal counsel in performing these duties as may be necessary.

5.  **Notification.**

a.  If the required vote for the removal of a chapter is obtained, the chapter shall be deemed removed without further action by the Fraternity as of the date on which the Executive Director certifies the result or such other date, if any, specified in the ballot.

b.  The Executive Director shall, upon certifying the result, immediately send a notice of removal of the chapter that includes the result of the vote to each collegiate member of the chapter, each alumna member of the chapter, each Advisory Board member of the chapter, each House Board member of the chapter, each member of Fraternity Council, each District Director, each Content Director, each Content Specialist, standing committee chairmen, special committee chairmen, each chapter President, each alumnae association President, the administration of the college or university where the chapter is located, and others as determined by Fraternity Council.

 KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

    c.  If a three-fourths affirmative vote is not obtained, the Executive Director shall immediately send the results of the vote to each member of Fraternity Council, each District Director, each Content Director, each Content Specialist in the district, standing committee chairmen, each Advisory Board member of the chapter, each House Board member of the chapter, each collegiate member of the chapter, and each alumna member of the chapter with notification from Fraternity Council stating the status of the chapter.

6.  **Status During Removal.** During removal, the chapter shall be ineligible to recruit for membership in the Fraternity, initiate members into the Fraternity, or be represented by a delegate to a Convention.

7.  **Requirements During Chapter Removal.** The chapter shall fulfill the following requirements during removal.

    a.  **Chapter Responsibilities.** The chapter shall pay all financial obligations, transfer chapter assets according to the current Fraternity financial policies, and the District Director shall take charge of the chapter's charter and archives and transfer them to Kappa Kappa Gamma Headquarters.

    b.  **House Corporation or House Association Responsibilities.** The house corporation or house association shall make satisfactory arrangements to settle all financial obligations, including mortgages due to the Fraternity or guaranteed by the Fraternity. It shall convey assets of the house corporation or house association according to the current Fraternity financial policies.

### 8.0 AMENDMENTS

**8.1 Amendment of Standing Rules.** These standing rules may be amended at any Convention by a majority vote provided that the amendment has been submitted in writing with a notice of three months prior to Convention or by a two-thirds vote without notice.

# # #

**APP.215**



KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

**Amendments............................................25**
   Amendment of Standing Rules ............ 25
**Conventions ............................................ 6**
   Convention Agenda................................. 7
   Convention Committees ......................... 8
      Appointment of Convention
         Committees.................................. 8
      Courtesy Resolutions Committees...... 8
      Credentials Committees ..................... 8
      Resolutions Committees ..................... 8
      Tellers Committees ............................. 8
   Convention Expenses .............................. 8
      Covered Expenses ............................... 8
         Housing Expenses ........................... 8
         Other Expenses .............................. 8
         Transportation Expenses ................ 8
      Individuals Eligible for Covered
         Expenses........................................ 8
         Chapter and Association Delegates 8
         Extended Stay ................................. 9
         Fraternity Representatives ............. 8
         Kappa Kappa Gamma Headquarters
          Staff and Special Guests.............. 8
   Credentialed Delegates........................... 6
      Approved Delegates............................ 6
      Delegate Accrediatation ..................... 6
      Delegate Attendance ......................... 6
   Organization of the Convention.............. 6
**Duties of Committees and Other**
**  Appointed Positions.............................. 3**
   Duties of a Content Director .................. 5
   Duties of a Content Specialist ................ 6
   Duties of Standing Committees ............. 4
      Bylaws ................................................ 4
      Convention ......................................... 4
      Finance ............................................... 4
      Leadership Education and
        Development.................................... 5
      Panhellenic Affairs ............................. 5
      *The Key* Publication............................ 5
**Duties of Committees And Other**
**  Appointed Positions**

      Duties of a Standing Committee
        Chairman............................................. 3
**Duties of Fraternity Officers and District**
**  Directors ................................................ 2**
   Duties of a District Director .................. 3
   Duties of a Vice Preisdent ...................... 2
   Duties of All Fraternity Officers ............. 2
   Duties of the President .......................... 2
   Duties of the Treasurer .......................... 2
**Fraternity Council .................................... 9**
   Duties of Fraternity Council ................... 9
      Administrative Duties ......................... 9
      Financial Duties .................................. 9
      Other Duties....................................... 9
**Members, Chapters, and Associations...... 1**
   Alcohol and Drugs ................................. 1
      Alumna Functions .............................. 1
      Chapter and Association Events ......... 1
      Chapter Facilities................................ 1
   Alumnae Candidate Selection................. 1
   Association Archives ............................... 1
   Chapter Archives ................................... 1
   **Collegiate New Member Selection** ........ 1
   Submitting Grade Verification ............... 1
**Procedures ............................................. 13**
   Chapter Standing ................................. 21
      Chapter Accountability .................... 21
        Notification ................................ 23
        Probation ................................... 22
        Procedures ................................. 21
        Suspension ................................. 22
        Warning of Probation ................. 21
      Removal of Chapter ......................... 23
        Initiating the Removal of a Chapter
         by Fraternity Council................ 23
        Notification ................................ 24
        Reasons for Removal ................... 23
        Requirements During Chapter
         Removal .................................... 25
         Chapter Responsibilities ........... 25
         House Corporation or House
          Association Responsibilities.. 25



KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

Status During Removal.................. 25
Unfavorable Conditions ............... 23
Vote to Remove a Chapter........... 24
Establishing a New Chapter
Fraternity Council Decision to Establish
a New Chapter ............................. 20
Directed by Fraternity Council ...... 20
Establishment by Petition ............. 20
Housing Requirement ................... 20
Vote Required ............................... 21
Initiation Into Membership in a New
Chapter.......................................... 21
Establishing a New Chapter ............... 20
Leadership Selection Committee
Appointment ...................................... 13
Application Process........................... 13
Committee Review Considerations .. 13
Recommendations to Fraternity
Council............................................... 13
Member Probation ............................... 13
Active Member Probation ............... 15
Investigation................................. 15
Notification ................................... 16
Probation Imposed by a Fraternity
Council Member, a District
Director, or the Standards
Director ........................................ 16
Probation Imposed by the Chapter
.................................................... 15
Probation Imposed by the Standards
Committee .................................... 15
Refusal to Remove Probation ....... 18
Removal or Extension of Probation
.................................................... 16
Status of an Active Member on
Probation ..................................... 16
New Member Probation .................. 13
Broken Pledge to Membership ..... 14
Notification ................................... 14
Probation Process ........................ 13
Status of a New Member on
Probation ..................................... 14
Term of Probation......................... 14

Removal or Extension of Probation .. 14
Requested Resignation and Dismissal .. 18
Active Member ................................ 18
Fraternity Council Procedure for
Dismissal if Refused by a Chapter
.................................................... 19
Refusal of a Requested Resignation
or Dismissal ................................. 19
Associate or Alumna Member .......... 20
Action Taken ................................. 20
Investigation................................. 20
Notification ................................... 20
Return of Fraternity Property ....... 20
Vote.............................................. 20
Written Complaint ........................ 20
Voluntary Resignation Procedure........ 18
Active Member ................................ 18
Return of Fraternity Property ....... 18
Written Request to a
Nonfunctioning Chapter ........... 18
Written Request to an Active
Chapter........................................ 18
Associate or Alumna Member .......... 18
Action Taken ................................. 18
Return of Fraternity Property ....... 18
Written Request............................ 18
The Fraternity........................................ 10
Finance ................................................. 10
Bank Accounts.................................. 10
Budget Adjustments ........................ 10
Disbursements ................................. 10
Fees Payment ................................... 10
Fiscal Year......................................... 10
Fraternity Operating Fund ............... 10
Source of Funds............................ 10
Uses.............................................. 10
Founders Day ........................................ 11
Insignia, Fraternity Jewelry, and Symbols
.................................................... 11
Badge of the Fraternity..................... 11
Coat-of-Arms.................................... 11
Fraternity Council Badge.................. 11
Fraternity Jewelry ............................ 12

**APP.217**



KAPPA KAPPA GAMMA FRATERNITY
STANDING RULES REVISION

New Member Pin ............................... 12
Official Emblem for Content Directors
........................................................ 12
Official Emblem for District Directors 12
Official Emblems ............................... 12
Recognition Pin ................................. 12
Symbols of the Fraternity ................. 12
   Banner ........................................... 13
   Colors ............................................ 12
   Flower ........................................... 12

Jewel ............................................... 12
Seal .................................................. 13
Publications ...................................... 11
*The Hoot* ........................................... 11
*The Key* ............................................. 11
*The Proceedings* .............................. 11
Ritual ................................................ 10
   Chapter Initiation of New Members . 10
   Ritual Changes................................. 10

**APP.218**

# ATTACHMENT 8

Appellate Case: 23-8065 Case 2:23-cv-00051-ABJ Document 06-1 26 Filed 04/20/23 Date Filed: 04/20/2023 Page: 224 Page 41 of 209

# Policies of
# Kappa Kappa Gamma Fraternity



Adopted by Fraternity Council in **February 2023.**

The Kappa Kappa Gamma Fraternity *Policies* are not to be shared with the public.
Contact the Fraternity Executive Director if there is a request for a copy of the Fraternity *Policies*.

 **FRATERNITY POLICIES**

Policy I Advisory Boards ........................................................................................ 1
Policy II Alumnae Associations ............................................................................. 2
Policy III Chapters.................................................................................................. 3
Policy IV Chapter Events ....................................................................................... 5
Policy V Chapter Facilities .................................................................................... 6
Policy VI Finance and Fundraising........................................................................ 9
Policy VII Hazing ................................................................................................... 10
Policy VIII Membership ......................................................................................... 11
Policy IX Panhellenic ............................................................................................ 14
Policy X Philanthropy ............................................................................................ 14
Policy XI Public Relations ..................................................................................... 15
Policy XII Parent and Guardian Communication ................................................. 16
Policy XIII Raids .................................................................................................... 17
Policy XIV Retaliation ........................................................................................... 17

**APP.221**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 323 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 226
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 142 of 209

 **FRATERNITY POLICIES**

## POLICIES OF
### KAPPA KAPPA GAMMA FRATERNITY

The Kappa Kappa Gamma Fraternity *Policies* are statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by the Kappa Kappa Gamma *Articles of Incorporation* and the Fraternity *Bylaws* and *Standing Rules*.

Fraternity Council adopted the policies in **October 2022**. This document replaces all previous versions.

The Fraternity *Policies* are to be used in conjunction with the *Articles of Incorporation* as well as the Fraternity *Bylaws* and *Standing Rules* as adopted by the **2022 Biennial Convention**. Failure to abide by the Fraternity *Policies* by a member or a chapter may result in disciplinary action.

## POLICY I
### ADVISORY BOARDS
(See the Fraternity Bylaws, Article IV. Section 2. J.)

**Section 1. Advisers.** An adviser shall be an alumna member of Kappa Kappa Gamma in good standing. An alumna expressing an interest to serve as an adviser to their own chapter will not serve until at least three years removed from the active chapter experience. An alumna shall serve in only one capacity, such as a chapter adviser, House Board member, or officer of an alumnae association. A District Director or Content Specialist shall not serve as an adviser in the district to which assigned. Advisers shall advise and guide the chapter officers, committees and Executive Board as a whole. An alumna with a daughter, granddaughter or sister in the chapter or going through Membership Recruitment on that respective campus shall not serve as a chapter adviser. The Advisory Board Specialist may grant exceptions in consultation with the Advisory Board Director.

**Section 2. Advisory Boards.** An Advisory Board shall meet at least twice per year.

   **A.    Advisory Board Recruitment.** In the areas where assistance is needed, the Advisory Board Specialist shall identify, recruit, and train potential advisers in consultation with the Advisory Board Director, Alumna Relations Specialist, and the designated Kappa Kappa Gamma Headquarters staff member**.**

   **B.    Convention.** Chapters are strongly encouraged to budget for the registration fee of the adviser representative attending Convention.

   **C.    Disagreements.** Cases of serious disagreements between chapters and advisers, the ineffectiveness of advisers, or conflicts with the Advisory Board shall be referred to the Advisory Board Specialist**.**

   **D.    Expenses.** Expenses of an Advisory Board may be a shared responsibility of the chapter and of the alumnae association(s) from which the advisers are selected. These expenses might include adviser representation at Kappa Leadership Conference, Convention registration fees, resource materials, copying, postage, etc.

   **E.    Meetings.** An adviser shall be present at chapter meetings for the election of officers, revision of the chapter Bylaws and Standing Rules, preparation and presentation of the budget, Executive Board meetings, officer training, Initiation, and including those of the

**APP.222**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 324 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 227
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 143 of 209

 **Kappa Kappa Gamma**                          FRATERNITY POLICIES

Nominating Committee and consideration of disciplinary action by the chapter and Standards Committee. Advisers may attend meetings electronically via telephone or through other electronic communications as long as all the members can simultaneously hear one another and participate during the meeting.

**F.    Selection.** Advisers shall be selected annually as a board with the joint approval of the chapter and executive board of the local alumnae association. In the absence of a local alumnae association, the board may be selected with the joint approval of the District Director, Advisory Board Specialist, and Alumna Relations Specialist.

**G.    Term of Office.** An adviser may serve two years in the same position. Whenever possible, adviser positions should be rotated in intervals.

<div align="center">

**POLICY II**
**ALUMNAE ASSOCIATIONS**
</div>

**Section 1. Alcohol.** (See the Fraternity Bylaws, Article V. Section 2. B and Standing Rule 1. 4.)

**A.    Events With Collegians.** Alcoholic beverages shall not be used or served in conjunction with alumna events where members who are not of legal drinking age are present. The Risk Prevention Director may grant exceptions in extraordinary circumstances.

**B.    Fraternity Ritual and Founders Day.** Alcoholic beverages shall not be used or served in conjunction with services of Fraternity ritual or Founders Day.

**C.    Alumnae association funds shall not be used to purchase alcohol.**

**Section 2. Association Treasurer Financial Report.** The association's financial report shall be prepared by the Treasurer and reviewed by at least one other member of the association prior to submission to Kappa Kappa Gamma Headquarters. The review process shall include:

- Ensuring the report cash balances reconcile to the bank statement(s).
- Verification of mathematical accuracy.
- Agreement on at least a random selection of 20% of invoices or other documentation.
- Other verification deemed necessary by the reviewing member(s).
- An electronic signature of the Treasurer and reviewing member(s) on the financial report.

**Section 3. Awards.** Alumnae associations in good standing shall be eligible to receive awards. (See the Fraternity Bylaws, Article V. Section 8. C.)

**Section 4. Delegates.** Each alumnae association is strongly encouraged to send a delegate to each biennial or special Convention for the enrichment of alumnae associations and the strengthening of the Fraternity at large. Unless unable to attend, the delegate shall be the alumnae association President.

**Section 5. Graduating Seniors.** Alumnae associations that support a local chapter should plan a program for the graduating seniors that bridges the transition from collegiate member to alumna member.

**Section 6. Lifetime Commitment.** Alumnae associations are encouraged to assist each member in developing a lifetime commitment of loyalty to the Fraternity and service to their community.

**APP.223**

 **Kappa Kappa Gamma**                    FRATERNITY POLICIES

**Section 7. Protocol.** When a new chapter of Kappa Kappa Gamma is installed, the alumnae associations of that district shall send a greeting in the care of the Chapter Services Department at Kappa Kappa Gamma Headquarters. The Chapter Services Department shall also coordinate the welcome gifts.

**Section 8. Per Capita Fees.** Alumna members must pay both the Fraternity per capita fee and local alumnae association dues in order to join an alumnae association. An alumnae association shall be responsible for paying the per capita fees of all of its dues-paying members and officers to the extent that they have not already been paid directly to the Fraternity by the individual members. An alumnae association consisting of any members who have not paid their required per capita fees shall not be considered in good standing, is not entitled to representation at Convention, and may be subject to the withdrawal of its charter.

<div align="center">

**POLICY III**
**CHAPTERS**
</div>

**Section 1. Alumna Awareness.** Chapters shall plan an ongoing program for active and new members about the vital role of the alumnae in the Fraternity.

**Section 2. Auxiliary Groups.** Participation in auxiliary groups of men's fraternities, including but not limited to little sisters, is prohibited and is in conflict with the National Panhellenic Conference Unanimous Agreements. The formation of male auxiliary groups, such as big brothers, is prohibited. The activities of such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status. Kappa chapters shall not bestow honorary status to individuals, such as Key Man or chapter sweetheart.

**Section 3. Awards.** Chapters are eligible to receive awards if, during the biennium, the chapter has obtained the necessary permission to initiate, is current in payment of Fraternity fees, has submitted the necessary reports to Kappa Kappa Gamma Headquarters and is not on Fraternity Council Action (i.e., Warning of Probation, Probation, or Suspension). District Directors may grant exceptions.

**Section 4. Chapter Merchandise.** Chapters purchasing merchandise shall receive at least two bids from authorized/licensed vendors on bulk orders. Individual chapter members are prohibited from receiving compensation (money or free merchandise) from a vendor in exchange for using that vendor.

**Section 5. Chapter Officer Education and Training.** Chapter officers are responsible for completing all relevant online and/or in-person training to learn about their officer role. Officers failing to exercise such responsibility may be subject to disciplinary action.

**Section 6. Convention Delegates.** Chapters shall send a delegate to each Convention. Unless excused by the District Director, the delegate shall be the chapter President.

**Section 7. Discipline.** (See Fraternity Bylaws, Article V. Section 7.)

   **A.** **Chapters.** Chapters are responsible for the discipline of active and new members. Chapters failing to exercise such responsibility are subject to Fraternity Council Action.

   **B.** **Members.** Any member failing to comply with the Fraternity *Articles of Incorporation* as well as the Fraternity *Bylaws*, *Standing Rules* and *Policies* is subject to disciplinary action. Any member of the Standards Committee facing disciplinary action shall not vote on any issues concerning that disciplinary situation.

**APP.224**

**Kappa Kappa Gamma**                                    FRATERNITY POLICIES

C. **Personal Responsibility.**

    1. **Health and Safety.** All members shall act in a manner that demonstrates respect and consideration for those around them, including respect and consideration for the health and safety of all community members. Members shall adhere to guidelines/directives from public health authorities, their college/university and their chapter/House Board in the event of an emergency.

    2. **Human Dignity.** Kappa Kappa Gamma expects all members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals. Any member who makes discriminatory, inflammatory or inappropriate actions based on race, national origin, religion, disability, age, gender identity, sexual orientation or other class protected by local, state/provincial, or federal law shall be subject to dismissal or other disciplinary action.

    3. **Unaffiliated Transfers and Associate Members.** Unaffiliated transfer members and associate members failing to comply with the Fraternity *Articles of Incorporation* as well as the Fraternity *Bylaws*, *Standing Rules* and *Policies* shall be reported to the Standards Director.

**Section 8. Emergency Information.** Each active and new member shall annually submit their emergency information.

**Section 9. Good Standing.** (See the Fraternity Bylaws, Article V. Section 7.) A chapter in good standing shall submit a scholarship report following each term; pay current Fraternity fees; complete Fraternity reports in a timely manner; adhere to the Fraternity *Articles of Incorporation*, *Bylaws*, *Standing Rules*, and *Policies*; and not be on Fraternity Council Action.

**Section 10. Graduating Members.** Graduating members who fail to comply with the Fraternity *Bylaws*, *Standing Rules* and *Policies,* university rules and regulations, and local, state/provincial and federal laws, or fail to uphold Fraternity standards may be referred to the Standards Specialist for consideration of direct Fraternity Council Action if the Standards Committee is unable to complete the standards process prior to graduation. (See the Fraternity Bylaws, Article III. Section 7.)

**Section 11. Kappa Leadership Conference.** Chapters shall budget for and send representatives to Kappa Leadership Conference as designated.

**Section 12. Membership Commitment Statement.** Each active and new member shall annually complete and adhere to the terms of the Membership Commitment Statement. Chapters can hold events with alcohol only after 100% of chapter members have completed the Membership Commitment Statement.

**Section 13. Men's Recruitment.** Participation in men's Fraternity events when or where the primary purpose is recruitment is prohibited per the NPC Unanimous Agreements.

**Section 14. Officers.** (See the Fraternity Bylaws, Article IV. Section 2. C and D.)

**Section 15. Protocol.** When a new chapter of Kappa Kappa Gamma is installed, members of Official Family and chapters are encouraged to send greetings in the care of the Chapter Services Department at Kappa Kappa Gamma Headquarters.

**Section 16. Ritual.** All services within the *Book of Ritual* shall be followed in their entirety without additions or deletions.

**Section 17. Unrecognized Groups.**

✲ **Kappa Kappa Gamma**                         FRATERNITY POLICIES

**A.** Collegiate members of suspended chapters are prohibited from participating in any activities that can be construed as functions of Kappa Kappa Gamma, including Recruitment, Initiation, meetings, and social events. Members who participate in the activities of an unrecognized group are subject to disciplinary action up to and including dismissal.

**B.** Members may plan or participate in events with men's fraternities and other student organizations only when those men's fraternities and student organizations are not suspended for reasons of organizational conduct.

<div align="center">

**POLICY IV**
**CHAPTER EVENTS**

</div>

All chapter events shall be planned and implemented with respect for the academic responsibilities of each active and new member and with concern for the image of the chapter and the Fraternity. All local, state/provincial and federal laws shall be followed when planning events. All Kappa-sponsored or co-sponsored events shall abide by the Risk Prevention Procedures.

**Section 1. Chapter Activities and Events.**

**A.** **Alcohol and Drugs.** Alcoholic beverages, drugs or other controlled substances shall not be used or served in conjunction with Founders Day, chapter philanthropic events, the new member period, chapter meetings, services of Fraternity ritual — including Formal Pledging, Inspiration Period, and Initiation — or any function related to Recruitment, including any time during pre-recruitment, Primary Recruitment, Continuous Recruitment, Continuous Open Bidding, and Bid Day.

**B.** **Behavior.** Chapter members are accountable for their own conduct and that of their guests at all events.

**C.** **Budget.** Chapter funds shall not be used to purchase alcohol. Monies shall not be collected by the chapter in order to purchase alcohol.

**D.** **Drinking.** Members are prohibited from underage drinking. Members shall not — collectively or individually — purchase for or serve alcohol to individuals who are under the legal drinking age.

**E.** **Firearms and Weapons.** The use, possession or storage of firearms or other weapons, including ammunition and explosives, is prohibited at chapter events.

**F.** **Illegal Substances.** Illegal substances (as classified at the state/provincial and/or federal level) may not be brought into and/or consumed by any member or guest at any Kappa-sponsored or co-sponsored event.

**G.** **Legal Drinking Age Identification System.** (See the Fraternity Bylaws, Article V. Sections 2 and 2. B.) If alcohol is to be served or consumed at a Kappa-sponsored or co-sponsored event, the chapter shall identify members and guests of legal drinking age.

**H.** **Open Parties.** Open parties are not permitted. Kappa-sponsored or co-sponsored parties shall be limited to members and their guests.

**I.** **Overnight Accommodations.** Parties that involve the rental of overnight accommodations, either by the chapter or by individuals, are prohibited.

**J.** **Pre-Parties and Post-Parties.** Pre- or post-parties are prohibited.

**APP.226**

 **Kappa Kappa Gamma**                    FRATERNITY POLICIES

**K.** **Rapid Consumption.** The rapid consumption of alcohol (e.g., drinking games) is prohibited.

**L.** **Sale of Alcohol.** The sale of alcoholic beverages by any member representing the chapter is prohibited.

**M.** **Transportation.** For off-campus chapter events, transportation procedures shall comply with the Fraternity Risk Prevention Procedures for all active and new members and their guests. Alcohol, drugs and other controlled substances are prohibited from being transported or used by members or their guests while traveling to and from chapter events.

**Section 2. Events Involving Alcohol.**

**A.** **Alcohol Service.** Collegians may not act as trained servers or security personnel at Kappa-sponsored or co-sponsored events that involve the use of alcohol for their own chapter.

**B.** **BYOB Events.** All chapter-sponsored and co-sponsored bring your own beverage (BYOB) events shall follow the BYOB Procedures outlined in the Waiver Application in addition to the respective university's policies**.**

**C.** **Eligibility for BYOB Events.** Chapters are eligible to participate in BYOB events on campus if they complete the Waiver Application and their application is approved. Waiver Applications are valid only for the upcoming/current academic year.

**D.** **Events at Third-Party Vendors.** Chapters shall hire trained servers or bartenders and security personnel at every Kappa-sponsored and co-sponsored event hosted by a third-party vendor. The number of security personnel shall be determined by the size and type of event. A request for an exception to the number of security personnel shall be directed to the Risk Prevention Specialist.

**E.** **Social Event Guest Age Minimum.** Chapter event guests are required to be 18 years of age or 17 years of age and an enrolled student at the institution to attend any chapter event with alcohol.


**POLICY V**
**CHAPTER FACILITIES**
(See the Fraternity Bylaws, Article XXII. Section 1.)

Kappa facilities are those properties owned, leased, rented, and operated by the chapter house corporation or alumnae association, the Fraternity Housing Corporation, or the institution where the chapter is located.

**Section 1. Day-To-Day Operations.**

**A.** **Alcohol and Drugs.**  (See the Fraternity Bylaws, Article V. Section 2. B and C.)

1.  The use or possession of alcohol by a member or nonmember is not permitted in a chapter facility or within the area considered part of that property, including parking lots.

2.  The use, sale, purchase or possession of any drugs or other controlled substances in violation of local, state/provincial or federal law is prohibited in a chapter facility or on chapter facility property, including parking lots.

**APP.227**

Kappa Kappa Gamma                                    FRATERNITY POLICIES

B. **Animals.** Animals shall not be permitted in a chapter facility. Exceptions may be granted for medical purposes in consultation with the designated Kappa Kappa Gamma Headquarters staff member(s).

C. **Fire Safety.** The use of any open flame, including but not limited to fireplaces, fire pits and candles, is prohibited in the chapter facility.

D. **Firearms and Weapons.** The use, possession or storage of firearms or other weapons on chapter property, including ammunition and explosives, is prohibited.

E. **Guest Privileges.** Nonmember guests may visit a Kappa facility during facility open hours only by invitation of the chapter or an individual member of the chapter and only if in compliance with the approved chapter visitation rule. The individual member is responsible for the conduct of their guest and shall be considerate of roommate(s) and other residents of the facility.

F. **Hours.** Chapters are expected to maintain reasonable closing hours conducive to academic excellence, consideration of others in the facility, and the safety of members.
   1. The chapter, Advisory Board and House Board/FHC shall determine and approve closing hours.
   2. Nonmembers are not allowed in a chapter facility after closing hours unless they are guests invited to stay overnight as outlined in the approved chapter visitation rule.

G. **Kitchens.** Noncertified personnel or individuals shall not use commercial-grade kitchen appliances.

H. **Meals.** Advisory Board or House Board members who eat at a chapter facility shall pay for their meals unless they are invited as guests.

I. **Property.** Abuse of property renders a chapter and/or individual liable for disciplinary action unless otherwise mandated by local, state/provincial or federal law. Individuals may also be held financially responsible.

J. **Residence Requirements.** It is the responsibility of each chapter to ensure the chapter facility is filled to capacity at all times. A live-in rule shall be developed by the chapter facility team, Advisory Board and House Board/FHC, approved by the chapter and stated in the chapter Standing Rules.
   1. **Alumna and Associate Members.** If all chapter members eligible to live in the chapter facility have been housed and space is available, a member granted Associate Membership or an alumna may live in the facility with the approval of the chapter and Advisory Board. Notification to House Board/FHC must be given prior to final approval.
   2. **Discounts.** No resident member shall receive free or discounted room and board rates.
   3. **Emergency Committee Live-In.** A minimum of two of the current or outgoing Emergency Committee officers is required to live in the chapter facility at all times.
   4. **Live-In Obligation.** A member has an obligation, in accordance with the chapter's live-in rule, to live in the chapter facility. Failure to fulfill this obligation may result in loss of membership.

**APP.228**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 330 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 233
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 149 of 209

 FRATERNITY POLICIES

5. **Nonmembers.** A nonmember, before being invited as a guest resident of the chapter facility, shall receive the unanimous vote of the chapter and approval of the local Advisory Board and House Board/FHC.

6. **Releasing From the Live-In Obligation.** Releasing a member from their live-in obligation is rarely permitted, especially when the chapter facility is not full to capacity. If extenuating circumstances make it necessary for a member to be released from the live-in obligation, the request shall be made in accordance with the chapter's live-in rule and approved by Advisory Board in consultation with House Board/FHC before the member is notified of the decision to release. These requests shall only be considered once all other options have been exhausted through the accommodations process.

7. **Transfers.** If all active and new members eligible to live in the chapter facility have been housed and space is available, a Kappa transfer may move into the facility with the approval of the chapter and Advisory Board. A statement of the transfer's good standing shall be secured from their chapter and notification to the House Board/FHC prior to final approval.

K. **Safety.** Kappa facilities shall be locked at all times. The chapter facilities team, Advisory Board and House Board/FHC are responsible for formulating rules to ensure the safety of the active and new members. In the event of an emergency, account for all members utilizing the chapter's preferred method for mass communication.

L. **Smoking.** Vaping and using e-cigarettes (e.g., Juul and CBD vape oils) and tobacco products are prohibited in all Kappa facilities.

M. **Visitation**

1. **Overnight Guests.** Each chapter, in conjunction with its Advisory Board and House Board/FHC, shall establish a procedure for the registration of nonmember guests staying overnight that includes roommate consent and reasonable notification of the House Director or the House Board President in the absence of a House Director. Visitors whose relationship with a resident member is intimate in nature are prohibited from being overnight guests. Each chapter shall include its procedure in the visitation rule**.**

2. **Procedures.** The procedures to establish the visitation policy shall be as follows:
   a. **Chapter Vote.** The proposed policy shall be approved by a three-fourths vote of the chapter members present at the meeting and voting as well as its Advisory Board and House Board/FHC. The policy shall contain provisions for enforcement and shall be included in the chapter Standing Rules.
   b. **Policy Reaffirmation.** All approved policies must be reaffirmed annually by a three-fourths vote of the chapter members present at the meeting and voting, Advisory Board, and House Board/FHC.

3. **Visitation in Private Areas.** Each chapter, in conjunction with its Advisory Board and House Board/FHC, shall establish a visitation policy regarding nonmember guests' access to private areas of a chapter facility during open hours, which shall not exceed the facility's open hours. Open hours are defined as hours in which nonmembers are permitted in the facility. Nonmember guests are never allowed

**APP.229**

 **Kappa Kappa Gamma**                    FRATERNITY POLICIES

in nonpublic areas of a chapter facility unless invited by a resident member and requires roommate consent and consideration of all other residents.

**Section 2. Management.**

**A.  Conflict of Interest.** All House Board members shall annually sign the Conflict of Interest Policy and Statement.

**B.  House Board Members.** A House Board member shall be an alumna member of Kappa Kappa Gamma in good standing. An alumna shall serve in only one capacity, such as chapter adviser, member of House Board, or officer of an alumnae association. A District Director or Content Specialist shall not serve as a House Board member in the district to which they are assigned. An alumna with a daughter, granddaughter or sister in the chapter or going through Membership Recruitment on that respective campus shall not serve on House Board. The Facilities Specialist shall grant exceptions in consultation with the Fraternity Facilities Director.

**C.  House Corporation/Association Fee.**

   1.  New members shall pay the house corporation/association fee within one year of the date of pledging. The fee is refundable if the new member is not initiated.

   2.  Affiliated transfers shall pay a prorated portion of the house corporation/association fee within the year of affiliation.

**D.  House Directors.** Kappa facilities housing 10 or more members shall have a House Director living on the premises unless excused by the designated Kappa Kappa Gamma Headquarters staff member with the approval of the Fraternity Facilities Director and District Director.

**E.  Insurance.** All insurance shall be carried through the Fraternity's master insurance program unless an exception to use another carrier is granted by the Finance Committee and approved by Fraternity Council.

**F.  Property.** Furniture, silver, dishes or equipment shall not be moved, taken from the chapter facility, or lent without the consent of House Board/FHC.


**POLICY VI**
**FINANCE AND FUNDRAISING**

**Section 1. Assessments.** A chapter may not assess any active, associate or new member. An assessment is defined as a required additional charge not approved as part of the chapter budget. The budget shall be adequate to cover all necessary expenses. Chapters cannot vote to assess members. If there are extra charges, they shall be optional.

**Section 2. Chapter Housing Projects.** (See the Fraternity Standing Rules, Rule 3.2. C. 9.) The Fraternity Facilities Content Director in consultation with the designated Kappa Kappa Gamma Headquarters staff member(s) shall present House Board renovation plans and proforma to secure a recommendation of the Fraternity Finance Committee and approval of Fraternity Council before the chapter housing project shall begin.

**Section 3. Financial Drives or Campaigns.** (See the Fraternity Bylaws, Article XIII. Section 2.) The Fraternity Facilities Director shall first review any financial drive or campaign. Upon recommendation from the Finance Committee, approval from Fraternity Council is required if the financial drive or campaign goes beyond the active members of the local

**APP.230**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 332 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 235
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 151 of 209

**Kappa Kappa Gamma**                                    FRATERNITY POLICIES

chapter or alumnae association from which Advisory Board and House Board members are selected.

**Section 4. Fines.** A chapter shall not fine any active, associate or new member. Chapters cannot vote to fine members.

**Section 5. Fundraising Proceeds.** All nonmember receipts from fundraising activities shall be used for philanthropic purposes. These receipts shall not be used for any chapter or alumnae association operating expenses, new member activities or gift purchases.

**Section 6. House Corporation/Association Financial Reporting.**

    **A.**    **House Corporation/Association Annual Report.** The house corporation/association annual report shall be prepared by the House Board Treasurer with input from the House Board President and then reviewed by at least one other member of House Board or an independent accounting firm prior to submission to the Fraternity Finance Director or their designee. The review procedures shall include:

- Ensuring the report cash balances reconcile to the bank statement(s).
- Verifying mathematical accuracy.
- Confirming at least 20% of disbursements agree with supporting invoices or other documentation.
- Performing other test procedures deemed necessary by the reviewing member(s).
- Providing manual signatures of the reviewer(s) on the annual report to prove a review was completed.

    **B.**    **House Corporation/Association Financial Reports.** If financial reporting is not completed within 30 days of the due date, House Board shall be considered delinquent.

**Section 7. House Corporation Renovations or Building Projects Fundraising.** Construction cannot commence and funds cannot be committed or dispersed for a renovation or building project until 65% of the total project fundraising goal is pledged.


<div align="center">

**POLICY VII**
**HAZING**

(See the Fraternity Bylaws, Article V. Section 2. A.)
</div>

All chapter activities shall respect the dignity of the individual. Any activity that is required as part of membership intake or as a condition of membership that is demeaning, embarrassing, or mentally or physically injurious to an individual or group is considered hazing and is not permitted. Hazing is prohibited and any member failing to comply with this policy is subject to dismissal from the Fraternity. This policy pertains to all members of the Fraternity.


Hazing is defined as any activity or action taken with or without consent of the individual involved that produces mental, emotional, psychological or physical discomfort, intimidation, humiliation, degradation, embarrassment, harassment or ridicule. Such activities and situations include, but are not limited to, blindfolding for any purpose; forced or coerced alcohol consumption or use of drugs or other controlled substances in violation of local, state/provincial or federal law; creation of excessive fatigue; physical and psychological shocks; treasure hunts, scavenger hunts or kidnaps; wearing apparel that is conspicuous and not

**APP.231**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 333 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 236
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 152 of 209

 **Kappa Kappa Gamma**                    FRATERNITY POLICIES

normally in good taste; engaging in stunts or degrading or humiliating games and activities; and late work sessions.

All members are subject to local, state/provincial, and federal law and the rules and regulations of the university where a Kappa Kappa Gamma chapter is located. To the extent those laws and university rules and regulations are broader or more stringent than Kappa Kappa Gamma's policy, then members shall comply with those broader or more stringent standards. Members are responsible for familiarizing themselves with those standards.

## POLICY VIII
## MEMBERSHIP

**Section 1. Classifications.** (See the Fraternity Bylaws, Article III. Section 1.)

   A.   **Active.** An active member is a collegian who has been initiated regardless of the number of hours being taken unless the member has previously achieved alumna status or been granted Associate Membership.

   B.   **Associate Member.** Associate Membership may be granted to an active member in good standing who, due to extraordinary circumstances, is unable to participate in the regular requirements of their chapter. Both Advisory Board and the District Director shall review each case for approval. An associate member is responsible for paying the annual per capita fee. Fraternity Council may grant Associate Membership to a member whose chapter has been suspended. (See the Fraternity Standing Rules, Rule 7.4. B.) Associate members who are away from the chapter for a period of one term will continue to be counted in chapter total. Fraternity Council sets the terms and conditions of Associate Membership, including the procedures for returning to active-member status.

**Section 2. Initiation.** (See the Fraternity Bylaws, Article III. Section 3.)

   A.   **Badge.** (See the Fraternity Bylaws, Article III. Section 3. A. 3.) Provisions for securing a badge shall be made before Initiation.

   B.   **Blindfolds.** The use of blindfolds during any service of initiation is prohibited.

   C.   **New Members.** Chapters are expected to initiate all new members during the same term they are pledged to membership. The Ritual and History Specialist may grant exceptions in consultation with the Fraternity Ritual and History Director. New members shall be initiated within one calendar year of signing a membership recruitment acceptance binding agreement.

   D.   **Reports.** (See Fraternity Standing Rules, Rule 6.2. B. 2.)

   E.   **Risk Prevention** All ritual-related events shall be in compliance with the Risk Prevention Procedures.

   F.   **Sleepovers.** Sleepovers associated with Initiation are only appropriate if every member has an adequate place to sleep and if participation is not mandatory for new members or active members.

**Section 3. Selection.** Membership Recruitment and selection are of vital concern to every active and new member of the chapter. Membership Recruitment and selection require thoughtful consideration and full participation. The designated adviser shall excuse members unable to participate in any facet of the recruitment process. All information

 **Kappa Kappa Gamma**          FRATERNITY POLICIES

concerning Recruitment and Kappa Kappa Gamma's membership selection processes is confidential and must be kept within the chapter.

**A.** **Academic Excellence.** (See the Fraternity Bylaws, Article III. Section 2. B. 2.) The chapter Academic Excellence Director (or Vice President Internal Affairs, if applicable) shall meet with their team and request input from the Academic Excellence Specialist regarding the overall academic health of the chapter. The academic team will recommend to the chapter their proposal regarding the approval of grade exceptions during Recruitment.

    **1.** **Chapters Allowing Academic Exceptions.** If the chapter votes to allow academic exceptions, members shall vote on the number of exceptions allowed in the new member class. This number shall be based on the expected quota, and a percentage of the new member class that may be granted academic exceptions shall be voted upon prior to the start of recruitment rounds. The chapter Academic Excellence Director (or Vice President Internal Affairs, if applicable) shall inform the Membership Specialist and Academic Excellence Specialist of the number of exceptions that have been determined by the chapter. The chapter Academic Excellence Director (or Vice President Internal Affairs, if applicable) will review the overall descending list of potential new members following the round prior to preference to ensure that only the predetermined number of grade exceptions are invited to preference. All potential new members beyond that number shall be removed from the invitation list.

    **2.** **Chapters Not Allowing Academic Exceptions.** If the chapter votes to not allow for grade exceptions, no exceptions will be granted and the chapter will release all potential new members who do not meet the minimum academic requirements as outlined in the Fraternity Bylaws, Article III. Section 2. B. 2 following the open house round.

**B.** **Advisers.** The Membership Adviser shall provide support to the Vice President Membership or the director in charge of membership selection when needed. In alignment with the National Panhellenic Conference *Manual of Information*, the participation of an adviser should be reserved as a behind-the-scenes role to assist and never to actively participate in Recruitment or the membership selection process. In the event the Membership Adviser is unavailable, the Membership Specialist shall assist the chapter as needed.

**C.** **Alcohol and Drugs.** (See the Fraternity Standing Rules, Rule 1.4.) The use of alcoholic beverages, drugs or other controlled substances shall not be used or served in conjunction with any function related to Recruitment, including any time during pre-recruitment, Primary Recruitment, Continuous Recruitment, Continuous Open Bidding, and Bid Day.

**D.** **Associate Members.** Associate members shall not participate in Membership Recruitment. The Membership Specialist may grant exceptions in extraordinary circumstances.

**E.** **Communication With Alumnae.** Chapter members, officers, and advisers shall not speak with alumnae regarding a potential new member. All communication regarding Recruitment from alumnae shall be directed to the Membership Specialist or Kappa

Case 2:23-cv-00051-ABJ     Document 47-4     Filed 02/28/25     Page 335 of 506
Appellate Case: 23-8065     Document: 010110962640     Date Filed: 12/04/2023     Page: 238
Case 2:23-cv-00051-ABJ     Document 6-1     Filed 04/20/23     Page 154 of 209

❀ **Kappa Kappa Gamma**                    FRATERNITY POLICIES

Kappa Gamma Headquarters. This shall include all forms of communication including but not limited to text, phone, email and social media messaging.

F.   **Continuous Open Bidding.** Chapters are expected to conduct Continuous Open Bidding until they are at the maximum allowable size on their campus. Bids shall be extended to allow for a period of education to take place during the term new members are pledged to membership. The Membership Specialist may grant exceptions in consultation with the Fraternity Membership Director.

G.   **Discussion.** Chapters shall not hold discussions of potential new members on any platform. This includes in-person, virtual, or digital platforms. Members shall provide individual input through connection scoring, round scoring, and preference points.

H.   **Familial Relationships.** Potential new members with familial relationships to members of Kappa Kappa Gamma shall not be given preferential treatment during Membership Recruitment.

I.   **Men.** Men shall not participate in any Kappa recruitment events, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements.

J.   **New Members.** (See the Fraternity Bylaws, Article III. Section 1. A. 3.) New members may attend recruitment events but may not vote.

K.   **References.** All members in good standing may submit references prior to Recruitment.

    **1.**   **Collegiate Member References.** A collegiate member may write a reference for a potential new member so long as the potential new member is not participating in Recruitment on the collegiate member's campus.

    **2.**   **Use of References.** Chapters may use references from alumnae and active members provided via the Kappa Kappa Gamma website for the purpose of matching during Recruitment. Chapters may not provide lists of those potential new members who received references to active members. Courtesy invitations of any kind are not practiced by Kappa Kappa Gamma.

L.   **Release Figures.** Chapters are expected to adhere to the release figures provided by the National Panhellenic Conference Release Figure Specialist. Any deviation from the invitation and flex numbers provided by the campus Panhellenic requires approval from the Membership Specialist. Chapters shall maximize their recruitment options by providing flex-plus and flex-minus lists as requested by their campus Panhellenic. Each list shall be fully completed and submitted. The Membership Specialist may grant exceptions to the flex-plus list in rare circumstances.

M.   **Scoring Lists.** Chapters shall not alter potential new member scoring lists, which are calculated solely by the voting platform, when submitting them to their campus Panhellenic for recruitment invitations.

    **1.**   **Deviations From Scoring.** The only time deviations from the voting platform's calculated list are acceptable is when they have been granted by the Membership Specialist for academic or other concerns. Only after the Membership Specialist has granted permission to alter the list may those names of potential new members be removed from the invitation list.

**APP.234**

 **Kappa Kappa Gamma**                    FRATERNITY POLICIES

    **2.** **Submission of Invitation Lists.** Only the Vice President Membership or director in charge of membership selection should complete the submission of the invitation lists to the campus Panhellenic.

**N.** **Reports.** A recruitment report shall be completed in *KeyReports* within 10 days of Formal Pledging.

**O.** **Virtual Recruitment.** All policies as outlined in this section shall also be applicable to chapters participating in a partially or fully virtual recruitment format.

**P.** **Voting.** The chapter shall use the voting platform provided by the Fraternity for all recruitment voting.

    **1.** **Administrative Access.** Administrative access to the voting platform shall be granted to the Vice President Membership or director in charge of membership selection, Vice President Standards, Vice President Internal Affairs or chapter Academic Excellence Director, chapter President and the appointed technology membership team member(s). Membership Advisers may be granted administrative access if requested by the Vice President Membership or director in charge of membership selection.

    **2.** **Voting Procedures.** Chapters shall follow all voting procedures outlined in the current voting procedure guidelines.

**Section 4. Suspension.** In rare instances, members may be placed on a temporary suspended status while an investigation into allegations of serious conduct violations occurs. While on suspended status, members cannot participate in Kappa meetings, events or activities aside from engaging in the standards process.

**Section 5. Transfer/Affiliation.** (See the Fraternity Bylaws, Article III. Section 4.) Chapters shall design a program to welcome and integrate transfers into chapter life. Upon successful completion of such a program by the transfer, the chapter shall consider their affiliation with all the privileges and responsibilities of membership. The Membership Specialist may grant associate status for an affiliated active member for special circumstances. In accordance with the NPC Transfer Member Policy, if a chapter is at total and wishes to affiliate a transfer member, it may do so even though the addition of that member will put the chapter over total.

<div align="center">

**POLICY IX**
**PANHELLENIC**
</div>

All members of Kappa Kappa Gamma shall abide by and uphold the National Panhellenic Conference Unanimous Agreements as set forth in the current National Panhellenic Conference *Manual of Information*. All members shall also support the policies of the National Panhellenic Conference.

<div align="center">

**POLICY X**
**PHILANTHROPY**
</div>

Each chapter and alumnae association is encouraged to support Kappa Kappa Gamma's philanthropies. Chapters and alumnae associations shall not host or participate in philanthropic activities that promote negative images of women or the sorority community, demeaning

 **Kappa Kappa Gamma**                    FRATERNITY POLICIES

actions toward others, including incivilities and sexual harassment, and any actions that negatively affect public perception of the Fraternity or the sorority community.

**Section 1. Community Philanthropy.** Chapters and alumnae associations may support a local organization of their choosing.

**Section 2. Inter/National Philanthropy.** Alumnae associations and chapters shall support the Fraternity's inter/national philanthropy through events, service-oriented projects, and monetary donations.

**Section 3. Kappa Kappa Gamma Foundation.** To maintain the strength and future growth of the Fraternity's philanthropic programs, associations and chapters are strongly encouraged to contribute a portion of funds raised from philanthropic events to the Kappa Kappa Gamma Foundation.

**Section 4. Philanthropic Partners.** Chapters and associations are strongly encouraged to contribute 50% of funds raised from philanthropic events to one or two approved partners of their choice.

**Section 5. Risk Prevention.** Chapters and associations are expected to follow the Fraternity's Risk Prevention Procedures before, during, and after all philanthropic events. Chapter events shall not include any alcohol, and eating contests are not permitted.


## POLICY XI
## PUBLIC RELATIONS

**Section 1. Chapter Annual Updates.** An annual chapter update shall be sent to all collegiate members and alumna members of the chapter, Fraternity Council, the District Director and the Content Specialists of the district, the Public Relations Director, *The Key* Publication Chairman, and Kappa Kappa Gamma Headquarters. The solicitation of funds to publish and distribute chapter updates is prohibited.

**Section 2. Endorsement of Products or Participation in Promotions.** Requests received by chapters or alumnae associations for endorsements of products and/or compensation for participation in commercial or political promotions, including endorsement on social media, are prohibited.

**Section 3. Internet.**
   **A.** **Chapter and Alumnae Association Websites.** All chapters shall use the OmegaOne website. Alumnae associations are encouraged to use the OmegaOne website.
   **B.** **Social Media.** All chapters, alumnae associations and members are expected to adhere to all federal, state/provincial and local laws, university procedures, and Kappa Kappa Gamma's Social Media Guidelines regarding internet usage to preserve and protect the name of Kappa Kappa Gamma and the privacy and security of its members.
   **C.** **Web Usage.** All chapter and alumnae association websites shall be in compliance with Kappa Kappa Gamma's current website guidelines.

**Section 4. Licensing.** Authorized vendors shall be those that have been granted licensing approval by the Fraternity to design, manufacture and sell products bearing the registered trademarks of Kappa Kappa Gamma Fraternity.

**Section 5. Local, Regional or National Media.**
   **A.** **Participation.** Individuals, chapters, Advisory Boards, House Boards, and alumnae associations shall secure the approval of Kappa Kappa Gamma Headquarters before

**APP.236**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 338 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 241
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 157 of 209

 FRATERNITY POLICIES

participating in any local, regional, or national media. Kappa Kappa Gamma Headquarters shall approve pictures, images or articles about chapters and alumnae associations before appearing in local, regional or national media.

B. **Use of Trademarks.** No member, chapter or association may display the registered trademarks of the Fraternity and/or property of the chapter or Fraternity on digital or physical media, including apparel, nor claim association with the Fraternity with any national media without prior approval by Kappa Kappa Gamma Headquarters.

**Section 6. Membership Lists.** Membership lists and member contact information available through the Kappa Kappa Gamma website, (e.g., names, emails, phone numbers, and mailing addresses) are for the use of collegiate and alumna members of Kappa Kappa Gamma only in conducting the Fraternity business and shall not be used in non-Fraternity business or furnished to or used by anyone outside of the Fraternity. Any solicitations of business, non-Fraternity philanthropic contributions, or political contributions are prohibited unless authorized by Fraternity Council. Questions regarding the use of such lists shall be referred to Kappa Kappa Gamma Headquarters.

**Section 7. Requests for Information.** Requests for information or opinions relating to Kappa Kappa Gamma, its members, chapters, Advisory Boards, House Boards, and alumnae associations (e.g., annual reports, chapter questionnaires, evaluation surveys and university relationship statements) shall be approved by the Fraternity President or Executive Director before an answer, oral or written, is submitted. The Panhellenic Specialist shall review award applications prior to submission.

**Section 8. Speaking for the Fraternity.** Chapters, alumnae associations, and members shall not speak for the Fraternity. This includes speaking for the Fraternity about any political, commercial, or controversial issue or indicating involvement of the Fraternity by the use of Kappa Kappa Gamma stationery or other means.

**Section 9. Trademarks.** (See the Fraternity Bylaws, Article XIV. Section 1.) The registered trademarks of Kappa Kappa Gamma Fraternity include, but are not limited to, the name Kappa Kappa Gamma; the tagline: Dream Boldly. Live Fully; the Greek letters KKΓ; the design of the badge; the new member pin; the Grand Seal; the Coat-of-Arms; the key identifier; and the fleur-de-key logo. Unauthorized reproduction, distribution, sales, or use of the above trademarks is prohibited. Requests for use of these insignia shall be submitted to Kappa Kappa Gamma Headquarters.

**POLICY XII**
**PARENT AND GUARDIAN COMMUNICATION**

As a private member organization, Kappa Kappa Gamma's relationship is with the Kappa member. The Kappa member is the main point of contact with the Fraternity and their chapter related to concerns with the chapter, facility or their membership experience. If a parent/guardian initiates communication regarding a member's experience, the Kappa member must be included in that conversation.

 **Kappa Kappa Gamma**                              FRATERNITY POLICIES

### POLICY XIII
### RAIDS

Every chapter is responsible for preventing raids and for disciplining those active and new members who encourage or participate in such raids. A raid is defined as an uninvited intrusion upon any Fraternity property or campus building.

### POLICY XIV
### RETALIATION

Retaliation in response to or related to a report of misconduct, including but not limited to hazing, sexual misconduct, bullying, and violations of federal, state, local, and Kappa policy, is prohibited and may result in disciplinary action, up to and including dismissal. Retaliation includes, but is not limited to, an act intended as retribution against a person for reporting bullying, harassment, hazing, misconduct, or improperly influencing the investigation of or the response to the report. Examples include: negative rumors, exclusion from usual group activities, or pressure, threats or implied threats to not report an incident, recant an earlier report, or provide false/misleading information to the authorities.



Kappa Kappa Gamma                                    FRATERNITY POLICIES

**INDEX**

| | | | |
|---|---|---|---|
| **Advisory Boards** | 1 | **Chapter Events** | 5 |
| Advisers | 1 | **Chapter Facilities** | 6 |
| Disagreements | 1 | Day-To-Day Operations | 6 |
| Expenses | 1 | Alcohol and Drugs | 6 |
| General Convention | 1 | Animals | 7 |
| Meetings | 1 | Fire Safety | 7 |
| Recruitment | 1 | Firearms and Weapons | 7 |
| Selection | 2 | Guest Privileges | 7 |
| Term of Office | 2 | Hours | 7 |
| **Alumnae Associations** | | Kitchens | 7 |
| Alcohol | 2 | Meals | 7 |
| Events With Collegians | 2 | Property | 7 |
| Fraternity Ritual and Founders Day | 2 | Residence Requirements | 7 |
| Awards | 2 | Alumna and Associate Members | 7 |
| Delegates | 2 | Discounts | 7 |
| Graduating Lifetime Commitment | 2 | Emergency Committee Live In | 7 |
| Graduating Seniors | 2 | Live-In Obligation | 7 |
| Protocol | 3 | Nonmembers | 8 |
| Treasurer Financial Report | 2 | Releasing From the Live-In | |
| **Alumnae Associations** | 2 | Obligation | 8 |
| **Chapter Events** | | Transfers | 8 |
| Chapter Activities and Events | 5 | Safety | 8 |
| Alcohol and Drugs | 5 | Smoking | 8 |
| Behavior | 5 | Visitation | 8 |
| Budget | 5 | Management | 9 |
| Drinking | 5 | Conflict of Interest | 9 |
| Firearms and Weapons | 5 | House Board Members | 9 |
| Illegal Substances | 5 | House Corporation/Association Fee | 9 |
| Open Parties | 5 | House Directors | 9 |
| Overnight Accommodations | 5 | Insurance | 9 |
| Pre-Parties and Post-Parties | 5 | Property | 9 |
| Rapid Consumption | 6 | Overnight Guests | 8 |
| Sale of Alcohol | 6 | **Chapter Visitation** | |
| Transportation | 6 | **Procedures** | 8 |
| Chapter Activities and Events Legal | | **Chapter Vote** | 8 |
| Drinking Age Identification System | 5 | **Policy Reaffirmation** | 8 |
| Events Involving Alcohol | 6 | **Visitation** | 8 |
| Alchol Service | 6 | **Chapters** | |
| BYOB Events | 6 | Alumna Awareness | 3 |
| Eligibility for BYOB Events | 6 | Auxiliary Groups | 3 |
| Events at Third-Party Vendors | 6 | Awards | 3 |
| Social Event Guest Age Minimum | 6 | Chapter Merchandise | 3 |

**APP.239**

 Kappa Kappa Gamma

FRATERNITY POLICIES

Chapter Officer Education and Training   3
Convention Delegates   3
Discipline   3
   Chapters   3
   Members   3
   Personal Responsibility   4
      Health and Safety   4
      Human Dignity   4
      Unaffiliated Trasfters and Associate
         Members   4
Emergency Information   4
Good Standing   4
Graduating Members   4
Kappa Leadership Conference   4
Membership Commitment Statement   4
Men's Recruitment   4
Officers   4
Protocol   4
Ritual   4
Unrecognized Groups   4
**Chapters**   3
**Finance and Fundraising**   9
   Assessments   9
   Chapter Housing Projects   9
   Financial Drives or Campaigns   9
   Fines   10
   Fundraising Proceeds   10
   House Corporation Renovations or
      Building Projects Fundraising   10
   House Corporation/Association Annual
      Report   10
   House Corporation/Association Financial
      Reports   10
**Hazing**   10
**Membership**
   Classifications   11
      Active   11
      Associate Member   11
   Initiation   11
      Badge   11
      Blindfolds   11
      New Members   11
      Reports   11
      Risk Prevention   11

Sleepovers   11
Selection   11
   Academic Excellence   12
      Chapters Allowing Academic
         Exceptions   12
      Chapters Not Allowing Academic
         Exceptions   12
   Advisers   12
   Alcohol and Drugs   12
   Associate Members   12
   Communication With Alumnae   12
   Continuous Open Bidding   13
   Discussion   13
   Familial Relationships   13
   Men   13
   New Members   13
   References   13
      Collegiate Member References   13
      Use of References   13
   Release Figures   13
   Reports   14
   Scoring Lists   13
      Deviations From Scoring   13
      Submission of Invitation Lists   14
   Virtual Recruitment   14
   Voting   14
      Administrative Access   14
      Voting Procedures   14
Suspension   14
Transfer/Affiliation   14
**Panhellenic**   14
**Parent and Guardian Communication**   16
**Philanthropy**   14
   Community Philanthropy   15
   Inter/National Philanthropy   15
   Kappa Kappa Gamma Foundation   15
   Philanthropic Partners   15
   Risk Prevention   15
**Public Relations**
   Chapter Annual Updates   15
   Endorsement of Products or Participation
      in Promotions   15
   Internet   15
      Chapter and Alumnae Association

**APP.240**

# Kappa Kappa Gamma

FRATERNITY POLICIES

| | | | | |
|---|---|---|---|---|
| Website | 15 | Membership Lists | 16 |
| Social Media | 15 | Requests for Information | 16 |
| Web Usage | 15 | Speaking for the Fraternity | 16 |
| Licensing | 15 | Trademarks | 16 |
| Local, Regional or National Media | 15 | **Raids** | 17 |
| Participation | 15 | **Retaliation** | 17 |
| Use of Trademarks | 16 | **Visitation** | *See* **Chapter Visitation** |

**APP.241**

# ATTACHMENT 9

I, _____, as a member of _____ Chapter of Kappa Kappa Gamma ("Kappa Kappa Gamma" or "the Fraternity"), promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the *Bylaws, Standing Rules and Policies* as well as my chapter Bylaws and Standing Rules. I recognize that membership in Kappa Kappa Gamma offers me many benefits and the opportunity for friendship, mutual support, personal growth and intellectual development. I understand that the privilege of membership comes with great responsibility.

*First signed as a new member, this Membership Commitment applies to a member's entire collegiate membership in Kappa Kappa Gamma. The annual signing is a reminder of these obligations. Please take the time to review the document.*

### GENERAL COMMITMENT

*Bylaws, Standing Rules and Policies:* I understand that all new and active members of Kappa Kappa Gamma have the responsibility to uphold all chapter, Fraternity, and university rules and regulations. All members are provided access to the Fraternity documents on the Fraternity website. It is the responsibility of the individual member to become familiar with these documents. Members who violate chapter, Fraternity, and/or university rules and regulations may be subject to discipline up to and including dismissal from the Fraternity.

Hold Harmless: I understand and agree that I am responsible and liable for my actions, including but not limited to negligent or intentional acts, errors or omissions. I agree to release my chapter, House Board/Fraternity Housing Corporation, and the Fraternity from liability related to and to defend, hold harmless and indemnify the chapter, House Board/Fraternity Housing Corporation and the Fraternity as well as their respective officers, agents, employees and volunteers from and against any claims, damages, costs or expenses, including attorney's fees, financial loss, any loss or damage to property, or injury or death to any person arising in any way out of my acts, errors or omissions.

Insurance: I understand and agree that the chapter, House Board/Fraternity Housing Corporation, and the Fraternity as well as their respective officers, directors, employees and agents shall not be responsible for any injury, loss or damage to my person or property. I understand that the Fraternity's insurance coverage is for general public liability. It is not accident insurance that covers any injury, loss or damage to my person or property sustained on the chapter premises and/or during chapter activities, and it is not a substitute for personal health or medical insurance or renters, homeowners or umbrella insurance. (Risk Prevention Procedures)

### LEGAL COMPLIANCE

*\*In addition to the Bylaws, Standing Rules, and Policies section above, all new and active members are subject to local, state/provincial and federal law. Members who violate such laws may be subject to discipline up to and including dismissal from Kappa Kappa Gamma. All new and active members are also subject to the rules and regulations of the university where a Kappa Kappa Gamma chapter is located. Members who violate such rules and regulations may be subject to discipline up to and including dismissal from Kappa Kappa Gamma. (Fraternity Bylaws, Article V)*

Hazing: I understand that hazing is prohibited and any new or initiated member failing to comply with this policy is subject to discipline up to and including dismissal from Kappa Kappa Gamma. This policy pertains to all members of the Fraternity. Hazing is defined as any activity or action taken with or without consent of the individual involved that produces mental, emotional, psychological or physical discomfort, intimidation, humiliation, degradation, embarrassment, harassment or ridicule. Such activities and situations include, but are not limited to, blindfolding for any purpose; forced or coerced alcohol consumption or use of drugs or other controlled substances in violation of local, state/provincial or federal law; creation of excessive fatigue; physical and psychological shocks; treasure hunts, scavenger hunts or kidnappings; wearing apparel that is conspicuous and not normally in good taste; engaging in stunts or degrading or humiliating games and activities; and late work sessions

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 345 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 248
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 164 of 209

# ATTACHMENT 10

 **Kappa Kappa Gamma**

HOUSE CONTRACT

**GAMMA OMICRON
KAPPA KAPPA GAMMA FRATERNITY
UNIVERSITY OF WYOMING
LIVE-IN HOUSE CONTRACT
DUE March 21, 2022 @ 5:00pm**

Contract Term:
**Fall 2022 Semester & Spring 2023 Semester**

Term Charges:

**Fall Semester 2022 $3,850.00**

Rent $1,300.00
Regular Board $2,200.00
Maintenance $350.00

**Spring Semester 2023 $3,850.00**

Rent $1,300.00
Regular Board $2,200.00
Maintenance $350.00

Default Deposit Amount:
**$250 due Upon Turning in the Live-In House Contract**
Unless the student has previously paid this security deposit and lived in the
Kappa house.
(See Section 7 below.)

Damage Deposit Amount:
**$300 due Upon Move-In/Check-In Date**
(See Section 12 below.)
Unless the student has previously paid this damage deposit and lived in the
Kappa house.

Student's Name: ███████████████

Address: ███████████████████████████████

Phone Number: ██████████████████

HB-13                                  1                              21.08

**APP.245**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 347 of 506

Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 250
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 166 of 209

 **Kappa Kappa Gamma**                                    HOUSE CONTRACT

**FOR GOOD AND VALUABLE CONSIDERATION**, Gamma Omicron chapter ("chapter") of Kappa Kappa Gamma Fraternity ("Fraternity"), the <u>Kappa Kappa Gamma Building Co.</u> ("House Board"), the student named above ("student") and, if applicable, the student's undersigned parent or legal guardian ("co-signer") do hereby mutually covenant and agree as follows.

1. **Residence in chapter house and Membership Status.** The chapter shall furnish room and board to the student in the chapter house ("chapter house") occupied by the chapter at <u>1604 E. Sorority Row, Laramie, Wyoming</u> at the University of Wyoming ("university") during the portions of the academic year defined in Exhibit A attached herein ("residential period"). The student shall pay fees for room and board to the chapter as described in Exhibit A. THIS CONTRACT IS NOT A LEASE OR ANY OTHER INTEREST IN REAL PROPERTY. IT IS A CONTRACTUAL ARRANGEMENT CONNECTED BY MEMBERSHIP OBLIGATIONS THAT CREATES A REVOCABLE LICENSE. The student shall reside in the chapter house and take board therein during the residential period subject to the terms and conditions of this contract. The student understands and agrees that residency in the chapter house is limited to members in good standing with the Fraternity who are regularly enrolled students at the university. Any occupancy outside the residential period shall be considered a holdover ("holdover period") pursuant to which this contract may be terminated by the chapter at will — not on a month-to-month basis — upon 24-hour notice to the student. This provision is included only to establish the chapter's remedies in the event the student does not vacate as required and nothing in this section shall create an option or right for the student to extend the occupancy beyond the residential period. Payment due to the chapter for any such holdover period shall be at a rate of $200 per day.

2. **House Board.** The chapter leases the chapter house from <u>Kappa Kappa Gamma Building Co.</u> ("House Board"). The student, the co-signer, and the chapter grant rights to House Board hereunder, which are essential terms of this contract.

3. **Enforcement.** The student and the co-signer agree that both the chapter and House Board have the right and standing, in their own name and on their own behalf, to enforce this contract, including, without limitation, the right to bring actions to enforce the terms of this contract, to collect amounts due hereunder and to terminate this contract as described in Section 16 and 17.

4. **No Agency and Joint Obligation.** The chapter, the student and their guests, and the co-signer are not subordinates or agents of House Board or the Fraternity. None of them shall, at any time, represent themselves as such. The chapter is an unincorporated association comprised of its members, including the student. As a member of the chapter, the student is jointly responsible and liable for and guarantees (on an equal basis with other members of the chapter) the performance of the chapter's obligations to House Board and the Fraternity.

5. **Other Services.** The chapter shall provide the student such services as are customarily furnished by the chapter to residents of the chapter house, subject to this contract, the Kappa Kappa Gamma Fraternity *Bylaws, Standing Rules and Policies* ("Fraternity standards"); and rules and regulations of the chapter, including, without limitation, the House Rules ("House Rules") attached hereto as Exhibit B, subject to any changes as

**APP.246**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 348 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 251
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 167 of 209

 **Kappa Kappa Gamma**                                      HOUSE CONTRACT

may be made by the chapter, House Board or the Fraternity at any time. As long as they
are a member in good standing of the Fraternity, the student shall also be entitled to all
other benefits of membership in the Fraternity.

6. **Charges and Payments.** In consideration of room, board and the services described in
the first sentence of Section 5, the student shall pay to the chapter the applicable
annual charges specified in Exhibit A for the entire academic year during the term of this
contract. The student shall pay all amounts due under this contract when and as billed
by the chapter, the Fraternity or House Board. All payments due under this contract are
sometimes collectively referred to as the "occupancy payment." Credit/debit card
transactions that are denied or checks that are returned will be considered late
payments and will result in the applicable late fees. Any unpaid balances remaining due
after termination of occupancy shall be subject to 1.5% interest per month — 18% per
annum or the highest amount allowed by law, if lower. In addition, the student may be
placed on any delinquency status that the university has established and shall be subject
to the terms thereof. The student acknowledges that the chapter, House Board and the
university may cooperate with regard to delinquency status and expressly authorizes
such actions by the university, chapter and House Board. The Occupancy Payment is
based on the academic year as a whole and the charges shall not be adjusted if the
academic year or residential period is modified for any reason. In the event of a default
by the student under this contract, the student hereby authorizes the chapter and
House Board to work with and cooperate with the university in withholding the
student's grades and/or diploma until all such defaults have been cured and to take
such actions on its own behalf and on behalf of the student as are required to complete
this process.

7. **Default Deposit.** The student shall pay any default deposit described in Exhibit A
("default deposit") to House Board upon execution of this contract. The default deposit
may be applied to remedy any default of the student under the terms and conditions of
this contract and shall be refunded by House Board upon the student's full performance
of their obligations under this contract as long as a forwarding address has been given.
The student acknowledges and agrees that the default deposit relates solely to this
contract, is not related in any way to a leasehold interest, and is not and shall not be
deemed to be a security deposit as defined under state law.

8. **Room Assignment, Public Areas and Guests.** This contract is for a non-exclusive right to
occupy living spaces in the chapter house and not for any particular room. House Board
makes no guarantee of the specific furniture to be available in each room. The chapter
reserves the right to assign the student to a room. The chapter or House Board reserve
the right to change the student's room assignment at any time in accordance with
chapter policies or if necessary for health reasons. Additionally, the student
acknowledges that disputes by or among occupants of the chapter house may occur and
neither the chapter nor House Board has a duty to accommodate the student or any
other occupant of the chapter house as a result of such disputes. The student
acknowledges that no provision of this contract imposes a duty upon the chapter or
House Board to terminate the occupancy rights of any other occupant of the chapter
house because of disputes among or between the student and other occupants of the

**APP.247**

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 349 of 506

Appellate Case: 23-8065   Document: 010110962640   Date Filed: 12/04/2023   Page: 252
Case 2:23-cv-00051-ABJ   Document 6-1   Filed 04/20/23   Page 168 of 209

 Kappa Kappa Gamma                                        HOUSE CONTRACT

chapter house. The student shall be permitted to use the public areas of the chapter house and to invite and host guests at the chapter house if allowed under the approved House Rules and approved Visitation Policy. Provided that all guests shall be subject to and abide by the terms of this contract to the same extent as the student, the student shall take all steps necessary to assure that their guests abide by this contract and the student shall be financially responsible for any claims, damages, losses, expenses or liabilities arising out of the acts or omissions of their guests. The student's guests, including overnight guests, must comply with the chapter's approved visitation policy. If the chapter does not have a visitation policy, the student acknowledges that they cannot host guests who are not members of the chapter in the private areas of the chapter house. **House Board reserves the right to suspend guest access to the facility for health or safety reasons.**

9.  **Board.** The board shall be available as described in Exhibit A. The chapter shall not be responsible for meals not served for reasons beyond its control. IT IS EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT NO CREDIT WILL BE ALLOWED FOR MEALS NOT TAKEN AT THE CHAPTER HOUSE OR FOR TIME SPENT LIVING ELSEWHERE, SUBJECT ONLY TO THE PROVISIONS SET FORTH RELATED TO THE STUDENT'S PETITION. In addition, in the event of a default by the student under this contract, the chapter or House Board may, at its option and in addition to and not in lieu of any other remedies that may be available, terminate the student's right to take meals at the chapter house and/or suspend the student's right to take meals as long as the event of default continues. The student shall not be entitled to any credit for meals not served as a result of the student's default under this contract and the remedies that the chapter or House Board elects to pursue.

10. **Residential Use and Compliance With Legal and Other Requirements.** The student shall use the chapter house solely for residential purposes. Neither the student nor their guests shall use their room or any other portion of chapter property for any purpose or in any manner that violates the law or constitutes a nuisance. The student and their guests shall, at all times, comply with all local, state, and federal laws, ordinances and regulations and health and safety orders; rules, regulations and policies of the chapter, House Board, the university and any insurer of the chapter, House Board or Fraternity; and the Fraternity standards. The student acknowledges that it is their responsibility to seek out, read and understand the foregoing rules, regulations and policies and the Fraternity standards and they agree to follow the same.

11. **Care of Property.** The student shall take good care of the chapter house and its furniture, furnishings and equipment ("facility furnishings"). The student shall keep the chapter house and the Facility Furnishings in a neat, clean and orderly condition. The student shall not damage the chapter house or the facility furnishings and the student shall make no alterations or additions to the chapter house without the prior written consent of House Board. The chapter and House Board may charge the student for any special services that either of them provides or any special costs that either of them incurs in connection with the student's use or misuse of the chapter house or chapter or House Board property. Upon the expiration or other termination of this contract, the student shall return all keys and security items promptly upon request of the chapter or

APP.248

 Kappa Kappa Gamma                    HOUSE CONTRACT

House Board, remove their personal property from the chapter house, and peaceably surrender possession of the premises and property in a clean condition and good repair, excepting solely ordinary wear and tear resulting from careful usage. After the surrender of possession by the student, the chapter and House Board shall have the right to dispose of any personal property left by the student in or on the premises. The chapter and House Board shall not be responsible for the student to account for the disposal of such property. The student shall not affix any items to the doors of their room. The student shall not drive any nails or screws into the woodwork, walls or ceilings of the chapter house and shall be responsible for any damage caused by items affixed thereto.

12. **Rules.** The student and their guests shall, in addition to complying with the provisions of Section 10 of this contract and the House Rules described in Exhibit B, observe the following rules: (a) no animals or pets whatsoever shall be brought or kept on the chapter house property (as a reasonable accommodation in connection with a student's disability, House Board may permit a bona fide service animal that is professionally trained and used for the assistance of such a student and bona fide assistance animals); (b) access to or use of the roof is prohibited; (c) tampering with or disabling any life safety or security system or device is prohibited; (d) flammables, bicycles and motorcycles shall be stored outside in designated areas; (e) the possession of firearms or other weapons on the chapter house property is prohibited; (f) the use of burning candles in the chapter house is prohibited; and (g) the use or possession of alcohol, marijuana or illegal substances is prohibited on the chapter house property. The student further agrees not to disturb, annoy, endanger or inconvenience neighbors or other occupants of the chapter house. The student acknowledges that violation of any of the foregoing rules is grounds for termination of this contract and the student's removal from the property.

13. **Right of Inspection.** The student agrees that House Board or its designated employees may, and reserves the right to, enter the student's room without prior notice for the purpose of inspecting the room and its contents to ascertain compliance with the terms of this contract, assure the safety of occupants of the chapter house, make such repairs, alterations, additions, and improvements as House Board may deem necessary or desirable, and for any other purpose that the chapter or House Board determines is in the best interest of the chapter and the Fraternity. The student acknowledges that House Board and its agents may report illegal items/activities to law enforcement and/or campus security.

14. **Insurance.** The chapter, House Board and the Fraternity as well as their respective officers, directors, employees and agents shall not be responsible for any injury, loss or damage to the student or the student's property, including their vehicle, resulting from fire, theft, or any other cause. The student agrees that they alone are responsible for securing personal insurance protection against such things as accidents, sicknesses, injuries or death, damage to or loss of their property and legal liability imposed on them for damage to persons or property and further acknowledges that neither the chapter, House Board or Fraternity carry insurance covering their personal property. The student is expected to insure any property they bring onto the chapter house premises

**APP.249**

 Kappa Kappa Gamma                    HOUSE CONTRACT

(including vehicles in the parking lot) against the risk of loss or damage and proof of insurance may be required as a condition of occupancy. The student agrees, provided such agreement does not invalidate any policy of insurance, that in the event of a claim against them for injury to persons or damage to property, insurance coverage, if any, under any policy of insurance secured or maintained by the chapter, House Board or the Fraternity, shall specifically be excess of and shall not contribute with any insurance otherwise available to the student. The student further agrees, provided such agreement does not invalidate any policy of insurance, that in the event their property is damaged or destroyed or they are injured and their loss is covered by insurance maintained by or for the benefit of the student, they hereby waive any rights of recovery or subrogation against the chapter, House Board or the Fraternity.

15. **Damage/Indemnification.** The student acknowledges and agrees that they are responsible and liable for their personal actions and those of their guests and invitees, including but not limited to negligent or intentional acts, errors or omissions. The student agrees to release the chapter, House Board and Fraternity from liability related to, and to defend, hold harmless and indemnify the chapter, House Board and the Fraternity as well as their respective officers, agents, employees and volunteers, from and against, any claims, damages, costs or expenses, including attorney's fees, financial loss, or any loss or damage to property or for injury or death to any person arising in any way out of the acts or omissions of the student or their guests, including but not limited to negligent their intentional acts, errors and omissions, or any breach of this contract by the student, their guests, invitees or agents. Notwithstanding the foregoing, the student's liability shall not extend to damage to the chapter house as well as its fixtures or furnishings to the extent that the chapter and House Board receives or is entitled to receive insurance proceeds from the chapter or House Board's insurance coverage as a result of such damage. DAMAGE TO COMMON AREAS OF THE CHAPTER HOUSE WILL BE CHARGED ON A PRO-RATA BASIS TO ALL OCCUPANTS OR MEMBERS. IN THE CASE WHERE INDIVIDUALS CAUSE DAMAGE AND THEY ARE CLEARLY IDENTIFIED, AT THE CHAPTER'S SOLE DETERMINATION, THE SPECIFIC INDIVIDUALS WILL BE HELD LIABLE FOR THE REPAIR CHARGES. **I understand that while House Board will take precautions to clean the facility and provide procedures to assist with social distancing, it will be up to me and to other residents of the property to limit outside exposure and to follow guidelines suggested to protect against the spread of COVID-19. I have elected to live in the facility and release the Fraternity, house corporation and any other individual volunteer, adviser, employee or board member from liability associated with the risks inherent in living in a communal environment.**

16. **Termination by the student.** Once this contract is signed by the student, it cannot be rescinded and may be terminated only as described in this contract. The student agrees to pay full charges due under this contract, even if the student vacates the chapter house before the end of the term of this contract. The foregoing applies regardless of the reason for the vacation of the chapter house. The only options for termination by the student include:

   a. **Assignment of the contract to another member:** The student may assign their house contract to another nonresident member in good standing, subject to the

**APP.250**

 Kappa Kappa Gamma                    HOUSE CONTRACT

consent of the chapter and House Board. There is no duty or obligation on the part of the chapter, Fraternity or House Board to find a replacement resident if the student vacates the chapter house or if this contract is terminated

b.  **Petition to House Board for release**: The student may petition House Board to hear their request for release from this contract and any amounts due for room and board following the student's vacation of the chapter house. House Board shall consider such factors as withdrawal from the university, transfer to another school, financial hardship, personal or family illness, or other extenuating circumstances, but the final determination shall be at House Board's sole discretion and shall be binding on the student. As all situations are unique, prior determinations of House Board shall in no way bind or affect its determination with regard to the student's petition.

c.  **Petition to the chapter for release**: The student may petition the chapter to hear their request for release from this contract and any amounts due for room and board following the student's vacation of the chapter house. The chapter shall consider such factors as withdrawal from the university, transfer to another school, financial hardship, personal or family illness, or other extenuating circumstances, but the final determination shall be at the chapter's sole discretion and shall be binding on the student. As all situations are unique, prior determinations of the chapter shall in no way bind or affect its determination with regard to the student's petition. A successful petition to the chapter for release will result in the chapter taking on the financial obligations of the student associated with this contract, with payment coming out of the chapter operating budget.

In the event that the above options for termination are unsuccessful, the student agrees to pay full charges due under this contract, even if the student vacates the chapter house before the end of the term of this contract, fails to move into the chapter house or chooses to resign their membership.

17.  **Termination by the Chapter/House Board.** The options for termination of this contract by the chapter/House Board include:

a.  **Breach of contact: if** the student fails to comply with this contract or their status as a member of the Fraternity or regularly enrolled student terminates for any reason, this contract may be terminated by the chapter or House Board. If the chapter decides to terminate the contract without approval from House Board, it will result in the chapter taking on the financial obligations of the student associated with this contract, with payment coming out of the chapter operating budget.

b.  **Loss of recognition, insolvency, uninhabitability**: The chapter or House Board may terminate this contract if the chapter loses recognition either by the university or the Fraternity, if House Board becomes insolvent for any reason or is unable to continue the lease of the current facility for any reason, or if the chapter house becomes uninhabitable by reason of fire, windstorm or any other catastrophe. If the chapter house becomes uninhabitable by reason of fire, windstorm or other catastrophe, House Board may repair the chapter house and

**APP.251**

 **Kappa Kappa Gamma**                                      HOUSE CONTRACT

then all obligations of this contract shall continue to be binding upon the student from the date of completion or rehabilitation to render the chapter house once again suitable for its intended use. House Board shall be entitled to reassign rooms, increase or lower the occupancy of rooms or use common area rooms for occupancy if it determines the same is required to accommodate all students following a loss.

   c.  **Unexpected house closure**: In addition to the other termination rights granted to house corporation in this agreement, House Board may close the chapter house and require the members to vacate the same in the event such action is required or encouraged by the university, or if the university has or will cancel or suspend in-person classes, whether due to public health emergencies, pandemics, communicable disease outbreaks or any other reason. In such case, the determination of whether payments made by or due from the student will be credited against future payments (or, with regard to seniors, refunded) will be made by House Board in its sole judgment on a case-by-case basis, considering all factors, including the length of time the chapter house is closed and the fixed expenses incurred by the house corporation.

18. **Surveillance.** The student acknowledges that House Board may have installed or may from time to time install security cameras inside and/or around the exterior perimeter of the chapter house as it determines at its sole discretion. The student expressly waives all and any claims related in any way to such security cameras or their audio or video footage. The student acknowledges that there is no expectation of live monitoring of surveillance feeds.

19. **Amendment and Assignment.** This contract shall not be amended except in writing signed by all of the parties that signed the original contract and/or current relevant officers. This contract is personal to the student and the student shall not sell or assign this contract without the prior written consent of the chapter and House Board, which may be withheld in their sole discretion.

20. **Liability of Co-Signer.** If the student is under the age of 18 or the age of majority in the state in which the contract will be performed as of the Effective Date, the co-signer may sign the contract as well and provide the contact information in Exhibit C attached herein. Nothing in this contract shall require the signature of a co-signer in order for the contract to be considered fully executed and binding on the student. If there is no co-signer to this contract, all references to the parties that include the co-signer shall be read solely to refer to the signing parties. The co-signer is directly and fully liable for all obligations of the student under this contract and is jointly and severally liable with the student hereunder. The co-signer shall have no occupancy rights at the chapter house as a result of this contract. The co-signer acknowledges that he or they are directly and indirectly benefitting from having the student live in the chapter house and that adequate consideration for entering into this contract has been received.

21. **General.** This contract represents the entire contract between the parties and may not be modified or amended except by mutual contract in writing and signed by all parties and/or current relevant officers. No waiver of any term or condition or the breach of any term or condition of this contract shall be deemed either to (i) constitute a waiver of

**APP.252**

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 354 of 506

Appellate Case: 23-8065   Document: 010110962640   Date Filed: 12/04/2023   Page: 257
Case 2:23-cv-00051-ABJ   Document 6-1   Filed 04/20/23   Page 173 of 209

 Kappa Kappa Gamma                    HOUSE CONTRACT

any subsequent breach of such term or condition, or (ii) justify or authorize any non-observance of such term or condition or any other term or condition. All notices to the student shall be sent to or posted at the chapter house, unless, following the termination of this contract, a forwarding address is provided in writing to the chapter. All fees, fines, charges and other payments due under this contract for noncompliance are hereby agreed to be liquidated damages. The chapter, House Board, student and co-signer agree that determining the exact amount of the chapter's damage in each case of noncompliance by the student is difficult, but that the fees, fines, charges and other payments set forth herein represent a fair estimate of chapter's damages and are hereby agreed to by the parties.

22. **Governing Law.** This contract is made with reference to and shall be construed in accordance with the laws of Wyoming in which state it shall be performed by the parties. Any action arising under the terms and conditions of this contract may be brought by any local, state or federal court located in Albany County, Wyoming having jurisdiction of the subject matter. The undersigned parties hereby consent that any such court shall have personal jurisdiction over them with respect to any such action.

23. **Counterparts.** This contract may be executed by counterparts and each set of fully executed counterparts may be deemed to be one original. Signatures to this contract transmitted by telecopy, email or other electronic means shall be valid and effective to bind the party. However, each party also agrees to promptly deliver an executed original of this contract with its actual signature to the other parties upon request, but a failure to do so shall not affect the enforceability of this contract.

(signatures on following page)

**APP.253**

## ✿ Kappa Kappa Gamma                    HOUSE CONTRACT

**IN WITNESS WHEREOF,** the chapter, House Board, the student, and co-signer have caused this contract to be executed as of the _____ day of <u>March</u>, 2022.

**Gamma Omicron Chapter of Kappa Kappa Gamma Fraternity**

_____          _____
Signature                           Printed Name

_____          _____
Chapter President                   Date

**Kappa Kappa Gamma Building Co.**

                                    Sandy Hoy Helzer
_____          _____
Signature                           Printed Name

_____          _____
House Board President                Date

[redacted]                          [redacted]

                                    Printed Name

Date

[redacted]                          [redacted]

                                    Printed Name

**APP.254**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 356 of 506

Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 259
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 175 of 209

 **Kappa Kappa Gamma**                                    HOUSE CONTRACT

### EXHIBIT A | SCHEDULE AND FEES

1. **Residence period.** The residence period shall begin on 8/13/2022 and end on May 13, 2023. The residence period shall exclude the following school breaks: Thanksgiving Break; Winter Break; Spring Break. The residence period shall not include any other periods during which House Board elects to close the chapter house.
2. **Board.** The board shall consist of 14 of meals per week to be served on the days and at the times determined by the chapter, subject to modification by House Board. No meals will be served outside of the residence period.
3. **Fees.** Rent, maintenance fee and regular board charges for entire academic year: $7,700.00 . Default deposit amount: $250.00 (include if applicable)

### EXHIBIT B | HOUSE RULES

1. Facility open hours and quiet hours will be posted in the chapter house. It is expected that all members will comply with this schedule.
2. Respect and courtesy for staff, guests and other residents is required at all times.
3. All facility security measurements must be followed, including but not limited to locking doors, not propping doors open, not sharing access codes/keys/fobs, etc.
4. All activities occurring in the chapter house or on the adjacent real estate shall comply with the risk management policies and guidelines of the Fraternity.
5. Members are not permitted to cook in the kitchen or use any commercial-grade fixtures or appliances.
6. The chapter house, including bedrooms, bathrooms and surrounding grounds, shall be kept and maintained in a clean, orderly, sanitary and habitable condition at all times.
7. Firearms, ammunition, weapons or explosives may not be possessed, stored or otherwise caused to be present in the chapter house or on the adjacent real estate.
8. Alcohol and illegal substances, including cannabis, are prohibited in the chapter house or on the adjacent real estate.
9. Tampering with, destroying or misusing smoke detectors, fire detection, security systems, and/or sprinkler systems/fire extinguishers in any way is strictly prohibited.
10. Open flames are not allowed in the chapter house. Only flameless candles may be used.
11. Smoking is prohibited. This includes but is not limited to juuls, vaping, and e-cigarettes.
12. Extension cords and string lights are not allowed in private bedrooms.
13. Small appliances, such as microwaves, coffee makers, air conditioning units, and space heaters, are not permitted in the residential spaces of the chapter house. House Board may approve health-related exceptions through the housing accommodations process.
14. No one is allowed on the roof, in mechanical rooms or other parts of the chapter house not designed for residential purposes at any time.
15. With the exception of furniture specifically designated for such purpose, no furniture or furnishings, including beds and mattresses, shall be relocated or placed outside of the chapter house without the consent of House Board.
16. There shall be no alteration or removal of any interior or exterior, permanent or decorative fixtures or equipment, including, without limitation, any plumbing, heating, water or electrical fixtures, equipment or systems.
17. There shall be no alteration, including painting, of any part of the chapter house.

**APP.255**

## ✳ Kappa Kappa Gamma                    HOUSE CONTRACT

18. No windows, doors, window frames, doorframes, door handles, locks or latches shall be removed or altered in any way.
19. No bridges, slides, pools, ponds, waterslides, stages or other structures shall be constructed within the chapter house or on the adjacent real estate.
20. Personal belongings are not to be stored in the chapter house during the summer months. House Board will dispose of items left behind. This includes furniture, appliances, bikes, etc.
21. **Members will adhere to guidelines provided by the Centers for Disease Control and Prevention as well as the state and local health department, university officials and chapter leadership regarding hygiene, social/physical distancing, and cleaning.**
22. **If requested, members will wear a mask at any time, including at all times when they are in communal living areas of the chapter facility.**
23. **Members will monitor their own symptoms, including taking their temperature as requested or required. In the event a member exhibits symptoms, including a fever above 100.4, they agree to notify the House Director as well as any required university or health department officials. Members agree to follow all guidance from those entities as well as the CDC related to self-quarantine.**
24. **Members will adhere to new rules and procedures regarding food service, sleeping quarters, hosting of guests, including nonresident members, scheduling of study spaces and other changes as required in order to keep the membership safe.**

### EXHIBIT C | PARENT/GUARDIAN CO-SIGNER INFORMATION



**APP.256**

ATTACHMENT 11

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 359 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 262
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 178 of 209

# LAW OFFICE OF JOHN G. KNEPPER, LLC

JOHN G. KNEPPER

# LONGHORN LAW

A LIMITED LIABILITY COMPANY
CASSIE CRAVEN − ATTORNEY AT LAW

<div style="display:flex; justify-content:space-between;">

John G. Knepper
1720 Carey Ave., Suite 590
Cheyenne, Wyoming 82001
John@KnepperLLC.com
307-632-2842

Cassie Craven
109 E. 17th St. Suite 223
Cheyenne, Wyoming 82001
ccraven.law@gmail.com
307-823-3062

</div>

November 4, 2022

<div style="display:flex; justify-content:space-between;">

Kappa Kappa Gamma
6640 Riverside Drive, Suite 200
Dublin, Ohio 43017
kkghq@kkg.org

Kappa Kappa Gamma
1604 E Sorority Row
Laramie, WY 82072

</div>

<div style="display:flex; justify-content:space-between;">

Kari Kittrell Poole
kpoole@kkg.org

Emily Logue
Emily.logue@kkg.org

</div>

<div style="display:flex; justify-content:space-between;">

Denise Rugani
Denise.rugani@kkg.org

Mary Pat Rooney
Marypat.rooney@kkg.org

</div>

**Re:  Kappa Kappa Gamma – Initiation of a Non-Woman, Artemis Langford**

To Whom It May Concern:

We represent 14 members of the Gamma Omicron chapter of the Kappa Kappa Gamma sorority at the University of Wyoming. Our clients have reached out with concerns about both the process and the ultimate decision of the Wyoming chapter's intention to abandon the sorority's 150-year commitment to providing a single-sex environment for young women to develop "the nobler qualities of the mind and the finer feelings of the heart."

We urge you to pause and review the decision of a small number of chapter members to violate the sorority's corporate by-laws and standing rules through the induction of a non-woman into this fraternal organization.

Several of our clients have asked to remain anonymous as the current behavior of members of the chapter has compromised their safety and privacy. It is our understanding that the members have raised concerns with the sorority's Executive Director, Kari Kittrell Poole, and she and some

<div style="text-align:right;">**APP.258**</div>

Kappa Kappa Gamma
Page 2 of 3

of the national officers of the sorority have failed to act. Our clients have suffered targeted harassment and discrimination by your organization.

Studies have repeatedly emphasized the importance of a single-sex environment for young women in particular. The single-sex environment allows young women the benefits of such a "supportive empowering community" to persist even after the young woman has graduated or otherwise left that environment. These statements and values are not only, the views of our clients, they are public assertions, made in 2019, by on behalf of Kappa Kappa Gamma about the importance of sororities for women. *See* Complaint, Kappa Alpha Theta Fraternity, Inc., *et al. v. Harvard Univ.*, Case No. 18-cv-12485, Docket No. 1 at ¶¶ 33, 93-97 (D. Mass. 2019).

Allowing a non-woman into the organization is a breach of contract and a violation of Kappa Kappa Gamma's by-laws and standing rules which form its commitment to its more than 280,000 initiated members (and more than 210,000 living alumnae), the other active collegiate chapters, and alumnae associations. The initiation of any non-woman should be halted immediately. Our clients will enforce their rights through the courts if this unthinkable course becomes necessary to prevent this illegal, harmful conduct.

Kappa Kappa Gamma is important to the families and individuals who have loved and served it for generations. Young women come to the organization for help establishing a sense of safety and identity. Kappa Kappa Gamma does not belong to a small number of individuals elected to positions of leadership. These leaders instead have a fiduciary duty to support the organization. Our clients are concerned that the sorority's leadership is now compromised and our clients now experience significant adverse impacts as a result. We ask that you care for all members in light of their welfare and prevent them from being placed into a harmful situation that they have been guaranteed will not exist. None of the sorority's membership provisions allow a non-woman to enter this women's organization. It is that simple.

Further, our clients are concerned that the decision process which has led to this unfortunate position was deeply flawed. The Chapter President, Jamie Neugebauer, conducted an illegal voting procedure. She hosted a one-sided dialogue regarding the non-woman who sought membership. Discussion was not allowed; leadership made threatening comments that a belief in the value of a single sex environment was bigoted, allowing only allowed one side to speak. Then, in a blatant violation of the requirement for a secret ballot, the chapter members voted through a Google Poll tracked by email. This public vote was only after a first vote, earlier that evening, was so close that officers approached individual women and pressured them to change their vote claiming a 'faulty voting system' in Google forms. The second Google form destroyed the required anonymity. Officers further stated they would go "door to door" if the votes weren't tendered, although it appears that this canvassing was selective. Votes were cast in small committee settings without privacy or secrecy. The goals of this endeavor were clear from the beginning, and they were not a valid selection process.

We ask in earnest that you act in haste and with prudence in a manner that respects the self-worth of all individuals involved. Our clients have been told that their, "values don't align with those of Kappa" so they should "reconsider being in Kappa," but they ask only that the sorority remain true to its legal commitments and its values. We encourage you to take a step back, and

**APP.259**

Kappa Kappa Gamma
Page 3 of 3

either legally alter the sorority's membership requirements and conduct a valid vote in accord with existing rules or halt the illegal course of conduct being pursued without regard to the great good the organization has accomplished as a single-sex organization over the past 150 years.

Regards,

John G. Knepper
Law Office of John G. Knepper, LLC

*Cassie Craven*

Cassie Craven
Longhorn Law Limited Liability Company

cc

University of Wyoming
c/o Dr. Edward Seidel, President
c/o Ryan Dineen O'Neill, Dean of Students
uwpres@uwyo.edu

# ATTACHMENT 12

❅ Kappa Kappa Gamma                    POSITION STATEMENTS

**ACADEMIC EXCELLENCE**
Kappa Kappa Gamma recognizes the value in striving for intellectual excellence and pursuing opportunities for self-growth. Each chapter is encouraged to foster scholastic excellence, actively support members who encounter academic challenges and provide an environment conducive to academic success for all.

**ALCOHOL-FREE CHAPTER FACILITIES**
Kappa Kappa Gamma supports alcohol-free chapter facilities. The Fraternity believes in the highest quality collegiate experience, and alcohol-free chapter facilities are more conducive to scholastic excellence as well as individual and chapter well-being.

**ALCOHOL USE**
Alcohol is not permitted in or on any part of the chapter property. Kappa-sponsored or co-sponsored events are limited to members and guests and must be in compliance with Kappa's Risk Management Procedures. Chapter funds may not be used to purchase alcohol. The sale of alcohol by any member representing the chapter is prohibited. Members may be subject to dismissal or other disciplinary action for the illegal use or misuse of alcohol.

**AMNESTY**
All members are expected to exercise personal responsibility for their own health and safety and show care for others. To ensure anyone at medical risk as a result of alcohol intoxication or overdose of any controlled substance — including a prescription drug — will receive prompt and appropriate medical attention, Kappa Kappa Gamma provides disciplinary amnesty in certain situations for individual members to remove any perceived barriers to calling for or seeking help.

**CONDUCT**
Kappa Kappa Gamma is a private organization whose members join voluntarily and agree to uphold the governing documents of the Fraternity. Members of Kappa Kappa Gamma have the responsibility to adhere to the standards of the Fraternity. Members may be subject to dismissal or other disciplinary action if they do not adhere to the standards of conduct expected by the Fraternity.

**HAZING**
Hazing is prohibited. Any member who participates in or permits hazing is subject to dismissal or other disciplinary action.

**HUMAN DIGNITY**
Kappa Kappa Gamma recognizes the value of each individual and expects its members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals. Kappa Kappa Gamma values diversity and does not discriminate based on race, national origin, religion, disability, age, gender identity, sexual orientation or other class protected by state, local or federal law. Members, collegians and alumnae, are encouraged to

APP.262

## ❉ Kappa Kappa Gamma                  POSITION STATEMENTS

promote and demonstrate an understanding of diversity, both on the college campus and in the world community.

### MEMBERSHIP SELECTION

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.

Kappa Kappa Gamma continues to seek members who:
- Will further the mission and purpose of the Fraternity.
- Have achieved academic success.
- Have demonstrated good character.
- Will enrich the life of the group through shared congeniality.
- Are responsible citizens and contributing members of their communities.

Each chapter of Kappa Kappa Gamma has the final choice of its own members.

### SINGLE-GENDER ORGANIZATIONS

Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.

The single-gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX.

### SUBSTANCE ABUSE

The use, sale, purchase or possession of any drugs or other controlled substance in violation of local, state or federal law is prohibited. Members not adhering to this statement may be subject to disciplinary action up to and including dismissal.

### VIOLENCE

Kappa Kappa Gamma does not tolerate violence in any form, including but not limited to sexual violence, dating and domestic violence, physical violence, mental abuse, emotional abuse or bullying.

Members of Kappa Kappa Gamma are encouraged to provide survivors of violent acts with a supportive and empowering environment. Any member of Kappa Kappa Gamma who is a perpetrator of an act of violence is subject to dismissal or other disciplinary action.

ATTACHMENT 13



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

**STANDING RULES
OF
GAMMA OMICRON CHAPTER OF
KAPPA KAPPA GAMMA FRATERNITY**

**[Insert date adopted or amended]**

**1.0 Members**

**1.1 Membership Commitment Statement.** The chapter shall require each member to sign the Membership Commitment Statement annually, including sections about legal compliance, personal conduct, and consequences of violations.

**1.2 Hazing.** Hazing is prohibited and any chapter member failing to comply shall be held accountable for inappropriate conduct.

**1.3 Attendance.** The chapter shall establish an attendance rule for unexcused absences.

    **A.  Excused Absences.**

        **1.  Chapter Meetings and Required Chapter Functions.**

            **a.  Written Excuses**. Written excuses for missing a chapter meeting or required chapter function shall be submitted in advance to the officer in charge of attendance for approval by Executive Board (unless otherwise specified in the chapter Standing Rules).

            **b.  Acceptable Excuses.** Acceptable excused absences shall be illness, family emergency, a required class offered only at the meeting/function time, school conflict, religious observations, or valid emergency.

            **c.  Approval**. Executive Board shall approve excused absences by a majority vote.

            **d.  Notification**. The officer in charge of attendance shall notify the member of Executive Board's decision.

        **2.  Initiation and Founders Day.**

            **a.  Written Excuses.**

                i.   Written excuses for missing Initiation shall be submitted in advance to the Executive Board Adviser for approval.

                ii.  Written excuses for missing the Founders Day observance shall be submitted in advance to the Executive Board Adviser for approval.

            **b.  Acceptable Excuses.** Acceptable excused absences shall be illness, family emergency, class, school conflict, religious observations, or valid emergency.

            **c.  Notification**. The Executive Board Adviser shall notify the member of their decision.

CS-02122.09

**APP.265**



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

3. **Membership Recruitment.**
   a. Written Excuses. Written excuses for missing Membership Recruitment — including workshops, recruitment rounds, or voting — shall be submitted to the Membership Adviser for approval 60 days prior to the events. In the absence of the Membership Adviser, a designated adviser may approve excuses.
   b. **Acceptable Excuses.** Excused absences shall be an illness, family emergency, a required class offered only at the meeting/function time, internship, school conflict, religious observations, or other conflicts as determined by the chapter.
   c. **Notification**. The Membership Adviser, or adviser granting the excuse, shall notify the member of their decision.

B. **Unexcused Absences.**
   1. **Chapter Member Absences.**
      a. **First Unexcused Absence.** Following the first unexcused absence, the officer in charge of attendance shall contact the member.
      b. **Second Unexcused Absence.** Following the second unexcused absence, the Standards Committee shall contact the member.
      c. **Third Unexcused Absence.** Following the third unexcused absence, the member shall be invited to attend a meeting of the Standards Committee.
   2. **Required Chapter Events.** All chapter members shall be required to attend chapter meetings, Formal Pledging, Founders Day, Membership Recruitment, and other functions as determined by the chapter.
   3. **Initiation.** All initiated collegians shall be required to attend Initiation.

**1.4 Academic Excellence.**
A. **Chapter Standard.** The chapter shall maintain a GPA equal to or higher than the university or college all-sorority average.
B. **Active Member Standard.** The chapter shall establish a GPA requirement for active members. Each active member's GPA from the previous academic term shall meet or exceed the chapter-specific GPA requirement of B-/ 2.7 average.
   1. **First Occurrence Below the Chapter-Specific GPA Requirement.** Following the first occurrence of a member failing to achieve the chapter-specific GPA requirement, the member will be called to meet with the Academic Excellence Team to discuss appropriate academic actions for the coming term.
   2. **Second Consecutive Occurrence Below the Chapter-Specific GPA Requirement.** Should a member fail to achieve the chapter-specific GPA requirement for a second consecutive term, the Academic Excellence Team may refer the member to the Standards Committee.

CS-02222.09

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 368 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 271
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 187 of 209

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

**1.5 Special Status.** Members who are unable to participate in chapter activities because of school-related activities shall be granted Special Status. Special Status may be approved for a personal, job, or school-related activity, including an academic demand, internship, student-teaching, athletics or club sports, student government, work-related responsibilities, and others as approved by Executive Board. Executive Board, with approval of the Finance Adviser, may grant Special Status only to members in good standing as established by the Fraternity.

    **A.** **Duration**. The duration of Special Status shall be established at the time the request is approved but shall be less than one school year.

    **B.** **Chapter Totals and GPA.** The member shall be listed on the membership roll and be counted in the chapter total. The member's grades shall be included in the chapter GPA.

    **C.** **Participation**. The member shall participate in chapter activities as their school-related responsibilities allow.

    **D.** **Fees**. The member shall pay the per capita fee and chapter fees according to their degree of participation.

    **E.** **New Member Special Status**. In special cases, a request for Special Status may be granted to a new member. In such cases, approval must be obtained from the District Director.

**1.6 Accountability.** All chapter members shall adhere to the Fraternity *Bylaws*, *Standing Rules* and *Policies*; the Membership Commitment Statement; the Risk Prevention Procedures; and the Social Media Guidelines. Failure to do so may result in Probation, requested resignation, or dismissal.

    **A.** **Active Member Probation**. An active member of a chapter may be placed on Probation for any of the following reasons: violation of member responsibilities, failure to adhere to the Fraternity or chapter documents, poor academic attitude, or failure to meet the requirements of an academic support plan.

        **1.** **Investigation**. If a member fails to uphold member responsibilities and expectations or upon complaint by a chapter committee, chapter officer, House Director, member of the Fraternity, or official of the college or university, the Standards Committee shall conduct an investigation.

        **2.** **Probation Imposed by the Standards Committee.**

            a. If the Standards Committee believes an active member should be placed on Probation, after informing the member of the reasons for the proposed Probation and having been given an opportunity to appear before the committee, the committee may impose Probation by a three-fourths vote. The committee may submit a statement giving the reason(s) for this action to the chapter.

            b. The length of such Probation shall be for a specified period not less than two weeks nor more than 10 weeks as determined by the Standards Committee or, with the approval of the Standards

CS-02322.09

**APP.267**



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

Director in consultation with the Standards Specialist, for a period of up to six months.

**3.  Probation Imposed by the Chapter.**

   a.  If the Standards Committee considers it advisable, it shall recommend to the chapter that the active member be placed on Probation. The committee shall notify the Standards Specialist.

   b.  The active member shall be informed of the reason(s) for the proposed Probation and shall be given the opportunity to respond in person or in writing at the meeting of the chapter. A three-fourths vote of the chapter members present and voting shall be necessary to impose Probation.

   c.  The length of Probation shall be for a specified period not less than two weeks or, with the approval of the Standards Director in consultation with the Standards Specialist, for a period over 10 weeks and up to six months.

**4.  Probation Imposed by a Fraternity Council Member, a District Director, or the Standards Director.**

   a.  If a member of Fraternity Council, a District Director, or the Standards Director believes that an active member should be placed on Probation, that member may require the chapter to vote on the question.

   b.  If the chapter vote is negative, a Fraternity Council member, a District Director, or the Standards Director may impose Probation. The chapter shall be notified of this action.

   c.  The length of Probation shall be for a specified period not less than two weeks or, with the approval of the Standards Director in consultation with the Standards Specialist, for a period over 10 weeks and up to six months.

**5.  Notification.** Immediately after an active member has been placed on Probation, the Vice President Standards shall send a complete report of the case with the action taken to the Standards Specialist and the Standards Director. The Standards Specialist and Standards Director shall be kept advised of any further action or information pertinent to the case, including notification of the termination of Probation.

**6.  Status of an Active Member on Probation.** An active member who has been placed on Probation shall be under the supervision of the Standards Committee. An active member on Probation shall be required to attend chapter meetings, Initiations, and such other functions the Standards Committee deems advisable. The member may not hold office or vote during the term of Probation unless granted an exception.

**7.  Removal or Extension of Probation.**

   a.  Probation imposed by the Standards Committee:

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

    i.   If after a member has completed two weeks of their probationary period and the Standards Committee determines the member has completed all probationary terms, the committee may vote to remove Probation early. A three-fourths vote of the committee shall be necessary to remove Probation.

    ii.  Provided the Standards Committee has not previously removed Probation, the Standards Committee may remove or extend Probation at the end of the probationary period. Probation may be extended for no less than two weeks but no more than six weeks by a three-fourths vote. Probation may be removed by a three-fourths vote. If a three-fourths vote for removal is not obtained, the Standards Committee shall recommend to the chapter that a vote be taken on removal of Probation. A three-fourths vote of the chapter members present and voting shall be necessary to remove Probation.

    iii.  If the probationary terms are violated before the end of the probationary period, the Standards Committee, with approval of the Standards Director in consultation with the Standards Specialist, may request the resignation of the member or recommend dismissal.

b.  Probation imposed by the chapter:

    i.   At the end of the probationary period, the chapter may remove or extend Probation. Probation may be extended once for no less than two weeks but no more than six months by a three-fourths vote. Probation may be removed by a three-fourths vote.

    ii.  At any time after two weeks and prior to the expiration of the probationary period, the chapter may review the progress and vote to remove Probation.

    iii.  If the probationary terms are violated before the end of the specified time, the Standards Committee, with the approval of the Standards Director in consultation with the Standards Specialist, may request the resignation of the active member or recommend dismissal.

c.  Probation imposed by a Fraternity Council member, a District Director, or the Standards Director:

    i.   At the end of the probationary period, the one who imposed Probation shall either remove or extend Probation.

CS-02522.09

**APP.269**



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

       ii.  A request that Probation is removed may be made by a majority vote of the chapter members present and voting. If the one who imposed Probation refuses to remove Probation upon request of the chapter, an appeal may be made to Fraternity Council. A majority vote of Fraternity Council shall be necessary to remove Probation.

       iii.  If the probationary terms are violated before the end of the specified time, with the approval of the Standards Director in consultation with the Standards Specialist, action leading to a requested resignation or dismissal may begin.

    **d.**  If a member leaves school before Probation has expired, the Standards Specialist and the Standards Director shall be notified and shall review the case and present it to Fraternity Council for a vote on the question of the status of the member.

  **8.**  **Refusal to Remove Probation.** If the removal of a Probation has been refused after six months, the Standards Specialist and Standards Director shall be immediately notified and action for dismissal may proceed.

**B.**  **Requested Resignation and Dismissal.** In the cases where a member violates their member responsibilities, the chapter, with the approval of the Standards Director, and when appropriate, the Content Director most closely related to the member violation, in consultation with the Standards Specialist, may take immediate action to request a member submit their resignation or recommend that Fraternity Council dismiss the member.

  **1.**  **Refusal of a Requested Resignation or Dismissal**. If a chapter refuses to accept a requested resignation or fails to recommend dismissal of a member and the Standards Committee, upon review of the case, believes such action is appropriate, the Standards Committee shall vote upon the question to report its findings and recommendations with the result of the chapter vote to the Standards Specialist and the Standards Director for presentation to Fraternity Council for such action as Fraternity Council deems advisable.

  **2.**  **Fraternity Council Procedure for Dismissal if Refused by a Chapter.** Fraternity Council shall review and act upon all cases of dismissal from membership initiated by a chapter or a Standards Committee.

    a.  The Standards Specialist shall request a report on the case from the chapter Standards Committee and notify the Standards Director.

    b.  The Standards Director shall notify the member in writing that the member has been suspended pending action by Fraternity Council and that the member may submit a written response to the Standards Director within a stated period. The Standards Director

CS-02622.09

**APP.270**



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

    shall also notify the chapter, the District Director, the Standards Specialist, and the Executive Director that:

      i.   Action for dismissal is pending.

      ii.   The member has been suspended.

      iii.   The member has received written notice of the proposed dismissal.

c.   Upon receiving the notice of Suspension, the member shall have no privileges of membership in the Fraternity.

d.   At the expiration of the time allotted for the member's response, the Standards Director, after consultation with the Standards Specialist, shall send a summary of the case, including a copy of the member's response (if any), to each member of Fraternity Council. A three-fourths vote of Fraternity Council shall be necessary to dismiss the member.

e.   The Executive Director shall send the member a notice of the action taken by Fraternity Council. The Executive Director also shall send notice to the District Director, the Standards Director, the Standards Specialist, and the chapter.

f.   If a three-fourths vote of Fraternity Council is not obtained, Fraternity Council shall make such recommendations to the chapter as it considers appropriate.

g.   Upon dismissal, the member may surrender their badge and certificate and shall surrender all proprietary materials to the chapter President. If the badge and certificate have been surrendered, the chapter President shall send the badge and certificate of membership to Kappa Kappa Gamma Headquarters.

**C.**  **Suspended Status.** In rare instances, members may be placed on a temporary suspended status while an investigation into allegations of serious conduct violations occurs. While on suspended status, members cannot participate in Kappa meetings, events or activities aside from engaging in the Standards process.

### 1.7 Resignations

**A.**  **Voluntary Resignation.**

    **1.**  **New Member.** A new member wishing to resign from their pledge to membership shall submit their resignation in writing and shall state the reason(s) for the resignation. The chapter shall accept such resignation and notify the new member, the Standards Specialist, and Kappa Kappa Gamma Headquarters.

    **2.**  **Active Member.**

        a.  **Written Request.** A member of an active chapter wishing to resign from membership shall present the chapter with a written and

CS-02722.09

 GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

dated letter stating the reason(s) for such action. The member shall be given 10 days to reconsider or withdraw their resignation.

b. **Vote**. If the member has not withdrawn their letter of resignation at the expiration of 10 days, a vote shall be taken upon the question of resignation. The Vice President Standards shall send the written statement of resignation and the dated report of the chapter vote to Kappa Kappa Gamma Headquarters.

c. **Return of Fraternity Property.** The member may surrender their badge and certificate of membership and shall surrender all Fraternity proprietary materials to the chapter President. If the badge and certificate have been surrendered and the member has voluntarily resigned, the chapter President shall send the badge and certificate of membership to Kappa Kappa Gamma Headquarters.

B. **Financial Responsibility.**

1. **New Members.** New members may have their charges prorated as follows. Each fee must be considered on an individual basis for its applicability.

   a. **Fraternity Headquarters Fees.**

      i. New Member Fee: Becomes nonrefundable after 30 days unless a resignation letter is received prior to 30 days.

      ii. Per Capita Fee: Only paid if the new member initiates. If not, this fee can be credited back to the new member's account and the chapter would not owe it to Kappa Kappa Gamma Headquarters on their behalf.

   b. **House Board Fees**: Charged at the discretion of House Board. The house corporation fee should never be charged to a new member who does not initiate.

   c. **Chapter Dues**: Should be prorated so the amount charged only reflects the number of days the new member was affiliated with the chapter, based on the date of the resignation letter, and any expenses incurred on the new member's behalf throughout the new member's affiliation.

2. **Active Members**. Active members may have their charges prorated as follows. Each fee must be considered on an individual basis for its applicability.

   a. **Fraternity Headquarters Fees.**

      i. Per Capita Fee: If the resignation letter is submitted to the chapter before Aug. 31, this fee shall be credited back to the active member's account. If the resignation letter is submitted after Aug. 31, it shall be reflected on the active member's bill.

CS-02822.09

**APP.272**



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

    b. **House Board Fees:** Charged at the discretion of House Board.

    c. **Chapter Dues**: Should be prorated using the date the resignation letter was submitted so it only reflects the time within the term that the member was considered an active member on the roster regardless of participation in chapter events.

**2.0 Operations**

  **2.1 Chapter Meetings.** Executive Board shall establish an annual calendar of regular chapter meetings.

    **A.** Meetings may occur on a virtual platform (if necessary). The chapter shall have a formal meeting at least once per month.

  **2.2 Risk Prevention.** All Kappa-sponsored or co-sponsored events must abide by the Risk Prevention Procedures as established by the Fraternity.

    **A.** **Transportation.** For off-campus chapter events, transportation procedures must comply with the Fraternity Risk Prevention Procedures for all active and new members and their guests. Alcohol, drugs and other controlled substances are prohibited from being transported or used by members or their guests while traveling to and from chapter events.

    **B.** **Event Procedures**. The procedures for hosting a safe event will be determined by the officer or director responsible for risk prevention. The officer in charge of the event shall determine the method of transportation for any chapter event held off campus. Any chapter member failing to adhere to the established procedures shall be referred to the Standards Committee.

    **C.** **Expenses**. Transportation expenses shall be included in the chapter budget.

  **2.3 Housing.**

    **A.** Management of chapter facilities shall be in accordance with the procedures set forth in the Fraternity resources and established by the Facility Team and House Board.

      **1.** Live-In Rule. It is the responsibility of each member to ensure the chapter facility is filled to capacity at all times defined as 52 women. No member will be eligible to live out of the facility until it is full to capacity.

        a. Establishment of Live-In Rule. The live-in rule shall be in accordance with the Fraternity resources and include the following:

          i. Timing

          ii. Procedure

          iii. Point System

          iv. Contracts

        b. Officer Live-In Requirement. At least two members of the chapter Emergency Committee are required to live in the facility. Those two are President and Vice President Operations. In addition, the following officers are required to live in: Vice President Standards,

CS-02922.09

**APP.273**

 GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

Vice President External Affairs, Facilities Director, and Risk Director.

   c. **Accommodations**. Members with medical disabilities requiring accommodation should utilize the Housing Accommodation Request Form.

2. **House Rules**. All chapter members shall be subject to the following rules as established by the Facility Team and approved by the chapter. The house rules shall include, but not be limited to, the following: closing hours, meal times, quiet hours, use of parking lot, lock-up procedures, procedures for chapter members to have a key to the facility, storage procedures, and vacation closing dates.

   a. No alcohol or illegal drugs are to be stored or consumed on Kappa property. This includes the chapter house, parking lot, and surrounding property.

   b. Members must adhere to conduct expectations as outlined in the housing policy.

   c. All members living in the house must complete their assigned duties as outlined in the Housing Policies.

   d. Members may not be in position of firearms in the chapter house or on the chapter property.

   e. Members are responsible for adherence to all required safety procedures as outlined in the housing policies.

   f. There shall be no animals in the chapter house in accordance with Fraternity Policies. House Board may grant exceptions for medical purposes in consultation with the designated Headquarters Staff.

3. **Room Assignments.** Room assignments should be determined through the chapter point system or a lottery while also taking into consideration roommate preference. Room assignments are subject to change at any time per the terms of the house contract.

   a. First priority shall be given to members with approved accommodations.

   b. Second priority shall be given to the President, Vice President Operations, Vice President Standards, and Vice President External Affairs.

   c. The remaining rooms shall be assigned based on the following criteria:

      a. Points system as outlined in the housing documents.

      b. Selection process as outlined in the housing documents.

4. **Roommate Assignments**. The Facility Team is responsible for roommate assignments. The Facility Team should determine a fair method for roommate selections that take into account member preference.

CS-021022.09

**APP.274**

 GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

5. **Room and Board.** No member shall receive room and board for free or at a discounted rate due to potential tax implications.

6. **Facility Team.** The Facility Team shall be responsible for the enforcement of the house rules. The Facility Team shall consist of a chairman and the Vice President Operations. The Facility Director shall be the chairman of the Facility Team. After the first infraction, the member shall meet with the Facility Team. After the second infraction, the member may be referred to the Standards Committee. Members may be referred to the Standards Committee after a first infraction as determined by the Facility Team.

**2.4 Visitation.**

A. **Visitation.** The chapter shall establish a visitation policy in accordance with Fraternity expectations. Nonmember guests must always be accompanied by a member or House Director. Nonmembers are not allowed in the basement without approval from the President, Vice President Operations, Facilities Director, or the House Director. Nonmembers visitation shall not exceed the facility's open hours. Open hours are defined as hours in which nonmembers are permitted in the facility.

   1. Chapter members are responsible for their guest(s) conduct in the house. The member who invited the guest who damages the facility will be required to pay the costs of the damage.

   2. Males will only be allowed upstairs or in the basement during events that are approved by the Facility Director in consultation with the House Director annually with times set before each event. Exceptions to this require approval from the House Director, President or Facility Director.

   3. Female guests may stay in the guest room if prior arrangements are made with the House Director, the housing policies are followed and a Guest Form is completed prior to the visit.

   4. Visitors whose relationship with a resident member is intimate in nature are prohibited from being overnight guests.

B. **Procedures.**

   1. **Chapter Vote.** The visitation policy shall be approved by a three-fourths vote of the chapter members present and voting as well as a three-fourths vote of both Advisory Board and House Board.

   2. **Policy Reaffirmation.** The visitation policy must be reaffirmed annually by a three-fourths vote of the chapter members present and voting as well as a three-fourths vote of the Advisory Board and House Board.

   3. **Suspension.** The visitation policy may be suspended by a three-fourths vote of the chapter, House Board, and Advisory Board in the event of an emergency or violation(s).

   4. **Violations.** Violations of the policy or behavior by a member or member's guest(s) that is not in keeping with Kappa Kappa Gamma standards,

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 377 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 280
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 196 of 209



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

interferes with the rights of others, or results in the destruction or loss of property may result in the suspension or withdrawal of the policy by Advisory Board and House Board after conversations with the standards team (i.e., the Standards Specialist and Standards Director), Facilities Director, and the Housing Department at Kappa Kappa Gamma Headquarters.

**2.5 Public Relations.**

    **A.** **Annual Chapter Update.** A chapter update shall be published annually. In accordance with the Fraternity Policies, solicitation of funds to publish and distribute the chapter update is prohibited. The name of the chapter update shall be *The Omicronian*.

    **B.** **Requests for Information.** In accordance with the Fraternity *Policies*, requests for information of any nature or opinions relating to Kappa Kappa Gamma or its members, such as annual reports, questionnaires, evaluation surveys or relationship statements, shall be approved by the Fraternity President or National Panhellenic Conference Delegate before an answer, oral or written, is submitted. Award applications should be reviewed by the National Panhellenic Conference Delegate prior to submission.

    **C.** **Endorsements, Promotions and National Publicity.** In accordance with the Fraternity *Policies*, requests for endorsements of products, participation in commercial or political promotions, or pictures and/or articles about the chapter or its members for use by the national media must be approved by Kappa Kappa Gamma Headquarters.

**4.** **Special Occasions.** The chapter shall celebrate Founders Day (October 13) in an appropriate manner.


**3.0 Finance**

    **3.1 Member Accounts**. The chapter member's account is payable in full within 15 days of the date of the bill. The due date shall be stated on each bill.

    **3.2 Payment Plan.**

        **A.** **Request for Payment Plan**. The committee or officer in charge of finance and/or Finance Adviser shall approve requests for payment plans with the member's understanding that all money due shall be paid in full within the term.

        **B.** **Terms**. Payment plan terms shall be established as follows:

            **1.** **Payment 1**. One-third of the total is due within 15 days of the first bill.

            **2.** **Payment 2**. One-third of the total is due within 15 days of the second bill.

            **3.** **Payment 3**. One-third of the total is due within 15 days of the third bill. Note: Billhighway divides each itemized fee into equal monthly installment amounts.

        **C.** **Exceptions**. The Finance Adviser shall approve exceptions to the established payments. The member must sign a promissory note if the agreed-upon payment plan differs from the standing rules. Although the member may be paying on

CS-021222.09



GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

time for a specialized payment plan, the Billhighway late fee may still apply to the balance if the installments are not paid in full within the allotted grace period.

**3.3 Delinquent Accounts.**

    **A.** **Past-Due Accounts**. If an account is one day past due, the Vice President Finance shall send notice to the member and establish a deadline for payment that is five days from the due date of the bill or establish an alternative payment schedule. If an account becomes more than five days past due, the member shall be referred to the Standards Committee. Members are responsible for payment of incurred Billhighway fees.

    **B.** **Failure to Meet Financial Obligations**. If the deadline for payment is not met, the member shall be referred to the Standards Committee. Failure to pay the delinquency or maintain the payment plan agreement may result in Social Probation, loss of chapter voting privileges, removal from chapter office, prohibition from initiating due to broken pledge to membership, or removal/loss of membership. Once a member is no longer active due to transfer, graduation, removal/loss of membership or disenrollment from the university, the chapter may refer the debt to a collection agency or pursuance through small claims court.

**3.4 Chapter Purchases.**

    **A.** **Reimbursement**. Any member seeking reimbursement for items purchased for chapter activities must submit a fully completed Reimbursement Voucher form. The member shall not be reimbursed unless this form is received with an itemized receipt.

    **B.** **Prepaid Cards**. Any administrator with a prepaid card must turn over all itemized receipts immediately to the Vice President Finance. Failure to do so may result in loss of prepaid card privileges.

    **C.** **Officer Overspending.** If an officer anticipates the department will go over budget, the situation shall be discussed with Executive Board. The officer must create a plan to address how the overage will be offset elsewhere in the budget. The proposed plan shall be voted on by Executive Board. A majority vote shall approve. If the officer fails to address the budget overage with Executive Board, they may be referred to the Standards Committee where a possible consequence may include removal from office.

    **D.** **Repayment of Unauthorized Purchases.**

        1. Any member who is suspected of making an unauthorized purchase will be referred to the Standards Committee. The Vice President Finance shall notify the Standards Committee of any suspected misuse of funds.

        2. Officers are responsible for overseeing and managing the budget.

        3. Members are responsible for reimbursement to the chapter for inappropriate spending, such as failing to produce receipts for purchases, use of chapter funds for personal expenditures, or failure to obtain proper pre-approval for purchases.

CS-021322.09

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 379 of 506

Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 282
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 198 of 209


GAMMA OMICRON CHAPTER STANDING RULES
Vice President Internal Affairs
maintains a digital copy with their files

4.  Members are responsible for refunding any undocumented or unauthorized purchases occurring as a result of misusing the prepaid card. An undocumented or unauthorized expense may include but is not limited to: purchases made without explicit approval, late or incorrect documentation, and/or failure to comply with university policy.

5.  If misuse of the prepaid card occurs, repayment to the chapter shall not be classified as a fine or assessment.

**4.0 Amendments.**

**4.1** The chapter Standing Rules may be amended or rescinded by a majority vote of those present and voting after at least seven days advance notice or by a two-thirds vote of those present and voting without prior notice. A two-thirds vote of the members present and voting shall suspend the chapter Standing Rules.

CS-021422.09

**APP.278**

# ATTACHMENT 14



GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**BYLAWS**
**of**
**GAMMA OMICRON CHAPTER**
**KAPPA KAPPA GAMMA FRATERNITY**

<u>[Insert date adopted or amended]</u>

**ARTICLE I**
**NAME**

In accordance with the wording of the charter of Kappa Kappa Gamma Fraternity, this chapter, located in Laramie, Wyoming and founded on February 25, 1927, shall be known as Gamma Omicron Chapter of Kappa Kappa Gamma Fraternity.

**ARTICLE II**
**PURPOSE**

The purpose of a chapter shall be:

to advance the mission and purpose of Kappa Kappa Gamma Fraternity;

to unite women through membership in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness;

to properly maintain the organization and operation of the chapter;

to cooperate with the host institution to advance academic interest and promote higher standards of social conduct; and

to cooperate with other campus organizations in solving mutual problems and building higher standards of womanhood.

**ARTICLE III**
**MEMBERS**

**Section 1. Membership.** Membership in this chapter of Kappa Kappa Gamma Fraternity shall be in accordance with the provisions of the Fraternity *Bylaws*. The classifications of chapter members are active, associate, and new member.

A. To be considered for membership, the potential member shall meet the minimum GPA.
    1. First-semester freshmen. A freshman shall have at least a B+/3.3 GPA average or its equivalent under any other grading system from high school.

CS-01122.09

**APP.280**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 382 of 506

Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 285
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 201 of 209



GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

2. Other potential members. Other potential members shall have at least a B-/2.7 GPA average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university.

B. **Exceptions**. In extraordinary cases, the chapter may petition the Membership Specialist for an exception to the GPA requirement.

**Section 2. Participation.** Members who are unable to participate in chapter activities because of school-related, job, or personal responsibilities may be granted Special Status in accordance with Section 1.5 in the chapter Standing Rules.

**Section 3. Standards.** Chapter members shall adhere to all member responsibilities, rules, policies, and procedures established by the Fraternity and the chapter.

**Section 4. Academic Excellence.** Chapter members shall meet and maintain the chapter-established GPA and shall submit verification of grades for each term to the officer in charge of academic excellence.

**Section 5. Active Member Rights.** Active members in good standing as established by the Fraternity have the right to vote, represent the chapter as a delegate, and hold office within the chapter.


**ARTICLE IV**
**CHAPTER ORGANIZATION**

Chapters may choose to assign directors to functional areas within a department. The vice president shall assume the duties of the functional area if a director is not assigned. With the approval of the Leadership Development Specialist in consultation with the District Director, the chapter shall determine which functional areas are assigned directors.


**Section 1. Departments.** The departments of the chapter shall be external affairs, finance, internal affairs, member development, membership, operations, and standards. Within each department, a director may be assigned to a functional area.

A. **External Affairs.** The External Affairs Department serves the chapter in the functional areas of events, risk prevention, Panhellenic affairs, philanthropy, and public relations.

B. **Finance.** The Finance Department serves the chapter in the area of finance.

C. **Internal Affairs.** The Internal Affairs Department serves the chapter in the functional areas of member engagement, ritual and history, and academic excellence.

D. **Member Development**. The Member Development Department serves the chapter in the functional areas of the New Member Experience, Senior Member Experience, All-Member Experience, and diversity, equity and inclusion.

E. **Membership**. The Membership Department serves the chapter in the functional areas of Primary Recruitment and Continuous Open Bidding.

F. **Operations**. The Operations Department serves the chapter in the functional areas of administration and facility.

G. **Standards**. The Standards Department serves the chapter in the area of standards.


CS-01222.09

**APP.281**

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**Section 2. Department Meetings.** Department meetings shall be held at least biweekly during
the academic year unless otherwise designated by the vice president of the department.

CS-01322.09

**APP.282**

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**ARTICLE V**
**OFFICERS AND DIRECTORS**

**Section 1. Officers and Directors.** The officers of the chapter shall be elected and they shall be the chapter President, Vice President External Affairs, Vice President Finance, Vice President Internal Affairs, Vice President Member Development, Vice President Membership, Vice President Operations, and Vice President Standards. The directors for the chapter shall be elected and shall be Events Director, Philanthropy Director, Risk Prevention Director, Academic Excellence Director, New Member Experience Director, and Facilities Director. The chapter shall annually review the officer and director structure. Changes must be approved by the Leadership Development Specialist in consultation with the District Director. Each vice president shall be responsible for a department of the chapter.

**Section 2. Qualifications of Officers and Directors.**

A. **Qualifications.** Only members in good standing as established by the Fraternity, and attaining at least a B-minus average for members other than first-semester freshmen or a B-plus average or its equivalent under any other grading system from high school for first-semester freshmen for the previous term shall be eligible to be nominated for or hold office unless the relevant Content Specialist (Academic Excellence Specialist or Standards Specialist), in consultation with the District Director, grants an exception.

B. **Maintaining Qualification.** If an officer or director fails to maintain the qualification to hold office, they shall become ineligible to remain in office unless the Academic Excellence Specialist or Standards Specialist, in consultation with the District Director, grants an exception. If an exception is not granted, the officer or director will be given a chance to resign. If the officer or director refuses to resign, removal proceedings shall commence.

**Section 3. Duties.**

A. **Duties of Officers.** The duties of the officers shall include the following:
   1. To act in the best interest of the chapter.
   2. To assume fiduciary responsibility of the chapter.
   3. To serve on Executive Board.
   4. To oversee the department and functional areas within the department.
   5. To hold biweekly meetings with their departments.
   6. To perform duties as outlined by the Fraternity.
   7. To make reports as required by the Fraternity or as requested.

B. **Duties of Directors.** The duties of the directors shall include the following:
   1. To act in the best interest of the chapter.
   2. To oversee their functional area.
   3. To meet as necessary.
   4. To perform duties as outlined by the Fraternity.

CS-01422.09

**APP.283**



GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**Section 4. Removal From Office.** Executive Board, in consultation with the District Director and the adviser to Executive Board, may recommend to the chapter the removal of any officer or director failing to adequately perform the duties of office, failing to maintain Fraternity standards, or falling below academic requirements. The officer or director shall be given the opportunity to defend herself. A two-thirds vote of the active chapter members at any regular or special meeting shall be required to remove an officer or director.

**Section 5. Vacancies.**

A. After a nomination is made by Executive Board, a majority vote of the active chapter members present at the meeting and voting shall fill a vacancy. Nominations from the floor shall be in order prior to voting.

B. In the event an officer or director is temporarily unable to perform the duties of office, Executive Board shall assign the duties to another member of the chapter who, if filling in for an Executive Board member, shall have the right to vote in place of the officer.

C. In the event the chapter President is permanently unable to perform the duties of office, Executive Board shall assign the President's duties to a vice president until a new chapter President is elected.

## ARTICLE VI
## NOMINATIONS AND ELECTIONS

**Section 1. Nominations.**

A. The Nominating Committee shall consist of a chairman appointed by Executive Board and a number of initiated members appropriate to the size and academic classes represented within the chapter. Four members, one from each academic class, shall be elected four weeks in advance of the chapter election. A member of Advisory Board shall act as an adviser to the committee without a vote.

B. All members interested in being considered for an elected position shall submit an application.

C. The committee shall select, from the list of members who submitted applications, candidates who are eligible and qualified to fill a position. They will conduct individual interviews with each selected candidate.

D. After all eligible candidates have been interviewed, the committee, by majority vote, shall slate one candidate for each position. The Nominating Committee Adviser shall be present during the meeting(s) at which the slate is developed and finalized. Only members in good standing as established by the Fraternity are eligible to be placed on the slate. Exceptions may be granted by the Academic Excellence Specialist, Standards Specialist, or Finance Specialist.

E. The committee shall report the slate of nominees, including their qualifications for office, electronically within 24 hours of the committee meeting at which the slate was finalized and at least 72 hours prior to the chapter meeting at which elections shall be held.

CS-01522.09

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 386 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 289
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 205 of 209

 Kappa Kappa Gamma

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

**F.** Nominations from the floor shall be in order on the night of elections and shall be called for after the report of the Nominating Committee has been submitted. If a nomination is made from the floor, the member making the nomination shall make a brief statement, no longer than one minute, of the nominated candidate's qualifications. No other discussion or comments are allowed.

**Section 2. Election.** The election of chapter officers and directors shall be held annually in accordance with Fraternity expectations unless the District Director grants an exception. Officers and directors shall be elected by ballot for a term of one year or until their successors are elected. A majority vote shall elect. Prior to the election date, the President shall decide if she will vote for each office or save her vote to break ties. The President's decision to vote or save her vote shall be announced to the chapter on the night of elections. If the President is voting, in the event of a tie, voting will continue until a clear majority has been reached. If the President is saving her vote to break ties, in the event of a tie, the President will vote to break the tie. In the event of no one receiving a majority vote, all candidates except the two with the highest number of votes will be removed and a revote will be taken. Proxy or absentee voting shall not be permitted.

**Section 3. Installation of Officers.** All chapter officers and department directors shall be installed at a formal meeting following a period of officer training in accordance with Fraternity expectations.

## ARTICLE VII
## CHAPTER MEETINGS

**Section 1. Chapter Meetings.** The chapter will meet regularly with a formal meeting being held at least once a month during the academic term. The officer or director responsible for communication shall notify all members of the meeting time and place.

**Section 2. Special Meetings.** A special chapter meeting may be called by the President or Executive Board or upon the written request of 50% of the members. The officer or director responsible for communication shall notify all members of the time, place and purpose of the meeting.

**Section 3. Quorum.** A majority of active chapter members shall constitute a quorum.

**Section 4. Voting.** A majority of active chapter members present at the meeting and voting shall determine all decisions except where otherwise specified.

## ARTICLE VIII
## EXECUTIVE BOARD

**Section 1. Composition.** Executive Board shall consist of the President and the vice presidents of each department.

**Section 2. Duties.** The duties of Executive Board shall be:

A. To be responsible for overseeing the business and the success of the chapter.

CS-01622.09

**APP.285**

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

B. To be responsible for the proper functioning of the chapter.

C. To administer the chapter finance program according to the guidelines approved by and under the direction of the Finance Department at Kappa Kappa Gamma Headquarters.

D. To send representatives to the College Panhellenic organization in accordance with National Panhellenic Conference Unanimous Agreements and according to the structure of the respective College Panhellenic.

E. To ensure that the archives of the chapter are properly maintained, including an alphabetical roll and chronological index of chapter initiates, proxy initiates, and affiliates.

F. To review the Fraternity *Bylaws*, *Standing Rules* and *Policies*, along with the chapter Bylaws and Standing Rules, at the beginning of each term of office.

G. To establish an annual calendar of meetings after officers and directors are installed. The calendar shall include a formal meeting at least once a month. If necessary, the Executive Board shall determine changes in the calendar.

**Section 3. Executive Board Meetings.** Executive Board shall meet weekly during the academic year unless otherwise designated by the board. A special meeting of Executive Board may be called by the President or upon written request of three members of Executive Board with a minimum of 24 hours' notice. A majority of the members of Executive Board shall constitute a quorum.

**ARTICLE IX**
**COMMITTEES AND TEAMS**

**Section 1. Standing Committees and Teams.** The chapter standing committees shall be the Standards Committee, the Emergency Committee, and the Academic Excellence Team.

A. Standards Committee. The Standards Committee shall be responsible for the maintenance of fraternity standards and policies. The Standards Committee shall consist of a chairman, President, Vice President Member Development and one member-at-large elected by the chapter at the time of chapter elections. The chairman of the Standards Committee shall be the Vice President Standards.

B. Emergency Committee. The Emergency Committee shall be responsible for safety protocol in all emergencies. The Emergency Committee shall consist of a chairman, the Vice President Operations, the Facility Director and Vice President Standards. The chairman of the Emergency Committee shall be the chapter President.

C. Academic Excellence Team. The Academic Excellence Team shall be responsible for the maintenance of the chapter academic standards. The Academic Excellence Team shall consist of a chairman and the Vice President of Internal Affairs as the Academic Coordinator. The chairman of the Academic Excellence Team shall be the Academic Excellence Director.

**Section 2. Other Committees and President's Ex-Officio Committee Membership**. Such other committees, standing or special, may be established by the membership or Executive

CS-01722.09

**APP.286**

 **Kappa Kappa Gamma**

GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

Board as may be deemed necessary from time to time. The President shall be a member *ex-officio* of all committees except the Nominating Committee.

CS-01822.09

**APP.287**



GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

## ARTICLE X
## ELECTRONIC MEETINGS

**Section 1. Electronic Meetings.** The membership; all committees, subcommittees, and teams; and any chapter subgroup may attend and participate in any meeting through any communications equipment that provides a transmission, including but not limited to by telephone, telecopy, or any electronic means from which it can be determined that the transmission was authorized by, and accurately reflects the intention of the participant involved and allows all persons participating in the meeting to contemporaneously communicate with each other.

**Section 2. Voting by Ballot.** An anonymous vote conducted through a designated internet meeting service or electronic means, such as audience response devices or computer software, shall be deemed to be a ballot vote, fulfilling any requirement that a vote be by ballot.

## ARTICLE XI
## COMMUNICATIONS

Unless a member indicates otherwise, all communication required in these bylaws, including meeting notices, may be sent electronically.

## ARTICLE XII
## CHAPTER ADVISERS AND ADVISORY BOARD

Advisory Board shall be composed of a chairman and alumna advisers to Executive Board and the vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director in consultation with the Leadership Development Director and Advisory Board Director.

Alumna members shall be selected annually to be advisers in accordance with the provisions of the Fraternity. Advisers shall serve in an advisory capacity without a vote.

## ARTICLE XIII
## FINANCE

**Section 1. Finance.** All matters pertaining to chapter finances shall be in accordance with the financial responsibilities, including chapter fees, as required by the Fraternity.

**Section 2. Dues.** Chapter dues include required fees and chapter operational expenses. The chapter shall review the budget annually. Chapter dues shall be determined by the budget and approved by chapter members annually. Once dues are approved by the chapter, they become a financial obligation of each member along with all required fees.

**Section 3. House Association Fee.**

A. **Fees.** The chapter house association shall annually establish the house association fee. This shall be paid within one year of the date of pledging.

CS-01922.09

**APP.288**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 390 of 506
Appellate Case: 23-8065    Document: 010110962640    Date Filed: 12/04/2023    Page: 293
Case 2:23-cv-00051-ABJ    Document 6-1    Filed 04/20/23    Page 209 of 209



GAMMA OMICRON CHAPTER BYLAWS
Vice President Internal Affairs maintains
digital copies with their files

A. Affiliated Members. A member who has affiliated with the chapter shall pay 50% of the chapter's house association fee.
B. Transfers. A member who transfers to the campus and does not affiliate but lives in the facility shall pay 50% of the chapter's house association fee.

## ARTICLE XIV
### DELEGATES

**Section 1. General Convention.** The chapter's delegate to General Convention shall be the chapter President unless excused by the District Director. If the chapter President is excused, the chapter shall select another member to be the delegate.

**Section 2. Other Leadership Conferences.** The chapter shall send delegates as specified by the Fraternity to other leadership conferences that may be scheduled from time to time.

**Section 3. College Panhellenic Council.** The chapter shall be a member of the College Panhellenic Association and shall be represented by a delegate in the College Panhellenic Council.

## ARTICLE XV
### PARLIAMENTARY AUTHORITY

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern the chapter in all cases in which they are applicable and in which they are not inconsistent with these bylaws and any special rules of order the chapter may adopt.

## ARTICLE XVI
### AMENDMENT OF THE BYLAWS

These bylaws may be amended at any business meeting of the chapter by a two-thirds vote, provided notice of any proposed amendments has been given at least seven days in advance. The chapter Bylaws shall be reviewed at least once each biennium and shall be approved by the Fraternity Bylaws Committee before being adopted by the chapter.

# # #

CS-011022.09

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of that document;

(3)    the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee LifeSafe, version 1.11.279, most recently updated on October 18, 2023, and according to the program is free of viruses.

Dated: December 4, 2023

<div style="columns:2">

GENE C. SCHAERR
CRISTINA MARTINEZ SQUIERS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

_/s/ Sylvia May Mailman_
SYLVIA MAY MAILMAN
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
s.maymailman@gmail.com

JOHN KNEPPER
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
John@KnepperLLC.com

CASSIE CRAVEN
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
cassie@longhornlawllc.com

</div>

_Counsel for Plaintiffs-Appellants_

No. 23-8065

# In the United States Court of Appeals for the Tenth Circuit

JAYLYN WESTENBROEK, ET AL.,

*Plaintiffs-Appellants*,

v.

KAPPA KAPPA GAMMA FRATERNITY, AN OHIO NON-PROFIT CORPORATION AS NOMINAL DEFENDANT AND AS A DIRECT DEFENDANT, ET AL.,

*Defendants-Appellees*,

ARTEMIS LANGFORD,

*Defendant*.

On Appeal from the United States District Court for the District of Wyoming
No. 2:23-CV-00051-ABJ, Hon. Alan B. Johnson

## APPELLANTS' APPENDIX IN SUPPORT OF BRIEF
## VOLUME 2 OF 2

GENE C. SCHAERR
CRISTINA MARTINEZ SQUIERS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

SYLVIA MAY MAILMAN
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
s.maymailman@gmail.com

JOHN KNEPPER
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
John@KnepperLLC.com

CASSIE CRAVEN
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
cassie@longhornlawllc.com

*Counsel for Plaintiffs-Appellants*

DECEMBER 4, 2023

## INDEX OF DOCUMENTS

| ECF NO. | DATE | DOCUMENT | VOL. | APP. PAGES |
|---------|------|----------|------|------------|
| | | **VOLUME I** | | |
| | | Docket Report, *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 2:23-cv-00051-ABJ (D. Wyo.) | 1 | 1–8 |
| 6 | 04/20/23 | First Am. Verified Member Derivative Compl. for Breach of Fiduciary Duties (04/20/23) | 1 | 9–80 |
| 6-1 | 04/20/23 | Attach. 1 to First Am. Compl.: Bylaws of Kappa Kappa Gamma Fraternity (Rev'd 09/22) | 1 | 81–110 |
| 6-1 | 04/20/23 | Attach. 2 to First Am. Compl.: Kappa Kappa Gamma Fraternity, Guide for Supporting Our LGBTQIA+ Members (2018) | 1 | 111–123 |
| 6-1 | 04/20/23 | Attach. 3 to First Am. Compl.: Ltr. Natalie M. McLaughlin, Legal Counsel to Kappa Kappa Gamma Fraternity, Inc. to Attorneys John G. Knepper & Cassie Craven Re: Response to Litigation Threat (11/15/22) | 1 | 124–127 |
| 6-1 | 04/20/23 | Attach. 4 to First Am. Compl.: Kappa Kappa Gamma Fraternity Articles of Incorporation, State of Ohio (07/26/30) & Restated Articles of Incorporation, State of Ohio (07/28/04) | 1 | 128–136 |
| 6-1 | 04/20/23 | Attach. 5 to First Am. Compl.: Kappa Kappa Gamma Fraternity Report of Bylaws Committee, Notice of Amendment to Bylaws & Bylaws Revision (03/22) | 1 | 137–166 |
| 6-1 | 04/20/23 | Attach. 6 to First Am. Compl.: Kappa Kappa Gamma Fraternity Bylaws and Standing Rules Revisions 2022: FAQs | 1 | 167–187 |

| ECF NO. | DATE | DOCUMENT | VOL. | APP. PAGES |
|---|---|---|---|---|
| 6-1 | 04/20/23 | Attach. 7 to First Am. Compl.: Standing Rules of Kappa Kappa Gamma Fraternity (rev'd 2022) | 1 | 188–218 |
| 6-1 | 04/20/23 | Attach. 8 to First Am. Compl.: Policies of Kappa Kappa Gamma Fraternity (adopted 02/23) | 1 | 219–241 |
| 6-1 | 04/20/23 | Attach. 9 to First Am. Compl.: Kappa Kappa Gamma Fraternity, Membership Commitment | 1 | 242–243 |
| 6-1 | 04/20/23 | Attach. 10 to First Am. Compl.: Gamma Omicron, Kappa Kappa Gamma Fraternity, Univ. of Wyo., Live-In House Contract (Fall 2022/Spring 2023) | 1 | 244–256 |
| 6-1 | 04/20/23 | Attach. 11 to First Am. Compl.: Ltr. from Attorneys John G. Knepper & Cassie Craven to Kappa Kappa Gamma Re: Kappa Kappa Gamma–Initiation of a Non-Woman, Artemis Langford (11/04/22) | 1 | 257–260 |
| 6-1 | 04/20/23 | Attach. 12 to First Am. Compl.: Kappa Kappa Gamma Fraternity Position Statements | 1 | 261–263 |
| 6-1 | 04/20/23 | Attach. 13 to First Am. Compl.: Kappa Kappa Gamma Fraternity, Gamma Omicron Chapter Standing Rules | 1 | 264–278 |
| 6-1 | 04/20/23 | Attach. 14 to First Am. Compl.: Kappa Kappa Gamma, Gamma Omicron Chapter Bylaws | 1 | 279–289 |
| **VOLUME II** | | | | |
| 19 | 06/20/23 | Defs. Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss Pls.' First Am. Verified Member Derivative Compl. | 2 | 1–3 |
| 20 | 06/20/23 | Mem. in Support of Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss Pls.' First Am. Verified Member Derivative Compl. | 2 | 4–33 |

| ECF NO. | DATE | DOCUMENT | VOL. | APP. PAGES |
|---|---|---|---|---|
| 24 | 07/05/23 | Pls.' Resp. in Opp'n to Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss | 2 | 34–54 |
| 26 | 07/12/23 | Reply In Support of Defs.' Kappa Kappa Gamma Fraternity, et al.'s Mot. to Dismiss | 2 | 55–66 |
| 31 | 08/25/23 | Order Granting Defs.' Mot. to Dismiss (ECF No. 19), Dismissing, Without Prejudice, Pls.' First Am. Verified Member Derivative Compl. for Breach of Fiduciary Duties (ECF No. 6), and Dismissing as Moot Def. Artemis Langford's Mot. to Dismiss (03/03/23) (Hon. Alan B. Johnson, U.S. District Judge) | 2 | 67–107 |
| 32 | 09/25/23 | Notice of Appeal | 2 | 108–110 |

Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:    sklosterman@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:    nmmclaughlin@vorys.com
         bwdressel@vorys.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 23-CV-00051-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

## DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION TO DISMISS

---

**COME NOW**, the Defendants Kappa Kappa Gamma Fraternity ("Kappa"), Mary Pat Rooney ("Rooney"), and Kappa Kappa Gamma Building Co. (the "Building Co.") (collectively, "Defendants") and hereby move this Court for an Order dismissing Plaintiffs' First Amended Verified Complaint ("Amended Complaint") pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure because the Court lacks subject-matter jurisdiction over the Building Co. and personal jurisdiction over Rooney, and the Amended Complaint fails to states a claim upon which the Court can grant relief. Defendants submit the accompanying Memorandum of Law in support of this Motion.

Dated: June 20, 2023                    Respectfully submitted,

                                        _/s/ Natalie M. McLaughlin_
                                        Natalie M. McLaughlin (Ohio Bar No. 0082203)*
                                        Brian W. Dressel (Ohio Bar No. 0097163)*
                                        VORYS, SATER, SEYMOUR AND PEASE, LLP
                                        52 East Gay Street
                                        Columbus, OH 43215
                                        Telephone:    (614) 464-5452
                                        Email:        nmmclaughlin@vorys.com
                                                      bwdressel@vorys.com
                                        *-Admitted Pro Hac Vice

                                        Scott P. Klosterman (#6-3081)
                                        WILLIAMS, PORTER, DAY & NEVILLE, P.C.
                                        159 North Wolcott, Suite 400
                                        P.O. Box 10700
                                        Casper, WY 82602-3902
                                        Telephone:    (307) 265-0700
                                        Facsimile:    (307) 266-2306
                                        E-Mail:       sklosterman@wpdn.net

                                        *Attorneys for Defendants Kappa Kappa Gamma
                                        Fraternity and Mary Pat Rooney*

-2-

**APP.002**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 20th day of June, 2023.

Cassie Craven (#7-5664)
LONGHORN LAW LIMITED LIABILITY
COMPANY
109 East 17th Street, Suite 11
Cheyenne, WY 82001
Telephone: (307) 823-3062
E-Mail: cassie@longhornlawllc.com

☒ CM/ECF Electronic Transmission
☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ Email

John G. Knepper (#7-4608)
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
E-Mail: John@KnepperLLC.com

☒ CM/ECF Electronic Transmission
☐ U.S. Mail (Postage Prepaid)
☐ Fax
☐ Overnight Delivery
☐ Hand Delivery
☒ Email

/s/ *Brian W. Dressel*
Brian W. Dressel

-3-

45308415

**APP.003**

Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
E-Mail:    sklosterman@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:    (614) 464-5452
Email:    nmmclaughlin@vorys.com
           bwdressel@vorys.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: 23-CV-00051-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION TO DISMISS

**APP.004**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

I.      INTRODUCTION .......................................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................... 3

III.    LEGAL ARGUMENT .................................................................................... 4

        A.    Standards of Review ............................................................................ 5

        B.    The Court Lacks Subject-Matter Jurisdiction Over the Breach of Contract Claim
              Against the Building Co ........................................................................ 7

        C.    The Court Lacks Personal Jurisdiction over Defendant Rooney ........................... 8

        D.    Plaintiffs' Derivative Claim Fails as a Matter of Law ............................................ 9

              i.     Plaintiffs Fail to Meet the Requirements of Rule 23.1 ............................. 10

              ii.    Plaintiffs Fail to Establish that Rooney Violated Kappa's Bylaws or
                     that Kappa has Unreasonably Interpreted its Bylaws ............................... 12

              iii.   Kappa has a Constitutional Right to Determine Who to Include and
                     Who to Exclude from Its Membership ..................................................... 16

        E.    Plaintiffs' Breach of Contract Claim Fails as a Matter of Law ........................... 17

        F.    Plaintiffs' Tortious Interference with Contract Claim Fails as a Matter of Law .. 20

        G.    Plaintiffs' Direct Claim Fails as a Matter of Law ................................................. 20

IV.     CONCLUSION .............................................................................................. 22

        CERTIFICATE OF SERVICE ...................................................................... 25

**APP.005**

## TABLE OF AUTHORITIES

### Cases

*Allen v. Bank of Am. Corp.*, No. 10-4205 (MJD/JSM), 2011 U.S. Dist. LEXIS 96836 (D. Minn. July 22, 2011) ..................................................................................... 23

*Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005) ........................................... 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 6

*Auletta v. Ortino (In re Ferro Corp. Derivative Litig.)*, 511 F.3d 611 (6th Cir. 2008) ............... 12

*B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820 (S.D. W. Va. Jan. 5, 2023) ......................................................................... 1

*Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio App. LEXIS 154 (Jan. 18, 2007) ...................... 21

*Barrash v. Am. Ass'n of Neurological Surgs., Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605 (S.D. Tex. Aug. 13, 2013) ............................................ 15

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ................................................... 14

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ...................................................... 16

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ................................................. 8

*Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768 (W.D. Tex. 1999) ...................... 15

*Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio App. 2003) .................................... 11, 12, 21

*Cent. Wyo. Med. Lab. v. Med. Testing Lab., Inc.*, 43 P.3d 121 (Wyo. 2002) ...................... 18

*Christian v. Loyakk, Inc.*, No. 22-CV-215-F, 2023 U.S. Dist. LEXIS 6952 (D. Wyo. Jan. 12, 2023) ................................................................................ 6, 8, 9

*Colo. Off-Highway Vehicle Coalition v. U.S. Forest Serv.*, 357 F.3d 1130 (10th Cir. 2004) ...... 18

*Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063 (10th Cir. 2008) ...................... 8

*Dutcher v. Matheson*, 733 F.3d 980 (10th Cir. 2013) ................................................. 7

*Flandro v. Salt Lake County Jail*, 53 F. App'x 499 (10th Cir. 2002) ............................... 6

*Grand Council v. Owens*, 620 N.E.2d 234 (Ohio App. 1993) ...................................... 11

*Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ................................. 2

*Haynes v. Peters*, 403 F. Supp. 3d 1072 (D.N.M. 2019) ............................................. 7

**APP.006**

*Heaton v. Rohl*, 954 N.E.2d 165 (Ohio App. 2011)........................................................ 21

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013)........................ 16

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557 (1995)...... 16

*In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 U.S. Dist. LEXIS 11608 (N.D. Ohio Mar. 21, 2006).................................................... 11

*In re Lubrizol S'holders Litig.*, 79 N.E.3d 579 (Ohio App. 2017)........................................ 10, 12

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)........................................................ 8

*Kadel v. Folwell*, No. 1:19CV272, 2022 U.S. Dist. LEXIS 103780 (M.D.N.C. June 10, 2022) ..................................................................................... 1

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991).................................................. 11

*Kirscher v. Wagner*, No. 19-CV-0037-ABJ, 2020 U.S. Dist. LEXIS 257235 (D. Wyo. Mar. 16, 2020) ............................................................................ 6

*McKinney v. Granite Park Fabrication*, No. 19-CV-00266-ABJ, 2020 U.S. Dist. LEXIS 257239 (D. Wyo. Mar. 12, 2020)..................................... 6

*Morgan v. Ramby*, No. 2012-Ohio-763, 2012 Ohio App. LEXIS 662 (Feb. 27, 2012) .............. 21

*Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013) ................................................ 9

*Peterson v. Meritain Health, Inc.*, 508 P.3d 696 (Wyo. 2022)...................................... 17

*Pikk v. Pedersen*, 826 F.3d 1222 (10th Cir. 2016)........................................................ 10, 11

*Putka v. First Catholic Slovak Union*, 600 N.E.2d 797 (Ohio App. 1991) ................... 14

*Rishell v. Jane Phillips Episcopal Mem. Med. Ctr.*, 94 F.3d 1407 (10th Cir. 1996) ............ 7

*Rudolph v. Cunningham*, No. 2:13-CV-00181-ABJ, 2015 U.S. Dist. LEXIS 44250 (D. Wyo. Mar. 31, 2015)................................................................. 6

*Schlinger v. McGhee*, 268 P.3d 264 (Wyo. 2012) ........................................................ 17

*Shaw v. AAA Eng'g & Drafting Inc.*, 138 F. App'x 62 (10th Cir. 2005)........................ 7

*Sheaffer v. State ex Rel. Univ. of Wyo.*, 202 P.3d 1030 (Wyo. 2009)........................... 20

*Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221 (10th Cir. 2001)............................ 6

*Sunshine Custom Paints & Body, Inc. v. S. Douglas Hwy. Water & Sewer Dist.*, 173 P.3d 398 (Wyo. 2007) ............................................................. 20

-iv-

**APP.007**

*Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) ........................................... 14

*Virgin Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 U.S. Dist. LEXIS 246099 (D. Wyo. Dec. 30, 2019) ........................................................................................................ 9

*Warwick v. Accessible Space, Inc.*, 448 P.3d 206 (Wyo. 2019) .................................................... 19

*Woodmen of World Life Ins. Soc. v. Manganaro*, 342 F.3d 1213 (10th Cir. 2003) ........................ 7

**<u>Statutes</u>**

28 U.S.C. § 1332 ............................................................................................................................ 7

Wyo. Stat. § 5-1-107 ...................................................................................................................... 8

**<u>Other Authorities</u>**

The Cambridge Dictionary ...................................................................................................... 15, 16

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(1) ................................................................................................................. 5

Fed. R. Civ. P. 12(b)(2) .............................................................................................................. 5, 6

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 5, 6

Fed. R. Civ. P. 19 .......................................................................................................................... 7

Fed. R. Civ. P. 23.1 ..................................................................................................................... 10

Fed. R. Civ. P. 23.1(b)(3) ........................................................................................................... 10

Fed. R. Civ. Proc. 19(a)(1)(B) ...................................................................................................... 7

**APP.008**

## I.    INTRODUCTION

Plaintiffs are current and recently graduated members of the Gamma Omicron chapter of the Kappa Kappa Gamma Fraternity ("Kappa").  In September 2022, the Gamma Omicron chapter voted to admit Artemis Langford ("Langford"), a transgender woman.  Rather than accept the results of their chapter's decision to admit Langford, Plaintiffs bring sorority recruitment to this Court and ask that it declare her membership void ab initio.  Plaintiffs believe that Langford and anyone else who is not biologically born female should be ineligible for membership in Kappa. Plaintiffs, however, fail to state any cognizable claim upon which relief can be granted against Kappa, the Kappa Kappa Gamma Building Co. (the "Building Co."), or Mary Pat Rooney ("Rooney") and fail to establish subject-matter jurisdiction over the sole claim against the Building Co. or personal jurisdiction over Rooney.

Plaintiffs are asking this Court to decide who can and who cannot join a private fraternal organization.  They implore this Court not only to void Langford's membership, but also to prohibit any transgender woman from joining Kappa.  Plaintiffs request the Court to insert itself into this controversial political debate and declare that a private organization can only interpret the term "woman" using Plaintiffs' exclusionary definition of biologically born females.[1]

Plaintiffs assert "[t]he claim that 'trans women are women' is a political slogan.  It is not a fact supported by social science or medical research."  (Am. Compl., ¶ 42.)  Other federal courts disagree: "[t]ransgender men are men; transgender women are women."  *Kadel v. Folwell*, No. 1:19CV272, 2022 U.S. Dist. LEXIS 103780, at *66 (M.D.N.C. June 10, 2022); *see also Grimm v.*

---

[1] A federal judge in West Virginia in assessing a transgender rights case recently stated:  "I will not get into the business of defining what it means to be a 'girl' or a 'woman.' The courts have no business creating such definitions."  *B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820, at *14 (S.D. W. Va. Jan. 5, 2023).

**APP.009**

*Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 620 (4th Cir. 2020) (discussing the "importance of gender affirmation," stressing "that hypothetical fears [about transgender students] such as the 'predator myth' were merely that – hypothetical," and finding that the federal judiciary should "affirm the burgeoning values . . . rather than preserve the prejudices of the past").

If the answer to the question of whether a transgender woman should be treated as a woman were as clear as Plaintiffs suggest, it would not occupy so much space in scholarly articles, political debate, or media commentary. There are undoubtedly difficult legal issues that some courts will have to consider as they assess legislation and policies affecting the rights of transgender people. But the Court need not wade into that controversy here; it can simply dismiss Plaintiffs' claims for being legally defective without entering the political fray.

Although Plaintiffs' purported legal claims are often confusing and inconsistently pled, the central issue in this case is simple: do the Plaintiffs have a ***legal right*** to be in a sorority that excludes transgender women? They do not.

Kappa's policy since 2015 has been to allow chapters to accept transgender women. That policy mirrors those of the 25 other national and international sororities that are a part of the National Panhellenic Conference ("NPC"). Kappa has shared the policy with its collegiate chapters. If Plaintiffs' disagreements with Kappa's inclusionary position actually represented the majority view of other Kappa members, as opposed to that of a vocal minority, they could presumably effect a change in the position. Plaintiffs can also resign their membership in the organization if a position of inclusion is too offensive to their personal values.[2] What they cannot do is have this Court define their sorority's membership for them.

---

[2] Defendants note, however, that if Plaintiffs wanted to join a women's organization that would guarantee exclusion of transgender women, ***none*** of the NPC sororities have that kind of exclusionary policy. (Attach. 3 to Am. Compl.)

-2-

**APP.010**

Plaintiffs' personal view on transgender inclusion aside, whether a sorority can define its membership to allow someone who is transgender to join is not a matter for federal courts—or any court—to decide. Therefore, for all the reasons set forth in this Motion, Defendants respectfully request that this Court dismiss Plaintiffs' claims in their entirety, with prejudice.

## II.    FACTUAL BACKGROUND

The Amended Complaint is rife with false, inflammatory allegations that do not relate to the claims Plaintiffs assert. Putting aside Plaintiffs' statements of opinion and irrelevant allegations, and accepting as true the allegations that actually relate to each cause of action, the Amended Complaint fails to set forth a cognizable legal claim.

The Gamma Omicron chapter at the University of Wyoming voted to accept Langford as a member in September 2022. (Am. Compl., ¶ 61.) No Kappa bylaw defines who qualifies as a "woman." (Attach. 1 to Am. Compl.) Kappa has allowed transgender women to qualify for membership since 2015, before Plaintiffs sought membership. (Attach. 12 to Am. Compl.) However, "[a]ctive members shall be responsible for selecting new members of their chapter." (Am. Compl., ¶ 61, Attach. 7 at 1.1). And "[e]ach chapter of Kappa Kappa Gamma has the final choice of its own members." (Am. Compl., ¶ 100, Attach. 12 to Am. Compl. at 2) The Building Co. also has no role in member selection and, in fact, only serves the purpose of providing and maintaining the Gamma Omicron house at the University of Wyoming. It is an independent non-profit Wyoming corporation and does not interact with Kappa on any non-housing issues.

Plaintiffs are upset that Langford was accepted for membership into their chapter because she is transgender, so they hired legal counsel. Plaintiffs' counsel contacted Kappa regarding Langford's admission on November 4, 2022 and explained why Plaintiffs objected to Kappa's admitting transgender women generally and Langford specifically. (Attach. 11 to Am. Compl.)

-3-

**APP.011**

That letter, which is the *only* communication from Plaintiffs' counsel before this lawsuit, complains that "a small number of chapter members . . . violate[d] the sorority's corporate by-laws and standing rules through the induction of a non-woman into this fraternal organization." (*Id.*)

That letter does not:  (1) assert that any director or member of Fraternity Council actively worked to secure the membership of Langford; (2) allege that Kappa's inclusive position statement issued in 2015 or its Guide for Supporting our LGBTQIA+ Members issued in 2018 violates any bylaw; (3) cite to any provision in the bylaws that is violated by Langford's admission; (4) allege any wrongdoing by Rooney; (5) allege that Langford had engaged in conduct that makes chapter members uncomfortable or violates Kappa's standards of conduct; or (6) allege any wrongdoing by the Building Co. or that there are any violations of members' housing contracts.  (*Id.*)

Kappa responded through counsel on November 15, 2022.  (Attach. 3 to Am. Compl.)  That correspondence clarified that Kappa was not involved in the selection of Langford and does not overrule membership decisions of collegiate chapters when members or alumnae disagree with them, but noted that Kappa includes transgender women and explained the reasons for that policy. (*Id.*)  Kappa also explained it was unaware of any bylaw violations, but stated: "[i]f there are specific provisions in any Kappa governing documents that you contend were not followed by Kappa, *please identify what those specific provisions are, what governing documents they are contained within, and what actions of Kappa you contend are in violation of those specific provisions*." (*Id.* (emphasis added).)  Plaintiffs' counsel *never* responded.

## III.    LEGAL ARGUMENT

The end goal of Plaintiffs' lawsuit is clear.  They do not like that their sorority chapter inducted a transgender member or that Kappa did not overturn the chapter's decision, so they ask

**APP.012**

the Court to declare Langford's membership void ab initio and, in so doing, tell a private fraternal organization whom it can and cannot accept as a member at any of its more than 145 chapters.

The majority of the Amended Complaint amounts to little more than a winding discussion of why Plaintiffs believe that transgender women should not be treated as women and should therefore be excluded from women's organizations. Plaintiffs then attempt to package those opinions as legal claims by alleging that Kappa is required by its bylaws to share this exclusionary viewpoint and that Plaintiffs have some contractual right to live in a sorority house that is free from the presence of transgender women. They do this through a member-derivative claim, a breach-of-contract claim, a tortious-interference-with-contract claim, and a member-direct claim.

Those efforts fail for a number of reasons. As an initial matter, Plaintiffs fail to establish subject-matter jurisdiction over the sole claim brought against the Building Co. and fail to establish personal jurisdiction over Rooney. Turning to the actual claims, Plaintiffs neither meet the procedural requirements for a derivative claim nor plead one in substance. They similarly do not demonstrate any contractual provision that was allegedly interfered with or breached. Finally, they fail to allege any other cause of action to support a claim for a direct action.

### A. <u>Standards of Review</u>

Rule 12(b) of the Federal Rules of Civil Procedure provides that certain defenses must be presented by motion. Relevant here, Defendants can move to dismiss a claim at the responsive-pleading stage for "lack of subject-matter jurisdiction" for the breach of contract claim against the Building Co., "lack of personal jurisdiction" for all claims against Rooney, and "failure to state a claim upon which relief can be granted" for all claims that survive jurisdictional dismissal. *See* Fed. R. Civ. P. 12(b)(1), (2), and (6).

A motion to dismiss for lack of subject-matter jurisdiction can facially attack the sufficiency of the complaint's allegations as to subject-matter jurisdiction or challenge the facts the plaintiffs are using to establish subject-matter jurisdiction. *Christian v. Loyakk, Inc.*, No. 22-CV-215-F, 2023 U.S. Dist. LEXIS 6952, at *13 (D. Wyo. Jan. 12, 2023). The Court accepts the allegations in the Complaint as true and assesses whether there is a basis for subject-matter jurisdiction. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).

In motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2), plaintiffs bear the burden of establishing personal jurisdiction. *Kirscher v. Wagner*, No. 19-CV-0037-ABJ, 2020 U.S. Dist. LEXIS 257235, at *4 (D. Wyo. Mar. 16, 2020). They can meet that burden by "demonstrating facts that if true would support jurisdiction over the defendant." *Rudolph v. Cunningham*, No. 2:13-CV-00181-ABJ, 2015 U.S. Dist. LEXIS 44250, at *9 (D. Wyo. Mar. 31, 2015) (citation omitted).

For a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "should assume [the] veracity" of ***factual*** allegations and "then determine whether they plausibly give rise to an entitlement to relief." *McKinney v. Granite Park Fabrication*, No. 19-CV-00266-ABJ, 2020 U.S. Dist. LEXIS 257239, at *5 (D. Wyo. Mar. 12, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679). In making this assessment, the Court is not bound to accept any legal conclusion or opinion alleged in the complaint as true. *Flandro v. Salt Lake County Jail*, 53 F. App'x 499, 500 (10th Cir. 2002) ("[w]e will accept the complainant's allegations of fact as true, but we will not accept assertions or opinions or conclusions where no facts are alleged to support them").

**APP.014**

**B.  The Court Lacks Subject-Matter Jurisdiction Over the Breach of Contract Claim Against the Building Co.**

Federal courts must have a statutory basis for exercising jurisdiction.  *Dutcher v. Matheson*, 733 F.3d 980, 984 (10th Cir. 2013).  Here, Plaintiffs invoke diversity jurisdiction under 28 U.S.C. § 1332.  Plaintiffs bear the burden of establishing the jurisdictional minimum of $75,000. *Woodmen of World Life Ins. Soc. v. Manganaro*, 342 F.3d 1213, 1216 (10th Cir. 2003).  When there are multiple defendants, however, the rules on aggregation are applicable:

> The statutory amount-in-controversy . . . must be satisfied as between a single plaintiff and a single defendant for a federal district court to have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold . . . If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims. . . . Similarly, multiple plaintiffs may aggregate the amounts of their claims against a single defendant if the claims are not "separate and distinct."

*Haynes v. Peters*, 403 F. Supp. 3d 1072, 1082 (D.N.M. 2019) (internal citations omitted).

Here, on the face of the Amended Complaint, Plaintiffs do not meet the $75,000 requirement to establish diversity jurisdiction over the breach-of-contract claim, which is the sole claim brought against the Building Co.  They explicitly state that they are not seeking ***any*** damages from the Building Co. at all.  (Am. Comp. ¶ 23.)[3]  Nor could Plaintiffs meet the threshold through

---

[3] Plaintiffs appear to believe that the Building Co. is nonetheless properly joined because it is a "necessary party" under Rule 19(a)(1)(B).  Courts evaluate these claims by considering:  (1) whether complete relief is available between the other parties; (2) whether the purportedly necessary party has an interest that will be impaired; and (3) whether another party would be subject to inconsistent obligations.  *Rishell v. Jane Phillips Episcopal Mem. Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996).  None of these factors suggest the Building Co. is a necessary party. *See also Shaw v. AAA Eng'g & Drafting Inc.*, 138 F. App'x 62, 66 (10th Cir. 2005) (Rule 19 "does not provide a joinder mechanism for plaintiffs").

**APP.015**

a second amendment to the Complaint, as the Building Co.'s only involvement in this case is because it is a party to House Contracts with some of the Plaintiffs.[4]  They do not seek to void these contracts, and even if they did, the full value of each contract including an entire year of board, rent, and maintenance is only $7,700 per Plaintiff.  Any contract rights Plaintiffs have are separate and distinct based on their own individual contracts, and even if a breach of contract claim for the full value of each individual contract were aggregated would not amount to $75,000.  As such, the Court should dismiss the sole claim against the Building Co. with prejudice.

## C.  The Court Lacks Personal Jurisdiction over Defendant Rooney

Plaintiffs' claims against Rooney can only proceed if the Court has personal jurisdiction over her, which it does not.  Personal jurisdiction is governed both by the law of the forum state and constitutional standards of due process.  *Christian*, 2023 U.S. Dist. LEXIS 6952, at *29–*30 (citation omitted).  Wyoming, the forum state, extends personal jurisdiction to the constitutional limit in the Due Process Clause.  *See* Wyo. Stat. § 5-1-107.  Thus, to establish personal jurisdiction over Rooney, Plaintiffs would need to establish that she has "minimum contacts" with the State of Wyoming such that her having to defend a lawsuit in the state "would not offend traditional notions of fair play and substantial justice."  *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

To establish minimum contacts, Plaintiffs need to show that Rooney "purposefully directed" her activities at the forum state and that Plaintiffs suffered injuries arising from those same activities.  *Id.* at 1071 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  "[J]urisdiction over the representatives of a corporation may not be predicated on jurisdiction over

---

[4] There are no allegations that the Building Co. was responsible for any of the complained-of conduct or any of Kappa's policy or membership decisions.

**APP.016**

the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum state." *Virgin Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 U.S. Dist. LEXIS 246099, at *8–*9 (D. Wyo. Dec. 30, 2019) (citation omitted). Furthermore, contacts of a company's officers or other agents "with a forum in their corporate capacity do not count for personal jurisdiction over the individual." *Christian*, 2023 U.S. Dist. LEXIS 6952, at *35 (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1277 (10th Cir. 2013)).

Here, the inquiry is easy. Rooney is a citizen of Illinois, not Wyoming. (Am. Compl., ¶ 22.) Plaintiffs do not allege that Rooney directed any activity at the State of Wyoming, let alone activity related to Plaintiffs' alleged injuries. They also do not allege that Rooney was present in Wyoming for any of the relevant events, or that she was involved in those events from afar. (Am. Compl.) Her involvement in administering Kappa policies as a Kappa officer, which Plaintiffs falsely paint as nefarious, also does not create personal jurisdiction in Wyoming. Those allegations concern actions affecting Kappa generally, not ones purposefully directed at Wyoming. Without allegation of a single contact between Rooney and the forum state, the Court lacks personal jurisdiction over Rooney and should dismiss all claims against her on that basis.

### D.  Plaintiffs' Derivative Claim Fails as a Matter of Law

Plaintiffs' first claim is a derivative cause of action under Ohio law. (Am. Comp. ¶¶ 160–167.) In the derivative claim, they seek to bring an action on behalf of all members of Kappa to enforce the purported rights of the organization.

As Defendants can best surmise, Plaintiffs plead this claim as one for a breach of fiduciary duty. (Am. Compl., ¶ 160 ("claims for breach of fiduciary duties on the part of corporate directors or officers are to be brought in derivative suits"); ¶ 163 ("the directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance")). Such a claim would typically be

-9-

**APP.017**

brought against individual directors or officers of a corporation.  *In re Lubrizol S'holders Litig.*, 79 N.E.3d 579, 585 (Ohio App. 2017).  Plaintiffs appear to assert this claim against Rooney, the only individual named in the Amended Complaint who owes a fiduciary duty to Kappa.[5]

Plaintiffs' derivative claim is legally deficient for at least four reasons.  First, the Court lacks personal jurisdiction over Rooney.  (*See supra* 9–10.)  Second, Plaintiffs fail to meet the requirements of Federal Rule of Civil Procedure 23.1 for bringing a derivative claim.  Third, Plaintiffs fail to identify any Kappa bylaw that Rooney violated.  Fourth, Kappa has the right to determine whom to include in its membership and impeding that decision would violate Kappa's right of association protected by the First Amendment.

### i.  *Plaintiffs Fail to Meet the Requirements of Rule 23.1*

Rule 23.1 of the Federal Rules of Civil Procedure imposes special requirements that plaintiffs must meet when asserting a derivative claim.  It requires plaintiffs to submit a verified complaint that states with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary from the shareholders or members," and "the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  The requirement to demand that the corporation take the actions desired may be excused if a plaintiff demonstrates that any further demand would have been futile.  *Pikk v. Pedersen*, 826 F.3d 1222, 1227 (10th Cir. 2016).

Plaintiffs claim the futility exception applies to them due to their extraordinarily limited efforts to resolve the matter without bringing a derivative claim.  (Am. Compl., ¶ 165.)  To

---

[5] Though Plaintiffs reference "the directors of the Sorority" and "the other Fraternity Council members" (Am. Compl., ¶¶ 163, 167), no director is a party to the Amended Complaint, nor is any Fraternity Council member besides Rooney.  There is no reason for suing only Rooney—who was not on the Council when it adopted the relevant policies—and not any other former or current Fraternity Council members—other than a personal vendetta of the alumnae funding this litigation.

-10-

determine if the futility exception applies to a case, courts "adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit." *Pikk*, 826 F.3d at 1228 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991)). Kappa is incorporated in Ohio (Am Compl., ¶ 21), and it is clear that Plaintiffs' efforts fall woefully short under Ohio law.

Ohio's futility standard is demanding. *In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 U.S. Dist. LEXIS 11608, at *13 (N.D. Ohio Mar. 21, 2006) ("establishing demand futility in Ohio is not an easy task"). "Futility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed." *Carlson v. Rabkin*, 789 N.E.2d 1122, 1128 (Ohio App. 2003). Ohio courts recognize that the requirement that plaintiffs first make a demand before proceeding with a derivative claim "is clearly not a technical procedural requirement" and instead "serves the very important purpose of ensuring that before a shareholder derivative suit is brought, the company's board of directors has considered all possible intracorporate remedies." *Grand Council v. Owens*, 620 N.E.2d 234, 238 (Ohio App. 1993).

Plaintiffs allege they "have repeatedly reached out to the corporation's leadership to contest its refusal to enforce the sorority's membership requirements." (Am. Compl., ¶ 165.) Plaintiffs do not allege that any of them had any personal communication raising the accusations in the Amended Complaint with the Fraternity Council. The only communication arguably directed to any member of Fraternity Council that Plaintiffs provided to the Court was the letter from their attorney on November 4, 2022. (Attach. 11 to Am. Compl.) As discussed above, that letter failed to assert the claims raised in the Amended Complaint. (*See supra* 4–5.) Notably, it makes no mention of Plaintiffs' allegation that Kappa's directors "actively work[ed] to secure the

**APP.019**

membership of Langford." (Am. Compl., ¶ 163.) If Plaintiffs had any reason to believe this accusation, they were required to bring it to Fraternity Council before filing this lawsuit.[6]

Counsel for Kappa responded to Plaintiffs' counsel's letter, explicitly asking them to identify any provision in any Kappa governing documents that was not followed. (Attach. 3 to Am. Compl.) Plaintiffs' counsel never responded before filing the initial Complaint in this case.

Plaintiffs' failure to raise their alleged concerns to the Fraternity Council and identify any allegedly violated bylaws or policies is fatal to their futility argument. Ohio law requires Plaintiffs to show that the minds of Kappa's Fraternity Council were "closed to argument" to excuse them from the requirement of making a demand that Kappa pursue litigation against Rooney. *Carlson*, 789 N.E.2d at 1128. Plaintiffs cannot satisfy the futility exception when the last communication they received from Kappa's legal counsel *invited* them to identify any bylaws or policies Kappa violated by allowing transgender women in general and Langford specifically to join the sorority.

## ii. **_Plaintiffs Fail to Establish that Rooney Violated Kappa's Bylaws or that Kappa has Unreasonably Interpreted its Bylaws_**

Second, even if Plaintiffs had satisfied Ohio's stringent futility standard to excuse them from satisfying the requirements of Federal Rule of Civil Procedure 23.1, the derivative claim is not one on which the Court can grant relief. To pursue a derivative claim, plaintiffs must allege "particular facts" against an individual defendant explaining what role that individual defendant had in the conduct to pursue a claim against that individual. *Auletta v. Ortino (In re Ferro Corp. Derivative Litig.)*, 511 F.3d 611, 621 (6th Cir. 2008) (Ohio derivative claim). It is not sufficient to make generalized allegations that "provide no specific facts indicating a nexus between any

---

[6] Alleging that a director is a wrongdoer does not inherently establish futility. *Lubrizol*, 79 N.E.3d at 587. Notably, no member of Fraternity Council was informed about Langford until **after** Langford had accepted the Gamma Omicron's invitation to join.

**APP.020**

individual committee member and any inappropriate action or failure to act." *Id.* Plaintiffs fail to allege any particular facts to establish that Rooney engaged in conduct to breach her fiduciary duty.

Furthermore, Plaintiffs fail to identify any bylaw that forbids Kappa from admitting a transgender woman. Throughout the Amended Complaint, Plaintiffs allege that the admission of Langford or any other transgender woman violates Kappa's bylaws, standing rules, and policies. They reference these documents repeatedly in the Amended Complaint and append them for the Court's consideration as if they resolve the question of whether Fraternity Council was required to override the chapter's membership decision. The trouble with this position is that ***none*** of the documents actually say what Plaintiffs allege.

Plaintiffs would have the Court take the following logical journey: (1) Kappa's bylaws and other documents say that it is an organization for women; (2) the term "women" necessarily only includes people biologically born female; and, therefore, (3) only people biologically born female can join Kappa. This argument fails at the second step. Nowhere in these documents can Plaintiffs find their restrictive definition of the term "woman." Kappa defines its membership in its position statement adopted in 2015 as individuals who identify as women. (*See supra* 3.) Plaintiffs cannot identify any bylaw, standing rule, or policy that prohibits Kappa from taking this position, and the term is unquestionably open to multiple interpretations.

For example, Plaintiffs' own proposed definition of "woman" is an "adult human female." (Am. Compl., ¶¶ 2, 49). If one interprets adult to be someone who is 18 years old, this is inconsistent with how Kappa has ever defined "women" because there are many women who have joined collegiate chapters of Kappa at 17 years old. Surely, Plaintiffs are not contending that

**APP.021**

Kappa violates its bylaws every time it admits a freshman who is young for her grade, but their own logic leads directly to that conclusion.

To see how the definition of a word may reasonably evolve over time, the Court need look no further than the Supreme Court's 2020 decision in *Bostock v. Clayton County*. *See* 140 S. Ct. 1731 (2020). There, the Supreme Court held "Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize today a necessary consequence of that legislative choice: An employer who fires an individual merely for being gay or transgender defies the law." *Id.* at 1754 (Gorsuch, J.); *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028–29 (10th Cir. 2021). Congress passed Title VII in the same 150-year period where Plaintiffs contend Langford is "not a woman as that word has been adopted and understood . . . for the past 150 years." (Am. Compl., ¶ 33.) If the Supreme Court can reasonably interpret "discrimination because of sex" to prohibit discrimination based upon someone's transgender status or sexual orientation, surely Kappa, as a private organization, can reasonably interpret its own bylaws to be similarly inclusive.

This Court's task, should it reach this question at all, is far easier than the one the Supreme Court faced in *Bostock*; it does not need to reach a definitive interpretation of what the word "woman" means. It need not delve into this politically charged issue and determine that Kappa's inclusive definition or Plaintiffs' exclusive definition is the ***only*** way to define "woman." Rather, Ohio law provides that "[g]enerally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein members have mutually agreed upon a charter or rules, the decision of the association itself is supreme." *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797, 802 (Ohio App. 1991). That is what happened here when a voluntary, non-profit organization decided in 2015 to define "women" to include transgender women.

**APP.022**

Plaintiffs' position that courts should step in to assess every challenged interpretation of an organization's bylaws has no logical stopping point.  Consider some of the bylaws in this case. Kappa member qualifications include that the candidate has "demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals."  (Attach. 1 to Am. Compl.) If a chapter admitted a candidate and some members thought that she lacked a regard for others, could those members then claim a violation of the bylaws and challenge her admission in court? If the bylaws of a private golf club only allowed members of "excellent playing ability to join," would courts find themselves litigating the newest member's handicap?  Will the Supreme Court one day judge whether someone is smart enough to join MENSA under its charter?  Of course not.

Judicial non-intervention in the decisions of a private organization is important because, "if the courts were to interfere [every time] some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility."  *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 779 (W.D. Tex. 1999) (internal quotation omitted).  As such, private organizations have the right to interpret their own governing documents:

> The right of a voluntary club or association to interpret its own organic agreements . . . is not inferior to its right to make and adopt them, and an individual, by becoming a member, subjects himself, within legal limits, to the association's power to administer as well as its power to make its rules . . . the requirements for judicial review are more than a mere breach of [an association's] own policies.

*Barrash v. Am. Ass'n of Neurological Surgs., Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605, at *16 (S.D. Tex. Aug. 13, 2013) (internal citations omitted).  The Court should defer to the decision of Kappa to inclusively define "women."[7]

---

[7] The Cambridge Dictionary and well known women's colleges have also adopted inclusive definitions of "women." https://www.campuspride.org/tpc/womens-colleges/ (identifying many

**APP.023**

    iii.    **_Kappa has a Constitutional Right to Determine Who to Include and Who to Exclude from Its Membership_**

As articulated by the United States Supreme Court, unless there is unlawful discrimination, the government (which includes a court) cannot determine whom a private organization must include or exclude in its membership. "Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 658 (2000) (internal citations omitted). Kappa unquestionably engages in expressive activity. As explained by the Tenth Circuit:

> [An organization's] speech or conduct may reflect the view of only a bare majority of the members, or even just the view of the members' delegate—such as the editor of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents an 'official position.' *See Dale*, 530 U.S. at 655 ("[T]he First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.' The Boy Scouts takes an official position . . . and that is sufficient for First Amendment purposes.")

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013).

The Supreme Court recognized, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). Plaintiffs here have asked this Court to do precisely that and interfere with Kappa's decision to adopt an inclusionary definition of the term "women" that includes individuals

---

well-known women's colleges that admit transgender women); (Woman, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/woman (defining "woman" as "an adult female human being" and as "an adult who lives and identifies as female though they may have been said to have a different sex at birth") (both last visited June 19, 2023).

**APP.024**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 420 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 29
Case 2:23-cv-00051-ABJ    Document 20    Filed 06/20/23    Page 22 of 30

who "identify as women" and to order instead that "women" can only be defined as individuals who are "adult human females."

In summary, Plaintiffs' derivative claim should be dismissed with prejudice for lack of personal jurisdiction; failure to follow procedural requirements; failure to identify a violated or unreasonably interpreted bylaw; and for seeking relief that would violate Kappa's right of association protected by the First Amendment.

### E. **Plaintiffs' Breach of Contract Claim Fails as a Matter of Law**

Plaintiffs' second claim is for breach of the contracts that some Plaintiffs allege they entered into with the Building Co. [8] (Am. Compl., ¶¶ 168–75.) Plaintiffs entered into their House Contracts in Wyoming and they contain a Wyoming choice-of-law provision. (Attach. 10 to Am. Compl.) Under Wyoming law, a breach-of-contract claim requires a "lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages." *Schlinger v. McGhee*, 268 P.3d 264, 268 (Wyo. 2012) (citation omitted). "A claim for breach of contract is asserted against the party to the contract." *Peterson v. Meritain Health, Inc.*, 508 P.3d 696, 707 n.7 (Wyo. 2022).

Like the first claim, it is difficult to decipher what Plaintiffs are attempting to assert. Plaintiffs allege the contracts were with the Building Co. but they plead that "Plaintiffs ***do not seek damages*** directly from [the Building Co.], but Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with the Defendant. As such, Plaintiffs believe the [Building Co.] is a required party to this litigation." (Am. Comp. ¶ 23 (emphasis added)).

---

[8] To the extent Plaintiffs purport to allege a breach of contract claim against Kappa or Rooney, the Court should dismiss it because Plaintiffs do not allege that either is a party to the House Contracts.

**APP.025**

Plaintiffs' breach of contract claim can be dismissed for lack of subject matter jurisdiction. (*See supra* 7–8.)  Moreover, as Plaintiffs specifically plead that they do not seek damages from the Building Co. and as damages are a requirement for a breach of contract claim, the Court can easily dispose of this claim on that basis as well.  Additionally, Plaintiffs do not have Article III standing to assert a breach of contract claim against the Building Co. given:  (1) Article III standing requires an actual "case or controversy"; and (2) "[a] case or controversy no longer exists when it is impossible for the court to grant any effectual relief whatsoever to a  prevailing party." *Colo. Off-Highway Vehicle Coalition v. U.S. Forest Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004).

Furthermore, Plaintiffs cannot fix this claim by amending the pleadings.  In assessing a claim for breach of contract, the job of courts is to "secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract."  *Cent. Wyo. Med. Lab. v. Med. Testing Lab., Inc*., 43 P.3d 121, 127 (Wyo. 2002).  Tellingly, Plaintiffs do not cite to any specific provisions of the House Contract that were breached.  Instead, Plaintiffs allege that the "Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house," that "men cannot enter the living areas of the Sorority except upon special circumstances that have been approved in advance," and that "Langford's access to and presence in the sorority house violates the housing contract that Plaintiffs signed."  (Am. Compl., ¶¶ 170–71.)

Reviewing the House Contract and House Rules, it is apparent that there is no provision that supports the interpretation Plaintiffs offer and, therefore, no plausible breach.  (Attach. 10 to Am. Compl.)  Specifically, nothing in those documents prevents Langford's access to and presence in the sorority house, including entering the living areas of the house.  *Id.*  Indeed, although Langford is not living in the house and will not be living in the house, as Plaintiffs acknowledge in their Amended Complaint (Am. Compl., ¶¶ 82, 86), nothing in the House Contract or House

**APP.026**

Rules prohibits her from living in the house.  Though the Gamma Omicron chapter may choose to restrict the visitation to the house, nothing in the House Contract or the House Rules obligates the Building Co. to ban transgender women or men from living in or accessing the house.

Furthermore, contrary to Plaintiffs' contention, the House Contract does not obligate the Building Co. to provide housing in accordance with the bylaws, standing rules, and policies of Kappa.  The only mention in the House Contract of those documents does not relate to any obligation of the Building Co:

> Other Services. The chapter shall provide the student such services as are customarily furnished by the chapter to residents of the chapter house, subject to this contract, the Kappa Kappa Gamma Fraternity Bylaws, Standing Rules and Policies ("Fraternity standards"); and rules and regulations of the chapter, including, without limitation, the House Rules ("House Rules") attached hereto as Exhibit B, subject to any changes as may be made by the chapter, House Board, or the Fraternity at any time.

(Attach.10, ¶ 5 to Am. Compl.)

Finally, even if there were some obligation in the House Contract for the Building Co. to comply with Kappa's bylaws, standing rules, and policies, Plaintiffs have not identified any provision in those governing documents that is violated by Langford, who is a member of the Gamma Omicron chapter, having access to and a presence in the house.[9]  This claim just circles back to the same argument dispelled above that Langford should have had her membership voided because she is a transgender woman.  As previously discussed, Kappa has defined women to include individuals who "identify as women" and nothing in Kappa's governing documents bars

---

[9] Plaintiffs do not allege that the Building Co. is responsible for any of Langford's alleged conduct or that the House Contracts are breached by Langford's alleged conduct.  Indeed, property owners and landlords have no duty to protect their tenants from another person and are not liable for the actions of another unless there is evidence of prior criminal or violent acts by another or notice of an imminent threat of danger.  *See Warwick v. Accessible Space, Inc.*, 448 P.3d 206, 212–213 (Wyo. 2019).

that interpretation. (*See supra* 13–16.) Therefore, the Court should dismiss Plaintiffs' breach of contract claim against the Building Co. with prejudice.

### F.   Plaintiffs' Tortious Interference with Contract Claim Fails as a Matter of Law

Plaintiffs assert a tortious interference claim against Kappa only (Am. Comp., ¶ 175).[10] The elements for a claim for tortious interference are (1) the existence of a valid contractual relationship; (2) knowledge of the contractual relationship; (3) intentional and improper interference inducing or causing a breach of the contract relationship; and (4) resultant damage to the party from that breach. *Sheaffer v. State ex Rel. Univ. of Wyo.*, 202 P.3d 1030, 1044 (Wyo. 2009). Accordingly, without an underlying breach of contract, a tortious interference claim fails.

Again, this claim is entirely premised on Kappa not voiding Langford's membership, which they claim prevents Plaintiffs "from having the benefit of the Housing Contract that they signed." (*See* Am. Compl., ¶ 175). It fails because there was no underlying breach of the House Contract. (*See supra* 18–19.) Without a breach of the House Contract, there can be no tortious interference with that contract. Plaintiffs also fail to allege anything that could constitute intentional and improper interference and fail to allege any resultant damages. Therefore, the Court should dismiss Plaintiffs' tortious interference claim against Kappa with prejudice.

### G.   Plaintiffs' Direct Claim Fails as a Matter of Law

Finally, Plaintiffs attempt to assert a direct cause of action, which is their most perplexing claim. (Am. Compl., ¶¶ 176-179). Once again, they do not identify whom they bring this claim

---

[10] Plaintiffs confusingly reference "Defendants" twice in this claim. They have not indicated, however, that this is a claim intended against Rooney or the Building Co. To the extent Plaintiffs seek to assert this claim against Rooney, it fails for lack of personal jurisdiction and because Plaintiffs have not alleged Rooney knew of the contracts or did anything to induce a breach. And the Building Co. cannot tortuously interfere with its own contract. *See Sunshine Custom Paints & Body, Inc. v. S. Douglas Hwy. Water & Sewer Dist.*, 173 P.3d 398, 404 (Wyo. 2007) (tortious interference requires a contract "between the plaintiff and a ***third party***") (emphasis added).

**APP.028**

against, but as they allege the harm is the "direct result of Defendants' actions to force the admission of Langford as a sorority member," Defendants will consider this an attempt to allege a direct action against Kappa and Rooney.

A plaintiff can bring a direct cause of action only when "(1) the injury arises out of a special duty, e.g., via contract, between the wrongdoer and the shareholder; or (2) the shareholder suffered damages separate and distinct from that suffered by other shareholders." *Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio App. 2011). In other words, the complaining shareholder must be "injured in a way that is separate and distinct from an injury to the corporation." *Morgan v. Ramby*, No. 2012-Ohio-763, 2012 Ohio App. LEXIS 662, at *11 (Feb. 27, 2012) (citations omitted). Plaintiffs do not allege an injury arising out of a special duty, so they must allege separate and distinct damages from those suffered by other members.

Of course, there must be some injury to the corporation from which the shareholder suffered distinct damages in order for a direct cause of action to proceed. *Carlson*, 789 N.E.2d 1122, 1126-27; *see also Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio App. LEXIS 154, at *7– *8 (Jan. 18, 2007) (analyzing plaintiff's breach of contract, fraud, and misrepresentation causes of action as direct actions). To the extent this claim is based upon Rooney's alleged breach of fiduciary duty, it fails for the reasons described above.[11] (*See supra* 10–17.)

Plaintiffs complain about being "deceived" into "believing that they were joining a woman-only organization," being "deprived of the all-female environment," and having to reside in a sorority house that Langford has access to because Langford has made them uncomfortable in

---

[11] Typically, claims for breach of fiduciary duty are alleged as derivative claims because the purported damage is to the corporation, not individual members. *Heaton*, 954 N.E.2d at 175 (internal citations omitted).

**APP.029**

various ways, including "threatening to publicly label them bigots."[12]  (Am. Comp. ¶ 178.) Plaintiffs, however, do not indicate what legal cause of action they are attempting to advance.

As Defendants can best surmise, Plaintiffs may be attempting to claim that they believed a transgender women could not join Kappa and that they have some right to have Langford excluded by Kappa and banned from the sorority house because she is transgender.  As discussed above, Plaintiffs have no legal claim against Rooney (or Kappa) for a transgender woman joining Kappa. (*See supra* 10–17).  Plaintiffs also have no legal claim against Kappa (or Rooney) because Langford is able to be present in the sorority house as a member of the chapter.  (*See supra* 17–20).  In summary, there is no articulated or plausible legal claim upon which Plaintiffs base the contention that they suffered individual legal harm distinct from that which they allege on behalf of all Kappa members.  Therefore, the Court should dismiss Plaintiffs' direct claim with prejudice.

## IV.    CONCLUSION

Plaintiffs are upset that Kappa has adopted an inclusive position allowing for the admission of transgender women.  They are upset that their collegiate chapter decided to admit Langford as a transgender woman.  They are upset that Kappa did not step in to override their chapter's membership decision.  And they are upset that they now have a transgender woman in their chapter who has access to and a presence in their sorority house.  They and their supporters have taken to the media to complain of the unfairness of having a transgender woman in their chapter and how

---

[12] Despite representing to the Court that they feared participation in this litigation due to "significant press coverage" and "the social media maelstrom that surrounds these issues generally" (ECF No. 2), Plaintiffs and one of their attorneys have appeared on multiple national news programs to discuss this case and make incendiary statements about Langford, Kappa, and transgender women.  A "bigot" is defined as "a person who is obstinately or intolerantly devoted to his or her own opinions and prejudices."  (https://www.merriam-webster.com/dictionary/bigot (last visited June 19, 2023).  Given Plaintiffs' public statements, their professed concern about being publicly labeled with this term by Langford rings hollow.  Other members of Kappa, students at their university, and the public can now determine whether a public label of "bigot" is warranted.

**APP.030**

it has deprived them of their right to be part of a sorority where everyone is biologically born female. One alumnae supporter has given media interviews declaring that Kappa's inclusion of someone who is transgender is the "biggest setback for women since suffrage." Plaintiffs and their supporters are indignant about Langford's admission and believe they have been wronged. But "the law is a tool of limited capacity. Not every wrong, even the worst, is cognizable as a legal claim." *Allen v. Bank of Am. Corp.*, No. 10-4205 (MJD/JSM), 2011 U.S. Dist. LEXIS 96836, at *29 (D. Minn. July 22, 2011) (citing *Alperin v. Vatican Bank*, 410 F.3d 532, 562 (9th Cir. 2005)). Our courts exist to address legal wrongs; they are not a place where people can go to reshape society to fit their exact sensibilities and preferences.

But perhaps the greatest wrongs in this case are not the ones Plaintiffs and their supporters imagine they have suffered, but the ones that they have inflicted through their conduct since filing the Complaint. Regardless of personal views on the rights of transgender people, the cruelty that Plaintiffs and their supporters have shown towards Langford and anyone in Kappa who supports Langford is disturbing.[13] This conduct has unsurprisingly resulted in hate mail and threats to Langford, Rooney, and others at Kappa, not to mention the inevitable mental toll inherent in being the target of such public and untrue vitriol. As just one example, following Plaintiffs' national media interviews with their attorney, an anonymous man left a threatening message against Kappa in response to those media interviews stating: "you cock sucking woke pieces of fucking human

---

[13] Plaintiffs appeared with their attorney, Cassie Craven, on national media interviews in which Langford is referred to as a "pervert," it is suggested she could be "getting off" on living with other members, and, in discussing her appearance, is analogized to be a pig wearing lipstick. *See* The Megyn Kelly Show, *Left's Trans Ideology Religion, and Men in Women's Spaces, with Sen. Josh Hawley & KKG Sisters Suing*, YOUTUBE, beginning at 49:52 (May 15, 2023), https://www.youtube.com/watch?v=51wAdkZEUC8. It is hard to imagine behavior that is more cruel, more un-sisterly, or more contrary to Kappa values. Plaintiffs' statement to the Court that Langford "deserves kindness" (Mot. for Reconsideration, ECF 6) was a flagrant misrepresentation of Plaintiffs' plans for conducting this litigation.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 427 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 36
Case 2:23-cv-00051-ABJ    Document 20    Filed 06/20/23    Page 29 of 30

garbage" and threatening "I'm going to do everything to destroy your fucking organization." This is what Plaintiffs have brought to their beloved organization and sisters since filing this litigation.[14]

This Court should dismiss all claims with prejudice for the myriad of reasons discussed in detail above. Dismissal may be unlikely to change Plaintiffs' and their supporters' feelings about having a transgender woman in their sorority or lead them to behave more kindly towards sorority sisters with different views. It may not cause them to reevaluate the morality of attacking the character and appearance of a college student in a publicity drive for divisive litigation or begin to acknowledge the humanity of transgender people in their words and actions.

What dismissal will do is establish that Plaintiffs' legal claims are baseless and show their supporters and others who may seek to use the courts for their own political purposes that funding frivolous litigation is not the way to resolve disputes or effect change. It may also be the first step in allowing Kappa and the Gamma Omicron chapter to begin rebuilding from the significant harm that Plaintiffs and their supporters have unleashed on this organization and chapter that they profess to love.

Dated: June 20, 2023

Respectfully submitted,

/s/ Natalie M. McLaughlin
Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:     (614) 464-5452
Email:          nmmclaughlin@vorys.com
                  bwdressel@vorys.com

Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:     (307) 265-0700
E-Mail:          sklosterman@wpdn.net

*Attorneys for Defendants Kappa Kappa Gamma Fraternity, Mary Pat Rooney, and the Kappa Kappa Gamma Building Co.*

---

[14] Kappa made a report to law enforcement after receiving this threatening message.

-24-

**APP.032**

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 20th day of June, 2023.

| Cassie Craven (#7-5664) | ☒ CM/ECF Electronic Transmission |
|---|---|
| LONGHORN LAW LLC | ☐ U.S. Mail (Postage Prepaid) |
| 109 East 17th Street, Suite 223 | ☐ Fax |
| Cheyenne, WY 82001 | ☐ Overnight Delivery |
| Telephone: (307) 823-3062 | ☐ Hand Delivery |
| E-Mail: ccraven.law@gmail.com | ☒ Email |

| John G. Knepper (#7-4608) | ☒ CM/ECF Electronic Transmission |
|---|---|
| LAW OFFICE OF JOHN G. KNEPPER, LLC | ☐ U.S. Mail (Postage Prepaid) |
| P.O. Box 1512 | ☐ Fax |
| Cheyenne, WY 82003 | ☐ Overnight Delivery |
| Telephone: (307) 632-2842 | ☐ Hand Delivery |
| E-Mail: john@knepperllc.com | ☒ Email |

/s/ *Brian W. Dressel*
Brian W. Dressel

45411231

**APP.033**

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, et al., on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 2:23-cv-00051-ABJ |
| v. | ) ) | |
| KAPPA KAPPA GAMMA FRATERNITY, et al., | ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO KAPPA KAPPA GAMMA'S MOTION TO DISMISS

At least the Kappa Kappa Gamma Defendants (the national Sorority, its President Mary Pat Rooney, and the Kappa Housing Corporation) and the Plaintiffs agree on one fact: Plaintiffs are members of the Kappa Kappa Gamma Fraternity, a nonprofit corporation organized under the laws of Ohio. Doc. 20 at 1. Beyond this, however, Kappa's current motion makes clear the parties agree on little else.

Kappa's motion distorts both the allegations in the Complaint and the relief that Plaintiffs seek. Fundamentally, Plaintiffs do not claim an inchoate "legal right to be in a Sorority that excludes transgender women." Doc. 20 at 2. Kappa Kappa Gamma is a nonprofit corporation that has, for more than 150 years, limited membership to women only. As Kappa's motion to dismiss makes clear, Rooney and the rest of the Fraternity Council have decided that Kappa must "evolve." Doc. 20 at 19. But corporations do not evolve. They change when the corporation's Articles of Incorporation or bylaws are amended. Plaintiffs claim the rather unremarkable right, as members

**APP.034**

of a nonprofit corporation, to insist that the corporation follow its bylaws and — when the Board of Directors refuses — to seek the aid of the courts. Plaintiffs do not dispute that Kappa Kappa Gamma *can* change its membership criteria. They dispute whether it has lawfully done so.

Kappa has moved to dismiss the Complaint for four reasons. They argue the Court lacks jurisdiction over Mary Pat Rooney, the President of Kappa Kappa Gamma; they argue that the Court lacks jurisdiction over the Plaintiffs' claim for breach of contract; they argue that the Plaintiffs have not adequately presented their demand to Kappa's Fraternity Council; and they argue the evolution of the word "woman" allows the Sorority leaders to admit men who claim to be women as members without any change to the bylaws. Plaintiffs will rearrange the order of the arguments slightly in this response, but none justify dismissal at this stage of litigation.

Rooney is the Chief Executive Officer of Kappa Kappa Gamma and the Complaint alleges that she has been directly involved in the decision to disregard the Sorority's bylaws and rules and to admit a man, Langford, as a member of Kappa Kappa Gamma. Tenth Circuit precedent holds that this Court has specific in personam jurisdiction over a derivative suit against corporate officials in the state where the injury to the corporation occurs. *See Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013). That location is Wyoming. Second, Kappa argues that the Complaint should be dismissed against the Sorority itself because the plaintiffs have failed to detail, with specificity, how they first sought a remedy from Rooney and the Fraternity Council of Kappa Kappa Gamma before filing suit. Kappa's argument misstates the allegations in the Complaint, in particular the recitation of the efforts of not just the Plaintiffs' attorneys but also the Plaintiffs and their parents to convince Kappa to address the bylaws violations identified in the Complaint. Doc 6. at ¶ 93-95; ¶140-142. Kappa also argues that this Court has no authority to determine Kappa

membership. This also misstates the Plaintiffs' argument. Plaintiffs are not arguing that Kappa could *never* change its membership requirements. Of course it can. The problem here is that Kappa has not. Kappa has availed itself of the corporate form, and it has adopted bylaws. These bylaws and other official policies restrict how the corporation may operate. If the corporation wishes to change, it must amend these bylaws. What the current leadership of the corporation cannot do is ignore these bylaws and pretend that they are above the law.

Finally, Kappa moves to dismiss the Plaintiffs lawsuit against the Kappa Building Corporation, arguing that the Plaintiffs have not met the jurisdictional threshold. In doing so, they both ignore and artificially limit the damages that Plaintiffs are claiming. Plaintiffs are not claiming only the cost of their rental payments for each year, they are also claiming additional special damages. (*see* Doc 6. at ¶¶ 154-156 & ¶158). Wyoming allows special damages for contract breach, especially when there are special circumstances and a special relationship, as here. Kappa's artificial attempt to lower the damages claimed is not sufficient to defeat jurisdiction.[1]

Kappa's motion to dismiss is unsurprising in some ways, as it provides the consistent response that Plaintiffs have received since they first raised their concerns in September 2022: sit down and shut up. Or quit. This attitude reflects the arrogance of the underlying attempt at the unlawful transformation of a 150-year-old institution.

Of particular note, this Court should be sensitive to the numerous unsupported factual allegations that are introduced in Kappa's response. Kappa states that it has had a policy to admit men since 2015. The difficulty is that there is no evidence of this fact. Indeed, to the extent that

---

[1] Kappa also makes several derivative arguments to dismiss the Complaint, but each rest on the underlying assumption that the Sorority has the authority to disregard the membership restrictions in its bylaws.

this policy existed, it appears to have been concealed. Plaintiffs have not yet claimed fraud in their Complaint, but this new detail suggests that this is only a matter of time. To the extent that Kappa leaders have had a policy to admit men who claim to be women, but the organization has held itself out as all-female, the national Sorority has been engaged in fraud. The brief includes other claims of fact that simply cannot be credited at this stage of litigation.

**<u>Standard of Review</u>**

At this early stage of litigation, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023).

Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that the defendant acted unlawfully but the complaint does not need to establish that the defendant probably acted unlawfully. *Mckinney v. Granite Peak Fabrication, LLC*, No. 19-CV-00266-ABJ, 2020 WL 10356870, at *2 (D. Wyo. Mar. 13, 2020) (citing *Iqbal*). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 433 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 42
Case 2:23-cv-00051-ABJ    Document 24    Filed 07/05/23    Page 5 of 21

"Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton*, 63 F.4th at 1276 (punctuation omitted). There is a "low bar for surviving a motion to dismiss," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.*

## I.    The Court has in personam jurisdiction over Rooney.

A federal district court's authority to assert personal jurisdiction in a diversity suit is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)). "[I]n addition to satisfying this state law requirement, the exercise of personal jurisdiction must not offend the due process clause of the Fourteenth Amendment." *United States v. Botefuhr*, 309 F.3d 1263, 1271 (10th Cir. 2002) (quotation omitted). Wyoming's long-arm statute confers the maximum jurisdiction permissible consistent with the Due Process Clause. *Markby v. St. Anthony Hosp. Sys.*, 647 P.2d 1068, 1070 (Wyo. 1982). Thus, this Court's analysis here is limited to a single due process analysis. *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010).

"Consistent with due process, a court may exercise specific personal jurisdiction over a non-resident defendant only when that defendant has the requisite 'minimum contacts' with the forum state, such that having to defend the lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[T]he Supreme Court has instructed that the 'minimum contacts' standard requires, first, that the out-of-state defendant

**APP.038**

must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' [a] defendant's forum-related activities.'" *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

### A.    Rooney has sufficient minimum contacts with Wyoming to support specific in personam jurisdiction in this Court.

The "purposefully directed" analysis "can appear in different guises," "[i]n all events, the shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Dudnikov*, 514 F.3d at 1071. Next, "[t]he import of the 'arising out of' analysis is whether the plaintiff can establish that the claimed injury resulted from the defendant's forum-related activities." *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (quotation omitted). Finally, "[i]f the defendant's actions create sufficient minimum contacts, the court must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." *Eighteen Seventy*, 32 F.4th at 966 (alterations and quotations omitted).

The "minimum contacts" standard requires, first, that Rooney must have "purposefully directed" her activities at residents of the forum state, and second, that the Plaintiffs' must "arise out of" Rooney's forum-related activities. Rooney argues that there is no basis to hold her subject to Wyoming jurisdiction when she has never been to Wyoming, but Tenth Circuit precedent makes clear that a corporate officer like Rooney can be sued in a derivative action by the corporation in the state when the injury occurred.  *Newsome v. Gallacher*, 722 F.3d 1257, 1264–81 (10th Cir.

2013). Even if the corporation is located elsewhere, courts do not "ignore where the injury was actually felt." *Id.* ar 1268. "Thus, in a lawsuit claiming breach of fiduciary duty, we believe it is appropriate to consider harm to those to whom a fiduciary duty was owed … when answering the question of who was injured and where." *Id.*

Here, the Kappa members with the greatest injury, the strongest interest in vindicating the corporation's interests, and—indeed—standing to object are tied to the Wyoming forum. The answer to "Who was injured, and where?" is that Kappa and its members were injured by the admission of Artemis Langford as a member of Kappa at the University of Wyoming.

As noted, purposeful direction in this suit has three requirements: (1) intentional action, (2) express aiming at the forum state, and (3) knowledge that the brunt of the injury would be felt in the forum state. *Dudnikov,* 514 F.3d at 1072. The intentional action element requires little discussion. The record contains no suggestion that Rooney acted unintentionally when she took the steps that let to Langford's admission. Rooney is the "chief executive officer," Doc 6-1 at 112, of a non-profit corporation that operates in the State of Wyoming. As the verified complaint alleges, decisions at the chapter level are not made by students at the University of Wyoming. Doc. 6 at ¶ 74. Rather, every single decision is made by the "workforce" that Rooney commands. Doc. 6 at ¶¶ 75-76. These include the decision to admit Langford to Kappa Kappa Gamma.[2]

---

[2] Kappa's Motion infers malicious intent in the decision not to name other corporate officers of Kappa Kappa Gamma. The opposite is true. Just as Plaintiffs did not name the local chapter officers who worked at Kappa's behest to admit Langford, the Plaintiffs named only one member of the Fraternity Council to reduce the collateral consequences of the lawsuit on third parties. The law does not require more, but if there is a concern, Plaintiffs can sue more Directors. The Plaintiffs are open to whatever direction is provided.

Kappa attempts to introduce new facts in its motion to dismiss, claiming that Rooney had no awareness of the events at issue here. First, this new fact is directly contrary to Plaintiffs' allegation that Rooney knew what was happening in Wyoming. These allegations are more than mere conjecture, especially when the executive director of Kappa (Rooney's subordinate) referred to Rooney's direct involvement, telling Plaintiffs they should stop complaining about Langford's admission because "your concerns were reviewed…we believe proceeding with initiation is the appropriate next step" so "Thank you for respecting this decision" Doc. 6 at ¶93. The use of "we" in the passive voice is evidence that the decision was made by Poole's superior (Rooney). *See also* Doc. 6-1 at 21. The President supervises staff. Finally, the careful wordsmithing in Kappa's memorandum indicates the extent of Rooney's involvement. Kappa states that Rooney was unaware until an invitation to join was extended to Langford. But this was not the last moment before Langford was inducted into membership. As the Complaint alleges, Plaintiffs repeatedly noted the various bylaws and other violations up until the date of Langford's actual induction in mid-November. Doc. 6 at ¶¶ 93-95; ¶¶ 140-142. Kappa appears to be seeking to mislead this Court with its factual assertion.

The express aiming element requires Wyoming to have been the "focal point" of the tort or contract action. *Dudnikov,* 514 F.3d at 1074. Langford is a member of the Kappa Kappa Gamma sorority chapter located at the University of Wyoming. The women who will be most affected by Langford's admission all attend college in Laramie, Wyoming. The sorority house where Langford said he "cannot wait to sleep with all the girls," Doc. 6 at ¶ 113, is in Wyoming. The final requirement is knowledge that the brunt of the injury would be felt in the forum state. This is also alleged. Doc. 6 at ¶ 166.

When a plaintiff satisfies its minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless "offend traditional notions of fair play and substantial justice." *Dudnikov,* 514 F.3d at 1080 (internal quotation marks omitted). "Such cases are rare." *Rusakiewicz v. Lowe,* 556 F.3d 1095, 1102 (10th Cir.2009). The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477. Kappa does not address the usual factors, but instead suggests that a corporate officer is not subject to jurisdiction because of the actions of the corporation in a forum. The Tenth Circuit's decision in *Newsome* makes clear that this is not a requirement of due process analysis.

Under the 'fiduciary shield doctrine,' a nonresident corporate agent generally is not individually subject to a court's jurisdiction based on acts undertaken on behalf of the corporation. *Newsome*, 722 F.3d at 1275. The fiduciary shield doctrine, however, only exists as a matter of state law. *Id.* As noted earlier, Wyoming has abandoned any limits on personal jurisdiction beyond what the Constitution provides.[3]

## II.    The Plaintiffs' derivative claim has been pled with specificity.

Kappa claims that the Complaint has not specifically alleged sufficient information to allow Rooney and the other corporate leaders to act and avoid a breach of fiduciary duty. This, however, misses the extent to which the Plaintiffs, their parents, and their attorneys asked for months for actions by Kappa. The demands did not begin in November 2022 with a letter from

---

[3]  Kappa cites a recent decision of another federal court in Wyoming which quotes the fiduciary shield doctrine. That case relies, ultimately, on a 1973 Wyoming Supreme Court case that applied the fiduciary shield doctrine. *Cozzens v. Piper Aircraft Corp.*, 514 P.2d 1375, 1378–80 (Wyo. 1973). At that time, Wyoming had a more limited long arm statute. As this Court has previously held, Wyoming no longer limits in personam jurisdiction beyond what the U.S. Constitution requires.

counsel. Doc. 6-1 at 178-180 (Attachment 11); (*see also* Doc. 6 at ¶ 93-95; ¶140-142 for other actions taken prior to formal demand.)

In September and early October 2022, Plaintiffs and, in some cases, their parents reached out to national Sorority leaders to raise concerns about Langford. At that time, Langford's membership had not yet been finalized. Doc. 6 at ¶ 93. The Executive Director of the Sorority, told Plaintiffs that their request had been presented to the Fraternity Council—which is led by Rooney—and refused. *Id.* Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

In November 2022, Plaintiffs, through counsel, again wrote to the national Sorority, requesting that Kappa Kappa Gamma prevent the initiation of Langford until concerns about his membership were resolved. Doc. 6-1 at 178-180 (Attachment 11). Plaintiffs' letter pointed out that Langford's membership is both a violation of the Sorority's bylaws and also breaches the housing contract that Plaintiffs signed with the Defendant Kappa Housing Corporation. The Sorority, through counsel, rejected Plaintiffs' request. Doc 6-1 at 45-47 (Attachment 3). The Sorority repeated its claim that Kappa Kappa Gamma is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id.* This statement, which disregards the actual meaning of the word "woman" as used by the Sorority for 150 years, was presented to Plaintiffs as the official policy of the Sorority. Kappa's counsel stated that the Sorority leadership has concluded that a woman need not be "biologically born as female." *Id.* at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs'

effort to obtain the desired action from the directors or comparable authority or other shareholders and/or members within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

**III.      There is no First Amendment or other bar that prevents this Court from holding that the Sorority's bylaws must be respected by its officers.**

Kappa suggests that the right of free association prevents this Court from interfering with its membership decisions. This misstates both the law and the Plaintiffs' argument. The Plaintiffs are not arguing that Kappa could *never* admit a man (transgender or otherwise) into its membership. Plaintiffs' allegation is that Kappa must faithfully follow its bylaws, which do not permit such membership, until these bylaws are changed.

In Ohio, a corporation's charter consists of its articles of incorporation and the Ohio laws in existence when the articles of incorporation were filed. *Opdyke v. Sec. Sav. & Loan Co.*, 157 Ohio St. 121, 131-32, 105 N.E.2d 9, 16 (1952). For a for-profit corporation, the corporate charter is a contract between the corporation and its stockholders. *Opdyke*, 105 N.E.2d at 16; (1952).] For a non-profit corporation, the corporate charter is a contract between the corporation and its members. *See* 18 Am. Jur. 2d Corporations § 33 ("The fundamental rules and principles of law of for-profit corporations are equally applicable to nonprofit corporations unless otherwise specifically provided otherwise in the enabling statutes.").

The corporate charter contains the terms upon which the corporators have agreed to associate; it sets forth both the authority that members can exercise as well as the limits within which the body of corporators can lawfully act in a corporate capacity. *Wegener v. Wegener*, 126 N.E. 892, 893–94 (Ohio 1920). Like other corporations, the Sorority and the Fraternity Council/Board must act consistently with its corporate charter, as this forms the basis for the entity's authority. When a corporation's actions exceed the authority granted by its corporate

**APP.044**

charter, the actions are ultra vires and void. *Id.* at 894. Board members who disregard or otherwise seek to circumvent the corporation's corporate charter violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance).

Kappa Kappa Gamma has bound itself through its Bylaws, Standing Rules, and Policies. *Brown v. Carter*, 15 Haw. 333, 344 (1903) ("The corporators may bind themselves by contract in the articles or outside the articles as well as in what they may prefer to call by-laws, as to their methods of dealing with officers."). Under Ohio law, the Bylaws of Kappa Kappa Gamma are the code of regulations for the corporation. *Kappa Kappa Gamma* Bylaws, art. xix (2022). The Kappa Kappa Gamma Bylaws explicitly restrict membership in the Sorority to women only. Doc. 6-1 at 183 (Attachment 12); Attachment B at 2 (art. III, sec. 1).

Kappa's response is that the meaning of the word "woman" has "reasonably evolve[d]" to include men to claim to identify as women. Doc. 20 at 19. But Kappa's citation, to the Supreme Court's decision in *Bostock*, is not a decision that adopts the concept of 'the evolution of words' that the Kappa Defendants advocate. Doc. 20 at 14 (citing *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020)). *Bostock*'s holding is that discrimination against transgender member is discrimination based on the person's sex. "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). *Id.* The Court acknowledged that meaning of words can change. "[W]e must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context."

*Id.* The Court, however, drew the opposite conclusion from that advocated here by Kappa: The law's ordinary meaning at the time of enactment usually governs. *Id.* at 1738. [4]

The words *woman* and *women*, as used in Kappa Kappa Gamma's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Sorority's 150 years, have always referred to female human beings. These words, as used by Kappa Kappa Gamma prior to Defendants' unlawful actions, have never referred to biological males who claim to be women. The Complaint goes to great lengths to draw upon the history of Kappa and its origins to provide the Court context on its early distinctions between men and women competing in the classroom and the reasons for its formation.

Moreover, it must be noted that Kappa's new definition of "woman" is inconsistent and illogical. As the Sorority's attorney explained to Plaintiffs, the Fraternity Council views gender as a "broader construct encompassing identity." Doc 6-1 at 45 (Attachment 3). This concept of gender connects to "[h]ow an individual defines themselves in terms of characteristics traditionally identified in this culture as male or female," which is a person's "gender identity." *Id*. at 34, 40 (Attachment 2). As a result, the Sorority's attorney claims that men can also become Kappa members if they "identify as women." *Id.* at 32.

Kappa cannot be a "single-gender organization" wherein members have a "single" gender identity unless the Sorority uses gender identity to make membership decisions. But the Sorority

---

[4] Kappa's response is to draw upon a definition that was adopted by one dictionary in late 2022 after Langford's membership. This is precisely the sort of revisionist interpretation that is not permissible, either in the corporate boardroom or the courtroom.

Page 13

**APP.046**

states that it does not discriminate based on gender identity. *Id.* at 1 ("Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on … gender identity…."). *Id.*

## IV.    The breach of contract and tortious interference claims do not fail.

To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages. Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts. There is the contract between Kappa and its members under Ohio corporate law. And there is the contract with the Kappa Kappa Gamma Housing Corporation. The Defendant Kappa Kappa Gamma Building Corp., and the Plaintiffs entered into a contract to provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. These Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house. Men cannot even enter the living areas of the Sorority except upon special circumstances that have been approved in advance. Through Defendant Kappa's actions, they have created a breach of contract as to both the sorority experience and paid housing experience that these young women were promised. Langford's access to and unfettered presences in the sorority house violates the housing contract that Plaintiffs signed and the Plaintiffs suffer extensive damage as a result, including PTSD, anxiety, and emotional damages in an exact amount to be proven at the time of trial but far in excess to the jurisdictional requirement required in this matter. Additionally, many recruits and members have fled the house or sorority for this reason. One member even moved a state away. These damages and harms at a time of a college woman's experience are impactful, unfair and unjust.

Page 14

Kappa argues that the Plaintiffs lack sufficient damages to bring their claims to federal court. This is incorrect. Plaintiffs assert—as the Sorority itself did when it filed a Complaint in the U.S. District Court for the District of Massachusetts in 2018—that single-sex sororities are a source of stability and community in college life for young women. The single-sex nature of a sorority is necessary to create this cohesive atmosphere. "[T]he opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests." Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment." Doc. 6 at 31-33 (quoting Kappa itself).

Jurisdiction based on diversity of citizenship exists when a dispute between citizens of different states involves an amount in controversy exceeding $75,000. 28 U.S.C. § 1332(a). In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation. *E. g., McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 181 (1936). The Tenth Circuit has followed what has commonly been referred to as the "either viewpoint rule" which considers either the value to the plaintiff or the cost to defendant of injunctive and declaratory relief as the measure of the amount in controversy for purposes of meeting the jurisdictional minimum. *Justice v. Atchison, Topeka and Santa Fe Ry. Co.,* 927 F.2d 503, 505 (10th Cir.1991). However, in multiple plaintiff cases, the "either viewpoint rule" does not override the well-established principle that each plaintiff or member of the class must individually satisfy the amount in controversy requirement. *Snyder v. Harris,* 394 U.S. 332, 335 (1969); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006). At bar, the damages of any particular Plaintiff exceed $75,000, the requisite amount in controversy and

**APP.048**

the jurisdictional threshold is met for this Court to properly exercise subject matter jurisdiction over this case.

Plaintiffs' Complaint is a derivative suit to obtain a judgment that Kappa Kappa Gamma remains as required by its Articles of Incorporation: a non-profit corporation "intended to unite women, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Doc.6-1 at 62 (emphasis added). Plaintiffs ask this Court to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules by fiat, and ask this Court to enjoin the unlawful implementation of the Guide. Plaintiffs ask this Court to hold that the admission of Artemis Langford, and any other man, as a member of Kappa Kappa Gamma is void ab initio. Plaintiffs further ask this Court to declare that Defendant Rooney and the other members of the Fraternity Council have violated their fiduciary duties to the Sorority. Plaintiffs further ask for damages, reflecting the injuries the Sorority has and will continue to suffer in its membership, including the closure of the Sorority's chapter at the University of Wyoming, loss of donations, decrease in alumnae support and participation, and permanent damage to the Sorority's reputation and mission. Doc. 6 at ¶ 11.

Plaintiffs also seek direct relief from the Defendants. Ohio law recognizes that faithless directors of a corporation can directly injure others through a breach of fiduciary duty in addition to the derivative injuries suffered by the corporation itself. In pursuit of an ideological agenda, Defendants have violated numerous other Bylaws, Standing Rules, and Policies of the Sorority, and caused the Sorority to act in a manner that has specifically harmed Plaintiffs and undermined contractual obligations to the Plaintiffs. The Fraternity's officers, directors, and employees

directly, and through alumnae advisers acting at Fraternity Council direction, pressured student members to endorse Langford's initiation to the Sorority. When Langford's membership vote violated the Sorority's secret-ballot procedures, Defendants and their agents knowingly disregarded the clear violations of the corporate rules. When Plaintiffs raised concerns about Langford's inappropriate and threatening behavior in the sorority house, Defendants and their agents refused to protect Plaintiffs and prevented others from doing so. Instead of protecting Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma altogether. Defendants have pushed Plaintiffs to resign even though—having already joined Kappa Kappa Gamma—Plaintiffs are permanently barred from joining a different sorority. Finally, Defendants have retaliated against Plaintiffs and other sorority members who object to the Board's unauthorized Guide. Plaintiffs ask for all remedies available in response to Defendants' wrongdoing, including monetary damages, punitive damages, injunctive relief, declaratory relief, and attorney fees. Doc. 6 at ¶ 12.

Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, as the parties are citizens of different States, all necessary parties are before this Court, and the sum of the matter in controversy, including damages and the value of the declaratory and injunctive relief sought by Plaintiffs, exceed seventy-five thousand dollars ($75,000.00). Doc. 6 at ¶ 13. Defendant Kappa Kappa Gamma Building Co., a Wyoming nonprofit corporation formed a contract with the Plaintiffs. While Plaintiffs do not seek damages directly from Kappa Housing Corp., Plaintiffs do allege that Kappa Kappa Gamma Fraternity has tortiously interfered with their contractual relationship with this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation. Fed. R. Civ. P. 19(a)(1)(B). Doc. 6 at ¶ 23. As a requirement of

**APP.050**

membership, Sorority members must "promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the Bylaws, Standing Rules, and Policies [of the Sorority] as well as my chapter Bylaws and Standing Rules." Attachment 9 (Commitment Form). Collegiate members pay dues at initiation and additional dues every year to the Sorority. Plaintiffs cannot resign from Kappa Kappa Gamma to join a different sorority. Kappa Kappa Gamma is one of the 26 sororities that comprise the National Panhellenic Conference (NPC). These sororities have all agreed a woman who joins one NPC sorority is permanently ineligible for membership in any other NPC sorority. Doc. 6 at ¶ 153. Each Plaintiff joined Kappa Kappa Gamma with the promise they would be able to live and socialize in an all-female environment. Defendants have repeatedly lauded the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will never have the benefits of a college sorority experience. Some of the damages to each Plaintiff are easily calculable, including the dues and housing payments that were made for the purpose of living in an all-female environment. Some will be more difficult to calculate, but they are no less real. For 150 years, Kappa Kappa Gamma has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa Kappa Gamma has stated that these benefits result from the single-sex experience. Plaintiffs agree that these benefits exist. The loss of these lifetime benefits is similarly calculable, and Defendants are responsible for this damage to Plaintiffs. Doc. 6 at ¶ 154.

The Sorority itself has also been damaged by Defendant Rooney and the other members of the Fraternity Council. Their violations of fiduciary duty have caused the sorority chapter at the University of Wyoming to lose significant membership in less than six months. With very few signed housing contracts for the next academic year, the sorority house at the University of

Wyoming will close and then the college chapter itself will fold. The loss of a sorority chapter has a significant effect beyond just the loss of dues from the college students there. These young women will become leaders, and—just as prior generations have—they will donate to the Sorority and its continued operation. The loss of a sorority chapter cuts off all future alumnae from that school. Doc. 6 at ¶ 155. Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty, and their contractual obligations to the Plaintiffs, by purporting to admit Langford into the Sorority. Doc. 6 at ¶ 158.

Specifically, damages will be attested to further during discovery and at the time of trial in this matter. For purposes of this briefing, this Court should recognize that room, board and dues alone include $9,100 per year, per Plaintiff. One would not pay sorority fees, far in excess of campus housing, unless there was significant benefit to their membership in the female living experience and bond. The value of sorority membership includes leadership training, mentoring and access to valuable female networks of 260,000 alumnae for career opportunities and internships, both during the collegiate experience and after. Experts will testify during this action that this experience alone could be worth $100,000 to each individual Plaintiff. Although Defendants say these young women could simply resign their lifetime membership, they have no

APP.052

ability to transfer to another NPC group. This too, is of significant monetary detriment far in excess of the jurisdictional threshold required in this matter.

### **Conclusion**

For the foregoing reasons, the Plaintiffs respectfully requests that this Court DENY Defendants' Motion to Dismiss and allow the Plaintiffs to be fully heard in this matter.


Respectfully submitted,


/s/ Cassie Craven_____    /s/ John Knepper_____
Cassie Craven, 7-5664                      John Knepper
Longhorn Law Limited Liability Company    Law Office of John G. Knepper, LLC
109 E. 17th St. Suite 11                   P.O. Box 1512
Cheyenne, Wyoming 82001                    Cheyenne, Wyoming 82003
307-823-3062                               307-632-2842
cassie@longhornlawllc.com                  John@KnepperLLC.com


Dated this 5th day of July, 2023.



### **CERTIFICATE OF SERVICE**

I hereby certify that on 5th day of July, a copy of the foregoing pleading, was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Cassie Craven_____
Cassie Craven, 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St. Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

/s/ John Knepper_____
John Knepper
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

**APP.054**

Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:(307) 265-0700
Facsimile: (307) 266-2306
E-Mail:   sklosterman@wpdn.net

Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:(614) 464-5452
Email:    nmmclaughlin@vorys.com
          bwdressel@vorys.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| JAYLYN WESTENBROEK, HANNAH, HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, <br><br> Plaintiffs, <br><br> v. <br><br> KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No.: 23-CV-00051-ABJ |

### REPLY IN SUPPORT OF DEFENDANTS KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA BUILDING CO.'S MOTION TO DISMISS

**APP.055**

## I. INTRODUCTION

Unable to offer any response to many of Defendants Kappa Kappa Gamma Fraternity ("Kappa"), Mary Pat Rooney ("Rooney"), and the Kappa Kappa Gamma Building Co.'s (the "Building Co.") arguments, Plaintiffs respond to Defendants' Motion to Dismiss by constructing straw men and advancing new theories of recovery found nowhere in their Amended Complaint. The entire endeavor amounts to little more than another plea for this Court to build them the social circle they want so that they can avoid the fact that their fellow sorority sisters voted to admit a transgender woman. But Plaintiffs still have not offered this Court a cognizable basis for taking a role in a college sorority's membership selection.

At multiple points, Plaintiffs' Response disregards the content of their own Amended Complaint as it draws on allegations Plaintiffs did not make. At another point, it spends pages attempting to dispel a jurisdiction argument that Defendants did not advance in their Motion to Dismiss. And, in the end, Plaintiffs give away the game when they do not even attempt to identify an actual bylaw that supports their preferred definition of the term "woman" or respond to Defendants' arguments on deferring to a private organization's interpretation of its own governing documents and fail to coherently explain how they suffered a breach of contract under the actual terms of the contract at issue in the Amended Complaint. As explained below, the arguments Plaintiffs advance fail, and the ones with which they do not even try to engage are fatal to their claims.

## II. DISCUSSION

Each of Plaintiffs' four claims depends on either a finding that Langford's admission to the Gamma Omicron chapter of Kappa violated a Kappa bylaw or that there was a breach of Plaintiffs'

**APP.056**

housing contract.[1]  It is therefore notable that Plaintiffs, now the better part of a year into contesting Langford's admission into Kappa, **<u>still</u>** cannot point to a bylaw that says she cannot join Kappa and do not identify any provision of their housing contract that was breached.  As evidenced by their Response, Plaintiffs cannot contest any of the following:

- No Kappa bylaw explicitly adopts Plaintiffs' exclusionary definition of the term "woman" or defines the term at all;

- Ohio law generally defers to an organization's interpretation of its own bylaws;

- Plaintiffs' position that a federal court should be involved in sorority recruitment has no logical stopping point and could drown the judiciary in disputes over the inner workings of private organizations; or

- No provision of the housing contract some Plaintiffs signed was breached by Langford's admission into Kappa.[2]

If the Court looks only at these undisputed arguments, it has sufficient grounds to grant the Motion to Dismiss in its entirety.  Plaintiffs' failure to present cogent argument or citation of pertinent legal authority to refute Defendants' arguments may be deemed a confession of the motion to dismiss.  *See*, U.S.D.C.L.R. 7.1(b)(2)(A); *Breen v. Black*, No. 15-CV-168-NDF, 2016 U.S. Dist. LEXIS 178820, at *3 (D. Wyo. Mar. 7, 2016) (citing *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006)) ("[t]he Court maintains the discretion to deem a motion confessed by the non-responding party").  The reason for this rule is, in part, because the Court

---

[1] In their Response, Plaintiffs contend that "there are actually two different contracts."  As discussed below, Plaintiffs have only asserted **<u>one</u>** breach-of-contract claim, and it is for breach of their housing contracts.

[2] Defendants argued that Plaintiffs could not identify a portion of their housing contract that was actually breached.  Plaintiffs responded by quoting their own Amended Complaint, but did not actually identify a portion of the contract (which they appended to the Amended Complaint) that supports their position.

**APP.057**

should not be called upon to do the work of a party. Plaintiffs should be held responsible for not responding to Defendants' arguments and the legal authority offered in support of such arguments.

Moreover, the arguments Plaintiffs offer in lieu of rebutting the Defendants' arguments fail on their own, only reinforcing the conclusion that their grievances belong nowhere near a federal courthouse. Defendants address these issues below.

### A. The Court Lacks Personal Jurisdiction over Rooney

In the Motion to Dismiss, Rooney explained how this Court lacked personal jurisdiction over her because Plaintiffs have not alleged that she had the requisite minimum contacts with Wyoming. In response, Plaintiffs assert that a fiduciary can have minimum contacts with a state where they do not live. (ECF No. 24 at 6 (citing *Newsome v. Gallacher*, 722 F.3d 1257, 1264–81 (10th Cir. 2013).) *Newsome*'s holding, however, is unremarkable. It does not hold that a fiduciary is inherently subject to the personal jurisdiction of any state where a plaintiff claims to have been wronged by a corporation, only that a fiduciary **can** be subject to such personal jurisdiction **when they have minimum contacts with the forum state**. *Newsome*, 722 F.3d at 1264. Rooney never contended otherwise.

As set forth in its moving papers, the minimum-contacts test required Plaintiffs to assert allegations establishing that Rooney purposefully directed conduct at Wyoming. *See Dudnikov v. Chalk and Vermilion Fine Arts*, 514 F.3d 1063, 1070–71 (10th Cir. 2008)). Plaintiffs' Complaint does not do so. Despite their contention that this issue "requires little discussion," Plaintiffs cannot point to any allegations that actually state **Rooney** directed **any** conduct at Wyoming. Instead, they discuss allegations they made about other people and contend that they are implicitly about Rooney. Under Plaintiffs' theory, Rooney, serving in a volunteer position on Kappa's Fraternity Council (not as the "Chief Executive Officer," as Plaintiffs state in their Response), would become

**APP.058**

subject to the personal jurisdiction of any state were a member of a "workforce" she allegedly "commands" directs conduct. Indeed, Plaintiffs' contention that Rooney, a non-employee who is a volunteer for Kappa, was directly involved in the Gamma Omicron chapter's decision to admit Langford is based on an email from Kari Kittrell Poole, an employee and Executive Director for Kappa, that does not reference Rooney. (ECF No. 24 at 8.)

Traversing the morass of false and irrelevant allegations in the Amended Complaint is no easy task, but any reader who is able to complete it will emerge on the other side without having read a single allegation that Rooney directed any conduct at Wyoming. Thus, Plaintiffs fail to establish personal jurisdiction over her.

**B.** **The Court Lacks Subject-Matter Jurisdiction over the Building Co.**

The Building Co. moved to dismiss the claim(s) against it for lack of subject-matter jurisdiction, noting that Plaintiffs concede on the face of the Amended Complaint that they are not seeking any damages from the Building Co. (ECF No. 20 at 12–13.) Kappa, on the other hand, did not move to dismiss the claims against it for lack of subject-matter jurisdiction. Yet, in response, Plaintiffs inexplicably spend roughly five pages articulating their various theories of damages to which they are entitled from Kappa.[3] (ECF No. 24 at 15–19.) Amidst this section,

---

[3] Although not relevant to this pleading, Plaintiffs' claims for damages are facially outrageous and not reflective of any reality. To the extent damages have been caused to Kappa and the Gamma Omicron chapter, they are more likely caused by the false defamatory statements Plaintiffs and their attorneys' have made, including in national media interviews. Given the campaign that Plaintiffs and their supporters appear engaged in to ensure "the sorority house at the University of Wyoming will close and then the college chapter itself will fold," no so-called "expert" will be able to opine that Kappa caused this harm through its inclusive policy. Indeed, as every other national sorority has a similar inclusive policy, this contention does not make any sense. Moreover, room and board for living in the Kappa house at the University of Wyoming is actually thousands of dollars **less** per year than on-campus room and board (https://www.uwyo.edu/sfa/cost-of-attendance/index.html), so Plaintiffs are not paying more for the "female living environment," regardless of how they define that term.

-4-

**APP.059**

which at many points resembles a copy-pasted collage of allegations from the Amended Complaint, Plaintiffs reiterate that they are not seeking damages from the Building Co. and state that the Building Co. has nonetheless been named because "Plaintiffs believe [the Building Co.] is a required party." (*Id.* at 17.)  Plaintiffs do not explain **why** they believe this or offer any authority suggesting their belief is grounded in the law, even though the Building Co. explained in the Motion to Dismiss why it is not a required party and how Plaintiffs cannot establish jurisdiction through Rule 19.  (ECF No. 20 at 7.)  Put simply, Plaintiffs never assert that they seek damages from the Building Co. in an amount that would give this Court subject-matter jurisdiction.

### C.  **Plaintiffs Have Not Met Rule 23.1's Requirements**

#### i.  ***Plaintiffs Misinterpret the Nature of Rule 23.1's Safeguards***

Plaintiffs did not meet Rule 23.1's requirement that they plead facts showing that they exhausted attempts to obtain the desired result from Kappa before filing this lawsuit.  Responding to Defendants' arguments on this point, Plaintiffs do not even address the governing law on futility, let alone show that they actually established it.

Plaintiffs note that they and their parents contacted Kappa with their concerns about transgender women in addition to their attorneys' communication with Kappa.  But futility does not turn on the number of communications; it requires Plaintiffs' to show that "the directors' minds [were] closed to argument."  *Carlson v. Rabkin*, 789 N.E.2d 1122, 1128 (Ohio App. 2003). Plaintiffs completely ignore the undisputed fact that the last communication they received from Kappa **invited** them to identify bylaws applicable to the situation.  They also ignore that their communications with Kappa prior to the lawsuit did not raise the allegation that Fraternity Council members had been involved in Langford's admission, which is a key factual allegation supporting a claim that those directors breached their fiduciary duties.  (*See* ECF No. 20 at 16–17.)

**APP.060**

Absent a legal argument from Plaintiffs that they established futility, the Court should find Plaintiffs did not meet the requirements of Rule 23.1.

### ii.   *Plaintiffs Again Fail to Identify a Bylaw Langford's Admission Breaches*

Defendants' Motion to Dismiss, like the November communication from its counsel, confronted Plaintiffs with a simple question: what Kappa bylaw compels Kappa to deny admission to transgender women?  Yet again, Plaintiffs fail to respond with an answer.

This entire case is premised on the idea that the term "women" only has one definition.  As Defendants have explained, it does not.  Courts, dictionaries, and society have not adopted a unified definition of the term, let alone the one Plaintiffs would prefer.  Kappa and the other sororities that have uniformly adopted the same view are not out of step with any kind of universal definition in including transgender women in their conception of who is a woman.  And Ohio law is clear that courts should not hold a magnifying glass to every interpretation a private organization makes of its own bylaws.  (ECF No. 20 at 17–20.)  Plaintiffs, of course, do not discuss the judicial non-intervention doctrine at all.

Instead they repeat ad nauseam some version of the idea that "the word[] . . . women . . . ha[s] always referred to female human beings."  (*See, e.g.* ECF No. 24 at 13.)  Setting aside the continued disrespectful and hurtful language Plaintiffs use in expressing this view, this case, as Plaintiffs themselves have defined it, is about Kappa's bylaws, and Plaintiffs do not identify any **bylaw** that establishes this definition.  Thus, Kappa is free to interpret its bylaws reasonably without having any member who disagrees with the interpretation challenge it in court.

Absent a bylaw that actually restricts Kappa's ability to accept transgender women as members, this case is nothing more than an attempt to have a court tell a private organization how to conduct its business and, specifically, define the people with whom the organization can

**APP.061**

associate. As discussed in the Motion to Dismiss, a court that takes that role in the governance of a private organization would violate the First Amendment.

### D. <u>Plaintiffs Do Not Allege a Breach of Contract or Tortious Interference</u>

Turning to Plaintiffs' contract claims, Plaintiffs respond to Defendants argument that they have not identified a breached contractual provision by admitting "that there may be some ambiguities in the Complaint." (ECF No. 24 at 14.) They say this is so "only because there are actually two different contracts." (*Id.*) There is, however, only one at issue in their Amended Complaint: the housing contract. Plaintiffs did not bring a breach-of-contract claim related to any membership contract.[4] (*See* ECF No. 6.) Plaintiffs' arguments about their membership contract are therefore irrelevant to their legal claims. And, on the housing contract, Plaintiffs do not address Defendants' argument that there is no provision in the contract (the full text of which is before the Court) that Plaintiffs allege was breached. Instead, they copy-paste the same nonsensical language on the contract from their Amended Complaint. Plaintiffs have failed to advance any relevant legal argument and the Court should dismiss the breach-of-contract and tortious-interference claims.

### E. <u>Plaintiffs Do Not Address Defendants' Arguments on Their Direct Claim</u>

Through their Motion to Dismiss, Defendants explained why Plaintiffs' direct claim fails. Plaintiffs do not respond. They instead repeat the same allegations without reference to any applicable authority. Once again, Plaintiffs have implicitly conceded that there is no legal authority opposing Defendants' arguments. Dismissal of the direct claim is appropriate.

---

[4] Had they done so, the claim would fail for the same reasons its derivative claims fail. Therefore, an amendment to add a new breach-of-contract claim based on a membership contract would be futile.

**APP.062**

**F.  Plaintiffs' Response Confirms that They Brought This Case as an Unserious Publicity Stunt, Not to Vindicate Legitimate Claims**

In filing her own Motion to Dismiss, Langford persuasively articulated how the Amended Complaint was little more than a "rambling . . . press release which [Plaintiffs] have used to gain national media attention and to fundraise."  (ECF No. 23 at 2.)  Plaintiffs' Response to this Motion to Dismiss (and to Langford's) confirms that they filed this case not to advance cognizable claims, only to generate publicity and cloak their view of the world in the authority of this Court.

Plaintiffs' Response contains almost no legal argument or citation to cases.  The overwhelming majority of citations it does include state black-letter law and standards but do not address Defendants' arguments.  They assert a derivative claim without discussing specific bylaws (or the lack thereof) and contract claims without addressing the text of the relevant agreement. They ask the Court to provide "direction" as to whom would be proper to sue in a derivative action. (*See* ECF No. 24 at 7.)  They respond to the Motion to Dismiss by referencing contracts and contacts about which they make no allegations.  They make outlandish claims of six-figure damages resulting from someone they do not like joining their sorority.  Their most developed argument is in response to a jurisdictional claim that no one has advanced.  They do not appear aware of what constitutes a "necessary party" to litigation and have accordingly sued two Defendants against whom they do not seek damages.  They even make, for the first time in a Response, baseless allegations of "fraud."

None of these "arguments" are reflective of a genuine desire to litigate substantive claims, though Defendants suspect that the strategy may fare better on the cable news circuit than in this Court.  Plaintiffs may continue to make disrespectful and untruthful statements to a public audience receptive to them, but they have no right to use this Court as a platform for trumpeting that message.  As Defendants have argued, it is not the role of courts to step in every time a person

**APP.063**

feels slighted or wronged; it is to resolve legal disputes.  And Plaintiffs are plainly and profoundly

unserious about litigating a legal dispute.

### III.   <u>CONCLUSION</u>

Though Plaintiffs and their supporters' voices may seem loud, there are many strong

women of Kappa who do not support their conduct and statements, and instead, stand behind the

organization and the chapter.  For example, in response to attempts to solicit funds for this

litigation, some Kappa members have responded to Plaintiffs' supporters as follows:

- This is the HIGHLY INAPPROPRIATE POLITICIZING some
alums are doing against a pledge, a college student, and our national
organization rather than working through our organization, about a
pledge that everyone on this chain KNOWS was only accepted into
this Kappa chapter because the current Kappa's CHOSE her!  The
insistence use of "biological male" vs transgender women highlights
and underscores the bias and bigotry on display here - which has
nothing to do with Kappa and what we stand for. Both disappointing
and offensive to hear so many "educated" women behaving so ugly
and hateful.  As a 4th generation Kappa, I assure you my ancestors
are rolling in their graves at the suggestion Kappa be used to keep
people out.  Doesn't belong here ladies!

- There are many members of Kappa who do not look like the
founders of our organization, white women who had the privilege of
attending college in 1870 when women could not vote, could not
own property except in very narrow circumstances, could not have
their own bank account or real estate holdings without the
"supervision" of a man, and so on...there are many active and alumni
members of Kappa who do not look like our founders. Had the
internet been around in the 1960s, I'm sure we would have seen
similar petitions to "save Kappa" from the wheel of societal
progress. There may, indeed, have been such an effort at the time in
the form of a letter-writing campaign filled with bigotry designed as
concern for the health of the organization.

There already are LGBT members of Kappa and, like our non-white
members, they add to the beautifully diverse tapestry that makes
Kappa strong. It is up to the ACTIVE members of Kappa Kappa
Gamma to select their members from the pool of interested PNMs
and as alumni, we must trust in them to help us build the future. If a
chapter has elected to invite a trans woman for membership, then

-9-

**APP.064**

they must believe that she embodies all the qualities we look for in our new members--except for what might be in her pants, which you seem to care a great deal about. I would argue that you and the other signers of this petition are doing far more to harm the future of Kappa than active members who believe in principles of diversity and inclusion.

I will not debate the humanity and inherent dignity of transgender persons with you or anyone else on this thread. I encourage you to look inward and explore why your response to another person's gender expression is repugnant to you or how it impacts your life in any meaningful way beyond personal discomfort that is rooted in your own biases.

These brave women give Kappa faith in the ability of this organization to overcome and thrive in spite of the hurtful course of conduct chosen by some members. Plaintiffs have no legal claims, and their response to Defendants' Motion to Dismiss makes that clear. The time has come for the Court to bring this charade to an end. Defendants respectfully request that the Court dismiss Plaintiffs' claims in their entirety, with prejudice.

Dated: July 12, 2023

/s/ *Brian W. Dressel*
Natalie M. McLaughlin (*Pro Hac Vice*)
Brian W. Dressel (*Pro Hac Vice*)
VORYS, SATER, SEYMOUR AND PEASE, LLP
52 East Gay Street
Columbus, OH 43215
Telephone:(614) 464-5452
Email:        nmmclaughlin@vorys.com
                   bwdressel@vorys.com

Respectfully submitted,

Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:(307) 265-0700
E-Mail:      sklosterman@wpdn.net

*Attorneys for Defendants Kappa Kappa Gamma Fraternity, Mary Pat Rooney, and the Kappa Kappa Gamma Building Co.*

**APP.065**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 461 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 70
Case 2:23-cv-00051-ABJ    Document 26    Filed 07/12/23    Page 12 of 12

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission and electronic mail this 12ʰ day of July, 2023.

Cassie Craven (#7-5664)                    ☒ CM/ECF Electronic Transmission
LONGHORN LAW LLC                           ☐ U.S. Mail (Postage Prepaid)
109 East 17th Street, Suite 223            ☐ Fax
Cheyenne, WY 82001                         ☐ Overnight Delivery
Telephone: (307) 823-3062                  ☐ Hand Delivery
E-Mail: ccraven.law@gmail.com              ☒ Email


John G. Knepper (#7-4608)                  ☒ CM/ECF Electronic Transmission
LAW OFFICE OF JOHN G. KNEPPER, LLC         ☐ U.S. Mail (Postage Prepaid)
P.O. Box 1512                              ☐ Fax
Cheyenne, WY 82003                         ☐ Overnight Delivery
Telephone: (307) 632-2842                  ☐ Hand Delivery
E-Mail: john@knepperllc.com                ☒ Email



                              /s/ *Brian W. Dressel*
                              Brian W. Dressel

**APP.066**

**FILED**



3:17 pm, 8/25/23

**Margaret Botkins**
**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| JAYLYN WESTENBROEK, HANNAH HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | |
| Plaintiffs, | |
| v. | Case No. 23-CV-51-ABJ |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant, MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | |
| Defendants. | |

**ORDER GRANTING DEFENDANTS' *MOTION TO DISMISS* (ECF NO. 19), DISMISSING, WITHOUT PREJUDICE, PLANTIFFS' *FIRST AMENDED VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES* (ECF NO. 6), AND DISMISSING AS MOOT DEFENDANT ARTEMIS LANGFORD'S *MOTION TO DISMISS* (ECF NO. 22)**

THIS MATTER comes before the Court following Defendants', Kappa Kappa

Gamma Fraternity, an Ohio non-profit corporation ("KKG", "Kappa Kappa Gamma", or

"Kappa"), Mary Pat Rooney, President of the Fraternity Council of Kappa Kappa Gamma

1

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 463 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 72
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 2 of 41

Fraternity ("Rooney"), and Kappa Kappa Gamma Building Co., a Wyoming non-profit corporation ("KKG Building Co.") (collectively, "Defendants"), *Motion to Dismiss*, filed on June 20, 2023. ECF No. 19. Pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6), Defendants move to dismiss Plaintiffs', Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, and Megan Kosar (collectively, "Plaintiffs"), *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* ("*Complaint*") (ECF No. 6), due to lacking subject matter jurisdiction over KKG Building Co., lacking personal jurisdiction over Rooney, and Plaintiffs' failure to state a claim upon which relief can be granted. ECF Nos. 19, at 2; 20.

Having reviewed the filings, the applicable law, and being otherwise fully advised, the Court **GRANTS** Defendants' *Motion to Dismiss* (ECF No. 19) and **DISMISSES, WITHOUT PREJUDICE,** Plaintiffs' *Complaint* (ECF No. 6).

Separately, the Court **DISMISSES AS MOOT** Defendant's, Artemis Langford ("Langford"), *Motion to Dismiss with Prejudice* ("Langford's *Motion to Dismiss*") (ECF No. 22), filed on June 20, 2023.

## BACKGROUND

Embittered by their chapter's admission of Artemis Langford, a transgender woman, six KKG sisters at the University of Wyoming sue their national sorority and its president. Plaintiffs, framing the case as one of first impression, ask the Court to, *inter alia*, void their sorority sister's admission, find that KKG's President violated her fiduciary obligations by betraying KKG's bylaws, and prevent other transgender women from joining KKG

2

nationwide. A "woman", say Plaintiffs, is not a transgender woman. Unadorned, this case condenses to this: who decides whether Langford is a Kappa Kappa Gamma sister? Though given the opportunity to vote this past fall, not the six Plaintiffs. Not KKG's Fraternity Council. Not even this federal Court. The University of Wyoming chapter voted to admit – and, more broadly, a sorority of hundreds of thousands approved – Langford. With its inquiry beginning and ending there, the Court will not define "woman" today. The delegate of a private, voluntary organization interpreted "woman", otherwise undefined in the non-profit's bylaws, expansively; this Judge may not invade Kappa Kappa Gamma's freedom of expressive association and inject the circumscribed definition Plaintiffs urge. Holding that Plaintiffs fail to plausibly allege their derivative, breach of contract, tortious interference, and direct claims, the Court dismisses, without prejudice, Plaintiffs' causes of action. This Court outlines the case's posture,[1] its standard of review, and its disposition in the pages that follow.

Founded in 1870, Kappa Kappa Gamma is a non-profit organization based in Dublin, Ohio. ECF Nos. 6, ¶¶ 21, 25, 28; 6-1, at 49, 55–56.[2] Today, KKG spans 140 college

---

[1] Recounting the pertinent facts, *infra*, the Court wades through a well-researched, yet meandering, complaint; for example, despite a seventy-two-page complaint excluding attachments, Plaintiffs devote four-and-a-half pages to their actual claims. Only the facts relevant to the four claims Plaintiffs bring against Defendants are outlined today. Those facts are accepted as true for the purpose of resolving the motion at bar. ECF No. 6; *see also* ECF Nos. 20, 24, 26. The Court also looks to documents attached as exhibits to Plaintiffs' *Complaint. See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.") (internal citations omitted).

[2] KKG filed its *Articles of Incorporation* with the Ohio Secretary of State in 1930. ECF No. 6-1, at 56.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 465 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 74
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 4 of 41

campuses and boasts 210,000 living alumnae. ECF No. 6, ¶ 26. Of note are policies from

KKG's national headquarters and the University of Wyoming's KKG chapter; bear with

me as I summarize both. Broadly, KKG's "purposes", *inter alia*, are:

> A. *To unite women*, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large[3] may attain social, moral, and intellectual excellence;
> B. To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, *with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures*[.]

ECF No. 6-1, at 52 (emphasis added). KKG has *Bylaws* ("bylaws"), *Standing Rules*,[4] and

*Fraternity Policies.* ECF Nos. 6, ¶ 53; 6-1, at 2–30, 109–38, 140–61. While the KKG

bylaws state that "[a] new member shall be a woman", no bylaw defines "woman". ECF

No. 6-1, at 6.[5]

In 2018, KKG published a *Guide for Supporting our LGBTQIA+ Members* ("2018

*Guide*").[6] ECF Nos. 6, ¶ 5; 6-1, at 32–43. The 2018 *Guide* states:

> Kappa Kappa Gamma is a single-gender organization *comprised of women and individuals who identify as women* whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character.

---

[3] KKG considers itself a "fraternity" in its governing documents. *E.g.*, ECF No. 6-1, at 5. However, emulating Plaintiffs and our national discourse, the Court refers to KKG as a "sorority".

[4] The *Standing Rules* state that "[a]ctive members shall be responsible for selecting new members of their chapter." ECF No. 6-1, at 111.

[5] When a new member, following acceptance of a local chapter's invitation, accepts admission to KKG and annually thereafter, she pledges to "uphold the [KKG] *Bylaws*, *Standing Rules and Policies* as well as [her] chapter Bylaws and Standing Rules." ECF No. 6-1, at 163.

[6] The parties dispute when KKG began to allow transgender women to qualify for membership. While Defendants allege that Kappa has allowed transgender women admission since 2015, Plaintiffs respond that "there is no evidence of this fact." *See* ECF Nos. 20, at 3; 24, at 3. The parties agree that KKG published its *Guide* in 2018. *See* ECF Nos. 6, ¶ 5; 20, at 4.

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 466 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 75
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 5 of 41

> . . .
> Each Kappa chapter has the final choice of its own members. . . . [T]he
> chapter is well within its right to offer [a] potential member [who is
> transgender] a bid.

ECF No. 6-1, at 32, 35 (emphasis added). While KKG's bylaws do not reflect the "and

individuals who identify as women" addition, accompanying documents, including KKG's

*Position Statements*[7] in 2021 and *FAQs*[8] in 2022, both published ahead of KKG's 2022

biennial convention, do. *Id.* at 105 (same language *supra*), 183 (same); *cf. id.* at 2–30, 58–

86.[9] An Illinois resident and volunteer, Rooney heads KKG's eight-member Fraternity

Council, consisting of directors and by extension staff tasked with supervising chapters

nationwide. ECF Nos. 6, ¶¶ 22, 71; 26, at 3.[10] Plaintiffs equate KKG's Fraternity Council

to a corporation's board of directors. *E.g.*, ECF No. 6, ¶ 4.

---

[7] The *Position Statements* also note that "[e]ach chapter of Kappa Kappa Gamma has the final choice of its own members." ECF No. 6-1, at 183.

[8] The *FAQs* state:

We also look to NPC [National Panhellenic Conference ("NPC")] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: 'For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.'

. . .

**Why are we including gender-neutral pronouns in the revised documents?**

This change is coming from a Convention resolution that formed Kappa's Diversity, Equity and Inclusion Committee. Kappa Kappa Gamma was founded 150 years ago on the principles of integrity, respect and regard for others. *Kappa has reflected on the path forward, and we are beginning with actions that speak to our belief that all members are valued. This is one of those action steps. We want to be as inclusive of all members as we can be.*

ECF No. 6-1, at 105 (emphasis in original and added).

[9] *See also* ECF No. 6-1, at 59 ("Inclusivity. Since diversity, equity and inclusion have been a focus and the subject of a previous resolution at [the] Convention, a concerted effort has been made to make sure the language of the documents is inclusive.").

[10] *See also* Kappa Kappa Gamma Fraternity Council, available at:
https://www.kappakappagamma.org/why-kappa/our-leadership-team/fraternity-council/
(accessed Aug. 25, 2023).

5

APP.071

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 467 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 76
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 6 of 41

Founded in 1927, the KKG, or Gamma Omicron, chapter at the University of Wyoming ("the UW chapter") has forty-four members and an on-campus house today. ECF Nos. 6, ¶ 78; 6-1, at 200. Plaintiffs[11] are six – some current and some graduated – chapter members and undergraduates at the University. ECF Nos. 6, ¶¶ 1, 15–20; 20, at 1. Because KKG headquarters has a "live-in rule", all UW chapter members must reside within the on-campus house in Laramie, Wyoming, signing a contract with KKG Building Co.[12] to do so. ECF No. 6-1, at 148, 165–76. Like KKG's governing documents, neither the UW chapter's *Bylaws*,[13] nor its *Standing Rules*, define "woman". *Id.* at 185–98, 200–09.

During fall 2022 recruitment, the UW chapter voted to admit Langford, a transgender[14] woman. ECF No. 6, ¶ 116. Per KKG protocol, Langford was subsequently approved by KKG headquarters prior to her initiation to the chapter. *Id.*, ¶¶ 68, 139, 141;

---

[11] In accordance with Tenth Circuit guidance, the Court twice denied Plaintiffs' request to proceed anonymously in this matter. ECF Nos. 3, 5. On April 20, 2023, complying with the Court's instruction, Plaintiffs filed an amended complaint featuring their true names. ECF No. 6.
[12] Though not seeking damages from KKG Building Co., Plaintiffs allege that KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B) required party to this action because five Plaintiffs signed housing contracts with KKG Building Co. for the 2022–23 academic year. ECF No. 6, ¶¶ 23, 84.
[13] The UW chapter *Bylaws* state that membership "shall be in accordance with the provisions of the Fraternity [*i.e.*, KKG] *Bylaws*." ECF No. 6-1, at 200.
[14] "Transgender" is a broad, umbrella term that is often used for individuals whose brain sex, gender identity, or gender expression either does not or is perceived not to match the physical sex they were assigned at birth. *See* Stevie V. Tran & Elizabeth M. Glazer, *Transgenderless*, 35 HARV. J.L. & GENDER 399, 399 n.1 (2012).

6

ECF No. 6-1, at 120. Following Langford's admission, Plaintiffs accuse Langford[15] of salacious impropriety at the chapter house and elsewhere.[16]

Plaintiffs' four claims include: (1) a derivative[17] cause of action, pursuant to Ohio Rev. Code Ann. § 1702.12(I)(1)(c),[18] against Rooney (ECF No. 6, ¶¶ 159–67) ("Count I"); (2) breach of contract against KKG and KKG Building Co. (*id.*, ¶¶ 168–72) ("Count II"); (3) tortious interference with a contract against KKG (*id.*, ¶¶ 173–75) ("Count III"); and (4) a direct[19] cause of action against KKG and Rooney (*id.*, ¶¶ 176–79) ("Count IV"). Plaintiffs request three declaratory judgments from this Court, ordering: (1) that Langford is ineligible for KKG membership and voiding, *ab initio*, her admission; (2) Defendants' violation of their obligations to KKG by admitting Langford; and (3) Defendants' violation of Plaintiffs' housing contracts. *Id.* at 70. Plaintiffs also seek preliminary and permanent

---

[15] Like KKG Building Co., Plaintiffs do not seek damages or relief from Langford, but label her a Fed. R. Civ. P. 19(a)(1)(B) required party. ECF No. 6, ¶ 1 n.2.

[16] Given Plaintiffs' dual dearth of claims against Langford and their inability to connect their allegations concerning Langford's behavior to their four causes of action against the remaining Defendants, the Court sees no reason to recount Plaintiffs' peripheral allegations against Langford.

[17] A derivative cause of action against an Ohioan non-profit corporation "seeks to vindicate the duty owed by the board of the corporation to the corporation as a whole and not a duty that is owed to a particular member or shareholder." *Wood v. Cashelmara Condo. Unit Owners Ass'n, Inc.*, No. 110696, 2022 WL 1422807, at *4–5 (8th Dist. May 5, 2022).

[18] Ohio law provides members of non-profit corporations with a derivative cause of action on behalf of the corporation; § 1702.12, *inter alia*, states:

   (I)(1) No lack of, or limitation upon, the authority of a corporation shall be asserted in any action except as follows:

   . . .

   (c) By a member as such or by or on behalf of the members against the corporation, a director, an officer, or a member as such.

Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also* ECF No. 6, ¶ 46.

[19] "A shareholder brings a derivative action on behalf of the corporation for injuries sustained by or wrongs done to the corporation, and a shareholder brings a direct action where the shareholder is injured in a way that is separate and distinct from the injury to the corporation." *HER, Inc. v. Parenteau*, 147 Ohio App. 3d 285, 291 (10th Dist. 2002).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 469 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 78
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 8 of 41

injunctive relief preventing Defendants from "seeking or encouraging" transgender women to join KKG, damages, and attorneys' fees and costs. *Id.*[20]

### STANDARD OF REVIEW

Defendants challenge Plaintiffs' *Complaint* on three bases – and three Federal Rules of Civil Procedure. I begin with a dose of procedural background; federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, federal courts are presumed to lack jurisdiction "unless and until a plaintiff pleads sufficient facts to establish it." *See Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) (internal citation omitted). If jurisdiction is challenged, the party asserting jurisdiction must demonstrate its existence by a preponderance of the evidence. *See id.* First, when considering a Fed. R. Civ. P. 12(b)(1) challenge to subject matter jurisdiction and the movant challenges the allegations set forth in the complaint, the Court must accept those allegations as true. *See Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Second, Plaintiffs bear the burden of establishing personal jurisdiction. *See Far W. Cap., Inc. v. Towne*, 46 F.3d 1071, 1075 (10th Cir. 1995). If, however, the Court resolves the pending motion on the basis of their *Complaint*, Plaintiffs need only make a prima-facie showing of personal jurisdiction. *See OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). Plaintiffs can make such a showing by alleging, "via

---

[20] Defendants, excluding Langford, filed their *Motion to Dismiss*, coupled with a *Memorandum in Support*, on June 20, 2023. ECF Nos. 19, 20. Plaintiffs responded in their *Response in Opposition* on July 5, 2023, to which Defendants replied on July 12, 2023. ECF Nos. 24, 26.

8

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 470 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 79
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 9 of 41

affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *See AST Sports Sci., Inc. v. CLF Distrib., Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). Like a Fed. R. Civ. P. 12(b)(1) challenge, the Court accepts as true all well-pleaded facts in the *Complaint* and resolves all factual disputes in Plaintiffs' favor. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Third, when considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, district courts follow a two-pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* *Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions", and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere

9

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 471 of 506

Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 80
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 10 of 41

possibility that Defendants acted unlawfully, but the complaint does not need to establish that Defendants probably acted unlawfully. *See id.*

## ANALYSIS

The Court dismisses KKG Building Co. and Plaintiffs' four claims without prejudice. First, Plaintiffs fail to plead this Court's subject matter jurisdiction over KKG Building Co. Second, Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. Third, while Plaintiffs demonstrate futility under Ohio law, their derivative claim against Rooney fails to escape KKG's First-Amendment-protected freedom of expressive association to include transgender members. Fourth, Plaintiffs fail to allege any breach of contract. Fifth, Plaintiffs fail to allege any tortious interference of contract. Sixth, Plaintiffs fail to allege a direct claim against Rooney under Ohio law. Below, the Court proceeds from the courthouse door to the courtroom, addressing challenges to jurisdiction and on the merits, *seriatim*.

A. *The Court's Subject Matter Jurisdiction over Plaintiffs' Breach of Contract Claim against,* inter alia, *KKG Building Co. (*i.e., *Count II).*

Plaintiffs fail to allege this Court's subject matter jurisdiction over KKG Building Co. Defendants move to dismiss Count II, alleging breach of contract against, *inter alia*, KKG Building Co., for lack of subject matter jurisdiction. *See* ECF Nos. 20, at 7–8; 26, at 4–5. Plaintiffs appear to concede, parroting language from their *Complaint* that they do not seek damages from KKG Building Co. but consider it a required party.[21]

---

[21] *Compare* ECF No. 6, ¶ 23 ("Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege that [KKG] has interfered with their contractual relationship with

Preliminarily, the Court admits its confusion disentangling Plaintiffs' Count II, which Plaintiffs seem to recognize.[22] Count II in Plaintiffs' *Complaint* appears to sue KKG Building Co.; yet, in their response, Plaintiffs clarify that they sue KKG for *two* breach of contract claims. This section addresses KKG Building Co.'s status vis-à-vis Count II.

To proceed under this Court's diversity jurisdiction, 28 U.S.C. § 1332, as Plaintiffs do, "all [] plaintiff[s] need[] to do is allege an amount in excess of $75,000 and [they] will get [their] way, unless [] defendant[s] [are] able to prove 'to a legal certainty' that the plaintiff's claim cannot recover the alleged amount." *McPhail v. Deere & Co.*, 529 F.3d 947, 953 (10th Cir. 2008) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)) (internal citation omitted); ECF No. 6, ¶ 13. In *Young*, U.S. District Judge James O. Browning opined:

> The statutory amount-in-controversy requirement, which presently stands at $75,000.00, must be satisfied *as between a single plaintiff and a single defendant* for a federal district court to have original jurisdiction over the dispute; a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement, nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold. If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims. Similarly, multiple

---

this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation.") (citing Fed. R. Civ. P. 19(a)(1)(B)), *with* ECF No. 24, at 17–18 (near-*verbatim* language).

[22] ECF No. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts. There is the contract between Kappa and its members under Ohio corporate law. And there is the contract with the Kappa Kappa Gamma Housing Corporation . . . *Through Defendant Kappa's actions, they have created a breach of contract* as to both the sorority experience and paid housing experience that these young women were promised.") (emphasis added);

11

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 473 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 82
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 12 of 41

> plaintiffs may aggregate the amounts of their claims against a single
> defendant if the claims are not separate and distinct.

*Young v. Hartford Cas. Ins. Co.*, 503 F. Supp. 3d 1125, 1172–73 (D.N.M. 2020) (internal

quotations and citations omitted) (emphasis added). Here, Plaintiffs' *Complaint* and

response cement that they, explicitly, do not levy claims against or seek damages from

KKG Building Co. Plaintiffs also do not seek injunctive or declaratory relief from KKG

Building Co. *See* ECF No. 6, at 70 ("Plaintiffs pray for . . . [a] declaratory judgment that

the Defendants have violated the housing contract[.]") (presumably referring to KKG

and/or Rooney); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir.

2006) ("The Tenth Circuit has followed what has commonly been referred to as the

'either viewpoint rule' which considers either the value to the plaintiff or the cost to

defendant of injunctive and declaratory relief as the measure of the amount in

controversy for purposes of meeting the jurisdictional minimum.") (internal quotation

omitted). Plaintiffs also do not allege that KKG Building Co. is jointly liable with its co-

defendants. Nor is this a case where unquantifiable variables prevent the Court from

declaring to a legal certainty that no jury would award Plaintiff more than $75,000;

Plaintiffs, in their words, do not seek damages from KKG Building Co. and, when

prompted by Defendants to their amount-in-controversy flaw, fail to respond.

Accordingly, because Plaintiffs do not seek damages against KKG Building Co. and fail

to plead an amount in controversy as to that Defendant, the Court dismisses KKG

Building Co. from Count II for lacking subject matter jurisdiction.

12

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 474 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 83
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 13 of 41

But wait, say Plaintiffs, KKG Building Co. is a Fed. R. Civ. P. 19(a)(1)(B)
required party. "When applying Rule 19, a district court must first determine whether the
absent party is necessary to the lawsuit[.]" *See Davis v. United States*, 192 F.3d 951, 957
(10th Cir. 1999) (citing Fed. R. Civ. P. 19(a)). Necessity weighs three factors, including:
"(1) whether complete relief would be available to the parties already in the suit, (2)
whether the absent party has an interest related to the suit which as a practical matter
would be impaired, and (3) whether a party already in the suit would be subjected to a
substantial risk of multiple or inconsistent obligations." *Rishell v. Jane Phillips Episcopal
Mem. Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996) (footnote omitted).[23] "If a
necessary person cannot be joined, the court proceeds to the second step, determining
'whether in equity and good conscience the action should proceed among the parties
before it, or should be dismissed, because the absent person . . . is indispensable' to the
litigation at hand." *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1289 (10th Cir.
2003) (quoting Fed. R. Civ. P. 19(b)) (internal brackets omitted).

---

[23] Identical in effect to *Rishell*'s three-factor test, Fed. R. Civ. P. 19(a) states:

(1) *Required Party.* A person who is subject to service of process and whose joinder will
not deprive the court of subject-matter jurisdiction must be joined as a party if:

   (A) in that person's absence, the court cannot accord complete relief among
   existing parties; or

   (B) that person claims an interest relating to the subject of the action and is so
   situated that disposing of the action in the person's absence may:

      (i) as a practical matter impair or impede the person's ability to protect the
      interest; or

      (ii) leave an existing party subject to a substantial risk of incurring double,
      multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

13

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 475 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 84
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 14 of 41

Plaintiffs bear the burden of demonstrating KKG Building Co.'s necessity, yet, beyond bare allusion to Fed. R. Civ. P. 19(a)(1)(B), make no effort to do so. *See Davis*, 192 F.3d at 951; ECF Nos. 6, ¶ 23; 24, at 17. Nor is it apparent to the Court whether joinder, in Plaintiffs' view, is warranted under Fed. R. Civ. P. 19(a)(1)(B)(i) or (ii). *See* Fed. R. Civ. P. 19(a)(1)(B); *see also* ECF No. 25, at 2, 4–8 (arguing for Langford's joinder under Fed. R. Civ. P. 19(a)). Considering, *sua sponte*, KKG Building Co.'s necessity under *Rishell*'s factors, none weigh in favor of KKG Building Co.'s joinder.

First, Plaintiffs fail to establish that complete relief cannot be granted among KKG and Rooney.[24] Though difficult to decipher,[25] Plaintiffs clarify that, under Count II, KKG's "actions" breached "two" contracts, including Plaintiffs' membership contracts with KKG in Ohio and their housing contracts with KKG Building Co. in Wyoming. ECF No. 24, at 14. As to Count III, Plaintiffs seemingly allege that KKG tortiously interfered with Plaintiffs' housing contracts – and, like Count II, not any improper action by KKG Building Co. ECF No. 6, ¶¶ 23 ("Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with [KKG Building Co.]."), 175. Because

---

[24] *See Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1183 (D.N.M. 2010) ("'Complete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought.'") (quoting *Champagne v. City of Kan. City, Kan.*, 157 F.R.D. 66, 67 (D. Kan. 1994)).

[25] *See also* ECF Nos. 24, at 14 ("Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts."), 20, at 17 n.8 ("To the extent Plaintiffs purport to allege a breach of contract claim against Kappa or Rooney, the Court should dismiss it because Plaintiffs do not allege that either is a party to the [KKG Building Co.] [c]ontracts.").

**APP.080**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 476 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 85
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 15 of 41

both contractual claims attack KKG's actions, not KKG Building Co.,[26] complete relief

can be granted among KKG and/or Rooney.

Second, KKG Building Co. does not have an interest in this suit at risk of

impairment. The Court's review of the housing contracts, in fact, belies Plaintiffs'

contention that KKG Building Co. contracted with Plaintiffs to "provide housing in

accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma." ECF

Nos. 6, ¶ 170; 24, at 14. The only applicable section of the housing contracts states:

> **5. Other Services.** *The chapter [i.e.,* the UW chapter] *shall provide the*
> *student such services* as are customarily furnished by the chapter to residents
> of the chapter house, subject to this contract, the Kappa Kappa Gamma
> Fraternity *Bylaws, Standing Rules and Policies*; and rules and regulations of
> the chapter, including, without limitation, the House Rules attached hereto
> as Exhibit, subject to any changes may be made by the chapter, House Board
> or the Fraternity at any time.

ECF No. 6-1, at 166–67 (identifiers omitted) (emphasis added). Notified of the lacking

contractual language supporting their claim, Plaintiffs, once again, fail to respond. *See* ECF

Nos. 20, at 19; 24. Thus, a key allegation to keep KKG Building Co. in this lawsuit – that

KKG Building Co. is contractually obligated to provide housing per headquarters policy –

withers under the Court's glancing scrutiny; if anything, the UW chapter must abide by

such policies, not KKG Building Co. ECF No. 6, ¶ 170. Furthermore, it is KKG's policies

that underpin the sorority's alleged breach and tortious interference; under Plaintiffs' view,

---

[26] ECF No. 6, ¶ 171 ("Langford's access to and presence in the sorority house violates the
housing contract that Plaintiffs signed."), ¶ 175 ("Through their [*i.e.,* KKG and/or Rooney's]
initiation of Langford, Defendants have prevented Plaintiffs from having the benefit of the
Housing Contract that they signed."), at 70 (requesting "[a] declaratory judgment that the
Defendants [*i.e.,* KKG and/or Rooney] have violated the housing contract").

15

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 477 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 86
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 16 of 41

this case turns on KKG's governing documents, not an independent non-profit confined to housing issues, of which any interests held are adequately represented by KKG and/or Rooney. *See id.*, ¶¶ 170, 175; *EquiMed, Inc. v. Genstler*, 170 F.R.D. 175, 179 (D. Kan. 1996) (finding that joinder of an absent party was not necessary if its interests were adequately represented by present parties) (citing *Rishell*, 94 F.3d at 1411–12); *Portable Solar, LLC v. Lion Energy, LLC*, No. 22-CV-00026-DAK, 2022 WL 3153869, at *2 (D. Utah Aug. 8, 2022) (noting that in tortious interference cases, courts should determine necessity "by evaluating whether the absent party's rights or obligations under an existing contract have necessarily become implicated"). However ineloquent, Plaintiffs' housing contracts with KKG Building Co., while possibly relevant to damages down the road, are *not* the subject of this litigation. *See Wolf Mountain Resorts, LC v. Talisker Corp.*, No. 07–CV–00548DAK, 2008 WL 65409, at *3 (D. Utah Jan. 4, 2008) ("It is well-established that a party to a contract *which is the subject of the litigation* is considered a necessary party.") (internal citation omitted) (emphasis added).

Third, there is no evidence to support an assertion that KKG or Rooney would be subject to a substantial risk of multiple or inconsistent obligations if KKG Building Co. was removed from this lawsuit. "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Sonnett v. Lankford*, No. 15–CV–0024–SWS, 2016 WL 9105175, at *2 (D. Wyo. Mar. 16, 2016) (internal quotation omitted). In short, nothing before the Court indicates that KKG or Rooney's abilities to protect their interests would be hindered by dismissing KKG Building Co.

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 478 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 87
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 17 of 41

Therefore, the Court finds that KKG Building Co. is not a Fed. R. Civ. P. 19(a)(1)(B) necessary party.[27] The action proceeds, as does the Court, without KKG Building Co.

B. *The Court's Personal Jurisdiction over Rooney.*

Shouldering their burden, Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The parties dispute Rooney's contacts with Wyoming. On one hand, Plaintiffs say that this Court has specific jurisdiction over a derivative suit against Rooney, a corporate official, in Wyoming, where alleged injury, past and future, occurred. *See* ECF No. 24, at 2 (citing *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013)). Defendants counter that Plaintiffs levy no allegation that Rooney directed any conduct at Wyoming. *See* ECF No. 26, at 3–4.

Plaintiffs assert one sect of personal jurisdiction – to wit, specific – which allows this Court to haul a nonresident defendant to Wyoming federal court. *See OMI Holdings, Inc.*, 149 F.3d at 1090–91.[28] Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*

---

[27] Because KKG Building Co. is not a necessary party, the Court need not proceed with an indispensability analysis under the Tenth Circuit's second step. *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1098 (10th Cir. 2003).

[28] This Court holds "'considerable leeway in deciding a pretrial motion to dismiss for lack of personal jurisdiction.'" *Tungsten Parts Wyo., Inc. v. Glob. Tungsten and Powders Corp.*, No. 21-CV-99-ABJ, 2022 WL 19263451, at *3 (D. Wyo. Jul. 13, 2022) (quoting *Cheyenne Publ'g, LLC v. Starostka*, 94 P.3d 463, 469 (Wyo. 2004) (internal citation omitted)). The Court also makes that determination "'on the basis of pleadings and other materials called to its attention.'" *Id.* (quoting *Staroskta*, 94 P.3d at 469).

17

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 479 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 88
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 18 of 41

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation, citation, and brackets omitted). "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state[29] and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Towne*, 46 F.3d at 1074.

Notably, "[s]pecific jurisdiction is proper if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'" *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Challenged today, purposeful direction[30] "calls for an inquiry into whether [Plaintiffs] have shown that [Rooney's] acts were (1) intentional, (2) 'expressly aimed' at Wyoming, and (3) done with 'knowledge that the brunt of the injury would be felt' in Wyoming." *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 959 (10th Cir. 2022) (quoting *Dudnikov*, 514 F.3d at 1072).[31]

---

[29] Wyoming's long-arm statute, Wyo. Stat. § 5-1-107(a), confers jurisdiction "on any basis not inconsistent with the Wyoming or United States constitution."

[30] Purposeful direction, or purposeful availment, requires that the defendant "deliberately . . . engaged in significant activities within the forum State or deliberately directed [her] activities at the forum State, so that [she] has manifestly availed [her]self of the privilege of conducting business there." *XMission, L.C.*, 955 F.3d at 840 (internal quotation, citation, and brackets omitted).

[31] Additionally, if the Court determines that the minimum contacts standard is satisfied, exercising personal jurisdiction over Rooney "must always be consonant with traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

18

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 480 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 89
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 19 of 41

Plaintiffs plead Rooney's[32] purposeful direction. Plaintiffs allege that Rooney,

despite "aware[ness]" of Langford's ineligibility, "violated [her] fiduciary duties to

[KKG] when [she] procured and approved the initiation of" Langford. ECF No. 6, ¶¶ 49,

105. Thus, the first element, intentional action, is satisfied; the record contains no

suggestion that Rooney acted unintentionally when, accepted as true, she approved

Langford's initiation following the UW chapter's invitation. While the parties disagree

when Rooney, or others on the Fraternity Council, knew about Langford's invitation to

join the UW chapter, Rooney's approval of Langford's induction, as alleged, occurred

thereafter. *See* ECF Nos. 20, at 12 n.6; 24, at 8.

The second element, express aiming at Wyoming, is more difficult for Plaintiffs,

but is nonetheless cleared. Yes, Plaintiffs' *Complaint* lacks reference to Rooney's

dealings with the UW chapter as President or her personal sign-off on Langford's

admission thirteen hundred miles away. The email from Executive Director[33] Kari

Kittrell Poole – informing Plaintiffs that their "concerns were reviewed by several

national officers of the organization" and "we believe proceeding with [Langford's]

---

[32] Plaintiffs' suing of only KKG's President, Rooney, and not other Fraternity Council members, is also debated. *See* ECF Nos. 20, at 10 n.5; 24, at 7 n.2 ("The law does not require more, but if there is a concern, Plaintiffs can sue more directors. [] Plaintiffs are open to whatever direction is provided."). § 1702.12(I)(1)(c) does not appear to require naming all directors or officers as defendants. *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c) (". . . against . . . *a* director, *an* officer[.]") (emphasis added); *see also In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 618–19 (6th Cir. 2008) ("[A] [pre-suit] demand may also be excused [from Ohio Civ. R. 23.1] 'when all directors are named as wrongdoers and defendants in a suit[.]'") (quoting *Carlson v. Rabkin*, 152 Ohio App. 3d 672, 681 (1st Dist. 2003)). Due to its inability, however, to locate any state authority on this question, the Court reserves judgment.

[33] ECF No. 6-1, at 21 ("An Executive Director, employed by the Fraternity, shall serve as the chief administrative officer and corporate secretary of the Fraternity and perform such duties as defined by Fraternity Council.").

19

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 481 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 90
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 20 of 41

initiation is the appropriate next step" – goes both ways; while that email could refer to

any of the other six members of the Fraternity Council, excluding Rooney, it is obviously

feasible that the Fraternity Council's corporate secretary was referring to the president[34]

of that body when she used "we". ECF No. 6, ¶¶ 93, 141. Forgoing separation of their

purposeful direction analysis by element, Defendants lean upon, without naming, the

fiduciary shield doctrine. *See* ECF No. 20, at 8–9 (quoting *Christian v. Loyakk, Inc.*, No.

19-CV-220-F, 2023 WL 170868, at *14 (D. Wyo. Jan. 12, 2023)) (also quoting *Virgin*

*Enter. Ltd. v. Virgin LLC*, No. 19-CV-220-F, 2019 WL 13222758, at *3 (D. Wyo. Dec.

30, 2019), that dealt with foreign service of process and is inapposite). Under that

doctrine,[35] even if a particular employee has "substantial contacts" with the forum state,

"those contacts will not count against the employee in the personal jurisdiction analysis

so long as the employee acted solely on the corporation's behalf." *Newsome*, 722 F.3d at

1275. Given that Rooney undoubtedly has not had "substantial contacts" with Wyoming,

Defendants appear to be arguing that contacts by Rooney's "workforce" (*e.g.*, KKG-

employed alumnae advisers at the UW chapter or Executive Director Poole)[36] in

Wyoming do not convey this Court's personal jurisdiction over Rooney. ECF No. 6, ¶ 74;

---

[34] "The members of Fraternity Council shall be the *officers* of the Fraternity: the President, the Four Vice Presidents, and the Treasurer." ECF No. 6-1, at 18 (emphasis added).

[35] Though the Wyoming Supreme Court has not expressly adopted the fiduciary shield doctrine, the Tenth Circuit invoked the doctrine under an application of Wyoming law. *See Newsome*, 722 F.3d at 1277.

[36] While this Judge is near-numb to hyperbole, Plaintiffs' statement that "every single [chapter] decision is made by the 'workforce' that Rooney commands" is plainly inaccurate. *See* ECF No. 24, at 7. Per the UW chapter's *Bylaws*, KKG advisers may not vote during recruitment of new members. *See* ECF No. 6-1, at 208 ("Advisers shall serve in an advisory capacity without a vote."). The KKG bylaws outline the same. *See id.* at 27 ("Advisers to each of the chapter officers . . . shall serve in an advisory capacity without vote.").

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 482 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 91
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 21 of 41

*see, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("Due process requires that a defendant be haled into court in a forum State based on h[er] own affiliation with the State, not based on the . . . 'attenuated' contacts [s]he makes by interacting with other persons affiliated with the State.") (quoting *Burger King Corp.*, 471 U.S. at 475).

Fair enough. Nevertheless, accepting Plaintiffs' allegation that Rooney approved Langford as true, as I must, the "'focal point'" of Rooney's actions occurred in Wyoming. *See Dudnikov*, 514 F.3d at 1076–77 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). Langford's admission, however minor among thousands across 140 chapters each fall and spring, occurred at a KKG chapter house in Wyoming; Rooney's alleged sign-off was an "intentional action[] that [was] expressly aimed at" Wyoming. *See id.* (finding express aiming where the defendants intended "to halt a Colorado-based sale by a Colorado resident" and the presiding-state's location was obvious from an eBay auction page) (emphasis altered). Moreover, a corporate officer[37] may be sued in a derivative action where the injury occurred. *See, e.g.*, *Newsome*,[38] 722 F.3d at 1268–69 (finding personal jurisdiction where corporate directors expressly aimed their wrongdoing at

---

[37] Defendants do not offer, nor can this Court unearth, controlling authority indicating that Rooney's volunteer status on the Fraternity Council dictates a contrary outcome than would a compensated officer. *See* ECF Nos. 20, at 8–9; 26, at 3–4; *see also Bronner v. Duggan*, 249 F. Supp. 3d 27, 40 (D.D.C. 2017) (finding that, despite the volunteer service of a governing body's officers, the directors could still anticipate being hauled into a Washington, D.C. court to account for their activities).

[38] Defendants' interpretation of *Newsome*, that a fiduciary can be subject to personal jurisdiction *if* that fiduciary has contacts with the forum state, lacks support. *See* ECF No. 26, at 3 (citing 722 F.3d at 1264, which merely outlined personal jurisdiction's general contours). Defendants also fail to engage with *Newsome*'s analysis of the purposeful direction elements. *See* 722 F.3d at 1268–74; ECF No. 20, at 9. Their reply offers no additional authority that compels the Court otherwise. *See* ECF No. 26, at 3–4.

21

Oklahoma when they saddled a subsidiary company, knowing it "operated exclusively" in Oklahoma, with overwhelming debt).

The final element of purposeful direction "concentrates on the consequences of the defendant's action–where was the alleged harm actually felt by the plaintiff." *Dudnikov*, 514 F.3d at 1075. I look, once again, to *Newsome*, where the Tenth Circuit found that a Delaware corporation and its creditors, to whom the defendants owed fiduciary duties, were injured primarily in Oklahoma because "the individual defendants knew that the brunt of any injury to [the corporation] would be felt in Oklahoma." *See* 722 F.3d at 1269 (citing *Dudnikov*, 514 F.3d at 1077). KKG operates via its Gamma Omicron chapter in Wyoming; when Rooney approved Langford's admission, injury, if any, would occur on campus in Laramie, Wyoming. ECF No. 6, ¶¶ 166–67. Therefore, Rooney "purposefully directed" her activities at Wyoming.[39] *See Dudnikov*, 514 F.3d at 1078 (internal quotation marks omitted).

Plaintiffs demonstrate this Court's personal jurisdiction over Rooney. The Court proceeds to the merits.

C. *Count I: Plaintiffs' Derivative Claim.*

Defendants critique Count I in two ways, including Plaintiffs': (1) failure to demonstrate futility under Ohio law; and (2) seeking of relief contravening a voluntary

---

[39] Because Defendants do not challenge personal jurisdiction on any basis but purposeful direction (*i.e.*, specific jurisdiction's initial element), the Court declines from engaging in unbriefed analyses concerning Plaintiffs' alleged injuries "aris[ing] out of or relat[ing] to those activities [above]" or "'offend[ed] traditional notions of fair play and substantial justice.'" *See XMission, L.C.*, 955 F.3d at 840 (internal quotation omitted); *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co.*, 326 U.S. at 316); ECF Nos. 20, at 8–9; 26, at 3–4.

organization's freedom of association. While Plaintiffs demonstrate futility under Ohio law, their derivative claim against Rooney[40] fails to escape KKG's First-Amendment-protected freedom of expressive association to include transgender members.

**1. Ohio Civ. R. 23.1 Futility.**

I begin with Defendants' argument of lacking Ohio Civ. R. 23.1 specificity. Due to KKG's incorporation in Ohio, Ohio law governs Plaintiffs' derivative claim.[41] "When members bring a derivative action against a nonprofit corporation, they are enforcing a corporate right just as shareholders in for-profit corporations." *Russell v. United Missionary Baptist Church*, 92 Ohio App. 3d 736, 739 (12th Dist. 1994); Ohio Rev. Code Ann. § 1702.12(I)(1)(c). Governing derivative actions, Ohio Civ. R. 23.1 states:

> **Derivative Actions by Shareholders.** . . . The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors and, if necessary, from the shareholders and the reasons for his failure to obtain the action or for not making the effort.

---

[40] *See* ECF No. 6, ¶¶ 163 ("[T]he directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance."), 166 ("As a result of Defendant's behavior . . ."), 167 ("[T]he behavior of Defendant Rooney and other Fraternity Council members will result in the chapter's closure[.]").

[41] Both parties appear to stipulate that, due to its incorporation in Ohio as a private, non-profit corporation, KKG is governed by Ohio law. *See* ECF Nos. 20, at 9; 24, at 11–12; 6-1, at 23 ("The Fraternity shall be governed in accordance with the laws of the state of Ohio[.]"); *see, e.g.*, *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1228 (10th Cir. 2016) (noting that "federal common law should adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit"); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 n.10 (3d Cir. 2005) (applying the law of the state of incorporation to breach of fiduciary duty claims); *Baker-Bey v. Delta Sigma Theta Sorority, Inc.*, No. 12–1364, 2013 WL 1742449, at *4 (E.D. Pa. Apr. 23, 2013) (same).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 485 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 94
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 24 of 41

Ohio Civ. R. 23.1; *see also* Fed. R. Civ. P. 23.1(b)(3)(A).[42] "'[N]o shareholder has an

independent right to bring suit *unless* the board [of directors] refuses to do so *and* that

refusal i[s] wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the

part of the directors.'" *In re Cardinal Health, Inc. Derivative Litig.*, 518 F. Supp. 3d

1046, 1064 (S.D. Ohio 2021) (quoting *Drage v. Procter & Gamble*, 119 Ohio App. 3d

19, 24 (1st Dist. 1997)) (emphasis in original). Failure to make this pre-suit demand is

excused, however, when a plaintiff can demonstrate that the demand would have been

futile. *Id.* (citing *Drage*, 119 Ohio App. 3d at 25).

> Ohio courts have found a demand presumptively futile '*where the directors
> are antagonistic, adversely interested, or involved in the transactions
> attacked.*' Likewise, for example, a demand may also be excused 'when all
> directors are named as wrongdoers and defendants in a suit, when there is
> self-dealing by the directors such that the directors gain directly from the
> challenged transactions, or when there is domination of nondefendant
> directors by the defendant directors.'

*In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618–19 (quoting *Bonacci*, 1992 WL

181682, at *4 and *Carlson*, 152 Ohio App. 3d at 681) (emphasis added). Defendants

argue that Plaintiffs' failure to elevate their concerns to the Fraternity Council and

identify violated KKG bylaws belies futility. *See* ECF No. 20, at 11–12. Plaintiffs

counter, sans state authority, that they and other relatives[43] pestered KKG for months

---

[42] "[Ohio] Civ. R. 23.1 and Fed. R. Civ. P. 23.1 are essentially the same." *Bonacci v. Ohio Highway Exp., Inc.*, No. 60825, 1992 WL 181682, at *4 (8th Dist. Jul. 30, 1992) (spacing altered).
[43] *See also* ECF No. 27-1, at 1 (*i.e.*, the mother of Plaintiff Holtmeier's email to a KKG officer). Though the email's date is unlisted, the Court presumes, based on the reference to Langford's accepting a bid "today", that the email was sent in October or early November 2022.

24

prior to Langford's induction and were ultimately rejected by Executive Director Poole's email in mid-November 2022. *See* ECF Nos. 24, at 10; 6, ¶ 165; 6-1, at 45–47.

Plaintiffs plead specific facts to demonstrate that the Fraternity Council, akin to Kappa's board of directors,[44] is "antagonistic, adversely interested, or involved in the transactions attacked." *See In re Ferro Corp. Derivative Litig.*, 511 F.3d at 618; *see also Leff v. CIP Corp.*, 540 F. Supp. 857, 868–69 (S.D. Ohio 1982) (when evident from a complaint that the directors of a corporation would oppose a derivative suit, formal demand on the directors is considered futile and unnecessary). Though demand futility in Ohio is no "easy task,"[45] further efforts by Plaintiffs to convince the Fraternity Council to alter their stance on admitting "individuals who identify as women" would be futile. For months ahead of Langford's induction, Plaintiffs, their families, and counsel petitioned Executive Director Poole, Rooney, KKG district and content directors, and KKG alumni representatives to overrule the UW chapter's decision. ECF Nos. 6-1, at 178–79; 24, at 9–11; 27-1, at 1. Addressing KKG leadership, including Rooney, Plaintiffs' counsel communicated the crux of their future claims, including "a breach of contract and a

---

[44] *See* Ohio Rev. Code Ann. §§ 1702.01(K) ("'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated."), 1702.30(B) ("A director shall perform the duties of a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. A director serving on a committee of directors is acting as a director."); ECF No. 6-1, at 18 ("Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law.").

[45] *In re Ferro Corp. Derivative Litig*, No. 04CV1626, 2006 WL 2038659, at *5 (N.D. Ohio Mar. 21, 2006).

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 487 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 96
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 26 of 41

violation of Kappa Kappa Gamma's by-laws and standing rules", recounted their failed efforts thus far (*e.g.*, being "told that their values don't align with those of Kappa so they should reconsider being in Kappa"), and requested that the Fraternity Council "legally alter the sorority's membership requirements and conduct a valid vote in accord with existing rules or halt the illegal course of conduct being pursued[.]" ECF No. 6-1, at 179–80 (internal quotation marks and errant comma omitted). Rooney, Executive Director Poole, and other Fraternity Council members are the same officers who purportedly approved Langford; under Plaintiffs' theory, Rooney and other directors violated KKG's bylaws[46] – of course the Fraternity Council would oppose Plaintiffs' federal lawsuit. Finding futility under Ohio Civ. R. 23.1, the Court forges on.

### 2. Kappa Kappa Gamma's Freedom of Expressive Association.

After much leadup, the Court turns to the gravamen of Plaintiffs' lawsuit. Their derivative claim condenses to this: from 1870 to 2018, KKG defined "woman" to exclude transgender women; any new definition may not be enacted, *ultra vires*, without a KKG bylaw amendment.[47] Expectedly, Defendants counter: private organizations may interpret their own governing documents and define "woman" as including transgender women.[48]

Defendants are correct. Defining "woman" is Kappa Kappa Gamma's bedrock right as a private, voluntary organization – and one this Court may not invade. Below, I apply Ohio and U.S. Supreme Court jurisprudence to the facts at bar.

---

[46] ECF No. 6, ¶¶ 163–65.
[47] *See* ECF Nos. 24, at 11–14; 6, ¶ 104.
[48] *See* ECF No. 20, at 12–15.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 488 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 97
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 27 of 41

First, Ohio law is highly deferential to associational interpretation. "As a general

rule, Ohio courts are unwilling to interfere with the management and internal affairs of a

voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010

WL 107015, at *5 (N.D. Ohio Jan. 6, 2010). More specifically:

> [T]hose who become members of non-profit corporations are presumed to
> have joined them with knowledge of their nature and the law applicable to
> them, and to have consented to be bound by the principles and rules of
> government, *or the policy which they have adopted, or may adopt . . .* [T]he
> member has, by voluntarily becoming a member of the order, chosen his
> forum for the redress of his grievances, and *unless there has been some
> palpable violation of the constitution or laws of the corporation whereby he
> has been deprived of valuable rights, the civil courts will not interfere.*

*Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074, at *3 (11th Dist. Dec. 4,

1978) (internal citations omitted) (emphasis added) (rejecting a member's plea to

overturn the termination of his club membership where the club met due process

requirements, including facilitating the member's presence and opportunity to be heard at

a hearing); *see Stibora v. Greater Cleveland Bowling Ass'n*, 63 Ohio App. 3d 107, 113

(8th Dist. 1989) ("'A voluntary association may, without direction or interference by the

courts, for its government, adopt a constitution, by-laws, rules and regulations which will

control as to all questions of discipline, *or internal policy and management*, and its *right

to interpret and administer the same is as sacred as the right to make them.*'") (quoting

*State ex rel. Givens v. Superior Court of Marion Cnty.*, 233 Ind. 235, 238 (1954)

(emphasis added); *Putka v. First Catholic Slovak Union*, 75 Ohio App. 3d 741, 748 (8th

Dist. 1991), *cert. denied*, 503 U.S. 986 (1992) ("Generally speaking, in matters of policy,

discipline or internal economy of a voluntary association, wherein the members have

27

APP.093

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 489 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 98
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 28 of 41

mutually agreed upon a charter or rules, the decision of the association itself is supreme.") (internal citation omitted).

I turn to guidance from the United States Supreme Court. In *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (Rehnquist, C.J.), the Court held that the application of New Jersey's nondiscrimination law, requiring the Boy Scouts to appoint James Dale, an openly gay man as a scoutmaster, ran "afoul of the Scouts' freedom of expressive association."[49] *Id.* at 656. The Court found that a state compelling the Scouts to include Dale would "interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs." *Id.* at 653–54. "[T]he First Amendment simply *does not require that every member of a group agree on every issue* in order for the group's policy to be 'expressive association.' The Boy Scouts takes an official position . . . and that is sufficient for First Amendment purposes."[50] *Id.* at 655 (emphasis added). Chief Justice Rehnquist concluded:

> 'While the law is free to promote all sorts of conduct in place of harmful behavior, *it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one*, however enlightened either purpose may strike the government.'

---

[49] Freedom of expressive association is the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Dale*, 530 U.S. at 647.

[50] *See also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013) (en banc) (Hartz, J., concurring) ("[An organization's] speech or conduct may reflect the view of only a bare majority of the members, *or even just the view of the members' delegate*–such as the editor of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents an 'official position.'") (quoting *Dale*, 530 U.S. at 655) (emphasis added).

APP.094

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 490 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 99
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 29 of 41

*Id.* at 661 (quoting *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515

U.S. 557, 579 (1995)) (emphasis added). *Dale*'s takeaway for the Court: the government

may not defy the internal decision-making of a private organization, including the criteria

governing that entity's membership.[51]

Voluntary organizations beget benefits and drawbacks. KKG provides community

on campus and a professional network for life.[52] Forty-four women in Laramie seemingly

prioritized those benefits when they rushed. Membership, on the other hand, relinquishes

a dose of personal autonomy. That organization may say or publish something anathema

to one or a faction of members. Take the 2018 *Guide*, speech that Plaintiffs undoubtedly

---

[51] Advanced by Defendants, *Bostock*, by contrast, is inapposite today. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) (Gorsuch, J.). There, the Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex" because "to discriminate on th[is] ground[] requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1741–42. Justice Gorsuch concluded that Title VII "prohibit[s] [employers] from firing employees on the basis of . . . transgender status." *Id.* at 1753. Both sides misapply *Bostock*. Defendants say that if the Supreme Court interpreted "discrimination because of sex" as protecting transgender individuals, so too may Kappa interpret its bylaws "to be similarly inclusive." *See* ECF No. 20, at 14. Plaintiffs respond that the law's ordinary meaning at enactment (*i.e.*, KKG's definition of "woman" in 1870) "usually governs." *See* ECF No. 24, at 12–13. Neither argument assists the Court today. Had the UW chapter or KKG denied Langford admission because she was transgender, *Bostock*, though addressing employer discrimination, would certainly amplify. On the other hand, *Bostock* concerned the Court's statutory interpretation of Title VII and not a private organization's internal bylaws. *See, e.g.*, 140 S. Ct. at 1738 ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending the statutes outside the legislative process reserved for the people's representatives.").

[52] In fact, each year of their KKG membership, Plaintiffs signed the following: "I recognize that membership in Kappa Kappa Gamma offers me many benefits and the opportunity for friendship, mutual support, personal growth and intellectual development. I understand that the privilege of membership comes with great responsibility." ECF No. 6-1, at 163; *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023) (Gorsuch, J.) ("In *Dale*, the Boy Scouts offered what some might consider a unique experience.") (citing 530 U.S. at 649–50).

29

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 491 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 100
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 30 of 41

disagree with. Just as the Boy Scouts were "an expressive association" entitled to First

Amendment protection, so too is Kappa Kappa Gamma.[53] *See Dale*, 530 U.S. at 647–56,

650 ("It seems indisputable that an association that seeks to transmit such a system of

values engages in expressive activity."). The law, or this Court, may not interfere with –

whether promoting or discouraging – that speech. *Dale* controls today, interestingly with

the shoe on the other foot.[54] Whether excluding gay scoutmasters in *Dale* or including

transgender women in Kappa, this Judge may not invade Kappa's sacrosanct,

associational right to engage in protected speech. KKG's "official position" of admitting

transgender women, even if decreed by a mere "delegate", is speech which this Court

may not impinge. *See Dale*, 530 U.S. at 655; *Sebelius*, 723 F.3d at 1149 (Hartz, J.,

---

[53] *See Iota XI Chapter of the Sigma CHI Fraternity v. Paterson*, 538 F. Supp. 2d 915, 923 (E.D. Va. 2008), *aff'd on other grounds*, 566 F.3d 138 (4th Cir. 2009) (extrapolating *Dale* to find that "a college fraternity is no different from the Boy Scouts"); *see also Schultz v. Wilson*, 304 F. Appx. 116, 120 (3d Cir. 2008) (unpublished) ("A social group is not protected unless it engages in expressive activity such as taking a stance on an issue of public, political, social, or cultural importance.") (internal citation omitted). The 2018 *Guide* was obviously such a stance by KKG. Because this matter presents no governmental action, which, in part, distinguishes *Dale*, the Court sees no reason to conduct *Dale*'s three-step analysis regarding a group's expressive association claim. *See* 530 U.S. at 650–56.

[54] Plaintiffs do not engage with *Dale*. Had they, Plaintiffs would likely contend that the Fraternity Council's unilateral decision to admit transgender women violated the members' First Amendment rights because it "force[d] the organization to send a message . . . that [it] accepts" transgender women for KKG membership, belying their views. *See Dale*, 530 U.S. at 650; *see also Green v. Miss United States of Am., LLC*, 52 F.4th 773, 802 (9th Cir. 2022) (rejecting a transgender applicant's plea to "use the power of the state to force Miss United States of America to express a message contrary to what it desires to express"). *Dale*'s posture, however, lends little to Plaintiffs; there, the Court considered the constitutionality of a state's nondiscrimination law compelling expression, rather than a member's challenge to an expressive decision of their voluntary organization. *See also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984) (Brennan, J.) ("There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together.").

concurring). Notably, there are also two associational layers before the Court. Not only did KKG headquarters publish their willingness to accept transgender women in 2018, the UW chapter voted to associate with Langford in 2022. *See Dale*, 530 U.S. at 658 ("Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment.") (internal quotation and brackets omitted). Cognizant of Langford's gender identity, the UW chapter determined that she met *their* criteria for membership, including, *inter alia*, "integrity, respect, and regard for others"; KKG confirmed the same thereafter. ECF No. 6-1, at 6–7. Their decisions lie beyond the purview of this Court.

Plaintiffs respond that Kappa's freedom of expressive association does not insulate the organization from amendment of its own bylaws. I disagree, especially where Plaintiffs cannot point the Court to the bylaw that defines "woman" the way they wish. Of course, an organization binds itself via its bylaws.[55] Those bylaws state that a new Kappa "shall be a woman".[56] ECF No. 6-1, at 6. The parties diverge from there. Whereas Plaintiffs circumscribe "woman", their delegate augmented the same. *See* ECF No. 24, at 11. In the Court's view, that is a lawful interpretation – explicitly authorized per the sorority's *Standing Rules* – of an otherwise-silent bylaw. *See* ECF No. 6-1, at 119 ("The

---

[55] ECF No. 6-1, at 23 ("The Fraternity *Bylaws* shall constitute the code of regulations of the Fraternity.").

[56] The Court sees no reason to disturb the governance process by which the Fraternity Council published its *Position Statements* in 2021 and *FAQs* in 2022 ahead of KKG's biennial convention in 2022. Any issue that Plaintiffs raise with respect to KKG's putatively improper counting of the two-thirds vote necessary for bylaw amendment belong before the sorority, not this Court. *See also* ECF No. 6-1, at 24 (mandating a two-thirds convention vote to amend a KKG bylaw, sans any requirement regarding the Fraternity Council's method (*e.g.*, voice or written) of counting votes).

**APP.097**

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 493 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 102
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 32 of 41

administrative duties of Fraternity Council shall include . . . [i]nterpreting the Fraternity *Bylaws* and *Standing Rules*[.]"). Plaintiffs' plea that the Court interpret "woman" as it was in 1870 clashes with this and other Courts' deference to organizational autonomy, or the notion that organizations deserve considerable latitude to interpret their own bylaws. For instance, the *Powell* court in Ohio spotlighted an exception to courts' general unwillingness to interfere with a voluntary association when "there has been some palpable violation of the constitution or laws of the corporation whereby [the member] has been deprived of valuable rights." 1978 WL 216074, at *4. Plaintiffs make no such showing. Instead, they ask this Court to overrule one interpretation and inject another. The Court refuses to do so.

Though an akin bylaw-interpretation, derivative challenge is non-existent, the Court's approach today, from a policy perspective, is practical. This Court cannot step in every time a member, or even multiple members, cries foul when a bylaw is disparately interpreted; if it did, KKG and its Fraternity Council would spend their days responding to derivative suits from their thousands of current members and 210,000 alumnae. *See also Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 13–cv–1054, 2013 WL 4401429, at *6 (S.D. Tex. Aug. 13, 2013) (noting that such interference would subject a non-profit, private organization to "frustration at every turn" and cause it "to founder in the waters of impotence and debility"). Our federal and state courts would similarly be overrun with disgruntled members challenging large organizations. Consider, also, that KKG supervises 140 chapters nationwide; reception of contested speech in today's climate will obviously vary. Finally, Plaintiffs' alternative recourse lies within their

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 494 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 103
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 33 of 41

chapter and organization, not this Court. An appeal to other chapters is one such route; disassociation, while drastic, is another.

In summary, the delegate of a private, voluntary organization, in pursuit of "inclusiv[ity]", broadened its interpretation of "woman". ECF No. 6-1, at 105. The Court will not interfere with its result, nor invade the organization's freedom of expressive association. Accordingly, this Court dismisses Count I.[57]

D. *Count II: Plaintiffs' Breach of Contract Claim.*

Plaintiffs fail to demonstrate any breach of contract. Plaintiffs allege KKG's breach of two contracts, including Plaintiffs': (1) membership contracts with KKG under Ohio law; and (2) housing contracts with KKG Building Co. under Wyoming law.[58] *See* ECF Nos. 24, at 14; 6-1, at 163, 165–76. Defendants respond that Plaintiffs do not allege any plausible breach of their housing contracts. *See* ECF Nos. 20, at 18; 26, at 7.

Defendants are correct on both contracts. I begin with Plaintiffs' membership contracts with KKG. Under Ohio law, "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (internal quotation omitted); *Tel. Mgmt. Corp. v. Goodyear Tire & Rubber Co.*, 32 F. Supp. 2d 960, 969 (N.D. Ohio 1998) ("A breach of contract is a failure without legal excuse to

---

[57] ECF No. 6, ¶¶ 159–67.

[58] Finding that KKG Building Co. was not a Fed. R. Civ. P. 19(a)(1)(B) required party within Section A. *supra*, the Court dismissed KKG Building Co. from this lawsuit.

perform any promise that forms a whole or a part of a contract.") (internal citation

omitted). Entirely unalleged in their *Complaint*, Plaintiffs supplement that KKG's

admission of Langford in the UW chapter house "created a breach of contract as to . . .

the sorority experience[.]" *See* ECF No. 24, at 14. While Plaintiffs and KKG formed a

membership contract and Plaintiffs appear to have performed, any demonstration of

element (3) is absent; Plaintiffs fail to point the Court to any contractual breach by KKG.

*See* ECF No. 6-1, at 163. The Court admits its confusion as to what contractual language

KKG, in Plaintiffs' view, breached. *See id.*; *Allied Erecting and Dismantling Co., Inc. v.*

*Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 728 (N.D. Ohio 2009) ("[W]here a

contract is clear and unambiguous, the court need not … go beyond the plain language of

the agreement to determine the rights and obligations of the parties.") (internal quotation

omitted). If anything, the membership contract primarily outlines Plaintiffs' obligations.

*See id.* Plaintiffs make no effort to contend otherwise.[59] Giving effect to the membership

contract before the Court, KKG undertook no contractual obligation to reject transgender

women. Accordingly, Plaintiffs fail to allege a breach of their membership contracts.

    Reverting to Wyoming law, I turn to Plaintiffs' housing contracts.[60] Here, a breach

of contract claim consists of: (1) "'a lawfully enforceable contract;'" (2) "'an unjustified

---

[59] If Plaintiffs argue that KKG breached their membership contracts by redefining "woman" sans
a bylaw amendment, they, similarly, fail to direct the Court to the contractual provision within
their membership contracts that KKG allegedly violates. Even when liberally construing
Plaintiffs' *Complaint* to incorporate an unpled breach of contract claim, the Court cannot do
counsels' job for them.

[60] *See* ECF No. 6-1, at 173 ("This contract is made with reference to and shall be construed in
accordance with the laws of Wyoming in which state it shall be performed by the parties.").

34

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 496 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 105
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 35 of 41

failure to timely perform all or any part of what is promised [*i.e.*, the breach];'" and (3)

'"entitlement of the injured party to damages."' *Peterson v. Meritain Health, Inc.*, 508

P.3d 696, 705 (Wyo. 2022) (quoting *Halling v. Yovanovich*, 391 P.3d 611, 616–17 (Wyo.

2017)) (internal brackets omitted). Plaintiffs allege that KKG breached their housing

contracts by allowing transgender women to live in the chapter house in violation of

KKG's governing documents. *See* ECF Nos. 6, ¶¶ 170–72; 24, at 14. Once again, though,

Plaintiffs fail to cite the Court to any explicit breach within the housing contracts; the

Court's analysis, thus, fails at element (2). ECF No. 6-1, at 165–76. As developed in

Section A. *supra*, the Court's review of the housing contract contradicts Plaintiffs. Within

those contracts, any obligations to comply with KKG's "*Bylaws, Standing Rules and*

*Policies* ('Fraternity standards')" were either undertaken by the UW chapter or Plaintiffs

themselves. *See, e.g., id.* at 166–67, 168 ("The student . . . shall, at all times, comply with

all . . . the Fraternity Standards. The student acknowledges that it is their responsibility to

seek out, read and understand . . . the Fraternity standards and they agree to follow the

same.").[61] Plaintiffs fail to show how KKG's receptive stance towards transgender

women "forms the whole or part of" their housing contracts. *See Reynolds v. Tice*, 595

P.2d 1318, 1323 (Wyo. 1979). Nowhere in the housing contracts do the parties contract

an obligation to "provide housing in accordance with" KKG's governing documents;

---

[61] Separately, KKG's bylaws state that *members* of KKG Building Co., described as "members of the Fraternity", "shall agree to be bound by . . . the Fraternity *Bylaws, Standing Rules* and *Policies*." *See* ECF No. 6-1, at 23–24.

35

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 497 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 106
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 36 of 41

Plaintiffs may not impose such an obligation on Defendants absent from those contracts. ECF No. 6, ¶ 170.

Accordingly, the Court dismisses Count II.[62]

E. *Count III: Plaintiffs' Tortious Interference Claim.*

Plaintiffs also fail to allege any tortious interference of contract. Plaintiffs claim that KKG[63] tortiously interfered with their housing contracts by inducting a transgender woman in violation of KKG's governing documents. ECF No. 6, ¶¶ 173–75. Defendants regurgitate that, without a breach of a housing contract, there can be no tortious interference with that contract. *See* ECF No. 20, at 20.

I concur with Defendants. To show tortious interference with a contract, Plaintiffs must allege: "(1) the existence of the contract; (2) the defendant's knowledge; (3) intentional and improper interference *inducing or causing a breach*; and (4) resulting damages." *First Wyo. Bank v. Mudge*, 748 P.2d 713, 715 (Wyo. 1998) (emphasis added) (citing Restatement (Second) of Torts, § 766 (Am. Law. Inst. 1979)). Inseverable from the Court's analyses above, Plaintiffs make no effort to demonstrate that KKG induced or caused a breach or termination of their housing contracts. *See USI Ins. Servs. LLC v. Craig*, No. 18-CV-79-F, 2019 WL 5295533, at *9–10 (D. Wyo. Apr. 9, 2019) (rejecting a

---

[62] ECF No. 6, ¶¶ 168–72.

[63] The Court admits its confusion by Plaintiffs' usage, twice, of "Defendants" within Count III. ECF No. 6, ¶ 175. However, because Plaintiffs use "Defendant Kappa Kappa Gamma" earlier in that paragraph and fail to clarify, even when prompted, the error in their response, the Court construes Count III as against solely KKG. *Id.*; *see* ECF Nos. 20, at 20 n.10; 24, at 17 ("Plaintiffs do allege that Kappa Kappa Gamma Fraternity has tortiously interfered with their contractual relationship with [KKG Building Co.]").

36

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 498 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 107
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 37 of 41

tortious interference claim where a plaintiff failed to show a breach of contract "[s]ince the third element of this tort requires an underlying breach of a contract"); ECF No. 24, at 14–20. Plaintiffs fail to even attempt their burden. *See* ECF No. 24; *Gore v. Sherard*, 50 P.3d 705, 710 (Wyo. 2002) (internal citation omitted). Given Plaintiffs' failure to allege a breach or termination by KKG, the Court need go no further.

Accordingly, the Court dismisses Count III.[64]

F. *Count IV: Plaintiffs' Direct Claim.*

Plaintiffs fail to allege a direct claim against Rooney. Count IV appears to allege that Plaintiffs suffered direct injuries due to KKG and Rooney's admission of Langford. ECF No. 6, ¶¶ 176–79. Defendants argue that Plaintiffs' contention that they suffered "individual legal harm distinct" from their derivative claim on behalf of all Kappa members is wanting. *See* ECF No. 20, at 20–22. Plaintiffs copy and paste allegations within their *Complaint* in response. *Compare* ECF No. 24, at 16–17, *with* ECF No. 6, ¶ 12.

Plaintiffs have not shown a special duty, nor a separate and distinct injury, to sustain their direct claim. Unlike a derivative action filed on behalf of a corporation, a shareholder may bring a direct action "against a director or officer[65] of the corporation '(1) where there is a special duty, such as contractual duty, between the wrongdoer and the shareholder, *and* (2) the shareholder suffered an injury separate and distinct from that

---

[64] ECF No. 6, ¶¶ 173–75.

[65] Though Plaintiffs appear to sue KKG and Rooney under Count IV, direct actions under Ohio law are only sanctioned against a corporation's director or officer. *Cf.* ECF No. 6, ¶ 179. Therefore, the Court solely considers Plaintiffs' direct claim against Rooney.

37

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 499 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 108
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 38 of 41

suffered by other shareholders.'" *Morgan v. Ramby*, Nos. CA2010–10–095, CA2010–10–
101, 2012 WL 626209, at *4 (12th Dist. Feb. 27, 2012) (quoting *Herman's, Inc. v. Sach–
Dolmar Div.*, 87 Ohio App. 3d 74, 77 (9th Dist. 1993)) (emphasis in original); *see also
Heaton v. Rohl*, 193 Ohio App. 3d 770, 782 (11th Dist. 2011) (noting that a shareholder
may bring a direct action where they demonstrate a special duty *or* a separate and distinct
injury) (internal citation omitted).

First, Plaintiffs do not allege a special duty. Injury flowing "from a breach of
corporate fiduciary duty" – as Plaintiffs briefly allude to – "amounts to nothing more than
loss of the [non-profit corporation's] value, which is an injury shared in common with all
other stockholders," or here, KKG members nationwide, and should be brought as a
derivative action. *See* ECF No. 24, at 16; *Barr v. Lauer*, No. 87514, 2007 WL 117502, at
*2 (8th Dist. Jan. 18, 2007); *Carlson*, 152 Ohio App. 3d at 679 ("As a general
proposition, claims for breach of fiduciary duties on the part of corporate directors or
officers are to be brought in derivative suits."); *see also Weston v. Weston Paper & Mfg.
Co.*, 74 Ohio St. 3d 377, 379 (Ohio 1996) (rejecting plaintiffs' argument that breach-of-
fiduciary-duties claims against corporate directors should be allowed as a direct action in
the absence of injury separate and distinct from the corporation). Moreover, for reasons
articulated in Section C. above, Plaintiffs have not shown that Rooney breached any
fiduciary duty to Plaintiffs by interpreting "woman" expansively.

Second, they also do not demonstrate a separate and distinct injury. Plaintiffs
allege that their "loss of privacy, frustration of contractual expectations, and emotional
distress" from Langford's induction are unique injuries. ECF No. 6, ¶ 179. However,

Case 2:23-cv-00051-ABJ   Document 47-4   Filed 02/28/25   Page 500 of 506
Appellate Case: 23-8065   Document: 010110962641   Date Filed: 12/04/2023   Page: 109
Case 2:23-cv-00051-ABJ   Document 31   Filed 08/25/23   Page 39 of 41

Plaintiffs sue Rooney, not their sorority sister; thus, only their frustrated contractual expectations merit consideration. Under Plaintiffs' theory, Rooney's actions contravene their pre-rush intent to join an organization that excludes transgender women. Yet, injury, if any, from Rooney's purported orchestration of Langford's admission inured to all KKG members alike, whether in Laramie or beyond, not merely Plaintiffs. In other words, Plaintiffs' putative injury – association with a transgender woman – technically affected all KKG members. Therefore, Plaintiffs' claims at bar, forgoing their determined unviability, belong as a derivative suit rather than a direct action. *See Grand Council of Ohio v. Owens*, 86 Ohio App. 3d 215, 220 (10th Dist. 1993) (determining that plaintiffs brought a derivative claim by "look[ing] to the nature of the alleged wrong rather than the designation used by plaintiffs"). Therefore, Plaintiffs fail to plead a special duty, nor a separate and distinct injury, to sustain their direct claim.

Accordingly, the Court dismisses Count IV.[66]

G. *Dismissal without Prejudice and Langford's* Motion to Dismiss *(ECF No. 22).*

Finally, Defendants argue that the Court should dismiss Plaintiffs' claims with prejudice. *See, e.g.*, ECF Nos. 20, at 22; 26, at 10. "'[A] dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'" *Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022) (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (internal citation omitted)) (emphasis in original) (brackets omitted). Defendants make no effort to

---

[66] ECF No. 6, ¶¶ 176–79.

Case 2:23-cv-00051-ABJ    Document 47-4    Filed 02/28/25    Page 501 of 506
Appellate Case: 23-8065    Document: 010110962641    Date Filed: 12/04/2023    Page: 110
Case 2:23-cv-00051-ABJ    Document 31    Filed 08/25/23    Page 40 of 41

argue futility and do not otherwise explain why dismissal with prejudice is appropriate; accordingly, the Court will dismiss Plaintiffs' claims without prejudice.[67]

Furthermore, due to the Court's dismissal today of Plaintiffs' four claims, the Court also dismisses Langford's *Motion to Dismiss* (ECF No. 22) as moot.[68]

## CONCLUSION

For the foregoing reasons, Plaintiffs' four claims fail. Pursuant to Fed. R. Civ. P. 12(b)(1), Defendant KKG Building Co. is dismissed. Pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' four claims against Defendants KKG and Rooney are dismissed without prejudice.

Therefore, IT IS **HEREBY ORDERED** that Defendants', Kappa Kappa Gamma, Rooney, and KKG Building Co., *Motion to Dismiss* (ECF No. 19) is **GRANTED**.

---

[67] If Plaintiffs wish to amend their complaint, the Court advises Plaintiffs that they devote more than 6% of their complaint to their legal claims against Defendants. It also counsels Plaintiffs to provide more factual detail, where feasible, as well as highlight the Defendant(s) it sues under each count and relevant state statutes and authority. Finally, if provided another opportunity to clarify unclear language within an amended complaint, Plaintiffs should not copy and paste their complaint in lieu of elaboration or legal research that assists the Court in disentangling their claims. *See, e.g.*, ECF No. 24, at 14, 16–19.

[68] Langford moves to dismiss herself because, *inter alia*, she is not a Fed. R. Civ. P. 19(a)(1)(B) required party. *See* ECF Nos. 23, at 4; 27, at 2, 4. Plaintiffs respond: "if Langford stipulates that [s]he is not a required party, Plaintiffs would support h[er] dismissal." ECF No. 25, at 13 n.4. Langford did not reply. ECF No. 27. Without addressing the substance of Langford's motion, the Court notes the irrelevancy of Langford's alleged behavior. The crux of Plaintiffs' lawsuit is their derivative claim against Rooney and contractual claims against KKG. Unbefitting in federal court, Langford's unsubstantiated behavior at the UW chapter house has no bearing on Plaintiffs' legal claims. The Court, however, acknowledges that Plaintiffs' requested relief seeks to void Langford's KKG membership.

Furthermore, IT IS **HEREBY ORDERED** that Plaintiffs' *First Amended Verified Member Derivative Complaint for Breach of Fiduciary Duties* (ECF No. 6) against Defendants is **DISMISSED WITHOUT PREJUDICE**.

Finally, IT IS **HEREBY ORDERED** that Defendant Langford's *Motion to Dismiss with Prejudice* (ECF No. 22) is **DISMISSED AS MOOT**.

IT IS **SO ORDERED**.

Dated this 25ᵗʰ day of August, 2023.

Alan B. Johnson
United States District Judge

41

**APP.107**

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

JAYLYN WESTENBROEK, et al., on        )
behalf of themselves and derivatively on   )
behalf of KAPPA KAPPA GAMMA       )
FRATERNITY,                                       )
      Plaintiffs,                              )
                            )
      v.                                                )      CASE NO. 2:23-cv-00051-ABJ
                            )
KAPPA KAPPA GAMMA FRATERNITY,   )
*et al.*,                                                )
                            )
      Defendants.                            )

## NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 1291 and Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiffs Jaylyn Westenbroek, Hannah Holtmeier, Allison Coghan, Grace Choate, Madeline Ramar, and Megan Kosar, derivatively on behalf of Kappa Kappa Gamma Fraternity, hereby provide notice of their appeal to the United States Court of Appeals for the Tenth Circuit from the final order entered by the district court on August 25, 2023 granting Defendants' motion to dismiss, insofar as that Order concerns Defendants Kappa Kappa Gamma Fraternity, Mary Pat Rooney, and Kappa Kappa Gamma Building Co. *See* Order (ECF No. 31), Ex. 1. Plaintiffs are not pursuing any claims against Defendant Artemis Langford.

**APP.108**

Respectfully submitted,


/s/ Cassie Craven                          /s/ John Knepper
Cassie Craven, 7-5664                       John Knepper
Longhorn Law Limited Liability Company      Law Office of John G. Knepper, LLC
109 E. 17th St., Suite 11                   P.O. Box 1512
Cheyenne, Wyoming 82001                     Cheyenne, Wyoming 82003
307-823-3062                                307-632-2842
cassie@longhornlawllc.com                   John@KnepperLLC.com


Dated September 25, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2023, a copy of the foregoing Notice of Appeal was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Cassie Craven                                 /s/ John Knepper
Cassie Craven, 7-5664                        John Knepper
Longhorn Law Limited Liability Company       Law Office of John G. Knepper, LLC
109 E. 17th St., Suite 11                    P.O. Box 1512
Cheyenne, Wyoming 82001                      Cheyenne, Wyoming 82003
307-823-3062                                 307-632-2842
cassie@longhornlawllc.com                    John@KnepperLLC.com

**APP.110**

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1)   all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)   if required to file additional hard copies, that the ECF submission is an exact copy of that document;

(3)   the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee LifeSafe, version 1.11.279, most recently updated on October 18, 2023, and according to the program is free of viruses.

Dated: December 4, 2023

GENE C. SCHAERR
CRISTINA MARTINEZ SQUIERS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*/s/ Sylvia May Mailman*
SYLVIA MAY MAILMAN
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
s.maymailman@gmail.com

JOHN KNEPPER
LAW OFFICE OF JOHN G. KNEPPER, LLC
P.O. Box 1512
Cheyenne, WY 82003
Telephone: (307) 632-2842
John@KnepperLLC.com

CASSIE CRAVEN
LONGHORN LAW LLC
109 East 17th Street, Suite 223
Cheyenne, WY 82001
Telephone: (307) 823-3062
cassie@longhornlawllc.com

*Counsel for Plaintiffs-Appellants*