**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **PATSY LEVANG, CHERYL TUCK-SMITH, SUSAN JENNINGS, MARGO KNORR, KAREN POPE, and ANN WITT,** | : <br> : <br> : <br> : |
| *Plaintiffs*, | : **Case No. 2:24-cv-00316-MHW-KAJ** <br> : |
| v. | : **Judge Michael H. Watson** <br> : |
| **KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTLEMAN,[1] LIZ WONG, KYLE DONNELLY, and BETH BLACK,** | : **Magistrate Judge Kimberly A. Jolson** <br> : <br> : <br> : <br> : <br> : |
| *Defendants*. | : |

---

**DEFENDANTS' MOTION TO DISMISS**

---

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Kappa Kappa Gamma Fraternity ("Kappa"), Mary Pat Rooney, Maria Brown, Nancy Campbell, Barb Goettleman, Liz Wong, Kyle Donnelly, and Beth Black hereby move to dismiss, with prejudice, all counts in Plaintiffs' Complaint.

As detailed in the attached Memorandum in Support, the Derivative Plaintiffs raise derivative claims that are premised on legal issues that were already decided by the District Court in Wyoming and are thereby barred by *res judicata*. As decisively held by the District Court in Wyoming on August 25, 2023, defining "women" to include "Individuals who identify as women" is Kappa's "bedrock right as a private, voluntary organization – and one this Court may not invade." *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-CV-51-ABJ, 2023 U.S. Dist. LEXIS

---

[1] Plaintiffs misspelled Ms. Goettelman's name in their filing. The correct spelling is Goettelman.

152458, at *29 (D. Wyom. Aug. 25, 2023). Those claims are further barred by the statute of limitations, and because they otherwise fail to state a claim upon which relief can be granted.

The individual claims brought by Plaintiffs Patsy Levang and Cheryl Tuck-Smith concerning their removal from Kappa must be dismissed because they fail to plausibly allege that Kappa did not afford them due process before terminating their membership, and courts do not re-litigate the membership decisions of private organizations. Indeed, the Complaint and the attachments thereto decisively show they were afforded all process they were owed. And Levang and Tuck-Smith's other claims concerning purported free-speech violations by private actors and defamation based on factually true statements are fatally flawed, even bordering on frivolous.

Finally, Plaintiffs' civil-conspiracy claim fails because there is no unlawful act to support a civil conspiracy. And Plaintiffs' claim for injunctive relief must be dismissed because no cause of action exists.

For these reasons, as explained further below, Defendants respectfully request that the Court dismiss Plaintiffs' claims in their entirety and with prejudice.

Respectfully submitted,

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin (0082203)
Trial Attorney
Brian W. Dressel (0097163)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-5452
nmmclaughlin@vorys.com
bwdressel@vorys.com

*Counsel for Defendants*

## MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

Kappa is a non-profit organization that is governed by a set of Bylaws and Standing Rules. Per the Bylaws, one criterion for admission is that the candidate be a "woman."  The Bylaws do not define the term "woman" at all.  Kappa's Standing Rules vest the Fraternity Council with the duty of "Interpreting the Fraternity Bylaws and Standing Rules."  In 2015, the Fraternity Council issued a position statement interpreting the term "woman" to include individuals who identify as women. In the nine years since, Kappa has explicitly allowed transgender women to join their membership.

On March 27, 2023, a small group of Kappa members filed a lawsuit and other claims in the District Court in Wyoming against Kappa, one member of Fraternity Council (though they referenced all of Fraternity Council), the local non-profit housing corporation, and a transgender collegiate member of Kappa challenging Kappa's ability to interpret the term "women."

As recognized by the District Court in Wyoming, Kappa has thousands of current members and over 210,000 alumnae.  That some contingent of the membership would prefer Kappa to only admit cisgender women and adopt an exclusionary position to transgender women is not necessarily surprising.  But those members' differing vision for what Kappa *should* be does not entitle them to a Court order telling Kappa—a private organization—what it *must* be.  The District Court of Wyoming decisively held that Kappa's interpretation of "women" to include individuals who identify as women was lawful and dismissed all claims against all Kappa parties.  Indeed, the court recognized that defining "woman" was Kappa's "bedrock right as a private, voluntary organization" and "one this Court may not invade" pursuant to Ohio and federal law.  *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *29.  The Kappa shareholders appealed that case, and their appeal is now pending before the United States Court of Appeals for the Tenth Circuit.  Plaintiffs in this case allege that they openly supported the plaintiffs in the Wyoming case.  (Compl., ECF No. 1, ¶ 7.)

Dissatisfied with how the district judge in Wyoming ruled in the prior case, Plaintiffs are trying again.  Once more, they fashion their disagreement with Fraternity Council's interpretation of Kappa's Bylaws issued ***nine*** years ago into derivative claims against Kappa's current Fraternity Council ***practically identical*** to those the Wyoming District Court has ***already rejected***.  Though the claims have slightly different dressings, they are still shareholder-derivative claims concerning the same legal issue:  whether Kappa has the right as a private organization to interpret "women" as used in its Bylaws to include "individuals who identify as women."  Given the prior decision, these claims are barred by *res judicata*.  The Court can also dismiss the derivative claims to the extent they are premised on Kappa's inclusive interpretation of the term "woman" as barred by the statute of limitations, as Kappa adopted this interpretation in 2015.

Separate from the derivative claims, Plaintiffs Levang and Tuck-Smith, who were dismissed from Kappa, dispute their dismissals.  They acknowledge, however, that Kappa followed its dismissal process, and that they were afforded all the process they were owed.  They also bring defamation claims based on Kappa accurately reporting their dismissal for policy violations and free-speech claims against Defendants for allegedly violating their right to free speech.  The Court can easily dispose of the defamation claims because only true statements were made and the free-speech claims because they are against private actors.  Therefore, Plaintiffs fail to state a claim upon which relief can be granted.  Finally, Plaintiffs bring a civil conspiracy claim and a claim for injunctive relief.  But there is no underlying unlawful act to support a civil-conspiracy claim, and there is no cause of action for injunctive relief, so the Court should dismiss both claims.

This case, like the one that came before it in the federal court in Wyoming, is a misuse of the litigation process.  How a private organization interprets its own governing documents and whom it chooses to admit are private matters to be resolved by the organization's members.  Opening the doors of federal courts to anyone dissatisfied with whom a private organization chooses to admit or

how it conducts its affairs would bury the courts in unnecessary litigation and decimate the ability of private organizations to function. This concern would only be magnified if members are permitted to sue the same organization over the same policies successively until they find a forum that allows them to force the change they seek through court order. As stated by the District Court in Wyoming:

> This Court cannot step in every time a member, or even multiple members, cries foul when a bylaw is disparately interpreted; if it did, [Kappa] and its Fraternity Council would spend their days responding to derivative suits from their thousands of current members and 210,000 alumnae." *See also Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 13-cv-1054, 2013 U.S. Dist. LEXIS 114605, at *6 (S.D. Tex. Aug. 13 2013) (noting that such interference would subject a non-profit, private organization to 'frustration at every turn' and cause it 'to founder in the waters of impotence and debility'). Our federal and state courts would similarly be overrun with disgruntled members challenging large organizations.

*Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *35.

Like the Wyoming complaint, Plaintiffs' Complaint is made up of scattershot allegations and does not clearly explain which allegations concern which causes of action, the Defendants against whom Plaintiffs assert most causes of action, or the state or federal law under which each cause of action is brought.[2] The Complaint is an attempt to obtain a different legal determination on an already-decided matter and to challenge internal disciplinary matters of a private organization that are not for a federal court to decide. This Court should reject Plaintiffs' baseless claims and misuse of legal process and dismiss all claims with prejudice.

## II.   FACTUAL BACKGROUND

### A.   The Parties

Kappa is a collegiate sorority made up of members who are still in college and alumnae members. Kappa has chapters on the campuses of over one-hundred colleges and universities.

---

[2] The Complaint does not reference the law of any other jurisdictions. Defendants assume all claims are under Ohio law, even though Plaintiffs only specify the governing law for some claims.

Plaintiffs Levang and Tuck-Smith are former members of Kappa who were dismissed for violating Kappa's policies.  The other Plaintiffs are current members of Kappa who joined Kappa in college and remain members of the sorority today.  All of the individual Defendants aside from Beth Black are members of Kappa's Fraternity Council, which is made up of volunteers charged with conducting Kappa's business.  Black is Kappa's Panhellenic Delegate.

**B.      Kappa Has Allowed Transgender Women to Be Admitted as Members Since 2015**

Kappa's Bylaws do not define the term "woman" at all.  (See Ex. 1 to Compl., ECF No. 1-2.)  Kappa's Standing Rules vest the Fraternity Council with the duty of "Interpreting the Fraternity Bylaws and Standing Rules."  (Standing Rule 5.1, Duties of Fraternity Council.[3])  Therefore, the Fraternity Council has the authority granted in Kappa's governing documents to interpret any term that is not specifically defined.  As alleged in the Complaint, in 2015, Kappa's Fraternity Council interpreted its Bylaws, which limit membership in Kappa to "women," to allow for the admission of transgender women.  (Compl., ECF No. 1, ¶ 50; ECF No. 1-7, p. 2).  Three years later, in 2018, Kappa issued a "Guide for Supporting our LGBTQIA+ Members."  (*Id.*, ¶ 52; ECF No. 1-8.)  This Guide again made clear that membership selection in Kappa includes individuals who identify as women.  (ECF No. 1-8, PageID 98.)

**C.      Wyoming Litigation**

After the Kappa chapter at the University of Wyoming voted to admit a transgender woman as a member, some members of the chapter (the "Wyoming plaintiffs") were upset and filed a lawsuit against Kappa, Mary Pat Rooney (the President of the Fraternity Council), the local non-profit that operates the Kappa house for the chapter, and the newly admitted transgender woman who had joined the sorority.  *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458.  They alleged a

---

[3] Plaintiffs are filing the Standing Rules under Seal per their Complaint.  (Compl., ECF No. 1, ¶44, fn 9; Order Granting Motion to File Document Under Seal, ECF No. 8.)

derivative claim for breach of fiduciary duty, a breach-of-contract claim, a tortious-interference-with-contract claim, and a direct claim related to Rooney's alleged breach of fiduciary duty.  *Id.*

### D.    Levang and Tuck-Smith's Policy Violations

Plaintiffs Levang and Tuck-Smith set out to support the Wyoming plaintiffs as they sued Kappa.  Levang and Tuck-Smith accessed contact information for Kappa alumnae and used it to solicit Kappa members to donate money to support the plaintiffs in litigation in which Kappa was a defendant.  (*See* Ex. 17 to Compl., ECF No. 1-17, PageID 150–51; Ex. 18 to Compl., ECF No. 1-18, PageID 153–54.)  Kappa members who received these communications complained.  (*Id.*)  Levang also appeared in several media stories about the case wherein she mentioned her prior role in Kappa's leadership in violation of Kappa's policies (Ex. 17 to Compl., ECF No. 1-17, PageID 151.)  Each woman also violated Kappa's Human Dignity Policy with their derogatory discussion of transgender women, including Kappa's Wyoming member.  (*See* Ex. 17 to Compl., ECF No. 1-17, PageID 152; Ex. 18 to Compl., ECF No. 1-18, PageID 154.)

### E.    Appeal of Wyoming Litigation

The Wyoming litigation has been unsuccessful to date for the plaintiffs.  The district court in Wyoming dismissed the complaint on all claims against the Kappa defendants on August 25, 2023.  *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458.  Plaintiffs appealed that dismissal, and the matter is now pending before the United States Court of Appeals for the Tenth Circuit.

## III.    LAW AND ARGUMENT

### A.    Standard of Review

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To avoid dismissal for failure to state a claim for relief, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While the plaintiff need not plead specific facts, her

statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal citations omitted).

"When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff." *Gadberry v. Bethesda Hosp., Inc.*, 608 F. Supp. 2d 916, 918 (S.D. Ohio 2009).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 579–80.  At its outset, however, a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  While a complaint need not contain "heightened fact pleading of specifics," it must provide "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss.  *Id*. at 570.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  As is explained below, accepting as true all of the factual allegations in the Complaint and applying the law, the Court can come to but one conclusion:  Plaintiff's Complaint fails in its entirety.

### B.    Plaintiffs' Derivative Claims Fail as A Matter of Law

Count I of the Complaint asserts a breach-of-fiduciary-duty claim against the Defendants who are members of Kappa's Fraternity Council for allowing transgender women to become members of Kappa, Count II asserts a claim for an ultra-vires action against the members of the Fraternity Council, and Count III asserts a claim for "Fraud Against Kappa" (collectively, the brief refers to these claims as the "derivative claims").

These claims fail as a matter of law for three reasons.  First, all of these claims relate to Kappa's interpretation of the term "women" as a membership requirement in its Bylaws.  Therefore, these derivative claims echo the derivative allegations in the *Westenbroek* case and are thus barred by the doctrine of *res judicata*.  Second, to the extent these claims are based on interpretations of the term "women" that Plaintiffs allege were issued in 2015 and 2018, they are barred by the statute of limitations.  Third, all of these claims fail to state a claim upon which relief can be granted because, as already recognized by the court in Wyoming, Kappa's Standing Rules permit Fraternity Council to interpret the Bylaws, the Bylaws do not define "women," and Ohio law provides that courts should defer to a private organization's reasonable interpretation of its own bylaws.  Furthermore, Plaintiffs' fraud claim fails because Plaintiffs have not alleged fraudulent activity.

### 1.    The Derivative Claims Are Barred by *Res Judicata*

Plaintiffs' derivative claims are barred by the doctrine of *res judicata* because another federal court has already rejected a derivative claim by other Kappa members alleging breach of fiduciary duty for the same policy at issue in Plaintiffs' claim—Kappa's interpretation of its Bylaws defining "women" to allow the admission of transgender members.  *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458.  In that case, the District Court in Wyoming explained:

> Their derivative claim condenses to this: from 1870 to 2018, KKG defined 'woman' to exclude transgender women; any new definition may not be enacted, ultra vices (sic), without a KKG bylaw amendment.  Expectedly, Defendants counter: private organizations may interpret their own governing documents and define 'woman' as including transgender women.  Defendants are correct.  Defining 'woman' is Kappa Gamma's bedrock right as a private, voluntary organization – and one this Court may not invade.

*Id.* at *29.  The court further held that it would not define "woman" and that it could "not invade Kappa Kappa Gamma's freedom of expressive association and inject the circumscribed definition Plaintiffs urge."  *Id.* at *3.  The court viewed Kappa's interpretation of the term to be a "lawful

interpretation – explicitly authorized per the sorority's Standing Rules – of an otherwise-silent bylaw." *Id.* at *34.

"*Res judicata* operates as a complete bar to any subsequent action on the same claim or cause of action *between the parties or those in privity with them*." *Brown v. City of Dayton*, 730 N.E.2d 958, 961 (Ohio 2000) (internal citation omitted) (emphasis in original). *Res judicata* also bars all those who could have joined the action and did not. *Grill v. Artistic Renovations*, 106 N.E.3d 934, (Ohio Ct. App. 2018). Thus, courts have recognized that for shareholder-derivative actions, parties and their privies include all nonparty shareholders. *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981).[4]

Claim preclusion under Ohio law applies as a "complete bar" when a "court of competent jurisdiction" renders "a final judgment or decree . . . on the same claim between the same parties or those in privity with them." *Bus. Dev. Corp. v. Rutter & Russin, LLC*, 37 F.4th 1123, 1129 (6th Cir. 2022) (citations omitted). Even if the cause of action is different in a subsequent suit, if the same issue was decided that was necessary to the prior suit, then that can preclude a party from re-litigating that issue of fact or law in a subsequent suit. *Godale v. Chester Twp. Bd. of Trs.*, 107 Ohio App. 3d 23, 24-25 (Ohio Ct. App. 1995). The dismissal for failure to state a claim under Rule 12(b)(6) is considered to be a "judgment on the merits." *Federated Dept. Stores v. Moitie*, 452 U.S. 394, 399 n.3 (1981); *Cobbs v. Katona*, 8 Fed. App'x 437, 438 (6th Circ. 2001) (holding a 12(b)(6) dismissal for failure to state a claim is a judgment on the merits which bars a subsequent action between parties or their privies from claims that could have been raised in a prior action).

---

[4] Though no Ohio case has ruled on this, the Ohio shareholder-derivative-action rule is modeled after the federal rule. Moreover, the Ohio Supreme Court has held that because the Ohio Rules of Civil Procedure are modeled after the Federal Rules of Civil Procedure, "federal law interpreting a federal rule, while not controlling, is persuasive authority in interpreting a similar Ohio rule." *Stammco, L.L.C. v. United Tel. Co. of Ohio*, 994 N.E.2d 408, 413 (Ohio 2013).

Plaintiffs are Kappa shareholders who could have joined the plaintiffs in *Westenbroek* in that shareholder-derivative action to challenge the same issue Plaintiffs challenge here – Kappa's ability to interpret its own Bylaws. The Wyoming District Court explicitly held that: (1) Kappa's governing documents explicitly authorized Fraternity Council to interpret Kappa's Bylaws, and that the interpretation of "woman" to including individuals who identify as woman was reasonable; (2) Ohio law provided this bedrock right to Kappa as a private voluntary organization; and (3) First Amendment federal law provided this right to Kappa. Indeed, the operative question under Ohio law is whether Plaintiffs' current derivative claims could have been litigated in the *Westenbroek* case. *See Bus. Dev. Corp.*, 37 F.4th at 1135. Each of the "derivative claims"—breach of fiduciary duty, ultra vires, and fraud—could have been advanced in the *Westenbroek* case.

The Derivative Plaintiffs in this case are in privity with the derivative plaintiffs in *Westenbroek* because they seek the exact same result: a court order telling Kappa and its Fraternity Council that it cannot interpret its own Bylaws to allow for the admission of transgender women and that the current Fraternity Council is responsible for alleged financial harm to Kappa because it followed an inclusive interpretation that has been in place for many years. All of the derivative claims are dependent on this Court holding that Kappa was not legally allowed to define "women" as it had under the Bylaws and that it must narrowly define "women" as Plaintiffs prefer. The Ohio Supreme Court has held that "a mutuality of interest, including an identity of desired result, creates privity between [the plaintiffs in a new case and a previous one]." *Brown*, 730 N.E.2d at 962. Plaintiffs are bound by the Wyoming decision dismissing the derivative claims under Rule 12(b)(6).

The opposite result would lead to absurd consequences in a case like this one. Kappa is a large organization that has interpreted its Bylaws in a way that some members disagree with, as evidenced by this case. Allowing Plaintiffs to proceed with a derivative claim based on that interpretation after another federal court already rejected the same arguments would subject private

organizations in Kappa's position to unending litigation. In any similar situation, aggrieved members of the organization could line up and take their shot at a derivative claim until they found a court willing to entertain it. And what would happen if this Court were to issue a decision that contradicted the District Court of Wyoming or the Tenth Circuit Court of Appeals? One federal court holding that Kappa can interpret its own Bylaws and another holding it cannot. These derivative cases with conflicting results is what the *res judicata* doctrine seeks to prevent.

### 2. Derivative Claims Based on Kappa's Policies Are Barred by the Statute of Limitations

To the extent the Court finds that *res judicata* does not bar all or some of Plaintiffs' derivative claims, it should hold that the statute of limitations does. In Ohio, claims for breach of fiduciary duty have a statute of limitations of four years. *See* Ohio Rev. Code 2305.09; *Blank v. Bluemile, Inc.*, 174 N.E.3d 859, 868 n.8 (Ohio Ct. App. 2021) ("Ohio's statute of limitation for a claim for breach of fiduciary duty is four years"). The statute of limitations for fraud is also four years. R.C. §2305.09(D). *Johnson v. Kandel*, No. 2022CA00024, 2022 Ohio App. LEXIS 3783, at *5 (Ohio Ct. App. 2022).

The heart of Plaintiffs' breach-of-fiduciary-duty claim is that, in 2015, Kappa's Fraternity Council issued a position statement interpreting Kappa's Bylaws to permit "individuals who identify as women" to join Kappa as members and issued a "Guide for Supporting Our LGBTQIA+ Members" in 2018. (*See* Compl., ECF No. 1, ¶¶ 50, 52.) The 2015 Policy forms the basis for the breach-of-fiduciary-duty claim because it is under that interpretation of the Bylaws that Kappa accepts transgender women as members. (*See id.* at ¶ 124 ("(b)y attempting to circumvent the Articles, Bylaws, and Standing Rules through the implementation of policies and position statements that contradict the express terms therein and allowing the membership of men absent a valid change to the Articles and Bylaws, the Fraternity Council violated KKG's Articles of

Incorporation, its Bylaws, and Standing Rules").)  Plaintiffs' fraud claim is premised on the position

statement as well.  (*See id.* at ¶ 158.)

Thus, per the Complaint, the derivative claims for breach of fiduciary duty and fraud are

based on actions taken in 2015 and 2018, roughly nine and five years before Plaintiffs filed the

Complaint.  As such, the statute of limitations bars the derivative claims.

> **3.      The Derivative Claims Fail for the Same Reasons Already Recognized by the District Court of Wyoming**

Plaintiffs also fail to state a plausible derivative claim on the merits.  Kappa's Bylaws do not

define the term "women," and Kappa reasonably interpreted this term to include transgender

women.  The Court should not disturb this reasonable interpretation.

> a.      Courts Defer to Private Organizations' Interpretation of Their Own Bylaws

Ohio law affords private organizations significant deference in reasonably interpreting their

own governing documents.   "Generally speaking, in matters of policy, discipline or internal

economy of a voluntary association, wherein members have mutually agreed upon a charter or

rules, the decision of the association itself is supreme."  *Putka v. First Catholic Slovak Union*, 600

N.E.2d 797, 802 (Ohio Ct. App. 1991).  Courts will only step in to disturb a private organization's

interpretation of its own bylaws "when there has been some palpable violation of the constitution or

laws of the corporation."  *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S.

Dist. LEXIS 822, at *14 (S.D. Ohio Jan. 6, 2010) (internal citation omitted).  The role of courts is

not to serve as the arbiter when members are simply arguing that their interpretation of a private

organization's bylaws is correct and the organization's is incorrect.  *Stibora v. Greater Cleveland

Bowling Ass'n*, 577 N.E.2d 1175, 1179 (Ohio Ct. App. 1989).

Courts presume a non-profit organization's directors act in the best interests of the

organization.   When an aggrieved shareholder brings a derivative action alleging a breach of

fiduciary duty, the shareholder must show that the alleged wrongdoers "have acted in bad faith or without the requisite objectivity," and failure to do so can result in dismissal at the pleading stage. *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (Ohio Ct. App. 2020) (internal citations omitted).  In assessing a derivative suit for breach of fiduciary duty, "it is presumed that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation."  *Brosz v. Fishman*, 99 F. Supp. 3d 776, 785 (S.D. Ohio 2015) (internal citation omitted).

"Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud."  *Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 171 (Ohio Ct. App. 1993) (internal citation omitted); *see also Tucker*, 790 N.E.2d at 375.

Judicial non-intervention in the decisions of a private organization is important because, "if the courts were to interfere [every time] some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility."  *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 779 (W.D. Tex. 1999) (internal quotation omitted).  As such, private organizations have the right to interpret their own governing documents:

> The right of a voluntary club or association to interpret its own organic agreements . . . is not inferior to its right to make and adopt them, and an individual, by becoming a member, subjects himself, within legal limits, to the association's power to administer as well as its power to make its rules . . . the requirements for judicial review are more than a mere breach of [an association's] own policies.

*Barrash*, 2013 U.S. Dist. LEXIS 114605, at *16 (internal citations omitted).

Allowing the pursuit of a derivative claim based on a challenge to any bylaw interpretation would lead to an unending parade of litigation where organizations like Kappa must conduct discovery and litigate over every interpretation of its bylaws and do so without any sort of deference.  And, at the end of the litigation process, courts would be tasked with telling private

organizations how to interpret their bylaws in the first instance, thus drastically expanding the rule of the judiciary in the lives of ordinary people.  Fortunately, Ohio law precludes this result.

Per Ohio law, therefore, the derivative claims turn on whether Kappa and the Fraternity Council's Bylaw interpretations were reasonable.

> b.  <u>Kappa's Interpretation that the Bylaws Allow for the Admission of Transgender Women Is Reasonable</u>

If Kappa's Bylaws defined the term "woman" in a way that explicitly excluded transgender women, the inclusive definition Kappa has used for nearly a decade might not be reasonable. Plaintiffs, however, do not contend that Kappa's Bylaws define the term, and a review of the Bylaws demonstrates that Plaintiffs would be unable to so argue.  (See Ex. 1 to Compl., ECF No. 1-2).  All the Bylaws state is that a member must be a "woman."  (See Ex. 1 to Compl., ECF No. 1-2, p. 5).  Therefore, the question here is whether Kappa has adopted an unreasonable construction of a plain and unambiguous provision.

Plaintiffs' entire case is premised on the conclusion that only "adult females" are women. This is one interpretation of the term, but not the only one.  "Currently, over 1.6 million adults and youth identify as transgender in the United States, or roughly 0.6 percent of Americans who are 13 years old or older."  *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023).  Some courts have explicitly recognized that "[a] transgender woman ***is a woman*** who was assigned male at birth." *Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907, at *6 (N.D. Ohio Sept. 25, 2023) (citation omitted) (emphasis added); *see also Kadel v. Folwell*, 620 F. Supp. 3d 339, 376 (M.D.N.C. 2022) ("[t]ransgender men are men; transgender women are women").

Last year, Chief Judge Marbley recognized that "biological markers that compromise an individual's 'biological sex'" include "*inter alia* their organs, their chromosomes, their hormones, and their gender identity."  *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707, at *23 (S.D. Ohio Jul. 28, 2023).  He explained:

> [B]iological sex is not quite as binary as that definition presumes.
> Instead, the concept of "biological sex" encompasses a multitude of
> biological components (including gender identity) that often diverge in
> the same individual; for any given person, some of their biological
> markers may align with maleness while other markers align with
> femaleness . . . Sometimes, that divergence manifests in obvious
> physical ways: for example, in intersex individuals whose reproductive
> or sexual anatomy [do not] fit into an exclusively male or female
> (binary) sex classification . . .  In others, the divergence in their
> biological components is still physical, but in less obvious or
> outwardly apparent ways . . .  Simply put, it is not so simple to define
> "biological sex" as just male or female.

*Id.* at *22–*23 (citations to court decisions and medical literature omitted).

The Court need not conclude that any of these sources or the myriad of others addressing the topic are correct.  The point is that the question of who is a woman does not have a straightforward answer.  Plaintiffs simply saying their view is the only reasonable one does not make it so.  Kappa's interpretation is reasonable, and that is enough for the Court to defer to it.

4.    **Plaintiffs Cannot Advance an Ultra Vires Derivative Claim Based on Levang and Tuck-Smith Being Dismissed from Kappa**

Plaintiffs' second cause of action appears to be a derivative ultra vires claim based in part on the same allegations in the first cause of action and in part on allegations that Levang and Tuck-Smith were improperly dismissed.  The portion of the claim related to Kappa's interpretation of its own Bylaws fails for the reasons discussed above.  And to the extent that Plaintiffs attempt to allege a derivative claim based on the dismissal of two members, the claim is not plausible because derivative suits are for injuries to the organization, not to individuals.  *See Carlson v. Rabkin*, 789 N.E.2d 1122, 1128 (Ohio Ct. App. 2003).  Levang and Tuck-Smith being expelled from Kappa is not a harm suffered by the organization, it is a harm suffered by two individuals.  The Derivative Plaintiffs, as current members, cannot bring a claim for exclusion of membership.  *Id.* at 1132–33.

### 5.    Plaintiffs Do Not Plausibly Allege a Claim of Fraud

In addition to failing for the numerous reasons described above, Plaintiffs' fraud claim fails for the additional reason that they have not alleged actionable fraud.  Most of the fraud claim is based on allegations that the Fraternity Council concealed or withheld information from Kappa's members.  Under Ohio law, however, an action for fraud based on a failure to disclose information can only be maintained when there was an affirmative duty on the part of the defendant to disclose the information.  *See Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 854 (Ohio Ct. App. 2000) ("a duty to disclose is a requirement if concealment of fact is alleged as a basis for fraud").  Plaintiffs do not allege that Defendant had a legal duty to disclose the information at issue in their fraud allegations.

Plaintiffs' remaining allegations supporting the fraud claim concern the idea that Kappa members have been purportedly misled in their understanding of how Kappa interprets the term "woman" and therefore donated money under false pretenses to a legally distinct entity.  Plaintiffs' own Complaint belies this claim.  As discussed above, Kappa issued a position statement concerning its interpretation of the term "woman" in 2015 and a Guide further addressing the issue in 2018, and further disclosed this in FAQs in 2022.  (Compl. ¶¶ 50, 52, 56).  Kappa was not hiding anything, and Plaintiffs do not even claim ignorance of these documents, some of which are publicly available for anyone who wants to know about Kappa's membership position outside the organization.[5]  Even if they did not seek out these documents, their ignorance does not entitle them to assert a fraud claim when Kappa's position has been issued and known for many years.

For these reasons, the claims asserted in Counts I–III are barred by the doctrine of *res judicata* and the statute of limitations and fail to state a claim on which relief can be granted.

---

[5]    *See*    https://www.kappakappagamma.org/globalassets/resources/general-resources/fraternity-position-statements.pdf;    https://www.kappakappagamma.org/globalassets/resources/general-resources/guide-for-supporting-our-lgbtqia-members2021.pdf.    The policies were also disclosed elsewhere, outside the sources alleged in the Complaint.

### C.      Plaintiffs' Free-Speech Claim Fails

Plaintiffs' free-speech claim is frivolous to the point of being sanctionable and evinces a fundamental misunderstanding of what the Ohio Constitution does and does not protect.  Plaintiffs misrepresent that the Ohio Constitution protects not only their right to be free from government restriction of their speech, but also from a private organization choosing to no longer associate with them when their speech violates that organization's policies.  It, of course, does no such thing. Neither Kappa nor the Fraternity Council had an obligation to "protect and honor" Plaintiffs' freedom of speech, and Plaintiffs have no cause of action to avoid the consequences of their speech.

The Supreme Court of Ohio held, "[W]hile Section 11 [of Article I of the Ohio Constitution] has an additional clause not found in the First Amendment, the plain language of this section, when read in its entirety, bans only the passing of a law that would restrain or abridge the liberty of speech."  *Eastwood Mall v. Slanco*, 626 N.E.2d 59, 61 (Ohio 1994).  Indeed, Ohio law actually provides that "the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment."  *Id.*  As such, "the First Amendment is the proper basis for interpretation" of Ohio's free-speech protections.  *Id.*  As the Court is aware, a claim under the First Amendment is not viable absent state action.  *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007). Plaintiffs do not allege any state action, which is enough to dispose of the free-speech claim.[6]

### D.      Levang and Tuck-Smith's Claims Concerning Their Dismissals Fail

Plaintiffs Levang and Tuck-Smith advance three claims related to their dismissal as Kappa members:  breach of contract, promissory estoppel, and wrongful termination as a matter of public policy.  (*See* Complaint, ECF No. 1, Counts VI–VIII.)  Levang and Tuck-Smith do not contest that they engaged in the conduct that led to their dismissal, only Kappa's interpretation that their

---

[6] Remarkably, Plaintiffs cite the *dissenting* opinion in *Eastwood Mall* to support the idea that they can assert a free-speech claim against private actors under the Ohio Constitution.  (*See* Complaint, ECF No. 1, ¶ 183.)  As should be obvious, dissenting opinions inherently do not reflect the law. Relying on one to advance a claim is not a good-faith use of the litigation process.

conduct violated Kappa's policies.  These claims fail because courts do not police the membership decisions of private organizations and only ensure that they provide members with due process.  As Plaintiffs do not allege any procedural irregularities, they fail to allege plausible claims related to Levang and Tuck-Smith's dismissal.

> **1.    Levang and Tuck-Smith Do Not Deny Their Underlying Conduct or that Kappa Followed Its Own Processes for Dismissing Members**

The Complaint submits as exhibits some of the correspondence between Levang, Tuck-Smith, and Kappa concerning their violations of Kappa policies, though this is not all of the correspondence concerning their violations.  (*See* Exs. 13–22 to Compl., ECF Nos. 1-14–1-22, 1-27.)  As that correspondence reflects, Kappa informed Levang that it was investigating violations of the following Kappa policies:  Use of Membership Lists and Contact Information Policy, Internet Policy, Local Regional or National Media Policy, Social Media Guidelines, Speaking for the Fraternity Policy, and the Human Dignity Policy.  (*See* Ex. 17 to Compl., ECF No. 1-17, PageID 150.)  Kappa informed Tuck-Smith she was being investigated for violation of the Use of Membership Lists and Contact Information Policy and the Human Dignity Policy.  (*See* Ex. 18 to Compl., ECF No. 1-18, PageID 153.)

Rather than dispute that they had engaged in the conduct alleged, each responded that her conduct was justified by her view that Kappa should not allow transgender women to be members.  (Exs. 19 and 20 to Compl., ECF Nos. 1-19 and 1-20.)  Indeed, after receiving a warning about use of membership lists and member contact information for non-sorority business (Ex. 11, ECF No. 1-12), the response from Levang and Tuck-Smith in sending out *another* communication to all Kappa Alumnae Association Presidents was that they were "entitled to use the list of sisters for communication and connection to each other" (*See* Ex. 12, ECF No. 1-13).  In that email they referred to a Kappa collegiate transgender member as a "fully intact male living in and having

access to their sleeping and safe places." (*Id.*)  This derogatory and discriminatory statement towards a fellow member implied the member was unsafe and predatory.

Kappa has established policies for the removal of alumna members like Levang and Tuck-Smith.  Article III(5)(B)(3) of the Bylaws provides that alumna members may be dismissed from Kappa by a three-fourths vote of the Fraternity Council.  (Bylaws, ECF No. 1-2, PageID 60.).  The Standing Rules, in turn, establish due-process safeguards to ensure that members considered for disciplinary action receive due process.  (Standing Rule 7.4, Requested Resignation and Dismissal.)  After giving Levang and Tuck-Smith the opportunity to respond and considering those responses, Kappa terminated the membership of each for the policy violations they committed.  (Exs. 21 and 22 to Compl., ECF Nos. 1-21 and 1-22.)  Plaintiffs acknowledge that Kappa followed its dismissal policy and even attach exhibits demonstrating that Kappa did so.  Their objection is with the result Kappa reached after following the process.

> **2.    Courts Only Consider Claims for Member Removal Based on a Denial of Due Process, So Plaintiffs' Claim of Removal In Violation of Public Policy Fails**

The role of courts in overseeing the membership decisions of private organizations is extremely limited.  Courts do not review the merits of an organization's decision to expel a member.  Rather, as discussed above, "in matters of policy, discipline or internal economy of a voluntary association, wherein the members have mutually agreed upon a charter or rules, the decision of the association itself is supreme."  *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797, 802 (Ohio Ct. App. 1991).  Courts do not interfere with voluntary organizations' decisions "except to ascertain whether or not the proceeding was pursuant to the rules and laws of the [organization], whether or not the proceeding was in good faith, and whether or not there was anything in the proceeding in violation of the laws of the land."  *State ex rel. Ohio High School Athletic Ass'n v. Judges of Ct. of Common Pleas*, 181 N.E.2d 261, 266 (Ohio 1962).

In accordance with these principles, "a member who an association seeks to expel is entitled to due process and natural justice which requires reasonable notice and hearing with the opportunity to defend the charges." *Bay v. Anderson Hills, Inc.*, 483 N.E.2d 491, 493 (Ohio Ct. App. 1984). For private organizations, "[d]ue process requires that an association follow the provisions of its own constitution in expelling a member." *Normali v. Cleveland Ass'n of Life Underwriters*, 315 N.E.2d 482, 485 (Ohio Ct. App. 1974). Ohio courts interpret "natural justice" to mean reasonable notice of the charges and an opportunity to be heard. *Bay*, 483 N.E.2d at 493.

As alleged in the Complaint, Levang and Tuck-Smith received the due process to which they were entitled. They received written notice of the charges against them, as well as subsequent explanation of the charges at their request. (Compl., ECF No. 1, ¶¶ 96 –98.) They then had the opportunity to respond, which they did through largely identical correspondence. (Exs. 19 and 20 to Compl., ECF Nos. 1-19 and 1-20.) Their correspondence did not deny the conduct alleged, but instead argued that they believed their conduct is permissible because of their view of what Kappa should be as a sorority. (*Id.*) Indeed, much of their responses addressed grievances they had with Kappa and the admission of a transgender woman by the vote of the Kappa collegiate chapter. (*Id.*)

One policy they were both found to have violated was Kappa's Human Dignity Policy, which states, in part, "Any member who makes discriminatory, inflammatory or inappropriate actions based on . . . gender identity . . . shall be subject to dismissal or other disciplinary action" (Fraternity Policy III, Section 7, Discipline:  Personal Responsibility, Human Dignity.)[7]  The statements Levang and Tuck-Smith have made about a collegiate transgender member of Kappa, were objectively inappropriate and discriminatory based on gender identity. Plaintiffs' right to advocate for their beliefs does not give them the right to make discriminatory and inappropriate statements about a Kappa transgender member without repercussions. As some examples, they

---

[7] Some of the policies that Plaintiffs violated are standalone policies and have not been attached to their Complaint.

called a transgender woman member in writing: "a male with male behavior," "a man with a penis and testosterone [who] is not a woman and should not be eligible for membership," a "he" who is "being used by activist forces as a pawn in their attempt to take over women only spaces," "a man claiming to be a woman," a "person with male behavior and male physique," and "a fully intact male." (*See* Exs. 10, 11, and 13 to Compl., ECF Nos. 1-11, 1-12, 1-14.)

Another policy they were both found to have violated was Kappa's Membership Lists Policy, which states, in part, "Membership lists and member contact information available through the Kappa Kappa Gamma website, (e.g., names, emails, phone, numbers, and mailing addresses) are for the use of collegiate and alumna members of Kappa Kappa Gamma only in conducting the Fraternity business and shall not be used in non-Fraternity business." (Fraternity Policy XI, Section 6, Membership Lists.)  As discussed above, and shown in their attachments to their Complaint, not only did they use membership lists and contact information to contact Kappa's Alumnae Association Presidents, but after being warned about this misuse of membership lists, they sent out another communication to Kappa's Alumnae Association Presidents asserting their entitlement to use membership lists as they pleased, and then sent out yet another email to Kappa's Alumnae Association Presidents a week later.  (*See* Exs. 11, 12, 17 to Compl., ECF Nos. 1-11, 1-12, 1-17.) Kappa informed Plaintiffs that they were forwarded each of these communications from other members who complained about the communications they were receiving (*See* Ex. 17.)  These facts are submitted with the exhibits and undisputed.

Plaintiffs' rambling responses to the notices of policy violations did not address the actual allegations Levang and Tuck-Smith received, nor did they deny engaging in any of the specific instances that supported the policy violations at issue (Compl., ECF Nos. 1-16, 1-20).[8]  After review

---

[8] Plaintiffs have attached records showing the nature of their policy violations to their Complaint. (*See* Exs. 9–20 to Compl., ECF Nos. 1-9–1-20.)  There are additional records, but they are not included with the Complaint.

of all relevant materials relating to the policy violation, Fraternity Council voted to dismiss Levang and Tuck-Smith from membership (*See* Exs. 21 and 22 to Compl., ECF Nos. 1-21, 1-22.)

There is no due-process violation in this decision.  Levang and Tuck-Smith had an opportunity to either cease the conduct that led to their expulsion or defend against the allegations when they were informed Kappa was considering their dismissal.  This is the due process Ohio law requires for the expulsion of members from private organizations.  Given that their own Complaint states that they received this process, there is nothing further for this Court to review.  Furthermore, Levang and Tuck-Smith have provided evidence to this Court that shows that not only did Kappa follow its disciplinary process, but also that Plaintiffs *in fact* violated the Human Dignity and Membership List policies.  The Court should not interfere with Kappa's determination that these policy violations warranted dismissal in accordance with its Standing Rules.

### 3.    Plaintiffs' Contract and Quasi-Contract Claims Related to Their Dismissal Also Fail

In addition to their violation-of-public-policy claim, Levang and Tuck-Smith bring claims for breach of contract and promissory estoppel based on their removal from Kappa's membership. Neither claim is plausible.

Plaintiffs' breach-of-contract claim stems from the premise that Kappa's Bylaws provided them with an unconditional right to lifetime membership in Kappa, which they do not.  As discussed above, the Bylaws require members to remain in good standing by complying with Kappa's policies and provide a mechanism to remove members who do not comply with those policies.  Ohio courts recognize that an organization does not breach its contract with its members in its Bylaws when it follows its own procedures for disciplining a member.  *See Williams v. NAACP*, 135 N.E.3d 1260, 1267 (Ohio Ct. App. 2019).  No Kappa document, Bylaws or otherwise, offers members an unconditional right to lifetime membership or carte blanche to do whatever they want and remain a member.  As the Kentucky Court of Appeals has recognized, expulsion from a

voluntary organization in which a person was a lifetime member does not support a breach-of-contract claim, even when the individual had paid significant amounts of money in dues on the premise that he would be a member for life.  *See Tinsley v. Wildwood Country Club, Inc.*, No. 2010-CA-001295-MR, 2011 Ky. App. Unpub. LEXIS 638 (Ky. Ct. App. Sept. 2, 2011).

Regardless of the result of the breach-of-contract claim, Plaintiffs cannot assert their promissory-estoppel claim.  The promissory-estoppel claim is based on representations made in Kappa's Bylaws which, as Plaintiffs note, is a contract.  "It is generally agreed that there can not be an express agreement and an implied contract for the same thing existing at the same time."  *Hughes v. Oberholtzer*, 123 N.E.2d 393, 396 (Ohio 1954).  When "there is an express agreement between the parties, the quasi-contractual claim[] of . . . promissory estoppel [is] barred."  *Williams*, 135 N.E.3d at 1269.  Thus, to the extent Plaintiffs have a claim against Kappa for broken promises, they would be remedied through the breach-of-contract claim, not a claim for promissory estoppel.

### E.    Plaintiffs' Defamation-Per-Se Claim Fails

Levang and Tuck-Smith do not actually allege that anyone made a false statement about them.  Instead, they advance an argument of defamation-by-implication.  Essentially, they argue that because Kappa members are only removed when they violate Kappa policies, anyone who heard Kappa's announcement about Levang and Tuck-Smith would have assumed the two women had acted in violation of Kappa's policies when, according to them, they did not.  The trouble with this argument is that the statement alleged—the notice of dismissal Kappa's Executive Director is required to send when an alumna member is removed—is itself true.  A communication that Levang and Tuck-Smith were removed as members of Kappa for violating Kappa's policies is unambiguously true, even if they disagree with the decision.

Defamation claims under Ohio law, of course, require an allegation of a *false* statement.  *See, e.g., Hersch v. E. W. Scripps Co.*, 445 N.E.2d 670, 678 (Ohio Ct. App. 1981).  The statement

that Levang and Tuck-Smith were removed from Kappa for policy violations is true, as evidenced by the fact that they advance several legal claims trying to reverse that decision. Plaintiffs do not allege any specific statement that was false. Their defamation-per-se claim is based on what others might think when they learned the women were removed. A defamation-per-se claim requires an untrue statement, and cannot rely on "implication" or "insinuation" arising from a true one. *Carr v. Educ. Theatre Ass'n*, 215 N.E.3d 584, 591 (Ohio Ct. App. 2023). A defamation-per-se claim that relies on implication necessarily fails. *Id.*[9]

### F.    Absent an Unlawful Act, Plaintiffs' Civil-Conspiracy Claim Fails

Without a plausible claim on any of their substantive causes of action, Plaintiffs' claim for civil conspiracy necessarily fails. "Ohio law does not recognize civil conspiracy as an independent cause of action." *Woods v. Sharkin*, 192 N.E.3d 1174, 1195 (Ohio Ct. App. 2022) (internal citation omitted). Thus, "[a]n underlying unlawful act is required before a civil conspiracy claim can succeed." *Id.* (internal citation omitted). Failure to state a viable tort claim means that a claim for civil conspiracy cannot proceed either. *Id.* As discussed herein, Plaintiffs do not allege any plausible claims, so their civil-conspiracy claim is not plausible either.

### G.    There Is No Cause of Action for Injunctive Relief

Count IX of the Complaint is for "Injunctive Relief." A cause of action for injunctive relief, however, is not recognized under federal or Ohio law. *See Huntington Nat'l Bank v. Guishard*, No. 2:12-CV-1035, 2012 U.S. Dist. LEXIS 167214, at *14 n.1 (S.D. Ohio Nov. 26, 2012) ("[a]n injunction, however, is not a cause of action, but a remedy"); *Woods*, 192 N.E.3d at 1195 ("in general, injunctive relief is a remedy, not a cause of action"). The Court should dismiss Plaintiffs' cause of action for injunctive relief.

---

[9] Now that Plaintiffs have filed this lawsuit and made many media appearances to complain of their dismissal, the specifics of it are public. Their defamation-per-se claim rings fairly hollow in light of their own public advertisement of dismissal.

**H.    The Court's Dismissal of Plaintiffs' Claims Should Be with Prejudice**

The Court should dismiss each claim for the reasons discussed above, and the Court should do so with prejudice.  The Court has discretion as to whether to permit Plaintiffs to amend their Complaint.  *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir. 1991).  The Court can deny leave to amend "when the proposed amendment would be futile," which is the case when an "amended complaint would not survive a renewed . . . motion to dismiss."  *Olwin Metal Fabrication v. Multicam, Inc.*, No., 3:22-cv-333, 2024 U.S. Dist. LEXIS 19626, at *19 (S.D. Ohio Feb. 5, 2024).

Here, amendment would not cure what ails Plaintiffs' complaint.  Amendment could not address the above arguments on how *res judicata* and the statute of limitations bar the derivative claims.  Amendment also would not cure the fact that Levang and Tuck-Smith have conceded that their removal did not contain any procedural irregularities or that they, in fact, violated Kappa's policies.  And amendment certainly would not allow Plaintiffs to establish either a free-speech claim based on the actions of a private organization or a defamation-per-se claim based on a true statement.  Accordingly, amendment would be futile, so the Court should dismiss the claims with prejudice.

## IV.    CONCLUSION

Plaintiffs are upset that Kappa has adopted an inclusive position allowing for the admission of transgender women.  They have disagreed with the organization's position on other issues in the past, and may well disagree with some positions in the future.  But this is part of being in an organization of hundreds of thousands of members; there will sometimes be disagreements about organizational direction.

In considering how to interpret its Bylaws in 2015, the Fraternity Council decided to be inclusive.  Their interpretation is in line with those of all 26 National Panhellenic Conference

sororities.  And in nine years, Kappa's decision to be inclusive has not destroyed the organization. It is each college chapter's decision whom to admit to their membership.  Plaintiffs point to a single transgender woman collegiate member who has been admitted and a single transgender woman non-collegiate member.  It is Plaintiffs who have sought to make Kappa's inclusive position into a purported organization-destroying issue.

Plaintiffs are seeking to accomplish organizational change through litigation.  Litigation, however, is the worst forum to do that.  Litigation is time-consuming and expensive and rarely provides the outcome one seeks, nor the satisfaction one expects.  The Kappa Defendants are confident in their positions in this litigation, both on this Motion and overall, as they know they did not breach their fiduciary duties, did not exceed the scope of their authority, did not engage in fraud, and followed their processes in dismissing members.  But prevailing in this litigation is just a small win.  The next day, everyone has to wake up and carry on the business of the organization and work together to try to do good for Kappa and its members.  The Kappa Defendants are hopeful that through dismissal, all parties can refocus their efforts on all they have in common, instead of the things upon which they disagree.  For all the reasons stated above, the Kappa Defendants respectfully request the Court dismiss all claims against them with prejudice.

Respectfully submitted,

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin (0082203)
Trial Attorney
Brian W. Dressel (0097163)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-5452
nmmclaughlin@vorys.com
bwdressel@vorys.com

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the U.S. District Court, Southern District of Ohio, on April 1, 2024, and served upon all parties of record via the Court's electronic filing system.

/s/ *Brian W. Dressel*
Brian W. Dressel