**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **PATSY LEVANG, CHERYL TUCK-SMITH, SUSAN JENNINGS, MARGO KNORR, KAREN POPE, and ANN WITT,** | : |
| | : |
| | : |
| | : |
| *Plaintiffs*, | : **Case No. 2:24-cv-00316-MHW-KAJ** |
| | : |
| v. | : **Judge Michael H. Watson** |
| | : |
| **KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTLEMAN,[1] LIZ WONG, KYLE DONNELLY, and BETH BLACK,** | : **Magistrate Judge Kimberly A. Jolson** |
| | : |
| | : |
| | : |
| | : |
| *Defendants*. | : |

---

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

---

## INTRODUCTION

Plaintiffs' Response to Defendants' Motion to Dismiss puts the central principle governing this litigation (and the Wyoming litigation that preceded it) in stark relief: Plaintiffs want federal courts to tell Kappa Kappa Gamma ("Kappa") how it must operate.  They expand at length on their opinion of how Kappa's Fraternity Council should determine its interpretations of its rules and under what circumstances members should be dismissed for violating Kappa's policies.  Courts, however, do not decide those matters for private voluntary organizations; their leadership and governing documents do.

Kappa's governing documents doom Plaintiffs' core claims.  They provide that Fraternity Council is charged with interpreting the documents and impose no requirement to put those interpretations up for an organization-wide discussion or vote.  Fraternity Council issued and

---

[1] Plaintiffs misspelled Ms. Goettelman's name in their filing.  The correct spelling is Goettelman.

publicized its interpretation of an undefined term in the governing documents.  They provide that all members accused of violating Kappa's policies must be afforded due process before they are dismissed from the organization.  Kappa afforded Plaintiffs Levang and Tuck-Smith exactly the procedure the governing documents required after the two Plaintiffs violated Kappa policies.  In light of those facts, the Court has no role to play in either Kappa's policy of admitting transgender women or the dismissal of Plaintiffs Levang and Tuck-Smith for violating policy.  Moreover, Plaintiffs' derivative claims are also barred by *res judicata* and the statute of limitations.

Plaintiffs' other legal claims are frivolous.  Their free-speech claim is premised on an interpretation of the Ohio Constitution that the Ohio Supreme Court has conclusively rejected, and their defamation per se claim is based on true statements.  The Court has no role in adjudicating this dispute over the governance of a private voluntary organization and should dismiss each of Plaintiffs' claims with prejudice.

### ARGUMENT

### I.    Plaintiffs Fail to State Derivative Claims

As discussed in Defendants' moving papers, Plaintiffs' derivative claims fail for a number of reasons.  First, Plaintiffs cannot re-litigate claims the District Court in Wyoming already decided, even though they style their claims slightly differently.  Second, the claims are barred by the statute of limitations because they concern the Fraternity Council's interpretations of Bylaws that were made nearly a decade ago.  Third, the derivative claims fail on the merits as a matter of law.  Plaintiffs also cannot save these claims by folding claims related to the dismissal of two individual members into derivative claims purportedly brought on behalf of the entire organization.

### A. *Res Judicata* Bars the Derivative Claims

None of Plaintiffs' attempts to distinguish their claims from the claims at issue in the prior Wyoming litigation are availing.[2]  The thrust of Plaintiffs' argument against the application of *res judicata* to the derivative claims is that Plaintiffs have fashioned their claims differently than the Wyoming derivative plaintiffs and have sued different defendants.  Specifically, Plaintiffs note that they sued Kappa's entire Fraternity Council, whereas only Defendant Rooney was sued in the Wyoming matter.  They also inaccurately try to cabin the derivative claims asserted in the Wyoming case to only issues related to the Kappa chapter to which the plaintiffs belonged.

The Wyoming Complaint, however, alleged wrongdoing against the entirety of Fraternity Council relating to their interpretation of the term "woman" and issuance of that interpretation, sought an injunction against Fraternity Council to remove them from their positions, and blamed Fraternity Council's actions for an alleged resulting decline in membership and alumnae giving and harm to Kappa across the country:

> 89.    Plaintiffs bring this action derivatively in the right and for the benefit of Kappa Kappa Gamma to redress the breaches of fiduciary duty and other violations of law by Defendant Mary Pat Rooney and other members of the Fraternity Council.

> 97.    . . . Defendant Rooney and the other members of the Fraternity Council have been actively involved in the development and dissemination of the revised membership policy in flagrant disregard of the Sorority's corporate governance documents.

> 98.    Defendant Rooney, with the other members of the Fraternity Council, served as the Board of Directors for the Sorority during the wrongful behavior alleged

---

[2] As far as cases Defendants have been able to locate, the Wyoming case was only the sixth decision to issue in a shareholder derivative claim under Ohio Revised Code 1702.12(I)(1)(c), the statute that allows members of a non-profit to sue that organization derivatively.  For the other five cases, one was dismissed against the members because they had no standing, and the other four were dismissed for failing to satisfy the procedural prerequisites for a derivative action.  *See Moore v. Christ's Christian Fellowship Church, Inc.*, 875 N.E.2d 121 (Ohio Ct. App. 2007), *Carlson v. Rabkin*, 789 N.E.2d 1122 (Ohio Ct. App. 2003), *Sayyah v. O'Farrell*, No. CA2000-06-017, 2001 Ohio App. LEXIS 1914 (Ohio Ct. App. Apr. 30, 2001), *Howard v. Covenant Apostolic Church*, 705 N.E.2d 385 (Ohio Ct. App. 1997), *Russell v. United Missionary Baptist Church*, 637 N.E.2d 82 (Ohio Ct. App. 1994).

herein, and each director knew of this wrongdoing but failed to act in the face of a known duty to act. For these reasons, Defendant Rooney faces a substantial likelihood of liability for her participation in these acts. The sustained failure of the Fraternity Council to ensure effective corporate governance and ensure compliance with the mission and purpose of the Sorority can only have been a result of a knowing breach or reckless disregard of fiduciary duties.

104.    Although the Guide was disseminated by the Sorority as a resource, Defendant Rooney and the members of the Fraternity Council have treated the Guide as a change to the Sorority's membership rules. Upon information and belief, Defendant Rooney and other members of the Fraternity Council regularly communicate through "GroupMe" to avoid oversight and potential discovery of their discussion of the changes to Kappa's membership requirements. Defendant Rooney's active work to conceal the Fraternity Council's decision-making, when considered in combination with the Sorority's *ultra vires* decision to permit men to become members of the Sorority, demonstrates that the Fraternity Council actions have not been made in good faith and are contrary to the best interests of the Sorority.

158.    Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty . . .

166.    As a result of Defendant's behavior, Kappa Kappa Gamma has lost its identity as an organization for women. . . . Upon information and belief, the insistence on admitting men to the Sorority has also resulted in a significant decline in alumnae giving, membership, and participation. These changes have also harmed the ability of Kappa Kappa Gamma chapters across the nation to recruit new members.

(*See* Declaration of Natalie McLaughlin ("McLaughlin Decl."), Ex. A, Wyom. Pl. Am. Compl. at ¶¶

89, 97, 98, 104, 158, 166.)  In fact, the derivative plaintiffs represented to the Wyoming District

Court in response to the motion to dismiss that the only reason the entirety of Fraternity Council

were not named defendants in the Wyoming Complaint at that stage was because "Plaintiffs named

only one member of the Fraternity Council to reduce the collateral consequences of the lawsuit on

third parties.  The law does not require more, but if there is a concern, Plaintiffs can sue more

Directors.  The Plaintiffs are open to whatever direction is provided."  (McLaughlin Decl., Ex. B, Pl. Resp. to Mot. to Dismiss Wyoming Case, p. 7, fn 2.)

Plaintiffs do not contest that they are in privity with the Wyoming plaintiffs, or that one shareholder can be barred by *res judicata* from raising the same derivative claim another court has rejected from a different shareholder.  As noted previously, "*[r]es judicata* operates as a complete bar to any subsequent action on the same claim or cause of action *between the parties or those in privity with them*."  *Brown v. City of Dayton*, 730 N.E.2d 958, 961 (Ohio 2000) (internal citation omitted) (emphasis in original).

Plaintiffs' attempt to avoid this result here fails because they cannot escape the reality that their derivative claims depend entirely on the Fraternity Council's ability to interpret[3] the term "woman" as it is used in Kappa's governing documents.  That a decision on this issue is ***necessary*** to decide Plaintiffs' derivative claims is enough for the Court to invoke the doctrine of claim preclusion.  *See Grant Fritzsche Enters. v. Fritzsche*, 667 N.E.2d 1004, (Ohio Ct. App. 1995) ("[e]ven where the cause of action is different in a subsequent suit, a judgment in a prior suit may still affect the outcome of the second suit").  Although Plaintiffs' "fraud" and "ultra vires" claims may require additional elements, each claim fails if the Court determines that the Fraternity Council acted within its lawful authority in interpreting the meaning of the term "woman."  If the Fraternity Council acted within its power in interpreting the Bylaws—as the District Court of Wyoming held it did—it was necessarily not acting fraudulently or beyond its power.  Thus, when the Wyoming

---

[3] Plaintiffs' suggestion that the Fraternity Council has "unilaterally redefined" the term "woman" is facially inaccurate given that all parties agree the term has *never* been defined in Kappa's governing documents.

plaintiffs lost on their derivative claim premised on the Fraternity Council's authority to interpret the term "woman," the current Plaintiffs became precluded from making the same argument.[4]

Plaintiffs' other tactic to avoid the results of the case they supported in Wyoming is to suggest that the Wyoming case was cabined to the events of the chapter at issue there. (*See* Resp. to Mot. to Dismiss, ECF No. 26, PageID 340 ("the causes of action in the Wyoming Lawsuit relate specifically to the effect of Fraternity Council's actions on the membership in the Gamma Omicron Chapter in Wyoming").) This argument ignores both the Wyoming District Court's opinion dismissing the case and the relief sought in the Wyoming complaint. In responding to the motion to dismiss, the Wyoming derivative plaintiffs asked the court "to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules by fiat." (Ex. B, Pl. Resp. to Mot. to Dismiss Wyoming Case, p. 16.) Plaintiffs here advance the same argument that Fraternity Council cannot interpret Kappa's Bylaws to allow for the admission of transgender women without an amendment to the Bylaws. (Resp. to Mot. to Dismiss, ECF No. 26, PageID 335–36.)

Both this case and the Wyoming case, at their core, concern the Fraternity Council's authority to interpret Kappa's Bylaws. In an organization the size of Kappa, it is not unusual that some members may disagree with the decisions of leadership in matters of organizational governance. Adopting Plaintiffs' argument to allow these derivative claims to proceed in this case would expose organizations to unending derivative litigation. By altering the claims or suing only one officer at a time, a group of members of any organization could travel the country in search of a court that would allow them to proceed on derivative claims related to organizational decisions.

---

[4] Defendants' *res judicata* arguments apply to the derivative claims insofar as those claims concern Fraternity Council's interpretation of the term woman and subsequent admission of members based on that interpretation. Defendants agree that the removal of members for policy violations was not litigated in the Wyoming case. Plaintiffs' attempt to assert derivative claims based on the removal of Plaintiffs Levang and Tuck-Smith as members instead fails because removal of individual members is not a basis for derivative claims on behalf of the entire organization. *See* p.14 *infra*.

Allowing derivative plaintiffs to bring successive duplicative suits across multiple jurisdictions so long as they tweak the precise slant of their arguments or sue different combinations of organizational leaders each time would bury organizations in litigation by effectively removing the protections of the *res judicata* doctrine.

> **B.**    **The Statute of Limitations Bars the Derivative Claims**

The allegations in the Complaint enable the Court to reach the statute-of-limitations issue for Plaintiffs' derivative claims at this stage in the proceedings.  Plaintiffs cite the Northern District of Ohio's decision in *Timken Co. v. Robert Bosch, LLC* for the proposition that "[g]enerally, a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is an inappropriate vehicle for dismissing a claim based on the statute of limitations."  (Resp. to Mot. to Dismiss, ECF No. 26, PageID 343 (quoting *Timken Co. v. Robert Bosch, LLC*, No. 5-22-CV-00530-AMK, 2023 U.S. Dist. LEXIS 99486, at *7 (N.D. Ohio Jun. 7, 2023)).)  The Court will observe, however, that Plaintiffs left off *Timken*'s crucial modification of that general principle, offered in the very next sentence: "[h]owever, dismissal may be warranted if 'the allegations in the complaint affirmatively show the claim is time-barred.'"  *Timken*, 2023 U.S. Dist. LEXIS 99486, at *7 (quoting *Cataldo v. US Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)).  Thus, given that Plaintiffs affirmatively allege that their claims are based on interpretations the Fraternity Council offered in 2015 and 2018, the Court can reach the statute-of-limitations issue.

For the breach-of-fiduciary-duty claim, the question before the Court is when Plaintiffs' interests were impaired by the alleged breach.  *See Clemens v. Nelson Fin. Grp., Inc.*, No. 2015-Ohio-1232, 2015 Ohio App. LEXIS 1216, at *25 (Ohio Ct. App. Mar. 31, 2015).  Plaintiffs argue that their interests were not impaired, at the earliest, until Kappa admitted a transgender woman in 2021.  The focus of Plaintiffs' Complaint, however, is that the Fraternity Council acted to "redefine" the term "woman" in Kappa's Bylaws.  This happened, per Plaintiffs' own allegations,

when the Council issued a statement on its interpretation of the term in 2015 and again in 2018.[5]  If issuing this statement was an improper rewriting of the Bylaws—which, as discussed throughout, it is not—that rewriting first occurred in 2015 and then again in 2018.  Either date is well outside the four-year statute of limitations.  The Court should not permit Plaintiffs to expand the statute of limitations every time the Fraternity Council acts consistently with the interpretation it announced nine years previously.

Plaintiffs also fail to establish that they are within the statute of limitations with regard to their fraud claim.  Plaintiffs' fraud claim is undermined by a logical fallacy.  It is premised on Fraternity Council allegedly misleading Kappa's membership on how it interpreted Kappa's Bylaws.  But the factual allegations in the Complaint are that the Fraternity Council publicly announced its interpretation several times.  (*See* Compl., ECF No. 1, ¶¶ 50, 52, 56.)   Those announcements put Plaintiffs on notice of the interpretation and started the clock on the statute of limitations.  "A cause of action for fraud . . . accrues either when the fraud is discovered, or [when] *in the exercise of reasonable diligence, the fraud should have been discovered*."  *Cundall v. US Bank*, 909 N.E.2d 1244, 1250 (Ohio 2009) (citations omitted) (emphasis added).  The purported fraud—interpreting Kappa's Bylaws to allow for the admission of transgender women—should have been discovered when the Fraternity Council publicly announced its exact interpretation in 2015.  The statute of limitations bars Plaintiffs' derivative claims.

---

[5] On the 2015 statement, Plaintiffs' Response to the Motion to Dismiss contradicts their own Complaint.  In the Response, they say it is "questionable" whether Fraternity Council actually released a statement on this issue in 2015 and that "Defendants incorrectly claim they informed the membership of their intentions through the 2015 position statement."  Plaintiffs' Complaint, however, affirmatively alleges that the Fraternity Council issued a position statement that stated the view that "women" in Kappa's Bylaws includes "individuals who identify as women."  (Compl., ¶ 50.)  The Court should consider the allegations in the Complaint above Plaintiffs' attempted repudiation of their allegation in briefing upon realizing its implications.

### C.    Ohio Law Precludes the Derivative Claims on the Merits

Not only are Plaintiffs' derivative claims barred by *res judicata* and the statute of limitations, but they also fail to allege sufficient facts to state a claim for relief that is plausible on the merits.  Per Kappa's governing documents, the Fraternity Council members are elected to govern the organization and the Council is charged with the duty of interpreting Kappa's Bylaws and other governing documents.  (Standing Rule 5.1, Duties of Fraternity Council.)  There is no obligation in the governing documents to discuss these interpretations or have Kappa's membership vote on them.  In an organization of Kappa's size, doing so would be impractical and paralyzing.  Nor do the governing documents impose upon the the Fraternity Council an obligation to share its interpretations in any specific manner.  Plaintiffs' vague assertion that Fraternity Council should have been more "transparent" in how it interpreted the Bylaws is belied both by the fact that Plaintiffs cannot point to any obligation to hold a discussion about this interpretation, vote upon this interpretation, or share this interpretation in some particular format.  And even if they could, Plaintiffs concede that the Fraternity Council repeatedly and publicly announced its exact interpretation of the term "woman" to Kappa's members.

The derivative Plaintiffs' response demonstrates that, like the derivative plaintiffs in the Wyoming case, they cannot overcome the deference Ohio law affords voluntary organizations in conducting their own affairs.  Plaintiffs also cannot demonstrate facts in their Complaint that support an actionable derivative claim for fraud or a basis to pursue a derivative claim on behalf of the entire membership based on the dismissal of two members who violated Kappa policy.  That Plaintiffs believe a different interpretation would be preferable or better serve Kappa's long-term interests does not provide a basis for the Court to step in and dictate to a voluntary organization how it must conduct its affairs.

      i.   <u>Principles of Deference Under Ohio Law Preclude Plaintiffs' Breach of Fiduciary Duty Claim</u>

To save their claim for breach of fiduciary duty, Plaintiffs invent a duty of the Fraternity Council to "provide notice and transparency to members." (Resp. to Mot. to Dismiss, ECF No. 26, PageID 345.) What Plaintiffs believe this duty entails is not entirely clear. But, more importantly, it is not actually found in Ohio law or Kappa's governing documents. The provisions of Ohio law that Plaintiffs cite in explaining Fraternity Council's duties actually provide that Fraternity Council (1) "[does] all things permitted by law and exercise[s] all authority within the purposes stated in its articles or incidental to those purposes"; and (2) "shall perform [its] duties . . . in good faith, in a manner [it] reasonably believes to be in or not opposed to the best interests of the corporation and with the care that an ordinarily prudent person in a like position would use under similar circumstances." *See* Ohio Rev. Code §§ 1702.12(F)(9) and 1702.30(B).

In Defendants' Motion to Dismiss, Defendants set out the well-established standard of judicial deference that Ohio law affords to voluntary organizations in interpreting their own governing documents. A voluntary organization may make and interpret its own bylaws without interference from the courts, and "its right to interpret and administer the same is as sacred as the right to make them." *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1179 (Ohio Ct. App. 1989). Indeed,

> courts will not assume to act in place of those authorized to interpret the constitution and by-laws of a voluntary association unless those upon whom the duty is placed acted in an ***arbitrary and unreasonable*** manner. This is also true with respect to the determination of all questions of policy and internal management.

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union*, No. 377, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166, at *17 (Ohio App. 1988) (emphasis added) (finding that the union's construction of its own governing documents was reasonable and deferring to this interpretation) (citing *Finlay v. Duffy*, 94 N.E.2d 466, 469 (Ohio Ct. App. 1950)). The term "arbitrary" has been defined as

10

"without adequate determining principle . . . not governed by any fixed rules or standard." *Ulliman v. Ohio High Sch. Ath. Ass'n*, 919 N.E.2d 763, 773 (Ohio Ct. App. 2009) (quoting *City fo Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095, 1097 (Ohio 1981)).

Plaintiffs' suggestion that the requirement of judicial deference for voluntary organizations would not apply because Kappa has "NOT" agreed on rules as to how it conducts its business (Resp. to Mot. to Dismiss, ECF No. 26, PageID 345) is, of course, demonstrably false. Plaintiffs appended Kappa's Bylaws and Standing Rules to their Complaint. Among other provisions, those governing documents vest the Fraternity Council with the duty of "Interpreting the Fraternity Bylaws and Standing Rules." (Standing Rule 5.1, Duties of Fraternity Council.) Plaintiffs do not contest that "women" is not defined in the Bylaws. And Fraternity Council is given the duty under the Standing Rules to interpret the Bylaws and is entitled to judicial deference under Ohio law in their interpretation unless Plaintiffs show the interpretation is arbitrary and unreasonable. Though Plaintiffs disagree with that interpretation, interpreting the term "women" to include transgender women is not arbitrary and unreasonable when so many other sources have recognized this interpretation. (*See* Mot. to Dismiss, ECF No. 23, PageID 314–15.)

Furthermore, to the extent the breach-of-fiduciary-duty claim is premised on "special treatment" allegedly afforded to transgender members of Kappa, there is also a presumption that all members of Fraternity Council acted in good faith and in the best interest of the organization. *See Brosz v. Fishman*, 99 F. Supp. 3d 776, 785 (S.D. Ohio 2015) (citing *Drage v. Proctor & Gamble*, 694 N.E.2d 479, 482 (Ohio Ct. App. 1997)). This is because Plaintiffs, who attached Kappa's governing documents to their Complaint, have not identified anything in the governing documents that precludes admitting the transgender woman as an alumnae member or initiating the transgender woman who joined Kappa's chapter at the University of Wyoming. As recognized by the District Court in Wyoming, because nothing in Kappa's Bylaws prohibits membership of transgender

women, were a federal court to force a private voluntary organization to exclude transgender women from its membership, it would fundamentally alter Kappa's expressive message in violation of the First Amendment. *Westenbroek v. Kappa Kappa Gamma Fraternity*, No, 23-CV-51-ABJ, 2023 U.S. Dist. LEXIS 152458, at *29–*36 (Aug. 25, 2023). Moreover, Plaintiffs do not identify anything that was violated by allowing the transgender alumna member to hold a leadership position. Plaintiffs do not cite any authority for the proposition that it is the business of the federal courts to adjudicate who should be able to join a voluntary organization or ascend to leadership positions in a voluntary organization.

The Court's analysis therefore returns to the question of whether the body charged with interpreting the Bylaws was permitted to interpret the meaning of an undefined term—"woman"—contained therein. Plaintiffs do not address the cases that limit courts' ability to step in as the arbiter of internal disputes within an organization as to how a bylaw is best interpreted. *See Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S. Dist. LEXIS 822, at *14 (S.D. Ohio Jan. 6, 2010) (internal citation omitted) (courts do not step in absent "some palpable violation of the constitution or laws of the corporation"). Plaintiffs also do not substantively respond to the various sources Defendants cited demonstrating that interpreting the term "women" to include transgender women is reasonable, only offering the conclusory assertion (in a footnote) that "Plaintiffs and other women know exactly what the term 'woman' means." (Resp. to Mot. to Dismiss, ECF No. 26, PageID 346.)

Plaintiffs instead argue that interpreting an undefined term in the Bylaws was tantamount to rewriting the Bylaws and that Fraternity Council's interpretation is invalid because it did not put the interpretation to a vote of all Kappa's members. Plaintiffs do not cite any provision of Kappa's Bylaws that requires such a vote or that sets standards for the "critical" disclosure and transparency that Fraternity Council did not meet. And, once again, per Plaintiffs' own allegations, Fraternity

Council shared its interpretation in 2015, 2018, and 2022.  Finally, Defendants Kappa and Rooney did not argue in the Wyoming litigation that the 2022 FAQ document was intended to rewrite the Bylaws, as Plaintiffs suggest.  Rather, they noted, in response to an argument made by the derivative plaintiffs on appeal that the court should strictly interpret Kappa's Bylaws under a supposed 1870s understanding of language, that the Bylaws currently in effect were ratified in 2022 and, in 2022, the term "woman" has a different meaning than what the plaintiffs had contended it had in 1870.  (McLaughlin Decl., Ex. C, 10th Cir. Appellees Br., pp. 33–36.)  Neither Kappa nor its Fraternity Council has ever argued that the Bylaws needed to be or were intended to be amended for Kappa to adopt an inclusive interpretation of the terms of the governing documents.

Plaintiffs do not seriously contest any of the core arguments offered by Defendants as to why the breach-of-fiduciary-duty claim fails on the merits.  Instead, they invent new duties for the Fraternity Council that are not found anywhere in Kappa's governing documents or Ohio law.  In the end, their argument boils down to the contention that they believe Kappa allowing for admission of transgender women is bad for Kappa, but that sort of policy decision in an internal organization is not in the purview of the federal courts.  The Court should dismiss the claim.

ii.    Plaintiffs Fail to Allege Facts that Would Support a Derivative Fraud Claim

Plaintiffs fail to respond to the basic argument that, in order to assert a claim of fraud for failure to disclose information, they were required to establish an affirmative obligation to disclose the information in question.  *See Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 854 (Ohio Ct. App. 2000) ("a duty to disclose is a requirement if concealment of fact is alleged as a basis for fraud").[6]  Instead, Plaintiffs make generalized accusations about dishonesty, bad faith, and concealing of Fraternity Council's view.

---

[6] Plaintiffs' passing reference to the "duty of disclosure" cited in *Zalvin v. Ayers*, 157 N.E.3d 256, 265 (Ohio Ct. App. 2020), has no relevance to this claim.  The duty to disclose referenced in that case arises "when a corporation seeks shareholder approval of fundamental corporate changes, such

At the risk of sounding repetitive, these arguments once again fail to respond to the undisputed fact that Fraternity Council has repeatedly publicized its interpretation of the term "woman" for nearly a decade.  If publicizing the interpretation at least three times (as the Complaint alleges Fraternity Council did) was not enough to avoid an allegation of unlawfully failing to disclose it, Plaintiffs do not explain how many announcements of the interpretation would suffice under the law.  Their allegation that they were "duped" into donating money to a non-party organization "without any indication that Fraternity Council determined that" the meaning of "women" included transgender women is flatly wrong.  Fraternity Council made several direct statements of its interpretation of the term, and Plaintiffs' ignorance of that fact cannot form a basis for a claim of fraud.  Even less so when the claim is premised on a failure to disclose information, and Plaintiffs cannot point to any affirmative duty to disclose or any dishonest statement by Fraternity Council.

          iii.    <u>Plaintiffs Cannot Assert Derivative Claims Based on the Dismissal of Two Members</u>

Plaintiffs' final substantive derivative claim—asserted on behalf of all Kappa members—is that Fraternity Council acted improperly in dismissing Plaintiffs Levang and Tuck-Smith.  This is based on an ambiguous contention that other members might be chilled in challenging what they see as improper conduct because these two women were dismissed.  As cited previously, claims related to a particular person's exclusion from membership are direct claims, not derivative ones.  *See Carlson v. Rabkin*, 789 N.E.2d 1122, 1128 (Ohio Ct. App. 2003).  Plaintiffs do not allege a concrete injury to the organization beyond what they speculate other members may glean from these dismissals.  The removal of Plaintiffs Levang and Tuck-Smith from Kappa's membership, to the extent actionable at all, is a matter to be decided in their individual claims, not on behalf of the

---

as a merger."  *Zalvin*, 157 N.E.3d at 265.  This principle of securities law has no bearing on Plaintiffs' claims for a private voluntary organization's interpretation of Bylaws.

entire organization.  Any other result would expose any number of ordinary governing actions by an organization's directors to derivative litigation based on speculation about what others may infer from the action.

II.    **Plaintiffs Levang and Tuck-Smith Fail to State Claims Related to Their Dismissal from Kappa**

  A.  **Levang and Tuck-Smith Have No Claim for Improper Dismissal Because Kappa Afforded Them Due Process and Plaintiffs Did Not Deny the Underlying Allegations of Misconduct**

  Plaintiffs do not dispute that Kappa has an established policy for dismissing its members, or that Kappa followed that process in dismissing Levang and Tuck-Smith.  And, as was the case when Levang and Tuck-Smith first responded to the allegations against them, Plaintiffs do not dispute the underlying conduct.  Specifically, they do not deny that Levang and Tuck-Smith used member contact information to solicit funds and raise awareness of a lawsuit that was not only brought against Fraternity Council members who were allegedly acting unlawfully but also against Kappa itself, along with one of Kappa's collegiate members.  They do not deny that they sent communications about a Kappa member suggesting she was predatory and unsafe.  In fact, they state that they had a "right to discriminate" against the student in question.  At this point, there are no facts left to dispute.  These former members admit to conduct that violates policies and were afforded the due process to which they were entitled.

  Plaintiffs' contention that Levang and Tuck-Smith's dismissals were bad-faith attempts to silence dissent falls flat in light of the surrounding context.  Plaintiffs cannot explain why Kappa removed only the two of them who dissented from Kappa's position.  Indeed, Plaintiffs make no suggestion that Kappa has tried to remove the other Plaintiffs in this case or any of the plaintiffs in the Wyoming case.  If Kappa was trying to root out dissent instead of policy violations, would it not have started with members who had sued Kappa in federal court?

Moreover, the dismissal was not "swift and severe," as Plaintiffs suggest.  The documents they attached to the Complaint demonstrate that Levang and Tuck-Smith were warned about their behavior and nonetheless persisted in it.  When confronted with allegations that other members had complained, Levang and Tuck-Smith each responded defiantly, taking the opportunity to complain about Kappa's inclusive policy instead of responding to the merits of the allegations.  They had every opportunity to respond to the allegations or correct their behavior and chose not to do so.  Under Plaintiffs' theory, they should have been granted carte blanche to violate Kappa's policies in the name of expressing opposing viewpoints simply because they took a view opposing Fraternity Council's actions.  There is no case law supporting this novel idea that if a member disagrees with a board's actions, she can violate the organization's policies, but be protected from punishment by claiming she was challenging the propriety of the board's actions.  To grant a member this protection would paralyze a board from holding its members accountable for policy violations and open the floodgates to frivolous litigation.  The Court should dismiss their claim for improper termination of membership.

### B.    Levang and Tuck-Smith Have No Contractual or Quasi-Contractual Right to Kappa Membership

Plaintiffs' arguments on the contractual and quasi-contractual claims related to Levang and Tuck-Smith's dismissals largely track the allegations in the Complaint.  They do not respond to Ohio law that provides that an organization does not breach its contract with its members in its Bylaws when it follows its own procedures for disciplining a member.  *See Williams v. NAACP*, 135 N.E.3d 1260, 1267 (Ohio Ct. App. 2019).  Instead, Plaintiffs expound on Levang and Tuck-Smith's purported contributions to Kappa.  But there is no proposition of law that says an organization cannot enforce its disciplinary processes against longtime members or members who previously held leadership positions.  Without a response to the law that allowed Kappa to effectuate these

dismissals pursuant to the policies in its governing documents, the Court should dismiss the breach-of-contract claim.

Defendants acknowledge that, in some cases, allowing a plaintiff to plead a promissory estoppel claim as an alternative to a breach-of-contract claim may be proper. But here, the promissory estoppel claim is premised on the same promises as are contained in the contract that forms the basis for the breach-of-contract claim. Plaintiffs do not allege that some other promise of lifetime membership was made to Levang and Tuck-Smith aside from what was contained in the documents at issue in the breach of contract claim. The Bylaws explicitly state that members can be dismissed for policy violations. (Bylaws, ECF No. 1-2, PageID 60.) Promissory estoppel claims must be dismissed if they contradict an unambiguous written contract. *Prime Invs., LLC v. Altimate Care, LLC*, No. 2022-Ohio-1181, 2022 Ohio App. LEXIS 1071, at *19 (Ohio Ct. App. 2002). Therefore, the Court should dismiss this claim as well.

### C.    Levang and Tuck-Smith's Defamation-Per-Se Claim Is Frivolous

Levang and Tuck-Smith's defamation-per-se claim is premised on the claim that Kappa would have, pursuant to its policies, communicated that the two women had been dismissed for violation of Kappa policies. This communication, which Plaintiffs assume occurred, would have been 100% true. Levang and Tuck-Smith *were* dismissed for violating Kappa policy. The Court knows this to be true because they challenge that dismissal in this case. There is no dispute that the two women were dismissed or that the stated basis for dismissal was the violation of Kappa policy. And those are the facts that would have been included in the statement allegedly made. This Court is not required to accept conclusory allegations as true at the motion to dismiss stage, only factual ones. And there is clearly no false statement alleged for the defamation-per-se claim.

Furthermore, it is worth noting that this statement that Plaintiffs assume occurred would have been a communication made pursuant to an obligation under the governing documents, and

therefore would be privileged against a defamation claim. "A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. *The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only*." *Hahn v. Kotten*, 331 N.E.2d 713, 718–19 (Ohio 1975) (emphasis in original). "The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty." *Id.* at 719–20 (citations omitted). Whether or not a publication was privileged is a question of law to be decided by the Court. *McCartney v. Oblates of St. Francis deSales*, 609 N.E.2d 216, 223 (Ohio Ct. App. 1992) (citations omitted). The privilege applies when someone makes a statement under a duty to inform others about a decision. *Hahn*, 331 N.E.2d at 722 (applying privilege to statement made pursuant to a duty to inform).

Here, Levang and Tuck-Smith allege that the statement in question they think was made would have been a communication about the termination of their membership. In addition to being true, this statement would be privileged against a defamation claim.

## D.    Levang and Tuck-Smith's Free-Speech Claim Is Even More Frivolous

The last substantive claim in the Complaint is Levang and Tuck-Smith's claim for violation of their free speech rights. If there were any doubt that the claim was frivolous, that doubt was resolved when the only arguments Plaintiffs could offer in support were (1) the Court should not follow binding precedent of the Ohio Supreme Court on questions of Ohio law; or (2) the Court should certify a question to the Ohio Supreme Court that it has already conclusively decided. Ohio

law on this point is clear and there is no basis for allowing Plaintiffs to proceed with this free-speech claim.

Plaintiffs' response for their free-speech claim amounts to an extensive discussion as to why the Ohio Supreme Court's decision in *Eastwood Mall v. Slanco*, 626 N.E.2d 59, 61 (Ohio 1994), was wrong. Plaintiffs make textual arguments, point to decisions on similar issues from other cases and Ohio courts before *Eastwood Mall*, and even discuss Alexis de Tocqueville. The thesis of all this is that the Ohio Constitution should protect their speech to the point of allowing them to sue a private organization when that organization takes action based on offensive speech that violates the organization's policies. The arguments reflect a recent trend of people misunderstanding the right to free speech to encompass a right to quash criticism of or avoid consequences from speech, and none of it is particularly compelling. But even if it were, it would not matter, because, as for the Ohio Constitution, the question is resolved.

*Eastwood Mall*'s holding is unambiguous: "while Section 11 [of Article I of the Ohio Constitution] has an additional clause not found in the First Amendment, the plain language of this section, when read in its entirety, bans only the passing of a law that would restrain or abridge the liberty of speech," and its protections are "no broader than the First Amendment." *Eastwood Mall*, 626 N.E.2d at 61. "The Ohio Supreme Court's determinations on questions of Ohio law are of course binding on this Court." *Stolz v. J & B Steel Erectors, Inc.*, 439 F. Supp. 3d 980, 985 (S.D. Ohio 2020). It is therefore unclear how Plaintiffs arrive at the conclusion that the Court need not overrule *Eastwood Mall* to allow a free-speech claim to proceed without state action. No federal court has authority to depart from this holding, and allowing Plaintiffs' free-speech claim to proceed would be an outright rejection of the precedent.

Plaintiffs' suggestion that the Court could instead certify the question to the Ohio Supreme Court in hopes that it will suddenly reverse *Eastwood Mall* is also unavailing. The Ohio Supreme

Court accepts certification of questions of Ohio law from federal courts under limited circumstances.  Specifically, "[t]he Supreme Court may answer a question of law certified to it by a court of the United States.  This rule is invoked if the certifying court, in a proceeding before it, issues a certification order finding there is a question of Ohio law that may be determinative of the proceeding *and for which there is no controlling precedent in the decisions of this Supreme Court*."  *Tri County Wholesale Distribs. v. Labatt USA Operating Co., LLC*, No. 2:13-CV-317, 2014 U.S. Dist. LEXIS 904, at *5 (S.D. Ohio Jan. 6, 2014) (quoting Ohio S. Ct. Prac. R. 9.1(A)) (emphasis added).  Here, there is controlling precedent, so certification is inappropriate.  The process exists for federal courts to hear from state supreme courts when a question of state law reaches the federal court before the state court has an opportunity to resolve it, not for federal courts to suggest to the state supreme court that it may have been wrong in a prior decision.

The free-speech claim has zero basis in law.  The Court should dismiss it.

## CONCLUSION

For these reasons and those argued in the initial briefing, Defendants respectfully request that the Court grant the Motion to Dismiss in its entirety.

Respectfully submitted,

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin (0082203)
Trial Attorney
Brian W. Dressel (0097163)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-5452
nmmclaughlin@vorys.com
bwdressel@vorys.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the U.S. District Court, Southern District of Ohio, on May 6, 2024, and served upon all parties of record via the Court's electronic filing system.

/s/ *Brian W. Dressel*
Brian W. Dressel

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATSY LEVANG, CHERYL TUCK-SMITH, SUSAN JENNINGS, MARGO KNORR, KAREN POPE, and ANN WITT,** | : | |
| | : | |
| | : | |
| | : | |
| *Plaintiffs*, | : | **Case No. 2:24-cv-00316-MHW-KAJ** |
| | : | |
| v. | : | **Judge Michael H. Watson** |
| | : | |
| **KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTLEMAN,[1] LIZ WONG, KYLE DONNELLY, and BETH BLACK,** | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| *Defendants*. | : | |

---

**DECLARATION OF NATALIE M. McLAUGHLIN**

---

Declarant Natalie M. McLaughlin, having personal knowledge of the facts stated herein, and being of legal age and of sound mind and memory, does hereby declare as follows:

1.       I am a partner with Vorys, Sater, Seymour and Pease LLP, and I serve as counsel for Defendants in the above-captioned matter.  I have personal knowledge of all the matters addressed in this Declaration.

2.       I am also counsel to the Defendants in the matter *Westenbroek, et al. v. Kappa Kappa Gamma Fraternity, et al.*, Case No. 23-CV-51 in the United States District Court for the District of Wyoming (the "Wyoming District Court Case"), which was dismissed by that court on August 25, 2023.  That case is now pending in the United States Court of Appeals for the Tenth Circuit at Case No. 23-8065 (the "Tenth Circuit Appeal"), in which case I am also counsel.

---

[1] Plaintiffs misspelled Ms. Goettelman's name in their filing.  The correct spelling is Goettelman.

3.    The exhibits to this Declaration are all true and accurate copies of pleadings filed with the court indicated in those cases.  Specifically:

      A.  Exhibit A is the Amended Complaint in the Wyoming District Court Case, filed on April 20, 2023;

      B.  Exhibit B is the Plaintiffs' Response to Defendants' Motion to Dismiss in the Wyoming District Court Case, filed on July 5, 2023; and

      C.  Exhibit C is the Appellees' Brief filed in the  Tenth Circuit Appeal on January 3, 2024.

I declare under the penalties of perjury that the foregoing is true and correct.

Executed on May 6, 2024.

                           */s/ Natalie M. McLaughlin*
                           Natalie M. McLaughlin (0082203)

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| JAYLYN WESTENBROEK, HANNAH HOLTMEIER, ALLISON COGHAN, GRACE CHOATE, MADELINE RAMAR, and MEGAN KOSAR, on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| KAPPA KAPPA GAMMA FRATERNITY, an Ohio non-profit corporation, as a Nominal Defendant and as a Direct Defendant; MARY PAT ROONEY, President of the Fraternity Council of KAPPA KAPPA GAMMA FRATERNITY, in her official capacity, KAPPA KAPPA GAMMA BUILDING CO., a Wyoming non-profit corporation, and ARTEMIS LANGFORD, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**DEMAND FOR JURY TRIAL**

**FIRST AMENDED VERIFIED MEMBER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES**

CASE NO. 2:23-cv-00051-ABJ

## FIRST AMENDED VERIFIED COMPLAINT

## INTRODUCTION

1.      Plaintiffs are young women and members of Kappa Kappa Gamma Fraternity, a national

women-only social organization with a chapter at the University of Wyoming (also called "the

Sorority" ).[1] Four months ago—after national Sorority officials disregarded the secret voting

---

[1] Founded in 1870, Kappa Kappa Gamma Fraternity pre-dates, by 30 years, use of the word "sorority" to refer to "[a] women's society in a college or university." *Sorority*, Oxford English Dictionary Online (Mar. 2023). Kappa Kappa Gamma's corporate documents refer to the entity as a fraternity. Modern usage distinguishes between "fraternities" for men and "sororities" for women, so this Complaint refers to Kappa Kappa Gamma as "the Sorority" and similar organizations as "sororities." This is consistent with Kappa Kappa Gamma's own publications.

process required by Sorority rules and after extensive behind-the-scenes direction from national Sorority officials and alumnae advisers—the Sorority inducted a man, Artemis Langford, as a member.[2]

**2.**     Kappa Kappa Gamma limits membership to women only. Under the Sorority's Bylaws, every new member must be "a woman." Attachment 1 at 2 (art. III, sec. 1.A). A woman is an adult human female. An adult human *male* is not a woman, no matter how he chooses to describe himself. From conception, every single cell in a man's body differs from the analogous cell in a woman: brain cells, muscle cells, bone cells. These cells mature and develop in different ways—before, during, and after puberty—for reasons that are still not fully understood. As but one example, medical researchers know testosterone affects the male brain through the mid-20s, but they still do not understand how the hormone affects cognition.

**3.**     Kappa Kappa Gamma was founded in 1870 as a single-sex organization for women, and it has consistently described itself as such. Defendants have not altered this membership requirement in *any* of the Sorority's corporate governance documents—its Articles of Incorporation, Bylaws, Standing Rules or Policies—in a manner that would permit a man to join Kappa Kappa Gamma. Instead, Defendant Mary Pat Rooney and other members of the Corporation's Fraternity Council (the Sorority's name for its Board of Directors) have unilaterally concluded a man can become a

---

*See*, *e.g.*, "Why Kappa: Membership Expectations" *available at* kappakappagamma.org/why-kappa/ membership-expectations (visited Feb. 2, 2023) ("Joining a sorority can provide you with support, connection, friendship, and growth that starts now and lasts a lifetime.")

[2] Plaintiffs do not seek damages or other relief from Langford. Plaintiffs allege that Langford's sorority membership is void, however, and this likely makes him a required party. Fed. R. Civ. P. 19(a)(1)(B). Langford is a Defendant for this reason only.

Kappa member if he claims to have the subjective belief he is a woman. This conclusion disregards biology, Kappa's 150-year history, and Kappa's purpose, mission, and bylaws.

4.      Kappa Kappa Gamma is an Ohio non-profit corporation, so Defendant Mary Pat Rooney and the other members of the Sorority's Fraternity Council (its Board of Directors) have fiduciary duties to the Sorority under Ohio law. At all times relevant to this matter, Defendant Rooney has owed Kappa Kappa Gamma and its members the fiduciary obligations of good faith, loyalty, candor, care, and compliance. She has a fiduciary duty to operate Kappa Kappa Gamma in an honest, fair, and just manner that is faithful to the nonprofit corporation's purpose and mission.

5.      Defendant Rooney and the members of Kappa Kappa Gamma's Fraternity Council have violated their fiduciary duties. At their direction, the Sorority issued a "Guide for Supporting our LGBTQIA+ Members" in 2018. Attachment 2 (the "Guide"). The Guide was sent to the Sorority's District Directors and Alumnae Advisers—women who supervise the Sorority's college chapters—and posted on the Sorority's website as "a resource that educates and supports our membership on the subject of the LGBTQIA+ community and its intersection with Kappa." The Guide states, without citation to any of the Sorority's Bylaws or other governing documents, that Kappa Kappa Gamma is a "single gender organization" that admits both "women" and "individuals who identify as women" (*i.e.*, men). *Id.* at 1.

6.      The commonly understood meaning of the phrase "single-gender organization" is the same as "single-sex organization": men or women, but not both. *See* Gender, Oxford English Dictionary Online (Mar. 2023) ("Males or females viewed as a group; = sex"). Under the Guide, however, "gender" is no longer a synonym for "sex." Instead, as the Sorority's attorney explained to Plaintiffs, the Fraternity Council views gender as a "broader construct encompassing identity."

Attachment 3 at 1. This concept of gender connects to "[h]ow an individual defines themselves in terms of characteristics traditionally identified in this culture as male or female," which is a person's "gender identity." Attachment 2 at 1, 9. As a result, the Sorority's attorney claims that men can also become Kappa members if they "identify as women." *Id.* at 1.

**7.**     Kappa cannot be a "single-gender organization" wherein members have a "single" gender identity unless the Sorority uses gender identity to make membership decisions.[3] But the Guide itself states that the Sorority does not discriminate based on gender identity. *Id.* at 1 ("Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on … gender identity…."). *Id.* What the Guide actually purports to do is change the Sorority's membership criteria. Under the Guide, all women—including, for example, nonbinary women who do not have a female gender identity—can become members. And, under the Guide, some men can also join.

**8.**     The Guide is an unlawful abandonment of the Sorority's requirement of single-sex membership. Kappa Kappa Gamma's founding principles and governance documents limit membership to women. An adult human male does not become a woman just because he tells others that he has a female 'gender identity' and behaves in what he believes to be a stereotypically female manner. In the same way, an adult human female does not cease to be a woman just because she refuses to dress or behave in a feminine manner. Defendant Rooney and the Fraternity Council members cannot, consistent with their fiduciary duties, twist the Sorority's longstanding

---

[3] The Guide describes the concept of "gender" as "more accurately viewed as a spectrum rather than a polarized, dichotomous concept." Attachment 2 at 11. If each person's gender lies somewhere along a spectrum, then one can never sort individuals into a "single gender." It is impossible for Kappa Kappa Gamma to be a "single-gender organization" under the Guide's own definition of gender.

membership requirement to conflate being female (being a woman) with femininity (acting like one believes a woman 'should').

9.  The Guide purports to create an opportunity for men to join Kappa Kappa Gamma in violation of the Sorority's longstanding restriction. By creating the Guide, and intentionally admitting a man as a Sorority member, Defendant Rooney and the other Fraternity Council members have violated their duty of loyalty, their duty of care, and their duty of obedience/compliance to the Sorority and its purpose and mission.

10. Since 1870—when a woman's presence in a college classroom, by itself, defied societal norms—Kappa Kappa Gamma has united women in defiance of stereotypes about how women "should" be. The Sorority provides a separate place where young women can speak for themselves; a place where young women do not have to constantly fight the social pressure of how men think women should behave. Now, Langford—a man who claims to be a woman because he thinks he knows how women should behave—has been brought into Plaintiffs' sorority house. The Fraternity Council has betrayed the central purpose and mission of Kappa Kappa Gamma, by conflating the experience of *being a woman* with the experience of men *engaging in behavior generally associated with women*.

11. Plaintiffs' Complaint is a derivative suit to obtain a judgment that Kappa Kappa Gamma remains as required by its Articles of Incorporation: a non-profit corporation "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4 (emphasis added). Plaintiffs ask this Court to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules

by fiat, and ask this Court to enjoin the unlawful implementation of the Guide. Plaintiffs ask this Court to hold that the admission of Artemis Langford, and any other man, as a member of Kappa Kappa Gamma is void *ab initio*. Plaintiffs further ask this Court to declare that Defendant Rooney and the other members of the Fraternity Council have violated their fiduciary duties to the Sorority. Plaintiffs further ask for damages, reflecting the injuries the Sorority has and will continue to suffer in its membership, including the closure of the Sorority's chapter at the University of Wyoming, loss of donations, decrease in *alumnae* support and participation, and permanent damage to the Sorority's reputation and mission.

12.     Plaintiffs also seek direct relief from the Defendants. Ohio law recognizes that faithless directors of a corporation can directly injure others through a breach of fiduciary duty in addition to the derivative injuries suffered by the corporation itself. In pursuit of an ideological agenda, Defendants have violated numerous other Bylaws, Standing Rules, and Policies of the Sorority, and caused the Sorority to act in a manner that has specifically harmed Plaintiffs and undermined contractual obligations to the Plaintiffs. The Fraternity's officers, directors, and employees directly, and through alumnae advisers acting at Fraternity Council direction, pressured student members to endorse Langford's initiation to the Sorority. When Langford's membership vote violated the Sorority's secret-ballot procedures, Defendants and their agents knowingly disregarded the clear violations of the corporate rules. When Plaintiffs raised concerns about Langford's inappropriate and threatening behavior in the sorority house, Defendants and their agents refused to protect Plaintiffs and prevented others from doing so. Instead of protecting Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma altogether. Defendants have pushed Plaintiffs to resign even though—having already joined Kappa

Kappa Gamma—Plaintiffs are permanently barred from joining a different sorority. Finally, Defendants have retaliated against Plaintiffs and other sorority members who object to the Board's unauthorized Guide. Plaintiffs ask for all remedies available in response to Defendants' wrongdoing, including monetary damages, punitive damages, injunctive relief, declaratory relief, and attorney fees.

## JURISDICTION AND VENUE

13.    Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, as the parties are citizens of different States, all necessary Parties are before this Court, and the sum of the matter in controversy, including damages and the value of the declaratory and injunctive relief sought by Plaintiffs, exceeds seventy-five thousand dollars ($75,000.00). Plaintiffs were members of Defendant Kappa Kappa Gamma Fraternity at the time of the actions at issue. This action is not a collusive one to confer jurisdiction the Court would otherwise lack.

14.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391, as two Defendants in this matter are citizens of the State of Wyoming and reside in the District of Wyoming, and the substantial part of the events giving rise to Plaintiffs' claims and injuries occurred in Wyoming.

## PARTIES

15.    Jaylyn Westenbroek is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

16.    Hannah Holtmeier is a citizen of Nebraska. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

17.     Allison Coghan is a citizen of Kansas. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

18.     Grace Choate is a citizen of Oklahoma. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

19.     Madeline Ramar is a citizen of Colorado. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

20.     Megan Kosar is a citizen of Virginia. She is a student at the University of Wyoming and a current member of Kappa Kappa Gamma Fraternity. She was a Kappa member at the time of the events giving rise to this case.

21.     Defendant, and nominal Defendant, Kappa Kappa Gamma Fraternity is a nonprofit corporation organized under the laws of Ohio with its headquarters located in Dublin, Ohio.

22.     Defendant Mary Pat Rooney is a citizen of Illinois and the President of the Fraternity Council of Kappa Kappa Gamma Fraternity.

23.     Defendant Kappa Kappa Gamma Building Co., is a Wyoming nonprofit corporation with its principal office at 1604 E. Sorority Row, Laramie, Wyoming (also called the "Kappa Housing Corp."). Plaintiffs do not seek damages directly from Kappa Housing Corp., but Plaintiffs do allege that Kappa Kappa Gamma Fraternity has interfered with their contractual relationship with this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation. Fed. R. Civ. P. 19(a)(1)(B).

24.     Upon information and belief, Defendant Artemis Langford is a citizen of Wyoming.
Langford currently resides in a dormitory in Laramie, Wyoming. In the alternative, Langford is a
Utah citizen as Langford's father and mother reside in Utah. As a third alternative, Langford is a
citizen of Washington State, as he presents a Washington State driver license with a Washington
State address when asked for official identification.

**STATEMENT OF FACTS**

I.   Kappa Kappa Gamma was established more than 150 years ago to unite women through membership...................................................12

   A.   Kappa Kappa Gamma has always been an organization limited to women. . 12

   B.   Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment. .................................................15

II.  The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women.....................................20

   A.  The Sorority's Corporate Charter specifically references women...................20

   B.  The Sorority's Bylaws, Standing Rules and Policies also limit membership to women. .................................................22

      1.   Kappa Kappa Gamma's Bylaws prohibit Langford's membership. .......23

      2.   Langford's selection process violated Kappa Kappa Gamma's Standing Rules. .................................................28

      3.   The Policies of Kappa Kappa Gamma prohibit Langford's membership in the Sorority. .................................................30

III. National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Langford's wrongful membership. .................................................32

IV.  Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies. .................................................35

V.   Defendants' evasion of Kappa Kappa Gamma's membership restrictions
     represents an ongoing violation of fiduciary duties to the Corporation, and any
     additional demands to the Sorority's Directors would be futile. ......................... 39

     A.  The Defendants have refused Plaintiffs' demands to prevent violation of the
         Sorority's restrictions on membership. .................................................. 40

     B.  Any further demand to the Fraternity Council, seeking enforcement of Kappa
         Kappa Gamma's membership restrictions, would be futile. ............................ 41

VI.  Kappa Kappa Gamma's effort to force the membership of Artemis Langford,
     and the experience of Plaintiffs since his admission, demonstrate the disruptive
     effect of a man on the sorority experience. ............................................. 46

     A.  Langford's behavior has destroyed the single-sex haven that Kappa members
         describe as the heart of the sorority experience. ................................. 49

     B.  Langford's interactions with the Sorority members prior to voting on his
         Membership. ................................................................................ 51

     C.  The Voting Process. ................................................................... 54

     D.  The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies. .... 57

     E.  Langford's conduct after Defendants granted him access to the sorority house.
         ................................................................................................ 59

     F.  Damages. ............................................................................... 63

I. **Kappa Kappa Gamma was established more than 150 years ago to unite women through membership.**

    A.     **Kappa Kappa Gamma has always been an organization limited to women.**

25.     In 1870, six women at Monmouth College in western Illinois founded the Kappa Kappa Gamma Fraternity. The Sorority's founders believed that Greek-letter societies helped male students, and college women should have the same opportunities. Women were a distinct minority in colleges in the late 19th century. At the time of Kappa Kappa Gamma's founding, only 11,000 women between the ages of 18 and 21 were enrolled in college in the entire United States. Men outnumbered women by nearly five to one on college campuses, and many colleges did not permit women to enroll at all. As one of Kappa's Presidents, Kay Smith Larson, described that era, "Women were often ignored in the classroom and ridiculed outside of it."

26.     Louise Bennett Boyd, one of the six founding members of Kappa Kappa Gamma, explained that the young women "concluded we would have something new; the world seemed to be moving too slowly for us and moreover the young men had Greek letter fraternities. We determined that nothing short of a Greek letter fraternity (we did not even speak of it as a sorority in those days) would satisfy us." Today, Kappa is one of the nation's oldest and largest sororities, with approximately 210,000 living alumnae, 140 collegiate chapters, and 230 alumnae associations.

27.     The first Bylaws of Kappa Kappa Gamma Fraternity make clear that only women can be members. The 1871 Bylaws state "Any lady may become a candidate for membership who shall be of good moral character, and of above average talent; and who, at the time of proposal, either is or has been in attendance at some college or seminary." Early sorority members were concerned with academics, scholarship and understanding what their responsibilities should be as "new

women" enjoying the privileges of fraternal life. Kappa Kappa Gamma Fraternity, *History: Kappa Kappa Gamma Through the Years* 126 (2000).

28.     In 1871, the Sorority's initiation ceremony was simple. New members were read the organization's constitution and took an oath of loyalty. *Id.* at 27. "The [Kappa] *Constitution* at that time was secret and contained the first purpose of the Fraternity which, with little change, remains the same today." *Id.* The first Kappa members affirmed their "union in the bonds of friendship…for the development of the nobler qualities of the mind and finer feelings of the heart, helping one another attain excellence and for the advancement of its members socially and in literary attainments." *Id.* When the Sorority filed its Articles of Incorporation with the Ohio Secretary of State in 1930, this first purpose was only slightly changed:

> To perpetuate Kappa Kappa Gamma Fraternity for the development of the nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence among its members.

Attachment 4 at 6. The Sorority's first purpose now explicitly links the original pledge of 150 years ago to the Sorority's single-sex identity:

> To unite **women**, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence.

*Id.* at 4 (emphasis added).

29.     The words *woman* and *women*, as used in Kappa Kappa Gamma's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Sorority's 150 years, have always referred to adult female human beings. These words, as used by Kappa Kappa Gamma prior to Defendants' unlawful actions, have never referred to biological males who claim to be women.

30. Kappa Kappa Gamma's communications, throughout its history, use vocabulary that reinforces that the Sorority uses the word "woman" with its traditional, immutable biological meaning. Members are part of a "sisterhood." "Editor's Letter," *The Key: 150 Anniversary*, Vol. 137, No. 1 at 1 (2020) ("Your commitment to Kappa—in word and in deed—helps to drive the future of our sisterhood."). The Sorority refers to members who have finished college as *alumnae*, the plural form of the Latin term *alumna*. *Alumna* and *alumnae* are gendered Latin words that refer exclusively to females. "Alumna," *Oxford English Dictionary* (Dec. 2022) ("A female former pupil or student of a particular school, university, etc.; a female graduate of a particular seat of learning."). *Alumnus* is the word for a male graduate. *Alumni* refers to a group of graduates that is all-male or one that includes both men and women.

31. When Kappa Kappa Gamma published an official history of the sorority's first sixty years (through 1930), two of the six sorority founders were still living. Louise Bennett Boyd and Jeannette Boyd introduced the book with an open letter to "Our dear Kappa girls." Burton-Roth & Whiting-Westermann, *History of Kappa Kappa Gamma Fraternity, 1870–1930* at v (1932). The Sorority's 1889 songbook is replete with references to young maids, girls, women, and sisters. Susan Goldsmith & Jessie Cougill, *Songs of the Kappa Kappa Gamma Fraternity* (1889).

32. Articles in the Sorority's official magazine, *The Key*, reflect the traditional, biological meaning of the word "woman." Perhaps the most salient article was published in 2002. The Sorority conducted focus groups and personal interviews to identify the traits that exemplify the Kappa experience. According to more than 500 collegiate members, alumnae, parents of Kappa members, Kappa volunteers, and university administrators, the "Benefits of Kappa Kappa Gamma" include "Friendship/Sisterhood":

> Kappa Kappa Gamma **is a single-sex haven in a mainly coed campus environment**.
>
> Kappa Kappa Gamma is a family away from home, diminishing campus size and impersonality.
>
> Kappa Kappa Gamma provides sisterhood support via alumnae associations in hundreds of cities.
>
> Kappa Kappa Gamma sustains members in bad times, celebrates good times, and shares all times.
>
> Kappa Kappa Gamma offers a diversity of background and interest among its members.

"In the Company of Leaders," *The Key (A Kappa Kappa Gamma Publication)*, Vol 119, No. 2 at 9 (Summer 2002) (emphasis added).

33. Artemis Langford is not a woman as that word has been adopted and understood by Kappa Kappa Gamma for the past 150 years. Artemis Langford is not an adult female human being. Artemis Langford would not have been eligible for membership in Kappa Kappa Gamma in 1870, nor would he have been eligible during any subsequent time since Kappa's founding. Artemis Langford is not eligible for Kappa membership today.

### B. Kappa Kappa Gamma provides unique benefits to college women through the creation of an all-female environment.

34. A woman is an adult human female. A man is an adult human male. For a biologist, these words distinguish between human beings who donate genetic material (men) or receive genetic material (women) during the reproductive process. The distinctions between men and women, however, extend far beyond reproductive biology. Genetic material within every cell in the human body guides that cell's creation and operation. This genetic coding is different for men and women from conception to death. No one questions that the endocrine systems of men and women, which

are essential to the development of sexual maturity, differ and affect the human body's development. But muscles, bones, and brains of men and women also differ at a cellular level. Scientists lack a complete understanding of sex-based differences, but there is scientific consensus that men's bodies and women's bodies are different.

35.     In many circumstances, whether an individual is a man or a woman "bears no relation to ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). A person's sex is determined at the moment of conception. Like race and national origin, sex is an immutable characteristic. Therefore, *governmental* distinctions between men and women are inherently suspect.

36.     Kappa Kappa Gamma and other Greek fraternities and sororities are private social organizations, however, and they *explicitly do* discriminate "on the basis of sex." 20 U.S.C. § 1681(a). Indeed, after passage of Title IX in 1972, the federal government took the position that fraternities and sororities could not continue as part of college life. Members of Congress, led by former Senator Birch Bayh, the Senate sponsor of Title IX, rejected this view. Senator Bayh stated that "[f]raternities and sororities have been a tradition in the country for over 200 years. Greek organizations, much like the single-sex college, must not be destroyed in a misdirected effort to apply Title IX." 120 Cong. Rec. 39992 (1974) (statement of Sen. Bayh). Therefore, in 1974, Congress amended Title IX to exempt Kappa Kappa Gamma and similar Greek organizations altogether. 20 U.S.C. § 1681(a)(6). Title IX does not apply at all to the "membership practices" of a non-profit "social fraternity or social sorority… the active membership of which consists primarily of students in attendance at an institution of higher education." *Id. See also* Pub. L. No. 93-568 § 3 (1974).

37.     Kappa Kappa Gamma discriminates against men to provide a sex-segregated environment for college women. The Sorority's Bylaws acknowledge that the Sorority discriminates on the basis of sex: "The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972." Attachment 1 at 9–10 (art. V., sec. 2.D). Single-gender, as the phrase is used in the Bylaws, means "single-sex" and not "gender identity" or a related concept. This is clear from the Bylaws' reference to Title IX, which prohibits discrimination "on the basis of sex."

38.     Social science research demonstrates that when young women are allowed to learn in an all-female environment, they are more likely to seek out 'nontraditional' academic subjects like math and science. Young women in single-sex environments are more likely to develop higher academic, and socially competent, self-images. Young women who attend single-sex schools are more positive about their own abilities and their control over their lives, are less inhibited by stereotyped gender role attitudes, and hold higher aspirations for their futures. These benefits are not limited to the classroom.  One study, for example, showed that strong female role models increased the willingness of college women to study more rigorous academic subjects (with more lucrative careers) such as economics.

39.     Until now, Kappa Kappa Gamma has been a strong defender of the benefits of an all-female environment for college women. Plaintiffs assert—as the Sorority itself did when it filed a Complaint in the U.S. District Court for the District of Massachusetts in 2018—that single-sex sororities are a traditional source of stability and community in college life for young women. The single-sex nature of a sorority is necessary to create this cohesive atmosphere. *See* Complaint, *Kappa Alpha Theta Fraternity, Inc., et al v. Harvard Univ.*, Dkt. No. 1:18-cv-12485 at ¶ 93 (D.

Mass.) (filed Dec. 3, 2018) (Kappa Kappa Gamma Fraternity is the second plaintiff named in the

Complaint.).

**40.**     Less than five years ago, Kappa Kappa Gamma made numerous allegations about "the

proven benefits of single-sex environments" for college women:

> ¶ 93. It is no surprise that single-sex organizations have thrived at Harvard for so many years. Single-sex social organizations represent a traditional source of stability and community in college life. They meet many of the social and cultural needs of students. They provide a surrogate family for students away from home and offer students an opportunity to grow with peers who share common values, problems, and goals. Members of all-male and all-female organizations feel that the single-sex nature of the groups is important to the cohesive atmosphere that the organizations provide.

> ¶ 94. A 2014 Gallup survey of more than 30,000 college graduates across the United States found that students who were members of fraternities or sororities experienced notable long-term benefits linked to their fraternity and sorority membership. These students were more likely to be "thriving" in their well-being and engaged at work than college graduates who did not join a fraternity or sorority. The survey found that fraternity and sorority members were more likely than other students to find fulfillment in daily work and interactions, to have strong social relationships and access to the resources people need, to feel financially secure, to be physically healthy, and to take part in a true community.

> ¶ 95. Single-sex environments are associated with a myriad of developmental and other benefits, particularly for young women. Many educational researchers have found that single-sex education contributes to academic achievement at all levels for women. There "is a body of research carried out since the late 1960's which shows that graduates of women's colleges are more likely to become achievers than are the women graduates of coeducational institutions." As an example, in the 1970s, graduates of women's colleges were more than twice as likely than graduates of co-ed colleges to enter medical school or to obtain a natural science or other doctoral degree.

> ¶ 96. Studies have found that women in single-sex schools at both the secondary and college levels have higher levels of self-esteem and a greater sense of personal control. Exposure to single-sex environments can even positively influence a woman's interest in nontraditional or male-dominated careers—one study concluded that "the opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests."

> Significantly, the benefits of having participated in a single-sex environment persist
> even after the woman has graduated or otherwise left the environment.

*Id.* at 31–33.

**41.**     Sorority representatives made these and similar assertions to Plaintiffs when they were considering whether to join Kappa Kappa Gamma. Sorority representatives make these representations to donors and alumnae. None of the research cited in the 2018 Complaint categorized "individuals who identify as women" (*i.e.* men) as "women" when defining a single-sex environment. *Id.* at 31–33. Kappa's 2018 Complaint relied on evidence from all-female, single-sex environments. In fact, Defendants have **no** peer-reviewed research that the benefits of a "single-sex" environment continue to exist when men "who identify as women" are admitted. Despite the lack of evidence to support this new theory, Defendants have continued to promote the benefits of the sorority environment to Plaintiffs and other prospective members.

**42.**     The claim that "trans women are women" is a political slogan. It is not a fact supported by social science or medical research. Kappa's view, less than five years ago, was that women and girls benefit from a single-sex environment. A single-sex environment excludes every man without regard to how the man claims to identify himself. Defendants should not be allowed to radically alter the very core of the Sorority's identity, and then claim to this Court, without evidence, that the Sorority's benefits remain. Kappa Kappa Gamma could, theoretically, abandon its 150-year commitment to women, but any such decision would need to be approved at the Sorority's biennial convention. Defendants cannot abandon the Sorority's mission and purpose by subterfuge, with an unsigned Guide from Defendant Rooney and the rest of the Fraternity Council that declares some men should now be called women.

## II.   The Corporate Charter and other governing documents of Kappa Kappa Gamma restrict membership to women.

### A.   The Sorority's Corporate Charter specifically references women.

**43.**   Kappa Kappa Gamma Fraternity is an Ohio non-profit corporation, and its Articles of Incorporation are available from the Ohio Secretary of State. In Ohio, a corporation's charter consists of its articles of incorporation and the Ohio laws in existence when the articles of incorporation were filed. With a for-profit corporation, the corporate charter is a contract between the corporation and its stockholders. For a non-profit corporation, the corporate charter is a contract between the corporation and its members.

**44.**   The Articles of Incorporation for Kappa Kappa Gamma, in conjunction with Ohio law when the Corporation was organized, form the Sorority's charter. As a nonprofit corporation, Kappa's corporate charter is a contract between the Sorority and its members, including Plaintiffs.

**45.**   A corporate charter contains the terms upon which the incorporators have agreed to associate. The charter therefore establishes the authority that members can exercise and sets the limits within which the body of corporators can lawfully act in a corporate capacity. Like other corporations, the Sorority and its Board of Directors (the Fraternity Council) must act consistently with Kappa's corporate charter. When a corporation's actions exceed the authority granted by its corporate charter, these actions are *ultra vires* and void. Such is the case here.

**46.**   Corporate board members who disregard or otherwise seek to circumvent a corporation's corporate charter violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance). Under Ohio's Nonprofit Corporation Law, claims involving a "lack of, or limitation upon, the authority of a corporation" can be asserted "[b]y or on behalf of the corporation against a director, an officer, or a member as such" and "[b]y a member as such or by or on behalf

of the members against the corporation, a director, an officer, or a member as such." Ohio Rev. Code Ann. § 1702.12(I) (2023).

47.     The Articles of Incorporation for Kappa Kappa Gamma restrict sorority membership to women. They prohibit any college chapter from defying this restriction. The Sorority's purposes in its Articles of Incorporation are, *inter alia*, "**[t]o unite women, through membership**" and further provide that all members must be selected "**in accordance with Fraternity standards and procedures**" (emphasis added):

> To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;
>
> To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;
>
> To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;
>
> To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;
>
> To advocate for and seek to address issues of concern for members and women in general;
>
> To provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and
>
> To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

Attachment 4 at 4.

48.     Kappa Kappa Gamma's Articles of Incorporation cannot be amended by its Board of Directors (the Fraternity Council). Any amendment must occur "in accordance with the Fraternity

*Bylaws*," *id.*, which require a two-thirds majority vote at the Sorority's biennial convention. Moreover, under the Bylaws, the "exact content" of any amendments must be provided at least three months prior to the convention:

> The Fraternity Articles of Incorporation and Bylaws may be amended by a Convention by a two-thirds vote provided notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention.

Attachment 1 at 20 (art. XXIV, sec. 1).

49.     Regardless of whether Kappa Kappa Gamma Fraternity *could* amend its corporate charter to provide that the Sorority's mission and purpose is to 'unite women *and men who identify as women* through membership,' Defendants have not adopted such an amendment. Under the corporate charter as it exists now, only women can be Kappa members. The Sorority has not amended its Articles of Incorporation to define "woman" to include men who claim to identify as women. The meaning of woman therefore remains constant to the meaning it has had since its use in 1870: an adult human female. Initiation of Artemis Langford as a member of Kappa Kappa Gamma violates Kappa Kappa Gamma's corporate charter and the contractual promise the corporation has made to Kappa members. Defendant Rooney and the other members of the Fraternity Council violated their fiduciary duties to the corporation when they procured and approved the initiation of a man as a Kappa member.

### B.     The Sorority's Bylaws, Standing Rules and Policies also limit membership to women.

50.     In addition to its corporate charter, Kappa Kappa Gamma has bound itself through its Bylaws, Standing Rules, and Policies. These corporate governance documents restrict Kappa membership to women and do not permit Langford's membership.

      1.     **Kappa Kappa Gamma's Bylaws prohibit Langford's membership.**

51.     Under Ohio law, the Bylaws of Kappa Kappa Gamma are the code of regulations for the corporation. Attachment 1 at 19 (art. XIX). The Bylaws restrict membership to women only:

> A.    New Member. **A new member shall be a woman** who has accepted an invitation to join the Fraternity but has not been initiated. A new member shall:
>
> > 1.  Have signed a dated, written pledge to membership witnessed in writing by an active or alumna member of the Fraternity;
> >
> > 2.  Remain eligible as a new member for a term of one year before the pledge to membership expires so long as enrolled in the same college or university; and
> >
> > 3.  Have the right to attend meetings, speak in debate and present their views to a committee on a referred question but shall not vote on any question. A new member shall not be present at a meeting during ritual for initiated members.

Attachment 1 at 2 (art. III, sec. 1) (emphasis added).

52.     While local chapter members of Kappa Kappa Gamma recruit and vote on new members, they must do so "in accordance with Fraternity standards and procedures." Attachment 4 at 4. Because the *Bylaws* require that every new member be a woman, and Langford is not a woman, his membership is void:

> Section 2. Qualifications. **A woman** may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.
>
> > A.  Collegiate New Member and Alumna Candidate. To qualify as either a collegiate new member or an alumna candidate, **a woman** shall:
> >
> > 1.  Have demonstrated integrity, respect, and regard for others and an appreciation for the worth of all individuals;
> >
> > 2.  Not be pledged to membership or be a member of any similar college or university women's social sorority except honorary or professional organizations;

3. Not have been initiated into any other member group of the National Panhellenic Conference;

4. Be eligible in accordance with the National Panhellenic Conference Unanimous Agreements; or

5. Be willing to pledge to uphold the Kappa Kappa Gamma Fraternity Bylaws, Standing Rules and Policies.

B. Collegiate New Member. To qualify as a collegiate new member, **a woman** shall be:

1. Be enrolled at any college or university having a chapter of the Fraternity; and

2. Have demonstrated academic interest and attained at least a B-plus average or its equivalent under any other grading system from high school or at least a B- minus average or its equivalent under any other grading system for the previous completed term as a full-time student at a college or university or a higher standard as defined by the chapter. In extraordinary cases, the chapter may petition the Membership Specialist for an exception.

C. Alumna Candidate. To qualify as an alumna candidate, **a woman** shall also:

1. Have attended a four-year college or university; and

2. Be at least five years out of a four-year college or university. Exceptions shall be granted for members of a petitioning group.

Attachment 1 at 3 (art. III, sec.2 (emphasis added)).

**53.** The Sorority last amended its Bylaws in 2022, adopting a complete revision. Upon information and belief, these changes were not lawful. At the 2022 Biennial Convention, Defendant Rooney and the other members of the Fraternity Council conducted a voice vote and— even though there were loud votes against the changes—concluded that the bylaws amendments received a two-thirds vote without actually counting votes. Tellingly, the minutes of the convention

Page 24 of 70

still have not been released. Even if the new bylaws were adopted in 2022, however, they do not alter the requirement that Kappa Kappa Gamma members must be women. *Id.*

54.     The evidence surrounding the 2022 Bylaws revisions supports the conclusion that the Sorority's membership criteria remain the same. In the Report of the Bylaws Committee, which accompanied the proposed Bylaws, there is no reference to "individuals who identify as women" or any discussion of a change to the Sorority's membership rules. The explanatory report for the Bylaws changes states that "[w]hile the documents now look different in structure, most of the content is unchanged." Attachment 5 at 1. The report identifies what it describes as "[s]ome of the major amendments and the rationale behind the change." *Id.* These changes do not include a change to membership rules. Admittedly, the Bylaws were changed to promote "inclusivity," but these changes were "to make sure the language of the documents is inclusive. The committee has tried to craft the documents in such a way that gendered pronouns are not used and references are inclusive of all of our membership." *Id.* at 2. The changes did not affect the actual criteria for membership.

55.     The 2022 Bylaws revisions did add a provision forbidding "Members, chapters and associations" of Kappa Kappa Gamma from engaging in discrimination, but this new antidiscrimination provision does not apply to the Sorority itself. *Id.* at 9–10. In fact, the provision explicitly recognizes that the Sorority *does* discriminate on the basis of sex:

> **D. Discrimination.** Discrimination based on race, national origin, religion, disability, age, sexual orientation, or other class protected by local, state, provincial, or federal law shall be prohibited. The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

Attachment 1 at 9 (art. V, sec. 2.D). The reference to the "single-gender nature of Greek-letter social organizations" is not a change to the Sorority's membership rules. It cannot be. The "exemption" in Title IX of the Educational Amendments of 1972 does not refer to gender identity. Rather, "single-gender" in this provision of the Bylaws means the same thing as "single-sex," because the Title IX exemption permits sororities to discriminate "on the basis of sex." 20 U.S.C. § 1681(a)(6).

56.    Shortly before the Sorority's biennial convention in 2022, the national headquarters staff provided another document to members, entitled "Bylaws and Standing Rules Revisions 2022: FAQS [Frequently Asked Questions]." Attachment 6. This document was provided in April 2022, less than two months before the convention. This FAQs document was not subject to a vote or otherwise approved at the convention. The document makes several statements that are not connected, in any way, to the Bylaws revisions that were under consideration:

**DIVERSITY, EQUITY AND INCLUSION**

**Can nonbinary people join? Is this a chapter-by-chapter decision?**

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's <u>Position Statements</u> on Membership Selection and Single-Gender Organizations.

We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

> **Have we vetted these changes with our legal counsel?**
>
> Yes. We have conferred with legal counsel as well as NPC on DEI-related updates to our Fraternity documents. We are confident that these changes would hold up if contested in a court of law.

*Id.* at 18.

57.     The FAQs document does not alter the Sorority's membership requirements. First, to the extent that the Sorority sought to adopt a new definition of woman, contrary to the word's longstanding meaning, this change must be made in the text of the Bylaws. Such a change cannot be presumed. Second, Kappa members must receive "notice" of any amendment to the Bylaws "indicating its exact content" at least three months before the convention. Attachment 1 at 20. (art. XXIV, sec. 1). Even if the FAQs document could somehow supplement the Bylaws amendments, this document was not presented to members with the required three-month notice. These FAQs were provided less than 60 days before the Convention, so they cannot be considered part of the "exact content" of the changes required by the Bylaws. Third, under Ohio law, the bylaws of a corporation cannot conflict with its Articles of Incorporation. Kappa's articles of incorporation make clear that the Sorority is limited to women; any bylaws amendments that say otherwise are unlawful. Finally, the language in the Bylaws FAQs does not actually support the claim that Langford is a woman. The language in the Bylaws FAQs does not say that a man who identifies as a woman is a "woman." Rather, the language expands the list of eligible members by adding another category: "women" and also "individuals who identify as women." If this second category were naturally subsumed within the meaning of "women," there would be no need for the FAQs statement at all.

58.     To the extent that Defendants intended to alter the membership requirements of Kappa Kappa Gamma through the 2022 Bylaw revisions, they have violated their fiduciary duties to the Defendant non-profit corporation. Defendant Mary Pat Rooney and the other members of the Fraternity Council have a fiduciary duty to be faithful to the Sorority's purpose and mission. This fiduciary duty requires that the Fraternity Council members act forthrightly in their efforts to carry out the Sorority's purpose and mission. Defendants cannot, consistent with their fiduciary duties, even *attempt* to alter the Bylaws of a 150-year-old organization through language that appears on page 18 of an explanatory document presented to members just before a vote on a Bylaws amendment that has no corresponding language.

### 2.     Langford's selection process violated Kappa Kappa Gamma's Standing Rules.

59.     Kappa Kappa Gamma has also adopted "Standing Rules" and "Policies" to govern the conduct of the Sorority. The Standing Rules describe the processes that must be followed when selecting a new member of the Sorority. Under the Articles of Incorporation, these "procedures" must be followed by every chapter when selecting new members. Attachment 4 at 4. Standing Rules can be amended by a majority vote at the Sorority's biennial national convention, provided that the proposed amendments were submitted, in writing, at least three months prior to the Convention. Attachment 7 at 25.

60.     The Standing Rules of the Sorority do not include any language that supports expansion of Kappa membership to a man who claims to identify as a woman.

61.     The Standing Rules do, however, impose two requirements that were violated in the admission of Langford to Kappa Kappa Gamma. Under the Standing Rules, all chapter members must vote on whether to admit a new member, unless a chapter member is excused from voting,

in writing, by the chapter's alumnae adviser. Attachment 7 at 1 (sec 1.1.A.1). For Langford's vote

on membership, the chapter officers adopted the opposite policy, forbidding Plaintiffs Choate and

Ramar, and all other members who were not present at the chapter meeting on September 20, 2022,

from voting on Langford's membership. None of these non-voters were excused, in writing, by

the chapter's alumnae adviser. Further, none of the Plaintiffs or other sorority members asked to

be excluded from the vote. The chapter committed a second violation when voting on Langford.

Any vote on a new member must be secret and must happen through use of the Sorority-approved

electronic voting system, which is a mobile phone application (app) called "Omega Recruit":

    1.1   Membership Selection.

    A.    Collegiate New Member Selection. Active members shall be responsible for selecting new members of their chapter. Any initiated member may provide information about qualified women. The electronic voting system selected by the Fraternity shall be used by the chapter.

        1.    Participation. All active members of the chapter shall participate in membership selection unless excused in writing by the designated chapter adviser.

        2.    Confidentiality. All information concerning the membership selection process is confidential and shall be kept within the chapter.

        3.    Bid List. The bid list shall be produced using the overall scoring calculation in the electronic voting system and shall not be manipulated.

Attachment 7 at 1. Langford's selection did not use Omega Recruit. Omega Recruit was used to

select new Kappa members during continuous open bidding at the University of Wyoming in

Spring 2022 and to select new Kappa members during the formal recruitment in Fall 2022. In

contrast, Langford's approval occurred through a Google Poll that was not anonymous.

**62.**    The Standing Rule requirement that every chapter use the "Omega Recruit" process was

imposed by the Sorority through an amendment to the Standing Rules in 2022. The requirement

that all chapter members must vote, unless excused by the chapter's alumnae adviser for membership, has existed since at least 2016. Langford's vote did not occur using Omega Recruit and chapter members were prevented from voting on his membership. Langford's selection process was a violation of the Sorority's Standing Rules, and it is invalid.

63.     When Plaintiffs, and their attorneys, wrote to Sorority officials after the vote on Langford, but before his initiation ceremony, their concerns were ignored.

### 3. The Policies of Kappa Kappa Gamma prohibit Langford's membership in the Sorority.

64.     The Sorority also has corporate governance documents called the "Policies of Kappa Kappa Gamma Fraternity" which are "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by the Kappa Kappa Gamma Articles of Incorporation and the Fraternity Bylaws and Standing Rules." Attachment 8 at 1.

65.     The Policies of Kappa Kappa Gamma also restrict Sorority membership to women. Policy III imposes requirements on the Sorority's college chapters that make clear the Sorority is a single-sex organization. Policy III prohibits Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Sorority or a chapter:

> **Section 2. Auxiliary Groups.** Participation in auxiliary groups of men's fraternities, including but not limited to little sisters, is prohibited and is in conflict with the National Panhellenic Conference Unanimous Agreements. The formation of male auxiliary groups, such as big brothers, is prohibited. **The activities of such groups are not conducive to harmonious chapter operations and jeopardize our single-sex status.** Kappa chapters shall not bestow honorary status to individuals, such as Key Man or chapter sweetheart.

Attachment 8 at 3 (emphasis added). Policy VIII explicitly prohibits men from participating in the Sorority's recruitment events:

> 3.I.    Men. **Men shall not participate in any Kappa recruitment events**, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements.

*Id.* at 13 (emphasis added). Langford is a man. His participation in Kappa recruitment was a violation of the Sorority's Policies.

**66.**    Kappa Kappa Gamma Policies also require that all members of a chapter vote on whether to accept a new member, unless excused in writing, and require that membership votes use the Sorority's designated electronic voting platform. *Id.* at 11 (§ 3) & 14 (§ 3.P).

**67.**    Kappa Policy III does include a reference to the concept of "gender identity," but this Policy does not permit Langford to join the Sorority. Under a section called "Personal Responsibility," Policy III requires that Kappa members respect Human Dignity. Like the Sorority's Bylaws, this provision requires Sorority to behave in a manner that respects others. The provision does not link gender identity to Kappa membership:

> **2. Human Dignity.** Kappa Kappa Gamma expects all members to promote integrity, respect and regard for others, and appreciation for the worth of all individuals. Any member who makes discriminatory, inflammatory or inappropriate actions based on race, national origin, religion, disability, age, gender identity, sexual orientation or other class protected by local, state/provincial, or federal law shall be subject to dismissal or other disciplinary action.

Attachment 8 at 4. Respect for human dignity is consistent with the Sorority's historical, longstanding membership requirements. Policy III applies to members' conduct; it does not change Kappa membership requirements. Respect for the worth of all individuals does not require sorority membership for all individuals. Moreover, because the Policy is adopted by the Fraternity Council, not the membership, the Policy cannot deviate or undermine the Sorority's Articles of Incorporation, Bylaws or Standing Rules.

**III.     National Kappa Kappa Gamma leaders, not individual collegiate chapters of the Sorority, have control and responsibility for membership decisions. Defendant Mary Pat Rooney and the other members of the Kappa Kappa Gamma Fraternity Council are responsible for Langford's wrongful membership.**

68.      Kappa Kappa Gamma acts through 140 collegiate chapters. Kappa Kappa Gamma chapters are not distinct entities in any way. The Fraternity Council, the employees of the Sorority, the Sorority's District Directors, and the Sorority's network of alumnae advisers provide direction to the student members of the Sorority. Langford could not have been admitted as a Kappa member without the explicit approval and support of the Fraternity Council and those acting at the Council's direction. Under the Standing Rules, no person can be initiated as a Kappa member without prior approval from Sorority headquarters:

> 6.2   Ritual.
>
> *        *        *
>
> B.     Chapter Initiation of New Members.
>
> *        *        *
>
> 2.     At least two weeks before Initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

Attachment 7 at 10. Sorority officials regularly reject ineligible members, even when a chapter has voted to admit the member. Reasons for rejection can include a failure to meet the grade requirements for new Kappa members.

69.      Upon information and belief, Sorority representatives not only approved Langford's membership, but national Sorority officials also encouraged chapter officers to pursue Langford

and guided chapter officers in the illegal selection process. Plaintiffs have not brought suit against their collegiate chapter. The Gamma Omicron chapter of Kappa Kappa Gamma Fraternity, which operates on the University of Wyoming's campus, did not have authority to admit Langford as a Kappa member. All decisions about compliance with the Sorority's corporate charter, Bylaws, Standing Rules, and Policies were made by adults acting on behalf of the national Sorority. While the Sorority's legal counsel stated that the Sorority does not participate in member selection, Attachment 3 at 1, this statement was not true as it relates to the admission of Langford.

**70.** Indeed, national Sorority officials and representatives are responsible for all membership decisions at collegiate chapters. The Sorority controls the intake of new members, the decision to expel or suspend Sorority members, and the decision to discipline, suspend or revoke a chapter. Kappa Kappa Gamma has a hierarchy of national, regional and local officers answerable to and involved in the national Sorority. No person may become a new Kappa member unless the Sorority's alumnae specialists or staff, in advance, have given "permission to initiate."

**71.** On the national level, the Fraternity Council has authority to approve, suspend or revoke a collegiate chapter. The Fraternity Council also has authority to suspend or dismiss any Sorority member. Below the Fraternity Council, the Sorority has Content Directors, who supervise all matters that relate to a specific aspect of the Sorority's operation (such as the Sorority's disciplinary process, called "Standards"). The Sorority has District Directors who supervise the activities of the local chapters and administer discipline to individual chapters for rules violations. Finally, the Sorority has paid staff at the national headquarters. All of these individuals operate under the supervision of an Executive Director who reports to the Fraternity Council.

72. The Standing Rules of the Sorority permit national officials to place any individual member on probation, even if collegiate chapter members do not support this decision. The Fraternity Council (the Sorority's board) can dismiss any member entirely. Attachment 7 at 13–20.

73. Every chapter must adopt its own bylaws and standing rules, which "must be approved by the Fraternity Bylaws Committee before becoming effective." *Id.* (art. iv, sec. 2.G.). All subsequent amendments must also be approved by the Sorority's officials. *Id.*

74. For every collegiate chapter, Kappa Kappa Gamma has a network of appointed alumnae who supervise operation of the chapter and the actions of individual chapter officers. The Sorority's Bylaws require this supervision:

> **J. Advisory Boards and Chapter Advisers.** A chapter Advisory Board shall assist the chapter in fulfilling its purpose and in the management of the affairs of the chapter. The board shall be composed of a chairman, alumna advisers to Executive Board and vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director, and in consultation with the Leadership Development and Advisory Board Directors.

Attachment 1 at 7 (art. IV, sec 2.J.). These appointed alumnae, in turn, report to other alumnae with broad responsibility over every aspect of sorority life, such as chapter operations, housing, membership recruitment and retention, and discipline of sorority members. Appointed alumnae control all aspects of chapter operation. For example, a chapter cannot host a social function (*e.g.*, a party) without submitting an event form to the national Sorority headquarters and also receiving approval from the chapter's appointed alumnae adviser. Fraternity Council members refer to these appointed alumnae as part of the Sorority's "workforce."

75. The President of each collegiate chapter *must* discuss matters with the chapter's alumnae adviser. In addition, each chapter's Vice President of Standards and Vice President of Academics

must work with an alumnae adviser. Alumnae advisers are selected by the Sorority, not by chapter members. Chapter members have no authority over the alumnae advisers, and these advisers *must be* present for all chapter meetings of significance:

> E. Meetings. An adviser shall be present at chapter meetings for the election of officers, revision of the chapter Bylaws and Standing Rules, preparation and presentation of the budget, Executive Board meetings, officer training, Initiation, and including those of the Nominating Committee and consideration of disciplinary action by the chapter and Standards Committee. Advisers may attend meetings electronically via telephone or through other electronic communications as long as all the members can simultaneously hear one another and participate during the meeting.

Attachment 8 at 1–2 (Policy I, sec. 2.E.).

76. All Kappa Kappa Gamma members commit that they will comply with federal and state law, and, where applicable, the regulations of a college or university. Members also pledge they "shall be responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct." Attachment 1 at 9 (art. V, sec. 1). These commitments reinforce the existing fiduciary duties of Defendant Mary Pat Rooney and other members of the Fraternity Council to the Sorority's mission and purpose.

## IV. Plaintiffs have a contract with Defendant Kappa Housing Corporation which guarantees housing in accordance with the Sorority's Bylaws, Standing Rules, and Policies.

77. Kappa Kappa Gamma is one of only three sororities with a residential house at the University of Wyoming. Plaintiffs chose to join the Sorority, in part, because they wanted to live communally in a single-sex environment. Some Plaintiffs wanted to be able to rely on other young women, including juniors and seniors, for help and advice with college. Some Plaintiffs sought to live in Kappa's single-sex environment because of religious or moral beliefs that young, unmarried women should not live with young, unmarried men. Some Plaintiffs are sisters or daughters of

Kappa Kappa Gamma alumnae and wanted to experience the close bonds that develop when living in a sorority house. Plaintiffs also include a victim of sexual assault who wanted a safe place to interact with other college students without the presence of men.

78.     The Kappa Kappa Gamma house at the University of Wyoming has a capacity of 52 young women. Currently, the chapter has 44 members, and approximately 36 women signed housing contracts to live in the Kappa sorority house during the current 2022–23 academic year. The national Sorority requires every chapter to have a "live-in rule" to guarantee the sorority house "is filled to capacity at all times." Attachment 8 at 7 (Policy V, sec. 1.J). Upon information and belief, Defendant Kappa Housing Corporation needs approximately forty Kappa members to live in the sorority house each year. If fewer than forty residents live in the sorority house, the Defendant Kappa Housing Corp. lacks sufficient revenue to operate and maintain the house.

79.     The Kappa Kappa Gamma sorority house at the University of Wyoming does not have facilities to support co-educational living. Most of the rooms are on the second floor of the house. There is a small common area on the second floor with a couch. The bedrooms on the second floor and the third floor are old, and many of the doors do not lock consistently. There are two communal bathrooms for the women on the second floor and one on the third floor. The doors to the communal bathrooms do not lock and do not require a code to enter. The primary bathroom on the second floor does not have a private area to disrobe before showering.

80.     The Kappa rules for the sorority house forbid all men from being on the second floor. Attachment 13 at 11 (House Standing Rule 2.4.A.2) ("Males will only be allowed upstairs or in the basement during events that are approved by the Facility Director in consultation with the House Director annually with times set before each event. Exceptions to this require approval from

the House Director, President or Facility Director."). Other than specific days, such as the fall

move-in date, even fathers and boyfriends are prohibited from being on the second floor. Plaintiffs

and other sorority members describe the second floor as a private, safe space where young women

can interact without concern that they will be on display for men.

81.     Since his admission to the Sorority, Langford has received all privileges of Kappa Kappa

Gamma membership, including access to living areas that are restricted to women only. Langford

does not currently live in the sorority house because he has a housing contract that requires him to

live in a dormitory at the University of Wyoming for the 2022–23 academic year.

82.     Even though Langford does not live in the sorority house, he has several times chosen to

sit for hours on the couch in the second-floor common area. He does not study. He does not speak

to the women who live there. Langford is not meeting another member of the sorority who lives

in the house. Instead, Langford stares at women walking past. One sorority member walked down

the hall to take a shower, wearing only a towel. She felt an unsettling presence, turned, and saw

Langford watching her silently.

83.     As a member of the Sorority, each Plaintiff "has an obligation, in accordance with the

chapter's live-in rule, to live in the chapter facility." Attachment 8 at 7 (Policy V, sec. 1.J). "Failure

to fulfill this obligation may result in a loss of membership." *Id.*  Under the live-in rule at the

University of Wyoming, no member is permitted to live outside of the sorority house until there

are 52 residents. Attachment 13 at 9 (sec. 2.3.A.1.).

84.     Plaintiffs Holtmeier, Coghan, Westenbroek, Choate, and Ramar signed a House Contract

with Defendant Kappa Housing Corp. for the 2022–23 academic year. Attachment 10. Under the

contract, Plaintiffs have paid $7,700 to live in the Defendant House Corporation's residential

building. This year, Plaintiffs have not received the benefit of their housing contracts, which guaranteed a single-sex environment that is separate from men and safe. Instead, Langford has regularly been present throughout the sorority house when there should be no men present.

85.     When the Plaintiffs, and in some cases the parents of the Plaintiffs, reached out to Sorority headquarters about Langford's admission, Kappa officials dismissed their concerns. Sorority officials falsely stated that the sorority house is no different than a co-ed dorm at the University of Wyoming. When Plaintiffs and their parents pointed out that the Kappa house does not have locked bathroom facilities, national officials were dismissive. Kappa officials recommended that, if Plaintiffs were uncomfortable or concerned about their safety, they should quit Kappa Kappa Gamma entirely.

86.     Defendants continue to pressure Plaintiffs, and other sorority members, to sign a housing contract for the next academic year, 2023–24. The cost of living in the sorority house has increased by $1,300 to $9,000 per year. Housing contracts were due on February 17, 2023. As of March 27, 2023, only ten women had signed housing contracts. At that time, Defendant Kappa Housing Corp. informed sorority members that Langford had been given permission to live outside the sorority house by national Sorority officials because of unspecified security concerns. The representative of the Kappa Housing Corp. stated that this should resolve concerns and permit members to sign housing contracts for the 2023–24 year. Authorization to live outside of the Kappa house is granted on a semester-by-semester basis, but the housing contract is for the entire academic year. Two sorority members, Jaylyn Westenbroek and Katelyn Fisher, asked that the housing contract be modified to permit the young women to terminate the contract if Langford moves in. Defendant

Kappa Housing Corp. refused this request. If a sorority member refuses to sign the housing contract, she is subject to discipline by the Sorority, including suspension or dismissal.

87. At present, the house will have at most 28 residents next year. Only 25 women have returned a signed contract. This dramatic decline is because of the lack of privacy in the sorority house and Langford's access to all areas within.

88. Defendants' wrongful admission of Langford to the Sorority has caused the sorority house to become financially unsustainable. As a direct result of Defendants' wrongful admission of Langford to the Sorority house, the Kappa house will close. Upon information and belief, once the Sorority house closes, the Kappa Kappa Gamma chapter at the University of Wyoming—which has been in existence since 1927 with thousands of alumnae, including prominent leaders in Wyoming and beyond—will close. Plaintiffs will not only be forced to seek housing elsewhere, away from the single-sex environment that Kappa offered, but they will also lose—forever—the opportunity to participate in a sorority during their college years at the University of Wyoming.

**V.     Defendants' evasion of Kappa Kappa Gamma's membership restrictions represents an ongoing violation of fiduciary duties to the Corporation, and any additional demands to the Sorority's Directors would be futile.**

89. Plaintiffs bring this action derivatively in the right and for the benefit of Kappa Kappa Gamma to redress the breaches of fiduciary duty and other violations of law by Defendant Mary Pat Rooney and other members of the Fraternity Council.

90. Plaintiffs will adequately and fairly represent the interests of Kappa Kappa Gamma Fraternity and its members in enforcing and prosecuting this action. Plaintiffs are college students and Kappa members, who are currently experiencing the changes that occur when a man becomes a part of an all-female sorority house.

91.     The Federal Rules of Civil Procedure, and analogous requirements adopted by the State of

Ohio, require that Plaintiffs' derivative action begin, first, with a request to the corporation.

Plaintiffs must describe with particularity the efforts by Plaintiffs to resolve this violation without

resort to litigation or, in the alternative, explain why any such request would be futile.

### A.     The Defendants have refused Plaintiffs' demands to prevent violation of the Sorority's restrictions on membership.

92.     The Articles of Incorporation, Bylaws, Standing Rules, and Policies of Kappa Kappa

Gamma Fraternity restrict membership in the Sorority to women only. Defendants have not

amended these corporate governance documents to permit membership for Langford, who is a man

who claims to identify as a woman.

93.     Plaintiffs demanded that the Sorority act to prevent the initiation of Langford, who is

ineligible to be a Kappa member. In September and early October 2022, Plaintiffs and, in some

cases, their parents reached out to national Sorority leaders to raise concerns about Langford.  At

that time, Langford's membership had not yet been finalized. In response, Kari Kitrell Poole, the

Executive Director of the Sorority, told Plaintiffs that their request had been presented to the

Fraternity Council and refused. Ms. Poole wrote that "your concerns were reviewed by several

national officers of the organization" and "we [these national officers] believe proceeding with

initiation is the appropriate next step." "Thank you for respecting this decision."

94.     In November 2022, Plaintiffs, through counsel, again wrote to the national Sorority,

requesting that Kappa Kappa Gamma prevent the initiation of Langford until concerns about his

membership were resolved. Attachment 11. Plaintiffs' letter pointed out that Langford's

membership is both a violation of the Sorority's bylaws and also breaches the housing contract

that Plaintiffs signed with the Defendant Kappa Housing Corporation.

95.     The Sorority, through counsel, rejected Plaintiffs' request. Attachment 3. The Sorority

repeated its claim that Kappa Kappa Gamma is a "single-gender organization" that admits "all

women, including individuals who may have been born as males but who identify as women." *Id.*

This statement, which disregards the actual meaning of the word "woman" as used by the Sorority

for 150 years, was presented to Plaintiffs as the official policy of the Sorority. Kappa's counsel

stated that the Sorority leadership has concluded that a woman need not be "biologically born as

female." *Id.* at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs'

request for relief within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

**B.     Any further demand to the Fraternity Council, seeking enforcement of Kappa Kappa Gamma's membership restrictions, would be futile.**

96.     Even had the Plaintiffs not demanded that the Sorority prevent Langford's wrongful

initiation, any demand would have been a futile, wasteful, and useless act. Defendant Rooney, and

the other members of the Fraternity Council, are unable to fairly consider any such demand because

the directors face a substantial likelihood of liability for their role in the Sorority's improper

conduct.

97.     The current Fraternity Council is unable to independently assess Plaintiffs' demands.

Defendant Rooney and the other members of the Fraternity Council have been actively involved

in the development and dissemination of the revised membership policy in flagrant disregard of

the Sorority's corporate governance documents.

98.     Defendant Rooney, with the other members of the Fraternity Council, served as the Board

of Directors for the Sorority during the wrongful behavior alleged herein, and each director knew

of this wrongdoing but failed to act in the face of a known duty to act. For these reasons, Defendant

Rooney faces a substantial likelihood of liability for her participation in these acts. The sustained

Page 41 of 70

failure of the Fraternity Council to ensure effective corporate governance and ensure compliance with the mission and purpose of the Sorority can only have been a result of a knowing breach or reckless disregard of fiduciary duties.

99.     The futility of any request by Plaintiffs is further demonstrated by the November 2022 letter to Plaintiffs' attorney from an attorney for the Sorority. The Sorority, through counsel, stated that "Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status." *Id.* at 2. With this statement, the Sorority's counsel indicates that the Sorority is not only unwilling to take action related to Langford, but the letter indicates that the Sorority has no intention to evaluate whether *any* member complies with the Sorority's requirement that a member be a woman. In stating that the Sorority has no interest in objective evidence about a member's sex, Kappa's counsel demonstrated that the current Sorority leadership will never take action to enforce the membership restrictions that guided the Sorority for its first 150 years.

100.    The letter from Kappa's attorney also lays out, for the first time, the subterfuge that Defendant Rooney and the Sorority's leadership have undertaken to undermine Kappa Kappa Gamma's longstanding membership criteria. The attorney refers to two "Position Statements" issued by the Sorority in September 2021. Position Statements are documents prepared by Sorority staff, and they are never presented to the Sorority's membership for approval or review. These position statements restate language that was originally included in the "Guide for Supporting our LGBTQIA+ Members." Attachment 2. Upon information and belief, the Position Statements were prepared by staff at Sorority headquarters at the direction of the Fraternity Council. In addition to

position statements on "Academic Excellence" and "Hazing," the Position Statements include the following paragraphs:

> **MEMBERSHIP SELECTION**
> Kappa Kappa Gamma is a single-gender organization comprised of women *and individuals who identify as women* whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.
>
> Kappa Kappa Gamma continues to seek members who:
> - Will further the mission and purpose of the Fraternity.
> - Have achieved academic success.
> - Have demonstrated good character.
> - Will enrich the life of the group through shared congeniality.
> - Are responsible citizens and contributing members of their communities.
>
> Each chapter of Kappa Kappa Gamma has the final choice of its own members.
>
> **SINGLE-GENDER ORGANIZATIONS**
> Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.
>
> The single-gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX.

Attachment 12 at 2 (emphasis added). Kappa "Position Statements" are not Bylaws, Standing Rules or Policies of the Sorority. These documents were issued *before* any changes to the Sorority's Bylaws in 2022, and they reflect further evidence that Defendant Rooney and the Sorority's Fraternity Council are knowingly working to undermine the Sorority's lawful membership criteria.

**101.** In the letter to Plaintiffs, Kappa's counsel also refers to a policy issued by the National Panhellenic Conference in 2020. The National Panhellenic Conference is an umbrella organization of twenty-six sororities active on college campuses. The attorney's letter cites the NPC Policy as

support for the Kappa Kappa Gamma's action, stating that the NPC policy means that "all women" may join a sorority, including men who claim to be women. The Kappa counsel's letter, however, selectively quotes the NPC policy. The letter incorrectly suggests that the NPC policy has an effect on the membership requirements of Kappa Kappa Gamma and the other sororities that belong to the NPC. This is false. The 2020 Policy Statement expressly states that it only applies to whether a man who identifies as a woman may participate in formal recruitment ("rush week"), a time when all twenty-six sororities recruit new members. Individual sorority membership requirements are unaffected by the NPC policy:

> Panhellenic Recruitment Eligibility (2020) – POLICY
>
> For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.

The Sorority cannot use the NPC policy to justify a change in Kappa Kappa Gamma's membership requirements. Moreover, the Sorority cannot claim that its policy reflects the NPC policy when it differs materially. The NPC policy requires that a man "consistently live[] and self-identif[y] as a woman." The Kappa Guide requires only that a man "identify" as a woman. Defendants have eliminated any requirement that a male applicant take any steps to demonstrate that he "consistently lives" as though he is a woman. The letter's misleading reference to the NPC policy is further evidence that the Sorority's leadership intended to act contrary to the corporation's governance documents.

102.    The "Guide for Supporting our LGBTQIA+ Members" is not a Bylaw of Kappa Kappa Gamma. The Guide is not a Standing Rule of Kappa Kappa Gamma. The Guide is not one of the

official Policies of Kappa Kappa Gamma. The Guide was not adopted by a vote of the Fraternity Council.

103.     The Guide was distributed to the Sorority's 'workforce' (alumnae who direct chapter operations) in 2018 as a "resource," but the document was not provided to all Sorority members. The Guide states that its purpose is to help fulfill the Sorority's expectation that members "promote integrity, respect, and regard for others, and appreciation of the worth of all individuals." The Guide does not read like an official corporate policy. Members can learn about "How to Be an Ally," "Using Inclusive Language," and "How to Support Someone Who Is Coming Out." Attachment 2 at 1–2. Much of the Guide is unobjectionable as a matter of setting expectations about how Kappa members will interact with others. Upon information and belief, much of the Guide repeats, without attribution, material created by an organization called CampusPride.org. *Compare* Attachment 2 with "Greek Ally Kit" *available at* bit.ly/401gHhv (visited March 3, 2023).

104.     Although the Guide was disseminated by the Sorority as a resource, Defendant Rooney and the members of the Fraternity Council have treated the Guide as a change to the Sorority's membership rules. Upon information and belief, Defendant Rooney and other members of the Fraternity Council regularly communicate through "GroupMe" to avoid oversight and potential discovery of their discussion of the changes to Kappa's membership requirements. Defendant Rooney's active work to conceal the Fraternity Council's decision-making, when considered in combination with the Sorority's *ultra vires* decision to permit men to become members of the Sorority, demonstrates that the Fraternity Council actions have not been made in good faith and are contrary to the best interests of the Sorority.

105.    As alleged herein and based on the duties imposed pursuant to the Fraternity's corporate governance, Ohio law, and obligations set forth in the Sorority's Code of Conduct, Defendant Rooney and the other members of the Fraternity Council were aware that Langford is ineligible to become a member of the Sorority. Given the duties placed on the directors of the Sorority, to the extent Defendant Rooney or any other member of the Fraternity Council did not have actual knowledge of these repeated violations, such lack of knowledge could only be the product of recklessness or willful disregard of their duties that constitutes bad faith. Any further demand upon the Sorority's leadership would be futile.

## VI.    Kappa Kappa Gamma's effort to force the membership of Artemis Langford, and the experience of Plaintiffs since his admission, demonstrate the disruptive effect of a man on the sorority experience.

106.    In pursuit of their improper goal of transforming Kappa Kappa Gamma through the initiation of Artemis Langford, Defendants have violated other Bylaws, Standing Rules, and Policies of the Sorority. Officers and employees of the national organization, and alumnae advisers acting at their direction, actively pressured members of the Chapter to support Langford's admission to the sorority, ignoring Bylaws and Standing Rules that would have foreclosed his initiation. Langford was selected and initiated as a Kappa member without following the Standing Rules and Policies that ensure a secret ballot.

107.    Since Langford's unlawful admission to Kappa Kappa Gamma, Defendants have disregarded concerns about Langford's inappropriate, and sometimes threatening, behavior. Instead, Defendants have retaliated against Plaintiffs and other sorority members who have raised concerns about the transformation of Kappa Kappa Gamma from a women's sorority into a co-ed organization.

108.    Plaintiffs Westenbroek, Holtmeier, Coghan, Ramar, and Kosar all participated in fall sorority recruitment, colloquially known as "rush week," during their first year at the University of Wyoming. Plaintiff Choate joined Kappa Kappa Gamma at another college and transferred to the University of Wyoming at the beginning of her sophomore year. During Kappa recruitment, Kappa Kappa Gamma members repeatedly described the Sorority as a sisterhood, a term universally understood to refer to women only. Ms. Holtmeier was told that, even after she graduates from college, "You are always going to have a sisterhood right there." No person told Plaintiffs that Kappa Kappa Gamma's definition of a "woman" includes men. No person told Plaintiffs that men who claim to identify as women could be accepted to membership and live in the Kappa sorority house with access to all private areas.

109.    During the recruitment process, Plaintiffs learned that if they joined Kappa Kappa Gamma, they would be forever barred from switching to a different sorority. Plaintiffs could have joined other sororities at the University of Wyoming. Plaintiffs would not have joined Kappa Kappa Gamma if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

110.    Plaintiffs' Complaint is supported by other Kappa members who are Wyoming citizens. These young women are not Plaintiffs solely because their participation could destroy this Court's jurisdiction should the Court conclude that Langford is a citizen of Wyoming and also a required party.

111.    Haley Rutsch, Elizabeth Renkert, and Madison Terrell are current members of Kappa Kappa Gamma. These non-party witnesses all participated in fall sorority recruitment during their first year at the University of Wyoming. During recruitment, the members of Kappa Kappa

Gamma repeatedly described the Sorority as a sisterhood for women only. No person told Rutsch, Renkert or Terrell that Kappa Kappa Gamma's definition of "woman" includes men who claim to identify as women. No person told these witnesses that, if they became members of Kappa Kappa Gamma, they would be required to live in the sorority house and that men who claim to identify as women would also be able reside in the house and have access to all private areas. During the recruitment process, Rutsch, Renkert, and Terrell were told that if they joined Kappa Kappa Gamma, they could never join a different sorority. These women could have pledged other sororities at the University of Wyoming. They would not have joined Kappa Kappa Gamma if the Sorority's recruiters or printed recruitment information had disclosed that the Sorority also admits men who claim to identify as women.

112.    Both Ms. Terrell and Katelyn Fisher participated in formal recruitment for Kappa Kappa Gamma in fall 2022, and they were offered the opportunity to join the Sorority at that time. Before initiation, the Sorority requires pledges to attend meetings to learn about the Sorority's history and values. Ms. Terrell, Ms. Fisher, and the other fall 2022 Kappa pledges did not know that Langford would also be joining the Sorority until he attended an educational meeting for new pledges. One pledge originally believed that Langford was at the meeting to write an article about the Sorority for the campus newspaper. Ms. Terrell wrote to national Sorority officials about her surprise, noting that she and other new members had not even received a "heads up" about Langford's potential membership. Sorority leadership has not responded to Ms. Terrell's concerns.

113.    Of the twelve women who were invited to become Kappa members in Fall 2022, four women dropped out before initiation because they did not want to live in a sorority house with a man. One pledge suffered a panic attack and required medical care as a result of her interactions

with Langford. This pledge informed Ms. Choate that, while at a new member meeting, Langford said, "I can't wait to live in the house and sleep with all the girls." Ms. Fisher's fellow pledges told her that they did not join Kappa Kappa Gamma because they did not feel comfortable living in a sorority house with Langford.

### A. Langford's behavior has destroyed the single-sex haven that Kappa members describe as the heart of the sorority experience.

**114.** Plaintiffs' concerns about the admission of a man into the Sorority have been validated by Langford's own behavior and statements.

**115.** Langford is 6'2" tall, and he weighs 260 pounds. No other member of Kappa Kappa Gamma has comparable size or strength. Langford is a sophomore at the University of Wyoming, but he is older than his peers. Prior to attending the University of Wyoming, Langford attended Eastern Washington University. Langford graduated from high school in 2020 and turned 21 years old in October 2022.

**116.** Langford states that he is transgender and that he self-identifies as a woman. His behavior, however, does not reflect a man living as a woman let alone a man attempting to "consistently live" as a woman (as noted in the NPC policy in paragraph 101 above). Langford was involved in an automobile crash in January 2023. At that time, Langford presented a Washington State driver license to the responding officer. The Washington license states that Langford is a male with residence in Bellevue, Washington. The license was issued in November 2020. Beginning in 2019, one year before Langford applied for his license, Washington State permitted applicants to select the gender that would appear on the license. When Langford applied for a Washington license, he could have reported he was male, female, or "X." Langford told the State of Washington that he is male. Langford could have sought to change the sex indicated on his license in 2021, when he

changed his legal name to Artemis Langford, but Langford did not do so. Langford's current driver license states he is male, and when he presented this official document to law enforcement officials in January 2023, Langford was making an assertion that he is male.

117.    Langford wears women's clothing only occasionally. He regularly travels about campus wearing baggy pants as would any other male student. Other than occasionally wearing women's clothing, Langford makes little effort to resemble a woman. He has not undergone treatments to create a more feminine appearance, such as female hormones, feminization surgery, or laser hair removal. Plaintiffs often observe Langford with the facial hair one would expect on a man who either did not shave that morning or whose facial hair has regrown by the evening.

118.    One Kappa member, Lillian Feist, has observed that Langford is very interested in politics and the law. When Langford encounters disagreement, he claims the other person disagrees with him because he is transgender. Langford then states that the disagreement is an act of discrimination. Ms. Feist has observed Langford use his transgender identity to threaten others with discipline, especially those he believes do not support his Kappa membership.

119.    Langford's behavior is made more threatening because Langford is sexually interested in women. Langford has a profile on Tinder—an online dating application—through which he seeks to meet women. Plaintiffs have regularly discovered Langford using his Kappa membership to enter private areas of the sorority house and watch other members. Ms. Rutsch and other members of the sorority work in the evenings, and these women may not return home until the evening hours (9 p.m. for Ms. Rutsch). On at least five occasions, Ms. Rutsch has entered the sorority house and observed Langford sitting alone in a chair in the living room. Langford's chair is located where he can see women walk through the foyer, but the women can only see him out of the corner of their

eyes. Langford does not speak to sorority members as they enter. Instead, Langford stares, following the women with his eyes. Ms. Rutsch and other members of the Sorority have seen no evidence that Langford is studying in the living room. Indeed, it would be difficult to study where Langford sits as there are no easily accessible writing surfaces or places to keep study materials. Langford has, while watching members enter the sorority house, had an erection visible through his leggings. Other times, he has had a pillow in his lap.

**B.  Langford's interactions with the Sorority members prior to voting on his Membership.**

**120.**  Langford first participated in the Panhellenic sorority recruitment at the University of Wyoming in Spring 2022. Langford did not apply to join Kappa Kappa Gamma at that time. Instead, Langford sought to join the Delta Delta Delta sorority. During the event to meet members of that sorority, Langford talked about his desire to be near cadavers and to touch dead bodies. Delta Delta Delta did not invite Langford to join the sorority. Plaintiff Choate learned of this conversation, but she was out of town during the chapter meeting to vote on Langford, and she was not able to present her concerns due to the illegal voting process approved by Defendants and their agents.

**121.**  In August 2022, Langford participated in the formal recruitment process for sororities at the University of Wyoming. The formal recruitment process permits prospective applicants to meet members of each of the four sororities at the University of Wyoming. On the first day of the week, young women attend presentations about sorority life. During the next two days, each sorority sets aside several hours for potential applicants to meet current sorority members. Prospective members visit a sorority house, where they meet with groups of current members in roughly five-minute intervals. After the meetings, the potential applicant and the sorority members rate the experience

Page 51 of 70

using Omega Recruit. Each day, the ratings are tabulated and the individual and the sorority determine whether to continue to discuss membership. During formal recruitment, the Membership Chair for the Kappa chapter at the University of Wyoming told other sorority members that Kappa rules did not permit them to refuse to admit Langford because he was a biological male. The Membership Chair also stated that all members would have to unanimously agree before Langford could live in the sorority house.

122.     During the week of formal recruitment, Langford avoided answering questions about his hobbies, passions, or involvement in other organizations. Plaintiffs Westenbroek, Holtmeier, Choate, and Ramar remember speaking with Langford during the formal recruitment process. Ms. Choate and Ms. Westenbroek remember Langford specifically asking whether he could live in the sorority house. While formal recruitment is intended to determine whether applicants have character traits that align with Kappa Kappa Gamma, Plaintiffs and other chapter members felt Langford lacked passion for the sorority experience. Plaintiffs voiced this concern to the chapter's Membership Chair.

123.     Langford did not complete the full recruitment week for Kappa Kappa Gamma, choosing to try to join a different sorority.

124.     After formal recruitment ended, Plaintiffs and other members of the Sorority believed Langford's membership application was moot. What the chapter's Membership Chair did not tell these Sorority members, however, was that Langford had reached out to pursue Kappa membership through a process called "continuous open bidding." Continuous open bidding allows women to become members of a sorority outside of formal recruitment. The Sorority requires all chapters to

use continuous open bidding if the sorority house has additional capacity. Attachment F at 13 (Policy VIII, sec. 3.F).

125.    The national Sorority's alumnae advisers also directed chapter officers to recruit Langford. From 2016 until Spring 2022, the Kappa chapter at the University of Wyoming was under continuing review by national Sorority leaders. These alumnae supervisors did not believe the chapter was providing the expected benefits to members. Having just concluded this multi-year evaluation period, alumnae advisers told the chapter President and other officers that they could raise the prominence of the Wyoming chapter and garner the favor of national Sorority leaders if they recruited and admitted Langford as Kappa Kappa Gamma's first transgender member.

126.    During Continuous Open Bidding, applicants visit the sorority house for dinner or meet Kappa members for coffee. The Membership Chair schedules these events and uses the chapter group chat to announce dinners and coffee dates to meet *other* prospective new members in fall 2022. This was not done for Langford. Most Plaintiffs did not know Langford was being considered for membership through the continuous open bidding process. Prior to the vote on Langford's membership, the only mention of his membership application occurred at a chapter meeting. At the meeting, the Membership Chair announced that Langford had asked to apply though continuous open bidding. The only written notice to chapter members about a proposed dinner to meet Langford was a brief reference in the paper minutes from that chapter meeting.

127.    When Ms. Holtmeier and Ms. Ramar asked about Langford's application, the Membership Chair stated that the chapter was required to permit Langford to apply, but she downplayed any possibility that he would become a Kappa member. The Membership Chair said so many Kappa members had come to her that it was "a 99.9% chance" that he would not be offered membership.

Just one week before the surprise vote on Langford, the Membership Chair continued to state that, if Langford were to join Kappa Kappa Gamma, he could not live in the sorority house unless every other member agreed.

128. National Sorority representatives usually have little involvement in member selection until after chapter members have voted. After that point, every prospective member must be reviewed and approved by the national Sorority; the chapter must receive "permission to initiate" each candidate. In Langford's case, however, national Sorority representatives, including the alumnae advisers, were extensively involved from the start of the continuous open bidding process. Upon information and belief, alumnae advisers coached chapter officers about the importance of Langford's admission.

### C. The Voting Process.

129. The chapter leaders who were in office in September 2022, with direction from alumnae advisers, implemented an illegal voting process to ensure that Langford was admitted to Kappa Kappa Gamma. (The chapter elects new officers each year in November, and the new officers take over at the end of the fall semester.) Under the Standing Rules and Policies of the Sorority, chapters must use the electronic voting system selected by the national Sorority, called "Omega Recruit," when voting on new members. Attachment 7 at 1 (Standing Rules 1.1A); Attachment 8 at 14 (Policy VIII, sec. 3.P.). This electronic voting system guarantees anonymity, and Omega Recruit was used in Spring 2022 for applicants in the continuous open bidding process. Further, under the Sorority's Standing Rules, all active chapter members "shall participate in membership selection unless excused in writing by the designated chapter adviser." Attachment 7 at 1 (Standing Rules 1.1.A.1).

**130.** Voting for Langford did not follow the required procedures. All Chapter members are expected to attend the weekly Chapter meeting on Monday evening. Members can be excused if they attend a Sunday evening Chapter Council meeting where officers discuss the upcoming meeting. Ms. Ramar and another sorority member attended the Chapter Council meeting prior to the vote on Langford's membership. At the Chapter Council meeting, officers intentionally concealed the fact that Langford's candidacy would be presented for a vote, that the chapter officers intended vote using a Google Poll, and that only those present at the chapter meeting could vote on Langford. Ms. Ramar and the other member would have attended the chapter meeting if they had known a vote on Langford would occur. They would have voted against Langford's admission.

**131.** At the Chapter meeting on September 19, 2022, members were told that they would vote that day on Langford. Sorority rules prohibit discussion during the voting process, but this restriction was not followed for Langford. Several members of the chapter, including the President, the Membership Chair, and the Vice President for Academic Excellence, spoke prior to the vote. Each made almost identical statements that, upon information and belief, were coordinated with national Sorority officials. Each speaker stated that members could only vote against Langford if they could articulate specific concerns about his personality. If members had not met Langford, then a "no" vote was evidence that the member was a bigot. Kappa members understand that bigotry is a basis for suspension or expulsion from the Sorority. The Membership Chair, however, had obscured the only opportunity to meet Langford. Upon information and belief, the Membership Chair, in conjunction with national Sorority officials, did so because it would permit her to threaten members if they did not vote for Langford.

**132.** The members who discussed Langford at the chapter meeting repeatedly referenced "transphobia" and "homophobia." One officer stated, "[r]egardless of what your political views are, our Kappa values are acceptance and kindness so if that is something that you disagree with, that's not in line with Kappa values." When other members asked to respond, the chapter President, stated, "No, no discussion." Then, the chapter President continued to recognize other members to speak about why Kappa Kappa Gamma had to admit Langford. Statements included: "You should basically be voting yes for everyone unless they truly go against Kappa's values." "It's 2022. If you vote no, it better be for, like, literal issues with that new member or else it's homophobic." "If you have something to say about this that isn't kind or respectful, keep it to yourself." "If your only concerns are about [Langford] living in the house, you are thinking too far down the road."

**133.** At the end of the chapter meeting, the chapter officers described the voting process. Rather than using Omega Recruit, chapter members would vote using a link to a Google Poll. Further, even though the link to the Google Poll would be emailed to all chapter members, the officers stated that only members who had attended the chapter meeting could vote. This restriction violated the Sorority's Standing Rules.

**134.** Thirty minutes after the link to the Google Poll was sent to members, the chapter officers sent out a link to a second Google Poll. This second Google Poll required voters to sign-in with their email address. When a Google Poll is conducted in this manner, it is not a secret ballot. The Google dashboard shows when each email address logs in, and it also records how the vote total changed. In addition, during the second vote, chapter officers moved throughout the sorority house, locating some (but not all) members and instructing them to vote on their phones while the officers watched. When enough votes for Langford's membership had been secured, the voting stopped.

**135.** At least three members of the Sorority voted against Langford in the first Google Poll and changed their vote in the second poll. When these women were told that they would have to vote again with an email address, they understood that the second vote would not be secret. The members changed their votes. At least one sorority member voted for Langford's membership only because she feared retribution. Ms. Rutsch voted against Langford's membership, and she has spoken with several other Kappa members who admitted that they also changed their votes in fear of reprisal.

**136.** Langford was admitted by a margin of either one or two votes. Had the chapter conducted a lawful voting process, according to the Sorority's required procedures, Langford would not have been offered membership in Kappa Kappa Gamma.

### D. The Sorority's refusal to enforce its Bylaws, Standing Rules and Policies.

**137.** The day after the vote on Langford, Plaintiffs Westenbroek and Ramar and another sorority member approached the chapter President and the Vice President for Standards about prior assurances that Langford would not live in the sorority house unless every member agreed. The chapter President responded that she had no idea where this assurance came from, that it was false, and that she had never heard anyone make such a statement. In August 2022, however, the chapter President was standing next to the Membership Chair on the stairs of the Sorority house when the Membership Chair made this statement about housing for Langford.

**138.** Plaintiffs expressed concern that the chapter would lose other initiated and uninitiated members who do not want to live with a man. The chapter officers are seniors who will never live with Langford. They replied "we don't care about numbers." When Plaintiffs objected to Langford's membership as a violation of Kappa rules, Defendants and their agents instructed

Plaintiffs to resign from Kappa Kappa Gamma if they disagreed with Langford's membership. At the time Defendants urged these Kappa members to resign, Defendants and their agents knew that Plaintiffs cannot join another Sorority.

139. In addition to the voting process for Langford, his membership application has been evaluated using a different standard. In fall 2022, Langford had a 1.9 cumulative grade point average. This GPA is disqualifying for Kappa applicants, who must have at least a 2.7 GPA. Attachment 14 at 1 (House Bylaws, art. III, sec. 1.A.1.). Nevertheless, Langford was approved by the national Sorority. Upon information and belief, the national Sorority did not even consider whether a grade exception was necessary before admitting Langford. Langford is also not on grade probation, despite the fact that his low GPA requires probation as a condition of membership.

140. When Plaintiffs and their parents raised concerns about Langford's presence in intimate areas of the sorority house, Sorority officials told them "just don't use the same bathroom that [Artemis] uses" and "since [Artemis] identifies as a woman you have no reason to feel uncomfortable." Sorority employees stated Langford's presence would be no different than a co-ed dormitory living situation. This is factually incorrect, as the co-ed dormitories at the University of Wyoming have locks and other protections for women. Sorority officials said that if Plaintiffs objected to Langford's membership, they do not subscribe to Kappa's values of inclusion and diversity.

141. Plaintiffs reached out to Kari Kitrell Poole, the Executive Director of the Sorority, with concerns about the voting process and Langford's membership. Ms. Poole responded that "your concerns were reviewed by several national officers of the organization" and "we [these national

officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

142.    After Plaintiff Holtmeier raised further concerns, she was brought before a disciplinary hearing. Chapter officers read prepared statements that they had discussed with Sorority officials and provided material so Ms. Holtmeier could "educate" herself. The Sorority's alumnae adviser for standards was present, and she spent the entire hearing texting with national Sorority officials on her phone. The material given to Ms. Holtmeier included the "Guide for Supporting our LGTBQIA+ Members." Ms. Holtmeier was threatened with further discipline if she did not agree that Langford is a woman or questioned whether his vote complied with the Sorority's rules. When Ms. Holtmeier asked questions, she was told "that's what we are supposed to do now." At least one other sorority member has also been threatened with discipline if she does not agree that Langford is a woman.

### E.    Langford's conduct after Defendants granted him access to the sorority house.

143.    Since the vote, Langford has received all privileges of Kappa Kappa Gamma membership, including access to living areas that are restricted to women only. Langford participates in the weekly meetings and the secret rituals of sorority chapter; he eats at the sorority house; he participates in other all-female activities that are closed to non-members. The second floor of the sorority house is off-limits to men at all times, and it has a small common room called the "PJ," so called because members can socialize there in pajamas. Since his admission, Langford has visited the P.J. several times, sometimes sitting alone for hours. At other times, members have entered the first-floor study room, turned on the lights, and found Langford asleep on the couch.

144.    Langford's conduct at the slumber party prior to the Kappa initiation ceremony for new members was inappropriate and threatening. Ms. Kosar offered to be responsible for taking pictures of the other pledges with a disposable camera. At some point in the evening, after Ms. Kosar had put down the camera briefly, Langford took the camera and began taking pictures of the young women at awkward moments when they were not prepared. During the evening, Langford repeatedly questioned the women about what vaginas look like, breast cup size, whether some women were considering breast reductions, and birth control. Langford talked about his virginity and at what age it would be appropriate for someone to have sex. Langford also talked about kissing a girl.

145.    Langford stated that he would not be staying the night at the slumber party, but he remained after all other women had departed, saying he would not leave "until after you fall asleep." Langford was supposed to leave by 10 p.m.. At about 11:15 p.m., when the lights had been turned off and other pledges were trying to sleep, Langford started loudly singing "God Rest Ye Merry Gentlemen" by himself in the corner of the room by the light of his laptop screen. Langford did not leave until midnight.

146.    The next morning, Langford returned and stood silently in the corner of the room near the door while other pledges changed from sleeping garments into other clothing. Ms. Kosar did not know that Langford had returned. Ms. Kosar had not slept wearing a bra. She faced away from the others and removed her shirt. After she had put on a new shirt, Ms. Kosar turned around and discovered Langford staring at her. After the morning activities, another Kappa member informed Ms. Kosar that while watching her, Langford had become sexually aroused. He stood by the door

with his hands over his genitals. Since that event, Langford has repeatedly asked Ms. Kosar about her romantic attachments.

147.   In December 2022, Ms. Renkert attended a yoga class sponsored by the Panhellenic union for members of all of the sororities at the University of Wyoming. Langford attended this yoga class, but he did not participate. He sat in the back of the room for an hour and watched the assembled young women flex their bodies. The door to the yoga studio was near where Langford sat, so he could have left without drawing attention or disrupting the class. Langford did not leave until the end of the one-hour class. Langford did not speak to anyone at the yoga event. After the class, participants were invited to stay for refreshments. Other participants commented on how uncomfortable they felt as Langford watched them.

148.   At times, sorority members have observed Langford writing detailed notes about members and their statements and behavior. Langford states that he is a journalist, and he has published articles and columns in *The Branding Iron*, the campus newspaper at the University of Wyoming. Langford told Ms. Feist that he is always writing things down in his notebook so that he can use them later in an article. Sorority members believe that Langford is recording these private comments in order to publish them at a later date.

149.   Langford uses his phone to take pictures of women in the sorority house without their knowledge or consent. In one incident, Langford walked up to a sorority member in the dining room, raised his phone to her face, took a picture, and then walked away without explanation or apology. Ms. Renkert has observed Langford taking other pictures with his phone while eating at the house. She has seen Langford rest his phone on the table in a manner that it appears as though he is scrolling through an app when he is, in fact, covertly using the camera to photograph women.

Page 61 of 70

150. In December 2022, Ms. Renkert submitted a letter of resignation to the chapter officers, because her interactions with Langford made her feel unsafe. She did not want to live in the sorority house with him. Shortly after submitting the letter of resignation, Ms. Renkert determined that she valued her "women-only" sisterhood experience. Ms. Renkert's parents offered to pay for off-campus housing, so Ms. Renkert now pays the full cost of living in the sorority house and also pays to live in an off-campus apartment.

151. Ms. Renkert withdrew her letter of resignation after her parents offered to pay for her housing. The Kappa chapter officers and their alumnae advisor, however, stated that Ms. Renkert could not do so. The alumnae advisor stated that Ms. Renkert was required to withdraw her letter by early January 2023, when all students were gone for semester break. Ms. Renkert objected to this interpretation of the Sorority's rules, and the Sorority's national officer for standards eventually agreed that the alumnae adviser was wrong. Ms. Renkert was entitled to have a vote on her request to resign. The chapter members overwhelmingly voted to let Ms. Renkert remain as a member in good standing.

152. Before the vote by chapter members, Ms. Renkert learned that Langford had sent a blacklist of chapter members to officials at the national Sorority headquarters. Langford's list contains the names of women he believes are transphobic and should be expelled from Kappa Kappa Gamma. Ms. Renkert learned that her name is on Langford's list. Upon information and belief, Ms. Renkert believes that the alumnae adviser intentionally put forward an incorrect interpretation of the Sorority rules in retaliation for her view that Langford is not a woman and not eligible to be a member of Kappa Kappa Gamma. Further, Ms. Renkert believes that Sorority officials have made, and will continue to make, efforts to eject her and the other Kappas on Langford's list from the

Sorority. This attempt to force Ms. Renkert out of the Sorority was in retaliation for her disagreement with Langford's membership. Langford has demonstrated and acted on his intention to pressure the Sorority, at the local and national level, to expel any member who is committed to preserving the women-only character of the Sorority.

### F.     Damages.

**153.**     As a requirement of membership, Sorority members must "promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the *Bylaws, Standing Rules, and Policies* [of the Sorority] as well as my chapter Bylaws and Standing Rules." Attachment 9. (Commitment Form). Collegiate members pay dues at initiation and additional dues every year to the Sorority. Plaintiffs cannot resign from Kappa Kappa Gamma to join a different sorority. Kappa Kappa Gamma is one of the 26 sororities that comprise the National Panhellenic Conference (NPC). These sororities have all agreed a woman who joins one NPC sorority is permanently ineligible for membership in any other NPC sorority.

**154.**     Each Plaintiff joined Kappa Kappa Gamma with the promise they would be able to live and socialize in an all-female environment. Defendants have repeatedly lauded the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will *never* have the benefits of a college sorority experience. Some of the damages to each Plaintiff are easily calculable, including the dues and housing payments that were made for the purpose of living in an all-female environment. Some will be more difficult to calculate, but they are no less real. For 150 years, Kappa Kappa Gamma has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa Kappa Gamma has stated that these benefits result from the single-sex experience. Plaintiffs agree that these benefits exist. The

loss of these lifetime benefits is similarly calculable, and Defendants are responsible for this damage to Plaintiffs.

155. The Sorority itself has also been damaged by Defendant Rooney and the other members of the Fraternity Council. Their violations of fiduciary duty have caused the sorority chapter at the University of Wyoming to lose significant membership in less than six months. With only ten signed housing contracts for the next academic year, the sorority house at the University of Wyoming will close and then the college chapter itself will fold. The loss of a sorority chapter has a significant effect beyond just the loss of dues from the college students there. These young women will become leaders, and—just as prior generations have—they will donate to the Sorority and its continued operation. The loss of a sorority chapter cuts off all future alumnae from that school.

156. Plaintiffs want Kappa Kappa Gamma to remain loyal to the promises the Sorority has made throughout its history. Plaintiffs ask for a declaratory judgment that Kappa Kappa Gamma remains as it claims in its articles of incorporation: an organization "intended to unite **women**, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Attachment 4 at 4. Plaintiffs seek to prevent the transformation of their intimate living arrangements and their social organization—without any change in the sorority's legal documents—into a co-ed organization that admits men and women.

157. So long as Langford has the same *legal* access as any other sorority member, young women will not seek Kappa membership at the University of Wyoming. Plaintiffs cannot rely on assurances that Langford will minimize his presence or otherwise alter his behavior. On April 6, 2023, shortly after information about this Complaint became public, Langford requested a

"standing excuse" that he not be required to attend Kappa events "until further guidance is given." On April 9, 2023, Langford extended this request to chapter meetings and other gatherings, asking that he be excused unless his presence is "absolutely essential." This time away lasted little more than a week. On April 17, 2023, Langford resumed his active presence at the sorority house.

158.    Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty, and their contractual obligations to the Plaintiffs, by purporting to admit Langford into the Sorority.

## COUNT I

### Derivative Cause of Action

159.    Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

160.    Under Ohio law, members of a nonprofit corporation can bring two types of claims. A derivative action is brought in the name of the corporation. Such a suit is the exception to the usual rule that a corporation's board of directors manages or supervises the management of the corporation, and it allows a member to circumvent a board's refusal to bring a suit on a claim. On the other hand, if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation, then the complaining shareholder has a direct action. An injury that

would be distinct from that suffered by other members could be shareholders could be a wrong involving one of the member's contractual rights as a member. As a general proposition, claims for breach of fiduciary duties on the part of corporate directors or officers are to be brought in derivative suits. This is because the damage that results from the fraudulent or negligent management of the corporation is primarily damage to the corporation and to the corporate assets, and because it affects the members only indirectly and all of them alike.

161.    Ohio's nonprofit-corporation law provides members of nonprofit corporations with a derivative cause of action on behalf of the corporation. When members bring a derivative cause of action against a nonprofit corporation, they are enforcing a corporate right just as shareholders may do in for-profit corporations. Because such a suit brought by a member is identical to a shareholder-derivative suit, the procedural requirements of Fed.R.Civ.P. 23.1 for bringing a shareholder-derivative suit must be fulfilled by members of a nonprofit corporation who bring such a derivative suit.

162.    Rule 23.1 establishes the requirements for maintaining a shareholders' derivative action. Specifically, complaining shareholders must (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort or did not make it, and (3) show that they "fairly and adequately" represent the interests of other shareholders "similarly situated."

163.    By not only allowing, but also by endorsing and actively working to secure the membership of Langford, the directors of the Sorority have violated their duties of loyalty, care, and obedience/compliance.

164.    The Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma, since the corporation's creation, have limited membership to women only. Women, as understood throughout the Sorority's existence, are adult female human beings. Langford is not a woman. He is a man.

165.    Plaintiffs have repeatedly reached out to the corporation's leadership to contest its refusal to enforce the Sorority's membership requirements. Defendants have not only refused to prevent Langford's membership, they maintain that no such membership requirement exists at all. To the extent any further demand is required, such a demand would have been futile.

166.    As a result of Defendant's behavior, Kappa Kappa Gamma has lost its identity as an organization for women. At the University of Wyoming chapter, almost half of the women who were offered membership in the Sorority in Fall 2022 have declined to become members. During Spring 2023 recruitment, only two women pledged to join the Sorority at the University of Wyoming. Upon information and belief, the insistence on admitting men to the Sorority has also resulted in a significant decline in alumnae giving, membership, and participation. These changes have also harmed the ability of Kappa Kappa Gamma chapters across the nation to recruit new members.

167.    The chapter at the University of Wyoming no longer has enough members to be financially viable, and the behavior of Defendant Rooney and the other Fraternity Council members will result in the chapter's closure unless the Court intervenes. Plaintiffs seek monetary, declaratory, and injunctive relief, as well as such fees and costs as are available.

## COUNT II

### Breach of Contract

**168.**     Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**169.**     To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages.

**170.**     Defendant Kappa Kappa Gamma Building Corp., and Plaintiffs have entered into a contract to provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. These Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house. Indeed, men cannot enter the living areas of the Sorority except upon special circumstances that have been approved in advance.

**171.**     Langford's access to and presence in the sorority house violates the housing contract that Plaintiffs signed.

**172.**     Plaintiffs have suffered damages as a result of this breach.

## COUNT III

### Tortious Interference with a Contract

**173.**     Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

**174.**     A claim of tortious interference with a contract requires (1) existence of the contract; (2) Defendant's knowledge of the contract; (3) intentional and improper interference *inducing or causing a breach*; and (4) resulting damages.

175. Defendant Kappa Kappa Gamma knew that Plaintiffs have a contract for housing with Kappa Kappa Gamma Building Corp. Defendants knew, because they required this language, that the contract requires the parties to comply with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. Through their initiation of Langford, Defendants have prevented Plaintiffs from having the benefit of the Housing Contract that they signed.

## COUNT IV

### Direct Cause of Action

176. Plaintiffs incorporate and reallege each and every allegation set forth above, as though set forth fully herein.

177. When wrongful acts are not only against the corporation but are also violations of a duty arising from contract or otherwise owed directly by the wrongdoer to the shareholder, the shareholder can bring suit for personal damages or other relief.

178. The Plaintiffs were deceived, believing that they were joining a woman-only organization, which has made them ineligible to join a different Sorority. Plaintiffs have now been deprived of the all-female environment that other Kappa members have enjoyed throughout the Sorority's 150 year history. Plaintiffs are now required, as a condition of membership, to reside in the same house as a 6'2", 260 pound man who stares at them, asks about their intimate past, makes notes about their statements and takes photographs of them without their consent, and intimidates them by threatening to publicly label them bigots if they raise concerns.

179. Plaintiffs' loss of privacy, frustration of contractual expectations, and emotional distress are not injuries that Plaintiffs share in common with all Sorority members. They are, however, the direct result of Defendants' actions to force the admission of Langford as a sorority member.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for the following relief:

**1.** A declaratory judgment that, under the organization's corporate governance documents, including its Bylaws, Standing Rules and Policies, Langford is not eligible for membership in Kappa Kappa Gamma Fraternity and his purported admission is therefore void *ab initio.*

**2.** A declaratory judgment that the Defendants have violated their obligations to the organization by purporting to admit Langford to the Sorority.

**3.** A declaratory judgment that the Defendants have violated the housing contract and Plaintiffs are entitled to the money damages they have suffered as a result thereof.

**4.** Preliminary and permanent injunctive relief preventing Defendants from seeking or encouraging Langford or any man from becoming members of the Sorority.

**5.** Monetary damages to compensate for Defendants' wrongful acts.

**6.** Plaintiffs' reasonable costs and attorneys' fees pursuant to applicable contractual language, statute or authority, and further relief this Court may grant in its discretion.

**7.** Any other relief that the Court deems just and appropriate.

Respectfully submitted,

/s/ Cassie Craven
Cassie Craven
Wyoming Bar No. 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St., Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

/s/ John Knepper
John Knepper
Wyoming Bar No. 7-4608
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

Dated this 20th day of April, 2023.

**UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING**

| | | |
|---|---|---|
| JAYLYN WESTENBROEK, et al., on behalf of themselves and derivatively on behalf of KAPPA KAPPA GAMMA FRATERNITY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 2:23-cv-00051-ABJ |
| v. | ) ) | |
| KAPPA KAPPA GAMMA FRATERNITY, et al., | ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO KAPPA KAPPA GAMMA'S MOTION TO DISMISS

At least the Kappa Kappa Gamma Defendants (the national Sorority, its President Mary Pat Rooney, and the Kappa Housing Corporation) and the Plaintiffs agree on one fact: Plaintiffs are members of the Kappa Kappa Gamma Fraternity, a nonprofit corporation organized under the laws of Ohio. Doc. 20 at 1. Beyond this, however, Kappa's current motion makes clear the parties agree on little else.

Kappa's motion distorts both the allegations in the Complaint and the relief that Plaintiffs seek. Fundamentally, Plaintiffs do not claim an inchoate "legal right to be in a Sorority that excludes transgender women." Doc. 20 at 2. Kappa Kappa Gamma is a nonprofit corporation that has, for more than 150 years, limited membership to women only. As Kappa's motion to dismiss makes clear, Rooney and the rest of the Fraternity Council have decided that Kappa must "evolve." Doc. 20 at 19. But corporations do not evolve. They change when the corporation's Articles of Incorporation or bylaws are amended. Plaintiffs claim the rather unremarkable right, as members

Page 1

of a nonprofit corporation, to insist that the corporation follow its bylaws and — when the Board of Directors refuses — to seek the aid of the courts. Plaintiffs do not dispute that Kappa Kappa Gamma *can* change its membership criteria. They dispute whether it has lawfully done so.

Kappa has moved to dismiss the Complaint for four reasons. They argue the Court lacks jurisdiction over Mary Pat Rooney, the President of Kappa Kappa Gamma; they argue that the Court lacks jurisdiction over the Plaintiffs' claim for breach of contract; they argue that the Plaintiffs have not adequately presented their demand to Kappa's Fraternity Council; and they argue the evolution of the word "woman" allows the Sorority leaders to admit men who claim to be women as members without any change to the bylaws. Plaintiffs will rearrange the order of the arguments slightly in this response, but none justify dismissal at this stage of litigation.

Rooney is the Chief Executive Officer of Kappa Kappa Gamma and the Complaint alleges that she has been directly involved in the decision to disregard the Sorority's bylaws and rules and to admit a man, Langford, as a member of Kappa Kappa Gamma. Tenth Circuit precedent holds that this Court has specific in personam jurisdiction over a derivative suit against corporate officials in the state where the injury to the corporation occurs. *See Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013). That location is Wyoming. Second, Kappa argues that the Complaint should be dismissed against the Sorority itself because the plaintiffs have failed to detail, with specificity, how they first sought a remedy from Rooney and the Fraternity Council of Kappa Kappa Gamma before filing suit. Kappa's argument misstates the allegations in the Complaint, in particular the recitation of the efforts of not just the Plaintiffs' attorneys but also the Plaintiffs and their parents to convince Kappa to address the bylaws violations identified in the Complaint. Doc 6. at ¶ 93-95; ¶140-142. Kappa also argues that this Court has no authority to determine Kappa

membership. This also misstates the Plaintiffs' argument. Plaintiffs are not arguing that Kappa could *never* change its membership requirements. Of course it can. The problem here is that Kappa has not. Kappa has availed itself of the corporate form, and it has adopted bylaws. These bylaws and other official policies restrict how the corporation may operate. If the corporation wishes to change, it must amend these bylaws. What the current leadership of the corporation cannot do is ignore these bylaws and pretend that they are above the law.

Finally, Kappa moves to dismiss the Plaintiffs lawsuit against the Kappa Building Corporation, arguing that the Plaintiffs have not met the jurisdictional threshold. In doing so, they both ignore and artificially limit the damages that Plaintiffs are claiming. Plaintiffs are not claiming only the cost of their rental payments for each year, they are also claiming additional special damages. (*see* Doc 6. at ¶¶ 154-156 & ¶158). Wyoming allows special damages for contract breach, especially when there are special circumstances and a special relationship, as here. Kappa's artificial attempt to lower the damages claimed is not sufficient to defeat jurisdiction.[1]

Kappa's motion to dismiss is unsurprising in some ways, as it provides the consistent response that Plaintiffs have received since they first raised their concerns in September 2022: sit down and shut up. Or quit. This attitude reflects the arrogance of the underlying attempt at the unlawful transformation of a 150-year-old institution.

Of particular note, this Court should be sensitive to the numerous unsupported factual allegations that are introduced in Kappa's response. Kappa states that it has had a policy to admit men since 2015. The difficulty is that there is no evidence of this fact. Indeed, to the extent that

---

[1] Kappa also makes several derivative arguments to dismiss the Complaint, but each rest on the underlying assumption that the Sorority has the authority to disregard the membership restrictions in its bylaws.

Page 3

this policy existed, it appears to have been concealed. Plaintiffs have not yet claimed fraud in their Complaint, but this new detail suggests that this is only a matter of time. To the extent that Kappa leaders have had a policy to admit men who claim to be women, but the organization has held itself out as all-female, the national Sorority has been engaged in fraud. The brief includes other claims of fact that simply cannot be credited at this stage of litigation.

## Standard of Review

At this early stage of litigation, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023).

Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that the defendant acted unlawfully but the complaint does not need to establish that the defendant probably acted unlawfully. *Mckinney v. Granite Peak Fabrication, LLC*, No. 19-CV-00266-ABJ, 2020 WL 10356870, at *2 (D. Wyo. Mar. 13, 2020) (citing *Iqbal*). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Page 4

"Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton*, 63 F.4th at 1276 (punctuation omitted). There is a "low bar for surviving a motion to dismiss," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.*

## I.    The Court has in personam jurisdiction over Rooney.

A federal district court's authority to assert personal jurisdiction in a diversity suit is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)). "[I]n addition to satisfying this state law requirement, the exercise of personal jurisdiction must not offend the due process clause of the Fourteenth Amendment." *United States v. Botefuhr*, 309 F.3d 1263, 1271 (10th Cir. 2002) (quotation omitted). Wyoming's long-arm statute confers the maximum jurisdiction permissible consistent with the Due Process Clause. *Markby v. St. Anthony Hosp. Sys.*, 647 P.2d 1068, 1070 (Wyo. 1982). Thus, this Court's analysis here is limited to a single due process analysis. *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010).

"Consistent with due process, a court may exercise specific personal jurisdiction over a non-resident defendant only when that defendant has the requisite 'minimum contacts' with the forum state, such that having to defend the lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[T]he Supreme Court has instructed that the 'minimum contacts' standard requires, first, that the out-of-state defendant

must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' [a] defendant's forum-related activities.'" *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

### A.      Rooney has sufficient minimum contacts with Wyoming to support specific in personam jurisdiction in this Court.

The "purposefully directed" analysis "can appear in different guises," "[i]n all events, the shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Dudnikov*, 514 F.3d at 1071. Next, "[t]he import of the 'arising out of' analysis is whether the plaintiff can establish that the claimed injury resulted from the defendant's forum-related activities." *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (quotation omitted). Finally, "[i]f the defendant's actions create sufficient minimum contacts, the court must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." *Eighteen Seventy*, 32 F.4th at 966 (alterations and quotations omitted).

The "minimum contacts" standard requires, first, that Rooney must have "purposefully directed" her activities at residents of the forum state, and second, that the Plaintiffs' must "arise out of" Rooney's forum-related activities. Rooney argues that there is no basis to hold her subject to Wyoming jurisdiction when she has never been to Wyoming, but Tenth Circuit precedent makes clear that a corporate officer like Rooney can be sued in a derivative action by the corporation in the state when the injury occurred.  *Newsome v. Gallacher*, 722 F.3d 1257, 1264–81 (10th Cir.

2013). Even if the corporation is located elsewhere, courts do not "ignore where the injury was actually felt." *Id.* ar 1268. "Thus, in a lawsuit claiming breach of fiduciary duty, we believe it is appropriate to consider harm to those to whom a fiduciary duty was owed … when answering the question of who was injured and where." *Id.*

Here, the Kappa members with the greatest injury, the strongest interest in vindicating the corporation's interests, and—indeed—standing to object are tied to the Wyoming forum. The answer to "Who was injured, and where?" is that Kappa and its members were injured by the admission of Artemis Langford as a member of Kappa at the University of Wyoming.

As noted, purposeful direction in this suit has three requirements: (1) intentional action, (2) express aiming at the forum state, and (3) knowledge that the brunt of the injury would be felt in the forum state. *Dudnikov,* 514 F.3d at 1072. The intentional action element requires little discussion. The record contains no suggestion that Rooney acted unintentionally when she took the steps that let to Langford's admission. Rooney is the "chief executive officer," Doc 6-1 at 112, of a non-profit corporation that operates in the State of Wyoming. As the verified complaint alleges, decisions at the chapter level are not made by students at the University of Wyoming. Doc. 6 at ¶ 74. Rather, every single decision is made by the "workforce" that Rooney commands. Doc. 6 at ¶¶ 75-76. These include the decision to admit Langford to Kappa Kappa Gamma.[2]

---

[2] Kappa's Motion infers malicious intent in the decision not to name other corporate officers of Kappa Kappa Gamma. The opposite is true. Just as Plaintiffs did not name the local chapter officers who worked at Kappa's behest to admit Langford, the Plaintiffs named only one member of the Fraternity Council to reduce the collateral consequences of the lawsuit on third parties. The law does not require more, but if there is a concern, Plaintiffs can sue more Directors. The Plaintiffs are open to whatever direction is provided.

Kappa attempts to introduce new facts in its motion to dismiss, claiming that Rooney had no awareness of the events at issue here. First, this new fact is directly contrary to Plaintiffs' allegation that Rooney knew what was happening in Wyoming. These allegations are more than mere conjecture, especially when the executive director of Kappa (Rooney's subordinate) referred to Rooney's direct involvement, telling Plaintiffs they should stop complaining about Langford's admission because "your concerns were reviewed…we believe proceeding with initiation is the appropriate next step" so "Thank you for respecting this decision" Doc. 6 at ¶93. The use of "we" in the passive voice is evidence that the decision was made by Poole's superior (Rooney). *See also* Doc. 6-1 at 21. The President supervises staff. Finally, the careful wordsmithing in Kappa's memorandum indicates the extent of Rooney's involvement. Kappa states that Rooney was unaware until an invitation to join was extended to Langford. But this was not the last moment before Langford was inducted into membership. As the Complaint alleges, Plaintiffs repeatedly noted the various bylaws and other violations up until the date of Langford's actual induction in mid-November. Doc. 6 at ¶¶ 93-95; ¶¶ 140-142. Kappa appears to be seeking to mislead this Court with its factual assertion.

The express aiming element requires Wyoming to have been the "focal point" of the tort or contract action. *Dudnikov,* 514 F.3d at 1074. Langford is a member of the Kappa Kappa Gamma sorority chapter located at the University of Wyoming. The women who will be most affected by Langford's admission all attend college in Laramie, Wyoming. The sorority house where Langford said he "cannot wait to sleep with all the girls," Doc. 6 at ¶ 113, is in Wyoming. The final requirement is knowledge that the brunt of the injury would be felt in the forum state. This is also alleged. Doc. 6 at ¶ 166.

When a plaintiff satisfies its minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless "offend traditional notions of fair play and substantial justice." *Dudnikov,* 514 F.3d at 1080 (internal quotation marks omitted). "Such cases are rare." *Rusakiewicz v. Lowe,* 556 F.3d 1095, 1102 (10th Cir.2009). The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477. Kappa does not address the usual factors, but instead suggests that a corporate officer is not subject to jurisdiction because of the actions of the corporation in a forum. The Tenth Circuit's decision in *Newsome* makes clear that this is not a requirement of due process analysis.

Under the 'fiduciary shield doctrine,' a nonresident corporate agent generally is not individually subject to a court's jurisdiction based on acts undertaken on behalf of the corporation. *Newsome*, 722 F.3d at 1275. The fiduciary shield doctrine, however, only exists as a matter of state law. *Id.* As noted earlier, Wyoming has abandoned any limits on personal jurisdiction beyond what the Constitution provides.[3]

## II. The Plaintiffs' derivative claim has been pled with specificity.

Kappa claims that the Complaint has not specifically alleged sufficient information to allow Rooney and the other corporate leaders to act and avoid a breach of fiduciary duty. This, however, misses the extent to which the Plaintiffs, their parents, and their attorneys asked for months for actions by Kappa. The demands did not begin in November 2022 with a letter from

---

[3] Kappa cites a recent decision of another federal court in Wyoming which quotes the fiduciary shield doctrine. That case relies, ultimately, on a 1973 Wyoming Supreme Court case that applied the fiduciary shield doctrine. *Cozzens v. Piper Aircraft Corp.*, 514 P.2d 1375, 1378–80 (Wyo. 1973). At that time, Wyoming had a more limited long arm statute. As this Court has previously held, Wyoming no longer limits in personam jurisdiction beyond what the U.S. Constitution requires.

counsel. Doc. 6-1 at 178-180 (Attachment 11); (*see also* Doc. 6 at ¶ 93-95; ¶140-142 for other actions taken prior to formal demand.)

In September and early October 2022, Plaintiffs and, in some cases, their parents reached out to national Sorority leaders to raise concerns about Langford. At that time, Langford's membership had not yet been finalized. Doc. 6 at ¶ 93. The Executive Director of the Sorority, told Plaintiffs that their request had been presented to the Fraternity Council—which is led by Rooney—and refused. *Id.* Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

In November 2022, Plaintiffs, through counsel, again wrote to the national Sorority, requesting that Kappa Kappa Gamma prevent the initiation of Langford until concerns about his membership were resolved. Doc. 6-1 at 178-180 (Attachment 11). Plaintiffs' letter pointed out that Langford's membership is both a violation of the Sorority's bylaws and also breaches the housing contract that Plaintiffs signed with the Defendant Kappa Housing Corporation. The Sorority, through counsel, rejected Plaintiffs' request. Doc 6-1 at 45-47 (Attachment 3). The Sorority repeated its claim that Kappa Kappa Gamma is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id.* This statement, which disregards the actual meaning of the word "woman" as used by the Sorority for 150 years, was presented to Plaintiffs as the official policy of the Sorority. Kappa's counsel stated that the Sorority leadership has concluded that a woman need not be "biologically born as female." *Id.* at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs'

Page 10

effort to obtain the desired action from the directors or comparable authority or other shareholders and/or members within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

## III. There is no First Amendment or other bar that prevents this Court from holding that the Sorority's bylaws must be respected by its officers.

Kappa suggests that the right of free association prevents this Court from interfering with its membership decisions. This misstates both the law and the Plaintiffs' argument. The Plaintiffs are not arguing that Kappa could *never* admit a man (transgender or otherwise) into its membership. Plaintiffs' allegation is that Kappa must faithfully follow its bylaws, which do not permit such membership, until these bylaws are changed.

In Ohio, a corporation's charter consists of its articles of incorporation and the Ohio laws in existence when the articles of incorporation were filed. *Opdyke v. Sec. Sav. & Loan Co.*, 157 Ohio St. 121, 131-32, 105 N.E.2d 9, 16 (1952). For a for-profit corporation, the corporate charter is a contract between the corporation and its stockholders. *Opdyke*, 105 N.E.2d at 16; (1952).] For a non-profit corporation, the corporate charter is a contract between the corporation and its members. *See* 18 Am. Jur. 2d Corporations § 33 ("The fundamental rules and principles of law of for-profit corporations are equally applicable to nonprofit corporations unless otherwise specifically provided otherwise in the enabling statutes.").

The corporate charter contains the terms upon which the corporators have agreed to associate; it sets forth both the authority that members can exercise as well as the limits within which the body of corporators can lawfully act in a corporate capacity. *Wegener v. Wegener*, 126 N.E. 892, 893–94 (Ohio 1920). Like other corporations, the Sorority and the Fraternity Council/Board must act consistently with its corporate charter, as this forms the basis for the entity's authority. When a corporation's actions exceed the authority granted by its corporate

charter, the actions are ultra vires and void. *Id.* at 894. Board members who disregard or otherwise seek to circumvent the corporation's corporate charter violate their duty of loyalty, duty of care, and duty of obedience (also called duty of compliance).

Kappa Kappa Gamma has bound itself through its Bylaws, Standing Rules, and Policies. *Brown v. Carter*, 15 Haw. 333, 344 (1903) ("The corporators may bind themselves by contract in the articles or outside the articles as well as in what they may prefer to call by-laws, as to their methods of dealing with officers."). Under Ohio law, the Bylaws of Kappa Kappa Gamma are the code of regulations for the corporation. *Kappa Kappa Gamma* Bylaws, art. xix (2022). The Kappa Kappa Gamma Bylaws explicitly restrict membership in the Sorority to women only. Doc. 6-1 at 183 (Attachment 12); Attachment B at 2 (art. III, sec. 1).

Kappa's response is that the meaning of the word "woman" has "reasonably evolve[d]" to include men to claim to identify as women. Doc. 20 at 19. But Kappa's citation, to the Supreme Court's decision in *Bostock*, is not a decision that adopts the concept of 'the evolution of words' that the Kappa Defendants advocate. Doc. 20 at 14 (citing *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020)). *Bostock*'s holding is that discrimination against transgender member is discrimination based on the person's sex. "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). *Id.* The Court acknowledged that meaning of words can change. "[W]e must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context."

Page 12

*Id.* The Court, however, drew the opposite conclusion from that advocated here by Kappa: The law's ordinary meaning at the time of enactment usually governs. *Id.* at 1738. [4]

The words *woman* and *women*, as used in Kappa Kappa Gamma's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Sorority's 150 years, have always referred to female human beings. These words, as used by Kappa Kappa Gamma prior to Defendants' unlawful actions, have never referred to biological males who claim to be women. The Complaint goes to great lengths to draw upon the history of Kappa and its origins to provide the Court context on its early distinctions between men and women competing in the classroom and the reasons for its formation.

Moreover, it must be noted that Kappa's new definition of "woman" is inconsistent and illogical. As the Sorority's attorney explained to Plaintiffs, the Fraternity Council views gender as a "broader construct encompassing identity." Doc 6-1 at 45 (Attachment 3). This concept of gender connects to "[h]ow an individual defines themselves in terms of characteristics traditionally identified in this culture as male or female," which is a person's "gender identity." *Id*. at 34, 40 (Attachment 2). As a result, the Sorority's attorney claims that men can also become Kappa members if they "identify as women." *Id.* at 32.

Kappa cannot be a "single-gender organization" wherein members have a "single" gender identity unless the Sorority uses gender identity to make membership decisions. But the Sorority

---

[4] Kappa's response is to draw upon a definition that was adopted by one dictionary in late 2022 after Langford's membership. This is precisely the sort of revisionist interpretation that is not permissible, either in the corporate boardroom or the courtroom.

states that it does not discriminate based on gender identity. *Id.* at 1 ("Kappa Kappa Gamma values diversity and inclusion and does not discriminate based on … gender identity…."). *Id.*

## IV.    The breach of contract and tortious interference claims do not fail.

To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages. Plaintiffs admit that there may be some ambiguities in the Complaint, but only because there are actually two different contracts. There is the contract between Kappa and its members under Ohio corporate law. And there is the contract with the Kappa Kappa Gamma Housing Corporation. The Defendant Kappa Kappa Gamma Building Corp., and the Plaintiffs entered into a contract to provide housing in accordance with the Bylaws, Standing Rules, and Policies of Kappa Kappa Gamma. These Bylaws, Standing Rules, and Policies do not permit men to live in the sorority house. Men cannot even enter the living areas of the Sorority except upon special circumstances that have been approved in advance. Through Defendant Kappa's actions, they have created a breach of contract as to both the sorority experience and paid housing experience that these young women were promised. Langford's access to and unfettered presences in the sorority house violates the housing contract that Plaintiffs signed and the Plaintiffs suffer extensive damage as a result, including PTSD, anxiety, and emotional damages in an exact amount to be proven at the time of trial but far in excess to the jurisdictional requirement required in this matter. Additionally, many recruits and members have fled the house or sorority for this reason. One member even moved a state away. These damages and harms at a time of a college woman's experience are impactful, unfair and unjust.

Page 14

Kappa argues that the Plaintiffs lack sufficient damages to bring their claims to federal court. This is incorrect. Plaintiffs assert—as the Sorority itself did when it filed a Complaint in the U.S. District Court for the District of Massachusetts in 2018—that single-sex sororities are a source of stability and community in college life for young women. The single-sex nature of a sorority is necessary to create this cohesive atmosphere. "[T]he opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests." Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment." Doc. 6 at 31-33 (quoting Kappa itself).

Jurisdiction based on diversity of citizenship exists when a dispute between citizens of different states involves an amount in controversy exceeding $75,000. 28 U.S.C. § 1332(a). In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation. *E. g., McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 181 (1936). The Tenth Circuit has followed what has commonly been referred to as the "either viewpoint rule" which considers either the value to the plaintiff or the cost to defendant of injunctive and declaratory relief as the measure of the amount in controversy for purposes of meeting the jurisdictional minimum. *Justice v. Atchison, Topeka and Santa Fe Ry. Co.,* 927 F.2d 503, 505 (10th Cir.1991). However, in multiple plaintiff cases, the "either viewpoint rule" does not override the well-established principle that each plaintiff or member of the class must individually satisfy the amount in controversy requirement. *Snyder v. Harris,* 394 U.S. 332, 335 (1969); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006). At bar, the damages of any particular Plaintiff exceed $75,000, the requisite amount in controversy and

the jurisdictional threshold is met for this Court to properly exercise subject matter jurisdiction over this case.

Plaintiffs' Complaint is a derivative suit to obtain a judgment that Kappa Kappa Gamma remains as required by its Articles of Incorporation: a non-profit corporation "intended to unite women, through membership in the sorority, in a close bond of friendship and to instill in them a spirit of mutual love and helpfulness." Doc.6-1 at 62 (emphasis added). Plaintiffs ask this Court to declare that the Officers, Directors, and other leaders of the Sorority cannot, without a formal change to Kappa Kappa Gamma's corporate charter, revise the Sorority's membership rules by fiat, and ask this Court to enjoin the unlawful implementation of the Guide. Plaintiffs ask this Court to hold that the admission of Artemis Langford, and any other man, as a member of Kappa Kappa Gamma is void ab initio. Plaintiffs further ask this Court to declare that Defendant Rooney and the other members of the Fraternity Council have violated their fiduciary duties to the Sorority. Plaintiffs further ask for damages, reflecting the injuries the Sorority has and will continue to suffer in its membership, including the closure of the Sorority's chapter at the University of Wyoming, loss of donations, decrease in alumnae support and participation, and permanent damage to the Sorority's reputation and mission. Doc. 6 at ¶ 11.

Plaintiffs also seek direct relief from the Defendants. Ohio law recognizes that faithless directors of a corporation can directly injure others through a breach of fiduciary duty in addition to the derivative injuries suffered by the corporation itself. In pursuit of an ideological agenda, Defendants have violated numerous other Bylaws, Standing Rules, and Policies of the Sorority, and caused the Sorority to act in a manner that has specifically harmed Plaintiffs and undermined contractual obligations to the Plaintiffs. The Fraternity's officers, directors, and employees

directly, and through alumnae advisers acting at Fraternity Council direction, pressured student members to endorse Langford's initiation to the Sorority. When Langford's membership vote violated the Sorority's secret-ballot procedures, Defendants and their agents knowingly disregarded the clear violations of the corporate rules. When Plaintiffs raised concerns about Langford's inappropriate and threatening behavior in the sorority house, Defendants and their agents refused to protect Plaintiffs and prevented others from doing so. Instead of protecting Plaintiffs, Defendants and their agents have urged Plaintiffs to quit Kappa Kappa Gamma altogether. Defendants have pushed Plaintiffs to resign even though—having already joined Kappa Kappa Gamma—Plaintiffs are permanently barred from joining a different sorority. Finally, Defendants have retaliated against Plaintiffs and other sorority members who object to the Board's unauthorized Guide. Plaintiffs ask for all remedies available in response to Defendants' wrongdoing, including monetary damages, punitive damages, injunctive relief, declaratory relief, and attorney fees. Doc. 6 at ¶ 12.

Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, as the parties are citizens of different States, all necessary parties are before this Court, and the sum of the matter in controversy, including damages and the value of the declaratory and injunctive relief sought by Plaintiffs, exceed seventy-five thousand dollars ($75,000.00). Doc. 6 at ¶ 13. Defendant Kappa Kappa Gamma Building Co., a Wyoming nonprofit corporation formed a contract with the Plaintiffs. While Plaintiffs do not seek damages directly from Kappa Housing Corp., Plaintiffs do allege that Kappa Kappa Gamma Fraternity has tortiously interfered with their contractual relationship with this Defendant. As such, Plaintiffs believe the Kappa Housing Corporation is a required party to this litigation. Fed. R. Civ. P. 19(a)(1)(B). Doc. 6 at ¶ 23. As a requirement of

membership, Sorority members must "promise to accept the responsibilities of lifelong membership in the Fraternity and uphold the Bylaws, Standing Rules, and Policies [of the Sorority] as well as my chapter Bylaws and Standing Rules." Attachment 9 (Commitment Form). Collegiate members pay dues at initiation and additional dues every year to the Sorority. Plaintiffs cannot resign from Kappa Kappa Gamma to join a different sorority. Kappa Kappa Gamma is one of the 26 sororities that comprise the National Panhellenic Conference (NPC). These sororities have all agreed a woman who joins one NPC sorority is permanently ineligible for membership in any other NPC sorority. Doc. 6 at ¶ 153. Each Plaintiff joined Kappa Kappa Gamma with the promise they would be able to live and socialize in an all-female environment. Defendants have repeatedly lauded the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will never have the benefits of a college sorority experience. Some of the damages to each Plaintiff are easily calculable, including the dues and housing payments that were made for the purpose of living in an all-female environment. Some will be more difficult to calculate, but they are no less real. For 150 years, Kappa Kappa Gamma has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa Kappa Gamma has stated that these benefits result from the single-sex experience. Plaintiffs agree that these benefits exist. The loss of these lifetime benefits is similarly calculable, and Defendants are responsible for this damage to Plaintiffs. Doc. 6 at ¶ 154.

The Sorority itself has also been damaged by Defendant Rooney and the other members of the Fraternity Council. Their violations of fiduciary duty have caused the sorority chapter at the University of Wyoming to lose significant membership in less than six months. With very few signed housing contracts for the next academic year, the sorority house at the University of

Wyoming will close and then the college chapter itself will fold. The loss of a sorority chapter has a significant effect beyond just the loss of dues from the college students there. These young women will become leaders, and—just as prior generations have—they will donate to the Sorority and its continued operation. The loss of a sorority chapter cuts off all future alumnae from that school. Doc. 6 at ¶ 155. Dialogue has failed, so Plaintiffs seek relief from this Court. Plaintiffs ask for an injunction preventing Sorority officials from implementing their unlawful alterations to the Sorority's purpose and mission. Plaintiffs seek to recover the costs the Sorority has incurred in promoting this unlawful change in its membership rules. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duty, and their contractual obligations to the Plaintiffs, by purporting to admit Langford into the Sorority. Doc. 6 at ¶ 158.

Specifically, damages will be attested to further during discovery and at the time of trial in this matter. For purposes of this briefing, this Court should recognize that room, board and dues alone include $9,100 per year, per Plaintiff. One would not pay sorority fees, far in excess of campus housing, unless there was significant benefit to their membership in the female living experience and bond. The value of sorority membership includes leadership training, mentoring and access to valuable female networks of 260,000 alumnae for career opportunities and internships, both during the collegiate experience and after. Experts will testify during this action that this experience alone could be worth $100,000 to each individual Plaintiff. Although Defendants say these young women could simply resign their lifetime membership, they have no

Page 19

ability to transfer to another NPC group. This too, is of significant monetary detriment far in excess of the jurisdictional threshold required in this matter.

## **Conclusion**

For the foregoing reasons, the Plaintiffs respectfully requests that this Court DENY Defendants' Motion to Dismiss and allow the Plaintiffs to be fully heard in this matter.

Respectfully submitted,

/s/ Cassie Craven_____          /s/ John Knepper_____
Cassie Craven, 7-5664                John Knepper
Longhorn Law Limited Liability Company   Law Office of John G. Knepper, LLC
109 E. 17th St. Suite 11             P.O. Box 1512
Cheyenne, Wyoming 82001              Cheyenne, Wyoming 82003
307-823-3062                         307-632-2842
cassie@longhornlawllc.com            John@KnepperLLC.com

Dated this 5th day of July, 2023.

## **CERTIFICATE OF SERVICE**

I hereby certify that on 5th day of July, a copy of the foregoing pleading, was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Cassie Craven_____          /s/ John Knepper_____
Cassie Craven, 7-5664               John Knepper
Longhorn Law Limited Liability Company    Law Office of John G. Knepper, LLC
109 E. 17th St. Suite 11            P.O. Box 1512
Cheyenne, Wyoming 82001             Cheyenne, Wyoming 82003
307-823-3062                        307-632-2842
cassie@longhornlawllc.com           John@KnepperLLC.com

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 115 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 1 of 67 PAGEID #: 476
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 1

NO. 23-8065

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JAYLYN WESTENBROEK, et al.,

**Plaintiffs-Appellants**

v.

KAPPA KAPPA GAMMA FRATERNITY, et al.,

**Defendants-Appellees**

**On Appeal from the United States District Court
for the District of Wyoming, No. 2:23-CV-00051-ABJ
The Honorable Alan B. Johnson**

**BRIEF OF DEFENDANTS-APPELLEES KAPPA KAPPA GAMMA
FRATERNITY, MARY PAT ROONEY, AND KAPPA KAPPA GAMMA
BUILDING CO.**

Natalie M. McLaughlin (Ohio Bar 0082203)
Brian W. Dressel (Ohio Bar 0097163)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5452
Facsimile:   (614) 464-5452
E-mail:   nmmclaughlin@vorys.com
            bwdressel@vorys.com

Scott P. Klosterman (Wyoming Bar No. 6-3081)
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:  (307) 265-0700
Facsimile:   (307) 266-2306
E-Mail:     sklosterman@wpdn.net

*Counsel for Defendants-Appellees Kappa Kappa Gamma Fraternity,
Mary Pat Rooney, and Kappa Kappa Gamma Building Co.*

**ORAL ARGUMENT NOT REQUESTED**

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 116 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 2 of 67  PAGEID #: 477
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 2

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Kappa Kappa Gamma Fraternity is a non-profit corporation that does not have a parent corporation.  No publicly held corporation owns more than 10% of Kappa Kappa Gamma Fraternity's stock.

Kappa Kappa Gamma Building Co. is a non-profit corporation that does not have a parent corporation.  No publicly held corporation owns more than 10% of Kappa Kappa Gamma Building Co.'s stock.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 117 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 3 of 67  PAGEID #: 478
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 3

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

RULE 26.1 DISCLOSURE STATEMENT ............................................................... ii

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF RELATED APPEALS ............................................ xiii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 3

STATEMENT OF THE CASE ................................................................ 3

    A.    Factual Background ................................................................. 3

    B.    Procedural History ................................................................. 7

SUMMARY OF THE ARGUMENT ..................................................... 11

ARGUMENT ..................................................................................... 14

    A.    Appellants Fail to State a Derivative Claim ........................ 14

        i.    Kappa Is Entitled to Reasonably Interpret Its Own
            Bylaws ................................................................... 14

            a.    Ohio Law Grants Deference to a Voluntary
                Organization Interpreting Its Own Bylaws and
                Governing Documents ................................... 14

            b.    There Is No Basis to Limit the Deference Owed to
                Kappa to Interpretations Concerning Member
                Discipline and Due Process ............................. 16

            c.    Declining to Defer to Kappa's Interpretation of Its
                Bylaws Would Undermine the Purposes of the
                Judicial Non-Intervention Doctrine and Ensnare
                Courts in Unnecessary Litigation ................... 22

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 118 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 4 of 67  PAGEID #: 479
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 4

ii.   Fraternity Council's Interpretation of Kappa's Bylaws
      Was Reasonable ........................................................................23

      a.   Kappa's Bylaws Do Not Define the Term
           "Woman" ........................................................................24

      b.   The Term "Woman" Is Open to More than One
           Reasonable Interpretation .............................................24

      c.   Even if the Court Were to Deny Kappa the Right
           to Interpret Its Own Governing Documents,
           Kappa's Interpretation Is Correct Under
           Appellants' More Demanding Analysis ........................32

iii.  Once Kappa Has Reasonably Interpreted Its Own
      Bylaws, a Court Dictating Whom It Can and Cannot
      Admit Would Violate the First Amendment............................36

      a.   Court Orders Constitute State Action............................37

      b.   Courts Cannot Make the Membership Decisions
           for Private Organizations .............................................38

iv.   To the Extent Appellants Now Assert a Derivative Claim
      Based on the Gamma Omicron Chapter's Election
      Procedures, They Have Forfeited the Claim in the
      District Court, Failed to Demonstrate Futility, and Failed
      to Allege Facts to Show Bad Faith ........................................40

      a.   Appellants Forfeited This Claim by not Raising It
           with The District Court and by not Arguing Plain
           Error in Their Brief ......................................................40

      b.   Appellants Failed to Demonstrate Futility for This
           Claim.............................................................................42

      c.   Appellants Failed to Allege Facts to Show Bad
           Faith ..............................................................................45

iv

Case 2:23-cv-00051-ABJ     Document 47-8     Filed 02/28/25     Page 119 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 5 of 67  PAGEID #: 480
Appellate Case: 23-8065     Document: 010110978097     Date Filed: 01/03/2024     Page: 5

B.      Appellants' Direct Claim Is Both Forfeited and Fails on the
        Merits..................................................................................46

        i.      Appellants Forfeited Their Direct Claim When They Did
                Not Defend It in the District Court in Response to the
                Motion to Dismiss......................................................46

        ii.     Even if Appellants Had Preserved Their Direct Claim, It
                Would Fail..................................................................47

        iii.    Appellants Have Not Alleged Any Frustration of
                Contractual Obligations ............................................48

C.      The Court Can Also Dispose of Appellants' Claims Against
        Rooney on Personal-Jurisdiction Grounds..........................49

CONCLUSION ..................................................................................... 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION AND
PRIVACY REDACTIONS

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 120 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 6 of 67 PAGEID #: 481
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 6

# <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (10th Cir. 2022) (en banc) (Wilson, J., dissenting; Pryor, J., dissenting) ............................ 27

*Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146 (Ohio 1978) ........................................................................................ 33

*Ashaheed v. Currington*, 7 F.4th 1236 (10th Cir. 2021) ......................................... 46

*B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820 (S.D. W. Va. Jan. 5, 2023) ............................ 26

*Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio App. LEXIS 154 (Jan. 18, 2007) ........................................................................... 47

*Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605 (S.D. Tex. Aug. 13, 2013) ................................................................................ 21

*Bhd. of Locomotive Eng'rs v. Folkes*, 109 S.E.2d 392 (Va. 1959) ......................................................................................... 21

*Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907 (N.D. Ohio Sept. 25, 2023) ........................................... 25

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ......................................... 38, 39

*Brosz v. Fishman*, 99 F. Supp. 3d 776 (S.D. Ohio 2015) ................................... 18

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..................................... 50

*Cal. Dental Ass'n v. Am. Dental Ass'n*, 590 P.2d 401 (Cal. 1979) ..................................................................................... 24

*Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768 (W.D. Tex. 1999) ...................................................................... 22

*Carlson v. Rabkin,* 789 N.E.2d 1122 (Ohio Ct. App. 2003) ........................... 43, 47

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 121 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 7 of 67  PAGEID #: 482
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 7

*Cincinnati Camp Meeting Ass'n v. Danby*, 56 N.E.2d 694 (Ohio
  Ct. App. 1943) ....................................................................................20

*City of Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095
  (Ohio 1981)..........................................................................................15

*Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036 (6th Cir.
  2001) ....................................................................................................29

*Crosby v. Beam*, 548 N.E.2d 217 (Ohio 1989) .....................................10

*Crossen v. Duffy*, 103 N.E.2d 769 (Ohio Ct. App. 1951).......................15

*D.N. v. DeSantis*, No. 21-cv-31344, 2023 U.S. Dist. LEXIS
  198678 (S.D. Fla. Nov. 6, 2023) ........................................................28

*Danese v. Ginesi*, 654 A.2d 479 (N.J. App. 1995) ................................21

*De Mille v. Amer. Fed'n of Radio Artists*, 187 P.2d 769 (Cal.
  1947)....................................................................................................20

*Democratic Party of United States v. Wis.*, 450 U.S. 107 (1981) ..........38

*Drage v. Proctor & Gamble*, 694 N.E.2d 479 (Ohio Ct. App.
  1997).....................................................................................................18

*Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063 (10th
  Cir. 2008).............................................................................................50

*Duke v. Smith*, 784 F. Supp. 865 (S.D. Fla. 1992).................................37

*Eighteen Seventy, LP v. Jayson*, 32 F.4th 956 (10th Cir. 2022) ............50

*Finlay v. Duffy*, 94 N.E.2d 466 (Ohio Ct. App. 1950)...........................15

*Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984
  (M.D. Tenn. Jun. 22, 2023) .......................................................... 27, 28

*Grand Council v. Owens*, 620 N.E.2d 234 (Ohio Ct. App. 1993)..........43

*Green v. Miss USA, LLC*, 52 F.4th 773 (9th Cir. 2022) .........................39

*Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272 (10th Cir. 1994)..........10

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 122 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 8 of 67 PAGEID #: 483
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 8

*Heaton v. Rohl*, 954 N.E.2d 165 (Ohio Ct. App. 2011) .................................... 11, 47

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023) .................................... 25, 28, 29, 33

*Henkel v. Aschinger*, No. 11CVH-11-14,324, et al., 2012 Ohio
Misc. LEXIS 5598 (Ohio Comm. Pleas 2012) ..................................................... 17

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir.
2013) ...................................................................................................................... 39

*Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67 (Ill.
Ct. App. 2021) .............................................................................................. 25, 28

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of
Boston*, 515 U.S. 557 (1995) .......................................................................... 38, 39

*In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006
U.S. Dist. LEXIS 11608 (N.D. Ohio Mar. 21, 2006) .......................................... 43

*In re Gas Natural, Inc.*, No. 1:13-CV-02805, 2014 U.S. Dist.
LEXIS 184046 (N.D. Ohio Sept. 24, 2014) ......................................................... 45

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ................................................ 50

*Joseph v. Joseph*, No. 19-3350, 2022 U.S. App. LEXIS 23216
(6th Cir. Aug. 18, 2022) ...................................................................................... 48

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022) ....................................... 25

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) ......................................... 42

*Koos v. Central Ohio Cellular*, 641 N.E.2d 265 (Ohio Ct. App.
1994) ...................................................................................................................... 19

*Liquidating Tr. of the Amcast Unsecured Creditor Liquidating
Tr. v. Baker*, 365 B.R. 91 (S.D. Ohio Bkrupty. 2007) .................................. 18, 19

*Maas v. Maas*, 161 N.E.3d 863 (Ohio Ct. App. 2020) ..................................... 30, 48

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................................. 29

*Morgan v. Ramby*, No. 2012-Ohio-763, 2012 Ohio App. LEXIS
662 (Feb. 27, 2012) ............................................................................................. 47

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 123 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 9 of 67 PAGEID #: 484
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 9

*Moya v. Schollenbarger,* 465 F.3d 444 (10th Cir. 2006)..........................................2

*Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895
    (10th Cir. 2017) ...........................................................................49

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of
    Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707
    (S.D. Ohio Jul. 28, 2023).................................................. 26, 27

*Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213
    (10th Cir. 2017) ...........................................................................40

*Peters v. Clark (In re Bryan)*, 857 F.3d 1078 (10th Cir. 2017) ...............................10

*Pikk v. Pedersen*, 826 F.3d 1222 (10th Cir. 2016)....................................................42

*Powell v. Ashtabula Yacht Club*, No. 953, 1978 Ohio App.
    LEXIS 8855, 1978 WL 216074 (Ohio Ct. App. 1978).........................14

*Putka v. First Catholic Slovak Union*, 600 N.E.2d 797 (Ohio Ct.
    App. 1991) ....................................................................... 14, 20

*Qz'Etax v. Ortiz*, 170 F. App'x 551 (10th Cir. 2006)..............................................26

*Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985) ......................................................19

*Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705,
    2010 U.S. Dist. LEXIS 822 (N.D. Ohio Jan. 6, 2010)..................... 14, 16, 17, 20

*Richison v. Ernest Grp., Inc.*, 634 F.3d 1123 (10th Cir. 2011) ................. 40, 41, 42

*Ross v. Bernhard*, 396 U.S. 531 (1970) ..................................................................17

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ...................................................................37

*Soule v. Conn. Ass'n of Sch.*, 57 F.4th 43 (2d Cir. 2022) ........................................28

*Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175
    (Ohio Ct. App. 1989).......................................................... 14, 15, 20

*Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165 (Ohio Ct.
    App. 1993)....................................................................................19

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 124 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 10 of 67  PAGEID #: 485
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 10

*Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518
    (10th Cir. 1987) ...................................................................................50

*Tucker v. Nat'l Ass'n of Postal Supervisors, Cleveland Branch
46*, 790 N.E.2d 370 (Ohio Mun. Ct. 2003)................................... 15, 20

*Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021) ...........................25

*Ulliman v. Ohio High Sch. Ath. Ass'n*, 919 N.E.2d 763 (Ohio
    Ct. App. 2009) .................................................................................15

*Un. Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633
    F.3d 951 (10th Cir. 2011) ...............................................................49

*United States v. Price*, 84 F.4th 738 (7th Cir. 2023) ...........................25

*W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, No.
    2:19-cv-00434, 2023 U.S. Dist. LEXIS 154406 (S.D. W. Va.
    Aug. 31, 2023).................................................................................36

*Walden v. Fiore*, 571 U.S. 277 (2014) ...................................................51

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No.
377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166 (Ohio
    App. 1988)........................................................................................15

*Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-CV-
    51-ABJ, 2023 U.S. Dist. LEXIS 152458 (D. Wyo. Aug. 25,
    2023)..................................... 1, 2, 4, 8, 10, 11, 14, 26, 41, 44, 49, 51

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) .................................26

*Zalvin v. Ayers*, 157 N.E.3d 256 (Ohio Ct. App. 2020)..........................18

## Statutes

28 U.S.C. § 1332(a) ...................................................................................1

Wyo. Stat. § 5-1-107 ...............................................................................49

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 125 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 11 of 67 PAGEID #: 486
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 11

**Other Authorities**

15A Charles Alan Wright, et al., Federal Practice & Procedure
§ 3914.6 .................................................................................................2

Endocrine Society Guidelines ......................................................... 29, 30

F.P. Kruijver et al., Male-to-female transsexuals have female
neuron numbers in a limbic nucleus, 85 J. CLINICAL
ENDOCRINOLOGY & METABOLISM 2034 (2000) ..................................27

Historically Women's Colleges with Trans-Inclusive
Admissions Policies, CAMPUS PRIDE,
https://www.campuspride.org/tpc/womens-colleges/ .........................31

Intersex, CLEVELAND CLINIC (Jul. 23, 2023),
https://my.clevelandclinic.org/health/articles/16324-intersex ...........27

Jennifer Levi & Kevin Barry, "Made to Feel Broken": Ending
Conversion Practices and Saving Transgender Lives, 136
HARV. L. REV. 1112 (2023) ...............................................................27

Statement from Women's Rights And Gender Justice
Organizations in Support of the Equality Act, NAT'L ORG.
FOR WOMEN, https://now.org/wp-
content/uploads/2021/03/Statement-of-Womens-Rights-And-
Gender-Justice-Organizations-in-Support-of-the-Equality-
Act-2.pdf (Mar. 16, 2021) ................................................................31

Statement of Women's Rights and Gender Justice
Organizations in Support of Full and Equal Access to
Participation in Athletics for Transgender People, AM. ASS'N
OF UNIV. WOMEN,
https://www.aauw.org/app/uploads/2020/02/Statement-from-
Womens-Organizations-Supporting-Full-and-Equal-Access-
to-Participation-in-Athletics-for-Transgender-People-nsa.pdf ...........31

Trans woman, MERRIAM-WEBSTER DICTIONARY
https://www.merriam-
webster.com/dictionary/trans%20woman#:~:text=%3A%20a
%20transgender%20woman%20%3A%20a%20woman,Zach
ary%20Zane (last visited Jan. 3, 2024) ............................................35

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 126 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 12 of 67  PAGEID #: 487
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 12

*Woman*, CAMBRIDGE DICTIONARY,
    https://dictionary.cambridge.org/us/dictionary/english/woman
    (last visited Jan. 3, 2024)......................................................................................35

*Women Demand: A Letter to the Federal Elected Officials and
    Candidates from the Women's Community*, NAT'L WOMEN'S
    LAW CENTER, https://nwlc.org/resource/women-demand-a-
    letter-to-federal-elected-officials-and-candidates-from-the-
    womens-community/; https://nwlc.org/wp-
    content/uploads/2020/09/Womens-Community-Transition-
    Letter-Draft-10.15.2020.pdf (Oct. 15, 2020) ......................................................31

**Rules**

Fed. R. Civ. P. 23.1 ..............................................................................................42

Fed. R. Civ. P. 23.1(b)(3).......................................................................................42

## <u>STATEMENT OF RELATED APPEALS</u>

No appeal in this action has been brought under the same or similar title before any appellate court.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 127 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 13 of 67  PAGEID #: 488
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 13

## JURISDICTIONAL STATEMENT

Appellees agree that the district court had jurisdiction over Appellees' claims against Kappa Kappa Gamma Fraternity ("Kappa"), but it did not have jurisdiction over the claims against Mary Pat Rooney ("Rooney") and Kappa Kappa Gamma Building Co. (the "Building Co.").  Specifically, the district court lacked subject-matter jurisdiction over Appellees' breach-of-contract claim against the Building Co. due to an insufficient amount in controversy under 28 U.S.C. § 1332(a), which the district court recognized in dismissing the claim. *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 23-CV-51-ABJ, 2023 U.S. Dist. LEXIS 152458 (D. Wyo. Aug. 25, 2023).  Appellees also maintain that the district court lacked personal jurisdiction over Rooney, as argued herein.

This Court lacks jurisdiction over the appeal because the district court's order on the Motion to Dismiss was without prejudice and therefore not a final, appealable order.  The district court pointedly denied Appellees' request to dismiss the Amended Complaint with prejudice, unambiguously stating that its dismissal was without prejudice.  *Id.* at *43–*44.  Appellees explained their basis for this conclusion in their Motion to Dismiss the Appeal, currently pending before the Court.

Appellants dispute this conclusion, arguing that the decision is appealable because it addressed the merits of their claims and not a procedural issue they

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 128 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 14 of 67 PAGEID #: 489
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 14

could cure through amendment.  For support of this argument, Appellants turn to this Court's decision in *Moya v. Schollenbarger,* 465 F.3d 444, 448–54 (10th Cir. 2006).  There, the Court considered an appeal of an order it found to be ambiguous as to whether it was dismissing the complaint or the entire action.  *Id.* at 448.  It concluded that the district court had intended to dismiss the case with prejudice because there was "not a sufficiently clear invitation for [plaintiff] to amend the complaint or otherwise continue the proceedings in the district court."  *Id.* at 454 (quoting 15A Charles Alan Wright, et al., Federal Practice & Procedure § 3914.6) (internal quotation marks omitted).

Here, the district court was far clearer.  It (1) rejected Appellees' request to dismiss the case with prejudice; (2) explicitly stated that the claims were dismissed ***without prejudice***; and (3) offered advice on how Appellants could have better positioned their claims in a second amended complaint to attempt to cure the defects it found in the First Amended Complaint.  *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *43–44.  In short, the district court extended Appellants an invitation to amend their complaint.  Instead, Appellants elected to proceed with filing an appeal of a non-final order.  Accordingly, this Court lacks appellate jurisdiction.

Considering this issue fully briefed, Appellees devote the remainder of their brief to the merits of Appellants' underlying legal claims.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 129 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 15 of 67  PAGEID #: 490
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 15

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether a private organization has a right to reasonably interpret an undefined term in its own bylaws under Ohio law and a First Amendment right to select its own members or, alternatively, whether a federal court can determine how to interpret an undefined term in a private organization's bylaws and determine whom that organization can and cannot admit to its membership.

2.    Whether, after not advancing any argument in support of their direct claim in responding to a motion to dismiss, aggrieved members can state a direct claim for alleged personal injury based on frustrated contractual expectations without identifying any contractual obligation that was owed to them and breached and without identifying any damages they suffered unique from the rest of the organization's members arising from a cognizable legal claim.

## STATEMENT OF THE CASE

### A. Factual Background

Appellants' opening brief offers a "Facts" section that contains: their preferred characterization of Kappa Bylaws, Standing Rules, and Policies as they refer to the terms "women," "men," "sex," and "gender"; misrepresentations about what Kappa's governing documents actually state (e.g., the Standing Rules do not explicitly provide that "no person can be initiated as a Kappa member without approval from Sorority headquarters" and do not require "that elections employ a

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 130 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 16 of 67  PAGEID #: 491
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 16

secret ballot." *See* App. 188–218; policy arguments about how Appellants think Kappa should operate; allegations about the Gamma Omicron's voting process for admitting Artemis Langford into membership at the University of Wyoming; and allegations about Langford's unsubstantiated behavior at the Gamma Omicron chapter house following the chapter's decision to admit her (which the district court found "[u]nbefitting in federal court" and "irrelevant" as they had "no bearing on Plaintiffs' legal claims").[1]  *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *44 n.68.

The undisputed facts necessary to decide this appeal are straightforward. Kappa is a non-profit corporation incorporated under Ohio law.  (App. 011.)  It is governed by a set of Bylaws and Standing Rules, each last revised in 2022.  (App. 169.)  Among other policies and procedures, those Bylaws set the criteria for membership in Kappa.  (App. 087.)  Per the Bylaws, one criteria for admission is that the candidate be a "woman."  (*Id.*)  The Bylaws do not define "woman" based

---

[1] Kappa recognizes that the Court takes factual allegations pled in a complaint as true at this procedural posture.  But given the publicity this case has generated and the nature of some of the allegations, Kappa notes that Langford and other chapter members have denied Appellants' inflammatory allegations.  This was briefed at the district court, but not relevant to this appeal.  Furthermore, for anyone assessing the credibility of those allegations, Appellants did not raise them in their pre-litigation correspondence concerning Langford's admission and the record is devoid of evidence that Appellants raised them at any point before filing this case. (*See* App. 258–60.)

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 131 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 17 of 67  PAGEID #: 492
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 17

on sex assigned at birth, chromosomal makeup, or any other genetic criteria.  (App. 082–110.)  In fact, the Bylaws do not define the term "woman" at all.  (*Id.*)

Kappa's Standing Rules vest the Fraternity Council with the duty of "Interpreting the Fraternity Bylaws and Standing Rules."  (App. 199.)  Therefore, the Fraternity Council has authority granted in Kappa's governing documents to interpret any term that is not specifically defined.   Since 2015, the Fraternity Council has interpreted the term "woman" to include individuals who identify as women.  (Aplt. Br. 8–9; App. 263.)  This interpretation is reflected in policies, guides, position statements, and FAQ documents issued by the Fraternity Council. (App. 112–14; 185; 263.)

Per Kappa's Standing Rules, chapter members at each collegiate chapter are responsible for selecting the new members of their chapter.  (App. 199.)  And "[e]ach chapter of Kappa Kappa Gamma has the final choice of its own members." (App. 263.)  Kappa's Gamma Omicron chapter operates at the University of Wyoming, located in Laramie.  (App. 041.)  Langford, a transgender woman, sought admission to the Gamma Omicron chapter in the fall semester of 2022. (App. 036–37.)  Langford was ultimately selected for membership by the members of that chapter.  (App. 009–10.)

Kappa's Fraternity Council has no role in the selection of collegiate members, neither endorsing potential members for selection nor overruling

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 132 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 18 of 67  PAGEID #: 493
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 18

decisions of a collegiate chapter.  (App. 125; 191 ("[a]ctive members shall be responsible for selecting new members of their chapter."))    Nonetheless, Appellants argue that "Kappa and Mary Pat Rooney, the President of the Council of Kappa, and the Wyoming Chapter leadership orchestrated and implemented a plan that resulted in" Langford's admission.  (Aplt. Br. 9.)  They go on to state the basis of this contention: "[i]t could not be otherwise: Kappa's Standing Rules explicitly provide that 'no person can be initiated as a Kappa member without approval from Sorority headquarters.'"  (*Id.*)  But the Standing Rules do not explicitly state that.    Rather, the Standing Rules simply state that "[i]f the ***requirements for initiation*** have been fulfilled, Kappa Kappa Gamma Headquarters ***shall issue*** the authorization for initiation."  (App. 200) (emphasis added).  The Requirements for Initiation stated in the Bylaws are as follows:

> A collegiate new member who is registered as a full-time student during the pledge to membership year or during the term in which they pledged, has met all financial obligations and Fraternity standards of conduct, has completed a period of education about the Fraternity, and is in good standing with the educational institution may be initiated.    In extraordinary cases, chapters may petition the Membership Director for an exception to these requirements.

(App. 087.)  Therefore, the only thing that headquarters is explicitly authorized to do is consider if a potential member fulfills the requirements for initiation.  If they

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 133 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 19 of 67  PAGEID #: 494
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 19

do, headquarters is required to authorize the initiation because it is each chapter's decision whom to admit to their chapter.

Appellants and others were upset that Langford was voted into their chapter, so they retained two lawyers to dispute the chapter's decision to allow a transgender woman into its membership.  (App. 258–60.)  Their attorneys sent a letter detailing their grievances to Kappa and members of the Fraternity Council. (*Id.*)  Kappa responded through its own outside counsel, explaining Kappa's policy of inclusion towards transgender women, informing Appellants' lawyers that membership decisions are decision of the chapter, and noting that Kappa does not overrule decisions of a collegiate chapter because some members or alumnae disagree with a chapter's decision.  (App. 125–27.)  Counsel further indicated it was unaware of the Gamma Omicron chapter violating Kappa's governing documents, but invited Appellants to identify any specific provisions they contend were not followed with regard to Langford's initiation.  (*Id.*)  This was the end of the parties' discussion of the issue prior to this litigation.

**B. Procedural History**

Appellants filed their Complaint against Kappa, Rooney, the Building Co., and Langford, initially seeking to proceed anonymously.  (App. 005–06.)  Before Appellees responded to the Complaint, the district court sua sponte denied Appellants' motion to proceed anonymously and their renewed motion to proceed

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 134 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 20 of 67 PAGEID #: 495
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 20

anonymously.  (*Id.*)  Appellants then filed an Amended Complaint asserting four claims[2]: a derivative claim for breach of fiduciary duty (against Rooney); breach of their housing contracts (against the Building Co.); tortious interference with contract (against Kappa); and a direct cause of action (against Rooney).  (App. 009–080.)  The Amended Complaint explicitly stated that it was not seeking any damages from the Building Co. or from Langford.  (App. 016–17.)  Instead, it stated that it had sued these Defendants because it believed they were necessary parties.  (*Id.*)

Appellees filed a Motion to Dismiss, advancing several arguments.[3]  The Building Co. argued that the district court lacked subject matter jurisdiction over the breach-of-contract claim because the purported basis for jurisdiction was diversity of citizenship.  (App. Vol. II 015–16.)  Appellants pled that they were not seeking damages from the Building Co., meaning they could not meet the jurisdictional threshold.  (*Id.*)[4]  Rooney argued that the district court lacked

---

[2] The Amended Complaint does not state against whom each claim is brought, but the district court made this determination in its decision, and Appellants did not appeal that determination.

[3] Langford filed a separate Motion to Dismiss that the district court dismissed as moot after dismissing all claims against the other Defendants.  *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *44.

[4] Many members of the Gamma Omicron chapter sign a lease to live in a chapter house near campus.  (App. 245–54.)  The house is operated by the Building Co., which is a separate entity from Kappa.  (*Id.*)  For members who live in the house,

Case 2:23-cv-00051-ABJ     Document 47-8     Filed 02/28/25     Page 135 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 21 of 67  PAGEID #: 496
Appellate Case: 23-8065     Document: 010110978097     Date Filed: 01/03/2024     Page: 21

personal jurisdiction over her because she lacked minimum contacts with Wyoming and there were insufficient allegations in the Amended Complaint to suggest otherwise.  (App. Vol. II 016–17.)   On the derivative claim, Appellees argued that Appellants had not met the procedural prerequisites to pursuing the claim in court.  (App. Vol. II 018–20.)

Turning to the merits of the claims, Appellees argued that, under Ohio law, Kappa, as a private organization and through its Fraternity Council, had the right to reasonably interpret its own Bylaws.  (App. Vol. II 020–23.)   They further explained how a court telling a private organization whom it can and cannot accept as a member would violate the organization's First Amendment freedom of association.   (App. Vol. II 024–25.)   On the contract claims, Appellees demonstrated how Appellants failed to allege the violation of any contractual provision, thus dooming a breach-of-contract or tortious-interference claim.  (App. Vol. II 025–28.)  Finally, on the direct claim, Appellees articulated how the failure of the derivative claim was fatal to the direct claim.   (App. Vol. II 028–30.) Appellants did not present any argument to the district court as to why that direct claim should not be dismissed.  (App. Vol. II 034–53.)

---

their leases are with the Building Co., not Kappa.  (*Id.*)  Since becoming a member, Langford has never lived in the Kappa house.  (App 045.)  Appellants' claim against the Building Co. was based simply on Langford's "access and presence" in the house.  (App. 047.)

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 136 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 22 of 67  PAGEID #: 497
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 22

The district court granted Appellees' Motion to Dismiss.  It agreed that the claim against the Building Co. lacked subject-matter jurisdiction.  And although the district court found that it had personal jurisdiction over Rooney and that Appellants had satisfied the procedural requirements of a derivative claim, it adopted Appellees' position on the merits of the underlying claims, dismissing each of them.

Appellants then appealed to this Court.  Notably, they do not pursue their breach-of-contract or tortious-interference claims on appeal, meaning they have abandoned those claims.  *Peters v. Clark (In re Bryan)*, 857 F.3d 1078, 1095 n.48 (10th Cir. 2017) (citing *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277–78 (10th Cir. 1994)) ("issue not briefed in opening brief is deemed abandoned on appeal").  The district court held that the breach-of-contract claim was the only claim against the Building Co. and the tortious-interference claim was the only claim against Kappa.  *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *8.  The district court further held that the derivative and direct claims were only against Rooney.  *Id.* at *8; *40.  Appellants do not appeal those determinations, nor would there have been a basis to do so.  This is because "[a] shareholder's derivative action is brought by a shareholder in the name of the corporation to enforce a corporate claim."  *Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989).  Thus, Appellants assert their derivative claim on behalf of Kappa, not against Kappa.

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 137 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 23 of 67 PAGEID #: 498
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 23

And a direct claim may only be brought against a director or officer. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *41 n.65; *see Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio Ct. App. 2011). Therefore, Appellants have abandoned claims against the Building Co. and Kappa, and the only remaining defendant to the Amended Complaint against whom Appellants are pursuing claims is Rooney.

## SUMMARY OF THE ARGUMENT

This case arises out of the results of a collegiate sorority chapter's internal membership vote at the University of Wyoming in fall 2022. Six of the chapter's members were upset that their sorority sisters voted to admit a transgender woman. Rather than accept their chapter's decision to admit a member that they personally did not want in their chapter, Appellants have asked a federal court to define the term "women" in Kappa's governing documents as a "biological female" and overturn the membership decision of their chapter and remove Langford from membership. The judiciary, however, should not interfere in the decisions of a private organization in interpreting their governing documents and determining who can and cannot be admitted as a member.

Appellants' request that a federal court overturn the results of their chapter's fall 2022 membership vote through a shareholder derivative action fails because it rests on two false premises. First, Appellants misapprehend the role of courts in policing the internal activities of private organizations. They argue, without any

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 138 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 24 of 67  PAGEID #: 499
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 24

legal basis, that judicial deference to organizational autonomy is not required in a derivative action for breach of fiduciary duty.  They instead ask the Court to analyze a private, non-profit organization's Bylaws using an originalist approach similar to what some jurists use to answer questions of statutory or constitutional interpretation, even though the bylaws of private organizations are neither statutes nor constitutional amendments.  Rather, Ohio law, which governs the derivative claim, provides that private organizations have autonomy to reasonably interpret their bylaws.  Kappa's own governing documents expressly give Kappa's Fraternity Council authority to interpret Kappa's Bylaws, and the Fraternity Council's interpretation of its Bylaws, which do not define the term in question, is reasonable.

Second, Appellants assume that the term "woman" can only refer to an individual who is a "biological female."  Although that is one interpretation of the term, it is not the only reasonable one.  Courts, social science, and numerous other segments of society have adopted a broader, more inclusive definition of the term. Kappa's Fraternity Council, not bound by a Bylaw that defines "woman" more restrictively, is free to inclusively define "woman" to include transgender women in interpreting Kappa's Bylaws.  Differences of opinion between some members on this inclusive definition—which will undoubtedly happen in an organization of over 210,000 members with diverse personal views—does not mean the definition

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 139 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 25 of 67  PAGEID #: 500
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 25

is unreasonable; it only reflects disagreement. This Court need not define the term "women" or make any judgment about what is the best definition of that term. Instead, the Court need only recognize that Kappa's Fraternity Council's definition of "women" to include transgender women is reasonable to affirm the district court.

There is no bar in the Bylaws prohibiting Kappa from admitting a transgender woman as a member. Were a court to nonetheless reject Kappa's interpretation of an undefined term in its Bylaws that impacts its membership, it would not only violate Ohio law that mandates deference to Kappa's reasonable interpretation of its Bylaws, but also deprive Kappa of associational freedoms the First Amendment guarantees for private organizations.

Finally, Appellants did not attempt to defend their direct claim in district court and so forfeited their ability to assert it in this Court. Nevertheless, to the extent it is based on breach of fiduciary duty, it necessarily fails for the same reasons as identified above. And to the extent Appellants are now attempting to advance a claim for alleged personal injury based on frustrated contractual expectations, they fail because they do not identify any contractual obligation that was owed to them and was either breached or frustrated.

As Appellants abandoned the other claims in the Amended Complaint, the Court should affirm the district court's dismissal of all claims.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 140 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 26 of 67 PAGEID #: 501
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 26

# **ARGUMENT**

## **A. Appellants Fail to State a Derivative Claim**

### i.   Kappa Is Entitled to Reasonably Interpret Its Own Bylaws

#### a. *Ohio Law Grants Deference to a Voluntary Organization Interpreting Its Own Bylaws and Governing Documents*

Ohio law allows private, non-profit organizations latitude to reasonably interpret their own governing documents.  As the district court recognized, "[a]s a general rule, Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association." *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *30 (quoting *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 U.S. Dist. LEXIS 822, at *13 (N.D. Ohio Jan. 6, 2010)).  Ohio law recognizes that a private organization's right to interpret its own bylaws, rules, and regulations "is as sacred as the right to make them." *Stibora v. Greater Cleveland Bowling Ass'n*, 577 N.E.2d 1175, 1179 (Ohio Ct. App. 1989).

"Generally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein members have mutually agreed upon a charter or rules, the decision of the association itself is supreme." *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797, 802 (Ohio Ct. App. 1991).  Courts will only step in to disturb a private organization's interpretation of its own bylaws "when there has been some palpable violation of the constitution or laws of the corporation." *Redden*, 2010 U.S. Dist. LEXIS 822, at *14 (quoting *Powell v. Ashtabula Yacht*

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 141 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 27 of 67  PAGEID #: 502
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 27

*Club*, No. 953, 1978 Ohio App. LEXIS 8855, 1978 WL 216074, at *4 (Ohio Ct. App. 1978)).  Stated another way:

> [C]ourts will not assume to act in place of those authorized to interpret the constitution and by-laws of a voluntary association unless those upon whom the duty is placed acted in an arbitrary and unreasonable manner. This is also true with respect to the determination of all questions of policy and internal management.

*Wellendorf v. Chauffeurs, Teamsters, etc., Local Union No. 377*, No. 87 C.A. 37, 1988 Ohio App. LEXIS 2166, at *17 (Ohio App. 1988) (finding that the union's construction of its own governing documents was reasonable and court would defer to this interpretation) (citing *Finlay v. Duffy*, 94 N.E.2d 466, 469 (Ohio Ct. App. 1950)); *Crossen v. Duffy*, 103 N.E.2d 769, 779 (Ohio Ct. App. 1951).  The term "arbitrary" has been defined by the Supreme Court of Ohio as "without adequate determining principle . . . not governed by any fixed rules or standard." *Ulliman v. Ohio High Sch. Ath. Ass'n*, 919 N.E.2d 763, 773 (Ohio Ct. App. 2009) (quoting *City of Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095, 1097 (Ohio 1981)) (internal quotation marks omitted).

When, as here, members are arguing that their interpretation of the bylaws is correct and the private organization's interpretation of the bylaws is incorrect, it "is not an issue to be decided by a court."  *See Stibora*, 577 N.E.2d at 1179; *Tucker v. Nat'l Ass'n of Postal Supervisors, Cleveland Branch 46*, 790 N.E.2d 370, 375 (Ohio Mun. Ct. 2003) (recognizing courts should only step in if the voluntary

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 142 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 28 of 67  PAGEID #: 503
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 28

organization's actions are "not just wrong, but also arbitrary and undertaken as a willful exercise of power").  Kappa's interpretation of its Bylaws is entitled to the same deference Ohio courts have consistently afforded Ohio's voluntary organizations.

> ### b. There Is No Basis to Limit the Deference Owed to Kappa to Interpretations Concerning Member Discipline and Due Process

Appellants strangely insist the Court cannot defer to Kappa's interpretation because "[a] derivative claim like the one Plaintiffs brought is not subject to the rule of non-interference."  (Aplt. Br. 18.)  They claim that judicial deference only applies when the claim is for "direct injuries resulting from a violation of due process or some other complaint personal to the plaintiff about an internal dispute-resolution process."  (*Id*. at 21.)  Appellants urge the Court not to defer to Kappa's interpretation of its own Bylaws because the derivative claim here "is not about due-process rights or a personal grievance concerning Kappa's internal-dispute resolution process."  (*Id*. at 22.)

Notably, Appellants do not cite **any** authority that cabins Ohio law's deference to organizations' interpretations of their bylaws only to specific types of claims, to due-process rights, or to personal grievances.[5]  In the absence of any

---

[5] Appellants represent that *Redden* supports this proposition because it applied the non-interference rule only to a claim concerning the sorority's disciplinary policy "and not plaintiff's separate claim for breach of fiduciary duties."  (Aplt. Br. 21–

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 143 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 29 of 67 PAGEID #: 504
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 29

precedent even suggesting the limitation Appellants present as established, there is ample reason to reject Appellant's attempt to distinguish their case from longstanding and well-recognized non-interference principles of Ohio law.

First, Appellants' packaging of their grievance as a derivative claim for breach of fiduciary duty instead of a direct injury claim does not alter the principle that Kappa's Fraternity Council is entitled to deference in interpreting Kappa's Bylaws and governing documents. Appellants appear to misunderstand the significance of a derivative claim. Common law refused to permit stockholders to call corporate managers to account in actions at law, so the equitable remedy of a derivate suit was created to be a "suit to enforce a *corporate* cause of action against offices, directors and third parties." *Henkel v. Aschinger*, No. 11CVH-11-14,324, et al., 2012 Ohio Misc. LEXIS 5598, at *12-13 (Ohio Comm. Pleas 2012) (citing *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)). A derivative suit requires a valid claim upon which the corporation could have sued, and a showing that the corporation itself refused to proceed after suitable demand (or some other extraordinary conditions). *Id.* at *13. Bringing a claim as a derivative action does

---

22.) *See Redden*, 2010 U.S. Dist. LEXIS 822, at *3–*4. What Appellants do not mention is that the court in *Redden* found that the plaintiff lacked standing to bring a breach-of-fiduciary-duty claim and thus did not need to reach the question of bylaw interpretation at all. *Id.* at *10–*11. The court made no finding that the non-interference rule was inapplicable to a claim for breach of fiduciary duties.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 144 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 30 of 67  PAGEID #: 505
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 30

not lower the deference accorded to Fraternity Council.  It is an equitable remedy to pursue a claim upon which Kappa could have sued.

Second, bringing a claim for breach of fiduciary duty also does not reduce the deference accorded to Fraternity Council.  Rather, there is a presumption for breach of fiduciary duty claims that Fraternity Council acted in good faith and cannot be liable.  When an aggrieved shareholder brings a derivative action alleging a breach of fiduciary duty, the shareholder must show that the alleged wrongdoers "have acted in bad faith or without the requisite objectivity." *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (Ohio Ct. App. 2020) (internal citations omitted) (dismissing breach of fiduciary duty claim for failure to state a claim upon which relief can be granted).  In assessing a derivative suit for breach of fiduciary duty, "it is presumed that any action taken by a director[6] on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Brosz v. Fishman*, 99 F. Supp. 3d 776, 785 (S.D. Ohio 2015) (citing *Drage v. Proctor & Gamble*, 694 N.E.2d 479, 482 (Ohio Ct. App. 1997)).  When officers and directors perform their duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances," they

---

[6] Ohio courts impose a similar common law fiduciary duty on officers as that imposed by Ohio statute on directors.  *Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Tr. v. Baker*, 365 B.R. 91, 103 (S.D. Ohio Bkrupty. 2007).

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 145 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 31 of 67 PAGEID #: 506
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 31

have no liability. *Liquidating Tr.*, 365 B.R. at 103. In evaluating a director's compliance with a fiduciary's duty of care, "Ohio courts adhere to the 'business judgment rule,' and will not usually inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion" as the courts recognized that "many important decisions are made under circumstances of uncertainty." *Koos v. Central Ohio Cellular*, 641 N.E.2d 265, 272 (Ohio Ct. App. 1994) (quoting *Radol v. Thomas*, 772 F.2d 244, 256 (6th Cir. 1985)) (internal quotation marks omitted).

Third, any claim based on Fraternity Council's decision on a matter of policy, including Bylaw interpretation, requires judicial deference. Appellants' argument is that Rooney and Fraternity Council, as fiduciaries of a voluntary organization, breached their fiduciary duties because they did not interpret and apply the Bylaws properly. (*See* Aplt. Br. 27–40.) The breach of fiduciary duty claim rests squarely on whether Fraternity Council was allowed to interpret and apply the Bylaws to include transgender women or whether they violated their fiduciary duty in interpreting and applying the Bylaws.

"Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud." *Strah v. Lake Cnty. Humane Soc'y*, 631 N.E.2d 165, 171 (Ohio Ct. App. 1993) (quoting

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 146 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 32 of 67 PAGEID #: 507
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 32

*Cincinnati Camp Meeting Ass'n v. Danby*, 56 N.E.2d 694, 696 (Ohio Ct. App. 1943)) (internal quotation marks omitted); *see also Tucker*, 790 N.E.2d at 375 (finding liability if the fiduciary's actions were "not just wrong, but also arbitrary and undertaken as a willful exercise of power"). Therefore, not only do Appellants have to overcome the presumption that Fraternity Council acted in good faith in accordance with their fiduciary obligations, but also the judicial deference accorded to Fraternity Council's interpretation of Kappa's Bylaws.

Ohio court cases establishing judicial deference give no indication that the rule only reaches claims concerning membership removal or internal discipline processes as Appellants suggest. In *Putka*, the court explained that courts defer to the decisions of private organizations "in matters of ***policy, discipline or internal economy***." *Putka*, 600 N.E.2d at 802 (emphasis added). The Northern District of Ohio in *Redden* described the deference as reaching the "internal affairs" of the organization, not just discipline issues. *Redden*, 2010 U.S. Dist. LEXIS 822, at *13. And when the court in *Stibora* held that a voluntary organization's right to interpret its governing documents was "sacred," it did not caveat that conclusion by limiting it to interpretations concerning questions of due process or personal grievance. *Stibora*, 577 N.E.2d at 1179.[7]

---

[7] The Court can also look across the country and find that courts have consistently granted the broad deference Appellants ask this Court to reject. *See, e.g., De Mille v. Amer. Fed'n of Radio Artists*, 187 P.2d 769, 775 (Cal. 1947) ("[t]he practical

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 147 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 33 of 67  PAGEID #: 508
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 33

In the absence of any case law to support Appellant's proposed limitation, it would be illogical for this Court to create new Ohio law on this matter. Consider the implications. Appellants would have the Court find that Kappa receives judicial deference in a Bylaw interpretation that removes a member for failing to meet membership qualifications, but no judicial deference in one that decides who can be a member for satisfying membership qualifications. Both interpretations address the composition of the organization's membership and membership qualifications and both interpretations stem from the same set of governing documents. Appellants do not explain why membership removal would be afforded significant deference while membership admittance would receive none.

---

and reasonable construction of the constitution and by-laws of a voluntary organization by its governing board is binding on the membership and will be recognized by the courts"); *Danese v. Ginesi*, 654 A.2d 479, 482 (N.J. App. 1995) ("[t]he courts recognize an association's right to adopt, administer, and interpret its own rules without judicial intervention"); *Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 4:13-cv-1054, 2013 U.S. Dist. LEXIS 114605, at *16 (S.D. Tex. Aug. 13, 2013) ("[u]nder Texas law . . . [t]he right of a voluntary club or association to interpret its own organic agreements, such as its charter, its by-laws and regulations, after they are made and adopted, is not inferior to its right to make and adopt them"); *Bhd. of Locomotive Eng'rs v. Folkes*, 109 S.E.2d 392, 398 (Va. 1959) ("[i]t is well established that the construction of the by-laws . . . belongs not to the court, but to the board, council or other tribunal provided for the purpose in the organization").

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 148 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 34 of 67 PAGEID #: 509
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 34

> c. *Declining to Defer to Kappa's Interpretation of Its Bylaws Would Undermine the Purposes of the Judicial Non-Intervention Doctrine and Ensnare Courts in Unnecessary Litigation*

The United States District Court for the Western District of Texas succinctly described the rationale for judicial non-intervention: "if the courts were to interfere [every time] some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility." *Campbell v. Am. Psychological Ass'n*, 68 F. Supp. 2d 768, 779 (W.D. Tex. 1999) (internal quotation omitted).  Appellants' position that the Court should not defer to Kappa's interpretation of its Bylaws defining membership criteria would confine private organizations and the courts to precisely this fate.

This irrational rule could just as easily apply to a claim for any of Fraternity Council's other interpretations of Bylaws, including membership criteria, so any disputed interpretation would arguably support a derivative claim for breach of fiduciary duty.  For example, under Kappa's Bylaws, a member, among other requirements, must "[h]ave demonstrated integrity, respect, and regard for others and an appreciation of the worth of all individuals" and "[b]e willing to pledge to uphold the Kappa Kappa Gamma Fraternity *Bylaws, Standing Rules* and *Policies*." (App. 087.)  The logical extension of Appellants' position is that any Kappa member could assert a legal claim for breach of fiduciary duty against Fraternity

Case 2:23-cv-00051-ABJ     Document 47-8     Filed 02/28/25     Page 149 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 35 of 67  PAGEID #: 510
Appellate Case: 23-8065     Document: 010110978097     Date Filed: 01/03/2024     Page: 35

Council if she believed her chapter was admitting members who lacked integrity and Fraternity Council failed to prevent the members' initiation.  The courts hearing the cases would not defer to Kappa's judgment, but instead, would judicially determine the meaning of "integrity" and who could be admitted under the courts' standards (which may differ between courts).  And those same principles of judicial intervention in bylaw interpretations would apply to any private organization.

The litigation stemming from a novel judicial non-deference rule to bylaw interpretation simply because it is advanced as a derivative claim for breach of fiduciary duty would bury courts, private organizations, and their members.  This underscores why Ohio law (like many other states' laws) only requires private organizations interpreting their own governing documents to make reasonable interpretations and otherwise stays away from the governance of private entities.

    ii.   <u>Fraternity Council's Interpretation of Kappa's Bylaws Was Reasonable</u>

Kappa and Rooney agree that the Fraternity Council cannot ignore Bylaws, but they did not do so in this case.  Instead, as discussed above, the judicial non-intervention doctrine provides that courts sustain reasonable interpretations of private organizations' governing documents.  An interpretation of Kappa's governing documents that allows for the admission of transgender women is reasonable.  Thus, the Court should sustain it.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 150 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 36 of 67  PAGEID #: 511
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 36

### a.  Kappa's Bylaws Do Not Define the Term "Woman"

If Kappa's Bylaws defined the term "woman" in a way that explicitly excluded transgender women, Kappa and Rooney would also agree that adopting an inclusive definition would not be reasonable.  As articulated by one court, a court should adjudicate a dispute if "a private voluntary organization plainly contravenes the terms of its bylaws" and is not "bound by an association's unreasonable construction of a plain and unambiguous provision of its constitution[.]"  *Cal. Dental Ass'n v. Am. Dental Ass'n*, 590 P.2d 401, 403, 406 (Cal. 1979).  But the parties agree that the term "woman" is not defined in Kappa's Bylaws.  (*See* Aplt. Resp. to Mot. to Dismiss ("[i]n ruling against Plaintiffs the court concluded that 'Plaintiffs *cannot* point the Court to the bylaw that defines 'women' the way they wish . . . This is true").)  All the Bylaws state is that members must be "women."  (App. 086.)  Fraternity Council is specifically authorized to interpret the Bylaws.  (App. 199.)  Given the lack of any definition in the Bylaws, Fraternity Council has interpreted "women" to include transgender women.  Therefore, the question here is whether Kappa has adopted an unreasonable construction of a plain and unambiguous provision.

### b.  The Term "Woman" Is Open to More than One Reasonable Interpretation

Appellants' position is premised on the assumption that only individuals who are "biological females" are women.  This is one interpretation of the term,

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 151 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 37 of 67 PAGEID #: 512
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 37

but not the only one.  Kappa's interpretation of the term to include transgender women is reasonable.

Currently, over 1.6 million adults and youth identify as transgender in the United States, or roughly 0.6 percent of Americans who are 13 years old or older. *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023).  Some courts, including a federal court in Ohio, have explicitly recognized that "[a] transgender woman *is a woman* who was assigned male at birth."  *Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907, at *6 (N.D. Ohio Sept. 25, 2023) (citation omitted) (emphasis added); *see also Kadel v. Folwell*, 620 F. Supp. 3d 339, 376 (M.D.N.C. 2022) ("[t]ransgender men are men; transgender women are women"); *Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67, 81 (Ill. Ct. App. 2021) (finding a transgender woman "is female, just like the women who are permitted to use the women's bathroom.  The only reason that [a transgender woman] is barred from using the women's bathroom is that she is a *transgender* woman, unlike the other women . . .") (emphasis in original)).

Many courts, including this one, have long referred to transgender women using she/her pronouns that Appellants would reserve only for people born biologically female.  *See, e.g., Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019 (10th Cir. 2021) (using female pronouns to refer to party who was a transgender woman); *Hecox*, 79 F.4th 1009 (same); *United States v. Price*, 84 F.4th 738 (7th

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 152 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 38 of 67 PAGEID #: 513
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 38

Cir. 2023) (same); *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) (same);

*Qz'Etax v. Ortiz*, 170 F. App'x 551, 553 (10th Cir. 2006) (same).

Other courts, including the district court in this case, have recognized that the question of who is a woman does not have a straightforward answer while declining to answer it definitively. *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *4 ("the Court will not define 'woman' today"); *B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316, 2023 U.S. Dist. LEXIS 1820, at *14 (S.D. W. Va. Jan. 5, 2023) ("I will not get into the business of defining what it means to be a 'girl' or a 'woman.' The courts have no business creating such definitions.").

Courts in the Sixth Circuit, where Kappa is headquartered and incorporated, have adopted expansive interpretations of "sex," which result in expansive definitions of "male" and "female." The Southern District of Ohio recognized that "biological markers" that compromise an individual's biological sex" include "inter alia their organs, their chromosomes, their hormones, and their gender identity." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595, 2023 U.S. Dist. LEXIS 131707, at *23 (S.D. Ohio Jul. 28, 2023). That court explained:

> [B]iological sex is not quite as binary as that definition presumes. Instead, the concept of "biological sex" encompasses a multitude of biological components (including gender identity) that often diverge in the same individual; for any given person, some of their biological markers may align with maleness while other markers

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 153 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 39 of 67  PAGEID #: 514
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 39

> align with femaleness . . . Sometimes, that divergence manifests in obvious physical ways: for example, in intersex individuals whose reproductive or sexual anatomy [do not] fit into an exclusively male or female (binary) sex classification . . . In others, the divergence in their biological components is still physical, but in less obvious or outwardly apparent ways . . . Simply put, it is not so simple to define "biological sex" as just male or female.

*Id.* at \*22–\*23 (citing *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 821–23 856–57 (10th Cir. 2022) (en banc) (Wilson, J., dissenting; Pryor, J., dissenting); Jennifer Levi & Kevin Barry, *"Made to Feel Broken": Ending Conversion Practices and Saving Transgender Lives*, 136 HARV. L. REV. 1112, 1117 (2023); *Intersex*, CLEVELAND CLINIC (Jul. 23, 2023), https://my.clevelandclinic.org/health/articles/16324-intersex; F.P. Kruijver et al., Male-to-female transsexuals have female neuron numbers in a limbic nucleus, 85 J. CLINICAL ENDOCRINOLOGY & METABOLISM 2034 (2000) (internal quotation marks omitted).

As explained by the Middle District of Tennessee:

> [S]ex can mean different things to different people and/or mean different things in different contexts, and the notion that there is only one definition of 'sex'—or only one sense in which the word 'sex' properly can be used—is patently wrongheaded.

*Gore v. Lee*, No. 3:19-cv-0328, 2023 U.S. Dist. LEXIS 107984, at \*30 (M.D. Tenn. Jun. 22, 2023). That court further recognized that "male" and "female" can

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 154 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 40 of 67 PAGEID #: 515
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 40

have meanings transcending mere external genitalia at birth and that a person may be able to switch between the two based on gender identity or changes in external genitalia. *Id.* at \*32. And that a birth certificate designation of "male" or "female" is not a designation that is "immutable over a person's life, or applies to every context, or is the only possible way to think of the person's 'sex,' or is the person's 'true sex.'" *Id.* at \*53; see also *Hobby Lobby Stores*, 186 N.E.3d at 79 (recognizing gender identity can be a factor used in state legislation to determine "sex," and that "sex" is not an immutable condition or "eternally fixed").

To see the difference of opinion on this issue, the Court can also look to the growing mass of cases addressing whether there is a place for transgender women and girls in sports. Some jurisdictions and administrative athletic bodies preclude or have sought to preclude transgender women from participating in women's sports. *See Hecox*, 79 F.4th 1015 (addressing injunction against enforcement of Idaho law that banned transgender women from participating in women's sports); *D.N. v. DeSantis*, No. 21-cv-31344, 2023 U.S. Dist. LEXIS 198678 (S.D. Fla. Nov. 6, 2023) (lawsuit over Florida law prohibiting transgender girls from participating in girls high school sports).[8] Others take the opposite approach. *Soule v. Conn.*

---

[8] That Florida saw it necessary to pass a law clarifying that transgender girls cannot "participat[e] . . . in any school-sponsored girls' sports" as opposed to relying on the fact that the sports in question were already expressly limited to girls underscores the point that "girls" or "women" are not terms that apply to only people born biologically female. *See D.N.*, 2023 U.S. Dist. LEXIS 198678, at \*5.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 155 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 41 of 67  PAGEID #: 516
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 41

*Ass'n of Sch.*, 57 F.4th 43 (2d Cir. 2022) (lawsuit over Connecticut policy allowing transgender students to compete on gender-specific athletic teams consistent with their gender identity).

Participation in high school and college sports is just one of many social and political debates surrounding the transgender community.  Indeed, whether one's sex can be changed is "a topic which has been in the news on many occasions and 'has become an issue of contentious political . . . debate.'"  *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1051 (6th Cir. 2001)) (internal quotation marks omitted).  Appellants and the amici supporting their position plainly have one view as to how policymakers in public and private realms should treat transgender women and girls.  Specific to this case, they want transgender women banned from Kappa. They are undoubtedly joined in those views by others across the country.  Others, including a majority of the members of Kappa's Gamma Omicron chapter, feel differently.

The biological reality of sex and gender is complicated.  *Hecox*, 79 F.4th at 1024.  The Ninth Circuit has cited the Endocrine Society Guidelines, which recognize:

> The phrase 'biological sex' is an imprecise term that can cause confusion.  A person's sex encompasses the sum of several biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and

Case: 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 156 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 42 of 67  PAGEID #: 517
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 42

> external genitalia, other secondary sex characteristics, and gender identity.  These attributes are not always aligned in the same direction.

*Id.*  But, in a case involving a private organization's interpretation of its governing documents, the Court does not need to resolve those complicated questions and define what it means to be a woman.  Instead, this Court only needs to decide whether Kappa, acting through Rooney and the Fraternity Council, interpreted its documents reasonably.  "[A] difference of opinion does not rise to the level of a breach of fiduciary duty." *Maas v. Maas*, 161 N.E.3d 863, 879 (Ohio Ct. App. 2020).  And interpreting the term "woman" in the same way as legislatures and courts that have touched on the question in other contexts was reasonable.[9]

As a final point, Appellants argue that the Bylaws "use 'woman' as it is commonly understood – a biological female."  (Aplt. Br. 27).  To determine whether Appellants' proposed definition is the only "common understanding" of "woman," this Court can look to how other women's organizations and groups define "woman."  Kappa's inclusive definition aligns with all other 25 sororities that are a part of the National Panhellenic Conference ("NPC").  (App. 126.)  It further aligns with the admissions policies of at least 22 historically women's

---

[9] Even if one were to adjudge that Kappa's interpretation as wrong, that is not sufficient to impose liability for a breach of fiduciary duty claim because the presumption is that Fraternity Council acted in good faith absent factual allegations that establish bad faith, fraud, or abuse of discretion. *See supra* 18–19.

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 157 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 43 of 67  PAGEID #: 518
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 43

colleges. (*See* App. 023–24 (citing *Historically Women's Colleges with Trans-Inclusive Admissions Policies*, CAMPUS PRIDE, https://www.campuspride.org/tpc/womens-colleges/ (citing to the policies, and providing links to those policies)). It further aligns with innumerable other private women's organizations that have defined "women" to include transgender women through their public statements.[10]

Interpreting the term "women" in the same way as other NPC groups, women's colleges, and women's organizations is reasonable and reflects a "common understanding" of this term.

---

[10] *Statement from Women's Rights And Gender Justice Organizations in Support of the Equality Act,* NAT'L ORG. FOR WOMEN, https://now.org/wp-content/uploads/2021/03/Statement-of-Womens-Rights-And-Gender-Justice-Organizations-in-Support-of-the-Equality-Act-2.pdf (Mar. 16, 2021) (statement signed by over 80 organizations that "transgender girls and women are girls and women"); *Women Demand: A Letter to the Federal Elected Officials and Candidates from the Women's Community*, NAT'L WOMEN'S LAW CENTER, https://nwlc.org/resource/women-demand-a-letter-to-federal-elected-officials-and-candidates-from-the-womens-community/; https://nwlc.org/wp-content/uploads/2020/09/Womens-Community-Transition-Letter-Draft-10.15.2020.pdf (Oct. 15, 2020) (letter signed by more than 200 organizations; "we use the phrase 'women and girls' and explicitly note that this includes transgender women and girls"); *Statement of Women's Rights and Gender Justice Organizations in Support of Full and Equal Access to Participation in Athletics for Transgender People*, AM. ASS'N OF UNIV. WOMEN, https://www.aauw.org/app/uploads/2020/02/Statement-from-Womens-Organizations-Supporting-Full-and-Equal-Access-to-Participation-in-Athletics-for-Transgender-People-nsa.pdf (statement signed by 23 organizations that "transgender girls and women are girls and women").

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 158 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 44 of 67  PAGEID #: 519
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 44

> c. *Even if the Court Were to Deny Kappa the Right to Interpret Its Own Governing Documents, Kappa's Interpretation Is Correct Under Appellants' More Demanding Analysis*

Even if Ohio law did not afford private organizations deference in reasonably interpreting their governing documents, which it plainly does, the result in this case would be the same. Appellants urge the Court to conduct an analysis of Kappa's Bylaws through an originalism-style lens wherein the Court would try to surmise the views of Kappa's founders in the 1870s and review dictionary definitions from the time of Kappa's founding to determine whether "women," as defined in Kappa's Bylaws, refers only to people who are biologically female. (Aplt. Br. 30–33.) As argued throughout, courts do not scrutinize the governance of private organizations like they do statutes and constitutional provisions, and doing so here would be improper. However, even under this proposed framework, Appellees prevail.

Appellants fixate on the 1870s to advance their argument, making repeated reference to Kappa's founders and how they would have understood the term "woman." Although the record is devoid of any evidence as to what Kappa's founders would have thought about transgender women, Appellants assure the Court that they only intended Kappa to include people born biologically female in their definition of women.[11] (*Id.* 30–32.) They say this must be so because

---

[11] "[T]transgender women like women generally . . . have historically been

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 159 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 45 of 67 PAGEID #: 520
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 45

dictionary definitions of that era so restricted the term.  (*Id.* 31.)  Their ultimate

conclusion is that the Court should approach this like a contract between two

parties: look at the plain language of the contract, interpreting words and phrases

as they would have been understood at the time the contract was formed.  (*Id.*

(quoting *Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146, 151 (Ohio 1978).)

But Appellants have not advanced a breach-of-contract claim.  They advance

a claim for breach of fiduciary duty, which is assessed under an entirely different

standard than a contract claim.  In a breach-of-fiduciary-duty claim, the Court

presumes Fraternity Council acted in good faith, and requires Appellants to allege

facts to establish bad faith. *See supra* 18–19.

Moreover, the problem with Appellants' approach is that the Bylaws in

question were not ratified in 1870, 1882, 1910, 1926, or 1966.  They were ratified

in 2022.  (App. 137–66.)  Appellants dismiss this change as a "technical revision,"

(Aplt. Br. 35), but the report of the Bylaws Committee and the general

understanding of the term "woman" in 2022 shows that Appellees' interpretation

prevails in this analysis.

The Bylaws Committee presented the proposed updated Bylaws with a

report discussing the changes on March 16, 2022.  (App. 138–40.)  That report

---

discriminated against, not favored."  *Hecox*, 80 F.4th at 1029.  Therefore, in
seeking to advance the interests of women whom had historically faced
discrimination, Kappa's founders may well have embraced transgender women.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 160 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 46 of 67  PAGEID #: 521
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 46

indicated that the drafters of the proposed Bylaws intended for them to be "inclusive of all our membership." (App. 139.)  By that point, Kappa had already issued its "Guide for Supporting Our LGBTQIA+ Members, which clarified that it interpreted the term "woman" to include transgender women. (App. 112.)  Paired with the contemporaneous statement that the Bylaws were drafted to be inclusive of all members, the Court can discern the intent for the term "woman," as used in the governing Bylaws, includes transgender women.   Furthermore, a FAQs document was also issued with the Bylaws and Standing Rules Revisions 2022 that stressed that Kappa was founded "on the principles of integrity, respect and regard for others" and, therefore, "want[s] to be as inclusive of all members as we can be." (App. 185.)

The FAQs further explained:

> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character.  Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.
>
> We also look to NPC policy as an NPC member organization.  The NPC Recruitment Eligibility (2020) policy states: "for the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman.  Each women's-only NPC member organization determines its own membership selection policies and procedures."

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 161 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 47 of 67  PAGEID #: 522
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 47

(*Id.* (providing link to position statements).)

Additionally, dictionary definitions of the word "women" used in 2022 reflect the evolution of its meaning. The Cambridge Dictionary has a definition of "woman" as "an adult who lives and identifies as female though they may have been said to have a different sex at birth." *Woman*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/woman (last visited Jan. 3, 2024). It provides an example that "Mary is a woman who was assigned male at birth." *Id.* The Merriam-Webster Dictionary defines a "trans woman" as "a woman who was identified as male at birth." *Trans woman*, MERRIAM-WEBSTER DICTIONARY    https://www.merriam-webster.com/dictionary/trans%20woman#:~: text=%3A%20a%20transgender%20woman%20%3A%20a%20woman,Zachary% 20Zane (last visited Jan. 3, 2024).

Thus, even if the Court failed to allow Kappa to interpret its own Bylaws and analyzed Appellants' claim based on the parties' understanding of the Bylaws applicable at the time of Langford's admission, it would be left with the Bylaws as enacted in 2022 which were: (1) presented for consideration by delegates in 2022 to Kappa's convention as intended to be "inclusive"; (2) explained in a FAQs document in 2022 to include individuals who identify as women, and referenced the previously issued position statement; (3) enacted after Kappa had issued multiple policies explaining that it considers individuals who identify as women to

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 162 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 48 of 67  PAGEID #: 523
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 48

be included within the definition of "women"; and (4) issued as contemporaneously published dictionaries comported with Kappa's definition of the term.[12]  At the time that Langford was admitted in the fall of 2022, it was clear that the term "women" in the Bylaws included individuals who identified as women and this should have been understood by all members, even if they disagreed with that interpretation.

### iii.  Once Kappa Has Reasonably Interpreted Its Own Bylaws, a Court Dictating Whom It Can and Cannot Admit Would Violate the First Amendment

The First Amendment right of a private organization to conduct itself as it sees fit and associate with members of its choosing is inherent in the judicial non-intervention doctrine.  Although Appellees agree that litigants cannot use the First Amendment as a shield against meeting their contractual obligations, a court telling a private organization that it cannot reasonably interpret its own governing documents to select members it chooses to associate with would violate the First Amendment.  "Interference with expressive associational rights is clearest when it involves matters concerning decisions about a group's membership." *W. Va. Coal.*

---

[12] Appellants also do not address the implications of their analysis on other portions of the membership criteria.  For instance, it would not make sense to assess the character and integrity of potential members today (an assessment the Bylaws require chapters to make) under the standards of 1870 society when standards of morality and decency differed vastly from those of the present day.  Yet Appellants would have Kappa make those assessments as they would have been understood by Kappa's founders regardless.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 163 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 49 of 67 PAGEID #: 524
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 49

*Against Domestic Violence, Inc. v. Morrisey*, No. 2:19-cv-00434, 2023 U.S. Dist. LEXIS 154406, *29–*31 (S.D. W. Va. Aug. 31, 2023).   As discussed above, Kappa's governing documents allow for the admission of any transgender woman whom a chapter votes to accept.   Thus, interference by this or any court in Kappa's decision to admit Langford (or any transgender woman) as a member because she is a transgender woman would violate the First Amendment.

### a.  Court Orders Constitute State Action

Responding to the district court's discussion of the serious First Amendment concerns that would flow from adopting Appellants' position, Appellants argue that the case does not implicate the First Amendment because there is no state action.[13]   (Aplt. Br. 25.)   But the Supreme Court has recognized that actions of courts constitute state actions.   *See Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948); *see also Duke v. Smith*, 784 F. Supp. 865, 870 (S.D. Fla. 1992) (recognizing a court interferes with the First Amendment freedom of expression in "substitut[ing] its own judgment for that of the [p]arty").   This Court dictating Kappa's membership would implicate Kappa's First Amendment freedoms.

---

[13] Of course, the First Amendment applies to all government actions, both state and federal.

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 164 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 50 of 67 PAGEID #: 525
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 50

      *b. Courts Cannot Make the Membership Decisions for Private Organizations*

At its core, this is a case about who can and cannot join the membership of a private organization. Specifically, it is about whether Kappa can admit transgender women to its membership or not. The First Amendment confines those decisions to organizations and their members, not government actors like courts and legislatures. "Impediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 658 (2000) (internal citations omitted). The Supreme Court recognized, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). "And as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational." *Democratic Party of United States v. Wis.*, 450 U.S. 107, 124 (1981).

First Amendment associational freedoms apply in the case of a private organization where members disagree about whom should be eligible for admission:

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 165 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 51 of 67  PAGEID #: 526
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 51

> [An organization's] speech or conduct may reflect the
> view of only a bare majority of the members, or even just
> the view of the members' delegate—such as the editor of
> a newspaper or the pastor of a congregation.  It suffices
> that the speech or conduct represents an official position.

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1149 (10th Cir. 2013)

(quoting *Dale*, 530 U.S. at 655) (internal quotation marks omitted).  In one recent

case, the Ninth Circuit concluded that requiring a beauty pageant to allow a

transgender woman to compete would violate the pageant's First Amendment

rights.  *See Green v. Miss USA, LLC*, 52 F.4th 773 (9th Cir. 2022).  The same logic

would control this case, the only difference being that Kappa is seeking to include

transgender women instead of exclude them.  But in both instances, it is the

organization that should make the decision, not the court.

Forcing Kappa to exclude Langford and other transgender women from its

membership implicates the same First Amendment concerns as forcing the Boy

Scouts of America to include gay scoutmasters, as was at issue in *Dale,* or forcing

a privately organized parade to allow a group to march when the organizers did not

agree with the message, as was at issue in *Hurley*.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 166 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 52 of 67 PAGEID #: 527
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 52

iv.   To the Extent Appellants Now Assert a Derivative Claim Based on
      the Gamma Omicron Chapter's Election Procedures, They Have
      Forfeited the Claim in the District Court, Failed to Demonstrate
      Futility, and Failed to Allege Facts to Show Bad Faith

a.   Appellants Forfeited This Claim by not Raising It with The
     District Court and by not Arguing Plain Error in Their Brief

A close reading of Appellants' brief reveals that the factual basis for their derivative claim has shifted since this case was in the district court.  Below, Appellants focused their derivative claim on the Bylaw interpretation that has occupied the majority of the analysis in this brief: whom is Kappa permitted to admit under its Bylaws?  (App. 073–75.)  Now, in their opening brief, Appellants attempt to add a second claim concerning the election procedures the Gamma Omicron chapter used in the vote on Langford's membership.  (Aplt. Br. 29). Appellants forfeited this claim by not addressing or asserting it below.

"When a plaintiff raises a legal theory on appeal that was not raised in the district court, we consider that theory forfeited."  *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1221 (10th Cir. 2017) (citing *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011)).  A forfeited argument can prevail only under plain-error review.  *Richison*, 634 F.3d at 1128.  Plain error is shown by establishing "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Parker Excavating*, 863 F.3d at 1221.  If, however, the

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 167 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 53 of 67  PAGEID #: 528
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 53

appellant fails to even argue that the new argument prevails under a plain-error standard, it "marks the end of the road for an argument for reversal not first presented to the district court." *Richison*, 634 F.3d at 1131.

Although the Amended Complaint made factual allegations concerning the election procedures the Gamma Omicron chapter used in voting on Langford's admission, Appellants' explanation of their derivative claim for breach of fiduciary duty focused entirely on the decision to admit transgender members, not the voting procedures the chapter used to do so.  (App. 073–75.)  As further evidence that Appellants did not intend to raise the argument in the district court, they did not discuss it at all when they argued that they had met the exhaustion requirement for a derivative claim.  (App. Vol. II 042–44.)  Appellees argued that Appellants had not shown futility given that Kappa's counsel had invited Appellees to identify specific provisions of Kappa's governing documents that Langford's admission allegedly violated.  (See App. 125–27; App. Vol. II 018–20.)  Responding to that argument, Appellants only addressed the alleged breach of fiduciary duty related to the admission of transgender women, not any claim concerning voting procedures. (App. Vol. II 042–44.)  On those arguments, the district court found that Appellants had met the futility requirements, without addressing any claim of voting irregularities. *See Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *26–29.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 168 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 54 of 67 PAGEID #: 529
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 54

For the first time on appeal, Appellants argue that their claim for breach of fiduciary duty also relates to non-anonymous and irregular voting at the chapter. (Aplt. Br. 29). Appellants, however, forfeited this argument by not raising it in the district court and then doomed it in this Court by not making a plain-error argument for its success. *See Richison*, 634 F.3d at 1131.

### b. *Appellants Failed to Demonstrate Futility for This Claim*

Furthermore, even if Appellants had argued plain error in their brief, they would have been unsuccessful because they would not have been able to show futility in a derivative claim premised on this theory. Rule 23.1 of the Federal Rules of Civil Procedure imposes special requirements that plaintiffs must meet when asserting a derivative claim. It requires plaintiffs to submit a verified complaint that states with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary from the shareholders or members," and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Courts can excuse this requirement when the plaintiff shows that further demand would have been futile. *Pikk v. Pedersen*, 826 F.3d 1222, 1227 (10th Cir. 2016).

In a futility analysis, courts "adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit." *Pikk*, 826 F.3d at 1228 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 169 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 55 of 67 PAGEID #: 530
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 55

1991)).   Ohio's futility standard is demanding.   *In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 U.S. Dist. LEXIS 11608, at \*13 (N.D. Ohio Mar. 21, 2006) ("establishing demand futility in Ohio is not an easy task").   "Futility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed."   *Carlson v. Rabkin,* 789 N.E.2d 1122, 1128 (Ohio Ct. App. 2003).   Ohio courts recognize that the requirement that plaintiffs first make a demand before proceeding with a derivative claim "is clearly not a technical procedural requirement" and instead "serves the very important purpose of ensuring that before a shareholder derivative suit is brought, the company's board of directors has considered all possible intracorporate remedies."   *Grand Council v. Owens*, 620 N.E.2d 234, 238 (Ohio Ct. App. 1993).

In arguing they met the futility requirement, Appellants relied on a letter from their attorney which raised their grievances with Kappa.   (App. 258–60.) This letter raised some concerns about the decision process of the chapter being "deeply flawed." (App. 259.)[14]   The letter, however, did not identify any Bylaw or Standing Rule that Appellants contend was violated by the Gamma Omicron

---

[14] Notably, Appellants' counsel's letter that was used to establish all the issues that were raised with Fraternity Council in November, approximately six weeks after the chapter's vote to admit Langford as a member, does not allege that any members were not able to participate in any voting.  (App. 258 –60.)  This was first alleged with the filing of the Complaint.

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 170 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 56 of 67  PAGEID #: 531
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 56

chapter's voting process. (App. 258–60.) Kappa's response invited Appellants to identify "specific provisions in any Kappa governing documents that [they] contend were not followed by Kappa." (App. 126.) Appellants did not respond.

The district court's conclusion on the only argument Appellants did present was that they established futility given that Kappa had made its policy of admitting transgender members clear. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *26–29. But the district court made no holding about the futility of raising any alleged voting irregularities as no such argument was advanced by Appellants.

Indeed, it is unclear under what authority Fraternity Council can deny membership to an individual based on an alleged issue that occurred with a chapter's voting process that is due to no fault of the member. As explained above, the only thing that headquarters is explicitly authorized to do in "approving a member" is consider if the requirements for initiation were fulfilled, which has nothing to do with a chapter's voting process. *See supra* 5–7. If they were, headquarters is required to authorize the initiation because it is each chapter's decision whom to admit to their chapter. *See id.* But, at the very least, these issues had to be raised with Fraternity Council to establish that Fraternity Council had authority to take an action and failed to do so in violation of its fiduciary duties. Appellants cannot meet Ohio's high bar for showing futility by crafting a new unsupported argument at this juncture.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 171 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 57 of 67  PAGEID #: 532
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 57

### c.    *Appellants Failed to Allege Facts to Show Bad Faith*

Finally, even if Appellants had argued plain error in their brief and even if they could establish futility to allow them to pursue a derivative claim, Appellants have failed to state a claim for breach of fiduciary duty based on alleged voting irregularities.    As discussed above, it is presumed that any action taken by Fraternity Council was taken in good faith and in the best interest of Kappa, and Appellants must show that Appellants acted in bad faith or without requisite objectivity.  *See supra* 18–19.   Furthermore, this Court cannot inquire into the wisdom of Fraternity Council's actions in the absence of fraud, bad faith, or abuse of discretion.  *See id.*

Fraternity Council did not conduct the alleged irregular voting procedure. All they are alleged to have done is allowed Langford to be initiated despite voting irregularities.  Simply failing to do something they allegedly should have done (even though the Bylaws do not authorize non-initiation due to a voting irregularity) is not sufficient to establish a breach of fiduciary duty.  There are no factual allegations to support any contention of fraud, bad faith, or abuse of discretion.  To satisfy the requirements under Ohio law for breach of fiduciary duty, plaintiffs "must plead facts, as distinct from generalized conclusions, which, if proved, would overcome the presumption that the [officers] have acted in good faith and in the best interests of the corporation."  *In re Gas Natural, Inc.*, No.

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 172 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 58 of 67 PAGEID #: 533
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 58

1:13-CV-02805, 2014 U.S. Dist. LEXIS 184046, at *51 (N.D. Ohio Sept. 24, 2014). Without factual allegations to support a contention of bad faith, Appellants cannot overcome the presumption of good faith accorded to Fraternity Council, and no breach of fiduciary duty claim can survive.

### B. Appellants' Direct Claim Is Both Forfeited and Fails on the Merits

Appellants forfeited their direct claim in the district court when they did not address it at all in response to Appellees' Motion to Dismiss. But even if they had not forfeited the claim, Appellants fail to state a direct claim because they do not plausibly allege an injury arising from any cognizable legal claim from which they suffered damages unique from the rest of Kappa's members.

i.    <u>Appellants Forfeited Their Direct Claim When They Did Not Defend It in the District Court in Response to the Motion to Dismiss</u>

Appellees moved to dismiss the Amended Complaint in its entirety, including Appellants' direct claim. In their response, Appellants argued that they had plausibly asserted a derivative claim (App. Vol. II 042–47), a breach-of-contract claim (App. Vol. II 047–53), and a tortious-interference claim (*id.*). They did not offer the district court any argument as to why it should permit their direct claims to proceed, which Appellees noted in their reply in support of the motion. (App. Vol. II 062.)

Under this Court's precedent, a party forfeits an argument by failing to raise it in response to a motion to dismiss. *See Ashaheed v. Currington*, 7 F.4th 1236,

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 173 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 59 of 67  PAGEID #: 534
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 59

1242 n.2 (10th Cir. 2021). Appellants did not attempt to defend their direct claim

below and so forfeited their ability to assert it in this Court.

### ii.  Even if Appellants Had Preserved Their Direct Claim, It Would Fail

With numerous grounds on which it can affirm the district court's dismissal

of Appellants' derivative claim, the Court can easily dispose of the direct claim

should it permit Appellants to pursue it despite their waiver in the district court.

To establish a direct claim, Appellants must show: "(1) the injury arises out

of a special duty, e.g., via contract, between the wrongdoer and the shareholder; or

(2) the shareholder suffered damages separate and distinct from that suffered by

other shareholders." *Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio Ct. App. 2011).

In other words, the complaining shareholder must be "injured in a way that is

separate and distinct from an injury to the corporation." *Morgan v. Ramby*, No.

2012-Ohio-763, 2012 Ohio App. LEXIS 662, at *11 (Feb. 27, 2012) (citations

omitted).

There must be some injury to the corporation from which the shareholder

suffered distinct damages in order for a direct cause of action to proceed. *Carlson*,

789 N.E.2d at 1126-27; *see also Barr v. Lauer*, No. 2007-Ohio-156, 2007 Ohio

App. LEXIS 154, at *7–*8 (Jan. 18, 2007) (analyzing plaintiff's breach of contract,

fraud, and misrepresentation causes of action as direct actions). "[A]ctions for

breach of fiduciary duty [against] directors or officers are generally to be brought

Case 2:23-cv-00051-ABJ   Document 47-8   Filed 02/28/25   Page 174 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 60 of 67  PAGEID #: 535
Appellate Case: 23-8065   Document: 010110978097   Date Filed: 01/03/2024   Page: 60

in derivative suits." *Joseph v. Joseph*, No. 19-3350, 2022 U.S. App. LEXIS 23216, at *30 (6th Cir. Aug. 18, 2022) (citing *Maas v. Maas*, 161 N.E.3d 863, 882 (Ohio Ct. App. 2020)).  To the extent this claim is based upon the alleged breach of fiduciary duty, it fails for the reasons discussed herein.

    iii.   Appellants Have Not Alleged Any Frustration of Contractual Obligations

In their argument on the direct claim, Appellants advance the theory that they have been uniquely injured by Rooney's purported breach of fiduciary duty due to the "contractual violations" they suffered.  (Aplt. Br. 42.)  But Appellants do not direct the Court to any contractual violations unique to them.  Appellants were similarly unable to point to the breach of any contractual provision in the district court when they were still advancing breach-of-contract and tortious-interference-with-contract claims.

Below, Appellees noted that there was no provision in the contracts Appellants had referenced in the Amended Complaint that Langford's admission into Kappa violated.  (App. Vol. II 026.)  In response, Appellants raised the existence of a second contract not at issue in the Amended Complaint, but failed to articulate a specific portion of a contract that was breached.  (App. Vol. II 047–52.) Most of the direct-claim section of Appellants' brief is spent discussing Langford's alleged behavior.  Even if the allegations about Langford's behavior were true— and there are substantial reasons to doubt their veracity—Appellants fail to show

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 175 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 61 of 67  PAGEID #: 536
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 61

how that behavior is connected to some unidentified contractual obligation that Rooney owed to them.  Absent such an argument, it is unclear how Appellants can articulate a direct claim rooted in the frustration of contractual expectations.

### C. The Court Can Also Dispose of Appellants' Claims Against Rooney on Personal-Jurisdiction Grounds

In the event the Court does not fully affirm based on the above argument, it can also affirm the district court with regard to claims against Rooney because the district court lacked jurisdiction over Rooney.  Rooney presented this argument in the Motion to Dismiss, and the district court rejected it.  *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at *20–25.  Given that the district court awarded complete relief to Rooney on other grounds, she may raise her jurisdictional argument as an alternative basis for affirming without filing a cross-appeal.  *See Un. Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 958 (10th Cir. 2011) (citations omitted).

"The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court."  *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (citations omitted).  Wyoming, the forum state, extends personal jurisdiction to the constitutional limit in the Due Process Clause.  *See* Wyo. Stat. § 5-1-107.  Thus, to establish personal jurisdiction over Rooney, Appellants needed to establish that she has "minimum contacts" with the State of Wyoming such that Rooney having to defend a lawsuit in the state

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 176 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 62 of 67  PAGEID #: 537
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 62

"would not offend traditional notions of fair play and substantial justice."
*Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008)
(quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal
quotation marks omitted).  To establish minimum contacts, they needed to show
that Rooney "purposefully directed" her activities at the forum state and that
Appellants suffered injuries arising from those same activities.  *Id.* at 1071 (citing
*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Purposeful direction
requires a demonstration that Rooney (1) acted intentionally; (2) "expressly aimed"
her actions at Wyoming; and (3) knew that the "brunt of the injury" would be felt
in Wyoming.  *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966–67 (10th Cir.
2022).  In the personal-jurisdiction context, contacts of a company's officers or
other agents in their capacity as officers do not establish personal jurisdiction over
the officers.  *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1527
(10th Cir. 1987).

Rooney is a citizen of Illinois, not Wyoming.  (App. 016.)  The Amended
Complaint did not allege that Rooney directed any activity at the State of
Wyoming, let alone activity related to Appellants' alleged injuries.  It also did not
allege that Rooney was present in Wyoming for any of the relevant events, or that
she was involved in those events from afar.  (App. 010–80.)  Her involvement in
administering Kappa policies as a Kappa officer also does not create personal

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 177 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 63 of 67 PAGEID #: 538
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 63

jurisdiction in Wyoming. Those allegations concern actions affecting Kappa generally, not ones purposefully directed at Wyoming. Without any allegation of a single contact between Rooney and the forum state, the district court lacked personal jurisdiction.

The district court's analysis of this issue gave Appellants' allegations too much credit in establishing the "expressly aimed" element of the purposeful-direction test. The district court held that Appellants had shown Rooney expressly aimed her conduct at Wyoming based on an email from a different person that used the term "we" in referencing Kappa proceeding with Langford's initiation. *Westenbroek*, 2023 U.S. Dist. LEXIS 152458, at \*22–\*23. Appellees respectfully disagree that Appellants were able to establish the express-aiming element with regard to Rooney without any allegations actually attributed to Rooney.

Additionally, the district court, while recognizing that Appellants cannot establish personal jurisdiction over Rooney using solely her contacts with Wyoming in her capacity as a Kappa director, found that the court had personal jurisdiction. *See Westenbroek*, at \*23–\*24 (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)), for the holding that "due process requires that a defendant be haled into court in a forum State based on h[er] own affiliation with the State, not based on the . . . 'attenuated' contacts [s]he makes by interacting with other

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 178 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 64 of 67  PAGEID #: 539
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 64

persons affiliated with the state" and then nonetheless concluding that Rooney's contacts were sufficient to establish personal jurisdiction).

For these reasons, the Court could also affirm on a finding that the district court lacked personal jurisdiction over Rooney.

## <u>CONCLUSION</u>

The district court correctly dismissed this case, recognizing that courts have a limited role to play in the governance of private, voluntary organizations. Kappa reasonably interpreted its Bylaws to permit chapters to induct transgender women as members. Appellants' objection to their chapter having done so does not give rise to a legal claim. Appellees accordingly ask the Court to affirm the district court's dismissal of Appellants' claims.

Dated: January 3, 2024                        Respectfully Submitted,

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin (Ohio Bar 0082203)
Brian W. Dressel (Ohio Bar 0097163)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5452
Facsimile:   (614) 464-5452
E-mail:  nmmclaughlin@vorys.com
              bwdressel@vorys.com

*Counsel for Defendants-Appellees*
*Kappa Kappa Gamma Fraternity,*
*Mary Pat Rooney, and Kappa Kappa*
*Gamma Building Co.*

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 179 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 65 of 67  PAGEID #: 540
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 65

Scott P. Klosterman (Wyoming Bar
No. 6-3081)
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:   (307) 265-0700
Facsimile:   (307) 266-2306
E-Mail:      sklosterman@wpdn.net

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 180 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 66 of 67  PAGEID #: 541
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 66

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify as follows:

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).  Excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), the brief contains 12,322 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).  It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin

Case 2:23-cv-00051-ABJ    Document 47-8    Filed 02/28/25    Page 181 of 181
Case: 2:24-cv-00316-MHW-KAJ Doc #: 27-4 Filed: 05/06/24 Page: 67 of 67  PAGEID #: 542
Appellate Case: 23-8065    Document: 010110978097    Date Filed: 01/03/2024    Page: 67

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

All required privacy redactions have been made to this document, and with the exception of those redactions, every document submitted in digital form is an exact copy of the written document filed with the clerk.  Said document has been scanned for viruses with Trend Micro Apex One Antivirus, version 18.917.00 (last updated January 3, 2024), and according to that program is free of viruses.

*/s/ Natalie M. McLaughlin*
Natalie M. McLaughlin