UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| HANNAH HOLTMEIER, <br> c/o Law Office of John G. Knepper, LLC <br> P.O. Box 1512 <br> Cheyenne, Wyoming 82003, <br><br> ALLISON COGHAN, <br> c/o Law Office of John G. Knepper, LLC <br> P.O. Box 1512 <br> Cheyenne, Wyoming 82003, <br><br> HALEY RUTSCH, <br> c/o Law Office of John G. Knepper, LLC <br> P.O. Box 1512 <br> Cheyenne, Wyoming 82003, <br><br> For themselves and derivatively on behalf <br> of KAPPA KAPPA GAMMA <br> FRATERNITY, <br><br>      Plaintiffs, <br> v. <br><br> KAPPA KAPPA GAMMA FRATERNITY, <br> an Ohio non-profit corporation, as a <br> Nominal Defendant and as a Direct <br> Defendant, <br><br> c/o Kari Kittrell, Statutory Agent <br> 6640 Riverside Drive Suite 200 <br> Dublin OH 43017, <br><br> MARY PAT ROONEY, President, <br> Kappa Kappa Gamma Fraternity Council, <br> c/o Kari Kittrell, Statutory Agent <br> 6640 Riverside Drive Suite 200 <br> Dublin OH 43017, <br><br> MARIA BROWN, Vice President, <br> Kappa Kappa Gamma Fraternity Council, <br> c/o Kari Kittrell, Statutory Agent <br> 6640 Riverside Drive Suite 200 <br> Dublin OH 43017, | Case No. 2:23-cv-00051-ABJ <br><br> Judge: Alan B. Johnson <br><br><br> **SECOND AMENDED VERIFIED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

NANCY CAMPBELL, Vice President )
Kappa Kappa Gamma Fraternity Council, )
c/o Kari Kittrell, Statutory Agent )
6640 Riverside Drive Suite 200 )
Dublin OH 43017, )
                                    )
BARB GOETTELMAN, Vice President, )
Kappa Kappa Gamma Fraternity Council, )
c/o Kari Kittrell, Statutory Agent )
6640 Riverside Drive Suite 200 )
Dublin OH 43017 )
                                    )
LIZ WONG, Vice President, )
Kappa Kappa Gamma Fraternity Council, )
c/o Kari Kittrell, Statutory Agent )
6640 Riverside Drive Suite 200 )
Dublin OH 43017, )
                                    )
KYLE DONNELLY, Treasurer, )
Kappa Kappa Gamma Fraternity Council, )
c/o Kari Kittrell, Statutory Agent )
6640 Riverside Drive Suite 200 )
Dublin OH 43017, )
                                    )
BETH BLACK, Panhellenic Delegate )
c/o Kari Kittrell, Statutory Agent )
6640 Riverside Drive Suite 200 )
Dublin OH 43017, )
                                    )
and )
                                    )
Jane Does 1-4 )
Addresses unknown )
                                    )
Defendants. )

Hannah Holtmeier, Allison Coghan, and Haley Rutsch, for themselves and derivatively on behalf of Kappa Kappa Gamma Fraternity ("Kappa", "the Fraternity", or, for ease of understanding, "the Sorority")[1] by and through their attorneys and pursuant to this Court's Order

---

[1] Kappa Kappa Gamma was founded in 1870, approximately 30 years before the word "sorority" was first used to describe "[a] women's society in a college or university." Sorority, Oxford English Dictionary Online (Mar. 2023). Kappa's corporate documents refer to the entity as a "fraternity."

of May 9, 2025, hereby bring this Second Amended Complaint for relief against Defendants Kappa

and Kappa Fraternity Council members Mary Pat Rooney, Maria Brown, Nancy Campbell, Barb

Goettelman, Liz Wong, Kyle Donnelly, and Beth Black (collectively the "Fraternity Council") and

the Jane Doe defendants. The Plaintiffs allege:

<strong>INTRODUCTION</strong>

1.    The Plaintiffs were all student members of Kappa, living in the chapter house of Kappa's

Gamma Omicron chapter at the University of Wyoming (the "Wyoming Chapter") at the time of

the events giving rise to this lawsuit. Plaintiffs remain current members of Kappa.

2.    In 2022 and 2023, Kappa's leadership, including its Fraternity Council, District Director,

and District membership advisor, disregarded established voting procedures and membership

requirements and improperly coerced or influenced the student members at the Wyoming Chapter

to admit a biological male student ("the Student"), who identifies as a woman, to membership in

the Fraternity in violation of the Wyoming Chapter bylaws and Kappa's Articles of Incorporation,

Bylaws and Standing Rules (Kappa's "Governing Documents").

3.    Student members of the Wyoming Chapter who opposed the male Student's membership

were accused of bigotry, discrimination and violations of Kappa's policies and values. Further, at

least one member was stripped of her leadership position within the Wyoming Chapter, and another

suffered retaliation such that she eventually felt compelled to resign her membership in Kappa

altogether. Plaintiff Holtmeier soured on her experience at the University of Wyoming and the

Wyoming Chapter, and she transferred to the University of Nebraska.

4.    This case challenges whether an Ohio private, non-profit organization can disregard its

mission, violate its Governing Documents, and improperly coerce Wyoming Chapter members to

3

pursue a social agenda that is contrary to the very principles upon which the organization was founded, ultimately causing the organization to lose its exempt status under Title IX.

## I.      PARTIES, JURISDICTION, AND VENUE

5.   Hannah Holtmeier was a citizen of Nebraska at the time of the initial filing in this case and lived in the Wyoming Chapter house as a student member of Kappa at the University of Wyoming at the time of the events giving rise to this case. She remains a member of Kappa.

6.   Allison Coghan was a citizen of Kansas at the time of the initial filing in this case and lived in the Wyoming Chapter house as a student member of Kappa at the University of Wyoming at the time of the events giving rise to this case. She remains a member of Kappa.

7.   Haley Rutsch was a citizen of Wyoming at the time of the initial filing in this case and lived in the Wyoming Chapter house as a student member of Kappa at the University of Wyoming at the time of the events giving rise to this case. She remains a member of Kappa.

8.   Kappa is a non-profit organization organized under the laws of the State of Ohio, with its principal place of business in Franklin County, Ohio.

9.   At the time of the initial filing in this case, Defendant Mary Pat Rooney was a resident of Chicago, Illinois; Maria Brown was a resident of Columbus, Ohio; Nancy Campbell was a resident of Cookeville, Tennessee; Barb Goettelman was a resident of Englewood, Colorado; Liz Wong was a resident of Toronto, Canada; and Kyle Donnelly was a resident of Falls Church, Virginia. These Defendants were elected members of Kappa's Fraternity Council at the time of the events giving rise to this lawsuit and its initial filing. Defendant Beth Black was a resident of Dublin, Ohio, and Black was appointed to Kappa's leadership team by the other members of the Fraternity Council as the delegate to the National Panhellenic Conference, serving as an ex-officio member of the Fraternity Council.

10. Jane Does 1-4 are national, regional or district level advisors and/or directors or employees who acted in concert with Fraternity Council to interfere with chapter elections by encouraging or instructing Wyoming Chapter officers to circumvent Kappa's established rules and procedures for the admission of new members and to improperly coerce and influence Wyoming Chapter members to ensure the admission of a biological male into the Fraternity.

11. Plaintiffs bring this action in the United States District for the District of Wyoming under 28 U.S.C. 1332(a)(1) as the parties are citizens of different states.

12. Plaintiffs assert that the amount in controversy exceeds $75,000.00, and Defendants' conduct has resulted and will result in injury to Plaintiffs in an amount in excess of $75,000.00.

13. Venue is proper in this judicial district under 28 U.S.C. 1391(b)(1) because a substantial part of the events giving rise to this lawsuit occurred in this District.

## STATEMENT OF FACTS

### I.  Kappa was established to unite *women* through membership.

A.  Kappa has always been an organization limited to women.

14. In 1870, six women at Monmouth College in western Illinois founded Kappa Kappa Gamma. The Sorority's founders saw that Greek-letter societies benefitted male students, and they wanted college women to have the same opportunities.

15. Women were a distinct minority in colleges in the late 19th century. At the time of Kappa's founding, only 11,000 women between the ages of 18 and 21 were enrolled in college in the entire United States. Men outnumbered women by nearly five to one on college campuses, and many colleges did not permit women to enroll at all. As one of Kappa's Presidents, Kay Smith Larson, described that era, "Women were often ignored in the classroom and ridiculed outside of it."

16. Louise Bennett Boyd, one of the six founding members of Kappa, explained that the young women "concluded we would have something new; the world seemed to be moving too slowly for us and moreover the young men had Greek letter fraternities. We determined that nothing short of a Greek letter fraternity (we did not even speak of it as a sorority in those days) would satisfy us."

17. Today, Kappa is one of the nation's oldest and largest sororities, with approximately 260,000 living alumnae, 140 collegiate chapters, and 370 alumnae associations according to Wikipedia.

18. Kappa's first Bylaws make clear that only women can be members. The 1871 Bylaws state "Any lady may become a candidate for membership who shall be of good moral character, and of above average talent; and who, at the time of proposal, either is or has been in attendance at some college or seminary." *Kappa Kappa Gamma Fraternity, History: Kappa Kappa Gamma Through the Years* 126 (2000).

19. Early sorority members were concerned with academics, scholarship and understanding what their responsibilities should be as "new women" enjoying the privileges of fraternal life. *Id.*

20. In 1871, the Fraternity's initiation ceremony was simple. New members were read the organization's constitution and took an oath of loyalty. *Id*. at 27. "The [Kappa] Constitution at that time was secret and contained the first purpose of the Fraternity which, with little change, remains the same today." *Id*. The first Kappa members affirmed their "union in the bonds of friendship…for the development of the nobler qualities of the mind and finer feelings of the heart, helping one another attain excellence and for the advancement of its members socially and in literary attainments." *Id*.

21. When the Fraternity filed its Articles of Incorporation with the Ohio Secretary of State in 1930, this first purpose was only slightly changed:

> To perpetuate Kappa Kappa Gamma Fraternity for the development of the nobler qualities of the mind and the finer feelings of the heart and for mutual helpfulness in the attainment of individual and social excellence among its members.

ECF 1, Attachment 4, Articles of Incorporation, at 126.[2] The Sorority's current first purpose explicitly links that original pledge of 150 years ago to the Fraternity's single-sex identity:

> To unite **women**, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence.

*Id*. at 123 (emphasis added).

22. The words woman and women, as used in Kappa's Articles of Incorporation, Bylaws, Standing Rules, Policies, and every other communication throughout the Fraternity's 150 years, have always referred to adult female human beings. These words, as used by Kappa prior to Defendants' unlawful actions, have never referred to biological males who claim to be women.

23.  Kappa's communications, throughout its history, use vocabulary that reinforces that the Fraternity uses the word "woman" with its traditional, immutable biological meaning based on sex, not gender identity. Members are part of a "sisterhood." "Editor's Letter," *The Key: 150 Anniversary*, Vol. 137, No. 1 at 1 (2020) ("Your commitment to Kappa—in word and in deed—helps to drive the future of our sisterhood.").

24. The Sorority refers to members who have finished college as alumnae, the plural form of the Latin word "alumna." Alumna and alumnae are feminine case (gendered) Latin words that refer exclusively to females. "Alumna," *Oxford English Dictionary* (Dec. 2022) ("A female former pupil or student of a particular school, university, etc.; a female graduate of a particular seat of learning.").

---

[2] Page references refer to the ECF page numbers assigned to the Original Complaint in this case.

25. When Kappa published an official history of the sorority's first sixty years (through 1930), two of the six sorority founders were still living. Louise Bennett Boyd and Jeannette Boyd introduced the book with an open letter to "Our dear Kappa girls." Burton-Roth & Whiting-Westermann, *History of Kappa Kappa Gamma Fraternity*, 1870–1930 at v (1932).

26. The Sorority's 1889 songbook is replete with references to young maids, girls, women, and sisters. Susan Goldsmith & Jessie Cougill, *Songs of the Kappa Kappa Gamma Fraternity* (1889).

27. Articles in the Fraternity's official magazine, The Key, reflect this traditional, biological meaning of the word "woman." Indeed, perhaps the most salient article was published in 2002. The Sorority conducted focus groups and personal interviews to identify the traits that exemplify the Kappa experience. According to more than 500 collegiate members, alumnae, parents of Kappa members, Kappa volunteers, and university administrators, the "Benefits of Kappa Kappa Gamma" include "Friendship/Sisterhood":

> Kappa Kappa Gamma is a ***single-sex*** haven in a mainly coed campus environment.
>
> Kappa Kappa Gamma is a family away from home, diminishing campus size and impersonality.
>
> Kappa Kappa Gamma provides sisterhood support via alumnae associations in hundreds of cities.
>
> Kappa Kappa Gamma sustains members in bad times, celebrates good times, and shares all times.
>
> Kappa Kappa Gamma offers a diversity of background and interest among its members.

"In the Company of Leaders," *The Key (A Kappa Kappa Gamma Publication)*, Vol 119, No. 2 at 9 (Summer 2002) (emphasis added).

B. <u>Kappa provides unique benefits to college women through the creation of an all-female environment subject to the Title IX exemption.</u>

28. Kappa and other Greek fraternities and sororities are not mere social clubs on campus. Sorority houses across the country provide school-sanctioned private single-sex housing for women. Sorority women share private living spaces with and build special supportive bonds with one another, due in part to this communal living. The Wyoming Chapter house, like many other sorority houses, has communal showers and same-sex communal bathrooms. Roommates share a single-room bedroom, and the bedrooms do not have locks on the doors. Even members who do not live in the sorority house have access to the private spaces of the house. For this reason, the importance of sororities was acknowledged by the US Congress in an amendment to Title IX that allows sororities to discriminate "on the basis of sex." 20 U.S.C. § 1681(a).

29. After passage of Title IX in 1972, the Nixon administration took the position that fraternities and sororities could not continue as part of college life because they discriminated on the basis of sex. Members of Congress, led by former Senator Birch Bayh, the Senate sponsor of Title IX, rejected this consequence. "Fraternities and sororities have been a tradition in the country for over 200 years. Greek organizations, much like the single-sex college, must not be destroyed in a misdirected effort to apply Title IX." 120 Cong. Rec. 39992 (1974) (statement of Sen. Bayh). Therefore, in 1974, Congress amended the text of Title IX to exempt Kappa and similar Greek organizations. 20 U.S.C. § 1681(a)(6).

30. Title IX's prohibition of discrimination based on sex does not apply to the "membership practices" of a non-profit "social fraternity or social sorority… the active membership of which consists primarily of students in attendance at an institution of higher education." *Id*. *See also* Pub. L. No. 93-568 § 3 (1974).

31. By this legislative amendment, Kappa is permitted to legally discriminate against men to provide a sex-segregated environment for college women. This discrimination has defined sororities for over 150 years and is part of what makes sororities special to the women who join them.

32. Social science research demonstrates that when young women learn in an all-female environment, they are more likely to seek out 'nontraditional' academic subjects like math and science. Young women in single-sex environments are more likely to develop higher academic, and socially competent, self-images. Young women who attend single-sex schools are more positive about their own abilities and their control over their lives, are less inhibited by stereotyped gender role attitudes, and hold higher aspirations for their futures.

33. These benefits are not limited to the classroom. One study, for example, shows that strong female role models increase the willingness of college women to study more rigorous academic subjects (with more lucrative careers) such as economics.

34. Kappa was once a strong defender of the benefits of an all-female environment for college women. In 2016, Harvard University adopted a policy that punished students who joined single-sex groups, even if these groups were not officially recognized by the school. In 2018, Kappa sued Harvard to overturn this policy, arguing that that single-sex sororities are a traditional source of stability and community in college life for young women. *See* Complaint, *Kappa Alpha Theta Fraternity, Inc., et al v. Harvard Univ.*, Dkt. No. 1:18-cv-12485 at ¶ 93 (D. Mass.) (filed Dec. 3, 2018) (Kappa is the second named plaintiff.).

35. In its complaint, Kappa and other plaintiffs asserted that

> 93. Single-sex social organizations represent a traditional source of stability and community in college life. They meet many of the social and cultural needs of students. They provide a surrogate family for students away from home and offer students an opportunity to grow with peers who share common values, problems,

and goals. Members of all-male and all-female organizations feel that the single-sex nature of the groups is important to the cohesive atmosphere that the organizations provide.

94. A 2014 Gallup survey of more than 30,000 college graduates across the United States found that students who were members of fraternities or sororities experienced notable long-term benefits linked to their fraternity and sorority membership. These students were more likely to be "thriving" in their well-being and engaged at work than college graduates who did not join a fraternity or sorority. The survey found that fraternity and sorority members were more likely than other students to find fulfillment in daily work and interactions, to have strong social relationships and access to the resources people need, to feel financially secure, to be physically healthy, and to take part in a true community.

95. Single-sex environments are associated with a myriad of developmental and other benefits, particularly for young women. Many educational researchers have found that single-sex education contributes to academic achievement at all levels for women. There "is a body of research carried out since the late 1960's which shows that graduates of women's colleges are more likely to become achievers than are the women graduates of coeducational institutions." As an example, in the 1970s, graduates of women's colleges were more than twice as likely than graduates of co-ed colleges to enter medical school or to obtain a natural science or other doctoral degree.

96. Studies have found that women in single-sex schools at both the secondary and college levels have higher levels of self-esteem and a greater sense of personal control. Exposure to single-sex environments can even positively influence a woman's interest in nontraditional or male-dominated careers—one study concluded that "the opportunity to interact in a single-sex environment is important at some stage of a young woman's life, if she is to develop nontraditional interests." Significantly, the benefits of having participated in a single-sex environment persist even after the woman has graduated or otherwise left the environment.

*Id.* at 31-33.

36. Kappa representatives made, and continue to make, these and similar assertions to Plaintiffs specifically and to other young women when they are considering whether to join Kappa. Sorority representatives make these same representations to donors and alumnae. Plaintiffs, other student members, and alumnae members and donors relied on these representations when they joined Kappa and agreed to undertake the financial obligations associated with their membership or made donations.

37. To date, Defendants have offered no research or other information to support that the benefits of a "single-sex" environment continue when men "who identify as women" are admitted to the Fraternity.

38. Kappa's view, for more than 150 years, was that women and girls benefit from a single-sex environment. A single-sex environment excludes every man without regard to how the man claims to identify himself. Defendants should not be allowed to radically alter the very core of the Fraternity's identity, and then claim, without evidence, that the Fraternity's benefits remain.

**II.     Kappa's governing documents restrict membership to women.**

39. Kappa is a non-profit corporation organized in and under the laws of the state of Ohio.

40. In Ohio, an organization's governing documents, including its articles of incorporation, constitution and bylaws serve as the contract between the organization and its members. *Ulliman v. Ohio High School Athletic Assn.,* 184 Ohio App. 3d 52, 2009 Ohio 3756, 919 NE2d 763, ¶50. When an organization fails to comply with its governing documents, it breaches its contract with its members. The Ohio courts regularly review and, when needed, enforce these bylaws against the boards of nonprofit corporations in lawsuits brought by members.

41. Kappa's governing documents establish the authority that members can exercise and set the limits within which the Fraternity Council can act.

42. Under Ohio law, a director must perform her duties in good faith; in a manner the director reasonably believes to be in, or not opposed to, the best interests of the corporation; and with the care that an ordinarily prudent person in a like position would use under similar circumstances. OH ST.§ 1702.30(B) (2024).

43. A director may be liable in damages for acting in bad faith or in reckless disregard for the best interests of the organization. OH ST.§ 1702.30(E) (2024).

44. Under Ohio law, claims involving a "lack of, or limitation upon, the authority of a corporation" can be asserted "[b]y or on behalf of the corporation against a director, an officer, or a member as such" and "[b]y a member as such or by or on behalf of the members against the corporation, a director, an officer, or a member as such." OH ST.§ 1702.12(I) (2024).

    A.  Kappa's Articles of Incorporation.

45. Kappa's Articles of Incorporation, dated July 28, 2004, restrict membership to women, an uncontroversial term that meant adult human females at that time. The Articles prohibit any college chapter from defying this restriction. The Fraternity's purposes in its Articles of Incorporation focus on supporting and uniting women:

> To unite women, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity-at-large may attain social, moral, and intellectual excellence;

> To establish chapters at various colleges and universities, provide for the proper organization, installation, and operation, with each chapter having the right and responsibility to select members of its choice in accordance with Fraternity standards and procedures;

> To cooperate with colleges and universities where chapters of the Fraternity are established, advance academic interest, and promote higher standards of social conduct;

> To cooperate with other organizations in solving mutual problems and building higher standards of womanhood;

> To advocate for and seek to address issues of concern for members and women in general;

> To provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and
> To have and protect a distinctive and exclusive badge and other insignia of membership and office and keep secret the ritual.

ECF 1, Attachment 4, Articles of Incorporation, at 123.

46. While the Articles permit local chapters to recruit and vote on new members, the Articles also make clear they must do so "in accordance with [Sorority] standards and procedures." ECF 1, Attachment 4, Articles of Incorporation, at 123.

47. Kappa's Articles cannot be amended by its Board of Directors (the Fraternity Council). Any amendment must occur "in accordance with the [Sorority] Bylaws," *id*., which require a two-thirds majority vote at the Fraternity's biennial convention. Moreover, under the Bylaws, the "exact content" of any amendments must be provided to the members at least three months before the convention. ECF 1, Attachment 1, Bylaws, Art. XXIV, Sec. 1, at 95.

  B. <u>Kappa's Bylaws</u>

48. Kappa's Bylaws also restrict membership to women only: "New Member. A new member shall be a woman who has accepted an invitation to join the Fraternity but has not been initiated." ECF 1, Attachment 1, Bylaws, Art. III, Sec. 1, at 77.

49. Because the Bylaws expressly affirm Kappa's single-sex status and require that every new member be a woman, biological men who identify as women do not meet the criteria for membership:

> Section 2. Qualifications. A ***woman*** may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met.
>
>  C. Collegiate New Member and Alumna Candidate. To qualify as either a collegiate new member or an alumna candidate, **<u>a woman</u>** shall \*\*\*
>
>  D. Collegiate New Member. To qualify as a collegiate new member, **<u>a woman</u>** shall also \*\*\* :
>
>  E. Alumna Candidate. To qualify as an alumna candidate, **<u>a woman</u>** shall also \*\*\*

ECF 1, Attachment 1, Bylaws Art. III, Sec. 2, at 78 (emphasis added).

50. In June 2022 at the Biennial Convention, Kappa members approved a new Bylaw provision forbidding "Members, chapters and associations" of Kappa from engaging in discrimination, while recognizing that the Fraternity discriminates on the basis of sex:

> Discrimination. *** The single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under the Title IX of the Educational Amendments of 1972.

ECF 1, Attachment 1, Bylaws Art. V, Sec. 2.D, at 84-85.

51. Based on the Bylaws' reference to and reliance on the "exemption" in Title IX of the Educational Amendments of 1972, which prohibits discrimination "on the basis of *sex*," the notion of a single-gender organization, as the phrase is used in the Bylaws, must be read as synonymous with "single-sex." 20 U.S.C. § 1681(a)(6) (emphasis added).

52. The Report of the Bylaws Committee related to this amendment makes no reference to any expansion of membership criteria to include "individuals who identify as women" which indicates that the provision was not intended to alter Kappa's criteria for membership. *Id.* at 2, ECF 1, Attachment 5, Report of the Bylaws Committee, at 129.

53. The Fraternity Council has, by its improper actions, ignored the meaning of this crucial membership limitation to women in Kappa's Bylaws without a representative vote[3] of the student membership or the hundreds of thousands of alumnae members on the issue of accepting men. Kappa women were shocked to learn of the unapproved admission of men into the Fraternity after the filing of the initial complaint in this case and the degree to which Fraternity Council has overstepped its role in Fraternity governance.

54. Indeed, less than two months before the Fraternity's Biennial Convention, Fraternity Council issued a document to members entitled, "Bylaws and Standing Rules Revisions 2022:

---

[3] Each alumnae association and collegiate chapter in good standing is allowed to have a representative vote on changes to Bylaws and Standing Rules.

FAQS [Frequently Asked Questions]." ECF 1-1, Attachment 6, at 32. This FAQs document was not subject to a vote or otherwise approved at the convention. It is not a Governing Document. It provides in relevant part:

> DIVERSITY, EQUITY AND INCLUSION
>
> Can nonbinary people join? Is this a chapter-by-chapter decision?
>
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.
>
> We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures."

*Id*. at 49.

55. The FAQs cannot operate as an amendment to Kappa's Bylaws or other Governing Documents. Kappa members must receive "notice" of any amendment to the Bylaws "indicating its exact content" at least three months before the convention. ECF 1, Attachment 1, Bylaws, Art. XXIV, sec. 1 at 95. These FAQs were provided less than 60 days before the Convention and did not contain any language of the proposed amendments to the Bylaws. They were never voted on and cannot be considered to alter any part of the "exact content" of the proposed changes that were provided as required by the Bylaws and approved.

56. Under Ohio law, a corporation's bylaws cannot conflict with its Articles of Incorporation. OH ST. §1702.30(A). Kappa's Articles and its Bylaws make clear that the Fraternity is limited to biological women.

### C.  Kappa's Standing Rules

57. Kappa has adopted "Standing Rules" to govern the conduct of the Fraternity.

58. The Standing Rules describe the processes that must be followed when selecting a new collegiate member of the Fraternity. ECF 1-1, Attachment 7, Standing Rules Revision, at 55. (Only collegiate chapter members vote when considering admission of a new collegiate member. Alumnae do not vote on the admission of collegiate members.) These "procedures" must be followed by every college chapter when selecting new members.

59. All chapter members of a particular chapter must vote on whether to admit a new member to its chapter, unless a chapter member is excused from voting, in writing, by the chapter's alumnae adviser. *Id.*

60. Standing Rules can be amended by a majority vote at the Fraternity's biennial national convention, provided that the proposed amendments were submitted, in writing, at least three months prior to the Convention. *Id.* at 25.

61. The Standing Rules do not include any language to support the expansion of Kappa membership to include a biological man who identifies as a woman.

### D.  Kappa's Policies

62. The Sorority also has "Policies of Kappa Kappa Gamma Fraternity" which are "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by Kappa's Articles of Incorporation, Bylaws and Standing Rules." ECF 1-1, Attachment 8, Fraternity Policies at 86.

63. Kappa's Policies are not voted on by members and are not considered as Governing Documents. These Policies also expressly restrict its membership to women. Policy III imposes requirements on the Fraternity's college chapters that make clear the Fraternity is a single-sex

organization. Policy III prohibits Kappa members from being affiliated with a men's fraternity or allowing men to have a recognized relationship with the Fraternity or a chapter. *Id.* at 88. Policy III also requires that Kappa members respect the human dignity of all individuals—whether members or not—a principle that is consistent with the Fraternity's historical, longstanding membership requirements. Policy III applies to members' conduct; it does not change Kappa membership requirements.

64. Policy VIII also explicitly prohibits men from participating in the Fraternity's recruitment events: "Men shall not participate in any Kappa recruitment events, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements." *Id.* at 98 (emphasis added).

65. Kappa's Policies also require that all chapter members vote on whether to accept a new member, unless excused in writing, and require that all membership voting use the Fraternity's designated electronic voting platform. *Id*. at 11 (§ 3) & 14 (§ 3.P). This approved voting platform, Omega Recruit, was required to be (but was not) used to conduct the illegal vote to admit the Student to the Wyoming Chapter.

66. Because the Polices are adopted by the Fraternity Council, not the membership, they cannot lawfully deviate from or undermine the Fraternity's Articles of Incorporation, Bylaws or Standing Rules.

### III.    Kappa's Organizational Structure is designed to ensure that all members honor the obligations set forth in its governing documents.

67. Kappa's Fraternity Council, not individual collegiate chapters of the Fraternity, has the final authority over chapter membership decisions. Plaintiffs, other members of the Wyoming Chapter, and other sorority members informed the Fraternity Council about the both the improper admission of the biological male Student and that Kappa's required standards and procedures were

not followed when the Student was offered membership in the Fraternity. The Fraternity Council considered whether to reject the Student entirely or to conduct another vote. The Fraternity Council chose to ignore the violations of Kappa's governing documents to pursue a social agenda that is contrary to the very principles upon which Kappa was founded. The Defendants are responsible for the Student's wrongful admission.

68. Kappa acts through its approximately 140 collegiate chapters. Kappa chapters are not distinct entities in any way. The Fraternity Council, District Directors, and the Fraternity's network of alumnae advisers provide direction to the student members of the Fraternity. Thus, the Student could not be admitted as a Kappa member of the Wyoming Chapter without the approval and support of the Fraternity Council and those members, officers and advisors acting at the Fraternity Council's direction.

69. Under the Standing Rules, no person can be initiated as a Kappa member without prior approval from headquarters:

> 6.2 Ritual.
>
> *      *      *
>
> Chapter Initiation of New Members.
>
> *      *      *
>
> At least two weeks before Initiation, the names of the new members to be initiated shall be sent to Kappa Headquarters. If the requirements for initiation have been fulfilled, Kappa Headquarters shall issue the authorization for initiation.

ECF 1-1, Attachment 7, Standing Rules, at 64.

70. Fraternity officials regularly reject ineligible members for a variety of reasons, including but not limited to failure of the pledge to meet the grade requirements, even when a chapter has voted to admit the member. The Fraternity Council was aware of the unusual circumstances of the

invitation to membership of the Student (more fully described below) when he was a potential new member. Fraternity Council actively and wrongfully facilitated his initiation as a member of Kappa.

71. On the national level, the Fraternity Council has authority to approve, suspend or revoke the charter of a collegiate chapter. Fraternity Council also has authority to suspend or dismiss any chapter member. Below the Fraternity Council, the Fraternity has Content Specialists and Content Directors, who supervise all matters that relate to a specific aspect of the Fraternity's operation (such as the Fraternity's disciplinary process, called "Standards"). The Fraternity has District Directors who supervise the activities of the local chapters within a geographic area and administer discipline to individual chapters for rules violations. Finally, the Fraternity has paid staff at the national headquarters. All of these individuals operate under the supervision of an Executive Director who reports to the Fraternity Council.

72. The Standing Rules of the Fraternity permit national officials to place any individual member on probation, even if collegiate chapter members do not support this decision. The Fraternity Council (the Fraternity's board) can dismiss any member entirely. ECF 1-1, Attachment 7, Standing Rules, at 67-74.

73. Although every chapter must adopt its own bylaws and standing rules, they "must be approved by the Fraternity Bylaws Committee before becoming effective." Id. (art. iv, sec. 2.G.). All subsequent amendments must also be approved by the Fraternity's officials. *Id.*

74. For every collegiate chapter, Kappa has a network of appointed alumnae who supervise operation of the chapter and the actions of individual chapter officers. The Sorority's Bylaws require this supervision:

> J. Advisory Boards and Chapter Advisers. A chapter Advisory Board shall assist
> the chapter in fulfilling its purpose and in the management of the affairs of the

chapter. The board shall be composed of a chairman, alumna advisers to Executive Board and vice presidents. Additional advisers may be added on a case-by-case basis with the approval of the Advisory Board Specialist, Leadership Development Specialist, and District Director, and in consultation with the Leadership Development and Advisory Board Directors.

ECF 1, Attachment 1 at 82 (art. IV, sec 2.J.). These appointed alumnae, in turn, report to other alumnae with broad responsibility over every aspect of sorority life, such as chapter operations, housing, membership recruitment and retention, and discipline of sorority members. Appointed alumnae control all aspects of chapter operation. For example, a chapter cannot host a social function (*e.g.*, a party) without submitting an event form to the designated national Fraternity representative and receiving approval from the chapter's appointed alumnae adviser. Fraternity Council members informally refer to these appointed alumnae as part of the Fraternity's "workforce."

75. The President of each collegiate chapter must discuss matters with the chapter's alumnae adviser. In addition, each chapter's Vice President of Standards and Vice President of Academics must work with an alumnae adviser. Alumnae advisers are selected by the Fraternity, not by chapter members. Chapter members have no authority over the alumnae advisers, and an adviser must be present for all chapter meetings of significance:

Meetings. An adviser shall be present at chapter meetings for the election of officers, revision of the chapter Bylaws and Standing Rules, preparation and presentation of the budget, Executive Board meetings, officer training, Initiation, and including those of the Nominating Committee and consideration of disciplinary action by the chapter and Standards Committee. Advisers may attend meetings electronically via telephone or through other electronic communications as long as all the members can simultaneously hear one another and participate during the meeting.

ECF 1-1, Attachment 8, Fraternity Policies, at 86-87 (Policy I, sec. 2.E.).

76. All Kappa members commit that they will comply with federal and state law, and, where applicable, the regulations of a college or university. Members also pledge they "shall be

responsible to preserve and advance the Fraternity's purpose, values, and standards of scholarship, finance, and conduct." ECF 1, Attachment 1, Bylaws, at 84 (art. V, sec. 1). These commitments reinforce the existing fiduciary duties of Defendants to uphold the Fraternity's mission and purpose.

**IV.    Kappa's unusual admission of the male Student to membership in the Fraternity.**

  A.  <u>The Recruitment Process</u>

77. The Student initially participated in sorority recruitment at the University of Wyoming in Spring 2022. At the time, the Student sought specifically to join the Delta Delta Delta sorority but was not invited to join the sorority.

78. Then, in August 2022, the Student participated in the formal Panhellenic recruitment process for sororities (formerly called "rush") at the University of Wyoming.

79. The formal recruitment process permits prospective applicants to meet members of each of the four sororities at the University of Wyoming. On the first day of the week, young women attend presentations about sorority life. During the next two days, each sorority sets aside several hours for potential applicants to meet current sorority members. Prospective members visit a sorority house, where they meet with groups of current members in roughly five-minute intervals. After the meetings, the potential applicant and the sorority members rate the experience online using an app called "Omega Recruit." Each day, the ratings are tabulated and the individual and the sorority determine whether to continue to discuss membership.

80. During formal recruitment, the Membership Chair for the Kappa chapter at the University of Wyoming told other sorority members that Kappa rules did not permit them to refuse to admit the Student because he was a biological male. The Membership Chair also stated that all members would have to unanimously agree before the Student could live in the sorority house.

81. For the Wyoming chapter, the process of formal recruitment is intended to determine whether applicants have character traits that align with Kappa and the chapter. The Student did not complete the full recruitment week for Kappa and chose to attempt to join a different sorority, but was again unsuccessful.

82. After formal recruitment ended, Plaintiffs and other members of the Wyoming Chapter believed the issue of the Student's membership application was closed. But, unbeknownst to the Wyoming Chapter members, the Student had reached out to the Wyoming Chapter Membership Chair to pursue Kappa membership through the continuous open bidding process ("COB").

83. By way of background, from 2016 until Spring 2022, the Wyoming Chapter was under continuing review (probation) by Fraternity leadership due to low membership numbers. As a result, Kappa's alumnae advisers directed the chapter president and chapter officers to recruit the Student as doing so could raise the prominence of the Wyoming Chapter and garner the favor of the Fraternity Council if they recruited and admitted the Student as Kappa's first transgender member.[4]

84. COB allows women to become members of a sorority outside of formal recruitment. The Fraternity requires all chapters to use COB if the sorority house has additional capacity. ECF 1-1, Attachment 8, Fraternity Policies at 98 (Policy VIII, sec. 3.F).

85. During COB, it is customary for applicants to visit the chapter house for dinner or meet chapter members for coffee. The Membership Chair schedules these events and uses the chapter group chat to announce dinners and coffee dates to meet other prospective new members. Although

---

[4] Sometime after the initial filing in this case, it was learned that Kappa has admitted a biological male as an alumnae (alumni) member and may have admitted other men prior to admitting the Student. Fraternity Council actively conceals from the membership the admission of men as Kappas, so the number of biological men admitted to membership in Kappa and when they joined is currently uncertain.

the Wyoming Chapter followed this normal process for other applicants in the Fall of 2022, it did not do so for the Student.

86. Indeed, most chapter members did not know the Student was being considered for membership through COB.

87. Prior to the vote on the Student's membership, the only mention of his membership application occurred at a single chapter meeting well before the vote. At that meeting, the Membership Chair announced that the Student had asked to apply through continuous open bidding. The only notice to chapter members about the time and date of a dinner to meet the Student was a brief reference in the paper minutes from that chapter meeting.

88. When Ms. Holtmeier and Madeline Ramar asked about the Student's application, the Membership Chair admitted that the Chapter was required to permit the Student to apply but downplayed any possibility that the Student would become a Kappa member, claiming there was "a 99.9% chance" that he would not be offered membership.

B. The Irregular Multiple Votes

89. The chapter leaders who were in office in September 2022,[5] with direction from alumnae advisers, implemented an unauthorized voting process that did not use Omega Recruit and that would ensure the Student's admission to Kappa.

90. All Chapter members are expected to attend the weekly Chapter meetings on Monday evenings. Members can be excused if they attend a Sunday evening Chapter Council meeting where officers discuss the upcoming meeting. Madeline Ramar and another sorority member attended the Chapter Council meeting on September 18, 2022, prior to the Chapter meeting the following evening on September 19, 2022.

---

[5] The chapter elects new officers each year in November, and the new officers take over at the end of the fall semester.

91. At the Chapter Council meeting, officers intentionally concealed the fact that the Student's candidacy would be presented for a vote that week, that the chapter officers intended to vote using a Google Poll (instead of Omega Recruit as required for membership selection), and that the officers would only permit those present at the Chapter meeting to vote on the Student's membership. Ms. Ramar and others would have attended the Chapter meeting if they had known a vote on the Student would occur. They would have voted against the Student's admission.

92. At the Chapter meeting on September 19, 2022, members were told that they would vote on the Student's membership the next day, September 20, 2022.

93. Fraternity rules prohibit discussion during the voting process, but this restriction was not followed for the Student. Several members of the chapter at the Chapter meeting, including the President, the Membership Chair, and the Vice President for Academic Excellence, spoke prior to the vote. Each stated that members could only vote against the Student if they could articulate specific concerns about the Student's personality. They advised members that if they had not met the Student, a "no" vote was evidence of bigotry which is a basis for suspension or expulsion from the Fraternity. Plaintiffs believe these officers were told by the Fraternity Council, and those acting on its behalf, to convey this threat.

94. The Membership Chair intentionally provided limited notice of the only opportunity to meet the Student as part of a plan hatched by national Fraternity representatives to ensure that Wyoming Chapter members would not have a basis to vote against the Student's membership.

95. At the end of the Chapter meeting, the chapter officers described the irregular voting process that was to be used for the Student. Rather than using Omega Recruit, chapter members would vote using a link to a Google Poll. Further, even though the link to the Google Poll would

be emailed to all chapter members, the officers stated that only members who had attended the Chapter meeting could vote.

96. One officer stated, "[r]egardless of what your political views are, our Kappa values are acceptance and kindness so if that is something that you disagree with, that's not in line with Kappa values." When members asked to respond to these statements, the chapter President answered, "No, no discussion." But for those who sought to advocate for the Student's membership, the chapter President allowed them to speak about why Kappa had to admit the Student. Statements included: "You should basically be voting yes for everyone unless they truly go against Kappa's values." "It's 2022. If you vote no, it better be for, like, literal issues with that new member or else it's homophobic." "If you have something to say about this that isn't kind or respectful, keep it to yourself." "If your only concerns are about [the Student] living in the house, you are thinking too far down the road."

97. As stated previously, Kappa's Standing Rules required "All active members of the chapter shall participate in membership selection unless excused in writing by the designated chapter adviser." *See* ECF 1-1, Attachment 7, Standing Rules Revision, Section 1.1.A.1, at 55.

98. For the September 20, 2022 vote on the Student, however, the chapter officers forbade chapter members Grace Ann Choate, Madeline Ramar, and any others who were not present at the September 19, 2022 Chapter meeting from participating in the membership vote.

99. Contrary to the requirements in the Standing Rules, none of these members were excused in writing from participating in the vote by the chapter's alumnae adviser and none had asked to be excluded from the vote. Indeed, they wanted to vote on the Student's membership selection and were forbidden from voting. This was highly unusual and violated Kappa's Standing Rules.

100.     The Chapter then failed to conduct the vote in secret through use of the Fraternity-approved electronic voting system—a mobile phone application called "Omega Recruit"—despite requirements that the Chapter "shall" use the electronic voting system selected by the Fraternity and that the process be confidential. ECF 1-1, Attachment 7,Standing Rules, Section, 1.1.A. and 1.1.A.2, p.55; ECF 1-1, Attachment 8, Kappa Policies, Policy VIII, Sec. 3, p.96-97.

101.     While the Wyoming Chapter used Omega Recruit to select new members during continuous open bidding in Spring 2022 and during the formal recruitment in Fall 2022, they did not follow these procedures regarding the Student during the September 20, 2022 vote.

102.     Thirty minutes after the link to the Google Poll was sent to members, the chapter officers sent out a link to a second Google Poll. This second Google Poll required voters to sign-in with their email address.

103.     When a Google Poll is conducted in this manner, it is not a secret ballot. The Google dashboard shows when each email address logs in, and it also records how the vote total changes.

104.     In addition, during the second vote, chapter officers moved throughout the sorority house, locating some (but not all) members and instructing them to vote on their phones while the officers watched. When enough votes for the Student's membership had been secured, the voting stopped. Nothing about this voting process on September 20, 2022, was normal. The results of the first vote should have ended the process. The second vote should not have occurred, but this error was multiplied when it was not confidential. This irregular process violated Kappa's Standing Rules and Policies in multiple ways.

105.     At least three members of the Wyoming Chapter voted against admitting the Student in the first Google Poll and changed their vote in the second poll. When these women were

told that they would have to vote again with an email address, they understood that the second vote would not be secret and they feared retribution.

106.    The Student was admitted by a narrow margin. Had the chapter conducted a lawful and normal voting process, according to the Fraternity's required procedures, the Student would not have been offered membership in Kappa.

C.    <u>After the Irregular Votes, the Defendants continued to refuse to honor Kappa's Bylaws, Standing Rules and Policies.</u>

1.    *Kappa, acting through Fraternity Council, disregarded membership requirements to accommodate the Student's membership.*

107.    National Fraternity representatives usually have little involvement in member selection until after chapter members have voted. After the vote, every prospective member must be reviewed and approved by Fraternity Council such that the chapter receives "permission to initiate" each candidate.

108.    Kappa's leadership evaluated the Student's membership application under a highly irregular and different standard than that of other female membership applicants.

109.    For instance, applicants to join the Wyoming Chapter must have at least a 2.7 GPA. ECF 1-1, Attachment 14, House Bylaws, Art. III, Sec. 1.A.1, 144-145. In fall 2022, however, the Student had a 1.9 cumulative grade point average. The Student was approved without a grade exception or placement on grade probation, despite the fact that the Student's low GPA would prohibit membership or, at a minimum, require probation as a condition of membership.

110.    Defendants have ultimate decision-making authority over membership decisions. They control the intake of new members, the decision to expel or suspend members, and the decision to discipline, suspend or revoke the charter of a chapter. Fraternity Council decisions are carried out by various representatives at the district, regional and chapter levels. Simply put, no

person may become a new Kappa member unless the Fraternity Council, in advance, has given "permission to initiate." They knew of the irregularities and violations of Governing Documents in the Student's application for membership and in the voting violations and irregularities that occurred on September 20, 2022. They approved the initiation of the Student into membership despite knowing that they were violating the Governing Documents in doing so.

> 2. *Kappa directed members who attempted to uphold Kappa's Mission and established rules to resign from membership.*

111.    After the vote, several members, including the Plaintiffs, objected to the Student's membership as a violation of Kappa's Governing Documents and made their objections known to the Defendants. In response, the Defendants, through their representatives, advised the Plaintiffs that, if they disagreed with the Student's membership, their values were inconsistent with Kappa's values and they should resign their membership.

112.    At the time Defendants urged these Kappa members to resign, Defendants knew that Plaintiffs would not ever be able to join another Sorority. (This is another factor that separates sororities from other campus clubs.)

113.    When the Plaintiffs and other chapter members, and in some cases the parents of these young women, reached out to Fraternity headquarters about the Student's admission, Kappa officials dismissed their concerns:

>   a.    Plaintiffs reached out to Kari Kitrell Poole, the Executive Director of the Fraternity, with concerns about the voting process and the Student's membership. Ms. Poole responded simply that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

b.  Fraternity officials falsely stated that the sorority house is no different than a co-ed dorm at the University of Wyoming.

c.  When Plaintiffs and their parents raised concerns about the Student's presence in intimate areas of the sorority house, Sorority officials told them not to use the same bathroom as the Student and "since [the Student] identifies as a woman you have no reason to feel uncomfortable."

114.    During the time between the chapter vote on the Student and before the student was initiated into Kappa as a member, Ryan O'Neil, the Dean of Students for the University of Wyoming at that time, visited the Wyoming Chapter house and held a special meeting with members in the living room. This meeting was arranged by the then chapter President, and it was described as due to the negative publicity about the admission of the Student into Kappa. The Dean of Students told Kappa members that she thought what they were doing (in admitting the Student) was great and that she was so proud of them. Dean O'Neil said that she has worked with the Student, who spent a lot of time in her office, and she knows the Student well. Dean O'Neil further stated that what they were doing was beautiful, and she was sorry they were going through this.  Plaintiffs and other chapter members who disagreed with the Student's initiation were uncomfortable with the inappropriate praise heaped on the Wyoming Chapter and endorsement of the Student's Kappa membership by a University of Wyoming official.

115.    Ultimately, Jaylyn Westenbroek, Grace Ann Choate, Meghan Kosar, and other chapter sorority members resigned from Kappa membership as a result of Defendants' conduct.

>    3.   *The Defendants retaliated against chapter members who challenged the
>         Fraternity's disregard for its governing documents.*

116.     Fraternity officials and Chapter leaders accused Wyoming Chapter members who

objected to the Student's membership of not subscribing to Kappa's values of inclusion and

diversity.

117.     After Ms. Holtmeier continued to raise concerns about the Student's membership,

she was brought before a disciplinary hearing. Chapter officers read prepared statements that they

had discussed with Fraternity officials and provided her with material, including Kappa's "Guide

for Supporting our LGTBQIA+ Members," so Ms. Holtmeier could "educate" herself.

118.     Ms. Holtmeier was threatened with further discipline if she did not agree that the

Student is a woman or continued to challenge the validity of the vote on his admission.

119.     When Ms. Holtmeier asked questions, she was told "that's what we are supposed

to do now."

120.     Ms. Holtmeier later transferred to Nebraska and affiliated with the Kappa chapter

there.

121.     Madeline Ramar was removed from her position as the Wyoming Chapter Finance

Chair solely because of her opposition to the Student's admission and because she signed onto the

First Amended Complaint as a Plaintiff.

122.     At least one other Chapter member was threatened with discipline if she did not

agree that the Student is a woman.

## V.     Fraternity Council refused Plaintiffs' demands to prevent violation of the Fraternity's restrictions on membership.

123.     Kappa's Articles of Incorporation, Bylaws, and Standing Rules restrict membership in the Fraternity to women only. Defendants have not amended these corporate governance documents to permit membership for the Student, who is a man who claims to identify as a woman.

124.     Plaintiffs made numerous efforts to prevent the Student's initiation to membership on the grounds that it violated Kappa's Governing Documents. As stated above, in September and early October 2022, Plaintiffs and, in some cases, their parents reached out to national Sorority leaders to raise concerns about the admission of the Student. At that time, the Student's membership had not yet been finalized. In response, Kari Kitrell Poole, the Executive Director of the Fraternity, told Plaintiffs that their request had been presented to the Fraternity Council and refused. Ms. Poole wrote that "your concerns were reviewed by several national officers of the organization" and "we [these national officers] believe proceeding with initiation is the appropriate next step." "Thank you for respecting this decision."

125.     In November 2022, Plaintiffs, through counsel, wrote to the Fraternity, requesting that Kappa prevent the initiation of the Student until concerns about his membership were resolved. ECF 1-1, Attachment 11, Correspondence dated November 4, 2022, at 122.

126.     Fraternity Council, responding through Kappa's counsel, rejected Plaintiffs' request. ECF 1, Attachment 3, Correspondence dated November 15, 2022, at 116. The Fraternity claimed that Kappa is a "single-gender organization" that admits "all women, including individuals who may have been born as males but who identify as women." *Id*. This statement disregards the Governing Documents and the actual meaning of the word "woman" as used by the Fraternity for 150 years, but it was presented as the official policy of the Fraternity.

127.     Kappa's counsel stated that the Fraternity leadership has concluded that a woman need not be "biologically born as female." *Id*. at 2. The attorney's letter, on behalf of the corporation, reflects a denial of Plaintiffs' request for relief within the meaning of Fed. R. Civ. P. 23.1(b)(3)(A).

128.     The futility of any further request by Plaintiffs is demonstrated by other language in the November 2022 letter from Kappa to the Plaintiffs' attorney. The letter states that "Kappa has never required any production of a birth certificate, a chromosomal test, or other proof of birth sex to initiate as a member or to maintain member status." *Id.* at 2. This statement indicates that Kappa was not only unwilling to take action related to the Student, but it also had no intention to evaluate whether *any* prospective member complies with the requirement in the Fraternity's Articles of Incorporation that only women may be Kappa members. By stating that the Fraternity has no interest in objective evidence about a member's sex, Kappa's counsel indicated that the Fraternity Council would never enforce the membership restrictions that guided the Kappa for its first 150 years.

129.     The letter from Kappa's attorney also disclosed the Fraternity Council's efforts to undermine Kappa's required membership criteria. The attorney referred to "Position Statements" issued by the Fraternity and to a "Guide for Supporting our LGBTQIA+ Members (the "Guide"), neither of which were published in Kappa's national magazine for members—the Key.

130.     Position Statements are documents prepared by Fraternity staff, and they are never presented to Fraternity membership for approval or review. Position Statements are not Governing Documents and cannot alter the meaning of Governing Documents. The meaning of Governing Documents can only be changed through a vote of delegates at convention. Position Statements are not distributed to Kappa member; they are merely uploaded without notice to the private

member portal of the Kappa website along with hundreds (if not thousands) of other documents. Members cannot be imputed to know the contents of Position Statements.

131.    After receipt of the November letter from Kappa's counsel, a search of the member portal located the Position Statements from 2021 that the letter apparently referenced. These position statements restate language that was originally included in the Guide. ECF 1, Attachment 2, at 102. Upon information and belief, the Position Statements were prepared at the direction of the Fraternity Council.

132.    The Position Statements include, in relevant part, the following language that is inconsistent with Kappa's Governing Documents:

MEMBERSHIP SELECTION

Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.

***

Each chapter of Kappa Kappa Gamma has the final choice of its own members.

SINGLE-GENDER ORGANIZATIONS

Kappa Kappa Gamma is a private, nonprofit organization for women founded in 1870. The single-gender nature of our organization is essential to the mission and purpose of Kappa Kappa Gamma and its chapters and alumnae associations. The right to limit membership in the Fraternity to women is protected by the U.S. Constitution.

The single-gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX.

ECF 1-1, Attachment 12, Kappa Position Statement, at 126-127 (emphasis added).

133.     Kappa "Position Statements" are not Bylaws, Standing Rules or even Policies of the Fraternity. These documents reflect that Fraternity Council is knowingly working to undermine the Fraternity's lawful membership criteria.

134.     Similarly, the Guide is not a Bylaw. While Kappa Bylaws constitute a contract between Kappa and its members under Ohio law, the Guide does not. The Guide is not a Standing Rule. The Guide is not even one of Kappa's official Policies. On information and belief, the Guide was not adopted by a vote of the Fraternity Council.

135.     The Guide was distributed to the Fraternity's 'workforce' (alumnae who direct chapter operations) in about 2018 as a "resource," but the document was not provided to all Kappa members. The Guide states that its purpose is to help fulfill the Fraternity's expectation that members "promote integrity, respect, and regard for others, and appreciation of the worth of all individuals." ECF 1, Attachment 2, at 103.

136.     Again, the Guide is not a Governing Document. Members can learn about "How to Be an Ally," "Using Inclusive Language," and "How to Support Someone Who Is Coming Out." ECF 1, Attachment 2, The Guide, at 103-104. Much of the Guide repeats, without attribution, material created by an organization called CampusPride.org. *Compare* ECF 1, Attachment 2 with "Greek Ally Kit" available at bit.ly/401gHhv (visited June 5, 2025).

137.     Although the Guide was disseminated by the Fraternity as a resource, once the admission of the Student into membership of the Wyoming chapter became an issue, the Fraternity Council pointed to the Guide as changing the Fraternity's membership criteria. Fraternity Council's active work to conceal its decision-making, when considered in combination with the Fraternity's *ultra vires* decision to permit men to become members of the Fraternity, demonstrates that the

Fraternity Council actions have not been made in good faith and are contrary to the best interests of the Fraternity.

138.     Kappa's attempt to define "women" to include men ("individuals who identify as women") is contrary to law. In Executive Order 14168 entered on January 20, 2025, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," the terms "women," "woman," "girls," and "girl" are defined as "adult and juvenile human females, respectively." 2025-02090 (90 FR 8615). Further, "sex" is defined as a person's "immutable biological classification as male or female," and the term specifically excludes the concept of "gender identity." *Id.*

139.     Kappa's interpretation is inconsistent with its reliance on the exemptions for "single sex" organizations under Title IX. As the court in *Tennessee v. Cardona* explained, "discrimination on the basis of sex means discrimination on the basis of being a male or female" and "expanding the meaning of 'on the basis of sex' to include 'gender identity' turns Title IX on its head." 762 F. Supp. 3d 615 (E.D. Ky. Jan 9, 2025) *available at* 2025 U.S. Dist. LEXIS 6197 *10.

140.     Kappa's efforts to expand its membership to men who identify as women squarely violates the exemptions under Title IX. Indeed, in a press release issued on June 2, 2025, the U.S. Department of Education Office of Civil Rights announced that it has launched an investigation into the University of Wyoming after the university allowed a man to join Kappa, a campus sorority. The press release further stated, "A sorority that admits male students is no longer a sorority by definition and thus loses the Title IX statutory exemption for a sorority's single-sex membership practices." See "The Department's Office for Civil Rights Launches Two Investigations to Vindicate Women's Rights under Title IX" https://www.ed.gov/about/news/press-release/us-department-of-education-recognizes-june-title-ix-month (site last visited June 4, 2025)

**VI.    Kappa's Fraternity Council Cannot Rely on NPC Policies to support its disregard for Kappa's Governing Documents.**

141.    In the November 2022 letter to Plaintiffs, Kappa's counsel also referred to a policy issued by the National Panhellenic Conference in 2020. The National Panhellenic Conference is an umbrella organization of twenty-six sororities active on college campuses. The attorney's letter cites the NPC Policy as support for Kappa's admission of the Student, stating that the NPC policy means that "all women" may join a sorority, including men who identify as women.

142.    Kappa counsel's letter, however, selectively quotes the NPC policy which, in its entirety, states as follows: "Panhellenic Recruitment Eligibility (2020) – POLICY For the purpose of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures." It is clear on its face that this policy only applies to participation in recruitment (formerly known as "rush") and has no effect on who can join any particular sorority. The letter falsely suggests that the NPC policy has an effect on Kappa's membership requirements and the other sororities that belong to the NPC.

143.    Defendants cannot use the NPC policy to justify its efforts to disavow Kappa's long-standing membership requirements.

144.    The Unanimous Agreements of NPC also have more force than policies. Unanimous Agreements are unanimously approved by each of the 26 sororities that are members of NPC. Kappa is bound by its Bylaws to comply with the NPC Unanimous Agreements. ECF 1, Attachment 1, Bylaws Article XV Sec 2, at 93. Unlike the policies of NPC, each individual Kappa is bound by Kappa Policies to uphold the Unanimous Agreements. "All members of Kappa Kappa Gamma shall abide by and uphold the National Panhellenic Conference Unanimous Agreements as set forth in the current National Panhellenic Conference Manual of Information. All members

shall also support the policies of the National Panhellenic Conference." ECF 1-1, Attachment 9, Policies at 99.

145.    The NPC Unanimous Agreement titled "PROTECTING THE RIGHT OF NPC MEMBERS TO REMAIN WOMEN-ONLY ORGANIZATIONS" requires all 26 sororities to "defend their right to exist as **single-sex** organizations." This Unanimous agreement states, in pertinent part as follows:

> NPC member organizations exist as **women-only** private social organizations. We believe that the right to enforce such membership restrictions is rooted in the freedom of association protected by the First Amendment of the U.S. Constitution. The U.S. Congress has recognized that right by providing in Title IX of the Education Amendments of 1972 that the membership practices of social fraternities and sororities are excepted from the prohibition contained in Title IX against discrimination **on the basis of sex** in participation in educational programs or related activities (20 USC 1681) and in exempting "bona fide private membership clubs" from the general prohibition against **sex discrimination** in employment practice (26 USC 501(c)). To further protect the right to maintain our membership policies, NPC reaffirms its long-held beliefs and policies in the form of a Unanimous Agreement.
>
> 1. The women's sororities of the National Panhellenic Conference have the right to confine their membership to women and **shall defend their right to exist as single-sex organizations**.
>
> 2. Auxiliaries. Each College Panhellenic shall denounce the participation of undergraduate Panhellenic women in auxiliary groups to men's fraternities.
>
> 3. Men's recruitment. Each College Panhellenic shall denounce the participation of Panhellenic women in men's fraternity events when or where the primary purpose is recruitment.

NPC Manual of Information, 29th Ed., January 2025, at 21-22 https://npcwomen.org/login/ college-panhellenics/moi-resources/ (site last visited June 4, 2025) (emphasis added).

146.    Plaintiffs made every effort and are continuing to defend Kappa's "right to exist as a single-sex organization." The Fraternity Council has improperly thwarted this effort at every turn.

**VII.   Fraternity Council and those acting in concert with them have concealed their disavowal and betrayal of Kappa's promises and obligations to women to induce members to join the sorority and improperly retaliated against Wyoming Chapter members for attempting to uphold Kappa's mission and governing principles.**

147.     Prior to joining Kappa, Plaintiffs all participated in regular fall sorority recruitment, colloquially known as "rush week," during their first year at the University of Wyoming. During Kappa recruitment, Kappa members repeatedly described the Fraternity as a "sisterhood," a term universally understood to refer to women only.

148.     Kappa represents to students that even after they graduate from college, they will have a lifetime sisterhood in Kappa.

149.     Kappa did not disclose to Plaintiffs or other prospective new members that its definition of a "woman" includes men who identify as women.

150.     During the recruitment process, Plaintiffs and other Wyoming Chapter members learned that if they joined Kappa, they would be forever barred from switching to a different sorority. Plaintiffs could have joined other sororities at the University of Wyoming. Plaintiffs would not have joined Kappa if the Fraternity's recruiters or printed recruitment information had disclosed that the Fraternity also admits men who claim to identify as women.

151.     Before initiation, the Fraternity requires prospective new members (formerly "pledges") to attend meetings to learn about the Fraternity's history and values. The other fall 2022 Kappa pledges did not know a biological male would also be joining the Fraternity and were surprised when the Student joined an educational meeting for their pledge class. One pledge initially believed the Student was at the meeting to write an article for the campus newspaper. One prospective member wrote to national Fraternity officials about this surprise, noting that she and other prospective new members had not even received a "heads up" about the Student's potential membership. Fraternity leadership never responded to these concerns.

152.     Ultimately, of the twelve young women who were invited to become Kappa members in Fall 2022, four women dropped out before initiation because they did not want to live in a sorority house with a biological man having access to their private and intimate spaces—including sleeping quarters on the second floor.

153.     Notwithstanding the promises Kappa made to current and prospective members regarding its commitment to women and sisterhood, Fraternity Council and the Jane Doe defendants acting in concert with them actively pressured members of the Wyoming Chapter to support the Student's admission, ignoring Governing Documents that foreclose the Student's initiation.

154.     In an effort to "transform" Kappa, without member approval, the Defendants violated the Articles, Bylaws, Standing Rules, and Policies of the Fraternity.

155.     Since the Student's improper admission to Kappa, Defendants retaliated against Plaintiffs and other Wyoming Chapters members who raised concerns about Kappa's transformation from a women's sorority into a co-ed organization.

156.     Each Plaintiff joined Kappa with the promise that they would be able to live and socialize in a single-sex, all-female environment. Defendants repeatedly laud the benefits of such an experience. Unless this Court holds Defendants to the promises and representations made to Plaintiffs, these young women will never have the benefits of the sorority experience they were promised. Some of the damages to each Plaintiff are easily calculable, including their Kappa dues. Other damages are less calculable at the outset, including difficult interactions with the Student. Plaintiffs were shocked and anguished by the Defendants' conduct and the way the Defendants and some members of the Wyoming Chapter treated them for standing up for Kappa as a single-sex organization.

157.     For 150 years, Kappa has promoted the lifetime benefits of the sorority experience. For 150 years, Kappa has stated that these benefits result from the single-sex experience.

158.     Kappa has also been damaged by Defendants' conduct. Their violations of fiduciary duty have caused the Wyoming Chapter to lose at least 4 pledges and other chapter members left the school entirely or resigned from Kappa as a result. Nationally, because the Fraternity Council kept the admission of men hidden from Kappa's general membership, other Kappa members were not aware that Kappa had admitted or could admit men. After the Plaintiffs made it known and filed this case, Kappas across the country were shocked and incensed by the Defendant's actions. Many withdrew financial support or stepped back from volunteer involvement. The Fraternity Council's actions have created a schism in the Kappa membership that persists to this day. These hundreds of thousands of alumnae members and collegiate members have no recourse except to the courts. Because all higher levels of leadership are appointed by Fraternity Council and because new Bylaws cannot be proposed without Fraternity Council pre-approval, this small group of women has silenced the rest of the Kappa members and continued to conceal their actions by not allowing discussion or debate on the issue of admitting men into Kappa.

159.     Kappa must be held to comply with its Governing Documents and must remain loyal to its mission and the promises the Fraternity has made to its members throughout its history.

160.     All attempts at dialogue have failed, so Plaintiffs seek relief from this Court. Plaintiffs seek to recover the costs the Fraternity has incurred in promoting this unlawful change in its membership criteria. To the extent that discovery demonstrates that each member of the Fraternity Council has colluded in this effort, these individuals should be removed from their positions. Plaintiffs ask this Court to declare that Defendants have violated their fiduciary duties

and their contractual obligations to the Plaintiffs, by purporting to admit the Student into the Fraternity

## **COUNT ONE**

### **(Breach Of Fiduciary Duty on behalf of Kappa Kappa Gamma Fraternity)**

161.     Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

162.     Under Ohio law, the regulations of an organization may make provisions related to the "qualifications, admission,…and suspension of members, and the termination of membership." OH ST § 1702.11(A)(2).

163.     Under Ohio law, a corporation may "exercise all authority within the purposes stated in its articles or incidental to those purposes." OH ST § 1702.12(F)(9).

164.     A director shall perform her duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation…." OH ST §1702.30(B).

165.     The Fraternity Council has breached its fiduciary duties to Kappa and its members in the following ways:

     a.  encouraging, advocating for, attempting to unduly influence Wyoming chapter members to support, and approving the Student's membership in direct contravention to the rules and requirements in Articles, Bylaws, Standing Rules and Policies;

     b.  actively concealing Kappa's efforts to disavow its Governing documents in order to admit biological males to membership in the Fraternity;

c.  unduly influencing Wyoming chapter officers to disregard mandatory voting procedures employed in the Student's selection process;

d.  disregarding Kappa's duty, as an Ohio citizen, to affirmatively protect and honor the freedom of speech protected under the Ohio Constitution by retaliating against members who challenged the validity of the Student's membership; and

e.  undermining the obligations, set forth in its Bylaws, to "advocate for and seek to address issues of concern for members and women in general" and instead focusing on meeting the demands of men who seek to be treated as if they were women. ECF 1-1, Bylaws, Article II.

166.  Fraternity Council's conduct destroys the rights of members, including the members of the Wyoming chapter and other student chapters to participate in a single-sex, woman-only environment.

167.  Fraternity Council's conduct has caused the University of Wyoming to be the subject of a Title IX investigation by the United States Department of Education for allowing Kappa to admit the Student as a member of the Wyoming Chapter.

168.  Fraternity Council's conduct has rendered Kappa "no longer a sorority by definition" and has caused it to lose its Title IX statutory exemption for a sorority's single-sex membership practices.

169.  Fraternity Council blatantly and knowingly defied the warnings and concerns of the Plaintiffs and other members of the Wyoming Chapter, attempted to silence any member objections to the Student's admission. Fraternity Council acted in bad faith and has recklessly and willfully disregarded Kappa's best interests.

170.     As a result of Defendants' conduct, Kappa suffered and continues to suffer reputational harm and has been damaged in an amount in excess of $75,000 for which Defendants are liable.

## COUNT TWO

### (Breach of Fiduciary Duty for ultra vires acts by Fraternity Council on behalf of Kappa Kappa Gamma Fraternity)

171.     Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

172.     Plaintiffs are members of Kappa in satisfaction of Section 1702.12(I) of the Ohio Revised Code.

173.     Fraternity Council exceeded its authority to act as required under Ohio Revised Code Section 1702.12.

174.     Fraternity Council failed to conduct Kappa's affairs as set forth in its Bylaws, as in force and effect at the time.

175.     Fraternity Council cannot, as a matter of law, establish Policies or engage in conduct that is contrary to Ohio law.

176.     Plaintiffs made repeated requests to the Fraternity Council to enforce the membership requirements set forth in the governing documents, but the Fraternity Council has denied their requests.

177.     Fraternity Council must be enjoined from violating Kappa's Articles, Bylaws, and Standing Rules; retaliating against members who seek to hold Fraternity Council to their obligations to comply with Governing Documents; and ordered to rescind their actions taken in breach of their fiduciary duties to Kappa.

178.    As a result of the Fraternity Council's conduct, Kappa has been compelled to incur damages in excess of $75,000 for which Fraternity Council is liable.

## COUNT THREE

### (Breach of Contract)

179.    Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

180.    Kappa's Governing Documents, including its articles of incorporation, constitution and bylaws serve as the contract between the organization and its members. *Ulliman v. Ohio High School Athletic Assn.,* 184 Ohio App. 3d 52, 2009 Ohio 3756, 919 NE2d 763, ¶50

181.    The promises Kappa made to its members, including Plaintiffs, are memorialized in Kappa's Governing Documents.

182.    Plaintiffs, other Wyoming Chapter members, and other active student members agreed to join Kappa, pay membership dues and, if required, live in the Wyoming Chapter house in exchange for the promise of participating in a single-sex organization committed to uniting and supporting women throughout their lifetimes.

183.    Defendants, by and through their conduct, violated Kappa's Bylaws and Standing Rules to compel the Wyoming Chapter members to admit the Student, caused Kappa to breach its obligations under the Governing Documents and, therefore, breach its contract with the Plaintiffs.

184.    As a result of Defendants' conduct and Kappa's resulting breach, Kappa is liable to Plaintiffs in an amount equal to the dues paid throughout the term of their memberships when Kappa was in breach and for any consequential or other damages resulting from the breach.

## COUNT FOUR

### (Fraud in the Inducement to enter into the Contract by Joining Kappa)

185.     Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Second Amended Verified Complaint as if fully set forth herein.

186.     At no time prior to consideration of admission of the Student into the Wyoming Chapter were Plaintiffs (or their parents) informed that men could become Kappas. Indeed, Kappa advertised and held itself out as an organization of women, for women, on social media and on its website. These misrepresentations continue to this day.

187.     Kappa, acting through the Fraternity Council, failed to disclose and actively concealed from Plaintiffs the fact that they had embarked on a concerted extralegal agenda to undermine the single sex nature of the organization and eviscerate the primary purpose of Kappa by admitting certain men.

188.     Fraternity Council continued to tout Kappa as a women's sorority when it knew that it had admitted at least one man prior to the Student (and possibly more), Kappa knew that stating that it was an "organization of women" was false (or at least misleading in concealing the crucial and material omission that it admitted men who identify as women). Kappa made these misrepresentations in purposeful or reckless disregard for the truth. The Plaintiffs reasonably relied on Kappas' false statements and misrepresentation and thought that they were joining a sorority for women – meaning it did not admit men.

189.     Had the Plaintiffs known that Fraternity Council was admitting men, they never would have joined Kappa. By joining Kappa, Plaintiffs lost the ability to ever join a different sorority instead.

190.     The Plaintiffs suffered other harm and damage as a result of their reliance on Kappa's material misrepresentations. Plaintiffs had to endure sharing their private intimate living spaces with the male Student. They were pressured to accept him as a sister. Plaintiffs felt humiliated, silenced, and demeaned as a result of the actions of Fraternity Council.

191.     As a result of Defendants' fraudulent conduct, the Defendants are liable to Plaintiffs in an amount equal to the dues paid throughout the term of their memberships and for consequential or other damages resulting from the fraud.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Hannah Holtmeier, Allison Coghan, and Haley Rutsch pray for judgment against Defendants, as follows:

1.     As to Count One of the Complaint, Plaintiffs seek an order entering judgment in their favor, derivatively and on behalf of Kappa Kappa Gamma, and against the Defendants, on behalf of Kappa Kappa Gamma, in an amount in excess of $75,000 together with (a) an order enjoining Kappa Kappa Gamma from violating KKG's Articles, Bylaws, Standing Rules and (b) an order to expel men from membership until such time as Kappa conducts a vote by the delegates of the membership in accordance with Kappa's Governing Documents, converting Kappa to a co-ed organization.

2.     As to Count Two of the Complaint, Plaintiffs seek an order in their favor, derivatively and on behalf of Kappa Kappa Gamma, (a) removing any members of the Fraternity Council, Directors or Advisors named as a Defendants in this matter, (b) entering judgment against the Defendants, on behalf of Kappa Kappa Gamma, in an amount in excess of $75,000 and (c) expelling men from membership until such time as Kappa conducts a vote by the delegates of the

membership in accordance with Kappa's Governing Documents, converting Kappa to a co-ed organization.

3.      As to Count Three of the Complaint, Plaintiffs each seek an order entering judgment in their favor, and against Kappa Kappa Gamma in an amount equivalent to the dues they paid during the period in which Kappa violated its Governing Documents and for any consequential or other damages resulting from the breach in an amount exceeding $75,000.

4.      As to Count Four of the Complaint, Plaintiffs each seek an order entering judgment in their favor, and against Kappa Kappa Gamma and/or Fraternity Council, as may be determined by the Court, in an amount equivalent to the dues they paid during the period in which Kappa violated its Governing Documents and for any consequential or other damages, resulting from the fraud in an amount exceeding $75,000.

5.      An award of interest, attorneys' fees, all expenses, costs, and any such other and further legal or equitable relief, including punitive damages, in favor of Plaintiffs as the Court deems just and proper.

Respectfully submitted,

*/s/ John Knepper*
John Knepper
Wyoming Bar No. 7-4608
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

*/s/ Cassie Craven*
Cassie Craven
Wyoming Bar No. 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St., Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

**VERIFICATION**

I, Hannah Holtmeier, hereby declare, under penalty of perjury, and verify that I am a member of the Kappa Kappa Gamma Fraternity, one of the Plaintiffs in the within action; that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true to the best of my knowledge and belief based upon the information available to me at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters I believe it to be true.

Date: _____June 6, 2025_____        Signed: /s/ Hannah Holtmeier_____

I, Allison Coghan, hereby declare, under penalty of perjury, and verify that I am a member of the Kappa Kappa Gamma Fraternity, one of the Plaintiffs in the within action; that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true to the best of my knowledge and belief based upon the information available to me at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters I believe it to be true.

Date: _____June 6, 2025_____        Signed: /s/ Allison Coghan_____

I, Haley Rutsch, hereby declare, under penalty of perjury, and verify that I am a member of the Kappa Kappa Gamma Fraternity, one of the Plaintiffs in the within action; that I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations contained therein are true to the best of my knowledge and belief based upon the information available to me at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters I believe it to be true.

Date: _____June 6, 2025_____ _        Signed: /s/ Haley Rutsch_____