## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

HANNAH HOLTMEIER, ALLISON COGHAN,  )
and HALEY RUTSCH, on behalf of themselves  )
and derivatively on behalf of KAPPA KAPPA  )
GAMMA FRATERNITY,  )
                                        )
      Plaintiffs,  )
                                          )
v.  )     Civil Action No.: 23-CV-00051-ABJ
                                          )
KAPPA KAPPA GAMMA FRATERNITY,  )
MARY PAT ROONEY, MARIA BROWN,  )
NANCY CAMPBELL, BARB GOETTELMAN,  )
LIZ WONG, KYLE DONNELLY, BETH BLACK,  )
and JANE DOES 1-4  )
                                          )
      Defendants.  )

### PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS

       Plaintiffs Hannah Holtmeier, Allison Coghan, and Haley Rutsch, on behalf of themselves and derivatively on behalf of Kappa Kappa Gamma Fraternity, respectfully oppose Defendants' Motion to Dismiss the Second Amended Complaint.

## I.      INTRODUCTION

       As the Court knows, Plaintiffs brought their lawsuit against Kappa Kappa Gamma more than two years ago to prevent the Fraternity's leadership from improperly circumventing the corporation's governing documents to transition the Fraternity away from its 150-year history as a single-sex organization to a co-ed organization.

       In this Second Amended Complaint, Plaintiffs do not ask the Court to define what a woman is. Rather, as is expected under Ohio law, Plaintiffs ask this Court to resolve a dispute between the parties about how *Kappa and its members* defined the term "woman" when it was adopted as part of the Fraternity's Articles of Incorporation, Bylaws, and Standing Rules ("Governing

Documents"). Plaintiffs contend that when these documents were adopted, this word referred to an individual's biological sex, not gender identity, and Kappa's Fraternity Council is unlawfully ignoring the requirements of Kappa's corporate documents. In Ohio, as in Wyoming, articles of incorporation and corporate bylaws are a contract between the association and its members. The usual rules of contract interpretation apply, and when parties to a contract disagree about the meaning of a specific term, a court steps in to determine what definition the parties intended. If a term is ambiguous, then the Court looks to extrinsic evidence at the time the contract was adopted. Plaintiffs allege that—whatever rules of interpretation are applied—Kappa's governing documents have always and only used the term "woman" to refer to biological women. *See*, *e.g.*, Second Amended Complaint ¶ 22, ECF 65 at 7.

Plaintiffs do not ask this Court to hold that Kappa cannot, in its Governing Documents, define "woman" using whatever definition the organization desires. Kappa is free to alter its Governing Documents, including to adopt a different definition of the term "woman," but in doing so, Kappa must follow its own rules, comply with relevant law, and act in good faith and in the best interests of the organization. Kappa's Governing Documents include specific requirements that set forth how amendments must be presented to, and approved by, the full body of Kappa members. The Second Amended Complaint alleges that Defendants intentionally and willfully failed to follow these requirements and asks whether, and to what extent, the directors of an Ohio nonprofit corporation can disregard more than a century of tradition and—claiming that they have unilaterally re-interpreted the meaning of a long agreed-upon term—fundamentally alter an organization's articles of incorporation and bylaws without disclosing the change to the membership and without following the approval process set forth by the organization's governing documents.

Defendants argue that the Ohio courts' internal affairs rule, also called the noninterference rule, gives authority to Kappa's Fraternity Council to make this change and avoid the amendment process. Defendants believe that so long as their interpretation of a term is reasonable, then members have no recourse to the courts. Defendants misstate the scope and limitations of this doctrine. Ohio courts have never held the internal affairs rule allows the legislative re-interpretation that Defendants seek (a concept that harkens to the recently overruled concept of *Chevron* deference). Ohio's internal affairs doctrine protects only the quasi-judicial adjudications of voluntary membership organizations. The broader rule urged by Defendants, but not ever adopted by Ohio courts, would undermine the bargain at the heart of corporate law: articles of incorporation and bylaws are a contract between shareholders and those selected to lead the corporation. The internal affairs rule does not allow Kappa's governing body to avoid the procedural requirements of the organization's governing documents and supply new interpretations of terms when it chooses.

Plaintiffs' Second Amended Complaint has thoroughly pleaded factual allegations supporting both the derivative and direct claims in this case, and, therefore, has met the standards necessary to overcome a motion to dismiss.

## II.    FACTUAL BACKGROUND

Plaintiffs seek to hold Kappa's directors, individuals comprising the Fraternity Council, and others within the fraternity's leadership, accountable for their intentional violation of the corporation's governing documents. Specifically, Plaintiffs allege that the Fraternity leadership defendants—in pursuit of their own personal political and social agenda—violated the corporation's bylaws by unilaterally adding a new category of members (biological males), (ECF 65, ¶¶ 39-76); that they manipulated the membership elections at the Gamma Omicron Chapter in

order to secure the membership of a biological male student who identified as a woman, (ECF 65, ¶¶ 77-106); and that the organization's leadership intentionally hid this momentous change from the membership while continuing to solicit new student members on the representation that the organization was and remains a *single-sex*[1] organization. (ECF 65, ¶¶ 35-36, 149- 151, 186-188).

Several times, Kappa has pointed to various documents from its website as evidence that the organization has expanded its membership criteria to include "women *and* individuals who identify as women." (ECF 65, ¶¶ 131-132) None of these documents, however, have ever been approved through the rigorous process that Kappa requires before making changes to its Governing Documents. By their own terms, these documents may be amended only by a two-thirds majority vote of the membership. Moreover, at no time did Fraternity Council disclose to its membership or to prospective members that these documents altered the agreed-upon meaning of Kappa's Governing Documents. Fraternity Council worked to violate Kappa's membership criteria and take Kappa away from its mission and purpose, yet it continued to promote the organization to new members as an organization that supports and unites women and continued to receive the protections of Title IX. (*Id.* at ¶¶ 138-140.) Since the Governing Documents were never modified or amended to reflect the new category of members, and Fraternity Council never provided its "interpretation" of the term "woman" for a vote, members were left to believe that the various online statements did not upend membership criteria. (*Id.* at ¶ 59.) Members were entirely unaware that the Fraternity Council intended these documents to redefine the agreed-upon meaning of terms within Kappa's Governing Documents without seeking the required approval. (*Id.* at ¶ 60.)

---

[1] *See* ECF 65, Second Amended Complaint at ¶ 138. For consistency, terms defined in the Second Amended Complaint will have the same meaning here.

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), Plaintiffs need not prove their case at the pleading stage. A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the sufficiency of the complaint. Thus, all well-pleaded allegations in the...complaint are accepted as true and viewed in the light most favorable to the nonmoving party.'" *Moffett v. Halliburton Energy Services, Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002). To survive a 12(b)(6) motion to dismiss, a plaintiff must allege that "enough factual matter, taken as true, [makes] his 'claim to relief...plausible on its face.'" *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [pleaded] factual content [ ] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Am. Hallmark Ins. Co. of Texas v. Ctr. St. Real Estate, LLC*, 2012 WL 13024403, *3 (D. Wyo. June 21, 2012). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III. ARGUMENT

### A. As this Court Previously Found, Plaintiffs Have Satisfied Rule 23.1's Requirements.

Rule 23.1 of both the Ohio and Federal Rules of Civil Procedure require a plaintiff's complaint in a derivative action to state with particularity the plaintiff's effort to obtain the desired action from the directors and, if necessary, from the shareholders or members; and the reasons for either not obtaining the action or not making the effort. Ohio R. Civ. P. 23.1; Fed. R. Civ. P. 23.1(b)(3)(a).[2] Here, Plaintiffs not only made a pre-suit demand, but they have also demonstrated

---

[2] This Court has acknowledged that Ohio Civil Rule 23.1 applies to Plaintiffs' derivative claims here. (ECF 31 at 23).

that further demands to Defendants are futile.

Before initiating this lawsuit, Plaintiffs, some of their parents, the parents of other Kappa members, and Plaintiff's counsel made demands to Fraternity Counsel to comply with Kappa's governing documents and prevent the admission of a biological male to membership. (ECF 65, ¶¶ 124-125; ECF 6-1, Attachment 11, Correspondence dated November 4, 2022, at 122.) Kappa and its Fraternity Council flatly rejected these demands.[3] (ECF 65, ¶¶ 126-127.) This Court acknowledged futility in its earlier opinion. (ECF 31 at 25).

The allegations in the Second Amended Complaint further demonstrate the futility of these demands. Futility exists "where the directors are antagonistic, adversely interested, or involved in the transactions attacked." *Robinson Family Trust v. Greig,* 2013 WL 1943330, Case No. 5:12 CV1713 (N.D. Ohio May 10, 2013). Plaintiffs can demonstrate futility by pleading facts that show a corporate board of directors was dominated in its decision making by one or more members who opposed the actions desired by the plaintiff. *In re Lubrizol S'holders Litig.,* 2017-Ohio-622, ¶ 46, 79 N.E.3d 579, 588. One such instance where a demand is excused as futile is when all directors are named as wrongdoers and defendants in a suit. *Carlson v. Rabkin*, 789 N.E.2d 1122,1128-29, 2003 -Ohio- 2071 (Ohio App. 2003).

As this Court already held, to characterize Fraternity Council as antagonistic or adversely interested or involved in the transactions here would be an understatement. The Fraternity Council has insisted that, under their new interpretation of the governing documents, the term woman is not limited to those "biologically born as female." (ECF 65, ¶¶ 127-128). Since the original filings

---

[3] Plaintiffs renewed their demands by letter from undersigned counsel dated June 6, 2025. Kappa received the demand and responded on July 8, 2025, denying the requested relief.

in this action, Fraternity Council has followed up to enforce its views by punishing members for their participation in this litigation. (*Id*. at ¶¶ 115-122, 138-140). Kappa continues to disregard case law and Executive Orders that hold their new understanding of the term "woman" is not only contrary to law but also jeopardizes Kappa's claimed Title IX exemption. Kappa's conduct has resulted in an investigation of the University of Wyoming by the Office of Civil Rights at the U.S. Department of Education. *Id.* The Fraternity Council's persistence in defying Kappa's governing documents despite the clear and undisputed harm to the Fraternity demonstrates that the Board members have no intention of considering Plaintiffs' demand.

**B.   The Internal Affairs Rule Applied by the Ohio Courts Does Not Bar Plaintiffs' Claims.**

**1. Ohio Courts Apply the Internal Affairs Rule to Quasi-judicial Actions Only.**

In Ohio, the internal affairs rule, also called the noninterference rule, holds that courts "will not interfere with the quasi-judicial decisions of voluntary associations unless such decisions are alleged and shown to be the result of fraud, arbitrariness, or collusion." *Lough v. Varsity Bowl, Inc*., 241 N.E. 61, 62 (Ohio Sup. Ct. 1968). Defendants' recitation of this rule omits this "quasi-judicial" qualification, making it seem that Ohio courts permit the governing body of an organization to reinterpret any provision in the governing documents so long as that interpretation is reasonable. (ECF 67 at 10).

Every case cited by Defendants—indeed every Ohio case that has ever relied on the noninterference rule—relates to a quasi-judicial determination, typically in the area of member discipline or expulsion. For example, in *Putka v. First Catholic Slovak Union*, the plaintiff challenged his expulsion from the organization, arguing he had been denied due process. 600 N.E.2d 797, 802 (Ohio Ct. App. 1991). The court, relying on the organization's bylaws, held that

Mr. Putka had received all process due to him. *Id*. The case did not involve an organization adopting a significant new, prospective rule through an interpretation of the bylaws, but rather actions by the board to enforce their bylaws as written and discipline a member for violating them. Likewise, *Redden v. Alpha Kappa Alpha Sorority* involved a quasi-judicial investigation into an officer that ended with the officer's expulsion. Again, the challenge related to due process for that specific member's expulsion, not contractual interpretation. 2010 WL 107015 (S.D. Ohio Jan. 6, 2010).

And in *Stibora v. Greater Cleveland Bowling Ass'n*, the plaintiff challenged his disciplinary suspension relating to the application of lane dressing (*i.e.,* oil) to bowling lanes. 63 Ohio App.3d 107 (Ohio Ct. App. 1989). Stibora argued that his interpretation of the lane dressing rules was the correct one and the association was in error, making "bare allegations in conclusory fashion" to challenge the suspension of his membership. The *Stibora* court, in reaching its decision, did not opine on the meaning of the lane dressing rules. Rather, the court looked to an Indiana decision which similarly roots the noninterference rule in an organization's interests in "questions of discipline, or internal policy and management":

> A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them.

*Id. (citing State ex rel. Givens, v. Superior Court of Marion Cnty.*, 117 N.E.2d 553, 555 (Ind. 1954). This understanding of the internal affairs rule—and its limitation to quasi-judicial determinations—comes directly from *Lough*, the 1968 case wherein the Ohio Supreme Court sets forth the doctrine. *Lough* reviewed an adjudication about who won a bowling competition and

specifically held that this rule applies to a voluntary organization's "quasi-judicial decisions." *Lough*, 243 N.E.2d at 63.

All of the cases in Ohio, including the Ohio Supreme Court's most recent decision, arise in the context of quasi-judicial actions by voluntary organizations. *See Ohio High School Athletic Assn. v. Ruehlman*, 2019-Ohio-2845, ¶ 34, (O'Connor, C.J., dissenting). Indeed, in a case decided just last month, Ohio's Fifth District Court of Appeals, citing *Putka*, explained that to the extent that courts defer to a voluntary organization's interpretation under this doctrine, it is in the context of due process claims relating "disciplinary actions taken by voluntary organizations." *Rutkowski v. United States Practical Shooting Ass'n*, 2025-Ohio-2182, ¶ 15-19 (5th Dist.).[4]

Here, Plaintiffs' derivative claims are not about due-process rights or a personal grievance concerning Kappa's internal-dispute resolution process. Rather, Plaintiffs allege, with particularity, the requirements for a derivative suit and how they meet those requirements. (See e.g., ECF 65, ¶ 158-160, 171-178) Plaintiffs state that the Governing Documents of Kappa have always "limited membership to women only," and Defendants have not only refused to enforce this requirement, but they have disregarded the governing documents that set forth this requirement, resulting in the sorority losing its identity as an organization for women. (*Id*. at ¶¶ 156, 166, 168). In doing so, Defendants acted in bad faith. (*Id*. at ¶ 163).

In their Motion to Dismiss, Defendants argue for more than application of Ohio's internal affairs rule. They ask this Court to extend the Ohio rule in a manner that undoes the contractual bargain at the heart of corporate law. Under Ohio law, "[c]onstitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its

---

[4] Notably, the *Rukowski* court held that the plaintiff's allegations of bad faith conduct by the organization were sufficient to exempt his case from application of the internal affairs rule.

members." *Ulliman v. Ohio High School Athletic Assn.*, 2009-Ohio-3756, ¶¶ 50-51 (2nd Dist.) (citing *Int'l Bhd. of Elec. Workers, Local Union No. 8 v. Gromnicki* (2000), 139 Ohio App.3d 641, 646, 745 N.E.2d 449, and *Ahmed v. Univ. Hosps. Health Care Sys., Inc.* (Apr. 18, 2002), Cuyahoga App. No. 79016, 2002 WL 664026, at * 6, and fn. 11; *Rose v. Giamatti*, 1989 WL 111386, *5 (Ohio Com.Pl. June 19, 1989). When the members and the association disagree, Ohio courts regularly provide declaratory relief that interprets the corporate documents using the rules of contract interpretation. *See, e.g., Keltz v. Enchanted Hills Community Assn.,*, 2014-Ohio-866, ¶ 20 (4th Dist.) (issuing declaratory judgment preventing community association from exercising powers beyond those conferred to it in declarations); *Singh v. Guru Gobind Singh Sikh Soc. of Cleveland*, 2014-Ohio-4844, ¶ 22 (8th Dist.) (granting declaratory judgment interpreting organization's procedures for amending bylaws).

No Ohio court has ever recognized an organization's ability to make a legislative policy change to its governing documents through interpretation, and there is no reason for this Court to extend the internal affairs doctrine beyond the quasi-judicial situations in which Ohio courts have applied it. If this were the case, the voting and amendment procedures set forth in articles of incorporation would be superfluous, if not altogether a fraud upon organization members. For example, in *Buchanan v. Shack*, Ohio's Second District Court of Appeals recited the internal affairs rule and its exceptions, but made clear that any decision must still follow the separate requirements of the corporation's own governing documents:

> In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision by such association ***in accord with its own charter and rules*** made by the governing body must be accepted by courts of law.

*Buchanan v. Shack*, 1995 WL 386938, *2 (2nd Dist. June 28, 1995) (*emphasis added*). Similarly, the Ohio Seventh District Court of Appeals has noted that where a voluntary organization "is

governed by a constitution and by-laws, [it] cannot visit punishment upon a member for any acts or conduct which were not violative of the constitution and by-laws at the time that such acts were committed." *Armstrong v. Duffy*, 103 N.E.2d 760, 766, (7th Dist. 1951). Ohio's Fourth District Court of Appeals, in the context of a due process complaint over member expulsion, treated the organization's compliance with its own constitution and bylaws as a necessary component of due process:

> A member of a private association may not be expelled without due process. This right is derived not from the constitution but rather from a theory of "Natural Justice." Due process in this respect is comprised of three basic elements: (1) absence of bad faith, (2) compliance with the constitution and bylaws of the association, and (3) natural justice."

*Browning v. Fraternal Order of Eagles, Ironton Aerie No. 895*, 1986 WL 9644, *1 (4th Dist. Aug. 22, 1986) (internal citations omitted). Again, these are disciplinary cases and highlight the factual context in which Ohio courts apply the internal affairs rule.

What Defendants promote in this Court is a vision of corporate law that is dangerous and new. Defendants promote a theory akin to the approach that prevailed for decades under *Chevron*: any interpretation of an ambiguous term by corporate leadership is reasonable, no matter what the original understanding might have been. But corporate law is based in contract, and the meaning of governing documents must be defined as *intended* by the parties. To the extent one finds ambiguity in a contract, the court must look more carefully, drawing in extrinsic evidence to resolve a question of fact. There is no place for the court simply to defer to one party or another before a factual inquiry investigation has even taken place.

11

**2. Plaintiffs Have Properly Alleged that Defendants Engaged in Fraud, Collusion, and Arbitrary Behavior.**

Even assuming that Ohio's internal affairs rule does apply to the Plaintiffs' complaint, the allegations in the Second Amended Complaint fall within that rule's recognized exceptions. The internal affairs rule does not provide absolute immunity for the interpretations of an organization's directors. As *Lough* made clear, directors may not avail themselves of the internal affairs rule when the decisions "are alleged and shown to be the result of fraud, arbitrariness, or collusion." *Lough*, 243 N.E. at 62. Nor can directors rely on the rule when they act outside their authority. *See Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 1:09CV705, 2010 WL 107015 at *5 (N.D. Ohio Jan. 6, 2010)(citing *Powell v. Ashtabula Yacht Club*, No. 953, 1978 WL 216074 (11th Dist. Ct. App. 1978).

Before giving deference to an interpretation under the internal affairs rule, the court must make (1) a factual determination regarding the absence of bad faith, (2) a legal review and construction of the associations' constitution and bylaws, and (3) a substantive due process inquiry into the fundamental fairness of the action or proceeding. Again, this approach reflects that a voluntary organization's governing documents are contracts. *BCI v. DeRycke*, 2003-Ohio-6321, ¶ 10 (9th Dist.); *Mace v. Carpenters & Joiners of America*, 1933 WL 2348, *14 (July 12, 1933) ("When one joins a voluntary organization such as the United Brotherhood, he agrees to be governed by its Constitution and rules as in the nature of a contract"). This means that courts review the association's governing documents de novo. *See BCI at* ¶ 10 ("[B]ecause the Code is

a contract between BCI and its shareholders, "the interpretation and construction of [it] is a matter of law, reserved to the court." )[5]

As a non-profit corporation incorporated in Ohio, Kappa has an obligation under Ohio law to comply with its Articles of Incorporation, Bylaws, and Standing Rules, all of which are contracts that limit membership to women. Ohio law grants shareholders in a non-profit organization the right to bring a derivative action to challenge actions taken by a board of directors that violate an organization's bylaws and governing directives. Ohio Rev. Code Ann. § 1702.12(I)(1)(c); *see also Carlson*, 789 N.E.2d at 1127. That is because corporate board members who disregard or otherwise seek to circumvent a corporation's governing documents necessarily violate their duty of loyalty, duty of care, and duty of obedience (also called the duty of compliance). *See* Ohio Rev. Code Ann. § 1702.12(I)(1)(c).

Plaintiffs have alleged that the Fraternity Council intentionally deceived Plaintiffs and other prospective members by claiming that Kappa was single-sex organization while cutting procedural corners and eligibility requirements in order to initiate a biological male into the organization. This is sufficient to withstand a motion to dismiss under Rule 12(b)(6). Simply put, the internal affairs rule does not, as Defendants argue, allow voluntary organizations to ignore the written rules they have made and allow directors to govern by whim.

### 3. Kappa's Governing Documents are Contracts and the Standard Rules of Contractual Interpretation Apply in this Litigation.

In Ohio, "[c]onstitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its members." *Ulliman v. Ohio High School*

---

[5] These limitations respect that contractual obligations imposed by an organization's governing documents and the fiduciary duty that directors owe to the organization.

*Athletic Assn.*, 2009-Ohio-3756, ¶¶ 50-51. "The construction of contracts is a matter of law." *Jurenovich v. Trumbull Mem. Hosp.*, 2020-Ohio-2667, ¶¶ 12-13 (11th Dist.) (citing *Cent. Funding, Inc. v. CompuServe Interactive Servs.*, 10th Dist. No. 02AP-972, 2003-Ohio-5037, 2003 WL 22177226, ¶ 42, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus.). The court's principal objective in construing a contract "is to ascertain and give effect to the intent of the parties." *Id.* (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 1999-Ohio-162, 714 N.E.2d 898 (1999)). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411 (Ohio Sup. Ct. 1987), paragraph one of the syllabus.). The Ohio Supreme Court has held that "[i]n interpreting a provision in a written contract, the words used should be read in context and given their usual and ordinary meaning." *Carroll Weir Funeral Home v. Miller,* 2 Ohio St.2d 189, 192, 207 N.E.2d 747, 749 (1965); *see also Cooper Tire & Rubber Co. v. Warner Mechanical Corp.*, 3d Dist. Hancock No. 5-06-39, 2007-Ohio-1357, 2007 WL 881499, ¶ 10 (Courts should give the "words or terms in an agreement their plain and ordinary meaning unless such a reading results in a manifestly absurd outcome or if there is clear evidence of a different meaning upon reviewing the entire agreement. * * *." )

When conducting that de novo review, the courts' "primary role is to give effect to the intent of the parties," and they "presume that the intent of the parties to a contract is within the language used in the written instrument." *Id.* at 88. If the court can determine the parties' intent from the plain language of the agreement, "there is no need to interpret the contract." *Id.* A court will not go beyond the agreement itself to interpret the intent of the parties unless the language used is unclear and ambiguous. *Blosser v. Enderlin*, 148 N.E. 393, paragraph two of the syllabus (Ohio Ct. App. 1925); *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio Sup. Ct.

1992). And in determining whether a contract's terms are ambiguous, courts will give "common words appearing in a written instrument…their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Shifrin*, 597 N.E.2d at 501-02.

While times may have changed, the word "woman" in its plain and ordinary usage—the usage understood for 150 years—is still a biological female. *See*, *e.g.*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/woman (defining "woman" as "an adult female person"). Plaintiffs, relying on Kappa's history, have alleged that all parties to this contract have always, as a factual matter, intended this term to mean biological women only. (ECF 65, ¶ 22). Indeed, in the context of a sorority intended to be a single-sex organization that lives together, reading woman to mean a biological female makes abundant sense. Kappa is, of course, free to amend its Governing Documents to expand membership to whomever it wants, provided it follows its own rules for the presentation of the proposed amendment and the voting procedures set forth in those documents. Kappa, however, has not done so.

Defendants argue their interpretation of "woman" is reasonable, but this is not the question before the Court. The meaning of "woman" to be determined by this Court is the meaning that Kappa's leadership and members intended the term to have when they drafted and ratified the Governing Documents. The Complaint alleges that Plaintiffs, like generations of Kappas before them, understood the term "woman" in their Articles of Incorporation and Bylaws (again, these are contracts) to mean biological females only. (ECF 65, ¶¶ 22-24) Defendants here put the cart before the horse. They wanted to change the Bylaws, and to avoid losing a vote to admit men who identified as women, they made the change anyway in a policy statement that had no force in the organization. Then, when members reacted to what Defendants had done, they claimed they were

interpreting an "ambiguous" term that was never before ambiguous and *THE* term that defines the organization. These allegations meet the definition of arbitrary, capricious and fraudulent actions.

Moreover, Defendants' assertion that "the question of who a woman is does not have a straightforward answer"[6] shows why the amendment process should have been followed. Indeed, failure to do so by the Fraternity Council is akin to evidence showing consciousness of guilt, whereby defendants concealed their actions and stifled any discussion about it. Assuming, *arguendo,* that Fraternity Council actually considered a "myriad" of sources defining that term, it had a duty to consider the impact of its ultimate decision on the future of the fraternity and its members. They also should have known that the term women is a material term in the Bylaws of a women's organization and that altering the meaning of that term required a vote of members. There can be no "meeting of the minds" to alter the Bylaws when a "myriad" of sources must be consulted to define the term. The "single sex" nature of the organization that has served as the foundation for the fraternity's mission and purpose to support and advocate for women, and, significantly, formed the basis for Kappa's protections under Title IX and its commitment under the NPC Unanimous Agreement IX. (*Id.* at ¶ 144-145). By altering that aspect of the Fraternity, without notice, debate or a vote by the membership, Fraternity Council interfered with the rights of its members and exceeded the scope of its authority. (*Id.* at ¶¶ 147,150-152.)

Defendants point out that some courts have opined, in contexts not applicable here, that a "transgender woman is a woman who was assigned male at birth." But the case they cite for that statement (*Bodiford v. Krause*, No. 1:23 CV 1191, 2023 U.S. Dist. LEXIS 169907, at *6 (N.D. Ohio

---

[6] Plaintiffs and other women know exactly what the term "woman" means. Defendants' assertion that this term is difficult to interpret undermines and undervalues the experiences that are unique to, and shared only by, women from childhood to adulthood.

Sept. 25, 2023) internally referenced Wikipedia and went on to say that the court considered the prisoner, who asserted he was a "transgender woman," to be a male because he was housed in a male prison. Another case had its judgment vacated in June in light of the Supreme Court's decision in *U.S. v. Skrmetti*, 605 U.S. ___, 145 S.Ct. 1816 (2025). All of these cases are irrelevant red herrings and an attempt to obscure the question posed by Plaintiffs in this litigation. Plaintiffs are not asking the Court to settle the question of who is, and who is not, a woman. Instead, Plaintiffs are asking for a declaration about the meaning adopted by *Kappa itself* in its Governing Documents. They argue that the term has for over 150 years been understood by all Kappa members and officers to refer only to biological women. (ECF 65, ¶ 22). Defendants disagree, believing the term is ambiguous. But even if this Court decides the term is ambiguous, the Court's analysis cannot stop there. The Court must then use the well-established rules for construction of contracts and look to extrinsic evidence to decide what the parties intended the term to mean. Plaintiffs have alleged that this evidence also indicates that the term refers only to biological women. (*Id.*) Determinations made by other courts in other contexts are irrelevant unless they informed the parties at the time of contracting.

### C. The First Amendment Does Not Provide a Shield to Defendants.

Defendants claim that the First Amendment right to associate freely prevents this Court from providing Plaintiffs with their requested relief. This misstates the issue before this Court. Plaintiffs are not asking the Court to order Kappa "to exclude transgender women." (ECF 67 at 3). Plaintiffs contend that Kappa—through its Governing Documents—has already decided to limit its membership to biological women only. (ECF 65, ¶¶ 45, 48-49.) Plaintiffs ask merely that Kappa fulfill the commitment it has already made to its members. Plaintiffs seek a declaration that Kappa's governing documents—contracts under Ohio law—when read in context and giving words their usual and ordinary meaning do not permit the admission of biological males.

Defendants have not—and cannot—identify any cases under which the First Amendment's freedom of association means that corporate articles of incorporation and bylaws are unenforceable in a court of law.

Defendants' reliance on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), is misplaced. Those cases involved situations in which *the Government* attempted to use its authority to force an organization to accept a member (or participant) the organization wanted to exclude. *Dale*, 530 U.S. at 656 (holding that the state's public accommodations law, which would have forced the Boy Scouts to accept a gay scoutmaster, infringed upon the group's freedom of association); *Hurley*, 515 U.S. at 575-76 (holding that the state's public accommodations law that would have forced a private parade to allow pro-LGBT participants was unconstitutional).

Here, in contrast, *Defendants*, the nationwide leaders of the sorority, are attempting to force Kappa to accept individuals that Kappa's own Bylaws exclude. Plaintiffs are not citing Wyoming or Ohio public accommodations law in their complaint. Neither State requires Kappa to associate, or disassociate, with anyone. Because there is no state action at issue, the First Amendment is not implicated. Kappa has imposed limitations on itself through its Governing Documents. If the Court agrees with Plaintiffs, Kappa can amend these same Governing Documents following the processes spelled out for such amendment. Under Defendants' argument, a court's involvement in any lawsuit is potentially prohibited state action, making every private contractual dispute one that cannot be adjudicated if it potentially infringes on a party's associational freedoms. This is not and has never been the law.

Courts routinely resolve disputes over an organization's membership decisions and whether an organization's expulsion of a member is consistent with that organization's bylaws and

rules. *See, e.g.*, *Gromnicki*, 745 N.E.2d at 452–53 (explaining that "[t]o determine when the union-member relationship terminated, we turn to the union's constitution"); *Browning v. Fraternal Ord. of Eagles*, No. 1769, 1986 WL 9644, at *1 (Ohio Ct. App. Aug. 22, 1986) (unreported) (Ohio courts review an expulsion of a member of a fraternal society for "compliance with the constitution and bylaws of the association"); *Milkie v. Acad. of Med. of Toledo & Lucas Cnty.*, 246 N.E.2d 598, 602 (Ohio Ct. App. 1969) (invalidating a member's expulsion from professional association). In such circumstances, the court's role is to enforce the organization's contracts. *Gromnicki*, 745 N.E.2d at 452–53 ("according to the United States Supreme Court, '[t]he court's role is but to enforce the contract'") (quoting *Nat'l Lab. Relations Bd. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 182 (1967)); *Reyes v. Laborers' Int'l Union of N. Am.*, 464 F.2d 595, 597 (10th Cir. 1972) (affirming a member's suspension because the court was not "apprised of any provision of the Union constitution which was violated by [the plaintiff's] suspension.").

Judicial enforcement of corporate requirements does not infringe an organization's First Amendment rights of association. The Court should not dismiss Plaintiffs' complaint on this basis.

### D. Plaintiffs' Fraudulent Inducement Claim is Properly Supported.

Defendants also claim that Plaintiffs have failed to plead an actionable claim for fraud in the inducement because "nothing about the admission of transgender women is inconsistent with Kappa being an organization for women" and Kappa had no legal duty to disclose the admission of transgender women to Plaintiffs. (ECF 67 at 17.) Defendants' arguments are wrong.

A claim of fraudulent inducement is premised on a misrepresentation of facts or other wrongful conduct that induce a party to enter into an agreement. *Am. Coal Sales Co. v. N.S. Power Inc.*, 2009 WL 467576, 2009 U.S. Dist. LEXIS 13550 (S.D.Ohio, Feb. 23, 2009) (citing *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 502–3, 1998–Ohio–612, 692 N.E.2d 574 (Ohio 1998)).

This is precisely the case here.

As explained in the Second Amended Complaint, Kappa promises prospective members a lifetime of sisterhood, which commonly refers to women. (ECF 65, ¶¶ 147-149.) Defendants have also broadly promoted—to the public, to the courts, and to the Plaintiffs—that membership in this sisterhood will convey tangible benefits. (ECF 65, ¶¶ 32-38.) Plaintiffs relied upon Kappa's continued representations that it was and is an organization of women, for women, in making their decision to join the fraternity and be bound by Kappa's governing documents—all of which enforce the notion that Kappa is a single-sex organization. (*Id*. ¶¶45,49,186,188.) In choosing Kappa, Plaintiffs forever lost their ability to seek out and join a different sorority. (*Id*. ¶189.) Defendants are aware that if Plaintiffs resigned from Kappa after becoming members, they would be barred from joining another sorority. (*Id*. ¶112.)

Further, contrary to their assertions, Fraternity Council had a clear obligation to disclose their intent to change the nature of the organization. The fiduciary relationship between a corporation's directors and both the corporation and its shareholders includes a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Zalvin*, 157 N.E.3d at 265. To that end, Plaintiffs allege that Defendants had an obligation to carry out their duties "in good faith and in the best interests of KKG and its members." (ECF 65, ¶164.) *See also Kleemann v. Carriage Trace, Inc.*, Montgomery App. No. 21873, 2007-Ohio-4209, 2007 WL 2343756, at ¶ 43. By definition, "good faith" is "honesty in fact in the conduct or transaction concerned." *DiPasquale v. Costas*, 2010-Ohio-832, ¶126-127, 926 N.E.2d 682, 706-707, citing *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 57, 2009-Ohio-3, 902 N.E.2d 1, at ¶ 10 (citations omitted). As the Supreme Court of Ohio has explained,

A lack of good faith is the equivalent of bad faith, and bad faith, although not

> susceptible of concrete definition, embraces more than bad judgment or negligence. **It imports a *dishonest purpose*,** moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.

*Vontz v. Miller*, 2016-Ohio-8477, ¶ 33, 111 N.E.3d 452, 461 (Ohio App. Ct. 2016) (citations omitted) (emphasis added). This is precisely the conduct that Plaintiffs have pled in the Second Amended Complaint and for which Fraternity Council should be held to account.

### E. Plaintiffs' Ultra Vires Claim Properly Encompasses Fraternity Council's Conduct.

The Kappa Bylaws provide that all members are accountable for inappropriate conduct. (ECF 6-1, Exhibit 1, Bylaws, Art. V, Section 7.) Fraternity Council members are not exempt. Plaintiffs properly alleged that Fraternity Council exceeded its authority, failed to conduct its affairs in accordance with the Bylaws, and failed to follow mandatory notice and voting procedures.  (ECF 65, ¶¶ 173-175.)  These allegations are sufficient to overcome a motion to dismiss.

### F. Defendants Are Judicially Estopped From Arguing that Amending the Complaint is Futile.

Defendants argue that the Court should dismiss the complaint with prejudice because the Plaintiffs argued (unsuccessfully) at the Court of Appeals that this Court's prior decision dismissing the First Amended Complaint without prejudice should be treated as final and appealable. Plaintiffs argued, unsuccessfully, that any attempt to amend the complaint to cure its deficiencies would be futile. The Court of Appeals disagreed and granted Defendants' Motion to Dismiss. Having succeeded in arguing that the case should be dismissed because the earlier decision was not final, Defendants are judicially estopped from now arguing that any amendment would be futile.

The doctrine of judicial estoppel protects the integrity of the judicial system by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Bradford v. Wiggins,* 516 F.3d 1189, 1194 (10th Cir.2008) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749-50 (2001)). In deciding whether to apply judicial estoppel, courts look to such factors as whether "1) a party's later position is clearly inconsistent with its earlier position; 2) a party has persuaded a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled; and 3) the party seeking to assert the inconsistent position would derive an unfair advantage if not estopped." *Id.* (quotation omitted). Defendants successfully argued that amendment was possible—in fact required. Following the Court of Appeals' dismissal, Defendants moved this court for an order requiring that the Plaintiffs file an amended complaint. Arguments about futility should be ignored.[7]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Respectfully submitted,

*/s/ John Knepper*
John Knepper
Wyoming Bar No. 7-4608
Law Office of John G. Knepper, LLC
P.O. Box 1512
Cheyenne, Wyoming 82003
307-632-2842
John@KnepperLLC.com

---

[7] Defendants' argument regarding the failure to serve all Defendants with process is irrelevant. By entering an appearance in this Motion, all Defendants have consented to this Court's jurisdiction. Regardless, Plaintiffs have 90 days to perfect service of the amended complaint under Federal Rule of Civil Procedure 4(m).

_/s/ Cassie Craven_
Cassie Craven
Wyoming Bar No. 7-5664
Longhorn Law Limited Liability Company
109 E. 17th St., Suite 11
Cheyenne, Wyoming 82001
307-823-3062
cassie@longhornlawllc.com

## <u>CERTIFICATE OF SERVICE</u>

John G. Knepper, an attorney, hereby certifies that on the 10th day of July, 2025, he

caused the foregoing document to be electronically filed with the Clerk of the Court using the

CM/ECF system which will send notification of such filing upon all counsel of record.


/s/ John G. Knepper