

**FILED**

4:07 pm, 8/22/25

**Margaret Botkins**
**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

HANNAH HOLTMEIER, ALLISON
COGHAN, and HALEY RUTSCH, on
behalf of themselves and derivatively on
behalf of KAPPA KAPPA GAMMA
FRATERNITY,

        Plaintiffs,

VS.

Case No. 23-CV-51

KAPPA KAPPA GAMMA
FRATERNITY, MARY PAT ROONEY,
MARIA BROWN, NANCY
CAMPBELL, BARB GOETTELMAN,
LIZ WONG, KYLE DONNELLY, BETH
BLACK, and JANE DOES 1-4,

        Defendants,

---

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 66)

THIS MATTER comes before the Court on Defendants' *Motion to Dismiss* (ECF No. 66), filed on June 26, 2025. Plaintiffs responded in opposition on July 10th (ECF No. 68), and Defendants replied on July 17th (ECF No. 69). Having considered all of the relevant materials, we hereby **GRANT** Defendants' motion.

### BACKGROUND

The facts of this case are well known to the parties at this point, almost two and a half years after this suit was initially filed. In the fall of 2022, a chapter of the Kappa

1

Kappa Gamma Fraternity ("Kappa") located at the University of Wyoming voted to accept, and later initiated, a transgender woman as a member of the sorority.[1] In March of 2023, seven then-current members of the sorority filed the original complaint in this case, asserting a breach of contract claim, a tortious-interference claim, and a direct cause of action against the admitted student, Kappa, and the Fraternity Council president. *See generally* ECF No. 1. We dismissed that complaint without prejudice on the grounds that the sorority was free, as a private organization, to define the word "woman" in its bylaws however it wanted, and therefore the sorority was not contractually obligated to reject transwomen members. ECF No. 31 at 26, 33. Plaintiffs appealed our dismissal to the Tenth Circuit, which denied it on jurisdictional grounds. ECF No. 39. Plaintiffs eventually filed this Second Amended Complaint (SAC) in June of this year. ECF No. 65.

The SAC recounts many of the same facts as the previous complaint, though this time it alleges four slightly different claims. Plaintiffs first allege a set of derivative claims against Kappa's Fraternity Council, who act as the organization's board of directors[2], for various breaches of their fiduciary duties. They also directly allege that

---

[1] Parties use both the terms "sorority" and "fraternity" to refer to Kappa. For the sake of consistency and comprehensibility, will use the term "sorority" when referring to the organization, except where Kappa is referred to as a fraternity in Bylaws and other quoted text.

[2] Ohio nonprofit law states that "'Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated." Ohio Rev. Code Ann. §§ 1702.0l(K). Article IX of Kappa's Bylaws states that

> all of the authority of the Fraternity shall be exercised by Fraternity Council. Fraternity Council serving hereunder shall have the power, authority and responsibilities of and shall perform the functions provided for directors under the Ohio Nonprofit Corporation Law.

ECF No. 1 at 146.

Kappa breached its contract with Plaintiffs and that the Fraternity Council fraudulently induced members to join the organization.

Having considered the issues presented (again), we find that the majority of the claims must be dismissed on the grounds that this Court still may not interfere with Kappa's contractually valid interpretation of its own Bylaws. Nothing in the Bylaws or the Standing Rules requires Kappa to narrowly define the words "women" or "woman" to include only those individuals born with a certain set of reproductive organs, particularly when even the dictionary cited by Plaintiffs offers a more expansive definition. Nor has Kappa or the Fraternity Council concealed this definition from its members: in fact, it has published and distributed multiple texts clarifying the issue. Finally, to the extent that Plaintiffs meant to articulate independent claims of breach of contract regarding the voting procedure used when the transgender woman was admitted, they have not shown that any resulting damages surpass the amount in controversy required to maintain federal jurisdiction.

## A. Relevant Governing Documents of Kappa

All of Plaintiffs' claims are based on Kappa's alleged violations of the contract between the organization and its members. We therefore begin by examining the basis and content of that contract. Kappa is a non-profit corporation organized in Ohio, and therefore it is subject to that state's laws. ECF No. 65 at 12. In Ohio, an organization's governing documents includes its constitution and bylaws, both of which serve as a contract between the organization and its members. *Ulliman v. Ohio High Sch. Athletic*

*Assn.*, 184 Ohio App. 3d 52, 62 (2009). We therefore turn to these documents to understand the basis of the contract.

We first identify the relevant portions of Kappa's Articles of Incorporation, which Plaintiffs implicitly argue is akin to a "constitution." Here, Kappa states that its "purpose" is to "unite women", "build[] higher standards of womanhood", "advocate for and seek to address issues of concern for members and women in general", and "provide opportunities for engagement throughout the lives of alumnae". ECF No. 65 at 13. The Articles permit local chapters to recruit and vote on new members "in accordance with [Sorority] standards and procedures." *Id.* at 14.

Next, we examine Kappa's Bylaws. The Bylaws state that a new member "shall be a woman", and the word "woman" is repeated several times in the "Qualifications" section. *Id.* Article IV also states that "Chapters shall have the right to select members of their choice in accordance with Fraternity standards and procedures." ECF No. 1 at 81. Additionally, at the June 2022 Biennial Convention, Kappa members approved[3] a new Bylaw forbidding Kappa members from engaging in discrimination, while also recognizing that the "single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under… Title IX". ECF No. 65 at 15.

Although not officially a Bylaw, Kappa issued a document to members entitled "Bylaws and Standing Rules Revision 2022" about two months before the Convention.

---

[3] Bylaws may only be amended by a two-thirds majority vote at Kappa's biennial convention, and the exact content of any proposed amendment must be shared with members three months beforehand. ECF No. 65 at 14.

ECF No. 65 at 15. In the FAQs section, under "DIVERSITY, EQUITY AND

INCLUSION", it states:

> Can nonbinary people join? Is this a chapter-by-chapter decision?
>
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.
>
> We also look to NPC [National Panhellenic Conference] policy as an NPC member organization. The NPC Recruitment Eligibility (2020) policy states: "For the purposes of participation in Panhellenic recruitment, woman is defined as an individual who consistently lives and self-identifies as a woman. Each women's-only NPC member organization determines its own membership selection policies and procedures.

ECF No. 65 at 16. Plaintiffs assert that this statement cannot be considered a governing

document because it was not specifically voted on and it was only released two months

ahead of the convention. *Id.*

Kappa also has a set of "Standing Rules," which Plaintiffs implicitly argue are also

part of the governing documents because, like the Bylaws, the Rules can only be

amended by majority vote at a Biennial Convention. ECF No. 1-1 at 79. As relevant here,

the Rules provide guidance on membership selection. They state that (1) "All active

members of the chapter shall participate in membership selection unless excused in

writing by the designated chapter adviser"; (2) "All information concerning the

membership selection process is confidential and shall be kept within the chapter"; and

(3) "The electronic voting system selected by the Fraternity shall be used by the chapter"

ECF No. 1-1 at 55.

5

The Rules also provide an outline of the role of the Fraternity Council. The duties

of the Council "shall include… Interpreting the Fraternity *Bylaws* and *Standing Rules*" as

well as "Appointing Fraternity members to all volunteer positions within the Fraternity,

filling vacancies that occur, and removing members from appointed positions, if deemed

necessary, by a three-fourths vote", among other things. ECF No. 1-1 at 63. The

Fraternity Council also has some role "authorizing" members for initiation:

> At least two weeks before initiation, the names of the new members to be initiated shall be sent to Kappa Kappa Gamma Headquarters. If the requirements for initiation have been fulfilled, Kappa Kappa Gamma Headquarters shall issue the authorization for initiation.

ECF No. 1-1 at 64.

Finally, there are various documents published by Kappa that Plaintiffs assert are

*not* governing documents because they are not voted on by the members. Among these

are Kappa "Policies," which, among other things, warn that "Any member who makes

discriminatory, inflammatory or inappropriate actions based on… gender identity, [or]

sexual orientation… shall be subject to dismissal or other disciplinary action." ECF No.

1-1 at 89. Kappa also publishes "Position Statements", which can be found on their

"member portal." One such Statement clarifies Kappa's position on "individuals who

identify as women":

> MEMBERSHIP SELECTION
> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. All chapters are expected to adhere to these documents.
>
> SINGLE GENDER ORGANIZATIONS

6

> Kappa Kappa Gamma is a private, nonprofit organization for women
> founded in 1870. The single-gender nature of our organization is essential to
> the mission and purpose of Kappa Kappa Gamma and its chapters and
> alumnae associations. The right to limit membership in the Fraternity to
> women is protected by the U.S. Constitution.

ECF No. 1-1 at 127. Kappa also published and distributed a "Guide for Supporting Our
LGBTQIA+ Members" in 2018, which states that the organization does not discriminate
based on "gender identity", repeats the Membership Selection paragraph above, and
provides twelve pages of advice on how to be respectful of gay and transgender Kappa
members. ECF No. 1 at 103-114.

B. **Admission of the Student**

Plaintiffs allege that several provisions of the governing documents were violated
when the Wyoming Chapter admitted a transgender woman (who we will subsequently
refer to as "the Student") as a member. The Student participated in formal sorority
recruitment at the University of Wyoming in August of 2022. ECF No. 65 at 22. During
this period, the Kappa Membership Chair for the Wyoming Chapter told sorority
members, including Plaintiffs, that Kappa rules did not permit them to refuse transgender
women. *Id.* at 22. The Student did not finish formal recruitment with Kappa, but
afterwards reached out to the Membership Chair to pursue membership through the
"continuous open bidding" process, which allows individuals to become members outside
of formal recruitment. *Id.* at 23.[4]

---

[4] Kappa requires all chapters with low membership to use the process. ECF No. 65 at 23. The Wyoming Chapter, which was on probation from 2016 until 2022 because of low membership numbers, used this system. *Id.*

Plaintiffs allege a few "irregularities" during the Student's pre-voting recruitment process, although they do not specify violations of any specific governing documents. First, they allege that Kappa's alumnae advisors directed the chapter president and officers to recruit the Student to raise the profile of the Wyoming chapter. *Id.* Second, Plaintiffs allege that members did not receive sufficient notice of the Student's application, although they admit that her application was mentioned at a chapter meeting "well before the vote" and that a dinner was set up to meet the Student, as was customary during the COB process. *Id.* at 24.

Plaintiffs also contend that several "irregularities" occurred during the voting process. The first has to do with notice. The chapter's vote on the Student's application took place on Tuesday, September 20, 2022. ECF No. 65 at 24. The Wyoming Chapter requires all members to attend weekly Monday-evening Chapter meetings, unless they attended a Chapter Council meeting the day before. *Id.* Plaintiffs contend that the officers intentionally concealed, at the Sunday Chapter Council meeting, that the Student's application would be voted on that week. *Id.* at 25. Plaintiffs admit that members were so informed during the regular Monday meeting, however. *Id.*

Second, Plaintiffs allege that although "Fraternity rules prohibit discussion during the voting process" (without citing a specific rule or bylaw), several officers spoke before the vote on the Student was held. ECF No. 65 at 25. They advised members that they should only vote "no" based on the Student's personality, and that a "no" vote without having met the student was evidence of bigotry. *Id.* Plaintiffs contend, without foundation, that The Fraternity Council required the Chapter officers to advocate for the

8

Student and "hatched" a "plan" with the officers to intentionally limit the other members' opportunity to meet the Student. *Id.*

Third, Plaintiffs state that the vote on the Student's admittance was conducted using the wrong voting software – a Google Poll link instead of a software called Omega Recruit. *Id.* at 25. Their primary issue with the use of Google Poll is that the vote was not conducted "in secret" because members had to use their emails when signing in to vote. *Id.* at 27. Additionally, two Google Poll links were sent out because the first one was faulty. ECF No. 1-1 at 123. Plaintiffs do not allege that the second vote had a different overall outcome than the first, or even that the first vote was completed – they claim that the second link was sent out within thirty minutes. ECF No. 65 at 27-28. However, they do claim that three members changed their votes between the first and second votes because they "understood that the second vote would not be secret and they feared retribution." *Id.* at 28. Plaintiffs do not cite a Bylaw or Standing Rule that requires anonymity.[5]

Finally, Plaintiffs allege that only people present at the Monday Chapter meeting the day before the vote were allowed to vote, in violation of the Standing Rule requiring that "all active members" participate. *Id.* at 24. Specifically, Plaintiffs allege that Chapter officers "forbade" two members, Madeline Ramar and Grace Ann Choate, from voting because they had not attended the previous day's meeting. *Id.* at 26. Plaintiffs also state

---

[5] Anonymity appears to be required, according to the Wyoming Chapter's bylaws, for "Electronic Meetings." ECF No. 1-1 at 152. However, Plaintiffs do not allege that the Chapter bylaws are governing documents, nor that this was an electronic meeting – it appears to have been in person.

that officers roamed the halls of the Chapter's house instructing "some (but not all)"

members to vote. *Id.* at 27.

Plaintiffs assert that had these inconsistencies not occurred, the Student would

have lost the vote and not been admitted. *Id.* at 28. They further contend that the

Fraternity Council knew about these "irregularities and violations of Governing

Documents" and still approved of the Student's membership, which further violated the

governing documents. *Id.* at 29.

### D. Parties' communication after the vote

Plaintiffs made several efforts to let Kappa know that they were displeased about a

transgender woman joining their ranks. They and their parents raised concerns about the

Student's admittance in September and early October to the Executive Director of Kappa.

ECF No. 65 at 29. The Director responded that she had reviewed Plaintiffs' concerns but

that the national officers "believe proceeding with initiation is the appropriate next step."

*Id.* Plaintiffs allege that sorority officials encouraged members who disagreed with the

Student's admittance to resign if "their values were inconsistent with Kappa's values." *Id.*

At least three members did ultimately resign, while Plaintiff Hannah Holtmeier

transferred to the University of Nebraska. *Id.* Another member, Madeline Ramar, was

removed from her position as Finance Chair. *Id.* at 31.

Plaintiffs also wrote to the Fraternity Council through their lawyers in November,

stating that the Student should not be admitted because she is a "non-woman" and that

the Chapter President "conducted an illegal voting procedure" involving a non-secret

Google Poll and public pressure. ECF No. 1-1 at 123. Kappa's counsel responded, stating

that a woman need not be "biologically born as female" to be a woman and a Kappa

member, and referred to Kappa's Position Statements and LGBTQIA+ Guide on the

issue. ECF No. 65 at 33.

Unable to resolve the dispute to their satisfaction, Plaintiffs first filed suit in

March of 2023. After two years of stop-and-start litigation, we now find ourselves

addressing Defendants' second motion to dismiss, based on Plaintiffs' second amended

complaint (SAC). We review each claim anew below.

### STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, district courts follow a two-

pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court "can

choose to begin by identifying pleadings that, because they are no more than conclusions,

are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions[,]" and "[t]hreadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id.* at 678.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement to

relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## ANALYSIS

### I.      Count One & Two: Fraternity Council's Breach of Fiduciary Duty

Plaintiffs allege, derivatively, that the Fraternity Council Defendants breached

their fiduciary duty to Kappa in six ways: by (a) encouraging the Wyoming Chapter to

admit a transgender woman in contravention of the governing documents; (b) concealing

Kappa's efforts to admit a transgender woman; (c) unduly influencing Wyoming Chapter

officers to disregard mandatory voting procedures; (d) disregarding "Kappa's duty" to

"affirmatively protect" freedom of speech under the Ohio Constitution; (e) failing to

"advocate for and seek to address issues of concern for members and women in general",

per Kappa Bylaws; and (f) acting ultra vires. Each of these claims fail, though for

different reasons.

We begin by reviewing relevant Ohio law. First, the Ohio Supreme Court defines

a derivative claim as one that is:

> brought by a shareholder in the name of the corporation to enforce a
> corporate claim. Such a suit is the exception to the usual rule that a
> corporation's board of directors manages or supervises the management of a
> corporation. A derivative action allows a shareholder to circumvent a board's
> refusal to bring a suit on a claim.

*Crosby v. Beam*, 47 Ohio St. 3d 105, 107, 548 N.E.2d 217, 219 (1989). Nonprofit

members may file derivative claims under Ohio nonprofit-corporation law. *Carlson v.*

*Rabkin*, 2003-Ohio-2071, ¶ 10, 152 Ohio App. 3d 672, 679, 789 N.E.2d 1122, 1127.

Plaintiffs face several hurdles in getting a derivative claim past the motion-to-dismiss stage, however. First, they must satisfy a procedural requirement called "demand futility." *Carlson,* 152 Ohio App. 3d at 679. Complaining members must

> (1) spell out, with particularity, the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort… and (3) show that they 'fairly and adequately' represent the interests of other shareholders 'similarly situated.'

*Id.* at 680. Alternately, complaining members may demonstrate that "the demand would have been futile… that the directors' minds are closed to argument." *Id.* (internal quotation mark removed). Members cannot rely on the fact that the directors are the ones being sued to prove futility – they must show that the directors "were conflicted or otherwise incapable of exercising reasonable business judgment." *In re Lubrizol S'holders Litig.,* 2017-Ohio-622, ¶ 37, 79 N.E.3d 579, 587.

Second, Plaintiffs must overcome the presumption that the board of directors of the organization they are suing acted in good faith. Under Ohio law, members may not initiate litigation just because they believe a board of directors has made a bad decision. Instead, they must show that the directors – here, the Fraternity Council – "have acted in bad faith or without the requisite objectivity." *Zalvin v. Ayers*, 157 N.E.3d 256, 263 (2020). Good faith is, by law, assumed. *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 25, 694 N.E.2d 479, 483 (1997) ("All acts of a board of directors of an Ohio corporation are presumed to have been taken in good faith."); Ohio Rev. Code § 1701.59(D)(1) ("A director shall not be found to have violated the director's duties… unless it is proved by clear and convincing evidence that the director has not acted in

13

good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, or with the care that an ordinarily prudent person in a like position would use under similar circumstances.")

Third, Plaintiffs must show that the Fraternity Council has broken their constitution or bylaws, or committed fraud or colluded in some way. Ohio courts generally leave non-profit organizations to manage themselves unless they have broken their own internal laws. This is sometimes called the principle of judicial non-intervention:

> Generally speaking, in matters of policy, discipline or internal economy of a voluntary association, wherein the members have mutually agreed upon a charter or rules, the decision of the association itself is supreme. *See, generally*, 60 Ohio Jurisprudence 3d (1985), Insurance, Section 1555. In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision by such association in accord with its own charter and rules made by the governing body must be accepted by courts of law.

*Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748, 600 N.E.2d 797, 802 (1991); *see also Strah v. Lake Cty. Humane Soc.*, 90 Ohio App. 3d 822, 831 (1993) ("Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud.").

If Plaintiffs cannot satisfy each of these requirements, their derivative claims must be dismissed.

      a. <u>Demand Futility</u>

Plaintiffs satisfied demand futility only for its dispute about Kappa's admittance of transgender women. To the extent that they allege independent claims about the voting

procedure used to admit her, regardless of her gender, the procedural requirements have not been met, and the relevant claims must be dismissed.

As articulated above, nonprofit corporation members must satisfy the procedural requirement of demand futility before filing a derivative suit. It is therefore Plaintiffs' burden, as a threshold issue, to show that they either articulated their demands to the Fraternity Council and failed, or that such a demand was futile. We note, however, that Plaintiffs' demands are really twofold. First, they believe that Kappa wrongly admitted a student that does not qualify as a "woman" as defined by the Bylaws. This dispute undergirds the vast majority of their claims. Second, Plaintiffs believe the Wyoming Chapter violated its own voting procedures in admitting her, regardless of gender. These are two independent accusations. As such, in order to satisfy this procedural requirement, Plaintiffs must show that the Fraternity Council was informed about and rejected each demand or that both demands were independently futile.

In our previous order, we held that Plaintiffs had satisfied the demand requirement for the first issue, the dispute over Kappa's admission of a transgender woman, because Plaintiffs provided evidence of their extended exchange on that topic with then-members of the Fraternity Council/then-defendants "Rooney, Executive Director Poole, and other Fraternity Council members", who are "the same officers who purportedly approved [the Student]." ECF No. 31 at 26. Generally speaking, the law-of-the-case doctrine would require us to apply the same holding here. *See Fish v. Schwab,* 957 F.3d 1105, 1139 (10th Cir. 2020) ("when a court rules on an issue of law, the ruling should continue to govern the same issues in subsequent stages in the same case") (citations omitted).

15

However, a complication arises here from the fact that since Plaintiffs' original complaint was filed, multiple rounds of new Fraternity Council members have been elected; as a result, the new Defendants are not all "the same officers who purportedly approved" the Student. While Defendant Mary Pat Rooney appears to have maintained her position on both the Council and on the list of defendants, Plaintiffs have replaced the other original defendants with six new Fraternity Council members. Three of these, Defendants allege, have already completed their stints on the Council and are no longer members. ECF No. 67 at 3 n.1.[6] Although Plaintiffs state that they "renewed their demands by letter" on the Friday before the Monday that the Second Amended Complaint was due to be filed, and that Kappa rejected the request on that Sunday (ECF No. 68 at 6 n.3), Defendants contend that such a flimsy attempt does not satisfy the requirements of futility.

The issue, as we see it, is whether the plaintiffs in a derivative suit must prove demand futility each time new directors (or here, Fraternity Council members) are elected. We hold that, at least in this situation, with regard to the dispute over the admittance of transgender women, no such action was required. "The weight of authority establishes that the futility of demand must be determined by looking at the positions of the parties when the derivative suit is initially filed." *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 26, 694 N.E.2d 479, 483 (1997). Plaintiffs previously satisfied this requirement with the prior Council. This case has been ongoing (*see generally* ECF No.

---

[6] Because Maria Brown, Liz Wong, and Beth Black are no longer members of the Fraternity Council (and Plaintiffs have not refuted this fact), they do not have the authority to grant the relief sought by Plaintiffs and shall be dismissed from this suit.

57) since then, and thus we assume new Council members were made aware of the dispute. Plaintiffs' allegations in this amended complaint are not so different from their original complaint that new Defendant Council members did not have notice of them. Therefore, demand futility has been met with regard to the issue of who may be considered a woman.

We next consider the accusation of violations of Kappa's voting procedure, which our prior Order did not discuss. Plaintiffs spend eight pages of their SAC, and several more in their opposition brief, detailing the ways in which they notified Defendants and Defendants' counsel of their issues with Kappa's interpretation of the word "woman." ECF No. 65 at 29-36; ECF No. 68 at 6. Only the briefest mention is made of voting "irregularities." We therefore turn to the documents in the record, in particular the letters exchanged between parties' counsel.

Here again, Plaintiffs' counsel's letter from November 4, 2022, focuses on the debate over the word "woman". Only at the end of the second page is the voting process mentioned: "Further, our clients are concerned that the decision process which has led to this unfortunate position was deeply flawed. The Chapter President... conducted an illegal voting procedure." ECF No. 1-1. at 123. The reasons mentioned for "illegality" are that the President held a one-sided dialogue before the vote and that

> in a blatant violation of the requirement for a secret ballot, the chapter members voted through a Google Poll tracked by email. This public vote was only after a first vote, earlier that evening, was so close that officers approached individual women and pressured them to change their vote claiming a 'faulty voting system' in Google forms.

*Id.* The paragraph reiterates the lack of secrecy several times.

17

Defendants' counsel, in turn, responds in depth to the "woman" debate, and states it is "unaware" of any further rules that had been broken. ECF No. 1 at 117. It further requests that

> If there are specific provisions in any Kappa governing documents that you contend were not followed by Kappa, please identify what those specific provisions are, what governing documents they are contained within, and what actions of Kappa you contend are in violation of those specific provisions.

ECF No. 1 at 117. There is no evidence that Plaintiffs did so.

It is worth noting, in addition, that the allegations in Plaintiffs' SAC do not match those in Plaintiffs' pre-lawsuit notice to Defendants. The SAC drops Plaintiffs' claim that members were pressured into voting differently by the Chapter's officers. ECF No. 65 at 27 (stating instead that three members decided to change their votes when they realized their votes would not be anonymous[7]). Instead, the SAC claims that Kappa violated its Standing Rule that requires that all active members to participate in membership selection unless excused. *Id.* at 26. Additionally, the SAC states that the use of Google Poll was itself a violation of the Standing Rules because each chapter is required to use a Kappa-approved voting platform called Omega Recruit.[8] *Id.* at 27.

In other words, Plaintiffs do not appear to have given Defendants notice of the voting-related violations that form the basis of one of their claims. Nor can we find any portion of the SAC or Plaintiffs' brief that claims that any demand of the Fraternity

---

[7] Although the SAC still complains that the vote was not secret, secrecy is not, in fact, required by any governing document.

[8] Upon the Court's independent review, no governing document, actually references "Omega Recruit" – the governing documents merely state that each chapter "shall" use the electronic voting system selected by Kappa. ECF No. 1-1 at 55. No document, governing or not, states what that system is.

18

Council on this matter would have been futile. Plaintiffs therefore have not satisfied the

demand futility requirement for their derivative claim based on the violations of Kappa's

voting procedure, and that claim must be dismissed.

Having found that Plaintiffs satisfied the procedural requirements for their dispute

about Kappa's definition of "woman", we spend the rest of this section evaluating those

claims on their merits.

> b. <u>Breach accusations #1 and #5</u>: "encouraging, advocating for, attempting to
> unduly influence the Wyoming chapter members to support, and approving
> the Student's membership in direct contravention to the… Articles, Bylaws,
> Standing Rules and Policies," and failing to "advocate for and seek to
> address issues of concern for members and women in general."

We dive immediately into the parties' central dispute: the debate over the

definition of the word "woman." Both the first and fifth allegations of breach of fiduciary

duty largely rest on Plaintiffs' assertion that the Fraternity Council admitted a transgender

woman in violation of Kappa's governing documents. When we ruled on this issue two

years ago, we held that we could not impinge on Kappa's First Amendment right of

expressive association to include transgender women, per *Boy Scouts of Am. V. Dale*, 530

U.S. 640 (2000). ECF No. 31 at 30. The law of the case doctrine dictates that we apply

the same holding here, but even if that were not the case, we reach the same conclusion,

independently, on the grounds that Ohio contract law allows Kappa to define "women" to

include individuals who identify as women.

Our previous ruling on Kappa's authority to interpret its own Bylaws is still

applicable here. As previously mentioned, the law-of-the-case doctrine holds that "when

a court rules on an issue of law, the ruling 'should continue to govern the same issues in

subsequent stages in the same case.'" *Fish*, 957 F.3d at 1139 (quoting *Bishop v. Smith*, 760 F.3d 1070, 1082 (10th Cir. 2014)). Courts only deviate when presented with new evidence, new and contrary controlling authority, or when their previous decision was clearly erroneous. *Id.*

Plaintiffs do not present new evidence in their SAC, but they do argue a possible new authority: Executive Order 14168, issued this year, states that "women… shall mean adult… human females" and "female… means a person belonging, at conception, to the sex that produces the large reproductive cell." 2025-02090 (90 FR 8615). We are not entirely sure what this definition means, not having a degree in biology.[9] But even assuming this definition aligned with Plaintiffs', it only applies to the Executive Branch's interpretation of federal laws and administration policy. It is not relevant in the world of private contracts, which is where we currently find ourselves.

This leaves only the "clearly erroneous" exception. The brunt of Plaintiffs' opposition brief, although not explicitly labeled as such, argues that our previous decision on this issue was erroneous. They argue that the First Amendment right to associate does not apply here because they are not asking the Court to force Kappa to exclude

---

[9] And even if we did, it might not help, since biologists seem to agree that no determination of biological sex can exist "at conception." *See* Karen K. Siu, et. al., The cell biology of fertilization: Gamete attachment and fusion, J. Cell Biol. 220 (2021). The article states, in relevant part:

> The cells produced by the first few divisions of the fertilized egg are totipotent and capable of differentiating into any cell type, including germ cells. PGCs [primordial germ cells] originate within the primary ectoderm of the embryo and then migrate into the yolk sac. Between weeks 4 and 6, the PGCs migrate back into the posterior body wall of the embryo, where they stimulate cells of the adjacent coelomic epithelium and mesonephros to form primitive sex cords and induce the formation of the genital ridges and gonads. The sex (gonadal) cords surround the PGCs and give rise to the tissue that will nourish and regulate the development of the maturing sex cells (ovarian follicles in the female and Sertoli cells in the male).

*Id.*

transgender women, but rather that the Court *en*force the existing private contract, which in turn (they allege) forces the organization to exclude transgender women. ECF No. 68 at 17-18.

However, even when we adopt Plaintiffs' framing and apply Ohio contract law, we come to the same conclusion: Kappa's Bylaws and Standing Rules do not require Kappa to exclude transgender women. Kappa and its Fraternity Council have reasonably interpreted an otherwise undefined term in the organization's Bylaws. Kappa's Bylaws explicitly authorize the Fraternity Council to make these interpretations. Ohio law explicitly authorizes organizations to govern themselves and interpret their own bylaws, and it does not permit this Court to interfere with such organizations' internal policy decisions unless they have broken their own bylaws or committed fraud or collusion. In short, we are required to leave Kappa alone.

The parties' fundamental dispute is whether the undefined term "woman" in Kappa's Bylaws *must* be interpreted to exclude transgender women. Both parties agree that Kappa is an organization dedicated to women. Where they diverge is that Plaintiffs argue that the word woman can *only* be defined as exclusive of transgender women. "The words woman and women, as used in Kappa's Articles of Incorporation, Bylaws, Standing Rules, Policies....have always referred to adult female human beings. These words... have never referred to biological males who claim to be women", and therefore any "change" to the definition requires an amendment. ECF No. 65 at 7, 15-16.

Plaintiffs cannot support this assertion. First, there is no definition of the term anywhere in the governing documents. It is simply repeated a dozen times without further

21

clarification. Plaintiffs' next argument, that there is only one "ordinary meaning" of the term woman, is defied by Plaintiffs' own source. They point out, correctly, that courts must give "common words appearing in a written instrument... their ordinary meaning." ECF No. 68 at 15 (quoting *Shifrin v. Forest City Enterprises, Inc.,* 597 N.E.2d 499, 501 (Ohio Sup. Ct. 1992). They then cite Merriam-Webster's definition of woman as "an adult female person" as evidence that "woman" excludes transgender women. ECF No. 68 at 15. However, when we turned to the same source's definition of female, we find not one but seven definitions of the word. Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/female. The first defines female as "of, relating to, or being the sex that typically has the capacity to bear young or produce eggs." *Id.* This would seem to conform to Plaintiffs' definition. However, the second definition is "having a gender identity that is the opposite of male" – which would include transgender women. *Id.* Plaintiffs' designated source does not appear to agree that only one common definition of "female", and therefore "woman", exists, and therefore we also remain unconvinced.

Third, Plaintiffs attempt to argue that the "intent of the parties" to limit "women" to only "biological females" is evident in various historical Kappa-produced texts, including Kappa songbooks referring to young maids, etc. The Court does not find any of the terms cited by Plaintiffs to show evidence of the intent of Kappa members to exclude transwomen. But even if it did, we could not consider it: external evidence of parties' intent is only admissible when "the language of a contract is unclear or ambiguous", and Plaintiffs rest their entire case on the argument that the term "woman" is not ambiguous –

that it can only have one, trans-exclusionary meaning. *DN Reynoldsburg, L.L.C. v. Maurices Inc.*, 2023-Ohio-3492, ¶ 26, 225 N.E.3d 454, 460. If we were to consider extrinsic evidence in this matter, it would conclusively show that *at the time Plaintiffs joined*, i.e. not in 1870, Kappa's well-publicized intent was to include transgender women. We discuss this in greater detail in the following section.

Independently, we find that within the governing documents themselves, there is more evidence that Kappa defines women by their gender and not their "biological sex." "Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enters., Inc.*, 1992-Ohio-28, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501. In June of 2022, at the Biennial Convention, Kappa members voted on and approved a new Bylaw provision that prohibits discrimination and explicitly used the term "single-gender", not "single-sex", to describe "Greek-letter social organizations."[10] ECF No. 1 at 84-85, 132. Arbitrarily, Plaintiffs assert that the reference to Title IX in this bylaw – the full sentence states "the single-gender nature of Greek-letter social organizations in the United States is recognized by an exemption under… Title IX" – somehow proves that the term "single-gender… must be read as synonymous with 'single-sex.'" ECF No. 65 at 15. This Court, however, must interpret a contract in a manner that "give[s] effect to the intent of the parties… [which] is presumed to reside in the language they chose to employ in the agreement." *Jurenovich v. Trumbull Mem'l Hosp.*, 2020-Ohio-2667, ¶ 13. We therefore

---

[10] Defendants note that "All 26 NPC [National Panhellenic Conference] sororities accept trans women into their memberships." ECF No. 69 at 11 n.3.

conclude Kappa meant exactly what it says, and that the sorority used "gender" instead of "sex" intentionally; to include all members whose gender identity is female.[11]

By contrast, Kappa's Bylaws do *not* reference a "single-sex" requirement. Plaintiffs try to convince this Court that such a phrase is implied, based on Kappa's previous advocacy for single-sex organizations. Plaintiffs point out that Article XV of Kappa's Bylaws state that "The Fraternity shall follow NPC [National Panhellenic Conference] Unanimous Agreements, policies, and procedures", and that one such Agreement states that "The women's sororities... shall defend their right to exist as single-sex organizations." ECF No. 1 at 93; ECF No. 68 at 38. However, Plaintiffs' argument that this would require Kappa to only admit "biological females" is defeated by a different NPC policy, which Kappa is also required by Bylaw to follow, and which unequivocally states that "woman is defined as an individual who consistently lives and self-identifies as a woman."[12] ECF No. 68 at 37. Read as a whole, this second policy more clearly indicates the intent of Kappa to include transgender women.

---

[11] We would reach the same conclusion if we considered the term ambiguous: analyzing parol evidence to evaluate the "intent of the parties" at the time that that amendment was passed, it is clear that Kappa intended it to include transgender members. The FAQs attached to this amendment, circulated among members two months before the Convention where the amendment passed, solidify that interpretation. ECF No. 1-1 at 49 ("Can nonbinary people join? Is this a chapter-by-chapter decision? Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection...").

[12] Plaintiffs' argument that because this policy is entitled "Panhellenic Recruitment Eligibility," it should only apply to recruitment, and not membership, is nonsensical. As Plaintiffs themselves note, "courts will give common words in a written instrument their plain and ordinary meaning, unless an absurd result would follow or there is clear evidence of another meaning from the face or overall contents of the instrument." *Cooper Tire & Rubber Co. v. Warner Mechanical Corp.*, 3d Dist. Hancock No. 5-06-39, 2007-Ohio-1357, 2007 WL 881499, ¶10. The purpose of recruitment is to identify and vet new members. In this context, it would be "absurd" to read this policy as applying this definition of "woman" only to recruitment, but not membership.

Concluding, therefore, that at a minimum Kappa's governing documents do not require the exclusion of transgender women, we find that Kappa has not broken its Bylaws in admitting one such individual. Kappa Bylaws specifically authorize the Fraternity Council to "[i]nterpret… the Fraternity Bylaws and Standing Rules." ECF No. 6-1 at 119. The Fraternity Council issued several publications in advance of the fall 2022 recruitment season making its interpretation of the word woman – to include individuals who identify as women – abundantly clear. These include Position Statements "Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women"), FAQs ("woman is defined as an individual who consistently lives and self-identifies as a woman"), and a Guide for supporting LGBTQIA+ members. ECF No. 65 at 16, 34, 35.

Because Kappa has interpreted this term in accordance with its own governing documents, we have no authority to review the dispute. "As a general rule, Ohio courts are unwilling to interfere with the management and internal affairs of a voluntary association." *Redden v. Alpha Kappa Alpha Sorority, Inc.*, No. 09CV705, 2010 WL 107015, at *5 (N.D. Ohio Jan. 6, 2010). The matter is not one open to judicial discretion:

> A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them.

*Stibora v. Greater Cleveland Bowling Assn.*, 63 Ohio App. 3d 107, 113, 577 N.E.2d 1175, 1179 (1989).

Exceptions to this rule are few, and none have been met here. "In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision… in accord with its own charter and rules made by the governing body must be accepted by the courts of law." *Putka v. First Cath. Slovak Union*, 75 Ohio App. 3d 741, 748 (1991); *see also Strah v. Lake Cty. Humane Soc.* 90 Ohio App. 3d 822, 831 (1993) ("Courts will not interfere with the internal management of a corporation not for profit in the absence of proof that the managing officers are acting in excess of their corporate power, or that they are guilty of collusion or fraud"). Plaintiffs argue that they have properly alleged that "Defendants Engaged in Fraud, Collusion, and Arbitrary Behavior" because "the Fraternity Council intentionally deceived Plaintiffs and other prospective members by claiming that Kappa was [a] single-sex organization…" (ECF No. 68 at 12-13).

These allegations are conclusory and contradicted by their own evidence. First, as is clear from the proceeding paragraphs, Defendants have not acted in excess of Kappa's corporate powers. Second, Defendants have not committed fraud because Plaintiffs cannot point to a concealment or false representation of a fact. *See Schmitz v. Natl. Collegiate Athletic Assn.*, 2016-Ohio-8041, ¶ 56, 67 N.E.3d 852, 868. The previously mentioned Position Statements, distributed LGBTQIA+ Guide, and sorority-wide vote and approval of the 2022 Bylaw amendment describing the Kappa as "single-gender", not "single-sex", show that Kappa never concealed the fact that transgender women for membership. Third, Plaintiffs' conclusory allegation that the Fraternity Council hatched a plan with the Wyoming Chapter to admit a transgender student is not evidence of collusion. In Ohio courts, the term generally refers to an agreement by multiple entities to

commit fraud or other misrepresentation. *See State ex rel. Dolle v. Miller*, 18 Ohio Dec.

218, 221 (Ohio Com. Pl. 1907), aff'd, 1907 WL 1152 (Ohio Cir. Ct. Dec. 28, 1907)

(considering a charge of "collusion among bidders to distribute territory, to keep prices

up and make the city pay more than it properly should"). As previously stated, none of

the Defendants misrepresented that the sorority was open to admitting transgender

women. Therefore, no collusion could have occurred based on these facts.

Finally, Plaintiffs' breach of fiduciary duty claim could also be interpreted as

implicitly arguing that, whether or not Kappa's rules *allowed* it to admit transgender

women, doing so was a "reckless" decision because it resulted in several women leaving

the sorority. *See* ECF No. 65 at 41, 43. However, this is precisely the type of decision-

making that has long been protected by the business-judgment rule: the decisions made

by boards of directors are insulated from judicial review as long as they are made in good

faith and with the best interests of the organization in mind. *Kleemann v. Carriage Trace,*

*Inc.*, 2007-Ohio-4209, ¶ 51. While Plaintiffs certainly show that they and other Kappa

members disagree with the Fraternity Council's decision to admit transgender women,

they do not allege facts that show that the Fraternity Council took any actions for any

reason other than what it believed was in the best interest of the organization. Plaintiffs

simply disagree with the Fraternity Council's assessment of what those interests were.

Nor have Plaintiffs shown that the Fraternity Council acted without "the care that

ordinarily prudent persons in like positions would use under similar circumstances" or act

with "reckless disregard." *Id.* at ¶ 56, 57. Indeed, the evidence provided *by Plaintiffs*

clearly shows that great care went into the decision. *See, e.g.,* ECF No. 1-1 at 49

27

(regarding the explicit policy of allowing non-binary people and "individuals who identify as women" to join, the organization stated "We have conferred with legal counsel as well as NPC on DEI-related updates to Fraternity documents. We are confident that these changes would hold up if contested in a court of law."); *id.* ("Kappa Kappa Gamma was founded 150 years ago on the principles of integrity, respect and regard for others. Kappa has reflected on the path forward, and we are beginning with actions that speak to our belief that all members are valued... We want to be as inclusive of all members as we can be.").

The reality is that Plaintiffs do have a remedy here – they are simply choosing not to use it. Plaintiffs could advocate for a new amendment to the Bylaws, defining the word "woman" as they wish, which would restrain Kappa from choosing between various reasonable definitions of the term. Such amendments may only be passed every other year, at Kappa's Biennial Convention, but one such Convention occurred over the course of this lawsuit and another hypothetically will occur next year. If as many Kappa members are upset about the admission of transgender women members as Plaintiffs claim, this internal remedy should be more than sufficient to achieve their aims.

Plaintiffs have not shown that Kappa violated its governing documents by admitting a transgender woman, and therefore this claim must be dismissed.

> c. <u>Breach accusation #2</u>: "actively concealing Kappa's efforts to disavow its Governing documents in order to admit biological males to membership in the Fraternity."

Plaintiffs do not allege sufficient facts to show that the Fraternity Council concealed its efforts to admit transgender women. Plaintiffs contend at a very general

28

level that Fraternity Council "concealed their disavowal and betrayal of Kappa's

promises and obligations to women" by not disclosing to Plaintiffs that Kappa's

definition of a "woman" "includes men identifying as women." ECF No. 65 at 39.

However, Plaintiffs admit that at least one publication was available on the Kappa

website (ECF No. 65 at 34) that addressed the issue of gender. They also admit that the

Guide for Supporting our LGBTQIA+ Members "was distributed to the Fraternity's

'workforce' (alumnae who direct chapter operations) in about 2018." *Id.* at 35. Finally,

Kappa's Policies specifically prohibit discrimination based on "gender identity". ECF

No. 1-1 at 89. These documents show that Kappa publicly and openly defined "women"

to include all individuals who identify as women. It may be true that those publications

are not governing documents, but they certainly contradict any claims of concealment.

Furthermore, Plaintiffs have pointed to no bylaw or statute that requires

organizations to publicly clarify every term in every policy before a new member joins.

Even if they could, Plaintiffs themselves admit that the Wyoming Chapter's Membership

Chair notified members during recruitment in the fall of 2022 that transgender women

were eligible to join Kappa. ECF No. 65 at 22. There is simply no evidence that

Defendants concealed or misrepresented their position on the matter.

> d. <u>Breach accusation #3</u>: "unduly influencing Wyoming chapter officers to
>    disregard mandatory voting procedures employed in the Student's selection
>    process."

Plaintiffs do not provide any facts that support this allegation. As Plaintiffs

themselves admit, "National Fraternity representatives usually have little involvement in

member selection until after chapter members have voted." ECF No. 65 at 28. Plaintiffs

do not describe a single instance of any member of the Fraternity Council conversing with Chapter officers, on any topic, before the September 20th vote occurred. Instead, Plaintiffs make the conclusory claim that they "believe officers were told by the Fraternity Council" to advocate for the Student's admission. However, even this contention does not mention specific voting procedures. Additionally, Plaintiffs have not satisfied the demand futility requirement for this claim under Ohio law, as discussed earlier in this opinion. *See supra* Section I (a).

> e. Breach accusation #4: "disregarding Kappa's duty, as an Ohio citizen, to affirmatively protect and honor the freedom of speech protected under the Ohio Constitution by retaliating against members who challenged the validity of the Student's membership."

Plaintiffs' allegations of retaliation fail because, first and foremost, the Ohio Constitution only protects against state actors, and Plaintiffs have not alleged that Kappa is a state actor. *See Herring v. Adkins, 2008-Ohio-7082*, ¶ 9, 150 Ohio Misc. 2d 13, 19, 902 N.E.2d 93, 98 ("the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment") (citing *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 222, 626 N.E.2d 59). Secondly, Plaintiffs' claim fails because, as previously mentioned, Ohio law holds that volunteer organizations may make their own disciplinary decisions, free of judicial review, as long as they do not violate due process and are not arbitrary, fraudulent, or the result of collusion.

Plaintiffs accuse the Fraternity Council of violating the Ohio Constitution's freedom of speech protections by "retaliating against members who challenged the validity of the Student's membership." ECF No. 65 at 43. Specifically, the SAC states

that Madeline Ramar was removed from her position as Wyoming Chapter Finance Chair

because of her opposition to the Student's admission and her decision to sign on to the

First Amended Complaint in this case. ECF No. 65 at 31.[13]

First, Ohio courts have specifically held that a voluntary organization's

disciplinary actions are not violative of the Ohio constitution's free speech provisions.

*See Putka*, 75 Ohio App. 3d at 746 (dismissing a claim that the Ohio Constitution's free

speech provision was violated when plaintiff was expelled from voluntary organization

for his speech).

Second, as Plaintiffs emphasize, the principle of judicial noninterference applies to

"an organization's interests in '*questions of discipline*, or internal policy and

management.'" ECF No. 68 at 8 (quoting *Stibora,* 63 Ohio App.3d at 113) (emphasis

added). Here, Article V, Section 4 of the Wyoming Chapter's bylaws[14] describe the

process of removing a chapter officer "for failing to adequately perform the duties of

office, [or] failing to maintain Fraternity standards." ECF No. 1-1 at 148. The record does

not provide the details of Kappa's decision to remove Ms. Ramar from her position, but

this Court notes at least one sorority-wide Policy she conceivably violated: Policy III,

Section C (2) states that "Any member who makes discriminatory, inflammatory, or

inappropriate actions based on... gender identity... shall be subject to dismissal or other

---

[13] The SAC also states that three Kappa members resigned of their own accord from the organization, a third member was "threatened with discipline", and a fourth, Plaintiff Hannah Holtmeier "continued to raise concerns about the Student's membership," for which she was "brought before a disciplinary hearing", provided with Kappa's "Guide for Supporting our LGBTQIA+ members" and "threatened with further discipline." ECF No. 65 at 31. None of these actions concluded in Kappa actually taking a disciplinary action – such as a probation or expulsion – so we do not consider them here. Even if we were to, however, the above principles would result in the same conclusion: dismissal of this claim.

[14] The Wyoming Chapter bylaws are distinct from Kappa Bylaws, which govern the organization as a whole.

disciplinary action." ECF No. 1-1 at 89. In any case, there are no allegations in the SAC

that Ms. Ramar's removal was "inconsistent with due process" or the result of

"arbitrariness, fraud, or collusion", and therefore it "will not be reviewed by the courts."

*Lough v. Varsity Bowl, Inc.*, 16 Ohio St. 2d 153, 155, 243 N.E.2d 61, 63 (1968). Nor have

Plaintiffs cited any caselaw to show that it is the Court's duty to review due process in

cases where a member is removed from an internal position but not ejected from the

organization as a whole.

Plaintiffs have not sufficiently pled a breach of fiduciary duty based on the Ohio

Constitution. We therefore dismiss this claim.

  f. <u>Breach #6</u>: the Fraternity Council "exceeded its authority to act" and "failed
    to conduct Kappa's affairs as set forth in its Bylaws."

This claim is duplicative of the above claims as it is based on Plaintiffs' assertion

that admitting a transgender woman was a violation of Kappa's commitment to only

admit "biological females." This limitation, we have held, does not exist, and therefore

this claim must also be dismissed.

**II. Count Three: Breach of Contract**

Plaintiffs' breach of contract claim is based on their assertion that "Plaintiffs…

agreed to join Kappa [and] pay membership dues… in exchange for the promise of

participating in a single-sex organization committed to uniting and supporting women

throughout their lifetimes." ECF No. 65 at 45. The Defendants allegedly breached the

"contract" created by Kappa's Bylaws and Standing Rules when it "compel[led] the

Wyoming Chapter members to admit the Student." *Id.*

Assuming the basis of the "breach" is that Kappa admitted a transgender woman, this claim must be dismissed. We first note that Plaintiffs did not specify *which* Bylaws and Standing Rules it was referring to in this claim. Because they did not, we conclude that the rules that Plaintiffs refer to are those that limit Fraternity membership to "women," based on the alleged promise of a single-sex organization. As we have previously stated, Kappa did not promise Plaintiffs a single-sex organization, nor did they violate any of their Bylaws or Standing Rules in admitting a transgender woman.

We also consider whether Plaintiffs could be referring to a violation of voting procedures. We find this unlikely because the remedy for such a breach would not align with Plaintiffs' requested relief (that Kappa expel all members that are not "biological women" on the basis that they are not women, etc.), and the matter is not mentioned in Plaintiffs' opposition brief or the breach allegation articulated at the end of their SAC. However, even if it was, the SAC does not contain sufficient facts to support the claim. The SAC alleges that Defendants encouraged the recruitment of the Student and advised Chapter officers on the discipline of members who opposed Kappa's inclusion of transgender women, but it does *not* allege that Defendants compelled – or even suggested – any violation of any voting Bylaw or Standing Rule. Based on the record, the vote appeared to be managed entirely by the Wyoming Chapter, without any involvement from the Fraternity Council or any other officer outside of the Chapter.

For all of these reasons, Plaintiffs have failed to articulate a claim for breach of contract that would survive in federal court. We therefore dismiss these claims.

## III.   Count Four: Fraud in the Inducement

Plaintiffs' claim for fraud in the inducement must be dismissed for failure to identify a false representation. Plaintiffs allege that Kappa fraudulently induced Plaintiffs to join the Fraternity by failing to disclose that "men could become Kappas" and holding "itself out as an organization of women." ECF No. 65 at 46. In order to state a claim for fraudulent inducement, Plaintiffs must show that Defendants made "a representation of fact... falsely, with knowledge of its falsity, or with utter disregard and recklessness[] as to whether it is true or false", among other things. *Mortg. Elec. Registration Sys., Inc. v. Mosley*, 2010-Ohio-2886, ¶ 31. Plaintiffs' claim fails because they cannot point to any statement by Kappa that was false: Kappa has never asserted that it does *not* accept transgender women. As we previously stated and as Plaintiffs admit, Kappa and the Fraternity Council published multiple public documents defining "women" to include individuals who identify as women, as the Student does. Therefore, Kappa may hold itself has an organization of women because it *is* an organization of women, according to its own definition.

Plaintiffs have not identified any false representations made by Defendants; therefore, their claim for fraud in the inducement must be dismissed.[15]

---

[15] To the extent that Plaintiffs assert this claim against Kappa based on the actions of the Wyoming Chapter officers at the time of the vote, we also find that Plaintiffs do not provide sufficient evidence to state a claim. In their SAC, Plaintiffs state that the Wyoming Chapter's Membership Chair and other Chapter officers "intentionally concealed the fact that the Student's candidacy would be presented for vote" at the secondary, Sunday night Chapter meeting. ECF No. 65 at 24-25. However, the Student's application and the date of the vote was announced at the primary, Monday-night Chapter meeting. *Id.* at 25. Plaintiffs cannot point to any bylaw, rule, or policy that states that applicant votes must be announced at the Sunday night meeting, nor that doing so was irregular in any way. Nor have they identified a false statement made by any Wyoming Chapter official.

## CONCLUSION

Having considered the written submissions, the applicable law, and being otherwise fully advised, **IT IS HEREBY ORDERED** that Defendant's *Motion to Dismiss* (ECF No. 66) is **GRANTED**. **IT IS FURTHER ORDERED** that Plaintiffs' *Second Amended Complaint* (ECF No. 65) is **DISMISSED WITH PREJUDICE.** We have reviewed the contractual terms twice and find that any attempt by Plaintiffs to amend those claims would be futile.

Dated this _22_ day of August, 2025.

Alan B. Johnson
United States District Judge